**EXHIBIT**

**PHONIX EX 9**

Case 25-34839

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| BUDDY MAC HOLDINGS, LLC, *et al.*,[1] | § | Case No. 25-34839-mvl11 |
| | § | |
| Debtors. | § | (Initial Debtor Cases Jointly |
| | § | Administered) |
| | § | |
| | § | (Joint Administration Requested for |
| | § | Subsequent Debtor Cases) |
| | § | |

**SUPPLEMENTAL DECLARATION OF WM. IAN MACDONALD**
**IN SUPPORT OF THE DEBTORS' SALE OF SUBSTANTIALLY ALL ASSETS**

I, William Ian MacDonald, pursuant to 28 U.S.C. §1746, hereby declare that the following is true to the best of my knowledge, information and belief:

1.      My name is William Ian MacDonald.  I am over twenty-one years of age, and I am fully competent to make this Declaration.  I have never been convicted of a felony or a crime of dishonesty or moral turpitude.

2.      I am the managing member of Buddy Mac Holdings, LLC and its subsidiaries, and am the sole shareholder and control person of MacDonald Capital Corporation, which owns and controls various debtor subsidiaries (collectively, the "**Company**").  I have been the Company's managing member since its founding.

3.      I am knowledgeable of and familiar with the Company's daily operations, its books and records, and its business and financial affairs, as well as the circumstances leading to the filing of these chapter 11 bankruptcy cases.  Except as otherwise indicated, the facts set forth in this Supplemental Declaration are based upon my personal knowledge, my review of relevant documents

---

[1] A complete list of the Debtors in these chapter 11 cases is available at https://dm.epiq11.com/case/buddyshome/info. The Debtors' service address is 400 E. Centre Park Blvd., Suite 101, DeSoto, Texas 75115.

and information, my opinions based upon my experience, my knowledge of and experience with the

Debtors' operations and financial condition and interviews my staff and I conducted with the Debtors'

officers, managers, employees and professional advisors.

## I.    <u>INTRODUCTION</u>

4.      I am authorized to, and do hereby, make this Supplemental Declaration in support of

the Debtors' *Emergency Motion for Entry of an Order (I) Authorizing (A) the Sale of Substantially All Assets*

*Free and Clear of Liens, Claims, and Encumbrances, and (B) the Assumption and Assignment of Certain Executory*

*Contracts and Unexpired Leases in Connection Therewith; and (II) Granting Related Relief* (the "<u>Sale Motion</u>"),

and in further support hereby incorporate each of my prior declarations.

## II.    <u>SALE PROCESS</u>

5.      As described in my Prior Declaration, the Company operates rent-to-own furniture

and appliance retail stores that rent and sell home furnishings, electronics, and appliances on a rent-

to-own basis.  The Company currently operates 46 store locations, 32 of which are operated by Initial

Debtors and 14 of which are operated by Subsequent Debtors

6.      Most of the Debtors are entities that operate, or formerly operated, or were intended

to operate, one of the Company's rent-to-own store locations (the "<u>Store Entities</u>"), and certain other

Debtors are entities that own the real property at which a store is located (the "<u>Real Estate Entities</u>").

The Store Entities include all Debtors other than (i) Buddy Mac Holdings, (ii) BMH RTO, LLC, (iii)

BMH-HR, LLC, and (iv) the Real Estate Entities.

7.      Prior to the Petition Date I worked to find a potential buyer for the Company, and

continued using my contacts in the industry throughout these Bankruptcy Cases in an effort to find

potential purchasers.  I also caused the Debtors to retain Mark Shapiro and the firm GlassRatner

Advisory & Capital Group LLC as Chief Restructuring Officer.  I tasked Mr. Shapiro to solicit

potential purchasers and understand that Mr. Shapiro connected with more than 50 different parties about the Company sale.

8.      In the end, the Debtors received two bids and, after negotiations, those two bids resulted in a cooperative sale proposal in which Phonix RBS LLC ("Phonix") will acquire substantially all of the Debtors' assets for a credit bid of $6,250,000, and S.K.C. Enterprises, Inc. ("SKC") will obtain 8 Debtors' assets for an additional $1,126,480, paid in cash, with net proceeds at closing paid to Phonix as lienholder.  I further understand that, at or immediately after closing, Phonix will satisfy the first lien encumbrances of SouthState Bank on certain real property acquired through its credit bid, providing additional value to the Debtors' estates.

### III.    <u>SALE OF REAL ESTATE</u>

#### A.    TIC Real Property Collateral

9.      As detailed in my prior Declarations, the Debtors own certain real property, some of which was collateral pledged to secure the INTRUST Loan prior to the Debtors' petition dates. Specifically, the Debtors pledged what I previously defined as "Real Properties" in Tyler, TX (Store #488), Caruthersville, MO (Store #646), and Marion, IL (Store #644) as additional collateral for the INTRUST Loan as part of amendments entered in August, 2025.  Phonix asserts liens on those properties pursuant to the INTRUST Loan Documents and on account of its DIP Loan.

10.      Certain of the Debtors' Real Properties are subject to tenancies-in-common ("TIC Interests").  Those Real Properties (the "TIC Properties") are located at: 414 N. Columbia St., Plainview, TX 79072 (the "Plainview TIC Property"); 218 N. Main St., Seminole, OK 74868 (the "Seminole TIC Property"); 1100 North Highway 491, Gallup, NM 87301 (the "Gallup TIC Property"); 501 W. Main St., Brownfield, TX 79316 (the "Brownfield TIC Property"); and 1404 W Gentry Pkwy, Tyler, Texas 75702 (the "Tyler TIC Property")

11.     The Debtors are selling the TIC Properties to Phonix, with the exception of the Tyler TIC Property, which is being marketed for a separate sale.

**B.     TIC Agreements**

12.     The TIC Properties are subject to limited tenancies in common, evidenced in part by certain documents titled *Agreement Among Tenants in Common* (the "TIC Agreements").  True and correct copies of the TIC Agreements for the Plainview TIC Property are attached hereto as Exhibit A.  True and correct copies of the TIC Agreements for the Seminole TIC Property are attached hereto as Exhibit B.  True and correct copies of the TIC Agreements for the Gallup TIC Property are attached hereto as Exhibit C.  True and correct copies of the TIC Agreements for the Brownfield TIC Property are attached hereto as Exhibit D.  True and correct copies of the TIC Agreements for the Tyler TIC Property are attached hereto as Exhibit E.

**C.     TIC Agreements and Encumbrance and Sale of TIC Properties**

13.     In each instance, the Debtor entity that owns the applicable TIC Property is defined as the "Current Property Owner" in the TIC Agreement and is granted unique rights relative to those of the other tenants-in-common, who are referred to simply as "Tenants" in the TIC Agreements.  For example, paragraph 4 of the TIC Agreements, titled "Ownership Rights of Tenants," makes clear that each Tenant (excluding the CPO) "irrevocably waives any and all rights that it has (i) to occupy the Property or any portion thereof, or to exclude any other Tenant from the property or any portion thereof, and (ii) to maintain any action for any partition of the Property, or otherwise force a sale of the Property during the term hereof…."

14.     Paragraph 10 of the TIC Agreements governs the encumbrance or sale of the applicable TIC Property.  While there are general prohibitions on Tenants selling the TIC Property, paragraph 10(c) expressly states:

CPO may, at any time, sell, finance, exchange or otherwise transfer or encumber all of the Property (including the other Ownership Interests) on such terms and conditions

as CPO may, in CPO's sole discretion, determine, so long as such transaction is a bona fide transaction and all of the terms and conditions of such transaction are fully disclosed to all Tenants at the time such transaction is entered into. If requested by CPO, all Tenants shall join in the conveyance of the Property and/or execute all documents necessary or desirable to close such transaction.

The Debtors, as applicable CPOs, may therefore encumber and sell the property at their sole discretion.

15.     Before bankruptcy, the Debtors pledged the Tyler TIC Property to secure the INTRUST Loan. After the commencement of these Chapter 11 Cases, the Debtors pledged the TIC Properties to secure the DIP Loan from Phonix. Now, the Debtors seek to sell the TIC Properties, with the exception of the Tyler TIC Property, to Phonix.

**D.     Notice to TIC Interest Holders and Participation in Cases**

16.     I understand that the holders of TIC Interests have been provided appropriate notice of the proposed sale and were provided appropriate notice of the Debtors' intent to pledge the TIC Property as collateral securing the DIP Loan.

17.     I electronically attended what I will describe as the "Final DIP Financing Hearing" in these Chapter 11 Cases on February 10, 2026, and noticed that Ronald Berg was also in attendance. Mr. Berg owns TIC Interests in each of the TIC Properties, has retained bankruptcy counsel, and is aware of the proposed transactions. I believe the other TIC Interest holders are similarly informed, and have been provided all appropriate notice in these Chapter 11 Cases.

**E.     Bona Fide Transactions**

18.     The sale of each of the TIC Properties is a bona fide transaction as that term is used in the TIC Agreements. I would describe Phonix as an adverse party to the Debtors. Phonix has negotiated hard throughout these Chapter 11 Cases, and the Debtors' professionals and I worked diligently to find other purchasers for the Debtors' assets. Sale of the TIC Properties to Phonix, who already possesses a properly perfected lien on the totality of the TIC Properties, TIC Interests

included, is a bona-fide purchaser pursuant to reasonable marketing process given the circumstances.

If any TIC Interest holder believed the TIC Properties were particularly valuable, they could have

submitted a bid to acquire the TIC Properties.  None did.  The proposed sale to Phonix therefore

reflects the best available offer after extensive good faith negotiations and a reasonable marketing

period and process.

**F.      Other Considerations for Sale of TIC Properties in Full, Including TIC Interests**

19.      As detailed in the TIC Agreements, Tenants are precluded from seeking to partition

the TIC Properties, and doing so would be impractical.  The TIC Properties are rural furniture stores,

not plots of undeveloped land.

20.      In addition, selling individual TIC Interests would not be fruitful.  First, the TIC

Properties, including all TIC Interests, are already subject to a properly perfected lien in Phonix's

favor.  Selling some, but not all, of the TIC Interests would achieve no purpose.  The holder of a TIC

Interest, if all the rest were sold, would retain an encumbered fractional interest in a piece of real

property that TIC Interest holder is precluded by contract from entering.  Selling the TIC Properties

on an interest-by-interest basis would be value destructive and would serve no benefit to any TIC

Interest holder.

21.      The benefit to the Debtors estate from the proposed sale of the TIC Properties is

meaningful and will reduce the total amount of debt owed to Phonix by the Debtors.  Even so, Phonix

is under-secured by the Debtors' collateral assets, meaning that even despite the proposed sale

transaction, the Debtors will still owe Phonix millions of dollars.  Phonix's liens encumber the TIC

Properties in full, including the TIC Interests.  They will therefore remain subject to foreclosure, and

the amount of Phonix's remaining lien will greatly exceed the value of any of the TIC Properties, and

certainly any of the TIC Interests.  The benefit to the Debtors' estates from the sale of the TIC

Properties, including the TIC Interests, therefore outweighs the detriment to of the sale to the TIC

Interest holders.

22.     Finally, none of the TIC Properties are used in the production, transmission, or

distribution for sale of electric energy or of natural or synthetic gas for heart, light, or power.

## IV.     <u>CONCLUSION</u>

23.     I declare under penalty of perjury that the foregoing is true and correct to the best of

my knowledge, information, and belief.


Dated: February 17, 2026
Dallas County, Texas


　　　　　　　　　　　　 */s/     William Ian MacDonald*
　　　　　　　　　　　　　　 William Ian MacDonald

# EXHIBIT A

# EXHIBIT A-1

**Plainview TIC - Berg**

## AGREEMENT AMONG TENANTS IN COMMON
### Plainview, TX

**THIS AGREEMENT AMONG TENANTS IN COMMON** ("Agreement") is made and entered into initially by and between SAM Plainview, LLC (a Texas Limited Liability Company) and Current Property Owner ("CPO") and **RONALD H. BERG**, an unmarried man in Irvine, California as the Incoming Property Owner ("IPO"), being sometimes referred to singularly as "Tenant" or collectively as the "Tenants".

### RECITALS

A.    It is the desire of the Tenants to hold, operate, maintain, finance, keep in repair, lease and/or sell or exchange, as tenants in common, that certain real property together with all improvements located therein, commonly known Buddy's which is more fully described on Exhibit "A" attached hereto and by this reference incorporated herein (the "Property").

B.    It is the desire of IPO to acquire an undivided interest in the Property from CPO as is more fully described In Exhibit 'A'.

NOW, THEREFORE, in consideration of the foregoing Recitals and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Tenants to hereby agree as follows:

1.    <u>Formation of Tenancy</u>.  The Tenants hereby acknowledge their ownership to be a tenancy in common (the "Tenancy") and this Agreement shall govern the ownership and management of the Property. The principal purpose of the Tenancy shall be to hold and maintain the Property as tenants in common for investment purposes.  The address of each Tenant for notice and all other purposes of this Agreement is set forth on the signature page hereof. Except as expressly provided herein, no Tenant shall sell, assign, hypothecate or otherwise dispose of or encumber its interest or any part thereof in the Property without the prior written consent of the other Tenants.

2.    <u>Term</u>. The Tenancy as governed hereby shall commence on the execution of this Agreement, and shall continue thereafter until dissolved or terminated pursuant to Sections 17 hereof.

3.    <u>Title to the Property</u>. Contemporaneously with the execution hereof, IPO has acquired an undivided interest in the Property as set forth in Exhibit 'A', the ("IPO Interest"), and CPO retains an interest in the Property as is more fully described in Exhibit 'A' (the "CPO Ownership Interest"). The CPO Ownership Interest and the IPO Ownership Interest are hereinafter sometimes referred to as the "Ownership Interests" or an "Ownership Interest." Each Tenant agrees to be bound by the terms and conditions of this Agreement.

4.    <u>Ownership Rights of Tenants</u>. Notwithstanding any statute or other rule of law and having previously been advised of their respective rights to bring an action for partition, the Tenants

**AGREEMENT AMONG TENANTS IN COMMON**                                    Page 1

agree that during the term hereof the Tenants shall only have those rights in the Property as expressly provided herein and each Tenant hereby irrevocably waives any and all rights that it has (i) to occupy the Property or any portion thereof, or to exclude any other Tenant from the Property or any portion thereof, and (ii) to maintain any action for any partition of the Property, or otherwise force a sale of the Property during the term hereof, all except as expressly provided herein.

5.    <u>Tenant Payment Obligations</u>.

(a)    Each Tenant agrees to pay its Agreed Share (such Agreed Share determined as provided, below) of all costs and expenses involved in owning, operating, maintaining, leasing, selling or exchanging the Property, including, but not limited to, ad valorem taxes, insurance premiums, repairs, necessary improvements, contractual fees, professional fees, lease commissions and utility costs, debt service and other financing-related costs, and capital repairs and replacements and other capital expenditures at the Property (collectively, "Owner Costs"). To the extent that the income from the Property is insufficient to pay all Owner Costs in the ordinary course of business, each Tenant's Agreed Share of such Owner Costs shall be paid by each Tenant, upon demand, prior to the due date of all such costs and expenses and no later than ten (10) days prior to the date when such costs and expenses are due.

For purposes of this Agreement, the Agreed Share of each Tenant shall be equal to his respective Ownership Interest in the Property. CPO, which shall be the Tenant managing the Tenancy, shall maintain a banking account or accounts at financial institutions on behalf of the Tenants and shall maintain reasonable reserves for future costs and expenses of the Property.

(b)    If any Tenant fails promptly to contribute such Tenant's share of the Owner Costs ("Defaulting Tenant"), the other Tenants may pay the entire amount' of such Owner Costs and the amount not paid by the Defaulting Tenant shall be deemed a loan to the Defaulting Tenant (the "Tenant Loan" or "Tenant Loans"). All Tenant Loans shall be payable on demand, shall bear interest at the rate of eighteen percent (18%) per annum, and shall constitute a lien on the interest of the Defaulting Tenant in the Property, which lien shall be expressly subject and subordinate to any existing or future lien of any third party lender with a lien on the Property. Each Defaulting Tenant authorizes each other Tenant making a Tenant Loan to execute and record such documents as such Tenant deems necessary to further or better evidence such loan and lien.

In the event a Tenant makes a loan or loans to the Defaulting Tenant ("Loaning Tenant") and any Tenant Loan remains unpaid for a thirty (30) day period after written notice is given to the Defaulting Tenant requesting payment, the Loaning Tenant may bring suit against the Defaulting Tenant for the amount of the Tenant Loans not paid plus all reasonable collection costs. All income from the sale and operation of the Property shall be paid to the Loaning Tenant until all Tenant Loans are paid in full.

**AGREEMENT AMONG TENANTS IN COMMON**                                    **Page 2**

     6.    <u>Distribution of Net Profits From Operation, Financing, Refinancing, Exchange, Lease and Sale of the Property</u>.

     (a)    All income derived from the operation of the Property in whatever form and however derived (less reasonable working capital and capital repairs and replacement reserves), shall be divided and paid when received as follows:

     (i)    First, to each Tenant in an amount equal to such Tenant's Agreed Share of the Owner Costs, or, at CPO's option, to pay such Tenant's Agreed Share of such Owner Costs directly on its behalf,

     (ii)    The IPO tenant shall receive the greater of (i) percentage interest of the net income of the Property as set forth in Exhibit 'A', or (ii) the annual pay rate paid on the originally invested amount set forth in Exhibit 'A' ("Originally Invested Amount") to be paid on a monthly basis,

     (iii)    The IPO tenant shall also a receive a two percent (2%) annual accrual on the invested amount to be paid upon redemption of the IPO interest, and

     (iv)    Thereafter, the CPO tenant shall receive the remaining available balance of the cash flow and distributions from all other distributable sources.

     (b)    In the event of the financing, refinancing, exchange or lease of the Property, or in the event of a sale under Section 10 herein, the Net Profits, if any, from the sale, lease, financing, refinancing or exchange of the Property shall be divided between the Tenants when received in the same manner set forth in Section 6(a). The term "Net Profits" for the purpose of this paragraph shall mean the net proceeds from any financing, refinancing, exchange or lease (less all reasonable and bona fide financing, exchange or leasing costs) or the net sales price of the Property (gross sales price less all reasonable and bona fide selling expenses) less; (i) the outstanding unpaid indebtedness of all notes secured by loans on the Property at the time of such sale; (ii) the outstanding principal balance plus accrued but unpaid interest on any Tenant Loans, and (iii) all other reasonable and bona fide expenses incurred by the Tenancy in connection with the ownership, maintenance, financing, refinancing, exchange, lease or the sale of the Property, including any unpaid Owner Costs. Each Tenant shall receive its share of the Net Profits under this Section 6(b) in the form of any promissory note(s) or cash received from the leasing, financing, refinancing, exchange or sale.

     7.    <u>Books and Records</u>. Proper and complete books of account of the Tenancy shall be kept by CPO (i.e., the Tenant managing the Tenancy) as an expense of the Tenancy and shall be open to inspection and copying by any Tenant or representatives of each Tenant at any reasonable time. The books and records of account shall be examined and reviewed as of the close of each calendar year by an accountant selected by CPO, and such accountant shall prepare an annual report thereof, copies of which will be furnished to each Tenant as soon, as possible after the conclusion of each calendar year. Each Tenant shall have the right to make a separate audit of the books and records of the Tenancy at such Tenant's own expense at any time and from time to time.

**AGREEMENT AMONG TENANTS IN COMMON**            **Page 3**

8.   Bank Accounts.  All funds of the Tenancy shall be deposited by CPO in a bank or brokerage account or accounts in the name of the Tenancy and funds from said bank account or accounts shall be disbursed upon the signature of CPO in the ordinary course of business, and in accordance with the provisions of this Agreement, unless all Tenants direct otherwise. Tenancy funds shall be used only for Tenancy purposes.

9.   Dissolution of a Tenant. The dissolution of any Tenant shall not have the affect of terminating or dissolving the Tenancy.  Upon the dissolution of a Tenant, the shareholders, partners, members or other equity owners thereof shall succeed to its interest in this Tenancy and shall be bound by the terms and provisions of this Agreement; however, in the event that the interest of the dissolved Tenant passes to more than one person, then, and in that event, such persons shall, within ninety (90) days after dissolution of the Tenant, execute and deliver to the other Tenants a written instrument (including Power of Attorney) appointing one person as and to be the Agent for collecting, receiving and making all payments and contributions required hereunder, shall vote the entire interest of the successors, and shall perform all other obligations of such successors performable by reason of or arising from their interest in the Tenancy; and, any and all payments and/or disbursements due arising from the successors interest in the Tenancy shall be deemed to have been validly made to such successors by paying the same to such duly designated Agent. In the event that said successors for any reason fail to designate such Agent in writing in the manner and within the time prescribed and continue to fail to cure such default after ten (10) days written notice from another Tenant to correct same, such other Tenant shall have the right to appoint such Agent.

10.   Transfer of Tenant's Interest and Sale of Property.

(a)   No Tenant may sell, transfer, convey, encumber or otherwise hypothecate the Property or its undivided interest in the Property without the written consent of the other Tenants, except as provided in Section 10(c) herein and Section 11 herein.

(b)   Any permitted transfer of a Tenant's Ownership Interest in the Property shall be subject to such transferee's written agreement to be bound by all of the terms and conditions of this Agreement; any transfer without such written assumption agreement shall be null and void.

(c)   CPO may, at any time, sell, finance, exchange or otherwise transfer or encumber all of the Property (including the other Ownership Interests) on such terms and conditions as CPO may, in CPO's sole discretion, determine, so long as such transaction is a bona fide transaction and all of the terms and conditions of such transaction are fully disclosed to all Tenants at the time such transaction is entered into.  If requested by CPO, all Tenants shall join in the conveyance of the Property and/or execute all documents necessary or desirable to close such transaction.

(d)   If the signature of a Tenant is required by a third party in connection with the transactions contemplated by Section 10(c), such Tenant agrees to execute and deliver such documents as such third party deems necessary or desirable to accomplish all of the foregoing.  If such Tenant fails to execute and deliver any such documents within ten (10) days following written notice from CPO, CPO is hereby authorized, and each Tenant grants to CPO an irrevocable power of attorney,

**AGREEMENT AMONG TENANTS IN COMMON**                                          Page 4

coupled with an interest, to execute and deliver any such documents by, in the name of and on behalf of such Tenant, which documents shall be binding upon such Tenant to the same extent as if such Tenant had personally executed and delivered the same.

(e)    A Tenant may not, without the prior written consent of CPO, which consent may be granted or withheld in the sole and absolute discretion of CPO, sell, transfer, convey, encumber or otherwise hypothecate all or any portion of the Property (including its Ownership Interest).

(f)    IPO Put Option ("Put Option") is available to IPO annually commencing on fifth anniversary of the agreement and extending to the full term of the Term of the Agreement.
Put Option value to be determined based on the greater of the

(i)    the (a) amount of the original purchased interest (as set forth in Exhibit 'A'), plus (b) a two percent (2%) per year accrual on the amount of the original purchased interest, or

(ii)    the amount of the original purchased interest (as set forth in Exhibit 'A'), plus the net increase above the current agreed upon market Property value set forth in Exhibit 'A' times the IPO percentage ownership interest set forth in Exhibit 'A'; (unless otherwise agreed, to be appraised by an independent third party appraiser within 6 months of the Owner Put Option being exercised);

(iii)    however in no event will the IPO Put Option be less than the redemption of original purchased interest plus the two percent (2%) annual accrual during the outstanding period of the interest held by IPO.

(g)    CPO Call Option ("Call Option") is available to CPO annually commencing on the third annual anniversary of the agreement and extending to the full term of the Agreement.
Call Option value to be determined based on the greater of the

(i)    (a) amount of the original purchased interest(as set forth in Exhibit 'A'), plus (b) a two percent (2%) per year accrual of the original purchased interest, or

(ii)    the amount of the original purchased interest (as set forth in Exhibit 'A'), plus net increase above the current agreed upon market Property value as set forth in Exhibit 'A' times the IPO percentage ownership interest set forth in Exhibit 'A'; (unless otherwise agreed, to be appraised by an independent third party appraiser within 6 months of the Owner Put Option being exercised);

(iii)    however in no event will the CPO Call Option be less than the redemption of original purchased interest plus the two percent (2%) annual accrual during the outstanding period of the interest held by IPO.

**AGREEMENT AMONG TENANTS IN COMMON**                                    **Page 5**

11.    <u>Management, Financing, and Leasing</u>.  It is the objective of the Tenants to maximize the market value of the Property by operating, leasing, financing, and/or sale of the Property.

(a)    The Tenants irrevocably authorize CPO, or any management company or management agent appointed by CPO, (i) to operate, manage and lease all or any portion of the Property upon such terms and conditions as CPO may determine necessary or advisable in its absolute and sole discretion; (ii) to pay from any revenues derived from operation of the Property, on or before the date due, all installments of principal and/or interest on all debts secured by a lien on the Property, (iii) to execute any and all documents necessary to manage and lease all or any portion of the Property as permitted herein, without the necessity of any other Tenant joining in the execution thereof including without limitation the sale, refinance merger or other material event.

(b)    If the signature of a Tenant is required by a third party, each Tenant agrees to execute and deliver such documents as such third party deems necessary or desirable to accomplish all of the foregoing and such management or lease of the Property.  If a Tenant fails to execute and deliver any such documents within ten (10) days following written notice from CPO, CPO is hereby authorized, and each Tenant grants to CPO an irrevocable power of attorney, coupled with an interest, to execute and deliver any such documents by, in the name of and on behalf of such Tenant, which documents shall be binding upon such Tenant to the same extent as if such Tenant had personally executed and delivered the same.

(c)    If third party management is not obtained for the Property by CPO, in its sole and absolute discretion, CPO may appoint itself or any affiliate as manager of the Tenancy and the Property.  For such services, CPO shall receive a management fee equal to eight percent (8%) of the gross revenues from the Property plus reasonable out of pocket costs, payable monthly following payment of debt service and all other Owner Costs then due.

(d)    Notwithstanding anything contained in this Section 11 to the contrary:

(i)    CPO may exercise the rights provided to CPO in Section 10(c) of this Agreement, without the written approval of any other Tenant, notwithstanding any statute or other law to the contrary.

(ii)    Any note, deed of trust, or loan documents executed in connection with a financing or refinancing of all or any portion of the Property shall not personally obligate a Tenant for the repayment of the principal or interest thereof without the written consent of such Tenant.

(iii)    No litigation shall be brought by or on behalf of a Tenant against a third party involving the Property without the written consent of CPO.

(iv)    By unanimous vote of the Tenants, CPO may be removed as manager of the Tenancy or the Property only upon a judicial determination, in a final, unappealable

**AGREEMENT AMONG TENANTS IN COMMON**                                        **Page 6**

judgment of a court of appropriate jurisdiction, of fraud or gross negligence on the part of CPO in connection with the management and operation of the Property.

12.    Conditional Option to Purchase at Selling Tenant's Adjusted Basis.

(a)    Option to Purchase at Selling Tenant's Adjusted Basis.  In the event that (i) any Tenant shall pledge, hypothecate or use as security for any loan or obligation, his interest in the Property or any portion thereof, and a default shall occur with respect to such loan or obligation resulting in the interest of such Tenant (or a portion thereof) being subject to levy or sale; or (ii) any Tenant shall make an assignment for the benefit of creditors or similar arrangement, or any proceeding shall be commenced by or against any Tenant under any bankruptcy, reorganization or other similar laws for the relief of debtors, or the property of a Tenant becomes subject to seizure or sale by reason of a judgment having been taken against him or it, or (iii) any Tenant shall fail to remove any lien or security interest on all or any portion of his interest in the Property within ten (10) days following written notice from any other Tenant, so that a third party lender may obtain a first lien on the Property with priority over such lien or security interest in connection with any financing or re-financing of the Property; then, in any of such events, the Ownership Interest of such Tenant (herein the "Selling Tenant") shall automatically be offered for sale to each other Tenant (herein the "Purchasing Tenant") in accordance with (b) and (c) below, upon notice of such event to each Tenant.

(b)    Option Exercise Procedures.  In the event that the Ownership Interest of a Tenant shall be offered for sale to the other Tenants pursuant to section (a) above, then the Purchasing Tenant(s) shall have the option, exercisable within ninety (90) days of receipt of notice thereof from the Selling Tenant, to purchase the complete Ownership Interest of the Selling Tenant, which purchase shall be, if more than one Purchasing Tenant exercises such option, pro rata in accordance with their respective Ownership Interests in the Property.

(c)    Purchase Price.  The purchase price for the interest of a Tenant to be sold pursuant to (a) shall be said Tenant's adjusted basis in the property after taking into consideration that Tenant's historical cost, return of capital, if any, with appropriate adjustments and allocations for all items of income or, expense accruing prior to the closing date.  All closing costs associated with such sale shall be borne by the Selling Tenant.  The purchase price shall be paid 100% in cash at closing, which is to occur within ninety (90) days of the Purchasing Tenant's receipt of notice from the Selling Tenant.

13.    NEGATION OF PARTNERSHIP; LIABILITY SEVERAL.  NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR CONSTRUED TO CREATE A PARTNERSHIP, JOINT VENTURE OR ASSOCIATION AMONG ANY OF THE PARTIES HERETO.  THE LIABILITY OF THE TENANTS UNDER THIS AGREEMENT SHALL BE SEVERAL, NOT JOINT AND SEVERAL, LIMITED AS TO EACH, TO ITS RESPECTIVE OWNERSHIP INTEREST.

14.    Events of Default.  If any of the following events shall occur and shall not be cured within the time period set forth in Section 14 after written notice thereof to the Tenant committing

**AGREEMENT AMONG TENANTS IN COMMON**                                      Page 7

such acts, such Tenant committing such act shall be deemed to have committed an Event of Default (herein so called):

(a)    A Tenant shall file a voluntary petition in bankruptcy or shall be adjudicated a bankrupt or insolvent, or shall file any petition or answer seeking any reorganization, arrangement, composition, readjustment liquidation, dissolution or similar relief for itself under any applicable federal state or other statute or law relative to bankruptcy, insolvency or other relief for debtors, or the appointment of any trustee, receiver, conservator or liquidator of said Party or of any part of its properties or interest in the Note or the Property, or

(b)    A Tenant shall admit in writing its inability to pay its debts as they mature; or

(c)    A Tenant shall make an assignment for the benefit of creditors or take any other similar action for the protection or benefit of creditors; or

(d)    A Tenant fails to make any payment required hereunder on a timely basis;

(e)    A Tenant shall fail to perform its covenants or obligations contained herein; or

(f)    A Tenant shall fail to perform its covenants or obligations contained in any agreement secured by a lien on the Property.

In addition to all other rights of CPO, if any other Tenant commits an uncured Event of Default, CPO may require such Tenant to convey its Ownership Interest in the Property in consideration for the payment to such Tenant of an amount equal to such Tenant's direct cost of acquiring his Ownership Interest from CPO, less such Tenant's closing costs incurred in connection with its acquisition of such Ownership Interest.

15.    Notice of Default and Cure.  In the event of an Event of Default, the remedies provided for in Section 14 shall apply only if said Event of Default is not timely cured.  If a Tenant believes another Tenant is in default hereunder, such Tenant shall give the defaulting Tenant written notice setting forth such default and the defaulting Tenant shall have thirty (30) days after the receipt of such notice to cure such default.  In the event such default is not cured during such thirty (30) day period, such defaulting Tenant shall be deemed to have committed such Event of Default and the other Tenant may enforce such Tenant's rights and remedies contained herein and at law.

Each Tenant (the "Indemnifying Tenant") agrees to indemnify the other Tenants for any loss, damage or claim arising from any uncured Event of Default of the Indemnifying Tenant.

16.    Election to be Excluded from Provisions of Subchapter K.  Each Tenant hereby elects to be excluded from all of the provisions of Subchapter K of Chapter I of the Internal Revenue Code of 1986, as amended (the "Code").  The exclusion elected by each Tenant hereunder shall commence with the execution of this Agreement.  Each Tenant hereby covenants and agrees that each Tenant shall abide by all regulatory requirements in order to maintain such election and shall report on such

**AGREEMENT AMONG TENANTS IN COMMON**                                   Page 8

Tenant's income tax return such respective share of items of income, deduction and credit which results from holding of the Property, in a manner consistent with the exclusion of the Tenancy from Subchapter K of Chapter I of the Code, commencing with the first taxable year of the Tenancy. No Tenant shall notify the Commissioner of Internal Revenue (the "Commissioner") that such Tenant desires that Subchapter K of the Code apply to the Tenancy and each Tenant hereby agrees to indemnify and hold each other Tenant free and harmless from all cost, liability, tax consequence and expense, including attorneys' fees, which results from any Tenant so notifying the Commissioner.

17.    <u>Dissolution</u>. The Tenancy, as governed hereby, shall be immediately dissolved upon the happening of any of the following events:

(i)    The sale or other disposition by the Tenants of all of the Property; or

(ii)    The decision of the Tenants that the Tenancy be dissolved; or

(iii)    Ten (10) years after the date hereof, absent prior extension of the term of the Tenancy (for one or more years) by written notice from CPO to the other Tenants, at CPO's option in its sole and absolute discretion.

18.    <u>Notices</u>. All notices under this Agreement must be in writing and shall be deemed to have been duly given if delivered personally or by certified mail, return receipt requested, to the addresses set forth on the signature page hereof.

19.    <u>Amendment; Additional Tenants</u>. This Agreement may be amended only by written agreement signed by all Tenants; provided, however, that CPO may sell additional undivided interests in the Property (from the CPO Ownership Interest) to third parties, in which case such other third party(ies) may be added to this Agreement by CPO as additional Tenants, with the same rights and obligations hereunder as are applicable to IPO and the IPO Ownership Interest, to the extent of the undivided interest in the Property constituting the Ownership Interest of such third party(ies) in the Property. In such event, the Ownership Interests of CPO hereunder shall be reduced pro rata, such that the aggregate Ownership Interests of the Tenants following such sale(s) of undivided interests in the CPO Ownership Interest shall continue to equal one hundred (100%).

20.    <u>Counterparts</u>. This Agreement may be executed in counterparts each of which shall be deemed to be an original, but such counterparts, when taken together, shall constitute but one agreement.

21.    <u>Gender</u>. All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine or neuter, singular or plural, as the identity of the person, persons, entity or entities may require.

22.    <u>Caption Headings</u>. Captions at the beginning of each numbered Section of this Agreement are solely for the convenience of the parties and shall not be deemed part of the context of this Agreement.

**AGREEMENT AMONG TENANTS IN COMMON**                                    Page 9

23. <u>Negotiated Transaction</u>. The provisions of this Agreement were negotiated by all of the parties hereto and said Agreement shall be deemed to have been drafted by all of the parties thereto.

24. <u>Further Assurances</u>. Each Tenant hereby agrees to promptly sign any additional instruments or documents which are necessary or appropriate to carry out the purpose of this Agreement.

25. <u>Interpretation</u>. It is the intent of the Tenants to own the Property for investment purposes, only and not for the conduct of a business, and to otherwise comply with all statutes and regulations allowing an election to be excluded from Subchapter K of the Code and this Agreement shall be interpreted to conform to such intent.

26. <u>Litigation</u>. In the event of any litigation between the parties hereto, the prevailing party in such litigation shall be paid all attorneys' fees, court costs and litigation expenses incurred in such litigation by the non-prevailing party. The parties hereto agree that specific performance is an appropriate remedy for the enforcement of the rights of the Tenants hereunder concerning a sale of the Property and the obligations of the parties hereunder.

27. <u>Recording</u>. A memorandum of this Agreement may be recorded by CPO and the other Tenants agree to cooperate and facilitate such recording.

[SIGNATURE PAGE FOLLOWS]

**AGREEMENT AMONG TENANTS IN COMMON**          Page 10

EXECUTED effective as of February1, 2022(the "Effective Date").

**SAM Plainview, LLC** (a Texas Limited Liability Company)

By: MacDonald Capital Corporation (a Texas corporation), gp

By:_____
    Name: Wm. Ian MacDonald
    Title: President

Date: Agreed to as of the "Effective Date" set forth above

Address:  400 East Centre Park Blvd., Suite 101
          DeSoto, Texas 75115
Facsimile: 972-283-0193

**RONALD H. BERG**

By: _____
   **Individually**

Date: Agreed to as of the "Effective Date" set forth above
Address:  20 Canyon Ridge,
         Irvine, CA  92603
Phone Number: (714) 402-2374
Facsimile:_____

**AGREEMENT AMONG TENANTS IN COMMON**         Page 11

## EXHIBIT A

### The Property

An undivided Six point Six Six percent (6.66%) interest in

Street Lots 1-4, Block 47, Old Town Plainview, Plainview, Hale County, Texas
414 North Columbia Avenue, Plainview, TX 79072

**Buyer:**
Ownership Interest Percentage: Six point Six Six percent (6.66%)

**Buyer:**
Purchase Price of Ownership Interest (Originally Invested Amount): $89,368.61

**Seller Ownership Interest:**
Seventy Three point One Nine percent (64.23%)

Agreed Upon Current Value of the Property: $2,151,553.

**AGREEMENT AMONG TENANTS IN COMMON**                          Page 12
DALLAS1 1068268v3 51997-00001

# EXHIBIT A-2

### Plainview TIC - Heath

## AGREEMENT AMONG TENANTS IN COMMON
### Plainview, TX

**THIS AGREEMENT AMONG TENANTS IN COMMON** ("Agreement") is made and entered into initially by and between SAM Plainview, LLC (a Texas Limited Liability Company) and Current Property Owner ("CPO") and **Donald P. Heath and Joanne O. Heath, Husband and Wife as Joint Tenants** in Irvine, California as the Incoming Property Owner ("IPO"), being sometimes referred to singularly as "Tenant" or collectively as the "Tenants".

### RECITALS

A.     It is the desire of the Tenants to hold, operate, maintain, finance, keep in repair, lease and/or sell or exchange, as tenants in common, that certain real property together with all improvements located therein, commonly known Buddy's which is more fully described on Exhibit "A" attached hereto and by this reference incorporated herein (the "Property").

B.     It is the desire of IPO to acquire an undivided interest in the Property from CPO as is more fully described In Exhibit 'A'.

NOW, THEREFORE, in consideration of the foregoing Recitals and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Tenants to hereby agree as follows:

1.     Formation of Tenancy.  The Tenants hereby acknowledge their ownership to be a tenancy in common (the "Tenancy") and this Agreement shall govern the ownership and management of the Property. The principal purpose of the Tenancy shall be to hold and maintain the Property as tenants in common for investment purposes.  The address of each Tenant for notice and all other purposes of this Agreement is set forth on the signature page hereof.  Except as expressly provided herein, no Tenant shall sell, assign, hypothecate or otherwise dispose of or encumber its interest or any part thereof in the Property without the prior written consent of the other Tenants.

2.     Term.  The Tenancy as governed hereby shall commence on the execution of this Agreement, and shall continue thereafter until dissolved or terminated pursuant to Sections 17 hereof.

3.     Title to the Property.  Contemporaneously with the execution hereof, IPO has acquired an undivided interest in the Property as set forth in Exhibit 'A', the ("IPO Interest"), and CPO retains an interest in the Property as is more fully described in Exhibit 'A' (the "CPO Ownership Interest"). The CPO Ownership Interest and the IPO Ownership Interest are hereinafter sometimes referred to as the "Ownership Interests" or an "Ownership Interest." Each Tenant agrees to be bound by the terms and conditions of this Agreement.

4.     Ownership Rights of Tenants.  Notwithstanding any statute or other rule of law and having previously been advised of their respective rights to bring an action for partition, the Tenants

**AGREEMENT AMONG TENANTS IN COMMON**                    **Page 1**

agree that during the term hereof the Tenants shall only have those rights in the Property as expressly provided herein and each Tenant hereby irrevocably waives any and all rights that it has (i) to occupy the Property or any portion thereof, or to exclude any other Tenant from the Property or any portion thereof, and (ii) to maintain any action for any partition of the Property, or otherwise force a sale of the Property during the term hereof, all except as expressly provided herein.

     5.    <u>Tenant Payment Obligations</u>.

     (a)    Each Tenant agrees to pay its Agreed Share (such Agreed Share determined as provided, below) of all costs and expenses involved in owning, operating, maintaining, leasing, selling or exchanging the Property, including, but not limited to, ad valorem taxes, insurance premiums, repairs, necessary improvements, contractual fees, professional fees, lease commissions and utility costs, debt service and other financing-related costs, and capital repairs and replacements and other capital expenditures at the Property (collectively, "Owner Costs"). To the extent that the income from the Property is insufficient to pay all Owner Costs in the ordinary course of business, each Tenant's Agreed Share of such Owner Costs shall be paid by each Tenant, upon demand, prior to the due date of all such costs and expenses and no later than ten (10) days prior to the date when such costs and expenses are due.

     For purposes of this Agreement, the Agreed Share of each Tenant shall be equal to his respective Ownership Interest in the Property. CPO, which shall be the Tenant managing the Tenancy, shall maintain a banking account or accounts at financial institutions on behalf of the Tenants and shall maintain reasonable reserves for future costs and expenses of the Property.

     (b)    If any Tenant fails promptly to contribute such Tenant's share of the Owner Costs ("Defaulting Tenant"), the other Tenants may pay the entire amount' of such Owner Costs and the amount not paid by the Defaulting Tenant shall be deemed a loan to the Defaulting Tenant (the "Tenant Loan" or "Tenant Loans"). All Tenant Loans shall be payable on demand, shall bear interest at the rate of eighteen percent (18%) per annum, and shall constitute a lien on the interest of the Defaulting Tenant in the Property, which lien shall be expressly subject and subordinate to any existing or future lien of any third party lender with a lien on the Property. Each Defaulting Tenant authorizes each other Tenant making a Tenant Loan to execute and record such documents as such Tenant deems necessary to further or better evidence such loan and lien.

     In the event a Tenant makes a loan or loans to the Defaulting Tenant ("Loaning Tenant") and any Tenant Loan remains unpaid for a thirty (30) day period after written notice is given to the Defaulting Tenant requesting payment, the Loaning Tenant may bring suit against the Defaulting Tenant for the amount of the Tenant Loans not paid plus all reasonable collection costs. All income from the sale and operation of the Property shall be paid to the Loaning Tenant until all Tenant Loans are paid in full.

**AGREEMENT AMONG TENANTS IN COMMON**                  **Page 2**

6.  <u>Distribution of Net Profits From Operation, Financing, Refinancing, Exchange, Lease and Sale of the Property</u>.

(a)    All income derived from the operation of the Property in whatever form and however derived (less reasonable working capital and capital repairs and replacement reserves), shall be divided and paid when received as follows:

(i)    First, to each Tenant in an amount equal to such Tenant's Agreed Share of the Owner Costs, or, at CPO's option, to pay such Tenant's Agreed Share of such Owner Costs directly on its behalf,

(ii)    The IPO tenant shall receive the greater of (i) percentage interest of the net income of the Property as set forth in Exhibit 'A', or (ii) the annual pay rate paid on the originally invested amount set forth in Exhibit 'A' ("Originally Invested Amount") to be paid on a monthly basis,

(iii)    The IPO tenant shall also a receive a two percent (2%) annual accrual on the invested amount to be paid upon redemption of the IPO interest, and

(iv)    Thereafter, the CPO tenant shall receive the remaining available balance of the cash flow and distributions from all other distributable sources.

(b)    In the event of the financing, refinancing, exchange or lease of the Property, or in the event of a sale under Section 10 herein, the Net Profits, if any, from the sale, lease, financing, refinancing or exchange of the Property shall be divided between the Tenants when received in the same manner set forth in Section 6(a). The term "Net Profits" for the purpose of this paragraph shall mean the net proceeds from any financing, refinancing, exchange or lease (less all reasonable and bona fide financing, exchange or leasing costs) or the net sales price of the Property (gross sales price less all reasonable and bona fide selling expenses) less; (i) the outstanding unpaid indebtedness of all notes secured by loans on the Property at the time of such sale; (ii) the outstanding principal balance plus accrued but unpaid interest on any Tenant Loans, and (iii) all other reasonable and bona fide expenses incurred by the Tenancy in connection with the ownership, maintenance, financing, refinancing, exchange, lease or the sale of the Property, including any unpaid Owner Costs. Each Tenant shall receive its share of the Net Profits under this Section 6(b) in the form of any promissory note(s) or cash received from the leasing, financing, refinancing, exchange or sale.

7.    <u>Books and Records</u>. Proper and complete books of account of the Tenancy shall be kept by CPO (i.e., the Tenant managing the Tenancy) as an expense of the Tenancy and shall be open to inspection and copying by any Tenant or representatives of each Tenant at any reasonable time. The books and records of account shall be examined and reviewed as of the close of each calendar year by an accountant selected by CPO, and such accountant shall prepare an annual report thereof, copies of which will be furnished to each Tenant as soon, as possible after the conclusion of each calendar year. Each Tenant shall have the right to make a separate audit of the books and records of the Tenancy at such Tenant's own expense at any time and from time to time.

**AGREEMENT AMONG TENANTS IN COMMON**                                    **Page 3**

8.      Bank Accounts.  All funds of the Tenancy shall be deposited by CPO in a bank or brokerage account or accounts in the name of the Tenancy and funds from said bank account or accounts shall be disbursed upon the signature of CPO in the ordinary course of business, and in accordance with the provisions of this Agreement, unless all Tenants direct otherwise. Tenancy funds shall be used only for Tenancy purposes.

9.      Dissolution of a Tenant. The dissolution of any Tenant shall not have the affect of terminating or dissolving the Tenancy.  Upon the dissolution of a Tenant, the shareholders, partners, members or other equity owners thereof shall succeed to its interest in this Tenancy and shall be bound by the terms and provisions of this Agreement; however, in the event that the interest of the dissolved Tenant passes to more than one person, then, and in that event, such persons shall, within ninety (90) days after dissolution of the Tenant, execute and deliver to the other Tenants a written instrument (including Power of Attorney) appointing one person as and to be the Agent for collecting, receiving and making all payments and contributions required hereunder, shall vote the entire interest of the successors, and shall perform all other obligations of such successors performable by reason of or arising from their interest in the Tenancy; and, any and all payments and/or disbursements due arising from the successors interest in the Tenancy shall be deemed to have been validly made to such successors by paying the same to such duly designated Agent.  In the event that said successors for any reason fail to designate such Agent in writing in the manner and within the time prescribed and continue to fail to cure such default after ten (10) days written notice from another Tenant to correct same, such other Tenant shall have the right to appoint such Agent.

10.      Transfer of Tenant's Interest and Sale of Property.

(a)      No Tenant may sell, transfer, convey, encumber or otherwise hypothecate the Property or its undivided interest in the Property without the written consent of the other Tenants, except as provided in Section 10(c) herein and Section 11 herein.

(b)      Any permitted transfer of a Tenant's Ownership Interest in the Property shall be subject to such transferee's written agreement to be bound by all of the terms and conditions of this Agreement; any transfer without such written assumption agreement shall be null and void.

(c)      CPO may, at any time, sell, finance, exchange or otherwise transfer or encumber all of the Property (including the other Ownership Interests) on such terms and conditions as CPO may, in CPO's sole discretion, determine, so long as such transaction is a bona fide transaction and all of the terms and conditions of such transaction are fully disclosed to all Tenants at the time such transaction is entered into.  If requested by CPO, all Tenants shall join in the conveyance of the Property and/or execute all documents necessary or desirable to close such transaction.

(d)      If the signature of a Tenant is required by a third party in connection with the transactions contemplated by Section 10(c), such Tenant agrees to execute and deliver such documents as such third party deems necessary or desirable to accomplish all of the foregoing.  If such Tenant fails to execute and deliver any such documents within ten (10) days following written notice from CPO, CPO is hereby authorized, and each Tenant grants to CPO an irrevocable power of attorney,

**AGREEMENT AMONG TENANTS IN COMMON**                              Page 4

coupled with an interest, to execute and deliver any such documents by, in the name of and on behalf of such Tenant, which documents shall be binding upon such Tenant to the same extent as if such Tenant had personally executed and delivered the same.

(e)     A Tenant may not, without the prior written consent of CPO, which consent may be granted or withheld in the sole and absolute discretion of CPO, sell, transfer, convey, encumber or otherwise hypothecate all or any portion of the Property (including its Ownership Interest).

(f)     IPO Put Option ("Put Option") is available to IPO annually commencing on fifth anniversary of the agreement and extending to the full term of the Term of the Agreement.
Put Option value to be determined based on the greater of the

(i)     the (a) amount of the original purchased interest (as set forth in Exhibit 'A'), plus (b) a two percent (2%) per year accrual on the amount of the original purchased interest, or

(ii)    the amount of the original purchased interest (as set forth in Exhibit 'A'), plus the net increase above the current agreed upon market Property value set forth in Exhibit 'A' times the IPO percentage ownership interest set forth in Exhibit 'A'; (unless otherwise agreed, to be appraised by an independent third party appraiser within 6 months of the Owner Put Option being exercised);

(iii)   however in no event will the IPO Put Option be less than the redemption of original purchased interest plus the two percent (2%) annual accrual during the outstanding period of the interest held by IPO.

(g)     CPO Call Option ("Call Option") is available to CPO annually commencing on the third annual anniversary of the agreement and extending to the full term of the Agreement.
Call Option value to be determined based on the greater of the

(i)     (a) amount of the original purchased interest (as set forth in Exhibit 'A'), plus (b) a two percent (2%) per year accrual of the original purchased interest, or

(ii)    the amount of the original purchased interest (as set forth in Exhibit 'A'), plus net increase above the current agreed upon market Property value as set forth in Exhibit 'A' times the IPO percentage ownership interest set forth in Exhibit 'A'; (unless otherwise agreed, to be appraised by an independent third party appraiser within 6 months of the Owner Put Option being exercised);

(iii)   however in no event will the CPO Call Option be less than the redemption of original purchased interest plus the two percent (2%) annual accrual during the outstanding period of the interest held by IPO.

**AGREEMENT AMONG TENANTS IN COMMON**                                      **Page 5**

11.    <u>Management, Financing, and Leasing</u>.  It is the objective of the Tenants to maximize the market value of the Property by operating, leasing, financing, and/or sale of the Property.

(a)    The Tenants irrevocably authorize CPO, or any management company or management agent appointed by CPO, (i) to operate, manage and lease all or any portion of the Property upon such terms and conditions as CPO may determine necessary or advisable in its absolute and sole discretion; (ii) to pay from any revenues derived from operation of the Property, on or before the date due, all installments of principal and/or interest on all debts secured by a lien on the Property, (iii) to execute any and all documents necessary to manage and lease all or any portion of the Property as permitted herein, without the necessity of any other Tenant joining in the execution thereof including without limitation the sale, refinance merger or other material event.

(b)    If the signature of a Tenant is required by a third party, each Tenant agrees to execute and deliver such documents as such third party deems necessary or desirable to accomplish all of the foregoing and such management or lease of the Property.  If a Tenant fails to execute and deliver any such documents within ten (10) days following written notice from CPO, CPO is hereby authorized, and each Tenant grants to CPO an irrevocable power of attorney, coupled with an interest, to execute and deliver any such documents by, in the name of and on behalf of such Tenant, which documents shall be binding upon such Tenant to the same extent as if such Tenant had personally executed and delivered the same.

(c)    If third party management is not obtained for the Property by CPO, in its sole and absolute discretion, CPO may appoint itself or any affiliate as manager of the Tenancy and the Property.  For such services, CPO shall receive a management fee equal to eight percent (8%) of the gross revenues from the Property plus reasonable out of pocket costs, payable monthly following payment of debt service and all other Owner Costs then due.

(d)    Notwithstanding anything contained in this Section 11 to the contrary:

(i)    CPO may exercise the rights provided to CPO in Section 10(c) of this Agreement, without the written approval of any other Tenant, notwithstanding any statute or other law to the contrary.

(ii)    Any note, deed of trust, or loan documents executed in connection with a financing or refinancing of all or any portion of the Property shall not personally obligate a Tenant for the repayment of the principal or interest thereof without the written consent of such Tenant.

(iii)    No litigation shall be brought by or on behalf of a Tenant against a third party involving the Property without the written consent of CPO.

(iv)    By unanimous vote of the Tenants, CPO may be removed as manager of the Tenancy or the Property only upon a judicial determination, in a final, unappealable

**AGREEMENT AMONG TENANTS IN COMMON**                    **Page 6**

judgment of a court of appropriate jurisdiction, of fraud or gross negligence on the part of CPO in connection with the management and operation of the Property.

12.    Conditional Option to Purchase at Selling Tenant's Adjusted Basis.

(a)    Option to Purchase at Selling Tenant's Adjusted Basis. In the event that (i) any Tenant shall pledge, hypothecate or use as security for any loan or obligation, his interest in the Property or any portion thereof, and a default shall occur with respect to such loan or obligation resulting in the interest of such Tenant (or a portion thereof) being subject to levy or sale; or (ii) any Tenant shall make an assignment for the benefit of creditors or similar arrangement, or any proceeding shall be commenced by or against any Tenant under any bankruptcy, reorganization or other similar laws for the relief of debtors, or the property of a Tenant becomes subject to seizure or sale by reason of a judgment having been taken against him or it, or (iii) any Tenant shall fail to remove any lien or security interest on all or any portion of his interest in the Property within ten (10) days following written notice from any other Tenant, so that a third party lender may obtain a first lien on the Property with priority over such lien or security interest in connection with any financing or re-financing of the Property; then, in any of such events, the Ownership Interest of such Tenant (herein the "Selling Tenant") shall automatically be offered for sale to each other Tenant (herein the "Purchasing Tenant") in accordance with (b) and (c) below, upon notice of such event to each Tenant.

(b)    Option Exercise Procedures. In the event that the Ownership Interest of a Tenant shall be offered for sale to the other Tenants pursuant to section (a) above, then the Purchasing Tenant(s) shall have the option, exercisable within ninety (90) days of receipt of notice thereof from the Selling Tenant, to purchase the complete Ownership Interest of the Selling Tenant, which purchase shall be, if more than one Purchasing Tenant exercises such option, pro rata in accordance with their respective Ownership Interests in the Property.

(c)    Purchase Price. The purchase price for the interest of a Tenant to be sold pursuant to (a) shall be said Tenant's adjusted basis in the property after taking into consideration that Tenant's historical cost, return of capital, if any, with appropriate adjustments and allocations for all items of income or, expense accruing prior to the closing date. All closing costs associated with such sale shall be borne by the Selling Tenant. The purchase price shall be paid 100% in cash at closing, which is to occur within ninety (90) days of the Purchasing Tenant's receipt of notice from the Selling Tenant.

13.    NEGATION OF PARTNERSHIP; LIABILITY SEVERAL. NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR CONSTRUED TO CREATE A PARTNERSHIP, JOINT VENTURE OR ASSOCIATION AMONG ANY OF THE PARTIES HERETO. THE LIABILITY OF THE TENANTS UNDER THIS AGREEMENT SHALL BE SEVERAL, NOT JOINT AND SEVERAL, LIMITED AS TO EACH, TO ITS RESPECTIVE OWNERSHIP INTEREST.

14.    Events of Default. If any of the following events shall occur and shall not be cured within the time period set forth in Section 14 after written notice thereof to the Tenant committing

**AGREEMENT AMONG TENANTS IN COMMON**           Page 7

such acts, such Tenant committing such act shall be deemed to have committed an Event of Default (herein so called):

(a)    A Tenant shall file a voluntary petition in bankruptcy or shall be adjudicated a bankrupt or insolvent, or shall file any petition or answer seeking any reorganization, arrangement, composition, readjustment liquidation, dissolution or similar relief for itself under any applicable federal state or other statute or law relative to bankruptcy, insolvency or other relief for debtors, or the appointment of any trustee, receiver, conservator or liquidator of said Party or of any part of its properties or interest in the Note or the Property, or

(b)    A Tenant shall admit in writing its inability to pay its debts as they mature; or

(c)    A Tenant shall make an assignment for the benefit of creditors or take any other similar action for the protection or benefit of creditors; or

(d)    A Tenant fails to make any payment required hereunder on a timely basis;

(e)    A Tenant shall fail to perform its covenants or obligations contained herein; or

(f)    A Tenant shall fail to perform its covenants or obligations contained in any agreement secured by a lien on the Property.

In addition to all other rights of CPO, if any other Tenant commits an uncured Event of Default, CPO may require such Tenant to convey its Ownership Interest in the Property in consideration for the payment to such Tenant of an amount equal to such Tenant's direct cost of acquiring his Ownership Interest from CPO, less such Tenant's closing costs incurred in connection with its acquisition of such Ownership Interest.

15.    Notice of Default and Cure.  In the event of an Event of Default, the remedies provided for in Section 14 shall apply only if said Event of Default is not timely cured.  If a Tenant believes another Tenant is in default hereunder, such Tenant shall give the defaulting Tenant written notice setting forth such default and the defaulting Tenant shall have thirty (30) days after the receipt of such notice to cure such default.  In the event such default is not cured during such thirty (30) day period, such defaulting Tenant shall be deemed to have committed such Event of Default and the other Tenant may enforce such Tenant's rights and remedies contained herein and at law.

Each Tenant (the "Indemnifying Tenant") agrees to indemnify the other Tenants for any loss, damage or claim arising from any uncured Event of Default of the Indemnifying Tenant.

16.    Election to be Excluded from Provisions of Subchapter K.  Each Tenant hereby elects to be excluded from all of the provisions of Subchapter K of Chapter I of the Internal Revenue Code of 1986, as amended (the "Code").  The exclusion elected by each Tenant hereunder shall commence with the execution of this Agreement.  Each Tenant hereby covenants and agrees that each Tenant shall abide by all regulatory requirements in order to maintain such election and shall report on such

**AGREEMENT AMONG TENANTS IN COMMON**                                      **Page 8**

Tenant's income tax return such respective share of items of income, deduction and credit which results from holding of the Property, in a manner consistent with the exclusion of the Tenancy from Subchapter K of Chapter I of the Code, commencing with the first taxable year of the Tenancy. No Tenant shall notify the Commissioner of Internal Revenue (the "Commissioner") that such Tenant desires that Subchapter K of the Code apply to the Tenancy and each Tenant hereby agrees to indemnity and hold each other Tenant free and harmless from all cost, liability, tax consequence and expense, including attorneys' fees, which results from any Tenant so notifying the Commissioner.

17.    <u>Dissolution</u>. The Tenancy, as governed hereby, shall be immediately dissolved upon the happening of any of the following events:

(i)    The sale or other disposition by the Tenants of all of the Property; or

(ii)    The decision of the Tenants that the Tenancy be dissolved; or

(iii)    Ten (10) years after the date hereof, absent prior extension of the term of the Tenancy (for one or more years) by written notice from CPO to the other Tenants, at CPO's option in its sole and absolute discretion.

18.    <u>Notices</u>. All notices under this Agreement must be in writing and shall be deemed to have been duly given if delivered personally or by certified mail, return receipt requested, to the addresses set forth on the signature page hereof.

19.    <u>Amendment; Additional Tenants</u>. This Agreement may be amended only by written agreement signed by all Tenants; provided, however, that CPO may sell additional undivided interests in the Property (from the CPO Ownership Interest) to third parties, in which case such other third party(ies) may be added to this Agreement by CPO as additional Tenants, with the same rights and obligations hereunder as are applicable to IPO and the IPO Ownership Interest, to the extent of the undivided interest in the Property constituting the Ownership Interest of such third party(ies) in the Property. In such event, the Ownership Interests of CPO hereunder shall be reduced pro rata, such that the aggregate Ownership Interests of the Tenants following such sale(s) of undivided interests in the CPO Ownership Interest shall continue to equal one hundred (100%).

20.    <u>Counterparts</u>. This Agreement may be executed in counterparts each of which shall be deemed to be an original, but such counterparts, when taken together, shall constitute but one agreement.

21.    <u>Gender</u>. All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine or neuter, singular or plural, as the identity of the person, persons, entity or entities may require.

22.    <u>Caption Headings</u>. Captions at the beginning of each numbered Section of this Agreement are solely for the convenience of the parties and shall not be deemed part of the context of this Agreement.

**AGREEMENT AMONG TENANTS IN COMMON**                                                  **Page 9**

23.    <u>Negotiated Transaction</u>.  The provisions of this Agreement were negotiated by all of the parties hereto and said Agreement shall be deemed to have been drafted by all of the parties thereto.

24.    <u>Further Assurances</u>.  Each Tenant hereby agrees to promptly sign any additional instruments or documents which are necessary or appropriate to carry out the purpose of this Agreement.

25.    <u>Interpretation</u>.  It is the intent of the Tenants to own the Property for investment purposes, only and not for the conduct of a business, and to otherwise comply with all statutes and regulations allowing an election to be excluded from Subchapter K of the Code and this Agreement shall be interpreted to conform to such intent.

26.    <u>Litigation</u>.  In the event of any litigation between the parties hereto, the prevailing party in such litigation shall be paid all attorneys' fees, court costs and litigation expenses incurred in such litigation by the non-prevailing party.  The parties hereto agree that specific performance is an appropriate remedy for the enforcement of the rights of the Tenants hereunder concerning a sale of the Property and the obligations of the parties hereunder.

27.    <u>Recording</u>.  A memorandum of this Agreement may be recorded by CPO and the other Tenants agree to cooperate and facilitate such recording.

[SIGNATURE PAGE FOLLOWS]

**AGREEMENT AMONG TENANTS IN COMMON**                                    Page 10

EXECUTED effective as of February 1, 2022 (the "Effective Date").

**SAM Plainview, LLC** (a Texas Limited Liability Company)

By: MacDonald Capital Corporation (a Texas corporation), gp

By: _____
      Name: Wm. Ian MacDonald
      Title: President

Date: Agreed to as of the "Effective Date" set forth above

Address: 400 East Centre Park Blvd., Suite 101
           DeSoto, Texas 75115
Facsimile: 972-283-0193

Donald P. Heath and Joanne O. Heath,
Husband and Wife as Joint Tenants

By: _____
Name: Donald P. Heath
Title: An Individual,

and

By: _____
Name: Joanne O. Heath
Title: An Individual

Address: 13 Klamath, Irvine, CA 92612
Telephone: (____) ____-_____;
Fax: _____

**AGREEMENT AMONG TENANTS IN COMMON**            Page 11

## EXHIBIT A

### The Property

An undivided interest of Nineteen point Two Seven percent (19.27%) interest in

Street Lots 1-4, Block 47, Old Town Plainview, Plainview, Hale County, Texas
414 North Columbia Avenue, Plainview, TX 79072

**Buyer:**
Ownership Interest Percentage:
Nineteen point Two Seven percent (19.27%)

**Buyer:**
Purchase Price of Ownership Interest
(Originally Invested Amount): $258,576.56

**Seller Ownership Interest:**
Seventy Three point One Nine percent (64.23%)

Agreed Upon Current Value of the Property: $2,151,553.

**AGREEMENT AMONG TENANTS IN COMMON**
DALLAS1 1068268v3 51997-00001

Page 12

# EXHIBIT A-3

### Plainview TIC - Hjorth

## AGREEMENT AMONG TENANTS IN COMMON

THIS AGREEMENT AMONG TENANTS IN COMMON ("Agreement") is made and entered into initially by and between SAM PLAINVIEW, LLC, a Texas limited liability company and Current Property Owner ("SP-CPO") and Family Trust of George M. Hjorth and Evlin D. Hjorth, 1523 West 330 North Saint George, UT 84770 as the Incoming Property Owner ("GEH-IPO"), being sometimes referred to singularly as "Tenant" or collectively as the "Tenants".

### RECITALS

A.    It is the desire of the Tenants to hold, operate, maintain, finance, keep in repair, lease and/or sell or exchange, as tenants in common, without rights of survivorship, that certain real property together with all improvements located therein, commonly known Buddy's located in Plainview, Texas, which is more fully described on Exhibit "A" attached hereto and by this reference incorporated herein (the "Property").

B.    It is the desire of GEH-IPO to acquire nine point six five percent (9.65%) undivided interest in the Property from SP-CPO leaving the total undivided interest of SP-CPO at sixty four point four-two percent (64.42%).

NOW, THEREFORE, in consideration of the foregoing Recitals and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Tenants to hereby agree as follows:

1.    Formation of Tenancy.    The Tenants hereby acknowledge their ownership to be a tenancy in common (the "Tenancy") and this Agreement shall govern the ownership and management of the Property. The principal purpose of the Tenancy shall be to hold and maintain the Property as tenants in common for investment purposes. The address of each Tenant for notice and all other purposes of this Agreement is set forth on the signature page hereof. Except as expressly provided herein, no Tenant shall sell, assign, hypothecate or otherwise dispose of or encumber its undivided interest or any part thereof in the Property without the prior written consent of the other Tenants.

2.    Term.    The Tenancy as governed hereby shall commence on the execution of this Agreement, and shall continue thereafter until dissolved pursuant to Section 17 hereof.

3.    Title to the Property.    Contemporaneously with the execution hereof, GEH-IPO has acquired an undivided nine-point six five percent (9.65%) undivided interest in the Property (the "GEH-IPO Interest"), and SP-CPO owns a sixty four point four-two percent (64.42%) undivided interest in the Property (the "SP-CPO Ownership Interest"). The SP-CPO Ownership Undivided interest and the GEH-IPO Ownership Undivided interest are hereinafter sometimes referred to as the "Ownership Interests" or an "Ownership Interest." Each Tenant agrees to be bound by the terms and conditions of this Agreement.

AGREEMENT AMONG TENANTS IN COMMON                                    Page 1

4.    Ownership Rights of Tenants.  Notwithstanding any statute or other rule of law and having previously been advised of their respective rights to bring an action for partition, the Tenants agree that during the term hereof the Tenants shall only have those rights in the Property as expressly provided herein and each Tenant hereby irrevocably waives any and all rights that it has (i) to occupy the Property or any portion thereof, or to exclude any other Tenant from the Property or any portion thereof, and (ii) to maintain any action for any partition of the Property, or otherwise force a sale of the Property during the term hereof, all except as expressly provided herein.

5.    Tenant Payment Obligations.

(a)    Each Tenant agrees to pay its Agreed Share (such Agreed Share determined as provided, below) of all costs and expenses involved in owning, operating, maintaining, leasing, selling or exchanging the Property, including, but not limited to, ad valorem taxes, insurance premiums, repairs, necessary improvements, contractual fees, professional fees, lease commissions and utility costs, debt service and other financing-related costs, and capital repairs and replacements and other capital expenditures at the Property (collectively, "Owner Costs").  To the extent that the income from the Property is insufficient to pay all Owner Costs in the ordinary course of business, each Tenant's Agreed Share of such Owner Costs shall be paid by each Tenant, upon demand, prior to the due date of all such costs and expenses and no later than ten (10) days prior to the date when such costs and expenses are due.

For purposes of this Agreement, the Agreed Share of each Tenant shall be equal to his respective Ownership Undivided interest in the Property.  SP-CPO, which shall be the Tenant managing the Tenancy, shall maintain a banking account or accounts at financial institutions on behalf of the Tenants and shall maintain reasonable reserves for future costs and expenses of the Property.

(b)    If any Tenant fails promptly to contribute such Tenant's share of the Owner Costs ("Defaulting Tenant"), the other Tenants may pay the entire amount of such Owner Costs and the amount not paid by the Defaulting Tenant shall be deemed a loan to the Defaulting Tenant (the "Tenant Loan" or "Tenant Loans").  All Tenant Loans shall be payable on demand, shall bear undivided interest at the rate of eighteen percent (18%) per annum, and shall constitute a lien on the undivided interest of the Defaulting Tenant in the Property, which lien shall be expressly subject and subordinate to any existing or future lien of any third party lender with a lien on the Property.  Each Defaulting Tenant authorizes each other Tenant making a Tenant Loan to execute and record such documents as such Tenant deems necessary to further or better evidence such loan and lien.

In the event a Tenant makes a loan or loans to the Defaulting Tenant ("Loaning Tenant") and any Tenant Loan remains unpaid for a thirty (30) day period after written notice is given to the Defaulting Tenant requesting payment, the Loaning Tenant may bring suit against the Defaulting Tenant for the amount of the Tenant Loans not paid plus all reasonable collection costs.  All income from the sale and operation of the Property shall be paid to the Loaning Tenant until all Tenant Loans are paid in full.

**AGREEMENT AMONG TENANTS IN COMMON**                                                    Page 2

6.    Distribution of Net Profits From Operation, Financing, Refinancing, Exchange, Lease and Sale of the Property.

(a)    All income derived from the operation of the Property in whatever form and however derived (less reasonable working capital and capital repairs and replacement reserves), shall be divided and paid when received as follows:

(i)    First, to each Tenant in an amount equal to such Tenant's Agreed Share of the Owner Costs, or, at SP-CPO's option, to pay such Tenant's Agreed Share of such Owner Costs directly on its behalf; and

(ii)    Thereafter, at least quarterly, to the Tenants in accordance with their Agreed Shares.

(b)    In the event of the financing, refinancing, exchange or lease of the Property, or in the event of a sale under Section 10 herein, the Net Profits, if any, from the sale, lease, financing, refinancing or exchange of the Property shall be divided between the Tenants when received in the same manner set forth in Section 6(a). The term "Net Profits" for the purpose of this paragraph shall mean the net proceeds from any financing, refinancing, exchange or lease (less all reasonable and bona fide financing, exchange or leasing costs) or the net sales price of the Property (gross sales price less all reasonable and bona fide selling expenses) less; (i) the outstanding unpaid indebtedness of all notes secured by loans on the Property at the time of such sale; (ii) the outstanding principal balance plus accrued but unpaid undivided interest on any Tenant Loans, and (iii) all other reasonable and bona fide expenses incurred by the Tenancy in connection with the ownership, maintenance, financing, refinancing, exchange, lease or the sale of the Property, including any unpaid Owner Costs. Each Tenant shall receive its share of the Net Profits under this Section 6(b) in the form of any promissory note(s) or cash received from the leasing, financing, refinancing, exchange or sale.

7.    Books and Records. Proper and complete books of account of the Tenancy shall be kept by SP-CPO (i.e., the Tenant managing the Tenancy) as an expense of the Tenancy and shall be open to inspection and copying by any Tenant or representatives of each Tenant at any reasonable time. The books and records of account shall be examined and reviewed as of the close of each calendar year by an accountant selected by SP-CPO, and such accountant shall prepare an annual report thereof, copies of which will be furnished to each Tenant as soon, as possible after the conclusion of each calendar year. Each Tenant shall have the right to make a separate audit of the books and records of the Tenancy at such Tenant's own expense at any time and from time to time.

8.    Bank Accounts. All funds of the Tenancy shall be deposited by SP-CPO in a bank or brokerage account or accounts in the name of the Tenancy and funds from said bank account or accounts shall be disbursed upon the signature of P-CPO in the ordinary course of business, and in accordance with the provisions of this Agreement, unless all Tenants direct otherwise. Tenancy funds shall be used only for Tenancy purposes.

AGREEMENT AMONG TENANTS IN COMMON                                    Page 3

9.    <u>Dissolution of a Tenant.</u> The dissolution of any Tenant shall not have the affect of terminating or dissolving the Tenancy. Upon the dissolution of a Tenant, the shareholders, partners, members or other equity owners thereof shall succeed to its undivided interest in this Tenancy and shall be bound by the terms and provisions of this Agreement; however, in the event that the undivided interest of the dissolved Tenant passes to more than one person, then, and in that event, such persons shall, within ninety (90) days after dissolution of the Tenant, execute and deliver to the other Tenants a written instrument (including Power of Attorney) appointing one person as and to be the Agent for collecting, receiving and making all payments and contributions required hereunder, shall vote the entire undivided interest of the successors, and shall perform all other obligations of such successors performable by reason of or arising from their undivided interest in the Tenancy; and, any and all payments and/or disbursements due arising from the successors undivided interest in the Tenancy shall be deemed to have been validly made to such successors by paying the same to such duly designated Agent. In the event that said successors for any reason fail to designate such Agent in writing in the manner and within the time prescribed and continue to fail to cure such default after ten (10) days written notice from another Tenant to correct same, such other Tenant shall have the right to appoint such Agent.

10.    <u>Transfer of Tenant's Undivided interest and Sale of Property.</u>

(a)    No Tenant may sell, transfer, convey, encumber or otherwise hypothecate the Property or its undivided interest in the Property without the written consent of the other Tenants, except as provided in Section 10(c) herein and Section 11 herein.

(b)    Any permitted transfer of a Tenant's Ownership Undivided interest in the Property shall be subject to such transferee's written agreement to be bound by all of the terms and conditions of this Agreement; any transfer without such written assumption agreement shall be null and void.

(c)    SP-CPO may, at any time, sell, finance, exchange or otherwise transfer or encumber all of the Property (including the other Ownership Interests) on such terms and conditions as SP-CPO may, in SP-CPO's sole discretion, determine, so long as such transaction is a bona fide transaction and all of the terms and conditions of such transaction are fully disclosed to all Tenants at the time such transaction is entered into. If requested by SP-CPO, all Tenants shall join in the conveyance of the Property and/or execute all documents necessary or desirable to close such transaction.

(d)    If the signature of a Tenant is required by a third party in connection with the transactions contemplated by Section 10(c), such Tenant agrees to execute and deliver such documents as such third party deems necessary or desirable to accomplish all of the foregoing. If such Tenant fails to execute and deliver any such documents within ten (10) days following written notice from SP-CPO, SP-CPO is hereby authorized, and *<u>each Tenant grants to SP-CPO an irrevocable power of attorney, coupled with an interest,</u>* to execute and deliver any such documents

AGREEMENT AMONG TENANTS IN COMMON                                        Page 4

by, in the name of and on behalf of such Tenant, which documents shall be binding upon such Tenant to the same extent as if such Tenant had personally executed and delivered the same.

(e)    A Tenant may not, without the prior written consent of SP-CPO, which consent may be granted or withheld in the sole and absolute discretion of SP-CPO, sell, transfer, convey, encumber or otherwise hypothecate all or any portion of the Property (including its Ownership Interest).

(f)    Put Option Available to GEH-IPO annually commencing on the third annual anniversary of the agreement and extending to the full term of the Term of the Agreement. Put Option value to be determined based on the greater of (i) the original amount of the purchased undivided interest plus a two percent (2%) per year accrual of the original purchased undivided interest or (ii) the current market value appraised by an independent third party appraiser within 3 months of the Owner Put Option being exercised.

(g)    Call Option Available to RB-CPO commencing on the effective date of the agreement and extending to the full term of the Term of the Agreement. Call Option value to be determined based on the greater of (i) the original amount of the purchased undivided interest plus a two percent (2%) per year accrual of the original purchased undivided interest or (ii) the current market value appraised by an independent third party appraiser within 3 months of the Owner Put Option being exercised.

11.    Management, Financing, and Leasing. It is the objective of the Tenants to maximize the market value of the Property by operating, leasing, financing, and/or sale of the Property.

(a)    The Tenants irrevocably authorize SP-CPO, or any management company or management agent appointed by SP-CPO, (i) to operate, manage and lease all or any portion of the Property upon such terms and conditions as SP-CPO may determine necessary or advisable; (ii) to pay from any revenues derived from operation of the Property, on or before the date due, all installments of principal and/or undivided interest on all debts secured by a lien on the Property, (iii). to execute any and all documents necessary to manage and lease all or any portion of the Property as permitted herein, without the necessity of any other Tenant joining in the execution thereof.

(b)    If the signature of a Tenant is required by a third party, each Tenant agrees to execute and deliver such documents as such third party deems necessary or desirable to accomplish all of the foregoing and such management or lease of the Property. If a Tenant fails to execute and deliver any such documents within ten (10) days following written notice from SP-CPO, SP-CPO is hereby authorized, and *each Tenant grants to SP-CPO an irrevocable power of attorney, coupled with an interest*, to execute and deliver any such documents by, in the name of and on behalf of such Tenant, which documents shall be binding upon such Tenant to the same extent as if such Tenant had personally executed and delivered the same.

(c)    If third party management is not obtained for the Property by SP-CPO, in its sole and absolute discretion, SP-CPO may appoint itself or any affiliate as manager of the Tenancy

**AGREEMENT AMONG TENANTS IN COMMON**                                                    **Page 5**

and the Property. For such services, SP-CPO shall receive a management fee equal to eight percent (8%) of the gross revenues from the Property, payable monthly following payment of debt service and all other Owner Costs then due.

    (d)    Notwithstanding anything contained in this Section 11 to the contrary:

        (i)    SP-CPO may exercise the rights provided to SP-CPO in Section 10(c) of this Agreement, without the written approval of any other Tenant, notwithstanding any statute or other law to the contrary.

        (ii)    Any note, deed of trust, or loan documents executed in connection with a financing or refinancing of all or any portion of the Property shall not personally obligate a Tenant for the repayment of the principal or undivided interest thereof without the written consent of such Tenant.

        (iii)    No litigation shall be brought by or on behalf of a Tenant against a third party involving the Property without the written consent of SP-CPO.

        (iv)    By unanimous vote of the Tenants other than SP-CPO, SP-CPO may be removed as manager of the Tenancy or the Property only upon a judicial determination, in a final, unappealable judgment of a court of appropriate jurisdiction, of fraud or gross negligence on the part of SP-CPO in connection with the management and operation of the Property.

    12.    Conditional Option to Purchase at Selling Tenant's Adjusted Basis.

    (a)    Option to Purchase at Selling Tenant's Adjusted Basis.  In the event that (i) any Tenant shall pledge, hypothecate or use as security for any loan or obligation, his undivided interest in the Property or any portion thereof, and a default shall occur with respect to such loan or obligation resulting in the undivided interest of such Tenant (or a portion thereof) being subject to levy or sale; or (ii) any Tenant shall make an assignment for the benefit of creditors or similar arrangement, or any proceeding shall be commenced by or against any Tenant under any bankruptcy, reorganization or other similar laws for the relief of debtors, or the property of a Tenant becomes subject to seizure or sale by reason of a judgment having been taken against him or it, or (iii) any Tenant shall fail to remove any lien or security undivided interest on all or any portion of his undivided interest in the Property within ten (10) days following written notice from any other Tenant, so that a third party lender may obtain a first lien on the Property with priority over such lien or security undivided interest in connection with any financing or re-financing of the Property; then, in any of such events, the Ownership Undivided interest of such Tenant (herein the "Selling Tenant") shall automatically be offered for sale to each other Tenant (herein the "Purchasing Tenant") in accordance with (b) and (c) below, upon notice of such event to each Tenant.

    (b)    Option Exercise Procedures.  In the event that the Ownership Undivided interest of a Tenant shall be offered for sale to the other Tenants pursuant to section (a) above, then

**AGREEMENT AMONG TENANTS IN COMMON**        Page 6

the Purchasing Tenant(s) shall have the option, exercisable within thirty (30) days of receipt of notice thereof from the Selling Tenant, to purchase the complete Ownership Undivided interest of the Selling Tenant, which purchase shall be, if more than one Purchasing Tenant exercises such option, pro rata in accordance with their respective Ownership Interests in the Property.

(d)    Purchase Price. The purchase price for the undivided interest of a Tenant to be sold pursuant to (a) shall be said Tenant's adjusted basis in the property after taking into consideration that Tenant's historical cost, return of capital, if any, with appropriate adjustments and allocations for all items of income or, expense accruing, prior to the closing date. All closing costs associated with such sale shall be borne by the Selling Tenant. The purchase price shall be paid 100% in cash at closing, which is to occur within thirty (30) days of the Purchasing Tenant's receipt of notice from the Selling Tenant.

13.    NEGATION OF PARTNERSHIP; LIABILITY SEVERAL.  NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR CONSTRUED TO CREATE A PARTNERSHIP, JOINT VENTURE OR ASSOCIATION AMONG ANY OF THE PARTIES HERETO. THE LIABILITY OF THE TENANTS UNDER THIS AGREEMENT SHALL BE SEVERAL, NOT JOINT AND SEVERAL, LIMITED AS TO EACH, TO ITS RESPECTIVE OWNERSHIP INTEREST.

14.    Events of Default. If any of the following events shall occur and shall not be cured within the time period set forth in Section 14 after written notice thereof to the Tenant committing such acts, such Tenant committing such act shall be deemed to have committed an Event of Default (herein so called):

(a)    A Tenant shall file a voluntary petition in bankruptcy or shall be adjudicated a bankrupt or insolvent, or shall file any petition or answer seeking any reorganization, arrangement, composition, readjustment liquidation, dissolution or similar relief for itself under any applicable federal state or other statute or law relative to bankruptcy, insolvency or other relief for debtors, or the appointment of any trustee, receiver, conservator or liquidator of said Party or of any part of its properties or undivided interest in the Note or the Property, or

(b)    A Tenant shall admit in writing its inability to pay its debts as they mature; or

(c)    A Tenant shall make an assignment for the benefit of creditors or take any other similar action for the protection or benefit of creditors; or

(d)    A Tenant fails to make any payment required hereunder on a timely basis;

(e)    A Tenant shall fail to perform its covenants or obligations contained herein; or

(f)    A Tenant shall fail to perform its covenants or obligations contained in any agreement secured by a lien on the Property.

AGREEMENT AMONG TENANTS IN COMMON                                      Page 7

In addition to all other rights of SP-CPO, if any other Tenant commits an uncured Event of Default, SP-CPO may require such Tenant to convey its Ownership Undivided interest in the Property in consideration for the payment to such Tenant of an amount equal to such Tenant's direct cost of acquiring his Ownership Undivided interest from SP-CPO -CPO, less such Tenant's closing costs incurred in connection with its acquisition of such Ownership Interest.

15.    Notice of Default and Cure. In the event of an Event of Default, the remedies provided for in Section 14 shall apply only if said Event of Default is not timely cured. If a Tenant believes another Tenant is in default hereunder, such Tenant shall give the defaulting Tenant written notice setting forth such default and the defaulting Tenant shall have thirty (30) days after the receipt of such notice to cure such default. In the event such default is not cured during such thirty (30) day period, such defaulting Tenant shall be deemed to have committed such Event of Default and the other Tenant may enforce such Tenant's rights and remedies contained herein and at law.

Each Tenant (the "Indemnifying Tenant") agrees to indemnify the other Tenants for any loss, damage or claim arising from any uncured Event of Default of the Indemnifying Tenant.

16.    Election to be Excluded from Provisions of Subchapter K. Each Tenant hereby elects to be excluded from all of the provisions of Subchapter K of Chapter I of the Internal Revenue Code of 1986, as amended (the "Code"). The exclusion elected by each Tenant hereunder shall commence with the execution of this Agreement. Each Tenant hereby covenants and agrees that each Tenant shall abide by all regulatory requirements in order to maintain such election and shall report on such Tenant's income tax return such respective share of items of income, deduction and credit which results from holding of the Property, in a manner consistent with the exclusion of the Tenancy from Subchapter K of Chapter I of the Code, commencing with the first taxable year of the Tenancy. No Tenant shall notify the Commissioner of Internal Revenue (the "Commissioner") that such Tenant desires that Subchapter K of the Code apply to the Tenancy and each Tenant hereby agrees to indemnity and hold each other Tenant free and harmless from all cost, liability, tax consequence and expense, including attorneys' fees, which results from any Tenant so notifying the Commissioner.

17.    Dissolution. The Tenancy, as governed hereby, shall be immediately dissolved upon the happening of any of the following events:

(i)    The sale or other disposition by the Tenants of all of the Property; or

(ii)    The decision of the Tenants that the Tenancy be dissolved; or

(iii)    Ten (10) years after the date hereof, absent prior extension of the term of the Tenancy (for one or more years) by written notice from SP-CPO to the other Tenants, at BMO-CPO's option in its sole and absolute discretion.

18.    Notices. All notices under this Agreement must be in writing and shall be deemed to have been duly given if delivered personally or by certified mail, return receipt requested, to the addresses set forth on the signature page hereof.

**AGREEMENT AMONG TENANTS IN COMMON**                              Page 8

19.    Amendment; Additional Tenants. This Agreement may be amended only by written agreement signed by all Tenants; provided, however, that SP-CPO may sell additional undivided interests in the Property (from the SP-CPO Ownership Interest) to third parties, in which case such other third party(ies) may be added to this Agreement by SP-CPO as additional Tenants, with the same or similar rights and obligations hereunder as are applicable to GEH-IPO and the GEH-IPO Ownership Interest, to the extent of the undivided undivided interest in the Property constituting the Ownership Undivided interest of such third party(ies) in the Property. In such event, the Ownership Interests of SP-CPO hereunder shall be reduced pro rata, such that the aggregate Ownership Interests of the Tenants following such sale(s) of undivided interests in the SP-CPO Ownership Undivided interest shall continue to equal one hundred (100%). If the signature of a Tenant is required by a third party, each Tenant agrees to execute and deliver such, documents as such third party deems necessary or desirable to accomplish all of the foregoing and such management or lease of the Property. If a Tenant fails to execute and deliver any such documents within ten (10) days following written notice from SP-CPO, SP-CPO is hereby authorized, and *each Tenant grants to SP-CPO an irrevocable power of attorney, coupled with an interest*, to execute and deliver any such documents by, in the name of and on behalf of such Tenant, which documents shall be binding upon such Tenant to the same extent as if such Tenant had personally executed and delivered the same.

20.    Counterparts. This Agreement may be executed in counterparts each of which shall be deemed to be an original, but such counterparts, when taken together, shall constitute but one agreement.

21.    Gender. All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine or neuter, singular or plural, as the identity of the person, persons, entity or entities may require.

22.    Caption Headings. Captions at the beginning of each numbered Section of this Agreement are solely for the convenience of the parties and shall not be deemed part of the context of this Agreement.

23.    Negotiated Transaction. The provisions of this Agreement were negotiated by all of the parties hereto and said Agreement shall be deemed to have been drafted by all of the parties thereto.

24.    Further Assurances. Each Tenant hereby agrees to promptly sign any additional instruments or documents which are necessary or appropriate to carry out the purpose of this Agreement.

25.    Interpretation. It is the intent of the Tenants to own the Property for investment purposes, only and not for the conduct of a business, and to otherwise comply with all statutes and regulations allowing an election to be excluded from Subchapter K of the Code and this Agreement shall be interpreted to conform to such intent.

**AGREEMENT AMONG TENANTS IN COMMON**                                   Page 9

26.    Litigation. In the event of any litigation between the parties hereto, the prevailing party in such litigation shall be paid all attorneys' fees, court costs and litigation expenses incurred in such litigation by the non-prevailing party. The parties hereto agree that specific performance is an appropriate remedy for the enforcement of the rights of the Tenants hereunder concerning a sale of the Property and the obligations of the parties hereunder.

27.    Recording. A memorandum of this Agreement may be recorded by SP-CPO and the other Tenants agree to cooperate and facilitate such recording.

[SIGNATURE PAGE FOLLOWS]

**AGREEMENT AMONG TENANTS IN COMMON**                    **Page 10**

EXECUTED effective as of February 26th , 2025.

**SAM PLAINFIELD, LLC**
a Texas limited liability, as Tenant-in-Common
By: MacDonald Capital Corporation
Managing Member

By: _____
Name: Wm. Ian MacDonald
Title: CEO

Address:  400 East Centre Park Blvd., Suite 101
DeSoto, Texas 75115
Facsimile: 972-283-0193

Date: _02/26/2025_

**Family Trust of George M. Hjorth and Evlin D. Hjorth**

By: _____
George M. Hjorth, Trustee

By: _____
Evlin D. Hjorth, Trustee

Address: 1523 West 330 North Saint George, UT 84770

Facsimile: _NONE_

AGREEMENT AMONG TENANTS IN COMMON                    Page 11

STATE OF TEXAS        §
                             §
COUNTY OF DALLAS    §

        This instrument was acknowledged before me on the 26ᵗʰ day of February, 2025, by Wm Ian MacDonald, CEO of MacDonald Capital Corporation, a Texas corporation and sole general partner of Sam Plainfield, LLC a Texas limited liability, on behalf of said corporation and said limited liability.

                                   _Chanel Boston_
                                 Notary Public, State of Texas

CHANEL BOSTON
My Notary ID # 128028038
Expires March 31, 2028

                                   My Commission expires:
                                   _3-31-2028_

**AGREEMENT AMONG TENANTS IN COMMON**                     Page 12

[SEAL]

STATE OF UTAH            )
                        )   ss.
COUNTY OF _Washington_  )

On February _26_ , 2025, before me, _____ _Jared Plewe_ _____, Notary Public,
personally appeared George M. Hjorth, personally known to me/proved to me on the basis of
satisfactory evidence to be the person(s) whose name(s) is subscribed to the within instrument, and
acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and
that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which
the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

JARED PLEWE
Notary Public - State of Utah
Commission Number: 721414
My Commission Expires on
November 10, 2025

_____
NOTARY PUBLIC,
STATE OF UTAH

My Commission expires:
_____ 11/10/25 _____

AGREEMENT AMONG TENANTS IN COMMON                    Page 13

[SEAL]

STATE OF UTAH                    )
                                 )   ss.
COUNTY OF Washington             )

On February 26, 2025, before me, _____ Jared Plewe _____, Notary Public, personally appeared **Evlin D. Hjorth**, personally known to me/proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is subscribed to the within instrument, and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

> JARED PLEWE
> Notary Public - State of Utah
> Commission Number: 721414
> My Commission Expires on
> November 10, 2025

NOTARY PUBLIC,
STATE OF UTAH

My Commission expires:
11/10/25

AGREEMENT AMONG TENANTS IN COMMON                    Page 14

## EXHIBIT A

An undivided interest of nine point six five percent (9.65%) in

## THE PROPERTY

LOTS 1,2,3, AND 4, BLOCK 47, ORIGINAL TOWN OF PLAINVIEW, HALE COUNTY, TEXAS, SAVE AND
EXCEPT A 10 FOOT HIGHWAY CUTBACK CORNER (50 SQUARE FEET) OUT OF THE NORTHWEST CORNER
OF LOT 1, AS RECORDED IN VOLUME 653, PAGE 501 OF THE DEED RECORDS OF HALE COUNTY, TEXAS.

**AGREEMENT AMONG TENANTS IN COMMON**                     **Page 15**
DALLAS1 1068268v3 51997-00001

# EXHIBIT A-4

**Plainview TIC - Klymkowych**

### AGREEMENT AMONG TENANTS IN COMMON

THIS AGREEMENT AMONG TENANTS IN COMMON ("Agreement") is made and entered into initially by and between **SAM PLAINVIEW, LLC,** a Texas limited liability company and Current Property Owner ("SP-CPO") and **BOHDAN KLYMKOWYCH AND NATALIE O. KLYMKOWYCH, AS TRUSTEES OR THEIR SUCCESSORS IN TRUST UNDER THE NATALIE O. KLYMKOWYCH TRUST AGREEMENT DATED AUGUST 9, 1994 AND ANY AMENDMENTS THERETO ("TST"),** domiciled in Corona, California as the Incoming Property Owner ("TST-IPO"), being sometimes referred to singularly as "Tenant" or collectively as the "Tenants".

### RECITALS

A.    It is the desire of the Tenants to hold, operate, maintain, finance, keep in repair, lease and/or sell or exchange, as tenants in common, without rights of survivorship, that certain real property together with all improvements located therein, commonly known Buddy's located in Plainview, Texas, which is more fully described on Exhibit "A" attached hereto and by this reference incorporated herein (the "Property").

B.    It is the desire of TST-IPO to acquire eight point three-six percent (8.36%) interest in the Property from SP-CPO and SP-CPO owns a sixty-eight point six-nine percent (68.69%) interest in the Property (the "SP-CPO Ownership Interest").

NOW, THEREFORE, in consideration of the foregoing Recitals and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Tenants to hereby agree as follows:

1.    Formation of Tenancy.  The Tenants hereby acknowledge their ownership to be a tenancy in common (the "Tenancy") and this Agreement shall govern the ownership and management of the Property. The principal purpose of the Tenancy shall be to hold and maintain the Property as tenants in common for investment purposes. The address of each Tenant for notice and all other purposes of this Agreement is set forth on the signature page hereof. Except as expressly provided herein, no Tenant shall sell, assign, hypothecate or otherwise dispose of or encumber its interest or any part thereof in the Property without the prior written consent of the other Tenants.

2.    Term.  The Tenancy as governed hereby shall commence on the execution of this Agreement, and shall continue thereafter until dissolved pursuant to Section 17 hereof.

3.    Title to the Property.  Contemporaneously with the execution hereof, TST-IPO has acquired an undivided eight point three-six percent (8.36%) interest in the Property, the ("TST-IPO Interest"), and SP-CPO owns a sixty-eight point six-nine percent (68.69%) interest in the Property (the "SP-CPO Ownership Interest"). The SP-CPO Ownership Interest and the TST-IPO Ownership

**AGREEMENT AMONG TENANTS IN COMMON**                                    **Page 1**

Interest are hereinafter sometimes referred to as the "Ownership Interests" or an "Ownership Interest." Each Tenant agrees to be bound by the terms and conditions of this Agreement.

4.    Ownership Rights of Tenants.  Notwithstanding any statute or other rule of law and having previously been advised of their respective rights to bring an action for partition, the Tenants agree that during the term hereof the Tenants shall only have those rights in the Property as expressly provided herein and each Tenant hereby irrevocably waives any and all rights that it has (i) to occupy the Property or any portion thereof, or to exclude any other Tenant from the Property or any portion thereof, and (ii) to maintain any action for any partition of the Property, or otherwise force a sale of the Property during the term hereof, all except as expressly provided herein.

5.    Tenant Payment Obligations.

(a)    Each Tenant agrees to pay its Agreed Share (such Agreed Share determined as provided below) of all costs and expenses involved in owning, operating, maintaining, leasing, selling or exchanging the Property, including, but not limited to, ad valorem taxes, insurance premiums, repairs, necessary improvements, contractual fees, professional fees, lease commissions and utility costs, debt service and other financing-related costs, and capital repairs and replacements and other capital expenditures at the Property (collectively, "Owner Costs"). To the extent that the income from the Property is insufficient to pay all Owner Costs in the ordinary course of business, each Tenant's Agreed Share of such Owner Costs shall be paid by each Tenant, upon demand, prior to the due date of all such costs and expenses and no later than ten (10) days prior to the date when such costs and expenses are due.

For purposes of this Agreement, the Agreed Share of each Tenant shall be equal to his respective Ownership Interest in the Property. SP-CPO, which shall be the Tenant managing the Tenancy, shall maintain a banking account or accounts at financial institutions on behalf of the Tenants and shall maintain reasonable reserves for future costs and expenses of the Property.

(b)    If any Tenant fails promptly to contribute such Tenant's share of the Owner Costs ("Defaulting Tenant"), the other Tenants may pay the entire amount of such Owner Costs and the amount not paid by the Defaulting Tenant shall be deemed a loan to the Defaulting Tenant (the "Tenant Loan" or "Tenant Loans"). All Tenant Loans shall be payable on demand, shall bear interest at the rate of eighteen percent (18%) per annum, and shall constitute a lien on the interest of the Defaulting Tenant in the Property, which lien shall be expressly subject and subordinate to any existing or future lien of any third party lender with a lien on the Property. Each Defaulting Tenant authorizes each other Tenant making a Tenant Loan to execute and record such documents as such Tenant deems necessary to further or better evidence such loan and lien.

In the event a Tenant makes a loan or loans to the Defaulting Tenant ("Loaning Tenant") and any Tenant Loan remains unpaid for a thirty (30) day period after written notice is given to the Defaulting Tenant requesting payment, the Loaning Tenant may bring suit against the Defaulting Tenant for the amount of the Tenant Loans not paid plus all reasonable collection costs.

**AGREEMENT AMONG TENANTS IN COMMON**                                          **Page 2**

All income from the sale and operation of the Property shall be paid to the Loaning Tenant until all Tenant Loans are paid in full.

     6.    Distribution of Net Profits From Operation, Financing, Refinancing, Exchange, Lease and Sale of the Property.

     (a)    All income derived from the operation of the Property in whatever form and however derived (less reasonable working capital and capital repairs and replacement reserves), shall be divided and paid when received as follows:

     (i)    First, to each Tenant in an amount equal to such Tenant's Agreed Share of the Owner Costs, or, at SP-CPO's option, to pay such Tenant's Agreed Share of such Owner Costs directly on its behalf; and

     (ii)    Thereafter, at least quarterly, to the Tenants in accordance with their Agreed Shares.

     (b)    In the event of the financing, refinancing, exchange or lease of the Property, or in the event of a sale under Section 10 herein, the Net Profits, if any, from the sale, lease, financing, refinancing or exchange of the Property shall be divided between the Tenants when received in the same manner set forth in Section 6(a). The term "Net Profits" for the purpose of this paragraph shall mean the net proceeds from any financing, refinancing, exchange or lease (less all reasonable and bona fide financing, exchange or leasing costs) or the net sales price of the Property (gross sales price less all reasonable and bona fide selling expenses) less; (i) the outstanding unpaid indebtedness of all notes secured by loans on the Property at the time of such sale; (ii) the outstanding principal balance plus accrued but unpaid interest on any Tenant Loans, and (iii) all other reasonable and bona fide expenses incurred by the Tenancy in connection with the ownership, maintenance, financing, refinancing, exchange, lease or the sale of the Property, including any unpaid Owner Costs. Each Tenant shall receive its share of the Net Profits under this Section 6(b) in the form of any promissory note(s) or cash received from the leasing, financing, refinancing, exchange or sale.

     7.    Books and Records. Proper and complete books of account of the Tenancy shall be kept by SP-CPO (i.e., the Tenant managing the Tenancy) as an expense of the Tenancy and shall be open to inspection and copying by any Tenant or representatives of each Tenant at any reasonable time. The books and records of account shall be examined and reviewed as of the close of each calendar year by an accountant selected by SP-CPO, and such accountant shall prepare an annual report thereof, copies of which will be furnished to each Tenant as soon, as possible after the conclusion of each calendar year. Each Tenant shall have the right to make a separate audit of the books and records of the Tenancy at such Tenant's own expense at any time and from time to time.

     8.    Bank Accounts. All funds of the Tenancy shall be deposited by SP-CPO in a bank or brokerage account or accounts in the name of the Tenancy and funds from said bank account or accounts shall be disbursed upon the signature of P-CPO in the ordinary course of business, and in

**AGREEMENT AMONG TENANTS IN COMMON**          **Page 3**

accordance with the provisions of this Agreement, unless all Tenants direct otherwise. Tenancy funds shall be used only for Tenancy purposes.

9.    Dissolution of a Tenant. The dissolution of any Tenant shall not have the affect of terminating or dissolving the Tenancy. Upon the dissolution of a Tenant, the shareholders, partners, members or other equity owners thereof shall succeed to its interest in this Tenancy and shall be bound by the terms and provisions of this Agreement; however, in the event that the interest of the dissolved Tenant passes to more than one person, then, and in that event, such persons shall, within ninety (90) days after dissolution of the Tenant, execute and deliver to the other Tenants a written instrument (including Power of Attorney) appointing one person as and to be the Agent for collecting, receiving and making all payments and contributions required hereunder, shall vote the entire interest of the successors, and shall perform all other obligations of such successors performable by reason of or arising from their interest in the Tenancy; and, any and all payments and/or disbursements due arising from the successors interest in the Tenancy shall be deemed to have been validly made to such successors by paying the same to such duly designated Agent. In the event that said successors for any reason fail to designate such Agent in writing in the manner and within the time prescribed and continue to fail to cure such default after ten (10) days written notice from another Tenant to correct same, such other Tenant shall have the right to appoint such Agent.

10.    Transfer of Tenant's Interest and Sale of Property.

(a)    No Tenant may sell, transfer, convey, encumber or otherwise hypothecate the Property or its undivided interest in the Property without the written consent of the other Tenants, except as provided in Section 10(c) herein and Section 11 herein.

(b)    Any permitted transfer of a Tenant's Ownership Interest in the Property shall be subject to such transferee's written agreement to be bound by all of the terms and conditions of this Agreement; any transfer without such written assumption agreement shall be null and void.

(c)    SP-CPO may, at any time, sell, finance, exchange or otherwise transfer or encumber all of the Property (including the other Ownership Interests) on such terms and conditions as SP-CPO may, in SP-CPO's sole discretion, determine, so long as such transaction is a bona fide transaction and all of the terms and conditions of such transaction are fully disclosed to all Tenants at the time such transaction is entered into. If requested by SP-CPO, all Tenants shall join in the conveyance of the Property and/or execute all documents necessary or desirable to close such transaction.

(d)    If the signature of a Tenant is required by a third party in connection with the transactions contemplated by Section 10(c), such Tenant agrees to execute and deliver such documents as such third party deems necessary or desirable to accomplish all of the foregoing. If such Tenant fails to execute and deliver any such documents within ten (10) days following written notice from SP-CPO, SP-CPO is hereby authorized, and each Tenant grants to SP-CPO an irrevocable power of attorney, coupled with an interest, to execute and deliver any such documents

**AGREEMENT AMONG TENANTS IN COMMON**                                    **Page 4**

by, in the name of and on behalf of such Tenant, which documents shall be binding upon such Tenant to the same extent as if such Tenant had personally executed and delivered the same.

(e)    A Tenant may not, without the prior written consent of SP-CPO, which consent may be granted or withheld in the sole and absolute discretion of SP-CPO, sell, transfer, convey, encumber or otherwise hypothecate all or any portion of the Property (including its Ownership Interest).

(f)    Put Option Available to TST-IPO annually commencing on the third annual anniversary of the agreement and extending to the full term of the Term of the Agreement. Put Option value to be determined based on the greater of (i) the original amount of the purchased interest plus a two percent (2%) per year accrual of the original purchased interest or (ii) the current market value appraised by an independent third party appraiser within 3 months of the Owner Put Option being exercised.

(g)    Call Option Available to RB-CPO annually commencing on the third annual anniversary of the agreement and extending to the full term of the Term of the Agreement. Call Option value to be determined based on the greater of (i) the original amount of the purchased interest plus a two percent (2%) per year accrual of the original purchased interest or (ii) the current market value appraised by an independent third party appraiser within 3 months of the Owner Put Option being exercised.

11.    Management, Financing, and Leasing.  It is the objective of the Tenants to maximize the market value of the Property by operating, leasing, financing, and/or sale of the Property.

(a)    The Tenants irrevocably authorize SP-CPO, or any management company or management agent appointed by SP-CPO, (i) to operate, manage and lease all or any portion of the Property upon such terms and conditions as SP-CPO may determine necessary or advisable; (ii) to pay from any revenues derived from operation of the Property, on or before the date due, all installments of principal and/or interest on all debts secured by a lien on the Property, (iii). to execute any and all documents necessary to manage and lease all or any portion of the Property as permitted herein, without the necessity of any other Tenant joining in the execution thereof.

(b)    If the signature of a Tenant is required by a third party, each Tenant agrees to execute and deliver such documents as such third party deems necessary or desirable to accomplish all of the foregoing and such management or lease of the Property. If a Tenant fails to execute and deliver any such documents within ten (10) days following written notice from SP-CPO, SP-CPO is hereby authorized, and each Tenant grants to SP-CPO an irrevocable power of attorney, coupled with an interest, to execute and deliver any such documents by, in the name of and on behalf of such Tenant, which documents shall be binding upon such Tenant to the same extent as if such Tenant had personally executed and delivered the same.

(c)    If third party management is not obtained for the Property by SP-CPO, in its sole and absolute discretion, SP-CPO may appoint itself or any affiliate as manager of the Tenancy and the Property. For such services, SP-CPO shall receive a management fee equal to eight percent

**AGREEMENT AMONG TENANTS IN COMMON**                                **Page 5**

(8%) of the gross revenues from the Property, payable monthly following payment of debt service and all other Owner Costs then due.

(d)    Notwithstanding anything contained in this Section 11 to the contrary:

(i)    SP-CPO may exercise the rights provided to SP-CPO in Section 10(c) of this Agreement, without the written approval of any other Tenant, notwithstanding any statute or other law to the contrary.

(ii)    Any note, deed of trust, or loan documents executed in connection with a financing or refinancing of all or any portion of the Property shall not personally obligate a Tenant for the repayment of the principal or interest thereof without the written consent of such Tenant.

(iii)    No litigation shall be brought by or on behalf of a Tenant against a third party involving the Property without the written consent of SP-CPO.

(iv)    By unanimous vote of the Tenants other than SP-CPO, SP-CPO may be removed as manager of the Tenancy or the Property only upon a judicial determination, in a final, unappealable judgment of a court of appropriate jurisdiction, of fraud or gross negligence on the part of SP-CPO in connection with the management and operation of the Property.

12.    Conditional Option to Purchase at Selling Tenant's Adjusted Basis.

(a)    Option to Purchase at Selling Tenant's Adjusted Basis.  In the event that (i) any Tenant shall pledge, hypothecate or use as security for any loan or obligation, his interest in the Property or any portion thereof, and a default shall occur with respect to such loan or obligation resulting in the interest of such Tenant (or a portion thereof) being subject to levy or sale; or (ii) any Tenant shall make an assignment for the benefit of creditors or similar arrangement, or any proceeding shall be commenced by or against any Tenant under any bankruptcy, reorganization or other similar laws for the relief of debtors, or the property of a Tenant becomes subject to seizure or sale by reason of a judgment having been taken against him or it, or (iii) any Tenant shall fail to remove any lien or security interest on all or any portion of his interest in the Property within ten (10) days following written notice from any other Tenant, so that a third party lender may obtain a first lien on the Property with priority over such lien or security interest in connection with any financing or re-financing of the Property; then, in any of such events, the Ownership Interest of such Tenant (herein the "Selling Tenant") shall automatically be offered for sale to each other Tenant (herein the "Purchasing Tenant") in accordance with (b) and (c) below, upon notice of such event to each Tenant.

(b)    Option Exercise Procedures.  In the event that the Ownership Interest of a Tenant shall be offered for sale to the other Tenants pursuant to section (a) above, then the Purchasing Tenant(s) shall have the option, exercisable within thirty (30) days of receipt of notice

**AGREEMENT AMONG TENANTS IN COMMON**                    **Page 6**

thereof from the Selling Tenant, to purchase the complete Ownership Interest of the Selling Tenant, which purchase shall be, if more than one Purchasing Tenant exercises such option, pro rata in accordance with their respective Ownership Interests in the Property.

(d)   Purchase Price. The purchase price for the interest of a Tenant to be sold pursuant to (a) shall be said Tenant's adjusted basis in the property after taking into consideration that Tenant's historical cost, return of capital, if any, with appropriate adjustments and allocations for all items of income or, expense accruing. prior to the closing date. All closing costs associated with such sale shall be borne by the Selling Tenant. The purchase price shall be paid 100% in cash at closing, which is to occur within thirty (30) days of the Purchasing Tenant's receipt of notice from the Selling Tenant.

13.   NEGATION OF PARTNERSHIP; LIABILITY SEVERAL. NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR CONSTRUED TO CREATE A PARTNERSHIP, JOINT VENTURE OR ASSOCIATION AMONG ANY OF THE PARTIES HERETO. THE LIABILITY OF THE TENANTS UNDER THIS AGREEMENT SHALL BE SEVERAL, NOT JOINT AND SEVERAL, LIMITED AS TO EACH, TO ITS RESPECTIVE OWNERSHIP INTEREST.

14.   Events of Default. If any of the following events shall occur and shall not be cured within the time period set forth in Section 14 after written notice thereof to the Tenant committing such acts, such Tenant committing such act shall be deemed to have committed an Event of Default (herein so called):

(a)   A Tenant shall file a voluntary petition in bankruptcy or shall be adjudicated a bankrupt or insolvent, or shall file any petition or answer seeking any reorganization, arrangement, composition, readjustment liquidation, dissolution or similar relief for itself under any applicable federal state or other statute or law relative to bankruptcy, insolvency or other relief for debtors, or the appointment of any trustee, receiver, conservator or liquidator of said Party or of any part of its properties or interest in the Note or the Property, or

(b)   A Tenant shall admit in writing its inability to pay its debts as they mature; or

(c)   A Tenant shall make an assignment for the benefit of creditors or take any other similar action for the protection or benefit of creditors; or

(d)   A Tenant fails to make any payment required hereunder on a timely basis;

(e)   A Tenant shall fail to perform its covenants or obligations contained herein; or

(f)   A Tenant shall fail to perform its covenants or obligations contained in any agreement secured by a lien on the Property.

In addition to all other rights of SP-CPO -CPO, if any other Tenant commits an uncured Event of Default, SP-CPO may require such Tenant to convey its Ownership Interest in the

**AGREEMENT AMONG TENANTS IN COMMON**                                **Page 7**

Property in consideration for the payment to such Tenant of an amount equal to such Tenant's direct cost of acquiring his Ownership Interest from SP-CPO -CPO, less such Tenant's closing costs incurred in connection with its acquisition of such Ownership Interest.

15.    Notice of Default and Cure.  In the event of an Event of Default, the remedies provided for in Section 14 shall apply only if said Event of Default is not timely cured. If a Tenant believes another Tenant is in default hereunder, such Tenant shall give the defaulting Tenant written notice setting forth such default and the defaulting Tenant shall have thirty (30) days after the receipt of such notice to cure such default.  In the event such default is not cured during such thirty (30) day period, such defaulting Tenant shall be deemed to have committed such Event of Default and the other Tenant may enforce such Tenant's rights and remedies contained herein and at law.

Each Tenant (the "Indemnifying Tenant") agrees to indemnify the other Tenants for any loss, damage or claim arising from any uncured Event of Default of the Indemnifying Tenant.

16.    Election to be Excluded from Provisions of Subchapter K.  Each Tenant hereby elects to be excluded from all of the provisions of Subchapter K of Chapter I of the Internal Revenue Code of 1986, as amended (the "Code"). The exclusion elected by each Tenant hereunder shall commence with the execution of this Agreement.  Each Tenant hereby covenants and agrees that each Tenant shall abide by all regulatory requirements in order to maintain such election and shall report on such Tenant's income tax return such respective share of items of income, deduction and credit which results from holding of the Property, in a manner consistent with the exclusion of the Tenancy from Subchapter K of Chapter I of the Code, commencing with the first taxable year of the Tenancy. No Tenant shall notify the Commissioner of Internal Revenue (the "Commissioner") that such Tenant desires that Subchapter K of the Code apply to the Tenancy and each Tenant hereby agrees to indemnify and hold each other Tenant free and harmless from all cost, liability, tax consequence and expense, including attorneys' fees, which results from any Tenant so notifying the Commissioner.

17.    Dissolution.  The Tenancy, as governed hereby, shall be immediately dissolved upon the happening of any of the following events:

(i)    The sale or other disposition by the Tenants of all of the Property; or

(ii)    The decision of the Tenants that the Tenancy be dissolved; or

(iii)    Ten (10) years after the date hereof, absent prior extension of the term of the Tenancy (for one or more years) by written notice from SP-CPO to the other Tenants, at BMO-CPO's option in its sole and absolute discretion.

18.    Notices.  All notices under this Agreement must be in writing and shall be deemed to have been duly given if delivered personally or by certified mail, return receipt requested, to the addresses set forth on the signature page hereof.

**AGREEMENT AMONG TENANTS IN COMMON**                    **Page 8**

19.    Amendment; Additional Tenants. This Agreement may be amended only by written agreement signed by all Tenants; provided, however, that SP-CPO may sell additional undivided interests in the Property (from the SP-CPO Ownership Interest) to third parties, in which case such other third party(ies) may be added to this Agreement by SP-CPO as additional Tenants, with the same rights and obligations hereunder as are applicable to TST-IPO and the TST-IPO Ownership Interest, to the extent of the undivided interest in the Property constituting the Ownership Interest of such third party(ies) in the Property. In such event, the Ownership Interests of SP-CPO hereunder shall be reduced pro rata, such that the aggregate Ownership Interests of the Tenants following such sale(s) of undivided interests in the SP-CPO Ownership Interest shall continue to equal one hundred (100%).

20.    Counterparts. This Agreement may be executed in counterparts each of which shall be deemed to be an original, but such counterparts, when taken together, shall constitute but one agreement.

21.    Gender. All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine or neuter, singular or plural, as the identity of the person, persons, entity or entities may require.

22.    Caption Headings. Captions at the beginning of each numbered Section of this Agreement are solely for the convenience of the parties and shall not be deemed part of the context of this Agreement.

23.    Negotiated Transaction. The provisions of this Agreement were negotiated by all of the parties hereto and said Agreement shall be deemed to have been drafted by all of the parties thereto.

24.    Further Assurances. Each Tenant hereby agrees to promptly sign any additional instruments or documents which are necessary or appropriate to carry out the purpose of this Agreement.

25.    Interpretation. It is the intent of the Tenants to own the Property for investment purposes, only and not for the conduct of a business, and to otherwise comply with all statutes and regulations allowing an election to be excluded from Subchapter K of the Code and this Agreement shall be interpreted to conform to such intent.

26.    Litigation. In the event of any litigation between the parties hereto, the prevailing party in such litigation shall be paid all attorneys' fees, court costs and litigation expenses incurred in such litigation by the non-prevailing party. The parties hereto agree that specific performance is an appropriate remedy for the enforcement of the rights of the Tenants hereunder concerning a sale of the Property and the obligations of the parties hereunder.

27.    Recording. A memorandum of this Agreement may be recorded by SP-CPO and the other Tenants agree to cooperate and facilitate such recording.

**AGREEMENT AMONG TENANTS IN COMMON**                          **Page 9**

[SIGNATURE PAGE FOLLOWS]

**AGREEMENT AMONG TENANTS IN COMMON**                    Page 10

EXECUTED with the effective date as of February 3rd, 2025.

SAM PLAINFIELD, LLC
a Texas limited liability, as Tenant-in-Common
By: MacDonald Capital Corporation
Managing Member

By: _____
Name: Wm. Ian MacDonald
Title: CEO

Address:  400 East Centre Park Blvd., Suite 101
DeSoto, Texas 75115
Facsimile: 972-283-0193

Date: _1/25/25'_

BOHDAN KLYMKOWYCH AND NATALIE O.
KLYMKOWYCH, AS TRUSTEES OR THEIR
SUCCESSORS IN TRUST UNDER THE NATALIE
O. KLYMKOWYCH TRUST AGREEMENT
DATED AUGUST 9, 1994 AND ANY
AMENDMENTS THERETO ("TST")

By: _____
BOHDAN KLYMKOWYCH, as Co-Trustee

Address: 9328 Holly Lane, Corona, CA  92883

Facsimile: _____

By: _____
NATALIE O. KLYMKOWYCH, as Co-Trustee

Address: 9328 Holly Lane, Corona, CA  92883

Facsimile: _____

AGREEMENT AMONG TENANTS IN COMMON                    Page 11

**STATE OF TEXAS**                §
                                  §
**COUNTY OF DALLAS**              §

    This instrument was acknowledged before me on the *3rd* day of *February* 2025, by Wm Ian MacDonald, CEO of MacDonald Capital Corporation, a Texas corporation and sole general partner of Sam Plainfield, LLC a Texas limited liability, on behalf of said corporation and said limited liability.

_____
Notary Public, State of Texas

CHANEL BOSTON
My Notary ID # 126028038
Expires March 31, 2028

My Commission expires:
3-31-2028

**AGREEMENT AMONG TENANTS IN COMMON**                **Page 12**

[SEAL]

STATE OF CALIFORNIA          )
                            )      ss.
COUNTY OF Riverside          )

On January 25th , 2025, before me, Brittany Mendoza-Felix _____, Notary Public, personally appeared **BOHDAN KLYMKOWYCH**, personally known to me/proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is subscribed to the within instrument, and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

NOTARY PUBLIC,
STATE OF CALIFORNIA

My Commission expires:
Jan 21,2026

BRITTANY MENDOZA-FELIX
Notary Public - California
Riverside County
Commission # 2391334
My Comm. Expires Jan 21, 2026

**AGREEMENT AMONG TENANTS IN COMMON**                    **Page 13**

[SEAL]

STATE OF CALIFORNIA        )
                           )    ss.
COUNTY OF Riverside        )

On January 25th, 2025, before me, Brittany Mendoza-Felix, Notary Public, personally appeared **NATALIE O. KLYMKOWYCH**, personally known to me/proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is subscribed to the within instrument, and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

NOTARY PUBLIC,
STATE OF CALIFORNIA

My Commission expires:
Jan 21, 2026

BRITTANY MENDOZA-FELIX
Notary Public - California
Riverside County
Commission # 2391334
My Comm. Expires Jan 21, 2026

AGREEMENT AMONG TENANTS IN COMMON                    Page 14

## EXHIBIT A

An undivided interest of eight point three-six percent (8.36%) interest in

### THE PROPERTY

LOTS 1,2,3, AND 4, BLOCK 47, ORIGINAL TOWN OF PLAINVIEW, HALE COUNTY, TEXAS, SAVE AND
EXCEPT A 10 FOOT HIGHWAY CUTBACK CORNER (50 SQUARE FEET) OUT OF THE NORTHWEST CORNER
OF LOT 1, AS RECORDED IN VOLUME 653, PAGE 591 OF THE DEED RECORDS OF HALE COUNTY, TEXAS.

**AGREEMENT AMONG TENANTS IN COMMON**                                    Page 15
DALLAS1 1068268v3 51997-00001

## Addendum 'B'
## This is a 1031 Transaction Financing Addendum

**LIKE-KIND EXCHANGE.** · Either party may desire to have Seller's sale of the Purchaser's Interest to Purchaser qualify as part of a deferred like-kind exchange within the meaning of Section 1031 of the Internal Revenue Code of 1986, as amended ("Like-Kind Exchange"). In connection therewith, either party may effectuate a deferred like-kind exchange through the use of a qualified intermediary in the manner described in Treas. Reg. Section 1.1031 (k)-1(g)(8), example 4. Each party agrees to cooperate with the other in effectuating such a deferred like-kind exchange through the use of such an intermediary including consenting to an assignment of Seller's or Purchaser's rights under this Contract to such an intermediary. Neither party, however, shall have any obligation to locate, contract for or take title to any property to accomplish said exchange or to incur any additional expenses associated with any such exchange transaction. Seller's original debt balance of debt balance of $614,306.25 shall be assumed by Buyer up to and including the amount of the debt portion of this 1031 transaction. Any tax consequences to Seller from the offset in the debt assumption as part of the Purchase Price shall be due to Seller upon demand Such amount is currently estimated to be One Hundred Sixty-One Thousand, Eight Hundred Ninety Four Dollars and Twenty Cents, and such amount will be adjusted to the actual amount of the 1031 debt in Buyers 1031 transaction with Long Beach Trading Company.

# EXHIBIT B

# EXHIBIT B-1

### Seminole TIC - Berg

## AGREEMENT AMONG TENANTS IN COMMON
### Seminole, OK

**THIS AGREEMENT AMONG TENANTS IN COMMON** ("Agreement") is made and entered into initially by and between MacDonald Capital Corporation (a Texas corporation) and Current Property Owner ("CPO") and **RONALD H. BERG**, an unmarried man in Irvine, California as the Incoming Property Owner ("IPO"), being sometimes referred to singularly as "Tenant" or collectively as the "Tenants".

### RECITALS

A.    It is the desire of the Tenants to hold, operate, maintain, finance, keep in repair, lease and/or sell or exchange, as tenants in common, that certain real property together with all improvements located therein, commonly known Buddy's which is more fully described on Exhibit "A" attached hereto and by this reference incorporated herein (the "Property").

B.    It is the desire of IPO to acquire an undivided interest in the Property from CPO as is more fully described In Exhibit 'A'.

NOW, THEREFORE, in consideration of the foregoing Recitals and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Tenants to hereby agree as follows:

1.    <u>Formation of Tenancy</u>.  The Tenants hereby acknowledge their ownership to be a tenancy in common (the "Tenancy") and this Agreement shall govern the ownership and management of the Property.  The principal purpose of the Tenancy shall be to hold and maintain the Property as tenants in common for investment purposes.  The address of each Tenant for notice and all other purposes of this Agreement is set forth on the signature page hereof.  Except as expressly provided herein, no Tenant shall sell, assign, hypothecate or otherwise dispose of or encumber its interest or any part thereof in the Property without the prior written consent of the other Tenants.

2.    <u>Term</u>.  The Tenancy as governed hereby shall commence on the execution of this Agreement, and shall continue thereafter until dissolved or terminated pursuant to Sections 17 hereof.

3.    <u>Title to the Property</u>.  Contemporaneously with the execution hereof, IPO has acquired an undivided interest in the Property as set forth in Exhibit 'A', the ("IPO Interest"), and CPO retains an interest in the Property as is more fully described in Exhibit 'A' (the "CPO Ownership Interest"). The CPO Ownership Interest and the IPO Ownership Interest are hereinafter sometimes referred to as the "Ownership Interests" or an "Ownership Interest." Each Tenant agrees to be bound by the terms and conditions of this Agreement.

4.    <u>Ownership Rights of Tenants</u>.  Notwithstanding any statute or other rule of law and having previously been advised of their respective rights to bring an action for partition, the Tenants

**AGREEMENT AMONG TENANTS IN COMMON**                                **Page 1**

agree that during the term hereof the Tenants shall only have those rights in the Property as expressly provided herein and each Tenant hereby irrevocably waives any and all rights that it has (i) to occupy the Property or any portion thereof, or to exclude any other Tenant from the Property or any portion thereof, and (ii) to maintain any action for any partition of the Property, or otherwise force a sale of the Property during the term hereof, all except as expressly provided herein.

    5.    <u>Tenant Payment Obligations</u>.

       (a)    Each Tenant agrees to pay its Agreed Share (such Agreed Share determined as provided, below) of all costs and expenses involved in owning, operating, maintaining, leasing, selling or exchanging the Property, including, but not limited to, ad valorem taxes, insurance premiums, repairs, necessary improvements, contractual fees, professional fees, lease commissions and utility costs, debt service and other financing-related costs, and capital repairs and replacements and other capital expenditures at the Property (collectively, "Owner Costs"). To the extent that the income from the Property is insufficient to pay all Owner Costs in the ordinary course of business, each Tenant's Agreed Share of such Owner Costs shall be paid by each Tenant, upon demand, prior to the due date of all such costs and expenses and no later than ten (10) days prior to the date when such costs and expenses are due.

       For purposes of this Agreement, the Agreed Share of each Tenant shall be equal to his respective Ownership Interest in the Property. CPO, which shall be the Tenant managing the Tenancy, shall maintain a banking account or accounts at financial institutions on behalf of the Tenants and shall maintain reasonable reserves for future costs and expenses of the Property.

       (b)    If any Tenant fails promptly to contribute such Tenant's share of the Owner Costs ("Defaulting Tenant"), the other Tenants may pay the entire amount' of such Owner Costs and the amount not paid by the Defaulting Tenant shall be deemed a loan to the Defaulting Tenant (the "Tenant Loan" or "Tenant Loans"). All Tenant Loans shall be payable on demand, shall bear interest at the rate of eighteen percent (18%) per annum, and shall constitute a lien on the interest of the Defaulting Tenant in the Property, which lien shall be expressly subject and subordinate to any existing or future lien of any third party lender with a lien on the Property. Each Defaulting Tenant authorizes each other Tenant making a Tenant Loan to execute and record such documents as such Tenant deems necessary to further or better evidence such loan and lien.

       In the event a Tenant makes a loan or loans to the Defaulting Tenant ("Loaning Tenant") and any Tenant Loan remains unpaid for a thirty (30) day period after written notice is given to the Defaulting Tenant requesting payment, the Loaning Tenant may bring suit against the Defaulting Tenant for the amount of the Tenant Loans not paid plus all reasonable collection costs. All income from the sale and operation of the Property shall be paid to the Loaning Tenant until all Tenant Loans are paid in full.

**AGREEMENT AMONG TENANTS IN COMMON**           **Page 2**

6.    <u>Distribution of Net Profits From Operation, Financing, Refinancing, Exchange, Lease and Sale of the Property</u>.

(a)    All income derived from the operation of the Property in whatever form and however derived (less reasonable working capital and capital repairs and replacement reserves), shall be divided and paid when received as follows:

(i)    First, to each Tenant in an amount equal to such Tenant's Agreed Share of the Owner Costs, or, at CPO's option, to pay such Tenant's Agreed Share of such Owner Costs directly on its behalf,

(ii)    The IPO tenant shall receive the greater of (i) percentage interest of the net income of the Property as set forth in Exhibit 'A', or (ii) the annual pay rate paid on the originally invested amount set forth in Exhibit 'A' ("Originally Invested Amount") to be paid on a monthly basis,

(iii)    The IPO tenant shall also a receive a two percent (2%) annual accrual on the invested amount to be paid upon redemption of the IPO interest, and

(iv)    Thereafter, the CPO tenant shall receive the remaining available balance of the cash flow and distributions from all other distributable sources.

(b)    In the event of the financing, refinancing, exchange or lease of the Property, or in the event of a sale under Section 10 herein, the Net Profits, if any, from the sale, lease, financing, refinancing or exchange of the Property shall be divided between the Tenants when received in the same manner set forth in Section 6(a). The term "Net Profits" for the purpose of this paragraph shall mean the net proceeds from any financing, refinancing, exchange or lease (less all reasonable and bona fide financing, exchange or leasing costs) or the net sales price of the Property (gross sales price less all reasonable and bona fide selling expenses) less; (i) the outstanding unpaid indebtedness of all notes secured by loans on the Property at the time of such sale; (ii) the outstanding principal balance plus accrued but unpaid interest on any Tenant Loans, and (iii) all other reasonable and bona fide expenses incurred by the Tenancy in connection with the ownership, maintenance, financing, refinancing, exchange, lease or the sale of the Property, including any unpaid Owner Costs. Each Tenant shall receive its share of the Net Profits under this Section 6(b) in the form of any promissory note(s) or cash received from the leasing, financing, refinancing, exchange or sale.

7.    <u>Books and Records</u>. Proper and complete books of account of the Tenancy shall be kept by CPO (i.e., the Tenant managing the Tenancy) as an expense of the Tenancy and shall be open to inspection and copying by any Tenant or representatives of each Tenant at any reasonable time. The books and records of account shall be examined and reviewed as of the close of each calendar year by an accountant selected by CPO, and such accountant shall prepare an annual report thereof, copies of which will be furnished to each Tenant as soon, as possible after the conclusion of each calendar year. Each Tenant shall have the right to make a separate audit of the books and records of the Tenancy at such Tenant's own expense at any time and from time to time.

**AGREEMENT AMONG TENANTS IN COMMON**                    **Page 3**

8.    <u>Bank Accounts</u>.  All funds of the Tenancy shall be deposited by CPO in a bank or brokerage account or accounts in the name of the Tenancy and funds from said bank account or accounts shall be disbursed upon the signature of CPO in the ordinary course of business, and in accordance with the provisions of this Agreement, unless all Tenants direct otherwise. Tenancy funds shall be used only for Tenancy purposes.

9.    <u>Dissolution of a Tenant</u>. The dissolution of any Tenant shall not have the affect of terminating or dissolving the Tenancy.  Upon the dissolution of a Tenant, the shareholders, partners, members or other equity owners thereof shall succeed to its interest in this Tenancy and shall be bound by the terms and provisions of this Agreement; however, in the event that the interest of the dissolved Tenant passes to more than one person, then, and in that event, such persons shall, within ninety (90) days after dissolution of the Tenant, execute and deliver to the other Tenants a written instrument (including Power of Attorney) appointing one person as and to be the Agent for collecting, receiving and making all payments and contributions required hereunder, shall vote the entire interest of the successors, and shall perform all other obligations of such successors performable by reason of or arising from their interest in the Tenancy; and, any and all payments and/or disbursements due arising from the successors interest in the Tenancy shall be deemed to have been validly made to such successors by paying the same to such duly designated Agent.  In the event that said successors for any reason fail to designate such Agent in writing in the manner and within the time prescribed and continue to fail to cure such default after ten (10) days written notice from another Tenant to correct same, such other Tenant shall have the right to appoint such Agent.

10.    <u>Transfer of Tenant's Interest and Sale of Property</u>.

(a)    No Tenant may sell, transfer, convey, encumber or otherwise hypothecate the Property or its undivided interest in the Property without the written consent of the other Tenants, except as provided in Section 10(c) herein and Section 11 herein.

(b)    Any permitted transfer of a Tenant's Ownership Interest in the Property shall be subject to such transferee's written agreement to be bound by all of the terms and conditions of this Agreement; any transfer without such written assumption agreement shall be null and void.

(c)    CPO may, at any time, sell, finance, exchange or otherwise transfer or encumber all of the Property (including the other Ownership Interests) on such terms and conditions as CPO may, in CPO's sole discretion, determine, so long as such transaction is a bona fide transaction and all of the terms and conditions of such transaction are fully disclosed to all Tenants at the time such transaction is entered into.  If requested by CPO, all Tenants shall join in the conveyance of the Property and/or execute all documents necessary or desirable to close such transaction.

(d)    If the signature of a Tenant is required by a third party in connection with the transactions contemplated by Section 10(c), such Tenant agrees to execute and deliver such documents as such third party deems necessary or desirable to accomplish all of the foregoing.  If such Tenant fails to execute and deliver any such documents within ten (10) days following written notice from CPO, CPO is hereby authorized, and each Tenant grants to CPO an irrevocable power of attorney,

**AGREEMENT AMONG TENANTS IN COMMON**                                    **Page 4**

coupled with an interest, to execute and deliver any such documents by, in the name of and on behalf of such Tenant, which documents shall be binding upon such Tenant to the same extent as if such Tenant had personally executed and delivered the same.

(e)    A Tenant may not, without the prior written consent of CPO, which consent may be granted or withheld in the sole and absolute discretion of CPO, sell, transfer, convey, encumber or otherwise hypothecate all or any portion of the Property (including its Ownership Interest).

(f)    IPO Put Option ("Put Option") is available to IPO annually commencing on fifth anniversary of the agreement and extending to the full term of the Term of the Agreement. Put Option value to be determined based on the greater of the

(i)    the (a) amount of the original purchased interest (as set forth in Exhibit 'A'), plus (b) a two percent (2%) per year accrual on the amount of the original purchased interest, or

(ii)    the amount of the original purchased interest (as set forth in Exhibit 'A'), plus the net increase above the current agreed upon market Property value set forth in Exhibit 'A' times the IPO percentage ownership interest set forth in Exhibit 'A'; (unless otherwise agreed, to be appraised by an independent third party appraiser within 6 months of the Owner Put Option being exercised);

(iii)    however in no event will the IPO Put Option be less than the redemption of original purchased interest plus the two percent (2%) annual accrual during the outstanding period of the interest held by IPO.

(g)    CPO Call Option ("Call Option") is available to CPO annually commencing on the third annual anniversary of the agreement and extending to the full term of the Agreement. Call Option value to be determined based on the greater of the

(i)    (a) amount of the original purchased interest(as set forth in Exhibit 'A'), plus (b) a two percent (2%) per year accrual of the original purchased interest, or

(ii)    the amount of the original purchased interest (as set forth in Exhibit 'A'), plus net increase above the current agreed upon market Property value as set forth in Exhibit 'A' times the IPO percentage ownership interest set forth in Exhibit 'A'; (unless otherwise agreed, to be appraised by an independent third party appraiser within 6 months of the Owner Put Option being exercised);

(iii)    however in no event will the CPO Call Option be less than the redemption of original purchased interest plus the two percent (2%) annual accrual during the outstanding period of the interest held by IPO.

**AGREEMENT AMONG TENANTS IN COMMON**                               **Page 5**

11.    <u>Management, Financing, and Leasing</u>.  It is the objective of the Tenants to maximize the market value of the Property by operating, leasing, financing, and/or sale of the Property.

(a)    The Tenants irrevocably authorize CPO, or any management company or management agent appointed by CPO, (i) to operate, manage and lease all or any portion of the Property upon such terms and conditions as CPO may determine necessary or advisable in its absolute and sole discretion; (ii) to pay from any revenues derived from operation of the Property, on or before the date due, all installments of principal and/or interest on all debts secured by a lien on the Property, (iii) to execute any and all documents necessary to manage and lease all or any portion of the Property as permitted herein, without the necessity of any other Tenant joining in the execution thereof including without limitation the sale, refinance merger or other material event.

(b)    If the signature of a Tenant is required by a third party, each Tenant agrees to execute and deliver such documents as such third party deems necessary or desirable to accomplish all of the foregoing and such management or lease of the Property.  If a Tenant fails to execute and deliver any such documents within ten (10) days following written notice from CPO, CPO is hereby authorized, and each Tenant grants to CPO an irrevocable power of attorney, coupled with an interest, to execute and deliver any such documents by, in the name of and on behalf of such Tenant, which documents shall be binding upon such Tenant to the same extent as if such Tenant had personally executed and delivered the same.

(c)    If third party management is not obtained for the Property by CPO, in its sole and absolute discretion, CPO may appoint itself or any affiliate as manager of the Tenancy and the Property.  For such services, CPO shall receive a management fee equal to eight percent (8%) of the gross revenues from the Property plus reasonable out of pocket costs, payable monthly following payment of debt service and all other Owner Costs then due.

(d)    Notwithstanding anything contained in this Section 11 to the contrary:

(i)    CPO may exercise the rights provided to CPO in Section 10(c) of this Agreement, without the written approval of any other Tenant, notwithstanding any statute or other law to the contrary.

(ii)    Any note, deed of trust, or loan documents executed in connection with a financing or refinancing of all or any portion of the Property shall not personally obligate a Tenant for the repayment of the principal or interest thereof without the written consent of such Tenant.

(iii)    No litigation shall be brought by or on behalf of a Tenant against a third party involving the Property without the written consent of CPO.

(iv)    By unanimous vote of the Tenants,  CPO may be removed as manager of the Tenancy or the Property only upon a judicial determination, in a final, unappealable

**AGREEMENT AMONG TENANTS IN COMMON**                                          **Page 6**

judgment of a court of appropriate jurisdiction, of fraud or gross negligence on the part of CPO in connection with the management and operation of the Property.

12.    <u>Conditional Option to Purchase at Selling Tenant's Adjusted Basis.</u>

(a)    <u>Option to Purchase at Selling Tenant's Adjusted Basis.</u>  In the event that (i) any Tenant shall pledge, hypothecate or use as security for any loan or obligation, his interest in the Property or any portion thereof, and a default shall occur with respect to such loan or obligation resulting in the interest of such Tenant (or a portion thereof) being subject to levy or sale; or (ii) any Tenant shall make an assignment for the benefit of creditors or similar arrangement, or any proceeding shall be commenced by or against any Tenant under any bankruptcy, reorganization or other similar laws for the relief of debtors, or the property of a Tenant becomes subject to seizure or sale by reason of a judgment having been taken against him or it, or (iii) any Tenant shall fail to remove any lien or security interest on all or any portion of his interest in the Property within ten (10) days following written notice from any other Tenant, so that a third party lender may obtain a first lien on the Property with priority over such lien or security interest in connection with any financing or re-financing of the Property; then, in any of such events, the Ownership Interest of such Tenant (herein the "Selling Tenant") shall automatically be offered for sale to each other Tenant (herein the "Purchasing Tenant") in accordance with (b) and (c) below, upon notice of such event to each Tenant.

(b)    <u>Option Exercise Procedures.</u>  In the event that the Ownership Interest of a Tenant shall be offered for sale to the other Tenants pursuant to section (a) above, then the Purchasing Tenant(s) shall have the option, exercisable within nintey (90) days of receipt of notice thereof from the Selling Tenant, to purchase the complete Ownership Interest of the Selling Tenant, which purchase shall be, if more than one Purchasing Tenant exercises such option, pro rata in accordance with their respective Ownership Interests in the Property.

(c)    <u>Purchase Price.</u>  The purchase price for the interest of a Tenant to be sold pursuant to (a) shall be said Tenant's adjusted basis in the property after taking into consideration that Tenant's historical cost, return of capital, if any, with appropriate adjustments and allocations for all items of income or, expense accruing prior to the closing date.  All closing costs associated with such sale shall be borne by the Selling Tenant.  The purchase price shall be paid 100% in cash at closing, which is to occur within nintey (90) days of the Purchasing Tenant's receipt of notice from the Selling Tenant.

13.    <u>NEGATION OF PARTNERSHIP; LIABILITY SEVERAL.</u>  NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR CONSTRUED TO CREATE A PARTNERSHIP, JOINT VENTURE OR ASSOCIATION AMONG ANY OF THE PARTIES HERETO.  THE LIABILITY OF THE TENANTS UNDER THIS AGREEMENT SHALL BE SEVERAL, NOT JOINT AND SEVERAL, LIMITED AS TO EACH, TO ITS RESPECTIVE OWNERSHIP INTEREST.

14.    <u>Events of Default.</u>  If any of the following events shall occur and shall not be cured within the time period set forth in Section 14 after written notice thereof to the Tenant committing

**AGREEMENT AMONG TENANTS IN COMMON**                                          **Page 7**

such acts, such Tenant committing such act shall be deemed to have committed an Event of Default (herein so called):

    (a)    A Tenant shall file a voluntary petition in bankruptcy or shall be adjudicated a bankrupt or insolvent, or shall file any petition or answer seeking any reorganization, arrangement, composition, readjustment liquidation, dissolution or similar relief for itself under any applicable federal state or other statute or law relative to bankruptcy, insolvency or other relief for debtors, or the appointment of any trustee, receiver, conservator or liquidator of said Party or of any part of its properties or interest in the Note or the Property, or

    (b)    A Tenant shall admit in writing its inability to pay its debts as they mature; or

    (c)    A Tenant shall make an assignment for the benefit of creditors or take any other similar action for the protection or benefit of creditors; or

    (d)    A Tenant fails to make any payment required hereunder on a timely basis;

    (e)    A Tenant shall fail to perform its covenants or obligations contained herein; or

    (f)    A Tenant shall fail to perform its covenants or obligations contained in any agreement secured by a lien on the Property.

In addition to all other rights of CPO, if any other Tenant commits an uncured Event of Default, CPO may require such Tenant to convey its Ownership Interest in the Property in consideration for the payment to such Tenant of an amount equal to such Tenant's direct cost of acquiring his Ownership Interest from CPO, less such Tenant's closing costs incurred in connection with its acquisition of such Ownership Interest.

15.    <u>Notice of Default and Cure</u>.  In the event of an Event of Default, the remedies provided for in Section 14 shall apply only if said Event of Default is not timely cured.  If a Tenant believes another Tenant is in default hereunder, such Tenant shall give the defaulting Tenant written notice setting forth such default and the defaulting Tenant shall have thirty (30) days after the receipt of such notice to cure such default.  In the event such default is not cured during such thirty (30) day period, such defaulting Tenant shall be deemed to have committed such Event of Default and the other Tenant may enforce such Tenant's rights and remedies contained herein and at law.

Each Tenant (the "Indemnifying Tenant") agrees to indemnify the other Tenants for any loss, damage or claim arising from any uncured Event of Default of the Indemnifying Tenant.

16.    <u>Election to be Excluded from Provisions of Subchapter K</u>.  Each Tenant hereby elects to be excluded from all of the provisions of Subchapter K of Chapter I of the Internal Revenue Code of 1986, as amended (the "Code").  The exclusion elected by each Tenant hereunder shall commence with the execution of this Agreement.  Each Tenant hereby covenants and agrees that each Tenant shall abide by all regulatory requirements in order to maintain such election and shall report on such

**AGREEMENT AMONG TENANTS IN COMMON**           **Page 8**

Tenant's income tax return such respective share of items of income, deduction and credit which results from holding of the Property, in a manner consistent with the exclusion of the Tenancy from Subchapter K of Chapter I of the Code, commencing with the first taxable year of the Tenancy. No Tenant shall notify the Commissioner of Internal Revenue (the "Commissioner") that such Tenant desires that Subchapter K of the Code apply to the Tenancy and each Tenant hereby agrees to indemnity and hold each other Tenant free and harmless from all cost, liability, tax consequence and expense, including attorneys' fees, which results from any Tenant so notifying the Commissioner.

17.    Dissolution.  The Tenancy, as governed hereby, shall be immediately dissolved upon the happening of any of the following events:

(i)    The sale or other disposition by the Tenants of all of the Property; or

(ii)    The decision of the Tenants that the Tenancy be dissolved; or

(iii)    Ten (10) years after the date hereof, absent prior extension of the term of the Tenancy (for one or more years) by written notice from CPO to the other Tenants, at CPO's option in its sole and absolute discretion.

18.    Notices.  All notices under this Agreement must be in writing and shall be deemed to have been duly given if delivered personally or by certified mail, return receipt requested, to the addresses set forth on the signature page hereof.

19.    Amendment; Additional Tenants.  This Agreement may be amended only by written agreement signed by all Tenants; provided, however, that CPO may sell additional undivided interests in the Property (from the CPO Ownership Interest) to third parties, in which case such other third party(ies) may be added to this Agreement by CPO as additional Tenants, with the same rights and obligations hereunder as are applicable to IPO and the IPO Ownership Interest, to the extent of the undivided interest in the Property constituting the Ownership Interest of such third party(ies) in the Property.  In such event, the Ownership Interests of CPO hereunder shall be reduced pro rata, such that the aggregate Ownership Interests of the Tenants following such sale(s) of undivided interests in the CPO Ownership Interest shall continue to equal one hundred (100%).

20.    Counterparts.  This Agreement may be executed in counterparts each of which shall be deemed to be an original, but such counterparts, when taken together, shall constitute but one agreement.

21.    Gender.  All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine or neuter, singular or plural, as the identity of the person, persons, entity or entities may require.

22.    Caption Headings.  Captions at the beginning of each numbered Section of this Agreement are solely for the convenience of the parties and shall not be deemed part of the context of this Agreement.

**AGREEMENT AMONG TENANTS IN COMMON**                                      **Page 9**

23.   <u>Negotiated Transaction</u>.  The provisions of this Agreement were negotiated by all of the parties hereto and said Agreement shall be deemed to have been drafted by all of the parties thereto.

24.   <u>Further Assurances</u>.  Each Tenant hereby agrees to promptly sign any additional instruments or documents which are necessary or appropriate to carry out the purpose of this Agreement.

25.   <u>Interpretation</u>.  It is the intent of the Tenants to own the Property for investment purposes, only and not for the conduct of a business, and to otherwise comply with all statutes and regulations allowing an election to be excluded from Subchapter K of the Code and this Agreement shall be interpreted to conform to such intent.

26.   <u>Litigation</u>.  In the event of any litigation between the parties hereto, the prevailing party in such litigation shall be paid all attorneys' fees, court costs and litigation expenses incurred in such litigation by the non-prevailing party.  The parties hereto agree that specific performance is an appropriate remedy for the enforcement of the rights of the Tenants hereunder concerning a sale of the Property and the obligations of the parties hereunder.

27.   <u>Recording</u>.  A memorandum of this Agreement may be recorded by CPO and the other Tenants agree to cooperate and facilitate such recording.

[SIGNATURE PAGE FOLLOWS]

**AGREEMENT AMONG TENANTS IN COMMON**                    **Page 10**

## EXHIBIT A

### The Property

An undivided Six point Zero Three percent (6.03%) interest in

Lots 18 and 19 of Block 24, The original town of Seminole
218 N. Main Street, Seminole, Oklahoma

**Buyer:**
i.  Ownership Interest Percentage: Six point Zero Three percent (6.03%)

**Buyer:**
Purchase Price of Ownership Interest (Originally Invested Amount): $48,941.79

**Seller Ownership Interest:**
Seventy Three point One Nine percent (76.51%)

Agreed Upon Current Value of the Property: $1,178,275.

**AGREEMENT AMONG TENANTS IN COMMON**                    **Page 12**
DALLAS1 1068268v3 51997-00001

EXECUTED effective as of February 1, 2022(the "Effective Date").

MacDonald Capital Corporation (a Texas corporation)

By: _____
    Name: Wm. Ian MacDonald
    Title: President

Date: Agreed to as of the "Effective Date" set forth above

Address:  400 East Centre Park Blvd., Suite 101
          DeSoto, Texas 75115
Facsimile: 972-283-0193

**RONALD H. BERG**

By: _____
    **Individually**

Date: Agreed to as of the "Effective Date" set forth above
Address:  20 Canyon Ridge,
          Irvine, CA  92603
Phone Number: (714) 402-2374
Facsimile: _____

**AGREEMENT AMONG TENANTS IN COMMON**                    Page 11

# EXHIBIT B-2

### Seminole TIC - Heath

## AGREEMENT AMONG TENANTS IN COMMON
### Seminole, OK

**THIS AGREEMENT AMONG TENANTS IN COMMON** ("Agreement") is made and entered into initially by and between **MacDonald Capital Corporation** (a Texas corporation) and Current Property Owner ("CPO") and **Donald P. Heath and Joanne O. Heath, Husband and Wife as Joint Tenants**, in Irvine, California as the Incoming Property Owner ("IPO"), being sometimes referred to singularly as "Tenant" or collectively as the "Tenants".

### RECITALS

A.    It is the desire of the Tenants to hold, operate, maintain, finance, keep in repair, lease and/or sell or exchange, as tenants in common, that certain real property together with all improvements located therein, commonly known Buddy's which is more fully described on Exhibit "A" attached hereto and by this reference incorporated herein (the "Property").

B.    It is the desire of IPO to acquire an undivided interest in the Property from CPO as is more fully described In Exhibit 'A'.

NOW, THEREFORE, in consideration of the foregoing Recitals and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Tenants to hereby agree as follows:

1.    <u>Formation of Tenancy</u>.  The Tenants hereby acknowledge their ownership to be a tenancy in common (the "Tenancy") and this Agreement shall govern the ownership and management of the Property.  The principal purpose of the Tenancy shall be to hold and maintain the Property as tenants in common for investment purposes.  The address of each Tenant for notice and all other purposes of this Agreement is set forth on the signature page hereof.  Except as expressly provided herein, no Tenant shall sell, assign, hypothecate or otherwise dispose of or encumber its interest or any part thereof in the Property without the prior written consent of the other Tenants.

2.    <u>Term</u>.  The Tenancy as governed hereby shall commence on the execution of this Agreement, and shall continue thereafter until dissolved or terminated pursuant to Sections 17 hereof.

3.    <u>Title to the Property</u>.  Contemporaneously with the execution hereof, IPO has acquired an undivided interest in the Property as set forth in Exhibit 'A', the ("IPO Interest"), and CPO retains an interest in the Property as is more fully described in Exhibit 'A' (the "CPO Ownership Interest").  The CPO Ownership Interest and the IPO Ownership Interest are hereinafter sometimes referred to as the "Ownership Interests" or an "Ownership Interest."  Each Tenant agrees to be bound by the terms and conditions of this Agreement.

**AGREEMENT AMONG TENANTS IN COMMON**                                    Page 1

4.    <u>Ownership Rights of Tenants</u>.  Notwithstanding any statute or other rule of law and having previously been advised of their respective rights to bring an action for partition, the Tenants agree that during the term hereof the Tenants shall only have those rights in the Property as expressly provided herein and each Tenant hereby irrevocably waives any and all rights that it has (i) to occupy the Property or any portion thereof, or to exclude any other Tenant from the Property or any portion thereof, and (ii) to maintain any action for any partition of the Property, or otherwise force a sale of the Property during the term hereof, all except as expressly provided herein.

5.    <u>Tenant Payment Obligations</u>.

(a)    Each Tenant agrees to pay its Agreed Share (such Agreed Share determined as provided, below) of all costs and expenses involved in owning, operating, maintaining, leasing, selling or exchanging the Property, including, but not limited to, ad valorem taxes, insurance premiums, repairs, necessary improvements, contractual fees, professional fees, lease commissions and utility costs, debt service and other financing-related costs, and capital repairs and replacements and other capital expenditures at the Property (collectively, "Owner Costs").  To the extent that the income from the Property is insufficient to pay all Owner Costs in the ordinary course of business, each Tenant's Agreed Share of such Owner Costs shall be paid by each Tenant, upon demand, prior to the due date of all such costs and expenses and no later than ten (10) days prior to the date when such costs and expenses are due.

For purposes of this Agreement, the Agreed Share of each Tenant shall be equal to his respective Ownership Interest in the Property.  CPO, which shall be the Tenant managing the Tenancy, shall maintain a banking account or accounts at financial institutions on behalf of the Tenants and shall maintain reasonable reserves for future costs and expenses of the Property.

(b)    If any Tenant fails promptly to contribute such Tenant's share of the Owner Costs ("Defaulting Tenant"), the other Tenants may pay the entire amount of such Owner Costs and the amount not paid by the Defaulting Tenant shall be deemed a loan to the Defaulting Tenant (the "Tenant Loan" or "Tenant Loans").  All Tenant Loans shall be payable on demand, shall bear interest at the rate of eighteen percent (18%) per annum, and shall constitute a lien on the interest of the Defaulting Tenant in the Property, which lien shall be expressly subject and subordinate to any existing or future lien of any third party lender with a lien on the Property.  Each Defaulting Tenant authorizes each other Tenant making a Tenant Loan to execute and record such documents as such Tenant deems necessary to further or better evidence such loan and lien.

In the event a Tenant makes a loan or loans to the Defaulting Tenant ("Loaning Tenant") and any Tenant Loan remains unpaid for a thirty (30) day period after written notice is given to the Defaulting Tenant requesting payment, the Loaning Tenant may bring suit against the Defaulting Tenant for the amount of the Tenant Loans not paid plus all reasonable collection costs.  All income from the sale and operation of the Property shall be paid to the Loaning Tenant until all Tenant Loans are paid in full.

**AGREEMENT AMONG TENANTS IN COMMON**                                    **Page 2**

6.     Distribution of Net Profits From Operation, Financing, Refinancing, Exchange, Lease and Sale of the Property.

(a)     All income derived from the operation of the Property in whatever form and however derived (less reasonable working capital and capital repairs and replacement reserves), shall be divided and paid when received as follows:

(i)     First, to each Tenant in an amount equal to such Tenant's Agreed Share of the Owner Costs, or, at CPO's option, to pay such Tenant's Agreed Share of such Owner Costs directly on its behalf,

(ii)     The IPO tenant shall receive the greater of (i) percentage interest of the net income of the Property as set forth in Exhibit 'A', or (ii) the annual pay rate paid on the originally invested amount set forth in Exhibit 'A' ("Originally Invested Amount") to be paid on a monthly basis,

(iii)     The IPO tenant shall also a receive a two percent (2%) annual accrual on the invested amount to be paid upon redemption of the IPO interest, and

(iv)     Thereafter, the CPO tenant shall receive the remaining available balance of the cash flow and distributions from all other distributable sources.

(b)     In the event of the financing, refinancing, exchange or lease of the Property, or in the event of a sale under Section 10 herein, the Net Profits, if any, from the sale, lease, financing, refinancing or exchange of the Property shall be divided between the Tenants when received in the same manner set forth in Section 6(a). The term "Net Profits" for the purpose of this paragraph shall mean the net proceeds from any financing, refinancing, exchange or lease (less all reasonable and bona fide financing, exchange or leasing costs) or the net sales price of the Property (gross sales price less all reasonable and bona fide selling expenses) less; (i) the outstanding unpaid indebtedness of all notes secured by loans on the Property at the time of such sale; (ii) the outstanding principal balance plus accrued but unpaid interest on any Tenant Loans, and (iii) all other reasonable and bona fide expenses incurred by the Tenancy in connection with the ownership, maintenance, financing, refinancing, exchange, lease or the sale of the Property, including any unpaid Owner Costs. Each Tenant shall receive its share of the Net Profits under this Section 6(b) in the form of any promissory note(s) or cash received from the leasing, financing, refinancing, exchange or sale.

7.     Books and Records.  Proper and complete books of account of the Tenancy shall be kept by CPO (i.e., the Tenant managing the Tenancy) as an expense of the Tenancy and shall be open to inspection and copying by any Tenant or representatives of each Tenant at any reasonable time. The books and records of account shall be examined and reviewed as of the close of each calendar year by an accountant selected by CPO, and such accountant shall prepare an annual report thereof, copies of which will be furnished to each Tenant as soon, as possible after the conclusion of each calendar year. Each Tenant shall have the right to make a separate audit of the books and records of the Tenancy at such Tenant's own expense at any time and from time to time.

**AGREEMENT AMONG TENANTS IN COMMON**                                    **Page 3**

8.    Bank Accounts.  All funds of the Tenancy shall be deposited by CPO in a bank or brokerage account or accounts in the name of the Tenancy and funds from said bank account or accounts shall be disbursed upon the signature of CPO in the ordinary course of business, and in accordance with the provisions of this Agreement, unless all Tenants direct otherwise.  Tenancy funds shall be used only for Tenancy purposes.

9.    Dissolution of a Tenant.  The dissolution of any Tenant shall not have the affect of terminating or dissolving the Tenancy.  Upon the dissolution of a Tenant, the shareholders, partners, members or other equity owners thereof shall succeed to its interest in this Tenancy and shall be bound by the terms and provisions of this Agreement; however, in the event that the interest of the dissolved Tenant passes to more than one person, then, and in that event, such persons shall, within ninety (90) days after dissolution of the Tenant, execute and deliver to the other Tenants a written instrument (including Power of Attorney) appointing one person as and to be the Agent for collecting, receiving and making all payments and contributions required hereunder, shall vote the entire interest of the successors, and shall perform all other obligations of such successors performable by reason of or arising from their interest in the Tenancy; and, any and all payments and/or disbursements due arising from the successors interest in the Tenancy shall be deemed to have been validly made to such successors by paying the same to such duly designated Agent.  In the event that said successors for any reason fail to designate such Agent in writing in the manner and within the time prescribed and continue to fail to cure such default after ten (10) days written notice from another Tenant to correct same, such other Tenant shall have the right to appoint such Agent.

10.    Transfer of Tenant's Interest and Sale of Property.

(a)    No Tenant may sell, transfer, convey, encumber or otherwise hypothecate the Property or its undivided interest in the Property without the written consent of the other Tenants, except as provided in Section 10(c) herein and Section 11 herein.

(b)    Any permitted transfer of a Tenant's Ownership Interest in the Property shall be subject to such transferee's written agreement to be bound by all of the terms and conditions of this Agreement; any transfer without such written assumption agreement shall be null and void.

(c)    CPO may, at any time, sell, finance, exchange or otherwise transfer or encumber all of the Property (including the other Ownership Interests) on such terms and conditions as CPO may, in CPO's sole discretion, determine, so long as such transaction is a bona fide transaction and all of the terms and conditions of such transaction are fully disclosed to all Tenants at the time such transaction is entered into.  If requested by CPO, all Tenants shall join in the conveyance of the Property and/or execute all documents necessary or desirable to close such transaction.

(d)    If the signature of a Tenant is required by a third party in connection with the transactions contemplated by Section 10(c), such Tenant agrees to execute and deliver such documents as such third party deems necessary or desirable to accomplish all of the foregoing.  If such Tenant fails to execute and deliver any such documents within ten (10) days following written notice from CPO, CPO is hereby authorized, and each Tenant grants to CPO an irrevocable power of attorney,

**AGREEMENT AMONG TENANTS IN COMMON**                                    **Page 4**

coupled with an interest, to execute and deliver any such documents by, in the name of and on behalf of such Tenant, which documents shall be binding upon such Tenant to the same extent as if such Tenant had personally executed and delivered the same.

      (e)    A Tenant may not, without the prior written consent of CPO, which consent may be granted or withheld in the sole and absolute discretion of CPO, sell, transfer, convey, encumber or otherwise hypothecate all or any portion of the Property (including its Ownership Interest).

      (f)    IPO Put Option ("Put Option") is available to IPO annually commencing on fifth anniversary of the agreement and extending to the full term of the Term of the Agreement.
          Put Option value to be determined based on the greater of the

      (i)    the (a) amount of the original purchased interest (as set forth in Exhibit 'A'), plus (b) a two percent (2%) per year accrual on the amount of the original purchased interest, or

      (ii)    the amount of the original purchased interest (as set forth in Exhibit 'A'), plus the net increase above the current agreed upon market Property value set forth in Exhibit 'A' times the IPO percentage ownership interest set forth in Exhibit 'A'; (unless otherwise agreed, to be appraised by an independent third party appraiser within 6 months of the Owner Put Option being exercised);

      (iii)    however in no event will the IPO Put Option be less than the redemption of original purchased interest plus the two percent (2%) annual accrual during the outstanding period of the interest held by IPO.

      (g)    CPO Call Option ("Call Option") is available to CPO annually commencing on the third annual anniversary of the agreement and extending to the full term of the Agreement.
          Call Option value to be determined based on the greater of the

      (i)    (a) amount of the original purchased interest(as set forth in Exhibit 'A'), plus (b) a two percent (2%) per year accrual of the original purchased interest, or

      (ii)    the amount of the original purchased interest (as set forth in Exhibit 'A'), plus net increase above the current agreed upon market Property value as set forth in Exhibit 'A'times the IPO percentage ownership interest set forth in Exhibit 'A'; (unless otherwise agreed, to be appraised by an independent third party appraiser within 6 months of the Owner Put Option being exercised);

      (iii)    however in no event will the CPO Call Option be less than the redemption of original purchased interest plus the two percent (2%) annual accrual during the outstanding period of the interest held by IPO.

**AGREEMENT AMONG TENANTS IN COMMON**          **Page 5**

11.    <u>Management, Financing, and Leasing</u>.  It is the objective of the Tenants to maximize the market value of the Property by operating, leasing, financing, and/or sale of the Property.

(a)    The Tenants irrevocably authorize CPO, or any management company or management agent appointed by CPO, (i) to operate, manage and lease all or any portion of the Property upon such terms and conditions as CPO may determine necessary or advisable in its absolute and sole discretion; (ii) to pay from any revenues derived from operation of the Property, on or before the date due, all installments of principal and/or interest on all debts secured by a lien on the Property, (iii) to execute any and all documents necessary to manage and lease all or any portion of the Property as permitted herein, without the necessity of any other Tenant joining in the execution thereof including without limitation the sale, refinance merger or other material event.

(b)    If the signature of a Tenant is required by a third party, each Tenant agrees to execute and deliver such documents as such third party deems necessary or desirable to accomplish all of the foregoing and such management or lease of the Property.  If a Tenant fails to execute and deliver any such documents within ten (10) days following written notice from CPO, CPO is hereby authorized, and each Tenant grants to CPO an irrevocable power of attorney, coupled with an interest, to execute and deliver any such documents by, in the name of and on behalf of such Tenant, which documents shall be binding upon such Tenant to the same extent as if such Tenant had personally executed and delivered the same.

(c)    If third party management is not obtained for the Property by CPO, in its sole and absolute discretion, CPO may appoint itself or any affiliate as manager of the Tenancy and the Property.  For such services, CPO shall receive a management fee equal to eight percent (8%) of the gross revenues from the Property plus reasonable out of pocket costs, payable monthly following payment of debt service and all other Owner Costs then due.

(d)    Notwithstanding anything contained in this Section 11 to the contrary:

(i)    CPO may exercise the rights provided to CPO in Section 10(c) of this Agreement, without the written approval of any other Tenant, notwithstanding any statute or other law to the contrary.

(ii)    Any note, deed of trust, or loan documents executed in connection with a financing or refinancing of all or any portion of the Property shall not personally obligate a Tenant for the repayment of the principal or interest thereof without the written consent of such Tenant.

(iii)    No litigation shall be brought by or on behalf of a Tenant against a third party involving the Property without the written consent of CPO.

(iv)    By unanimous vote of the Tenants, CPO may be removed as manager of the Tenancy or the Property only upon a judicial determination, in a final, unappealable

**AGREEMENT AMONG TENANTS IN COMMON**                                    Page 6

judgment of a court of appropriate jurisdiction, of fraud or gross negligence on the part of CPO in connection with the management and operation of the Property.

12.    Conditional Option to Purchase at Selling Tenant's Adjusted Basis.

(a)    Option to Purchase at Selling Tenant's Adjusted Basis.  In the event that (i) any Tenant shall pledge, hypothecate or use as security for any loan or obligation, his interest in the Property or any portion thereof, and a default shall occur with respect to such loan or obligation resulting in the interest of such Tenant (or a portion thereof) being subject to levy or sale; or (ii) any Tenant shall make an assignment for the benefit of creditors or similar arrangement, or any proceeding shall be commenced by or against any Tenant under any bankruptcy, reorganization or other similar laws for the relief of debtors, or the property of a Tenant becomes subject to seizure or sale by reason of a judgment having been taken against him or it, or (iii) any Tenant shall fail to remove any lien or security interest on all or any portion of his interest in the Property within ten (10) days following written notice from any other Tenant, so that a third party lender may obtain a first lien on the Property with priority over such lien or security interest in connection with any financing or re-financing of the Property; then, in any of such events, the Ownership Interest of such Tenant (herein the "Selling Tenant") shall automatically be offered for sale to each other Tenant (herein the "Purchasing Tenant") in accordance with (b) and (c) below, upon notice of such event to each Tenant.

(b)    Option Exercise Procedures.  In the event that the Ownership Interest of a Tenant shall be offered for sale to the other Tenants pursuant to section (a) above, then the Purchasing Tenant(s) shall have the option, exercisable within ninety (90) days of receipt of notice thereof from the Selling Tenant, to purchase the complete Ownership Interest of the Selling Tenant, which purchase shall be, if more than one Purchasing Tenant exercises such option, pro rata in accordance with their respective Ownership Interests in the Property.

(c)    Purchase Price.  The purchase price for the interest of a Tenant to be sold pursuant to (a) shall be said Tenant's adjusted basis in the property after taking into consideration that Tenant's historical cost, return of capital, if any, with appropriate adjustments and allocations for all items of income or, expense accruing prior to the closing date.  All closing costs associated with such sale shall be borne by the Selling Tenant.  The purchase price shall be paid 100% in cash at closing, which is to occur within ninety (90) days of the Purchasing Tenant's receipt of notice from the Selling Tenant.

13.    NEGATION OF PARTNERSHIP; LIABILITY SEVERAL.  NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR CONSTRUED TO CREATE A PARTNERSHIP, JOINT VENTURE OR ASSOCIATION AMONG ANY OF THE PARTIES HERETO.  THE LIABILITY OF THE TENANTS UNDER THIS AGREEMENT SHALL BE SEVERAL, NOT JOINT AND SEVERAL, LIMITED AS TO EACH, TO ITS RESPECTIVE OWNERSHIP INTEREST.

14.    Events of Default.  If any of the following events shall occur and shall not be cured within the time period set forth in Section 14 after written notice thereof to the Tenant committing

**AGREEMENT AMONG TENANTS IN COMMON**                                     Page 7

such acts, such Tenant committing such act shall be deemed to have committed an Event of Default (herein so called):

(a)    A Tenant shall file a voluntary petition in bankruptcy or shall be adjudicated a bankrupt or insolvent, or shall file any petition or answer seeking any reorganization, arrangement, composition, readjustment liquidation, dissolution or similar relief for itself under any applicable federal state or other statute or law relative to bankruptcy, insolvency or other relief for debtors, or the appointment of any trustee, receiver, conservator or liquidator of said Party or of any part of its properties or interest in the Note or the Property, or

(b)    A Tenant shall admit in writing its inability to pay its debts as they mature; or

(c)    A Tenant shall make an assignment for the benefit of creditors or take any other similar action for the protection or benefit of creditors; or

(d)    A Tenant fails to make any payment required hereunder on a timely basis;

(e)    A Tenant shall fail to perform its covenants or obligations contained herein; or

(f)    A Tenant shall fail to perform its covenants or obligations contained in any agreement secured by a lien on the Property.

In addition to all other rights of CPO, if any other Tenant commits an uncured Event of Default, CPO may require such Tenant to convey its Ownership Interest in the Property in consideration for the payment to such Tenant of an amount equal to such Tenant's direct cost of acquiring his Ownership Interest from CPO, less such Tenant's closing costs incurred in connection with its acquisition of such Ownership Interest.

15.    <u>Notice of Default and Cure</u>.  In the event of an Event of Default, the remedies provided for in Section 14 shall apply only if said Event of Default is not timely cured.  If a Tenant believes another Tenant is in default hereunder, such Tenant shall give the defaulting Tenant written notice setting forth such default and the defaulting Tenant shall have thirty (30) days after the receipt of such notice to cure such default.  In the event such default is not cured during such thirty (30) day period, such defaulting Tenant shall be deemed to have committed such Event of Default and the other Tenant may enforce such Tenant's rights and remedies contained herein and at law.

Each Tenant (the "Indemnifying Tenant") agrees to indemnify the other Tenants for any loss, damage or claim arising from any uncured Event of Default of the Indemnifying Tenant.

16.    <u>Election to be Excluded from Provisions of Subchapter K</u>.  Each Tenant hereby elects to be excluded from all of the provisions of Subchapter K of Chapter I of the Internal Revenue Code of 1986, as amended (the "Code").  The exclusion elected by each Tenant hereunder shall commence with the execution of this Agreement.  Each Tenant hereby covenants and agrees that each Tenant shall abide by all regulatory requirements in order to maintain such election and shall report on such

**AGREEMENT AMONG TENANTS IN COMMON**                                      **Page 8**

Tenant's income tax return such respective share of items of income, deduction and credit which results from holding of the Property, in a manner consistent with the exclusion of the Tenancy from Subchapter K of Chapter I of the Code, commencing with the first taxable year of the Tenancy. No Tenant shall notify the Commissioner of Internal Revenue (the "Commissioner") that such Tenant desires that Subchapter K of the Code apply to the Tenancy and each Tenant hereby agrees to indemnity and hold each other Tenant free and harmless from all cost, liability, tax consequence and expense, including attorneys' fees, which results from any Tenant so notifying the Commissioner.

17.    <u>Dissolution</u>.  The Tenancy, as governed hereby, shall be immediately dissolved upon the happening of any of the following events:

       (i)    The sale or other disposition by the Tenants of all of the Property; or

      (ii)    The decision of the Tenants that the Tenancy be dissolved; or

     (iii)    Ten (10) years after the date hereof, absent prior extension of the term of the Tenancy (for one or more years) by written notice from CPO to the other Tenants, at CPO's option in its sole and absolute discretion.

18.    <u>Notices</u>.  All notices under this Agreement must be in writing and shall be deemed to have been duly given if delivered personally or by certified mail, return receipt requested, to the addresses set forth on the signature page hereof.

19.    <u>Amendment; Additional Tenants</u>.  This Agreement may be amended only by written agreement signed by all Tenants; provided, however, that CPO may sell additional undivided interests in the Property (from the CPO Ownership Interest) to third parties, in which case such other third party(ies) may be added to this Agreement by CPO as additional Tenants, with the same rights and obligations hereunder as are applicable to IPO and the IPO Ownership Interest, to the extent of the undivided interest in the Property constituting the Ownership Interest of such third party(ies) in the Property. In such event, the Ownership Interests of CPO hereunder shall be reduced pro rata, such that the aggregate Ownership Interests of the Tenants following such sale(s) of undivided interests in the CPO Ownership Interest shall continue to equal one hundred (100%).

20.    <u>Counterparts</u>.  This Agreement may be executed in counterparts each of which shall be deemed to be an original, but such counterparts, when taken together, shall constitute but one agreement.

21.    <u>Gender</u>.  All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine or neuter, singular or plural, as the identity of the person, persons, entity or entities may require.

22.    <u>Caption Headings</u>.  Captions at the beginning of each numbered Section of this Agreement are solely for the convenience of the parties and shall not be deemed part of the context of this Agreement.

**AGREEMENT AMONG TENANTS IN COMMON**                                    **Page 9**

23.    Negotiated Transaction.  The provisions of this Agreement were negotiated by all of the parties hereto and said Agreement shall be deemed to have been drafted by all of the parties thereto.

24.    Further Assurances.  Each Tenant hereby agrees to promptly sign any additional instruments or documents which are necessary or appropriate to carry out the purpose of this Agreement.

25.    Interpretation.  It is the intent of the Tenants to own the Property for investment purposes, only and not for the conduct of a business, and to otherwise comply with all statutes and regulations allowing an election to be excluded from Subchapter K of the Code and this Agreement shall be interpreted to conform to such intent.

26.    Litigation.  In the event of any litigation between the parties hereto, the prevailing party in such litigation shall be paid all attorneys' fees, court costs and litigation expenses incurred in such litigation by the non-prevailing party.  The parties hereto agree that specific performance is an appropriate remedy for the enforcement of the rights of the Tenants hereunder concerning a sale of the Property and the obligations of the parties hereunder.

27.    Recording.  A memorandum of this Agreement may be recorded by CPO and the other Tenants agree to cooperate and facilitate such recording.

[SIGNATURE PAGE FOLLOWS]

**AGREEMENT AMONG TENANTS IN COMMON**                          Page 10

EXECUTED effective as of February 1, 2022 (the "Effective Date").

MacDonald Capital Corporation (a Texas corporation)

By: _____
    Name: Wm. Ian MacDonald
    Title: President

Date: Agreed to as of the "Effective Date" set forth above

Address:  400 East Centre Park Blvd., Suite 101
              DeSoto, Texas 75115
Facsimile: 972-283-0193

Donald P. Heath and Joanne O. Heath,
Husband and Wife as Joint Tenants

By: _____
Name: Donald P. Heath
Title: An Individual,

and

By: _____
Name: Joanne O. Heath
Title: An Individual

Address: 13 Klamath, Irvine, CA 92612
Telephone: (____) ____-_____;
Fax: _____

**AGREEMENT AMONG TENANTS IN COMMON**           Page 11

## EXHIBIT A

### The Property

An undivided interest of Seventeen point Four Six percent (17.46%) interest in

Lots 18 and 19 of Block 24, The original town of Seminole
218 N. Main Street, Seminole, Oklahoma

**Buyer:**
Ownership Interest Percentage:
Seventeen point Four Six percent (17.46%)

**Buyer:**
Purchase Price of Ownership Interest (Originally Invested Amount): $141,606.78

**Seller Ownership Interest:**
Seventy Three point One Nine percent (76.51%)

Agreed Upon Current Value of the Property: $1,178,275.

**AGREEMENT AMONG TENANTS IN COMMON**                          Page 12
DALLAS1 1068268v3 51997-00001

# EXHIBIT C

# EXHIBIT C-1

**Gallup TIC - Berg**

## AGREEMENT AMONG TENANTS IN COMMON
### Gallup, NM

**THIS AGREEMENT AMONG TENANTS IN COMMON** ("Agreement") is made and entered into initially by and between Buddy Mac Six RE, LLC (a Texas Limited Liability Company) and Current Property Owner ("CPO") and **RONALD H. BERG**, an unmarried man in Irvine, California as the Incoming Property Owner ("IPO"), being sometimes referred to singularly as "Tenant" or collectively as the "Tenants".

## RECITALS

A.     It is the desire of the Tenants to hold, operate, maintain, finance, keep in repair, lease and/or sell or exchange, as tenants in common, that certain real property together with all improvements located therein, commonly known Buddy's which is more fully described on Exhibit "A" attached hereto and by this reference incorporated herein (the "Property").

B.     It is the desire of IPO to acquire an undivided interest in the Property from CPO as is more fully described In Exhibit 'A'.

NOW, THEREFORE, in consideration of the foregoing Recitals and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Tenants to hereby agree as follows:

1.     <u>Formation of Tenancy</u>.  The Tenants hereby acknowledge their ownership to be a tenancy in common (the "Tenancy") and this Agreement shall govern the ownership and management of the Property.  The principal purpose of the Tenancy shall be to hold and maintain the Property as tenants in common for investment purposes.  The address of each Tenant for notice and all other purposes of this Agreement is set forth on the signature page hereof.  Except as expressly provided herein, no Tenant shall sell, assign, hypothecate or otherwise dispose of or encumber its interest or any part thereof in the Property without the prior written consent of the other Tenants.

2.     <u>Term</u>.  The Tenancy as governed hereby shall commence on the execution of this Agreement, and shall continue thereafter until dissolved or terminated pursuant to Sections 17 hereof.

3.     <u>Title to the Property</u>.  Contemporaneously with the execution hereof, IPO has acquired an undivided interest in the Property as set forth in Exhibit 'A', the ("IPO Interest"), and CPO retains an interest in the Property as is more fully described in Exhibit 'A' (the "CPO Ownership Interest").  The CPO Ownership Interest and the IPO Ownership Interest are hereinafter sometimes referred to as the "Ownership Interests" or an "Ownership Interest."  Each Tenant agrees to be bound by the terms and conditions of this Agreement.

4.     <u>Ownership Rights of Tenants</u>.  Notwithstanding any statute or other rule of law and having previously been advised of their respective rights to bring an action for partition, the Tenants

**AGREEMENT AMONG TENANTS IN COMMON**                                        **Page 1**

agree that during the term hereof the Tenants shall only have those rights in the Property as expressly provided herein and each Tenant hereby irrevocably waives any and all rights that it has (i) to occupy the Property or any portion thereof, or to exclude any other Tenant from the Property or any portion thereof, and (ii) to maintain any action for any partition of the Property, or otherwise force a sale of the Property during the term hereof, all except as expressly provided herein.

     5.     <u>Tenant Payment Obligations</u>.

     (a)     Each Tenant agrees to pay its Agreed Share (such Agreed Share determined as provided, below) of all costs and expenses involved in owning, operating, maintaining, leasing, selling or exchanging the Property, including, but not limited to, ad valorem taxes, insurance premiums, repairs, necessary improvements, contractual fees, professional fees, lease commissions and utility costs, debt service and other financing-related costs, and capital repairs and replacements and other capital expenditures at the Property (collectively, "Owner Costs"). To the extent that the income from the Property is insufficient to pay all Owner Costs in the ordinary course of business, each Tenant's Agreed Share of such Owner Costs shall be paid by each Tenant, upon demand, prior to the due date of all such costs and expenses and no later than ten (10) days prior to the date when such costs and expenses are due.

     For purposes of this Agreement, the Agreed Share of each Tenant shall be equal to his respective Ownership Interest in the Property. CPO, which shall be the Tenant managing the Tenancy, shall maintain a banking account or accounts at financial institutions on behalf of the Tenants and shall maintain reasonable reserves for future costs and expenses of the Property.

     (b)     If any Tenant fails promptly to contribute such Tenant's share of the Owner Costs ("Defaulting Tenant"), the other Tenants may pay the entire amount' of such Owner Costs and the amount not paid by the Defaulting Tenant shall be deemed a loan to the Defaulting Tenant (the "Tenant Loan" or "Tenant Loans"). All Tenant Loans shall be payable on demand, shall bear interest at the rate of eighteen percent (18%) per annum, and shall constitute a lien on the interest of the Defaulting Tenant in the Property, which lien shall be expressly subject and subordinate to any existing or future lien of any third party lender with a lien on the Property. Each Defaulting Tenant authorizes each other Tenant making a Tenant Loan to execute and record such documents as such Tenant deems necessary to further or better evidence such loan and lien.

     In the event a Tenant makes a loan or loans to the Defaulting Tenant ("Loaning Tenant") and any Tenant Loan remains unpaid for a thirty (30) day period after written notice is given to the Defaulting Tenant requesting payment, the Loaning Tenant may bring suit against the Defaulting Tenant for the amount of the Tenant Loans not paid plus all reasonable collection costs. All income from the sale and operation of the Property shall be paid to the Loaning Tenant until all Tenant Loans are paid in full.

**AGREEMENT AMONG TENANTS IN COMMON**          **Page 2**

6.  <u>Distribution of Net Profits From Operation, Financing, Refinancing, Exchange, Lease and Sale of the Property</u>.

(a)    All income derived from the operation of the Property in whatever form and however derived (less reasonable working capital and capital repairs and replacement reserves), shall be divided and paid when received as follows:

(i)    First, to each Tenant in an amount equal to such Tenant's Agreed Share of the Owner Costs, or, at CPO's option, to pay such Tenant's Agreed Share of such Owner Costs directly on its behalf,

(ii)    The IPO tenant shall receive the greater of (i) percentage interest of the net income of the Property as set forth in Exhibit 'A', or (ii) the annual pay rate paid on the originally invested amount set forth in Exhibit 'A' ("Originally Invested Amount") to be paid on a monthly basis,

(iii)    The IPO tenant shall also a receive a two percent (2%) annual accrual on the invested amount to be paid upon redemption of the IPO interest, and

(iv)    Thereafter, the CPO tenant shall receive the remaining available balance of the cash flow and distributions from all other distributable sources.

(b)    In the event of the financing, refinancing, exchange or lease of the Property, or in the event of a sale under Section 10 herein, the Net Profits, if any, from the sale, lease, financing, refinancing or exchange of the Property shall be divided between the Tenants when received in the same manner set forth in Section 6(a).  The term "Net Profits" for the purpose of this paragraph shall mean the net proceeds from any financing, refinancing, exchange or lease (less all reasonable and bona fide financing, exchange or leasing costs) or the net sales price of the Property (gross sales price less all reasonable and bona fide selling expenses) less; (i) the outstanding unpaid indebtedness of all notes secured by loans on the Property at the time of such sale; (ii) the outstanding principal balance plus accrued but unpaid interest on any Tenant Loans, and (iii) all other reasonable and bona fide expenses incurred by the Tenancy in connection with the ownership, maintenance, financing, refinancing, exchange, lease or the sale of the Property, including any unpaid Owner Costs.  Each Tenant shall receive its share of the Net Profits under this Section 6(b) in the form of any promissory note(s) or cash received from the leasing, financing, refinancing, exchange or sale.

7.    <u>Books and Records</u>.  Proper and complete books of account of the Tenancy shall be kept by CPO (<u>i.e.</u>, the Tenant managing the Tenancy) as an expense of the Tenancy and shall be open to inspection and copying by any Tenant or representatives of each Tenant at any reasonable time. The books and records of account shall be examined and reviewed as of the close of each calendar year by an accountant selected by CPO, and such accountant shall prepare an annual report thereof, copies of which will be furnished to each Tenant as soon, as possible after the conclusion of each calendar year. Each Tenant shall have the right to make a separate audit of the books and records of the Tenancy at such Tenant's own expense at any time and from time to time.

**AGREEMENT AMONG TENANTS IN COMMON**                                    **Page 3**

8. <u>Bank Accounts</u>. All funds of the Tenancy shall be deposited by CPO in a bank or brokerage account or accounts in the name of the Tenancy and funds from said bank account or accounts shall be disbursed upon the signature of CPO in the ordinary course of business, and in accordance with the provisions of this Agreement, unless all Tenants direct otherwise. Tenancy funds shall be used only for Tenancy purposes.

9. <u>Dissolution of a Tenant</u>. The dissolution of any Tenant shall not have the affect of terminating or dissolving the Tenancy. Upon the dissolution of a Tenant, the shareholders, partners, members or other equity owners thereof shall succeed to its interest in this Tenancy and shall be bound by the terms and provisions of this Agreement; however, in the event that the interest of the dissolved Tenant passes to more than one person, then, and in that event, such persons shall, within ninety (90) days after dissolution of the Tenant, execute and deliver to the other Tenants a written instrument (including Power of Attorney) appointing one person as and to be the Agent for collecting, receiving and making all payments and contributions required hereunder, shall vote the entire interest of the successors, and shall perform all other obligations of such successors performable by reason of or arising from their interest in the Tenancy; and, any and all payments and/or disbursements due arising from the successors interest in the Tenancy shall be deemed to have been validly made to such successors by paying the same to such duly designated Agent. In the event that said successors for any reason fail to designate such Agent in writing in the manner and within the time prescribed and continue to fail to cure such default after ten (10) days written notice from another Tenant to correct same, such other Tenant shall have the right to appoint such Agent.

10. <u>Transfer of Tenant's Interest and Sale of Property</u>.

(a) No Tenant may sell, transfer, convey, encumber or otherwise hypothecate the Property or its undivided interest in the Property without the written consent of the other Tenants, except as provided in Section 10(c) herein and Section 11 herein.

(b) Any permitted transfer of a Tenant's Ownership Interest in the Property shall be subject to such transferee's written agreement to be bound by all of the terms and conditions of this Agreement; any transfer without such written assumption agreement shall be null and void.

(c) CPO may, at any time, sell, finance, exchange or otherwise transfer or encumber all of the Property (including the other Ownership Interests) on such terms and conditions as CPO may, in CPO's sole discretion, determine, so long as such transaction is a bona fide transaction and all of the terms and conditions of such transaction are fully disclosed to all Tenants at the time such transaction is entered into. If requested by CPO, all Tenants shall join in the conveyance of the Property and/or execute all documents necessary or desirable to close such transaction.

(d) If the signature of a Tenant is required by a third party in connection with the transactions contemplated by Section 10(c), such Tenant agrees to execute and deliver such documents as such third party deems necessary or desirable to accomplish all of the foregoing. If such Tenant fails to execute and deliver any such documents within ten (10) days following written notice from CPO, CPO is hereby authorized, and each Tenant grants to CPO an irrevocable power of attorney,

**AGREEMENT AMONG TENANTS IN COMMON**                    **Page 4**

coupled with an interest, to execute and deliver any such documents by, in the name of and on behalf of such Tenant, which documents shall be binding upon such Tenant to the same extent as if such Tenant had personally executed and delivered the same.

(e)    A Tenant may not, without the prior written consent of CPO, which consent may be granted or withheld in the sole and absolute discretion of CPO, sell, transfer, convey, encumber or otherwise hypothecate all or any portion of the Property (including its Ownership Interest).

(f)    IPO Put Option ("Put Option") is available to IPO annually commencing on fifth anniversary of the agreement and extending to the full term of the Term of the Agreement.
Put Option value to be determined based on the greater of the

(i)    the (a) amount of the original purchased interest (as set forth in Exhibit 'A'), plus (b) a two percent (2%) per year accrual on the amount of the original purchased interest, or

(ii)    the amount of the original purchased interest (as set forth in Exhibit 'A'), plus the net increase above the current agreed upon market Property value set forth in Exhibit 'A' times the IPO percentage ownership interest set forth in Exhibit 'A'; (unless otherwise agreed, to be appraised by an independent third party appraiser within 6 months of the Owner Put Option being exercised);

(iii)    however in no event will the IPO Put Option be less than the redemption of original purchased interest plus the two percent (2%) annual accrual during the outstanding period of the interest held by IPO.

(g)    CPO Call Option ("Call Option") is available to CPO annually commencing on the third annual anniversary of the agreement and extending to the full term of the Agreement.
Call Option value to be determined based on the greater of the

(i)    (a) amount of the original purchased interest(as set forth in Exhibit 'A'), plus (b) a two percent (2%) per year accrual of the original purchased interest, or

(ii)    the amount of the original purchased interest (as set forth in Exhibit 'A'), plus net increase above the current agreed upon market Property value as set forth in Exhibit 'A'times the IPO percentage ownership interest set forth in Exhibit 'A'; (unless otherwise agreed, to be appraised by an independent third party appraiser within 6 months of the Owner Put Option being exercised);

(iii)    however in no event will the CPO Call Option be less than the redemption of original purchased interest plus the two percent (2%) annual accrual during the outstanding period of the interest held by IPO.

**AGREEMENT AMONG TENANTS IN COMMON**                    **Page 5**

11.    <u>Management, Financing, and Leasing</u>.  It is the objective of the Tenants to maximize the market value of the Property by operating, leasing, financing, and/or sale of the Property.

(a)    The Tenants irrevocably authorize CPO, or any management company or management agent appointed by CPO, (i) to operate, manage and lease all or any portion of the Property upon such terms and conditions as CPO may determine necessary or advisable in its absolute and sole discretion; (ii) to pay from any revenues derived from operation of the Property, on or before the date due, all installments of principal and/or interest on all debts secured by a lien on the Property, (iii) to execute any and all documents necessary to manage and lease all or any portion of the Property as permitted herein, without the necessity of any other Tenant joining in the execution thereof including without limitation the sale, refinance merger or other material event.

(b)    If the signature of a Tenant is required by a third party, each Tenant agrees to execute and deliver such documents as such third party deems necessary or desirable to accomplish all of the foregoing and such management or lease of the Property.  If a Tenant fails to execute and deliver any such documents within ten (10) days following written notice from CPO, CPO is hereby authorized, and each Tenant grants to CPO an irrevocable power of attorney, coupled with an interest, to execute and deliver any such documents by, in the name of and on behalf of such Tenant, which documents shall be binding upon such Tenant to the same extent as if such Tenant had personally executed and delivered the same.

(c)    If third party management is not obtained for the Property by CPO, in its sole and absolute discretion, CPO may appoint itself or any affiliate as manager of the Tenancy and the Property.  For such services, CPO shall receive a management fee equal to eight percent (8%) of the gross revenues from the Property plus reasonable out of pocket costs, payable monthly following payment of debt service and all other Owner Costs then due.

(d)    Notwithstanding anything contained in this Section 11 to the contrary:

(i)    CPO may exercise the rights provided to CPO in Section 10(c) of this Agreement, without the written approval of any other Tenant, notwithstanding any statute or other law to the contrary.

(ii)    Any note, deed of trust, or loan documents executed in connection with a financing or refinancing of all or any portion of the Property shall not personally obligate a Tenant for the repayment of the principal or interest thereof without the written consent of such Tenant.

(iii)    No litigation shall be brought by or on behalf of a Tenant against a third party involving the Property without the written consent of CPO.

(iv)    By unanimous vote of the Tenants, CPO may be removed as manager of the Tenancy or the Property only upon a judicial determination, in a final, unappealable

**AGREEMENT AMONG TENANTS IN COMMON**                    Page 6

judgment of a court of appropriate jurisdiction, of fraud or gross negligence on the part of CPO in connection with the management and operation of the Property.

12.    Conditional Option to Purchase at Selling Tenant's Adjusted Basis.

(a)    Option to Purchase at Selling Tenant's Adjusted Basis. In the event that (i) any Tenant shall pledge, hypothecate or use as security for any loan or obligation, his interest in the Property or any portion thereof, and a default shall occur with respect to such loan or obligation resulting in the interest of such Tenant (or a portion thereof) being subject to levy or sale; or (ii) any Tenant shall make an assignment for the benefit of creditors or similar arrangement, or any proceeding shall be commenced by or against any Tenant under any bankruptcy, reorganization or other similar laws for the relief of debtors, or the property of a Tenant becomes subject to seizure or sale by reason of a judgment having been taken against him or it, or (iii) any Tenant shall fail to remove any lien or security interest on all or any portion of his interest in the Property within ten (10) days following written notice from any other Tenant, so that a third party lender may obtain a first lien on the Property with priority over such lien or security interest in connection with any financing or re-financing of the Property; then, in any of such events, the Ownership Interest of such Tenant (herein the "Selling Tenant") shall automatically be offered for sale to each other Tenant (herein the "Purchasing Tenant") in accordance with (b) and (c) below, upon notice of such event to each Tenant.

(b)    Option Exercise Procedures. In the event that the Ownership Interest of a Tenant shall be offered for sale to the other Tenants pursuant to section (a) above, then the Purchasing Tenant(s) shall have the option, exercisable within ninety (90) days of receipt of notice thereof from the Selling Tenant, to purchase the complete Ownership Interest of the Selling Tenant, which purchase shall be, if more than one Purchasing Tenant exercises such option, pro rata in accordance with their respective Ownership Interests in the Property.

(c)    Purchase Price. The purchase price for the interest of a Tenant to be sold pursuant to (a) shall be said Tenant's adjusted basis in the property after taking into consideration that Tenant's historical cost, return of capital, if any, with appropriate adjustments and allocations for all items of income or, expense accruing prior to the closing date. All closing costs associated with such sale shall be borne by the Selling Tenant. The purchase price shall be paid 100% in cash at closing, which is to occur within ninety (90) days of the Purchasing Tenant's receipt of notice from the Selling Tenant.

13.    NEGATION OF PARTNERSHIP; LIABILITY SEVERAL. NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR CONSTRUED TO CREATE A PARTNERSHIP, JOINT VENTURE OR ASSOCIATION AMONG ANY OF THE PARTIES HERETO. THE LIABILITY OF THE TENANTS UNDER THIS AGREEMENT SHALL BE SEVERAL, NOT JOINT AND SEVERAL, LIMITED AS TO EACH, TO ITS RESPECTIVE OWNERSHIP INTEREST. ·

14.    Events of Default. If any of the following events shall occur and shall not be cured within the time period set forth in Section 14 after written notice thereof to the Tenant committing

**AGREEMENT AMONG TENANTS IN COMMON**                    **Page 7**

such acts, such Tenant committing such act shall be deemed to have committed an Event of Default (herein so called):

(a)    A Tenant shall file a voluntary petition in bankruptcy or shall be adjudicated a bankrupt or insolvent, or shall file any petition or answer seeking any reorganization, arrangement, composition, readjustment liquidation, dissolution or similar relief for itself under any applicable federal state or other statute or law relative to bankruptcy, insolvency or other relief for debtors, or the appointment of any trustee, receiver, conservator or liquidator of said Party or of any part of its properties or interest in the Note or the Property, or

(b)    A Tenant shall admit in writing its inability to pay its debts as they mature; or

(c)    A Tenant shall make an assignment for the benefit of creditors or take any other similar action for the protection or benefit of creditors; or

(d)    A Tenant fails to make any payment required hereunder on a timely basis;

(e)    A Tenant shall fail to perform its covenants or obligations contained herein; or

(f)    A Tenant shall fail to perform its covenants or obligations contained in any agreement secured by a lien on the Property.

In addition to all other rights of CPO, if any other Tenant commits an uncured Event of Default, CPO may require such Tenant to convey its Ownership Interest in the Property in consideration for the payment to such Tenant of an amount equal to such Tenant's direct cost of acquiring his Ownership Interest from CPO, less such Tenant's closing costs incurred in connection with its acquisition of such Ownership Interest.

15.    Notice of Default and Cure. In the event of an Event of Default, the remedies provided for in Section 14 shall apply only if said Event of Default is not timely cured. If a Tenant believes another Tenant is in default hereunder, such Tenant shall give the defaulting Tenant written notice setting forth such default and the defaulting Tenant shall have thirty (30) days after the receipt of such notice to cure such default. In the event such default is not cured during such thirty (30) day period, such defaulting Tenant shall be deemed to have committed such Event of Default and the other Tenant may enforce such Tenant's rights and remedies contained herein and at law.

Each Tenant (the "Indemnifying Tenant") agrees to indemnify the other Tenants for any loss, damage or claim arising from any uncured Event of Default of the Indemnifying Tenant.

16.    Election to be Excluded from Provisions of Subchapter K. Each Tenant hereby elects to be excluded from all of the provisions of Subchapter K of Chapter I of the Internal Revenue Code of 1986, as amended (the "Code"). The exclusion elected by each Tenant hereunder shall commence with the execution of this Agreement. Each Tenant hereby covenants and agrees that each Tenant shall abide by all regulatory requirements in order to maintain such election and shall report on such

**AGREEMENT AMONG TENANTS IN COMMON**                    Page 8

Tenant's income tax return such respective share of items of income, deduction and credit which results from holding of the Property, in a manner consistent with the exclusion of the Tenancy from Subchapter K of Chapter I of the Code, commencing with the first taxable year of the Tenancy. No Tenant shall notify the Commissioner of Internal Revenue (the "Commissioner") that such Tenant desires that Subchapter K of the Code apply to the Tenancy and each Tenant hereby agrees to indemnify and hold each other Tenant free and harmless from all cost, liability, tax consequence and expense, including attorneys' fees, which results from any Tenant so notifying the Commissioner.

17.    Dissolution.  The Tenancy, as governed hereby, shall be immediately dissolved upon the happening of any of the following events:

(i)    The sale or other disposition by the Tenants of all of the Property; or

(ii)    The decision of the Tenants that the Tenancy be dissolved; or

(iii)    Ten (10) years after the date hereof, absent prior extension of the term of the Tenancy (for one or more years) by written notice from CPO to the other Tenants, at CPO's option in its sole and absolute discretion.

18.    Notices.  All notices under this Agreement must be in writing and shall be deemed to have been duly given if delivered personally or by certified mail, return receipt requested, to the addresses set forth on the signature page hereof.

19.    Amendment; Additional Tenants.  This Agreement may be amended only by written agreement signed by all Tenants; provided, however, that CPO may sell additional undivided interests in the Property (from the CPO Ownership Interest) to third parties, in which case such other third party(ies) may be added to this Agreement by CPO as additional Tenants, with the same rights and obligations hereunder as are applicable to IPO and the IPO Ownership Interest, to the extent of the undivided interest in the Property constituting the Ownership Interest of such third party(ies) in the Property.  In such event, the Ownership Interests of CPO hereunder shall be reduced pro rata, such that the aggregate Ownership Interests of the Tenants following such sale(s) of undivided interests in the CPO Ownership Interest shall continue to equal one hundred (100%).

20.    Counterparts.  This Agreement may be executed in counterparts each of which shall be deemed to be an original, but such counterparts, when taken together, shall constitute but one agreement.

21.    Gender.  All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine or neuter, singular or plural, as the identity of the person, persons, entity or entities may require.

22.    Caption Headings.  Captions at the beginning of each numbered Section of this Agreement are solely for the convenience of the parties and shall not be deemed part of the context of this Agreement.

**AGREEMENT AMONG TENANTS IN COMMON**                    Page 9

23.   Negotiated Transaction.  The provisions of this Agreement were negotiated by all of the parties hereto and said Agreement shall be deemed to have been drafted by all of the parties thereto.

24.   Further Assurances.  Each Tenant hereby agrees to promptly sign any additional instruments or documents which are necessary or appropriate to carry out the purpose of this Agreement.

25.   Interpretation.  It is the intent of the Tenants to own the Property for investment purposes, only and not for the conduct of a business, and to otherwise comply with all statutes and regulations allowing an election to be excluded from Subchapter K of the Code and this Agreement shall be interpreted to conform to such intent.

26.   Litigation.  In the event of any litigation between the parties hereto, the prevailing party in such litigation shall be paid all attorneys' fees, court costs and litigation expenses incurred in such litigation by the non-prevailing party.  The parties hereto agree that specific performance is an appropriate remedy for the enforcement of the rights of the Tenants hereunder concerning a sale of the Property and the obligations of the parties hereunder.

27.   Recording.  A memorandum of this Agreement may be recorded by CPO and the other Tenants agree to cooperate and facilitate such recording.

[SIGNATURE PAGE FOLLOWS]

**AGREEMENT AMONG TENANTS IN COMMON**                    Page 10

EXECUTED effective as of February 1, 2022 (the "Effective Date").

**Buddy Mac Six RE, LLC (a Texas Limited Liability Company)**

By: _____
        Name: Wm. Ian MacDonald
        Title: Manager

Date: Agreed to as of the "Effective Date" set forth above

Address:   400 East Centre Park Blvd., Suite 101
              DeSoto, Texas 75115
Facsimile: 972-283-0193

**RONALD H. BERG**

By: _____
        **Individually**

Date: Agreed to as of the "Effective Date" set forth above
Address:   20 Canyon Ridge,
              Irvine, CA   92603
Phone Number: (714) 402-2374
Facsimile: _____

**AGREEMENT AMONG TENANTS IN COMMON**                    **Page 11**

## EXHIBIT A

### The Property

An undivided Six point Eight Nine percent (6.89%) interest in

Lot One (1) of ROLLIE SUBDIVISION UNIT SIX (6), to the City of Gallup, New Mexico, as the same is shown and designated on the plat thereof filed in the office of the County Clerk of McKinley County, New Mexico on January 22, 1988.

As provided in Section 14-11-10.1 NMSA 1978, the simple description of the property is 1100 N. Highway 491, the City of Gallup, County of McKinley and State of New Mexico.

**Buyer:**
Ownership Interest Percentage:
Six point Eight Nine percent (6.89%)

**Buyer:**
Purchase Price of Ownership Interest (Originally Invested Amount): $51,228.71

**Seller Ownership Interest:**
Seventy Three point One Nine percent (73.19%)

Agreed Upon Current Value of the Property: $1,233,333.

**AGREEMENT AMONG TENANTS IN COMMON**                    Page 12
DALLAS1 1068268v3 51997-00001

# EXHIBIT C-2

**Gallup TIC - Heath**

## AGREEMENT AMONG TENANTS IN COMMON
### Gallup, NM

**THIS AGREEMENT AMONG TENANTS IN COMMON** ("Agreement") is made and entered into initially by and between **Buddy Mac Six RE, LLC** (a Texas Limited Liability Company) and Current Property Owner ("CPO") and **Donald P. Heath and Joanne O. Heath, Husband and Wife as Joint Tenants** in Irvine, California as the Incoming Property Owner ("IPO"), being sometimes referred to singularly as "Tenant" or collectively as the "Tenants".

### RECITALS

A.    It is the desire of the Tenants to hold, operate, maintain, finance, keep in repair, lease and/or sell or exchange, as tenants in common, that certain real property together with all improvements located therein, commonly known Buddy's which is more fully described on Exhibit "A" attached hereto and by this reference incorporated herein (the "Property").

B.    It is the desire of IPO to acquire an undivided interest in the Property from CPO as is more fully described In Exhibit 'A'.

NOW, THEREFORE, in consideration of the foregoing Recitals and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Tenants to hereby agree as follows:

1.    <u>Formation of Tenancy</u>.  The Tenants hereby acknowledge their ownership to be a tenancy in common (the "Tenancy") and this Agreement shall govern the ownership and management of the Property.  The principal purpose of the Tenancy shall be to hold and maintain the Property as tenants in common for investment purposes.  The address of each Tenant for notice and all other purposes of this Agreement is set forth on the signature page hereof.  Except as expressly provided herein, no Tenant shall sell, assign, hypothecate or otherwise dispose of or encumber its interest or any part thereof in the Property without the prior written consent of the other Tenants.

2.    <u>Term</u>.  The Tenancy as governed hereby shall commence on the execution of this Agreement, and shall continue thereafter until dissolved or terminated pursuant to Sections 17 hereof.

3.    <u>Title to the Property</u>.  Contemporaneously with the execution hereof, IPO has acquired an undivided interest in the Property as set forth in Exhibit 'A', ("IPO Interest"), and CPO retains an interest in the Property as is more fully described in Exhibit 'A' (the "CPO Ownership Interest").  The CPO Ownership Interest and the IPO Ownership Interest are hereinafter sometimes referred to as the "Ownership Interests" or an "Ownership Interest."  Each Tenant agrees to be bound by the terms and conditions of this Agreement.

4.    <u>Ownership Rights of Tenants</u>.  Notwithstanding any statute or other rule of law and having previously been advised of their respective rights to bring an action for partition, the Tenants

**AGREEMENT AMONG TENANTS IN COMMON**                          **Page 1**

agree that during the term hereof the Tenants shall only have those rights in the Property as expressly provided herein and each Tenant hereby irrevocably waives any and all rights that it has (i) to occupy the Property or any portion thereof, or to exclude any other Tenant from the Property or any portion thereof, and (ii) to maintain any action for any partition of the Property, or otherwise force a sale of the Property during the term hereof, all except as expressly provided herein.

5.    Tenant Payment Obligations.

(a)    Each Tenant agrees to pay its Agreed Share (such Agreed Share determined as provided, below) of all costs and expenses involved in owning, operating, maintaining, leasing, selling or exchanging the Property, including, but not limited to, ad valorem taxes, insurance premiums, repairs, necessary improvements, contractual fees, professional fees, lease commissions and utility costs, debt service and other financing-related costs, and capital repairs and replacements and other capital expenditures at the Property (collectively, "Owner Costs"). To the extent that the income from the Property is insufficient to pay all Owner Costs in the ordinary course of business, each Tenant's Agreed Share of such Owner Costs shall be paid by each Tenant, upon demand, prior to the due date of all such costs and expenses and no later than ten (10) days prior to the date when such costs and expenses are due.

For purposes of this Agreement, the Agreed Share of each Tenant shall be equal to his respective Ownership Interest in the Property. CPO, which shall be the Tenant managing the Tenancy, shall maintain a banking account or accounts at financial institutions on behalf of the Tenants and shall maintain reasonable reserves for future costs and expenses of the Property.

(b)    If any Tenant fails promptly to contribute such Tenant's share of the Owner Costs ("Defaulting Tenant"), the other Tenants may pay the entire amount of such Owner Costs and the amount not paid by the Defaulting Tenant shall be deemed a loan to the Defaulting Tenant (the "Tenant Loan" or "Tenant Loans"). All Tenant Loans shall be payable on demand, shall bear interest at the rate of eighteen percent (18%) per annum, and shall constitute a lien on the interest of the Defaulting Tenant in the Property, which lien shall be expressly subject and subordinate to any existing or future lien of any third party lender with a lien on the Property. Each Defaulting Tenant authorizes each other Tenant making a Tenant Loan to execute and record such documents as such Tenant deems necessary to further or better evidence such loan and lien.

In the event a Tenant makes a loan or loans to the Defaulting Tenant ("Loaning Tenant") and any Tenant Loan remains unpaid for a thirty (30) day period after written notice is given to the Defaulting Tenant requesting payment, the Loaning Tenant may bring suit against the Defaulting Tenant for the amount of the Tenant Loans not paid plus all reasonable collection costs. All income from the sale and operation of the Property shall be paid to the Loaning Tenant until all Tenant Loans are paid in full.

**AGREEMENT AMONG TENANTS IN COMMON**                    Page 2

6.    <u>Distribution of Net Profits From Operation, Financing, Refinancing, Exchange, Lease and Sale of the Property</u>.

(a)    All income derived from the operation of the Property in whatever form and however derived (less reasonable working capital and capital repairs and replacement reserves), shall be divided and paid when received as follows:

(i)    First, to each Tenant in an amount equal to such Tenant's Agreed Share of the Owner Costs, or, at CPO's option, to pay such Tenant's Agreed Share of such Owner Costs directly on its behalf,

(ii)    The IPO tenant shall receive the greater of (i) percentage interest of the net income of the Property as set forth in Exhibit 'A', or (ii) the annual pay rate paid on the originally invested amount set forth in Exhibit 'A' ("Originally Invested Amount") to be paid on a monthly basis,

(iii)    The IPO tenant shall also a receive a two percent (2%) annual accrual on the invested amount to be paid upon redemption of the IPO interest, and

(iv)    Thereafter, the CPO tenant shall receive the remaining available balance of the cash flow and distributions from all other distributable sources.

(b)    In the event of the financing, refinancing, exchange or lease of the Property, or in the event of a sale under Section 10 herein, the Net Profits, if any, from the sale, lease, financing, refinancing or exchange of the Property shall be divided between the Tenants when received in the same manner set forth in Section 6(a). The term "Net Profits" for the purpose of this paragraph shall mean the net proceeds from any financing, refinancing, exchange or lease (less all reasonable and bona fide financing, exchange or leasing costs) or the net sales price of the Property (gross sales price less all reasonable and bona fide selling expenses) less; (i) the outstanding unpaid indebtedness of all notes secured by loans on the Property at the time of such sale; (ii) the outstanding principal balance plus accrued but unpaid interest on any Tenant Loans, and (iii) all other reasonable and bona fide expenses incurred by the Tenancy in connection with the ownership, maintenance, financing, refinancing, exchange, lease or the sale of the Property, including any unpaid Owner Costs. Each Tenant shall receive its share of the Net Profits under this Section 6(b) in the form of any promissory note(s) or cash received from the leasing, financing, refinancing, exchange or sale.

7.    <u>Books and Records</u>. Proper and complete books of account of the Tenancy shall be kept by CPO (i.e., the Tenant managing the Tenancy) as an expense of the Tenancy and shall be open to inspection and copying by any Tenant or representatives of each Tenant at any reasonable time. The books and records of account shall be examined and reviewed as of the close of each calendar year by an accountant selected by CPO, and such accountant shall prepare an annual report thereof, copies of which will be furnished to each Tenant as soon, as possible after the conclusion of each calendar year. Each Tenant shall have the right to make a separate audit of the books and records of the Tenancy at such Tenant's own expense at any time and from time to time.

**AGREEMENT AMONG TENANTS IN COMMON**                    **Page 3**

8.    Bank Accounts. All funds of the Tenancy shall be deposited by CPO in a bank or brokerage account or accounts in the name of the Tenancy and funds from said bank account or accounts shall be disbursed upon the signature of CPO in the ordinary course of business, and in accordance with the provisions of this Agreement, unless all Tenants direct otherwise. Tenancy funds shall be used only for Tenancy purposes.

9.    Dissolution of a Tenant. The dissolution of any Tenant shall not have the affect of terminating or dissolving the Tenancy. Upon the dissolution of a Tenant, the shareholders, partners, members or other equity owners thereof shall succeed to its interest in this Tenancy and shall be bound by the terms and provisions of this Agreement; however, in the event that the interest of the dissolved Tenant passes to more than one person, then, and in that event, such persons shall, within ninety (90) days after dissolution of the Tenant, execute and deliver to the other Tenants a written instrument (including Power of Attorney) appointing one person as and to be the Agent for collecting, receiving and making all payments and contributions required hereunder, shall vote the entire interest of the successors, and shall perform all other obligations of such successors performable by reason of or arising from their interest in the Tenancy; and, any and all payments and/or disbursements due arising from the successors interest in the Tenancy shall be deemed to have been validly made to such successors by paying the same to such duly designated Agent. In the event that said successors for any reason fail to designate such Agent in writing in the manner and within the time prescribed and continue to fail to cure such default after ten (10) days written notice from another Tenant to correct same, such other Tenant shall have the right to appoint such Agent.

10.    Transfer of Tenant's Interest and Sale of Property.

(a)    No Tenant may sell, transfer, convey, encumber or otherwise hypothecate the Property or its undivided interest in the Property without the written consent of the other Tenants, except as provided in Section 10(c) herein and Section 11 herein.

(b)    Any permitted transfer of a Tenant's Ownership Interest in the Property shall be subject to such transferee's written agreement to be bound by all of the terms and conditions of this Agreement; any transfer without such written assumption agreement shall be null and void.

(c)    CPO may, at any time, sell, finance, exchange or otherwise transfer or encumber all of the Property (including the other Ownership Interests) on such terms and conditions as CPO may, in CPO's sole discretion, determine, so long as such transaction is a bona fide transaction and all of the terms and conditions of such transaction are fully disclosed to all Tenants at the time such transaction is entered into. If requested by CPO, all Tenants shall join in the conveyance of the Property and/or execute all documents necessary or desirable to close such transaction.

(d)    If the signature of a Tenant is required by a third party in connection with the transactions contemplated by Section 10(c), such Tenant agrees to execute and deliver such documents as such third party deems necessary or desirable to accomplish all of the foregoing. If such Tenant fails to execute and deliver any such documents within ten (10) days following written notice from CPO, CPO is hereby authorized, and each Tenant grants to CPO an irrevocable power of attorney,

**AGREEMENT AMONG TENANTS IN COMMON**                                    **Page 4**

coupled with an interest, to execute and deliver any such documents by, in the name of and on behalf of such Tenant, which documents shall be binding upon such Tenant to the same extent as if such Tenant had personally executed and delivered the same.

    (e)    A Tenant may not, without the prior written consent of CPO, which consent may be granted or withheld in the sole and absolute discretion of CPO, sell, transfer, convey, encumber or otherwise hypothecate all or any portion of the Property (including its Ownership Interest).

    (f)    IPO Put Option ("Put Option") is available to IPO annually commencing on fifth anniversary of the agreement and extending to the full term of the Term of the Agreement.

    Put Option value to be determined based on the greater of the

    (i)    the (a) amount of the original purchased interest (as set forth in Exhibit 'A'), plus (b) a two percent (2%) per year accrual on the amount of the original purchased interest, or

    (ii)    the amount of the original purchased interest (as set forth in Exhibit 'A'), plus the net increase above the current agreed upon market Property value set forth in Exhibit 'A' times the IPO percentage ownership interest set forth in Exhibit 'A'; (unless otherwise agreed, to be appraised by an independent third party appraiser within 6 months of the Owner Put Option being exercised);

    (iii)    however in no event will the IPO Put Option be less than the redemption of original purchased interest plus the two percent (2%) annual accrual during the outstanding period of the interest held by IPO.

    (g)    CPO Call Option ("Call Option") is available to CPO annually commencing on the third annual anniversary of the agreement and extending to the full term of the Agreement.

    Call Option value to be determined based on the greater of the

    (i)    (a) amount of the original purchased interest(as set forth in Exhibit 'A'), plus (b) a two percent (2%) per year accrual of the original purchased interest, or

    (ii)    the amount of the original purchased interest (as set forth in Exhibit 'A'), plus net increase above the current agreed upon market Property value as set forth in Exhibit 'A' times the IPO percentage ownership interest set forth in Exhibit 'A'; (unless otherwise agreed, to be appraised by an independent third party appraiser within 6 months of the Owner Put Option being exercised);

    (iii)    however in no event will the CPO Call Option be less than the redemption of original purchased interest plus the two percent (2%) annual accrual during the outstanding period of the interest held by IPO.

**AGREEMENT AMONG TENANTS IN COMMON**        **Page 5**

11.    <u>Management, Financing, and Leasing</u>.  It is the objective of the Tenants to maximize the market value of the Property by operating, leasing, financing, and/or sale of the Property.

(a)    The Tenants irrevocably authorize CPO, or any management company or management agent appointed by CPO, (i) to operate, manage and lease all or any portion of the Property upon such terms and conditions as CPO may determine necessary or advisable in its absolute and sole discretion; (ii) to pay from any revenues derived from operation of the Property, on or before the date due, all installments of principal and/or interest on all debts secured by a lien on the Property, (iii) to execute any and all documents necessary to manage and lease all or any portion of the Property as permitted herein, without the necessity of any other Tenant joining in the execution thereof including without limitation the sale, refinance merger or other material event.

(b)    If the signature of a Tenant is required by a third party, each Tenant agrees to execute and deliver such documents as such third party deems necessary or desirable to accomplish all of the foregoing and such management or lease of the Property.  If a Tenant fails to execute and deliver any such documents within ten (10) days following written notice from CPO, CPO is hereby authorized, and each Tenant grants to CPO an irrevocable power of attorney, coupled with an interest, to execute and deliver any such documents by, in the name of and on behalf of such Tenant, which documents shall be binding upon such Tenant to the same extent as if such Tenant had personally executed and delivered the same.

(c)    If third party management is not obtained for the Property by CPO, in its sole and absolute discretion, CPO may appoint itself or any affiliate as manager of the Tenancy and the Property.  For such services, CPO shall receive a management fee equal to eight percent (8%) of the gross revenues from the Property plus reasonable out of pocket costs, payable monthly following payment of debt service and all other Owner Costs then due.

(d)    Notwithstanding anything contained in this Section 11 to the contrary:

(i)    CPO may exercise the rights provided to CPO in Section 10(c) of this Agreement, without the written approval of any other Tenant, notwithstanding any statute or other law to the contrary.

(ii)    Any note, deed of trust, or loan documents executed in connection with a financing or refinancing of all or any portion of the Property shall not personally obligate a Tenant for the repayment of the principal or interest thereof without the written consent of such Tenant.

(iii)    No litigation shall be brought by or on behalf of a Tenant against a third party involving the Property without the written consent of CPO.

(iv)    By unanimous vote of the Tenants, CPO may be removed as manager of the Tenancy or the Property only upon a judicial determination, in a final, unappealable

**AGREEMENT AMONG TENANTS IN COMMON**                                    **Page 6**

judgment of a court of appropriate jurisdiction, of fraud or gross negligence on the part of CPO in connection with the management and operation of the Property.

12.     Conditional Option to Purchase at Selling Tenant's Adjusted Basis.

(a)     Option to Purchase at Selling Tenant's Adjusted Basis.  In the event that (i) any Tenant shall pledge, hypothecate or use as security for any loan or obligation, his interest in the Property or any portion thereof, and a default shall occur with respect to such loan or obligation resulting in the interest of such Tenant (or a portion thereof) being subject to levy or sale; or (ii) any Tenant shall make an assignment for the benefit of creditors or similar arrangement, or any proceeding shall be commenced by or against any Tenant under any bankruptcy, reorganization or other similar laws for the relief of debtors, or the property of a Tenant becomes subject to seizure or sale by reason of a judgment having been taken against him or it, or (iii) any Tenant shall fail to remove any lien or security interest on all or any portion of his interest in the Property within ten (10) days following written notice from any other Tenant, so that a third party lender may obtain a first lien on the Property with priority over such lien or security interest in connection with any financing or re-financing of the Property; then, in any of such events, the Ownership Interest of such Tenant (herein the "Selling Tenant") shall automatically be offered for sale to each other Tenant (herein the "Purchasing Tenant") in accordance with (b) and (c) below, upon notice of such event to each Tenant.

(b)     Option Exercise Procedures.  In the event that the Ownership Interest of a Tenant shall be offered for sale to the other Tenants pursuant to section (a) above, then the Purchasing Tenant(s) shall have the option, exercisable within ninety (90) days of receipt of notice thereof from the Selling Tenant, to purchase the complete Ownership Interest of the Selling Tenant, which purchase shall be, if more than one Purchasing Tenant exercises such option, pro rata in accordance with their respective Ownership Interests in the Property.

(c)     Purchase Price.  The purchase price for the interest of a Tenant to be sold pursuant to (a) shall be said Tenant's adjusted basis in the property after taking into consideration that Tenant's historical cost, return of capital, if any, with appropriate adjustments and allocations for all items of income or, expense accruing prior to the closing date.  All closing costs associated with such sale shall be borne by the Selling Tenant.  The purchase price shall be paid 100% in cash at closing, which is to occur within ninety (90) days of the Purchasing Tenant's receipt of notice from the Selling Tenant.

13.     NEGATION OF PARTNERSHIP; LIABILITY SEVERAL.  NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR CONSTRUED TO CREATE A PARTNERSHIP, JOINT VENTURE OR ASSOCIATION AMONG ANY OF THE PARTIES HERETO.  THE LIABILITY OF THE TENANTS UNDER THIS AGREEMENT SHALL BE SEVERAL, NOT JOINT AND SEVERAL, LIMITED AS TO EACH, TO ITS RESPECTIVE OWNERSHIP INTEREST.

14.     Events of Default.  If any of the following events shall occur and shall not be cured within the time period set forth in Section 14 after written notice thereof to the Tenant committing

**AGREEMENT AMONG TENANTS IN COMMON**                                    Page 7

such acts, such Tenant committing such act shall be deemed to have committed an Event of Default (herein so called):

     (a)    A Tenant shall file a voluntary petition in bankruptcy or shall be adjudicated a bankrupt or insolvent, or shall file any petition or answer seeking any reorganization, arrangement, composition, readjustment liquidation, dissolution or similar relief for itself under any applicable federal state or other statute or law relative to bankruptcy, insolvency or other relief for debtors, or the appointment of any trustee, receiver, conservator or liquidator of said Party or of any part of its properties or interest in the Note or the Property, or

     (b)    A Tenant shall admit in writing its inability to pay its debts as they mature; or

     (c)    A Tenant shall make an assignment for the benefit of creditors or take any other similar action for the protection or benefit of creditors; or

     (d)    A Tenant fails to make any payment required hereunder on a timely basis; or

     (e)    A Tenant shall fail to perform its covenants or obligations contained herein; or

     (f)    A Tenant shall fail to perform its covenants or obligations contained in any agreement secured by a lien on the Property.

In addition to all other rights of CPO, if any other Tenant commits an uncured Event of Default, CPO may require such Tenant to convey its Ownership Interest in the Property in consideration for the payment to such Tenant of an amount equal to such Tenant's direct cost of acquiring his Ownership Interest from CPO, less such Tenant's closing costs incurred in connection with its acquisition of such Ownership Interest.

15.    <u>Notice of Default and Cure</u>. In the event of an Event of Default, the remedies provided for in Section 14 shall apply only if said Event of Default is not timely cured. If a Tenant believes another Tenant is in default hereunder, such Tenant shall give the defaulting Tenant written notice setting forth such default and the defaulting Tenant shall have thirty (30) days after the receipt of such notice to cure such default. In the event such default is not cured during such thirty (30) day period, such defaulting Tenant shall be deemed to have committed such Event of Default and the other Tenant may enforce such Tenant's rights and remedies contained herein and at law.

Each Tenant (the "Indemnifying Tenant") agrees to indemnify the other Tenants for any loss, damage or claim arising from any uncured Event of Default of the Indemnifying Tenant.

16.    <u>Election to be Excluded from Provisions of Subchapter K</u>. Each Tenant hereby elects to be excluded from all of the provisions of Subchapter K of Chapter I of the Internal Revenue Code of 1986, as amended (the "Code"). The exclusion elected by each Tenant hereunder shall commence with the execution of this Agreement. Each Tenant hereby covenants and agrees that each Tenant shall abide by all regulatory requirements in order to maintain such election and shall report on such

**AGREEMENT AMONG TENANTS IN COMMON**          **Page 8**

Tenant's income tax return such respective share of items of income, deduction and credit which results from holding of the Property, in a manner consistent with the exclusion of the Tenancy from Subchapter K of Chapter I of the Code, commencing with the first taxable year of the Tenancy. No Tenant shall notify the Commissioner of Internal Revenue (the "Commissioner") that such Tenant desires that Subchapter K of the Code apply to the Tenancy and each Tenant hereby agrees to indemnify and hold each other Tenant free and harmless from all cost, liability, tax consequence and expense, including attorneys' fees, which results from any Tenant so notifying the Commissioner.

17.    Dissolution.  The Tenancy, as governed hereby, shall be immediately dissolved upon the happening of any of the following events:

(i)     The sale or other disposition by the Tenants of all of the Property; or

(ii)    The decision of the Tenants that the Tenancy be dissolved; or

(iii)   Ten (10) years after the date hereof, absent prior extension of the term of the Tenancy (for one or more years) by written notice from CPO to the other Tenants, at CPO's option in its sole and absolute discretion.

18.    Notices.  All notices under this Agreement must be in writing and shall be deemed to have been duly given if delivered personally or by certified mail, return receipt requested, to the addresses set forth on the signature page hereof.

19.    Amendment; Additional Tenants.  This Agreement may be amended only by written agreement signed by all Tenants; provided, however, that CPO may sell additional undivided interests in the Property (from the CPO Ownership Interest) to third parties, in which case such other third party(ies) may be added to this Agreement by CPO as additional Tenants, with the same rights and obligations hereunder as are applicable to IPO and the IPO Ownership Interest, to the extent of the undivided interest in the Property constituting the Ownership Interest of such third party(ies) in the Property. In such event, the Ownership Interests of CPO hereunder shall be reduced pro rata, such that the aggregate Ownership Interests of the Tenants following such sale(s) of undivided interests in the CPO Ownership Interest shall continue to equal one hundred (100%).

20.    Counterparts.  This Agreement may be executed in counterparts each of which shall be deemed to be an original, but such counterparts, when taken together, shall constitute but one agreement.

21.    Gender.  All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine or neuter, singular or plural, as the identity of the person, persons, entity or entities may require.

22.    Caption Headings.  Captions at the beginning of each numbered Section of this Agreement are solely for the convenience of the parties and shall not be deemed part of the context of this Agreement.

**AGREEMENT AMONG TENANTS IN COMMON**                                                **Page 9**

23.    <u>Negotiated Transaction</u>.  The provisions of this Agreement were negotiated by all of the parties hereto and said Agreement shall be deemed to have been drafted by all of the parties thereto.

24.    <u>Further Assurances</u>.  Each Tenant hereby agrees to promptly sign any additional instruments or documents which are necessary or appropriate to carry out the purpose of this Agreement.

25.    <u>Interpretation</u>.  It is the intent of the Tenants to own the Property for investment purposes, only and not for the conduct of a business, and to otherwise comply with all statutes and regulations allowing an election to be excluded from Subchapter K of the Code and this Agreement shall be interpreted to conform to such intent.

26.    <u>Litigation</u>.  In the event of any litigation between the parties hereto, the prevailing party in such litigation shall be paid all attorneys' fees, court costs and litigation expenses incurred in such litigation by the non-prevailing party.  The parties hereto agree that specific performance is an appropriate remedy for the enforcement of the rights of the Tenants hereunder concerning a sale of the Property and the obligations of the parties hereunder.

27.    <u>Recording</u>.  A memorandum of this Agreement may be recorded by CPO and the other Tenants agree to cooperate and facilitate such recording.


[SIGNATURE PAGE FOLLOWS]


**AGREEMENT AMONG TENANTS IN COMMON**                              Page 10

EXECUTED effective as of February 1, 2022 (the "Effective Date").

**Buddy Mac Six RE, LLC (a Texas Limited Liability Company)**

By: _____

       Name: Wm. Ian MacDonald
       Title: Manager

Date: Agreed to as of the "Effective Date" set forth above

Address:  400 East Centre Park Blvd., Suite 101
            DeSoto, Texas 75115
Facsimile: 972-283-0193

**Donald P. Heath and Joanne O. Heath,
Husband and Wife as Joint Tenants**

By: _____
Name: Donald P. Heath
Title: An Individual,

and

By: _____
Name: Joanne O. Heath
Title: An Individual

Address: 13 Klamath, Irvine, CA 92612
Telephone: (____) ____-_____;
Fax: _____

**AGREEMENT AMONG TENANTS IN COMMON**          **Page 11**

## EXHIBIT A

### The Property

An undivided Nineteen point Nine Two percent (19.92%) interest in

Lot One (1) of ROLLIE SUBDIVISION UNIT SIX (6), to the City of Gallup, New Mexico, as the same is shown and designated on the plat thereof filed in the office of the County Clerk of McKinley County, New Mexico on January 22, 1988.

As provided in Section 14-11-10.1 NMSA 1978, the simple description of the property is 1100 N. Highway 491. the City of Gallup, County of McKinley and State of New Mexico.

**Buyer:**
Ownership Interest Percentage:
Nineteen point Nine Two percent (19.92%)

**Buyer:**
Purchase Price of Ownership Interest (Originally Invested Amount): $148,223.67

**Seller Ownership Interest:**
Seventy Three point One Nine percent (73.19%)

Agreed Upon Current Value of the Property: $1,233,333.

**AGREEMENT AMONG TENANTS IN COMMON**
DALLAS1 1068268v3 51997-00001

Page 12

# EXHIBIT D

# EXHIBIT D-1

**Brownfield TIC - Berg**

## AGREEMENT AMONG TENANTS IN COMMON
### Brownfield, TX

**THIS AGREEMENT AMONG TENANTS IN COMMON** ("Agreement") is made and entered into initially by and between SAM Brownfield, LLC (a Texas Limited Liability Company) and Current Property Owner ("CPO") and **RONALD H. BERG**, an unmarried man in Irvine, California as the Incoming Property Owner ("IPO"), being sometimes referred to singularly as "Tenant" or collectively as the "Tenants".

### RECITALS

A.      It is the desire of the Tenants to hold, operate, maintain, finance, keep in repair, lease and/or sell or exchange, as tenants in common, that certain real property together with all improvements located therein, commonly known Buddy's which is more fully described on Exhibit "A" attached hereto and by this reference incorporated herein (the "Property").

B.      It is the desire of IPO to acquire an undivided interest in the Property from CPO as is more fully described In Exhibit 'A'.

NOW, THEREFORE, in consideration of the foregoing Recitals and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Tenants to hereby agree as follows:

1.      <u>Formation of Tenancy</u>.  The Tenants hereby acknowledge their ownership to be a tenancy in common (the "Tenancy") and this Agreement shall govern the ownership and management of the Property.  The principal purpose of the Tenancy shall be to hold and maintain the Property as tenants in common for investment purposes.  The address of each Tenant for notice and all other purposes of this Agreement is set forth on the signature page hereof.  Except as expressly provided herein, no Tenant shall sell, assign, hypothecate or otherwise dispose of or encumber its interest or any part thereof in the Property without the prior written consent of the other Tenants.

2.      <u>Term</u>.  The Tenancy as governed hereby shall commence on the execution of this Agreement, and shall continue thereafter until dissolved or terminated pursuant to Sections 17 hereof.

3.      <u>Title to the Property</u>.  Contemporaneously with the execution hereof, IPO has acquired an undivided interest in the Property as set forth in Exhibit 'A', (the "IPO Interest"), and CPO retains an interest in the Property as is more fully described in Exhibit 'A' (the "CPO Ownership Interest").  The CPO Ownership Interest and the IPO Ownership Interest are hereinafter sometimes referred to as the "Ownership Interests" or an "Ownership Interest."  Each Tenant agrees to be bound by the terms and conditions of this Agreement.

4.      <u>Ownership Rights of Tenants</u>.  Notwithstanding any statute or other rule of law and having previously been advised of their respective rights to bring an action for partition, the Tenants

**AGREEMENT AMONG TENANTS IN COMMON**                                          **Page 1**

agree that during the term hereof the Tenants shall only have those rights in the Property as expressly provided herein and each Tenant hereby irrevocably waives any and all rights that it has (i) to occupy the Property or any portion thereof, or to exclude any other Tenant from the Property or any portion thereof, and (ii) to maintain any action for any partition of the Property, or otherwise force a sale of the Property during the term hereof, all except as expressly provided herein.

    5.    <u>Tenant Payment Obligations</u>.

    (a)    Each Tenant agrees to pay its Agreed Share (such Agreed Share determined as provided, below) of all costs and expenses involved in owning, operating, maintaining, leasing, selling or exchanging the Property, including, but not limited to, ad valorem taxes, insurance premiums, repairs, necessary improvements, contractual fees, professional fees, lease commissions and utility costs, debt service and other financing-related costs, and capital repairs and replacements and other capital expenditures at the Property (collectively, "Owner Costs"). To the extent that the income from the Property is insufficient to pay all Owner Costs in the ordinary course of business, each Tenant's Agreed Share of such Owner Costs shall be paid by each Tenant, upon demand, prior to the due date of all such costs and expenses and no later than ten (10) days prior to the date when such costs and expenses are due.

    For purposes of this Agreement, the Agreed Share of each Tenant shall be equal to his respective Ownership Interest in the Property. CPO, which shall be the Tenant managing the Tenancy, shall maintain a banking account or accounts at financial institutions on behalf of the Tenants and shall maintain reasonable reserves for future costs and expenses of the Property.

    (b)    If any Tenant fails promptly to contribute such Tenant's share of the Owner Costs ("Defaulting Tenant"), the other Tenants may pay the entire amount' of such Owner Costs and the amount not paid by the Defaulting Tenant shall be deemed a loan to the Defaulting Tenant (the "Tenant Loan" or "Tenant Loans"). All Tenant Loans shall be payable on demand, shall bear interest at the rate of eighteen percent (18%) per annum, and shall constitute a lien on the interest of the Defaulting Tenant in the Property, which lien shall be expressly subject and subordinate to any existing or future lien of any third party lender with a lien on the Property. Each Defaulting Tenant authorizes each other Tenant making a Tenant Loan to execute and record such documents as such Tenant deems necessary to further or better evidence such loan and lien.

    In the event a Tenant makes a loan or loans to the Defaulting Tenant ("Loaning Tenant") and any Tenant Loan remains unpaid for a thirty (30) day period after written notice is given to the Defaulting Tenant requesting payment, the Loaning Tenant may bring suit against the Defaulting Tenant for the amount of the Tenant Loans not paid plus all reasonable collection costs. All income from the sale and operation of the Property shall be paid to the Loaning Tenant until all Tenant Loans are paid in full.

**AGREEMENT AMONG TENANTS IN COMMON**        Page 2

6.    Distribution of Net Profits From Operation, Financing, Refinancing, Exchange, Lease and Sale of the Property.

(a)    All income derived from the operation of the Property in whatever form and however derived (less reasonable working capital and capital repairs and replacement reserves), shall be divided and paid when received as follows:

(i)    First, to each Tenant in an amount equal to such Tenant's Agreed Share of the Owner Costs, or, at CPO's option, to pay such Tenant's Agreed Share of such Owner Costs directly on its behalf,

(ii)    The IPO tenant shall receive the greater of (i) percentage interest of the net income of the Property as set forth in Exhibit 'A', or (ii) the  annual pay rate paid on the originally invested amount set forth in Exhibit 'A' ("Originally Invested Amount") to be paid on a monthly basis,

(iii)    The IPO tenant shall also a receive a two percent (2%) annual accrual on the invested amount to be paid upon redemption of the IPO interest, and

(iv)    Thereafter, the CPO tenant shall receive the remaining available balance of the cash flow and distributions from all other distributable sources.

(b)    In the event of the financing, refinancing, exchange or lease of the Property, or in the event of a sale under Section 10 herein, the Net Profits, if any, from the sale, lease, financing, refinancing or exchange of the Property shall be divided between the Tenants when received in the same manner set forth in Section 6(a).  The term "Net Profits" for the purpose of this paragraph shall mean the net proceeds from any financing, refinancing, exchange or lease (less all reasonable and bona fide financing, exchange or leasing costs) or the net sales price of the Property (gross sales price less all reasonable and bona fide selling expenses) less; (i) the outstanding unpaid indebtedness of all notes secured by loans on the Property at the time of such sale; (ii) the outstanding principal balance plus accrued but unpaid interest on any Tenant Loans, and (iii) all other reasonable and bona fide expenses incurred by the Tenancy in connection with the ownership, maintenance, financing, refinancing, exchange, lease or the sale of the Property, including any unpaid Owner Costs.  Each Tenant shall receive its share of the Net Profits under this Section 6(b) in the form of any promissory note(s) or cash received from the leasing, financing, refinancing, exchange or sale.

7.    Books and Records.  Proper and complete books of account of the Tenancy shall be kept by CPO (i.e., the Tenant managing the Tenancy) as an expense of the Tenancy and shall be open to inspection and copying by any Tenant or representatives of each Tenant at any reasonable time. The books and records of account shall be examined and reviewed as of the close of each calendar year by an accountant selected by CPO, and such accountant shall prepare an annual report thereof, copies of which will be furnished to each Tenant as soon, as possible after the conclusion of each calendar year.  Each Tenant shall have the right to make a separate audit of the books and records of the Tenancy at such Tenant's own expense at any time and from time to time.

**AGREEMENT AMONG TENANTS IN COMMON**                                   **Page 3**

8.    <u>Bank Accounts</u>.  All funds of the Tenancy shall be deposited by CPO in a bank or brokerage account or accounts in the name of the Tenancy and funds from said bank account or accounts shall be disbursed upon the signature of CPO in the ordinary course of business, and in accordance with the provisions of this Agreement, unless all Tenants direct otherwise.  Tenancy funds shall be used only for Tenancy purposes.

9.    <u>Dissolution of a Tenant</u>. The dissolution of any Tenant shall not have the affect of terminating or dissolving the Tenancy.  Upon the dissolution of a Tenant, the shareholders, partners, members or other equity owners thereof shall succeed to its interest in this Tenancy and shall be bound by the terms and provisions of this Agreement; however, in the event that the interest of the dissolved Tenant passes to more than one person, then, and in that event, such persons shall, within ninety (90) days after dissolution of the Tenant, execute and deliver to the other Tenants a written instrument (including Power of Attorney) appointing one person as and to be the Agent for collecting, receiving and making all payments and contributions required hereunder, shall vote the entire interest of the successors, and shall perform all other obligations of such successors performable by reason of or arising from their interest in the Tenancy; and, any and all payments and/or disbursements due arising from the successors interest in the Tenancy shall be deemed to have been validly made to such successors by paying the same to such duly designated Agent.  In the event that said successors for any reason fail to designate such Agent in writing in the manner and within the time prescribed and continue to fail to cure such default after ten (10) days written notice from another Tenant to correct same, such other Tenant shall have the right to appoint such Agent.

10.    <u>Transfer of Tenant's Interest and Sale of Property</u>.

(a)    No Tenant may sell, transfer, convey, encumber or otherwise hypothecate the Property or its undivided interest in the Property without the written consent of the other Tenants, except as provided in Section 10(c) herein and Section 11 herein.

(b)    Any permitted transfer of a Tenant's Ownership Interest in the Property shall be subject to such transferee's written agreement to be bound by all of the terms and conditions of this Agreement; any transfer without such written assumption agreement shall be null and void.

(c)    CPO may, at any time, sell, finance, exchange or otherwise transfer or encumber all of the Property (including the other Ownership Interests) on such terms and conditions as CPO may, in CPO's sole discretion, determine, so long as such transaction is a bona fide transaction and all of the terms and conditions of such transaction are fully disclosed to all Tenants at the time such transaction is entered into.  If requested by CPO, all Tenants shall join in the conveyance of the Property and/or execute all documents necessary or desirable to close such transaction.

(d)    If the signature of a Tenant is required by a third party in connection with the transactions contemplated by Section 10(c), such Tenant agrees to execute and deliver such documents as such third party deems necessary or desirable to accomplish all of the foregoing.  If such Tenant fails to execute and deliver any such documents within ten (10) days following written notice from CPO, CPO is hereby authorized, and each Tenant grants to CPO an irrevocable power of attorney,

**AGREEMENT AMONG TENANTS IN COMMON**                                    **Page 4**

coupled with an interest, to execute and deliver any such documents by, in the name of and on behalf of such Tenant, which documents shall be binding upon such Tenant to the same extent as if such Tenant had personally executed and delivered the same.

(e)    A Tenant may not, without the prior written consent of CPO, which consent may be granted or withheld in the sole and absolute discretion of CPO, sell, transfer, convey, encumber or otherwise hypothecate all or any portion of the Property (including its Ownership Interest).

(f)    IPO Put Option ("Put Option") is available to IPO annually commencing on fifth anniversary of the agreement and extending to the full term of the Term of the Agreement.
Put Option value to be determined based on the greater of the

(i)    the (a) amount of the original purchased interest (as set forth in Exhibit 'A'), plus (b) a two percent (2%) per year accrual on the amount of the original purchased interest, or

(ii)    the amount of the original purchased interest (as set forth in Exhibit 'A'), plus the net increase above the current agreed upon market Property value set forth in Exhibit 'A' times the IPO percentage ownership interest set forth in Exhibit 'A'; (unless otherwise agreed, to be appraised by an independent third party appraiser within 6 months of the Owner Put Option being exercised);

(iii)    however in no event will the IPO Put Option be less than the redemption of original purchased interest plus the two percent (2%) annual accrual during the outstanding period of the interest held by IPO.

(g)    CPO Call Option ("Call Option") is available to CPO annually commencing on the third annual anniversary of the agreement and extending to the full term of the Agreement.
Call Option value to be determined based on the greater of the

(i)    (a) amount of the original purchased interest(as set forth in Exhibit 'A'), plus (b) a two percent (2%) per year accrual of the original purchased interest, or

(ii)    the amount of the original purchased interest (as set forth in Exhibit 'A'), plus net increase above the current agreed upon market Property value as set forth in Exhibit 'A'times the IPO percentage ownership interest set forth in Exhibit 'A'; (unless otherwise agreed, to be appraised by an independent third party appraiser within 6 months of the Owner Put Option being exercised);

(iii)    however in no event will the CPO Call Option be less than the redemption of original purchased interest plus the two percent (2%) annual accrual during the outstanding period of the interest held by IPO.

**AGREEMENT AMONG TENANTS IN COMMON**                                            Page 5

11. <u>Management, Financing, and Leasing</u>. It is the objective of the Tenants to maximize the market value of the Property by operating, leasing, financing, and/or sale of the Property.

(a)    The Tenants irrevocably authorize CPO, or any management company or management agent appointed by CPO, (i) to operate, manage and lease all or any portion of the Property upon such terms and conditions as CPO may determine necessary or advisable in its absolute and sole discretion; (ii) to pay from any revenues derived from operation of the Property, on or before the date due, all installments of principal and/or interest on all debts secured by a lien on the Property, (iii) to execute any and all documents necessary to manage and lease all or any portion of the Property as permitted herein, without the necessity of any other Tenant joining in the execution thereof including without limitation the sale, refinance merger or other material event.

(b)    If the signature of a Tenant is required by a third party, each Tenant agrees to execute and deliver such documents as such third party deems necessary or desirable to accomplish all of the foregoing and such management or lease of the Property. If a Tenant fails to execute and deliver any such documents within ten (10) days following written notice from CPO, CPO is hereby authorized, and each Tenant grants to CPO an irrevocable power of attorney, coupled with an interest, to execute and deliver any such documents by, in the name of and on behalf of such Tenant, which documents shall be binding upon such Tenant to the same extent as if such Tenant had personally executed and delivered the same.

(c)    If third party management is not obtained for the Property by CPO, in its sole and absolute discretion, CPO may appoint itself or any affiliate as manager of the Tenancy and the Property. For such services, CPO shall receive a management fee equal to eight percent (8%) of the gross revenues from the Property plus reasonable out of pocket costs, payable monthly following payment of debt service and all other Owner Costs then due.

(d)    Notwithstanding anything contained in this Section 11 to the contrary:

(i)    CPO may exercise the rights provided to CPO in Section 10(c) of this Agreement, without the written approval of any other Tenant, notwithstanding any statute or other law to the contrary.

(ii)    Any note, deed of trust, or loan documents executed in connection with a financing or refinancing of all or any portion of the Property shall not personally obligate a Tenant for the repayment of the principal or interest thereof without the written consent of such Tenant.

(iii)    No litigation shall be brought by or on behalf of a Tenant against a third party involving the Property without the written consent of CPO.

(iv)    By unanimous vote of the Tenants, CPO may be removed as manager of the Tenancy or the Property only upon a judicial determination, in a final, unappealable

**AGREEMENT AMONG TENANTS IN COMMON**                    **Page 6**

judgment of a court of appropriate jurisdiction, of fraud or gross negligence on the part of CPO in connection with the management and operation of the Property.

      12.    Conditional Option to Purchase at Selling Tenant's Adjusted Basis.

      (a)    Option to Purchase at Selling Tenant's Adjusted Basis.  In the event that (i) any Tenant shall pledge, hypothecate or use as security for any loan or obligation, his interest in the Property or any portion thereof, and a default shall occur with respect to such loan or obligation resulting in the interest of such Tenant (or a portion thereof) being subject to levy or sale; or (ii) any Tenant shall make an assignment for the benefit of creditors or similar arrangement, or any proceeding shall be commenced by or against any Tenant under any bankruptcy, reorganization or other similar laws for the relief of debtors, or the property of a Tenant becomes subject to seizure or sale by reason of a judgment having been taken against him or it, or (iii) any Tenant shall fail to remove any lien or security interest on all or any portion of his interest in the Property within ten (10) days following written notice from any other Tenant, so that a third party lender may obtain a first lien on the Property with priority over such lien or security interest in connection with any financing or re-financing of the Property; then, in any of such events, the Ownership Interest of such Tenant (herein the "Selling Tenant") shall automatically be offered for sale to each other Tenant (herein the "Purchasing Tenant") in accordance with (b) and (c) below, upon notice of such event to each Tenant.

      (b)    Option Exercise Procedures.  In the event that the Ownership Interest of a Tenant shall be offered for sale to the other Tenants pursuant to section (a) above, then the Purchasing Tenant(s) shall have the option, exercisable within ninety (90) days of receipt of notice thereof from the Selling Tenant, to purchase the complete Ownership Interest of the Selling Tenant, which purchase shall be, if more than one Purchasing Tenant exercises such option, pro rata in accordance with their respective Ownership Interests in the Property.

      (c)    Purchase Price.  The purchase price for the interest of a Tenant to be sold pursuant to (a) shall be said Tenant's adjusted basis in the property after taking into consideration that Tenant's historical cost, return of capital, if any, with appropriate adjustments and allocations for all items of income or, expense accruing prior to the closing date.  All closing costs associated with such sale shall be borne by the Selling Tenant.  The purchase price shall be paid 100% in cash at closing, which is to occur within ninety (90) days of the Purchasing Tenant's receipt of notice from the Selling Tenant.

      13.    NEGATION OF PARTNERSHIP; LIABILITY SEVERAL.  NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR CONSTRUED TO CREATE A PARTNERSHIP, JOINT VENTURE OR ASSOCIATION AMONG ANY OF THE PARTIES HERETO.  THE LIABILITY OF THE TENANTS UNDER THIS AGREEMENT SHALL BE SEVERAL, NOT JOINT AND SEVERAL, LIMITED AS TO EACH, TO ITS RESPECTIVE OWNERSHIP INTEREST.

      14.    Events of Default.  If any of the following events shall occur and shall not be cured within the time period set forth in Section 14 after written notice thereof to the Tenant committing

**AGREEMENT AMONG TENANTS IN COMMON**        Page 7

such acts, such Tenant committing such act shall be deemed to have committed an Event of Default (herein so called):

     (a)    A Tenant shall file a voluntary petition in bankruptcy or shall be adjudicated a bankrupt or insolvent, or shall file any petition or answer seeking any reorganization, arrangement, composition, readjustment liquidation, dissolution or similar relief for itself under any applicable federal state or other statute or law relative to bankruptcy, insolvency or other relief for debtors, or the appointment of any trustee, receiver, conservator or liquidator of said Party or of any part of its properties or interest in the Note or the Property, or.

     (b)    A Tenant shall admit in writing its inability to pay its debts as they mature; or

     (c)    A Tenant shall make an assignment for the benefit of creditors or take any other similar action for the protection or benefit of creditors; or

     (d)    A Tenant fails to make any payment required hereunder on a timely basis;

     (e)    A Tenant shall fail to perform its covenants or obligations contained herein; or

     (f)    A Tenant shall fail to perform its covenants or obligations contained in any agreement secured by a lien on the Property.

In addition to all other rights of CPO, if any other Tenant commits an uncured Event of Default, CPO may require such Tenant to convey its Ownership Interest in the Property in consideration for the payment to such Tenant of an amount equal to such Tenant's direct cost of acquiring his Ownership Interest from CPO, less such Tenant's closing costs incurred in connection with its acquisition of such Ownership Interest.

15.    <u>Notice of Default and Cure</u>.  In the event of an Event of Default, the remedies provided for in Section 14 shall apply only if said Event of Default is not timely cured. If a Tenant believes another Tenant is in default hereunder, such Tenant shall give the defaulting Tenant written notice setting forth such default and the defaulting Tenant shall have thirty (30) days after the receipt of such notice to cure such default. In the event such default is not cured during such thirty (30) day period, such defaulting Tenant shall be deemed to have committed such Event of Default and the other Tenant may enforce such Tenant's rights and remedies contained herein and at law.

Each Tenant (the "Indemnifying Tenant") agrees to indemnify the other Tenants for any loss, damage or claim arising from any uncured Event of Default of the Indemnifying Tenant.

16.    <u>Election to be Excluded from Provisions of Subchapter K</u>.  Each Tenant hereby elects to be excluded from all of the provisions of Subchapter K of Chapter I of the Internal Revenue Code of 1986, as amended (the "Code"). The exclusion elected by each Tenant hereunder shall commence with the execution of this Agreement. Each Tenant hereby covenants and agrees that each Tenant shall abide by all regulatory requirements in order to maintain such election and shall report on such

**AGREEMENT AMONG TENANTS IN COMMON**         **Page 8**

Tenant's income tax return such respective share of items of income, deduction and credit which results from holding of the Property, in a manner consistent with the exclusion of the Tenancy from Subchapter K of Chapter I of the Code, commencing with the first taxable year of the Tenancy. No Tenant shall notify the Commissioner of Internal Revenue (the "Commissioner") that such Tenant desires that Subchapter K of the Code apply to the Tenancy and each Tenant hereby agrees to indemnify and hold each other Tenant free and harmless from all cost, liability, tax consequence and expense, including attorneys' fees, which results from any Tenant so notifying the Commissioner.

17.    Dissolution.  The Tenancy, as governed hereby, shall be immediately dissolved upon the happening of any of the following events:

(i)    The sale or other disposition by the Tenants of all of the Property; or

(ii)    The decision of the Tenants that the Tenancy be dissolved; or

(iii)    Ten (10) years after the date hereof, absent prior extension of the term of the Tenancy (for one or more years) by written notice from CPO to the other Tenants, at CPO's option in its sole and absolute discretion.

18.    Notices.  All notices under this Agreement must be in writing and shall be deemed to have been duly given if delivered personally or by certified mail, return receipt requested, to the addresses set forth on the signature page hereof.

19.    Amendment; Additional Tenants.  This Agreement may be amended only by written agreement signed by all Tenants; provided, however, that CPO may sell additional undivided interests in the Property (from the CPO Ownership Interest) to third parties, in which case such other third party(ies) may be added to this Agreement by CPO as additional Tenants, with the same rights and obligations hereunder as are applicable to IPO and the IPO Ownership Interest, to the extent of the undivided interest in the Property constituting the Ownership Interest of such third party(ies) in the Property. In such event, the Ownership Interests of CPO hereunder shall be reduced pro rata, such that the aggregate Ownership Interests of the Tenants following such sale(s) of undivided interests in the CPO Ownership Interest shall continue to equal one hundred (100%).

20.    Counterparts.  This Agreement may be executed in counterparts each of which shall be deemed to be an original, but such counterparts, when taken together, shall constitute but one agreement.

21.    Gender.  All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine or neuter, singular or plural, as the identity of the person, persons, entity or entities may require.

22.    Caption Headings.  Captions at the beginning of each numbered Section of this Agreement are solely for the convenience of the parties and shall not be deemed part of the context of this Agreement.

**AGREEMENT AMONG TENANTS IN COMMON**                                    **Page 9**

23. <u>Negotiated Transaction</u>. The provisions of this Agreement were negotiated by all of the parties hereto and said Agreement shall be deemed to have been drafted by all of the parties thereto.

24. <u>Further Assurances</u>. Each Tenant hereby agrees to promptly sign any additional instruments or documents which are necessary or appropriate to carry out the purpose of this Agreement.

25. <u>Interpretation</u>. It is the intent of the Tenants to own the Property for investment purposes, only and not for the conduct of a business, and to otherwise comply with all statutes and regulations allowing an election to be excluded from Subchapter K of the Code and this Agreement shall be interpreted to conform to such intent.

26. <u>Litigation</u>. In the event of any litigation between the parties hereto, the prevailing party in such litigation shall be paid all attorneys' fees, court costs and litigation expenses incurred in such litigation by the non-prevailing party. The parties hereto agree that specific performance is an appropriate remedy for the enforcement of the rights of the Tenants hereunder concerning a sale of the Property and the obligations of the parties hereunder.

27. <u>Recording</u>. A memorandum of this Agreement may be recorded by CPO and the other Tenants agree to cooperate and facilitate such recording.

[SIGNATURE PAGE FOLLOWS]

**AGREEMENT AMONG TENANTS IN COMMON** **Page 10**

EXECUTED effective as of February1, 2022(the "Effective Date").

**SAM Brownfield, LLC** (a Texas Limited Liability Company)

By: MacDonald Capital Corporation (a Texas corporation), gp

By:_____

      Name: Wm. Ian MacDonald
      Title: Manager

Date: Agreed to as of the "Effective Date" set forth above

Address:  400 East Centre Park Blvd., Suite 101
           DeSoto, Texas 75115
Facsimile: 972-283-0193

**RONALD H. BERG**

By:_____
    **Individually**

Date: Agreed to as of the "Effective Date" set forth above
Address:  20 Canyon Ridge,
         Irvine, CA  92603
Phone Number: (714) 402-2374
Facsimile:_____

*AGREEMENT AMONG TENANTS IN COMMON*                    Page 11

## EXHIBIT A

### The Property

An undivided Six point Five One percent (6.51%) interest in

501 West Main Street, Brownfield, TX 79316
Lots 7 and 8, Block 23, Original Town of Brownfield,
Brownfield, Terry County, Texas

**Buyer:**
Ownership Interest Percentage: Six point Five One percent (6.51%)

**Buyer:**
Purchase Price of Ownership Interest (Originally Invested Amount): $35,166.12

**Seller Ownership Interest:**
Seventy Three point One Nine percent (74.66%)

Agreed Upon Current Value of the Property: $846,625.

**AGREEMENT AMONG TENANTS IN COMMON**                    Page 12
DALLAS1 1068268v3 51997-00001

# EXHIBIT D-2

**Brownfield TIC - Heath**

## AGREEMENT AMONG TENANTS IN COMMON
### Brownfield, TX

**THIS AGREEMENT AMONG TENANTS IN COMMON** ("Agreement") is made and entered into initially by and between SAM Brownfield, LLC (a Texas Limited Liability Company) and Current Property Owner ("CPO") and **Donald P. Heath and Joanne O. Heath, Husband and Wife as Joint Tenants** in Irvine, California as the Incoming Property Owner ("IPO"), being sometimes referred to singularly as "Tenant" or collectively as the "Tenants".

## RECITALS

A.      It is the desire of the Tenants to hold, operate, maintain, finance, keep in repair, lease and/or sell or exchange, as tenants in common, that certain real property together with all improvements located therein, commonly known Buddy's which is more fully described on Exhibit "A" attached hereto and by this reference incorporated herein (the "Property").

B.      It is the desire of IPO to acquire an undivided interest in the Property from CPO as is more fully described In Exhibit 'A'.

NOW, THEREFORE, in consideration of the foregoing Recitals and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Tenants to hereby agree as follows:

1.      <u>Formation of Tenancy</u>.  The Tenants hereby acknowledge their ownership to be a tenancy in common (the "Tenancy") and this Agreement shall govern the ownership and management of the Property. The principal purpose of the Tenancy shall be to hold and maintain the Property as tenants in common for investment purposes. The address of each Tenant for notice and all other purposes of this Agreement is set forth on the signature page hereof. Except as expressly provided herein, no Tenant shall sell, assign, hypothecate or otherwise dispose of or encumber its interest or any part thereof in the Property without the prior written consent of the other Tenants.

2.      <u>Term</u>.  The Tenancy as governed hereby shall commence on the execution of this Agreement, and shall continue thereafter until dissolved or terminated pursuant to Sections 17 hereof.

3.      <u>Title to the Property</u>.  Contemporaneously with the execution hereof, IPO has acquired an undivided interest in the Property as set forth in Exhibit 'A', the ("IPO Interest"), and CPO retains an interest in the Property as is more fully described in Exhibit 'A' (the "CPO Ownership Interest"). The CPO Ownership Interest and the IPO Ownership Interest are hereinafter sometimes referred to as the "Ownership Interests" or an "Ownership Interest." Each Tenant agrees to be bound by the terms and conditions of this Agreement.

4.      <u>Ownership Rights of Tenants</u>.  Notwithstanding any statute or other rule of law and having previously been advised of their respective rights to bring an action for partition, the Tenants

**AGREEMENT AMONG TENANTS IN COMMON**                          **Page 1**

agree that during the term hereof the Tenants shall only have those rights in the Property as expressly provided herein and each Tenant hereby irrevocably waives any and all rights that it has (i) to occupy the Property or any portion thereof, or to exclude any other Tenant from the Property or any portion thereof, and (ii) to maintain any action for any partition of the Property, or otherwise force a sale of the Property during the term hereof, all except as expressly provided herein.

5.    <u>Tenant Payment Obligations</u>.

(a)    Each Tenant agrees to pay its Agreed Share (such Agreed Share determined as provided, below) of all costs and expenses involved in owning, operating, maintaining, leasing, selling or exchanging the Property, including, but not limited to, ad valorem taxes, insurance premiums, repairs, necessary improvements, contractual fees, professional fees, lease commissions and utility costs, debt service and other financing-related costs, and capital repairs and replacements and other capital expenditures at the Property (collectively, "Owner Costs"). To the extent that the income from the Property is insufficient to pay all Owner Costs in the ordinary course of business, each Tenant's Agreed Share of such Owner Costs shall be paid by each Tenant, upon demand, prior to the due date of all such costs and expenses and no later than ten (10) days prior to the date when such costs and expenses are due.

For purposes of this Agreement, the Agreed Share of each Tenant shall be equal to his respective Ownership Interest in the Property. CPO, which shall be the Tenant managing the Tenancy, shall maintain a banking account or accounts at financial institutions on behalf of the Tenants and shall maintain reasonable reserves for future costs and expenses of the Property.

(b)    If any Tenant fails promptly to contribute such Tenant's share of the Owner Costs ("Defaulting Tenant"), the other Tenants may pay the entire amount' of such Owner Costs and the amount not paid by the Defaulting Tenant shall be deemed a loan to the Defaulting Tenant (the "Tenant Loan" or "Tenant Loans"). All Tenant Loans shall be payable on demand, shall bear interest at the rate of eighteen percent (18%) per annum, and shall constitute a lien on the interest of the Defaulting Tenant in the Property, which lien shall be expressly subject and subordinate to any existing or future lien of any third party lender with a lien on the Property. Each Defaulting Tenant authorizes each other Tenant making a Tenant Loan to execute and record such documents as such Tenant deems necessary to further or better evidence such loan and lien.

In the event a Tenant makes a loan or loans to the Defaulting Tenant ("Loaning Tenant") and any Tenant Loan remains unpaid for a thirty (30) day period after written notice is given to the Defaulting Tenant requesting payment, the Loaning Tenant may bring suit against the Defaulting Tenant for the amount of the Tenant Loans not paid plus all reasonable collection costs. All income from the sale and operation of the Property shall be paid to the Loaning Tenant until all Tenant Loans are paid in full.

**AGREEMENT AMONG TENANTS IN COMMON**                                  Page 2

6.    Distribution of Net Profits From Operation, Financing, Refinancing, Exchange, Lease and Sale of the Property.

(a)    All income derived from the operation of the Property in whatever form and however derived (less reasonable working capital and capital repairs and replacement reserves), shall be divided and paid when received as follows:

(i)    First, to each Tenant in an amount equal to such Tenant's Agreed Share of the Owner Costs, or, at CPO's option, to pay such Tenant's Agreed Share of such Owner Costs directly on its behalf,

(ii)    The IPO tenant shall receive the greater of (i) percentage interest of the net income of the Property as set forth in Exhibit 'A', or (ii) the annual pay rate paid on the originally invested amount set forth in Exhibit 'A' ("Originally Invested Amount") to be paid on a monthly basis,

(iii)    The IPO tenant shall also a receive a two percent (2%) annual accrual on the invested amount to be paid upon redemption of the IPO interest, and

(iv)    Thereafter, the CPO tenant shall receive the remaining available balance of the cash flow and distributions from all other distributable sources.

(b)    In the event of the financing, refinancing, exchange or lease of the Property, or in the event of a sale under Section 10 herein, the Net Profits, if any, from the sale, lease, financing, refinancing or exchange of the Property shall be divided between the Tenants when received in the same manner set forth in Section 6(a).  The term "Net Profits" for the purpose of this paragraph shall mean the net proceeds from any financing, refinancing, exchange or lease (less all reasonable and bona fide financing, exchange or leasing costs) or the net sales price of the Property (gross sales price less all reasonable and bona fide selling expenses) less; (i) the outstanding unpaid indebtedness of all notes secured by loans on the Property at the time of such sale; (ii) the outstanding principal balance plus accrued but unpaid interest on any Tenant Loans, and (iii) all other reasonable and bona fide expenses incurred by the Tenancy in connection with the ownership, maintenance, financing, refinancing, exchange, lease or the sale of the Property, including any unpaid Owner Costs.  Each Tenant shall receive its share of the Net Profits under this Section 6(b) in the form of any promissory note(s) or cash received from the leasing, financing, refinancing, exchange or sale.

7.    Books and Records.  Proper and complete books of account of the Tenancy shall be kept by CPO (i.e., the Tenant managing the Tenancy) as an expense of the Tenancy and shall be open to inspection and copying by any Tenant or representatives of each Tenant at any reasonable time. The books and records of account shall be examined and reviewed as of the close of each calendar year by an accountant selected by CPO, and such accountant shall prepare an annual report thereof, copies of which will be furnished to each Tenant as soon, as possible after the conclusion of each calendar year. Each Tenant shall have the right to make a separate audit of the books and records of the Tenancy at such Tenant's own expense at any time and from time to time.

**AGREEMENT AMONG TENANTS IN COMMON**                                    **Page 3**

8.      Bank Accounts.  All funds of the Tenancy shall be deposited by CPO in a bank or brokerage account or accounts in the name of the Tenancy and funds from said bank account or accounts shall be disbursed upon the signature of CPO in the ordinary course of business, and in accordance with the provisions of this Agreement, unless all Tenants direct otherwise.  Tenancy funds shall be used only for Tenancy purposes.

9.      Dissolution of a Tenant.  The dissolution of any Tenant shall not have the affect of terminating or dissolving the Tenancy.  Upon the dissolution of a Tenant, the shareholders, partners, members or other equity owners thereof shall succeed to its interest in this Tenancy and shall be bound by the terms and provisions of this Agreement; however, in the event that the interest of the dissolved Tenant passes to more than one person, then, and in that event, such persons shall, within ninety (90) days after dissolution of the Tenant, execute and deliver to the other Tenants a written instrument (including Power of Attorney) appointing one person as and to be the Agent for collecting, receiving and making all payments and contributions required hereunder, shall vote the entire interest of the successors, and shall perform all other obligations of such successors performable by reason of or arising from their interest in the Tenancy; and, any and all payments and/or disbursements due arising from the successors interest in the Tenancy shall be deemed to have been validly made to such successors by paying the same to such duly designated Agent.  In the event that said successors for any reason fail to designate such Agent in writing in the manner and within the time prescribed and continue to fail to cure such default after ten (10) days written notice from another Tenant to correct same, such other Tenant shall have the right to appoint such Agent.

10.      Transfer of Tenant's Interest and Sale of Property.

(a)      No Tenant may sell, transfer, convey, encumber or otherwise hypothecate the Property or its undivided interest in the Property without the written consent of the other Tenants, except as provided in Section 10(c) herein and Section 11 herein.

(b)      Any permitted transfer of a Tenant's Ownership Interest in the Property shall be subject to such transferee's written agreement to be bound by all of the terms and conditions of this Agreement; any transfer without such written assumption agreement shall be null and void.

(c)      CPO may, at any time, sell, finance, exchange or otherwise transfer or encumber all of the Property (including the other Ownership Interests) on such terms and conditions as CPO may, in CPO's sole discretion, determine, so long as such transaction is a bona fide transaction and all of the terms and conditions of such transaction are fully disclosed to all Tenants at the time such transaction is entered into.  If requested by CPO, all Tenants shall join in the conveyance of the Property and/or execute all documents necessary or desirable to close such transaction.

(d)      If the signature of a Tenant is required by a third party in connection with the transactions contemplated by Section 10(c), such Tenant agrees to execute and deliver such documents as such third party deems necessary or desirable to accomplish all of the foregoing.  If such Tenant fails to execute and deliver any such documents within ten (10) days following written notice from CPO, CPO is hereby authorized, and each Tenant grants to CPO an irrevocable power of attorney,

**AGREEMENT AMONG TENANTS IN COMMON**                                              **Page 4**

coupled with an interest, to execute and deliver any such documents by, in the name of and on behalf of such Tenant, which documents shall be binding upon such Tenant to the same extent as if such Tenant had personally executed and delivered the same.

 (e) A Tenant may not, without the prior written consent of CPO, which consent may be granted or withheld in the sole and absolute discretion of CPO, sell, transfer, convey, encumber or otherwise hypothecate all or any portion of the Property (including its Ownership Interest).

 (f) IPO Put Option ("Put Option") is available to IPO annually commencing on fifth anniversary of the agreement and extending to the full term of the Term of the Agreement.
 Put Option value to be determined based on the greater of the

  (i) the (a) amount of the original purchased interest (as set forth in Exhibit 'A'), plus (b) a two percent (2%) per year accrual on the amount of the original purchased interest, or

  (ii) the amount of the original purchased interest (as set forth in Exhibit 'A'), plus the net increase above the current agreed upon market Property value set forth in Exhibit 'A' times the IPO percentage ownership interest set forth in Exhibit 'A'; (unless otherwise agreed, to be appraised by an independent third party appraiser within 6 months of the Owner Put Option being exercised);

  (iii) however in no event will the IPO Put Option be less than the redemption of original purchased interest plus the two percent (2%) annual accrual during the outstanding period of the interest held by IPO.

 (g) CPO Call Option ("Call Option") is available to CPO annually commencing on the third annual anniversary of the agreement and extending to the full term of the Agreement.
 Call Option value to be determined based on the greater of the

  (i) (a) amount of the original purchased interest(as set forth in Exhibit 'A'), plus (b) a two percent (2%) per year accrual of the original purchased interest, or

  (ii) the amount of the original purchased interest (as set forth in Exhibit 'A'), plus net increase above the current agreed upon market Property value as set forth in Exhibit 'A' times the IPO percentage ownership interest set forth in Exhibit 'A'; (unless otherwise agreed, to be appraised by an independent third party appraiser within 6 months of the Owner Put Option being exercised);

  (iii) however in no event will the CPO Call Option be less than the redemption of original purchased interest plus the two percent (2%) annual accrual during the outstanding period of the interest held by IPO.

**AGREEMENT AMONG TENANTS IN COMMON**       Page 5

11.   <u>Management, Financing, and Leasing</u>.  It is the objective of the Tenants to maximize the market value of the Property by operating, leasing, financing, and/or sale of the Property.

(a)   The Tenants irrevocably authorize CPO, or any management company or management agent appointed by CPO, (i) to operate, manage and lease all or any portion of the Property upon such terms and conditions as CPO may determine necessary or advisable in its absolute and sole discretion; (ii) to pay from any revenues derived from operation of the Property, on or before the date due, all installments of principal and/or interest on all debts secured by a lien on the Property, (iii) to execute any and all documents necessary to manage and lease all or any portion of the Property as permitted herein, without the necessity of any other Tenant joining in the execution thereof including without limitation the sale, refinance merger or other material event.

(b)   If the signature of a Tenant is required by a third party, each Tenant agrees to execute and deliver such documents as such third party deems necessary or desirable to accomplish all of the foregoing and such management or lease of the Property.  If a Tenant fails to execute and deliver any such documents within ten (10) days following written notice from CPO, CPO is hereby authorized, and each Tenant grants to CPO an irrevocable power of attorney, coupled with an interest, to execute and deliver any such documents by, in the name of and on behalf of such Tenant, which documents shall be binding upon such Tenant to the same extent as if such Tenant had personally executed and delivered the same.

(c)   If third party management is not obtained for the Property by CPO, in its sole and absolute discretion, CPO may appoint itself or any affiliate as manager of the Tenancy and the Property.  For such services, CPO shall receive a management fee equal to eight percent (8%) of the gross revenues from the Property plus reasonable out of pocket costs, payable monthly following payment of debt service and all other Owner Costs then due.

(d)   Notwithstanding anything contained in this Section 11 to the contrary:

(i)   CPO may exercise the rights provided to CPO in Section 10(c) of this Agreement, without the written approval of any other Tenant, notwithstanding any statute or other law to the contrary.

(ii)   Any note, deed of trust, or loan documents executed in connection with a financing or refinancing of all or any portion of the Property shall not personally obligate a Tenant for the repayment of the principal or interest thereof without the written consent of such Tenant.

(iii)   No litigation shall be brought by or on behalf of a Tenant against a third party involving the Property without the written consent of CPO.

(iv)   By unanimous vote of the Tenants, CPO may be removed as manager of the Tenancy or the Property only upon a judicial determination, in a final, unappealable

**AGREEMENT AMONG TENANTS IN COMMON**                    Page 6

judgment of a court of appropriate jurisdiction, of fraud or gross negligence on the part of CPO in connection with the management and operation of the Property.

12.    Conditional Option to Purchase at Selling Tenant's Adjusted Basis.

(a)    Option to Purchase at Selling Tenant's Adjusted Basis. In the event that (i) any Tenant shall pledge, hypothecate or use as security for any loan or obligation, his interest in the Property or any portion thereof, and a default shall occur with respect to such loan or obligation resulting in the interest of such Tenant (or a portion thereof) being subject to levy or sale; or (ii) any Tenant shall make an assignment for the benefit of creditors or similar arrangement, or any proceeding shall be commenced by or against any Tenant under any bankruptcy, reorganization or other similar laws for the relief of debtors, or the property of a Tenant becomes subject to seizure or sale by reason of a judgment having been taken against him or it, or (iii) any Tenant shall fail to remove any lien or security interest on all or any portion of his interest in the Property within ten (10) days following written notice from any other Tenant, so that a third party lender may obtain a first lien on the Property with priority over such lien or security interest in connection with any financing or re-financing of the Property; then, in any of such events, the Ownership Interest of such Tenant (herein the "Selling Tenant") shall automatically be offered for sale to each other Tenant (herein the "Purchasing Tenant") in accordance with (b) and (c) below, upon notice of such event to each Tenant.

(b)    Option Exercise Procedures. In the event that the Ownership Interest of a Tenant shall be offered for sale to the other Tenants pursuant to section (a) above, then the Purchasing Tenant(s) shall have the option, exercisable within ninety (90) days of receipt of notice thereof from the Selling Tenant, to purchase the complete Ownership Interest of the Selling Tenant, which purchase shall be, if more than one Purchasing Tenant exercises such option, pro rata in accordance with their respective Ownership Interests in the Property.

(c)    Purchase Price. The purchase price for the interest of a Tenant to be sold pursuant to (a) shall be said Tenant's adjusted basis in the property after taking into consideration that Tenant's historical cost, return of capital, if any, with appropriate adjustments and allocations for all items of income or, expense accruing prior to the closing date. All closing costs associated with such sale shall be borne by the Selling Tenant. The purchase price shall be paid 100% in cash at closing, which is to occur within nintey (90) days of the Purchasing Tenant's receipt of notice from the Selling Tenant.

13.    NEGATION OF PARTNERSHIP; LIABILITY SEVERAL. NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR CONSTRUED TO CREATE A PARTNERSHIP, JOINT VENTURE OR ASSOCIATION AMONG ANY OF THE PARTIES HERETO. THE LIABILITY OF THE TENANTS UNDER THIS AGREEMENT SHALL BE SEVERAL, NOT JOINT AND SEVERAL, LIMITED AS TO EACH, TO ITS RESPECTIVE OWNERSHIP INTEREST.

14.    Events of Default. If any of the following events shall occur and shall not be cured within the time period set forth in Section 14 after written notice thereof to the Tenant committing

**AGREEMENT AMONG TENANTS IN COMMON**                    Page 7

such acts, such Tenant committing such act shall be deemed to have committed an Event of Default (herein so called):

    (a)    A Tenant shall file a voluntary petition in bankruptcy or shall be adjudicated a bankrupt or insolvent, or shall file any petition or answer seeking any reorganization, arrangement, composition, readjustment liquidation, dissolution or similar relief for itself under any applicable federal state or other statute or law relative to bankruptcy, insolvency or other relief for debtors, or the appointment of any trustee, receiver, conservator or liquidator of said Party or of any part of its properties or interest in the Note or the Property, or

    (b)    A Tenant shall admit in writing its inability to pay its debts as they mature; or

    (c)    A Tenant shall make an assignment for the benefit of creditors or take any other similar action for the protection or benefit of creditors; or

    (d)    A Tenant fails to make any payment required hereunder on a timely basis;

    (e)    A Tenant shall fail to perform its covenants or obligations contained herein; or

    (f)    A Tenant shall fail to perform its covenants or obligations contained in any agreement secured by a lien on the Property.

In addition to all other rights of CPO, if any other Tenant commits an uncured Event of Default, CPO may require such Tenant to convey its Ownership Interest in the Property in consideration for the payment to such Tenant of an amount equal to such Tenant's direct cost of acquiring his Ownership Interest from CPO, less such Tenant's closing costs incurred in connection with its acquisition of such Ownership Interest.

    15.    Notice of Default and Cure. In the event of an Event of Default, the remedies provided for in Section 14 shall apply only if said Event of Default is not timely cured. If a Tenant believes another Tenant is in default hereunder, such Tenant shall give the defaulting Tenant written notice setting forth such default and the defaulting Tenant shall have thirty (30) days after the receipt of such notice to cure such default. In the event such default is not cured during such thirty (30) day period, such defaulting Tenant shall be deemed to have committed such Event of Default and the other Tenant may enforce such Tenant's rights and remedies contained herein and at law.

Each Tenant (the "Indemnifying Tenant") agrees to indemnify the other Tenants for any loss, damage or claim arising from any uncured Event of Default of the Indemnifying Tenant.

    16.    Election to be Excluded from Provisions of Subchapter K. Each Tenant hereby elects to be excluded from all of the provisions of Subchapter K of Chapter I of the Internal Revenue Code of 1986, as amended (the "Code"). The exclusion elected by each Tenant hereunder shall commence with the execution of this Agreement. Each Tenant hereby covenants and agrees that each Tenant shall abide by all regulatory requirements in order to maintain such election and shall report on such

**AGREEMENT AMONG TENANTS IN COMMON**        **Page 8**

Tenant's income tax return such respective share of items of income, deduction and credit which results from holding of the Property, in a manner consistent with the exclusion of the Tenancy from Subchapter K of Chapter I of the Code, commencing with the first taxable year of the Tenancy. No Tenant shall notify the Commissioner of Internal Revenue (the "Commissioner") that such Tenant desires that Subchapter K of the Code apply to the Tenancy and each Tenant hereby agrees to indemnity and hold each other Tenant free and harmless from all cost, liability, tax consequence and expense, including attorneys' fees, which results from any Tenant so notifying the Commissioner.

17.    Dissolution.  The Tenancy, as governed hereby, shall be immediately dissolved upon the happening of any of the following events:

(i)    The sale or other disposition by the Tenants of all of the Property; or

(ii)    The decision of the Tenants that the Tenancy be dissolved; or

(iii)    Ten (10) years after the date hereof, absent prior extension of the term of the Tenancy (for one or more years) by written notice from CPO to the other Tenants, at CPO's option in its sole and absolute discretion.

18.    Notices.  All notices under this Agreement must be in writing and shall be deemed to have been duly given if delivered personally or by certified mail, return receipt requested, to the addresses set forth on the signature page hereof.

19.    Amendment; Additional Tenants.  This Agreement may be amended only by written agreement signed by all Tenants; provided, however, that CPO may sell additional undivided interests in the Property (from the CPO Ownership Interest) to third parties, in which case such other third party(ies) may be added to this Agreement by CPO as additional Tenants, with the same rights and obligations hereunder as are applicable to IPO and the IPO Ownership Interest, to the extent of the undivided interest in the Property constituting the Ownership Interest of such third party(ies) in the Property.  In such event, the Ownership Interests of CPO hereunder shall be reduced pro rata, such that the aggregate Ownership Interests of the Tenants following such sale(s) of undivided interests in the CPO Ownership Interest shall continue to equal one hundred (100%).

20.    Counterparts.  This Agreement may be executed in counterparts each of which shall be deemed to be an original, but such counterparts, when taken together, shall constitute but one agreement.

21.    Gender.  All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine or neuter, singular or plural, as the identity of the person, persons, entity or entities may require.

22.    Caption Headings.  Captions at the beginning of each numbered Section of this Agreement are solely for the convenience of the parties and shall not be deemed part of the context of this Agreement.

**AGREEMENT AMONG TENANTS IN COMMON**                                            **Page 9**

23.    <u>Negotiated Transaction</u>.  The provisions of this Agreement were negotiated by all of the parties hereto and said Agreement shall be deemed to have been drafted by all of the parties thereto.

24.    <u>Further Assurances</u>.  Each Tenant hereby agrees to promptly sign any additional instruments or documents which are necessary or appropriate to carry out the purpose of this Agreement.

25.    <u>Interpretation</u>.  It is the intent of the Tenants to own the Property for investment purposes, only and not for the conduct of a business, and to otherwise comply with all statutes and regulations allowing an election to be excluded from Subchapter K of the Code and this Agreement shall be interpreted to conform to such intent.

26.    <u>Litigation</u>.  In the event of any litigation between the parties hereto, the prevailing party in such litigation shall be paid all attorneys' fees, court costs and litigation expenses incurred in such litigation by the non-prevailing party.  The parties hereto agree that specific performance is an appropriate remedy for the enforcement of the rights of the Tenants hereunder concerning a sale of the Property and the obligations of the parties hereunder.

27.    <u>Recording</u>.  A memorandum of this Agreement may be recorded by CPO and the other Tenants agree to cooperate and facilitate such recording.

[SIGNATURE PAGE FOLLOWS]

**AGREEMENT AMONG TENANTS IN COMMON**                    **Page 10**

EXECUTED effective as of February 1, 2022 (the "Effective Date").

**SAM Brownfield, LLC** (a Texas Limited Liability Company)

By: MacDonald Capital Corporation (a Texas corporation), gp

By: _____
     Name: Wm. Ian MacDonald
     Title: Manager

Date: Agreed to as of the "Effective Date" set forth above

Address:  400 East Centre Park Blvd., Suite 101
          DeSoto, Texas 75115
Facsimile: 972-283-0193

Donald P. Heath and Joanne O. Heath,
Husband and Wife as Joint Tenants

By: _____
Name: Donald P. Heath
Title: An Individual,

and

By: _____
Name: Joanne O. Heath
Title: An Individual

Address: 13 Klamath, Irvine, CA 92612
Telephone: (____) ____-_____;
Fax: _____

**AGREEMENT AMONG TENANTS IN COMMON**        Page 11

## EXHIBIT A

### The Property

An undivided Eighteen point Eight Four percent (18.84%) interest in

501 West Main Street, Brownfield, TX 79316
Lots 7 and 8, Block 23, Original Town of Brownfield,
Brownfield, Terry County, Texas

**Buyer:**
Ownership Interest Percentage:
Eighteen point Eight Four percent (18.84%)

**Buyer:**
Purchase Price of Ownership Interest
(Originally Invested Amount): $101,748.63.

**Seller Ownership Interest:**
Seventy Three point One Nine percent (74.66%)

Agreed Upon Current Value of the Property: $846,625

**AGREEMENT AMONG TENANTS IN COMMON**                    Page 12
DALLAS1 1068268v3 51997-00001

Exhibit 'A' (2) – Brownfield, TX

Description of the Property
A Eighteen point Eight Four percent (18.84%) UNDIVIDED INTEREST ("Purchaser's Interest")
in that certain real property described as

501 West Main Street, Brownfield, TX 79316
Lots 7 and 8, Block 23, Original Town of Brownfield,
Brownfield, Terry County, Texas

# EXHIBIT E

# EXHIBIT E-1

**Tyler TIC - Berg**

## AGREEMENT AMONG TENANTS IN COMMON
### Brownfield, TX

**THIS AGREEMENT AMONG TENANTS IN COMMON** ("Agreement") is made and entered into initially by and between SAM Brownfield, LLC (a Texas Limited Liability Company) and Current Property Owner ("CPO") and **RONALD H. BERG**, an unmarried man in Irvine, California as the Incoming Property Owner ("IPO"), being sometimes referred to singularly as "Tenant" or collectively as the "Tenants".

### RECITALS

A.      It is the desire of the Tenants to hold, operate, maintain, finance, keep in repair, lease and/or sell or exchange, as tenants in common, that certain real property together with all improvements located therein, commonly known Buddy's which is more fully described on Exhibit "A" attached hereto and by this reference incorporated herein (the "Property").

B.      It is the desire of IPO to acquire an undivided interest in the Property from CPO as is more fully described In Exhibit 'A'.

NOW, THEREFORE, in consideration of the foregoing Recitals and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Tenants to hereby agree as follows:

1.      <u>Formation of Tenancy</u>.  The Tenants hereby acknowledge their ownership to be a tenancy in common (the "Tenancy") and this Agreement shall govern the ownership and management of the Property.  The principal purpose of the Tenancy shall be to hold and maintain the Property as tenants in common for investment purposes.  The address of each Tenant for notice and all other purposes of this Agreement is set forth on the signature page hereof.  Except as expressly provided herein, no Tenant shall sell, assign, hypothecate or otherwise dispose of or encumber its interest or any part thereof in the Property without the prior written consent of the other Tenants.

2.      <u>Term</u>.  The Tenancy as governed hereby shall commence on the execution of this Agreement, and shall continue thereafter until dissolved or terminated pursuant to Sections 17 hereof.

3.      <u>Title to the Property</u>.  Contemporaneously with the execution hereof, IPO has acquired an undivided interest in the Property as set forth in Exhibit 'A', the ("IPO Interest"), and CPO retains an interest in the Property as is more fully described in Exhibit 'A' (the "CPO Ownership Interest").  The CPO Ownership Interest and the IPO Ownership Interest are hereinafter sometimes referred to as the "Ownership Interests" or an "Ownership Interest."  Each Tenant agrees to be bound by the terms and conditions of this Agreement.

4.      <u>Ownership Rights of Tenants</u>.  Notwithstanding any statute or other rule of law and having previously been advised of their respective rights to bring an action for partition, the Tenants

**AGREEMENT AMONG TENANTS IN COMMON**                                    **Page 1**

agree that during the term hereof the Tenants shall only have those rights in the Property as expressly provided herein and each Tenant hereby irrevocably waives any and all rights that it has (i) to occupy the Property or any portion thereof, or to exclude any other Tenant from the Property or any portion thereof, and (ii) to maintain any action for any partition of the Property, or otherwise force a sale of the Property during the term hereof, all except as expressly provided herein.

    5.    <u>Tenant Payment Obligations</u>.

    (a)    Each Tenant agrees to pay its Agreed Share (such Agreed Share determined as provided, below) of all costs and expenses involved in owning, operating, maintaining, leasing, selling or exchanging the Property, including, but not limited to, ad valorem taxes, insurance premiums, repairs, necessary improvements, contractual fees, professional fees, lease commissions and utility costs, debt service and other financing-related costs, and capital repairs and replacements and other capital expenditures at the Property (collectively, "Owner Costs"). To the extent that the income from the Property is insufficient to pay all Owner Costs in the ordinary course of business, each Tenant's Agreed Share of such Owner Costs shall be paid by each Tenant, upon demand, prior to the due date of all such costs and expenses and no later than ten (10) days prior to the date when such costs and expenses are due.

    For purposes of this Agreement, the Agreed Share of each Tenant shall be equal to his respective Ownership Interest in the Property. CPO, which shall be the Tenant managing the Tenancy, shall maintain a banking account or accounts at financial institutions on behalf of the Tenants and shall maintain reasonable reserves for future costs and expenses of the Property.

    (b)    If any Tenant fails promptly to contribute such Tenant's share of the Owner Costs ("Defaulting Tenant"), the other Tenants may pay the entire amount' of such Owner Costs and the amount not paid by the Defaulting Tenant shall be deemed a loan to the Defaulting Tenant (the "Tenant Loan" or "Tenant Loans"). All Tenant Loans shall be payable on demand, shall bear interest at the rate of eighteen percent (18%) per annum, and shall constitute a lien on the interest of the Defaulting Tenant in the Property, which lien shall be expressly subject and subordinate to any existing or future lien of any third party lender with a lien on the Property. Each Defaulting Tenant authorizes each other Tenant making a Tenant Loan to execute and record such documents as such Tenant deems necessary to further or better evidence such loan and lien.

    In the event a Tenant makes a loan or loans to the Defaulting Tenant ("Loaning Tenant") and any Tenant Loan remains unpaid for a thirty (30) day period after written notice is given to the Defaulting Tenant requesting payment, the Loaning Tenant may bring suit against the Defaulting Tenant for the amount of the Tenant Loans not paid plus all reasonable collection costs. All income from the sale and operation of the Property shall be paid to the Loaning Tenant until all Tenant Loans are paid in full.

**AGREEMENT AMONG TENANTS IN COMMON**        **Page 2**

6.     <u>Distribution of Net Profits From Operation, Financing, Refinancing, Exchange, Lease and Sale of the Property.</u>

(a)     All income derived from the operation of the Property in whatever form and however derived (less reasonable working capital and capital repairs and replacement reserves), shall be divided and paid when received as follows:

(i)     First, to each Tenant in an amount equal to such Tenant's Agreed Share of the Owner Costs, or, at CPO's option, to pay such Tenant's Agreed Share of such Owner Costs directly on its behalf,

(ii)     The IPO tenant shall receive the greater of (i) percentage interest of the net income of the Property as set forth in Exhibit 'A', or (ii) the annual pay rate paid on the originally invested amount set forth in Exhibit 'A' ("Originally Invested Amount") to be paid on a monthly basis,

(iii)     The IPO tenant shall also a receive a two percent (2%) annual accrual on the invested amount to be paid upon redemption of the IPO interest, and

(iv)     Thereafter, the CPO tenant shall receive the remaining available balance of the cash flow and distributions from all other distributable sources.

(b)     In the event of the financing, refinancing, exchange or lease of the Property, or in the event of a sale under Section 10 herein, the Net Profits, if any, from the sale, lease, financing, refinancing or exchange of the Property shall be divided between the Tenants when received in the same manner set forth in Section 6(a). The term "Net Profits" for the purpose of this paragraph shall mean the net proceeds from any financing, refinancing, exchange or lease (less all reasonable and bona fide financing, exchange or leasing costs) or the net sales price of the Property (gross sales price less all reasonable and bona fide selling expenses) less; (i) the outstanding unpaid indebtedness of all notes secured by loans on the Property at the time of such sale; (ii) the outstanding principal balance plus accrued but unpaid interest on any Tenant Loans, and (iii) all other reasonable and bona fide expenses incurred by the Tenancy in connection with the ownership, maintenance, financing, refinancing, exchange, lease or the sale of the Property, including any unpaid Owner Costs. Each Tenant shall receive its share of the Net Profits under this Section 6(b) in the form of any promissory note(s) or cash received from the leasing, financing, refinancing, exchange or sale.

7.     <u>Books and Records.</u> Proper and complete books of account of the Tenancy shall be kept by CPO (i.e., the Tenant managing the Tenancy) as an expense of the Tenancy and shall be open to inspection and copying by any Tenant or representatives of each Tenant at any reasonable time. The books and records of account shall be examined and reviewed as of the close of each calendar year by an accountant selected by CPO, and such accountant shall prepare an annual report thereof, copies of which will be furnished to each Tenant as soon, as possible after the conclusion of each calendar year. Each Tenant shall have the right to make a separate audit of the books and records of the Tenancy at such Tenant's own expense at any time and from time to time.

**AGREEMENT AMONG TENANTS IN COMMON**                                        **Page 3**

8.    <u>Bank Accounts</u>.  All funds of the Tenancy shall be deposited by CPO in a bank or brokerage account or accounts in the name of the Tenancy and funds from said bank account or accounts shall be disbursed upon the signature of CPO in the ordinary course of business, and in accordance with the provisions of this Agreement, unless all Tenants direct otherwise. Tenancy funds shall be used only for Tenancy purposes.

9.    <u>Dissolution of a Tenant</u>. The dissolution of any Tenant shall not have the affect of terminating or dissolving the Tenancy.  Upon the dissolution of a Tenant, the shareholders, partners, members or other equity owners thereof shall succeed to its interest in this Tenancy and shall be bound by the terms and provisions of this Agreement; however, in the event that the interest of the dissolved Tenant passes to more than one person, then, and in that event, such persons shall, within ninety (90) days after dissolution of the Tenant, execute and deliver to the other Tenants a written instrument (including Power of Attorney) appointing one person as and to be the Agent for collecting, receiving and making all payments and contributions required hereunder, shall vote the entire interest of the successors, and shall perform all other obligations of such successors performable by reason of or arising from their interest in the Tenancy; and, any and all payments and/or disbursements due arising from the successors interest in the Tenancy shall be deemed to have been validly made to such successors by paying the same to such duly designated Agent.  In the event that said successors for any reason fail to designate such Agent in writing in the manner and within the time prescribed and continue to fail to cure such default after ten (10) days written notice from another Tenant to correct same, such other Tenant shall have the right to appoint such Agent.

10.    <u>Transfer of Tenant's Interest and Sale of Property</u>.

(a)    No Tenant may sell, transfer, convey, encumber or otherwise hypothecate the Property or its undivided interest in the Property without the written consent of the other Tenants, except as provided in Section 10(c) herein and Section 11 herein.

(b)    Any permitted transfer of a Tenant's Ownership Interest in the Property shall be subject to such transferee's written agreement to be bound by all of the terms and conditions of this Agreement; any transfer without such written assumption agreement shall be null and void.

(c)    CPO may, at any time, sell, finance, exchange or otherwise transfer or encumber all of the Property (including the other Ownership Interests) on such terms and conditions as CPO may, in CPO's sole discretion, determine, so long as such transaction is a bona fide transaction and all of the terms and conditions of such transaction are fully disclosed to all Tenants at the time such transaction is entered into.  If requested by CPO, all Tenants shall join in the conveyance of the Property and/or execute all documents necessary or desirable to close such transaction.

(d)    If the signature of a Tenant is required by a third party in connection with the transactions contemplated by Section 10(c), such Tenant agrees to execute and deliver such documents as such third party deems necessary or desirable to accomplish all of the foregoing.  If such Tenant fails to execute and deliver any such documents within ten (10) days following written notice from CPO, CPO is hereby authorized, and each Tenant grants to CPO an irrevocable power of attorney,

**AGREEMENT AMONG TENANTS IN COMMON**                                    **Page 4**

coupled with an interest, to execute and deliver any such documents by, in the name of and on behalf of such Tenant, which documents shall be binding upon such Tenant to the same extent as if such Tenant had personally executed and delivered the same.

(e)    A Tenant may not, without the prior written consent of CPO, which consent may be granted or withheld in the sole and absolute discretion of CPO, sell, transfer, convey, encumber or otherwise hypothecate all or any portion of the Property (including its Ownership Interest).

(f)    IPO Put Option ("Put Option") is available to IPO annually commencing on fifth anniversary of the agreement and extending to the full term of the Term of the Agreement.
Put Option value to be determined based on the greater of the

(i)    the (a) amount of the original purchased interest (as set forth in Exhibit 'A'), plus (b) a two percent (2%) per year accrual on the amount of the original purchased interest, or

(ii)    the amount of the original purchased interest (as set forth in Exhibit 'A'), plus the net increase above the current agreed upon market Property value set forth in Exhibit 'A' times the IPO percentage ownership interest set forth in Exhibit 'A'; (unless otherwise agreed, to be appraised by an independent third party appraiser within 6 months of the Owner Put Option being exercised);

(iii)    however in no event will the IPO Put Option be less than the redemption of original purchased interest plus the two percent (2%) annual accrual during the outstanding period of the interest held by IPO.

(g)    CPO Call Option ("Call Option") is available to CPO annually commencing on the third annual anniversary of the agreement and extending to the full term of the Agreement.
Call Option value to be determined based on the greater of the

(i)    (a) amount of the original purchased interest(as set forth in Exhibit 'A'), plus (b) a two percent (2%) per year accrual of the original purchased interest, or

(ii)    the amount of the original purchased interest (as set forth in Exhibit 'A'), plus net increase above the current agreed upon market Property value as set forth in Exhibit 'A'times the IPO percentage ownership interest set forth in Exhibit 'A'; (unless otherwise agreed, to be appraised by an independent third party appraiser within 6 months of the Owner Put Option being exercised);

(iii)    however in no event will the CPO Call Option be less than the redemption of original purchased interest plus the two percent (2%) annual accrual during the outstanding period of the interest held by IPO.

**AGREEMENT AMONG TENANTS IN COMMON**                                    **Page 5**

11.    <u>Management, Financing, and Leasing</u>.  It is the objective of the Tenants to maximize the market value of the Property by operating, leasing, financing, and/or sale of the Property.

(a)    The Tenants irrevocably authorize CPO, or any management company or management agent appointed by CPO, (i) to operate, manage and lease all or any portion of the Property upon such terms and conditions as CPO may determine necessary or advisable in its absolute and sole discretion; (ii) to pay from any revenues derived from operation of the Property, on or before the date due, all installments of principal and/or interest on all debts secured by a lien on the Property, (iii) to execute any and all documents necessary to manage and lease all or any portion of the Property as permitted herein, without the necessity of any other Tenant joining in the execution thereof including without limitation the sale, refinance merger or other material event.

(b)    If the signature of a Tenant is required by a third party, each Tenant agrees to execute and deliver such documents as such third party deems necessary or desirable to accomplish all of the foregoing and such management or lease of the Property.  If a Tenant fails to execute and deliver any such documents within ten (10) days following written notice from CPO, CPO is hereby authorized, and each Tenant grants to CPO an irrevocable power of attorney, coupled with an interest, to execute and deliver any such documents by, in the name of and on behalf of such Tenant, which documents shall be binding upon such Tenant to the same extent as if such Tenant had personally executed and delivered the same.

(c)    If third party management is not obtained for the Property by CPO, in its sole and absolute discretion, CPO may appoint itself or any affiliate as manager of the Tenancy and the Property.  For such services, CPO shall receive a management fee equal to eight percent (8%) of the gross revenues from the Property plus reasonable out of pocket costs, payable monthly following payment of debt service and all other Owner Costs then due.

(d)    Notwithstanding anything contained in this Section 11 to the contrary:

(i)    CPO may exercise the rights provided to CPO in Section 10(c) of this Agreement, without the written approval of any other Tenant, notwithstanding any statute or other law to the contrary.

(ii)    Any note, deed of trust, or loan documents executed in connection with a financing or refinancing of all or any portion of the Property shall not personally obligate a Tenant for the repayment of the principal or interest thereof without the written consent of such Tenant.

(iii)    No litigation shall be brought by or on behalf of a Tenant against a third party involving the Property without the written consent of CPO.

(iv)    By unanimous vote of the Tenants,  CPO may be removed as manager of the Tenancy or the Property only upon a judicial determination, in a final, unappealable

**AGREEMENT AMONG TENANTS IN COMMON**                                        **Page 6**

judgment of a court of appropriate jurisdiction, of fraud or gross negligence on the part of CPO in connection with the management and operation of the Property.

12.    Conditional Option to Purchase at Selling Tenant's Adjusted Basis.

(a)    Option to Purchase at Selling Tenant's Adjusted Basis. In the event that (i) any Tenant shall pledge, hypothecate or use as security for any loan or obligation, his interest in the Property or any portion thereof, and a default shall occur with respect to such loan or obligation resulting in the interest of such Tenant (or a portion thereof) being subject to levy or sale; or (ii) any Tenant shall make an assignment for the benefit of creditors or similar arrangement, or any proceeding shall be commenced by or against any Tenant under any bankruptcy, reorganization or other similar laws for the relief of debtors, or the property of a Tenant becomes subject to seizure or sale by reason of a judgment having been taken against him or it, or (iii) any Tenant shall fail to remove any lien or security interest on all or any portion of his interest in the Property within ten (10) days following written notice from any other Tenant, so that a third party lender may obtain a first lien on the Property with priority over such lien or security interest in connection with any financing or re-financing of the Property; then, in any of such events, the Ownership Interest of such Tenant (herein the "Selling Tenant") shall automatically be offered for sale to each other Tenant (herein the "Purchasing Tenant") in accordance with (b) and (c) below, upon notice of such event to each Tenant.

(b)    Option Exercise Procedures. In the event that the Ownership Interest of a Tenant shall be offered for sale to the other Tenants pursuant to section (a) above, then the Purchasing Tenant(s) shall have the option, exercisable within ninety (90) days of receipt of notice thereof from the Selling Tenant, to purchase the complete Ownership Interest of the Selling Tenant, which purchase shall be, if more than one Purchasing Tenant exercises such option, pro rata in accordance with their respective Ownership Interests in the Property.

(c)    Purchase Price. The purchase price for the interest of a Tenant to be sold pursuant to (a) shall be said Tenant's adjusted basis in the property after taking into consideration that Tenant's historical cost, return of capital, if any, with appropriate adjustments and allocations for all items of income or, expense accruing prior to the closing date. All closing costs associated with such sale shall be borne by the Selling Tenant. The purchase price shall be paid 100% in cash at closing, which is to occur within ninety (90) days of the Purchasing Tenant's receipt of notice from the Selling Tenant.

13.    NEGATION OF PARTNERSHIP; LIABILITY SEVERAL. NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR CONSTRUED TO CREATE A PARTNERSHIP, JOINT VENTURE OR ASSOCIATION AMONG ANY OF THE PARTIES HERETO. THE LIABILITY OF THE TENANTS UNDER THIS AGREEMENT SHALL BE SEVERAL, NOT JOINT AND SEVERAL, LIMITED AS TO EACH, TO ITS RESPECTIVE OWNERSHIP INTEREST.

14.    Events of Default. If any of the following events shall occur and shall not be cured within the time period set forth in Section 14 after written notice thereof to the Tenant committing

**AGREEMENT AMONG TENANTS IN COMMON**                    **Page 7**

such acts, such Tenant committing such act shall be deemed to have committed an Event of Default (herein so called):

(a)    A Tenant shall file a voluntary petition in bankruptcy or shall be adjudicated a bankrupt or insolvent, or shall file any petition or answer seeking any reorganization, arrangement, composition, readjustment liquidation, dissolution or similar relief for itself under any applicable federal state or other statute or law relative to bankruptcy, insolvency or other relief for debtors, or the appointment of any trustee, receiver, conservator or liquidator of said Party or of any part of its properties or interest in the Note or the Property, or

(b)    A Tenant shall admit in writing its inability to pay its debts as they mature; or

(c)    A Tenant shall make an assignment for the benefit of creditors or take any other similar action for the protection or benefit of creditors; or

(d)    A Tenant fails to make any payment required hereunder on a timely basis;

(e)    A Tenant shall fail to perform its covenants or obligations contained herein; or

(f)    A Tenant shall fail to perform its covenants or obligations contained in any agreement secured by a lien on the Property.

In addition to all other rights of CPO, if any other Tenant commits an uncured Event of Default, CPO may require such Tenant to convey its Ownership Interest in the Property in consideration for the payment to such Tenant of an amount equal to such Tenant's direct cost of acquiring his Ownership Interest from CPO, less such Tenant's closing costs incurred in connection with its acquisition of such Ownership Interest.

15.    Notice of Default and Cure.  In the event of an Event of Default, the remedies provided for in Section 14 shall apply only if said Event of Default is not timely cured.  If a Tenant believes another Tenant is in default hereunder, such Tenant shall give the defaulting Tenant written notice setting forth such default and the defaulting Tenant shall have thirty (30) days after the receipt of such notice to cure such default.  In the event such default is not cured during such thirty (30) day period, such defaulting Tenant shall be deemed to have committed such Event of Default and the other Tenant may enforce such Tenant's rights and remedies contained herein and at law.

Each Tenant (the "Indemnifying Tenant") agrees to indemnify the other Tenants for any loss, damage or claim arising from any uncured Event of Default of the Indemnifying Tenant.

16.    Election to be Excluded from Provisions of Subchapter K.  Each Tenant hereby elects to be excluded from all of the provisions of Subchapter K of Chapter I of the Internal Revenue Code of 1986, as amended (the "Code").  The exclusion elected by each Tenant hereunder shall commence with the execution of this Agreement.  Each Tenant hereby covenants and agrees that each Tenant shall abide by all regulatory requirements in order to maintain such election and shall report on such

**AGREEMENT AMONG TENANTS IN COMMON**                    **Page 8**

Tenant's income tax return such respective share of items of income, deduction and credit which results from holding of the Property, in a manner consistent with the exclusion of the Tenancy from Subchapter K of Chapter I of the Code, commencing with the first taxable year of the Tenancy. No Tenant shall notify the Commissioner of Internal Revenue (the "Commissioner") that such Tenant desires that Subchapter K of the Code apply to the Tenancy and each Tenant hereby agrees to indemnity and hold each other Tenant free and harmless from all cost, liability, tax consequence and expense, including attorneys' fees, which results from any Tenant so notifying the Commissioner.

17.   <u>Dissolution</u>. The Tenancy, as governed hereby, shall be immediately dissolved upon the happening of any of the following events:

(i)   The sale or other disposition by the Tenants of all of the Property; or

(ii)   The decision of the Tenants that the Tenancy be dissolved; or

(iii)   Ten (10) years after the date hereof, absent prior extension of the term of the Tenancy (for one or more years) by written notice from CPO to the other Tenants, at CPO's option in its sole and absolute discretion.

18.   <u>Notices</u>. All notices under this Agreement must be in writing and shall be deemed to have been duly given if delivered personally or by certified mail, return receipt requested, to the addresses set forth on the signature page hereof.

19.   <u>Amendment; Additional Tenants</u>. This Agreement may be amended only by written agreement signed by all Tenants; provided, however, that CPO may sell additional undivided interests in the Property (from the CPO Ownership Interest) to third parties, in which case such other third party(ies) may be added to this Agreement by CPO as additional Tenants, with the same rights and obligations hereunder as are applicable to IPO and the IPO Ownership Interest, to the extent of the undivided interest in the Property constituting the Ownership Interest of such third party(ies) in the Property. In such event, the Ownership Interests of CPO hereunder shall be reduced pro rata, such that the aggregate Ownership Interests of the Tenants following such sale(s) of undivided interests in the CPO Ownership Interest shall continue to equal one hundred (100%).

20.   <u>Counterparts</u>. This Agreement may be executed in counterparts each of which shall be deemed to be an original, but such counterparts, when taken together, shall constitute but one agreement.

21.   <u>Gender</u>. All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine or neuter, singular or plural, as the identity of the person, persons, entity or entities may require.

22.   <u>Caption Headings</u>. Captions at the beginning of each numbered Section of this Agreement are solely for the convenience of the parties and shall not be deemed part of the context of this Agreement.

**AGREEMENT AMONG TENANTS IN COMMON**                                        **Page 9**

23.    <u>Negotiated Transaction</u>. The provisions of this Agreement were negotiated by all of the parties hereto and said Agreement shall be deemed to have been drafted by all of the parties thereto.

24.    <u>Further Assurances</u>. Each Tenant hereby agrees to promptly sign any additional instruments or documents which are necessary or appropriate to carry out the purpose of this Agreement.

25.    <u>Interpretation</u>. It is the intent of the Tenants to own the Property for investment purposes, only and not for the conduct of a business, and to otherwise comply with all statutes and regulations allowing an election to be excluded from Subchapter K of the Code and this Agreement shall be interpreted to conform to such intent.

26.    <u>Litigation</u>. In the event of any litigation between the parties hereto, the prevailing party in such litigation shall be paid all attorneys' fees, court costs and litigation expenses incurred in such litigation by the non-prevailing party. The parties hereto agree that specific performance is an appropriate remedy for the enforcement of the rights of the Tenants hereunder concerning a sale of the Property and the obligations of the parties hereunder.

27.    <u>Recording</u>. A memorandum of this Agreement may be recorded by CPO and the other Tenants agree to cooperate and facilitate such recording.

[SIGNATURE PAGE FOLLOWS]

**AGREEMENT AMONG TENANTS IN COMMON**                                      **Page 10**

EXECUTED effective as of February 1, 2022(the "Effective Date").

SAM Brownfield, LLC (a Texas Limited Liability Company)

By: MacDonald Capital Corporation (a Texas corporation), gp

By: _____

    Name: Wm. Ian MacDonald
    Title: Manager

Date: Agreed to as of the "Effective Date" set forth above

Address:  400 East Centre Park Blvd., Suite 101
          DeSoto, Texas 75115
Facsimile: 972-283-0193


**RONALD H. BERG**

By: _____

    **Individually**

Date: Agreed to as of the "Effective Date" set forth above
Address:  20 Canyon Ridge,
          Irvine, CA  92603
Phone Number: (714) 402-2374
Facsimile: _____


*AGREEMENT AMONG TENANTS IN COMMON*          Page 11

## EXHIBIT A

### The Property

An undivided Six point Five One percent (6.51%) interest in

501 West Main Street, Brownfield, TX 79316
Lots 7 and 8, Block 23, Original Town of Brownfield,
Brownfield, Terry County, Texas

**Buyer:**
Ownership Interest Percentage: Six point Five One percent (6.51%)

**Buyer:**
Purchase Price of Ownership Interest (Originally Invested Amount): $35,166.12

**Seller Ownership Interest:**
Seventy Three point One Nine percent (74.66%)

Agreed Upon Current Value of the Property: $846,625.

**AGREEMENT AMONG TENANTS IN COMMON**
DALLAS1 1068268v3 51997-00001

Page 12

# EXHIBIT E-2

**Tyler TIC - Bolsinger**

## AGREEMENT AMONG TENANTS IN COMMON

**THIS** AGREEMENT AMONG TENANTS IN COMMON ("Agreement") is made and entered into initially by and between **Buddy Mac One, LLC,** a Texas limited liability company and Current Property Owner ('BMO-CPO') and **Darwin M. Bolsinger and Margie A. Bolsinger, Trustees of The Darwin M. Bolsinger and Margie A. Bolsinger Trust, dated July 8, 2005,** a trust domiciled in Santa Ana, California as the Incoming Property Owner ("TRST-IPO"), being sometimes referred to singularly as "Tenant" or collectively as the "Tenants".

## RECITALS

A.     It is the desire of the Tenants to hold, operate, maintain, finance, keep in repair, lease and/or sell or exchange, <u>as tenants in common, without rights of survivorship,</u> that certain real property together with all improvements located therein, commonly known as Enterprise Centre in DeSoto, Texas, which is more fully described on <u>Exhibit "A"</u> attached hereto and by this reference incorporated herein (the "Property").

B.     It is the desire of TRST-IPO to acquire an undivided interest of fourteen point six four percent (14.64%) interest in the Property from BMO-CPO leaving the total undivided interest of BMO-CPO at eighty-five point three six percent (85.36%).

NOW, THEREFORE, in consideration of the foregoing Recitals and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Tenants to hereby agree as follows:

1.     <u>Formation of Tenancy.</u> The Tenants hereby acknowledge their ownership to be a tenancy in common (the "Tenancy") and this Agreement shall govern the ownership and management of the Property. The principal purpose of the Tenancy shalt be to hold and maintain the Property as tenants in common for investment purposes. The address of each Tenant for notice and all other purposes of this Agreement is set forth on the signature page hereof. Except as expressly provided herein, no Tenant shall sell, assign, hypothecate or otherwise dispose of or encumber its interest or any part thereof in the Property without the prior written consent of the other Tenants.

2.     <u>Term.</u> The Tenancy as governed hereby shall commence on the execution of this Agreement, and shall continue thereafter until dissolved pursuant to Section 17 hereof.

3.     <u>Title to the Property.</u> Contemporaneously with the execution hereof, TRST-IPO has acquired a fourteen-point six four percent (14.64%) interest in the Property, the ("TRST-IPO Interest"), and BMO-CPO owns an undivided eighty-five point three six percent (85.36%)interest in the Property (the "BMO-CPO Ownership Interest"). The BMO-CPO Ownership Interest and the TRST-IPO Ownership Interest are hereinafter sometimes referred to as the "Ownership Interests" or an "Ownership Interest." Each Tenant agrees to be bound by the terms and conditions of this Agreement.

**AGREEMENT AMONG TENANTS IN COMMON**                                    Page 1

4.    <u>Ownership Rights of Tenants</u>.  Notwithstanding any statute or other rule of law and having previously been advised of their respective rights to bring an action for partition, the Tenants agree that during the term hereof the Tenants shall only have those rights in the Property as expressly provided herein and each <u>Tenant hereby irrevocably waives</u> any and all rights that it has (i) to occupy the Property or any portion thereof, or to exclude any other Tenant from the Property or any portion thereof, and (ii) to maintain any action for any partition of the Property, or otherwise force a sale of the Property during the term hereof, all except as expressly provided herein.

5.    <u>Tenant Payment Obligations</u>.

(a)    Each Tenant agrees to pay its Agreed Share (such Agreed Share determined as provided, below) of all costs and expenses involved in owning, operating, maintaining, leasing, selling or exchanging the Property, including, but not limited to, ad valorem taxes, insurance premiums, repairs, necessary improvements, contractual fees, professional fees, lease commissions and utility costs, debt service and other financing-related costs, and capital repairs and replacements and other capital expenditures at the Property (collectively, "Owner Costs").  To the extent that the income from the Property is insufficient to pay all Owner Costs in the ordinary course of business, each Tenant's Agreed Share of such Owner Costs shall be paid by each Tenant, upon demand, prior to the due date of all such costs and expenses and no later than ten (10) days prior to the date when such costs and expenses are due.

For purposes of this Agreement, the Agreed Share of each Tenant shall be equal to his respective Ownership Interest in the Property.  BMO-CPO, which shall be the Tenant managing the Tenancy, shall maintain a banking account or accounts at financial institutions on behalf of the Tenants and shall maintain reasonable reserves for future costs and expenses of the Property.

(b)    If any Tenant fails promptly to contribute such Tenant's share of the Owner Costs ("Defaulting Tenant"), the other Tenants may pay the entire amount' of such Owner Costs and the amount not paid by the Defaulting Tenant shall be deemed a loan to the Defaulting Tenant (the "Tenant Loan" or "Tenant Loans").  All Tenant Loans shall be payable on demand, shall bear interest at the rate of eighteen percent (18%) per annum, and shall constitute a lien on the interest of the Defaulting Tenant in the Property, which lien shall be expressly subject and subordinate to any existing or future lien of any third party lender with a lien on the Property.  Each Defaulting Tenant authorizes each other Tenant making a Tenant Loan to execute and record such documents as such Tenant deems necessary to further or better evidence such loan and lien.

In the event a Tenant makes a loan or loans to the Defaulting Tenant ("Loaning Tenant") and any Tenant Loan remains unpaid for a thirty (30) day period after written notice is given to the Defaulting Tenant requesting payment, the Loaning Tenant may bring suit against the Defaulting Tenant for the amount of the Tenant Loans not paid plus all reasonable collection costs. All income from the sale and operation of the Property shall be paid to the Loaning Tenant until all Tenant Loans are paid in full.

**AGREEMENT AMONG TENANTS IN COMMON**                                **Page 2**

6.    Distribution of Net Profits From Operation, Financing, Refinancing, Exchange, Lease and Sale of the Property.

(a)    All income derived from the operation of the Property in whatever form and however derived (less reasonable working capital and capital repairs and replacement reserves), shall be divided and paid when received as follows:

(i)    First, to each Tenant in an amount equal to such Tenant's Agreed Share of the Owner Costs, or, at BMO-CPO's option, to pay such Tenant's Agreed Share of such Owner Costs directly on its behalf; and

(ii)    Thereafter, at least quarterly, to the Tenants in accordance with their Agreed Shares.

(b)    In the event of the financing, refinancing, exchange or lease of the Property, or in the event of a sale under Section 10 herein, the Net Profits, if any, from the sale, lease, financing, refinancing or exchange of the Property shall be divided between the Tenants when received in the same manner set forth in Section 6(a). The term "Net Profits" for the purpose of this paragraph shall mean the net proceeds from any financing, refinancing, exchange or lease (less all reasonable and bona fide financing, exchange or leasing costs) or the net sales price of the Property (gross sales price less all reasonable and bona fide selling expenses) less; (i) the outstanding unpaid indebtedness of all notes secured by loans on the Property at the time of such sale; (ii) the outstanding principal balance plus accrued but unpaid interest on any Tenant Loans, and (iii) all other reasonable and bona fide expenses incurred by the Tenancy in connection with the ownership, maintenance, financing, refinancing, exchange, lease or the sale of the Property, including any unpaid Owner Costs. Each Tenant shall receive its share of the Net Profits under this Section 6(b) in the form of any promissory note(s) or cash received from the leasing, financing, refinancing, exchange or sale.

7.    Books and Records.  Proper and complete books of account of the Tenancy shall be kept by BMO-CPO (i.e., the Tenant managing the Tenancy) as an expense of the Tenancy and shall be open to inspection and copying by any Tenant or representatives of each Tenant at any reasonable time. The books and records of account shall be examined and reviewed as of the close of each calendar year by an accountant selected by BMO-CPO, and such accountant shall prepare an annual report thereof, copies of which will be furnished to each Tenant as soon, as possible after the conclusion of each calendar year. Each Tenant shall have the right to make a separate audit of the books and records of the Tenancy at such Tenant's own expense at any time and from time to time.

8.    Bank Accounts.  All funds of the Tenancy shall be deposited by BMO-CPO in a bank or brokerage account or accounts in the name of the Tenancy and funds from said bank account or accounts shall be disbursed upon the signature of BMO-CPO in the ordinary course of business, and in accordance with the provisions of this Agreement, unless all Tenants direct otherwise. Tenancy funds shall be used only for Tenancy purposes.

**AGREEMENT AMONG TENANTS IN COMMON**                                    Page 3

9.    <u>Dissolution of a Tenant</u>. The dissolution of any Tenant shall not have the affect of terminating or dissolving the Tenancy. Upon the dissolution of a Tenant, the shareholders, partners, members or other equity owners thereof shall succeed to its interest in this Tenancy and shall be bound by the terms and provisions of this Agreement; however, in the event that the interest of the dissolved Tenant passes to more than one person, then, and in that event, such persons shall, within ninety (90) days after dissolution of the Tenant, execute and deliver to the other Tenants a written instrument (including Power of Attorney) appointing one person as and to be the Agent for collecting, receiving and making all payments and contributions required hereunder, shall vote the entire interest of the successors, and shall perform all other obligations of such successors performable by reason of or arising from their interest in the Tenancy; and, any and all payments and/or disbursements due arising from the successors interest in the Tenancy shall be deemed to have been validly made to such successors by paying the same to such duly designated Agent. In the event that said successors for any reason fail to designate such Agent in writing in the manner and within the time prescribed and continue to fail to cure such default after ten (10) days written notice from another Tenant to correct same, such other Tenant shall have the right to appoint such Agent.

10.    <u>Transfer of Tenant's Interest and Sale of Property</u>.

(a)    No Tenant may sell, transfer, convey, encumber or otherwise hypothecate the Property or its undivided interest in the Property without the written consent of the other Tenants, except as provided in Section 10(c) herein and Section 11 herein.

(b)    Any permitted transfer of a Tenant's Ownership Interest in the Property shall be subject to such transferee's written agreement to be bound by all of the terms and conditions of this Agreement; any transfer without such written assumption agreement shall be null and void.

(c)    BMO-CPO may, at any time, sell, finance, exchange or otherwise transfer or encumber all of the Property (including the other Ownership Interests) on such terms and conditions as BMO-CPO may, in BMO-CPO's sole discretion, determine, so long as such transaction is a bona fide transaction and all of the terms and conditions of such transaction are fully disclosed to all Tenants at the time such transaction is entered into. If requested by BMO-CPO, all Tenants shall join in the conveyance of the Property and/or execute all documents necessary or desirable to close such transaction.

(d)    If the signature of a Tenant is required by a third party in connection with the transactions contemplated by Section 10(c), such Tenant agrees to execute and deliver such documents as such third party deems necessary or desirable to accomplish all of the foregoing. If such Tenant fails to execute and deliver any such documents within ten (10) days following written notice from BMO-CPO, BMO-CPO is hereby authorized, and each Tenant grants to BMO-CPO an irrevocable power of attorney, coupled with an interest, to execute and deliver any such documents by, in the name of and on behalf of such Tenant, which documents shall be binding upon such Tenant to the same extent as if such Tenant had personally executed and delivered the same.

**AGREEMENT AMONG TENANTS IN COMMON**                                 Page 4

(e)    A Tenant may not, without the prior written consent of BMO-CPO, which consent may be granted or withheld in the sole and absolute discretion of BMO-CPO, sell, transfer, convey, encumber or otherwise hypothecate all or any portion of the Property (including its Ownership Interest).

(f)    Put Option Available to TRST-IPO annually commencing on the third annual anniversary of the agreement and extending to the full term of the Term of the Agreement. Put Option value to be determined based on the greater of (i) the original amount of the purchased interest plus a two percent (2%) per year accrual of the original purchased interest or (ii) the current market value appraised by an independent third party appraiser within 3 months of the Owner Put Option being exercised.

(g)    Call Option Available to BMO-CPO annually commencing on the third annual anniversary of the agreement and extending to the full term of the Term of the Agreement. Call Option value to be determined based on the greater of (i) the original amount of the purchased interest plus a two percent (2%) per year accrual of the original purchased interest or (ii) the current market value appraised by an independent third party appraiser within 3 months of the Owner Put Option being exercised.

11.    Management, Financing, and Leasing. It is the objective of the Tenants to maximize the market value of the Property by operating, leasing, financing, and/or sale of the Property.

(a)    The Tenants irrevocably authorize BMO-CPO, or any management company or management agent appointed by BMO-CPO, (i) to operate, manage and lease all or any portion of the Property upon such terms and conditions as BMO-CPO may determine necessary or advisable; (ii) to pay from any revenues derived from operation of the Property, on or before the date due, all installments of principal and/or interest on all debts secured by a lien on the Property, (iii). to execute any and all documents necessary to manage and lease all or any portion of the Property as permitted herein, without the necessity of any other Tenant joining in the execution thereof.

(b)    If the signature of a Tenant is required by a third party, each Tenant agrees to execute and deliver such documents as such third party deems necessary or desirable to accomplish all of the foregoing and such management or lease of the Property. If a Tenant fails to execute and deliver any such documents within ten (10) days following written notice from BMO-CPO, BMO-CPO is hereby authorized, and each Tenant grants to BMO-CPO an irrevocable power of attorney, coupled with an interest, to execute and deliver any such documents by, in the name of and on behalf of such Tenant, which documents shall be binding upon such Tenant to the same extent as if such Tenant had personally executed and delivered the same.

(c)    If third party management is not obtained for the Property by BMO-CPO, in its sole and absolute discretion, BMO-CPO may appoint itself or any affiliate as manager of the Tenancy and the Property. For such services, BMO-CPO shall receive a management fee equal to eight percent (8%) of the gross revenues from the Property, payable monthly following payment of debt service and all other Owner Costs then due.

**AGREEMENT AMONG TENANTS IN COMMON**                                    Page 5

(d)     Notwithstanding anything contained in this Section 11 to the contrary:

(i)     BMO-CPO may exercise the rights provided to BMO-CPO in Section 10(c) of this Agreement, without the written approval of any other Tenant, notwithstanding any statute or other law to the contrary.

(ii)     Any note, deed of trust, or loan documents executed in connection with a financing or refinancing of all or any portion of the Property shall not personally obligate a Tenant for the repayment of the principal or interest thereof without the written consent of such Tenant.

(iii)     No litigation shall be brought by or on behalf of a Tenant against a third party involving the Property without the written consent of BMO-CPO.

(iv)     By unanimous vote of the Tenants other than BMO-CPO, BMO-CPO may be removed as manager of the Tenancy or the Property only upon a judicial determination, in a final, unappealable judgment of a court of appropriate jurisdiction, of fraud or gross negligence on the part of BMO-CPO in connection with the management and operation of the Property.

12.     <u>Conditional Option to Purchase at Selling Tenant's Adjusted Basis</u>.

(a)     <u>Option to Purchase at Selling Tenant's Adjusted Basis</u>.  In the event that (i) any Tenant shall pledge, hypothecate or use as security for any loan or obligation, his interest in the Property or any portion thereof, and a default shall occur with respect to such loan or obligation resulting in the interest of such Tenant (or a portion thereof) being subject to levy or sale; or (ii) any Tenant shall make an assignment for the benefit of creditors or similar arrangement, or any proceeding shall be commenced by or against any Tenant under any bankruptcy, reorganization or other similar laws for the relief of debtors, or the property of a Tenant becomes subject to seizure or sale by reason of a judgment having been taken against him or it, or (iii) any Tenant shall fail to remove any lien or security interest on all or any portion of his interest in the Property within ten (10) days following written notice from any other Tenant, so that a third party lender may obtain a first lien on the Property with priority over such lien or security interest in connection with any financing or re-financing of the Property; then, in any of such events, the Ownership Interest of such Tenant (herein the "Selling Tenant") shall automatically be offered for sale to each other Tenant (herein the "Purchasing Tenant") in accordance with (b) and (c) below, upon notice of such event to each Tenant.

(b)     <u>Option Exercise Procedures</u>.  In the event that the Ownership Interest of a Tenant shall be offered for sale to the other Tenants pursuant to section (a) above, then the Purchasing Tenant(s) shall have the option, exercisable within thirty (30) days of receipt of notice thereof from the Selling Tenant, to purchase the complete Ownership Interest of the Selling Tenant, which purchase shall be, if more than one Purchasing Tenant exercises such option, pro rata in accordance with their respective Ownership Interests in the Property.

**AGREEMENT AMONG TENANTS IN COMMON**         Page 6

(d)    Purchase Price.  The purchase price for the interest of a Tenant to be sold pursuant to (a) shall be said Tenant's adjusted basis in the property after taking into consideration that Tenant's historical cost, return of capital, if any, with appropriate adjustments and allocations for all items of income or, expense accruing. prior to the closing date.  All closing costs associated with such sale shall be borne by the Selling Tenant.  The purchase price shall be paid 100% in cash at closing, which is to occur within thirty (30) days of the Purchasing Tenant's receipt of notice from the Selling Tenant.

13.    NEGATION OF PARTNERSHIP; LIABILITY SEVERAL.  NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR CONSTRUED TO CREATE A PARTNERSHIP, JOINT VENTURE OR ASSOCIATION AMONG ANY OF THE PARTIES HERETO. THE LIABILITY OF THE TENANTS UNDER THIS AGREEMENT SHALL BE SEVERAL, NOT JOINT AND SEVERAL, LIMITED AS TO EACH, TO ITS RESPECTIVE OWNERSHIP INTEREST.

14.    Events of Default.  If any of the following events shall occur and shall not be cured within the time period set forth in Section 14 after written notice thereof to the Tenant committing such acts, such Tenant committing such act shall be deemed to have committed an Event of Default (herein so called):

(a)    A Tenant shall file a voluntary petition in bankruptcy or shall be adjudicated a bankrupt or insolvent, or shall file any petition or answer seeking any reorganization, arrangement, composition, readjustment liquidation, dissolution or similar relief for itself under any applicable federal state or other statute or law relative to bankruptcy, insolvency or other relief for debtors, or the appointment of any trustee, receiver, conservator or liquidator of said Party or of any part of its properties or interest in the Note or the Property, or

(b)    A Tenant shall admit in writing its inability to pay its debts as they mature; or

(c)    A Tenant shall make an assignment for the benefit of creditors or take any other similar action for the protection or benefit of creditors; or

(d)    A Tenant fails to make any payment required hereunder on a timely basis;

(e)    A Tenant shall fail to perform its covenants or obligations contained herein; or

(f)    A Tenant shall fail to perform its covenants or obligations contained in any agreement secured by a lien on the Property.

In addition to all other rights of BMO-CPO, if any other Tenant commits an uncured Event of Default, BMO-CPO may require such Tenant to convey its Ownership Interest in the Property in consideration for the payment to such Tenant of an amount equal to such Tenant's direct cost of acquiring his Ownership Interest from BMO-CPO, less such Tenant's closing costs incurred in connection with its acquisition of such Ownership Interest.

**AGREEMENT AMONG TENANTS IN COMMON**                                      Page 7

15.   <u>Notice of Default and Cure</u>.  In the event of an Event of Default, the remedies provided for in Section 14 shall apply only if said Event of Default is not timely cured.  If a Tenant believes another Tenant is in default hereunder, such Tenant shall give the defaulting Tenant written notice setting forth such default and the defaulting Tenant shall have thirty (30) days after the receipt of such notice to cure such default.  In the event such default is not cured during such thirty (30) day period, such defaulting Tenant shall be deemed to have committed such Event of Default and the other Tenant may enforce such Tenant's rights and remedies contained herein and at law.

Each Tenant (the "Indemnifying Tenant") agrees to indemnify the other Tenants for any loss, damage or claim arising from any uncured Event of Default of the Indemnifying Tenant.

16.   <u>Election to be Excluded from Provisions of Subchapter K</u>.  Each Tenant hereby elects to be excluded from all of the provisions of Subchapter K of Chapter I of the Internal Revenue Code of 1986, as amended (the "Code").  The exclusion elected by each Tenant hereunder shall commence with the execution of this Agreement.  Each Tenant hereby covenants and agrees that each Tenant shall abide by all regulatory requirements in order to maintain such election and shall report on such Tenant's income tax return such respective share of items of income, deduction and credit which results from holding of the Property, in a manner consistent with the exclusion of the Tenancy from Subchapter K of Chapter I of the Code, commencing with the first taxable year of the Tenancy.  No Tenant shall notify the Commissioner of Internal Revenue (the "Commissioner") that such Tenant desires that Subchapter K of the Code apply to the Tenancy and each Tenant hereby agrees to indemnity and hold each other Tenant free and harmless from all cost, liability, tax consequence and expense, including attorneys' fees, which results from any Tenant so notifying the Commissioner.

17.   <u>Dissolution</u>.  The Tenancy, as governed hereby, shall be immediately dissolved upon the happening of any of the following events:

(i)   The sale or other disposition by the Tenants of all of the Property; or

(ii)   The decision of the Tenants that the Tenancy be dissolved; or

(iii)   Ten (10) years after the date hereof, absent prior extension of the term of the Tenancy (for one or more years) by written notice from BMO-CPO to the other Tenants, at BMO-CPO's option in its sole and absolute discretion.

18.   <u>Notices</u>.  All notices under this Agreement must be in writing and shall be deemed to have been duly given if delivered personally or by certified mail, return receipt requested, to the addresses set forth on the signature page hereof.

19.   <u>Amendment; Additional Tenants</u>.  This Agreement may be amended only by written agreement signed by all Tenants; provided, however, that BMO-CPO may sell additional undivided interests in the Property (from the BMO-CPO Ownership Interest) to third parties, in which case such other third party(ies) may be added to this Agreement by BMO-CPO as additional Tenants,

**AGREEMENT AMONG TENANTS IN COMMON**                    **Page 8**

with the same rights and obligations hereunder as are applicable to TRST-IPO and the TRST-IPO Ownership Interest, to the extent of the undivided interest in the Property constituting the Ownership Interest of such third party(ies) in the Property.  In such event, the Ownership Interests of BMO-CPO hereunder shall be reduced pro rata, such that the aggregate Ownership Interests of the Tenants following such sale(s) of undivided interests in the BMO-CPO Ownership Interest shall continue to equal one hundred (100%).

20.    Counterparts.  This Agreement may be executed in counterparts each of which shall be deemed to be an original, but such counterparts, when taken together, shall constitute but one agreement.

21.    Gender.  All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine or neuter, singular or plural, as the identity of the person, persons, entity or entities may require.

22.    Caption Headings.  Captions at the beginning of each numbered Section of this Agreement are solely for the convenience of the parties and shall not be deemed part of the context of this Agreement.

23.    Negotiated Transaction.  The provisions of this Agreement were negotiated by all of the parties hereto and said Agreement shall be deemed to have been drafted by all of the parties thereto.

24.    Further Assurances.  Each Tenant hereby agrees to promptly sign any additional instruments or documents which are necessary or appropriate to carry out the purpose of this Agreement.

25.    Interpretation.  It is the intent of the Tenants to own the Property for investment purposes, only and not for the conduct of a business, and to otherwise comply with all statutes and regulations allowing an election to be excluded from Subchapter K of the Code and this Agreement shall be interpreted to conform to such intent.

26.    Litigation.  In the event of any litigation between the parties hereto, the prevailing party in such litigation shall be paid all attorneys' fees, court costs and litigation expenses incurred in such litigation by the non-prevailing party.  The parties hereto agree that specific performance is an appropriate remedy for the enforcement of the rights of the Tenants hereunder concerning a sale of the Property and the obligations of the parties hereunder.

27.    Recording.  A memorandum of this Agreement may be recorded by BMO-CPO and the other Tenants agree to cooperate and facilitate such recording.

[SIGNATURE PAGE FOLLOWS]

**AGREEMENT AMONG TENANTS IN COMMON**                                    Page 9

EXECUTED effective as of February 4th , 2021.

**Buddy Mac One, LLC**
a Texas limited liability, as Tenant-in-Common
By: MacDonald Capital Corporation
Managing Member

By: _____
Name: Wm. Ian MacDonald
Title: CEO

Address:  400 East Centre Park Blvd., Suite 101
DeSoto, Texas 75115
Facsimile: 972-283-0193

Date: _02 - 05 - 2021_

**DARWIN M. BOLSINGER AND MARGIE A. BOLSINGER, TRUSTEES OF THE DARWIN M. BOLSINGER AND MARGIE A. BOLSINGER TRUST, DATED JULY 8, 2005.,**
as Tenant-in-Common

By: _____
Darwin M. Bolsinger, Trustee

By: _____
Margie A. Bolsinger, Trustee

Address:  9911 Sanderland,
Santa Ana, CA   92075566

Facsimile: _714-639-4706_

**AGREEMENT AMONG TENANTS IN COMMON**                  Page 10

STATE OF TEXAS      §
                    §
COUNTY OF DALLAS     §

    This instrument was acknowledged before me on the _____ day of February, 2021, by Wm Ian MacDonald, CEO of MacDonald Capital Corporation, a Texas corporation and sole general partner of Buddy Mac One, LLC a Texas limited liability, on behalf of said corporation and said limited liability.

JODENA R CUPPY
Notary ID #129750740
My Commission Expires
March 18, 2022

Notary Public, State of Texas

My Commission expires:

3/18/22

**AGREEMENT AMONG TENANTS IN COMMON**             Page 11

[SEAL]

**STATE OF CALIFORNIA**          )
                                 )    ss.
**COUNTY OF ORANGE**             )

On February 5th, 2021, before me, _____CARL CHENG_____, Notary Public, personally appeared DARWIN M. BOLSINGER, personally known to me/proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is subscribed to the within instrument, and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

CARL CHENG
COMM. # 2315026
ORANGE COUNTY
NOTARY PUBLIC-CALIFORNIA
MY COMMISSION EXPIRES
DECEMBER 09, 2023

**NOTARY PUBLIC,**
**STATE OF CALIFORNIA**

My Commission expires:

12/09/2023

**AGREEMENT AMONG TENANTS IN COMMON**                    Page 12

[SEAL]

STATE OF CALIFORNIA           )
                             )   ss.
COUNTY OF ORANGE              )

On February _5th_, 2021, before me, _____CARL  CHENG_____, Notary Public, personally appeared MARGIE A. BOLSINGER , personally known to me/proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is subscribed to the within instrument, and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____
NOTARY PUBLIC,
STATE OF CALIFORNIA

My Commission expires:
_____12 / 09 / 2023_____

CARL CHENG
COMM. # 2315026
ORANGE COUNTY
NOTARY PUBLIC-CALIFORNIA
MY COMMISSION EXPIRES
DECEMBER 09, 2023

AGREEMENT AMONG TENANTS IN COMMON                              Page 13



**AGREEMENT AMONG TENANTS IN COMMON**                    Page 14

Exhibit A
Legal Description

An Undivided Interest of fourteen point six four percent (14.64%)
in the property described below

Purchase Price of Ownership Interest: $248,500

Being .811 of Lot 57, New City Block 669-M, PATTERSON
HEIGHT, an addition to the City of Tyler, according to
the plat thereof recorded in Volume I, Page 209, of the
Plat Records of Smith County, Texas.

## EXHIBIT A

### THE PROPERTY

Being all of Lot 57, New City Block 669-M, PATTERSON HEIGHTS, an addition to the City of Tyler, according to the plat thereof recorded in Volume 1, Page 209, of the Plat Records of Smith County, Texas.

**AGREEMENT AMONG TENANTS IN COMMON**                                    Page 15
DALLAS1 1068268v3 51997-00001

# EXHIBIT E-3

### Tyler TIC - Heath

## AGREEMENT AMONG TENANTS IN COMMON
### Tyler, TX

**THIS AGREEMENT AMONG TENANTS IN COMMON** ("Agreement") is made and entered into initially by and between **Buddy Mac One, LLC** (a Texas Limited Liability Company) and Current Property Owner ("CPO") and **Donald P. Heath and Joanne O. Heath, Husband and Wife as Joint Tenants** in Irvine, California as the Incoming Property Owner ("IPO"), being sometimes referred to singularly as "Tenant" or collectively as the "Tenants".

### RECITALS

A.    It is the desire of the Tenants to hold, operate, maintain, finance, keep in repair, lease and/or sell or exchange, as tenants in common, that certain real property together with all improvements located therein, commonly known Buddy's which is more fully described on Exhibit "A" attached hereto and by this reference incorporated herein (the "Property").

B.    It is the desire of IPO to acquire an undivided interest in the Property from CPO as is more fully described In Exhibit 'A'.

NOW, THEREFORE, in consideration of the foregoing Recitals and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Tenants to hereby agree as follows:

1.    Formation of Tenancy.  The Tenants hereby acknowledge their ownership to be a tenancy in common (the "Tenancy") and this Agreement shall govern the ownership and management of the Property.  The principal purpose of the Tenancy shall be to hold and maintain the Property as tenants in common for investment purposes.  The address of each Tenant for notice and all other purposes of this Agreement is set forth on the signature page hereof.  Except as expressly provided herein, no Tenant shall sell, assign, hypothecate or otherwise dispose of or encumber its interest or any part thereof in the Property without the prior written consent of the other Tenants.

2.    Term.  The Tenancy as governed hereby shall commence on the execution of this Agreement, and shall continue thereafter until dissolved or terminated pursuant to Sections 17 hereof.

3.    Title to the Property.  Contemporaneously with the execution hereof, IPO has acquired an undivided interest in the Property as set forth in Exhibit 'A', the ("IPO Interest"), and CPO retains an interest in the Property as is more fully described in Exhibit 'A' (the "CPO Ownership Interest").  The CPO Ownership Interest and the IPO Ownership Interest are hereinafter sometimes referred to as the "Ownership Interests" or an "Ownership Interest."  Each Tenant agrees to be bound by the terms and conditions of this Agreement.

**AGREEMENT AMONG TENANTS IN COMMON**                                    Page 1

4.  <u>Ownership Rights of Tenants</u>.  Notwithstanding any statute or other rule of law and having previously been advised of their respective rights to bring an action for partition, the Tenants agree that during the term hereof the Tenants shall only have those rights in the Property as expressly provided herein and each Tenant hereby irrevocably waives any and all rights that it has (i) to occupy the Property or any portion thereof, or to exclude any other Tenant from the Property or any portion thereof, and (ii) to maintain any action for any partition of the Property, or otherwise force a sale of the Property during the term hereof, all except as expressly provided herein.

5.  <u>Tenant Payment Obligations</u>.

(a)  Each Tenant agrees to pay its Agreed Share (such Agreed Share determined as provided, below) of all costs and expenses involved in owning, operating, maintaining, leasing, selling or exchanging the Property, including, but not limited to, ad valorem taxes, insurance premiums, repairs, necessary improvements, contractual fees, professional fees, lease commissions and utility costs, debt service and other financing-related costs, and capital repairs and replacements and other capital expenditures at the Property (collectively, "Owner Costs").  To the extent that the income from the Property is insufficient to pay all Owner Costs in the ordinary course of business, each Tenant's Agreed Share of such Owner Costs shall be paid by each Tenant, upon demand, prior to the due date of all such costs and expenses and no later than ten (10) days prior to the date when such costs and expenses are due.

For purposes of this Agreement, the Agreed Share of each Tenant shall be equal to his respective Ownership Interest in the Property.  CPO, which shall be the Tenant managing the Tenancy, shall maintain a banking account or accounts at financial institutions on behalf of the Tenants and shall maintain reasonable reserves for future costs and expenses of the Property.

(b)  If any Tenant fails promptly to contribute such Tenant's share of the Owner Costs ("Defaulting Tenant"), the other Tenants may pay the entire amount of such Owner Costs and the amount not paid by the Defaulting Tenant shall be deemed a loan to the Defaulting Tenant (the "Tenant Loan" or "Tenant Loans").  All Tenant Loans shall be payable on demand, shall bear interest at the rate of eighteen percent (18%) per annum, and shall constitute a lien on the interest of the Defaulting Tenant in the Property, which lien shall be expressly subject and subordinate to any existing or future lien of any third party lender with a lien on the Property.  Each Defaulting Tenant authorizes each other Tenant making a Tenant Loan to execute and record such documents as such Tenant deems necessary to further or better evidence such loan and lien.

In the event a Tenant makes a loan or loans to the Defaulting Tenant ("Loaning Tenant") and any Tenant Loan remains unpaid for a thirty (30) day period after written notice is given to the Defaulting Tenant requesting payment, the Loaning Tenant may bring suit against the Defaulting Tenant for the amount of the Tenant Loans not paid plus all reasonable collection costs.  All income from the sale and operation of the Property shall be paid to the Loaning Tenant until all Tenant Loans are paid in full.

**AGREEMENT AMONG TENANTS IN COMMON**                                    **Page 2**

    6.    <u>Distribution of Net Profits From Operation, Financing, Refinancing, Exchange, Lease and Sale of the Property.</u>

    (a)    All income derived from the operation of the Property in whatever form and however derived (less reasonable working capital and capital repairs and replacement reserves), shall be divided and paid when received as follows:

    (i)    First, to each Tenant in an amount equal to such Tenant's Agreed Share of the Owner Costs, or, at CPO's option, to pay such Tenant's Agreed Share of such Owner Costs directly on its behalf,

    (ii)    The IPO tenant shall receive the greater of (i) percentage interest of the net income of the Property as set forth in Exhibit 'A', or (ii) the annual pay rate paid on the originally invested amount set forth in Exhibit 'A' ("Originally Invested Amount") to be paid on a monthly basis,

    (iii)    The IPO tenant shall also a receive a two percent (2%) annual accrual on the invested amount to be paid upon redemption of the IPO interest, and

    (iv)    Thereafter, the CPO tenant shall receive the remaining available balance of the cash flow and distributions from all other distributable sources.

    (b)    In the event of the financing, refinancing, exchange or lease of the Property, or in the event of a sale under Section 10 herein, the Net Profits, if any, from the sale, lease, financing, refinancing or exchange of the Property shall be divided between the Tenants when received in the same manner set forth in Section 6(a). The term "Net Profits" for the purpose of this paragraph shall mean the net proceeds from any financing, refinancing, exchange or lease (less all reasonable and bona fide financing, exchange or leasing costs) or the net sales price of the Property (gross sales price less all reasonable and bona fide selling expenses) less; (i) the outstanding unpaid indebtedness of all notes secured by loans on the Property at the time of such sale; (ii) the outstanding principal balance plus accrued but unpaid interest on any Tenant Loans, and (iii) all other reasonable and bona fide expenses incurred by the Tenancy in connection with the ownership, maintenance, financing, refinancing, exchange, lease or the sale of the Property, including any unpaid Owner Costs. Each Tenant shall receive its share of the Net Profits under this Section 6(b) in the form of any promissory note(s) or cash received from the leasing, financing, refinancing, exchange or sale.

    7.    <u>Books and Records.</u>  Proper and complete books of account of the Tenancy shall be kept by CPO (i.e., the Tenant managing the Tenancy) as an expense of the Tenancy and shall be open to inspection and copying by any Tenant or representatives of each Tenant at any reasonable time. The books and records of account shall be examined and reviewed as of the close of each calendar year by an accountant selected by CPO, and such accountant shall prepare an annual report thereof, copies of which will be furnished to each Tenant as soon, as possible after the conclusion of each calendar year. Each Tenant shall have the right to make a separate audit of the books and records of the Tenancy at such Tenant's own expense at any time and from time to time.

**AGREEMENT AMONG TENANTS IN COMMON**        **Page 3**

8.  <u>Bank Accounts</u>. All funds of the Tenancy shall be deposited by CPO in a bank or brokerage account or accounts in the name of the Tenancy and funds from said bank account or accounts shall be disbursed upon the signature of CPO in the ordinary course of business, and in accordance with the provisions of this Agreement, unless all Tenants direct otherwise. Tenancy funds shall be used only for Tenancy purposes.

9.  <u>Dissolution of a Tenant</u>. The dissolution of any Tenant shall not have the affect of terminating or dissolving the Tenancy. Upon the dissolution of a Tenant, the shareholders, partners, members or other equity owners thereof shall succeed to its interest in this Tenancy and shall be bound by the terms and provisions of this Agreement; however, in the event that the interest of the dissolved Tenant passes to more than one person, then, and in that event, such persons shall, within ninety (90) days after dissolution of the Tenant, execute and deliver to the other Tenants a written instrument (including Power of Attorney) appointing one person as and to be the Agent for collecting, receiving and making all payments and contributions required hereunder, shall vote the entire interest of the successors, and shall perform all other obligations of such successors performable by reason of or arising from their interest in the Tenancy; and, any and all payments and/or disbursements due arising from the successors interest in the Tenancy shall be deemed to have been validly made to such successors by paying the same to such duly designated Agent. In the event that said successors for any reason fail to designate such Agent in writing in the manner and within the time prescribed and continue to fail to cure such default after ten (10) days written notice from another Tenant to correct same, such other Tenant shall have the right to appoint such Agent.

10.  <u>Transfer of Tenant's Interest and Sale of Property</u>.

(a)  No Tenant may sell, transfer, convey, encumber or otherwise hypothecate the Property or its undivided interest in the Property without the written consent of the other Tenants, except as provided in Section 10(c) herein and Section 11 herein.

(b)  Any permitted transfer of a Tenant's Ownership Interest in the Property shall be subject to such transferee's written agreement to be bound by all of the terms and conditions of this Agreement; any transfer without such written assumption agreement shall be null and void.

(c)  CPO may, at any time, sell, finance, exchange or otherwise transfer or encumber all of the Property (including the other Ownership Interests) on such terms and conditions as CPO may, in CPO's sole discretion, determine, so long as such transaction is a bona fide transaction and all of the terms and conditions of such transaction are fully disclosed to all Tenants at the time such transaction is entered into. If requested by CPO, all Tenants shall join in the conveyance of the Property and/or execute all documents necessary or desirable to close such transaction.

(d)  If the signature of a Tenant is required by a third party in connection with the transactions contemplated by Section 10(c), such Tenant agrees to execute and deliver such documents as such third party deems necessary or desirable to accomplish all of the foregoing. If such Tenant fails to execute and deliver any such documents within ten (10) days following written notice from CPO, CPO is hereby authorized, and each Tenant grants to CPO an irrevocable power of attorney,

**AGREEMENT AMONG TENANTS IN COMMON**                              **Page 4**

coupled with an interest, to execute and deliver any such documents by, in the name of and on behalf of such Tenant, which documents shall be binding upon such Tenant to the same extent as if such Tenant had personally executed and delivered the same.

(e)    A Tenant may not, without the prior written consent of CPO, which consent may be granted or withheld in the sole and absolute discretion of CPO, sell, transfer, convey, encumber or otherwise hypothecate all or any portion of the Property (including its Ownership Interest).

(f)    IPO Put Option ("Put Option") is available to IPO annually commencing on fifth anniversary of the agreement and extending to the full term of the Term of the Agreement.
Put  Option value to be determined based on the greater of the

(i)    the (a) amount of the original purchased interest (as set forth in Exhibit 'A', plus (b) a two percent (2%) per year accrual on the amount of the original purchased interest, or

(ii)    the amount of the original purchased interest (as set forth in Exhibit 'A'), plus the net increase above the current agreed upon market Property value set forth in Exhibit 'A' times the IPO percentage ownership interest set forth in Exhibit 'A'; (unless otherwise agreed, to be appraised by an independent third party appraiser within 6 months of the Owner Put Option being exercised);

(iii)    however in no event will the IPO Put Option be less than the redemption of original purchased interest plus the two percent (2%) annual accrual during the outstanding period of the interest held by IPO.

(g)    CPO Call Option ("Call Option") is available to CPO annually commencing on the third annual anniversary of the agreement and extending to the full term of the Agreement.
Call Option value to be determined based on the greater of the

(i)    (a) amount of the original purchased interest(as set forth in Exhibit 'A'), plus (b) a two percent (2%) per year accrual of the original purchased interest, or

(ii)    the amount of the original purchased interest (as set forth in Exhibit 'A'), plus net increase above the current agreed upon market Property value as set forth in Exhibit 'A'times the IPO percentage ownership interest set forth in Exhibit 'A'; (unless otherwise agreed, to be appraised by an independent third party appraiser within 6 months of the Owner Put Option being exercised);

(iii)    however in no event will the CPO Call Option be less than the redemption of original purchased interest plus the two percent (2%) annual accrual during the outstanding period of the interest held by IPO.

**AGREEMENT AMONG TENANTS IN COMMON**                                   **Page 5**

11.    <u>Management, Financing, and Leasing</u>.  It is the objective of the Tenants to maximize the market value of the Property by operating, leasing, financing, and/or sale of the Property.

(a)    The Tenants irrevocably authorize CPO, or any management company or management agent appointed by CPO, (i) to operate, manage and lease all or any portion of the Property upon such terms and conditions as CPO may determine necessary or advisable in its absolute and sole discretion; (ii) to pay from any revenues derived from operation of the Property, on or before the date due, all installments of principal and/or interest on all debts secured by a lien on the Property, (iii) to execute any and all documents necessary to manage and lease all or any portion of the Property as permitted herein, without the necessity of any other Tenant joining in the execution thereof including without limitation the sale, refinance merger or other material event.

(b)    If the signature of a Tenant is required by a third party, each Tenant agrees to execute and deliver such documents as such third party deems necessary or desirable to accomplish all of the foregoing and such management or lease of the Property.  If a Tenant fails to execute and deliver any such documents within ten (10) days following written notice from CPO, CPO is hereby authorized, and each Tenant grants to CPO an irrevocable power of attorney, coupled with an interest, to execute and deliver any such documents by, in the name of and on behalf of such Tenant, which documents shall be binding upon such Tenant to the same extent as if such Tenant had personally executed and delivered the same.

(c)    If third party management is not obtained for the Property by CPO, in its sole and absolute discretion, CPO may appoint itself or any affiliate as manager of the Tenancy and the Property.  For such services, CPO shall receive a management fee equal to eight percent (8%) of the gross revenues from the Property plus reasonable out of pocket costs, payable monthly following payment of debt service and all other Owner Costs then due.

(d)    Notwithstanding anything contained in this Section 11 to the contrary:

(i)    CPO may exercise the rights provided to CPO in Section 10(c) of this Agreement, without the written approval of any other Tenant, notwithstanding any statute or other law to the contrary.

(ii)    Any note, deed of trust, or loan documents executed in connection with a financing or refinancing of all or any portion of the Property shall not personally obligate a Tenant for the repayment of the principal or interest thereof without the written consent of such Tenant.

(iii)    No litigation shall be brought by or on behalf of a Tenant against a third party involving the Property without the written consent of CPO.

(iv)    By unanimous vote of the Tenants, CPO may be removed as manager of the Tenancy or the Property only upon a judicial determination, in a final, unappealable

**AGREEMENT AMONG TENANTS IN COMMON**                                    Page 6

judgment of a court of appropriate jurisdiction, of fraud or gross negligence on the part of CPO in connection with the management and operation of the Property.

12.    Conditional Option to Purchase at Selling Tenant's Adjusted Basis.

(a)    Option to Purchase at Selling Tenant's Adjusted Basis.  In the event that (i) any Tenant shall pledge, hypothecate or use as security for any loan or obligation, his interest in the Property or any portion thereof, and a default shall occur with respect to such loan or obligation resulting in the interest of such Tenant (or a portion thereof) being subject to levy or sale; or (ii) any Tenant shall make an assignment for the benefit of creditors or similar arrangement, or any proceeding shall be commenced by or against any Tenant under any bankruptcy, reorganization or other similar laws for the relief of debtors, or the property of a Tenant becomes subject to seizure or sale by reason of a judgment having been taken against him or it, or (iii) any Tenant shall fail to remove any lien or security interest on all or any portion of his interest in the Property within ten (10) days following written notice from any other Tenant, so that a third party lender may obtain a first lien on the Property with priority over such lien or security interest in connection with any financing or re-financing of the Property; then, in any of such events, the Ownership Interest of such Tenant (herein the "Selling Tenant") shall automatically be offered for sale to each other Tenant (herein the "Purchasing Tenant") in accordance with (b) and (c) below, upon notice of such event to each Tenant.

(b)    Option Exercise Procedures.  In the event that the Ownership Interest of a Tenant shall be offered for sale to the other Tenants pursuant to section (a) above, then the Purchasing Tenant(s) shall have the option, exercisable within ninety (90) days of receipt of notice thereof from the Selling Tenant, to purchase the complete Ownership Interest of the Selling Tenant, which purchase shall be, if more than one Purchasing Tenant exercises such option, pro rata in accordance with their respective Ownership Interests in the Property.

(c)    Purchase Price.  The purchase price for the interest of a Tenant to be sold pursuant to (a) shall be said Tenant's adjusted basis in the property after taking into consideration that Tenant's historical cost, return of capital, if any, with appropriate adjustments and allocations for all items of income or, expense accruing prior to the closing date.  All closing costs associated with such sale shall be borne by the Selling Tenant.  The purchase price shall be paid 100% in cash at closing, which is to occur within ninety (90) days of the Purchasing Tenant's receipt of notice from the Selling Tenant.

13.    NEGATION OF PARTNERSHIP; LIABILITY SEVERAL.  NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR CONSTRUED TO CREATE A PARTNERSHIP, JOINT VENTURE OR ASSOCIATION AMONG ANY OF THE PARTIES HERETO.  THE LIABILITY OF THE TENANTS UNDER THIS AGREEMENT SHALL BE SEVERAL, NOT JOINT AND SEVERAL, LIMITED AS TO EACH, TO ITS RESPECTIVE OWNERSHIP INTEREST.

14.    Events of Default.  If any of the following events shall occur and shall not be cured within the time period set forth in Section 14 after written notice thereof to the Tenant committing

**AGREEMENT AMONG TENANTS IN COMMON**                    **Page 7**

such acts, such Tenant committing such act shall be deemed to have committed an Event of Default (herein so called):

(a)    A Tenant shall file a voluntary petition in bankruptcy or shall be adjudicated a bankrupt or insolvent, or shall file any petition or answer seeking any reorganization, arrangement, composition, readjustment liquidation, dissolution or similar relief for itself under any applicable federal state or other statute or law relative to bankruptcy, insolvency or other relief for debtors, or the appointment of any trustee, receiver, conservator or liquidator of said Party or of any part of its properties or interest in the Note or the Property, or

(b)    A Tenant shall admit in writing its inability to pay its debts as they mature; or

(c)    A Tenant shall make an assignment for the benefit of creditors or take any other similar action for the protection or benefit of creditors; or

(d)    A Tenant fails to make any payment required hereunder on a timely basis;

(e)    A Tenant shall fail to perform its covenants or obligations contained herein; or

(f)    A Tenant shall fail to perform its covenants or obligations contained in any agreement secured by a lien on the Property.

In addition to all other rights of CPO, if any other Tenant commits an uncured Event of Default, CPO may require such Tenant to convey its Ownership Interest in the Property in consideration for the payment to such Tenant of an amount equal to such Tenant's direct cost of acquiring his Ownership Interest from CPO, less such Tenant's closing costs incurred in connection with its acquisition of such Ownership Interest.

15.    Notice of Default and Cure. In the event of an Event of Default, the remedies provided for in Section 14 shall apply only if said Event of Default is not timely cured. If a Tenant believes another Tenant is in default hereunder, such Tenant shall give the defaulting Tenant written notice setting forth such default and the defaulting Tenant shall have thirty (30) days after the receipt of such notice to cure such default. In the event such default is not cured during such thirty (30) day period, such defaulting Tenant shall be deemed to have committed such Event of Default and the other Tenant may enforce such Tenant's rights and remedies contained herein and at law.

Each Tenant (the "Indemnifying Tenant") agrees to indemnify the other Tenants for any loss, damage or claim arising from any uncured Event of Default of the Indemnifying Tenant.

16.    Election to be Excluded from Provisions of Subchapter K. Each Tenant hereby elects to be excluded from all of the provisions of Subchapter K of Chapter I of the Internal Revenue Code of 1986, as amended (the "Code"). The exclusion elected by each Tenant hereunder shall commence with the execution of this Agreement. Each Tenant hereby covenants and agrees that each Tenant shall abide by all regulatory requirements in order to maintain such election and shall report on such

**AGREEMENT AMONG TENANTS IN COMMON**                    Page 8

Tenant's income tax return such respective share of items of income, deduction and credit which results from holding of the Property, in a manner consistent with the exclusion of the Tenancy from Subchapter K of Chapter I of the Code, commencing with the first taxable year of the Tenancy. No Tenant shall notify the Commissioner of Internal Revenue (the "Commissioner") that such Tenant desires that Subchapter K of the Code apply to the Tenancy and each Tenant hereby agrees to indemnity and hold each other Tenant free and harmless from all cost, liability, tax consequence and expense, including attorneys' fees, which results from any Tenant so notifying the Commissioner.

17.     Dissolution. The Tenancy, as governed hereby, shall be immediately dissolved upon the happening of any of the following events:

(i)     The sale or other disposition by the Tenants of all of the Property; or

(ii)    The decision of the Tenants that the Tenancy be dissolved; or

(iii)   Ten (10) years after the date hereof, absent prior extension of the term of the Tenancy (for one or more years) by written notice from CPO to the other Tenants, at CPO's option in its sole and absolute discretion.

18.     Notices. All notices under this Agreement must be in writing and shall be deemed to have been duly given if delivered personally or by certified mail, return receipt requested, to the addresses set forth on the signature page hereof.

19.     Amendment; Additional Tenants. This Agreement may be amended only by written agreement signed by all Tenants; provided, however, that CPO may sell additional undivided interests in the Property (from the CPO Ownership Interest) to third parties, in which case such other third party(ies) may be added to this Agreement by CPO as additional Tenants, with the same rights and obligations hereunder as are applicable to IPO and the IPO Ownership Interest, to the extent of the undivided interest in the Property constituting the Ownership Interest of such third party(ies) in the Property. In such event, the Ownership Interests of CPO hereunder shall be reduced pro rata, such that the aggregate Ownership Interests of the Tenants following such sale(s) of undivided interests in the CPO Ownership Interest shall continue to equal one hundred (100%).

20.     Counterparts. This Agreement may be executed in counterparts each of which shall be deemed to be an original, but such counterparts, when taken together, shall constitute but one agreement.

21.     Gender. All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine or neuter, singular or plural, as the identity of the person, persons, entity or entities may require.

22.     Caption Headings. Captions at the beginning of each numbered Section of this Agreement are solely for the convenience of the parties and shall not be deemed part of the context of this Agreement.

**AGREEMENT AMONG TENANTS IN COMMON**                                        **Page 9**

23.    <u>Negotiated Transaction</u>.  The provisions of this Agreement were negotiated by all of the parties hereto and said Agreement shall be deemed to have been drafted by all of the parties thereto.

24.    <u>Further Assurances</u>.  Each Tenant hereby agrees to promptly sign any additional instruments or documents which are necessary or appropriate to carry out the purpose of this Agreement.

25.    <u>Interpretation</u>.  It is the intent of the Tenants to own the Property for investment purposes, only and not for the conduct of a business, and to otherwise comply with all statutes and regulations allowing an election to be excluded from Subchapter K of the Code and this Agreement shall be interpreted to conform to such intent.

26.    <u>Litigation</u>.  In the event of any litigation between the parties hereto, the prevailing party in such litigation shall be paid all attorneys' fees, court costs and litigation expenses incurred in such litigation by the non-prevailing party.  The parties hereto agree that specific performance is an appropriate remedy for the enforcement of the rights of the Tenants hereunder concerning a sale of the Property and the obligations of the parties hereunder.

27.    <u>Recording</u>.  A memorandum of this Agreement may be recorded by CPO and the other Tenants agree to cooperate and facilitate such recording.

[SIGNATURE PAGE FOLLOWS]

**AGREEMENT AMONG TENANTS IN COMMON**                                        Page 10

EXECUTED effective as of February 1, 2022 (the "Effective Date").

**Buddy Mac One, LLC (a Texas Limited Liability Company)**

By: _____

     Name: Wm. Ian MacDonald
     Title: Manager

Date: Agreed to as of the "Effective Date" set forth above

Address:  400 East Centre Park Blvd., Suite 101
          DeSoto, Texas 75115
Facsimile: 972-283-0193

Donald P. Heath and Joanne O. Heath,
Husband and Wife as Joint Tenants

By: _____
Name: Donald P. Heath
Title: An Individual,

and

By: _____
Name: Joanne O. Heath
Title: An Individual

Address: 13 Klamath, Irvine, CA 92612
Telephone: (____) ____-_____;
Fax: _____

**AGREEMENT AMONG TENANTS IN COMMON**          Page 11

## EXHIBIT A

### The Property

An undivided Twenty One point Four Eight percent (21.48%) interest in

### 1404 West Gentry, Smith County, Tyler, Texas

Lot 57, NCB 669-M, PATTERSON HEIGHTS, City of Tyler, according to the plat thereof recorded in
Volume 1, Page 209, (Cabinet A, Slide 160-A), Plat Records of Smith County, Texas.

**Buyer:**
Ownership Interest Percentage:
Twenty One point Four Eight percent (21.48%)

**Buyer:**
Purchase Price of Ownership Interest
(Originally Invested Amount): $77,623.17

**Seller Ownership Interest:**
Seventy Three point One Nine percent (27.05%)

Agreed Upon Current Value of the Property: $645,883.

**AGREEMENT AMONG TENANTS IN COMMON**
DALLAS1 1068268v3 51997-00001

Page 12