John J. Kane (SBN 24066794)
Kyle Woodard (SBN 24102661)
JaKayla J. DaBera (SBN 24129114)
**KANE RUSSELL COLEMAN LOGAN PC**
901 Main Street, Suite 5200
Dallas, Texas 75202
Telephone: (214) 777-4200
Email: jkane@krcl.com
Email: kwoodard@krcl.com
Email: jdabera@krcl.com

**COUNSEL FOR DEBTORS
AND DEBTORS-IN-POSSESSION**

Mark C. Taylor (SBN 19713225)
Casey Roy (SBN 00791578)
**KANE RUSSELL COLEMAN LOGAN PC**
401 Congress Ave., Suite 2100
Austin, Texas 78701
Telephone: (512) 487-6650
Email: mtaylor@krcl.com
Email: croy@krcl.com



EXHIBIT

PHONIX EX 10

Case 25-34839

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| BUDDY MAC HOLDINGS, LLC, *et al.*, | § | Case No. 25-34839-mvl11 |
| | § | |
| Debtors.[1] | § | (Jointly Administered) |
| | § | |

### DEBTORS' EMERGENCY MOTION TO SUPPLEMENT NOTICE OF DIP FINANCING MOTION TO TIC INTEREST HOLDERS AND FOR SUPPLEMENTAL ORDER APPROVING DIP FINANCING ON A FINAL BASIS

> **Emergency relief has been requested. Relief is requested not later than February 26, 2026, at 3:00 p.m.**
>
> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing, if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**
>
> **A hearing will be conducted on this matter at a setting to be provided by the Court in Courtroom #2, 14th Floor, Earle Cabell Federal Building, 1100 Commerce Street, Dallas, TX 75242. You may participate in the hearing either in person or by an audio and video connection.**

---

[1] A complete list of the Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax ID numbers, is set forth on the attached **Schedule I** ("Initial Debtors") and **Schedule II** ("Subsequent Debtors"). The Debtors' service address is 400 E. Centre Park Blvd., Suite 101, DeSoto, Texas 75115.

> **Audio communication will be by use of the Court's dial-in facility. You may access the facility at 650-479-3207, access code 2301 476 1957. Video communication will be by use of the Cisco WebEx platform. Connect via the Cisco WebEx application or click the link on Judge Larson's home page. The meeting code is 23014761957. Click the settings icon in the upper right corner and enter your name under the personal information setting.**
>
> **Hearing appearances must be made electronically in advance of electronic hearings. To make your appearance, click the "Electronic Appearance" link on Judge Larson's home page. Select the case name, complete the required fields and click "Submit" to complete your appearance.**

Buddy Mac Holdings, LLC ("Buddy Mac Holdings") and its debtor subsidiaries and affiliates, as debtors and debtors-in-possession (collectively, the "Debtors") in the above-referenced chapter 11 cases (the "Cases"), file this *Emergency Motion to Supplement Notice of DIP Financing Motion to TIC Interest Holders and for Supplemental Order Approving DIP Financing on a Final Basis* (the "Motion"), which, at its core, seeks to provide additional notice to certain TIC Interest holders of the Debtors' *Motion for Entry of Interim and Final Orders Authorizing the Debtors to Obtain Post-Petition Financing and Granting Related Relief* (the "DIP Motion") [Dkt. No. 173] and an opportunity for those TIC Interest holders to object to the imposition of DIP Liens, as defined in the DIP Motion, before entry by this Court of a supplemental order clarifying the relief granted in this Court's *Order (I) Authorizing the Debtors, on a Final Basis to (A) Obtain Postpetition Financing and (B) Use Cash Collateral (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* (the "Final DIP Order") [Dkt. No. 293] and respectfully state as follows:

## I.    PRELIMINARY STATEMENT

1.    The Debtors seek an emergency hearing from this Court to address a notice error discovered by Debtors' counsel during the evening of February 18, 2026. At that time it came to

Debtors' counsel's attention that certain TIC Interest holders were not properly served the Debtors'

DIP Motion, though the DIP Motion sought to affect their interests in property.  While the Court

has already determined that the DIP Motion, DIP Loan, and DIP Credit Agreement, as defined in

the DIP Motion, were appropriate and necessary, the result of good faith negotiations, an exercise

of the Debtors' business judgment and in the best interest of the Debtors, their estates, and

creditors, the Debtors, in an abundance of caution, wish to provide the affected TIC Interest holders

with notice and an opportunity to object and be heard before this Court enters a supplemental order

extending its rulings to the TIC Properties and their interests.

## KEY FACTS

2.       On January 25, 2026, the Subsequent Debtors filed for bankruptcy relief in a

coordinated effort to benefit the Debtors' total business enterprise, and to provide the Debtors an

opportunity to market their assets for a final sale in bankruptcy.  As detailed to this Court at

multiple hearings, the Debtors endeavored to preserve their operations as a going concern in order

to maximize value for all stakeholders, return as much to creditors as possible—including secured

and unsecured creditors—and, if at all possible, take out Phonix RBS LLC ("Phonix"), the

Debtors' pre and postpetition lender, and reorganize.

3.       To even dream of accomplishing those goals, the Debtors needed money to operate

in bankruptcy and to avoid administrative insolvency and a conversion to Chapter 7.  To that end,

the Debtors filed three intimately interconnected motions on January 26, 2026: (i) the *Emergency

Motion for Entry of an Order (I) Authorizing (A) the Sale of Substantially All Assets Free and

Clear of Liens, Claims, and Encumbrances, and (B) the Assumption and Assignment of Certain

Executory Contracts and Unexpired Leases in Connection Therewith; and (II) Granting Related

Relief* (the "Sale and Bid Procedures Motion") [Dkt. No. 172]; (ii) the DIP Motion; and (iii) the

11862110v1 (75669.00003.000)

*Emergency Motion for (I) Approval of Compromise Between the Debtors and Phonix RBS LLC Pursuant to Federal Rule of Bankruptcy Procedure 9019 (II) and Granting Related Relief* (the "9019 Motion") [Dkt. No. 174].

4.      In summary, through the Sale Motion the Debtors sought a framework by which to market and sell substantially all of their assets in a competitive process with Phonix as a stalking horse bidder.  By the DIP Motion the Debtors sought $1.5 million of new financing with which to fund their cases, secured by all of the Debtors' assets, including newly pledged real property collateral referenced as Subject RTO Debtor Real Property.  Finally, through the 9019 Motion the Debtors sought a means of resolving all pending litigation and disputes, facilitating the commitment of additional collateral by Ian MacDonald to support the DIP Motion, and inducing Phonix to serve as stalking horse bidder for substantially all of the Debtors' assets and/including the Subject RTO Debtor Real Property.

5.      As noted in the Sale Motion, certain of the Subject RTO Debtor Real Property is subject to TIC Interests obtained through and governed by TIC Agreements (such a property is defined as a "TIC Property").  As detailed thoroughly in the *Supplemental Declaration of Wm. Ian MacDonald in Support of the Debtors' Sale of Substantially All Assets* (the "MacDonald TIC Declaration") [Dkt. No. 309] which is incorporated herein by reference, the TIC Agreements ensure the applicable Debtor "CPO" retains total control over the TIC Property.  Section 10(c) of each TIC Agreement expressly states:

> CPO may, at any time, sell, finance, exchange or otherwise transfer or encumber all of the Property (including the other Ownership Interests) on such terms and conditions as CPO may, in CPO's sole discretion, determine, so long as such transaction is a bona fide transaction and all of the terms and conditions of such transaction are fully disclosed to all Tenants at the time such transaction is entered into.  If requested by CPO, all Tenants shall join in the conveyance of the Property and/or execute all documents necessary or desirable to close such transaction.

- 4 -

The Debtors, as the CPOs, may therefore encumber and sell the TIC Properties at their sole

discretion.  They need only provide notice to the TIC Interest holders (the "Tenants" under TIC

Agreements) to bind their interests to any encumbrances or sales.[2]  The "Tenants" cannot decline.

6.      The Debtors recognize, however, that due to a mistake in counsel's chain of

instruction, the Debtors' service agent did not, in fact, serve the TIC Interest holders a copy of the

DIP Motion.[3]  TIC Interest holders _were_ served the Sale Motion and 9019 Motion, and were

provided notice of the commencement of the Debtors' bankruptcy cases.[4]

7.      There can be no denying that the TIC Interest holders have actual knowledge of the

Debtors' bankruptcy cases.  They received notice of the commencement of the Debtors' cases and

the designation of complex cases by December 11, 2025.[5] As noted during the February 10, 2026

final hearing on the Debtors' DIP Motion, Mr. Berg, a TIC Interest holder, was present and

participating in the Debtors' bankruptcy cases.  Mr. Berg has since filed an objection to the Sale

Motion on account of his TIC Interests and has argued that, although he received notice enough of

the Sale Motion to timely file an objection, he has been denied due process.

---

[2] To be clear, the TIC Interest holders are passive investors in Debtor entities, and the TIC Agreements are investment contracts, treated as a security (and similar to an equity investment in the Debtor) under the Bankruptcy Code.  As noted by the Supreme Court, the test for whether an instrument is an investment contract is "whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." *S.E.C. v. Edwards*, 540 U.S. 389, 393 (2004).  As is the case with each of the TIC Agreements, tenancy-in-common agreements that preclude use or control of property but that ensure a preferred rate of return from the controlling party's operations are generally viewed as investment contracts.  *See In re DBSI, Inc.*, 476 B.R. 413, 427 (Bankr. D. Del. 2012).  Debtors contend that they could therefore sell the TIC Interests in conjunction with the Debtors' interests pursuant to section 363(h) of the Bankruptcy Code, and any claim asserted by TIC Interest holders for a portion of any proceeds would be a subordinated general unsecured claim pursuant to section 510(b) of the Bankruptcy Code.

[3] Debtors' counsel discovered this oversight when preparing its Witness and Exhibit List for the final sale hearing scheduled for February 19, 2026, immediately notified Phonix's counsel, investigated the cause of the oversight, and notified counsel for the UST, Phonix, Mr. Berg, and the Committee that it would file this Motion and seek emergency relief.

[4] As evidenced by *unredacted* copies of Certificates of Service found at Dkt. Nos. 205, 220, and 247.

[5] As evidenced by *unredacted* Certificate of Service found at Dkt. No. 76.

11862110v1 (75669.00003.000)

8.      As noted by the Fifth Circuit, "If an interested party has notice or actual knowledge of the bankruptcy, that party must come forward and protect their enhanced rights…or else lose their rights through the sweeping discharge of Chapter 11." *In re German Pellets Louisiana, L.L.C.* 91 F.4th 802, 809 (5th Cir. 2024) (internal quotations omitted) (citing *In re Christopher*, 28 F.3d 512, 515, 519 (5th Cir. 1994)).  While Berg has done so with respect to the Sale Motion, no TIC Interest holder responded to the DIP Motion.

## **REQUEST FOR RELIEF**

9.      Through their DIP Motion, the Debtors sought to use the TIC Properties as DIP Collateral securing the DIP Loan.  That DIP Collateral would include the totality of the TIC Properties, including the TIC Interest owned by the TIC Interest holders, as is already the case with the TIC Properties encumbered by SouthState Bank's liens.  To do so, the Debtors were required by the TIC Agreements to provide notice to the TIC Interest holders at the time they were encumbering the assets with Phonix's DIP Liens.  While the Debtors have arguably provided such notice to the TIC Interest holders, the Debtors believe notice is of the utmost importance and that, in an abundance of caution, the TIC Interest holders should be provided additional, albeit limited, notice of the DIP Motion and the Debtors proposed encumbrances of the TIC Properties, and an opportunity to object and be heard.

10.      Accordingly, this Motion seeks entry of a supplemental order to the Final DIP Order recognizing service of the DIP Motion and this Motion on the TIC Interest holders, and simply extending the findings of facts and conclusions of law found in the Final DIP Order to the TIC Interest holders and, to the extent it does not already do so, the TIC Properties and TIC Interests. *See* 11 U.S.C. § 105(a).

**CAUSE**

11.     Cause exists to grant this Motion on an emergency basis.  Debtors notice error calls into question the extent and perfection of Phonix's DIP Liens on the TIC Properties, in contravention of the agreement and expectation of the parties.  That, in turn, may jeopardize Phonix's ability to acquire the TIC Properties, in full, subject only to Permitted Encumbrances (like SouthState Bank's liens), which Phonix proposed to pay off at closing under the Settlement Agreement and their APA.

12.     Without a clear order granting Phonix the DIP Liens it anticipated acquiring, and which the Debtors agreed to deliver, Phonix has threatened potential action against the Debtors, and has requested that the Debtors hold $550,000 of their final DIP Loan draw in suspense, which the Debtors have agreed to do.  Phonix's demand in turn threatens the ability of the Debtors' estates to pay their post-petition administrative expenses as they come due.

13.     Further, if Phonix will not close on the acquisition of the TIC Properties, then SouthState Bank will not be paid off in full.  If there is no closing on the TIC Properties, then there is arguably a default under the Settlement Agreement, and parties to whom releases were to be granted may be in jeopardy of losing the benefit of their bargain.

14.     Accordingly, cause exists for this Court to exercise its powers under section 105 of the Bankruptcy Code to grant this Motion, and to provide a limited notice and objection period before hosting a hearing on this Motion and, if approved, entering a supplemental or clarifying order finding notice of the DIP Motion and this Motion were appropriate and that, after due consideration, the Final DIP Order is enforceable against the TIC Properties and TIC Interests.

**II.     WAIVER OF BANKRUPTCY RULES 6004(a) AND 6004(h)**

15.     The Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) because the Court has already made all

necessary findings for the DIP Motion and has entered the DIP Final Order, with the exception of the narrow issue of supplemental notice regarding the TIC Properties.  The Debtors further request that the Court enter an order finding that the Debtors established cause to exclude the relief requested in the motion from the 14-day stay period under Bankruptcy Rule 6004(h).

### III.    <u>NOTICE</u>

16.    Notice of this Motion will be provided to the following parties or their counsel, if known: (i) the U.S. Trustee; (ii) the Committee; (iii) Phonix and any other secured creditors; (iv) the TIC Interest holders; (v) all governmental agencies having a regulatory or statutory interest in these Cases; (vi) parties that have requested notice pursuant to Bankruptcy Rule 2002; and (vi) any other parties included on the Master Service List.

**WHEREFORE**, the Debtors respectfully request that the Court enter an Order, substantially in the form attached hereto, granting this Motion and all relief requested herein, and that the Debtors be granted such other and further relief to which they are justly entitled.

11862110v1 (75669.00003.000)

Dated: February 19, 2026

Respectfully submitted,

**KANE RUSSELL COLEMAN LOGAN PC**

*/s/ John J. Kane*
Joseph M. Coleman (SBN 04566100)
John J. Kane (SBN 24066794)
Kyle Woodard (SBN 24102661)
JaKayla J. DaBera (SBN 24129114)
901 Main Street, Suite 5200
Dallas, Texas 75202
Telephone: (214) 777-4200
Email: jcoleman@krcl.com
Email: jkane@krcl.com
Email: kwoodard@krcl.com
Email: jdabera@krcl.com

- and -

Mark C. Taylor (SBN 19713225)
Casey Roy (SBN 00791578)
401 Congress Ave., Suite 2100
Austin, Texas 78701
Telephone: (512) 487-6650
Email: mtaylor@krcl.com
Email: croy@krcl.com

**COUNSEL FOR DEBTORS AND
DEBTORS-IN-POSSESSION**

11862110v1 (75669.00003.000)

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on February 19, 2026, a true and correct copy of the foregoing document, together with all exhibits and attachments hereto, was filed with the Court and served via the Court's CM/ECF system upon all parties registered to receive such electronic service in these Cases.

*/s/ John J. Kane*
John J. Kane

11862110v1 (75669.00003.000)

## Schedule I
### Initial Debtors

|  | Name | Petition Date | Case No. | Tax ID (last 4) |
|---|---|---|---|---|
| 1. | Buddy Mac One, LLC | 12/1/2025 | 25-34788 | 0935 |
| 2. | BMH One RE, LLC | 12/1/2025 | 25-34789 | 4305 |
| 3. | BMH 95 RE Caruthersville, LLC | 12/1/2025 | 25-34790 | 1264 |
| 4. | BMH 96 RE Marion, LLC | 12/1/2025 | 25-34791 | 0659 |
| 5. | Buddy Mac Holdings, LLC | 12/4/2025 | 25-34839 | 1297 |
| 6. | BMH RTO, LLC | 12/4/2025 | 25-34840 | 9489 |
| 7. | Buddy Mac Twenty-One, LLC | 12/4/2025 | 25-34841 | 1269 |
| 8. | Buddy Mac Twenty-Two, LLC | 12/4/2025 | 25-34842 | 6474 |
| 9. | Buddy Mac Twenty-Three, LLC | 12/4/2025 | 25-34843 | 3668 |
| 10. | Buddy Mac Twenty-Four, LLC | 12/4/2025 | 25-34844 | 3328 |
| 11. | Buddy Mac Twenty-Five, LLC | 12/4/2025 | 25-34845 | 5604 |
| 12. | Buddy Mac Twenty-Six, LLC | 12/4/2025 | 25-34846 | 5425 |
| 13. | Buddy Mac Twenty-Seven, LLC | 12/4/2025 | 25-34847 | 1574 |
| 14. | BMH-TNM 28, LLC | 12/4/2025 | 25-34848 | 5391 |
| 15. | BMH-TNM 29, LLC | 12/4/2025 | 25-34849 | 0350 |
| 16. | BMH-TNM 30, LLC | 12/4/2025 | 25-34850 | 5692 |
| 17. | BMH-TNM 31, LLC | 12/4/2025 | 25-34851 | 5137 |
| 18. | BMH-TNM 32, LLC | 12/4/2025 | 25-34852 | 3430 |
| 19. | BMH-TNM 33, LLC | 12/4/2025 | 25-34853 | 8037 |
| 20. | BMH-RCL 34, LLC | 12/4/2025 | 25-34854 | 7055 |
| 21. | BMH-RCL 35, LLC | 12/4/2025 | 25-34855 | 7332 |
| 22. | BMH-RCL 36, LLC | 12/4/2025 | 25-34856 | 4707 |
| 23. | BMH-RCL 37, LLC | 12/4/2025 | 25-34857 | 4598 |
| 24. | BMH-RCL 38, LLC | 12/4/2025 | 25-34858 | 7218 |
| 25. | BMH-RCL 39, LLC | 12/4/2025 | 25-34859 | 5340 |
| 26. | BMH-RCL 40, LLC | 12/4/2025 | 25-34860 | 8100 |
| 27. | BMH-RCL 41, LLC | 12/4/2025 | 25-34861 | 5735 |
| 28. | BMH-RCL 42, LLC | 12/4/2025 | 25-34862 | 3438 |
| 29. | BMH-FAN 43, LLC | 12/4/2025 | 25-34863 | 8956 |
| 30. | BMH-FAN 44, LLC | 12/4/2025 | 25-34864 | 9133 |
| 31. | BMH-FAN 45, LLC | 12/4/2025 | 25-34865 | 1642 |
| 32. | BMH-FAN 46, LLC | 12/4/2025 | 25-34866 | 1756 |
| 33. | BMH-FAN 47, LLC | 12/4/2025 | 25-34867 | 7435 |
| 34. | BMH-FAN 48, LLC | 12/4/2025 | 25-34868 | 7860 |
| 35. | BMH-FAN 49, LLC | 12/4/2025 | 25-34869 | 8079 |
| 36. | BMH-FAN 50, LLC | 12/4/2025 | 25-34870 | 8219 |
| 37. | BMH-FAN 51, LLC | 12/4/2025 | 25-34871 | 5786 |
| 38. | BMH-FAN 52, LLC | 12/4/2025 | 25-34872 | 6191 |
| 39. | BMH-FAN 53, LLC | 12/4/2025 | 25-34873 | 6281 |
| 40. | BMH-FAN 54, LLC | 12/4/2025 | 25-34874 | 6340 |
| 41. | BMH-SM 79, LLC | 12/4/2025 | 25-34875 | 9545 |

|  | Name | Petition Date | Case No. | Tax ID (last 4) |
|---|---|---|---|---|
| 42. | BMH-SM 80, LLC | 12/4/2025 | 25-34876 | 9640 |
| 43. | BMH-SM 81, LLC | 12/4/2025 | 25-34877 | 9709 |
| 44. | BMH-SM 82, LLC | 12/4/2025 | 25-34879 | 0107 |
| 45. | BMH-SM 83, LLC | 12/4/2025 | 25-34880 | 0236 |
| 46. | BMH-SM 84, LLC | 12/4/2025 | 25-34881 | 0340 |
| 47. | BMH-SM 85, LLC | 12/4/2025 | 25-34882 | 2526 |
| 48. | BMH-SM 86, LLC | 12/4/2025 | 25-34883 | 2731 |
| 49. | BMH-SM 87, LLC | 12/4/2025 | 25-34884 | 2817 |

**Schedule II**
**Subsequent Debtors**

|     | Name | Petition Date | Case No. | Tax ID (last 4) |
| --- | --- | --- | --- | --- |
| 50. | Buddy Mac Two, LLC | 1/25/2026 | 26-30327 | 6357 |
| 51. | Buddy Mac Six, LLC | 1/25/2026 | 26-30328 | 6848 |
| 52. | Buddy Mac Six RE, LLC | 1/25/2026 | 26-30329 | 2150 |
| 53. | Buddy Mac Eight, LLC | 1/25/2026 | 26-30330 | 2634 |
| 54. | Buddy Mac Eleven, LLC | 1/25/2026 | 26-30331 | 5242 |
| 55. | Buddy Mac Twelve, LLC | 1/25/2026 | 26-30332 | 1300 |
| 56. | Buddy Mac Eighteen, LLC | 1/25/2026 | 26-30333 | 0397 |
| 57. | Buddy Mac Nineteen, LLC | 1/25/2026 | 26-30334 | 0149 |
| 58. | BMH-NEW 58, LLC | 1/25/2026 | 26-30335 | 4176 |
| 59. | BMH-NEW 62, LLC | 1/25/2026 | 26-30336 | 7985 |
| 60. | BMH-WF TX 67, LLC | 1/25/2026 | 26-30337 | 0887 |
| 61. | BMH-TB 75, LLC | 1/25/2026 | 26-30338 | 3879 |
| 62. | BMH 85 RE Sikeston, LLC | 1/25/2026 | 26-30339 | 2698 |
| 63. | BMH Prime 95, LLC | 1/25/2026 | 26-30340 | 2635 |
| 64. | BMH Prime 96, LLC | 1/25/2026 | 26-30341 | 8446 |
| 65. | BMH Prime 97, LLC | 1/25/2026 | 26-30342 | 2430 |
| 66. | BMH-HR, LLC | 1/25/2026 | 26-30343 | 0229 |
| 67. | MacDonald Capital Corporation | 1/25/2026 | 26-30344 | 9459 |
| 68. | SAMBrownfield, LLC | 1/25/2026 | 26-30345 | 8187 |
| 69. | SAMPlainview, LLC | 1/25/2026 | 26-30346 | 4414 |

### **Exhibit A**

(DIP Motion)

John J. Kane (SBN 24066794)
Kyle Woodard (SBN 24102661)
JaKayla J. DaBera (SBN 24129114)
**KANE RUSSELL COLEMAN LOGAN PC**
901 Main Street, Suite 5200
Dallas, Texas 75202
Telephone: (214) 777-4200
Email: jkane@krcl.com
Email: kwoodard@krcl.com
Email: jdabera@krcl.com

Mark C. Taylor (SBN 19713225)
Casey Roy (SBN 00791578)
**KANE RUSSELL COLEMAN LOGAN PC**
401 Congress Ave., Suite 2100
Austin, Texas 78701
Telephone: (512) 487-6650
Email: mtaylor@krcl.com
Email: croy@krcl.com

**COUNSEL FOR DEBTORS
AND DEBTORS-IN-POSSESSION**

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| BUDDY MAC HOLDINGS, LLC, *et al.*, | § | Case No. 25-34839-mvl11 |
| | § | |
| Debtors.[1] | § | (Jointly Administered) |
| | § | |

**DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL
ORDERS AUTHORIZING THE DEBTORS TO OBTAIN POST-PETITION
FINANCING AND GRANTING RELATED RELIEF**

---

**Emergency relief has been requested.  Relief is requested not later than
January 27, 2026, at 3:00 p.m.**

**If you object to the relief requested or you believe that emergency
consideration is not warranted, you must appear at the hearing, if one is set,
or file a written response prior to the date that relief is requested in the
preceding paragraph.  Otherwise, the Court may treat the pleading as
unopposed and grant the relief requested.**

**A hearing will be conducted on this matter on Tuesday, January 27, 2026 at
3:00 p.m. CT in Courtroom #2, 14th Floor, Earle Cabell Federal Building,
1100 Commerce Street, Dallas, TX 75242.  You may participate in the
hearing either in person or by an audio and video connection.**

---

[1] A complete list of the Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax ID numbers, is set forth on the attached **Schedule I** (Initial Debtors) and **Schedule II** (Subsequent Debtors).  The Debtors' service address is 400 E. Centre Park Blvd., Suite 101, DeSoto, Texas 75115.

> **Audio communication will be by use of the Court's dial-in facility. You may access the facility at 650-479-3207, access code 2301 476 1957. Video communication will be by use of the Cisco WebEx platform. Connect via the Cisco WebEx application or click the link on Judge Larson's home page. The meeting code is 23014761957. Click the settings icon in the upper right corner and enter your name under the personal information setting.**
>
> **Hearing appearances must be made electronically in advance of electronic hearings. To make your appearance, click the "Electronic Appearance" link on Judge Larson's home page. Select the case name, complete the required fields and click "Submit" to complete your appearance.**

Buddy Mac Holdings, LLC ("Buddy Mac Holdings") and its debtor subsidiaries and affiliates, as debtors and debtors-in-possession (collectively, the "Debtors") in the above-referenced chapter 11 cases (the "Cases"), file this *Emergency Motion for Entry of Interim and Final Orders Authorizing the Debtors to Obtain Post-Petition Financing and Granting Related Relief* (the "Motion") and respectfully state as follows:

## I.    PRELIMINARY STATEMENT

1.     By this Motion, the Debtors seek, *inter alia*, approval of post-petition financing to be provided by Phonix RBS LLC (the "DIP Lender") in the aggregate principal amount of up to $1,500,000.00 (the "DIP Loan Agreement" or "DIP Facility," a copy of which is attached as **Exhibit B**).

2.     The DIP Facility will be funded by the DIP Lender, consisting of delayed draw term loans the proceeds of which shall be used for inventory purchases for certain of the Debtors' stores.

3.     The Debtors believe that the proposed DIP Loan Agreement represents significantly better-than-market terms to the Debtors, and the DIP Loan Agreement is vital to maximizing the value of the Debtors' estates for the benefit of all creditors in these cases. As further described herein, the DIP Facility will facilitate the Debtors' ability to obtain store

inventory and run a sale process to maximize and preserve the value of the estates for the benefit
of creditors.

## II.    BANKRUPTCY RULE 4001 SUMMARY

4.    Pursuant to Bankruptcy Rule 4001(c)(1)(B), the material terms of the proposed DIP
Facility are summarized as follows:

*[remainder of page left intentionally blank]*

| | | |
|---|---|---|
| **DIP Lender/ Borrowers** | DIP Lender: Phonix RBS LLC, a Texas limited liability company<br>Borrowers: the Debtors | |
| **Term** | The Termination Date (the "Term") shall be the earliest to occur of: (a) the Maturity Date, which is February 22, 2026; (b) delivery of a termination declaration to Borrowers during the continuance of an Event of Default pursuant to the DIP Loan Agreement; (c) the effective date or substantial consummation of an Approved 363 Sale; (d) the effective date or substantial consummation of a plan of reorganization or plan of liquidation in the Case; (e) the date of filing or support by the Debtors of a plan of reorganization or plan of liquidation that does not provide for the indefeasible payment in full in cash of all Obligations (including for the avoidance of doubt, even if prior to the Final Order, all Pre-Petition Revolving Obligations); (f) date of the conversion of the Case to a case under Chapter 7 of the Bankruptcy Code; (g) the date of the dismissal of the Case. | DIP Loan Agreement §12 |
| **Loan Commitment** | Credit facility in a maximum aggregate principal amount of up to $1,500,000 delayed draw term loans with an initial draw of $750,000.00 immediately available to be drawn by Debtors to direct Lender to purchase inventory on behalf of Debtors and at the direction of Debtors based on identified need for each store (each advance a "Loan" and collectively the "Loans"). Borrowers may request an additional $1,000,000.00 (the "Accordion Amount"), in minimum increments of $250,000.00. The Accordion Amount is uncommitted and available at the sole and absolute discretion of DIP Lender. All Loans shall become due and payable on the Termination Date. | |
| **Conditions of Borrowing** | Conditions Precedent to Each Loan. On the Closing Date and the funding date of each Loan, the following conditions precedent shall have been satisfied:<br><br>• The Bankruptcy Court shall have entered an order approving the DIP Loan Agreement on an Interim (and subsequent Interim) and, thereafter, Final basis.<br>• All conditions precedent to funding under the DIP Financing Documents, a copy of which is attached as , a, a B, have occurred. | Interim Order<br><br>¶ 3(e) |
| **Interest Rate** | Ten percent (10%) per annum | |
| **Roll-Up** | Roll-up of Pre-Petition Lender debt equal to $3.00 per $1.00 of funds advanced under the DIP Loan Agreement upon entry of the Final order | Interim Order<br><br>¶ 4 |
| **Use of Loan Proceeds / Budget** | Proceeds of the Loans under the DIP Loan Agreement will be used to purchase inventory on behalf of Debtors and at the | |

| | direction of Debtors based on identified need for each store, under the DIP Budget. | |
|---|---|---|
| | Use of DIP Facility proceeds, and any other cash, shall be in accordance with an approved budget, including the DIP Budget attached to this Motion as <u>Exhibit A</u>, if approved. | |
| **Fees and Payments**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | No upfront fees.  Interest will accrue, and the full amount drawn, plus interest, attorneys fees and other allowed costs and expenses will be due and payable upon a sale of the Debtors or substantially all of their assets, subject to the Fee Deferment Provision. | |
| **Liens and Priorities**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(i)* | To secure repayment of advances from the DIP Loan Agreement, the DIP Lender shall have continuing first-priority perfected priming security interests and liens in and on the following assets of the Debtors (collectively, the "<u>DIP Collateral</u>"):<br><br>• All assets of the Debtors; provided, however, that a lien on any Employee Retention Tax Credit shall be limited to amounts actually advanced, and only as to any diminution occurring during the period covered by the Interim Order<br>• Claims and causes of action arising under Chapter 5 of the Bankruptcy Code ("<u>Avoidance Actions</u>"), only upon entry of the Final Order<br>• Commercial Tort Claims<br><br>The DIP Lender shall also have a superpriority administrative expense claim under section 364(c)(1) of the Bankruptcy Code with over all other administrative expenses pursuant to the Bankruptcy Code, subject only to the Carve-Out. | Interim Order<br>¶ 11 |
| **Adequate Protection for / Valuation of Prepetition Interests**<br><br>*Bankruptcy Rule 4001(b)(1)(B)(ii-iii)* | Replacement liens to extent of diminution in value<br><br>Superpriority administrative expense claim with priority over other administrative claims<br><br>Interest at the rate (10%) specified under the Pre-Petition Financing Documents, to be accrued<br><br>Attorneys' Fees, to be accrued and payable pursuant to the Payment Deferment Provisions | Interim Order<br><br>¶ 11,12 |
| **Lien and Application of the ERC Funds** | Upon entry of the Interim Order, a lien on by the "<u>ERC Funds</u>" meaning the sum of (i) the initial ERC funds on hand, estimated at [$202,000], which amount is net of the  portion of the ERC Funds used to pay Debtors professionals a $175,000 retainer before the January Debtors, including BMH HR, LLC ("<u>BMH HR</u>"), file chapter 11, plus (ii) the additional ERC Funds | Interim Order<br>¶ 15 |

| | | |
|---|---|---|
| | received by BMH HR immediately prior to or after the Third Petition Date, in the net amount (less Commission) of $2,878,514.82. | |
| | Upon entry of the Interim Order, Lenders shall apply the initial ERC Funds in BMH HR to the Pre-Petition Obligations in accordance with the Settlement Agreement, and BMH HR shall transfer to the Lenders the remaining ERC Funds, which shall be held in the Suspense Account pending entry of the Final Order. | |
| | Until entry of the Final Order, the ERC Funds are to be held in the Suspense Account and may not be applied, hypothecated, or charged against by the Lenders except as specifically and expressly authorized hereunder or by further order of the Bankruptcy Court upon notice to the Debtors and MacDonald. The Suspense Account, in addition to being segregated for the specific purpose of holding the ERC Funds and identified to the Debtors and MacDonald specifically, shall be established by Lenders with Wells Fargo Bank, N.A. | |
| | The Lender may, only upon the entry of the Final Order, apply the ERC Funds, as deemed proceeds of the Pre-Petition Collateral to the Pre-Petition Obligations or DIP Obligations in its sole and absolute discretion (in an amount equal to funds advanced or deemed advanced under this Interim Order). | |
| | At all times after entry of the Interim Order, the ERC Funds shall secure the DIP Obligations, but only to the extent of funds actually advanced, and the Adequate Protection Obligations, but only as to any diminution occurring during the period covered by the Interim Order | |
| **Modification of the Automatic Stay**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(iv)* | Stay relief is granted to the extent necessary to permit the Debtors granting of liens and super-priority administrative claim treatment and to comply with the Interim Order, and shall also be granted upon the occurrence of an Event of Default. | Interim Order ¶ 32 |
| **Effects on Plan Exclusivity**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(v)* | None/Not applicable | |
| **Milestones**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(vi)* | Filing of the January Debtors voluntary petitions, the DIP Motion and the Sale Motion, in form and substance acceptable to the Lenders, on or before January 26, 2026. | Interim Order ¶ 22 |

| | First Day hearings and entry of Interim DIP Order by January 27, 2026 | |
| | | |
| | Retention of and motion to approve broker for sale of the RTO Real Property in Tyler, Texas by seven (7) days after the Third Petition Date | |
| | | |
| | Entry into and filing of an asset purchase agreement naming DIP Lender as stalking horse bidder, in a form and substance acceptable to the DIP Lender, and (2) filing a motion establishing bidding procedures on or before January 26, 2026, which motion, bid procedures, and bid procedures order must be in form and substance acceptable to the Lenders | |
| | | |
| | Entry of a Final DIP Order, in form and substance acceptable to the Lenders, and approval of the Settlement Agreement on or before February 10, 2026, unless otherwise agreed in writing by the Pre-Petition Lender and the DIP Lender. | |
| | | |
| | Auction in connection with the Sale Motion to be held within twenty-one (21) days from entry of the Interim DIP Order. | |
| | | |
| | Entry of a sale order, in form and substance acceptable to the Lenders, on or before February 19, 2026. | |
| | | |
| | Consummation of a sale of the assets on or before February 22, 2026. | |
| | | |
| | Closing of the Texas Sale within forty-five (45) days of the filing of the Retention Application | |
| | | |
| | If any qualified bids are received in accordance with the Bid Procedures, an auction shall be conducted at the Combined Hearing. | |
| **Modification of Applicable Non-bankruptcy Law regarding Liens**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(vii)* | The Interim Order provides for a customary waiver or modification of applicability of non-bankruptcy law to the perfection or enforcement of liens. | Interim Order ¶ 11(c) |
| **Waiver or Release of Estate Claims**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(viii)* | Yes.<br><br>Challenge Period of fifteen (15) days provided to other parties. | Interim Order<br><br>¶26, 28 |

11826795v2 (75669.00003.000)

| | | |
|---|---|---|
| **Indemnification**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(ix)* | None/Not applicable | |
| **Waiver of Rights Under § 506(c)**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(x)* | The Interim Order provides for waiver of the Debtors' rights under section 506(c) of the Bankruptcy Code only upon entry of a Final Order. | Interim Order ¶ 27 |
| **Liens on Chapter 5 Causes of Action**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(x)* | The Interim Order gives the DIP Lender a lien on Avoidance Actions to secure repayment of the Loans, only upon entry of the Final Order | Interim Order ¶ 11(a) |
| **Carve-Out**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | As used in this Interim Order, "Carve Out" means the sum of (i) all fees and expenses required to be paid to the Clerk of the Court and the United States Trustee pursuant to 28 U.S.C. § 1930(a) plus interest at the statutory rate (the "Statutory Fees"); and (ii) to the extent allowed by order of this Court, all unpaid fees and expenses accrued or incurred by persons or firms retained by the Debtors and the Official Committee of Unsecured Creditors appointed in these Cases in an amount not to exceed $500,000; fees and expenses of a Chapter 7 Trustee not to exceed $20,000.00. For the avoidance of doubt and notwithstanding anything to the contrary in this Interim Order, the Carve Out shall not be available until (1) the entry of the Final Order, (2) the approval of the Settlement Agreement and the granting of releases to the Prepetition Lender and DIP Lender therein, and (3) the granting of a waiver of surcharge, marshalling, and Bankruptcy Code section 552(b) equities exception as set forth in the Final Order | Interim Order<br><br>¶18-20 |
| **Events of Default**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | The DIP Facility shall include customary events of default that are reasonably acceptable to the DIP Lender, including, without limitation, the following:<br><br>• Failure to comply with Milestones in the Interim Order;<br>• Events of Default under the DIP Loan Agreement | Interim Order<br><br>¶22 |

### III.    JURISDICTION & VENUE

5.    The United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Court"), has jurisdiction of the Cases and this Motion under 28 U.S.C. § 1334.  This Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2).

6.    Venue is proper under 28 U.S.C. §§ 1408 & 1409.

7.    The legal predicates for the relief requested in this Application are sections 363 and 364 of title 11 of the United States Code (the "Bankruptcy Code"), rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and section D of the Procedures for Complex Cases in the Northern District of Texas (the "Complex Case Procedures").

### IV.    BACKGROUND

8.    On December 4, 2025 (the "Petition Date"), Buddy Mac Holdings, LLC, BMH RTO, LLC ("BMH RTO"), and forty-three subsidiaries of BMH RTO (collectively, the "RTO Subsidiaries," and together with BMH RTO, the "RTO Debtors") each filed a voluntary petition for relief in this Court under chapter 11 of the Bankruptcy Code.  Additional Debtors (which are Buddy Mac One, LLC, BMH One RE, LLC, BMH 95 RE Caruthersville, LLC, and BMH 96 RE Marion, LLC) each filed voluntary chapter 11 petitions on December 1, 2025.  Finally, a third set of Debtors (which are identified on Schedule II) filed voluntary petitions on January 25, 2026 (the "Third Petition Date"). .

9.    Additional information regarding the Debtors' business history, capital structure, and circumstances leading to these chapter 11 cases (the "Cases") is set forth in the *Declaration of William I. MacDonald* and the *Declaration of Mark Shapiro* [ECF #12, #13 and #169], along with the additional Declarations filed on January 26, 2026  (collectively, the "Declarations") filed in support of the Debtors' voluntary petitions and requests for emergency first-day relief.

10.     On December 19, 2025, the United States Trustee for the Northern District of Texas (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee") in these cases [ECF #86].

## V.     RELIEF REQUESTED

11.     By this Motion, the Debtors seek authority to borrow money on a post-petition basis pursuant to the terms of the DIP Loan Agreement on an interim basis pending a Final Hearing. The Terms of the DIP Facility are outlined in the Rule 4001 Summary in paragraph 5 of this Motion.

12.     The Debtors specifically request entry of an interim order, substantially in the form attached hereto (the "Interim Order"), and a final order (the "Final Order") providing for, among other things:

> a. authorizing the Debtors to obtain senior secured, post-petition financing on a super-priority basis from the DIP Lender in the aggregate principal amount of $1,500,000.00, with the ability to request the additional $1,000,000.00 Accordion Amount, which Accordion Amount is uncommitted;
>
> b. granting valid, enforceable, non-avoidable, and automatically fully perfected priming liens on, and security interests in, the applicable collateral (the "DIP Collateral") pursuant to sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code;
>
> c. granting allowed superpriority administrative claims to the DIP Lender, subject to those granted to Phonix as Pre-Petition Lender, with respect to the DIP Facility pursuant to section 364(c)(1) of the Bankruptcy Code;
>
> d. providing for a Roll-Up of Pre-Petition Lender debt equal to $3.00 per $1.00 of funds advanced under the DIP Loan Agreement upon entry of the Final Order;
>
> e. modifying the automatic stay of section 362 of the Bankruptcy Code to the extent necessary to comply with the relief requested in this Motion and as set forth in the DIP Documents;
>
> f. waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of the Interim Order;

    g.   finding the DIP Lender a "good faith" lender pursuant to section 364(e) of the Bankruptcy Code and granting all protections afforded therein;

    h.   authorizing the use of the DIP Lender's cash collateral ("<u>Cash Collateral</u>");

    i.   scheduling a final hearing on the Motion; and

    j.   entering the Final Order approving the relief granted in the Interim Order.

13.    The Debtors in the exercise of their business judgment, are confident that debtor-in-possession financing on the same or similar terms as the DIP Facility offered by the DIP Lender would not be available from any other third-party lenders. Consequently, the Debtors believe that the DIP Lender's proposed DIP Loan Agreement is the best source, on the best terms, for obtaining crucial postpetition financing here.

14.    Based on their cash needs during the interim period, an immediate and critical need exists for the Debtors to obtain funds in order to continue the operations of their business. At this time, the ability of the Debtors to finance their operations through the incurrence of new indebtedness is vital to the preservation and maintenance of the Debtors' going-concern value. The use of the DIP Loan Agreement is vital, necessary and critical to the Debtors' ongoing operations and maximize value for the estates.

15.    The funds are necessary to (1) purchase inventory for the Debtors' stores; (2) fund a sale process; and (3) provide for payment of other expenses as set forth in the Budget attached as **<u>Exhibit A</u>**.

16.    Accordingly, the Debtors requests interim approval of the DIP Loan Agreement to afford the Debtors critical liquidity to fund operations and these Cases. Absent the immediate relief sought herein, the Debtors face a material and certain risk of substantial, irreparable harm. On the other hand, access to the DIP Facility will ensure the Debtors have sufficient funds to preserve and maximize the value of their estates, and to responsibly administer these Cases.

11826795v2 (75669.00003.000)

## VI.    BASIS FOR RELIEF REQUESTED

**A.    The Debtors Should Be Authorized to Obtain Post-Petition Financing.**

17.    The statutory requirement for obtaining post-petition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code]."   11 U.S.C. § 364(c).   Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code.   Specifically, courts look to whether: (i) the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code; (ii) the credit transaction is necessary to preserve the assets of the estate; and (iii) the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lender. *See In re Ames Dep't Stores*, 115 B.R. 34, 37-40 (Bankr. S.D.N.Y. 1990).

18.    Further, pursuant to section 364(d) of the Bankruptcy Code, a court may authorize a debtor to obtain post-petition credit secured by a lien that is equal or senior in priority to existing liens on encumbered property (i.e., a priming lien) when a debtor is unable to obtain credit on other terms and the interests of existing lienholders are adequately protected, or if the existing lienholders consent to such priming.   11 U.S.C. § 364(d).

19.    The Debtors propose to provide liens and super-priority treatment pursuant to sections 364(c) and (d) of the Bankruptcy Code.   The Debtors intend to provide the DIP Lender with first-priority liens on  substantially all assets of the Debtors on the terms contained in the Interim an, thereafter, Final Order and the DIP Loan Agreement as consideration and security for the DIP Facility.   As set forth below, the Debtors submit that the Motion and the DIP Loan Agreement satisfy the requirements of the Bankruptcy Code and Bankruptcy Rules, and should be approved by the Court.

20.     In considering the above-stated factors, courts grant considerable deference to a debtor's business judgment in obtaining post-petition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See, e.g., In re N. Bay Gen. Hosp., Inc.*, No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) (order approving post-petition financing on an interim basis as exercise of debtors' business judgment); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

21.     To determine whether the business judgment standard is satisfied, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances."  *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006).

      **i.**      **The Terms of the DIP Loan Agreement are Fair, Reasonable, and Adequate.**

22.     In considering whether the terms of post-petition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. Apr. 17, 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co.* (*In re Ellingsen McLean Oil Co., Inc.*), 65 B.R. 358, 365 n.7 (W.D. Mich. Apr. 30, 1986) (recognizing a debtor may have to enter into "hard" bargains to acquire funds for its reorganization).

23.     The Debtors' determination to move forward with the DIP Loan Agreement  is a sound exercise of their business judgment following an arm's length negotiation process.  The

11826795v2 (75669.00003.000)

Debtors and their advisors determined that the DIP Facility provides financing on more favorable economic terms than other alternatives available in the market, if any.  The Debtors and their advisors also determined that the DIP Facility provides certainty with respect to the capital necessary for the administration of these Cases through the culmination of a successful plan confirmation process.

24.     Accordingly, the Court should authorize the Debtors' entry into the DIP Loan Agreement as a reasonable exercise of the Debtors' business judgment.

**ii.     No Comparable Alternative to the DIP Loan Agreement is Reasonably Available.**

25.     The Debtors does not believe that comparable alternative sources of financing are reasonably available given the realities imposed by the Debtors' business and the Debtors' inability to solicit alternative financing proposals on better or equally favorable terms.  The Debtors' CRO, Marc Shapiro, has been seeking DIP financing since the start of the case, without success. In fact, the Debtors believe that alternative funding from other sources could never be reasonably obtained by virtue of the better-than-commercial terms set forth in the DIP Loan Agreement and made available by the DIP Lender, to sustain the Debtors' ongoing operations and prevent undue interruption, to facilitate a value-maximizing sale of the Debtors' assets, to preserve value for the Debtors' estates, and allow for fundraising necessary to a plan confirmation process.

26.     In determining whether or not unsecured credit is obtainable, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code.  *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa 1987).  Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to

conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr.

N.D. Ga. 1988), aff'd sub nom. *Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4

(N.D. Ga. 1989).

27.    The Debtors believe the DIP Loan Agreement is the best available opportunity

under the circumstances in funding these Cases.  For these reasons, and pursuant to section 364 of

the Bankruptcy Code, the requirement that alternative credit on more favorable terms is

unavailable, is satisfied.

### iii.    The DIP Facility is in the Best Interest of the Estates.

28.    As discussed above, the Debtors determined in their business judgment that the DIP

Facility provides the best and most favorable financing available.  The DIP Loan Agreement

provides vital access to liquidity, paves the way to a successful sale of the Debtors' business, and

protects against market and liquidity uncertainty.  The DIP Loan Agreement will also help instill

confidence in the Debtors' customers, vendors, employees, and contract counterparties that

operations are appropriately funded and that the bankruptcy filings will not negatively impact the

Debtors' overall business. The funds from the DIP Facility will enable the Debtors to purchase

new inventory, which will enhance value and generate new customer contracts and payments, to

fund a short sale process, and to ensure adequate funding during the sale process.  As such, the

DIP Facility is fundamental to the preservation and maintenance of the Debtors' going-concern

value during these proceedings.

## B.    The DIP Lender Should be Deemed a Good Faith Lender under Section 364(e) of the Bankruptcy Code.

29.    Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect

on loans extended to a debtor, and its right in any lien securing those loans, even if the authority

of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.

Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal

11 U.S.C. § 364(e).

30.    As explained herein, the DIP Loan Agreement is the result of (a) the Debtors' reasonable and informed determination that the DIP Lender offered the most favorable terms on which to obtain vital post-petition financing; and (b) arm's-length, good faith negotiations between the Debtors and the DIP Lender.

31.    The Debtors submit that the terms and conditions of the DIP Loan Agreement are reasonable and appropriate under the circumstances, and that the Debtors will use proceeds of the DIP Loan Agreement  only in accordance with Interim Order if approved by this Court. Accordingly, the Debtors request that the Court find that the DIP Lender is a "good faith" lender within the meaning of section 364(e) of the Bankruptcy Code and are entitled to the protections afforded by that section.

**C.    Authorization to Use Cash Collateral**

32.    To the extent that the Loan proceeds are considered the DIP Lender's cash collateral, the Debtors are authorized to use such cash collateral under section 363(c)(2)(A) of the Bankruptcy Code, because the DIP Lender consents to such use.  *See* 11 U.S.C. § 363(c)(2).  The Debtors assert that neither Phonix nor any other parties have an interest in any Loan proceeds from the DIP Lender.

**D.    The Automatic Stay should be Modified to Effectuate the Relief Requested.**

33.    The relief requested herein contemplates a limited modification of the automatic stay to permit the Debtors and the Lender to perform the transactions and actions contemplated or permitted in the Interim Order.

34.    Courts typically approve stay modifications of this type when requested in connection with a debtor's request to use Cash Collateral.  *See, e.g., EP Energy Corporation, et al.*, No. 19-35654 (MI) (Bankr. S.D. Tex. Oct. 4, 2019) (Docket No. 62 (approving provision modifying automatic stay in connection with debtors' use of cash collateral); *In re Jones Energy, Inc.*, No. 19-32112 (DRJ) (Bankr. S.D. Tex. Apr. 15, 2019) (Docket No. 78) (same); *In re Westmoreland Coal Co.*, No. 18-35672 (DRJ) (Bankr. S.D. Tex. Oct. 10, 2018) (Docket No. 92) (same); *In re Seadrill Ltd.*, No. 17-60079 (DRJ) (Bankr. S.D. Tex. Sept. 13, 2017) (Docket No. 98) (same); *In re Sherwin Alumina Co., LLC*, No. 16-20012 (DRJ) (Bankr. S.D. Tex. Jan. 13, 2016) (Docket No. 76) (same).

35.    Here, the stay relief provisions are a reasonable exercise of the Debtors' business judgment, are appropriate under the present circumstances, and, accordingly, should be approved.

## VII.    EMERGENCY CONSIDERATION

36.    The Debtors' current funding availability, need to purchase inventory, and need to proceed with a prompt sale process and resolution with Phonix, warrant emergency consideration of this Motion.  The Debtors need funds from the DIP Loan Agreement  to avoid irreparable harm, as noted to this Court by multiple parties on the record at prior hearings, and in pleadings pending or previously pending before this Court.  The Debtors must have capital with which to fund their operations to a successful value-maximizing sale or plan process.

## VIII.  REQUEST FOR FINAL HEARING

37.     As noted above, pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors respectfully request that the Court set a date for the Final Hearing at the earliest date and time of the Court's convenience that will ensure adequate notice and due process to all parties-in-interest to these Cases.

38.     The Debtors respectfully request that they be authorized to serve a copy of the signed Interim Order, which fixes the time and date for the filing of objections, if any, by first-class mail on the Notice Parties (as defined below) and to any other party that has filed a request for notices with this Court, if the same shall have filed a request for notice. The Debtors respectfully request that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001.

## IX.  WAIVER OF BANKRUPTCY RULES 6004(a) AND 6004(h)

39.     The Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## X.  NOTICE

40.     Notice of this Motion will be provided to the following parties or their counsel, if known: (i) the U.S. Trustee; (ii) the Committee; (iii) Phonix and any other secured creditors; (iv) all governmental agencies having a regulatory or statutory interest in these Cases; (v) parties that have requested notice pursuant to Bankruptcy Rule 2002; and (vi) any other parties included on the Master Service List.

## XI.    CONCLUSION

41.    For the reasons set forth above, prompt entry of the Interim Order is necessary to avoid immediate and irreparable harm to the Debtors' estates and is consistent with and warranted under Bankruptcy Rule 4001(b)(2) and (c)(2).

42.    Nothing contained herein is intended or shall be construed as (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' or any appropriate party in interest's rights to dispute the amount of, basis for, or validity of any claim against the Debtors; (c) a waiver of any claims or causes of action which may exist against any creditor or interest holder; or (d) an approval assumption, adoption, or rejection of any agreement, contract, lease, program, or policy between the Debtors and any third party under section 365 of the Bankruptcy Code.  Likewise, if the Court grants the relief herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' right to dispute such claim subsequently.

WHEREFORE, the Debtors respectfully request that the Court enter an Interim Order, substantially in the form attached hereto, granting this Motion and all relief requested herein, and that the Debtors be granted such other and further relief to which they are justly entitled.

Dated: January 26, 2026

Respectfully submitted,

**KANE RUSSELL COLEMAN LOGAN PC**

*/s/ Mark C. Taylor*
Joseph M. Coleman (SBN 04566100)
John J. Kane (SBN 24066794)
Kyle Woodard (SBN 24102661)
JaKayla J. DaBera (SBN 24129114)
901 Main Street, Suite 5200
Dallas, Texas 75202
Telephone: (214) 777-4200
Email: jcoleman@krcl.com
Email: jkane@krcl.com
Email: kwoodard@krcl.com
Email: jdabera@krcl.com

- and -

Mark C. Taylor (SBN 19713225)
Casey Roy (SBN 00791578)
401 Congress Ave., Suite 2100
Austin, Texas 78701
Telephone: (512) 487-6650
Email: mtaylor@krcl.com
Email: croy@krcl.com

**COUNSEL FOR DEBTORS AND
DEBTORS-IN-POSSESSION**

11826795v2 (75669.00003.000)

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on January 26, 2026, a true and correct copy of the foregoing document, together with all exhibits and attachments hereto, was filed with the Court and served via the Court's CM/ECF system upon all parties registered to receive such electronic service in these Cases.

*/s/ Mark C. Taylor* _____

11826795v2 (75669.00003.000)

<u>Schedule I</u>
**Initial Debtors**

| | Name | Petition Date | Case No. | Tax ID (last 4) |
|---|---|---|---|---|
| 1. | Buddy Mac One, LLC | 12/1/2025 | 25-34788 | 0935 |
| 2. | BMH One RE, LLC | 12/1/2025 | 25-34789 | 4305 |
| 3. | BMH 95 RE Caruthersville, LLC | 12/1/2025 | 25-34790 | 1264 |
| 4. | BMH 96 RE Marion, LLC | 12/1/2025 | 25-34791 | 0659 |
| 5. | Buddy Mac Holdings, LLC | 12/4/2025 | 25-34839 | 1297 |
| 6. | BMH RTO, LLC | 12/4/2025 | 25-34840 | 9489 |
| 7. | Buddy Mac Twenty-One, LLC | 12/4/2025 | 25-34841 | 1269 |
| 8. | Buddy Mac Twenty-Two, LLC | 12/4/2025 | 25-34842 | 6474 |
| 9. | Buddy Mac Twenty-Three, LLC | 12/4/2025 | 25-34843 | 3668 |
| 10. | Buddy Mac Twenty-Four, LLC | 12/4/2025 | 25-34844 | 3328 |
| 11. | Buddy Mac Twenty-Five, LLC | 12/4/2025 | 25-34845 | 5604 |
| 12. | Buddy Mac Twenty-Six, LLC | 12/4/2025 | 25-34846 | 5425 |
| 13. | Buddy Mac Twenty-Seven, LLC | 12/4/2025 | 25-34847 | 1574 |
| 14. | BMH-TNM 28, LLC | 12/4/2025 | 25-34848 | 5391 |
| 15. | BMH-TNM 29, LLC | 12/4/2025 | 25-34849 | 0350 |
| 16. | BMH-TNM 30, LLC | 12/4/2025 | 25-34850 | 5692 |
| 17. | BMH-TNM 31, LLC | 12/4/2025 | 25-34851 | 5137 |
| 18. | BMH-TNM 32, LLC | 12/4/2025 | 25-34852 | 3430 |
| 19. | BMH-TNM 33, LLC | 12/4/2025 | 25-34853 | 8037 |
| 20. | BMH-RCL 34, LLC | 12/4/2025 | 25-34854 | 7055 |
| 21. | BMH-RCL 35, LLC | 12/4/2025 | 25-34855 | 7332 |
| 22. | BMH-RCL 36, LLC | 12/4/2025 | 25-34856 | 4707 |
| 23. | BMH-RCL 37, LLC | 12/4/2025 | 25-34857 | 4598 |
| 24. | BMH-RCL 38, LLC | 12/4/2025 | 25-34858 | 7218 |
| 25. | BMH-RCL 39, LLC | 12/4/2025 | 25-34859 | 5340 |
| 26. | BMH-RCL 40, LLC | 12/4/2025 | 25-34860 | 8100 |
| 27. | BMH-RCL 41, LLC | 12/4/2025 | 25-34861 | 5735 |
| 28. | BMH-RCL 42, LLC | 12/4/2025 | 25-34862 | 3438 |
| 29. | BMH-FAN 43, LLC | 12/4/2025 | 25-34863 | 8956 |
| 30. | BMH-FAN 44, LLC | 12/4/2025 | 25-34864 | 9133 |
| 31. | BMH-FAN 45, LLC | 12/4/2025 | 25-34865 | 1642 |
| 32. | BMH-FAN 46, LLC | 12/4/2025 | 25-34866 | 1756 |
| 33. | BMH-FAN 47, LLC | 12/4/2025 | 25-34867 | 7435 |
| 34. | BMH-FAN 48, LLC | 12/4/2025 | 25-34868 | 7860 |
| 35. | BMH-FAN 49, LLC | 12/4/2025 | 25-34869 | 8079 |
| 36. | BMH-FAN 50, LLC | 12/4/2025 | 25-34870 | 8219 |
| 37. | BMH-FAN 51, LLC | 12/4/2025 | 25-34871 | 5786 |
| 38. | BMH-FAN 52, LLC | 12/4/2025 | 25-34872 | 6191 |
| 39. | BMH-FAN 53, LLC | 12/4/2025 | 25-34873 | 6281 |
| 40. | BMH-FAN 54, LLC | 12/4/2025 | 25-34874 | 6340 |
| 41. | BMH-SM 79, LLC | 12/4/2025 | 25-34875 | 9545 |

Case 25-34839-mvl11   Doc 31   Filed 02/26/26   Entered 02/26/26 15:41:52   Desc
Main Document   Page 23 of 24

| | Name | Petition Date | Case No. | Tax ID (last 4) |
|---|---|---|---|---|
| 42. | BMH-SM 80, LLC | 12/4/2025 | 25-34876 | 9640 |
| 43. | BMH-SM 81, LLC | 12/4/2025 | 25-34877 | 9709 |
| 44. | BMH-SM 82, LLC | 12/4/2025 | 25-34879 | 0107 |
| 45. | BMH-SM 83, LLC | 12/4/2025 | 25-34880 | 0236 |
| 46. | BMH-SM 84, LLC | 12/4/2025 | 25-34881 | 0340 |
| 47. | BMH-SM 85, LLC | 12/4/2025 | 25-34882 | 2526 |
| 48. | BMH-SM 86, LLC | 12/4/2025 | 25-34883 | 2731 |
| 49. | BMH-SM 87, LLC | 12/4/2025 | 25-34884 | 2817 |

**Schedule II**
**Subsequent Debtors**

|     | Name | Petition Date | Case No. | Tax ID (last 4) |
| --- | --- | --- | --- | --- |
| 50. | Buddy Mac Two, LLC | 1/25/2026 | 26-30327 | 6357 |
| 51. | Buddy Mac Six, LLC | 1/25/2026 | 26-30328 | 6848 |
| 52. | Buddy Mac Six RE, LLC | 1/25/2026 | 26-30329 | 2150 |
| 53. | Buddy Mac Eight, LLC | 1/25/2026 | 26-30330 | 2634 |
| 54. | Buddy Mac Eleven, LLC | 1/25/2026 | 26-30331 | 5242 |
| 55. | Buddy Mac Twelve, LLC | 1/25/2026 | 26-30332 | 1300 |
| 56. | Buddy Mac Eighteen, LLC | 1/25/2026 | 26-30333 | 0397 |
| 57. | Buddy Mac Nineteen, LLC | 1/25/2026 | 26-30334 | 0149 |
| 58. | BMH-NEW 58, LLC | 1/25/2026 | 26-30335 | 4176 |
| 59. | BMH-NEW 62, LLC | 1/25/2026 | 26-30336 | 7985 |
| 60. | BMH-WF TX 67, LLC | 1/25/2026 | 26-30337 | 0887 |
| 61. | BMH-TB 75, LLC | 1/25/2026 | 26-30338 | 3879 |
| 62. | BMH 85 RE Sikeston, LLC | 1/25/2026 | 26-30339 | 2698 |
| 63. | BMH Prime 95, LLC | 1/25/2026 | 26-30340 | 2635 |
| 64. | BMH Prime 96, LLC | 1/25/2026 | 26-30341 | 8446 |
| 65. | BMH Prime 97, LLC | 1/25/2026 | 26-30342 | 2430 |
| 66. | BMH-HR, LLC | 1/25/2026 | 26-30343 | 0229 |
| 67. | MacDonald Capital Corporation | 1/25/2026 | 26-30344 | 9459 |
| 68. | SAMBrownfield, LLC | 1/25/2026 | 26-30345 | 8187 |
| 69. | SAMPlainview, LLC | 1/25/2026 | 26-30346 | 4414 |

## EXHIBIT A

**Budget**

**Buddy Mac Holdings, LLC** *et. al.*

*Cash Budget*
$ - Thousands

| | Filing Date>> | 4-Dec | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Week #--->** | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | Budget Total |
| | | Actual | Actual | Actual | Actual | Actual | Actual | Actual | Budget | Budget | Budget | Budget | Budget | |
| | **Week Ending--->** | 6-Dec | 13-Dec | 20-Dec | 27-Dec | 3-Jan | 10-Jan | 17-Jan | 24-Jan | 31-Jan | 7-Feb | 14-Feb | 21-Feb | 12 Weeks |
| **Cash Receipts** | | $ - | $ 387.0 | $ 318.7 | $ 241.5 | $ 379.6 | $ 430.4 | $ 315.7 | $ 292.0 | $ 305.6 | $ 599.5 | $ 422.4 | $ 436.0 | $ 4,128.4 |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Inventory Purchases | | - | - | 196.2 | 21.5 | 117.7 | - | - | 1,000.0 | - | 200.0 | - | - | 1,535.4 |
| Payroll and Benefits | | - | 0.8 | 207.0 | - | - | 252.1 | - | 217.0 | - | 310.0 | 85.0 | 310.0 | 1,381.9 |
| Property Taxes | | - | 0.1 | - | - | 3.5 | 9.5 | 1.2 | 20.9 | - | - | - | - | 35.2 |
| Store Rent Expense | | - | - | - | - | - | 173.4 | - | 3.6 | - | 272.3 | - | 155.0 | 604.4 |
| Repairs & Maintenance | | - | 4.3 | (0.2) | - | - | 3.8 | 0.3 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 33.2 |
| Insurance | | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Vehicle Leases | | - | - | - | - | - | - | - | 58.0 | - | - | - | 90.0 | 148.0 |
| General and Administrative | | - | 35.1 | (0.2) | 6.5 | 6.8 | 67.8 | 16.2 | 50.0 | 20.0 | 70.0 | 20.0 | 20.0 | 312.3 |
| Corporate Support | | - | 3.3 | 66.0 | - | 73.6 | 1.1 | 62.2 | 5.0 | 98.7 | 55.1 | 98.7 | 10.0 | 473.7 |
| Sales Taxes | | - | - | 25.9 | 106.8 | - | - | - | 100.0 | - | - | - | 153.0 | 385.6 |
| **Total Operating Disbursements** | | $ - | $ 43.7 | $ 494.7 | $ 134.8 | $ 453.7 | $ 255.7 | $ 296.9 | $ 1,242.5 | $ 433.7 | $ 687.4 | $ 433.7 | $ 433.0 | $ 4,909.8 |
| **Operating Cash Flow** | | $ - | $ 343.3 | $ (176.0) | $ 106.7 | $ (74.1) | $ 174.7 | $ 18.8 | $ (950.5) | $ (128.1) | $ (87.9) | $ (11.4) | $ 3.0 | $ (781.4) |
| Accumulated | | - | 343.3 | 167.3 | 274.1 | 200.0 | 374.7 | 393.5 | (557.0) | (685.1) | (773.1) | (784.4) | (781.4) | |
| **Other (Sources)/Uses** | | | | | | | | | | | | | | |
| DIP Proceeds | | - | - | - | - | - | - | - | (750.0) | - | (750.0) | - | - | (1,500.0) |
| Funds from BMH-HR, LLC | | - | - | - | - | - | (56.5) | - | (100.0) | - | - | - | - | (156.5) |
| Adequate Protection - Phonix | | - | - | - | - | - | - | 56.5 | 100.0 | - | - | - | - | 156.5 |
| Restructuring Fees | | - | - | - | - | - | - | - | - | 21.2 | - | - | 775.0 | 796.2 |
| Critical Vendors | | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utilities Deposit | | - | - | 25.0 | - | - | - | - | - | - | - | - | - | 25.0 |
| **Total Other (Sources/Uses)** | | - | - | 25.0 | - | - | (56.5) | 56.5 | (750.0) | 21.2 | (750.0) | - | 775.0 | (678.8) |
| **Net Cash Flow** | | $ - | $ 343.3 | $ (201.0) | $ 106.7 | $ (74.1) | $ 231.3 | $ (37.7) | $ (200.5) | $ (149.3) | $ 662.1 | $ (11.4) | $ (772.0) | $ (102.6) |
| Accumulated | | - | 343.3 | 142.3 | 249.1 | 175.0 | 406.2 | 368.5 | 168.0 | 18.7 | 680.8 | 669.4 | (102.6) | (102.6) |
| **Cash Balance** | $ 133.9 | $ 133.9 | $ 477.3 | $ 276.3 | $ 383.0 | $ 308.9 | $ 540.2 | $ 502.5 | $ 302.0 | $ 152.6 | $ 814.7 | $ 803.3 | $ 31.4 | $ 31.4 |


## **EXHIBIT B**

**Loan Agreement**

**SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION LOAN, SECURITY AND
GUARANTY AGREEMENT**

**among**

**BUDDY MAC HOLDINGS, LLC,
as RTO Parent,**

**MACDONALD CAPITAL CORPORATION
as MCC Parent,**

**BMH RTO, LLC,
AND
EACH DEBTOR LISTED AS A BORROWER ON THE SIGNATURE PAGES HERETO,
as Borrowers,**

**THE PARENT AND EACH DEBTOR LISTED AS A GUARANTOR ON THE SIGNATURE
PAGES HERETO,
as Guarantors,**

**and**

**PHONIX RBS, LLC, as Lender**

**January 27, 2026**

## TABLE OF CONTENTS

1.  LOANS AND OTHER FINANCIAL ACCOMMODATIONS. ........................................2

2.  CONDITIONS OF LENDING. ........................................................................5

3.  INTEREST; FEES; EXPENSES; INDEMNIFICATION; TAXES. ..................................7

4.  SECURITY. ..........................................................................................11

5.  COLLECTIONS; SET OFF; DEPOSIT ACCOUNTS; NOTICE OF ASSIGNMENT;
    POWER OF ATTORNEY; LENDER REPORTS. ..........................................13

6.  REPRESENTATIONS AND WARRANTIES.......................................................17

7.  AFFIRMATIVE COVENANTS. ....................................................................21

8.  REPORTING. .........................................................................................25

9.  NEGATIVE COVENANTS. .........................................................................28

10. DEFAULT; RIGHTS AND REMEDIES UPON DEFAULT. ......................................33

11. STANDARDS FOR EXERCISING REMEDIES. ..................................................41

12. TERMINATION........................................................................................42

13. MISCELLANEOUS. .................................................................................42

14. DEFINITIONS.........................................................................................46

15. JOINT AND SEVERAL LIABILITY ..............................................................63

16. SUPERPRIORITY CLAIMS, DIP COLLATERAL SECURITY, ETC.........................65

17. ACKNOWLEDGMENT; REAFFIRMATION AND RELEASE..................................68

18. GUARANTY……………………………………………………………………….71

i

## SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION LOAN, SECURITY AND GUARANTY AGREEMENT

January [•], 2026

Pursuant to Section 364(c) and (d) of the Bankruptcy Code, this SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION LOAN, SECURITY AND GUARANTY AGREEMENT (as amended or modified from time to time, this "**Agreement**"), is entered into as of the date set forth above by and among **BUDDY MAC HOLDINGS, LLC** (the "**RTO Parent**"), **MACDONALD CAPITAL CORPORATION** (the "**MCC Parent**"), **BMH RTO, LLC,** a Texas limited liability company ("**BMH RTO**"), and each Debtor listed as a "Borrower" on the signature pages hereto (together with each other Person that executes a joinder agreement and becomes a "Borrower" hereunder and BMH RTO, each a "**Borrower**" and collectively, the "**Borrowers**"), each Debtor listed as a "Guarantor" on the signature pages hereto (together with the RTO Parent and MCC Parent and each other Person that executes a joinder agreement and becomes a "Guarantor" hereunder, each a "**Guarantor**" and collectively, the "**Guarantors**"; each Borrower and each Guarantor are each individually a "**Debtor**" and collectively, the "**Debtors**"), and **PHONIX RBS, LLC,** a Delaware limited liability company ( "**Lender**").

## RECITALS

A.    On December 1, 2025 (the "**First Petition Date**"), Buddy Mac One, LLC ("**Buddy Mac One**"), BMH One RE, LLC ("**BMH One**"), BMH 95 RE Caruthersville, LLC ("**BMH 95**"), and BMH 96 RE Marion, LLC ("**BMH 96**"; together with BMH One and BMH 95, the "**Limited Recourse Guarantors**") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, and on December 4, 2025 (the "**Second Petition Date**"), BMH RTO, LLC and affiliated Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, commencing Chapter 11 bankruptcy cases which are jointly administered under Bankruptcy Case No. 25-34839 (collectively and individually as the context may require, the "**Case**") before the United States Bankruptcy Court for the Northern District of Texas (the "**Bankruptcy Court**"). The Debtors that filed their respective Cases on the First Petition Date and the Second Petition Date are referred to herein as the "**BMH Debtors**."

B.    The BMH Debtors are operating their business as debtors-in-possession under Chapter 11 of the Bankruptcy Code. William Ian MacDonald acts as the Debtors' chief executive officer.

C.    On January 23, 2026 (the "**Third Petition Date**"; the term "**Applicable Petition Date**" refers to any of the First Petition Date, the Second Petition Date or the Third Petition Date as the context may require)), the entities listed on **Exhibit 9** (collectively the "**Buddy Mac Entities**") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code before the Bankruptcy Court, commencing Chapter 11 bankruptcy cases, which will be jointly administered with the BMH Debtor Cases. Each Debtor remains in possession of its assets and is operating its business as a debtor-in-possession under Chapter 11 of the Bankruptcy Code.

D.    Pursuant to that certain Amended and Restated Loan, Security and Guaranty Agreement dated as of February 28, 2025 (as has been amended, supplemented and modified through the date hereof, the "**Pre-Petition Loan Agreement**"), by and among BMH RTO, LLC, as borrower ("**BMH RTO**"), the Pre-Petition Guarantors party thereto, and Phonix RBS, LLC, as assignee of Intrust Bank, N.A. (the "**Pre-Petition Lender**"), Pre-Petition Lender made certain credit facilities and advances of credit available to certain of the Debtors prior to the Second Petition Date on the terms and conditions set forth therein, which credit facilities and advances of credit and all other Pre-Petition Obligations (as defined below) thereunder

1

were unconditionally guaranteed by certain Pre-Petition Guarantors and secured by Liens on substantially all the assets of BMH RTO and certain of the Pre-Petition Guarantors.

E.    The Borrowers have requested that during the Case, Lender make advances and other financial accommodations available to the Borrowers of up to the Credit Limit specified herein on a senior secured, superpriority basis, pursuant to, inter alia, Sections 364(c) and (d) of the Bankruptcy Code.

F.    Lender is willing to provide advances and other financial accommodations to the Borrowers on a senior secured, superpriority basis on the terms and subject to the conditions of this Agreement, so long as, among other things, such post-petition credit obligations are (i) secured by Liens on all of the assets, property and interests, real and personal, tangible and intangible, of the Debtors, whether now owned or hereafter acquired, which Liens are superior to all other Liens pursuant to Sections 364(c) and (d) of the Bankruptcy Code (subject to (x) the priority of Liens set forth in Section II(b) of the Interim Order and (y) the Carve-Out); (ii) given priority over any administrative expenses of the kind specified in the Bankruptcy Code, including without limitation, under Sections 105, 326, 328, 330, 331, 503(b), 507, 364(c)(1), 546(c), 726, or 1114 and, upon entry of a Final Order, sections 506(c) and 552(b) of the Bankruptcy Code, as provided in the Interim Order and the Final Order; and (iii) guaranteed by the Guarantors pursuant to the terms of **Section 18**.

IN CONSIDERATION of the foregoing recitals, which are incorporated herein by this reference, the mutual covenants and undertakings herein contained, the Debtors, the other Borrowers, the Guarantors, Lender and Issuer (as hereinafter defined) hereby agree as follows:

**1.    LOANS AND OTHER FINANCIAL ACCOMMODATIONS.**

    **(a)    Term Loans**.

        **(i)    New Money Term Loans**.  Subject to the terms and provisions of this Agreement, and also subject to any further restrictions or limitations in the Final Order (or, prior to the entry of the Final Order, the Interim Order), Lender agrees to make Term Loans to the Borrowers, during the period from the Closing Date until the Maturity Date, in an aggregate principal amount not to exceed the amount of the Credit Limit; provided, however, that (A) the amount of Term Loans to be borrowed for any advance during any week shall be in an aggregate principal amount not to exceed the amount required pursuant to the Approved Budget (subject to Permitted Variances) as then in effect and (B) during the Interim Availability Period, the total aggregate principal amount of the outstanding Term Loans shall not exceed the Interim Availability Amount.

        **(ii)    Limitations**.  Notwithstanding the foregoing:

            (A)    The Credit Limit shall be permanently reduced immediately and without further action upon the making of each Term Loan in an aggregate amount equal to the aggregate amount of such Term Loan. The Credit Limit shall terminate immediately and without further action on the Maturity Date.  The aggregate principal amount of the Term Loans made during the period from the Closing Date until the Maturity Date shall not exceed the Credit Limit.  Any principal amount of a Term Loan which is repaid or prepaid may not be reborrowed.

            (B)    During the Interim Availability Period, the Term Loans in an amount up to the Interim Availability Amount may be advanced by Lender; provided that during the Interim Availability Period, Borrowers will use the proceeds from any Term Loans to

2

direct Lender to purchase inventory on behalf of the Borrowers and at the direction of
the Borrowers based on identified need for each store, at the prices that the Borrowers
have negotiated, and by virtue of the inventory purchase, which purchases shall be
deemed the funding of a Term Loan. For the avoidance of doubt, the purchase of such
inventory shall not be deemed control of the Debtors. If a dispute arises between Lender
and Debtors regarding the appropriate stores to which inventory should be delivered, the
Debtors, in the fulfillment of their fiduciary obligations to their estates, shall have final
say. During the Final Availability Period, Term Loans in an amount up to the Final
Availability Amount plus any undrawn Interim Availability Amount may be advanced by
Lender; provided, that in no event shall the aggregate amount of the Term Loans
advanced exceed $1,500,000, subject to **Section 1(c)**.

  (iii) **Term Note**. All term loans made by Lender pursuant to this **Section 1** (each a
"**Term Loan**" and collectively, the "**Term Loans**") shall bear interest pursuant to **Section
3(a)(i)** and, at the option of Lender, shall be evidenced by and repayable in accordance with a term
note payable to Lender (or its registered assigns) substantially in the form of **Exhibit 2** hereto (as
amended, modified, replaced, substituted, superseded or restated from time to time, the "**Term
Note**"), as the same may hereafter be amended, supplemented or restated from time to time and
any note or notes issued in substitution therefor, but in all events shall be conclusively evidenced
by Lender's records of loans and repayments (absent manifest error) and shall be payable as
described herein.

  (iv) **Protective Advances**. Notwithstanding anything to the contrary contained herein,
at its option, and without limiting any other rights or remedies, following prior written notice to
Borrower (which such prior notice is not required to the extent an Event of Default shall have
occurred and be continuing), Lender may at any time make a Term Loan or other advances
hereunder to pay or discharge any taxes, liens, rent, security interests or other encumbrances at any
time levied against, impacting in any manner or placed on any of the DIP Collateral, and may
procure and make a Term Loan or other advance hereunder to pay any premiums on any insurance
required to be carried by a Borrower, and provide for the maintenance and preservation of any of
the DIP Collateral, and otherwise take any action reasonably deemed necessary by Lender to protect
its security, and all amounts expended by Lender in connection with any of the foregoing matters,
including reasonable attorneys' fees, shall be considered Obligations of Borrowers and outstanding
Term Loans (and shall be added to Borrowers' balance of Term Loans pursuant to this Agreement),
and shall be secured by the DIP Collateral.

  (v) **Advance Procedures**. Unless otherwise approved by Lender in its sole discretion,
all requests for Term Loans shall be made upon the Borrower's irrevocable notice to Lender, which
may be given by (A) telephone, or (B) a written notice; provided that any telephone notice must be
confirmed immediately by delivery to Lender of a written notice. Each such notice must be
received by Lender not later than 1:00 p.m. (New York time) one Business Day prior to (or in the
case of the initial Borrowing, the same day of) the requested date of any Term Loan.

  (vi) **Roll-Up of Pre-Petition Revolver Obligations**

  (A) Immediately upon entry of the Final Order, a portion of the outstanding
Pre-Petition Revolver Obligations (the "**Roll-Up Amount**") held by Lender shall be
automatically "rolled up" and converted into Term Loans, on a cashless basis of three

3

dollars ($3.00) of Roll-Up Amount for each dollar of Term Loans, and constitute Obligations of the Debtors hereunder for all purposes hereunder as if originally funded on the Closing Date (the "**Roll-Up Loans**"), without any further action by the Debtors or any other party (which conversion shall not, for the avoidance of doubt, constitute a novation). The conversion (or "roll-up") shall be authorized as compensation for, in consideration for, and solely on account of, the agreement of the Pre-Petition Lender, as Lender hereunder, to fund the Term Loans hereunder and not as payments under, adequate protection for, or otherwise on account of, any Pre-Petition Revolver Obligations. Notwithstanding any other provision of the Interim Order, the Final Order, or the Loan Documents, all rights of the Pre-Petition Lender shall be fully preserved, including with respect to the Roll-Up Loans.

(B)    Subject to the terms and conditions set forth herein and in the Final Order, and without any further action by any party to this Agreement, each Lender's Roll-Up Loans shall be deemed to be Loans, administered hereunder and secured by perfected Liens on, and security interests in, all of the DIP Collateral of the Debtors to the same extent as all other Obligations of the Debtors hereunder. For the avoidance of doubt, until any Pre-Petition Revolver Obligations are deemed to be Roll-Up Loans as provided herein, such Pre-Petition Revolver Obligations shall remain Pre-Petition Revolver Obligations under the Pre-Petition Credit Agreement and guaranteed by the guarantors of and secured by and entitled to the benefits of all liens created and arising under the Pre-Petition Loan Documents, which liens shall remain in full force and effect on a continuous basis, unimpaired, uninterrupted and undischarged, and having the same perfected status and priority. The Roll-Up Loans and the other Term Loans shall jointly constitute a single facility hereunder.

(vii)    **Payment Direction**. Each Borrower hereby authorizes and directs Lender, in Lender's sole discretion (provided, however, Lender shall have no obligation to do so): (A) to make, or treat as being made, a Term Loan to Borrowers, and add the same to Borrowers' balance of Term Loans pursuant to this Agreement, in order to pay accrued interest, fees, charges and expenses and other Obligations, as the same become due and payable pursuant to this Agreement, or any note or other agreement between a Borrower and Lender; (B) to charge any of Borrowers' or other Debtors' accounts under the control of Lender for the payment of any such Obligations; and/or (C) apply the proceeds of DIP Collateral and any other funds of such Borrower or other Debtors received by Lender, including, without limitation, payments on accounts and other payments from sales or lease of inventory to the payment of any such Obligations. Lender shall use commercially reasonable efforts to give Borrowers notice of any such payments or charges under clauses (A) and (B) respectively promptly following the same.

**(b)**    <u>**Mandatory Prepayments**</u>.

(i)    When any Debtor receives any Net Cash Proceeds: (A) under any insurance policy on account of damage or destruction of any DIP Collateral, or (B) as a result of any taking or condemnation of any DIP Collateral, Debtors shall, no later than one (1) Business Days after the receipt thereof, make a repayment of the Post-Petition Obligations or Pre-Petition Revolver Obligations (as determined by Lender in its sole and absolute discretion) in an amount equal to one hundred percent (100%) of such net cash proceeds. Such repayments shall be applied to the Obligations in accordance with **Section 5(b)** hereof.

4

(ii)    In the event of any issuance or other incurrence of Indebtedness (other than Indebtedness permitted hereunder) by any Debtor, or the issuance of Equity Interests by any Debtor, Debtors shall, no later than one (1) Business Day after the receipt by such Debtor of any net cash proceeds (i.e., gross cash proceeds less the reasonable direct costs of such issuance or incurrence) of such issuance or incurrence, make a repayment of the Post-Petition Obligations or Pre-Petition Revolver Obligations (as determined by Lender in its sole and absolute discretion) in an amount equal to one hundred percent (100%) of such net cash proceeds.  The foregoing shall not be deemed to be implied consent to any such sale otherwise prohibited by the terms and conditions hereof.  Such repayments shall be applied to the Obligations in accordance with **Section 5(b)** hereof.

(iii)    When any Debtor sells or otherwise disposes of any DIP Collateral (including, without limitation any Subject RTO Real Property), Borrowers shall make a repayment of the Post-Petition Obligations or Pre-Petition Revolver Obligations (as determined by Lender in its sole and absolute discretion) in an amount equal to one hundred percent (100%) of the net cash proceeds of such sale (i.e., gross cash proceeds less the reasonable direct costs of such sales or other dispositions) and less amounts required to be first paid over to the holder(s) of any applicable Senior Liens as a result of such sale or disposition), such repayments to be made promptly but in no event more than one (1) Business Days following receipt of such net proceeds, and until the date of payment, such proceeds shall be held in trust for Lender.  The foregoing shall not be deemed to be implied consent to any such sale otherwise prohibited by the terms and conditions hereof.  Such repayments shall be applied to the Obligations in accordance with **Section 5(b)** hereof.

(iv)    Subject to **Section 4(l)** and the Final Order, when BMH HR LLC ("**BMH HR**") receives additional ERC Funds, which ERC Funds constitute DIP Collateral, Borrowers shall, or shall cause BMH HR to, make a repayment of the Post-Petition Obligations or Pre-Petition Revolver Obligations (as determined by Lender in its sole and absolute discretion) in an amount equal to one hundred percent (100%) of the net cash proceeds of such ERC Funds (i.e., gross cash proceeds less the reasonable direct broker's fee) along with any pre-existing ERC Funds in its possession less the Additional ERC Remittance required to be paid over to Debtors in the amount of $175,000 for professional fee retainers, costs, and expenses. To the extent such Additional ERC Remittance has not been previously paid, and subject to entry of the Final Order, such repayments shall be made promptly but in no event more than one (1) Business Days following receipt of such net proceeds, or entry of the Final Order approving this agreement, whichever is later, and until the date of payment, such proceeds shall be held in trust for Lender.  Such repayments shall be applied to the Obligations in accordance with **Section 5(b)** hereof.

(v)    Borrowers shall, or shall cause Ian MacDonald to, as a Pre-Petition Guarantor, and in exchange for the consideration provided herein, make a repayment of the Post-Petition Obligations or Pre-Petition Revolver Obligations (as determined by Lender in its sole and absolute discretion) in an amount equal to seventy-five percent (75%) of the net cash proceeds received by Ian MacDonald (whether through his direct or indirect ownership of the Boulders Property) from the sale of the Boulders Property, such repayments to be made promptly but in no event more than one (1) Business Days following receipt of such net proceeds, and until the date of payment, such proceeds shall be held in trust for Lender.  Such repayments shall be applied to the Obligations in accordance with Section 5(b) hereof.

5

(c)     **Incremental Facility Increase.**

    (i)     **Request for Incremental Facility Increase**. Borrowers may, by notice to the Lender, request that the Credit Limit be increased by up to an amount (for all such requests) not exceeding $1,000,000 (such amount, the "**Accordion Amount**" and such increase to the Credit Limit as in effect on the Closing Date, the "**Incremental Facility Increase**"); provided that (i) any such request for the Incremental Facility Increase shall be in a minimum amount of the lesser of (x) $250,000 (or such lesser amount as may be approved by Lender) and (y) the entire remaining amount available under this **Section 1(c)** and (ii) Borrowers shall make no more than a total of four (4) requests for an Incremental Facility Increase under this **Section 1(c)** (unless otherwise approved by Lender)

    (ii)     **Conditions to Effectiveness Incremental Lenders**. The Accordion Amount may be provided by Lender. Notwithstanding anything herein to the contrary, Lender shall not have any obligation to agree to provide all or part of the Accordion Amount pursuant to this **Section 1(c)** and any election to do so shall be in the sole discretion of such Lender.

    (iii)     **Terms of the Incremental Facility Increase**. Lender and the Borrowers shall determine the effective date for such Incremental Facility Increase pursuant to this **Section 1(c)** (an "**Incremental Commitment Effective Date**"); provided that such date shall be a Business Day at least ten Business Days after delivery of the Accordion Increase Notice (unless otherwise approved by Lender) and at least 30 days prior to the Maturity Date then in effect (unless otherwise approved by Lender).

    Effective as of the applicable Incremental Commitment Effective Date, subject to the terms and conditions set forth in this Section, the Accordion Amount shall constitute part of the Credit Limit, and the Loans made by it on such Incremental Commitment Effective Date pursuant to this **Section 1(c)** shall be Term Loans, for all purposes of this Agreement.

    (iv)     **Conditions to Effectiveness**. Notwithstanding the foregoing, the Incremental Facility Increase pursuant to this Section shall not be effective with respect to Lender unless:

    (A)     no Default or Event of Default shall have occurred and be continuing on the Incremental Commitment Effective Date and after giving effect to the Loans of the Accordion Amount to be made on the Incremental Commitment Effective Date;

    (B)     the representations and warranties contained in this Agreement are true and correct on and as of the Incremental Commitment Effective Date and after giving effect to such Incremental Facility Increase, as though made on and as of such date (or, if any such representation or warranty is expressly stated to have been made as of a specific date, as of such specific date);

    (C)     Lender shall have approved the Incremental Facility Increase.

**2.     CONDITIONS OF LENDING.**

6

(a)    **Initial Loans**. The willingness of Lender to consider making the initial loan hereunder shall be subject to the condition precedent that Lender shall have received all of the following, each in form and substance satisfactory to Lender, subject to waiver of any such requirement by Lender:

(i)    This Agreement and each applicable Loan Document, properly executed on behalf of the Debtors or other applicable party.

(ii)    A Term Note in favor of Lender.

(iii)    The Initial DIP Budget.

(iv)    The Case shall have been commenced in the Bankruptcy Court and all of the first day orders entered at the time of commencement of the Case shall be reasonably satisfactory, in form and substance, to Lender and no trustee or examiner shall have been appointed with respect to the Debtors, or any of them, or any property of or any Estate of any Debtor;

(v)    The Interim Order shall have been entered by the Bankruptcy Court, which Interim Order (A) shall have been entered upon an application or motion of the Debtors satisfactory in form and substance to Lender and upon prior notice to such parties required to receive such notice and such other parties as may be reasonably requested by Lender; (B) shall be in full force and effect and shall not have been amended, modified or stayed, or reversed; and, if the Interim Order is the subject of a pending objection, appeal or motion for reconsideration in any respect, neither the Interim Order, nor the making of the Term Loans, nor the performance by the Debtors of any of the Obligations shall be the subject of a presently effective stay, and (C) shall otherwise satisfy the requirements of the definition of Interim Order set forth herein. The Debtors and the Lender shall be entitled to rely in good faith upon the Interim Order notwithstanding any such objection, appeal or motion for reconsideration;

(vi)    Current searches of appropriate filing offices showing that (A) no state or federal tax liens have been filed and remain in effect against any Debtor, (B) no financing statements have been filed and remain in effect against any Debtor, except (1) the financing statements relating to the liens set forth on **Schedule E** and (2) the Obligations, and (C) Lender has duly filed all financing statements necessary to perfect the security interests granted hereunder, to the extent the security interests are capable of being perfected by filing.

(vii)    A certificate of the Clerk, Secretary or an Assistant Secretary, or other manager or officer approved by Lender, of each Debtor certifying as to (A) the resolutions of the directors/managers and, if required, the shareholders/members of such Debtor, authorizing the execution, delivery and performance of this Agreement and related Loan Documents, as applicable, (B) the certified Articles/Certificate of Incorporation/Organization/Formation and Bylaws/Operating Agreement (or other similar constituting documents) of such Debtor, and (C) the signatures of the officers or agents of such Debtor authorized to execute and deliver this Agreement and other instruments, agreements and certificates, including loan requests, on behalf of such Debtor.

(viii)    A current certificate issued by the Secretary of State of the state of such Debtor's formation, certifying that such Debtor is legally existing and in good standing under the laws of such jurisdiction to the extent such jurisdiction issues such or similar certifications.

7

(ix)    Evidence that each Debtor is duly licensed or qualified to transact business in all jurisdictions where the character of the property owned or leased or the nature of the business transacted by it makes such licensing or qualification necessary.

(x)    Certificates of the insurance required hereunder, and related assignments as applicable, with all hazard insurance containing a lender's loss payable endorsement in favor of Lender and naming Lender as an additional insured (including as to foreign credit insurance).

(xi)    Payment of the fees due through the date of the initial loan and expenses incurred by Lender through such date required to be paid by Borrowers pursuant to this Agreement.

(xii)    An executed and sworn declaration by Ian MacDonald (the "MacDonald Declaration") to the effect that his final personal financial statement delivered to Lender on that date is true and correct, which personal financial statement form shall  be consistent with the representations received by Lender as to such personal financial statement from counsel for Ian MacDonald counsel on January 15, 2025, all in form and substance satisfactory to Lender.

(xiii)    An executed Consent from Ian MacDonald consenting to the Debtors entering into this Agreement and the terms and conditions hereof.

(xiv)    An executed Settlement Agreement.

(xv)    Such other documents, instruments and agreements as Lender in its discretion may reasonably require.

(b)    **Loans Funded On and After the Final Order Entry Date**.  The willingness of Lender to consider making any loan hereunder on and after the Final Order Entry Date shall be subject to the condition precedent that Lender shall have received all of the following, each in form and substance satisfactory to Lender:

(i)    **Final DIP Orders and Cash Management Order**.  The Final Order Entry Date shall have occurred, and the conditions set forth in this **Section 2** shall have been satisfied.  The Final Order and the Cash Management Order shall be in full force and effect and shall not have been reversed, modified, amended, stayed, vacated or subject to a stay pending appeal, in the case of any modification, amendment or stay pending appeal, in any manner, or relating to any matter, that is adverse to the interests of Lender.  The Final Order shall approve the Settlement Agreement, authorize the compromise and transactions evidenced and contemplated thereby, including, without limitation, the Participation Agreement and the PEC Pledge Agreement.  Debtors shall be in compliance with the Final Order.

(ii)    **Milestones**.  Debtors shall have satisfied all Milestones which are required to be satisfied on or prior to the date such Loan is funded.

(iii)    **Approved Budget**.  Lender shall have received, and approved, the Approved Budget that is in effect as of the Final Order Entry Date.

(iv)    **Payment of Fees, Etc**.  Borrowers shall have paid all fees, costs, expenses and taxes then payable by the Borrowers pursuant to this Agreement and the other Loan Documents to the Lenders, including, without limitation, any and all fees, costs, expenses and taxes set forth in the Interim Order and the Final Order.

8

(v) **Participation Agreement**. An executed Participation Agreement.

(vi) **PEC Pledge Agreement**. An executed PEC Pledge Agreement.

(vii) **Real Estate Documents**. Mortgage, Assignment of Leases and Rents, Hazardous Materials Indemnification Agreements and Fixture Filings each properly executed, as applicable, and delivered by the Borrowers in favor of Lender, each in form and substance satisfactory to Lender, with respect to the Real Property DIP Collateral.

(viii) **Other Real Estate Documents**. Such other documentation and opinions, in form and substance satisfactory to Lender, in connection with the granting of the Mortgages on the Real Property DIP Collateral, including surveys, financing statements, fixture filings, flood insurance, flood insurance certifications and environmental audits. All such environmental audits and surveys shall be prepared or issued by parties reasonably acceptable to Lender.

(ix) **Other Documents; Miscellaneous.** Such other documents, instruments and agreements as Lender in its discretion may reasonably require.

(c) **Conditions Precedent to All Borrowings**. The obligation of each Lender to make any Loan at any time is subject to the following conditions precedent:

(i) **Notice of Borrowing**. Lender shall have received a notice of borrowing in accordance with **Section 1(a)(v)** and the other requirements hereof.

(ii) **Representations and Warranties**. The representations and warranties contained in Section 6 hereof are correct in all material respects (except to the extent such representations and warranties are qualified by materiality, in which case they shall be correct in all respects) on and as of the date of such loan, as though made on and as of such date, except to the extent that such representations and warranties relate solely to an earlier date in which case they shall be true and correct in all material respects as of such earlier date; and

(iii) **No Default or Event of Default**. No event has occurred and is continuing or would result from such loan which constitutes an Event of Default or which, with notice or the passage of time or both, would constitute an Event of Default.

(iv) **Other Conditions Precedent**. With respect to any Loan (i) made during the Interim Availability Period, the conditions specified in **Section 3(a)** shall have been satisfied and (ii) made during the Final Availability Period, the conditions specified in **Section 3(b)** shall have been satisfied.

(v) **Status of Bankruptcy Cases**. The Cases shall not have been dismissed or converted under Chapter 7 of the Bankruptcy Code.

(vi) **Trustees**. (i) No trustee or examiner with enlarged powers (beyond those set forth in Bankruptcy Code sections 1106(a)(3) and (4)) shall have been appointed with respect to the Debtors or their respective properties and (ii) no trustee under Chapter 7 of the Bankruptcy Code or under Chapter 11 of the Bankruptcy Code shall have been appointed in the Cases.

(vii) **Milestones**. Each Milestone that is required to be complied with prior to or concurrently with the borrowing shall have been complied with.

9

(viii)    **Interim Order and Final Order**.  Debtors shall be in compliance with the Interim Order and the Final Order, as applicable.

(ix)    **Approved Budget**.  The Approved Budget shall be in full force and effect on and as of the proposed date of borrowing, and the making of any Loan on any such borrowing date shall be in accordance with the Approved Budget (or as otherwise approved in advance in writing by Lender).

(x)    **Professional Fee Reserve**.  The Professional Fee Reserve (as defined in the Interim Order) shall have been funded in sufficient amounts in accordance with the Interim Order and the Final Order and the Approved Budget (applicable as of the date of such Loan).

(xi)    **Legality**.  The making of such Loan shall not contravene any law, rule or regulation applicable to Lender.

(xii)    **Proceedings; Receipt of Documents**.  All proceedings in connection with the making of such Loan and the other transactions contemplated by this Agreement and the other Loan Documents, and all documents incidental hereto and thereto, shall be satisfactory to Lender and its counsel, and Lender and such counsel shall have received such other agreements, instruments, approvals, and other documents, each in form and substance satisfactory to Lender, as Lender may reasonably request.

(d)    **Effect of Requests**. Each request by Borrowers for the making of any loan shall be deemed to constitute a representation and warranty by each Borrower that the conditions precedent set forth in clauses (c)(ii) and (c)(iii) above of this **Section 2** will be satisfied at the time of the making of such loan.

3.    **INTEREST; FEES; EXPENSES; INDEMNIFICATION; TAXES.**

(a)    **Interest Rates**.

(i)    **Term Loans; Other Obligations**.  Interest on (A) the Pre-Petition Obligations shall be governed as to rates of interest and other fees and related charges by the Pre-Petition Loan Agreement and the other Pre-Petition Loan Documents and (B) the amounts outstanding hereunder, including, without limitation, under the Term Notes, shall bear interest at the rate of ten percent (10%) per annum.

(ii)    **[Reserved].**

(iii)    **Adjustment.**  Interest shall be computed on the basis of the actual number of days elapsed over a year of three hundred sixty (360) days.  Lender's determination of such interest rate shall be binding and conclusive absent manifest error.  The interest rate need not and may not necessarily be the lowest or most favorable rate.

(iv)    **Maximum Rate.**  It is the intention of the parties hereto to comply strictly with applicable usury laws, if any; accordingly, notwithstanding any provisions to the contrary in this Agreement or any other documents or instruments executed in connection herewith, in no event shall this Agreement or such documents or instruments require or permit the payment, taking, reserving, receiving, collecting or charging of any sums constituting interest under applicable laws which exceed the maximum amount permitted by such laws.  If any such excess interest is called for, contracted for, charged, paid, taken, reserved, collected or received in connection with the Obligations or in any communication by Lender or any other Person to a Borrower or any other Person, or in the event all or part of the principal of the Obligations or interest thereon shall be

10

prepaid or accelerated, so that under any of such circumstances or under any other circumstance whatsoever the amount of interest contracted for, charged, taken, collected, reserved, or received on the amount of principal actually outstanding from time to time under this Agreement shall exceed the maximum amount of interest permitted by applicable usury laws, if any, then in any such event it is agreed as follows: (i) the provisions of this paragraph shall govern and control, (ii) neither any Borrower nor any other Person now or hereafter liable for the payment of the Obligations shall be obligated to pay the amount of such interest to the extent such interest is in excess of the maximum amount of interest permitted by applicable usury laws, if any, (iii) any such excess which is or has been received notwithstanding this paragraph shall be credited against the then unpaid principal balance hereof or, if the Obligations have been or would be paid in full by such credit, refunded to Borrowers, and (iv) the provisions of this Agreement and the other documents or instruments executed in connection herewith, and any communication to Borrowers, shall immediately be deemed reformed and such excess interest reduced, without the necessity of executing any other document, to the maximum lawful rate allowed under applicable laws as now or hereafter construed by courts having jurisdiction hereof or thereof. Without limiting the foregoing, all calculations of the rate of interest contracted for, charged, taken, collected, reserved, or received in connection herewith which are made for the purpose of determining whether such rate exceeds the maximum lawful rate shall be made to the extent permitted by applicable laws by amortizing, prorating, allocating and spreading during the period of the full term of the Obligations, including all prior and subsequent renewals and extensions, all interest at any time contracted for, charged, taken, collected, reserved or received. The terms of this paragraph shall be deemed to be incorporated in every Loan Document and communication relating to the Obligations.

(v)    **Default Rate**. Upon the occurrence of, and during the continuance of, an Event of Default, Borrowers, as additional compensation to Lender for its increased credit risk, promises to pay interest on all Obligations (including, without limitation, principal, whether or not past due, past due interest and any other amounts past due under this Agreement) at a per annum rate equal to the sum of the rate of interest then specified in this **Section 3(a)** plus the Default Rate Margin (the "**Default Rate**").

(b)    <u>Interest Payments</u>. Interest shall be payable in lawful money of the United States of America to Lender, or as Lender shall direct, without set-off, deduction or counterclaim monthly, in arrears, on the first Business Day of each month, commencing on the first Business Day of the month next succeeding the date hereof.

(c)    <u>Fees and Charges</u>.

(i)    **Appraisals**. To the extent funds are available within the DIP Budget to satisfy such costs and expenses, Borrowers hereby agree to pay Lender, on demand, Lender's reasonable fees, costs and expenses (including any reasonable fees, costs and expenses incurred by any appraiser) in connection with any appraisals of all or any part of the DIP Collateral conducted at the request of Lender; provided, however, that absent an Event of Default, the Borrowers will not have to reimburse Lender for such fees, costs and expenses for more than one (1) appraisal per DIP Collateral category (i.e., separate appraisals may be obtained for inventory and equipment) in any twelve (12) month period (in addition, Borrowers shall be obligated to reimburse Lender for all fees, costs and expenses related to appraisals obtained prior to the date hereof).

(ii)    **Late Fee.** If any amount due under this Agreement is not received by Lender within five (5) Business Days of the date such amount is due, Borrowers shall pay to Lender a late

11

fee of five percent (5%) of such amount not paid, such late fee to be immediately due and payable by Borrowers without demand by Lender.

(d)      **Expenses.**  In accordance with the Fee Deferment Provision (as defined in the Interim Order) pursuant to Section I(4) of the Interim Order, Lenders are entitled to accrue, as amounts due and owing pursuant to this Credit Agreement, any and all reasonable counsel fees and other expenses incurred by Lender in connection with the preparation, interpretation, enforcement, administration or amendment of this Agreement, or of any documents relating thereto, and any and all expenses, including, but not limited to, a collection charge on all accounts collected, and all other expenses of like or unlike nature which may be expended by Lender to obtain or enforce payment of any account either as against the account debtor, a Borrower, or any guarantor or surety of a Borrower or in the prosecution or defense of any action or concerning any matter growing out of or connected with the subject matter of this Agreement, the Obligations or the DIP Collateral or any of Lender's rights or interests therein or thereto, including, without limiting the generality of the foregoing, any counsel fees or expenses incurred in any bankruptcy or insolvency proceedings and all costs and expenses (including search fees) incurred or paid by Lender in connection with the administration, supervision, protection or realization on any security held by Lender for the debt secured hereby, whether such security was granted by a Debtor or by any other Person primarily or secondarily liable (with or without recourse) with respect to such debt, and all costs and expenses incurred by Lender in connection with the defense, settlement or satisfaction of any action, claim or demand asserted against Lender in connection therewith, which amounts shall be considered advances to protect Lender's security, and shall be secured hereby.

**NOTWITHSTANDING ANYTHING TO THE CONTRARY PROVIDED FOR HEREIN OR IN ANY OTHER LOAN DOCUMENTS, ALL OBLIGATIONS ARISING HEREUNDER OR IN CONNECTION HEREWITH CONSISTING OF (1) INTEREST ON THE TERM LOANS MADE HEREUNDER, (2) COLLECTION DAYS PROVIDED FOR IN SECTION 5(b) HEREOF, (3) ANY EXPENSE REIMBURSEMENT OR INDEMNITY OBLIGATION FOR OR WITH RESPECT TO MATTERS NOT ADDRESSED IN THE DIP BUDGET, SHALL, INSTEAD OF BEING DUE AND PAYABLE ON THE DATE OTHERWISE PROVIDED FOR HEREUNDER AND/OR UNDER ANY APPLICABLE DOCUMENT, BE DEFERRED TO AND INSTEAD BE DUE AND PAYABLE ON THE EARLIEST OF (x) THE MATURITY DATE, (y) ANY PAYMENT IN FULL OF THE POST-PETITION OBLIGATIONS, OR (z) ANY ACCELERATION OF THE POST-PETITION OBLIGATIONS IN ACCORDANCE WITH THE PROVISIONS OF SECTION 10 HEREOF.**

(e)      **Indemnification**. Except to the extent solely caused by Lender's gross negligence or willful misconduct, as finally determined by a court of competent jurisdiction, each Debtor will indemnify and save Lender harmless from all loss, costs, damage, liability or expenses (including, without limitation, court costs and reasonable attorneys' fees) that Lender may sustain or incur by reason of defending or protecting this security interest or the priority thereof or enforcing the Obligations, or in the prosecution or defense of any action or proceeding concerning any matter growing out of or in connection with this Agreement and/or any other documents now or hereafter executed in connection with this Agreement and/or the Obligations and/or the DIP Collateral.  This indemnity shall survive the repayment of the Obligations and the termination of Lender's agreement to make loans available to Borrowers and the termination of this Agreement.

(f)      **Taxes**. At the option of Lender, each Borrower will furnish to Lender, from time to time, within five (5) days after the accrual in accordance with applicable law of any Borrower's obligation to make deposits for F.I.C.A. and withholding taxes and/or sales taxes, proof satisfactory to Lender that such deposits or payments have been made as required.  Should a Borrower fail to make any of such deposits or furnish such proof then Lender may, in its sole and absolute discretion, (i) make any of such deposits or

12

any part thereof, (ii) pay such taxes, or any part thereof, or (iii) set-up such reserves as Lender, in its judgment, shall deem necessary to satisfy the liability for such taxes. Each amount so deposited or paid shall constitute an advance under the terms hereof, repayable on demand with interest, as provided herein, and secured by all DIP Collateral and any other property at any time pledged by a Borrower with Lender. Nothing herein shall be deemed to obligate Lender to make any such deposit or payment or set-up such reserve and the making of one or more of such deposits or payments or the setting-up of such reserve shall not constitute (i) an agreement on Lender's part to take any further or similar action, or (ii) a waiver of any default by any Borrower under the terms hereof.

4.    **SECURITY.**

(a)    **Security Interest**.  Subject to the terms and conditions of the Interim Order and the Final Order, to secure the full payment and performance of all of the Obligations, each Debtor, for valuable consideration, receipt whereof is hereby acknowledged, hereby grants to Lender a continuing security interest in and to, and assigns to Lender, all assets of such Debtor, wherever located and whether now owned or hereafter owned, existing, acquired or arising, whether tangible or intangible, wherever now or hereafter located, and whether or not eligible or qualified for lending purposes, including, without limitation, the following: all Pre-Petition Collateral, all accounts, chattel paper, RTO Contracts, documents, software, general intangibles (including without limitation all patents, patent applications, trademarks, trademark applications, trade names, trade secrets, goodwill, copyrights, copyright applications, registrations, licenses, software, franchises, customer lists, tax refund claims (including, without limitation, ERC tax refunds), claims against carriers and shippers, all causes of action, whether pursuant to federal or applicable state law, and the proceeds thereof and property received thereby whether by judgment, settlement, or otherwise, and upon entry of the Final Order, all Avoidance Actions of the Debtors or their Estates; all property and assets of such Debtor and its Estate included in the definition of "DIP Collateral" in the Interim Order, or, after the entry of the Final Order, in the Final Order, guarantee claims, contracts rights, payment intangibles, all security interests, security deposits and rights to indemnification), intellectual property, payment intangibles, instruments, deposit accounts, bank accounts, deposits, money, letters of credit and letter of credit rights, supporting obligations, commercial tort claims, investment property (including, without limitation, any equity interests in its subsidiaries and all economic rights, all control rights, authority and powers and all equity interests in the Boulders Property owned by Ian MacDonald (whether directly or indirectly), inventory, equipment, farm products, health-care-insurance receivables, vehicles, fixtures, books and records, and other goods (as those terms are defined in the Code), any other property of such Debtor now or hereafter in the possession, custody or control of Lender or any agent or any parent, Affiliate or Subsidiary of Lender or any Participant with Lender in the Loans, for any purpose (whether for safekeeping, deposit, collection, custody, pledge, transmission or otherwise), without limitation of any of the foregoing, all of the Pre-Petition Collateral in which any Debtor or its Estate has any right, title, or interest, and all additions, accessions, replacements, substitutions, proceeds and products of all of the foregoing in any form, including, without limitation, all proceeds of credit, fire or other insurance, and also including, without limitation, rents and profits resulting from the temporary use of any of the foregoing (hereinafter called the "**DIP Collateral**").  In addition, (i) all real property, leaseholds, rents and profits, and proceeds thereof, including without limitation Subject RTO Real Property and the Real Property DIP Collateral shall be deemed to be included as part of the DIP Collateral, and (ii) all security interests granted pursuant to the Participation Agreement and the PEC Pledge Agreement shall be deemed to be included as part of shall be deemed to be included as part of the DIP Collateral.

It is the intention of the parties that if Lender shall fail to have a perfected Lien in any particular property or assets of any Debtor for any reason whatsoever, but the provisions of this Agreement and/or of the other Loan Documents, or of the Interim Order and/or the Final Order, together with all financing statements and other public filings relating to Liens filed or recorded by Lender against Debtors, would be sufficient to

13

create a perfected Lien in any property or assets that such Debtor may receive upon the sale, lease, license, exchange, transfer or disposition of such particular property or assets, then all such "proceeds" of such particular property or assets shall be included in the DIP Collateral as original Collateral that is the subject of a direct and original grant of a security interest as provided for herein and in the Loan Documents, and/or in the Interim Order and/or Final Order (and not merely as proceeds (as defined in Article 9 of the Code) in which a security interest is created or arises solely pursuant to Section 9-315 of the Code).

(b)    **Government Contracts**.  If any of a Debtor's accounts arise out of contracts with the United States or any department, agency, or instrumentality thereof, such Debtor will promptly notify Lender thereof in writing and execute any instruments and take any steps reasonably required by Lender in order that all monies due and to become due under such contracts shall be assigned to and enforceable by Lender and notice thereof given to and an acknowledgment given by the applicable contracting officer in accordance with the Federal Assignment of Claims Act.

(c)    **Instruments**.  If any of a Debtor's accounts should be evidenced by promissory notes, trade acceptances, or other instruments for the payment of money, such Debtor will promptly deliver same to Lender, appropriately endorsed to Lender's order and, regardless of the form of such endorsement, such Debtor hereby waives presentment, demand, notice of dishonor, protest and notice of protest and all other notices with respect thereto.

(d)    **Possessory Collateral**.  If any Debtor receives any DIP Collateral and any investment property (as defined in the Code) consisting of certificated securities, such Debtor shall deliver the original thereof to Lender together with an appropriate endorsement or other specific evidence of assignment thereof to Lender (in form and substance reasonably acceptable to Lender).  If an endorsement or assignment of any such items shall not be made for any reason, Lender is hereby irrevocably authorized, as attorney and agent-in-fact (coupled with an interest) for the Debtor, to endorse or assign the same on the Debtor's behalf.

(e)    **Bailee**.  If any goods are at any time in the possession of a bailee, Debtors shall promptly notify Lender thereof and, if requested by Lender, shall promptly obtain an acknowledgment from the bailee, in form and substance satisfactory to Lender, that the bailee holds such DIP Collateral for the benefit of the Debtors and Lender and shall act upon the instructions of Lender, without the further consent of any Debtor.  Lender agrees with Debtors that Lender shall not give any such instructions unless an Event of Default has occurred and is continuing or would occur after taking into account any action by a Debtor with respect to the bailee.

(f)    **Letters of Credit**.  If any Debtor is at any time a beneficiary under a letter of credit now or hereafter issued in favor of such Debtor, such Debtor shall promptly notify Lender thereof and, at the request and option of Lender, such Debtor  shall, pursuant to an agreement in form and substance reasonably satisfactory to Lender, either (i) arrange for the issuer and any confirmer of such letter of credit to consent to an assignment to Lender of the proceeds of any drawing under the letter of credit, or (ii) arrange for Lender to become the transferee beneficiary of the letter of credit, with Lender agreeing, in each case, that the proceeds of any drawing under the letter of credit are to be applied in the same manner as any other payment on an account.

(g)    **Commercial Tort Claims**.  If any Debtor  shall at any time hold or acquire a commercial tort claim, such Borrower shall promptly notify Lender in a writing signed by such Debtor of the brief details thereof and grant to Lender in such writing a security interest therein, and in the proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance reasonably satisfactory to Lender.

14

(h)    **Financing Statements**. Each Debtor hereby irrevocably authorizes Lender at any time and from time to time to file in any Uniform Commercial Code jurisdiction any initial financing statements and amendments thereto that (a) indicate the DIP Collateral (i) as all assets of such Debtor or words of similar effect, regardless of whether any particular asset comprised in the DIP Collateral falls within the scope of Article 9 of the Uniform Commercial Code of such jurisdiction, or (ii) as being of an equal or lesser scope or with greater detail, and (b) contain any other information required by the Uniform Commercial Code for the sufficiency or filing office acceptance of any financing statement or amendment, including (i) whether such Debtor is an organization, the type of organization and any organization identification number issued to such Debtor, and (ii) in the case of a financing statement filed as a fixture filing or indicating DIP Collateral as as-extracted DIP Collateral or timber to be cut, a sufficient description of real property to which the DIP Collateral relates.  Each Debtor agrees to furnish any such information to Lender promptly upon request.  Each Debtor also ratifies its authorization for Lender to have filed in any Uniform Commercial Code jurisdiction any like initial financing statements or amendments thereto if filed prior to the date hereof.

(i)    **Access**. Each Debtor hereby grants to Lender for a term to commence on the date of this Agreement and continuing thereafter until all debts and Obligations (other than inchoate indemnification or reimbursement obligations or other obligations which, by their terms, survive termination of this Agreement) of any kind or character owing from Borrowers to Lender are fully paid and discharged, the right to use all premises or places of business which any Debtor presently has or may hereafter have and where any of the DIP Collateral may be located, at a total rental for the entire period of $1.00.  Unless and until an Event of Default has occurred and Lender determines to exercise its rights against the DIP Collateral, and subject to the terms and provisions of the Interim Order (or the Final Order, when entered) Lender agrees not to exercise the rights granted in this **Section 4(i)**.

(j)    **License**. Each Debtor hereby grants to Lender for a term to commence on the date of this Agreement and continuing thereafter until all debts and Obligations (other than inchoate indemnification or reimbursement obligations or other obligations which, by their terms, survive termination of this Agreement) of any kind or character owed to Lender are fully paid and discharged, a non-exclusive irrevocable royalty-free license in connection with Lender's exercise of its rights hereunder, to use, apply or affix any trademark, trade name logo or the like and to use any patents, in which a Debtor now or hereafter has rights, which license may be used by Lender upon and after the occurrence of any one or more of the Events of Default, provided, however, that such use by Lender shall be suspended if such Events of Default are waived.  This license shall be in addition to, and not in lieu of, the inclusion of all Debtors' trademarks, servicemarks, tradenames, logos, goodwill, patents, franchises and licenses in the DIP Collateral; in addition to the right to use said DIP Collateral as provided in this paragraph, Lender shall have full right to exercise any and all of its other rights regarding DIP Collateral with respect to such trademarks, servicemarks, tradenames, logos, goodwill, patents, franchises and licenses.

(k)    **Security Interest in the DIP Collateral**.  Subject to the terms and conditions of the Interim Order and the Final Order, to secure the prompt payment and performance to the Post-Petition Lender of the Post-Petition Obligations of whatever kind, nature or description, absolute or contingent, now existing or hereafter arising, Lender shall have and is hereby granted by each Debtor, effective as of the Applicable Petition Date, valid and perfected first priority (subject to the Senior Liens and the Carve-Out), security interests and liens in and upon all pre- and post- petition property of each Debtor, whether existing on the Applicable Petition Date or thereafter acquired including a continuing security interest in and to and Lien on all of its DIP Collateral, whether now owned or existing or hereafter created, acquired or arising and wheresoever located.  Each Debtor shall mark its books and records as may be necessary or appropriate to evidence, protect and perfect Lender's security interest and shall cause its financial statements to reflect such security interest.  Without limiting the generality of the foregoing, as adequate protection and as

15

consideration to Pre-Petition Lender for its agreement to the terms hereof and as replacement Collateral for the Pre-Petition Collateral used, consumed or sold by the Debtors in the Case, the DIP Collateral shall secure the Pre-Petition Obligations to the extent of the diminution in value of the Pre-Petition Collateral.

(l)     **ERC Funds**.  As security for the Obligations and as adequate protection, immediately upon the entry of the Interim Order, the Obligations (in an amount equal to funds advanced or deemed advanced under the Interim Order) and those Adequate Protection Obligations incurred by Lender exclusively during the period between the entry of the Interim Order and Final Order, are secured by the "ERC Funds" meaning the sum of (i) the initial ERC Funds on hand, estimated at $202,931.58, which amount is net of the portion of the ERC Funds used to pay Debtors professionals a $175,000 retainer before the Buddy Mac Entities, including BMH HR, file chapter 11, plus (ii) the additional ERC Funds received by BMH HR immediately prior to or after the Third Petition Date, in the amount (less commission) of $2,878,514.82. Immediately upon the entry of the Interim Order, Lender shall apply the initial ERC Funds in BMH HR to the Pre-Petition Obligations in accordance with the Settlement Agreement, and BMH HR shall transfer to Lender the remaining ERC Funds, which shall be held by Lender in a segregated, suspense account (the "**Suspense Account**") pending entry of the Final Order. Until entry of the Final Order, the ERC Funds are to be held in the Suspense Account and may not be applied, hypothecated, or charged against by Lender except as specifically and expressly authorized under the Interim Order or by further order of the Bankruptcy Court upon notice to the Debtors and Ian MacDonald.  The Suspense Account, in addition to being segregated for the specific purpose of holding the ERC Funds and identified to the Debtors and Ian MacDonald specifically, shall be established by Lender with Wells Fargo Bank, N.A.  Lender may, only upon the entry of the Final Order, apply the ERC Funds to the Pre-Petition Obligations or DIP Obligations in its sole and absolute discretion (in an amount equal to funds advanced or deemed advanced hereunder and under the Interim Order). At all times after entry of the Interim Order, the ERC Funds shall secure the DIP Obligations, but only to the extent of funds actually advanced, and the Adequate Protection Obligations, but only as to any diminution occurring during the period covered by the Interim Order.

**5.     COLLECTIONS; SET OFF; DEPOSIT ACCOUNTS; NOTICE OF ASSIGNMENT; POWER OF ATTORNEY; LENDER REPORTS.**

(a)     **Collections**.  Borrowers will immediately, upon receipt of all checks, drafts, cash and other remittances in payment of any inventory sold or in payment or on account of Borrowers' accounts, contracts, contract rights, notes, bills, drafts, acceptances, general intangibles, choses in action and all other forms of obligations, deposit to the Collection Account accompanied by a remittance report in form reasonably specified by Lender.  Borrowers may deliver said proceeds to Lender in the same form received except for the endorsement of a Borrower where necessary to permit collection of items, which endorsement Borrowers agree to make.

(b)     **Application and Collection Days**.

(i)     Lender will credit (conditional upon final collection and receipt of the remittance report and identification by the Debtors of such collections) all payments against the Obligations; provided, however, for the purpose of computing interest, any items or payments received by Lender shall not be considered to have been credited against any loans secured hereby until three (3) Business Days after receipt by Lender of any such items.  The order and method of such application to the Obligations shall be in the sole discretion of Lender and any portion of such funds which Lender elects not to so apply shall be paid over from time to time by Lender to Borrowers.

(ii)     All repayments received by Lender hereunder shall be applied to either the Pre-Petition Revolver Obligations or the Post-Petition Obligations as Lender may determine in its sole

16

and absolute discretion, so long as such application is in accordance with the authorizations set forth in the Interim Order and (once entered) the Final Order; provided that, amounts charged to the Borrowers' Account by Lender in connection with the coming due of any specific Obligations as provided for in **Section 3(b)** shall be applied by Lender to the payment of such particular Obligation. Following the occurrence and during the continuance of any Event of Default, all repayments received by Lender hereunder shall be applied to either the Pre-Petition Revolver Obligations or the Post-Petition Obligations as Lender may determine in its sole and absolute discretion, so long as such application is in accordance with the authorizations set forth in the Interim Order and (once entered) the Final Order, until the Post-Petition Obligations and the Pre-Petition Revolver Obligations are paid in full and thereafter to such Person as may be legally entitled thereto, provided that, unless Lender shall at any time elect otherwise in its sole and absolute discretion, repayments applied to the Post-Petition Obligations shall be applied, first, to pay the interest and/or principal of all protective advances made pursuant to **Section 1(a)** and/or any other Post-Petition Obligations then owing to Lender and due and payable, all until paid in full, second, to pay the interest and/or principal of all Term Loans and/or any other Obligations then owing to Lender and due and payable, all until paid in full, and, thereafter, to such Person as may be legally entitled thereto.

(iii)     For purposes of **Section 5(b)(ii)** and without limiting the otherwise generally applicable provisions of **Section 13(j)**, "paid in full" of a type of Obligation means indefeasible payment in cash or immediately available funds of all amounts owing on account of such type of Obligation, including interest accrued after the commencement (or any conversion to Chapter 7) of the Case, default interest, interest on interest, and expense reimbursements, irrespective of whether any of the foregoing would be or is allowed or disallowed in whole or in part in any insolvency proceeding.

(c)     **Set Off**. Each Borrower hereby grants to Lender a lien, security interest and right of setoff as security for all liabilities and Obligations to Lender, whether now existing or hereafter arising, upon and against all deposits, credits, collateral and property, now or hereafter in the possession, custody, safekeeping or control of Lender. At any time, with reasonable prior written notice (which such prior notice, subject to the terms and provisions of the Interim Order (or the Final Order, when entered), is not required to the extent an Event of Default shall have occurred and be continuing), Lender may set off the same or any part thereof and apply the same to any liability or Obligation of a Borrower and any guarantor regardless of the adequacy of any other collateral securing the Obligations. ANY AND ALL RIGHTS TO REQUIRE LENDER TO EXERCISE ITS RIGHTS OR REMEDIES WITH RESPECT TO ANY OTHER DIP COLLATERAL WHICH SECURES THE OBLIGATIONS, PRIOR TO EXERCISING ITS RIGHT OF SETOFF WITH RESPECT TO SUCH DEPOSITS, CREDITS OR OTHER PROPERTY OF A BORROWER OR ANY GUARANTOR, ARE HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVED.

(d)     **Deposit Accounts**. Each Debtor shall maintain all of its bank accounts, including without limitation, its operating and depository accounts, as described on **Schedule B** (the "**Bank Schedule**") during the Term. Upon fulfillment of the applicable conditions set forth in this Agreement and Lender's determination to make a loan to Borrowers, Lender shall disburse the proceeds of the requested loan by crediting the same to an operating account of a Borrower designated by the Borrowers to receive proceeds of loan advances on the Bank Schedule (the "**Designated Account**"). Each Borrower hereby agrees to maintain the accounts as set forth on the Bank Schedule except for changes consented to in advance by Lender, which any such consent by Lender may be conditioned, among other things, upon receipt of an updated Bank Schedule. Upon the request of Lender, each Borrower shall, and shall cause the respective bank to, enter into and thereafter maintain a control or blocked account agreement with respect to the

17

accounts of such Borrower set forth on the Bank Schedule, such agreement to be in form and substance satisfactory to Lender; provided, that, the provisions of this **Section 5(d)** shall not apply to deposit accounts specially and exclusively used for payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of Borrowers' salaried employees (so long as each such account does not contain amounts in excess of amounts necessary to pay such payroll and related expenses).

(e)     **Account Verification**.  Lender may in its own name or in the name of others communicate with account debtors in order to verify with them to Lender's reasonable satisfaction the existence, amount and terms of any accounts.  Upon request by Lender, Debtors shall provide Lender with a full and complete list of account debtors including contact information with respect to each account debtor and a copy of each RTO Contract.

(f)     **Notice of Assignment**.  Upon request of Lender at any time during the continuance of an Event of Default and subject to the terms and provisions of the Interim Order (or the Final Order, when entered), each Debtor will so notify such account debtors and will indicate on all billings to such account debtors that their accounts must be paid to Lender.  Lender shall have full power to collect, compromise, endorse, sell or otherwise deal with the DIP Collateral or proceeds thereof in its own name or in the name of a Debtor.

(g)     **Power of Attorney**.  Without any further order of the Bankruptcy Court (but subject to the Interim Order (or the Final Order, when entered)),each Debtor hereby grants to Lender an irrevocable power of attorney, coupled with an interest, authorizing and permitting Lender (acting through any of its officers, employees, attorneys or agents), at Lender's option, but without obligation, with or without notice to any Debtor, and at Debtor's expense, to do any or all of the following, in Debtor's name or otherwise:

(i)     execute on behalf of any Debtor any documents that Lender may, in its sole discretion, deem advisable in order to perfect, protect and maintain Lender's security interests, and priority thereof, in the DIP Collateral (including such financing statements and continuation financing statements, and amendments or other modifications thereto, as Lender shall deem necessary or appropriate); and

(ii)     after the occurrence and during the continuance of an Event of Default following entry of the Interim Order; (I) to endorse the name of such Debtor or any of such Debtor's officers or agents upon any notes, checks, drafts, money orders, or other instruments of payment or remittances (including payments payable under any policy of insurance on the DIP Collateral) or DIP Collateral that may come into possession of Lender in full or part payment of any amounts owing to Lender; (II) to sign and endorse the name of such Debtor or any of such Debtor's officers or agents upon any invoice, freight or express bill, bill of lading, storage or warehouse receipts, drafts against Debtors, assignments, verifications and notices (provided that collection notifications shall be subject to **Section 5(f)**) in connection with accounts, and any instrument or documents relating thereto or to such Debtor's rights therein, (III) receive and otherwise take control in any manner of any cash or non-cash items of payment or proceeds of DIP Collateral; (IV) endorse or assign to Lender on Debtor's behalf any portion of DIP Collateral evidenced by an agreement, Instrument or document if an endorsement or assignment of any such items is not made by such Debtor pursuant to **Section 5(a)**; (V) notify account debtors that DIP Collateral has been assigned to Lender and that payments shall be made directly to Lender, (VI) to give written notice to such office and officials of the United States Post Office to effect such change or changes of address so that all mail addressed to such Debtor may be delivered directly to Lender, (VII) instruct any third party having custody or control of any DIP Collateral or books or records belonging to, or relating to, any Debtor to give Lender the same rights of access and other rights with respect thereto as

18

Lender has under this Agreement or any other Loan Document; (VIII) execute on behalf of any Debtor any document exercising, transferring or assigning any option to purchase, sell or otherwise dispose of or lease (as lessor or lessee) any real or personal property which is part of the DIP Collateral or in which Lender has an interest; (IX) execute on behalf of any Debtor any invoices relating to any accounts, any draft against any account debtor, any proof of claim in bankruptcy, any notice of Lien or claim, and any assignment or satisfaction of mechanic's, materialman's or other Lien; (X) execute on behalf of any Debtor any notice to any account debtor; (XI) pay, contest or settle any Lien, charge, encumbrance, security interest and adverse claim in or to any of the DIP Collateral, or any judgment based thereon, or otherwise take any action to terminate or discharge the same; (XII) grant extensions of time to pay, compromise claims relating to, and settle accounts, chattel paper and general intangibles for less than face value and execute all releases and other documents in connection therewith; (XIII) settle and adjust, and give releases of, any insurance claim that relates to any of the DIP Collateral and obtain payment therefor; and (XIV) vote any right or interest with respect to any investment property.

This power of attorney shall be irrevocable as long as a Debtor may be indebted to Lender and does hereby grant upon such Debtor's said attorney full power to do any and all things necessary to be done in and about the premises as fully and effectually as such Debtor might or could do, and hereby ratifying all that said attorney shall lawfully do or cause to be done by virtue hereof. Neither Lender nor the attorney shall be liable for any acts or omissions nor for any error of judgment or mistake, except for their gross negligence or willful misconduct.

(h)      **Viewing Rights**.  Lender shall be provided and thereafter have viewing rights with respect to any bank account maintained by any Debtor.

(i)      **Lender Reports**. After the end of each month, Lender will render to Borrowers a statement of Borrowers' loan account with Lender hereunder, showing all applicable credits and debits, which Lender may distribute by electronic mail, or other electronic means.  Each statement shall be considered correct and to have been accepted by Borrowers and shall be conclusively binding upon Borrowers in respect of all charges, debits and credits of whatsoever nature contained therein under or pursuant to this Agreement, and the closing balance shown therein, unless a Borrower notifies Lender in writing of any discrepancy within twenty (20) days from the delivery by Lender to Borrowers of any such monthly statement.

## 6.      REPRESENTATIONS AND WARRANTIES.

Any request for a loan hereunder will be deemed a representation by the Debtors that all representations and warranties in this **Section 6** are true, correct and complete in all material respects as of the time of the request, unless they relate exclusively to an earlier date in which case they shall be true and correct in all material respects as of such earlier date, and unless they are qualified by materiality in which case they shall be true and correct in all respects.  Each Debtor represents and warrants that:

(a)      **Places of Business; Principal Executive Office; Inventory Locations.**

(i)      Such Debtor has no places of business other than the places of business listed on **Schedule A**, as such **Schedule A** may be updated in accordance with this **Section 6(a)**;

(ii)      Such Debtor's principal executive office and the office where such Debtor keeps its records concerning its accounts, contract rights and other property, is that shown on **Schedule A**;

19

    **(iii)**  All inventory presently owned by a Debtor is stored at the locations set forth on **Schedule A**, as updated in accordance with this **Section 6**; and

    **(iv)**  Each Debtor will notify Lender promptly, and in no event later than thirty (30) days after any such change, in writing, and provide an updated **Schedule A** reflecting the same, of any change in the location of any place of business or the location at which inventory or equipment is stored or the establishment of any new place of business or location at which inventory or equipment is stored or office where its records are kept which would be shown in this Agreement if it were executed after such change.

    **(b)**  **Existence; Qualification**. Each Debtor is a corporation, partnership or limited liability company, as applicable, duly organized or formed, validly existing and in good standing under the laws of their respective States of organization or formation, as applicable as reflected in the preamble of this Agreement and shall hereafter remain in good standing as a corporation or limited liability company, as applicable, in such jurisdiction. Each Debtor is duly qualified and in good standing in every other state in which it is doing business, and shall hereafter remain duly qualified and in good standing in every other state in which the failure to qualify or become licensed could have a material adverse effect on the financial condition, business or operations of a Debtor or the value of any DIP Collateral. The Certificate of Formation/Articles of Incorporation and all amendments thereto of each Debtor have been duly filed and are in proper order.

    **(c)**  **Name; Organizational Identification Number**. Each Debtor's exact legal name is as set forth in this Agreement. The organizational identification number of each Debtor is as set forth on **Schedule A** annexed hereto.

    **(d)**  **Authority; Conflict**. The execution, delivery and performance of this Agreement, and any other document executed in connection herewith, are, subject to the entry of the Interim Order (or the Final Order, when entered) and subject to any restrictions arising on account of the Debtors' status as "debtors" under the Bankruptcy Code, within each Debtor's corporate or company powers, have been duly authorized, are not in contravention of law or the terms of such Debtor's charter, by-laws, operating agreement, or other incorporation or company papers, or of any indenture, agreement or undertaking to which a Debtor is a party or by which it or any of its properties may be bound. Subject to the entry of the Interim Order (or the Final Order, when entered), this Agreement constitutes, and each of the other Loan Documents upon execution and delivery will constitute, the legal, valid and binding obligation of the Borrowers, enforceable against it in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally, by general equitable principles or by principles of good faith and fair dealing (regardless of whether enforcement is sought in equity or at law).

    **(e)**  **Capitalization**. All capital stock, membership interests or other equity interests issued by each Debtor and outstanding were and are properly issued and all books and records of the applicable Debtor, including but not limited to its minute books, by-laws, operating agreements and books of account, are accurate and up to date and will be so maintained.

    **(f)**  **Title; Liens**. Each Debtor owns all of the assets reflected in the most recent of such Debtor's financial statements provided to Lender, except assets sold or otherwise disposed of in the ordinary course of business since the date thereof, and such assets together with any assets acquired since such date, including without limitation the DIP Collateral, are free and clear of any lien, pledge, security interest, charge, adverse right or claim or trust (statutory or otherwise), mortgage or encumbrance of any nature whatsoever, except for Permitted Liens. The Real Property owned by each Debtor and each subsidiary

20

thereof is as set forth on **Schedule A** annexed hereto.  Each Debtor's leases of personal property are as set forth on **Schedule C** annexed hereto.  Each Debtor is in full compliance with all of the terms of each of its respective capital, operating and real property leases, except where the failure to so comply could not reasonably be expected to have a material adverse effect.

**(g)**     **Taxes**. Each Debtor has made or filed all tax returns, reports and declarations relating to any material tax liability required by any jurisdiction to which it is subject (any tax liability which may result in a Lien on any DIP Collateral being hereby deemed material);, subject to any prohibition under the Bankruptcy Code with respect to pre-petition claims, but otherwise in accordance with applicable law and if, as, and to the extent contemplated and provided for and permitted in the DIP Budget (subject to Permitted Variances, has paid all taxes shown or determined to be due thereon except those being contested in good faith and which a Debtor has, prior to the date of such contest, identified in writing to Lender as being contested; and has made adequate provision for the payment of all taxes so contested, so that no Lien resulting from unpaid Taxes will encumber any DIP Collateral.

**(h)**     **Compliance**.  Each Debtor (i) is subject to no charter, corporate or other legal restriction, or any judgment, award, decree, order, governmental rule or regulation or contractual restriction which would reasonably be expected to have a material adverse effect on its financial condition, business or operations, and (ii) is in compliance with its charter documents, by-laws or operating agreement, all material contractual requirements by which it or any of its properties may be bound and all applicable laws, rules and regulations (including without limitation those relating to environmental protection) other than laws, rules or regulations the validity or applicability of which it is contesting in good faith or provisions of any of the foregoing the failure to comply with which cannot reasonably be expected to materially adversely affect its financial condition, business or operations or the value of any DIP Collateral.

**(i)**     **Litigation**.  Except for the Case, there is no action, suit, proceeding, or to any Debtor's knowledge, investigation pending or, threatened against or affecting it or any of its assets before or by any court or other governmental authority which, if determined adversely to it, would have a material adverse effect on its financial condition, business or operations or the value of any DIP Collateral.

**(j)**     **ERISA**.  Each Debtor is in compliance with ERISA in all material respects; no Reportable Event has occurred and is continuing with respect to any Plan; and no Debtor has an unfunded vested liability under any Plan.  The word "**Plan**" as used in this Agreement means "employee benefit plan" (as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974 ("**ERISA**")) as to which any Debtor or any ERISA Affiliate (a) is (currently or hereafter), or at any time during the immediately preceding six (6) years has, sponsored, maintained or contributed to on behalf of any of its employees or (b) has (currently or hereafter), or has had at any time within the preceding six (6) years, any liability (contingent or otherwise).

**(k)**     **OFAC;  Sanctions;  Anti-Corruption  Laws;  Anti-Money  Laundering  Laws;  Anti-Terrorism Laws**.

**(i)**     No Debtor nor any of its Subsidiaries is in violation of any Sanctions.  No Debtor nor any of its Subsidiaries nor, to the knowledge of such Debtor, any director, officer, employee, agent or Affiliate of such Debtor or such Subsidiary (a) is a Sanctioned Person or a Sanctioned Entity, (b) has any assets located in Sanctioned Entities, or (c) derives revenues from investments in, or transactions with Sanctioned Persons or Sanctioned Entities.  Each of the Debtors and its Subsidiaries has implemented and maintains in effect policies and procedures reasonably designed to ensure compliance with Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws. Each of the Debtors and its Subsidiaries, and to the knowledge of each such Debtor, each director,

officer, employee, agent and Affiliate of each such Debtor and each such Subsidiary, is in compliance with all Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws.  No proceeds of any loan made hereunder will be used to fund any operations in, finance any investments or activities in, or make any payments to, a Sanctioned Person or a Sanctioned Entity, or otherwise used in any manner that would result in a violation of any Sanction, Anti-Corruption Law or Anti-Money Laundering Law by any Person (including Lender or other individual or entity participating in any transaction).

   **(ii)** To the extent applicable, each Debtor and each of its Subsidiaries are in compliance with applicable Anti-Terrorism Laws.

   **(l)**  **Debt**.  Except for the Debt to Lender to be outstanding following the date hereof, the Debt of the Debtors that will be outstanding immediately following the Applicable Petition Date has been disclosed in writing to Lender and shall be further disclosed in writing from time to time thereafter.

   **(m)**  **Intellectual Property**.  For purposes of this Agreement, "**Intellectual Property Rights**" **means** all actual or prospective rights and goodwill associated therewith arising in connection with any intellectual property or other proprietary rights, including all rights arising in connection with copyrights, patents, industrial designs, service marks, trade dress, trade secrets, trademarks, trade names or mask works.

   **(i)** Set forth on **Schedule F** annexed hereto is a complete list of all patents, industrial designs, applications for patents, trademarks, applications to register trademarks, service marks, applications to register service marks, mask works, trade dress and copyrights for which each Debtor is the owner of record (the "**Owned Intellectual Property**").

   **(ii)** Except as set forth on **Schedule F** annexed hereto and other than (in the case of each of the following) as a result of the Case and subject to any necessary order or authorization of the Bankruptcy Court, (A) the Debtors own the Owned Intellectual Property free and clear of all restrictions (including covenants not to sue any Person), court orders, injunctions, decrees, writs or Liens (other than Permitted Liens), whether by agreement memorialized in a record authenticated by a Borrower or otherwise, (B) no Person other than the Debtors owns or has been granted any right in the Owned Intellectual Property (other than rights that have been subordinated or disclosed to Lender in writing, in each case, on terms acceptable to Lender in its reasonable discretion), (C) all Owned Intellectual Property is valid, subsisting and enforceable, and (D) the Debtors have taken all commercially reasonable action necessary to maintain and protect the Owned Intellectual Property.

   **(iii)** Set forth on **Schedule F** annexed hereto is a complete list of all agreements under which a Debtor has licensed Intellectual Property Rights from another Person ("**Licensed Intellectual Property**") other than readily available, non-negotiated licenses of computer software and other intellectual property used solely for performing accounting, word processing and similar administrative tasks ("**Off-the-shelf Software**") and a summary of any ongoing payments any Debtor is obligated to make with respect thereto.  Except as set forth on **Schedule F** annexed hereto, other than (in the case of each of the following) as a result of the Case and subject to any necessary order or authorization of the Bankruptcy Court, the Debtors' licenses to use the Licensed Intellectual Property, copies of which have been given to Lender, are free and clear of all restrictions, Liens, court orders, injunctions, decrees, or writs.  Except as disclosed in **Schedule F** annexed hereto, no Debtor is contractually obligated to make royalty payments of a material nature, or pay fees to any owner of, licensor of, or other claimant to, any Intellectual Property Rights.

22

(iv)      Except for Off-the-shelf Software and as disclosed on **Schedule F** annexed hereto, the Owned Intellectual Property and the Licensed Intellectual Property constitute all Intellectual Property Rights used or necessary to conduct each Borrower's business as it is presently conducted.

(v)      Except as disclosed on **Schedule F** annexed hereto, no Debtor has knowledge of, and has not received notice either orally or in writing alleging, any infringement of another Person's Intellectual Property Rights (including any claim set forth in writing that a Debtor must license or refrain from using the Intellectual Property Rights of any Person) nor, to any Debtor's knowledge, is there any threatened claim or any reasonable basis for any such claim.

(n)    **[Reserved]**.

(o)    **Environmental Condition**. (i) To each Debtor's knowledge, no Debtor's nor any of its Subsidiaries' properties or assets has ever been used by a Debtor, its Subsidiaries, or by previous owners or operators in the disposal of, or to produce, store, handle, treat, release, or transport, any Hazardous Substances, where such disposal, production, storage, handling, treatment, release or transport was in violation, in any material respect, of any applicable Environmental Law, (ii) to each Debtor's knowledge, no Debtor's nor any of its Subsidiaries' properties or assets has ever been designated or identified in any manner pursuant to any environmental protection statute as a Hazardous Substances disposal site, (iii) no Debtor nor any of its Subsidiaries has received notice that a Lien arising under any Environmental Law has attached to any revenues or to any real property and improvements owned or operated by a Debtor or its Subsidiaries, and (iv) no Debtor nor any of its Subsidiaries nor any of their respective facilities or operations is subject to any outstanding written order, consent decree, or settlement agreement with any Person relating to any Environmental Law or environmental related liabilities that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.

(p)    **Affiliates of Borrower**. No Affiliate of any Borrower (excluding foreign Affiliates) is currently engaged in any business activities competitive to the business activities or prospects of such Borrower as currently conducted or contemplated, or otherwise is engaged in activities similar to the business of such Borrower as currently conducted or contemplated.

(q)    **DIP Budget**. The DIP Budget was prepared in good faith by the Debtors in consultation with Lender and its advisors and is based upon assumptions which, as of the date of delivery thereof, the Debtors believe provide a reasonable basis for the projections contained therein and reflect the Debtors' reasonable judgment based on present circumstances of the most likely set of conditions and course of action for the projected period (it being recognized that such projections are not to be viewed as facts and are subject to significant uncertainties and contingencies many of which are beyond the control of the Debtors, that no assurance can be given that any particular financial projections will be realized, that actual results may differ from projected results and that such differences may be material).

(r)    **Submissions to Lender**. All financial and other information submitted to Lender by or on behalf of the Debtors, including without limitation submissions and advance requests made through Lender's electronic client portal, was true and correct in all material respects when submitted or requested and, as to projections, valuations or proforma financial statements, present a good faith opinion as to such projections, valuations and proforma condition and results.

(s)    **Accounts**.

(i)      [Reserved].

23

(ii)  With respect to all Accounts, all such Accounts are genuine and in all respects what they purport to be, arise out of a completed, bona fide and unconditional and non-contingent sale and delivery of goods or rendition of services by the applicable Debtor in the ordinary course of its business and in accordance with the terms and conditions of all purchase orders, contracts or other documents relating thereto, each Account Debtor thereunder had the capacity to contract at the time any contract or other document giving rise to such Accounts were executed, and the transactions giving rise to such Accounts comply with all applicable laws and governmental rules and regulations.

(t)  **Equipment.**  The Equipment of each Debtor is in good operating condition and repair, and all necessary replacements of and repairs thereto were or are in the processes of being made so that the operating efficiency thereof shall be maintained and preserved within reasonable time frames, reasonable wear and tear excepted.

## 7.  AFFIRMATIVE COVENANTS.

(a)  **Insurance**. Each Debtor agrees to keep all the DIP Collateral insured with coverage and in amounts not less than that usually carried by one engaged in a like business and in any event not less than that reasonably required by Lender (with loss payable to Lender (including as a Lender loss payee as to any and all property coverages) and Borrowers, as their interests may appear, hereby appointing Lender as attorney for Borrowers in obtaining, adjusting, settling and canceling such insurance and endorsing any drafts.  As further assurance for the payment and performance of the Obligations, each Debtor hereby assigns to Lender all sums, including returns of unearned premiums, which may become payable under any policy of insurance on the DIP Collateral and each Borrower hereby directs each insurance company issuing any such policy to make payment of such sums directly to Lender.  Without limiting the generality of the foregoing, to the extent any Borrower maintains any credit insurance policies in respect of any accounts or account debtors, then such Borrower shall cause such policies to be collaterally assigned to Lender, as security for the Obligations, pursuant to assignments in form and substance reasonably satisfactory to Lender.

(b)  **Books and Records**.  Each Debtor will at all times keep accurate and complete records of such Debtor's inventory, accounts and other DIP Collateral.

(c)  **Field Examinations.** Lender, or any of its agents, shall have the right to call at Borrowers' or any other Debtors' place or places of business at intervals to be determined by Lender, following reasonable prior written notice (which such prior notice is not required to the extent an Event of Default shall have occurred and be continuing), and without hindrance or delay, to inspect, audit, check, and make extracts from any copies of the books, records, journals, orders, receipts, correspondence which relate to Borrowers' accounts, and other DIP Collateral or other transactions, between the parties thereto and the general financial condition of Borrowers and the other Debtors and Lender may remove any of such records temporarily for the purpose of having copies made thereof; provided, however, that unless an Event of Default shall have occurred and be continuing, Lender shall not conduct more than four (4) such inspections or audits in any twelve (12) month period.

(d)  **Existence and Good Standing**.  Each Debtor will maintain its corporate/company existence in good standing and comply in all material respects with all laws and regulations of the United States or of any state or states thereof or of any political subdivision thereof, or of any governmental authority which may be applicable to it or to its business.

24

    (e)    **Taxes**. Each Borrower and each Debtor will pay, at such times and in such manner as to prevent any penalty from accruing or any Lien arising (other than Permitted Liens) or charge from attaching to its property, all real and personal property taxes, assessments and charges and all franchises, income, unemployment, old age benefits, withholding, sales, goods and services, harmonized sales and other taxes assessed (i) against it or upon the DIP Collateral, or (ii) for its use or operation (unless a Borrower is challenging such tax or assessment pursuant to a Permitted Protest pursuant to **Section 9(b)** hereof), or (iii) upon this Agreement, or upon any note or notes evidencing the Obligations, and will, at the request of Lender, promptly furnish Lender the receipted bills therefor.  At its option, to the extent that a default or an Event of Default shall have occurred and be continuing, Lender may discharge taxes, liens or security interests or other encumbrances at any time levied or placed on the DIP Collateral, may pay for insurance on the DIP Collateral and may pay for the maintenance and preservation of the DIP Collateral.  Each Debtor agrees to reimburse Lender on demand for any payments made, or any expenses incurred by Lender pursuant to the foregoing authorization, and upon failure of any Debtor so to reimburse Lender, any such sums paid or advanced by Lender shall be deemed secured by the DIP Collateral and constitute part of the Obligations.

    (f)    **Hazardous Substances**. Each Debtor will immediately notify Lender upon receipt of notification of any potential or known material release or threat of material release of any Hazardous Substances in violation of any Environmental Law.

    (g)    **OFAC; Sanctions; Anti-Corruption Laws; Anti-Money Laundering Laws; Anti-Terrorism Laws.**

    (i)    Each Debtor will, and will cause each of its Subsidiaries to, comply with all applicable Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws.  Each of the Debtors and its Subsidiaries shall implement and maintain in effect policies and procedures reasonably designed to ensure compliance by the Debtors and their Subsidiaries and their respective directors, officers, employees, agents and Affiliates with Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws.

    (ii)    Each Debtor will, and will cause each of its Subsidiaries to, to the extent the same are applicable to such Person, comply with any Anti-Terrorism Laws.

    (h)    **Use of Proceeds**.  Borrowers shall use or direct the use of proceeds of the Term Loans made by Lender hereunder and the Cash Collateral, in accordance with the terms of the Final Order, or, prior to the entry of the Final Order, the Interim Order and the Loan Documents, and as limited by the Approved Budget, for, inter alia: (a) the purchase of inventory by Lender on behalf of the Debtors (for the avoidance of doubt, pursuant to the Approved Budget, the interim draw of $750,000 shall be used on account of inventory purchases), (b) general operating, corporate, and working capital purposes of the Debtors in the ordinary course of business, exclusive of the inventory purchases by Lender; (c) reasonable and documented costs, fees, and other expenses of Lender; (d) Adequate Protection Payments; (e) approved fees and expenses of the Debtors' and Committees' professionals; and (f) upon entry of the Final Order, the Roll-Up Amount shall be used for the Roll-Up, which amount shall include any post-petition advance that has been made by Lender to the Debtors since the First Petition Date, and will be made by the Lender to the Debtors under this Agreement following the entry of the Interim Order, in each case under the foregoing clauses (a) through (f): (i) to the extent such use of proceeds is not otherwise prohibited under the terms of this Agreement (including that no part of the proceeds of the loans made to Debtors will be used to purchase or carry any such Margin Stock or to extend credit to others for the purpose of purchasing or carrying any such Margin Stock or for any purpose that violates the provisions of Regulation T, U or X of the Board of Governors) and (ii) if, as, and to the extent contemplated and provided for and permitted in the DIP Budget

25

(subject to Permitted Variances). No part of the proceeds of any loan will be used, directly or indirectly, in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws, Anti-Money Laundering Laws or Anti-Terrorism Laws.

Notwithstanding anything herein to the contrary, Debtors hereby authorize Lender to purchase inventory on behalf of the Debtors and to buy inventory that the Debtors have identified as being needed for each store, and at the prices that the Debtors have negotiated, and by virtue of the inventory purchase which shall be deemed Loans pursuant to **Section 1** hereof, Lender shall not be deemed to be in control of the Debtors.

      (i)    **Material Contracts**. Each Borrower will at all times pay rent on or before the due date thereof under its leases that are Material Contracts.

      (j)    **Additional Assurances**. Each Debtor will, at its expense, upon request of Lender promptly and duly take, execute, acknowledge and deliver (and/or cause such other applicable Person to take, execute, acknowledge and deliver) all such further acts, documents, agreements and instruments as may from time to time be necessary or desirable or as Lender may from time to time reasonably require in order to (i) correct any defect, error or omission which may at any time be discovered, (ii) carry out the intent and purposes of the Loan Documents and the transactions contemplated thereby, (iii) establish, create, preserve, protect and perfect a first priority lien (subject only to Permitted Liens) in favor of Lender in all real and personal property (wherever located) from time to time owned by the Debtor and in all capital stock and other equity from time to time owned by any Debtor, (iv) cause each subsidiary of a Debtor to guarantee all of the Obligations, all pursuant to documentation that is in form and substance reasonably satisfactory to Lender, and (v) facilitate the collection of the DIP Collateral. Without limiting the foregoing, each Debtor shall, at its own cost and expense, promptly and duly take, execute, acknowledge and deliver (and/or cause such other applicable Person to take, execute, acknowledge and deliver) to Lender all promissory notes, security agreements, agreements with landlords, mortgagees and processors and other bailees, subordination and intercreditor agreements and other agreements, instruments and documents, in each case in form and substance reasonably acceptable to Lender, as Lender may request from time to time to perfect, protect, and maintain Lender's security interests in the DIP Collateral, including the required priority thereof, and to fully carry out the transactions contemplated by the Loan Documents.

      (k)    **Milestones**. Each Debtor shall comply with all Milestones.

      (l)    **Participation Agreement and PEC Pledge Agreement**. Immediately upon entry of the Final Order or a court order authorizing the Settlement Agreement, as the case may be, to the extent applicable, (i) Ian MacDonald and MacDonald Realty Group LLC shall grant to Lender a participation in their rights in respect of the advances made to, and in respect of their equity in, MRG Boulders (collectively, the "**Subject Boulders Interest**") to accommodate and support the Pre-Petition Obligations, the DIP Obligations, and the Adequate Protection Obligations (each as defined in the Interim Order and the Final Order, as applicable), which grant shall be made and documented by a participation agreement (the "Participation Agreement") and other related documents, agreements, and instruments to be entered into upon entry of the Final DIP Order, all of which shall be in form and substance satisfactory to Lender in its sole discretion; and (ii) William Ian MacDonald shall grant to Lender a lien on, and security interest in, all of his unencumbered limited partner interests (the "**PEC LP Interests**") in P.E.C. Finance Ltd. to accommodate and support the Pre-Petition Obligations, the DIP Obligations, and Adequate Protection Obligations (each as defined in the Interim Order and the Final Order, as applicable), which grant shall be made and documented by a pledge agreement (the "**PEC Pledge Agreement**") and

26

other related documents, agreements, and instruments to be entered into upon entry of the Final DIP Order, all of which shall be in form and substance satisfactory to Lender in its sole discretion.

     **(m)**     **DIP Budgetary Compliance**.  Debtors:

     **(i)**     shall not permit the actual cash disbursements for all Debtors, tested as of the last business day of each week (beginning with the week in which the Applicable Petition Date occurs) for the cumulative period beginning with the week in which the Applicable Petition Date occurs and ending on such testing date, to exceed one hundred ten percent (110%) of the aggregate cash disbursements for all Debtors projected in the DIP Budget for such period (provided, however, that in Lender's reasonable discretion and without court order, approval of, or notice to, any other Persons, Lender may increase such percentage up to one hundred fifteen percent (115%)) of the projected disbursements in the DIP Budget for such period); provided that, notwithstanding anything to the contrary in the foregoing:

     **(A)**     during any applicable testing period, the Debtors may reallocate the amounts of any disbursements permitted under any one or more particular line item categories of the DIP Budget but not so spent/dispersed by the Debtors under such line item categories to any one or more other line item categories during the same testing period, except that:

     i)     no amounts may be reallocated from any line item category of the DIP Budget that does not cover Non-Allocable Disbursements to any line item categories that do cover Non-Allocable Disbursements and

     ii)     without the prior consent of Lender grated in its sole and absolute discretion, no amounts may be relocated to any "miscellaneous" line item category of the DIP Budget from any other line item categories;

(the ability of the Debtors' to exceed the limitations on cash disbursements during any applicable testing period by up to 10% (or, with the approval of Lender granted in reasonable discretion, 15%) and the limited ability of Debtors to reallocate unspent amounts from one or more line item categories in any applicable testing period to one or more other line item categories in the same testing period, all as and to the extent provided for in this **Section 7(m)**, collectively, the "**Permitted Variances**").

     **(ii)**     shall not permit the actual cash receipts (including without limitation, all collections on Accounts and all other proceeds of DIP Collateral) of all Debtors, tested as of the last business day of each week (beginning with the week in which the Applicable Petition Date occurs) for the cumulative period beginning with the week in which the Applicable Petition Date occurs and ending on such testing date, to be less than ninety (90%) of the aggregate cash receipts for all Debtors projected in the DIP Budget for such period (provided, however, that in Lender's sole and absolute discretion and without court order, approval of, or notice to, any other Persons, Lender may decrease such percentage down to eighty five percent (85%)).

     **(n)**     **Retention of Consultant by Debtors**.  Debtors engaged and retained Mark Shapiro of GlassRatner Capital and Advisory Group LLC (the "**Consultant**") for the purposes of, among other things, finding a buyer to purchase all or substantially all of the assets and properties of the Debtors in the U.S., including the DIP Collateral under Section 363 of the Bankruptcy Code and assisting the Debtors in their

27

chapter 11 Case, including the preparation of the DIP Budget.  Subject to the protection of applicable privileges, Debtors hereby (i) authorize any and all of the officers or other representative of Lender (and its employees, officers, partners, and directors), to communicate directly with the Consultant (and such employees, officers, partners, and directors of any such firm of the Consultant) to discuss the affairs, finances, condition, and compliance with the terms of this Agreement and other Loan Documents of each of the Debtors and their Subsidiaries and joint ventures and (ii) authorize the Consultant (and such employees, officers, partners, and directors of any such firm of the Consultant) to engage in such communications directly with Lender (and its employees, officers, partners, and directors), and agree that Debtors shall cause the Consultant to cooperate with Lender (and its employees, officers, partners, and directors), in all such communications and respond to all requests of Lender (and its employees, officers, partners, and directors) and keep Lender fully informed of the progress of the business and operations of Debtors and respond fully to any inquiries of Lender regarding the business and operations of Debtors. Debtors shall not terminate the Consultant without the consent of Lender unless they deem it necessary to the fulfillment of their fiduciary duties to their estate or because conflicts preclude continued engagement. If the Consultant resigns, Debtors shall immediately notify Lender in writing and provide Lender with a copy of any notice of resignation immediately upon the sending of such notice by the Consultant.

## 8.    REPORTING.

(a)    **Financial Reporting**.  The Debtors shall deliver or cause to be delivered to Lender, each to be in form, scope and substance satisfactory to Lender:

(i)    monthly financial reporting consistent with prepetition Loan Documents by and between Phonix and Debtors; financial reporting required of Debtors by Existing Reporting Orders, or any other order of the Bankruptcy Court, including the Interim Order and Final Order; and other monthly financial reporting reasonably requested by Lender of Borrower, and where applicable and reasonably requested, containing a certification by such chief financial officer as to the statements being accurate and fairly presenting the financial condition of the Debtors and a certification to the effect that such officer has not become aware of any Event of Default that has occurred and is continuing or, if there is any such event, describing it and the steps, if any, being taken in response thereto or to otherwise remediate it.

(b)    **DIP Collateral Reporting**.  The Debtors shall deliver or cause to be delivered to Lender, each to be in form, scope and substance satisfactory to Lender:

(i)    monthly collateral reporting consistent with prepetition Loan Documents by and between Phonix and Debtors; monthly collateral reporting required of Debtors by any Existing Reporting Orders, or any other order of the Bankruptcy Court, including the Interim Order and Final Order; and other monthly collateral reporting reasonably requested by Lender of Borrower;

(ii)    within ten (10) days of the close of each month, and to the extent produced in the ordinary course of Borrowers' business: (a) a reconciliation of Borrowers' accounts receivable aging to its general ledger, a reconciliation of Borrowers' unbilled accounts receivable, and Lender's collateral statement of accounts, (b) a reconciliation of accounts payable aging to its general ledger, and (c) in each case a roll forward from the previous report, in form, scope and substance satisfactory to Lender;

28

(iii)       monthly loan and collateral descriptions, including, without limitation, Borrowers' sales, cash receipts, adjustments, in the form supplied by Lender to Borrowers;

(iv)       as of the date of this Agreement and within ten (10) days of the close of each month thereafter or more frequently as may be requested by Lender, Borrowers' detailed inventory stock status report and a reconciliation of such stock status report to its general ledger in form, scope and substance satisfactory to Lender;

**(c)       DIP Budgetary Reporting.**

(i)       Beginning on January 28, 2026, and continuing on each Wednesday thereafter, Debtors shall deliver to Lender a certificate of the chief financial officer of the Debtors or their Financial Advisor setting forth (x) a weekly cash flow analysis comparing the prior week's actual cash disbursements and cash receipts for all Debtors to the projected cash disbursements and cash receipts for all Debtors projected for such week in the DIP Budget, in a form and format and with a scope and level of detail acceptable to Lender in its discretion and (y) demonstrating Debtors' compliance with (or failure to comply with) the covenants set forth in **Section 7(m)** hereof.

(ii)       Debtors may, at any time and from time to time, but no more than twice during the term of this Agreement, deliver to Lender a proposed revised and updated DIP Budget for the period beginning with the week that begins no less than five (5) Business Days after the delivery thereof (or such earlier week as to which Lender shall consent in its sole and absolute discretion ) through the Maturity Date, which shall be in substantially the same form and detail of the Initial DIP Budget, and accompanied by a certificate signed by the chief financial officer of the Debtors to the effect that such DIP Budget has been prepared in good faith by the chief financial officer of the Debtors and based upon assumptions which provide a reasonable basis for the projections contained therein and reflect the Debtors' reasonable judgment based on present circumstances of the most likely set of conditions and course of action for the projected period and that such officer has no reason to question the reasonableness of any material assumptions on which such projections were prepared. Upon receipt of each such proposed updated DIP Budget, Lender shall review the same, and if, following a reasonable opportunity to review and comment thereon, Lender in its sole and absolute discretion shall give its written approval to such proposed updated DIP Budget, it shall become the "DIP Budget" as defined and for all purposes hereunder and under the Interim Order and (upon entry of the Final Order) the Final Order effective as of the first day of the first week covered thereby.

(d)       **Case Reporting**. Debtors will deliver to Lender: (a) substantially contemporaneous with the filing thereof, copies of all pleadings, motions, applications, financial information and other papers and documents filed by the Debtors in the Case, with copies of such papers and documents also provided to or served on Lender's counsel; (b) substantially contemporaneous with the receipt and/or execution thereof, copies of all letters of intent, expressions of interest, and offers to purchase with respect to any of the Collateral; (c) substantially contemporaneously with delivery thereof to the Committee or any other official or unofficial committee in the Case, copies of all material written reports and all term sheets for a Reorganization Plan or any sale under Section 363 of the Bankruptcy Code given by the Debtors to the Committee or any other official or unofficial committee in the Case, with copies of such reports and term sheets also provided to or served on Lender's counsel; and (d) projections, operating plans and other financial information and information, reports or statements regarding the Debtors, their business and the Collateral as Lender may from time to time reasonably request.

29

(e)    **Other Reporting and Notifications**.  The Debtors shall deliver or cause to be delivered to Lender, each to be in form, scope and substance satisfactory to Lender:

(i)    within ten (10) days after any Debtor's receipt, any management letter prepared by the Debtors' independent auditors;

(ii)    contemporaneously with the delivery to shareholders or governmental agencies, copies of all material reports and information delivered to shareholders or filed with governmental agencies or that otherwise pertain to, or affect, the Loan Documents;

(iii)    within ten (10) days following the end of each fiscal month, copies of all bank account statements and reconciliations for all bank accounts maintained by any Debtors and a schedule of all bank accounts of any Debtors;

(iv)    promptly upon Lender's written request, a schedule of Debt of the Debtors outstanding as of such fiscal quarter end;

(v)    as of the date of this Agreement and thereafter upon the request by Lender, a detailed master customer list;

(vi)    promptly upon Lender's written request, such other information about the financial condition and operations of any Borrower or any Guarantor, as Lender may, from time to time, reasonably request;

(vii)    promptly upon becoming aware such change in circumstance, written notification to Lender of any change in circumstance that would affect the accuracy of any representation or warranty in **Section 6** hereof, unless the representation and warranty specifically relates to an earlier date;

(viii)    promptly upon becoming aware such event or circumstance, written notification to Lender of any breach or non-performance of, or any default under (A) any Material Contract or (B) any contractual obligation of any Debtor, or any violation of, or non-compliance with, any applicable law, which, in the case of this clause (B) would reasonably be expected to result, either individually or in the aggregate, in a material adverse effect, and including, in the case of clauses (A) and (B), a description of such breach, non-performance, default, violation or non-compliance and the steps, if any, such Debtor has taken, is taking or proposes to take in respect thereof;

(ix)    promptly upon becoming aware such event or circumstance, written notification to Lender of any cancellation or material change in any insurance maintained by any Debtor;

(x)    promptly upon becoming aware such event or circumstance, written notification to Lender of any "default" or "event of default" under any Debt of a Debtor from Lender other than Lender;

(xi)    promptly of: (A) any material delay in any Debtor's performance of any of its material obligations to any account debtor or the assertion of any claims, offsets, defenses or counterclaims by any account debtor, or any disputes with account debtors, or any settlement, adjustment or compromise thereof, and (B) all material adverse information relating to the financial condition of any account debtor;

30

     **(xii)**    Promptly upon becoming aware of any sale contemplated in accordance with the Milestones; and

     **(xiii)**    promptly upon becoming aware of any Event of Default, or the occurrence or existence of an event which, with the passage of time or the giving of notice or both, would constitute an Event of Default hereunder, notice thereof in writing.

     **(f)**    All information regarding sales, cash receipts, accounts and inventory shall be transmitted to Lender electronically, in acceptable formats (files with extensions *.prn, *.pdf, *.txt, *.xls, *.xlsx, and other electronic readable formats are acceptable; scanned copies are not acceptable), either transmitted to Lender via internet or e-mail.  In the event that Borrowers fail to report such information to Lender electronically, Lender reserves the right, in its sole discretion, to charge Borrowers a monthly fee in an amount necessary to cover the costs of the manual input of such data by Lender.

     **(g)**    For the avoidance of doubt, the foregoing requirements are without limitation of the obligations of the Debtors to provide reporting, notices, or other information or cooperation to Lender set forth in any Existing Reporting Orders, which obligations shall (i) survive entry of the Interim Order or any Final Order and (ii) constitute obligations of the Debtors under this Agreement, the breach of which shall constitute an Event of Default.

## 9.    NEGATIVE COVENANTS.

No Debtor will at any time:

     **(a)**    <u>Disposition of DIP Collateral</u>. sell, assign, exchange or otherwise dispose of any of the DIP Collateral, other than (I) inventory consisting of (i) scrap, waste, defective goods and the like; (ii) obsolete goods; (iii) finished goods sold in the ordinary course of business or any interest therein to any individual, partnership, trust or other corporation, provided that such sale in the ordinary course of business shall not include a transfer in total or partial satisfaction of a debt; (II) equipment which is no longer required or obsolete or deemed necessary for the conduct of such Debtor's business, so long as such Debtor receives therefor a sum substantially equal to such equipment's fair value, remits such sum to Lender in accordance with the terms of this Agreement or replaces such equipment with other equipment of similar value which is subject to a first security interest in Lender's favor, (III)  Restricted Payments to the extent expressly permitted hereunder; and (IV) any discount, other compromise or sale for less than the face value of receivables (or notes accepted to evidence same) in order to resolve disputes that occur in the ordinary course of business, provided that the aggregate amount of any such discount or compromise does not exceed ten percent of the face amount of the applicable receivable and the sale price of any such receivable is not less than ninety percent of the face amount of such receivable;

     **(b)**    <u>Liens</u>. create, permit to be created or suffer to exist any lien, encumbrance, adverse right or claim or deemed trust, or security interest of any kind ("**Lien**") upon any of the DIP Collateral or any other property of such Debtor, now owned or hereafter acquired, except:

(I) with respect to the DIP Collateral that is not Real Property DIP Collateral:

     **(i)**    landlords', carriers', warehousemen's, mechanics' and other similar liens arising by operation of law in the ordinary course of such Debtor's business;

31

(ii)     Liens arising out of pledge or deposits under worker's compensation, unemployment insurance, old age pension, social security, retirement benefits or other similar legislation;

(iii)     purchase money Liens arising in the ordinary course of business for the purchase of equipment so long as the Debt secured thereby does not exceed the lesser of the cost or fair market value of the property subject thereto, and such Lien extends to no other property, and the amount of the Debt secured thereby does not exceed the amount outstanding prior to the Closing Date at any time;

(iv)     Liens for unpaid taxes that are either (x) not yet due and payable, or (y) are subject of Permitted Protests and to the extent contemplated and provided for and permitted in the DIP Budget (subject to Permitted Variances);

(v)     Liens which are the subject of Permitted Protests and to the extent contemplated and provided for and permitted in the DIP Budget (subject to Permitted Variances);

(vi)     rights of setoff or bankers' liens upon deposits of cash in favor of banks or other depository institutions, solely to the extent incurred in connection with the maintenance of such deposit accounts in the ordinary course of business and to the extent contemplated and provided for and permitted in the DIP Budget (subject to Permitted Variances);

(vii)     the Liens (if any) listed on **Schedule E** annexed hereto or those leases of personal property set forth on **Schedule C** annexed hereto;

(viii)     Liens in favor of Lender and Pre-Petition Lender; and

(II) with respect to the Real Property DIP Collateral, Liens permitted pursuant to the terms of the respective Mortgage applicable to such Real Property DIP Collateral.

The term "**Permitted Protests**" as used herein means the right of a Debtor to protest any Lien (other than a Lien that secures the Obligations), taxes (other than payroll taxes or taxes that are the subject of a federal tax lien) or rental payment, provided that (x) the Debtor has disclosed the related Lien to Lender, (y) any such protest is instituted and diligently prosecuted by such Debtor in good faith, and (z) Lender is reasonably satisfied that, while such protest is pending, there will be no impairment of the enforceability, validity or priority of any of the Liens of Lender in and to the DIP Collateral;

(c)     <u>Loans</u>. make any loans or advances to any individual, partnership, trust or other corporation, including without limitation a Debtor's directors, officers and employees;

(d)     <u>Guarantees</u>. assume, guaranty, endorse or otherwise become directly or contingently liable in respect of (including without limitation by way of agreement, contingent or otherwise, to purchase, provide funds to or otherwise invest in a Debtor or otherwise to assure a creditor against loss), any Debt (except (i) guarantees by endorsement of instruments for deposit or collection in the ordinary course of business, (ii) guarantees in favor of Lender and Pre-Petition Lender, and (iii) guarantees set forth on **Schedule I** hereof);

(e)     <u>Debt</u>. issue evidence of Debt or suffer to exist Debt in addition to Debt to Lender except (i) Debt of a Debtor other than for money borrowed, incurred or arising in the ordinary course of business, (ii) Subordinated Debt and other Debt of a Debtor for money borrowed which is on terms satisfactory to

32

Lender and has been subordinated on terms and conditions satisfactory to Lender, (iii) Debt relating to Liens permitted under **Section 9(b)(I)(iii)**, (iv) any guarantees of Debt permitted under **Section 9(d)** hereof; (v) any Debt relating to Liens listed on **Schedule E** hereof, and (v) accounts payable incurred in the ordinary course of business (to the extent constituting Debt hereunder);

(f)    **Investments**. (i) use any loan proceeds to purchase or carry any "margin stock" (as defined in Regulation U of the Board of Governors of the Federal Reserve System) or (ii) invest in or purchase any stock, securities, membership interest or other Equity Interests of any individual, partnership, trust, limited liability company or other corporation except readily marketable direct obligations of, or obligations guaranteed by, the United States of America or any agency thereof;

(g)    **Transactions with Affiliates**. enter into any lease or other transaction with any shareholder, officer or Affiliate on terms any less favorable than those which might be obtained at the time from Persons who or which are not such a shareholder, officer or Affiliate, except for (i) payment of dividends, distributions, directors fees, and other similar payments permitted under **Section 9(l)** or **Section 9(q)** hereof, (ii) loans or advances permitted pursuant to **Section 9(c)** hereof, (iii) payment to employees and officers of reasonable compensation and employee benefits in the ordinary course of business, and (iv) the reimbursement of out of pocket costs and expenses for employees, directors, officers and consultants in the ordinary course of business;

(h)    **Subsidiaries.** sell, transfer or otherwise dispose of any stock of any subsidiary of a Debtor;

(i)    **Mergers, Consolidations, Sales, Asset Acquisitions, or Statutory Plan of Division or Liquidation.** (i) merge, amalgamate, or consolidate with or into any corporation; (ii) enter into any joint venture or partnership with any Person; (iii) convey, lease or sell all or any material portion of its property or assets or business to any other Person except as permitted by **Section 9(a)**; (iv) convey, lease or sell any of its assets to any Person for less than the fair market value thereof; (v) acquire (in any transaction analogous in purpose or effect to a consolidation, amalgamation, or merger) all or substantially all of the assets of any Person, or (vi) consummate any statutory plan of division;

(j)    **Change in Legal Status**. (i) change its name, its place of business or, if more than one, chief executive office, or its mailing address or organizational identification number if it has one, or (ii) change its type of organization, jurisdiction of organization or other legal structure.  If a Debtor does not have an organizational identification number and later obtains one, such Debtor shall promptly notify Lender of such organizational identification number;

(k)    **Amendments of Certain Agreements; Material Contracts.**

(i)    amend or modify any agreement, instrument or document evidencing or relating to any such subordinated debt, except in accordance with the subordination agreement relative thereto or the subordination provisions thereof; or

(ii)    amend or modify any management or similar agreement in any manner which is materially adverse to the interests of Lender as determined in Lender's reasonable discretion; or

(iii)    amend and modify any Material Contract in any manner which is materially adverse to the interests of Lender as determined in Lender's reasonable discretion.

33

(l)    **Restricted Payments**. make any Restricted Payments other than repayments of Debt referenced in **Section 9(e)(i)** so long as such payments are made in the ordinary course of business and are subject to the Approved Budget.

(m)    **[Reserved]**;

(n)    **[Reserved]**;

(o)    **Compliance with ERISA**. (i) maintain, or permit any ERISA Affiliate to maintain, or become obligated to contribute, to any Plan other than those Plans disclosed on **Schedule G**, (ii) engage, or knowingly permit any ERISA Affiliate to engage, in any non-exempt "prohibited transaction", as that term is defined in section 406 of ERISA and Section 4975 of the IRC, (iii) incur, or permit any ERISA Affiliate to incur, any "accumulated funding deficiency", as that term is defined in Section 302 of ERISA or Section 412 of the IRC, (iv) terminate, or permit any ERISA Affiliate to terminate, any Plan where such event could result in any material liability of any Debtor or any ERISA Affiliate or the imposition of a lien on the property of any Debtor or any ERISA Affiliate pursuant to Section 4068 of ERISA, (v) assume, or permit any ERISA Affiliate to assume any obligation to contribute to any Multiemployer Plan, (vi) incur or permit any ERISA Affiliate to incur, any withdrawal liability to any Multiemployer Plan, (vii) fail promptly to notify Lender of the occurrence of any Termination Event, (viii) fail to comply in any material respect, or permit an ERISA Affiliate to fail to comply in any material respect, with the requirements of ERISA or the IRC or other applicable law in respect of any Plan, (ix) fail to meet, or permit any ERISA Affiliate to fail to meet, all minimum funding requirements under ERISA or the IRC or postpone or delay or allow any ERISA Affiliate to postpone or delay any funding requirement with respect of any Plan.

(p)    **Equipment**. permit (i) any Equipment to become affixed to any real property leased to any Debtor so that an interest arises therein under the real estate laws of the applicable jurisdiction unless the landlord of such real property has executed a landlord waiver or leasehold mortgage in favor of and in form reasonably acceptable to Lender, or (ii) permit any of the Equipment of any Debtor to become an accession to any personal property other than Equipment that is subject to first priority (except for Permitted Liens) Liens in favor of Lender.

(q)    **[Reserved]**.

(r)    **Bankruptcy Matters**.

(i)    Fail to file with the Bankruptcy Court and deliver to Lender, within forty (40) days after the Applicable Petition Date, all Bankruptcy Schedules of the Debtors.

(ii)    Fail to serve:

(A)    all secured creditors, all judgment creditors (if any) actually known to the Debtors, the twenty (20) largest unsecured creditors, the federal and state taxing authorities, any and all Governmental Bodies holding a claim, any of the Debtors' unions, and any other party claiming an interest in the Collateral in accordance with the Federal Rules of Bankruptcy Procedure with a copy of the Motion and Interim Order as approved by the Bankruptcy Court in accordance with the Federal Rules of Bankruptcy Procedure; and

(B)    all parties from whom the Debtors have received or that the Debtors believe they may have received goods from within twenty (20) days of the filing of the Case, and who have not been paid, a copy of the Interim Order and notice of the hearing

34

on entry of the proposed Final Order in accordance with the Federal Rules of Bankruptcy Procedure.

      (C)    a certificate from the Secretary or another authorized officer of each Debtor attesting to the resolutions of such Debtor's board of directors, manager or managing member, ratifying its execution, delivery, and performance of the Loan Documents to which it is a party, such resolution to be in form and substance reasonably acceptable to Lender.

## 10. DEFAULT; RIGHTS AND REMEDIES UPON DEFAULT.

    **(a)**    The occurrence of any one or more of the following events listed below (herein, each an "**Event of Default**" and individually and collectively, "**Events of Default**") shall constitute an Event of Default hereunder and shall also constitute a default under all Loan Documents and any other agreements between Lender and any Debtor and instruments and papers given Lender by any Debtor, whether such agreements, instruments, or papers now exist or hereafter arise.

    **(i)**    The failure by a Borrower to pay when due, any principal, interest or fees due under this Agreement or the Term Loan Note.

    **(ii)**    The failure by a Borrower to pay when due any costs, expenses owed to Lender, or other Obligations where such failure is not cured within three (3) days following the date when due.

    **(iii)**    (A) Except as provided in clauses (iii)(B), (iii)(C) and (iii)(D) below, the failure by a Debtor to promptly, punctually and faithfully perform, or observe any term, covenant or agreement on its part to be performed or observed pursuant to any of the provisions of this Agreement, or (B) the failure by a Borrower to promptly, punctually and faithfully perform, or observe any term, covenant or agreement on its part to be performed or observed pursuant to **Sections 7(d) or 7(f)** hereof and the continuation of such default for seven (7) days following the initial failure, or (C) the failure by a Borrower to promptly, punctually and faithfully perform, or observe any term, covenant or agreement on its part to be performed or observed pursuant to pursuant to **Sections 7(e) or 7(i)** hereof or any other Loan Documents, and the continuation of such default for fifteen (15) days following the initial failure.

    **(iv)**    Any warranty, representation, written report or certification made or delivered to Lender by or on behalf of any Debtor pursuant to or in connection with this Agreement or any other Loan Document or Lender's electronic client portal, was not true or accurate in any material respect (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of the date of issuance, delivery or making or deemed making thereof, including when made and reaffirmed in accordance with **Section 2**.

    **(v)**    The occurrence of any event such that any Post-Petition Debt of a Debtor from any creditor or lender other than Lender, involving an aggregate amount of $100,000 or more, could be accelerated, notwithstanding that such acceleration has not taken place.

    **(vi)**    The occurrence of any event which would cause a lien creditor, as that term is defined in Section 9-102 of the Code, to take priority over the Liens of Lender in the DIP Collateral.

35

(vii)      Except to the extent in respect of clause (B) the lien and amount owed is subject to a Permitted Protest, a filing against or relating to a Debtor of (A) a federal tax lien in favor of the United States of America or any political subdivision of the United States of America, or (B) a state tax lien in favor of any state of the United States of America or any political subdivision of any such state, and the payment pertaining to such lien is not paid before such payment is delinquent.

(viii)     Any (x) Lien in respect of the DIP Collateral securing the Post-Petition Obligations created or provided for under any Loan Agreement and/or under the Final Order (or, prior to the entry of the Final Order, the Interim Order), (y) any Adequate Protection Lien in respect of the DIP Collateral securing any Adequate Protection Obligations created or provided for under the Final Order (or, prior to the entry of the Final Order, the Interim Order), or (y) any Pre-Petition Liens in respect of the Pre-Petition Collateral created or provided for under any Pre-Petition Loan Documents, in any such case, for any reason ceases to be or is not a valid and perfected Lien having a first priority interest (subject only to Senior Liens and the Carve-Out, and, with respect to the Pre-Petition Liens, the Liens of Lender securing the Post-Petition Obligations created or provided for under any Loan Agreement and/or under the Final Order (or, prior to the entry of the Final Order, the Interim Order) and the Adequate Protection Liens);

(ix)       The occurrence of any event of default under any other Loan Document or other agreement between Lender and a Debtor or instrument or paper given Lender by any Borrower, whether such agreement, instrument, or paper now exists or hereafter arises (notwithstanding that Lender may not have exercised its rights upon default under any such other agreement, instrument or paper).

(x)        Any act by, against, or relating to a Debtor, or its property or assets, which act constitutes the application for, consent to, or sufferance of the appointment of a receiver, trustee, liquidator, monitor or other Person, pursuant to court action or otherwise, over all or any material part of a Debtor's property (which, in the case of any involuntary act, is not discharged, dismissed or stayed within forty five (45) days, so long as during which period the Debtor is diligently seeking the discharge, dismissal or stay of such act and Lender shall be under no obligation to advance any Term Loans).

(xi)       The entry of one or more judgments (other than the Interim Order and the Final Order and any judgment resulting in an allowed general unsecured claim) in excess of $100,000 in the aggregate against a Debtor or its assets, which judgment is not satisfied or appealed from (with execution or similar process stayed) within twenty (20) days of its entry, except to the extent fully covered (other than to the extent of customary deductibles) by insurance pursuant to which the insurer has not denied coverage.

(xii)      The entry of any court order which enjoins, restrains or in any way prevents a Debtor from conducting all or any material part of its business affairs in the ordinary course of business.

(xiii)     The occurrence of any loss, theft, damage or destruction to any material asset(s) of a Debtor, except to the extent fully covered (other than to the extent of customary deductibles) by insurance pursuant to which the insurer has not denied coverage.

36

(xiv)    Any act by or against, or relating to a Debtor or its assets pursuant to which any creditor of such Debtor seeks to reclaim or repossess or reclaims or repossesses all, or a portion with a value in excess of $100,000, of such Debtor's assets.

(xv)    [Reserved].

(xvi)    This Agreement shall, at any time after its execution and delivery and for any reason, cease (A) to create a valid and perfected first priority Lien in and to the DIP Collateral; or (B) to be in full force and effect or shall be declared null and void, or the validity or enforceability hereof shall be contested by a Debtor or any other Guarantor of Borrowers denies it has any further liability or obligation hereunder.

(xvii)    Any Guarantor shall repudiate, purport to revoke or fail to perform his, her or its obligations under his, her or its guaranty or any other guarantor shall cease to exist.

(xviii)    Any Debtor shall take or participate in any action which would be prohibited under the provisions of any subordination or intercreditor agreement or make any payment on subordinated debt to any Person or entity that was not entitled to receive under the provisions of any such agreement.

(xix)    Any Change of Control shall occur unless subject to the prior written consent of the Lender.

(xx)    The occurrence of an ERISA Termination Event.

(xxi)    [Reserved].

(xxii)    the Bankruptcy Court shall enter any order, that has not been consented to by Lender (i) revoking, reversing, staying, vacating, rescinding, modifying, supplementing or amending (x) the Interim Order, the Final Order (after entry thereof), any Bidding Procedures Order (after entry thereof), any Sale Order (after entry thereof), this Agreement, any other Loan Document, the Pre-Petition Loan Agreement Documents or any other Pre-Petition Loan Document, or (y) any other "first day" orders to the extent such revocation, reversal, stay, vacation, rescission, modification, supplement or amendment is materially adverse to the interests of Lender or the Pre-Petition Lender, (ii) permitting any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to any Debtor equal or superior to the priority of Lender in respect of the Obligations, or there shall arise any such Superpriority Claim, or (iii) granting or permitting the grant of a Lien on the DIP Collateral superior to, or pari passu with, the Liens of Lender on the Pre-Petition Collateral or the DIP Collateral (other than the Senior Liens (as defined in the Interim Order), and the Carve-Out);

(xxiii)    the Bankruptcy Court shall enter any order (i) appointing a Chapter 11 trustee under Section 1104 of the Bankruptcy Code in the Case, (ii) appointing an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code in the Case, (iii) appointing a fiduciary or representative of the estate with decision-making or other management authority over some or all of any Debtor's senior management, (iv) substantively consolidating the estate of any Debtor with the estate of any other Person, (v) dismissing the Case or converting the Case to a Chapter 7 case; or (vi) approving a sale of substantially all of the assets of the Borrowers and/or of the Debtors which order does not provide for Payment in Full of the

37

Pre-Petition Obligations and Post-Petition Obligations upon consummation of such sale and which shall otherwise be reasonable satisfactory to Lender, and in connection with such sale order, Post-Petition Lender and Pre-Petition Lender shall not have received a release (on terms and conditions and in form and substance satisfactory to Lender in its sole discretion) of Post-Petition Lender and Pre-Petition Lender in full from all claims of the Debtors and their estates on or before the entry of such sale order;

(xxiv)    this Agreement, any of the other Loan Documents, the Interim Order or the Final Order for any reason ceases to be in full force and effect or is declared to be null and void by a court of competent jurisdiction, or any of the Debtors shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court) any other Person's motion to, disallow in whole or in part the Post-Petition Lender' claim in respect of the Post-Petition Obligations, or to challenge the validity and enforceability of the Liens in favor of any of Lender or the Pre-Petition Lender securing any part of the Obligations;

(xxv)    any Debtor files a motion with the Bankruptcy Court asserting that any of Lender or Pre-Petition Lender do not have a right to, or supports a motion filed with the Bankruptcy Court that asserts the Lender or Pre-Petition Lender do not have the right to, credit bid for any assets of the Debtors in connection with any sale pursuant to Section 363(k) of the Bankruptcy Code;

(xxvi)    the Bankruptcy Court shall enter any order granting relief from the automatic stay to any creditor holding or asserting a Lien, reclamation claim or other rights on the assets of any Debtor in excess of $[50,000];

(xxvii)    except (i) as permitted by the Interim Order or Final Order (or any other order of the Bankruptcy Court) and if, as, and to the extent contemplated and provided for and permitted in the DIP Budget (subject to Permitted Variances) hereof, or (ii) as otherwise agreed to by Lender in writing, and approved by all necessary Bankruptcy Court orders/approvals, any Debtor shall make any Pre-Petition Payment (including, without limitation, related to any reclamation claims but excluding any Pre-Petition Payment in respect of the Pre-Petition Obligations of the Pre-Petition Lender) following the Closing Date;

(xxviii) any Debtor shall be unable to pay its Post-Petition debts as they mature, shall fail to comply with any order of the Bankruptcy Court in any material respect, or shall fail to make, as and when such payments become due or otherwise; provided however, that the foregoing shall not apply to any debts as to which the Debtors contest in good faith;

(xxix)    [Reserved];

(xxx)    any Debtor shall file a motion in the Case (i) to use Cash Collateral under Section 363(c) of the Bankruptcy Code without Lender's prior written consent except to the extent expressly permitted in the Interim Order or, once entered, the Final Order, (ii) to sell a material portion of the assets of any Debtor without Lender's prior written consent, (iii) to recover from any portions of the DIP Collateral any costs or expenses of preserving or disposing of such DIP Collateral under Section 506(c) of the Bankruptcy Code, or to cut off rights in the DIP Collateral under Section 552(b) of the Bankruptcy Code, or (iv) to obtain additional financing under Sections 364(c) or (d) of the Bankruptcy Code not otherwise permitted under this Agreement, unless such motion and additional financing shall provide that upon closing and consummation of such financing, all of the Pre-Petition Obligations and the Post-Petition Obligations shall be Paid in Full and both Pre-Petition Lender and Post-Petition Lender receive a release (on terms and conditions

38

and in form and substance satisfactory to Lender in its sole discretion) in full from all claims of the Debtors and their estates;

(xxxi)    (i) a Reorganization Plan is filed in the Case by one or more of the Debtors which does not contain provisions for termination of Lender's commitment to make Advances hereunder and Payment in Full of the Pre-Petition Obligations and the Post-Petition Obligations and the release of both the Pre-Petition Lender and the Post-Petition Lender (on terms and conditions and in form and substance satisfactory to Lender) in full from all claims of the Debtors and their estates, in each case, on or before, and the continuation of the Liens and security interests granted to Lender and the Pre-Petition Lender until, the effective date of such Reorganization Plan, or (ii) an order shall be entered by the Bankruptcy Court confirming a Reorganization Plan in the Case which does not contain provisions for termination of Lender's commitment to make Advances hereunder and Payment in Full of the Pre-Petition Obligations and the Post-Petition Obligations and the release of both the Pre-Petition Lender and the Post-Petition Lender (on terms and conditions and in form and substance satisfactory to Lender) in full from all claims of the Debtors and their estates on or before, and the continuation of the Liens and security interests granted to Pre-Petition Lender until, the effective date of such Reorganization Plan upon entry thereof;

(xxxii)    the expiration or termination of the "exclusive period" of the Debtors under Section 1121 of the Bankruptcy Code for the filing of a plan of reorganization;

(xxxiii) (i) any Debtor engages in or takes any action to support any challenge to the validity, perfection, priority, extent and/or enforceability of any of the Obligations, the Pre-Petition Obligations, the Liens of Lender in the DIP Collateral, the Adequate Protection Liens, or the Liens of Pre-Petition Lender in the Pre-Petition Collateral or (ii) any Debtor engages in, or takes any action to support, any investigation or asserts any claims or causes of action (or directly or indirectly support assertion of the same) against the Lender or the Pre-Petition Lender and/or any of their respective Liens in the DIP Collateral and/or the Pre-Petition Collateral, as applicable; provided, however, that it shall not constitute an Event of Default under subsections (i) or (ii) hereof if any Debtor provides documents and information with respect to the Pre-Petition Loan Documents and any pre-petition Lender enforcement actions to (x) the Creditors' Committee and (y) with prior written notice to Lender of any requirement to do so, any other party in interest;

(xxxiv)    the termination or rejection of any contract of any Debtor which would reasonably be expected to result in a Material Adverse Effect;

(xxxv)    the failure of the Debtors to satisfy any of the Milestones :

(xxxvi)    the Case is converted (as to any one or more Debtors) to a case under Chapter 7 of the Bankruptcy Code;

(xxxvii)        the Case is dismissed (as to any one or more Debtors);

(xxxviii)        a breach by the Debtors of the terms or provisions of the Interim Order or Final Order;

(xxxix) any Person shall be permitted to surcharge the DIP Collateral or the Pre-Petition Collateral under Section 506(c) of the Bankruptcy Code, or any costs or expenses whatsoever shall be imposed against the DIP Collateral or the Pre-Petition Collateral, other than the Carve-Out;

39

    **(xl)**    Lender or Pre-Petition Lender shall be made subject to any equitable remedy of marshalling or any similar doctrine with respect to the Collateral and the Pre-Petition Collateral; or

    **(xli)**    Any of the Debtors cease the ordinary course operation of their businesses (except in connection with an Approved 363 Sale).

    **(b)**    Subject to the Interim Order (or the Final Order, when entered) and **Section 10(j)**, upon the occurrence, and during the continuance, of an Event of Default, Lender may, with three (3) Business Days prior notice, declare any obligation Lender may have hereunder to be cancelled, declare all Obligations to be due and payable and, and without the necessity of seeking relief from the automatic stay or any further order from the Bankruptcy Court, proceed to enforce payment of the Obligations and to exercise any and all of the rights and remedies afforded to Lender by the Code or under the terms of this Agreement, the other Loan Documents or otherwise.

    **(c)**    Subject to the Interim Order (or the Final Order, when entered) and the last paragraph of this Section 10, any sale or other disposition of the DIP Collateral may be at public or private sale upon such terms and in such manner as Lender deems advisable, having due regard to compliance with any statute or regulation which might affect, limit or apply to Lender's disposition of the DIP Collateral. Lender may conduct any such sale or other disposition of the DIP Collateral upon a Debtor's premises. Unless the DIP Collateral is perishable or threatens to decline speedily in value, or is of a type customarily sold on a recognized market (in which event Lender shall provide Borrowers with such notice as may be practicable under the circumstances), Lender shall give Borrowers at least the greater of the minimum notice required by law or ten (10) days prior written notice of the date, time and place of any proposed public sale, and of the date after which any private sale or other disposition of the DIP Collateral may be made. Lender may purchase the DIP Collateral, or any portion of it at any public sale.

    **(d)**    If Lender sells any of the DIP Collateral on credit, the Borrowers will be credited only with payments actually made by the purchaser of such DIP Collateral and received by Lender. If the purchaser fails to pay for the DIP Collateral, Lender may re-sell the DIP Collateral, and the Borrowers shall be credited with the proceeds of the sale.

    **(e)**    In connection with Lender's exercise of Lender's rights under this Agreement, Lender may enter upon, occupy and use any premises owned or occupied by a Debtor, and may exclude such Debtor from such premises or portion thereof as may have been so entered upon, occupied, or used by Lender. Lender may, but shall not be required to remove any of the DIP Collateral from any such premises upon Lender's taking possession thereof, and may render any DIP Collateral unusable to Borrowers. In no event shall Lender be liable to a Debtor for use or occupancy by Lender of any premises pursuant to this Agreement.

    **(f)**    Upon the occurrence and during the continuance of any Event of Default, Lender may require a Borrower to assemble the DIP Collateral and make it available to Lender at such Borrower's sole risk and expense at a place or places which are reasonably convenient to both Lender and such Borrower.

    **(g)**    Any default of this Agreement by a Debtor shall constitute, likewise, a default by such Debtor of any other existing agreement with Lender, and any default by a Debtor of any other agreement with Lender shall constitute a default of this Agreement.

    **(h)**    Each Borrower acknowledges that the purpose of this section is to provide non-exhaustive indications of what actions or omissions by Lender would not be commercially unreasonable in Lender's exercise of remedies against the DIP Collateral and that other actions or omissions by Lender shall not be

40

deemed commercially unreasonable solely on account of not being indicated in this section. Without limitation upon the foregoing, nothing contained in this section shall be construed to grant any rights to any Borrower or to impose any duties on Lender that would not have been granted or imposed by this Agreement or by applicable law in the absence of this section.

Notwithstanding any other provision of this Agreement or any other Loan Document:

(i)        Upon the occurrence of and during the continuance of an Event of Default, and without the necessity of seeking relief from the automatic stay or any further order from the Bankruptcy Court, but subject to the provisions of **Sections 10(b)** and **10(j)** hereof, (i) Lender shall no longer have any obligation to make any Term Loans (or otherwise extend credit) hereunder; (ii) all amounts outstanding under Loan Documents shall, at the option of Lender, be accelerated and become immediately due and payable; (iii) Lender and the Pre-Petition Lender shall be entitled to immediately terminate the Debtors' right to use Cash Collateral, without further application or Order of the Bankruptcy Court, provided, however, that the Debtors shall have the right to use Cash Collateral to pay their weekly ordinary course payroll included in the Approved Budget through the date on which such Event of Default occurs; (iv) the Debtors shall be bound by all post-default restrictions, prohibitions, and other terms as provided in the Interim Order, the Final Order, the Loan Documents; (v) Lender shall be entitled to charge the default rate of interest hereunder; and (vi) subject only to the notice requirement set forth in subparagraph (b) above, Lender shall be entitled to take any other action or exercise any other right or remedy as provided in the Interim Order, the Final Order, the Loan Documents, or applicable law, including, without limitation, setting off any Obligations with DIP Collateral, Pre-Petition Collateral or proceeds in the possession of Pre-Petition Lender or Lender, continue collecting (and the Debtors shall be obligated to turn over) all proceeds of DIP Collateral or Pre-Petition Collateral, as applicable, and Lender shall be able to apply such proceeds to repayment of the Post-Petition Obligations or Pre-Petition Revolver Obligations (as determined by Lender in its sole and absolute discretion), and enforcing any and all rights and remedies with respect to the DIP Collateral or Pre-Petition Collateral, as applicable.

(j)        Upon the occurrence and during the continuance of an Event of Default, and after providing not less than thee (3) Business Days' advance written notice thereof (which may be by electronic mail) by means of delivery of a termination declaration (the "**Remedies Notice Period**" (which Remedies Notice Period applies only to the DIP Collateral enforcement remedies described below)) to counsel to the Debtors, the U.S. Trustee, and counsel to any Committee, Lender shall be entitled to take any action and exercise all rights and remedies provided to them by the Interim Order, the Final Order, or the Documents, or applicable law, unless otherwise ordered by the Bankruptcy Court, as Lender may deem appropriate in its sole discretion to, among other things, proceed against and realize upon the DIP Collateral (including the Pre-Petition Collateral) or any other assets or properties of the Debtors' Estates upon which Lender, been or may hereafter be granted liens or security interests to obtain the full and indefeasible payment of all the Obligations. During the Remedies Notice Period, the Debtors and/or a Committee (if appointed) shall be entitled to seek an emergency hearing within the Remedies Notice Period with respect to the termination declaration and whether an Event of Default has occurred and is continuing. However, notwithstanding anything to the contrary provided for herein (specifically including without limitation this subparagraph (b) and the immediately preceding subparagraph (b)), at no time prior to Payment in Full of the Obligations, including but not limited to during any Remedies Notice Period, shall Lender be prohibited from or limited in its ability to apply any and all payments in respect of the Obligations (including without limitation payments pursuant to **Section 1(b)** hereof) and any and all proceeds of DIP Collateral received into the Controlled Collections Accounts received by any of them to the Obligations in accordance with **Section 5(b)** hereof.

## 11.        STANDARDS FOR EXERCISING REMEDIES.

41

To the extent that applicable law imposes duties on Lender to exercise remedies in a commercially reasonable manner, each Borrower acknowledges and agrees that it is not commercially unreasonable for Lender (a) to fail to incur expenses reasonably deemed significant by Lender to prepare DIP Collateral for disposition or otherwise to complete raw material or work in process into finished goods or other finished products for disposition, (b) to fail to obtain third party consents for access to DIP Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain governmental or third party consents for the collection or disposition of DIP Collateral to be collected or disposed of, (c) to fail to exercise collection remedies against account debtors or other Persons obligated on DIP Collateral or to remove liens or encumbrances on or any adverse claims against DIP Collateral, (d) to exercise collection remedies against account debtors and other Persons obligated on DIP Collateral directly or through the use of collection agencies and other collection specialists, (e) to advertise dispositions of DIP Collateral through publications or media of general circulation, whether or not the DIP Collateral is of a specialized nature, (f) to contact other Persons, whether or not in the same business as a Borrower, for expressions of interest in acquiring all or any portion of the DIP Collateral, (g) to hire one or more professional auctioneers to assist in the disposition of DIP Collateral, whether or not the DIP Collateral is of a specialized nature, (h) to dispose of the DIP Collateral by utilizing Internet sites that provide for the auction of assets of the types included in the DIP Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets, (i) to dispose of assets in wholesale rather than retail markets, (j) to disclaim disposition warranties, and specifically to disclaim any warranties of title or the like, (k) to purchase insurance or credit enhancements to insure Lender against risks of loss, collection or disposition of DIP Collateral or to provide to Lender a guaranteed return from the collection or disposition of DIP Collateral, or (l) to the extent deemed appropriate by Lender, to obtain the services of other brokers, investment bankers, consultants and other professionals to assist Lender in the collection or disposition of any of the DIP Collateral.  Each Borrower acknowledges that the purpose of this section is to provide non-exhaustive indications of what actions or omissions by Lender would not be commercially unreasonable in Lender's exercise of remedies against the DIP Collateral and that other actions or omissions by Lender shall not be deemed commercially unreasonable solely on account of not being indicated in this section.  Without limitation upon the foregoing, nothing contained in this section shall be construed to grant any rights to any Borrower or to impose any duties on Lender that would not have been granted or imposed by this Agreement or by applicable law in the absence of this section.

## 12.    TERMINATION.

This Agreement, which shall inure to the benefit of and shall be binding upon the respective successors and permitted assigns of each Debtor and Lender, shall become effective on the Closing Date and shall continue in full force and effect until the Termination Date (such period from the Closing Date through and ending on the Termination Date, the "**Term**").  At the end of the Term, Borrowers shall pay the Full Payment to Lender.  Further, upon termination of this Agreement, all of the rights, interests and remedies of Lender and Obligations of the Debtors shall survive and Borrowers shall have no right to receive, and Lender shall have no obligation to make, any further loans.  Upon Full Payment to Lender, all rights and remedies of the Debtors and Lender hereunder (other than inchoate indemnification and reimbursement obligations and other obligations which, by their terms, survive termination of this Agreement) shall cease, so long as any payment so made to Lender and applied to the Obligations is not thereafter recovered from or repaid by Lender in whole or in part in any bankruptcy, insolvency or similar proceeding instituted by or against a Debtor, whereupon this Agreement shall be automatically reinstated without any further action by any Debtor and Lender and shall continue to be fully applicable to such Obligations to the same extent as though the payment so recovered or repaid had never been originally made on such Obligations.

## 13.    MISCELLANEOUS.

42

(a)  **Governing Law; Sealed Instrument**.  The laws of the State of New York shall exclusively (without regard to rules or principles relating to conflicts of laws) govern the construction of this Agreement and the rights and duties of the parties hereto.  This Agreement shall take effect as a sealed instrument.

(b)  **Consent to Jurisdictions**.  Each Debtor and Lender agree that any action or proceeding to enforce or arising out of this Agreement may be commenced in the Bankruptcy Court, and each Debtor waives personal service of process and agrees that a summons and complaint commencing an action or proceeding in any such court shall be properly served and confer personal jurisdiction if served by registered or certified mail to a Debtor, or as otherwise provided by the laws of the State of New York or the United States of America.

(c)  **WAIVER OF JURY TRIAL**.  EACH DEBTOR AND LENDER EACH HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHT SUCH DEBTOR OR LENDER MAY HAVE OR HEREAFTER HAVE TO A TRIAL BY JURY IN RESPECT OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT.  Each Debtor hereby certifies that neither Lender nor any of its representatives, agents or counsel has represented, expressly or otherwise, that Lender would not, in the event of any such suit, action or proceeding, seek to enforce this waiver of right to trial by jury.  Each Debtor acknowledges that Lender has been induced to enter into this Agreement by, among other things, this waiver.  Each Debtor acknowledges that it has read the provisions of this Agreement and in particular, this section; has consulted legal counsel; understands the right it is granting in this Agreement and is waiving in this section in particular; and makes the above waiver knowingly, voluntarily and intentionally.

(d)  **Assignment and Participations**. This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties hereto; provided, however, that Debtors may not assign this Agreement or any rights or duties hereunder without Lender's prior written consent and any prohibited assignment shall be absolutely void.  No consent to an assignment by Lender shall release any Borrower from its Obligations.  Lender may assign this Agreement and its rights and duties hereunder and no consent or approval by a Debtor is required in connection with any such assignment.  Lender reserves the right to sell, assign, transfer, negotiate or grant participations in all or any part of, or any interest in Lender's rights and benefits hereunder.  In connection with any assignment or participation, Lender may disclose all documents and information which Lender now or hereafter may have relating to a Debtor or a Debtor's business.  To the extent that Lender assigns its rights and obligations hereunder to another party, Lender thereafter shall be released from such assigned obligations to the Debtors and such assignment shall effect a novation between the Debtors and such other party.

(e)  **[Reserved]**.

(f)  **Notices**.  Unless otherwise provided in this Agreement, all notices or demands by any party relating to this Agreement or any other loan document shall be in writing and (except for financial statements and other informational documents which may be sent by first-class mail, postage prepaid) shall be personally delivered or sent by registered or certified mail (postage prepaid, return receipt requested ), overnight courier, or electronic mail to the Debtors at its address set forth on **Exhibit 1** to this Agreement, or to Lender at its address set forth on **Exhibit 1** to this Agreement.

The parties hereto may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other.  All notices or demand sent in accordance with this section shall be deemed received on the earlier of the date of actual receipt or three (3) days after the deposit thereof in the mail.

43

(g)    <u>**Records**</u>.  Lender shall have no obligation to maintain any electronic records or any documents, schedules, invoices, agings or any other paper delivered to Lender by a Debtor in connection with this Agreement or any other agreement for more than four (4) months after receipt of the same by Lender.

(h)    <u>**Amendments.**</u>  This Agreement can only be amended by a writing signed by Lender and each Borrower.

(i)    <u>**Counterparts and Signatures**</u>.  This Agreement may be executed in multiple counterparts, each of which shall be effective upon delivery and, thereafter, shall be deemed to be an original, and all of which shall be taken as one and the same instrument with the same effect as if each party hereto had signed on the same signature page.  Any signature page of this Agreement may be detached from any counterpart of this Agreement without impairing the legal effect of any signature thereto and may be attached to another part of this Agreement identical in form hereto and having attached to it one or more additional signature pages.  This Agreement may be transmitted by facsimile machine or by electronic mail in portable document format ("pdf") and signatures appearing on faxed instruments and/or electronic mail instruments shall be treated as original signatures.  Any party delivering an executed counterpart of this Agreement by telefacsimile or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement, but the failure to deliver an original executed counterpart shall not affect the validity, enforceability or binding effect hereof.

(j)    <u>**Construction**</u>.  Unless the context of this Agreement or any other Loan Document clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, the terms "includes" and "including" are not limiting, and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or."  The words "hereof," "herein," "hereby," "hereunder," and similar terms in this Agreement or any other Loan Document refer to this Agreement or such other Loan Document, as the case may be, as a whole and not to any particular provision of this Agreement or such other Loan Document, as the case may be.  Section, subsection, clause, schedule, and exhibit references herein are to this Agreement unless otherwise specified.  Any reference in this Agreement or in any other Loan Document to any agreement, instrument, or document shall include all alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements, thereto and thereof, as applicable (subject to any restrictions on such alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements set forth herein).  The words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties.

(k)    <u>**Code**</u>.  Unless otherwise defined herein, any terms (including Accounts, account debtor, certificated security, chattel paper, commercial tort claims, deposit Accounts, documents, electronic chattel paper, Equipment, farm products, fixtures, general intangibles, goods, health-care-insurance receivables, instruments, Inventory, letter-of-credit rights, proceeds, supporting obligations and tangible chattel paper) used in this Agreement that are defined in the Code shall be construed and defined as set forth in the Code unless otherwise defined herein; provided, that to the extent that the Code is used to define any term herein and such term is defined differently in different Articles of the Code, the definition of such term contained in Article 9 of the Code shall govern.

(l)    <u>**Time**</u>.  Unless the context of this Agreement or any other Loan Document clearly requires otherwise, all references to time of day refer to Eastern standard time or Eastern daylight saving time, as in effect in New York, New York on such day.  For purposes of the computation of a period of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to"

44

and "until" each means "to and including"; provided that, with respect to a computation of fees or interest payable to Lender, such period shall in any event consist of at least one full day.

(m)  **Schedules and Exhibits**.  All of the schedules and exhibits attached to this Agreement shall be deemed incorporated herein by reference.

(n)  **Dollars**.  All amounts referred to herein shall be in Dollars.  All of the property and assets of the Debtors, including, without limitation, its receivables, shall be valued in, and converted into, Dollars in accordance with Lender's customary banking and conversion practices and procedures.

(o)  **Accounting Terms**. All accounting terms not specifically defined herein shall be construed in accordance with GAAP; provided, that if Borrowers notify Lender that Borrowers request an amendment to any provision hereof to eliminate the effect of any Accounting Change occurring after the Closing Date or in the application thereof on the operation of such provision, regardless of whether any such notice is given before or after such Accounting Change or in the application thereof, then Lender and Borrowers agree that they will negotiate in good faith amendments to the provisions of this Agreement that are directly affected by such Accounting Change with the intent of having the respective positions of Lender and Debtors after such Accounting Change conform as nearly as possible to their respective positions immediately before such Accounting Change took effect.  When used herein, the term "financial statements" shall include the notes and schedules thereto.  Whenever the term "Borrower" or "Debtor" is used in respect of a financial covenant or a related definition, it shall be understood to mean each such Person and its Subsidiaries on a consolidated basis, unless the context clearly requires otherwise. Notwithstanding anything to the contrary contained herein, all financial statements delivered hereunder shall be prepared, and all financial covenants contained herein shall be calculated, without giving effect to any election under the Statement of Financial Accounting Standards Board's Accounting Standards Codification Topic 825 (or any similar accounting principle) permitting a Person to value its financial liabilities or Debt at the fair value thereof.

(p)  **Divisions**.  For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

(q)  **Events of Default**.  Notwithstanding anything to the contrary contained herein, any references herein to "during the continuance of," defaults or Events of Default "continuing" or "cure" or words to similar effect in any Loan Document, shall not be construed in any manner to allow for any cure periods that are not otherwise expressly and specifically provided for in this Agreement or any other Loan Document, or create any burden or standard of providing any waivers as to the related Events of Default. Such references are simply included to address the possibility that such cure rights may be expressly and specifically provided for in this Agreement or other Loan Documents for certain provisions, or waivers conceptually may be provided in Lender's sole and unfettered discretion, and the parties hereto agreement as to how such applicable provisions will be construed in the event of any such cure or waiver.

(r)  **Ambiguity**.  Neither this Agreement nor any uncertainty or ambiguity herein shall be construed or resolved against Lender or a Debtor, whether under any rule of construction or otherwise.  On the contrary, this Agreement has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of all parties hereto.

45

    **(s)**    <u>**Authority**</u>. Lender is authorized to make loans under the terms of this Agreement upon the request, either written or oral, in the name of any Borrower by any authorized person whose name appears at the end of this Agreement or by any of the following named persons, from time to time, holding the following offices of any Borrower, President, Treasurer, Chief Executive Officer, Chief Financial Officer and such other officers and authorized signatories as may from time to time be set forth in separate resolutions. Each Borrower agrees that any and all loans made by Lender to Borrowers or for their account at the request of the Borrowers or pursuant to the terms of this Agreement shall be conclusively deemed to have been authorized by such Borrower and to have been made pursuant to duly authorized requests therefor on its behalf.

    **(t)**    <u>**Rights and Remedies**</u>. No delay or omission on the part of Lender in exercising any rights shall operate as a waiver of such right or any other right. Waiver on any one occasion shall not be construed as a bar to or waiver of any right or remedy on any future occasion. All Lender's rights and remedies, whether evidenced hereby or by any other agreement, instrument or paper, shall be cumulative and may be exercised singularly or concurrently. It is distinctly understood and agreed that all of the rights of Lender contained in this Agreement shall likewise apply, insofar as applicable, to any modification of or supplement to this Agreement and to any other agreements between Lender and any Debtor.

    **(u)**    <u>**Severability**</u>. Paragraph and section headings used in this Agreement are for convenience only, and shall not affect the construction of this Agreement. If one or more provisions of this Agreement (or the application thereof) shall be invalid, illegal or unenforceable in any respect in any jurisdiction, the same shall not invalidate or render illegal or unenforceable such provision (or its application) in any other jurisdiction or any other provision of this Agreement (or its application).

    **(v)**    <u>**Integration**</u>. This Agreement, together with the other documents and instruments executed concurrently herewith represent the entire and final understanding of the parties with respect to the transactions contemplated hereby and shall not be contradicted or qualified by evidence of any prior, contemporaneous or subsequent other agreement, oral or written, before the date hereof.

    **(w)**    <u>**Patriot Act**</u>. Lender hereby notifies the Debtors that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies the Debtors and each other party to the transaction contemplated hereunder, which information includes the name and address of the Debtors and each such other party and other information that will allow Lender to identify the Debtors and each such other party in accordance therewith.

**14.**    **DEFINITIONS.**

    "**Additional ERC Remittance**" means ERC Funds of BMH HR LLC in the aggregate amount of $175,000.

    "**Adequate Protection Claims**" shall have the meaning given thereto in the Final Order, or, prior to the entry of the Final Order, the Interim Order

    "**Adequate Protection Liens**" shall have the meaning given thereto in the Final Order, or, prior to the entry of the Final Order, the Interim Order.

    "**Adequate Protection Obligations**" shall have the meaning given thereto in the Final Order, or, prior to the entry of the Final Order, the Interim Order.

"**Adequate Protection Payments**" shall have the meaning given thereto in the Final Order, or, prior to the entry of the Final Order, the Interim Order.

"**Affiliate**" means any Person (i) which directly or indirectly Controls, or is controlled by or is under common control with a Debtor or a subsidiary, (ii) which directly or indirectly beneficially holds or owns twenty five percent (25%) or more of any class of voting stock of a Debtor or any subsidiary, or (iii) ten percent (10%) or more of the voting stock of which is directly or indirectly beneficially owned or held by a Debtor or a subsidiary.

"**Agreement**" shall have the meaning set forth in the preamble.

"**Allowed Professional Fees**" shall have the meaning given to the term "Allowed Professional Fees" in the Final Order, or, prior to the entry of the Final Order, the Interim Order.

"**Anti-Corruption Laws**" means the FCPA, the U.K. Bribery Act of 2010, as amended, and all other applicable laws and regulations or ordinances concerning or relating to bribery or corruption in any jurisdiction in which any Debtor or any of its Subsidiaries or Affiliates is located or is doing business.

"**Anti-Money Laundering Laws**" means the applicable laws or regulations in any jurisdiction in which any Debtor or any of its Subsidiaries or Affiliates is located or is doing business that relates to money laundering, any predicate crime to money laundering, or any financial record keeping and reporting requirements related thereto.

"**Anti-Terrorism Laws**" means (a) Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended), (b) the Patriot Act; (c) the International Emergency Economic Powers Act, along with any other enabling legislation or executive order relating thereto or any regulations passed thereunder, including the foreign assets control regulations of the United States Treasury Department (31 C.F.R., Subtitle B, Chapter V), and (d) any Sanctions.

"**Applicable Petition Date**" shall have the meaning set forth in the recitals hereto.

"**Approved 363 Sale**" shall mean any sale of any Debtor's assets or business pursuant to Section 363 of the Bankruptcy Code approved by the Lender pursuant to an asset purchase agreement approved by and acceptable to Lender in its sole and absolute discretion, and pursuant to appropriate orders of the Bankruptcy Court that are approved by and acceptable to Lender in its sole and absolute discretion, including (for the avoidance of doubt) any sale as contemplated and provided for in **Exhibit 10**

"**Avoidance Actions**" shall have the meaning given to such term in the Interim Order, or, after the entry of the Final Order, in the Final Order.

"**Bank Schedule**" shall have the meaning set forth in **Section 5(d)**.

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy" and any other federal bankruptcy law.

"**Bidding Procedures Order**" has the meaning specified therefor in **Exhibit 10** of this Agreement.

"**BMH HR LLC**" means BMH HR LLC, a Texas limited liability company.

47

"**Board of Governors**" means the Board of Governors of the Federal Reserve System of the United States (or any successor).

"**Borrower**" and "**Borrowers**" shall have the respective meaning set forth in the preamble.

"**Boulders Property**" means the apartment complex commonly known as The Boulders at Lake Ridge Apartments 4421 82nd Street, Lubbock, TX 79424.

"**Business Day**" means any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of the State of New York or is a day on which banking institutions located in such state are closed.

"**Carve-Out**" shall have the meaning given to such term in the Interim Order, or, after the entry of the Final Order, in the Final Order.

"**Case**" shall have the meaning set forth in the recitals hereto.

"**Cash Collateral**" shall have the meaning given to such term in the Interim Order, or, after the entry of the Final Order, in the Final Order.

"**Cash Management Order**" means an order entered by the Bankruptcy Code, in form and substance acceptable to Lender, governing the Debtors' cash management system.

"**Challenge Period**" shall have the meaning given to such term in the Interim Order, or, after the entry of the Final Order, in the Final Order.

"**Change in Law**" means the occurrence after the date hereof:  (a) the adoption or effectiveness of any law, rule, regulation, judicial ruling, judgment or treaty, (b) any change in any law, rule, regulation, judicial ruling, judgment or treaty or in the administration, interpretation, implementation or application by any Governmental Authority of any law, rule, regulation, guideline or treaty, (c) any new, or adjustment to, requirements prescribed by the Board of Governors for "Eurocurrency Liabilities" (as defined in Regulation D of the Board of Governors), requirements imposed by the Federal Deposit Insurance Corporation, or similar requirements imposed by any domestic or foreign governmental authority or resulting from compliance by Lender with any request or directive (whether or not having the force of law) from its lenders or related agent pertaining to any central bank or other Governmental Authority and related in any manner to SOFR, the Term SOFR Reference Rate, or Term SOFR, or (d) the making or issuance by any Governmental Authority of any request, rule, guideline or directive, whether or not having the force of law; provided that notwithstanding anything in the Agreement to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives concerning capital adequacy promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities shall, in each case, be deemed to be a "Change in Law," regardless of the date enacted, adopted or issued.

"**Change of Control**" means [reserved].

"**Closing Date**" means January 27, 2026 or the date on which the Bankruptcy Court enters the Interim Order.

"**Code**" means the Uniform Commercial Code, as in effect from time to time in the State of New York.

"**Collection Account**" means an account in the name of Lender and designated from time to time as the Collection Account hereunder by written notice from Lender to the Borrowers, and which is initially described on **Schedule B**.

"**Committee**" shall have the meaning given to such term in the Interim Order, or, after the entry of the Final Order, in the Final Order.

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of any Person, whether through the ownership of voting securities, by contract or otherwise.

"**Credit Limit**" shall have the meaning set forth in **Exhibit 1**.

"**Creditors' Committee**" means the official unsecured creditors' committee appointed in the Case.

"**Debt**" means of a Person as of a given date, all items of indebtedness or liability which in accordance with GAAP would be included in determining total liabilities as shown on the liabilities side of a balance sheet for such Person and shall also include the aggregate payments required to be made by such Person at any time under any lease that is considered a capitalized lease under GAAP (except, that, any such balance that constitutes an accrued expense or trade payment shall not be considered "Debt").

"**Default Rate**" shall have the meaning set forth in **Section 3(a)**.

"**Default Rate Margin**" shall have the meaning set forth in **Exhibit 1**.

"**Designated Account**" shall have the meaning set forth in **Section 5(d)**.

"**DIP Collateral**" shall have the meaning set forth in **Section 4(a)**.

"**DIP Budget**" shall mean the DIP Budget prepared by the Debtors, in consultation with the Lender, in good faith based upon assumptions which the Debtors believe to be reasonable and delivered to and approved by Lender on or before the Closing Date and attached hereto as Exhibit 6 (the "**Initial DIP Budget**"), setting forth Debtors' cash flow forecast in reasonable detail satisfactory to Lender including projected weekly disbursements, projected weekly cash collections and receipts and such line item detail as satisfactory to Lender, for the period commencing with the week in which the Closing Date shall occur and ending with February 21, 2026, as such DIP Budget may be updated from time to time in accordance with and subject to approval of Lender in its sole and absolute discretion as set forth in **Section 7(m)** hereof.

"**Disqualified Equity Interests**" means any Equity Interest that, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (a) matures or is mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation or otherwise (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Loans and all other Obligations that are accrued and payable and the termination of the commitments to lend hereunder), (b) is redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests), in whole

49

or in part, (c) provides for the scheduled payments of dividends in cash, or (d) is or becomes convertible into or exchangeable for Debt or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is 180 days after the Maturity Date.

"**Distributions**" means all payment or distributions to shareholders in cash or in property other than reasonable salaries, bonuses and expense reimbursements.

"**Dollars**" means lawful money of the United States.

"**Environmental Law**" means any federal, state, local or other governmental statute, regulation, law or ordinance dealing with the protection of human health and the environment.

"**Equity Interests**" means, with respect to a Person, shares of capital stock, partnership interests, membership or limited liability company interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such interest.

"**ERC**" means a United States refundable tax credit (sometimes called the employee retention tax credit or the employee retention credit) for certain eligible businesses and tax-exempt organizations that had employees and were affected during the COVID-19 pandemic.

"**ERC Funds**" means funds representing a United States refundable tax credit (sometimes called the employee retention tax credit or the employee retention credit) for certain eligible businesses and tax-exempt organizations that had employees and were affected during the COVID-19 pandemic.

"**ERISA**" shall have the meaning set forth in **Section 6(j)**.

"**ERISA Affiliate**" means (a) any Person, trade or business (whether or not incorporated) subject to ERISA whose employees are treated as being employed by the same employer as the employees of any Debtor under Section 414(b) of the IRC, (b) any Person, trade or business (whether or not incorporated) subject to ERISA whose employees are treated as being employed by the same employer as the employees of any Debtor under Section 414(c) of the IRC, (c) solely for purposes of Section 302 of ERISA and Section 412 of the IRC, any organization subject to ERISA that is a member of an affiliated service group of which any Debtor is a member under Section 414(m) of the IRC, or (d) solely for purposes of Section 302 of ERISA and Section 412 of the IRC, any Person subject to ERISA that is a party to an arrangement with any Debtor and whose employees are aggregated with the employees of any Debtor under Section 414(o) of the IRC.

"**ERISA Termination Event**" means (i) a Reportable Event with respect to any Plan; (ii) the existence with respect to any Plan of a non-exempt "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the IRC) for which a Borrower could have liability that would result in a material adverse effect; (iii) the withdrawal of a Borrower or any ERISA Affiliate from an Plan or Multiemployer Plan during a plan year in which such entity was a "substantial employer" as defined in Section 4001(a)(2) of ERISA; (iv) the providing of notice of intent to terminate an Plan in a distress termination described in Section 4041(c) of ERISA; (v) the institution by the Pension Benefit Guaranty Corporation of proceedings to terminate an Plan or Multiemployer Plan; (vi) any event or condition (a) which might constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan or Multiemployer Plan, or (b) that may result in termination of a Multiemployer Plan pursuant to Section 4041A of ERISA; or (vii) the partial or complete withdrawal within the meaning of

50

Sections 4203 and 4205 of ERISA, of a Borrower or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization.

"**Estate**" means, as to any Debtor, such Debtor and its bankruptcy estate (as defined under Bankruptcy Code section 541).

"**Event of Default**" and "**Events of Default**" shall have the respective meanings set forth in **Section 10(a)**.

"**Existing Reporting Orders**" shall mean (1) the *Interim Order Authorizing Debtors' Use of Cash Collateral and Granting Adequate Protection and Related Relief* [Docket No. 61], (2) the *Final Order (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System and Maintain Existing Bank Accounts and Business Forms and Honor Certain Prepetition Obligations Related to the Use Thereof, and (B) Continue to Perform Intercompany Transactions, and (II) Granting Related Relief* [Docket No. 130], (3), the *Order Granting Debtors' Emergency Motion for Authority to Pay Prepetition Wages, Compensation, and Employee Benefits* [Docket No. 66] and (4) any other order entered in the Cases obligating the Debtors to provide reporting, notices, or other information or cooperation to Lender or , in each case as the same is amended, renewed, extended, or replaced in form and substance acceptable to Lender.

"**FCPA**" means the Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder.

"**Final Order**" means a final order of the Bankruptcy Court in the Case authorizing and approving this Agreement and the other Loan Documents under, *inter alia*, Sections 364(c) and (d) of the Bankruptcy Code on a final basis and entered at or after a final hearing, in form and substance satisfactory to Lender in its reasonable discretion.  The Final Order shall, among other things:

(a)    authorize the transactions contemplated by this Agreement and the extensions of credit under this Agreement in an amount not less than the Credit Limit provided for herein;

(b)    grant the claim and Lien status and Liens described in **Section 16**, and prohibit the granting of additional Liens on the assets of Debtors and any Superpriority Claim status except for any Liens and Claims specifically provided for in such order;

(c)    provide that such Liens are automatically perfected as of the Applicable Petition Date by the entry of the Final Order and also grant to Lender relief from the automatic stay of Section 362(a) of the Bankruptcy Code to enable Lender, if Lender elects to do so in its discretion, to make all filings and recordings and to take all other actions considered necessary or advisable by Lender to perfect, protect and insure the priority of its Liens upon the DIP Collateral as a matter of non-bankruptcy law;

(d)    provide that no Person will be permitted to surcharge the DIP Collateral under Section 506(c) of the Bankruptcy Code, nor shall any costs or expenses whatsoever be imposed against the DIP Collateral, except for the Carve-Out; and

(e)    provide Lender with the option, in its discretion, to effect a "Final Roll-Up" as defined in and described in the Interim Order, and reimbursement in full in cash of all reasonable professional fees, costs and expenses of the Pre-Petition Lender, in each case using the proceeds of loans and extensions of credit hereunder, in each case upon entry of such Final Order.

51

"**Final Order Entry Date**" means the date on which the Final Order is entered by the Bankruptcy Court.

"**First Petition Date**" shall have the meaning set forth in the recitals hereto.

"**Full Payment**" means (a) the full and indefeasible cash payment of the Obligations, and prior to giving effect to the Final Roll-Up, the then outstanding Pre-Petition Obligations (other than inchoate indemnification and reimbursement obligations and other obligations which, by their terms, survive termination of this Agreement), including any interest, fees and other charges accruing during an insolvency proceeding (whether or not allowed in the proceeding), (b) the termination or expiration of the commitments of Lender to make Term Loans, and (c) the execution and delivery by Debtors of a general release in favor of Lender and Pre-Petition Lender.

"**GAAP**" means generally accepted accounting principles, applied on a basis consistent with the accounting practices applied in the financial statements required to be delivered hereunder.

"**Governmental Authority**" means the government of any nation or any political subdivision thereof, whether at the national, state, territorial, provincial, county, municipal or any other level, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of, or pertaining to, government (including any supra-national bodies such as the European Union or the European Central Bank).

"**Guarantor**" means each of the Guarantors party to this agreement as of the date hereof and each Person that becomes a guarantor after the date hereof.

"**Hazardous Substances**" means pollutants, contaminants, hazardous substances, hazardous wastes, petroleum and fractions thereof, and all other chemicals, wastes, substances and materials listed in, regulated by or identified in any Environmental Law; and

"**IRC**" means the Internal Revenue Code of 1986, as amended and in effect from time to time.

"**Initial DIP Budget**" has the meaning specified therefor in the definition of "DIP Budget".

"**Intellectual Property Rights**" shall have the meaning set forth in **Section 6(m)**.

"**Interim Availability Amount**" means $750,000.

"**Interim Availability Period**" means the period commencing on the Interim Order Entry Date and ending on the date of, and immediately prior to, the Bankruptcy Court's entry of the Final DIP Order on the Final Order Entry Date.

"**Interim Order**" means an order of the Bankruptcy Court in the Case authorizing and approving this Agreement and the other Loan Documents, for an interim period, under, *inter alia*, Sections 364(c) and (d) of the Bankruptcy Code and entered at or after a hearing, in form and substance substantially similar to that attached hereto as Exhibit 7 and/or satisfactory to Lender in its sole and absolute discretion. The Interim Order shall, among other things, have:

(a) authorized the transactions contemplated by this Agreement and the extensions of credit under this Agreement in an amount not less than the Credit Limit provided for herein;

52

(b)      granted the claim and Lien status and Liens described in Section 16, and prohibited the granting of additional Liens on the assets of Debtors except for any Liens and Claims specifically provided for in such order;

(c)      provided that such Liens are automatically perfected as of the Applicable Petition Date by the entry of the Interim Order and also granted to the Lender relief from the automatic stay of Section 362(a) of the Bankruptcy Code to enable the Lender, if the Lender elects to do so in its discretion, to make all filings and recordings and to take all other actions considered necessary or advisable by the Lender to perfect, protect and insure the priority of its Liens upon the DIP Collateral as a matter of non-bankruptcy law;

(d)      provided that, upon entry of the Final Order, no Person will be permitted to surcharge the DIP Collateral under Section 506(c) of the Bankruptcy Code, nor shall any costs or expenses whatsoever be imposed against the DIP Collateral, except for the Carve-Out;

(e)      provided for a "roll-up" of all of Pre-Petition Revolver Obligations upon entry of such Final Order, and

(f)      authorized Lender to apply payments received hereunder and proceeds of DIP Collateral received by Lender to either the Pre-Petition Revolver Obligations or the Post-Petition Obligations as Lender may determine in its sole and absolute discretion, as contemplated by **Section 5(b)** hereof.

"**IP License Agreement**" any license agreement granting to a Borrower a license of Intellectual Property Rights that is used in any Borrower's Inventory.

"**Lender**" shall have the meaning set forth in the preamble.

"**Licensed Intellectual Property**" shall have the meaning set forth in **Section 6(m)**.

"**Lien**" shall have the meaning set forth in **Section 9(b)**.

"**Loan Documents**" means this Agreement, the Interim Order, the Final Order (upon the issuance thereof), the Term Note, the Settlement Agreement, the Participation Agreement, the PEC Pledge Agreement, each guaranty or other agreement signed by a Guarantor or Debtor, work through agreements, any pledge agreements, each subordination agreement, each intercreditor agreement, each security agreement, each Mortgage, the Mortgage Documents, together with every other agreement, note, document, contract or instrument to which a Borrower or any other Debtor now or in the future may be a party and which may be required by Lender in connection with, or as a condition to, the execution of this Agreement, each as may be amended, modified, replaced, substituted, superseded or restated from time to time.

"**Loan**" and "**Loans**" individually and collectively refer to the Term Loan and Term Loans.

"**Debtor**" and "**Debtors**" shall have the meaning set forth in the preamble.

"**Material Contract**" means (a) any contract or other agreement (other than the Loan Documents), written or oral, of a Borrower involving monetary liability of or to any Person in an amount in excess of $500,000 in any fiscal year, (b) any lease of a Borrower pertaining to a location with Eligible Inventory of such Borrower is located, and (c) any other contract or other agreement (other than the Loan Documents),

53

whether written or oral, to which a Borrower is a party as to which the breach, nonperformance, cancellation or failure to renew by any party thereto would have a material adverse effect.

"**Maturity Date**" shall have the meaning set forth in **Exhibit 1**.

"**Milestones**" means each of the milestones set forth on **Exhibit 10**.

"**Monthly Financial Statement**" means, for any given month, the financial statements received by Lender from the Debtors in accordance with **Section 8(a)(i)**.

"**Mortgages**" means, individually and collectively, one or more mortgages, deeds of trust, or deeds to secure debt, executed and delivered by the Debtors, any Subsidiary of the Debtors or any Guarantor in favor of Lender, in form and substance reasonably satisfactory to Lender, that encumber the Real Property DIP Collateral, each as may be amended, modified, replaced, substituted, superseded or restated from time to time.

"**Mortgage Documents**" means the Mortgages and each other document executed in connection with the Real Property DIP Collateral, including any assignments and indemnities, each as may be amended, modified, replaced, substituted, superseded or restated from time to time.

"**Multiemployer Plan**" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which any Debtor or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding six plan years, has made or been obligated to make contributions.

"**Net Cash Proceeds**" means the cash proceeds of any asset sale (including cash proceeds received as deferred payments pursuant to a note, installment receivable or otherwise, but only upon actual receipt) net of (a) reasonable attorney, accountant, and investment banking fees and other customary transaction costs, (b) reasonable brokerage commissions, (c) amounts required to be applied to the repayment of debt secured by a Lien not prohibited by this Agreement on the asset being sold, and (d) reasonable taxes paid or reasonably estimated to be payable as a result of such asset sale.

"**Non-Allocable Disbursements**" means (i) disbursements/payments in respect of professional fees, including funding in respect of the Carve Out, (ii) disbursements/payments in respect of this Agreement or the other Loan Documents and/or the Post-Petition Obligations (including interest and fees payable hereunder), (iii) Adequate Protection Payments, and (iv) payments to the Office of the United States Trustee.

"**Obligations**" means:

(1) to the extent arising under or in connection with this Agreement or any other Loan Document, any and all loans (including the Term Loans and Roll-Up Loans), debts, principal, interest (including any interest that accrues after the Closing Date, reimbursement or indemnification obligations, premiums, liabilities (including all amounts charged to the Borrowers as Term Loans pursuant to this Agreement), obligations (including indemnification obligations (including any indemnification obligations that accrue after the conversion of the Case to a chapter 7 case as to any Debtor, regardless of whether allowed or allowable in whole or in part as a claim in any such chapter 7 case)), fees (including any fees that accrue after the conversion of the Case to a chapter 7 case as to any Debtor, regardless of whether allowed or allowable in whole or in part as a claim in any such chapter 7 case), expenses (including any fees, costs or expenses that accrue after the conversion of the Case to a chapter 7 case as to any Debtor regardless of whether allowed or allowable in whole or in part as a claim in any such chapter 7 case),

54

guaranties, and all covenants and duties of any other kind and description owing by any Debtor arising out of, under, pursuant to, in connection with, or evidenced by this Agreement or any of the other Loan Documents, the Interim Order, and/or the Final Order, and irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, and including all interest not paid when due and all other expenses or other amounts that Debtors are required to pay or reimburse by the Loan Documents or by law or otherwise in connection with the Loan Documents.  Without limiting the generality of the foregoing, the Obligations of Debtors under the Loan Documents include the obligation to pay (i) the principal of the Term Loans, (ii) interest accrued on the Term Loans, (iii) expenses, (vi) fees payable under this Agreement or any of the other Loan Documents and (vii) indemnities and other amounts payable by any Debtor under any Loan Document, and

(2)    all Pre-Petition Obligations (after giving effect to the Final Roll-Up);

in each case, whether now existing or arising hereafter and notwithstanding that any such Obligations or claims therefor shall be disallowed, voided or subordinated in any insolvency proceeding or under any debtor relief law or other applicable law.

"**OFAC**" means The Office of Foreign Assets Control of the U.S. Department of the Treasury.

"**OFAC Prohibited Person**" means (a) a Person on OFAC's list of Specially Designated Nationals and Blocked Persons, or any other OFAC sanctions list, or (b) a Person with whom any Borrower would be prohibited from transacting with under OFAC sanctions regulations.

"**Off-the-shelf Software**" shall have the meaning set forth in **Section 6(m)**.

"**Owned Intellectual Property**" shall have the meaning set forth in **Section 6(m)**.

"**Parent**" shall have the meaning set forth in the preamble.

"**Participation Agreement**" shall have the meaning set forth in **Section 7(l)**.

"**Patriot Act**" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA Patriot Act of 2001), as amended, and the rules and regulations thereunder.

"**PEC Pledge Agreement**" shall have the meaning set forth in **Section 7(l)**.

"**Permitted Liens**" means those liens permitted pursuant to **Section 9(b)** of this Agreement.

"**Permitted Protest**" shall have the meaning set forth in **Section 9(b)**.

"**Person**" means any individual, corporation, partnership, joint venture, limited and unlimited liability company, association, joint stock company, trust, unincorporated organization or government or any agency or political subdivision of a governmental entity, and any such Person's successors and assigns.

"**Plan**" shall have the meaning set forth in **Section 6(j)**.

"**Post-Petition Obligations**" means all Obligations other than the Pre-Petition Obligations; for the avoidance of doubt, and notwithstanding anything to the contrary otherwise provided for herein.

55

"**Pre-Petition Collateral**" means all "Collateral" (as defined in Pre-Petition Loan Agreement) in existence as of the Applicable Petition Date of each Debtor party to the Pre-Petition Loan Agreement.

"**Pre-Petition Financing Documents**" means the Pre-Petition Loan Agreement, the "Loan Documents" as defined in the Pre-Petition Loan Agreement, and each document, agreement and instrument (and all schedules and exhibits thereto) executed in connection therewith, in each case, as in effect immediately prior to the Applicable Petition Date.

"**Pre-Petition Guarantors**" means the guarantors party to the Pre-Petition Loan Agreement.

"**Pre-Petition Lender**" means the meaning set forth in the recitals hereto.

"**Pre-Petition Liens**" means, collectively, the Liens granted by Debtors to the Pre-Petition Lender on the Pre-Petition Collateral.

"**Pre-Petition Loan Agreement**" shall have the meaning set forth in the recitals hereto.

"**Pre-Petition Loan Documents**" means the Pre-Petition Loan Agreement, the "Loan Documents" as defined in the Pre-Petition Loan Agreement, and each document, agreement and instrument (and all schedules and exhibits thereto) executed in connection therewith, in each case, as in effect immediately prior to the Applicable Petition Date.

"**Pre-Petition Obligations**" shall have the meaning set forth in **Section 17(a)** hereof.

"**Pre-Petition Payment**" means a payment (by way of adequate protection or otherwise) of principal or interest or otherwise on account of any pre-petition Indebtedness or trade payables or other pre-petition claims against any Debtor.

"**Pre-Petition Released Claim**" or "**Pre-Petition Released Claims**" shall have the meaning set forth in **Section 17** hereof.

"**Pre-Petition Revolver Obligations**" means, collectively, all Pre-Petition Obligations.

"**Pre-Petition Revolving Loan**" means a "Revolving Loan" as defined in (and funded under) the Pre-Petition Loan Agreement.

"**Qualified Equity Interest**" means and refers to any Equity Interests issued by a Borrower (and not by one or more of its Subsidiaries) that is not a Disqualified Equity Interest.

"**Real Property**" means any estates or interests in real property now owned or hereafter acquired by a Debtor or any subsidiary of a Debtor and the improvements thereto.

"**Real Property DIP Collateral**" means the Real Property described on **Exhibit 8** attached hereto.

"**Reorganization Plan**" means a plan or plans of reorganization in the Case.

"**Reportable Event**" means a reportable event as defined in Section 4043 of ERISA and the regulations issued thereunder as to which the Pension Benefit Guaranty Corporation and any entity succeeding to any or all of its functions under ERISA has not waived the notification requirement of Section 4043(a), or the failure of a Plan to meet the minimum funding standards of Section 412 of the Internal

56

Revenue Code of 1986, as amended (without regard to whether the Plan is a plan described in Section 4021(a)(2) of ERISA) or under Section 302 of ERISA.

"**Restricted Payment**" means to (a) declare or pay any dividend or make any other payment or distribution, directly or indirectly, on account of Equity Interests issued by a Debtor (including any payment in connection with any merger or consolidation involving such Debtor) or to the direct or indirect holders of Equity Interests issued by such Debtor in their capacity as such (other than dividends or distributions payable in Qualified Equity Interests issued by such Debtor), or (b) purchase, redeem, make any sinking fund or similar payment, or otherwise acquire or retire for value (including in connection with any merger or consolidation involving a Debtor) any Equity Interests issued by such Debtor, or (c) make any payment to retire, or to obtain the surrender of, any outstanding warrants, options, or other rights to acquire Equity Interests of a Debtor now or hereafter outstanding, or (d) make, or cause or suffer to permit any of any Debtor's Subsidiaries to make, any payment or prepayment of principal of, premium, if any, or interest on, or redemption, purchase, retirement, defeasance (including in-substance or legal defeasance), sinking fund or similar payment with respect to, any Debt.

"**RTO Contracts**" means all commercial paper held by Debtors with respect to the business of renting, on a rent-to-own basis, and selling furniture, electronics, appliances, and other merchandise to customers conducted at the Debtors' store locations, including without limitation, all of such Debtors' rights, titles and interests under the consumer rental agreements held by Debtors.

"**Sale Order**" means an order of the Bankruptcy Court, on terms and conditions and in form and substance acceptable to the Lender in its sole and absolute discretion, approving any Approved 363 Sale.

"**Sanctioned Entity**" means (a) a country or territory or a government of a country or territory, (b) an agency of the government of a country or territory, (c) an organization directly or indirectly controlled by a country or territory or its government, or (d) a Person resident in or determined to be resident in a country or territory, in each case of clauses (a) through (d) that is a target of Sanctions, including a target of any country or list-based sanctions program administered and enforced by OFAC or any Canadian Governmental Authority.

"**Sanctioned Person**" means, at any time (a) any Person named on the list of Specially Designated Nationals and Blocked Persons maintained by OFAC, OFAC's consolidated Non-SDN list or any other Sanctions-related list maintained by any Governmental Authority, (b) a Person or legal entity that is a target of Sanctions, (c) any Person operating, organized or resident in a Sanctioned Entity, or (d) any Person directly or indirectly owned or controlled (individually or in the aggregate) by or acting on behalf of any such Person or Persons described in clauses (a) through (c) above.

"**Sanctions**" means individually and collectively, respectively, any and all economic sanctions, trade sanctions, financial sanctions, sectoral sanctions, secondary sanctions, trade embargoes anti-terrorism laws and other sanctions laws, regulations or embargoes, including those imposed, administered or enforced from time to time by: (a) the United States of America, including those administered by OFAC, the U.S. Department of State, the U.S. Department of Commerce, or through any existing or future executive order, (b) the United Nations Security Council, (c) the European Union or any European Union member state, (d) Her Majesty's Treasury of the United Kingdom, or (d) any other Governmental Authority with jurisdiction over Lender or any Debtor or any of their respective Subsidiaries or Affiliates.

"**Second Petition Date**" shall have the meaning set forth in the recitals hereto.

57

"**Settlement Agreement**" means that certain Settlement Agreement dated as of the date hereof by and among the Debtors, Ian MacDonald and Lender in form and substance substantially similar to that attached hereto as **Exhibit 11** and satisfactory to the Pre-Petition Lender and Lender in their respective sole and absolute discretion.

"**Senior Liens**" means, collectively, (i) the Prior Permitted Liens, (ii) any valid, perfected, and unavoidable Lien (other than the Pre-Petition Liens) existing as of the Applicable Petition Date, which is senior in priority to the liens granted to the Pre-Petition Lender in the Pre-Petition Collateral, and (iii) any valid and unavoidable Lien, which is senior in priority to the Pre-Petition Liens granted to the Pre-Petition Lender in the Pre-Petition Collateral that is validly perfected subsequent to the Applicable Petition Date as permitted by Bankruptcy Code section 546(b).

"**Subject RTO Real Property**" means all real property owned by the Debtors specified on Schedule 7 to the Settlement Agreement.

"**Superpriority Claim**" means an allowed claim against any Debtor or such Debtor's estate in the Case which is an administrative expense claim having priority over (a) any and all allowed administrative expenses (other than the Carve-Out) and (b) all unsecured claims now existing or hereafter arising, including any administrative expenses of the kind specified in the Bankruptcy Code, including without limitation Sections 105, 326, 328, 330, 331, 364(c)(1), 365, 503, 506(c) (upon entry of the Final Order), 507, 546, 726, 1113 or 1114 of the Bankruptcy Code.

"**Term**" shall have the meaning set forth in **Section 12(a)**.

"**Term Loan**" or "**Term Loans**" shall have the meaning set forth in **Section 1(a)**.

"**Termination Date**" means the earliest to occur of (the date of such earliest occurrence, the "Termination Date"): (a) the Maturity Date; (b) delivery of a termination declaration to Borrowers during the continuance of an Event of Default pursuant to Section 10; (c) the effective date or substantial consummation of an Approved 363 Sale; (d) the effective date or substantial consummation of a plan of reorganization or plan of liquidation in the Case; (e) the date of filing or support by the Debtors of a plan of reorganization or plan of liquidation that does not provide for the indefeasible payment in full in cash of all Obligations (including for the avoidance of doubt, even if prior to the Final Order, all Pre-Petition Revolving Obligations); (f) date of the conversion of the Case to a case under Chapter 7 of the Bankruptcy Code; (g) the date of the dismissal of the Case.

"**Term Note**" shall have the meaning set forth in **Section 1(a)**.

"**Third Petition Date**" shall have the meaning set forth in the recitals.

"**U.S. Trustee**" shall have the meaning given to such term in the Interim Order, or, after the entry of the Final Order, in the Final Order.

## 15.    JOINT AND SEVERAL LIABILITY•

(a)    Each Borrower is accepting joint and several liability hereunder and under the other Loan Documents in consideration of the financial accommodations to be provided by Lender under this Agreement, for the mutual benefit, directly and indirectly, of each Borrower and in consideration of the undertakings of each other Borrower to accept joint and several liability for the Obligations.

58

**(b)**    If and to the extent that any Borrower shall fail to make any payment with respect to any of the Obligations as and when due or to perform any of the Obligations in accordance with the terms thereof, then in each such event the other Borrowers will make such payment with respect to, or perform, such Obligation.

**(c)**    The Obligations of each Borrower under the provisions of this **Section 15** constitute the absolute and unconditional, full recourse Obligations of each Borrower enforceable against each Borrower to the full extent of its properties and assets, irrespective of the validity, regularity or enforceability of this Agreement or any other circumstances whatsoever.

**(d)**    Except as otherwise expressly provided in this Agreement, each Borrower hereby waives notice of acceptance of its joint and several liability, notice of any Loans issued under or pursuant to this Agreement, notice of the occurrence of any Event of Default, or of any demand for any payment under this Agreement, notice of any action at any time taken or omitted by Lender under or in respect of any of the Obligations, any requirement of diligence or to mitigate damages and, generally, to the extent permitted by applicable law, all demands, notices and other formalities of every kind in connection with this Agreement (except as otherwise provided in this Agreement).  Each Borrower hereby assents to, and waives notice of, any extension or postponement of the time for the payment of any of the Obligations, the acceptance of any payment of any of the Obligations, the acceptance of any partial payment thereon, any waiver, consent or other action or acquiescence by Lender at any time or times in respect of any default by any Borrower in the performance or satisfaction of any term, covenant, condition or provision of this Agreement, any and all other indulgences whatsoever by Lender in respect of any of the Obligations, and the taking, addition, substitution or release, in whole or in part, at any time or times, of any security for any of the Obligations or the addition, substitution or release, in whole or in part, of any Borrower.  Without limiting the generality of the foregoing, each Borrower assents to any other action or delay in acting or failure to act on the part of Lender with respect to the failure by any Borrower to comply with any of its respective Obligations, including, without limitation, any failure strictly or diligently to assert any right or to pursue any remedy or to comply fully with applicable laws or regulations thereunder, which might, but for the provisions of this **Section 15** afford grounds for terminating, discharging or relieving any Borrower, in whole or in part, from any of its Obligations under this **Section 15**, it being the intention of each Borrower that, so long as any of the Obligations hereunder remain unsatisfied, the Obligations of each Borrower under this **Section 15** shall not be discharged except by performance and then only to the extent of such performance.  The Obligations of each Borrower under this **Section 15** shall not be diminished or rendered unenforceable by any winding up, reorganization, arrangement, liquidation, reconstruction or similar proceeding with respect to any Borrower or Lender.

**(e)**    Each Borrower represents and warrants to Lender that such Borrower is currently informed of the financial condition of Borrowers and of all other circumstances which a diligent inquiry would reveal and which bear upon the risk of nonpayment of the Obligations.  Each Borrower further represents and warrants to Lender that such Borrower has read and understands the terms and conditions of the Loan Documents.  Each Borrower hereby covenants that such Borrower will continue to keep informed of Borrowers' financial condition, the financial condition of other guarantors, if any, and of all other circumstances which bear upon the risk of nonpayment or nonperformance of the Obligations.

**(f)**    Each Borrower waives all rights and defenses arising out of an election of remedies by Lender, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed Lender's rights of subrogation and reimbursement against such Borrower.

59

(g)     The provisions of this **Section 15** are made for the benefit of Lender and its successors and assigns, and may be enforced by it or them from time to time against any Borrower as often as occasion therefor may arise and without requirement on the part of Lender, successor or assign first to marshal any of its or their claims or to exercise any of its or their rights against any Borrower or to exhaust any remedies available to it or them against any Borrower or to resort to any other source or means of obtaining payment of any of the Obligations hereunder or to elect any other remedy.  The provisions of this **Section 15** shall remain in effect until all of the Obligations shall have been paid in full or otherwise fully satisfied.  If at any time, any payment, or any part thereof, made in respect of any of the Obligations, is rescinded or must otherwise be restored or returned by Lender upon the insolvency, bankruptcy or reorganization of any Borrower, or otherwise, the provisions of this **Section 15** will forthwith be reinstated in effect, as though such payment had not been made.

(h)     Until the Obligations have been paid in full and this Agreement has been terminated, each Borrower hereby agrees that it will not enforce any of its rights of contribution or subrogation against any other Borrower with respect to any liability incurred by it hereunder or under any of the other Loan Documents, any payments made by it to Lender with respect to any of the Obligations or any collateral security therefor until such time as all of the Obligations have been paid in full in cash.  Any claim which any Borrower may have against any other Borrower with respect to any payments to Lender hereunder or under any other Loan Documents are hereby expressly made subordinate and junior in right of payment, without limitation as to any increases in the Obligations arising hereunder or thereunder, to the prior payment in full in cash of the Obligations and, in the event of any insolvency, bankruptcy, receivership, liquidation, reorganization or other similar proceeding under the laws of any jurisdiction relating to any Borrower, its debts or its assets, whether voluntary or involuntary, all such Obligations shall be paid in full in cash before any payment or distribution of any character, whether in cash, securities or other property, shall be made to any other Borrower therefor.

(i)     Each Borrower hereby agrees that, after the occurrence and during the continuance of any default or Event of Default, the payment of any amounts due with respect to the Debt owing by any Borrower to any other Borrower is hereby subordinated to the prior payment in full in cash of the Obligations.  Each Borrower hereby agrees that after the occurrence and during the continuance of any default or Event of Default, such Borrower will not demand, sue for or otherwise attempt to collect any Debt of any other Borrower owing to such Borrower until the Obligations shall have been paid in full in cash.  If, notwithstanding the foregoing sentence, such Borrower shall collect, enforce or receive any amounts in respect of such Debt, such amounts shall be collected, enforced and received by such Borrower as trustee for Lender, and such Borrower shall deliver any such amounts to Lender, for application to the Obligations.

16.     **SUPERPRIORITY CLAIMS, DIP COLLATERAL SECURITY, ETC**. The Debtors hereby represent and warrant, covenant and agree, and acknowledge that:

(a)     (A) pursuant to the Final Order (or, prior to the entry of the Final Order, the Interim Order), to secure all Post-Petition Obligations, whether now existing or hereafter arising, subject only to the Carve-Out, Lender has been granted an allowed superpriority administrative expense claim in Debtors' Estates pursuant to Bankruptcy Code section 364(c)(1), having priority in right of payment over any and all other obligations, liabilities, and indebtedness of any of such Debtors, whether now in existence or hereafter incurred by any of such Debtors of every kind or nature, including any and all unsecured claims, administrative expenses, adequate protection claims, priority claims or any other claims of the kind specified in, or ordered pursuant to, the Bankruptcy Code, including without limitation, *inter alia*, Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 507, 364(c)(1), 546(c), 726 or 1114 and, upon entry of the Final Order, sections 506(c) and 552(b) (the "**DIP Superpriority Claim**"); and (B) other than

60

the Carve-Out, (a) effective upon entry of the Final Order with respect to rights preserved under Bankruptcy Code Section 506(c), no costs or expenses of administration, including without limitation, professional fees allowed and payable under Bankruptcy Code sections 328, 330, and 331, or otherwise, that have been or may be incurred in the Case, or in any successor cases under the Bankruptcy Code, and (b) no priority claims are, or will be, senior to, prior to, or on a parity with the DIP Superpriority Claim or the Post-Petition Obligations or with any other claims of the Lender arising hereunder;

    **(b)**        pursuant to the Final Order (or, prior to the entry of the Final Order, the Interim Order where applicable), to secure the prompt payment and performance of any and all Post-Petition Obligations of Debtors to Lender of whatever kind, nature, or description, absolute or contingent, now existing or hereafter arising, Lender has been granted, effective *nunc pro tunc* as of the Applicable Petition Date, valid, binding, enforceable, continuing, non-avoidable and perfected first priority (subject only to any Senior Liens (including the Carve-Out)), security interests and liens in and upon all property and rights and interests in property of each of the Debtors or their Estates of any kind or nature whatsoever in existence as of the Applicable Petition Date as well as thereafter created or acquired, and wherever located, including without limitation, all of the DIP Collateral as defined herein;

    **(i)**        subject to Section IX of the Interim Order and any corresponding provisions of the Final Order, the Liens in favor of Lender described in the foregoing Section 4 (the "**DIP Liens**") are and shall be:

        (A)        pursuant to Bankruptcy Code section 364(c)(2), continuing valid, perfected, enforceable, first priority, and fully perfected liens on and security interests in all of the Debtors' right, title, and interest in, to, and under all DIP Collateral that is not otherwise encumbered by a validly perfected security interest or lien as of the Applicable Petition Date;

        (B)        pursuant to Bankruptcy Code section 364(c)(3), a continuing valid, enforceable, second priority, and fully perfected lien on and security interest (other than as set forth in clause (c) below) in all of the Debtors' right, title, and interest in, to, and under all DIP Collateral which is subject to, as of the Applicable Petition Date, a Senior Lien,

        (C)        subject to any applicable Senior Liens, pursuant to Bankruptcy Code section 364(d), valid, enforceable, and fully perfected first priority senior priming security interests in and senior priming liens upon all of the Debtors' right, title, and interest in, to, and under all DIP Collateral, including, without limitation, priming security interests and priming liens which are senior to (i) the Pre-Petition Liens held by the Pre-Petition Lender, on behalf of the Pre-Petition Lender, and (ii) the Adequate Protection Liens;

        (D)        notwithstanding anything to the contrary contained in the Interim Order or the Final Order, the DIP Liens and the Adequate Protection Liens shall not be subject or subordinate to (i) Bankruptcy Code sections 510, 549, or 550; (ii) any lien or security interest that is avoided or preserved for the benefit of the Debtors or their Estates under Bankruptcy Code section 551; or (iii) any intercompany or affiliate liens of the Debtors;

    **(ii)**        (A) until the Payment in Full of the Pre-Petition Obligations, the Pre-Petition Lender, for itself and for the benefit of the Pre-Petition Lender, has been granted, pursuant to the Final Order (or, prior to the entry of the Final Order, the Interim Order where applicable), the Adequate Protection Liens, which are valid, binding, enforceable and perfected replacement and additional security interests in and liens on all the Debtors' right, title, and interest in and to the

61

DIP Collateral to the extent of the Adequate Protection Obligations, which liens shall be junior in all respects only to the DIP Liens, the Senior Liens, and the Carve Out; (B) the Adequate Protection Liens shall be deemed to be fully perfected as of the Applicable Petition Date and, subject to Section IX of the Interim Order and any corresponding provisions of the Final Order, not subject to subordination or avoidance for any cause or purpose in the Case, and (C) except for the DIP Liens and the Senior Liens and the Carve Out), the Adequate Protection Liens (i) shall not be made subject to or *pari passu* with any lien or security interest by any court order heretofore or hereafter entered in the Case (unless with the consent of the Pre-Petition Lender); (ii) shall not be subject to Bankruptcy Code sections 506(c) (upon entry of the Final Order), 510, 549, or 550 and (iii) no lien or interest avoided and preserved for the benefit of any Estate pursuant to Bankruptcy Code section 551 shall be made *pari passu* with or senior to the Adequate Protection Liens;

(iii)    pursuant to the Final Order (or, prior to the entry of the Final Order, the Interim Order), As further adequate protection, to the extent that the Adequate Protection Liens do not adequately protect the diminution in value of the Pre-Petition Lender's interest in the Pre-Petition Collateral, the Pre-Petition Lender is hereby granted the Adequate Protection Claim against the Debtors' Estates under Bankruptcy Code sections 503 and 507(b), which shall, subject only to the DIP Superpriority Claim and the Carve-Out, have priority over all other administrative expense claims, priority claims and unsecured claims against the Debtors or their Estates, which are now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses and priority or other claims of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 364, 365, 503(a), 503(b), 506(c) (upon entry of the Final Order), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114;

(iv)    the Final Order (and prior to the entry thereof, the Interim Order where applicable) is sufficient and conclusive evidence of the priority, perfection, and validity of the DIP Liens, effective as of the Applicable Petition Date, without any further act and without regard to any other federal, state, or local requirements or law requiring notice, filing, registration, recording, or possession of the DIP Collateral, or other act to validate or perfect such security interest or lien, including, without limitation, control agreements with any financial institution(s) holding any deposit account of Borrowers or any Guarantor (a "**Perfection Act**"). Notwithstanding the foregoing, if Lender or the Pre-Petition Lender (on account of its Adequate Protection Liens) shall, in their respective sole discretion, elect for any reason to file, record, or otherwise effectuate any Perfection Act, pursuant to the Final Order (or, prior to the entry of the Final Order, the Interim Order), each of Lender and the Pre-Petition Lender (with the prior written consent of Lender) is authorized to perform such act, and, pursuant to the Final Order (or, prior to the entry of the Final Order, the Interim Order), Debtors are authorized to perform such acts to the extent necessary or reasonably requested by Lender and/or the Pre-Petition Lender, which act or acts shall be deemed to have been accomplished as of the Applicable Petition Date notwithstanding the date and time actually accomplished, and in such event, the subject filing or recording office is authorized to accept, file or record any document in regard to such act in accordance with applicable law. Pursuant to the Final Order (or, prior to the entry of the Final Order, the Interim Order), Lender and/or the Pre-Petition Lender may choose to file, record or present a certified copy of the Final Order (or, prior to the entry of the Final Order, the Interim Order where applicable), in the same manner as a Perfection Act, which shall be tantamount to a Perfection Act, and, in such event, the subject filing or recording office is authorized to accept, file, or record such certified copy of the Final Order (or, prior to the entry of the Final Order, the Interim Order where applicable) in accordance with applicable law. Should Lender and/or the Pre-Petition Lender so choose and attempt to file, record or perform a Perfection Act, no defect or failure in connection with such attempt shall in any way limit, waive, or alter the validity, enforceability, attachment, priority, or

62

perfection of the DIP Liens or the Adequate Protection Liens granted herein by virtue of the entry of the Final Order (or, prior to the entry of the Final Order, the Interim Order where applicable).

(c)    **Non-Exclusive Relief**.  The agreement of Lender to provide Post-Petition financing to Borrowers will not prohibit Lender or Pre-Petition Lender from moving in the Bankruptcy Court for any other and further relief which Lender or such Pre-Petition Lender, as applicable, believes in good faith to be reasonably and immediately necessary to protect their rights with respect to the DIP Collateral and/or the Pre-Petition Collateral (as applicable) (including a request for Debtors to abandon any part of the DIP Collateral and/or the Pre-Petition Collateral (as applicable)) or otherwise.

(d)    **No Intent to Hinder, Delay or Defraud**.  Neither the incurrence of the Obligations, the granting of Liens under this Agreement on the DIP Collateral to secure the Obligations, the creation of the Liens on the DIP Collateral to secure the Obligations under the Interim Order or Final Order and/or any other Loan Document, the granting of Liens under this Agreement on the DIP Collateral to secure the Adequate Protection Obligations or the creation of the Liens on the DIP Collateral to secure the Adequate Protection Obligations under the Interim or Final Order and/or any other Loan Document, was incurred, granted or transferred, as applicable, with any intent to hinder, delay or defraud any of its respective creditors.

(e)    **Grants, Rights and Remedies**.  The Liens and administrative priority granted by or pursuant to the Interim Order, the Final Order, this Agreement or any other Loan Document (and, in the case of Liens in the Pre-Petition Collateral in favor of the Pre-Petition Lender, granted by or pursuant to the Pre-Petition Loan Documents) are independently granted.  The Interim Order, the Final Order, this Agreement and the other Loan Documents (and, in the case of Liens in the Pre-Petition Collateral in favor of the Pre-Petition Lender, the Pre-Petition Loan Documents) supplement each other, and the grants, priorities, rights and remedies of Lender hereunder and thereunder and of Pre-Petition Lender hereunder and thereunder are cumulative.

## 17.    ACKNOWLEDGMENT; REAFFIRMATION AND RELEASE.

(a)    As of the Second Petition Date, the aggregate amount of all Obligations (as defined in the Pre-Petition Loan Agreement) owing by Debtors to the Pre-Petition Lender under and in connection with the Pre-Petition Financing Documents was not less than (A) $12,792,674.70, consisting of (1) Pre-Petition Revolving Loans in an outstanding principal amount of $11,974,354 under the Pre-Petition Loan Agreement, plus interest accrued and accruing thereon at the rate in effect on the Second Petition Date, plus (2) accrued and accruing fees, plus (3) all accrued and accruing costs and expenses (including attorneys' fees and legal expenses), plus (4) any other charges and liabilities accrued, accruing or chargeable, whether due or to become due, matured or contingent, under the Pre-Petition Loan Agreement (collectively, "**Pre-Petition Obligations**").  Without limiting the foregoing, the Pre-Petition Obligations shall include all indemnification obligations of Debtors to the Pre-Petition Lender arising under the Pre-Petition Financing Documents, including without limitation the indemnitee and other protections provided to indemnitees under the obligations arising under the Pre-Petition Loan Agreement which survive payment in full of the Pre-Petition Obligations.

(b)    The Pre-Petition Obligations constitute allowed, legal, valid, binding, enforceable, and non-avoidable obligations of Debtors, and are not subject to any offset, deduction, defense, counterclaim, avoidance, recovery, recharacterization, or subordination pursuant to the Bankruptcy Code or any other applicable law, and the Debtors do not possess, and shall not assert, any claim, counterclaim, setoff, deduction, or defense of any kind, nature, or description that would in any way impair, reduce, or affect the validity, enforceability, and nonavoidability of any of the Pre-Petition Obligations.

(c)      Each Debtor confirms and agrees that:

(i)      as of the Applicable Petition Date, the Pre-Petition Lender, had and shall continue to have, and the Pre-Petition Obligations were and shall continue to be secured by, the Pre-Petition Liens on the Pre-Petition Collateral, which were and are valid, binding, perfected, enforceable and non-avoidable first priority security interests and Liens, subject only to (A) Senior Liens, and (B) from and after the entry of the Final Order, or, prior to the entry of the Final Order, the Interim Order, (1) the Carve-Out, (2) the Liens of Lender securing the Post-Petition Obligations, and (3) the Adequate Protection Liens,

(ii)      the Pre-Petition Lender has a valid, binding and perfected nonavoidable and first priority security interest (subject only to (A) Senior Liens, and (B) from and after the entry of the Final Order, or, prior to the entry of the Final Order, the Interim Order, (1) the Carve-Out, (2) the Liens of Lender securing the Post-Petition Obligations, and (3) the Adequate Protection Liens)) and lien in all of Debtor's Cash Collateral, including all amounts on deposit in all of Debtor's banking, checking or other deposit accounts with each of the Pre-Petition Lender, whether as original Collateral or proceeds of other Pre-Petition Collateral, and all such Cash Collateral is part of the Pre-Petition Collateral, and

(iii)      pursuant to the Final Order, or, prior to the entry of the Final Order, the Interim Order where applicable, the Pre-Petition Lender, has been granted and shall continue to have valid, enforceable and perfected security interests and Liens on all the Debtors' right, title, and interest in and to the DIP Collateral to the extent of the Adequate Protection Obligations, which liens shall be junior in all respects only to the DIP Liens, the Senior Liens and the Carve-Out).

(d)      In consideration of, and as a condition to Lender  making Term Loans under this Agreement, the Pre-Petition Lender consenting to the use of Cash Collateral, and providing other credit and financial accommodations to the Debtors pursuant to the provisions of the Interim Order and the DIP Loan Documents, each Debtor, on behalf of itself, its successors and assigns and its Estate (collectively, the "**Releasors**"), subject only to Section IX of the Interim Order, hereby absolutely releases and forever discharges and acquits Pre-Petition Lender and each of its successors, participants, and assigns, and their present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees, and other representatives (the Pre-Petition Lender, and all such other parties being hereinafter referred to collectively as the "**Releasees**") of and from any and all claims, demands, causes of action, suits, covenants, contracts, controversies, agreements, promises, sums of money, accounts, bills, reckonings, damages, and any and all other claims, counterclaims, cross claims, defenses, rights of set-off, demands, and liabilities whatsoever (individually, a "**Pre-Petition Released Claim**" and collectively, the "**Pre-Petition Released Claims**") of every kind, name, nature and description, known or unknown, foreseen or unforeseen, matured or contingent, liquidated or unliquidated, primary or secondary, suspected or unsuspected, both at law and in equity, including, without limitation, any so-called "lender liability" claims or defenses, that any Releasor may now or hereafter own, hold, have, or claim to have against the Releasees, or any of them for, upon, or by reason of any nature, cause, or thing whatsoever that arose or may have arisen at any time on or prior to the date of the Interim Order, in respect of the Debtors, the Pre-Petition Obligations, the Pre-Petition Financing Documents, and any Pre-Petition Revolving Loans or other financial accommodations under the Pre-Petition Financing Documents; **provided**, **however**, that such release shall not be effective with respect to the Debtors until entry of the Final Order, and with respect to the Estates, until the expiration of the Challenge Period.

(e)      In addition, (i)(x) with respect to the Debtors, upon entry of the Final Order and (y) with respect to the Debtors' Estates, upon expiration of the Challenge Period, (ii) the Payment in Full of the

64

Obligations, and (iii) termination of the rights and obligations arising under the Interim Order and the Loan Documents (which payment and termination shall be on terms and conditions acceptable to Lender), Lender shall be automatically deemed to be absolutely and forever released and discharged from any and all obligations, liabilities, actions, duties, responsibilities, commitments, claims, and causes of action arising, occurring in connection with, or related to the Loan Documents or the Interim Order (whether known or unknown, direct or indirect, matured or contingent, foreseen or unforeseen, due or not due, primary or secondary, liquidated or unliquidated).

(f)     Upon the entry of the Final Order, and subject to Section IX of the Interim Order with respect to all applicable parties other than the Debtors, each Releasor hereby absolutely, unconditionally and irrevocably covenants and agrees with each Releasee that it will not sue (at law, in equity, in any regulatory proceeding, or otherwise) any Releasee on the basis of any Pre-Petition Released Claim that has been released and discharged by each Releasor pursuant to Section IX(28)(b) of the Interim Order and Section 17(a) above. If any Releasor violates the foregoing covenant, Debtors agree to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.

(g)     Each Debtor, in its capacity as a Borrower or Guarantor under the Pre-Petition Financing Documents or as a Borrower or Guarantor hereunder, as applicable, hereby: (i) ratifies, assumes, adopts and agrees to be bound by all of the Pre-Petition Financing Documents to which it is a party and (ii) agrees to pay all Pre-Petition Obligations for which it is obligated in accordance with the terms of the Pre-Petition Loan Documents and in accordance with the Interim Order and Final Order. All of the Pre-Petition Financing Documents to which any Debtor, in its capacity as a capacity as a Borrower or Guarantor under the Pre-Petition Financing Documents, as applicable, are hereby and shall be deemed adopted and assumed in full by each such Debtor, in each case as a Debtor and Debtor-in-possession, and considered as agreements among the Debtors, on the one hand, and Pre-Petition Lender, on the other.

(h)     Each Debtor, in its capacity as a Borrower or Guarantor hereunder or under the Pre-Petition Financing Documents , as applicable, hereby acknowledges and agrees that: (i) Lender (or its designee) may credit bid some or all of the Pre-Petition Obligations and the Post-Petition Obligations, which are in the aggregate amount acknowledged hereunder, to acquire the DIP Collateral pursuant to documents, agreements, instruments, orders and papers that are in form and substance acceptable to Lender; (ii)_ Lender (or its designee) may act as a stalking horse purchaser for substantially all of the Debtors' assets, which are DIP Collateral, and as such will require (x) the Debtors to establish a minimum topping bid of $650,000 in respect of any such stalking horse bid by Lender, (y) such minimum topping bid shall also include reasonable expense reimbursement for the Lender in connection with the professional fees and expenses incurred in connection with this DIP financing and the related sale process contemplated by the Milestones, which shall not exceed $550,000, and (z) the Lender shall have designation rights in respect of all Material Contracts, including, without limitation, Debtor leases of non-residential real property.

(i)     Notwithstanding the foregoing or anything herein to the contrary, the Pre-Petition Lender agrees to the deferral of any and all fees to the closing of the Credit Bid (as defined in the Interim Order). In the event that the Credit Bid is topped by an alternate bidder, the fees of the Pre-Petition Lender and Lender shall be paid immediately upon the closing of the sale of the Debtors' assets, however, shall the Credit Bid be the successful bidder, the fees of the Pre-Petition Lender and the Lender shall be paid through the Loans pursuant to this Agreement.

## 18.     <u>GUARANTY.</u>

65

(d)  **Guaranty**.  Each Guarantor hereby jointly and severally and unconditionally and irrevocably guarantees the punctual payment when due, whether at stated maturity, by acceleration or otherwise, of all Obligations of the Borrowers now or hereafter existing under any Loan Document, whether for principal, interest (including, without limitation, all interest that accrues after the commencement of any Insolvency Proceeding of any Borrower, whether or not a claim for post-filing interest is allowed in such Insolvency Proceeding), fees, commissions, expense reimbursements, indemnifications or otherwise (such obligations, to the extent not paid by the Borrowers, being the "**Guaranteed Obligations**"), and agrees to pay any and all expenses (including reasonable counsel fees and expenses) incurred by Secured Parties in enforcing any rights under the guaranty set forth in this Section 18.  Without limiting the generality of the foregoing, each Guarantor's liability shall extend to all amounts that constitute part of the Guaranteed Obligations and would be owed by the Borrowers to the Secured Parties under any Loan Document but for the fact that they are unenforceable or not allowable due to the existence of an Insolvency Proceeding involving any Borrower.  Notwithstanding any of the foregoing, Guaranteed Obligations shall not include any Excluded Swap Obligations.  In no event shall the obligation of any Guarantor hereunder exceed the maximum amount such Guarantor could guarantee under any Debtor Relief Law.

(e)  **Guaranty Absolute**.  Each Guarantor jointly and severally guarantees that the Guaranteed Obligations will be paid strictly in accordance with the terms of the Loan Documents, regardless of any law, regulation or order now or hereafter in effect in any jurisdiction affecting any of such terms or the rights of the Secured Parties with respect thereto.  Each Guarantor agrees that this Section 18 constitutes a guaranty of payment when due and not of collection and waives any right to require that any resort be made by the Agent or any Lender to any Collateral.  The obligations of each Guarantor under this **Error! Reference source not found.** are independent of the Guaranteed Obligations, and a separate action or actions may be brought and prosecuted against each Guarantor to enforce such obligations, irrespective of whether any action is brought against any Debtor or whether any Debtor is joined in any such action or actions.  The liability of each Guarantor under this **Error! Reference source not found.** shall be irrevocable, absolute and unconditional irrespective of, and each Guarantor hereby irrevocably waives any defenses it may now or hereafter have in any way relating to, any or all of the following:

(i)  any lack of validity or enforceability of any Loan Document or any agreement or instrument relating thereto;

(ii)  any change in the time, manner or place of payment of, or in any other term of, all or any of the Guaranteed Obligations, or any other amendment or waiver of or any consent to departure from any Loan Document, including, without limitation, any increase in the Guaranteed Obligations resulting from the extension of additional credit to any Debtor or otherwise;

(iii)  any taking, exchange, release or non-perfection of any Collateral, or any taking, release or amendment or waiver of or consent to departure from any other guaranty, for all or any of the Guaranteed Obligations;

(iv)  the existence of any claim, set-off, defense or other right that any Guarantor may have at any time against any Person, including, without limitation, Lender;

(v)  any change, restructuring or termination of the corporate, limited liability company or partnership structure or existence of any Debtor; or

(vi)  any other circumstance (including, without limitation, any statute of limitations) or any existence of or reliance on any representation by the Secured Parties that might otherwise constitute a defense available to, or a discharge of, any Debtor or any other guarantor or surety.

66

This **Error! Reference source not found.** shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Guaranteed Obligations is rescinded or must otherwise be returned by Secured Parties or any other Person upon the insolvency, bankruptcy or reorganization of any Borrower or otherwise, all as though such payment had not been made.

     **(f)**     <u>Waiver</u>. Each Guarantor hereby waives (i) promptness and diligence, (ii) notice of acceptance and any other notice with respect to any of the Guaranteed Obligations and this **Error! Reference source not found.** and any requirement that the Secured Parties exhaust any right or take any action against any Debtor or any other Person or any Collateral, (iii) any right to compel or direct Lender to seek payment or recovery of any amounts owed under this **Error! Reference source not found.** from any one particular fund or source or to exhaust any right or take any action against any other Debtor, any other Person or any Collateral, (iv) any requirement that any Lender protect, secure, perfect or insure any security interest or Lien on any property subject thereto or exhaust any right to take any action against any Debtor, any other Person or any Collateral, and (v) any other defense available to any Guarantor. Each Guarantor agrees that the Secured Parties shall have no obligation to marshal any assets in favor of any Guarantor or against, or in payment of, any or all of the Obligations. Each Guarantor acknowledges that it will receive direct and indirect benefits from the financing arrangements contemplated herein and that the waiver set forth in this 1(f) is knowingly made in contemplation of such benefits. Each Guarantor hereby waives any right to revoke this **Error! Reference source not found.**, and acknowledges that this Error! Reference source not found. is continuing in nature and applies to all Guaranteed Obligations, whether existing now or in the future.

     **(g)**     <u>Continuing Guaranty; Assignments</u>. This **Error! Reference source not found.** is a continuing guaranty and shall (a) remain in full force and effect until the later of the cash payment in full of the Guaranteed Obligations (other than Contingent Indemnity Obligations) and all other amounts payable under this **Error! Reference source not found.** and the Maturity Date, (b) be binding upon each Guarantor, its successors and assigns and (c) inure to the benefit of and be enforceable by the Secured Parties and their successors, pledgees, transferees and assigns. Without limiting the generality of the foregoing clause (c), Lender may pledge, assign or otherwise transfer all or any portion of its rights and obligations under this Agreement (including, without limitation, all or any portion of its commitments, its Loans owing to it) to any other Person, and such other Person shall thereupon become vested with all the benefits in respect thereof granted such Lender herein or otherwise, in each case as provided in Section 13(d).

     **(h)**     <u>Subrogation</u>. No Guarantor will exercise any rights that it may now or hereafter acquire against any Debtor or any other guarantor that arise from the existence, payment, performance or enforcement of such Guarantor's obligations under this **Error! Reference source not found.**, including, without limitation, any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of the Secured Parties against any Debtor or any other guarantor or any Collateral, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including, without limitation, the right to take or receive from any Debtor or any other guarantor, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security solely on account of such claim, remedy or right, unless and until all of the Guaranteed Obligations (other than contingent indemnity obligations) and all other amounts payable under this **Error! Reference source not found.** shall have been paid in full in cash and the Maturity Date shall have occurred. If any amount shall be paid to any Guarantor in violation of the immediately preceding sentence at any time prior to the later of the payment in full in cash of the Guaranteed Obligations (other than contingent indemnity obligations) and all other amounts payable under this **Error! Reference source not found.** and the Maturity Date, such amount shall be held in trust for the benefit of the Secured Parties and shall forthwith be paid to the Secured Parties to be credited and applied to the Guaranteed Obligations and all other amounts payable under this **Error! Reference source not found.**, whether matured or unmatured, in

67

accordance with the terms of this Agreement, or to be held as Collateral for any Guaranteed Obligations or other amounts payable under this **Error! Reference source not found.** thereafter arising.  If (i) any Guarantor shall make payment to the Secured Parties of all or any part of the Guaranteed Obligations, (ii) all of the Guaranteed Obligations and all other amounts payable under this **Error! Reference source not found.** shall be paid in full in cash and (iii) the Maturity Date shall have occurred, the Secured Parties will, at such Guarantor's request and expense, execute and deliver to such Guarantor appropriate documents, without recourse and without representation or warranty, necessary to evidence the transfer by subrogation to such Guarantor of an interest in the Guaranteed Obligations resulting from such payment by such Guarantor.

(i) <u>Contribution</u>.  All Guarantors desire to allocate among themselves, in a fair and equitable manner, their obligations arising under this Guaranty.  Accordingly, in the event any payment or distribution is made on any date by a Guarantor under this Guaranty such that its Aggregate Payments exceeds its Fair Share as of such date, such Guarantor shall be entitled to a contribution from each of the other Guarantors in an amount sufficient to cause each Guarantor's Aggregate Payments to equal its Fair Share as of such date.  "**Fair Share**" means, with respect to any Guarantor as of any date of determination, an amount equal to (a) the ratio of (i) the Fair Share Contribution Amount with respect to such Guarantor, to (ii) the aggregate of the Fair Share Contribution Amounts with respect to all Guarantors multiplied by, (b) the aggregate amount paid or distributed on or before such date by all Guarantors under this Guaranty in respect of the obligations Guaranteed.  "**Fair Share Contribution Amount**" means, with respect to any Guarantor as of any date of determination, the maximum aggregate amount of the obligations of such Guarantor under this Guaranty that would not render its obligations hereunder subject to avoidance as a fraudulent transfer or conveyance under Section 548 of Title 11 of the United States Code or any comparable applicable provisions of state law; <u>provided</u>, solely for purposes of calculating the "Fair Share Contribution Amount" with respect to any Guarantor for purposes of this 1(i), any assets or liabilities of such Guarantor arising by virtue of any rights to subrogation, reimbursement or indemnification or any rights to or obligations of contribution hereunder shall not be considered as assets or liabilities of such Guarantor.  "**Aggregate Payments**" means, with respect to any Guarantor as of any date of determination, an amount equal to (A) the aggregate amount of all payments and distributions made on or before such date by such Guarantor in respect of this Guaranty (including, without limitation, in respect of this 1(i)), <u>minus</u> (B) the aggregate amount of all payments received on or before such date by such Guarantor from the other Guarantors as contributions under this 1(i).  The amounts payable as contributions hereunder shall be determined as of the date on which the related payment or distribution is made by the applicable Guarantor.  The allocation among Guarantors of their obligations as set forth in this 1(i) shall not be construed in any way to limit the liability of any Guarantor hereunder.  Each Guarantor is a third party beneficiary to the contribution agreement set forth in this 1(i).

•Signature Page to Follow]

68

**IN WITNESS WHEREOF**, the parties hereto have caused this Secured Superpriority Debtor-In-Possession Loan, Security and Guaranty Agreement to be duly executed as of the date first above written.

The entities defined as Borrowers hereunder are authorized by Resolutions attached to each of their respective Petitions or otherwise to enter into this agreement.  Mr. William Ian MacDonald, acting as Manager and/or controlling Member or Shareholder, as the case may be, is hereby authorized to execute this agreement on behalf of each of the below Borrower, and so executes this Agreement in such capacity.

<u>**BORROWERS:**</u>

**BMH RTO, LLC**
**BUDDY MAC TWENTY-ONE, LLC**
**BUDDY MAC TWENTY-TWO, LLC**
**BUDDY MAC TWENTY-THREE, LLC**
**BUDDY MAC TWENTY-FOUR, LLC**
**BUDDY MAC TWENTY-FIVE, LLC**
**BUDDY MAC TWENTY-SIX, LLC**
**BUDDY MAC TWENTY-SEVEN, LLC**
**BMH-TNM 28, LLC**
**BMH-TNM 29, LLC**
**BMH-TNM 30, LLC**
**BMH-TNM 31, LLC**
**BMH-TNM 32, LLC**
**BMH-TNM 33, LLC**
**BMH-RCL 34, LLC**
**BMH-RCL 35, LLC**
**BMH-RCL 36, LLC**
**BMH-RCL 37, LLC**
**BMH-RCL 38, LLC**
**BMH-RCL 39, LLC**
**BMH-RCL 40, LLC**
**BMH-RCL 41, LLC**
**BMH-RCL 42, LLC**
**BMH-FAN 43, LLC**
**BMH-FAN 44, LLC**
**BMH-FAN 45, LLC**
**BMH-FAN 46, LLC**
**BMH-FAN 47, LLC**
**BMH-FAN 48, LLC**
**BMH-FAN 49, LLC**
**BMH-FAN 50, LLC**
**BMH-FAN 51, LLC**
**BMH-FAN 52, LLC**
**BMH-FAN 53, LLC**
**BMH-FAN 54, LLC**

*[Secured Superpriority Debtor-In-Possession Loan, Security and Guaranty Agreement]*

**BMH-SM 79, LLC**
**BMH-SM 80, LLC**
**BMH-SM 81, LLC**
**BMH-SM 82, LLC**
**BMH-SM 83, LLC**
**BMH-SM 84, LLC**
**BMH-SM 85, LLC**
**BMH-SM 86, LLC**
**BMH-SM 87, LLC**
**BUDDY MAC ONE, LLC**
**BMH ONE RE, LLC**
**BMH 95 RE CARUTHERSVILLE, LLC**
**BMH 96 RE MARION, LLC**
**BUDDY MAC TWO, LLC**
**BUDDY MAC SIX, LLC**
**BUDDY MAC SIX RE, LLC**
**BUDDY MAC EIGHT, LLC**
**BUDDY MAC ELEVEN, LLC**
**BUDDY MAC TWLEVE, LLC**
**BUDDY MAC EIGHTEEN, LLC**
**BUDDY MAC NINETEEN, LLC**
**BMH-NEW 58, LLC**
**BMH-NEW 62, LLC**
**BMH-WF TX 67, LLC**
**BMH-TB 75, LLC**
**BMH 85 RE SIKESTON, LLC**
**BMH PRIME 95, LLC**
**BMH PRIME 96, LLC**
**BMH PRIME 97, LLC**
**BMH HR LLC**
**SAM BROWNFIELD, LLC**
**SAM PLAINVIEW, LLC**
**MACDONALD CAPITAL CORPORATION**


By:_____
Name:
Title:

70

**GUARANTORS:**

**BUDDY MAC HOLDINGS, LLC**


By:_____
Name:
Title:


**MACDONALD CAPITAL CORPORATION**


By:_____
Name:
Title:


**LENDER:**

**PHONIX RBS, LLC**


By:_____
Name:
Title:

71

SCHEDULES

The following Schedules to the within Secured Superpriority Debtor-In-Possession Loan, Security and Guaranty Agreement are respectively described in the section indicated.  Those Schedules in which no information has been inserted shall be deemed to read "None".

**SCHEDULE A**

**[TO BE PROVIDED]**

**<u>SCHEDULE B</u>**

**Bank Schedule**

Buddy Mac Holdings, LLC, et al.
Case No. 25-34839-mvl11

**Initial Debtors' Bank Accounts**

| STORE | DEBTOR NAME | CASH BANK | CASH BANK ACCT NO. | SOUTHSTATE BANK ACCT NO. |
|---|---|---|---|---|
| #488 | Buddy Mac One LLC | Chase Bank | xxxxx7932 | xxxxxxxx4715 |
| #432 | Buddy Mac Twenty-one LLC | Banc First | xxxxxx4362 | xxxxxx4744 |
| #433** | Buddy Mac Twenty-two LLC | Banc First | xxxxxx4370 | xxxxxx4736 |
| #434 | Buddy Mac Twenty-three LLC | RBC Bank | xxxxx2480 | xxxxxx4769 |
| #435 | Buddy Mac Twenty-four LLC | Banc First | xxxxxx4420 | xxxxxx4777 |
| #436** | Buddy Mac Twenty-five LLC | Banc First | xxxxxx4388 | xxxxxx4751 |
| #437 | Buddy Mac Twenty-six LLC | Banc First | xxxxxx4404 | xxxxxx4785 |
| #515** | Buddy Mac Twenty-seven LLC | Security Bank of Tulsa | xxx6781 | xxxxxx4793 |
| #375 | BMH-TNM 28 LLC | Wells Fargo | xxxxxx8638 | xxxxxx5188 |
| #568** | BMH-TNM 29 LLC | Wells Fargo | xxxxxx0102 | xxxxxx5204 |
| #376 | BMH-TNM 30 LLC | Wells Fargo | xxxxxx0128 | xxxxxx5212 |
| #377 | BMH-TNM 31 LLC | Wells Fargo | xxxxxx0169 | xxxxxx5220 |
| #378 | BMH-TNM 32 LLC | Wells Fargo | xxxxxx0201 | xxxxxx5238 |
| #592 | BMH-TNM 33 LLC | SUNDOWN BANK | xx3949 | xxxxxx5246 |
| #311** | BMH-RCL 34 LLC | ARVEST | xxxx3842 | xxxxxx5253 |
| #312** | BMH-RCL 35 LLC | ARVEST | xxxx5484 | xxxxxx5261 |
| #310** | BMH-RCL 36 LLC | ARVEST | xxxx5882 | xxxxxx5279 |
| #307 | BMH-RCL 37 LLC | ARVEST | xxxx6250 | xxxxxx5287 |
| #308** | BMH-RCL 38 LLC | ARVEST | xxxx6632 | xxxxxx5295 |
| #313 | BMH-RCL 39 LLC | ARVEST | xxxx7275 | xxxxxx5303 |
| #309 | BMH-RCL 40 LLC | COMMERCE BANK | xxxxx5431 | xxxxxx5311 |
| #305 | BMH-RCL 41 LLC | Wells Fargo | xxxxxx8620 | xxxxxx5329 |
| #304** | BMH-RCL 42 LLC | Regions Bank | xxxxxx1501 | xxxxxx5337 |
| #612 | BMH-FAN 43 LLC | Community First Banking Company | xxxxx0221 | xxxxxx5266 |
| #603 | BMH-FAN 44 LLC | Centennial Bank | xxxxx8079 | xxxxxx5308 |
| #604 | BMH-FAN 45 LLC | Centennial Bank | xxxxx8857 | xxxxxx5274 |
| #605 | BMH-FAN 46 LLC | Southern Bankcorp | xxx7406 | xxxxxx5316 |
| #614 | BMH-FAN 47 LLC | Arvest Bank | xxxx0616 | xxxxxx5282 |
| #606 | BMH-FAN 48 LLC | Partners Bank | xxxx1928 | xxxxxx5324 |
| #607 | BMH-FAN 49 LLC | Southern Bankcorp | xxx7414 | xxxxxx5290 |
| #608 | BMH-FAN 50 LLC | FIRST HORIZON | xxxxxxx2680 | xxxxxx5332 |
| #609 | BMH-FAN 51 LLC | Centennial Bank | xxxxx8997 | xxxxxx5340 |
| #610 | BMH-FAN 52 LLC | Arvest Bank | xxxx0315 | xxxxxx5357 |
| #613 | BMH-FAN 53 LLC | Regions Bank | xxxxxx1056 | xxxxxx5365 |
| #611** | BMH-FAN 54 LLC | FIRST HORIZON | xxxxxxx2672 | xxxxxx5373 |
| #631 | BMH-SM 79, LLC | FIRST STATE COMMUNITY BANK | xxx8575 | xxxxxx3435 |
| #632 | BMH-SM 80, LLC | FIRST STATE COMMUNITY BANK | xxx8633 | xxxxxx3377 |
| #633 | BMH-SM 81, LLC | FIRST STATE COMMUNITY BANK | xxx8641 | xxxxxx3393 |
| #634 | BMH-SM 82, LLC | FIRST STATE COMMUNITY BANK | xxx8682 | xxxxxx3443 |
| #635 | BMH-SM 83, LLC | FIRST STATE COMMUNITY BANK | xxx8708 | xxxxxx3427 |
|  | BMH-SM 84, LLC | N/A | N/A | xxxxxx3385 |
| #636 | BMH-SM 85, LLC | FIRST STATE COMMUNITY BANK | xxx8724 | xxxxxx3419 |
| #637 | BMH-SM 86, LLC | FIRST STATE COMMUNITY BANK | xxx8922 | xxxxxx3401 |
| #638** | BMH-SM 87, LLC | FIRST STATE COMMUNITY BANK | xxx8948 | xxxxxx3450 |
|  | BMH-RTO, LLC | N/A | N/A | xxxxxx5485 |
|  | **Buddy Mac Holdings LLC** | **Wells Fargo DIP ACCOUNT** | xxxxxx7011 | N/A |
|  | **Buddy Mac Holdings LLC** | **UTILITY DEPOSIT** | N/A | xxxxxx5234 |

** closed/merged into other stores

Buddy Mac Holdings, LLC, et al.
Case No. 25-34839-mvl11

**Subsequent Debtors' Bank Accounts**

| STORE | DEBTOR NAME | CASH BANK | CASH BANK ACCT NO. | SOUTHSTATE BANK ACCT NO. |
|---|---|---|---|---|
| #489 | Buddy Mac Two LLC | Wells Fargo | xxxxxx2420 | xxxxxx0620 |
| #496 | Buddy Mac Six LLC | Wells Fargo | xxxxxx1223 | xxxxxx1784 |
| #602 | Buddy Mac Eight LLC | Wells Fargo | xxxxxx7086 | xxxxxx1800 |
| #601 | Buddy Mac Eleven LLC | Wells Fargo | xxxxxx4471 | xxxxxx1834 |
| #497 | Buddy Mac Twelve LLC | Chase bank | xxxxx9353 | xxxxxx0355 |
| #430 | Buddy Mac Eighteen LLC | Regions Bank | xxxxxx6323 | xxxxxx3845 |
| #620 | BMH- NEW 58, LLC | Bank of Commerce | xxx2300 | xxxxxx4276 |
| #643 | BMH-WF TX 67, LLC | Wells Fargo | xxxxxx6859 | xxxxxx5242 |
| #007 | BMH-TB 75, LLC | Wells Fargo | xxxxxx9825 | xxxxxx5903 |
| #646 | BMH PRIME 95 LLC | First State Bank and Trust | xxx0738 | xxxxxx8591 |
| #644 | BMH PRIME 96 LLC | Regions Bank | xxxxxx3446 | xxxxxx8583 |
| #645 | BMH Prime 97, LLC | Arvest Bank | xxxx7059 | xxxxxx7585 |
| 615 | Buddy Mac Nineteen, LLC | Arvest Bank | xxxx1366 | xxxxxx5208 |
| 641 | BMH-NEW 62, LLC | Happy State | xxxxxx2351 | xxxxxx7593 |
| | BMH-HR, LLC | Plains Capital | xxxx2900 | xxxxxx9042 |
| | MacDonald Capital Corp. | | N/A | xxxxxx4987 |
| | Buddy Mac Six RE LLC | | N/A | N/A |
| | SAM Plainview, LLC | | N/A | N/A |
| | SAM Brownfield, LLC | | N/A | N/A |
| | BMH 85 RE Sikeston, LLC | | N/A | N/A |

** closed/merged into other stores

**PHONIX EX. 10**                                    **Page 118 of 525**

## SCHEDULE C

**Personal Property Leases**

**[TO BE PROVIDED]**

## SCHEDULE D

## [Reserved]

<u>**SCHEDULE E**</u>

**Other Encumbrances and Liens**

**[TO BE PROVIDED]**

## SCHEDULE F

**Intellectual Property**

**[TO BE PROVIDED]**

**SCHEDULE G**

**ERISA PLANS**

**[TO BE PROVIDED]**

## SCHEDULE H

## [Reserved]

**<u>SCHEDULE I</u>**

**Guarantees**

**[TO BE PROVIDED]**

## EXHIBIT 1

### Financial and Other Terms

The following capitalized terms shall have the respective and corresponding meaning set forth in the table below.

| Credit Limit | $1,500,000 |
|---|---|
| Accordion Amount | $1,000,000 |
| Default Rate Margin | 2.00% |
| Maturity Date | February 22, 2026 |

**DEBTOR NOTICE ADDRESS:**

Buddy Mac Holdings, LLC
400 East Centre Park Blvd.
Suite 101
DeSoto, TX  75115
Email: ian@macfamco.com
Attention: Ian MacDonald

With a copy to:

Kane Russell Coleman Logan PC
901 Main St., Suite 5200
Dallas, Texas 75202
Email: jkane@krcl.com
Attention: John Kane

**LENDER NOTICE ADDRESS:**

Phonix RBS, LLC
7219 Renee Parker Way
Barling, AR 42933
Email: brent@motusadvised.com
Attention: Brent Turner, Manager of Member AF Newco 1 LLC, its sole member

With a copy to (which shall not constitute notice):

Blank Rome LLP
One Logan Square
130 North 18th Street
Philadelphia, PA 19103
Email: regina.kelbon@blankrome.com
Attention: Regina Stango Kelbon

## EXHIBIT 2

## TERM NOTE

$1,500,000.00

January [  ], 2026
New York, New York

For value received, each of the undersigned (hereinafter jointly, severally and collectively, "**Borrowers**" and each, a "**Borrower**") hereby jointly and severally promise to pay in accordance with the Loan Agreement (defined below), to the order of Phonix RBS, LLC , a Delaware limited liability company (the "**Lender**"), at its offices in 7219 Renee Parker Way, Barling, AR 42933, or at any other place designated at any time by the holder hereof, in lawful money of the United States of America and in immediately available funds, the principal sum of $1,500,000.00 or, if less, the aggregate unpaid principal amount of all Term Loans made by Lender to Borrowers under the Loan Agreement, together with interest on the principal amount hereunder remaining unpaid from time to time, computed on the basis of the actual number of days elapsed and a 360-day year, from the date hereof until this Term Note (as amended, modified, replaced, substituted, superseded or restated from time to time, the "**Note**") is fully paid at the rate from time to time in effect under the Secured Superpriority Debtor-In-Possession Loan, Security and Guaranty Agreement of even date herewith (as amended, modified, replaced, substituted, superseded, extended, renewed, or restated from time to time, the "**Loan Agreement**"; capitalized terms used herein and not otherwise defined have the meanings set forth in the Loan Agreement) by and among Lender, Borrowers and the other parties thereto. The principal hereof and interest accruing thereon shall be due and payable as provided in the Loan Agreement.

This Note may be prepaid only in accordance with the Loan Agreement.

This Note is issued pursuant, and is subject, to the Loan Agreement, which provides, among other things, for acceleration hereof. This Note is the "Term Note" referred to in the Loan Agreement.

This Note is secured, among other things, pursuant to the Loan Agreement, and may now or hereafter be secured by one or more other security agreements, mortgages, deeds of trust, assignments or other instruments or agreements.

Borrowers hereby agree to pay all costs of collection, including attorneys' fees and legal expenses in the event this Note is not paid when due, whether or not legal proceedings are commenced.

Presentment or other demand for payment, notice of dishonor and protest are expressly waived.

**[*Signature Page to Follow*]**

       All rights and obligations hereunder shall be governed by the laws of the State of New York, without regard to conflicts of law principles, but including giving effect to Sections 5-1401 and 5-1402 of the New York General Obligations Law.  This Note shall be deemed to be under seal. The entities defined as Borrowers hereunder are authorized by Resolutions attached to each of their respective Petitions or otherwise to enter into this agreement.  Mr. William Ian MacDonald, acting as Manager and/or controlling Member or Shareholder, as the case may be, is hereby authorized to execute this agreement on behalf of each of the below Borrower, and so executes this Agreement in such capacity.

### **BORROWERS:**

**BMH RTO, LLC**
**BUDDY MAC TWENTY-ONE, LLC**
**BUDDY MAC TWENTY-TWO, LLC**
**BUDDY MAC TWENTY-THREE, LLC**
**BUDDY MAC TWENTY-FOUR, LLC**
**BUDDY MAC TWENTY-FIVE, LLC**
**BUDDY MAC TWENTY-SIX, LLC**
**BUDDY MAC TWENTY-SEVEN, LLC**
**BMH-TNM 28, LLC**
**BMH-TNM 29, LLC**
**BMH-TNM 30, LLC**
**BMH-TNM 31, LLC**
**BMH-TNM 32, LLC**
**BMH-TNM 33, LLC**
**BMH-RCL 34, LLC**
**BMH-RCL 35, LLC**
**BMH-RCL 36, LLC**
**BMH-RCL 37, LLC**
**BMH-RCL 38, LLC**
**BMH-RCL 39, LLC**
**BMH-RCL 40, LLC**
**BMH-RCL 41, LLC**
**BMH-RCL 42, LLC**
**BMH-FAN 43, LLC**
**BMH-FAN 44, LLC**
**BMH-FAN 45, LLC**
**BMH-FAN 46, LLC**
**BMH-FAN 47, LLC**
**BMH-FAN 48, LLC**
**BMH-FAN 49, LLC**
**BMH-FAN 50, LLC**
**BMH-FAN 51, LLC**
**BMH-FAN 52, LLC**
**BMH-FAN 53, LLC**
**BMH-FAN 54, LLC**
**BMH-SM 79, LLC**
**BMH-SM 80, LLC**
**BMH-SM 81, LLC**
**BMH-SM 82, LLC**
**BMH-SM 83, LLC**
**BMH-SM 84, LLC**

**BMH-SM 85, LLC**
**BMH-SM 86, LLC**
**BMH-SM 87, LLC**
**BUDDY MAC ONE, LLC**
**BMH ONE RE, LLC**
**BMH 95 RE CARUTHERSVILLE, LLC**
**BMH 96 RE MARION, LLC**
**BUDDY MAC TWO, LLC**
**BUDDY MAC SIX, LLC**
**BUDDY MAC SIX RE, LLC**
**BUDDY MAC EIGHT, LLC**
**BUDDY MAC ELEVEN, LLC**
**BUDDY MAC TWLEVE, LLC**
**BUDDY MAC EIGHTEEN, LLC**
**BUDDY MAC NINETEEN, LLC**
**BMH-NEW 58, LLC**
**BMH-NEW 62, LLC**
**BMH-WF TX 67, LLC**
**BMH-TB 75, LLC**
**BMH 85 RE SIKESTON, LLC**
**BMH PRIME 95, LLC**
**BMH PRIME 96, LLC**
**BMH PRIME 97, LLC**
**BMH HR LLC**
**SAM BROWNFIELD, LLC**
**SAM PLAINVIEW, LLC**

By:_____
Name:
Title:

**EXHIBIT 3**

**[Reserved]**

## EXHIBIT 4

### [Reserved]

**EXHIBIT 5**

**[Reserved]**

**EXHIBIT 6**

**DIP Budget**

See attached.

Case 25-34839-mvl11    Doc 357-10    Filed 02/25/26    Entered 02/25/26 14:14:10    Desc
PHONIX EX 10    Page 134 of 525

Case 25-34839-mvl11    Doc 370-2    Filed 02/20/26    Entered 02/20/26 05:45:32    Desc
Exhibit B – Loan Agreement Page 121 Page 94 of 121

**Buddy Mac Holdings, LLC** *et. al.*

*Cash Budget*
$ - Thousands

| | Filing Date>> **4-Dec** | Actual 1 | Actual 2 | Actual 3 | Actual 4 | Actual 5 | Actual 6 | Actual 7 | Budget 8 | Budget 9 | Budget 10 | Budget 11 | Budget 12 | Budget Total 12 Weeks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending---> | | 6-Dec | 13-Dec | 20-Dec | 27-Dec | 3-Jan | 10-Jan | 17-Jan | 24-Jan | 31-Jan | 7-Feb | 14-Feb | 21-Feb | |
| **Cash Receipts** | | $ - | $ 387.0 | $ 318.7 | $ 241.5 | $ 379.6 | $ 430.4 | $ 315.7 | $ 292.0 | $ 305.6 | $ 599.5 | $ 422.4 | $ 436.0 | $ 4,128.4 |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Inventory Purchases | | - | - | 196.2 | 21.5 | 117.7 | - | - | 1,000.0 | - | 200.0 | - | - | 1,535.4 |
| Payroll and Benefits | | - | 0.8 | 207.0 | - | 252.1 | - | 217.0 | - | 310.0 | 85.0 | 310.0 | - | 1,381.9 |
| Property Taxes | | - | 0.1 | - | - | 3.5 | 9.5 | 1.2 | 20.9 | - | - | - | - | 35.2 |
| Store Rent Expense | | - | - | - | - | - | 173.4 | - | 3.6 | - | 272.3 | - | 155.0 | 604.4 |
| Repairs & Maintenance | | - | 4.3 | (0.2) | - | - | 3.8 | 0.3 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 33.2 |
| Insurance | | - | - | - | - | - | - | - | - | - | - | - | - | |
| Vehicle Leases | | - | - | - | - | - | - | - | 58.0 | - | - | - | 90.0 | 148.0 |
| General and Administrative | | - | 35.1 | (0.2) | 6.5 | 6.8 | 67.8 | 16.2 | 50.0 | 20.0 | 70.0 | 20.0 | 20.0 | 312.3 |
| Corporate Support | | - | 3.3 | 66.0 | - | 73.6 | 1.1 | 62.2 | 5.0 | 98.7 | 55.1 | 98.7 | 10.0 | 473.7 |
| Sales Taxes | | - | - | 25.9 | 106.8 | - | - | - | 100.0 | - | - | - | 153.0 | 385.6 |
| **Total Operating Disbursements** | | $ - | $ 43.7 | $ 494.7 | $ 134.8 | $ 453.7 | $ 255.7 | $ 296.9 | $ 1,242.5 | $ 433.7 | $ 687.4 | $ 433.7 | $ 433.0 | $ 4,909.8 |
| **Operating Cash Flow** | | $ - | $ 343.3 | $ (176.0) | $ 106.7 | $ (74.1) | $ 174.7 | $ 18.8 | $ (950.5) | $ (128.1) | $ (87.9) | $ (11.4) | $ 3.0 | $ (781.4) |
| Accumulated | | - | 343.3 | 167.3 | 274.1 | 200.0 | 374.7 | 393.5 | (557.0) | (685.1) | (773.1) | (784.4) | (781.4) | |
| **Other (Sources)/Uses** | | | | | | | | | | | | | | |
| DIP Proceeds | | - | - | - | - | - | - | - | (750.0) | - | (750.0) | - | - | (1,500.0) |
| Funds from BMH-HR, LLC | | - | - | - | - | - | (56.5) | - | (100.0) | - | - | - | - | (156.5) |
| Adequate Protection - Phonix | | - | - | - | - | - | - | 56.5 | 100.0 | - | - | - | - | 156.5 |
| Restructuring Fees | | - | - | - | - | - | - | - | - | 21.2 | - | - | 775.0 | 796.2 |
| Critical Vendors | | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utilities Deposit | | - | - | 25.0 | - | - | - | - | - | - | - | - | - | 25.0 |
| **Total Other (Sources/Uses)** | | - | - | 25.0 | - | - | (56.5) | 56.5 | (750.0) | 21.2 | (750.0) | - | 775.0 | (678.8) |
| **Net Cash Flow** | | $ - | $ 343.3 | $ (201.0) | $ 106.7 | $ (74.1) | $ 231.3 | $ (37.7) | $ (200.5) | $ (149.3) | $ 662.1 | $ (11.4) | $ (772.0) | $ (102.6) |
| Accumulated | | - | 343.3 | 142.3 | 249.1 | 175.0 | 406.2 | 368.5 | 168.0 | 18.7 | 680.8 | 669.4 | (102.6) | (102.6) |
| **Cash Balance** | $ 133.9 | $ 133.9 | $ 477.3 | $ 276.3 | $ 383.0 | $ 308.9 | $ 540.2 | $ 502.5 | $ 302.0 | $ 152.6 | $ 814.7 | $ 803.3 | $ 31.4 | $ 31.4 |

**EXHIBIT 7**

**Interim Order**

See attached.

**EXHIBIT 8**

**Real Property DIP Collateral**

**[TO BE PROVIDED]**

## EXHIBIT 9

### Buddy Mac Entities

1.  Buddy Mac Two, LLC
2.  Buddy Mac Six, LLC
3.  Buddy Mac Six RE, LLC
4.  Buddy Mac Eight, LLC
5.  Buddy Mac Eleven, LLC
6.  Buddy Mac Twleve, LLC
7.  Buddy Mac Eighteen, LLC
8.  Buddy Mac Nineteen, LLC
9.  BMH-NEW 58, LLC
10. BMH-NEW 62, LLC
11. BMH-WF TX 67, LLC
12. BMH-TB 75, LLC
13. BMH 85 RE Sikeston, LLC
14. BMH Prime 95, LLC
15. BMH Prime 96, LLC
16. BMH Prime 97, LLC
17. BMH HR LLC
18. SAM Brownfield, LLC
19. SAM Plainview, LLC
20. MacDonald Capital Corporation

**EXHIBIT 10**

**Milestones**

Within the time periods set forth below (or such later times as Lender may agree in its sole and absolute discretion), the Debtors shall perform each action with respect to the Case as set forth below (the "**Milestones**"):

| Event [1] | Milestone |
|---|---|
| Filing of the (i) Buddy Mac Entity voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, (ii) DIP Motion, in form and substance satisfactory to Lender in its sole discretion, and (iii) motion for the sale of substantially all of their assets pursuant to Section 363 of the Bankruptcy Code (the "Sale Motion"), which Sale Motion shall be in form and substance satisfactory to Lender in its sole discretion | No later than Friday, January 23, 2026. |
| Retain and file an application ("Retention Application") to retain a third-party national real estate brokerage firm to market the Subject RTO Real Property owned by Buddy Mac One in Tyler, Texas (the "Texas Sale") | Within 7 days of the Third Petition Date |
| (i) Enter into an asset purchase agreement naming Lender as stalking horse bidder, in a form and substance acceptable to Lender, and (ii) file a motion establishing bidding procedures 2026 and (iii) obtain entry of a bidding procedures order (the "Bidding Procedures Order"), which motion, bid procedures, and Bidding | On or before January 26, 2026 |

---

[1] Each event involving the filing of a motion shall include the filing of any necessary application to expedite the hearing on such motion to accommodate the milestones set forth herein.

| | |
|---|---|
| Procedures Order must be in form and substance acceptable to Lender | |
| Obtain entry of Interim Order, in form and substance acceptable to Lender, and hold a first day hearing in the Buddy Mac Entity cases: | No later than January 27, 2026 |
| Committee completes its investigation and consents to releases by the estates: | No later than February 6, 2026 |
| Obtain entry of a Final Order, in form and substance acceptable to Lender, and obtain approval of Settlement Agreement, in form and substance acceptable to Lender | No later than February 10, 2026 |
| Hold an auction in connection with the Sale Motion | Within 21 days from the entry of the Interim Order |
| Sale hearing and obtain entry of Sale Order, in form and substance acceptable to Lender | No later than February 19, 2026 |
| Debtors to consummate a sale of assets | No later than February 22, 2026 |
| Debtors to close Texas Sale | Within 45 days of the filing of the Retention Application |

Case 25-34839-mvl11   Doc 357-10   Filed 02/25/26   Entered 02/25/26 14:14:10   Desc
PHONIX EX 10   Page 140 of 525

Case 25-34839-mvl11   Doc 320-2   Filed 02/20/26   Entered 02/20/26 05:45:23   Desc
Exhibit B Exhibit A Agreement 127 of 290 Page 100 of 121

**EXHIBIT 11**

**Settlement Agreement**

See attached.

**Execution Version**

## SETTLEMENT AGREEMENT AND MUTUAL RELEASES

This *Settlement Agreement and Mutual Release* (the "**Settlement Agreement**"), dated as of January 26, 2026, is entered into by and among William Ian MacDonald (and any successor thereto) and certain affiliated MacDonald Entities identified on Schedule 1 hereto (collectively, "**MacDonald**"), BMH RTO, LLC and the other BMH Debtors (as defined below; the BMH Debtors and the Buddy Mac Entities (as defined below) are referred to herein collectively as the "**Debtors**"), and Phonix RBS, LLC ("**Lender**" or "**Phonix**"). MacDonald, the Debtors, and Phonix may be referenced herein collectively as the "**Parties**" and/or each as a "**Party**."

## BACKGROUND

A. On December 1, 2025 (the "**First Petition Date**"), Buddy Mac One, LLC ("**Buddy Mac One**"), BMH One RE, LLC ("**BMH One**"), BMH 95 RE Caruthersville, LLC ("**BMH 95**"), and BMH 96 RE Marion, LLC ("**BMH 96**"; together with BMH One and BMH 95, the "**Limited Recourse Guarantors**") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, and on December 4, 2025 (the "**Second Petition Date**"), BMH RTO, LLC and affiliated Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, commencing Chapter 11 bankruptcy cases which are jointly administered under Bankruptcy Case No. 25-34839 (collectively and individually as the context may require, the "**Case**") before the United States Bankruptcy Court for the Northern District of Texas (the "**Bankruptcy Court**"). The Debtors that filed their respective Cases on the First Petition Date and the Second Petition Date are referred to herein as the "**BMH Debtors**."

B. The BMH Debtors are operating their business as debtors-in-possession under Chapter 11 of the Bankruptcy Code. William Ian MacDonald acts as the Debtors' chief executive officer.

C. Phonix is the BMH Debtors' pre-petition secured creditor with a blanket lien on all BMH Debtor assets, including cash collateral, and is owed secured obligations in an aggregate amount of at least $12.83 million. William Ian MacDonald has guaranteed the payment of the Phonix pre-petition indebtedness. Pre-petition, Phonix has filed enforcement actions against the BMH Debtors and William Ian MacDonald, including, without limitation, a receivership petition in Kansas state court and a claim asserting tort and other claims against William Ian MacDonald in Texas state court. As those claims are asserted against William Ian MacDonald those claims are referred to as the "**Phonix Pre-Petition MacDonald Enforcement Actions.**"

D. The BMH Debtors have sought to administer the Case based on the use of Phonix' cash collateral, to which Phonix did not consent. Phonix has objected to the BMH Debtors' use of cash collateral and has filed motions to convert the Case to a case under chapter 7 of the Bankruptcy Code and, in the alternative, for relief from the automatic stay to asserts its rights and claims against the BMH Debtors and their assets. The BMH Debtors have opposed such relief.

E.   On January 20, 2026, Phonix submitted a non-binding, non-inclusive summary expression of interest (the "**Phonix Expression**") in respect of a settlement, post-petition financing, and related sale matters to MacDonald and to the Debtors.

F.   On January 21, 2026, prior to the hearing on the Debtors' request for final authority to use cash collateral, William Ian MacDonald submitted a signed and sworn declaration regarding his personal financial statement (the "**MacDonald PFS**"), which declaration attached the MacDonald PFS, affirming that the MacDonald PFS was true and correct. Among other things, (1) MacDonald owns a direct interest in MRG Boulders Apartments, Ltd. ("**MRG Boulders**") and MacLubbock Boulders GP, Inc. ("**MacLubbock BGP**") (as general partner), which owns the Boulders Property (as defined below), (2) MRG Boulders is indebted to MacDonald Realty Group LLC (this entity is also the general partner of P.E.C. Finance, Ltd. and the fee owner of the Subject Alvarado Property (as defined below) ("**MacDonald Realty**" and the term "MacDonald Realty" shall include any MacDonald affiliate, subsidiary or related party as it relates to Boulders Advances) and the MacDonald Family Trust on account of advances made to MRG Boulders in an aggregate amount of no less than $4,239,910.13[1] (the "**Boulders Advances**"), (3) no less than $2,839,909.13 of the Boulders Advances is directly or indirectly owed to MacDonald Realty, and (4) no less than $1,400,001 of the Boulders Advances is directly or indirectly owed to the MacDonald Family Trust.

G.   On or about January 23, 2026 (the "**Third Petition Date**"; together with the First Petition Date and the Second Petition Date, the "**Petition Date**"), the entities listed on **Exhibit "G"** (collectively, the "**Buddy Mac Entities**") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code before the Bankruptcy Court, commencing chapter 11 bankruptcy cases, which will be jointly administered with the BMH Debtor Cases. Each Debtor remains in possession of its assets and is operating its business as a debtor-in-possession under Chapter 11 of the Bankruptcy Code.

H.   On January 23, 2026, each of the Debtors and Phonix entered into that certain Secured Superpriority Debtor-In-Possession Loan, Security, and Guaranty Agreement (the "**DIP Credit Agreement**") and the Debtors have filed an emergency motion (the "**DIP Motion**") seeking approval of the DIP Credit Agreement on an interim and a final basis and for related relief, including, without limitation, approval of this Settlement Agreement at the final hearing on the DIP Motion pursuant to the DIP Motion. The DIP Motion requires MacDonald to pledge certain non-Debtor assets as collateral for the Phonix DIP loan and contemplates the sale of the Debtors' assets to Phonix by a credit bid, with MacDonald's consent and support. The agreement embodied in this transaction resolves disputes and claims by and among the Debtors, Phonix, and MacDonald, including, without limitation, the Phonix Pre-Petition MacDonald Enforcement Actions. Initially capitalized terms in this Settlement Agreement that are not otherwise defined shall have the meaning set forth in the DIP Credit Agreement, DIP Orders (as defined below), or in the Phonix Expression.

---

[1] This amount includes only intercompany transfers made to MRG Boulders as advances, and does not include Accrued Management Fees, which Fees are subordinate as to payment and otherwise to the Boulders Advances, the Subject Boulders Interest, and the Estate Boulders Share.

I.  The Parties have engaged in extensive good faith, arms' length negotiations and have agreed to resolve all matters between them on the terms set forth herein.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree that:

1.  <u>Recitals</u>. The recitals set forth above are agreed to by the Parties and are incorporated herein by reference.

2.  <u>Conditions to Settlement Effective Date</u>. The effective date (the "**Settlement Effective Date**") of this Settlement Agreement and all of its terms shall be the date upon which all of the following have occurred: (i) the Buddy Mac Entities will have filed voluntary petitions under chapter 11 of the Bankruptcy Code and their cases will have been jointly administered in the Case (for the avoidance of doubt, neither MRG Boulders Apartments, Ltd. nor its general partner entity, shall file chapter 11 cases); (ii) this Settlement Agreement shall have been signed and delivered by and among the Parties; (iii) the unstayed entry of the Interim DIP Order (as defined in the Phonix Expression) by the Bankruptcy Court and the implementation of the transactions contemplated by the Phonix Expression and the DIP Documents, including, without limitation, in respect of the ERC Funds (as that term is defined in the Interim DIP Order) (for the avoidance of doubt, upon entry of the Final DIP Order, the ERC Funds shall be released to Phonix for application against its Pre-Petition Loan and DIP Loan obligations pursuant to the Final DIP Order and the DIP Documents and effective upon entry of the Final DIP Order, the ERC Funds shall be deemed collateral for the Pre-Petition Loan obligations as well as the DIP Loan obligations under the DIP Documents and the Final DIP Order), and, the transactions contemplated by the Sale Motion (as defined in the Interim DIP Order), in accordance with the milestones and other deadlines set forth in the Phonix Expression and the Interim DIP Order; (iv) MacDonald, MacDonald Realty, and MacLubbock BGP  shall grant to Phonix the Subject Boulders Interest (as defined below); (v) William Ian MacDonald shall grant to Phonix the Subject PEC Interest (as defined below); (vi) William Ian MacDonald and MacDonald Realty shall grant to Phonix the Subject Alvarado Mortgage (as defined below); and (vi) the entry of a final and non-appealable order of the Bankruptcy Court approving the Final DIP Order, which Final DIP Order likewise approves this Settlement Agreement.

3.  <u>Subject Boulders Interest</u>. **MacDonald, MacLubbock BGP, and MacDonald Realty shall grant to Phonix a participation in their rights in respect of the advances made to, and in respect of MacDonald's and MacLubbock BGP's equity in, MRG Boulders (collectively, the "Subject Boulders Interest") to accommodate and support the Phonix Pre-Petition Obligations, the DIP Obligations, and Adequate Protection Obligations (each as defined in the DIP Orders, as applicable), which grant shall be made and documented by a participation agreement (the "Participation Agreement") and other related documents, agreements, and instruments to be entered into prior to, and effective upon, entry of the Final DIP Order.** The Boulders real property that is the subject of the Subject Boulders Interest (the "**Boulders Property**"), which is owned and controlled by MacDonald and MacLubbock BGP, will be sold in an orderly process. Such orderly Boulders Property sale process is subject to Phonix rights of consent to: (i) the selection of the broker, (ii) the material conditions and requirements of the marketing process (marketing and sale milestones acceptable to Phonix shall be established), and (iii) the selection of a buyer (the "**Sale Process Consent Rights**"). The consents set forth in

the preceding sentence (a) shall be further evidenced by the Participation Agreement and (b) shall not be unreasonably withheld; in the event of any dispute regarding the withholding of any such consent, such dispute shall be subject to dispute resolution procedures to be set forth in the Participation Agreement. The Boulders Property shall be marketed by a third party national real estate brokerage firm unaffiliated with MacDonald or his affiliates (an "**Acceptable Broker**"), with the assistance of the Debtors' CRO, Mark Shapiro, and William Ian MacDonald to the extent his assistance is requested, and sold as soon as reasonably possible for a market price for cash. Phonix shall be entitled to regular updates regarding the marketing and sale process from any appointed broker. Further, MacDonald shall provide to Phonix updates regarding the financial condition and results relating to the Subject Boulder Interest promptly upon (x) the occurrence of any material changes thereto and (y) otherwise upon reasonable request. If the buyer assumes the senior loan encumbering the Boulders Property, the buyer will provide a new personal guaranty of the loan and William Ian MacDonald will be released from his personal guaranty of the loan, and with sale proceeds net of normal and reasonable closing costs to third parties for the transaction, to be distributed to Phonix on account of the Subject Boulders Interest as set forth herein.

4.    <u>Subject Boulders Sale Distribution Matters</u>. MacDonald, MacLubbock BGP and Phonix agree, and the Debtors consent to such agreement, that, upon any sale of the Boulders Property, the net closing proceeds, after payment of the senior mortgage on the Boulders Property and normal and reasonable closing expenses to third parties and subject to the terms of the sale contract, shall be divided and paid at closing: (i) sixty percent (60%) to Phonix; (ii) twenty five percent (25%) to the MacDonald Family Irrevocable Trust; and (iii) fifteen percent (15%) to the Debtors' estates (the "**Estate Boulders Share**").  These sale distribution matters shall be further evidenced by the Participation Agreement.

5.    <u>Subject PEC Interest</u>. **William Ian MacDonald shall grant to Phonix a lien on, and security interest in, all of his limited partner interests (the "PEC LP Interests") in P.E.C. Finance Ltd. (such lien and security interest, the "Subject PEC Interest") to accommodate and support the Phonix Pre-Petition Obligations, the DIP Obligations, and Adequate Protection Obligations, which grant shall be made and documented by a pledge agreement (the "Pledge Agreement") and other related documents, agreements, and instruments to be entered into prior to, and effective upon, entry of the Final DIP Order.** Phonix shall be permitted to purchase the PEC LP Interests in the WholeCo Sale (as defined below) pursuant to its credit bid. The real property, which is subject to liens and encumbrances which shall be addressed pursuant to the Subject PEC Real Property Sale Process (as defined below), that is owned and controlled by P.E.C. Finance Ltd. (the "**Subject PEC Real Property**"), will be sold in an orderly process, which may include the existing process ongoing in respect of the Subject PEC Real Property (the "**Subject PEC Real Property Sale Process**"). The Subject PEC Real Property Sale Process is subject to Phonix's Sale Process Consent Rights, which (a) shall be further evidenced by the Pledge Agreement and (b) shall not be unreasonably withheld; in the event of any dispute regarding the withholding of any such consent, such dispute shall be subject to dispute resolution procedures to be set forth in the Pledge Agreement. The Subject PEC Real Property shall be marketed by an Acceptable Broker (which may be the existing broker), with the assistance of the Debtors' CRO, Mark Shapiro, and William Ian MacDonald to the extent his assistance is requested, and sold as soon as reasonably possible for a market price for cash. Phonix shall be entitled to regular updates regarding the marketing and sale process from any appointed broker. Further, MacDonald shall provide to Phonix updates regarding the financial condition and results

relating to the Subject PEC Interest promptly upon (x) the occurrence of any material changes thereto and (y) otherwise upon reasonable request. MacDonald Realty, in its capacity as general partner of P.E.C. Finance, Ltd., by executing this Settlement Agreement, hereby (i) consents to the sale of the Subject PEC Real Property as conducted in accordance with the procedures specified above and (ii) agrees to execute and deliver to Phonix and PEC Finance, Ltd., as applicable, such further documents, instruments, and agreements reasonably requested in order to facilitate such sale and process. If the buyer assumes the senior loan encumbering the Subject PEC Real Property, the buyer will provide a new personal guaranty of the loan and William Ian MacDonald will be released from his personal guaranty of the loan, and with sale proceeds net of normal and reasonable closing costs to third parties for the transaction, to be distributed to Phonix on account of the Subject PEC Interest as set forth herein. William Ian MacDonald hereby represents and warrants to Phonix that the PEC LP Interests are not subject to any liens, pledges or security interests. If the Subject PEC Real Property is sold pursuant to the Subject PEC Real Property Sale Process, Phonix agrees that it shall distribute fifty percent (50%) of the proceeds from such sale to William Ian MacDonald.

6. <u>Subject Alvarado Real Property</u>. In respect of that certain real property owned by MacDonald Realty in Alvarado, Texas (the "**Subject Alvarado Real Property**"), to secure (i) Phonix DIP Obligations and Adequate Protection Obligations under the Interim DIP Order, and (ii) Phonix DIP Obligations, Adequate Protection Obligations, and Pre-Petition Obligations under the Final DIP Order after entry of the Final DIP Order and upon entry of the Final DIP Order, MacDonald Realty shall grant Phonix a mortgage lien (by deed of trust or as otherwise reasonably required by Phonix) (the "**Subject Alvarado Mortgage**") on the Subject Alvarado Real Property. Upon closing on the WholeCo Sale, MacDonald Realty shall convey to Phonix (or its designee) title to the Subject Alvarado Real Property by appropriate form of deed or conveyancing document acceptable to Phonix and related documents, agreements, and instruments, and Phonix will agree to a fixed reduction to its DIP Obligations and Pre-Petition Obligations, which shall be $298,000. MacDonald Realty hereby represents and warrants to Phonix that the Subject Alvarado Real Property is not subject to any lien or other encumbrance.

7. <u>Subject RTO Real Property</u>. In respect of all real property owned by the Debtors specified on Schedule 7 hereto (such real property owned by the Debtors, the "**Subject RTO Real Property**"), Phonix and the Debtors agree that, subject to the Interim DIP Order and Final DIP Order (the "**DIP Orders**") and pursuant to the DIP Orders and the DIP Documents (and Phonix rights of consultation and consent to be contained therein), the Debtors will (a) file an application to retain, within 7 days of the filing of the Buddy Mac Entity Chapter 11 cases, a third party real estate brokerage firm unaffiliated with the Debtors or MacDonald to market the Subject RTO Real Property owned by Buddy Mac One, LLC in Tyler, Texas, and (b) the Debtors (and or any successor trustee) will sell such Subject RTO Real Property under Bankruptcy Code section 363(b) in the Debtors' Chapter 11 cases within 45 days of the filing of the retention application. In respect of the other Subject RTO Real Property, such property shall be subject to the Sale Motion and Phonix will include such Subject RTO Real Property in its credit bid and as part of that credit bid will satisfy any SouthState Bank mortgage liens on such Subject RTO Real Property at closing on the credit bid; *provided, however*, that Phonix will consent to the sale of Subject RTO Real Property owned by BMH 95 RE Caruthersville, LLC and BMH 85 RE Sikeston, LLC to National RTO to be applied as provided in the following sentence in satisfaction of its lien encumbering such Subject RTO Real Property, so long as the portion of the National RTO cash purchase price

allocated to such Subject RTO Real Property is paid to Phonix at any closing with National RTO. After satisfaction of SouthState Bank mortgage liens as set forth above, Phonix may apply the proceeds of the sale of any Subject RTO Real Property paid to Phonix to any of the Pre-Petition Obligations, DIP Obligations, or Adequate Protection Obligations in Phonix's sole discretion. Phonix reserves rights of direction and designation in respect of any leases relating to the Subject RTO Real Property.

8.      <u>Debtor/MacDonald Acknowledgments of Phonix Secured Claims</u>. Subject to the entry of the Final DIP Order and Bankruptcy Court approval of this Settlement Agreement, each of the Debtors and MacDonald acknowledge and consent to the validity, extent, amount, priority and enforceability of Phonix Pre-Petition Obligations, Phonix DIP Obligations, Phonix security interests and liens on Pre-Petition Collateral, the inclusion of the assets of BMH HR, LLC in such Phonix Pre-Petition Collateral, and Phonix DIP Liens and rights in DIP Collateral, and as otherwise set forth in the DIP Documents, the Interim DIP Order, and the Final DIP Order. For the avoidance of doubt, the acknowledgments and consents set forth in this paragraph shall survive execution of this Settlement Agreement. The DIP Credit Agreement, other DIP Documents, Interim DIP Order, and Final DIP Order shall be in form and substance acceptable to Phonix.

9.      <u>Credit Bidding</u>. Subject to the terms of this Settlement Agreement and as set forth in the DIP Documents and the DIP Orders, pursuant to documents (such documents, the "**Phonix Sale Documents**") acceptable to Phonix evidencing such a transaction (such transaction, the "**WholeCo Sale**"), including, without limitation the Sale Motion and an Asset Purchase Agreement, Phonix shall be designated as the stalking horse bidder for the sale of substantially all of the Debtors' assets and will be permitted to acquire such assets in a credit bid (including the DIP Obligations, Pre-Petition Obligations, and Adequate Protection Obligations) provided that third parties may top the credit bid at the sale hearing by submitting a higher and better offer, subject to bidding and sale procedures acceptable to Phonix which shall include an agreed minimum bid increment and reasonable bid protections and expense reimbursement. The Phonix Sale Documents shall be in form and substance acceptable to Phonix.

10.      <u>Budget</u>. The Debtors shall propose a winddown budget. The winddown budget shall be acceptable to Phonix and shall be funded solely from (a) residual assets of the estates after closing of the transactions contemplated by the Sale Motion to Phonix or a topping bidder  and (b) the proceeds of the Estate Boulders Share.   The wind-down budget may be used to fund a liquidating Chapter 11 plan process, which can be done on a consolidated approval process basis or liquidation of the Debtors' estates by a Chapter 7 trustee following the conversion of the Debtors' cases. In the context of a liquidating plan, to the extent any Phonix debt remains outstanding following consummation of the WholeCo Sale, in any plan of reorganization, and without any impairment of its rights as a purchaser or secured creditor, Phonix agrees to subordinate any deficiency claim, whatever the priority or character of that deficiency claim under the Final DIP Order, that it may have to the claims of general unsecured creditors solely for purposes of enabling distribution of the Estate Boulders Share, and any contingent recoveries upon estate claims and causes of action arising under Chapter 5 not released pursuant to this Settlement Agreement, the Final DIP Order, or the WholeCo Sale order, to unsecured creditors, and facilitating plan confirmation (for the avoidance of doubt, such subordination shall not affect or impair Phonix's right to receive:  (i) the balance of the proceeds of the Subject Boulders Interest, (ii) the proceeds of the sale of (x) the Subject Real RTO Property owned by Buddy Mac One, LLC

in Tyler, Texas, and (y) the Subject PEC Real Property, or (iii) title to the Subject Alvarado Real Property).  Any such plan and confirmation order shall be in form and substance acceptable to Phonix, MacDonald, and the Debtors.  Any such liquidating plan will incorporate and implement this Settlement Agreement.

11.    Debtors' MacDonald Release. **Effective on the Settlement Effective Date, the Debtors, on behalf of themselves and their estates (collectively, the "Estate Releasors") shall be deemed to have irrevocably and unconditionally, fully, finally, and forever waived, released, acquitted and discharged William Ian MacDonald and any and all of his affiliates, relations, agents, representatives, attorneys, and parties directly related to such released parties such as family-related trusts and MacDonald Capital, LP (in each case excluding, for the avoidance of doubt, the Debtors and their estates) (the "MacDonald Releasees") from any and all claims, manner of actions, causes of action, suits, costs, debts, liabilities, obligations, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, executions and demands whatsoever, of whatever kind or nature, whether known or unknown, suspected or unsuspected, in law or equity, which the Estate Releasors have, have had, may have or may claim to have against the MacDonald Releasees arising out of, related to or in connection with chapter 5 of the Bankruptcy Code or arising from MacDonald's actions or inactions in any capacity, including as chief executive officer, director, manager or authorized representative of the Debtors; provided, however and for the avoidance of doubt, the foregoing release shall not limit nor be deemed to limit the rights of the Debtors to enforce this Settlement Agreement in accordance with its terms and/or to assert claims against William Ian MacDonald if the MacDonald PFS is materially false.**

12.    Phonix MacDonald Release. **Effective on the Settlement Effective Date, Phonix, binding their successors and assigns, shall be deemed to have irrevocably and unconditionally, fully, finally, and forever waived, released, acquitted and discharged the MacDonald Releasees, as defined above, from any and all claims, manner of actions, causes of action, suits, costs, debts, liabilities, obligations, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, executions and demands whatsoever, of whatever kind or nature, whether known or unknown, suspected or unsuspected, in law or equity, which Phonix has, has had, may have or may claim to have against the MacDonald Releasees in connection with the Phonix Pre-Petition Debt Documents, any guaranty claims in respect of such Phonix Pre-Petition Debt Documents, and arising out of, related to or in connection with the Phonix MacDonald Pre-Petition Enforcement Actions; provided, however and for the avoidance of doubt, the foregoing release shall not limit nor be deemed to limit the rights, liens, security interests, claims, and expenses of Phonix under the DIP Documents, cash collateral orders of the Bankruptcy Court, the Interim DIP Order, the Final DIP Order, any asset purchase agreement ("Phonix CB APA") evidencing the sale of substantially all of the Debtors assets by credit bid to Phonix (the "WholeCo Sale"), the sale order of the Bankruptcy Court authorizing the WholeCo Sale or an alternative transaction to the WholeCo Sale expressly permitted by the Phonix CB APA, and any related Phonix Sale Documents, to enforce this Settlement Agreement or the Participation Agreement, in accordance with each of its terms, and/or to assert claims against the MacDonald Releasees if the MacDonald PFS is materially false.**

13.     <u>MacDonald/Debtor Phonix Release</u>. **Effective on the Settlement Effective Date, each of MacDonald, the MacDonald Releasees, and the Debtors (on behalf of themselves and their estates), and their affiliates, attorneys, financial advisors, and other professionals, and related entities (the "Debtor/MacDonald Releasors" and, together with the Estate Releasors and Phonix, collectively, the "Releasors"), binding their successors and assigns, shall be deemed to have irrevocably and unconditionally, fully, finally, and forever waived, released, acquitted and discharged Phonix, its assignor and/or predecessor-in-interest, affiliates, and related entities, and each of their respective managers, directors, officers, employees, agents, and representatives, (the "Phonix Releasees") from (a) any and all claims, manner of actions, causes of action, suits, costs, debts, liabilities, obligations, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, executions and demands whatsoever, of whatever kind or nature, whether known or unknown, suspected or unsuspected, in law or equity, which the Debtor/MacDonald Releasors have, have had, may have or may claim to have against the Phonix Releasees arising out of, related to or in connection with the Pre-Petition Debt Documents and arising out of, related to or in connection with the Phonix MacDonald Pre-Petition Enforcement Actions; provided, however and for the avoidance of doubt, the foregoing release shall not limit nor be deemed to limit the rights of Debtor/MacDonald Releasors to enforce this Settlement Agreement in accordance with its terms.**

14.     <u>Debtor/Phonix Transfer Release</u>. **Effective on the Settlement Effective Date, each of Phonix and the Debtors, and their affiliates and related entities, binding their successors and assigns, shall be deemed to have irrevocably and unconditionally, fully, finally and forever waived and released any and all claims and/or causes of action, including but not limited to Chapter 5 causes of action, which could arise from those transfers referenced in the Plains Capital Bank Deposit Report(s) dated January 15, 2026 and attached hereto as Appendix 14.**

15.     For avoidance of doubt, the releases contained in this Settlement Agreement include any released claim that any Releasor does not know or suspect to exist in such Releasor's favor at the time of such release that if known by such Releasor, might have affected this Settlement Agreement. With respect such releases, the Parties stipulate and agree that, on their own behalf and on behalf of their respective Releasors, upon the execution of this Settlement Agreement, each of the Releasors expressly waives and shall be deemed to have waived, any and all rights and benefits of California Civil Code § 1542, to the extent applicable, which provides:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

Each of the Parties expressly waives, and shall be deemed to have waived, on its behalf on and behalf of its respective Releasors, any and all rights and benefits conferred by any law of any state or territory of the United States, or principle of common law or foreign law, that is similar,

comparable or equivalent in effect to California Civil Code § 1542. The Releasors may hereafter discover facts in addition to or different from those that any of them now knows or believes to be true with respect to the subject matter of the releases contained in this Settlement Agreement, but each of the Releasors shall expressly have and be deemed to have, fully, finally and forever settled and released any and all of the claims subject to the releases contained in this Settlement Agreement, known or unknown, suspected or unsuspected, contingent or non-contingent, whether or not concealed or hidden, that now exist or heretofore have existed, upon any theory of law or equity now existing or coming into existence in the future, including, but not limited to, conduct that is negligent, reckless, intentional, with or without malice, or a breach of any duty, law or rule, without regard to the subsequent discovery or existence of such different or additional facts. The Parties acknowledge, and shall be deemed to have acknowledged, that the foregoing waiver was separately bargained for and a key element of the settlement of which this release is a part.

16.     Notwithstanding anything to the contrary in the DIP Documents or this Settlement Agreement, the Debtors and MacDonald shall retain and not transfer to Phonix any rights, claims and/or defenses any of them may have against the Buddy's Franchisor and its parent company FRG, arising out of the franchisor/franchisee relationship between the parties, including the Debtors and MacDonald and their affiliates.

17.     <u>No Admissions</u>. This Settlement Agreement is not and shall not in any way be construed as an admission by the Parties of any allegations made in connection with the matters that are the subject of releases or as an admission of any liability by any Party.

18.     <u>Severability</u>. The Parties agree that if any provision of this Settlement Agreement is determined by a court of competent jurisdiction to be illegal, invalid, or unenforceable, that provision shall not be a part of this Settlement Agreement. The legality, validity, and enforceability of the remaining provisions shall not be affected by a provision of this Settlement Agreement that is illegal, invalid, or unenforceable.

19.     <u>Miscellaneous</u>.

a.     Neither this Settlement Agreement, nor any statement made or action taken in connection with the negotiation of this Settlement Agreement, shall be offered or received in evidence or in any way referred to in any legal action or administrative proceeding among or between the Parties hereto, other than as may be necessary: (i) to obtain approval of and to enforce this Settlement Agreement (including the mutual releases contained herein) or (ii) to seek damages or injunctive relief in connection therewith.

b.     Each of the Parties shall execute and deliver any and all additional papers, documents, and other assurances, and shall do any and all acts and things reasonably necessary or appropriate in conjunction with the performance of each of the Parties' respective obligations hereunder.

c.     No provision of this Settlement Agreement is intended to confer any rights, benefits, remedies, obligations, or liabilities hereunder upon any person other than the Parties hereto and their respective successors.

d.    This Settlement Agreement shall be governed by and construed in accordance with the law of the state of Texas without regard to any choice of law provisions.

e.    This Settlement Agreement may be signed in counterpart originals and delivered by facsimile or email, which, when fully executed, shall constitute a single original.

f.    Except as provided in paragraph 3, the Bankruptcy Court shall retain exclusive jurisdiction (and the Parties expressly consent to such jurisdiction) with respect to any disputes arising from or related to, or other actions to interpret, administer, or enforce the terms and provisions of, this Settlement Agreement.

g.    Each person or entity who executes this Settlement Agreement on behalf of another person or entity represents and warrants that he, she, or it is duly authorized to execute this Settlement Agreement on behalf of such person or entity, has the requisite authority to bind such person or entity, and such person or entity has full knowledge of and has consented to this Settlement Agreement. The representations and warranties set forth in this paragraph shall survive execution of this Settlement Agreement.

h.    In executing the Settlement Agreement, each of the Parties represents and warrants, for itself, that: (i) it does so with full knowledge of its available rights, (ii) it is not relying and has not relied upon any representations made by any person with regard to the Settlement Agreement, other than any written representations and agreements contained herein, (iii) it has had available to it such information as it or its counsel considered necessary to making an informed judgment concerning the Settlement Agreement, and (iv) it has conducted such investigation as it or its counsel deemed appropriate regarding the settlement and its rights and asserted rights in connection with the matters that are the subject of the Settlement Agreement.

i.    The Parties acknowledge that this Settlement Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof, and all prior agreements, negotiations and understandings with respect to the subject matter hereof are canceled and superseded by this Settlement Agreement.

j.    This Settlement Agreement shall not be modified, altered, amended, or vacated without the written consent of all parties hereto or order of the Bankruptcy Court.

k.    This Settlement Agreement shall inure to the benefit of and be binding upon the successors and assigns of the Parties hereto, including any subsequently appointed Chapter 7 trustee.

l.    The headings of all sections of this Settlement Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision hereof.

20.    <u>Bankruptcy Court Approval</u>. The Debtors shall seek approval of this Settlement Agreement at the hearing on final relief in respect of the DIP Motion. In the event the Bankruptcy Court denies approval of this Settlement Agreement, this Settlement Agreement shall be null and void and of no force and effect, and the Parties shall be returned to the same positions they were

in prior to execution of this Settlement Agreement, as if this Settlement Agreement had never been executed.

[signature page(s) follow]

IN WITNESS WHEREOF, this Settlement Agreement is hereby executed as of the date first set forth above:

ACCEPTED AND AGREED TO BY:

**PHONIX RBS LLC**

By: _____

Name: Brent Turner

Title: Manager

[signature page(s) continue]

Signature Page to Settlement Agreement and Mutual Release

_____ [seal]
WILLIAM IAN MACDONALD


**DEBTORS:**

BUDDY MAC HOLDINGS, LLC
BMH RTO, LLC
BUDDY MAC TWENTY-ONE, LLC
BUDDY MAC TWENTY-TWO, LLC
BUDDY MAC TWENTY-THREE, LLC
BUDDY MAC TWENTY-FOUR, LLC
BUDDY MAC TWENTY-FIVE, LLC
BUDDY MAC TWENTY-SIX, LLC
BUDDY MAC TWENTY-SEVEN, LLC
BMH-TNM 28, LLC
BMH-TNM 29, LLC
BMH-TNM 30, LLC
BMH-TNM 31, LLC
BMH-TNM 32, LLC
BMH-TNM 33, LLC
BMH-RCL 34, LLC
BMH-RCL 35, LLC
BMH-RCL 36, LLC
BMH-RCL 37, LLC
BMH-RCL 38, LLC
BMH-RCL 39, LLC
BMH-RCL 40, LLC
BMH-RCL 41, LLC
BMH-RCL 42, LLC
BMH-FAN 43, LLC
BMH-FAN 44, LLC
BMH-FAN 45, LLC
BMH-FAN 46, LLC
BMH-FAN 47, LLC
BMH-FAN 48, LLC
BMH-FAN 49, LLC
BMH-FAN 50, LLC
BMH-FAN 51, LLC
BMH-FAN 52, LLC
BMH-FAN 53, LLC
BMH-FAN 54, LLC
BMH-SM 79, LLC
BMH-SM 80, LLC
BMH-SM 81, LLC

Signature Page to Settlement Agreement and Mutual Release

BMH-SM 82, LLC
BMH-SM 83, LLC
BMH-SM 84, LLC
BMH-SM 85, LLC
BMH-SM 86, LLC
BMH-SM 87, LLC
BUDDY MAC ONE, LLC
BMH ONE RE, LLC
BMH 95 RE CARUTHERSVILLE, LLC
BMH 96 RE MARION, LLC
BUDDY MAC TWO, LLC
BUDDY MAC SIX, LLC
BUDDY MAC SIX RE, LLC
BUDDY MAC EIGHT, LLC
BUDDY MAC ELEVEN, LLC
BUDDY MAC TWLEVE, LLC
BUDDY MAC EIGHTEEN, LLC
BUDDY MAC NINETEEN, LLC
BMH-NEW 58, LLC
BMH-NEW 62, LLC
BMH-WF TX 67, LLC
BMH-TB 75, LLC
BMH 85 RE SIKESTON, LLC
BMH PRIME 95, LLC
BMH PRIME 96, LLC
BMH PRIME 97, LLC
BMH HR LLC
SAM BROWNFIELD, LLC
SAM PLAINVIEW, LLC
MACDONALD CAPITAL CORPORATION

By: _____
  Name: William Ian MacDonald
  Title: Authorized Representative

[signature page(s) continue]

Signature Page to Settlement Agreement and Mutual Release

Docusign Envelope ID: 5527638B-3B98-4CFB-8B44-C68F9E565A97

**MACDONALD ENTITIES:**

MRG BOULDERS APARTMENTS, LTD.
MRG PREMIUM FINANCE, LLC
MACLUBBOCK BOULDERS GP INC.
P.E.C. FINANCE, LTD.
MACDONALD REALTY GROUP, LLC
MACDONALD CAPITAL, LP

By: _____
     Ian MacDonald
Name: William Ian MacDonald
Title: Authorized Representative

Signature Page to Settlement Agreement and Mutual Release

## SCHEDULE 1

### MacDonald Entities

1. MRG Boulders Apartments, Ltd.
2. MRG Premium Finance, LLC
3. MacLubbock Boulders GP Inc.
4. P.E.C. Finance, Ltd.
5. MacDonald Capital, LP
6. MacDonald Realty Group, LLC

## SCHEDULE 7

### Subject RTO Debtor Real Property

| Ownership Entity | Street Address | City, State | ZIP |
|---|---|---|---|
| SAMPlainview, LLC | 414 N. Columbia St. | Plainview, TX | 79072 |
| MacDonald Capital Corp | 218 N. Main St. | Seminole, OK | 74868 |
| Buddy Mac Six RE, LLC | 1100 N. HWY 491 | Gallup, NM | 87301 |
| SAMBrownfield, LLC | 501 W. Main St. | Brownfield, TX | 79316 |
| BMH 85 RE Sikeston, LLC | 1501 E Malone Ave | Sikeston, MO | 63801 |
| BMH One RE, LLC | 1404 W. Gentry Pkwy | Tyler, TX | 75702 |
| BMH 95 RE Caruthersville, LLC | 810 W 13th St | Caruthersville, MO | 63830 |
| BMH 96 RE Marion, LLC | 103 N Carbon | Marion, IL | 62959 |

## <u>EXHIBIT G</u>

### Buddy Mac Entities

1. Buddy Mac Two, LLC
2. Buddy Mac Six, LLC
3. Buddy Mac Six RE, LLC
4. Buddy Mac Eight, LLC
5. Buddy Mac Eleven, LLC
6. Buddy Mac Twleve, LLC
7. Buddy Mac Eighteen, LLC
8. Buddy Mac Nineteen, LLC
9. BMH-NEW 58, LLC
10. BMH-NEW 62, LLC
11. BMH-WF TX 67, LLC
12. BMH-TB 75, LLC
13. BMH 85 RE Sikeston, LLC
14. BMH Prime 95, LLC
15. BMH Prime 96, LLC
16. BMH Prime 97, LLC
17. BMH HR LLC
18. SAM Brownfield, LLC
19. SAM Plainview, LLC

## APPENDIX 14

**Plains Capital Bank Deposit Report(s)**

(See attached)

# Deposit Accounts Activity Summary

| | |
|---|---|
| **Report Created:** | 01/15/2026 12:00:31 AM (ET) |
| **Account:** | Bmh-Hr LLC - Checking - 111322994 - *2900 - Available $387,161.58 |
| **Date range:** | 11/01/2025 to 01/14/2026 |
| **Transaction types:** | All transactions |
| **Detail option:** | Includes transaction detail |

### Bmh-Hr LLC - Checking - 111322994 -  *2900 - Available $387,161.58

| Post Date | Reference | Additional Reference | Description | Debit | Credit | Calculated Balance |
|---|---|---|---|---:|---:|---:|
| 01/09/2026 | 000000000000000 | | MISCELLANEOUS DEBIT WIRE FEE | $35.00 | | $387,161.58 |
| 01/09/2026 | 202600900025360 | | OUTGOING WIRE TRANSFER OUTGOING WIRE 2026009000253600;  BNF BMH RTO LLC;REF | $56,545.57 | | $387,196.58 |
| 01/07/2026 | 997000107184549 | | BOOK TRANSFER DEBIT REF 0071845L    FUNDS TRANSFER TO DEP XXXXX6665    FROM BCY A PPRV PMT | $24,583.33 | | $443,742.15 |
| 12/31/2025 | 000000000000000 | | INTEREST CREDIT | | $115.11 | $468,325.48 |
| 12/31/2025 | 997001231102246 | | BOOK TRANSFER DEBIT REF 3651022L    FUNDS TRANSFER TO DEP XXXXX6665    FROM APPRO VED BMH BCY DEC | $24,583.33 | | $468,210.37 |
| 12/29/2025 | 000000000000000 | | MISCELLANEOUS DEBIT WIRE FEE | $35.00 | | $492,793.70 |
| 12/29/2025 | 202536300019110 | | OUTGOING WIRE TRANSFER OUTGOING WIRE 2025363000191100;  BNF KUTAK ROCK LLP IOLTA ACCOUNT;REF | $9,578.69 | | $492,828.70 |
| 12/03/2025 | 000000000000000 | | MISCELLANEOUS DEBIT WIRE FEE | $35.00 | | $502,407.39 |
| 12/03/2025 | 202533700021580 | | OUTGOING WIRE TRANSFER OUTGOING WIRE 2025337000215800;  BNF KANE RUSSELL COLEMAN & LOGAN PC TRU ST ACC;REF | $75,000.00 | | $502,442.39 |
| 12/01/2025 | 000000000000000 | | MISCELLANEOUS DEBIT WIRE FEE | $35.00 | | $577,442.39 |
| 12/01/2025 | 202533500029920 | | OUTGOING WIRE TRANSFER OUTGOING WIRE 2025335000299200;  BNF GLASS RATNER ADVISORY & CAPITAL GRO UP, LL;REF | $150,000.00 | | $577,477.39 |
| 12/01/2025 | 997001201132905 | | BOOK TRANSFER DEBIT REF 3351329L    FUNDS TRANSFER TO DEP XXXXX6665    FROM PAY | $45,000.00 | | $727,477.39 |
| 11/28/2025 | 000000000000000 | | INTEREST CREDIT | | $19.05 | $772,477.39 |

| 11/26/2025 | 000000000000000 | | MISCELLANEOUS DEBIT WIRE FEE | $35.00 | | $772,458.34 |
| 11/26/2025 | 202533000034050 | | OUTGOING WIRE TRANSFER OUTGOING WIRE 2025330000340500;  BNF KANE RUSSELL COLEMAN & LOGAN PC TRU ST ACC;REF | $500,000.00 | | $772,493.34 |
| 11/26/2025 | 000000000000000 | | MISCELLANEOUS DEBIT WIRE FEE | $35.00 | | $1,272,493.34 |
| 11/26/2025 | 202533000033900 | | OUTGOING WIRE TRANSFER OUTGOING WIRE 2025330000339000;  BNF KUTAK ROCK LLP IOLTA ACCOUNT;REF | $5,000.00 | | $1,272,528.34 |
| 11/21/2025 | 000000000000000 | | MISCELLANEOUS DEBIT WIRE FEE | $35.00 | | $1,277,528.34 |
| 11/21/2025 | 202532500008490 | | OUTGOING WIRE TRANSFER OUTGOING WIRE 2025325000084900;  BNF CLIFFORD TOWNS;REF | $249,816.33 | | $1,277,563.34 |
| 11/21/2025 | 000000000000000 | | MISCELLANEOUS DEBIT WIRE FEE | $35.00 | | $1,527,379.67 |
| 11/21/2025 | 202532500007570 | | OUTGOING WIRE TRANSFER OUTGOING WIRE 2025325000075700;  BNF BUDDY MAC HOLDINGS LLC; REF | $199,866.21 | | $1,527,414.67 |
| 11/21/2025 | 000000000000000 | | MISCELLANEOUS DEBIT WIRE FEE | $35.00 | | $1,727,280.88 |
| 11/21/2025 | 202532500008220 | | OUTGOING WIRE TRANSFER OUTGOING WIRE 2025325000082200;  BNF ZARCO EINHORN SALKOWSKI & BRITO PA; REF | $100,000.00 | | $1,727,315.88 |
| 11/21/2025 | 000000000000000 | | MISCELLANEOUS DEBIT WIRE FEE | $35.00 | | $1,827,315.88 |
| 11/21/2025 | 202532500007720 | | OUTGOING WIRE TRANSFER OUTGOING WIRE 2025325000077200;  BNF JACKSON WALKER LLP;REF | $100,000.00 | | $1,827,350.88 |
| 11/21/2025 | 000000000000000 | | MISCELLANEOUS DEBIT WIRE FEE | $35.00 | | $1,927,350.88 |
| 11/21/2025 | 202532500007520 | | OUTGOING WIRE TRANSFER OUTGOING WIRE 2025325000075200;  BNF WOMBLE BOND DICKENSON LP;REF | $80,376.81 | | $1,927,385.88 |
| 11/19/2025 | | | MISCELLANEOUS DEBIT WIRE FEE | $35.00 | | $2,007,762.69 |
| 11/19/2025 | | | OUTGOING WIRE TRANSFER OUTGOING WIRE 2025323000242800; BNF SRB CAPITAL   LLC;REF | $607,519.63 | | $2,007,797.69 |
| 11/18/2025 | | | DEPOSIT | | $2,615,317.32 | $2,615,317.32 |
| 01/14/2026 | **Totals** | | | **$2,228,289.90** | **$2,615,451.48** | |

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| BUDDY MAC HOLDINGS, LLC, *et al.*, | Case No. 25-34839 |
| Debtors.[1] | (Jointly Administered) |

**ORDER (I) AUTHORIZING THE DEBTORS, FOR THE INTERIM PERIOD, TO
(A) OBTAIN POSTPETITION FINANCING AND (B) USE CASH COLLATERAL,
(II) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE
EXPENSE CLAIMS, (III) GRANTING ADEQUATE PROTECTION, (IV) MODIFYING
THE AUTOMATIC STAY, (V) GRANTING RELATED RELIEF, AND
(VI) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001**

Upon the motion ("DIP Motion") of Buddy Mac Holdings, LLC ("Parent"), BMH RTO,

LLC ("BMH RTO"), and each debtor subsidiary of Parent listed as a "Borrower" on the DIP Loan

Agreement (as defined below) (each a "Borrower" and collectively, the "Borrowers"), and each

debtor subsidiary listed as a "Guarantor" on the DIP Loan Agreement (each, including Parent, a

---

[1]    A complete list of the Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax ID numbers, is set forth on Schedules I and II to the Motion. A complete list of the Debtors is also available on the claims agent's website: https://dm.epiq11.com/case/buddyshome/info.  The Debtors' service address is 400 E. Centre Park Blvd., Suite 101, DeSoto, Texas 75115.

1

"<u>Guarantor</u>"), each of the foregoing is a debtor and debtor-in-possession (collectively the

"<u>Debtors</u>," and each, a "<u>Debtor</u>") in the above-captioned chapter 11 cases (collectively,

"<u>Chapter 11 Cases</u>"), pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3),

364(d), 364(e), and 507(b) of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*. (the

"<u>Bankruptcy Code</u>") and rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of

Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") and rules 2002-1, 4001-1, 5005-1, and 9013-1 of

the Local Bankruptcy Rules of the United States Bankruptcy Court for the Northern District of

Texas (the "<u>Bankruptcy Local Rules</u>"), and Section D of the Procedures for Complex Cases in the

Northern District of Texas (the "<u>Complex Case Procedures</u>") for the United States Bankruptcy

Court for the Northern District of Texas (this "<u>Court</u>") seeking entry of an interim order (this

"<u>Interim Order</u>") and a final order, in form and substance acceptable to the Prepetition Lender and

the DIP Lender (the "<u>Final Order</u>"; together with the Interim Order, the "<u>DIP Orders</u>") granting

the following relief to be provided herein until the date that a Final Order has been entered (such

interim period being the "<u>Interim Period</u>") among other things:

1.      authorization and approval for the Debtors to obtain up to $1.5 million[2] in principal
of post-petition revolving credit debtor-in-possession financing and other financial
accommodations (the "<u>DIP Facility</u>"), but only up to $750,000 during the Interim Period, and the
revolving loans made under such facility, the "<u>DIP Loans</u>"), pursuant to and in accordance with
the terms and conditions set forth in that certain *Secured Superpriority Debtor-in-Possession Loan,
Security, and Guaranty Agreement* (as it may be amended, modified, supplemented, extended,
restated or replaced from time to time, the "<u>DIP Loan Agreement</u>")[3] substantially in the form
attached hereto as **Exhibit 2**, by and among the Debtors, as borrower and/or guarantors, and Phonix
RBS LLC, as Lender (the "<u>DIP Lender</u>");

2.      authorization for the Debtors to use or direct the use of the proceeds of the DIP
Facility, DIP Collateral and Pre-Petition Collateral (each as defined herein) (the "<u>Cash
Collateral</u>"), in accordance with the terms of the DIP Orders and the DIP Financing Documents
(as defined herein), and as limited by the Approved Budget (as defined herein), for, *inter alia*:

---

[2] Exclusive of the Accordion Amount of $1,000,000, which, subject to the sole and absolute discretion of the DIP
Lender, may be made available to the Debtors following the entry of the Final Order.

[3] Capitalized terms used but not otherwise defined herein have the meaning ascribed to them in the DIP Loan
Agreement.

(a) the purchase of inventory by Lender on behalf of the Debtors (for the avoidance of doubt, pursuant to the Approved Budget, the interim draw of $750,000 shall be used on account of inventory purchases as more fully set forth in the DIP Loan Agreement and this Interim Order), (b) general operating, corporate, and working capital purposes of the Debtors in the ordinary course of business, exclusive of the inventory purchases by the DIP Lender as more fully set forth in the DIP Loan Agreement and this Interim Order; (c) reasonable and documented costs, fees, and other expenses of DIP Lender; (d) Adequate Protection Payments (as defined herein); (e) approved fees and expenses of the Debtors' and Committees' professionals; and (f) upon entry of the Final Order, a portion of the outstanding amount of the Loan (as defined in the Pre-Petition Loan Agreement; referred to herein as the "Pre-Petition Loan") to be automatically "rolled-up" and converted into DIP Loans, on a cashless basis of three dollars ($3.00) of Roll-Up Amount for every one dollar ($1.00) of funded DIP Loans (the "Roll-Up"), which amount shall include any post-petition advance that has been made by Lender to the Debtors since the First Petition Date, and will be made by the Lender to the Debtors under the DIP Facility following the entry of the Interim Order.

3.      approval of, authorization and direction for Debtors to (a) enter into, execute and perform under (i) the DIP Loan Agreement and (ii) all security agreements, pledge agreements, notes, guarantees, mortgages, deeds of trust, control agreements, Uniform Commercial Code financing statements, certificates, reports and other agreements, documents and instruments either or both executed and/or delivered with or to the DIP Lender in connection with or related thereto (collectively, as amended, modified, supplemented, extended, restated or replaced from time to time, the "DIP Financing Documents"), with such DIP Financing Documents in form and substance acceptable to the Pre-Petition Lender and the DIP Lender, and (c) take and perform all other acts and steps as may be required or contemplated by or in connection with the DIP Financing Documents and the DIP Orders;

4.      granting to the DIP Lender, priming (subject to the limitations set forth in proviso 11(b)(3)), valid, perfected and enforceable liens (as defined in Bankruptcy Code section 101 (37)) in and upon all of the DIP Collateral to secure all existing and future obligations and liabilities of every kind or nature (including without limitation, principal of, and accrued interest on, amounts advanced to the Debtors under the DIP Facility), and all other fees, and indemnity obligations, reimbursement obligations, any other Obligations (as defined in the DIP Loan Agreement) under or in connection with the DIP Financing Documents, whether due or to become due, absolute or contingent, (collectively, the "DIP Obligations");

5.      granting to the DIP Lender an allowed superpriority administrative expense claim status for the DIP Obligations, pursuant to Bankruptcy Code section 364(c)(1) and 507(b), subject to the terms of the DIP Orders;

6.      authorizing Lender's use for the direct purchase of inventory, and the Debtors' use, in accordance with the terms of the DIP Financing Documents and as limited by the Approved Budget, of all Cash Collateral and DIP Loans;

7.      granting adequate protection, including without limitation, Adequate Protection Liens, Adequate Protection Claims, and Adequate Protection Payments (each as defined herein and collectively, the "Adequate Protection Obligations") to (a) Phonix RBS, LLC, as successor in interest to INTRUST Bank, N.A. ("Pre-Petition Lender", together with the DIP Lender the

"Lenders") under that certain Loan, Security and Guaranty Agreement dated as of February 28, 2025 (as amended, restated, amended and restated, modified, supplemented, or extended from time to time, the "Pre-Petition Loan Agreement") by and among debtor BMH RTO, LLC, as borrower ("Pre-Petition Borrower"), Ian MacDonald ("MacDonald"), Buddy Mac Holdings, LLC ("Parent"), and certain subsidiary guarantors (collectively, the "Pre-Petition Guarantors") from time to time party thereto, and the Pre-Petition Lender, and all security agreements, pledge agreements, notes, mortgages, guarantees, control agreements, collateral access agreements, and related agreements and documents (collectively, with the Pre-Petition Loan Agreement, as amended, modified, supplemented, extended, restated, amended and restated, or replaced from time to time, the "Pre-Petition Financing Documents");

8.      approving the treatment of the collection and use by Debtors of any Pre-Petition Collateral (as defined below) and post- petition Collateral by the Debtors in accordance with the Approved Budget as a dollar for dollar Adequate Protection Claim in the manner and on the terms set forth in the DIP Loan Agreement and the DIP Orders;

9.      subject to entry of the Interim Order, authorizing the application of the remaining proceeds of the initial ERC Funds in BHM HR to the unpaid pre-petition Obligations  in accordance with the settlement agreement attached to the DIP Loan Agreement, and transfer of the remaining ERC Funds, which shall be held by Lenders in a segregated, suspense account (the "Suspense Account") subject to the restrictions specified further in this Interim Order at paragraph 15 and the details of the account having been identified to the Debtors and MacDonald prior to entry of this Interim Order in a writing to counsel,  pending entry of the Final Order, and upon entry of the Final Order, application of the remaining ERC funds in BMH HR to be applied by Lenders, as deemed proceeds of the pre-petition Collateral, on account of the pre-petition Obligations or the DIP Facility, in Lenders' sole and absolute discretion. At all times after entry of the Interim Order, the ERC Funds shall secure the DIP Obligations, but only to the extent of funds actually advanced, and the Adequate Protection Obligations, but only as to any diminution occurring during the period covered by the Interim Order;

10.      subject to entry of a Final Order, the waiver of: (a) the ability of the Debtors and their bankruptcy estates (as defined under Bankruptcy Code section 541, the "Estates") to surcharge against the DIP Collateral with respect to the DIP Lender and the Pre-Petition Collateral with respect to the Pre-Petition Lender pursuant to Bankruptcy Code section 506(c); (b) the applicability of the "equities of the case" exception under Bankruptcy Code section 552(b) with respect to the proceeds, products, offspring or profits of the DIP Collateral and Pre-Petition Collateral;

11.      subject to entry of a Final Order, the waiver of the equitable doctrine of "marshaling" and any similar equitable doctrine with respect to (a) any of the DIP Collateral (as defined herein) for the benefit of any party other than the DIP Lender, and (b) any of the Pre-Petition Collateral (as defined herein), including Cash Collateral, for the benefit of any party other than the Pre-Petition Lender;

12.      approval of the milestones set forth in the DIP Loan Agreement;

13.     Subject to entry of the Final Order, approval of the remaining terms of the settlement agreement (the "Settlement Agreement"), in a form and substance acceptable to the Pre-Petition Lender and the DIP Lender, attached as Exhibit A to the *Debtors' Emergency Motion for (I) Approval of Settlement Agreement Between the Debtors and Phonix RBS LLC Pursuant to Federal Rule of Bankruptcy Procedure 9019; and (II) Granting Related Relief* [ECF #____], and the granting of releases contained therein and in this Interim Order;

14.     pursuant to section 1(c) of the DIP Loan Agreement, and upon the entry of the Final Order, authorizing DIP Lender, in its sole and absolute discretion, to make available an additional $1,000,000 (the "Accordion Amount"), solely for the purpose of purchasing additional inventory on behalf of the Debtors, and increasing the Credit Limit as in effect on the Closing Date;

15.     modifying the automatic stay imposed by Bankruptcy Code section 362 to the extent hereinafter set forth and waiving the fourteen (14) day stay provisions of Bankruptcy Rule 4001(a)(3);

16.     waiving the 21-day provision of Bankruptcy Rule 6003(b), the notice requirements of Bankruptcy Rule 6004(a), waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of this Interim Order; and

17.     scheduling a final hearing on the DIP Motion ("Final Hearing") for entry of a Final Order authorizing the DIP Facility and the use of Cash Collateral as contemplated hereby on a final basis and granting such other relief as is requested in the DIP Motion and approving the form of notice with respect to the Final Hearing.

Notice of the DIP Motion, the relief requested therein during the Interim Period, and the Interim Hearing (as defined herein) ("Notice") having been served by the Debtors in accordance with Bankruptcy Rule 4001-1 on: (i) the United States Trustee for Region 6 ("U.S. Trustee"); (ii) proposed counsel for the Official Committee of Unsecured Creditors (the "Committee"); (iii) the Pre-Petition Lender and counsel thereto; (iv) the proposed DIP Lender and counsel thereto; (v) the Internal Revenue Service; (vi) other governmental agencies having a regulatory or statutory interest in these cases; (vii) all parties known to the Debtors that hold any liens, mortgages or security interests in the Debtors' assets, including those parties that have filed UCC-1 financing statements against the Debtors, or that, to the Debtors' knowledge, have asserted any liens or mortgages on any of the Debtors' assets; (viii) all landlords and warehouseman of the Debtors; (ix) all creditors known to the Debtors to be holding a judgment against the Debtors; (x) any other

parties claiming an interest in the Pre-Petition Collateral (defined below); and (xi) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Noticed Parties").  In light of the nature of the relief requested, no other or further notice is required.

This Court having considered the relief requested in the DIP Motion for the Interim Period, the First Day Declarations,[4] the DIP Declaration,[5] and the arguments of counsel made at the Interim Hearing; an interim hearing on the DIP Motion having been held by this Court and concluded (the "Interim Hearing"); all objections and reservations of rights, if any, to the relief requested in the DIP Motion for the Interim Period having been withdrawn, resolved, or overruled by this Court; it appearing that approval of the interim relief requested in the DIP Motion is fair and reasonable and in the best interests of the Debtors and their Estates, and is necessary to avoid immediate and irreparable harm to the Debtors and their Estates pending the Final Hearing; it appearing that the Debtors' entry into and performance under the DIP Financing Documents and the other transactions contemplated by this Interim Order is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor:

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[6]**

A.    <u>Disposition</u>.  The relief requested in the DIP Motion is **GRANTED** to the extent set forth herein for the Interim Period in accordance with the terms of this Interim Order.  Any

---

[4]    The term "First Day Declarations" means that certain collectively, (1) *Declaration of William Ian MacDonald in Support of the Debtors' Chapter 11 Petitions and First Date Motions* [D.I. 12] "Debtor First Day Declaration")and (2) *Declaration of Mark Shapiro in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [D.I. 13] (the "CRO First Day Declaration")

[5]    The term "DIP Declaration" means the *Declaration of Mark Shapiro in Support of the Debtors' Sale and DIP Financing Motions* filed on January 26, 2026.

[6]    The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To

objections to the DIP Motion with respect to the entry of this Interim Order that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are hereby denied and overruled. This Interim Order shall become effectively immediately upon its entry and any applicable stay (including under Bankruptcy Rule 6004) is waived to permit such effectiveness.

B.    <u>Petition Dates</u>. On December 1, 2025 (the "<u>First Petition Date</u>"), Buddy Mac One, LLC ("<u>Buddy Mac One</u>") , BMH One RE, LLC ("<u>BMH One</u>"), BMH 95 RE Caruthersville, LLC ("<u>BMH 95</u>"), and BMH 96 RE Marion, LLC ("<u>BMH 96</u>")  filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, and on December 4, 2025 (the "<u>Second Petition Date</u>"), an additional  forty five (45) related entities (together with Buddy Mac One, BMH One, BMH 95, and BMH 96, the "<u>December Debtors</u>") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, and on January [22], 2026 (the "<u>Third Petition Date</u>", together with the First Petition Date and the Second Petition Date, the "<u>Petition Dates</u>" and each individually referred to as the applicable "<u>Petition Date</u>"), twenty-one (21) additional related entities (the "<u>January Debtors</u>") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

C.    <u>Debtors-in-Possession</u>.    The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  No trustee or examiner has been appointed in the Chapter 11 Cases. On December 19, 2025, the U.S. Trustee appointed the Committee.

D.    <u>Jurisdiction and Venue</u>.  The Court has jurisdiction of these Chapter 11 Cases, the DIP Motion, this Interim Order and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  This Court's consideration of the DIP Motion constitutes a "core" proceeding

---

the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

as defined in 28 U.S.C. §§ 157(b)(2)(A), (D) and (M).   This Court may enter a final order

consistent with Article III of the United States Constitution.   Venue of the Chapter 11 Cases and

the DIP Motion in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.   The statutory and

procedural bases for the relief sought in the DIP Motion and granted in this Interim Order are

Bankruptcy Code sections 105, 361, 362, 363, 364, 503, 506, 507, and 552, Bankruptcy Rules

2002, 4001, 6003, 6004, and 9014, and Bankruptcy Local Rules 2002-1, 4001-1, 5005-1, and

9013-1, and the Complex Case Procedures.

E.      <u>Notice</u>.   Upon the record presented to this Court at the Interim Hearing, and under

the exigent circumstances set forth therein and in the DIP Motion, the First Day Declarations and

the DIP Declaration, notice of the DIP Motion and the relief requested thereby and granted in this

Interim Order has been provided in accordance with Bankruptcy Rules 2002, 4001(b) and

4001(c)(1) and Bankruptcy Local Rule 9013-1, which notice was appropriate under the

circumstances and sufficient for entry of this Interim Order.  No other or further notice of the DIP

Motion is required for entry of this Interim Order.  The interim relief granted herein is necessary

to avoid immediate and irreparable harm to the Debtors and their Estates pending a Final Hearing.

F.      <u>Final Hearing</u>.   At the Final Hearing, the Debtors will seek approval of the Final

Order, which shall be subject to the terms and conditions of the DIP Financing Documents and

contain approval of the Settlement Agreement.  Notice of the Final Hearing and Final Order will

be provided in accordance with this Interim Order.

G.      <u>Debtors' Acknowledgements and Agreements</u>.   Without prejudice to the rights of

all parties-in-interest other than the Debtors, but subject to the limitations contained in Section

11826835v2 (75669.00003.000)

VIII below, the Debtors admit, stipulate, acknowledge, and agree (the "<u>Debtors' Stipulations</u>")
that:

(1).    *Pre-Petition Financing Documents*.    Prior to the commencement of the
Chapter 11 Cases, Pre-Petition Borrower and Pre-Petition Guarantors, entered into the Pre-Petition
Loan Agreement with INTRUST Bank, N.A. The Pre-Petition Financing Documents were
subsequently assigned to Pre-Petition Lender pursuant to that certain *Loan Sale Agreement* dated
as of September 2, 2025. Pursuant to the Pre-Petition Financing Documents, Pre-Petition Lender
made loans and advances, and provided other financial accommodations to the Pre-Petition
Borrower. The Pre-Petition Guarantors guaranteed the Pre-Petition Obligations (as defined herein)
of the Pre-Petition Borrower under the Pre-Petition Loan Agreement.  The Pre-Petition Obligations
(as defined herein) matured prior to the assignment of the Pre-Petition Financing Documents to
Pre-Petition Lender, are due and owing in accordance with the terms of the Pre-Petition Financing
Documents, and all commitments of the Pre-Petition Lender are terminated.

(2).    *Pre-Petition Obligations*.

(a).    *Pre-Petition Loan Obligations*.    As of the First Petition Date, the
Pre-Petition Borrower and the Pre-Petition Guarantors were justly and lawfully indebted and liable
to the Pre-Petition Lender, without defense, counterclaim or offset of any kind, in the aggregate
amount of not less than $12,792,674.70, including, without limitation, Pre-Petition Loans in an
outstanding principal amount of $11,974,354 (together with accrued and unpaid interest, any fees,
costs, expenses and disbursements (including attorneys' fees, accountants' fees, auditor fees,
appraisers' fees and financial advisors' fees, and related expenses and disbursements),
indemnification obligations, hedging obligations, guarantee obligations, and other charges,
amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued,

accruing, due, owing, or chargeable in respect of any of the Pre-Petition Borrower's or the Pre-Petition Guarantors' obligations pursuant to, or secured by, the Pre-Petition Financing Documents, including all Obligations (as defined in the Pre-Petition Loan Agreement) (collectively, the "Pre-Petition Obligations")), which Pre-Petition Obligations have been guaranteed on a joint and several basis by the Pre-Petition Guarantors.

(b).     The Pre-Petition Obligations constitute allowed, legal, valid, binding, enforceable, and non-avoidable obligations of Debtors, and are not subject to any offset, deduction, defense, counterclaim, avoidance, recovery, recharacterization, or subordination pursuant to the Bankruptcy Code or any other applicable law, and the Debtors do not possess, and shall not assert, any claim, counterclaim, setoff, deduction, or defense of any kind, nature, or description that would in any way impair, reduce, or affect the validity, enforceability, and non-avoidability of any of the Pre-Petition Obligations.

(3).     *Pre-Petition Collateral (for Pre-Petition Obligations).*

(a).     As of the First Petition Date, the Pre-Petition Obligations were secured pursuant to the Pre-Petition Financing Documents by valid, binding, perfected, enforceable, and non-avoidable security interests and liens ("Pre-Petition Liens") granted by the Debtors to the Pre-Petition Lender upon the "Collateral" (as defined in the Pre-Petition Loan Agreement) in existence as of the First Petition Date (hereafter, the "Pre-Petition Collateral").

(b).     The Pre-Petition Lender has a valid, binding, and perfected nonavoidable security interest and lien in all of Pre-Petition Collateral, including Cash Collateral, including all amounts on deposit in all of Pre-Petition Borrower's banking, checking, or other deposit accounts whether as original collateral or as proceeds of other Pre-Petition Collateral, and all such Cash Collateral is part of the Pre-Petition Collateral.

- 10 -

11826835v2 (75669.00003.000)

(c).    The Pre-Petition Lender's security interests are perfected by those certain UCC-1 financing statements naming each of the Borrowers and Guarantors, UCC-3 amendments assigning such financing statements from INTRUST Bank, LLC to Pre-Petition Lender, the Limited Recourse Guaranty (as defined in the Pre-Petition Loan Agreement), and three (3) Mortgages on the respective real properties of the Guarantors (the "Guarantor Real Property").

(d).    The Debtors do not possess, and will not assert, any claim, counterclaim, setoff, deduction, or defense of any kind, nature, or description that would in any way impair, reduce, or affect the validity, enforceability, and non-avoidability of any of the Pre-Petition Lender's liens, claims, or security interests in the Pre-Petition Collateral, which liens and security interests are not subject to subordination or avoidance pursuant to the Bankruptcy Code or any other applicable law.

H.    Adequate Protection.

(1).    Based on the DIP Motion, the First Day Declarations, and the DIP Declaration, and the record presented to this Court at the Interim Hearing, the terms of the adequate protection granted to the Pre-Petition Lender as provided in this Interim Order are fair and reasonable under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and provide the Debtors with reasonably equivalent value and fair consideration.

(2).    *Adequate Protection Obligations*.  The Debtors acknowledge and agree that the Pre-Petition Lender is entitled to and being provided with adequate protection (including the Adequate Protection Obligations) with respect to the aggregate diminution in value ("Diminution in Value") of the Pre-Petition Lender's respective interests in the Pre-Petition Collateral for any reason for which adequate protection may be granted under the Bankruptcy Code, including as a

11826835v2 (75669.00003.000)

result of the: (a) provisions of this Interim Order granting either or both first priority and priming liens on the Pre-Petition Collateral to the DIP Lender with respect to the DIP Facility; (b) use of the Cash Collateral since the First Petition Date; (c) use, sale, lease, decrease, or depreciation of the Pre-Petition Collateral since the First Petition Date; (d) subordination to the Carve Out solely as provided for herein; and (e) the imposition of the automatic stay under Bankruptcy Code section 362(a) or otherwise pursuant to Bankruptcy Code sections 361(a), 363(c), 364(c), and 364(d)(1). Pursuant to Bankruptcy Code sections 361, 363 and 507(b), as adequate protection for any Diminution in Value, since the First Petition Date, the Debtors have agreed to provide the Pre-Petition Lender with the Adequate Protection Liens, the Adequate Protection Claim and the Adequate Protection Payments (each as defined herein), which Adequate Protection Payments shall be payable from the proceeds of DIP Loans and any other asset of the Debtors' estates.

(3). In exchange for such adequate protection (including the Adequate Protection Obligations), the Pre-Petition Lender has agreed to the Debtors' use of the Cash Collateral on the terms set forth in this Interim Order and the DIP Loan Agreement.

(4). *Necessity for Adequate Protection*. The adequate protection being provided pursuant to this Interim Order is authorized by the Bankruptcy Code, is consistent with the Debtors' need for the DIP Facility and will facilitate the Debtors' ability to continue their business operations.

I. <u>No Control</u>. The Pre-Petition Lender nor the DIP Lender, as applicable, do not control (or have in the past controlled) the Debtors or their properties or operations, have authority to determine the manner in which any Debtors' operations are conducted or are control persons or insiders of the Debtors by virtue of any of the actions taken with respect to, in connection with,

related to or arising from the Pre-Petition Financing Documents or the DIP Documents or the Settlement Agreement.

    J.    <u>Findings Regarding the DIP Facilities and Use of Cash Collateral.</u>

    (1).   *Request for DIP Financing*.  The Debtors have requested that the DIP Lender extend loans, advances, and other financial accommodations and the DIP Lender is only willing to do so as more particularly described, and subject to the terms and conditions set forth, in this Interim Order and the DIP Financing Documents.

    (2).   *Need for DIP Financing*.  As set forth in the DIP Declaration and the First Day Declaration, and the record of the Cash Collateral Hearings since the First Petition Date, the Debtors do not have sufficient available sources of working capital to fund the purchase of inventory and generate sufficient working capital in the ordinary course without the DIP Facility and the ability to use Cash Collateral, or to fund these Chapter 11 Cases without the DIP Facility, all on the terms set forth in the DIP Financing Documents and this Interim Order. The Debtors' ability to maintain business relationships with their vendors, suppliers, and customers, to pay their employees, and to otherwise fund their operations is essential to the viability of the Debtors and to run a sale process and the Chapter 11 Cases. The ability of the Debtors to obtain sufficient working capital and liquidity through the proposed DIP Facility and the use of Cash Collateral on the terms set forth in the DIP Financing Documents and this Interim Order is vital to the preservation and maximization of the going concern value one or more of the Debtors' currently operating businesses pending sale(s) of such assets. Accordingly, the Debtors have an immediate need to obtain funds from the DIP Facility and authorization to use Cash Collateral for the purposes and on the terms and subject to the limitations set forth herein and in the DIP Financing Documents, including the Approved Budget (defined herein), in order to, among other things, (a) maintain

business relationships; (b) permit the continued operation of their businesses; (c) make Adequate

Protection Payments; (d) pay the costs of administration of these Chapter 11 Cases and satisfy

their other working capital and general corporate purposes; (e) minimize disruption of their

business operations; and (f) manage and preserve the assets of the Debtors' Estates in order to

maximize the value of such assets and the recoveries to creditors of the Estates and to conduct a

sale process.

(3).    *No Credit Available on More Favorable Terms*.    As stated in the DIP

Declaration, the Debtors are unable to procure financing or other financial accommodations on

more favorable terms from sources other than from the DIP Lender under the DIP Financing

Documents and are unable to obtain satisfactory unsecured credit allowable under Bankruptcy

Code section 364(a) or 364(b) and 503(b)(1) as an administrative expense.  The Debtors also are

unable to obtain secured credit for the purposes set forth in the DIP Financing Documents and the

consensual use of Cash Collateral on more favorable terms without the grant of liens (including

priming liens) on all or substantially all of the Debtors' assets pursuant to Bankruptcy Code

sections 364(c) and (d), subject to the Carve Out solely as provided for herein.  In the Debtors'

business judgment, the Debtors cannot procure the necessary financing on terms more favorable

than the financing offered by the DIP Lender pursuant to the DIP Financing Documents and this

Interim Order.

(4).    *Budget*.    Based upon the record presented to this Court by the Debtors,

(a)the Debtors have prepared and delivered the Initial DIP Budget (as defined in the DIP Loan

Agreement), in the form attached hereto as **Exhibit 1** (the Initial DIP Budget and each subsequent

approved budget shall constitute without duplication, the "Approved Budget"), (b) the Approved

Budget was prepared by the Debtors, with the assistance of their professional advisors and

management, as well as review and approval of the DIP Lender, and (c) the Approved Budget (as the same may be amended or extended solely as provided for herein) sets forth, among other things, the projected cash receipts and disbursements for the periods covered thereby.  The Initial DIP Budget and any supplemental Approved Budget may be modified, amended and updated from time to time in accordance with the DIP Loan Agreement, and, once approved in writing by the DIP Lender pursuant to the DIP Loan Agreement, shall supplement and replace the Initial DIP Budget or the then Approved Budget. If any revised Approved Budget is not approved in writing by the DIP Lender pursuant to the DIP Loan Agreement, the then-existing Approved Budget shall remain in full force and effect. The Debtors believe in good faith that the Approved Budget, subject to such variances as permitted in the DIP Loan Agreement is achievable and will allow the Debtors to operate in chapter 11 during the term of the Approved Budget. The Pre-Petition Lender and the DIP Lender are relying upon the Debtors' compliance with the Approved Budget, subject to such variances as permitted in the DIP Loan Agreement, in determining to consent to the use of Cash Collateral solely as contemplated in this Interim Order and to enter into (or as the case may be, consent to) the DIP Facility as provided for in this Interim Order and the DIP Financing Documents.

(5).    *Business Judgment and Good Faith Pursuant to Section 364(e) and Section 363(m).*  Based on the record before this Court, including the Debtors' Stipulations, (a) the Debtors and the Pre-Petition Lender and the DIP Lender have negotiated at arms' length and in good faith regarding the terms of the DIP Financing Documents, the Settlement Agreement, the DIP Facility, and the Debtors' use of Pre-Petition Collateral, including the Cash Collateral, respectively, all subject to the terms of this Interim Order and (b) the terms of the DIP Loan Agreement, the other DIP Financing Documents, and the DIP Facility are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties,

11826835v2 (75669.00003.000)

and constitute reasonably equivalent value and fair consideration. Any credit extended under the terms of this Interim Order shall be deemed to have been extended in "good faith" (as that term is used in Bankruptcy Code sections 364(e) and 363(m)) by the Pre-Petition Lender and the DIP Lender, as applicable.

(6).    *No Objection*. The Pre-Petition Lender has no objection to the DIP Facility and the use of Cash Collateral on the terms and conditions set forth in this Interim Order. Nothing in this Interim Order, including, without limitation, any of the provisions herein with respect to adequate protection, shall constitute, or be deemed to constitute, a finding that the interests of the Pre-Petition Lender are or will be adequately protected with respect to any non-consensual use of Pre-Petition Collateral, including Cash Collateral.

(7).    *No Responsible Person.* The Debtors stipulate that in making the decision to finance the Debtors' continued business operations through the DIP Facility, to permit the Debtors to use Cash Collateral for the limited purposes set forth herein, in administering any loans, in approving the Initial Budget, or in taking any actions permitted by this Interim Order or the DIP Financing Documents, neither the DIP Lender nor the Pre-Petition Lender shall be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person," "owner or operator," or part of any "control group" with respect to any of the Debtors or the management of the Debtors ore owe any fiduciary duty to the Debtors, their respective creditors, shareholders, or Estates.

(8).    *Good Cause*. Good and sufficient cause has been shown for the entry of this Interim Order and for authorizing the Debtors to obtain financing pursuant to the DIP Facility and to use the Cash Collateral of the Pre-Petition Lender (solely to the extent consistent with the Approved Budget) and to authorize the provision of adequate protection. The relief requested in

the DIP Motion is necessary, essential, and appropriate, and is in the best interest of and will benefit the Debtors and their Estates, as its implementation will, among other things, provide the Debtors with the necessary liquidity to: (a) minimize disruption to the Debtors' efforts for the continued operations of their businesses; (b) preserve and maximize the value of the Debtors' Estates; and (c) avoid immediate and irreparable harm to the Debtors, their respective businesses, employees, and assets.

(9).    *Immediate Entry.*  Good and sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2), 6003(b), and, to the extent applicable, 6004(h).  Absent the immediate grant by this Court of the interim relief sought by the DIP Motion, each Debtors' Estates will be immediately and irreparably harmed pending the Final Hearing.  Consummation of the DIP Facility and the use of Cash Collateral, in accordance with the terms of this Interim Order, the Approved Budget and the DIP Financing Documents, and approval of the Settlement Agreement is in the best interests of the Debtors' Estates and is consistent with the Debtors' exercise of their fiduciary duties.

Based upon the foregoing findings and conclusions, the DIP Motion, and the record before this Court with respect to the DIP Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

**I.    Authorization and Terms of Financing.**

1.    <u>DIP Motion Granted</u>.  The interim relief sought in the DIP Motion is granted, the interim financing described herein is authorized and approved, and the use of Cash Collateral during the Interim Period is authorized, in each case subject to the terms and conditions set forth in the DIP Financing Documents, the Approved Budget and this Interim Order.  All objections to

this Interim Order to the extent not withdrawn, waived, settled, or resolved are hereby denied and overruled.  This Interim Order shall become effective immediately upon its entry.

2.  <u>Authorization to Borrow, Guaranty, and Use Loan Proceeds</u>.  To prevent immediate and irreparable harm to the Debtors' Estates, the Debtors are hereby expressly authorized and empowered to immediately borrow, or guaranty, as applicable, and obtain, on a joint and several basis, DIP Loans under the DIP Facility, and the Debtors (on a joint and several basis) are hereby authorized and empowered to incur all other indebtedness and obligations owing to the DIP Lender on the terms and subject to the conditions and limitations set forth in the DIP Financing Documents and this Interim Order, during the Interim Period up to the maximum aggregate amount of $750,000 with respect to the DIP Facility, subject to the Approved Budget (with any variances permitted thereto under the terms and conditions of the DIP Loan Agreement) and from the entry of this Interim Order through and including the earliest to occur of (i) entry of the Final Order or (ii) the Termination Date (as defined in the DIP Loan Agreement). It is specifically contemplated that the Lender, in coordination with the Debtors, will arrange for the purchase of inventory to be delivered to Debtor locations and the Lender will purchase the inventory on behalf of the Debtors and such purchase will be deemed an advance under the DIP Facility.

3.  <u>Financing Documents</u>.

(a).  *Authorization*.  The Debtors are hereby authorized to execute, deliver, enter into and, as applicable, perform all of their obligations under the DIP Financing Documents.  The Debtors are hereby authorized to borrow money which will occur by (1) the Lender purchasing inventory for the Debtors' stores pursuant to the DIP Loan Agreement, or in Lender's sole and absolute discretion funding the Accordion Amount for the sole purpose of purchasing additional inventory, and (2) such other funding as permitted by the DIP Financing Documents, which shall

- 18 -

11826835v2 (75669.00003.000)

be used for all limited purposes permitted hereunder and under the DIP Financing Documents (and subject to and in accordance with the Approved Budget). Upon entry of this Interim Order, in furtherance of the foregoing and without further approval of this Court, the Debtors are hereby authorized and empowered, and the automatic stay imposed by Bankruptcy Code section 362 is hereby lifted to the extent necessary, to: (i) enter into, execute, deliver, perform, and comply with all of the terms, conditions, and covenants of the DIP Financing Documents, including, without limitation, the DIP Loan Agreement and all security and pledge agreements (including any mortgage); (ii) execute and deliver all certificates, reports, statements, and other agreements and documents required or contemplated by the DIP Financing Documents (including, without limitation, documents required for the Debtors' performance of their obligations under the DIP Financing Documents and the creation and perfection of liens granted or contemplated therein); and (iii) pay all obligations incurred under the DIP Financing Documents in accordance herewith (whether principal, interest, fees, costs, expenses, indemnities, or other amounts described in the DIP Financing Documents as such amounts become earned, due, and payable and without need to obtain further Court approval, including, without limitation, appraisal fees, late fees, and the fees and disbursements of the DIP Lender's attorneys, advisors, accountants, and other consultants, whether or not such fees arose before or after the First Petition Date), and perform all other undertakings and acts required or contemplated by, the DIP Financing Documents.

(b).    *Approval of Financing Documents*. The DIP Financing Documents (and all certificates, reports, statements, and other agreements and documents) are approved to the extent necessary to implement the terms and provisions of this Interim Order.

(c).    *Amendment of DIP Financing Documents*. The Debtors and the DIP Lender are hereby authorized to approve and implement, in accordance with the terms of the DIP

Financing Documents, any modification of the DIP Financing Documents; *provided*, *however*, that

any material modification or amendment to the DIP Financing Documents that is materially

adverse to the interests of the Debtors or their Estates (or to the interest of any of the Pre-Petition

Lender) shall be subject to providing notice of such material modification or amendment to counsel

to the Committee, the U.S. Trustee and the Pre-Petition Lender, each of which shall have three (3)

business days from the date of such notice within which to object in writing to such modification

or amendment unless the  Committee, U.S. Trustee, and/or the Pre-Petition Lender, as applicable,

agrees in writing to a shorter period.  If no timely objection is raised by the Committee, the U.S.

Trustee or the Pre-Petition Lender to any material modification or amendment to the DIP

Financing Documents, then such modification or amendment shall become effective upon the

expiration of the aforementioned notice period.  If a timely objection is interposed, the Court shall

resolve such objection prior to such modification or amendment becoming effective.

      (d).    *Application of DIP Facility Proceeds*.  The advances under the DIP Facility

and the use of Cash Collateral shall be used in each case solely in a manner consistent with the

terms and conditions of the DIP Financing Documents and this Interim Order and in accordance

with and as may be limited by the Approved Budget (subject to any variances thereto permitted

under the terms and conditions of the DIP Loan Agreement), solely as follows:

      (i)    for the purchase or deemed purchase of inventory.

      (ii)    to pay fees, costs, and expenses, subject to the Fee Deferment

Provision (as defined below), as provided in the applicable DIP Financing Documents, including

amounts incurred in connection with the preparation, negotiation, execution and delivery of the

DIP Loan Agreement and the other DIP Financing Documents;

(iii) for general operating and working capital purposes, for the payment of fees, expenses, and costs incurred in connection with the Chapter 11 Cases, and other proper corporate purposes of the Debtors not otherwise prohibited by the terms hereof for working capital, and other lawful corporate purposes of the Debtors;

(iv) for making other payments as expressly provided in this Interim Order and the Approved Budget (including, the Carve-Out which will only be available upon entry of the Final Order, for the payment of the Debtors' and Committees' Professional Fees, as set forth in the Approved Budget);

(v) following entry of a Final Order, at the discretion of the DIP Lender, to effectuate the Roll-Up on the basis of 3 to 1 for every dollar advanced or deemed advanced (for the purchase of inventory) on a post petition basis, without which the DIP Lender would not be willing to provide the DIP Loans;

(e). *Conditions Precedent*.  The DIP Lender shall have no obligation to make any loan or advance under the DIP Loan Agreement unless the conditions precedent to such loan or extension of credit under the DIP Loan Agreement have been satisfied in full or waived in accordance with the DIP Loan Agreement.  The Debtors shall have no ability to use Cash Collateral unless the conditions precedent to the use of such Cash Collateral have been satisfied in full or waived in accordance with the DIP Loan Agreement.

(f). *Budget Maintenance*.  The Debtors' proposed budget shall become the "Approved Budget" upon written approval of such budget by the DIP Lender, and the Debtors shall update the Approved Budget each month unless otherwise agreed to by the DIP Lender, subject to written approval of the DIP Lender. If any revised Approved Budget is not approved by the DIP Lender pursuant to the DIP Loan Agreement, the prior Approved Budget shall remain in

full force and effect.  A copy of any updated Approved Budget shall be filed with the Court within

one (1) business day after it has been approved in writing by the DIP Lender.

4.     <u>Payments and Application of Payments</u>.  The Debtors are authorized to make all

payments and transfers of the Estates' property to the DIP Lender as provided, permitted, or

required under the DIP Financing Documents and this Interim Order, which payments, proceeds,

and other amounts shall be applied either to the Pre-Petition Obligations or the DIP Obligations in

such order and manner determined by the DIP Lender's sole and absolute discretion, including to

effectuate the Roll-Up, through which each one dollar borrowed by the Debtors under the DIP

Facility (a) Debtors are deemed to have borrowed and incurred DIP Obligations in the amount of

three dollars, and (b) three dollars of Pre-Petition Obligations owed to Pre-Petition Lender shall

be "rolled-up" into DIP Obligations.  Upon entry of this Interim Order, the DIP Financing

Documents shall constitute legal, valid, binding, and non-avoidable obligations of the Debtors,

enforceable in accordance with the terms of this Interim Order and the other DIP Financing

Documents, against each Debtor, or in any case under chapter 7 of the Bankruptcy Code upon the

conversion of any of the Chapter 11 Cases or any other chapter of the Bankruptcy Code, or in any

other proceedings superseding or related to any of the foregoing (collectively, the "<u>Successor</u>

<u>Cases</u>").  No obligation, payment, transfer, or grant of security hereunder or under the DIP

Financing Documents to the DIP Lender shall be stayed, restrained, voidable, avoidable, or

recoverable under the Bankruptcy Code or under applicable law (including, without limitation,

under Bankruptcy Code sections 502(d), 544, and 547 to 550 or under any applicable state Uniform

Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance

Act, or similar statute or common law), or subject to any defense, avoidance, reduction, setoff,

recoupment, offset, recharacterization, subordination (whether equitable, contractual, or

otherwise), disallowance, impairment, claim, counterclaim, cross-claim, or challenge, whether under the Bankruptcy Code or any other applicable law or regulation by any person or entity for any reason. Without limiting the generality of the foregoing, and subject to the Fee Deferment Provision (as defined below), the Debtors are authorized, without further Order of this Court, to (i) pay all principal, interest, fees, and indemnities when due, under the DIP Financing Documents and (ii) pay or reimburse the DIP Lender, in accordance with the DIP Financing Documents for all present and future costs and expenses, including, without limitation, all Mandatory Prepayments, and, subject to the Fee Deferment Provision (as defined below), all reasonable and documented professional fees, consultant fees, and legal fees and expenses paid or incurred by the DIP Lender in connection with the financing transactions in, as well as the enforcement or amendment of the DIP Financing Documents and this Interim Order regardless of whether such amounts are in the Approved Budget; *provided*, *however*, that DIP Lender shall pay for such amounts from DIP Collateral/sale proceeds and acknowledges that the Approved Budget does not contain a specific line item for its period in respect of such fees and expenses; *provided further, however,* that DIP Lender shall send a redacted summary invoice of any professional fees, consultant fees, and legal fees and expenses incurred by DIP Lender, regardless of whether such fees and expenses were incurred pre- or post-petition (subject in all respects to applicable privilege or work product doctrines) to the Debtors and their counsel, the U.S. Trustee and the Committee's counsel. Within ten (10) days after delivery of such invoices in accordance with this paragraph (or such shorter time period agreed to by the DIP Lender, the Debtors, the U.S. Trustee, and the Committee), the Debtors shall pay such fees and costs; *provided*, *however*, that to the extent an objection has been raised to certain professional, consultant, or legal fees and costs incurred on or after the First Petition Date within such ten (10) days, Debtors shall pay only such fees and costs

- 23 -

11826835v2 (75669.00003.000)

to which no objection has been raised; *provided further*, that such ten (10) day notice period shall not apply to the payment of any such professional, consultant, or legal fees and costs paid on or about (x) the effective date of, a plan of reorganization (the "Chapter 11 Plan") in the Chapter 11 Cases or (y) the closing of any sale of Debtors' assets that results in the payment in full of all Pre-Petition Obligations and DIP Obligations owed to the Prepetition Lender or DIP Lender. To the extent there is an objection with respect to any such professional, consultant, or legal fees, costs and expenses that is not consensually resolved, this Court may resolve the objection. Such written invoices shall include the invoices of Blank Rome LLP, counsel to the DIP Lender, Berkeley Research Group, LLC, as consultant to the DIP Lender, and any other professional, advisor, or agent reasonably retained by the DIP Lender in connection with the Chapter 11 Cases and as permitted by the DIP Financing Documents; *provided*, *however*, that none of such fees and expenses payable pursuant to this paragraph shall be subject to the United States Trustee Guidelines or shall require approval by the Court unless an objection is interposed that cannot be resolved by the parties. No recipient of any such payment shall be required to file with respect thereto any interim or final fee application with the Court. Notwithstanding the foregoing, the Pre-Petition Lender and DIP Lender agree to the deferral of any and all fees of its counsel and consultants until the closing of the Credit Bid, however, if the Pre-Petition Lender or DIP Lender, as applicable, is the successful bidder, the fees of the Pre-Petition Lender and DIP Lender shall be added to the DIP Obligations (the "Fee Deferment Provision").

5.     Interest and Fees. The rate(s) of interest to be charged for the DIP Loans under the DIP Facility shall be the rates set forth in the DIP Loan Agreement and shall be calculated in the manner and payable at the times set forth therein. The fees charged under the DIP Facility shall be those set forth in the DIP Loan Agreement (including, without limitation, the fees identified in

Section 3(c) of the DIP Loan Agreement) and shall be unconditionally payable in the amounts and at the times set forth in the DIP Loan Agreement; *provided*, that if Debtors' fail to pay such fees at the times set forth in the DIP Loan Agreement, the DIP Lender is authorized to charge the DIP Facility for such fees. Subject to the Fee Deferment Provision, the Debtors are hereby authorized and directed to pay, in accordance with this Interim Order, the principal, interest, fees, payments, expenses, and other amounts described above and in the DIP Financing Documents as such amounts become due and without need to obtain further Court approval, and the Debtors shall be jointly and severally obligated to pay all such amounts, and satisfy all such obligations, which in each case shall constitute DIP Obligations hereunder and under the applicable DIP Financing Documents.

6.      <u>Application of Collections</u>.  All proceeds of the Pre-Petition Collateral and DIP Collateral, including, for the avoidance of doubt, the proceeds from the sale of certain assets in Missouri pursuant to the *Debtors Emergency Motion for Entry of an Order (I) Authorizing (A) The Sale of Missouri Stores Free and Clear of Liens, Claims, and Encumbrances, and (B) The Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection therewith; and (II) Granting Related Relief* (the "<u>Missouri Sale</u>"), the Texas Sale (as defined below), and any other sale outside of the ordinary course of business, shall be applied to reduce the Pre-Petition Obligations or the DIP Facility, in the Lender's sole and absolute discretion at the earlier of the maturity of the DIP Facility and or the closing of the sale, whichever is sooner; in the interim all proceeds of collections on account of the Pre-Petition Collateral a may be used solely in accordance with the Budget, the DIP Financing Documents and the Pre-Petition Financing Documents, as applicable, and this Interim Order, in such order and manner determined by the

DIP Lender in its sole and absolute discretion. On the Termination Date, all Collateral Proceeds shall be turned over to the Lender, except for the Carve Out upon entry of the Final Order.

7. <u>Continuation of Pre-Petition Procedures</u>. All pre-petition practices and procedures for the payment and collection of proceeds of Pre-Petition Collateral or DIP Collateral, including the turnover of Cash Collateral to the DIP Lender for application in accordance with this Interim Order and the DIP Loan Agreement, and the use of any lockbox or blocked depository bank account arrangements, will be unchanged, remain in place, and be identical under the DIP Financing Documents for the benefit of the DIP Lender and are hereby approved and shall continue without interruption after the commencement of the Chapter 11 Cases; *provided*, *however*, that the practices and procedures are otherwise consistent with the terms of the *Final Order Authorizing the Debtors to (A) Continue to Operate Their Cash Management System and Maintain Existing Bank Accounts and Business Forms and Honor Certain Prepetition Obligations Related to the Use Thereof, and (B) Continue to Perform Intercompany Transactions, and (II) Granting Related Relief* [D.I. 130] and any further final orders that may be entered with respect to the Debtors' cash management system.

8. <u>Roll-Up</u>. Upon entry of the Final Order, without any further action by the Debtors or any other party, and subject to the rights of parties set forth in Section VIII below, at the option of DIP Lender and in accordance with the DIP Loan Agreement and the other DIP Financing Documents, the Lender shall treat all advances made or deemed made or to be made under the DIP Facility since the First Petition Date as an exchange and substitute for a portion of the Pre-Petition Obligations, including without limitation the Pre-Petition Loans outstanding under the Pre-Petition Loan Agreement on the date of the Final Order on a cashless, three dollar to one dollar basis with the DIP Facility and subject to the terms and conditions set forth in the DIP Financing Documents.

- 26 -

11826835v2 (75669.00003.000)

For example, if the total advanced under the DIP Facility is $1.5 million, the prepetition Obligation will be deemed reduced by $4.5 million and the post-petition Obligations will be deemed increased by $4.5 million.

9.    Purchase of Inventory as Advances. Upon entry of the Interim Order, and as directed by the Debtors and agreed upon by the DIP Lender, DIP Lender shall purchase inventory on behalf of the Debtors and at the direction of the Debtors based on identified need for each store, at the prices that the Debtors have negotiated, and by virtue of the inventory purchase, which purchases shall be deemed an advance under the DIP Facility. For the avoidance of doubt, the purchase of such inventory shall not be deemed control of the Debtors.

10.    [Reserved.]

## II.    Collateralization and Superpriority Administrative Claim Status.

11.    Collateralization.

(a).    *DIP Lien Grant.* To secure the prompt payment and performance of any and all DIP Obligations of the Debtors to the DIP Lender of whatever kind, nature, or description, absolute or contingent, now existing or hereafter arising, DIP Lender shall have and is hereby granted, effective as of and from the First Petition Date, valid, binding, enforceable, continuing, non-avoidable and perfected security interests and liens (such security interests and liens collectively, "DIP Liens") in and upon all property and rights and interests in property of each of the Debtors or their Estates of any kind or nature whatsoever in existence as of the First Petition Date as well as thereafter created or acquired, and wherever located, including, without limitation: (i) all Pre-Petition Collateral; (ii) all accounts and accounts receivable, inventory, chattel paper, equipment, fixtures, machinery, commercial tort claims, deposit accounts, instruments, documents, cash and cash equivalents, investment property (including without limitation all equity interests in subsidiaries), books and records, patents, trademarks, trade names, copyrights, rights under license

agreements and all other intellectual property, rights, rebates, refunds (including ERC Funds) and

other claims under and with respect to insurance policies, tax refunds, deposits, rebates, contract

rights and other general intangibles, software, letter of credit rights, money, and inter-company

claims or receivables (whether or not evidenced by notes) at any time owing to each Debtor; (iii)

all real property, leaseholds, rents and profits, and proceeds thereof, including without limitation

the Guarantor Real Property and the Subject RTO Real Property (as defined in Exhibit 11 to the

DIP Loan Agreement); (iv) if not otherwise described above, all of the property or rights in

property identified as Collateral (as defined in the Pre-Petition Loan Agreement) and DIP

Collateral (as defined in the DIP Loan Agreement); (v) all claims and causes of action of the

Debtors and their Estates, whether pursuant to federal or applicable state law, and the proceeds

thereof and property received thereby, whether by judgment, settlement, or otherwise including,

and upon entry of a Final Order, all claims and causes of action under chapter 5 of the Bankruptcy

Code and Bankruptcy Code section 724(a) (collectively "Avoidance Actions") and all proceeds

thereof and the property received thereby whether by judgment, settlement, or otherwise, whether

pursuant to federal law or applicable state law; (vi) all other personal property of the Debtors and

their Estates of every kind and nature; and (vii) as to all of the foregoing, all rents, issues, products,

proceeds (including insurance policies), and profits of, from, or generated by any of the foregoing,

in whatever form (all of the foregoing being collectively referred to in this Interim Order as "DIP

Collateral").

> (b).   The DIP Liens shall be:

>> (i)   *Liens on Unencumbered Property.*   Pursuant to Bankruptcy Code

section 364(c)(2), continuing valid, perfected, enforceable, and non-avoidable, and fully perfected

liens on and security interests in all now owned or hereafter acquired assets and property of the

Debtors' right, title, and interest in, to, and under all DIP Collateral that is not otherwise encumbered by a validly perfected security interest or lien as of the First Petition Date, including Avoidance Actions and proceeds thereof upon entry of the Final Order;

(ii)     *Liens on Encumbered Assets.*  Pursuant to Bankruptcy Code section 364(c)(3), a continuing valid, enforceable, and non-avoidable, and fully perfected lien on and security interest (other than as set forth in clauses (iii) and (iv) below) in all now owned or hereafter acquired assets and property of the Debtors' right, title, and interest in, to, and under all DIP Collateral that is subject to, as of the First Petition Date, a Senior Lien;

(iii)     *Priming Liens on Encumbered Assets.*  Pursuant to Bankruptcy Code section 364(d), valid, enforceable, non-avoidable, and fully perfected priming security interests in and priming liens upon all now owned or hereafter acquired assets and property of the Debtors' right, title, and interest in, to, and under all Pre-Petition Collateral; *provided however*, the DIP Liens shall not prime any valid, perfected, unavoidable liens or mortgages held by South Street Bank in the January Debtors;

(iv)     *Liens Senior to Certain Other Liens.*  Notwithstanding anything to the contrary contained in this Interim Order, the DIP Liens and the Adequate Protection Liens (as defined herein) shall not be subject to (A) avoidance or subordination (equitable or otherwise) under Bankruptcy Code sections 510, 549, or 550, or any other provision of the Bankruptcy Code or applicable law (B) any lien or security interest that is avoided or preserved for the benefit of the Debtors or their Estates under Bankruptcy Code section 551, (C) any liens arising after the First Petition Date provided for herein or (D) any intercompany or affiliate liens of the Debtors, if any; *provided* that the Adequate Protection Liens shall be subject to Section VIII herein.

(c).    *Post-Petition Lien Perfection*.  This Interim Order shall be sufficient and conclusive evidence of the priority, perfection, and validity of the post-petition liens and security interests granted herein, effective as of the applicable petition date, without any further act and without regard to any other federal, state, or local requirements or law requiring notice, filing, registration, recording, or possession of the DIP Collateral, or other act to validate or perfect such security interest or lien, including, without limitation, control agreements with any financial institution(s) holding any deposit account of the Debtors (a "Perfection Act").  Notwithstanding the foregoing, if the DIP Lender or the Pre-Petition Lender elects for any reason to file, record, or otherwise effectuate any Perfection Act, each of the DIP Lender and the Pre-Petition Lender, as applicable, is authorized to perform such Perfection Act, and the Debtors are authorized to perform such Perfection Acts to the extent necessary or required by the DIP Lender or Pre-Petition Lender, which act or acts shall be deemed to have been accomplished as of the First Petition Date notwithstanding the date and time actually accomplished, and in such event, the subject filing or recording office is authorized to accept, file, or record any document in regard to such act in accordance with applicable law.  The DIP Lender and/or the Pre-Petition Lender may choose, or may choose to direct the Debtors, to file, record, or present a certified copy of this Interim Order in the same manner as a Perfection Act, which shall be tantamount to a Perfection Act, and, in such event, the subject filing or recording office is authorized to accept, file, or record such certified copy of this Interim Order in accordance with applicable law. Should the DIP Lender and/or the Pre-Petition Lender so choose and attempt to file, record, or perform a Perfection Act, no defect or failure in connection with such attempt shall in any way limit, waive, or alter the validity, enforceability, attachment, priority, or perfection of the DIP Liens or the Adequate Protection Liens granted herein by virtue of the entry of this Interim Order.

- 30 -

11826835v2 (75669.00003.000)

12.    <u>Superpriority Administrative Expense</u>.

(a).    For the applicable DIP Obligations, whether now existing or hereafter arising pursuant to this Interim Order, the applicable DIP Financing Documents, or otherwise, subject only to the Carve Out, the DIP Lender is granted an allowed superpriority administrative expense claim in the Debtors' Estates pursuant to Bankruptcy Code section 364(c)(1), having priority in right of payment over any and all other obligations, liabilities, and indebtedness of any of such Debtors, whether now in existence or hereafter incurred by any of such Debtors, of every kind or nature, including any and all unsecured claims, administrative expenses, adequate protection claims, priority claims or any other claims of the kind specified in, or ordered pursuant to, the Bankruptcy Code, including without limitation, *inter alia*, Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 507, 364(c)(1), 546(c), 726, or 1114 and, upon entry of a Final Order, sections 506(c) and 552(b) (the "<u>DIP Superpriority Claims</u>").

(b).    (i) with respect to rights preserved under Bankruptcy Code section 506(c), no costs or expenses of administration, including, without limitation, professional fees allowed and payable under Bankruptcy Code sections 328, 330, and 331, or otherwise, that have been or may be incurred in the Chapter 11 Cases, or in any Successor Cases, and (ii) no priority claims are, or will be, senior to, prior to, or *pari passu* with the DIP Superpriority Claims or the DIP Obligations or with any other claims of the DIP Lender arising hereunder.

**III.    Authorization to Use Cash Collateral.**

13.    Subject to the terms and conditions of this Interim Order, pursuant to Bankruptcy Code section 363(c)(2), the Debtors are authorized to use Cash Collateral, in accordance with the DIP Loan Agreement and as may be limited by the Approved Budget (subject to variances permitted under the terms and conditions of the DIP Loan Agreement). Absent entry of the Final Order by the Court, the Debtors shall no longer be authorized to use Cash Collateral at the

expiration of the Interim Period without the prior written approval of the DIP Lender. Except for the sale of inventory in the ordinary course of Debtors' business (and the proceeds thereof) or as may be otherwise expressly permitted herein or in the DIP Loan Agreement, or in any agency arrangement between Debtors and a third party in connection with the liquidation of the DIP Collateral approved in writing by DIP Lender and Pre-Petition Lender, nothing in this Interim Order shall be deemed to authorize the use, sale, lease, encumbrance, or disposition of any assets of the Debtors or their Estates or the use of any Cash Collateral or other proceeds resulting therefrom.

**IV.    Adequate Protection for Pre-Petition Lender.**

14.    <u>Pre-Petition Adequate Protection</u>. As adequate protection for the interests of the Pre-Petition Lender in the Pre-Petition Collateral on account of the Adequate Protection Obligations, the Pre-Petition Lender is being provided with adequate protection as set forth below.

(a).    *Adequate Protection Liens*. Solely to the extent of any Diminution in Value of such interests pursuant to Bankruptcy Code section 361 and 363(c) as of the First Petition Date, the Debtors shall grant the Pre-Petition Lender valid and perfected replacement security interests in, and liens on (the "<u>Adequate Protection Liens</u>"), the DIP Collateral.

(i)    The Adequate Protection Liens shall be deemed to be valid, binding, enforceable and fully-perfected as of the applicable petition for such Debtor, and, subject to Section VIII below, not subject to subordination or avoidance for any cause or purpose in these Chapter 11 Cases.

(ii)    The Adequate Protection Liens shall be enforceable against the Debtors, their Estates and any successors thereto, including without limitation, any trustee or other Estate representative appointed or elected in the Chapter 11 Cases or any Successor Cases. The Adequate Protection Liens (A) shall not be made subject to or *pari passu* with any lien or security

interest by any court Order heretofore or hereafter entered in these Chapter 11 Cases (unless with the consent of the Pre-Petition Lender); (B) upon entry of a Final Order, shall not be subject to Bankruptcy Code section 506(c); (C) shall not be subject to Bankruptcy Code sections 510, 549, or 550; and (D) no lien or interest avoided and preserved for the benefit of any Estate pursuant to Bankruptcy Code section 551 shall be made *pari passu* with or senior to the Adequate Protection Liens.

(b).    *Adequate Protection Claim*.  As further adequate protection, to the extent that the Adequate Protection Liens do not adequately protect the Diminution in Value of the Pre-Petition Lender's interests in the Pre-Petition Collateral since the applicable Petition Date, the Pre-Petition Lender is hereby granted, to the extent of such Diminution in Value, on a dollar for dollar basis of the Collateral used in accordance with the Approved Budget, an allowed superpriority administrative expense claim (the "Adequate Protection Claim" and together with the Adequate Protection Liens, the "Adequate Protection") in these Chapter 11 Cases or an Successor Cases against the Debtors' Estates under Bankruptcy Code sections 503 and 507(b), which shall have priority over all other administrative expense claims, priority claims, and unsecured claims against the Debtors or their Estates, which are now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses and priority or other claims of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 364, 365, 503(a), 503(b), 506(c) (upon entry of a Final Order), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114.

(c).    *Interest*.  As further adequate protection, the Pre-Petition Lender shall be entitled to interest accruing on account of the outstanding Pre-Petition Obligations at the default rate set forth in the Pre-Petition Financing Documents, which was in effect as of the First Petition

Date and which shall accrue and be paid at the times and in the manner set forth in the Pre-Petition Financing Documents.

(d).    *Adequate Protection Payments*.    As further adequate protection, and without limiting any rights of the Pre-Petition Lender under Bankruptcy Code section 506(b) (which rights are hereby preserved), the Debtors shall pay or reimburse the Pre-Petition Lender (the "Adequate Protection Payments") for any and all of its reasonable fees, costs, expenses, and charges accrued and payable under the Pre-Petition Financing Documents, including, without limitation, the fees, costs and expenses of the Pre-Petition Lender (including attorneys' fees and costs) as provided in Section 3(d) of the Pre-Petition Loan Agreement, whether accrued and unpaid pre-petition or accrued and unpaid post-petition, all without further notice, motion, or application to, Order of, or hearing before, this Court. Subject to Payment Deferment Provision, any and all fees, costs, and expenses charged under the Pre-Petition Financing Documents shall be as set forth in the Pre-Petition Financing Documents and shall be payable at the times set forth in the Pre-Petition Financing Documents.

(e).    *Procedure for Payment of Professional, Consulting, and Legal Fees as Adequate Protection Payments*.    Subject to Payment Deferment Provision, within ten (10) days after delivery by Pre-Petition Lender of a redacted summary invoice for all professional, consulting, and legal fees and expenses incurred by Pre-Petition Lender, regardless of whether such fees and expenses were incurred pre- or post-petition (subject in all respects to applicable privilege or work product doctrines) to the Debtors and their counsel, the U.S. Trustee and the Committee's counsel (or such shorter time period agreed to by the Pre-Petition Lender, Debtors, the U.S. Trustee, and the Committee), Debtors shall pay such reasonable professional, consulting, and legal fees and costs from the DIP Loans or Cash Collateral, *provided, however,* that to the extent an objection

has been raised to certain professional, consulting, or legal fees and costs within such ten (10) days,

Debtors shall pay only such fees and costs to which no objection has been raised, *provided further,*

that such ten (10) day notice period shall not apply to the payment of any such fees and costs paid

at or in connection with (i) the closing of the DIP Facility, (ii) pursuant to, and on or about the

effective date of, a Chapter 11 Plan in these Chapter 11 Cases, or (iii) the closing of any sale of

Debtors' assets that results in the payment in full of all Pre-Petition Obligations and DIP

Obligations owed to the Prepetition Lender and DIP Lender, as applicable. To the extent there is

an objection with respect to such costs and fees that is not consensually resolved, the Court may

resolve the objection. Such written invoices shall include the invoices of Blank Rome LLP, as

counsel to the Pre-Petition Lender, and any other professional, advisor, or agent reasonably

retained by the Pre-Petition Lender or its counsel in connection with the Chapter 11 Cases and as

permitted by the Pre-Petition Financing Documents; *provided*, *however*, that none of such fees and

expenses paid pursuant to this paragraph shall be subject to the United States Trustee Guidelines

or shall require approval by the Court unless an objection is interposed that cannot be resolved by

the parties. No recipient of any such payment shall be required to file with respect thereto any

interim or final fee application with the Court.

15.    *ERC Funds*.    As security for the DIP Obligations and as adequate protection,

immediately upon the entry of the Interim Order, the DIP Obligations (in an amount equal to funds

advanced or deemed advanced under this Interim Order) and the Adequate Protection Obligations

(but only as to any diminution occurring during the period covered by the Interim Order), are

secured by the "ERC Funds" meaning the sum of (i) the initial ERC funds on hand, estimated at

$202,000, which amount is net of the  portion of the ERC Funds used to pay Debtors professionals

a $175,000 retainer before the January Debtors, including BMH HR, LLC ("BMH HR"), file

chapter 11, plus (ii) the additional ERC Funds received by BMH HR immediately prior to or after the Third Petition Date, in the net amount (less Commission) of $2,878,514.82. Immediately upon the entry of the Interim Order, Lenders shall apply the initial ERC Funds in BMH HR to the Pre-Petition Obligations in accordance with the Settlement Agreement, and BMH HR shall transfer to the Lenders the remaining ERC Funds, which shall be held in the Suspense Account pending entry of the Final Order. Until entry of the Final Order, the ERC Funds are to be held in the Suspense Account and may not be applied, hypothecated, or charged against by the Lenders except as specifically and expressly authorized hereunder or by further order of the Bankruptcy Court upon notice to the Debtors and MacDonald. The Suspense Account, in addition to being segregated for the specific purpose of holding the ERC Funds and identified to the Debtors and MacDonald specifically, shall be established by Lenders with Wells Fargo Bank, N.A. The Lender may, only upon the entry of the Final Order, apply the ERC Funds, as deemed proceeds of the Pre-Petition Collateral to the Pre-Petition Obligations or DIP Obligations in its sole and absolute discretion (in an amount equal to funds advanced or deemed advanced under this Interim Order). At all times after entry of the Interim Order, the ERC Funds shall secure the DIP Obligations, but only to the extent of funds actually advanced, and the Adequate Protection Obligations, but only as to any diminution occurring during the period covered by the Interim Order.

16.    *Missouri Sale Proceeds*. As security for the DIP Obligations and as adequate protection, the proceeds of the Missouri Sale shall be paid to Lenders by National RTO and immediately applied to the Pre-Petition Obligations or DIP Obligations, in Lenders' sole and absolute discretion (in an amount equal to funds advanced or deemed advanced under this Interim Order).

17.    [Reserved.]

## V.    Carve Out.

18.    *Carve Out.*  Upon entry of the Final Order, the DIP Liens granted to the DIP Lender, the DIP Superpriority Claim provided to the DIP Lender, the Adequate Protection Liens, and the Adequate Protection Claims shall be subject only to the right of payment and priority of the following expenses (which expenses are collectively referred to as the "Carve Out"), to the extent provided herein:

(a).    all fees required to be paid to the Clerk of the Court and to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6), together with the statutory rate of interest, which shall not be limited by any budget;

(b).    the allowed fees and expenses actually incurred by persons or firms retained by the Debtors or the Committee on or after the First Petition Date and prior to the delivery of a Carve Out Trigger Notice (as defined herein) whose retention is approved by this Court pursuant to Bankruptcy Code section 327, 328, 363, or 1103 (each a "Professional" and collectively, the "Professionals") and payable, subject in all respects to the terms of this Interim Order, any Final Order, and any other interim or other compensation Order entered by this Court in these Chapter 11 Cases (the "Interim Compensation Procedures"), (i) for the period prior to the delivery of a Carve Out Trigger Notice to the Debtors, Debtors' counsel, and counsel for any Committee, an amount not to exceed the lesser of (A) the aggregate weekly amounts budgeted to be funded in advance for each such Professional for such week in accordance with the Approved Budget (to the extent a Carve Out Trigger Notice is delivered mid-week, pro-rated for such week) and (B) the actual amount of such Allowed Professional Fees for each Professional incurred on or after the First Petition Date up through and including the date a Carve Out Trigger Notice is delivered ("Allowed Professional Fees").  The Carve Out shall include all Allowed Professional Fees that are incurred or earned (i) at any time before delivery of a Carve Out Trigger Notice as provided

11826835v2 (75669.00003.000)

above, whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice,

subject and limited in all respects to the amounts set forth in the Approved Budget for payment of

such Professionals, *provided*, that the budgeted disbursements for subsequent Approved Budget

periods shall be amended so that the Borrower may (x) carry forward any unspent budgeted line

item disbursements for Professionals from prior periods and (y) carry back any unspent budgeted

line item disbursements for Professionals from future periods (the "Pre-EOD Carve Out"), and (ii)

beginning the first day after the delivery by DIP Lender of written notice (which for the avoidance

of doubt may be by electronic mail) of the occurrence of an Event of Default (as defined herein)

(such notice, the "Carve Out Trigger Notice") to the Debtors, the Debtors' counsel, and counsel

for the Committee, the fees and expenses incurred by the Professionals retained by the Debtors in

an aggregate amount not to exceed $15,000 and $15,000 for the Chapter 7 trustee (the "Post-EOD

Carve Out", with the aggregate amounts of the Pre-EOD Carve Out and the Post-EOD Carve Out,

the "Carve Out Cap").  For the avoidance of doubt, the Carve Out Cap shall not exceed $500,000

in the aggregate, as set forth in the Approved Budget; p*rovided further*, *however*, that the Carve

Out shall not include any bonus, sale transaction fees, success fees, completion fees, substantial

contribution fees, or any other fees of similar import of any of the Professionals. Notwithstanding

the foregoing, the Carve Out Trigger Notice shall be deemed to have been delivered to the required

notice parties on the Termination Date (as defined in the DIP Loan Agreement); provided further,

however, for the avoidance of doubt and notwithstanding anything to the contrary in this Interim

Order, the Carve Out shall not be available until (1) the entry of the Final Order, (2) the approval

of the Settlement Agreement and the granting of releases to the Prepetition Lender and DIP Lender

therein, and (3) the granting of a waiver of surcharge, marshalling, and Bankruptcy Code section

552(b) equities exception as set forth in the Final Order.

(c).    Subject to the terms of this Interim Order, the Carve Out Cap shall be allocated on a Professional-by-Professional basis based on the amounts budgeted to be funded in advance for each Professional pursuant to the Approved Budget.

(d).    For the avoidance of doubt, (i) so long as a Carve Out Trigger Notice has not been issued, the Debtors shall be permitted to pay Allowed Professional Fees as the same may be due and payable in accordance with the DIP Loan Agreement and this Interim Order; and (ii) nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement or compensation described herein.  The Debtors' professionals shall be permitted to apply the retainers in their possession once their fees have been approved by Order of the Court.

19.    <u>Excluded Professional Fees</u>.  Notwithstanding anything to the contrary in this Interim Order, neither the Carve Out, nor the proceeds of the DIP Facility or DIP Collateral shall be used to pay any Allowed Professional Fees or any other fees or expenses incurred by any Professional in connection with any of the following: (a) an assertion or joinder in any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any Order, judgment, determination, or similar relief:  (i) challenging the legality, validity, priority, perfection, or enforceability of the Pre-Petition Obligations, the DIP Obligations, the Pre-Petition Lender's or the DIP Lender's respective liens on and security interests in any of the Pre-Petition Collateral or DIP Collateral, as applicable; (ii) seeking to invalidate, set aside, avoid, or subordinate, in whole or in part, the Pre-Petition Obligations or DIP Obligations or the Pre-Petition Lender's or DIP Lender's respective liens on and security interests in the Pre-Petition Collateral or the DIP Collateral, as applicable; or (iii) preventing, hindering, or delaying the Pre-Petition Lender's or DIP Lender's respective assertion or enforcement of any lien, claim, right, or security interest or realization upon any Pre-Petition Collateral or DIP Collateral, as applicable, in

11826835v2 (75669.00003.000)

accordance with the terms and conditions of this Interim Order; (b) without the consent of the DIP

Lender, a request to use Cash Collateral or DIP Loans in any manner except to the extent expressly

permitted in this Interim Order and DIP Financing Documents; (c) a request, without the prior

written consent of DIP Lender, for authorization to obtain debtor-in-possession financing or other

financial accommodations pursuant to Bankruptcy Code section 364(c) or 364(d) other than from

the DIP Lender as contemplated herein), unless such other debtor-in-possession financing or

financial accommodation is used, in whole or in part, to indefeasibly pay and satisfy in full in cash

all Pre-Petition Obligations and DIP Obligations owed respectively to the Pre-Petition Lender and

DIP Lender as contemplated herein; (d) the commencement or prosecution of any action or

proceeding of any claims, causes of action, or defenses against the Pre-Petition Lender or the DIP

Lender, or any of their respective officers, directors, employees, agents, attorneys, affiliates,

successors, or assigns, including, without limitation, any attempt to avoid any claim, lien, or

interest of, or obtain any recovery from any of the Pre-Petition Lender or the DIP Lender, under

Chapter 5 of the Bankruptcy Code; *provided*, *however*, that, subject to the Carve Out Cap, an

amount not to exceed $[20,000.00] in the aggregate of the indebtedness incurred pursuant to the

DIP Facility may be used to pay the Allowed Professional Fees of the Committee to investigate

(but not prosecute) claims or any Challenge against and possible objections with respect to the

Pre-Petition Obligations, and the pre-petition liens and security interests of, the Pre-Petition

Lender (including, without limitation, issues regarding validity, perfection, priority, or

enforceability of the secured claims of the Pre-Petition Lender).

      20.    *Payment of Carve Out*.

      (a).    Payment of any amounts on account of the Carve Out, whether by or on

behalf of the DIP Lender, shall not and shall not be deemed to, reduce the Pre-Petition Obligations

or the DIP Obligations, and shall not, and shall not be deemed to, subordinate any of the DIP

Lender's liens and security interests in the DIP Collateral or the DIP Superpriority Claims to any

junior pre- or post-petition lien, interest, or claim in favor of any other party. DIP Lender shall not,

under any circumstance, be responsible for the payment or reimbursement of any fees or

disbursements of any Professionals incurred in connection with the Chapter 11 Cases or Successor

Cases under any chapter of the Bankruptcy Code, and nothing in this Section V shall be construed

to obligate DIP Lender, in any way, to pay compensation to or to reimburse expenses of any

Professional, or to ensure that the Debtors have sufficient funds to pay such compensation or

reimbursement.

      (b).    Nothing in this Interim Order shall be construed as a consent to the

allowance of the fees and expenses of any Professional or shall affect the right of the Pre-Petition

Lender and/or the DIP Lender to object to the allowance and payment of such fees and expenses.

So long as no Event of Default has occurred or is continuing, the Debtors shall be permitted to pay

fees and expenses allowed and payable pursuant to an Order of the Court, including any Order

approving Interim Compensation Procedures, under Bankruptcy Code sections 330 and 331, as the

same may be due and payable, solely to the extent set forth in the Approved Budget, and not to

exceed the amounts set forth in the Approved Budget; *provided*, *however*, that any such payment

shall be subject to entry of a final Order of the Court of each Professional's final application for

allowance of such fees and expenses.

## VI.   Right to Credit Bid.

    21.    Pursuant to Bankruptcy Code section 363(k), the Pre-Petition Lender and the DIP

Lender, as the case may be, may credit bid against the assets of the Debtors' estates, and the PEC

LP Interests (as defined in exhibit 11 to the DIP Loan Agreement), up to the outstanding aggregate

amount of the Pre-Petition Obligations and DIP Obligations in respect of any such sale (the "Credit

Bid"), the form of which, including any proposed asset purchase agreement and related sale order, is reasonably acceptable to the Pre-Petition Lender and the DIP Lender. In the context of the Credit Bid, MacDonald Realty Group, LLC will convey certain real property in Alvarado, TX to the DIP Lender by its designee, which will satisfy any DIP Lender deed of trust on such real property, and the conveyance, when closed shall reduce the Pre-Petition Obligations and the DIP Obligations by $[298,000], which reduction may be applied to such Obligations in such order as the DIP Lender may elect.

**VII.     Default; Rights and Remedies; Relief from Stay.**

22.     <u>Events of Default</u>.  The following shall constitute an "<u>Event of Default</u>" under this Interim Order:

(a).     the occurrence of any Event of Default as defined and under the DIP Loan Agreement.

(b).     the failure of (1) the January Debtors to file voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, (2) the Debtors to file the DIP Motion, or (3) the Debtors to file a motion for the sale of substantially all of their assets pursuant to Section 363 of the Bankruptcy Code (the "<u>Sale Motion</u>"), in form and substance acceptable to the Lenders, by January 26, 2026.

(c).     the failure of the Debtors to (1) hold a First Day Hearing for the January Debtors, and (2) obtain entry of the Interim Order by January 27, 2026.

(d).     the failure of the Debtors to retain and file an application ("<u>Retention Application</u>") to retain a third-party national real estate brokerage firm to market the Subject RTO Real Property owned by Buddy Mac One in Tyler, Texas (the "<u>Texas Sale</u>"), with seven (7) days after the Third Petition Date.

(e).    the failure of Debtors to (1) enter into and file an asset purchase agreement naming DIP Lender as stalking horse bidder, in a form and substance acceptable to the DIP Lender, and (2) file a motion establishing bidding procedures, on or before January 26, 2026, which motion, bid procedures, and bid procedures order must be in form and substance acceptable to the Lenders.

(f).    the failure of the Debtors to obtain entry of a Final DIP Order, in form and substance acceptable to the Lenders, and approval of the Settlement Agreement on or before February 10, 2026, unless otherwise agreed in writing by the Pre-Petition Lender and the DIP Lender.

(g).    the failure of the Debtors to hold an auction in connection with the Sale Motion within twenty-one (21) days from entry of the Interim DIP Order.

(h).    the failure to obtain a sale order, in form and substance acceptable to Lenders, on or before February 19, 2026.

(i).    the failure of the Debtors to consummate a sale of the assets on or before February 22, 2026.

(j).    the failure of the Debtors to close the Texas Sale within forty-five (45) days of the filing of the Retention Application.

23.    Rights and Remedies Upon Event of Default/Relief from Stay.

(a).    Upon the occurrence of and during the continuance of an Event of Default, and without the necessity of seeking relief from the automatic stay or any further Order of the Court or providing an Enforcement Notice (as defined below):  (i) the DIP Lender shall no longer have any obligation to make any DIP Loans (or otherwise extend credit) under the DIP Facility; (ii) all amounts outstanding under the DIP Financing Documents shall, at the option of the DIP Lender, be accelerated and become immediately due and payable; (iii) the DIP Lender and the Pre-

11826835v2 (75669.00003.000)

Petition Lender shall be entitled to immediately terminate the Debtors' right to use Cash Collateral,
without further application or Order of this Court, *provided*, *however*, that the Debtors shall have
the right to use Cash Collateral to pay (a) their weekly ordinary course payroll as provided in the
Approved Budget, (b) Professional Fees included in the Approved Budget through the date on
which such Event of Default occurs, *provided, however,* that such Professional Fees, other than
those amounts being paid out of retainers paid pre-petition, shall be paid subject to Order of this
Court and shall not be paid prior to entry of the Final Order and the approval of the Settlement
Agreement thereby; (iv) the Debtors shall be bound by all post-default restrictions, prohibitions,
and other terms as provided in this Interim Order, the DIP Loan Agreement and the other DIP
Financing Documents and the Pre-Petition Financing Documents; (v) the DIP Lender shall be
entitled to charge the default rate of interest under the DIP Loan Agreement.

      (b).   Without further notice, application or order of this Court, upon the
occurrence of and during the continuance of an Event of Default, and after providing not less than
three (3) business days' advance written notice thereof (such period the "Remedies Notice Period")
(which three (3) business day period applies only to the DIP Collateral enforcement remedies
described below), which notice may be by electronic mail (the "Enforcement Notice"), to counsel
to the Debtors, the U.S. Trustee, and counsel the Committee, the DIP Lender and the Pre-Petition
Lender, as applicable, shall be entitled to take any other action and exercise all other rights and
remedies provided in this Interim Order, the DIP Financing Documents, the Pre-Petition Financing
Documents, or applicable law (including, without limitation, setting off any DIP Obligations or
Pre-Petition Obligations with DIP Collateral, Pre-Petition Collateral or proceeds in the possession
of the Pre-Petition Lender or DIP Lender), unless otherwise ordered by this Court, as the DIP
Lender or the Pre-Petition Lender, as applicable, may deem appropriate in their sole discretion to,

11826835v2 (75669.00003.000)

among other things, proceed against and realize upon the DIP Collateral or any other assets or properties of the Debtors' Estates upon which the DIP Lender and the Pre-Petition Lender, as applicable, has been or may hereafter be granted liens or security interests to obtain the full and indefeasible payment of all the Pre-Petition Obligations and DIP Obligations. Notwithstanding the foregoing or anything in paragraph 22(a) above, upon delivery of the Enforcement Notice, the Debtor shall turnover all proceeds of collection directly to the Lender, and the Lender may apply the proceeds received into the lockbox or collection account to reduce the Pre-Petition Obligations or the DIP Obligations in any order at the sole discretion of the DIP Lender during the Remedies Notice Period.

(c).    Additionally, upon the occurrence and during the continuance of an Event of Default, expiration of the Remedies Notice Period, and the exercise by a DIP Lender or a Pre-Petition Lender of their respective rights and remedies under this Interim Order, the DIP Financing Documents, or Pre-Petition Financing Documents, the Debtors shall cooperate with the DIP Lender in the exercise of such rights and remedies and assist the DIP Lender in effecting any sale or other disposition of the DIP Collateral required by the DIP Lender, including any sale of DIP Collateral pursuant to Bankruptcy Code section 363 or assumption and assignment of DIP Collateral consisting of contracts and leases pursuant to Bankruptcy Code section 365, in each case, upon such terms that are acceptable to the DIP Lender.

(d).    Upon the occurrence and during the continuance of an Event of Default, and subject to the Remedies Notice Period provided for above, in connection with a liquidation of any of the Pre-Petition Collateral or DIP Collateral as provided for herein, the DIP Lender or the Pre-Petition Lender (or any of their respective employees, agents, consultants, contractors, or other professionals), as applicable, shall have the right, at the sole cost and expense of the Debtors, to:

11826835v2 (75669.00003.000)

(i) enter upon, occupy, and use any real or personal property, fixtures, equipment, leasehold interests, or warehouse arrangements owned or leased by the Debtors; *provided*, *however*, that the DIP Lender may only be permitted to do so in accordance with (A) existing rights under applicable non-bankruptcy law, including, without limitation, applicable leases, (B) any pre-petition (and, if applicable, post-petition) landlord waivers or consents, or (C) further order of the Court on motion and notice appropriate under the circumstances; and (ii) use any and all trademarks, tradenames, copyrights, licenses, patents, equipment, or any other similar assets of the Debtors, or assets that are owned by or subject to a lien of any third party and that are used by the Debtors in their businesses; *provided*, *however*, the DIP Lender and the Pre-Petition Lender may use such assets upon entry of this Interim Order to the extent permitted by non-bankruptcy law.  The DIP Lender (or the Pre-Petition Lender) will be responsible for the payment of any applicable fees, rentals, royalties, or other amounts owing to such lessor, licensor or owner of such property (other than the Debtors) for the period of time that the DIP Lender actually occupies any real property or uses the equipment or the intellectual property (but in no event for any accrued and unpaid fees, rentals, or other amounts owing for any period prior to the date that the DIP Lender actually occupies or uses such assets or properties).

(e).    The rights and remedies of the DIP Lender and Pre-Petition Lender specified herein are cumulative and not exclusive of any rights or remedies that the DIP Lender and/or Pre-Petition Lender may have under the DIP Financing Documents or Pre-Petition Financing Documents, as applicable, or otherwise and may be exercised in whole or in part in any order.  With respect to the exercise of such rights and remedies, the fourteen-day stay provisions of Bankruptcy Rules 6004(h) and 4001(a)(3) are hereby waived.

11826835v2 (75669.00003.000)

(f).    Nothing herein shall prevent or preclude the Debtors from seeking appropriate relief from the Court including, but not limited to, a determination that no Event of Default has occurred.

24.    <u>Relief from Stay</u>.  For the purpose of exercising rights, options and remedies set forth in this Section VII, upon expiration of the Remedies Notice Period, unless otherwise ordered by the Court, the Pre-Petition Lender and DIP Lender, as applicable, shall be automatically and completely relieved from the effect of any stay under Bankruptcy Code section 362, any other restriction on the enforcement of their liens upon and security interests in the DIP Collateral or any other rights granted to them, or any of them, pursuant to the terms and conditions of the DIP Financing Documents, the Pre-Petition Financing Documents, or this Interim Order.

25.    <u>Waiver Agreements</u>.  Subject to entry of a Final Order, all rights, options, and remedies granted to the Pre-Petition Lender or DIP Lender in either or both of any landlord or warehouseman's waiver and/or consent executed and delivered in connection with the Pre-Petition Obligations and Pre-Petition Loan Agreement, as applicable, including the right to access any premises leased by Debtors and access the Pre-Petition Collateral, shall be deemed to be continuing, enforceable, and applicable to and binding upon the landlords and other parties to such waiver or consent agreements with respect to the Pre-Petition Collateral and DIP Collateral.

**VIII.    Challenges to Pre-Petition Obligations.**

26.    The Debtors have admitted, stipulated, and agreed to the various stipulations and admissions contained in this Interim Order, including, without limitation, the Debtors' Stipulations included in Paragraph G, which stipulations and admissions are and shall be binding upon the Debtors. For any party in interest, including the Committee, upon no later than the date that is fifteen (15) days from entry of this Interim Order (the "<u>Initial Challenge Period</u>"), the stipulations and admissions contained in this Interim Order, including without limitation, the Debtors'

Stipulations, shall also be binding upon the Debtors' Estates and all other parties in interest,

including the Committee and any other person or entity acting or seeking to act on behalf of the

Debtors' Estates, and any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors

(a "Trustee") for all purposes, unless (a) during the Initial Challenge Period the Committee or any

other party interest, in each case with request standing, has properly and timely filed an adversary

proceeding as required under the Bankruptcy Rules (x) challenging the amount, validity,

enforceability, priority or extent of the Pre-Petition Obligations, the liens of the Pre-Petition

Lender on the Pre-Petition Collateral securing the Pre-Petition Obligations or (y) otherwise

asserting any other claims, counterclaims, causes of action, objections, contests, or defenses

against the Pre-Petition Lender on behalf of the Debtors' Estates ((x) and (y), collectively, referred

to herein as "Challenges") in connection with the matters related to the Pre-Petition Financing

Documents, the Pre-Petition Obligations, the Pre-Petition Liens, or the Pre-Petition Collateral, and

(b) there is a final non-appealable order in favor of the plaintiff sustaining any such Challenge or

claim in any such timely filed adversary proceeding; *provided*, *however*, that, as to the Debtors,

all such Challenges are hereby irrevocably waived and relinquished effective as of the applicable

Petition Date.  If during the Initial Challenge Period, the Committee or other third party files a

motion for standing with a draft complaint identifying and describing all Challenge(s) consistent

with applicable law and rules of procedure, the Initial Challenge Period will be tolled for the

Committee or other third party solely with respect to the Challenge(s) asserted in the draft

complaint until three (3) business days from the entry of an Order granting the motion for standing

to prosecute such Challenge(s) described in the draft complaint and permitted by the Court (the

"Extended Challenge Period", together with the Initial Challenge Period, the "Challenge Period").

If standing is denied by the Court, the Challenge Period shall be deemed to have expired.  If no

11826835v2 (75669.00003.000)

such Challenge or motion for standing, as applicable, is timely filed prior to the expiration of the

Initial Challenge Period, without further order of the Court:    (1) the Debtors' stipulations,

admissions and releases contained in this Interim Order (including the Debtors' Stipulations and

the releases set forth in paragraph 26 below) shall be binding on all parties in interest, including

the Debtors' Estates, the Committee, and any subsequently appointed Trustee, case fiduciary, or

other successors and assigns of the Debtors and the Debtors' Estates; (2) the Pre-Petition

Obligations shall constitute allowed claims, not subject to counterclaim, setoff, subordination,

recharacterization, defense or avoidance, for all purposes in these Chapter 11 Cases and any

Successor Cases, including, without limitation, any subsequent chapter 7 case; (3) the Pre-Petition

Lender's liens on the Pre-Petition Collateral shall be deemed to have been, as of the First Petition

Date, and to be, legal, valid, binding, perfected, and with the priority specified in the Debtors'

Stipulations, not subject to defense, counterclaim, recharacterization, subordination or avoidance;

and (4) the Pre-Petition Obligations, the Pre-Petition Lender's liens on the Pre-Petition Collateral;

and the Pre-Petition Lender (and its respective agents, affiliates, subsidiaries, directors, officers,

representatives, attorneys or advisors) shall not be subject to any other or further Challenge by the

Committee or any other party in interest, and the Committee or party in interest shall be enjoined

from seeking to exercise the rights of the Debtors' Estates, including, without limitation, any

successor thereto (including, without limitation, any estate representative or a Trustee, whether

such Trustee is appointed or elected prior to or following the expiration of the Initial Challenge

Period); *provided*, *however*, that if the Chapter 11 Cases are converted to chapter 7 or a Trustee is

appointed prior to the expiration of the Initial Challenge Period, any such estate representative or

Trustee shall receive the full benefit of any remaining Initial Challenge Period or ten (10) days

from appointment, whichever is greater, subject to the limitations described herein. If any

11826835v2 (75669.00003.000)

Challenge or motion for standing, as applicable, is timely and properly filed prior to the expiration

of the Initial Challenge Period, the releases, stipulations, and admissions (including without

limitation, in the Debtors' Stipulations), contained in this Interim Order shall nonetheless remain

binding and preclusive (as provided in the second sentence of this paragraph) on the Committee

and any other person, including any Trustee appointed in any Chapter 11 Case(s) or Successor

Cases, as applicable, except as to any such findings and admissions that were expressly challenged

as set forth with specificity in the original complaint initiating the adversary proceeding, and any

claims or challenges not so specified shall be deemed forever, waived, released and barred,

including any amended or additional claims that may or could have been asserted thereafter

through an amended complaint under Federal Rules of Civil Procedure 15 or otherwise. Nothing

in this Interim Order vests or confers on any person, including the Committee, any Trustee, or any

other party in interest, standing or authority to pursue any claim or cause of action belonging to

the Debtors or their Estates.

## IX.    Debtors' Waivers and Releases.

27.    <u>Section 506(c) Claims; 552(b) Equities;  Marshaling</u>.  Upon entry of a Final Order,

no costs or expenses of administration that have been or may be incurred in the Chapter 11 Cases

or Successor Cases at any time shall be charged against any of the Pre-Petition Lender or the DIP

Lender, their respective claims, or the DIP Collateral or Pre-Petition Collateral, as applicable,

pursuant to Bankruptcy Code section 506(c) without the prior written consent of the DIP Lender

(and no such consent shall be implied from any other action, inaction or acquiescence by the DIP

Lender or the Pre-Petition Lender). Upon entry of a Final Order, the Pre-Petition Lender and DIP

Lender shall each be entitled to all of the rights and benefits of Bankruptcy Code section 552(b),

and the "equities of the case" exception under Bankruptcy Code section 552(b) shall not apply to

the Pre-Petition Lender and DIP Lender with respect to proceeds, products, offspring, or profits of

11826835v2 (75669.00003.000)

any of the Pre-Petition Collateral or DIP Collateral, as applicable. Subject to entry of a Final Order, in no event shall the DIP Lender or the Pre-Petition Lender be subject to the equitable doctrine of "marshaling" or any similar equitable doctrine with respect to the Pre-Petition Collateral or the DIP Collateral.

28.    <u>Release</u>.

(a).    In consideration of and as a condition to the DIP Lender making the DIP Facility available under the applicable DIP Loan Agreement, the consent by the Pre-Petition Lender and DIP Lender to the use of Cash Collateral, the consent of the Pre-Petition Lender to have its liens primed as specifically set forth herein, and providing other credit and financial accommodations to the Debtors pursuant to the provisions of this Interim Order and the DIP Financing Documents (including the Carve Out provisions), each Debtor, on behalf of itself, and successors and assigns and its Estate (collectively, the "<u>Releasors</u>"), hereby absolutely releases and forever discharges and acquits the Pre-Petition Lender and each of its respective successors, participants, and assigns, and their present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees, and other representatives (the Pre-Petition Lender, and all such other parties being hereinafter referred to collectively as the "<u>Releasees</u>") of and from any and all claims, demands, causes of action, suits, covenants, contracts, controversies, agreements, promises, sums of money, accounts, bills, reckonings, damages, and any and all other claims, counterclaims, cross claims, defenses, rights of set-off, demands, and liabilities whatsoever (individually, a "<u>Pre-Petition Released Claim</u>" and collectively, the "<u>Pre-Petition Released Claims</u>") of every kind, name, nature and description, known or unknown, foreseen or unforeseen, matured or contingent, liquidated or unliquidated, primary or secondary, suspected or unsuspected, both at law and in equity, including, without limitation, any so-called

11826835v2 (75669.00003.000)

"lender liability" claims or defenses, that any Releasor may now or hereafter own, hold, have, or claim to have against the Releasees, or any of them for, upon, or by reason of any nature, cause, or thing whatsoever that arose or may have arisen at any time on or prior to the date of this Interim Order, arising out of, relating to, or in connection with, any of the Pre-Petition Obligations, the Pre-Petition Financing Documents, any Pre-Petition Loans, or other financial accommodations under the Pre-Petition Financing Documents; *provided*, *however*, that such release shall be immediately effective as to the Debtors upon the entry of the Interim Order, but shall not be effective as to the Estates until the entry of the Final Order and the expiration of the Challenge Period, which shall all occur on the same day, as provided in Paragraph 25 above. In addition, upon the closing of the credit bid for the payment and satisfaction in full of all Obligations (as defined in the DIP Financing Documents) owed to the DIP Lender by the Debtors, and termination of the rights and obligations arising under this Interim Order, any Final Order, and the DIP Financing Documents (which payment and termination shall be on terms and conditions acceptable to the DIP Lender), the DIP Lender shall be automatically deemed to be absolutely and forever released and discharged from any and all obligations, liabilities, actions, duties, responsibilities, commitments, claims, and causes of action arising, occurring in connection with, or related to the DIP Financing Documents, this Interim Order, or any Final Order (whether known or unknown, direct or indirect, matured or contingent, foreseen or unforeseen, due or not due, primary or secondary, liquidated or unliquidated).

(b).     Subject to Section VIII with respect to all applicable parties other than the Debtors, each Releasor hereby absolutely, unconditionally and irrevocably covenants and agrees with each of the Releasee that it will not sue (at law, in equity, in any regulatory proceeding, or otherwise) any Releasee on the basis of any Pre-Petition Released Claim that has been released

11826835v2 (75669.00003.000)

and discharged by each Releasor pursuant to clause 25(a) above.  If any Releasor violates the
forgoing covenant, Debtors agree to pay, in addition to such other damages as any Releasee may
sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a
result of such violation.

## X.  Other Rights and Obligations.

29.    <u>No Modification or Stay of this Interim Order</u>.  Based upon the record presented to
the Court by the Debtors, notwithstanding (a) any stay, modification, amendment, supplement,
*vacatur*, revocation, or reversal of this Interim Order, the DIP Financing Documents or any term
hereunder or thereunder, (b) the failure to obtain a Final Order pursuant to Bankruptcy Rule
400l(c)(2), or (c) the dismissal or conversion of one or more of the Chapter 11 Cases, the DIP
Lender shall retain and be entitled to all of the rights, remedies, privileges, and benefits in favor of
the DIP Lender pursuant to Bankruptcy Code section 364(e), this Interim Order, and the DIP
Financing Documents as of the date any event referred to in clauses (a), (b) or (c) shall have
occurred.

30.    <u>Power to Waive Rights; Duties to Third Parties</u>.  The Pre-Petition Lender and the
DIP Lender shall have the right, in their respective sole discretions, to waive any of the terms,
rights, and remedies provided or acknowledged in this Interim Order, the Pre-Petition Loan
Agreement, or the DIP Loan Agreement ("<u>Lender Rights</u>") with respect to each of them, as
applicable, and shall have no obligation or duty to any other party with respect to the exercise or
enforcement, or failure to exercise or enforce, any Lender Right(s).  Any waiver by any of them
of any Lender Rights shall apply solely to such party and to the Lender Right so waived and shall
not be or constitute a continuing waiver, except that any waiver by the Pre-Petition Lender or the
DIP Lender shall bind the Pre-Petition Lender or DIP Lender, as applicable, in accordance with
the Pre-Petition Financing Documents or DIP Financing Documents. Any delay in or failure to

exercise or enforce any Lender Right shall neither constitute a waiver of such Lender Right, nor

cause or enable any other party to rely upon or in any way seek to assert as a defense to any

obligation owed by the Debtors to the Pre-Petition Lender or the DIP Lender.  For the avoidance

of doubt, such discretion with respect to the DIP Lender shall be governed by the terms of the DIP

Loan Agreement.

31.    <u>Reservation of Rights</u>.  The terms, conditions, and provisions of this Interim Order

are in addition, and without prejudice, to the rights of the Pre-Petition Lender or the DIP Lender,

as applicable, to pursue any and all rights and remedies under the Bankruptcy Code, the DIP

Financing Documents, the Pre-Petition Financing Documents, or any other applicable agreement

or law, including, without limitation, rights to seek either or both adequate protection and

additional or different adequate protection, to seek relief from the automatic stay, to seek an

injunction, to oppose any request for use of Cash Collateral, other Pre-Petition Collateral or the

proceeds of the DIP Facility (other than as permitted under this Interim Order and the DIP Loan

Agreement) or the granting of any interest in the DIP Collateral (other than as contemplated herein

or permitted under the DIP Financing Documents), to object to any sale of assets, and to object to

applications for either or both allowance and payment of compensation of Professionals or other

parties seeking compensation or reimbursement from the Estates.

32.    <u>Modification of the Automatic Stay</u>.  The automatic stay under Bankruptcy Code

section 362(a) is hereby modified as necessary to effectuate all of the terms and provisions of this

Interim Order and the DIP Financing Documents, including, without limitation, the application of

collections, authorization to make payments, granting of liens, and perfection of liens.

11826835v2 (75669.00003.000)

33.    <u>Binding Effect</u>.

(a).    The provisions of this Interim Order, the DIP Financing Documents, the DIP Superpriority Claims, DIP Liens, Adequate Protection Liens, Adequate Protection Claims, the DIP Obligations and any and all rights, remedies, privileges, and benefits in favor of the DIP Lender, and the Pre-Petition Lender provided or acknowledged in this Interim Order, and any actions taken pursuant thereto, shall be effective immediately upon entry of this Interim Order pursuant to Bankruptcy Rules 6004(g) and 7062, shall continue in full force and effect, and shall survive entry of any such other Order, including, without limitation, any order that may be entered confirming any plan of reorganization, converting one or more of the Chapter 11 Cases to any other chapter under the Bankruptcy Code, or dismissing one or more of the Chapter 11 Cases.

(b).    Any order dismissing one or more of the Chapter 11 Cases under Bankruptcy Code section 1112 or otherwise shall be deemed to provide (in accordance with Bankruptcy Code sections 105 and 349) that (i) the DIP Lender's and the Pre-Petition Lender's respective, liens on, and security interests in, the DIP Collateral shall continue in full force and effect notwithstanding such dismissal until the DIP Obligations, Adequate Protection Obligations, and  Pre-Petition Obligations, as applicable, owed to such parties, respectively, are indefeasibly paid and satisfied in full, and (ii) this Court shall retain jurisdiction, to the extent permissible under applicable law, notwithstanding such dismissal, for the purposes of enforcing the DIP Superpriority Claims, DIP Liens, Adequate Protection Liens, and Adequate Protection Claims of the Pre-Petition Lender and DIP Lender, as applicable.

(c).    In the event this Court modifies any of the provisions of this Interim Order or the DIP Financing Documents following a Final Hearing, this Interim Order shall remain in full force and effect, except as expressly amended or modified at such Final Hearing.

- 55 -

(d).    This Interim Order shall be binding upon the Debtors, their Estates, all parties in interest in the Chapter 11 Cases, and their respective successors and assigns, including any trustee or other fiduciary appointed in the Chapter 11 Cases or any Successor Cases of any Debtors, and shall inure to the benefit of the Pre-Petition Lender, the DIP Lender, the Debtors, and their respective successors and assigns, subject to the rights of any party in interest or trustee under Section VIII above.

34.    <u>Proofs of Claim</u>.  Notwithstanding the entry of an order establishing a bar date in any of these Chapter 11 Cases, or the conversion of these Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, neither the Pre-Petition Lender nor the DIP Lender shall be required to file proofs of claim in any of the Chapter 11 Cases or Successor Cases with respect to, as applicable, any of Pre-Petition Obligations, Adequate Protection Obligations, Adequate Protection Liens, DIP Obligations, DIP Liens, DIP Superpriority Claims, or any other claims or liens granted hereunder or created by this Interim Order. The Pre-Petition Lender and the DIP Lender are hereby authorized and entitled, in each's respective sole and absolute discretion, but in no event are required, to file (and amend and/or supplement, as each sees fit) proofs of claim in each of the Chapter 11 Cases on behalf of the Pre-Petition Lender in respect of the Pre-Petition Obligations or on behalf of the DIP Lender in respect of the applicable DIP Obligations, as applicable. Any proof of claim so filed shall be deemed to be in addition to, and not in lieu of, any other proof of claim that may be filed by any of the Pre-Petition Lender or DIP Lender.

35.    <u>Waiver of Bankruptcy Rule 6003(b), 6004(a) and 6004(h)</u>.  The 21-day provision of Bankruptcy Rule 6003(b), the notice requirements of Bankruptcy Rule 6004(a), and the 14-day stay of 6004(h) are hereby waived.

11826835v2 (75669.00003.000)

36.    <u>Order Controls</u>.  In the event of a conflict between (a) the terms and provisions of the DIP Financing Documents or the Pre-Petition Financing Documents, as applicable, and (b) the terms and provisions of this Interim Order, then in each case the terms and provisions of this Interim Order shall govern.

37.    <u>Calculation of Dates</u>.  All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

38.    <u>No Third Party Rights</u>.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

39.    The terms of the provision of the *Interim Order Authorizing Debtors' Use of Cash Collateral and Granting Adequate Protection and Related Relief* [D.I. 61] (the "<u>First Interim Cash Collateral Order</u>"), the *Second Interim Order Authorizing Debtors' Use of Cash Collateral and Granting Adequate Protection and Related Relief* [D.I. 144] (the "<u>Second Interim Cash Collateral Order</u>"), and *Third Interim Order Authorizing Debtors' Use of Cash Collateral and Granting Adequate Protection and Related Relief* [D.I. ____] (the "<u>Third Interim Cash Collateral Order</u>", collectively, the "<u>Earlier Cash Collateral Orders</u>"), shall remain in full force and affect as to the rights and benefits of the Pre-Petition Lender. This Interim Order shall provide additional adequate protection to the Pre-Petition Lender since the First Petition Date. To the extent there are any inconsistencies between the Earlier Cash Collateral Orders and this Interim Order, this Interim Order shall control.

## XI.    Final Hearing and Response Dates.

40.    The Final Hearing on the DIP Motion pursuant to Bankruptcy Rule 4001(c)(2) is scheduled for **_____ __, 2026 at __:__ _.m. (prevailing Central Time**) before this Court.  The Debtors shall promptly mail copies of this Interim Order to the Noticed Parties, and to any other

party that has filed a request for notices with this Court. Any party in interest objecting to the

relief sought at the Final Hearing shall serve and file written objections, which objections shall be

served upon (a) counsel for the Debtors, Kane Russell Coleman Logan PC., 901 Main Street, Suite

5200, Dallas, TX 75202; Attn: John J. Kane (jkane@krcl.com), Kyle Woodard

(kwoodard@krcl.com), JaKayla J. DaBera (jdabera@krcl.com), Mark C. Taylor

(mtaylor@krcl.com), and Casey Roy (croy@krcl.com); (b) counsel for the DIP Lender and Pre-

Petition Lender, Blank Rome LLP, One Logan Square, 130 N. 18th Street, Philadelphia,

Pennsylvania 19103, Attn: Regina Stango Kelbon, Esq. (regina.kelbon@blankrome.com), and

Michael B. Schaedle, Esq. (mike.schaedle@blankrome.com), and David Clem

(david.clem@blankrome.com); (c) counsel to the Committee, Dykema Gossett PLLC, 1717 Main

Street, Suite 4200, Dallas, Texas 7520, Attn: Jeffrey R. Fine (JFine@dykema.com), William J.

Hotze (Whotze@dykema.com), Nicholas Zugaro (NZugaro@dykema.com), and Dominique A.

Douglas (DDouglas@dykema.com); (d) the U.S. Trustee, Attn: Meredyth A. Kippes

(meredyth.kippes@usdoj.com); and shall be filed with the Clerk of the United States Bankruptcy

Court for the Northern District of Texas, by no later than _____ __, **2026 at 4:00 p.m.**

**(prevailing Central Time)**.

### END OF ORDER###

11826835v2 (75669.00003.000)

<u>**Exhibit 1**</u>

**Initial Budget**

# Buddy Mac Holdings, LLC *et. al.*

*Cash Budget*
$ - Thousands

| | Filing Date>> 4-Dec | Actual 1 6-Dec | Actual 2 13-Dec | Actual 3 20-Dec | Actual 4 27-Dec | Actual 5 3-Jan | Actual 6 10-Jan | Actual 7 17-Jan | Budget 8 24-Jan | Budget 9 31-Jan | Budget 10 7-Feb | Budget 11 14-Feb | Budget 12 21-Feb | Budget Total 12 Weeks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Receipts** | | $ - | $ 387.0 | $ 318.7 | $ 241.5 | $ 379.6 | $ 430.4 | $ 315.7 | $ 292.0 | $ 305.6 | $ 599.5 | $ 422.4 | $ 436.0 | $ 4,128.4 |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Inventory Purchases | | - | - | 196.2 | 21.5 | 117.7 | - | - | 1,000.0 | - | 200.0 | - | - | 1,535.4 |
| Payroll and Benefits | | - | 0.8 | 207.0 | - | 252.1 | - | 217.0 | - | 310.0 | 85.0 | 310.0 | - | 1,381.9 |
| Property Taxes | | - | 0.1 | - | - | 3.5 | 9.5 | 1.2 | 20.9 | - | - | - | - | 35.2 |
| Store Rent Expense | | - | - | - | - | - | 173.4 | - | 3.6 | - | 272.3 | - | 155.0 | 604.4 |
| Repairs & Maintenance | | - | 4.3 | (0.2) | - | - | 3.8 | 0.3 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 33.2 |
| Insurance | | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Vehicle Leases | | - | - | - | - | - | - | - | 58.0 | - | - | - | 90.0 | 148.0 |
| General and Administrative | | - | 35.1 | (0.2) | 6.5 | 6.8 | 67.8 | 16.2 | 50.0 | 20.0 | 70.0 | 20.0 | 20.0 | 312.3 |
| Corporate Support | | - | 3.3 | 66.0 | - | 73.6 | 1.1 | 62.2 | 5.0 | 98.7 | 55.1 | 98.7 | 10.0 | 473.7 |
| Sales Taxes | | - | - | 25.9 | 106.8 | - | - | - | 100.0 | - | - | - | 153.0 | 385.6 |
| **Total Operating Disbursements** | | $ - | $ 43.7 | $ 494.7 | $ 134.8 | $ 453.7 | $ 255.7 | $ 296.9 | $ 1,242.5 | $ 433.7 | $ 687.4 | $ 433.7 | $ 433.0 | $ 4,909.8 |
| **Operating Cash Flow** | | $ - | $ 343.3 | $ (176.0) | $ 106.7 | $ (74.1) | $ 174.7 | $ 18.8 | $ (950.5) | $ (128.1) | $ (87.9) | $ (11.4) | $ 3.0 | $ (781.4) |
| **Accumulated** | | - | 343.3 | 167.3 | 274.1 | 200.0 | 374.7 | 393.5 | (557.0) | (685.1) | (773.1) | (784.4) | (781.4) | |
| **Other (Sources)/Uses** | | | | | | | | | | | | | | |
| DIP Proceeds | | - | - | - | - | - | - | - | (750.0) | - | (750.0) | - | - | (1,500.0) |
| Funds from BMH-HR, LLC | | - | - | - | - | - | (56.5) | - | (100.0) | - | - | - | - | (156.5) |
| Adequate Protection - Phonix | | - | - | - | - | - | - | 56.5 | 100.0 | - | - | - | - | 156.5 |
| Restructuring Fees | | - | - | - | - | - | - | - | - | 21.2 | - | - | 775.0 | 796.2 |
| Critical Vendors | | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utilities Deposit | | - | - | 25.0 | - | - | - | - | - | - | - | - | - | 25.0 |
| **Total Other (Sources/Uses)** | | - | - | 25.0 | - | - | (56.5) | 56.5 | (750.0) | 21.2 | (750.0) | - | 775.0 | (678.8) |
| **Net Cash Flow** | | $ - | $ 343.3 | $ (201.0) | $ 106.7 | $ (74.1) | $ 231.3 | $ (37.7) | $ (200.5) | $ (149.3) | $ 662.1 | $ (11.4) | $ (772.0) | $ (102.6) |
| **Accumulated** | | - | 343.3 | 142.3 | 249.1 | 175.0 | 406.2 | 368.5 | 168.0 | 18.7 | 680.8 | 669.4 | (102.6) | (102.6) |
| **Cash Balance** | $ 133.9 | $ 133.9 | $ 477.3 | $ 276.3 | $ 383.0 | $ 308.9 | $ 540.2 | $ 502.5 | $ 302.0 | $ 152.6 | $ 814.7 | $ 803.3 | $ 31.4 | $ 31.4 |

# Exhibit 2

**DIP Loan Agreement**

**SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION LOAN, SECURITY AND GUARANTY AGREEMENT**

**among**

**BUDDY MAC HOLDINGS, LLC,**
**as RTO Parent,**

**MACDONALD CAPITAL CORPORATION**
**as MCC Parent,**

**BMH RTO, LLC,**
**AND**
**EACH DEBTOR LISTED AS A BORROWER ON THE SIGNATURE PAGES HERETO,**
**as Borrowers,**

**THE PARENT AND EACH DEBTOR LISTED AS A GUARANTOR ON THE SIGNATURE PAGES HERETO,**
**as Guarantors,**

**and**

**PHONIX RBS, LLC, as Lender**

**January 27, 2026**

## TABLE OF CONTENTS

| | | |
|---|---|---|
| 1. | LOANS AND OTHER FINANCIAL ACCOMMODATIONS. | 2 |
| 2. | CONDITIONS OF LENDING. | 5 |
| 3. | INTEREST; FEES; EXPENSES; INDEMNIFICATION; TAXES. | 7 |
| 4. | SECURITY. | 11 |
| 5. | COLLECTIONS; SET OFF; DEPOSIT ACCOUNTS; NOTICE OF ASSIGNMENT; POWER OF ATTORNEY; LENDER REPORTS. | 13 |
| 6. | REPRESENTATIONS AND WARRANTIES. | 17 |
| 7. | AFFIRMATIVE COVENANTS. | 21 |
| 8. | REPORTING. | 25 |
| 9. | NEGATIVE COVENANTS. | 28 |
| 10. | DEFAULT; RIGHTS AND REMEDIES UPON DEFAULT. | 33 |
| 11. | STANDARDS FOR EXERCISING REMEDIES. | 41 |
| 12. | TERMINATION. | 42 |
| 13. | MISCELLANEOUS. | 42 |
| 14. | DEFINITIONS. | 46 |
| 15. | JOINT AND SEVERAL LIABILITY | 63 |
| 16. | SUPERPRIORITY CLAIMS, DIP COLLATERAL SECURITY, ETC. | 65 |
| 17. | ACKNOWLEDGMENT; REAFFIRMATION AND RELEASE. | 68 |
| 18. | GUARANTY | 71 |

i

## SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION LOAN, SECURITY AND GUARANTY AGREEMENT

January [•], 2026

Pursuant to Section 364(c) and (d) of the Bankruptcy Code, this SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION LOAN, SECURITY AND GUARANTY AGREEMENT (as amended or modified from time to time, this "**Agreement**"), is entered into as of the date set forth above by and among **BUDDY MAC HOLDINGS, LLC** (the "**RTO Parent**"), **MACDONALD CAPITAL CORPORATION** (the "**MCC Parent**"), **BMH RTO, LLC,** a Texas limited liability company ("**BMH RTO**"), and each Debtor listed as a "Borrower" on the signature pages hereto (together with each other Person that executes a joinder agreement and becomes a "Borrower" hereunder and BMH RTO, each a "**Borrower**" and collectively, the "**Borrowers**"), each Debtor listed as a "Guarantor" on the signature pages hereto (together with the RTO Parent and MCC Parent and each other Person that executes a joinder agreement and becomes a "Guarantor" hereunder, each a "**Guarantor**" and collectively, the "**Guarantors**"; each Borrower and each Guarantor are each individually a "**Debtor**" and collectively, the "**Debtors**"), and **PHONIX RBS, LLC,** a Delaware limited liability company ( "**Lender**").

## RECITALS

A. On December 1, 2025 (the "**First Petition Date**"), Buddy Mac One, LLC ("**Buddy Mac One**"), BMH One RE, LLC ("**BMH One**"), BMH 95 RE Caruthersville, LLC ("**BMH 95**"), and BMH 96 RE Marion, LLC ("**BMH 96**"; together with BMH One and BMH 95, the "**Limited Recourse Guarantors**") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, and on December 4, 2025 (the "**Second Petition Date**"), BMH RTO, LLC and affiliated Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, commencing Chapter 11 bankruptcy cases which are jointly administered under Bankruptcy Case No. 25-34839 (collectively and individually as the context may require, the "**Case**") before the United States Bankruptcy Court for the Northern District of Texas (the "**Bankruptcy Court**"). The Debtors that filed their respective Cases on the First Petition Date and the Second Petition Date are referred to herein as the "**BMH Debtors**."

B. The BMH Debtors are operating their business as debtors-in-possession under Chapter 11 of the Bankruptcy Code. William Ian MacDonald acts as the Debtors' chief executive officer.

C. On January 23, 2026 (the "**Third Petition Date**"; the term "**Applicable Petition Date**" refers to any of the First Petition Date, the Second Petition Date or the Third Petition Date as the context may require)), the entities listed on **Exhibit 9** (collectively the "**Buddy Mac Entities**") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code before the Bankruptcy Court, commencing Chapter 11 bankruptcy cases, which will be jointly administered with the BMH Debtor Cases. Each Debtor remains in possession of its assets and is operating its business as a debtor-in-possession under Chapter 11 of the Bankruptcy Code.

D. Pursuant to that certain Amended and Restated Loan, Security and Guaranty Agreement dated as of February 28, 2025 (as has been amended, supplemented and modified through the date hereof, the "**Pre-Petition Loan Agreement**"), by and among BMH RTO, LLC, as borrower ("**BMH RTO**"), the Pre-Petition Guarantors party thereto, and Phonix RBS, LLC, as assignee of Intrust Bank, N.A. (the "**Pre-Petition Lender**"), Pre-Petition Lender made certain credit facilities and advances of credit available to certain of the Debtors prior to the Second Petition Date on the terms and conditions set forth therein, which credit facilities and advances of credit and all other Pre-Petition Obligations (as defined below) thereunder

1

were unconditionally guaranteed by certain Pre-Petition Guarantors and secured by Liens on substantially all the assets of BMH RTO and certain of the Pre-Petition Guarantors.

E.    The Borrowers have requested that during the Case, Lender make advances and other financial accommodations available to the Borrowers of up to the Credit Limit specified herein on a senior secured, superpriority basis, pursuant to, inter alia, Sections 364(c) and (d) of the Bankruptcy Code.

F.    Lender is willing to provide advances and other financial accommodations to the Borrowers on a senior secured, superpriority basis on the terms and subject to the conditions of this Agreement, so long as, among other things, such post-petition credit obligations are (i) secured by Liens on all of the assets, property and interests, real and personal, tangible and intangible, of the Debtors, whether now owned or hereafter acquired, which Liens are superior to all other Liens pursuant to Sections 364(c) and (d) of the Bankruptcy Code (subject to (x) the priority of Liens set forth in Section II(b) of the Interim Order and (y) the Carve-Out); (ii) given priority over any administrative expenses of the kind specified in the Bankruptcy Code, including without limitation, under Sections 105, 326, 328, 330, 331, 503(b), 507, 364(c)(1), 546(c), 726, or 1114 and, upon entry of a Final Order, sections 506(c) and 552(b) of the Bankruptcy Code, as provided in the Interim Order and the Final Order; and (iii) guaranteed by the Guarantors pursuant to the terms of **Section 18**.

IN CONSIDERATION of the foregoing recitals, which are incorporated herein by this reference, the mutual covenants and undertakings herein contained, the Debtors, the other Borrowers, the Guarantors, Lender and Issuer (as hereinafter defined) hereby agree as follows:

**1.    LOANS AND OTHER FINANCIAL ACCOMMODATIONS.**

**(a)    Term Loans**.

**(i)    New Money Term Loans**.  Subject to the terms and provisions of this Agreement, and also subject to any further restrictions or limitations in the Final Order (or, prior to the entry of the Final Order, the Interim Order), Lender agrees to make Term Loans to the Borrowers, during the period from the Closing Date until the Maturity Date, in an aggregate principal amount not to exceed the amount of the Credit Limit; provided, however, that (A) the amount of Term Loans to be borrowed for any advance during any week shall be in an aggregate principal amount not to exceed the amount required pursuant to the Approved Budget (subject to Permitted Variances) as then in effect and (B) during the Interim Availability Period, the total aggregate principal amount of the outstanding Term Loans shall not exceed the Interim Availability Amount.

**(ii)    Limitations**.  Notwithstanding the foregoing:

(A)    The Credit Limit shall be permanently reduced immediately and without further action upon the making of each Term Loan in an aggregate amount equal to the aggregate amount of such Term Loan. The Credit Limit shall terminate immediately and without further action on the Maturity Date.  The aggregate principal amount of the Term Loans made during the period from the Closing Date until the Maturity Date shall not exceed the Credit Limit.  Any principal amount of a Term Loan which is repaid or prepaid may not be reborrowed.

(B)    During the Interim Availability Period, the Term Loans in an amount up to the Interim Availability Amount may be advanced by Lender; provided that during the Interim Availability Period, Borrowers will use the proceeds from any Term Loans to

2

direct Lender to purchase inventory on behalf of the Borrowers and at the direction of
the Borrowers based on identified need for each store, at the prices that the Borrowers
have negotiated, and by virtue of the inventory purchase, which purchases shall be
deemed the funding of a Term Loan. For the avoidance of doubt, the purchase of such
inventory shall not be deemed control of the Debtors. If a dispute arises between Lender
and Debtors regarding the appropriate stores to which inventory should be delivered, the
Debtors, in the fulfillment of their fiduciary obligations to their estates, shall have final
say. During the Final Availability Period, Term Loans in an amount up to the Final
Availability Amount plus any undrawn Interim Availability Amount may be advanced by
Lender; provided, that in no event shall the aggregate amount of the Term Loans
advanced exceed $1,500,000, subject to **Section 1(c)**.

  **(iii)**  **Term Note**.  All term loans made by Lender pursuant to this **Section 1** (each a
"**Term Loan**" and collectively, the "**Term Loans**") shall bear interest pursuant to **Section
3(a)(i)** and, at the option of Lender, shall be evidenced by and repayable in accordance with a term
note payable to Lender (or its registered assigns) substantially in the form of **Exhibit 2** hereto (as
amended, modified, replaced, substituted, superseded or restated from time to time, the "**Term
Note**"), as the same may hereafter be amended, supplemented or restated from time to time and
any note or notes issued in substitution therefor, but in all events shall be conclusively evidenced
by Lender's records of loans and repayments (absent manifest error) and shall be payable as
described herein.

  **(iv)**  **Protective Advances**.  Notwithstanding anything to the contrary contained herein,
at its option, and without limiting any other rights or remedies, following prior written notice to
Borrower (which such prior notice is not required to the extent an Event of Default shall have
occurred and be continuing), Lender may at any time make a Term Loan or other advances
hereunder to pay or discharge any taxes, liens, rent, security interests or other encumbrances at any
time levied against, impacting in any manner or placed on any of the DIP Collateral, and may
procure and make a Term Loan or other advance hereunder to pay any premiums on any insurance
required to be carried by a Borrower, and provide for the maintenance and preservation of any of
the DIP Collateral, and otherwise take any action reasonably deemed necessary by Lender to protect
its security, and all amounts expended by Lender in connection with any of the foregoing matters,
including reasonable attorneys' fees, shall be considered Obligations of Borrowers and outstanding
Term Loans (and shall be added to Borrowers' balance of Term Loans pursuant to this Agreement),
and shall be secured by the DIP Collateral.

  **(v)**  **Advance Procedures**.  Unless otherwise approved by Lender in its sole discretion,
all requests for Term Loans shall be made upon the Borrower's irrevocable notice to Lender, which
may be given by (A) telephone, or (B) a written notice; provided that any telephone notice must be
confirmed immediately by delivery to Lender of a written notice.  Each such notice must be
received by Lender not later than 1:00 p.m. (New York time) one Business Day prior to (or in the
case of the initial Borrowing, the same day of) the requested date of any Term Loan.

  **(vi)**  **Roll-Up of Pre-Petition Revolver Obligations**

  **(A)**  Immediately upon entry of the Final Order, a portion of the outstanding
Pre-Petition Revolver Obligations (the "**Roll-Up Amount**") held by Lender shall be
automatically "rolled up" and converted into Term Loans, on a cashless basis of three

3

dollars ($3.00) of Roll-Up Amount for each dollar of Term Loans, and constitute Obligations of the Debtors hereunder for all purposes hereunder as if originally funded on the Closing Date (the "**Roll-Up Loans**"), without any further action by the Debtors or any other party (which conversion shall not, for the avoidance of doubt, constitute a novation). The conversion (or "roll-up") shall be authorized as compensation for, in consideration for, and solely on account of, the agreement of the Pre-Petition Lender, as Lender hereunder, to fund the Term Loans hereunder and not as payments under, adequate protection for, or otherwise on account of, any Pre-Petition Revolver Obligations. Notwithstanding any other provision of the Interim Order, the Final Order, or the Loan Documents, all rights of the Pre-Petition Lender shall be fully preserved, including with respect to the Roll-Up Loans.

(B)    Subject to the terms and conditions set forth herein and in the Final Order, and without any further action by any party to this Agreement, each Lender's Roll-Up Loans shall be deemed to be Loans, administered hereunder and secured by perfected Liens on, and security interests in, all of the DIP Collateral of the Debtors to the same extent as all other Obligations of the Debtors hereunder. For the avoidance of doubt, until any Pre-Petition Revolver Obligations are deemed to be Roll-Up Loans as provided herein, such Pre-Petition Revolver Obligations shall remain Pre-Petition Revolver Obligations under the Pre-Petition Credit Agreement and guaranteed by the guarantors of and secured by and entitled to the benefits of all liens created and arising under the Pre-Petition Loan Documents, which liens shall remain in full force and effect on a continuous basis, unimpaired, uninterrupted and undischarged, and having the same perfected status and priority. The Roll-Up Loans and the other Term Loans shall jointly constitute a single facility hereunder.

(vii)    **Payment Direction**. Each Borrower hereby authorizes and directs Lender, in Lender's sole discretion (provided, however, Lender shall have no obligation to do so): (A) to make, or treat as being made, a Term Loan to Borrowers, and add the same to Borrowers' balance of Term Loans pursuant to this Agreement, in order to pay accrued interest, fees, charges and expenses and other Obligations, as the same become due and payable pursuant to this Agreement, or any note or other agreement between a Borrower and Lender; (B) to charge any of Borrowers' or other Debtors' accounts under the control of Lender for the payment of any such Obligations; and/or (C) apply the proceeds of DIP Collateral and any other funds of such Borrower or other Debtors received by Lender, including, without limitation, payments on accounts and other payments from sales or lease of inventory to the payment of any such Obligations. Lender shall use commercially reasonable efforts to give Borrowers notice of any such payments or charges under clauses (A) and (B) respectively promptly following the same.

**(b)**    <u>**Mandatory Prepayments**</u>.

(i)    When any Debtor receives any Net Cash Proceeds: (A) under any insurance policy on account of damage or destruction of any DIP Collateral, or (B) as a result of any taking or condemnation of any DIP Collateral, Debtors shall, no later than one (1) Business Days after the receipt thereof, make a repayment of the Post-Petition Obligations or Pre-Petition Revolver Obligations (as determined by Lender in its sole and absolute discretion) in an amount equal to one hundred percent (100%) of such net cash proceeds. Such repayments shall be applied to the Obligations in accordance with **Section 5(b)** hereof.

4

(ii)    In the event of any issuance or other incurrence of Indebtedness (other than Indebtedness permitted hereunder) by any Debtor, or the issuance of Equity Interests by any Debtor, Debtors shall, no later than one (1) Business Day after the receipt by such Debtor of any net cash proceeds (i.e., gross cash proceeds less the reasonable direct costs of such issuance or incurrence) of such issuance or incurrence, make a repayment of the Post-Petition Obligations or Pre-Petition Revolver Obligations (as determined by Lender in its sole and absolute discretion) in an amount equal to one hundred percent (100%) of such net cash proceeds.  The foregoing shall not be deemed to be implied consent to any such sale otherwise prohibited by the terms and conditions hereof.  Such repayments shall be applied to the Obligations in accordance with **Section 5(b)** hereof.

(iii)    When any Debtor sells or otherwise disposes of any DIP Collateral (including, without limitation any Subject RTO Real Property), Borrowers shall make a repayment of the Post-Petition Obligations or Pre-Petition Revolver Obligations (as determined by Lender in its sole and absolute discretion) in an amount equal to one hundred percent (100%) of the net cash proceeds of such sale (i.e., gross cash proceeds less the reasonable direct costs of such sales or other dispositions) and less amounts required to be first paid over to the holder(s) of any applicable Senior Liens as a result of such sale or disposition), such repayments to be made promptly but in no event more than one (1) Business Days following receipt of such net proceeds, and until the date of payment, such proceeds shall be held in trust for Lender.  The foregoing shall not be deemed to be implied consent to any such sale otherwise prohibited by the terms and conditions hereof.  Such repayments shall be applied to the Obligations in accordance with **Section 5(b)** hereof.

(iv)    Subject to **Section 4(l)** and the Final Order, when BMH HR LLC ("**BMH HR**") receives additional ERC Funds, which ERC Funds constitute DIP Collateral, Borrowers shall, or shall cause BMH HR to, make a repayment of the Post-Petition Obligations or Pre-Petition Revolver Obligations (as determined by Lender in its sole and absolute discretion) in an amount equal to one hundred percent (100%) of the net cash proceeds of such ERC Funds (i.e., gross cash proceeds less the reasonable direct broker's fee) along with any pre-existing ERC Funds in its possession less the Additional ERC Remittance required to be paid over to Debtors in the amount of $175,000 for professional fee retainers, costs, and expenses. To the extent such Additional ERC Remittance has not been previously paid, and subject to entry of the Final Order, such repayments shall be made promptly but in no event more than one (1) Business Days following receipt of such net proceeds, or entry of the Final Order approving this agreement, whichever is later, and until the date of payment, such proceeds shall be held in trust for Lender.  Such repayments shall be applied to the Obligations in accordance with **Section 5(b)** hereof.

(v)    Borrowers shall, or shall cause Ian MacDonald to, as a Pre-Petition Guarantor, and in exchange for the consideration provided herein, make a repayment of the Post-Petition Obligations or Pre-Petition Revolver Obligations (as determined by Lender in its sole and absolute discretion) in an amount equal to seventy-five percent (75%) of the net cash proceeds received by Ian MacDonald (whether through his direct or indirect ownership of the Boulders Property) from the sale of the Boulders Property, such repayments to be made promptly but in no event more than one (1) Business Days following receipt of such net proceeds, and until the date of payment, such proceeds shall be held in trust for Lender.  Such repayments shall be applied to the Obligations in accordance with Section 5(b) hereof.

5

(c)    **Incremental Facility Increase.**

        (i)    **Request for Incremental Facility Increase**. Borrowers may, by notice to the Lender, request that the Credit Limit be increased by up to an amount (for all such requests) not exceeding $1,000,000 (such amount, the "**Accordion Amount**" and such increase to the Credit Limit as in effect on the Closing Date, the "**Incremental Facility Increase**"); <u>provided</u> that (i) any such request for the Incremental Facility Increase shall be in a minimum amount of the lesser of (x) $250,000 (or such lesser amount as may be approved by Lender) and (y) the entire remaining amount available under this **Section 1(c)** and (ii) Borrowers shall make no more than a total of four (4) requests for an Incremental Facility Increase under this **Section 1(c)** (unless otherwise approved by Lender)

        (ii)    **Conditions to Effectiveness Incremental Lenders**. The Accordion Amount may be provided by Lender. Notwithstanding anything herein to the contrary, Lender shall not have any obligation to agree to provide all or part of the Accordion Amount pursuant to this **Section 1(c)** and any election to do so shall be in the sole discretion of such Lender.

        (iii)    **Terms of the Incremental Facility Increase**. Lender and the Borrowers shall determine the effective date for such Incremental Facility Increase pursuant to this **Section 1(c)** (an "**Incremental Commitment Effective Date**"); <u>provided</u> that such date shall be a Business Day at least ten Business Days after delivery of the Accordion Increase Notice (unless otherwise approved by Lender) and at least 30 days prior to the Maturity Date then in effect (unless otherwise approved by Lender).

        Effective as of the applicable Incremental Commitment Effective Date, subject to the terms and conditions set forth in this Section, the Accordion Amount shall constitute part of the Credit Limit, and the Loans made by it on such Incremental Commitment Effective Date pursuant to this **Section 1(c)** shall be Term Loans, for all purposes of this Agreement.

        (iv)    **Conditions to Effectiveness**. Notwithstanding the foregoing, the Incremental Facility Increase pursuant to this Section shall not be effective with respect to Lender unless:

        (A)    no Default or Event of Default shall have occurred and be continuing on the Incremental Commitment Effective Date and after giving effect to the Loans of the Accordion Amount to be made on the Incremental Commitment Effective Date;

        (B)    the representations and warranties contained in this Agreement are true and correct on and as of the Incremental Commitment Effective Date and after giving effect to such Incremental Facility Increase, as though made on and as of such date (or, if any such representation or warranty is expressly stated to have been made as of a specific date, as of such specific date);

        (C)    Lender shall have approved the Incremental Facility Increase.

2.    **CONDITIONS OF LENDING.**

6

    (a)    **Initial Loans**. The willingness of Lender to consider making the initial loan hereunder shall be subject to the condition precedent that Lender shall have received all of the following, each in form and substance satisfactory to Lender, subject to waiver of any such requirement by Lender:

    **(i)**    This Agreement and each applicable Loan Document, properly executed on behalf of the Debtors or other applicable party.

    **(ii)**    A Term Note in favor of Lender.

    **(iii)**    The Initial DIP Budget.

    **(iv)**    The Case shall have been commenced in the Bankruptcy Court and all of the first day orders entered at the time of commencement of the Case shall be reasonably satisfactory, in form and substance, to Lender and no trustee or examiner shall have been appointed with respect to the Debtors, or any of them, or any property of or any Estate of any Debtor;

    **(v)**    The Interim Order shall have been entered by the Bankruptcy Court, which Interim Order (A) shall have been entered upon an application or motion of the Debtors satisfactory in form and substance to Lender and upon prior notice to such parties required to receive such notice and such other parties as may be reasonably requested by Lender; (B) shall be in full force and effect and shall not have been amended, modified or stayed, or reversed; and, if the Interim Order is the subject of a pending objection, appeal or motion for reconsideration in any respect, neither the Interim Order, nor the making of the Term Loans, nor the performance by the Debtors of any of the Obligations shall be the subject of a presently effective stay, and (C) shall otherwise satisfy the requirements of the definition of Interim Order set forth herein. The Debtors and the Lender shall be entitled to rely in good faith upon the Interim Order notwithstanding any such objection, appeal or motion for reconsideration;

    **(vi)**    Current searches of appropriate filing offices showing that (A) no state or federal tax liens have been filed and remain in effect against any Debtor, (B) no financing statements have been filed and remain in effect against any Debtor, except (1) the financing statements relating to the liens set forth on **Schedule E** and (2) the Obligations, and (C) Lender has duly filed all financing statements necessary to perfect the security interests granted hereunder, to the extent the security interests are capable of being perfected by filing.

    **(vii)**    A certificate of the Clerk, Secretary or an Assistant Secretary, or other manager or officer approved by Lender, of each Debtor certifying as to (A) the resolutions of the directors/managers and, if required, the shareholders/members of such Debtor, authorizing the execution, delivery and performance of this Agreement and related Loan Documents, as applicable, (B) the certified Articles/Certificate of Incorporation/Organization/Formation and Bylaws/Operating Agreement (or other similar constituting documents) of such Debtor, and (C) the signatures of the officers or agents of such Debtor authorized to execute and deliver this Agreement and other instruments, agreements and certificates, including loan requests, on behalf of such Debtor.

    **(viii)**    A current certificate issued by the Secretary of State of the state of such Debtor's formation, certifying that such Debtor is legally existing and in good standing under the laws of such jurisdiction to the extent such jurisdiction issues such or similar certifications.

7

     **(ix)**    Evidence that each Debtor is duly licensed or qualified to transact business in all jurisdictions where the character of the property owned or leased or the nature of the business transacted by it makes such licensing or qualification necessary.

     **(x)**    Certificates of the insurance required hereunder, and related assignments as applicable, with all hazard insurance containing a lender's loss payable endorsement in favor of Lender and naming Lender as an additional insured (including as to foreign credit insurance).

     **(xi)**    Payment of the fees due through the date of the initial loan and expenses incurred by Lender through such date required to be paid by Borrowers pursuant to this Agreement.

     **(xii)**    An executed and sworn declaration by Ian MacDonald (the "<u>MacDonald Declaration</u>") to the effect that his final personal financial statement delivered to Lender on that date is true and correct, which personal financial statement form shall  be consistent with the representations received by Lender as to such personal financial statement from counsel for Ian MacDonald counsel on January 15, 2025, all in form and substance satisfactory to Lender.

     **(xiii)**    An executed Consent from Ian MacDonald consenting to the Debtors entering into this Agreement and the terms and conditions hereof.

     **(xiv)**    An executed Settlement Agreement.

     **(xv)**    Such other documents, instruments and agreements as Lender in its discretion may reasonably require.

     **(b)**    <u>**Loans Funded On and After the Final Order Entry Date**</u>.  The willingness of Lender to consider making any loan hereunder on and after the Final Order Entry Date shall be subject to the condition precedent that Lender shall have received all of the following, each in form and substance satisfactory to Lender:

     **(i)**    **Final DIP Orders and Cash Management Order**.  The Final Order Entry Date shall have occurred, and the conditions set forth in this **Section 2** shall have been satisfied.  The Final Order and the Cash Management Order shall be in full force and effect and shall not have been reversed, modified, amended, stayed, vacated or subject to a stay pending appeal, in the case of any modification, amendment or stay pending appeal, in any manner, or relating to any matter, that is adverse to the interests of Lender.  The Final Order shall approve the Settlement Agreement, authorize the compromise and transactions evidenced and contemplated thereby, including, without limitation, the Participation Agreement and the PEC Pledge Agreement.  Debtors shall be in compliance with the Final Order.

     **(ii)**    **Milestones**.  Debtors shall have satisfied all Milestones which are required to be satisfied on or prior to the date such Loan is funded.

     **(iii)**    **Approved Budget**.  Lender shall have received, and approved, the Approved Budget that is in effect as of the Final Order Entry Date.

     **(iv)**    **Payment of Fees, Etc**.  Borrowers shall have paid all fees, costs, expenses and taxes then payable by the Borrowers pursuant to this Agreement and the other Loan Documents to the Lenders, including, without limitation, any and all fees, costs, expenses and taxes set forth in the Interim Order and the Final Order.

8

      **(v)**     **Participation Agreement**. An executed Participation Agreement.

      **(vi)**     **PEC Pledge Agreement**. An executed PEC Pledge Agreement.

      **(vii)**     **Real Estate Documents**. Mortgage, Assignment of Leases and Rents, Hazardous Materials Indemnification Agreements and Fixture Filings each properly executed, as applicable, and delivered by the Borrowers in favor of Lender, each in form and substance satisfactory to Lender, with respect to the Real Property DIP Collateral.

      **(viii)**     **Other Real Estate Documents**. Such other documentation and opinions, in form and substance satisfactory to Lender, in connection with the granting of the Mortgages on the Real Property DIP Collateral, including surveys, financing statements, fixture filings, flood insurance, flood insurance certifications and environmental audits. All such environmental audits and surveys shall be prepared or issued by parties reasonably acceptable to Lender.

      **(ix)**     **Other Documents; Miscellaneous.** Such other documents, instruments and agreements as Lender in its discretion may reasonably require.

    **(c)**    **Conditions Precedent to All Borrowings**. The obligation of each Lender to make any Loan at any time is subject to the following conditions precedent:

      **(i)**     **Notice of Borrowing**. Lender shall have received a notice of borrowing in accordance with **Section 1(a)(v)** and the other requirements hereof.

      **(ii)**     **Representations and Warranties**. The representations and warranties contained in Section 6 hereof are correct in all material respects (except to the extent such representations and warranties are qualified by materiality, in which case they shall be correct in all respects) on and as of the date of such loan, as though made on and as of such date, except to the extent that such representations and warranties relate solely to an earlier date in which case they shall be true and correct in all material respects as of such earlier date; and

      **(iii)**     **No Default or Event of Default**. No event has occurred and is continuing or would result from such loan which constitutes an Event of Default or which, with notice or the passage of time or both, would constitute an Event of Default.

      **(iv)**     **Other Conditions Precedent**. With respect to any Loan (i) made during the Interim Availability Period, the conditions specified in **Section 3(a)** shall have been satisfied and (ii) made during the Final Availability Period, the conditions specified in **Section 3(b)** shall have been satisfied.

      **(v)**     **Status of Bankruptcy Cases**. The Cases shall not have been dismissed or converted under Chapter 7 of the Bankruptcy Code.

      **(vi)**     **Trustees**. (i) No trustee or examiner with enlarged powers (beyond those set forth in Bankruptcy Code sections 1106(a)(3) and (4)) shall have been appointed with respect to the Debtors or their respective properties and (ii) no trustee under Chapter 7 of the Bankruptcy Code or under Chapter 11 of the Bankruptcy Code shall have been appointed in the Cases.

      **(vii)**     **Milestones**. Each Milestone that is required to be complied with prior to or concurrently with the borrowing shall have been complied with.

9

(viii)    **Interim Order and Final Order**.  Debtors shall be in compliance with the Interim Order and the Final Order, as applicable.

(ix)    **Approved Budget**.  The Approved Budget shall be in full force and effect on and as of the proposed date of borrowing, and the making of any Loan on any such borrowing date shall be in accordance with the Approved Budget (or as otherwise approved in advance in writing by Lender).

(x)    **Professional Fee Reserve**.  The Professional Fee Reserve (as defined in the Interim Order) shall have been funded in sufficient amounts in accordance with the Interim Order and the Final Order and the Approved Budget (applicable as of the date of such Loan).

(xi)    **Legality**.  The making of such Loan shall not contravene any law, rule or regulation applicable to Lender.

(xii)    **Proceedings; Receipt of Documents**.  All proceedings in connection with the making of such Loan and the other transactions contemplated by this Agreement and the other Loan Documents, and all documents incidental hereto and thereto, shall be satisfactory to Lender and its counsel, and Lender and such counsel shall have received such other agreements, instruments, approvals, and other documents, each in form and substance satisfactory to Lender, as Lender may reasonably request.

(d)    **Effect of Requests**.  Each request by Borrowers for the making of any loan shall be deemed to constitute a representation and warranty by each Borrower that the conditions precedent set forth in clauses (c)(ii) and (c)(iii) above of this **Section 2** will be satisfied at the time of the making of such loan.

**3.    INTEREST; FEES; EXPENSES; INDEMNIFICATION; TAXES.**

(a)    **Interest Rates**.

(i)    **Term Loans; Other Obligations**.  Interest on (A) the Pre-Petition Obligations shall be governed as to rates of interest and other fees and related charges by the Pre-Petition Loan Agreement and the other Pre-Petition Loan Documents and (B) the amounts outstanding hereunder, including, without limitation, under the Term Notes, shall bear interest at the rate of ten percent (10%) per annum.

(ii)    **[Reserved]**.

(iii)    **Adjustment.**  Interest shall be computed on the basis of the actual number of days elapsed over a year of three hundred sixty (360) days.  Lender's determination of such interest rate shall be binding and conclusive absent manifest error.  The interest rate need not and may not necessarily be the lowest or most favorable rate.

(iv)    **Maximum Rate.**  It is the intention of the parties hereto to comply strictly with applicable usury laws, if any; accordingly, notwithstanding any provisions to the contrary in this Agreement or any other documents or instruments executed in connection herewith, in no event shall this Agreement or such documents or instruments require or permit the payment, taking, reserving, receiving, collecting or charging of any sums constituting interest under applicable laws which exceed the maximum amount permitted by such laws.  If any such excess interest is called for, contracted for, charged, paid, taken, reserved, collected or received in connection with the Obligations or in any communication by Lender or any other Person to a Borrower or any other Person, or in the event all or part of the principal of the Obligations or interest thereon shall be

10

prepaid or accelerated, so that under any of such circumstances or under any other circumstance whatsoever the amount of interest contracted for, charged, taken, collected, reserved, or received on the amount of principal actually outstanding from time to time under this Agreement shall exceed the maximum amount of interest permitted by applicable usury laws, if any, then in any such event it is agreed as follows: (i) the provisions of this paragraph shall govern and control, (ii) neither any Borrower nor any other Person now or hereafter liable for the payment of the Obligations shall be obligated to pay the amount of such interest to the extent such interest is in excess of the maximum amount of interest permitted by applicable usury laws, if any, (iii) any such excess which is or has been received notwithstanding this paragraph shall be credited against the then unpaid principal balance hereof or, if the Obligations have been or would be paid in full by such credit, refunded to Borrowers, and (iv) the provisions of this Agreement and the other documents or instruments executed in connection herewith, and any communication to Borrowers, shall immediately be deemed reformed and such excess interest reduced, without the necessity of executing any other document, to the maximum lawful rate allowed under applicable laws as now or hereafter construed by courts having jurisdiction hereof or thereof.   Without limiting the foregoing, all calculations of the rate of interest contracted for, charged, taken, collected, reserved, or received in connection herewith which are made for the purpose of determining whether such rate exceeds the maximum lawful rate shall be made to the extent permitted by applicable laws by amortizing, prorating, allocating and spreading during the period of the full term of the Obligations, including all prior and subsequent renewals and extensions, all interest at any time contracted for, charged, taken, collected, reserved or received.  The terms of this paragraph shall be deemed to be incorporated in every Loan Document and communication relating to the Obligations.

(v)    **Default Rate**.  Upon the occurrence of, and during the continuance of, an Event of Default, Borrowers, as additional compensation to Lender for its increased credit risk, promises to pay interest on all Obligations (including, without limitation, principal, whether or not past due, past due interest and any other amounts past due under this Agreement) at a per annum rate equal to the sum of the rate of interest then specified in this **Section 3(a)** plus the Default Rate Margin (the "**Default Rate**").

(b)    <u>**Interest Payments**</u>.  Interest shall be payable in lawful money of the United States of America to Lender, or as Lender shall direct, without set-off, deduction or counterclaim monthly, in arrears, on the first Business Day of each month, commencing on the first Business Day of the month next succeeding the date hereof.

(c)    <u>**Fees and Charges**</u>.

(i)    **Appraisals**.  To the extent funds are available within the DIP Budget to satisfy such costs and expenses, Borrowers hereby agree to pay Lender, on demand, Lender's reasonable fees, costs and expenses (including any reasonable fees, costs and expenses incurred by any appraiser) in connection with any appraisals of all or any part of the DIP Collateral conducted at the request of Lender; provided, however, that absent an Event of Default, the Borrowers will not have to reimburse Lender for such fees, costs and expenses for more than one (1) appraisal per DIP Collateral category (i.e., separate appraisals may be obtained for inventory and equipment) in any twelve (12) month period (in addition, Borrowers shall be obligated to reimburse Lender for all fees, costs and expenses related to appraisals obtained prior to the date hereof).

(ii)    **Late Fee.**  If any amount due under this Agreement is not received by Lender within five (5) Business Days of the date such amount is due, Borrowers shall pay to Lender a late

11

fee of five percent (5%) of such amount not paid, such late fee to be immediately due and payable by Borrowers without demand by Lender.

(d)      **Expenses.**  In accordance with the Fee Deferment Provision (as defined in the Interim Order) pursuant to Section I(4) of the Interim Order, Lenders are entitled to accrue, as amounts due and owing pursuant to this Credit Agreement, any and all reasonable counsel fees and other expenses incurred by Lender in connection with the preparation, interpretation, enforcement, administration or amendment of this Agreement, or of any documents relating thereto, and any and all expenses, including, but not limited to, a collection charge on all accounts collected, and all other expenses of like or unlike nature which may be expended by Lender to obtain or enforce payment of any account either as against the account debtor, a Borrower, or any guarantor or surety of a Borrower or in the prosecution or defense of any action or concerning any matter growing out of or connected with the subject matter of this Agreement, the Obligations or the DIP Collateral or any of Lender's rights or interests therein or thereto, including, without limiting the generality of the foregoing, any counsel fees or expenses incurred in any bankruptcy or insolvency proceedings and all costs and expenses (including search fees) incurred or paid by Lender in connection with the administration, supervision, protection or realization on any security held by Lender for the debt secured hereby, whether such security was granted by a Debtor or by any other Person primarily or secondarily liable (with or without recourse) with respect to such debt, and all costs and expenses incurred by Lender in connection with the defense, settlement or satisfaction of any action, claim or demand asserted against Lender in connection therewith, which amounts shall be considered advances to protect Lender's security, and shall be secured hereby.

**NOTWITHSTANDING ANYTHING TO THE CONTRARY PROVIDED FOR HEREIN OR IN ANY OTHER LOAN DOCUMENTS, ALL OBLIGATIONS ARISING HEREUNDER OR IN CONNECTION HEREWITH CONSISTING OF (1) INTEREST ON THE TERM LOANS MADE HEREUNDER, (2) COLLECTION DAYS PROVIDED FOR IN SECTION 5(b) HEREOF, (3) ANY EXPENSE REIMBURSEMENT OR INDEMNITY OBLIGATION FOR OR WITH RESPECT TO MATTERS NOT ADDRESSED IN THE DIP BUDGET, SHALL, INSTEAD OF BEING DUE AND PAYABLE ON THE DATE OTHERWISE PROVIDED FOR HEREUNDER AND/OR UNDER ANY APPLICABLE DOCUMENT, BE DEFERRED TO AND INSTEAD BE DUE AND PAYABLE ON THE EARLIEST OF (x) THE MATURITY DATE, (y) ANY PAYMENT IN FULL OF THE POST-PETITION OBLIGATIONS, OR (z) ANY ACCELERATION OF THE POST-PETITION OBLIGATIONS IN ACCORDANCE WITH THE PROVISIONS OF SECTION 10 HEREOF.**

(e)      **Indemnification**. Except to the extent solely caused by Lender's gross negligence or willful misconduct, as finally determined by a court of competent jurisdiction, each Debtor will indemnify and save Lender harmless from all loss, costs, damage, liability or expenses (including, without limitation, court costs and reasonable attorneys' fees) that Lender may sustain or incur by reason of defending or protecting this security interest or the priority thereof or enforcing the Obligations, or in the prosecution or defense of any action or proceeding concerning any matter growing out of or in connection with this Agreement and/or any other documents now or hereafter executed in connection with this Agreement and/or the Obligations and/or the DIP Collateral.  This indemnity shall survive the repayment of the Obligations and the termination of Lender's agreement to make loans available to Borrowers and the termination of this Agreement.

(f)      **Taxes**. At the option of Lender, each Borrower will furnish to Lender, from time to time, within five (5) days after the accrual in accordance with applicable law of any Borrower's obligation to make deposits for F.I.C.A. and withholding taxes and/or sales taxes, proof satisfactory to Lender that such deposits or payments have been made as required.  Should a Borrower fail to make any of such deposits or furnish such proof then Lender may, in its sole and absolute discretion, (i) make any of such deposits or

12

any part thereof, (ii) pay such taxes, or any part thereof, or (iii) set-up such reserves as Lender, in its judgment, shall deem necessary to satisfy the liability for such taxes.  Each amount so deposited or paid shall constitute an advance under the terms hereof, repayable on demand with interest, as provided herein, and secured by all DIP Collateral and any other property at any time pledged by a Borrower with Lender. Nothing herein shall be deemed to obligate Lender to make any such deposit or payment or set-up such reserve and the making of one or more of such deposits or payments or the setting-up of such reserve shall not constitute (i) an agreement on Lender's part to take any further or similar action, or (ii) a waiver of any default by any Borrower under the terms hereof.

4.        **SECURITY.**

        **(a)        Security Interest**.  Subject to the terms and conditions of the Interim Order and the Final Order, to secure the full payment and performance of all of the Obligations, each Debtor, for valuable consideration, receipt whereof is hereby acknowledged, hereby grants to Lender a continuing security interest in and to, and assigns to Lender, all assets of such Debtor, wherever located and whether now owned or hereafter owned, existing, acquired or arising, whether tangible or intangible, wherever now or hereafter located, and whether or not eligible or qualified for lending purposes, including, without limitation, the following: all Pre-Petition Collateral, all accounts, chattel paper, RTO Contracts, documents, software, general intangibles (including without limitation all patents, patent applications, trademarks, trademark applications, trade names, trade secrets, goodwill, copyrights, copyright applications, registrations, licenses, software, franchises, customer lists, tax refund claims (including, without limitation, ERC tax refunds), claims against carriers and shippers, all causes of action, whether pursuant to federal or applicable state law, and the proceeds thereof and property received thereby whether by judgment, settlement, or otherwise, and upon entry of the Final Order, all Avoidance Actions of the Debtors or their Estates; all property and assets of such Debtor and its Estate included in the definition of "DIP Collateral" in the Interim Order, or, after the entry of the Final Order, in the Final Order, guarantee claims, contracts rights, payment intangibles, all security interests, security deposits and rights to indemnification), intellectual property, payment intangibles, instruments, deposit accounts, bank accounts, deposits, money, letters of credit and letter of credit rights, supporting obligations, commercial tort claims, investment property (including, without limitation, any equity interests in its subsidiaries and all economic rights, all control rights, authority and powers and all equity interests in the Boulders Property owned by Ian MacDonald (whether directly or indirectly), inventory, equipment, farm products, health-care-insurance receivables, vehicles, fixtures, books and records, and other goods (as those terms are defined in the Code), any other property of such Debtor now or hereafter in the possession, custody or control of Lender or any agent or any parent, Affiliate or Subsidiary of Lender or any Participant with Lender in the Loans, for any purpose (whether for safekeeping, deposit, collection, custody, pledge, transmission or otherwise), without limitation of any of the foregoing, all of the Pre-Petition Collateral in which any Debtor or its Estate has any right, title, or interest, and all additions, accessions, replacements, substitutions, proceeds and products of all of the foregoing in any form, including, without limitation, all proceeds of credit, fire or other insurance, and also including, without limitation, rents and profits resulting from the temporary use of any of the foregoing (hereinafter called the "**DIP Collateral**").  In addition, (i) all real property, leaseholds, rents and profits, and proceeds thereof, including without limitation Subject RTO Real Property and the Real Property DIP Collateral shall be deemed to be included as part of the DIP Collateral, and (ii) all security interests granted pursuant to the Participation Agreement and the PEC Pledge Agreement shall be deemed to be included as part of shall be deemed to be included as part of the DIP Collateral.

It is the intention of the parties that if Lender shall fail to have a perfected Lien in any particular property or assets of any Debtor for any reason whatsoever, but the provisions of this Agreement and/or of the other Loan Documents, or of the Interim Order and/or the Final Order, together with all financing statements and other public filings relating to Liens filed or recorded by Lender against Debtors, would be sufficient to

13

create a perfected Lien in any property or assets that such Debtor may receive upon the sale, lease, license, exchange, transfer or disposition of such particular property or assets, then all such "proceeds" of such particular property or assets shall be included in the DIP Collateral as original Collateral that is the subject of a direct and original grant of a security interest as provided for herein and in the Loan Documents, and/or in the Interim Order and/or Final Order (and not merely as proceeds (as defined in Article 9 of the Code) in which a security interest is created or arises solely pursuant to Section 9-315 of the Code).

      **(b)**    **Government Contracts**.  If any of a Debtor's accounts arise out of contracts with the United States or any department, agency, or instrumentality thereof, such Debtor will promptly notify Lender thereof in writing and execute any instruments and take any steps reasonably required by Lender in order that all monies due and to become due under such contracts shall be assigned to and enforceable by Lender and notice thereof given to and an acknowledgment given by the applicable contracting officer in accordance with the Federal Assignment of Claims Act.

      **(c)**    **Instruments**.  If any of a Debtor's accounts should be evidenced by promissory notes, trade acceptances, or other instruments for the payment of money, such Debtor will promptly deliver same to Lender, appropriately endorsed to Lender's order and, regardless of the form of such endorsement, such Debtor hereby waives presentment, demand, notice of dishonor, protest and notice of protest and all other notices with respect thereto.

      **(d)**    **Possessory Collateral**.  If any Debtor receives any DIP Collateral and any investment property (as defined in the Code) consisting of certificated securities, such Debtor shall deliver the original thereof to Lender together with an appropriate endorsement or other specific evidence of assignment thereof to Lender (in form and substance reasonably acceptable to Lender).  If an endorsement or assignment of any such items shall not be made for any reason, Lender is hereby irrevocably authorized, as attorney and agent-in-fact (coupled with an interest) for the Debtor, to endorse or assign the same on the Debtor's behalf.

      **(e)**    **Bailee**. If any goods are at any time in the possession of a bailee, Debtors shall promptly notify Lender thereof and, if requested by Lender, shall promptly obtain an acknowledgment from the bailee, in form and substance satisfactory to Lender, that the bailee holds such DIP Collateral for the benefit of the Debtors and Lender and shall act upon the instructions of Lender, without the further consent of any Debtor.  Lender agrees with Debtors that Lender shall not give any such instructions unless an Event of Default has occurred and is continuing or would occur after taking into account any action by a Debtor with respect to the bailee.

      **(f)**    **Letters of Credit**.  If any Debtor is at any time a beneficiary under a letter of credit now or hereafter issued in favor of such Debtor, such Debtor shall promptly notify Lender thereof and, at the request and option of Lender, such Debtor  shall, pursuant to an agreement in form and substance reasonably satisfactory to Lender, either (i) arrange for the issuer and any confirmer of such letter of credit to consent to an assignment to Lender of the proceeds of any drawing under the letter of credit, or (ii) arrange for Lender to become the transferee beneficiary of the letter of credit, with Lender agreeing, in each case, that the proceeds of any drawing under the letter of credit are to be applied in the same manner as any other payment on an account.

      **(g)**    **Commercial Tort Claims**.  If any Debtor  shall at any time hold or acquire a commercial tort claim, such Borrower shall promptly notify Lender in a writing signed by such Debtor of the brief details thereof and grant to Lender in such writing a security interest therein, and in the proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance reasonably satisfactory to Lender.

14

    (h)    **Financing Statements**. Each Debtor hereby irrevocably authorizes Lender at any time and from time to time to file in any Uniform Commercial Code jurisdiction any initial financing statements and amendments thereto that (a) indicate the DIP Collateral (i) as all assets of such Debtor or words of similar effect, regardless of whether any particular asset comprised in the DIP Collateral falls within the scope of Article 9 of the Uniform Commercial Code of such jurisdiction, or (ii) as being of an equal or lesser scope or with greater detail, and (b) contain any other information required by the Uniform Commercial Code for the sufficiency or filing office acceptance of any financing statement or amendment, including (i) whether such Debtor is an organization, the type of organization and any organization identification number issued to such Debtor, and (ii) in the case of a financing statement filed as a fixture filing or indicating DIP Collateral as as-extracted DIP Collateral or timber to be cut, a sufficient description of real property to which the DIP Collateral relates.  Each Debtor agrees to furnish any such information to Lender promptly upon request.  Each Debtor also ratifies its authorization for Lender to have filed in any Uniform Commercial Code jurisdiction any like initial financing statements or amendments thereto if filed prior to the date hereof.

    (i)    **Access**. Each Debtor hereby grants to Lender for a term to commence on the date of this Agreement and continuing thereafter until all debts and Obligations (other than inchoate indemnification or reimbursement obligations or other obligations which, by their terms, survive termination of this Agreement) of any kind or character owing from Borrowers to Lender are fully paid and discharged, the right to use all premises or places of business which any Debtor presently has or may hereafter have and where any of the DIP Collateral may be located, at a total rental for the entire period of $1.00.  Unless and until an Event of Default has occurred and Lender determines to exercise its rights against the DIP Collateral, and subject to the terms and provisions of the Interim Order (or the Final Order, when entered) Lender agrees not to exercise the rights granted in this **Section 4(i)**.

    (j)    **License**. Each Debtor hereby grants to Lender for a term to commence on the date of this Agreement and continuing thereafter until all debts and Obligations (other than inchoate indemnification or reimbursement obligations or other obligations which, by their terms, survive termination of this Agreement) of any kind or character owed to Lender are fully paid and discharged, a non-exclusive irrevocable royalty-free license in connection with Lender's exercise of its rights hereunder, to use, apply or affix any trademark, trade name logo or the like and to use any patents, in which a Debtor now or hereafter has rights, which license may be used by Lender upon and after the occurrence of any one or more of the Events of Default, provided, however, that such use by Lender shall be suspended if such Events of Default are waived.  This license shall be in addition to, and not in lieu of, the inclusion of all of Debtors' trademarks, servicemarks, tradenames, logos, goodwill, patents, franchises and licenses in the DIP Collateral; in addition to the right to use said DIP Collateral as provided in this paragraph, Lender shall have full right to exercise any and all of its other rights regarding DIP Collateral with respect to such trademarks, servicemarks, tradenames, logos, goodwill, patents, franchises and licenses.

    (k)    **Security Interest in the DIP Collateral**.  Subject to the terms and conditions of the Interim Order and the Final Order, to secure the prompt payment and performance to the Post-Petition Lender of the Post-Petition Obligations of whatever kind, nature or description, absolute or contingent, now existing or hereafter arising, Lender shall have and is hereby granted by each Debtor, effective as of the Applicable Petition Date, valid and perfected first priority (subject to the Senior Liens and the Carve-Out), security interests and liens in and upon all pre- and post- petition property of each Debtor, whether existing on the Applicable Petition Date or thereafter acquired including a continuing security interest in and to and Lien on all of its DIP Collateral, whether now owned or existing or hereafter created, acquired or arising and wheresoever located.  Each Debtor shall mark its books and records as may be necessary or appropriate to evidence, protect and perfect Lender's security interest and shall cause its financial statements to reflect such security interest.  Without limiting the generality of the foregoing, as adequate protection and as

15

consideration to Pre-Petition Lender for its agreement to the terms hereof and as replacement Collateral for the Pre-Petition Collateral used, consumed or sold by the Debtors in the Case, the DIP Collateral shall secure the Pre-Petition Obligations to the extent of the diminution in value of the Pre-Petition Collateral.

**(l)** **ERC Funds**.  As security for the Obligations and as adequate protection, immediately upon the entry of the Interim Order, the Obligations (in an amount equal to funds advanced or deemed advanced under the Interim Order) and those Adequate Protection Obligations incurred by Lender exclusively during the period between the entry of the Interim Order and Final Order, are secured by the "ERC Funds" meaning the sum of (i) the initial ERC Funds on hand, estimated at $202,931.58, which amount is net of the portion of the ERC Funds used to pay Debtors professionals a $175,000 retainer before the Buddy Mac Entities, including BMH HR, file chapter 11, plus (ii) the additional ERC Funds received by BMH HR immediately prior to or after the Third Petition Date, in the amount (less commission) of $2,878,514.82. Immediately upon the entry of the Interim Order, Lender shall apply the initial ERC Funds in BMH HR to the Pre-Petition Obligations in accordance with the Settlement Agreement, and BMH HR shall transfer to Lender the remaining ERC Funds, which shall be held by Lender in a segregated, suspense account (the "**Suspense Account**") pending entry of the Final Order. Until entry of the Final Order, the ERC Funds are to be held in the Suspense Account and may not be applied, hypothecated, or charged against by Lender except as specifically and expressly authorized under the Interim Order or by further order of the Bankruptcy Court upon notice to the Debtors and Ian MacDonald.  The Suspense Account, in addition to being segregated for the specific purpose of holding the ERC Funds and identified to the Debtors and Ian MacDonald specifically, shall be established by Lender with Wells Fargo Bank, N.A.  Lender may, only upon the entry of the Final Order, apply the ERC Funds to the Pre-Petition Obligations or DIP Obligations in its sole and absolute discretion (in an amount equal to funds advanced or deemed advanced hereunder and under the Interim Order). At all times after entry of the Interim Order, the ERC Funds shall secure the DIP Obligations, but only to the extent of funds actually advanced, and the Adequate Protection Obligations, but only as to any diminution occurring during the period covered by the Interim Order.

**5.    COLLECTIONS; SET OFF; DEPOSIT ACCOUNTS; NOTICE OF ASSIGNMENT; POWER OF ATTORNEY; LENDER REPORTS.**

**(a)**    **Collections**.  Borrowers will immediately, upon receipt of all checks, drafts, cash and other remittances in payment of any inventory sold or in payment or on account of Borrowers' accounts, contracts, contract rights, notes, bills, drafts, acceptances, general intangibles, choses in action and all other forms of obligations, deposit to the Collection Account accompanied by a remittance report in form reasonably specified by Lender.  Borrowers may deliver said proceeds to Lender in the same form received except for the endorsement of a Borrower where necessary to permit collection of items, which endorsement Borrowers agree to make.

**(b)**    **Application and Collection Days**.

**(i)**    Lender will credit (conditional upon final collection and receipt of the remittance report and identification by the Debtors of such collections) all payments against the Obligations; provided, however, for the purpose of computing interest, any items or payments received by Lender shall not be considered to have been credited against any loans secured hereby until three (3) Business Days after receipt by Lender of any such items.  The order and method of such application to the Obligations shall be in the sole discretion of Lender and any portion of such funds which Lender elects not to so apply shall be paid over from time to time by Lender to Borrowers.

**(ii)**    All repayments received by Lender hereunder shall be applied to either the Pre-Petition Revolver Obligations or the Post-Petition Obligations as Lender may determine in its sole

16

and absolute discretion, so long as such application is in accordance with the authorizations set forth in the Interim Order and (once entered) the Final Order; provided that, amounts charged to the Borrowers' Account by Lender in connection with the coming due of any specific Obligations as provided for in **Section 3(b)** shall be applied by Lender to the payment of such particular Obligation. Following the occurrence and during the continuance of any Event of Default, all repayments received by Lender hereunder shall be applied to either the Pre-Petition Revolver Obligations or the Post-Petition Obligations as Lender may determine in its sole and absolute discretion, so long as such application is in accordance with the authorizations set forth in the Interim Order and (once entered) the Final Order, until the Post-Petition Obligations and the Pre-Petition Revolver Obligations are paid in full and thereafter to such Person as may be legally entitled thereto, provided that, unless Lender shall at any time elect otherwise in its sole and absolute discretion, repayments applied to the Post-Petition Obligations shall be applied, first, to pay the interest and/or principal of all protective advances made pursuant to **Section 1(a)** and/or any other Post-Petition Obligations then owing to Lender and due and payable, all until paid in full, second, to pay the interest and/or principal of all Term Loans and/or any other Obligations then owing to Lender and due and payable, all until paid in full, and, thereafter, to such Person as may be legally entitled thereto.

(iii)    For purposes of **Section 5(b)(ii)** and without limiting the otherwise generally applicable provisions of **Section 13(j)**, "paid in full" of a type of Obligation means indefeasible payment in cash or immediately available funds of all amounts owing on account of such type of Obligation, including interest accrued after the commencement (or any conversion to Chapter 7) of the Case, default interest, interest on interest, and expense reimbursements, irrespective of whether any of the foregoing would be or is allowed or disallowed in whole or in part in any insolvency proceeding.

(c)    <u>Set Off</u>. Each Borrower hereby grants to Lender a lien, security interest and right of setoff as security for all liabilities and Obligations to Lender, whether now existing or hereafter arising, upon and against all deposits, credits, collateral and property, now or hereafter in the possession, custody, safekeeping or control of Lender. At any time, with reasonable prior written notice (which such prior notice, subject to the terms and provisions of the Interim Order (or the Final Order, when entered), is not required to the extent an Event of Default shall have occurred and be continuing), Lender may set off the same or any part thereof and apply the same to any liability or Obligation of a Borrower and any guarantor regardless of the adequacy of any other collateral securing the Obligations. ANY AND ALL RIGHTS TO REQUIRE LENDER TO EXERCISE ITS RIGHTS OR REMEDIES WITH RESPECT TO ANY OTHER DIP COLLATERAL WHICH SECURES THE OBLIGATIONS, PRIOR TO EXERCISING ITS RIGHT OF SETOFF WITH RESPECT TO SUCH DEPOSITS, CREDITS OR OTHER PROPERTY OF A BORROWER OR ANY GUARANTOR, ARE HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVED.

(d)    <u>Deposit Accounts</u>. Each Debtor shall maintain all of its bank accounts, including without limitation, its operating and depository accounts, as described on **Schedule B** (the "**Bank Schedule**") during the Term. Upon fulfillment of the applicable conditions set forth in this Agreement and Lender's determination to make a loan to Borrowers, Lender shall disburse the proceeds of the requested loan by crediting the same to an operating account of a Borrower designated by the Borrowers to receive proceeds of loan advances on the Bank Schedule (the "**Designated Account**"). Each Borrower hereby agrees to maintain the accounts as set forth on the Bank Schedule except for changes consented to in advance by Lender, which any such consent by Lender may be conditioned, among other things, upon receipt of an updated Bank Schedule. Upon the request of Lender, each Borrower shall, and shall cause the respective bank to, enter into and thereafter maintain a control or blocked account agreement with respect to the

17

accounts of such Borrower set forth on the Bank Schedule, such agreement to be in form and substance satisfactory to Lender; provided, that, the provisions of this **Section 5(d)** shall not apply to deposit accounts specially and exclusively used for payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of Borrowers' salaried employees (so long as each such account does not contain amounts in excess of amounts necessary to pay such payroll and related expenses).

(e)    **Account Verification**.  Lender may in its own name or in the name of others communicate with account debtors in order to verify with them to Lender's reasonable satisfaction the existence, amount and terms of any accounts.  Upon request by Lender, Debtors shall provide Lender with a full and complete list of account debtors including contact information with respect to each account debtor and a copy of each RTO Contract.

(f)    **Notice of Assignment**.  Upon request of Lender at any time during the continuance of an Event of Default and subject to the terms and provisions of the Interim Order (or the Final Order, when entered), each Debtor will so notify such account debtors and will indicate on all billings to such account debtors that their accounts must be paid to Lender.  Lender shall have full power to collect, compromise, endorse, sell or otherwise deal with the DIP Collateral or proceeds thereof in its own name or in the name of a Debtor.

(g)    **Power of Attorney**.  Without any further order of the Bankruptcy Court (but subject to the Interim Order (or the Final Order, when entered)), each Debtor hereby grants to Lender an irrevocable power of attorney, coupled with an interest, authorizing and permitting Lender (acting through any of its officers, employees, attorneys or agents), at Lender's option, but without obligation, with or without notice to any Debtor, and at Debtor's expense, to do any or all of the following, in Debtor's name or otherwise:

(i)    execute on behalf of any Debtor any documents that Lender may, in its sole discretion, deem advisable in order to perfect, protect and maintain Lender's security interests, and priority thereof, in the DIP Collateral (including such financing statements and continuation financing statements, and amendments or other modifications thereto, as Lender shall deem necessary or appropriate); and

(ii)    after the occurrence and during the continuance of an Event of Default following entry of the Interim Order; (I) to endorse the name of such Debtor or any of such Debtor's officers or agents upon any notes, checks, drafts, money orders, or other instruments of payment or remittances (including payments payable under any policy of insurance on the DIP Collateral) or DIP Collateral that may come into possession of Lender in full or part payment of any amounts owing to Lender; (II) to sign and endorse the name of such Debtor or any of such Debtor's officers or agents upon any invoice, freight or express bill, bill of lading, storage or warehouse receipts, drafts against Debtors, assignments, verifications and notices (provided that collection notifications shall be subject to **Section 5(f)**) in connection with accounts, and any instrument or documents relating thereto or to such Debtor's rights therein, (III) receive and otherwise take control in any manner of any cash or non-cash items of payment or proceeds of DIP Collateral; (IV) endorse or assign to Lender on Debtor's behalf any portion of DIP Collateral evidenced by an agreement, Instrument or document if an endorsement or assignment of any such items is not made by such Debtor pursuant to **Section 5(a)**; (V) notify account debtors that DIP Collateral has been assigned to Lender and that payments shall be made directly to Lender, (VI) to give written notice to such office and officials of the United States Post Office to effect such change or changes of address so that all mail addressed to such Debtor may be delivered directly to Lender, (VII) instruct any third party having custody or control of any DIP Collateral or books or records belonging to, or relating to, any Debtor to give Lender the same rights of access and other rights with respect thereto as

18

Lender has under this Agreement or any other Loan Document; (VIII) execute on behalf of any Debtor any document exercising, transferring or assigning any option to purchase, sell or otherwise dispose of or lease (as lessor or lessee) any real or personal property which is part of the DIP Collateral or in which Lender has an interest; (IX) execute on behalf of any Debtor any invoices relating to any accounts, any draft against any account debtor, any proof of claim in bankruptcy, any notice of Lien or claim, and any assignment or satisfaction of mechanic's, materialman's or other Lien; (X) execute on behalf of any Debtor any notice to any account debtor; (XI) pay, contest or settle any Lien, charge, encumbrance, security interest and adverse claim in or to any of the DIP Collateral, or any judgment based thereon, or otherwise take any action to terminate or discharge the same; (XII) grant extensions of time to pay, compromise claims relating to, and settle accounts, chattel paper and general intangibles for less than face value and execute all releases and other documents in connection therewith; (XIII) settle and adjust, and give releases of, any insurance claim that relates to any of the DIP Collateral and obtain payment therefor; and (XIV) vote any right or interest with respect to any investment property.

This power of attorney shall be irrevocable as long as a Debtor may be indebted to Lender and does hereby grant upon such Debtor's said attorney full power to do any and all things necessary to be done in and about the premises as fully and effectually as such Debtor might or could do, and hereby ratifying all that said attorney shall lawfully do or cause to be done by virtue hereof. Neither Lender nor the attorney shall be liable for any acts or omissions nor for any error of judgment or mistake, except for their gross negligence or willful misconduct.

(h)    **Viewing Rights**.  Lender shall be provided and thereafter have viewing rights with respect to any bank account maintained by any Debtor.

(i)    **Lender Reports**. After the end of each month, Lender will render to Borrowers a statement of Borrowers' loan account with Lender hereunder, showing all applicable credits and debits, which Lender may distribute by electronic mail, or other electronic means.  Each statement shall be considered correct and to have been accepted by Borrowers and shall be conclusively binding upon Borrowers in respect of all charges, debits and credits of whatsoever nature contained therein under or pursuant to this Agreement, and the closing balance shown therein, unless a Borrower notifies Lender in writing of any discrepancy within twenty (20) days from the delivery by Lender to Borrowers of any such monthly statement.

## 6.    REPRESENTATIONS AND WARRANTIES.

Any request for a loan hereunder will be deemed a representation by the Debtors that all representations and warranties in this **Section 6** are true, correct and complete in all material respects as of the time of the request, unless they relate exclusively to an earlier date in which case they shall be true and correct in all material respects as of such earlier date, and unless they are qualified by materiality in which case they shall be true and correct in all respects.  Each Debtor represents and warrants that:

(a)    **Places of Business; Principal Executive Office; Inventory Locations.**

(i)    Such Debtor has no places of business other than the places of business listed on **Schedule A**, as such **Schedule A** may be updated in accordance with this **Section 6(a)**;

(ii)    Such Debtor's principal executive office and the office where such Debtor keeps its records concerning its accounts, contract rights and other property, is that shown on **Schedule A**;

19

(iii)     All inventory presently owned by a Debtor is stored at the locations set forth on **Schedule A**, as updated in accordance with this **Section 6**; and

(iv)     Each Debtor will notify Lender promptly, and in no event later than thirty (30) days after any such change, in writing, and provide an updated **Schedule A** reflecting the same, of any change in the location of any place of business or the location at which inventory or equipment is stored or the establishment of any new place of business or location at which inventory or equipment is stored or office where its records are kept which would be shown in this Agreement if it were executed after such change.

(b)     **Existence; Qualification**. Each Debtor is a corporation, partnership or limited liability company, as applicable, duly organized or formed, validly existing and in good standing under the laws of their respective States of organization or formation, as applicable as reflected in the preamble of this Agreement and shall hereafter remain in good standing as a corporation or limited liability company, as applicable, in such jurisdiction. Each Debtor is duly qualified and in good standing in every other state in which it is doing business, and shall hereafter remain duly qualified and in good standing in every other state in which the failure to qualify or become licensed could have a material adverse effect on the financial condition, business or operations of a Debtor or the value of any DIP Collateral. The Certificate of Formation/Articles of Incorporation and all amendments thereto of each Debtor have been duly filed and are in proper order.

(c)     **Name; Organizational Identification Number**. Each Debtor's exact legal name is as set forth in this Agreement. The organizational identification number of each Debtor is as set forth on **Schedule A** annexed hereto.

(d)     **Authority; Conflict**. The execution, delivery and performance of this Agreement, and any other document executed in connection herewith, are, subject to the entry of the Interim Order (or the Final Order, when entered) and subject to any restrictions arising on account of the Debtors' status as "debtors" under the Bankruptcy Code, within each Debtor's corporate or company powers, have been duly authorized, are not in contravention of law or the terms of such Debtor's charter, by-laws, operating agreement, or other incorporation or company papers, or of any indenture, agreement or undertaking to which a Debtor is a party or by which it or any of its properties may be bound. Subject to the entry of the Interim Order (or the Final Order, when entered), this Agreement constitutes, and each of the other Loan Documents upon execution and delivery will constitute, the legal, valid and binding obligation of the Borrowers, enforceable against it in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally, by general equitable principles or by principles of good faith and fair dealing (regardless of whether enforcement is sought in equity or at law).

(e)     **Capitalization**. All capital stock, membership interests or other equity interests issued by each Debtor and outstanding were and are properly issued and all books and records of the applicable Debtor, including but not limited to its minute books, by-laws, operating agreements and books of account, are accurate and up to date and will be so maintained.

(f)     **Title; Liens**. Each Debtor owns all of the assets reflected in the most recent of such Debtor's financial statements provided to Lender, except assets sold or otherwise disposed of in the ordinary course of business since the date thereof, and such assets together with any assets acquired since such date, including without limitation the DIP Collateral, are free and clear of any lien, pledge, security interest, charge, adverse right or claim or trust (statutory or otherwise), mortgage or encumbrance of any nature whatsoever, except for Permitted Liens. The Real Property owned by each Debtor and each subsidiary

20

thereof is as set forth on **Schedule A** annexed hereto. Each Debtor's leases of personal property are as set forth on **Schedule C** annexed hereto. Each Debtor is in full compliance with all of the terms of each of its respective capital, operating and real property leases, except where the failure to so comply could not reasonably be expected to have a material adverse effect.

(g)     **Taxes**. Each Debtor has made or filed all tax returns, reports and declarations relating to any material tax liability required by any jurisdiction to which it is subject (any tax liability which may result in a Lien on any DIP Collateral being hereby deemed material);, subject to any prohibition under the Bankruptcy Code with respect to pre-petition claims, but otherwise in accordance with applicable law and if, as, and to the extent contemplated and provided for and permitted in the DIP Budget (subject to Permitted Variances, has paid all taxes shown or determined to be due thereon except those being contested in good faith and which a Debtor has, prior to the date of such contest, identified in writing to Lender as being contested; and has made adequate provision for the payment of all taxes so contested, so that no Lien resulting from unpaid Taxes will encumber any DIP Collateral.

(h)     **Compliance**. Each Debtor (i) is subject to no charter, corporate or other legal restriction, or any judgment, award, decree, order, governmental rule or regulation or contractual restriction which would reasonably be expected to have a material adverse effect on its financial condition, business or operations, and (ii) is in compliance with its charter documents, by-laws or operating agreement, all material contractual requirements by which it or any of its properties may be bound and all applicable laws, rules and regulations (including without limitation those relating to environmental protection) other than laws, rules or regulations the validity or applicability of which it is contesting in good faith or provisions of any of the foregoing the failure to comply with which cannot reasonably be expected to materially adversely affect its financial condition, business or operations or the value of any DIP Collateral.

(i)     **Litigation**. Except for the Case, there is no action, suit, proceeding, or to any Debtor's knowledge, investigation pending or, threatened against or affecting it or any of its assets before or by any court or other governmental authority which, if determined adversely to it, would have a material adverse effect on its financial condition, business or operations or the value of any DIP Collateral.

(j)     **ERISA**. Each Debtor is in compliance with ERISA in all material respects; no Reportable Event has occurred and is continuing with respect to any Plan; and no Debtor has an unfunded vested liability under any Plan. The word "**Plan**" as used in this Agreement means "employee benefit plan" (as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974 ("**ERISA**")) to which any Debtor or any ERISA Affiliate (a) is (currently or hereafter), or at any time during the immediately preceding six (6) years has, sponsored, maintained or contributed to on behalf of any of its employees or (b) has (currently or hereafter), or has had at any time within the preceding six (6) years, any liability (contingent or otherwise).

(k)     **OFAC; Sanctions; Anti-Corruption Laws; Anti-Money Laundering Laws; Anti-Terrorism Laws**.

(i)     No Debtor nor any of its Subsidiaries is in violation of any Sanctions. No Debtor nor any of its Subsidiaries nor, to the knowledge of such Debtor, any director, officer, employee, agent or Affiliate of such Debtor or such Subsidiary (a) is a Sanctioned Person or a Sanctioned Entity, (b) has any assets located in Sanctioned Entities, or (c) derives revenues from investments in, or transactions with Sanctioned Persons or Sanctioned Entities. Each of the Debtors and its Subsidiaries has implemented and maintains in effect policies and procedures reasonably designed to ensure compliance with Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws. Each of the Debtors and its Subsidiaries, and to the knowledge of each such Debtor, each director,

21

officer, employee, agent and Affiliate of each such Debtor and each such Subsidiary, is in compliance with all Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws. No proceeds of any loan made hereunder will be used to fund any operations in, finance any investments or activities in, or make any payments to, a Sanctioned Person or a Sanctioned Entity, or otherwise used in any manner that would result in a violation of any Sanction, Anti-Corruption Law or Anti-Money Laundering Law by any Person (including Lender or other individual or entity participating in any transaction).

(ii)    To the extent applicable, each Debtor and each of its Subsidiaries are in compliance with applicable Anti-Terrorism Laws.

**(l)**    **Debt**. Except for the Debt to Lender to be outstanding following the date hereof, the Debt of the Debtors that will be outstanding immediately following the Applicable Petition Date has been disclosed in writing to Lender and shall be further disclosed in writing from time to time thereafter.

**(m)**    **Intellectual Property**. For purposes of this Agreement, "**Intellectual Property Rights**" **means** all actual or prospective rights and goodwill associated therewith arising in connection with any intellectual property or other proprietary rights, including all rights arising in connection with copyrights, patents, industrial designs, service marks, trade dress, trade secrets, trademarks, trade names or mask works.

(i)    Set forth on **Schedule F** annexed hereto is a complete list of all patents, industrial designs, applications for patents, trademarks, applications to register trademarks, service marks, applications to register service marks, mask works, trade dress and copyrights for which each Debtor is the owner of record (the "**Owned Intellectual Property**").

(ii)    Except as set forth on **Schedule F** annexed hereto and other than (in the case of each of the following) as a result of the Case and subject to any necessary order or authorization of the Bankruptcy Court, (A) the Debtors own the Owned Intellectual Property free and clear of all restrictions (including covenants not to sue any Person), court orders, injunctions, decrees, writs or Liens (other than Permitted Liens), whether by agreement memorialized in a record authenticated by a Borrower or otherwise, (B) no Person other than the Debtors owns or has been granted any right in the Owned Intellectual Property (other than rights that have been subordinated or disclosed to Lender in writing, in each case, on terms acceptable to Lender in its reasonable discretion), (C) all Owned Intellectual Property is valid, subsisting and enforceable, and (D) the Debtors have taken all commercially reasonable action necessary to maintain and protect the Owned Intellectual Property.

(iii)    Set forth on **Schedule F** annexed hereto is a complete list of all agreements under which a Debtor has licensed Intellectual Property Rights from another Person ("**Licensed Intellectual Property**") other than readily available, non-negotiated licenses of computer software and other intellectual property used solely for performing accounting, word processing and similar administrative tasks ("**Off-the-shelf Software**") and a summary of any ongoing payments any Debtor is obligated to make with respect thereto. Except as set forth on **Schedule F** annexed hereto, other than (in the case of each of the following) as a result of the Case and subject to any necessary order or authorization of the Bankruptcy Court, the Debtors' licenses to use the Licensed Intellectual Property, copies of which have been given to Lender, are free and clear of all restrictions, Liens, court orders, injunctions, decrees, or writs. Except as disclosed in **Schedule F** annexed hereto, no Debtor is contractually obligated to make royalty payments of a material nature, or pay fees to any owner of, licensor of, or other claimant to, any Intellectual Property Rights.

22

(iv)    Except for Off-the-shelf Software and as disclosed on **Schedule F** annexed hereto, the Owned Intellectual Property and the Licensed Intellectual Property constitute all Intellectual Property Rights used or necessary to conduct each Borrower's business as it is presently conducted.

(v)    Except as disclosed on **Schedule F** annexed hereto, no Debtor has knowledge of, and has not received notice either orally or in writing alleging, any infringement of another Person's Intellectual Property Rights (including any claim set forth in writing that a Debtor must license or refrain from using the Intellectual Property Rights of any Person) nor, to any Debtor's knowledge, is there any threatened claim or any reasonable basis for any such claim.

(n)    [**Reserved**].

(o)    **Environmental Condition**.  (i) To each Debtor's knowledge, no Debtor's nor any of its Subsidiaries' properties or assets has ever been used by a Debtor, its Subsidiaries, or by previous owners or operators in the disposal of, or to produce, store, handle, treat, release, or transport, any Hazardous Substances, where such disposal, production, storage, handling, treatment, release or transport was in violation, in any material respect, of any applicable Environmental Law, (ii) to each Debtor's knowledge, no Debtor's nor any of its Subsidiaries' properties or assets has ever been designated or identified in any manner pursuant to any environmental protection statute as a Hazardous Substances disposal site, (iii) no Debtor nor any of its Subsidiaries has received notice that a Lien arising under any Environmental Law has attached to any revenues or to any real property and improvements owned or operated by a Debtor or its Subsidiaries, and (iv) no Debtor nor any of its Subsidiaries nor any of their respective facilities or operations is subject to any outstanding written order, consent decree, or settlement agreement with any Person relating to any Environmental Law or environmental related liabilities that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.

(p)    **Affiliates of Borrower**.  No Affiliate of any Borrower (excluding foreign Affiliates) is currently engaged in any business activities competitive to the business activities or prospects of such Borrower as currently conducted or contemplated, or otherwise is engaged in activities similar to the business of such Borrower as currently conducted or contemplated.

(q)    **DIP Budget**.  The DIP Budget was prepared in good faith by the Debtors in consultation with Lender and its advisors and is based upon assumptions which, as of the date of delivery thereof, the Debtors believe provide a reasonable basis for the projections contained therein and reflect the Debtors' reasonable judgment based on present circumstances of the most likely set of conditions and course of action for the projected period (it being recognized that such projections are not to be viewed as facts and are subject to significant uncertainties and contingencies many of which are beyond the control of the Debtors, that no assurance can be given that any particular financial projections will be realized, that actual results may differ from projected results and that such differences may be material).

(r)    **Submissions to Lender**.  All financial and other information submitted to Lender by or on behalf of the Debtors, including without limitation submissions and advance requests made through Lender's electronic client portal, was true and correct in all material respects when submitted or requested and, as to projections, valuations or proforma financial statements, present a good faith opinion as to such projections, valuations and proforma condition and results.

(s)    **Accounts**.

(i)    [Reserved].

23

    **(ii)**    With respect to all Accounts, all such Accounts are genuine and in all respects what they purport to be, arise out of a completed, bona fide and unconditional and non-contingent sale and delivery of goods or rendition of services by the applicable Debtor in the ordinary course of its business and in accordance with the terms and conditions of all purchase orders, contracts or other documents relating thereto, each Account Debtor thereunder had the capacity to contract at the time any contract or other document giving rise to such Accounts were executed, and the transactions giving rise to such Accounts comply with all applicable laws and governmental rules and regulations.

    **(t)**    **Equipment.**  The Equipment of each Debtor is in good operating condition and repair, and all necessary replacements of and repairs thereto were or are in the processes of being made so that the operating efficiency thereof shall be maintained and preserved within reasonable time frames, reasonable wear and tear excepted.

**7.**    **AFFIRMATIVE COVENANTS.**

    **(a)**    **Insurance**. Each Debtor agrees to keep all the DIP Collateral insured with coverage and in amounts not less than that usually carried by one engaged in a like business and in any event not less than that reasonably required by Lender (with loss payable to Lender (including as a Lender loss payee as to any and all property coverages) and Borrowers, as their interests may appear, hereby appointing Lender as attorney for Borrowers in obtaining, adjusting, settling and canceling such insurance and endorsing any drafts. As further assurance for the payment and performance of the Obligations, each Debtor hereby assigns to Lender all sums, including returns of unearned premiums, which may become payable under any policy of insurance on the DIP Collateral and each Borrower hereby directs each insurance company issuing any such policy to make payment of such sums directly to Lender. Without limiting the generality of the foregoing, to the extent any Borrower maintains any credit insurance policies in respect of any accounts or account debtors, then such Borrower shall cause such policies to be collaterally assigned to Lender, as security for the Obligations, pursuant to assignments in form and substance reasonably satisfactory to Lender.

    **(b)**    **Books and Records**. Each Debtor will at all times keep accurate and complete records of such Debtor's inventory, accounts and other DIP Collateral.

    **(c)**    **Field Examinations.** Lender, or any of its agents, shall have the right to call at Borrowers' or any other Debtors' place or places of business at intervals to be determined by Lender, following reasonable prior written notice (which such prior notice is not required to the extent an Event of Default shall have occurred and be continuing), and without hindrance or delay, to inspect, audit, check, and make extracts from any copies of the books, records, journals, orders, receipts, correspondence which relate to Borrowers' accounts, and other DIP Collateral or other transactions, between the parties thereto and the general financial condition of Borrowers and the other Debtors and Lender may remove any of such records temporarily for the purpose of having copies made thereof; provided, however, that unless an Event of Default shall have occurred and be continuing, Lender shall not conduct more than four (4) such inspections or audits in any twelve (12) month period.

    **(d)**    **Existence and Good Standing**. Each Debtor will maintain its corporate/company existence in good standing and comply in all material respects with all laws and regulations of the United States or of any state or states thereof or of any political subdivision thereof, or of any governmental authority which may be applicable to it or to its business.

(e)    **Taxes**. Each Borrower and each Debtor will pay, at such times and in such manner as to prevent any penalty from accruing or any Lien arising (other than Permitted Liens) or charge from attaching to its property, all real and personal property taxes, assessments and charges and all franchises, income, unemployment, old age benefits, withholding, sales, goods and services, harmonized sales and other taxes assessed (i) against it or upon the DIP Collateral, or (ii) for its use or operation (unless a Borrower is challenging such tax or assessment pursuant to a Permitted Protest pursuant to **Section 9(b)** hereof), or (iii) upon this Agreement, or upon any note or notes evidencing the Obligations, and will, at the request of Lender, promptly furnish Lender the receipted bills therefor. At its option, to the extent that a default or an Event of Default shall have occurred and be continuing, Lender may discharge taxes, liens or security interests or other encumbrances at any time levied or placed on the DIP Collateral, may pay for insurance on the DIP Collateral and may pay for the maintenance and preservation of the DIP Collateral. Each Debtor agrees to reimburse Lender on demand for any payments made, or any expenses incurred by Lender pursuant to the foregoing authorization, and upon failure of any Debtor so to reimburse Lender, any such sums paid or advanced by Lender shall be deemed secured by the DIP Collateral and constitute part of the Obligations.

(f)    **Hazardous Substances**. Each Debtor will immediately notify Lender upon receipt of notification of any potential or known material release or threat of material release of any Hazardous Substances in violation of any Environmental Law.

(g)    **OFAC; Sanctions; Anti-Corruption Laws; Anti-Money Laundering Laws; Anti-Terrorism Laws.**

(i)    Each Debtor will, and will cause each of its Subsidiaries to, comply with all applicable Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws. Each of the Debtors and its Subsidiaries shall implement and maintain in effect policies and procedures reasonably designed to ensure compliance by the Debtors and their Subsidiaries and their respective directors, officers, employees, agents and Affiliates with Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws.

(ii)    Each Debtor will, and will cause each of its Subsidiaries to, to the extent the same are applicable to such Person, comply with any Anti-Terrorism Laws.

(h)    **Use of Proceeds**. Borrowers shall use or direct the use of proceeds of the Term Loans made by Lender hereunder and the Cash Collateral, in accordance with the terms of the Final Order, or, prior to the entry of the Final Order, the Interim Order and the Loan Documents, and as limited by the Approved Budget, for, inter alia: (a) the purchase of inventory by Lender on behalf of the Debtors (for the avoidance of doubt, pursuant to the Approved Budget, the interim draw of $750,000 shall be used on account of inventory purchases), (b) general operating, corporate, and working capital purposes of the Debtors in the ordinary course of business, exclusive of the inventory purchases by Lender; (c) reasonable and documented costs, fees, and other expenses of Lender; (d) Adequate Protection Payments; (e) approved fees and expenses of the Debtors' and Committees' professionals; and (f) upon entry of the Final Order, the Roll-Up Amount shall be used for the Roll-Up, which amount shall include any post-petition advance that has been made by Lender to the Debtors since the First Petition Date, and will be made by the Lender to the Debtors under this Agreement following the entry of the Interim Order, in each case under the foregoing clauses (a) through (f): (i) to the extent such use of proceeds is not otherwise prohibited under the terms of this Agreement (including that no part of the proceeds of the loans made to Debtors will be used to purchase or carry any such Margin Stock or to extend credit to others for the purpose of purchasing or carrying any such Margin Stock or for any purpose that violates the provisions of Regulation T, U or X of the Board of Governors) and (ii) if, as, and to the extent contemplated and provided for and permitted in the DIP Budget

25

(subject to Permitted Variances). No part of the proceeds of any loan will be used, directly or indirectly, in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws, Anti-Money Laundering Laws or Anti-Terrorism Laws.

Notwithstanding anything herein to the contrary, Debtors hereby authorize Lender to purchase inventory on behalf of the Debtors and to buy inventory that the Debtors have identified as being needed for each store, and at the prices that the Debtors have negotiated, and by virtue of the inventory purchase which shall be deemed Loans pursuant to **Section 1** hereof, Lender shall not be deemed to be in control of the Debtors.

(i)    **Material Contracts**. Each Borrower will at all times pay rent on or before the due date thereof under its leases that are Material Contracts.

(j)    **Additional Assurances**.  Each Debtor will, at its expense, upon request of Lender promptly and duly take, execute, acknowledge and deliver (and/or cause such other applicable Person to take, execute, acknowledge and deliver) all such further acts, documents, agreements and instruments as may from time to time be necessary or desirable or as Lender may from time to time reasonably require in order to (i) correct any defect, error or omission which may at any time be discovered, (ii) carry out the intent and purposes of the Loan Documents and the transactions contemplated thereby, (iii) establish, create, preserve, protect and perfect a first priority lien (subject only to Permitted Liens) in favor of Lender in all real and personal property (wherever located) from time to time owned by the Debtor and in all capital stock and other equity from time to time owned by any Debtor, (iv) cause each subsidiary of a Debtor to guarantee all of the Obligations, all pursuant to documentation that is in form and substance reasonably satisfactory to Lender, and (v) facilitate the collection of the DIP Collateral.  Without limiting the foregoing, each Debtor shall, at its own cost and expense, promptly and duly take, execute, acknowledge and deliver (and/or cause such other applicable Person to take, execute, acknowledge and deliver) to Lender all promissory notes, security agreements, agreements with landlords, mortgagees and processors and other bailees, subordination and intercreditor agreements and other agreements, instruments and documents, in each case in form and substance reasonably acceptable to Lender, as Lender may request from time to time to perfect, protect, and maintain Lender's security interests in the DIP Collateral, including the required priority thereof, and to fully carry out the transactions contemplated by the Loan Documents.

(k)    **Milestones**.  Each Debtor shall comply with all Milestones.

(l)    **Participation Agreement and PEC Pledge Agreement**.  Immediately upon entry of the Final Order or a court order authorizing the Settlement Agreement, as the case may be, to the extent applicable, (i) Ian MacDonald and MacDonald Realty Group LLC shall grant to Lender a participation in their rights in respect of the advances made to, and in respect of their equity in, MRG Boulders (collectively, the "**Subject Boulders Interest**") to accommodate and support the Pre-Petition Obligations, the DIP Obligations, and the Adequate Protection Obligations (each as defined in the Interim Order and the Final Order, as applicable), which grant shall be made and documented by a participation agreement (the "Participation Agreement") and other related documents, agreements, and instruments to be entered into upon entry of the Final DIP Order, all of which shall be in form and substance satisfactory to Lender in its sole discretion; and (ii) William Ian MacDonald shall grant to Lender a lien on, and security interest in, all of his unencumbered limited partner interests (the "**PEC LP Interests**") in P.E.C. Finance Ltd. to accommodate and support the Pre-Petition Obligations, the DIP Obligations, and Adequate Protection Obligations (each as defined in the Interim Order and the Final Order, as applicable), which grant shall be made and documented by a pledge agreement (the "**PEC Pledge Agreement**") and

26

other related documents, agreements, and instruments to be entered into upon entry of the Final DIP Order, all of which shall be in form and substance satisfactory to Lender in its sole discretion.

**(m)** **DIP Budgetary Compliance**.  Debtors:

**(i)** shall not permit the actual cash disbursements for all Debtors, tested as of the last business day of each week (beginning with the week in which the Applicable Petition Date occurs) for the cumulative period beginning with the week in which the Applicable Petition Date occurs and ending on such testing date, to exceed one hundred ten percent (110%) of the aggregate cash disbursements for all Debtors projected in the DIP Budget for such period (provided, however, that in Lender's reasonable discretion and without court order, approval of, or notice to, any other Persons, Lender may increase such percentage up to one hundred fifteen percent (115%)) of the projected disbursements in the DIP Budget for such period); provided that, notwithstanding anything to the contrary in the foregoing:

**(A)** during any applicable testing period, the Debtors may reallocate the amounts of any disbursements permitted under any one or more particular line item categories of the DIP Budget but not so spent/dispersed by the Debtors under such line item categories to any one or more other line item categories during the same testing period, except that:

i) no amounts may be reallocated from any line item category of the DIP Budget that does not cover Non-Allocable Disbursements to any line item categories that do cover Non-Allocable Disbursements and

ii) without the prior consent of Lender grated in its sole and absolute discretion, no amounts may be relocated to any "miscellaneous" line item category of the DIP Budget from any other line item categories;

(the ability of the Debtors' to exceed the limitations on cash disbursements during any applicable testing period by up to 10% (or, with the approval of Lender granted in reasonable discretion, 15%) and the limited ability of Debtors to reallocate unspent amounts from one or more line item categories in any applicable testing period to one or more other line item categories in the same testing period, all as and to the extent provided for in this **Section 7(m)**, collectively, the "**Permitted Variances**").

**(ii)** shall not permit the actual cash receipts (including without limitation, all collections on Accounts and all other proceeds of DIP Collateral) of all Debtors, tested as of the last business day of each week (beginning with the week in which the Applicable Petition Date occurs) for the cumulative period beginning with the week in which the Applicable Petition Date occurs and ending on such testing date, to be less than ninety (90%) of the aggregate cash receipts for all Debtors projected in the DIP Budget for such period (provided, however, that in Lender's sole and absolute discretion and without court order, approval of, or notice to, any other Persons, Lender may decrease such percentage down to eighty five percent (85%)).

**(n)** **Retention of Consultant by Debtors**.  Debtors engaged and retained Mark Shapiro of GlassRatner Capital and Advisory Group LLC (the "**Consultant**") for the purposes of, among other things, finding a buyer to purchase all or substantially all of the assets and properties of the Debtors in the U.S., including the DIP Collateral under Section 363 of the Bankruptcy Code and assisting the Debtors in their

27

chapter 11 Case, including the preparation of the DIP Budget. Subject to the protection of applicable privileges, Debtors hereby (i) authorize any and all of the officers or other representative of Lender (and its employees, officers, partners, and directors), to communicate directly with the Consultant (and such employees, officers, partners, and directors of any such firm of the Consultant) to discuss the affairs, finances, condition, and compliance with the terms of this Agreement and other Loan Documents of each of the Debtors and their Subsidiaries and joint ventures and (ii) authorize the Consultant (and such employees, officers, partners, and directors of any such firm of the Consultant) to engage in such communications directly with Lender (and its employees, officers, partners, and directors), and agree that Debtors shall cause the Consultant to cooperate with Lender (and its employees, officers, partners, and directors), in all such communications and respond to all requests of Lender (and its employees, officers, partners, and directors) and keep Lender fully informed of the progress of the business and operations of Debtors and respond fully to any inquiries of Lender regarding the business and operations of Debtors. Debtors shall not terminate the Consultant without the consent of Lender unless they deem it necessary to the fulfillment of their fiduciary duties to their estate or because conflicts preclude continued engagement. If the Consultant resigns, Debtors shall immediately notify Lender in writing and provide Lender with a copy of any notice of resignation immediately upon the sending of such notice by the Consultant.

8.   **REPORTING.**

(a)   **Financial Reporting**. The Debtors shall deliver or cause to be delivered to Lender, each to be in form, scope and substance satisfactory to Lender:

(i)   monthly financial reporting consistent with prepetition Loan Documents by and between Phonix and Debtors; financial reporting required of Debtors by Existing Reporting Orders, or any other order of the Bankruptcy Court, including the Interim Order and Final Order; and other monthly financial reporting reasonably requested by Lender of Borrower, and where applicable and reasonably requested, containing a certification by such chief financial officer as to the statements being accurate and fairly presenting the financial condition of the Debtors and a certification to the effect that such officer has not become aware of any Event of Default that has occurred and is continuing or, if there is any such event, describing it and the steps, if any, being taken in response thereto or to otherwise remediate it.

(b)   **DIP Collateral Reporting**. The Debtors shall deliver or cause to be delivered to Lender, each to be in form, scope and substance satisfactory to Lender:

(i)   monthly collateral reporting consistent with prepetition Loan Documents by and between Phonix and Debtors; monthly collateral reporting required of Debtors by any Existing Reporting Orders, or any other order of the Bankruptcy Court, including the Interim Order and Final Order; and other monthly collateral reporting reasonably requested by Lender of Borrower;

(ii)   within ten (10) days of the close of each month, and to the extent produced in the ordinary course of Borrowers' business: (a) a reconciliation of Borrowers' accounts receivable aging to its general ledger, a reconciliation of Borrowers' unbilled accounts receivable, and Lender's collateral statement of accounts, (b) a reconciliation of accounts payable aging to its general ledger, and (c) in each case a roll forward from the previous report, in form, scope and substance satisfactory to Lender;

28

      (iii)      monthly loan and collateral descriptions, including, without limitation, Borrowers' sales, cash receipts, adjustments, in the form supplied by Lender to Borrowers;

      (iv)      as of the date of this Agreement and within ten (10) days of the close of each month thereafter or more frequently as may be requested by Lender, Borrowers' detailed inventory stock status report and a reconciliation of such stock status report to its general ledger in form, scope and substance satisfactory to Lender;

**(c)**      **DIP Budgetary Reporting.**

      (i)      Beginning on January 28, 2026, and continuing on each Wednesday thereafter, Debtors shall deliver to Lender a certificate of the chief financial officer of the Debtors or their Financial Advisor setting forth (x) a weekly cash flow analysis comparing the prior week's actual cash disbursements and cash receipts for all Debtors to the projected cash disbursements and cash receipts for all Debtors projected for such week in the DIP Budget, in a form and format and with a scope and level of detail acceptable to Lender in its discretion and (y) demonstrating Debtors' compliance with (or failure to comply with) the covenants set forth in **Section 7(m)** hereof.

      (ii)      Debtors may, at any time and from time to time, but no more than twice during the term of this Agreement, deliver to Lender a proposed revised and updated DIP Budget for the period beginning with the week that begins no less than five (5) Business Days after the delivery thereof (or such earlier week as to which Lender shall consent in its sole and absolute discretion ) through the Maturity Date, which shall be in substantially the same form and detail of the Initial DIP Budget, and accompanied by a certificate signed by the chief financial officer of the Debtors to the effect that such DIP Budget has been prepared in good faith by the chief financial officer of the Debtors and based upon assumptions which provide a reasonable basis for the projections contained therein and reflect the Debtors' reasonable judgment based on present circumstances of the most likely set of conditions and course of action for the projected period and that such officer has no reason to question the reasonableness of any material assumptions on which such projections were prepared. Upon receipt of each such proposed updated DIP Budget, Lender shall review the same, and if, following a reasonable opportunity to review and comment thereon, Lender in its sole and absolute discretion shall give its written approval to such proposed updated DIP Budget, it shall become the "DIP Budget" as defined and for all purposes hereunder and under the Interim Order and (upon entry of the Final Order) the Final Order effective as of the first day of the first week covered thereby.

      **(d)**      **Case Reporting**. Debtors will deliver to Lender: (a) substantially contemporaneous with the filing thereof, copies of all pleadings, motions, applications, financial information and other papers and documents filed by the Debtors in the Case, with copies of such papers and documents also provided to or served on Lender's counsel; (b) substantially contemporaneous with the receipt and/or execution thereof, copies of all letters of intent, expressions of interest, and offers to purchase with respect to any of the Collateral; (c) substantially contemporaneously with delivery thereof to the Committee or any other official or unofficial committee in the Case, copies of all material written reports and all term sheets for a Reorganization Plan or any sale under Section 363 of the Bankruptcy Code given by the Debtors to the Committee or any other official or unofficial committee in the Case, with copies of such reports and term sheets also provided to or served on Lender's counsel; and (d) projections, operating plans and other financial information and information, reports or statements regarding the Debtors, their business and the Collateral as Lender may from time to time reasonably request.

29

      **(e)**     <u>**Other Reporting and Notifications**</u>. The Debtors shall deliver or cause to be delivered to Lender, each to be in form, scope and substance satisfactory to Lender:

      **(i)**     within ten (10) days after any Debtor's receipt, any management letter prepared by the Debtors' independent auditors;

      **(ii)**     contemporaneously with the delivery to shareholders or governmental agencies, copies of all material reports and information delivered to shareholders or filed with governmental agencies or that otherwise pertain to, or affect, the Loan Documents;

      **(iii)**     within ten (10) days following the end of each fiscal month, copies of all bank account statements and reconciliations for all bank accounts maintained by any Debtors and a schedule of all bank accounts of any Debtors;

      **(iv)**     promptly upon Lender's written request, a schedule of Debt of the Debtors outstanding as of such fiscal quarter end;

      **(v)**     as of the date of this Agreement and thereafter upon the request by Lender, a detailed master customer list;

      **(vi)**     promptly upon Lender's written request, such other information about the financial condition and operations of any Borrower or any Guarantor, as Lender may, from time to time, reasonably request;

      **(vii)**     promptly upon becoming aware such change in circumstance, written notification to Lender of any change in circumstance that would affect the accuracy of any representation or warranty in **Section 6** hereof, unless the representation and warranty specifically relates to an earlier date;

      **(viii)**     promptly upon becoming aware such event or circumstance, written notification to Lender of any breach or non-performance of, or any default under (A) any Material Contract or (B) any contractual obligation of any Debtor, or any violation of, or non-compliance with, any applicable law, which, in the case of this clause (B) would reasonably be expected to result, either individually or in the aggregate, in a material adverse effect, and including, in the case of clauses (A) and (B), a description of such breach, non-performance, default, violation or non-compliance and the steps, if any, such Debtor has taken, is taking or proposes to take in respect thereof;

      **(ix)**     promptly upon becoming aware such event or circumstance, written notification to Lender of any cancellation or material change in any insurance maintained by any Debtor;

      **(x)**     promptly upon becoming aware such event or circumstance, written notification to Lender of any "default" or "event of default" under any Debt of a Debtor from Lender other than Lender;

      **(xi)**     promptly of: (A) any material delay in any Debtor's performance of any of its material obligations to any account debtor or the assertion of any claims, offsets, defenses or counterclaims by any account debtor, or any disputes with account debtors, or any settlement, adjustment or compromise thereof, and (B) all material adverse information relating to the financial condition of any account debtor;

30

(xii)    Promptly upon becoming aware of any sale contemplated in accordance with the Milestones; and

(xiii)    promptly upon becoming aware of any Event of Default, or the occurrence or existence of an event which, with the passage of time or the giving of notice or both, would constitute an Event of Default hereunder, notice thereof in writing.

(f)    All information regarding sales, cash receipts, accounts and inventory shall be transmitted to Lender electronically, in acceptable formats (files with extensions *.prn, *.pdf, *.txt, *.xls, *.xlsx, and other electronic readable formats are acceptable; scanned copies are not acceptable), either transmitted to Lender via internet or e-mail.  In the event that Borrowers fail to report such information to Lender electronically, Lender reserves the right, in its sole discretion, to charge Borrowers a monthly fee in an amount necessary to cover the costs of the manual input of such data by Lender.

(g)    For the avoidance of doubt, the foregoing requirements are without limitation of the obligations of the Debtors to provide reporting, notices, or other information or cooperation to Lender set forth in any Existing Reporting Orders, which obligations shall (i) survive entry of the Interim Order or any Final Order and (ii) constitute obligations of the Debtors under this Agreement, the breach of which shall constitute an Event of Default.

9.    **NEGATIVE COVENANTS.**

No Debtor will at any time:

(a)    **Disposition of DIP Collateral**. sell, assign, exchange or otherwise dispose of any of the DIP Collateral, other than (I) inventory consisting of (i) scrap, waste, defective goods and the like; (ii) obsolete goods; (iii) finished goods sold in the ordinary course of business or any interest therein to any individual, partnership, trust or other corporation, provided that such sale in the ordinary course of business shall not include a transfer in total or partial satisfaction of a debt; (II) equipment which is no longer required or obsolete or deemed necessary for the conduct of such Debtor's business, so long as such Debtor receives therefor a sum substantially equal to such equipment's fair value, remits such sum to Lender in accordance with the terms of this Agreement or replaces such equipment with other equipment of similar value which is subject to a first security interest in Lender's favor, (III)  Restricted Payments to the extent expressly permitted hereunder; and (IV) any discount, other compromise or sale for less than the face value of receivables (or notes accepted to evidence same) in order to resolve disputes that occur in the ordinary course of business, provided that the aggregate amount of any such discount or compromise does not exceed ten percent of the face amount of the applicable receivable and the sale price of any such receivable is not less than ninety percent of the face amount of such receivable;

(b)    **Liens**. create, permit to be created or suffer to exist any lien, encumbrance, adverse right or claim or deemed trust, or security interest of any kind ("**Lien**") upon any of the DIP Collateral or any other property of such Debtor, now owned or hereafter acquired, except:

(I) with respect to the DIP Collateral that is not Real Property DIP Collateral:

(i)    landlords', carriers', warehousemen's, mechanics' and other similar liens arising by operation of law in the ordinary course of such Debtor's business;

31

(ii)    Liens arising out of pledge or deposits under worker's compensation, unemployment insurance, old age pension, social security, retirement benefits or other similar legislation;

(iii)    purchase money Liens arising in the ordinary course of business for the purchase of equipment so long as the Debt secured thereby does not exceed the lesser of the cost or fair market value of the property subject thereto, and such Lien extends to no other property, and the amount of the Debt secured thereby does not exceed the amount outstanding prior to the Closing Date at any time;

(iv)    Liens for unpaid taxes that are either (x) not yet due and payable, or (y) are subject of Permitted Protests and to the extent contemplated and provided for and permitted in the DIP Budget (subject to Permitted Variances);

(v)    Liens which are the subject of Permitted Protests and to the extent contemplated and provided for and permitted in the DIP Budget (subject to Permitted Variances);

(vi)    rights of setoff or bankers' liens upon deposits of cash in favor of banks or other depository institutions, solely to the extent incurred in connection with the maintenance of such deposit accounts in the ordinary course of business and to the extent contemplated and provided for and permitted in the DIP Budget (subject to Permitted Variances);

(vii)    the Liens (if any) listed on **Schedule E** annexed hereto or those leases of personal property set forth on **Schedule C** annexed hereto;

(viii)    Liens in favor of Lender and Pre-Petition Lender; and

(II) with respect to the Real Property DIP Collateral, Liens permitted pursuant to the terms of the respective Mortgage applicable to such Real Property DIP Collateral.

The term "**Permitted Protests**" as used herein means the right of a Debtor to protest any Lien (other than a Lien that secures the Obligations), taxes (other than payroll taxes or taxes that are the subject of a federal tax lien) or rental payment, provided that (x) the Debtor has disclosed the related Lien to Lender, (y) any such protest is instituted and diligently prosecuted by such Debtor in good faith, and (z) Lender is reasonably satisfied that, while such protest is pending, there will be no impairment of the enforceability, validity or priority of any of the Liens of Lender in and to the DIP Collateral;

(c)    **Loans**. make any loans or advances to any individual, partnership, trust or other corporation, including without limitation a Debtor's directors, officers and employees;

(d)    **Guarantees**. assume, guaranty, endorse or otherwise become directly or contingently liable in respect of (including without limitation by way of agreement, contingent or otherwise, to purchase, provide funds to or otherwise invest in a Debtor or otherwise to assure a creditor against loss), any Debt (except (i) guarantees by endorsement of instruments for deposit or collection in the ordinary course of business, (ii) guarantees in favor of Lender and Pre-Petition Lender, and (iii) guarantees set forth on **Schedule I** hereof);

(e)    **Debt**. issue evidence of Debt or suffer to exist Debt in addition to Debt to Lender except (i) Debt of a Debtor other than for money borrowed, incurred or arising in the ordinary course of business, (ii) Subordinated Debt and other Debt of a Debtor for money borrowed which is on terms satisfactory to

32

Lender and has been subordinated on terms and conditions satisfactory to Lender, (iii) Debt relating to Liens permitted under **Section 9(b)(I)(iii)**, (iv) any guarantees of Debt permitted under **Section 9(d)** hereof; (v) any Debt relating to Liens listed on **Schedule E** hereof, and (v) accounts payable incurred in the ordinary course of business (to the extent constituting Debt hereunder);

(f)　　**Investments**. (i) use any loan proceeds to purchase or carry any "margin stock" (as defined in Regulation U of the Board of Governors of the Federal Reserve System) or (ii) invest in or purchase any stock, securities, membership interest or other Equity Interests of any individual, partnership, trust, limited liability company or other corporation except readily marketable direct obligations of, or obligations guaranteed by, the United States of America or any agency thereof;

(g)　　**Transactions with Affiliates**. enter into any lease or other transaction with any shareholder, officer or Affiliate on terms any less favorable than those which might be obtained at the time from Persons who or which are not such a shareholder, officer or Affiliate, except for (i) payment of dividends, distributions, directors fees, and other similar payments permitted under **Section 9(l)** or **Section 9(q)** hereof, (ii) loans or advances permitted pursuant to **Section 9(c)** hereof, (iii) payment to employees and officers of reasonable compensation and employee benefits in the ordinary course of business, and (iv) the reimbursement of out of pocket costs and expenses for employees, directors, officers and consultants in the ordinary course of business;

(h)　　**Subsidiaries.** sell, transfer or otherwise dispose of any stock of any subsidiary of a Debtor;

(i)　　**Mergers, Consolidations, Sales, Asset Acquisitions, or Statutory Plan of Division or Liquidation.** (i) merge, amalgamate, or consolidate with or into any corporation; (ii) enter into any joint venture or partnership with any Person; (iii) convey, lease or sell all or any material portion of its property or assets or business to any other Person except as permitted by **Section 9(a)**; (iv) convey, lease or sell any of its assets to any Person for less than the fair market value thereof; (v) acquire (in any transaction analogous in purpose or effect to a consolidation, amalgamation, or merger) all or substantially all of the assets of any Person, or (vi) consummate any statutory plan of division;

(j)　　**Change in Legal Status**. (i) change its name, its place of business or, if more than one, chief executive office, or its mailing address or organizational identification number if it has one, or (ii) change its type of organization, jurisdiction of organization or other legal structure. If a Debtor does not have an organizational identification number and later obtains one, such Debtor shall promptly notify Lender of such organizational identification number;

(k)　　**Amendments of Certain Agreements; Material Contracts.**

(i)　　amend or modify any agreement, instrument or document evidencing or relating to any such subordinated debt, except in accordance with the subordination agreement relative thereto or the subordination provisions thereof; or

(ii)　　amend or modify any management or similar agreement in any manner which is materially adverse to the interests of Lender as determined in Lender's reasonable discretion; or

(iii)　　amend and modify any Material Contract in any manner which is materially adverse to the interests of Lender as determined in Lender's reasonable discretion.

33

(l)    <u>**Restricted Payments**</u>.  make any Restricted Payments other than repayments of Debt referenced in **Section 9(e)(i)** so long as such payments are made in the ordinary course of business and are subject to the Approved Budget.

(m)    <u>**[Reserved]**</u>;

(n)    <u>**[Reserved]**</u>;

(o)    <u>**Compliance with ERISA**</u>.  (i) maintain, or permit any ERISA Affiliate to maintain, or become obligated to contribute, to any Plan other than those Plans disclosed on **Schedule G**, (ii) engage, or knowingly permit any ERISA Affiliate to engage, in any non-exempt "prohibited transaction", as that term is defined in Section 406 of ERISA and Section 4975 of the IRC, (iii) incur, or permit any ERISA Affiliate to incur, any "accumulated funding deficiency", as that term is defined in Section 302 of ERISA or Section 412 of the IRC, (iv) terminate, or permit any ERISA Affiliate to terminate, any Plan where such event could result in any material liability of any Debtor or any ERISA Affiliate or the imposition of a lien on the property of any Debtor or any ERISA Affiliate pursuant to Section 4068 of ERISA, (v) assume, or permit any ERISA Affiliate to assume any obligation to contribute to any Multiemployer Plan, (vi) incur or permit any ERISA Affiliate to incur, any withdrawal liability to any Multiemployer Plan, (vii) fail promptly to notify Lender of the occurrence of any Termination Event, (viii) fail to comply in any material respect, or permit an ERISA Affiliate to fail to comply in any material respect, with the requirements of ERISA or the IRC or other applicable law in respect of any Plan, (ix) fail to meet, or permit any ERISA Affiliate to fail to meet, all minimum funding requirements under ERISA or the IRC or postpone or delay or allow any ERISA Affiliate to postpone or delay any funding requirement with respect of any Plan.

(p)    <u>**Equipment**</u>.  permit (i) any Equipment to become affixed to any real property leased to any Debtor so that an interest arises therein under the real estate laws of the applicable jurisdiction unless the landlord of such real property has executed a landlord waiver or leasehold mortgage in favor of and in form reasonably acceptable to Lender, or (ii) permit any of the Equipment of any Debtor to become an accession to any personal property other than Equipment that is subject to first priority (except for Permitted Liens) Liens in favor of Lender.

(q)    <u>**[Reserved]**</u>.

(r)    <u>**Bankruptcy Matters**</u>.

(i)    Fail to file with the Bankruptcy Court and deliver to Lender, within forty (40) days after the Applicable Petition Date, all Bankruptcy Schedules of the Debtors.

(ii)    Fail to serve:

(A)    all secured creditors, all judgment creditors (if any) actually known to the Debtors, the twenty (20) largest unsecured creditors, the federal and state taxing authorities, any and all Governmental Bodies holding a claim, any of the Debtors' unions, and any other party claiming an interest in the Collateral in accordance with the Federal Rules of Bankruptcy Procedure with a copy of the Motion and Interim Order as approved by the Bankruptcy Court in accordance with the Federal Rules of Bankruptcy Procedure; and

(B)    all parties from whom the Debtors have received or that the Debtors believe they may have received goods from within twenty (20) days of the filing of the Case, and who have not been paid, a copy of the Interim Order and notice of the hearing

34

on entry of the proposed Final Order in accordance with the Federal Rules of Bankruptcy Procedure.

(C)    a certificate from the Secretary or another authorized officer of each Debtor attesting to the resolutions of such Debtor's board of directors, manager or managing member, ratifying its execution, delivery, and performance of the Loan Documents to which it is a party,  such resolution to be in form and substance reasonably acceptable to Lender.

## 10.    DEFAULT; RIGHTS AND REMEDIES UPON DEFAULT.

(a)    The occurrence of any one or more of the following events listed below (herein, each an "**Event of Default**" and individually and collectively, "**Events of Default**") shall constitute an Event of Default hereunder and shall also constitute a default under all Loan Documents and any other agreements between Lender and any Debtor and instruments and papers given Lender by any Debtor, whether such agreements, instruments, or papers now exist or hereafter arise.

(i)    The failure by a Borrower to pay when due, any principal, interest or fees due under this Agreement or the Term Loan Note.

(ii)    The failure by a Borrower to pay when due any costs, expenses owed to Lender, or other Obligations where such failure is not cured within three (3) days following the date when due.

(iii)    (A) Except as provided in clauses (iii)(B), (iii)(C) and (iii)(D) below, the failure by a Debtor to promptly, punctually and faithfully perform, or observe any term, covenant or agreement on its part to be performed or observed pursuant to any of the provisions of this Agreement, or (B)  the failure by a Borrower to promptly, punctually and faithfully perform, or observe any term, covenant or agreement on its part to be performed or observed pursuant to **Sections 7(d) or 7(f)** hereof and the continuation of such default for seven (7) days following the initial failure, or (C) the failure by a Borrower to promptly, punctually and faithfully perform, or observe any term, covenant or agreement on its part to be performed or observed pursuant to pursuant to **Sections 7(e) or 7(i)** hereof or any other Loan Documents, and the continuation of such default for fifteen (15) days following the initial failure.

(iv)    Any warranty, representation, written report or certification made or delivered to Lender by or on behalf of any Debtor pursuant to or in connection with this Agreement or any other Loan Document or Lender's electronic client portal, was not true or accurate in any material respect (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of the date of issuance, delivery or making or deemed making thereof, including when made and reaffirmed in accordance with **Section 2**.

(v)    The occurrence of any event such that any Post-Petition Debt  of a Debtor from any creditor or lender other than Lender, involving an aggregate amount of $100,000 or more, could be accelerated, notwithstanding that such acceleration has not taken place.

(vi)    The occurrence of any event which would cause a lien creditor, as that term is defined in Section 9-102 of the Code, to take priority over the Liens of Lender in the DIP Collateral.

(vii)    Except to the extent in respect of clause (B) the lien and amount owed is subject to a Permitted Protest, a filing against or relating to a Debtor of (A) a federal tax lien in favor of the United States of America or any political subdivision of the United States of America, or (B) a state tax lien in favor of any state of the United States of America or any political subdivision of any such state, and the payment pertaining to such lien is not paid before such payment is delinquent.

(viii)    Any (x) Lien in respect of the DIP Collateral securing the Post-Petition Obligations created or provided for under any Loan Agreement and/or under the Final Order (or, prior to the entry of the Final Order, the Interim Order), (y) any Adequate Protection Lien in respect of the DIP Collateral securing any Adequate Protection Obligations created or provided for under the Final Order (or, prior to the entry of the Final Order, the Interim Order), or (y) any Pre-Petition Liens in respect of the Pre-Petition Collateral created or provided for under any Pre-Petition Loan Documents, in any such case, for any reason ceases to be or is not a valid and perfected Lien having a first priority interest (subject only to Senior Liens and the Carve-Out, and, with respect to the Pre-Petition Liens, the Liens of Lender securing the Post-Petition Obligations created or provided for under any Loan Agreement and/or under the Final Order (or, prior to the entry of the Final Order, the Interim Order) and the Adequate Protection Liens);

(ix)    The occurrence of any event of default under any other Loan Document or other agreement between Lender and a Debtor or instrument or paper given Lender by any Borrower, whether such agreement, instrument, or paper now exists or hereafter arises (notwithstanding that Lender may not have exercised its rights upon default under any such other agreement, instrument or paper).

(x)    Any act by, against, or relating to a Debtor, or its property or assets, which act constitutes the application for, consent to, or sufferance of the appointment of a receiver, trustee, liquidator, monitor or other Person, pursuant to court action or otherwise, over all or any material part of a Debtor's property (which, in the case of any involuntary act, is not discharged, dismissed or stayed within forty five (45) days, so long as during which period the Debtor is diligently seeking the discharge, dismissal or stay of such act and Lender shall be under no obligation to advance any Term Loans).

(xi)    The entry of one or more judgments (other than the Interim Order and the Final Order and any judgment resulting in an allowed general unsecured claim) in excess of $100,000 in the aggregate against a Debtor or its assets, which judgment is not satisfied or appealed from (with execution or similar process stayed) within twenty (20) days of its entry, except to the extent fully covered (other than to the extent of customary deductibles) by insurance pursuant to which the insurer has not denied coverage.

(xii)    The entry of any court order which enjoins, restrains or in any way prevents a Debtor from conducting all or any material part of its business affairs in the ordinary course of business.

(xiii)    The occurrence of any loss, theft, damage or destruction to any material asset(s) of a Debtor, except to the extent fully covered (other than to the extent of customary deductibles) by insurance pursuant to which the insurer has not denied coverage.

36

(xiv)    Any act by or against, or relating to a Debtor or its assets pursuant to which any creditor of such Debtor seeks to reclaim or repossess or reclaims or repossesses all, or a portion with a value in excess of $100,000, of such Debtor's assets.

(xv)    [Reserved].

(xvi)    This Agreement shall, at any time after its execution and delivery and for any reason, cease (A) to create a valid and perfected first priority Lien in and to the DIP Collateral; or (B) to be in full force and effect or shall be declared null and void, or the validity or enforceability hereof shall be contested by a Debtor or any other Guarantor of Borrowers denies it has any further liability or obligation hereunder.

(xvii)    Any Guarantor shall repudiate, purport to revoke or fail to perform his, her or its obligations under his, her or its guaranty or any other guarantor shall cease to exist.

(xviii)    Any Debtor shall take or participate in any action which would be prohibited under the provisions of any subordination or intercreditor agreement or make any payment on subordinated debt to any Person or entity that was not entitled to receive under the provisions of any such agreement.

(xix)    Any Change of Control shall occur unless subject to the prior written consent of the Lender.

(xx)    The occurrence of an ERISA Termination Event.

(xxi)    [Reserved].

(xxii)    the Bankruptcy Court shall enter any order, that has not been consented to by Lender (i) revoking, reversing, staying, vacating, rescinding, modifying, supplementing or amending (x) the Interim Order, the Final Order (after entry thereof), any Bidding Procedures Order (after entry thereof), any Sale Order (after entry thereof), this Agreement, any other Loan Document, the Pre-Petition Loan Agreement Documents or any other Pre-Petition Loan Document, or (y) any other "first day" orders to the extent such revocation, reversal, stay, vacation, rescission, modification, supplement or amendment is materially adverse to the interests of Lender or the Pre-Petition Lender, (ii) permitting any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to any Debtor equal or superior to the priority of Lender in respect of the Obligations, or there shall arise any such Superpriority Claim, or (iii) granting or permitting the grant of a Lien on the DIP Collateral superior to, or pari passu with, the Liens of Lender on the Pre-Petition Collateral or the DIP Collateral (other than the Senior Liens (as defined in the Interim Order), and the Carve-Out);

(xxiii)    the Bankruptcy Court shall enter any order (i) appointing a Chapter 11 trustee under Section 1104 of the Bankruptcy Code in the Case, (ii) appointing an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code in the Case, (iii) appointing a fiduciary or representative of the estate with decision-making or other management authority over some or all of any Debtor's senior management, (iv) substantively consolidating the estate of any Debtor with the estate of any other Person, (v) dismissing the Case or converting the Case to a Chapter 7 case; or (vi) approving a sale of substantially all of the assets of the Borrowers and/or of the Debtors which order does not provide for Payment in Full of the

37

Pre-Petition Obligations and Post-Petition Obligations upon consummation of such sale and which shall otherwise be reasonable satisfactory to Lender, and in connection with such sale order, Post-Petition Lender and Pre-Petition Lender shall not have received a release (on terms and conditions and in form and substance satisfactory to Lender in its sole discretion) of Post-Petition Lender and Pre-Petition Lender in full from all claims of the Debtors and their estates on or before the entry of such sale order;

(xxiv)    this Agreement, any of the other Loan Documents, the Interim Order or the Final Order for any reason ceases to be in full force and effect or is declared to be null and void by a court of competent jurisdiction, or any of the Debtors shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court) any other Person's motion to, disallow in whole or in part the Post-Petition Lender' claim in respect of the Post-Petition Obligations, or to challenge the validity and enforceability of the Liens in favor of any of Lender or the Pre-Petition Lender securing any part of the Obligations;

(xxv)    any Debtor files a motion with the Bankruptcy Court asserting that any of Lender or Pre-Petition Lender do not have a right to, or supports a motion filed with the Bankruptcy Court that asserts the Lender or Pre-Petition Lender do not have the right to, credit bid for any assets of the Debtors in connection with any sale pursuant to Section 363(k) of the Bankruptcy Code;

(xxvi)    the Bankruptcy Court shall enter any order granting relief from the automatic stay to any creditor holding or asserting a Lien, reclamation claim or other rights on the assets of any Debtor in excess of $[50,000];

(xxvii)    except (i) as permitted by the Interim Order or Final Order (or any other order of the Bankruptcy Court) and if, as, and to the extent contemplated and provided for and permitted in the DIP Budget (subject to Permitted Variances) hereof, or (ii) as otherwise agreed to by Lender in writing, and approved by all necessary Bankruptcy Court orders/approvals, any Debtor shall make any Pre-Petition Payment (including, without limitation, related to any reclamation claims but excluding any Pre-Petition Payment in respect of the Pre-Petition Obligations of the Pre-Petition Lender) following the Closing Date;

(xxviii) any Debtor shall be unable to pay its Post-Petition debts as they mature, shall fail to comply with any order of the Bankruptcy Court in any material respect, or shall fail to make, as and when such payments become due or otherwise; provided however, that the foregoing shall not apply to any debts as to which the Debtors contest in good faith;

(xxix)    [Reserved];

(xxx)    any Debtor shall file a motion in the Case (i) to use Cash Collateral under Section 363(c) of the Bankruptcy Code without Lender's prior written consent except to the extent expressly permitted in the Interim Order or, once entered, the Final Order, (ii) to sell a material portion of the assets of any Debtor without Lender's prior written consent, (iii) to recover from any portions of the DIP Collateral any costs or expenses of preserving or disposing of such DIP Collateral under Section 506(c) of the Bankruptcy Code, or to cut off rights in the DIP Collateral under Section 552(b) of the Bankruptcy Code, or (iv) to obtain additional financing under Sections 364(c) or (d) of the Bankruptcy Code not otherwise permitted under this Agreement, unless such motion and additional financing shall provide that upon closing and consummation of such financing, all of the Pre-Petition Obligations and the Post-Petition Obligations shall be Paid in Full and both Pre-Petition Lender and Post-Petition Lender receive a release (on terms and conditions

38

and in form and substance satisfactory to Lender in its sole discretion) in full from all claims of the Debtors and their estates;

(xxxi)   (i) a Reorganization Plan is filed in the Case by one or more of the Debtors which does not contain provisions for termination of Lender's commitment to make Advances hereunder and Payment in Full of the Pre-Petition Obligations and the Post-Petition Obligations and the release of both the Pre-Petition Lender and the Post-Petition Lender (on terms and conditions and in form and substance satisfactory to Lender) in full from all claims of the Debtors and their estates, in each case, on or before, and the continuation of the Liens and security interests granted to Lender and the Pre-Petition Lender until, the effective date of such Reorganization Plan, or (ii) an order shall be entered by the Bankruptcy Court confirming a Reorganization Plan in the Case which does not contain provisions for termination of Lender's commitment to make Advances hereunder and Payment in Full of the Pre-Petition Obligations and the Post-Petition Obligations and the release of both the Pre-Petition Lender and the Post-Petition Lender (on terms and conditions and in form and substance satisfactory to Lender) in full from all claims of the Debtors and their estates on or before, and the continuation of the Liens and security interests granted to Pre-Petition Lender until, the effective date of such Reorganization Plan upon entry thereof;

(xxxii)   the expiration or termination of the "exclusive period" of the Debtors under Section 1121 of the Bankruptcy Code for the filing of a plan of reorganization;

(xxxiii)  (i) any Debtor engages in or takes any action to support any challenge to the validity, perfection, priority, extent and/or enforceability of any of the Obligations, the Pre-Petition Obligations, the Liens of Lender in the DIP Collateral, the Adequate Protection Liens, or the Liens of Pre-Petition Lender in the Pre-Petition Collateral or (ii) any Debtor engages in, or takes any action to support, any investigation or asserts any claims or causes of action (or directly or indirectly support assertion of the same) against the Lender or the Pre-Petition Lender and/or any of their respective Liens in the DIP Collateral and/or the Pre-Petition Collateral, as applicable; provided, however, that it shall not constitute an Event of Default under subsections (i) or (ii) hereof if any Debtor provides documents and information with respect to the Pre-Petition Loan Documents and any pre-petition Lender enforcement actions to (x) the Creditors' Committee and (y) with prior written notice to Lender of any requirement to do so, any other party in interest;

(xxxiv)  the termination or rejection of any contract of any Debtor which would reasonably be expected to result in a Material Adverse Effect;

(xxxv)   the failure of the Debtors to satisfy any of the Milestones :

(xxxvi)  the Case is converted (as to any one or more Debtors) to a case under Chapter 7 of the Bankruptcy Code;

(xxxvii)   the Case is dismissed (as to any one or more Debtors);

(xxxviii)   a breach by the Debtors of the terms or provisions of the Interim Order or Final Order;

(xxxix) any Person shall be permitted to surcharge the DIP Collateral or the Pre-Petition Collateral under Section 506(c) of the Bankruptcy Code, or any costs or expenses whatsoever shall be imposed against the DIP Collateral or the Pre-Petition Collateral, other than the Carve-Out;

39

(xl)    Lender or Pre-Petition Lender shall be made subject to any equitable remedy of marshalling or any similar doctrine with respect to the Collateral and the Pre-Petition Collateral; or

(xli)    Any of the Debtors cease the ordinary course operation of their businesses (except in connection with an Approved 363 Sale).

(b)    Subject to the Interim Order (or the Final Order, when entered) and **Section 10(j)**, upon the occurrence, and during the continuance, of an Event of Default, Lender may, with three (3) Business Days prior notice, declare any obligation Lender may have hereunder to be cancelled, declare all Obligations to be due and payable and, and without the necessity of seeking relief from the automatic stay or any further order from the Bankruptcy Court, proceed to enforce payment of the Obligations and to exercise any and all of the rights and remedies afforded to Lender by the Code or under the terms of this Agreement, the other Loan Documents or otherwise.

(c)    Subject to the Interim Order (or the Final Order, when entered) and the last paragraph of this Section 10, any sale or other disposition of the DIP Collateral may be at public or private sale upon such terms and in such manner as Lender deems advisable, having due regard to compliance with any statute or regulation which might affect, limit or apply to Lender's disposition of the DIP Collateral. Lender may conduct any such sale or other disposition of the DIP Collateral upon a Debtor's premises. Unless the DIP Collateral is perishable or threatens to decline speedily in value, or is of a type customarily sold on a recognized market (in which event Lender shall provide Borrowers with such notice as may be practicable under the circumstances), Lender shall give Borrowers at least the greater of the minimum notice required by law or ten (10) days prior written notice of the date, time and place of any proposed public sale, and of the date after which any private sale or other disposition of the DIP Collateral may be made. Lender may purchase the DIP Collateral, or any portion of it at any public sale.

(d)    If Lender sells any of the DIP Collateral on credit, the Borrowers will be credited only with payments actually made by the purchaser of such DIP Collateral and received by Lender. If the purchaser fails to pay for the DIP Collateral, Lender may re-sell the DIP Collateral, and the Borrowers shall be credited with the proceeds of the sale.

(e)    In connection with Lender's exercise of Lender's rights under this Agreement, Lender may enter upon, occupy and use any premises owned or occupied by a Debtor, and may exclude such Debtor from such premises or portion thereof as may have been so entered upon, occupied, or used by Lender. Lender may, but shall not be required to remove any of the DIP Collateral from any such premises upon Lender's taking possession thereof, and may render any DIP Collateral unusable to Borrowers. In no event shall Lender be liable to a Debtor for use or occupancy by Lender of any premises pursuant to this Agreement.

(f)    Upon the occurrence and during the continuance of any Event of Default, Lender may require a Borrower to assemble the DIP Collateral and make it available to Lender at such Borrower's sole risk and expense at a place or places which are reasonably convenient to both Lender and such Borrower.

(g)    Any default of this Agreement by a Debtor shall constitute, likewise, a default by such Debtor of any other existing agreement with Lender, and any default by a Debtor of any other agreement with Lender shall constitute a default of this Agreement.

(h)    Each Borrower acknowledges that the purpose of this section is to provide non-exhaustive indications of what actions or omissions by Lender would not be commercially unreasonable in Lender's exercise of remedies against the DIP Collateral and that other actions or omissions by Lender shall not be

40

deemed commercially unreasonable solely on account of not being indicated in this section. Without limitation upon the foregoing, nothing contained in this section shall be construed to grant any rights to any Borrower or to impose any duties on Lender that would not have been granted or imposed by this Agreement or by applicable law in the absence of this section.

Notwithstanding any other provision of this Agreement or any other Loan Document:

      **(i)**      Upon the occurrence of and during the continuance of an Event of Default, and without the necessity of seeking relief from the automatic stay or any further order from the Bankruptcy Court, but subject to the provisions of **Sections 10(b)** and **10(j)** hereof, (i) Lender shall no longer have any obligation to make any Term Loans (or otherwise extend credit) hereunder; (ii) all amounts outstanding under Loan Documents shall, at the option of Lender, be accelerated and become immediately due and payable; (iii) Lender and the Pre-Petition Lender shall be entitled to immediately terminate the Debtors' right to use Cash Collateral, without further application or Order of the Bankruptcy Court, <u>provided</u>, <u>however</u>, that the Debtors shall have the right to use Cash Collateral to pay their weekly ordinary course payroll included in the Approved Budget through the date on which such Event of Default occurs; (iv) the Debtors shall be bound by all post-default restrictions, prohibitions, and other terms as provided in the Interim Order, the Final Order, the Loan Documents; (v) Lender shall be entitled to charge the default rate of interest hereunder; and (vi) subject only to the notice requirement set forth in subparagraph (b) above, Lender shall be entitled to take any other action or exercise any other right or remedy as provided in the Interim Order, the Final Order, the Loan Documents, or applicable law, including, without limitation, setting off any Obligations with DIP Collateral, Pre-Petition Collateral or proceeds in the possession of Pre-Petition Lender or Lender, continue collecting (and the Debtors shall be obligated to turn over) all proceeds of DIP Collateral or Pre-Petition Collateral, as applicable, and Lender shall be able to apply such proceeds to repayment of the Post-Petition Obligations or Pre-Petition Revolver Obligations (as determined by Lender in its sole and absolute discretion), and enforcing any and all rights and remedies with respect to the DIP Collateral or Pre-Petition Collateral, as applicable.

      **(j)**      Upon the occurrence and during the continuance of an Event of Default, and after providing not less than thee (3) Business Days' advance written notice thereof (which may be by electronic mail) by means of delivery of a termination declaration (the "**Remedies Notice Period**" (which Remedies Notice Period applies only to the DIP Collateral enforcement remedies described below)) to counsel to the Debtors, the U.S. Trustee, and counsel to any Committee, Lender shall be entitled to take any action and exercise all rights and remedies provided to them by the Interim Order, the Final Order, or the Documents, or applicable law, unless otherwise ordered by the Bankruptcy Court, as Lender may deem appropriate in its sole discretion to, among other things, proceed against and realize upon the DIP Collateral (including the Pre-Petition Collateral) or any other assets or properties of the Debtors' Estates upon which Lender, been or may hereafter be granted liens or security interests to obtain the full and indefeasible payment of all the Obligations. During the Remedies Notice Period, the Debtors and/or a Committee (if appointed) shall be entitled to seek an emergency hearing within the Remedies Notice Period with respect to the termination declaration and whether an Event of Default has occurred and is continuing. However, notwithstanding anything to the contrary provided for herein (specifically including without limitation this subparagraph (b) and the immediately preceding subparagraph (b)), at no time prior to Payment in Full of the Obligations, including but not limited to during any Remedies Notice Period, shall Lender be prohibited from or limited in its ability to apply any and all payments in respect of the Obligations (including without limitation payments pursuant to **Section 1(b)** hereof) and any and all proceeds of DIP Collateral received into the Controlled Collections Accounts received by any of them to the Obligations in accordance with **Section 5(b)** hereof.

## 11.    STANDARDS FOR EXERCISING REMEDIES.

41

To the extent that applicable law imposes duties on Lender to exercise remedies in a commercially reasonable manner, each Borrower acknowledges and agrees that it is not commercially unreasonable for Lender (a) to fail to incur expenses reasonably deemed significant by Lender to prepare DIP Collateral for disposition or otherwise to complete raw material or work in process into finished goods or other finished products for disposition, (b) to fail to obtain third party consents for access to DIP Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain governmental or third party consents for the collection or disposition of DIP Collateral to be collected or disposed of, (c) to fail to exercise collection remedies against account debtors or other Persons obligated on DIP Collateral or to remove liens or encumbrances on or any adverse claims against DIP Collateral, (d) to exercise collection remedies against account debtors and other Persons obligated on DIP Collateral directly or through the use of collection agencies and other collection specialists, (e) to advertise dispositions of DIP Collateral through publications or media of general circulation, whether or not the DIP Collateral is of a specialized nature, (f) to contact other Persons, whether or not in the same business as a Borrower, for expressions of interest in acquiring all or any portion of the DIP Collateral, (g) to hire one or more professional auctioneers to assist in the disposition of DIP Collateral, whether or not the DIP Collateral is of a specialized nature, (h) to dispose of the DIP Collateral by utilizing Internet sites that provide for the auction of assets of the types included in the DIP Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets, (i) to dispose of assets in wholesale rather than retail markets, (j) to disclaim disposition warranties, and specifically to disclaim any warranties of title or the like, (k) to purchase insurance or credit enhancements to insure Lender against risks of loss, collection or disposition of DIP Collateral or to provide to Lender a guaranteed return from the collection or disposition of DIP Collateral, or (l) to the extent deemed appropriate by Lender, to obtain the services of other brokers, investment bankers, consultants and other professionals to assist Lender in the collection or disposition of any of the DIP Collateral.  Each Borrower acknowledges that the purpose of this section is to provide non-exhaustive indications of what actions or omissions by Lender would not be commercially unreasonable in Lender's exercise of remedies against the DIP Collateral and that other actions or omissions by Lender shall not be deemed commercially unreasonable solely on account of not being indicated in this section.  Without limitation upon the foregoing, nothing contained in this section shall be construed to grant any rights to any Borrower or to impose any duties on Lender that would not have been granted or imposed by this Agreement or by applicable law in the absence of this section.

## 12.    TERMINATION.

This Agreement, which shall inure to the benefit of and shall be binding upon the respective successors and permitted assigns of each Debtor and Lender, shall become effective on the Closing Date and shall continue in full force and effect until the Termination Date (such period from the Closing Date through and ending on the Termination Date, the "**Term**").  At the end of the Term, Borrowers shall pay the Full Payment to Lender.  Further, upon termination of this Agreement, all of the rights, interests and remedies of Lender and Obligations of the Debtors shall survive and Borrowers shall have no right to receive, and Lender shall have no obligation to make, any further loans.  Upon Full Payment to Lender, all rights and remedies of the Debtors and Lender hereunder (other than inchoate indemnification and reimbursement obligations and other obligations which, by their terms, survive termination of this Agreement) shall cease, so long as any payment so made to Lender and applied to the Obligations is not thereafter recovered from or repaid by Lender in whole or in part in any bankruptcy, insolvency or similar proceeding instituted by or against a Debtor, whereupon this Agreement shall be automatically reinstated without any further action by any Debtor and Lender and shall continue to be fully applicable to such Obligations to the same extent as though the payment so recovered or repaid had never been originally made on such Obligations.

## 13.    MISCELLANEOUS.

42

(a) **Governing Law; Sealed Instrument**. The laws of the State of New York shall exclusively (without regard to rules or principles relating to conflicts of laws) govern the construction of this Agreement and the rights and duties of the parties hereto. This Agreement shall take effect as a sealed instrument.

(b) **Consent to Jurisdictions**. Each Debtor and Lender agree that any action or proceeding to enforce or arising out of this Agreement may be commenced in the Bankruptcy Court, and each Debtor waives personal service of process and agrees that a summons and complaint commencing an action or proceeding in any such court shall be properly served and confer personal jurisdiction if served by registered or certified mail to a Debtor, or as otherwise provided by the laws of the State of New York or the United States of America.

(c) **WAIVER OF JURY TRIAL**. EACH DEBTOR AND LENDER EACH HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHT SUCH DEBTOR OR LENDER MAY HAVE OR HEREAFTER HAVE TO A TRIAL BY JURY IN RESPECT OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT. Each Debtor hereby certifies that neither Lender nor any of its representatives, agents or counsel has represented, expressly or otherwise, that Lender would not, in the event of any such suit, action or proceeding, seek to enforce this waiver of right to trial by jury. Each Debtor acknowledges that Lender has been induced to enter into this Agreement by, among other things, this waiver. Each Debtor acknowledges that it has read the provisions of this Agreement and in particular, this section; has consulted legal counsel; understands the right it is granting in this Agreement and is waiving in this section in particular; and makes the above waiver knowingly, voluntarily and intentionally.

(d) **Assignment and Participations**. This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties hereto; provided, however, that Debtors may not assign this Agreement or any rights or duties hereunder without Lender's prior written consent and any prohibited assignment shall be absolutely void. No consent to an assignment by Lender shall release any Borrower from its Obligations. Lender may assign this Agreement and its rights and duties hereunder and no consent or approval by a Debtor is required in connection with any such assignment. Lender reserves the right to sell, assign, transfer, negotiate or grant participations in all or any part of, or any interest in Lender's rights and benefits hereunder. In connection with any assignment or participation, Lender may disclose all documents and information which Lender now or hereafter may have relating to a Debtor or a Debtor's business. To the extent that Lender assigns its rights and obligations hereunder to another party, Lender thereafter shall be released from such assigned obligations to the Debtors and such assignment shall effect a novation between the Debtors and such other party.

(e) **[Reserved]**.

(f) **Notices**. Unless otherwise provided in this Agreement, all notices or demands by any party relating to this Agreement or any other loan document shall be in writing and (except for financial statements and other informational documents which may be sent by first-class mail, postage prepaid) shall be personally delivered or sent by registered or certified mail (postage prepaid, return receipt requested ), overnight courier, or electronic mail to the Debtors at its address set forth on **Exhibit 1** to this Agreement, or to Lender at its address set forth on **Exhibit 1** to this Agreement.

The parties hereto may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other. All notices or demand sent in accordance with this section shall be deemed received on the earlier of the date of actual receipt or three (3) days after the deposit thereof in the mail.

43

(g)    <u>Records</u>.  Lender shall have no obligation to maintain any electronic records or any documents, schedules, invoices, agings or any other paper delivered to Lender by a Debtor in connection with this Agreement or any other agreement for more than four (4) months after receipt of the same by Lender.

(h)    <u>Amendments.</u>  This Agreement can only be amended by a writing signed by Lender and each Borrower.

(i)    <u>Counterparts and Signatures</u>. This Agreement may be executed in multiple counterparts, each of which shall be effective upon delivery and, thereafter, shall be deemed to be an original, and all of which shall be taken as one and the same instrument with the same effect as if each party hereto had signed on the same signature page.  Any signature page of this Agreement may be detached from any counterpart of this Agreement without impairing the legal effect of any signature thereto and may be attached to another part of this Agreement identical in form hereto and having attached to it one or more additional signature pages.  This Agreement may be transmitted by facsimile machine or by electronic mail in portable document format ("pdf") and signatures appearing on faxed instruments and/or electronic mail instruments shall be treated as original signatures.  Any party delivering an executed counterpart of this Agreement by telefacsimile or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement, but the failure to deliver an original executed counterpart shall not affect the validity, enforceability or binding effect hereof.

(j)    <u>Construction</u>.  Unless the context of this Agreement or any other Loan Document clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, the terms "includes" and "including" are not limiting, and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or."  The words "hereof," "herein," "hereby," "hereunder," and similar terms in this Agreement or any other Loan Document refer to this Agreement or such other Loan Document, as the case may be, as a whole and not to any particular provision of this Agreement or such other Loan Document, as the case may be.  Section, subsection, clause, schedule, and exhibit references herein are to this Agreement unless otherwise specified.  Any reference in this Agreement or in any other Loan Document to any agreement, instrument, or document shall include all alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements, thereto and thereof, as applicable (subject to any restrictions on such alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements set forth herein).  The words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties.

(k)    <u>Code</u>.  Unless otherwise defined herein, any terms (including Accounts, account debtor, certificated security, chattel paper, commercial tort claims, deposit Accounts, documents, electronic chattel paper, Equipment, farm products, fixtures, general intangibles, goods, health-care-insurance receivables, instruments, Inventory, letter-of-credit rights, proceeds, supporting obligations and tangible chattel paper) used in this Agreement that are defined in the Code shall be construed and defined as set forth in the Code unless otherwise defined herein; provided, that to the extent that the Code is used to define any term herein and such term is defined differently in different Articles of the Code, the definition of such term contained in Article 9 of the Code shall govern.

(l)    <u>Time</u>. Unless the context of this Agreement or any other Loan Document clearly requires otherwise, all references to time of day refer to Eastern standard time or Eastern daylight saving time, as in effect in New York, New York on such day.  For purposes of the computation of a period of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to"

44

and "until" each means "to and including"; provided that, with respect to a computation of fees or interest payable to Lender, such period shall in any event consist of at least one full day.

(m)    **Schedules and Exhibits**.  All of the schedules and exhibits attached to this Agreement shall be deemed incorporated herein by reference.

(n)    **Dollars**.  All amounts referred to herein shall be in Dollars.  All of the property and assets of the Debtors, including, without limitation, its receivables, shall be valued in, and converted into, Dollars in accordance with Lender's customary banking and conversion practices and procedures.

(o)    **Accounting Terms**. All accounting terms not specifically defined herein shall be construed in accordance with GAAP; provided, that if Borrowers notify Lender that Borrowers request an amendment to any provision hereof to eliminate the effect of any Accounting Change occurring after the Closing Date or in the application thereof on the operation of such provision, regardless of whether any such notice is given before or after such Accounting Change or in the application thereof, then Lender and Borrowers agree that they will negotiate in good faith amendments to the provisions of this Agreement that are directly affected by such Accounting Change with the intent of having the respective positions of Lender and Debtors after such Accounting Change conform as nearly as possible to their respective positions immediately before such Accounting Change took effect.  When used herein, the term "financial statements" shall include the notes and schedules thereto.  Whenever the term "Borrower" or "Debtor" is used in respect of a financial covenant or a related definition, it shall be understood to mean each such Person and its Subsidiaries on a consolidated basis, unless the context clearly requires otherwise. Notwithstanding anything to the contrary contained herein, all financial statements delivered hereunder shall be prepared, and all financial covenants contained herein shall be calculated, without giving effect to any election under the Statement of Financial Accounting Standards Board's Accounting Standards Codification Topic 825 (or any similar accounting principle) permitting a Person to value its financial liabilities or Debt at the fair value thereof.

(p)    **Divisions**.  For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

(q)    **Events of Default**. Notwithstanding anything to the contrary contained herein, any references herein to "during the continuance of," defaults or Events of Default "continuing" or "cure" or words to similar effect in any Loan Document, shall not be construed in any manner to allow for any cure periods that are not otherwise expressly and specifically provided for in this Agreement or any other Loan Document, or create any burden or standard of providing any waivers as to the related Events of Default. Such references are simply included to address the possibility that such cure rights may be expressly and specifically provided for in this Agreement or other Loan Documents for certain provisions, or waivers conceptually may be provided in Lender's sole and unfettered discretion, and the parties hereto agreement as to how such applicable provisions will be construed in the event of any such cure or waiver.

(r)    **Ambiguity**.  Neither this Agreement nor any uncertainty or ambiguity herein shall be construed or resolved against Lender or a Debtor, whether under any rule of construction or otherwise.  On the contrary, this Agreement has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of all parties hereto.

45

    **(s)**    **Authority**.  Lender is authorized to make loans under the terms of this Agreement upon the request, either written or oral, in the name of any Borrower by any authorized person whose name appears at the end of this Agreement or by any of the following named persons, from time to time, holding the following offices of any Borrower, President, Treasurer, Chief Executive Officer, Chief Financial Officer and such other officers and authorized signatories as may from time to time be set forth in separate resolutions.  Each Borrower agrees that any and all loans made by Lender to Borrowers or for their account at the request of the Borrowers or pursuant to the terms of this Agreement shall be conclusively deemed to have been authorized by such Borrower and to have been made pursuant to duly authorized requests therefor on its behalf.

    **(t)**    **Rights and Remedies**.  No delay or omission on the part of Lender in exercising any rights shall operate as a waiver of such right or any other right.  Waiver on any one occasion shall not be construed as a bar to or waiver of any right or remedy on any future occasion.  All Lender's rights and remedies, whether evidenced hereby or by any other agreement, instrument or paper, shall be cumulative and may be exercised singularly or concurrently.  It is distinctly understood and agreed that all of the rights of Lender contained in this Agreement shall likewise apply, insofar as applicable, to any modification of or supplement to this Agreement and to any other agreements between Lender and any Debtor.

    **(u)**    **Severability**. Paragraph and section headings used in this Agreement are for convenience only, and shall not affect the construction of this Agreement.  If one or more provisions of this Agreement (or the application thereof) shall be invalid, illegal or unenforceable in any respect in any jurisdiction, the same shall not invalidate or render illegal or unenforceable such provision (or its application) in any other jurisdiction or any other provision of this Agreement (or its application).

    **(v)**    **Integration**.  This Agreement, together with the other documents and instruments executed concurrently herewith represent the entire and final understanding of the parties with respect to the transactions contemplated hereby and shall not be contradicted or qualified by evidence of any prior, contemporaneous or subsequent other agreement, oral or written, before the date hereof.

    **(w)**    **Patriot Act**.  Lender hereby notifies the Debtors that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies the Debtors and each other party to the transaction contemplated hereunder, which information includes the name and address of the Debtors and each such other party and other information that will allow Lender to identify the Debtors and each such other party in accordance therewith.

**14.**    **DEFINITIONS.**

    "**Additional ERC Remittance**" means ERC Funds of BMH HR LLC in the aggregate amount of $175,000.

    "**Adequate Protection Claims**" shall have the meaning given thereto in the Final Order, or, prior to the entry of the Final Order, the Interim Order

    "**Adequate Protection Liens**" shall have the meaning given thereto in the Final Order, or, prior to the entry of the Final Order, the Interim Order.

    "**Adequate Protection Obligations**" shall have the meaning given thereto in the Final Order, or, prior to the entry of the Final Order, the Interim Order.

46

"**Adequate Protection Payments**" shall have the meaning given thereto in the Final Order, or, prior to the entry of the Final Order, the Interim Order.

"**Affiliate**" means any Person (i) which directly or indirectly Controls, or is controlled by or is under common control with a Debtor or a subsidiary, (ii) which directly or indirectly beneficially holds or owns twenty five percent (25%) or more of any class of voting stock of a Debtor or any subsidiary, or (iii) ten percent (10%) or more of the voting stock of which is directly or indirectly beneficially owned or held by a Debtor or a subsidiary.

"**Agreement**" shall have the meaning set forth in the preamble.

"**Allowed Professional Fees**" shall have the meaning given to the term "Allowed Professional Fees" in the Final Order, or, prior to the entry of the Final Order, the Interim Order.

"**Anti-Corruption Laws**" means the FCPA, the U.K. Bribery Act of 2010, as amended, and all other applicable laws and regulations or ordinances concerning or relating to bribery or corruption in any jurisdiction in which any Debtor or any of its Subsidiaries or Affiliates is located or is doing business.

"**Anti-Money Laundering Laws**" means the applicable laws or regulations in any jurisdiction in which any Debtor or any of its Subsidiaries or Affiliates is located or is doing business that relates to money laundering, any predicate crime to money laundering, or any financial record keeping and reporting requirements related thereto.

"**Anti-Terrorism Laws**" means (a) Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended), (b) the Patriot Act; (c) the International Emergency Economic Powers Act, along with any other enabling legislation or executive order relating thereto or any regulations passed thereunder, including the foreign assets control regulations of the United States Treasury Department (31 C.F.R., Subtitle B, Chapter V), and (d) any Sanctions.

"**Applicable Petition Date**" shall have the meaning set forth in the recitals hereto.

"**Approved 363 Sale**" shall mean any sale of any Debtor's assets or business pursuant to Section 363 of the Bankruptcy Code approved by the Lender pursuant to an asset purchase agreement approved by and acceptable to Lender in its sole and absolute discretion, and pursuant to appropriate orders of the Bankruptcy Court that are approved by and acceptable to Lender in its sole and absolute discretion, including (for the avoidance of doubt) any sale as contemplated and provided for in **Exhibit 10**

"**Avoidance Actions**" shall have the meaning given to such term in the Interim Order, or, after the entry of the Final Order, in the Final Order.

"**Bank Schedule**" shall have the meaning set forth in **Section 5(d)**.

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy" and any other federal bankruptcy law.

"**Bidding Procedures Order**" has the meaning specified therefor in **Exhibit 10** of this Agreement.

"**BMH HR LLC**" means BMH HR LLC, a Texas limited liability company.

47

"**Board of Governors**" means the Board of Governors of the Federal Reserve System of the United States (or any successor).

"**Borrower**" and "**Borrowers**" shall have the respective meaning set forth in the preamble.

"**Boulders Property**" means the apartment complex commonly known as The Boulders at Lake Ridge Apartments 4421 82nd Street, Lubbock, TX 79424.

"**Business Day**" means any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of the State of New York or is a day on which banking institutions located in such state are closed.

"**Carve-Out**" shall have the meaning given to such term in the Interim Order, or, after the entry of the Final Order, in the Final Order.

"**Case**" shall have the meaning set forth in the recitals hereto.

"**Cash Collateral**" shall have the meaning given to such term in the Interim Order, or, after the entry of the Final Order, in the Final Order.

"**Cash Management Order**" means an order entered by the Bankruptcy Code, in form and substance acceptable to Lender, governing the Debtors' cash management system.

"**Challenge Period**" shall have the meaning given to such term in the Interim Order, or, after the entry of the Final Order, in the Final Order.

"**Change in Law**" means the occurrence after the date hereof:  (a) the adoption or effectiveness of any law, rule, regulation, judicial ruling, judgment or treaty, (b) any change in any law, rule, regulation, judicial ruling, judgment or treaty or in the administration, interpretation, implementation or application by any Governmental Authority of any law, rule, regulation, guideline or treaty, (c) any new, or adjustment to, requirements prescribed by the Board of Governors for "Eurocurrency Liabilities" (as defined in Regulation D of the Board of Governors), requirements imposed by the Federal Deposit Insurance Corporation, or similar requirements imposed by any domestic or foreign governmental authority or resulting from compliance by Lender with any request or directive (whether or not having the force of law) from its lenders or related agent pertaining to any central bank or other Governmental Authority and related in any manner to SOFR, the Term SOFR Reference Rate, or Term SOFR, or (d) the making or issuance by any Governmental Authority of any request, rule, guideline or directive, whether or not having the force of law; provided that notwithstanding anything in the Agreement to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives concerning capital adequacy promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities shall, in each case, be deemed to be a "Change in Law," regardless of the date enacted, adopted or issued.

"**Change of Control**" means [reserved].

"**Closing Date**" means January 27, 2026 or the date on which the Bankruptcy Court enters the Interim Order.

48

"**Code**" means the Uniform Commercial Code, as in effect from time to time in the State of New York.

"**Collection Account**" means an account in the name of Lender and designated from time to time as the Collection Account hereunder by written notice from Lender to the Borrowers, and which is initially described on **Schedule B**.

"**Committee**" shall have the meaning given to such term in the Interim Order, or, after the entry of the Final Order, in the Final Order.

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of any Person, whether through the ownership of voting securities, by contract or otherwise.

"**Credit Limit**" shall have the meaning set forth in **Exhibit 1**.

"**Creditors' Committee**" means the official unsecured creditors' committee appointed in the Case.

"**Debt**" means of a Person as of a given date, all items of indebtedness or liability which in accordance with GAAP would be included in determining total liabilities as shown on the liabilities side of a balance sheet for such Person and shall also include the aggregate payments required to be made by such Person at any time under any lease that is considered a capitalized lease under GAAP (except, that, any such balance that constitutes an accrued expense or trade payment shall not be considered "Debt").

"**Default Rate**" shall have the meaning set forth in **Section 3(a)**.

"**Default Rate Margin**" shall have the meaning set forth in **Exhibit 1**.

"**Designated Account**" shall have the meaning set forth in **Section 5(d)**.

"**DIP Collateral**" shall have the meaning set forth in **Section 4(a)**.

"**DIP Budget**" shall mean the DIP Budget prepared by the Debtors, in consultation with the Lender, in good faith based upon assumptions which the Debtors believe to be reasonable and delivered to and approved by Lender on or before the Closing Date and attached hereto as Exhibit 6 (the "**Initial DIP Budget**"), setting forth Debtors' cash flow forecast in reasonable detail satisfactory to Lender including projected weekly disbursements, projected weekly cash collections and receipts and such line item detail as satisfactory to Lender, for the period commencing with the week in which the Closing Date shall occur and ending with February 21, 2026, as such DIP Budget may be updated from time to time in accordance with and subject to approval of Lender in its sole and absolute discretion as set forth in **Section 7(m)** hereof.

"**Disqualified Equity Interests**" means any Equity Interest that, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (a) matures or is mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation or otherwise (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Loans and all other Obligations that are accrued and payable and the termination of the commitments to lend hereunder), (b) is redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests), in whole

49

or in part, (c) provides for the scheduled payments of dividends in cash, or (d) is or becomes convertible into or exchangeable for Debt or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is 180 days after the Maturity Date.

"**Distributions**" means all payment or distributions to shareholders in cash or in property other than reasonable salaries, bonuses and expense reimbursements.

"**Dollars**" means lawful money of the United States.

"**Environmental Law**" means any federal, state, local or other governmental statute, regulation, law or ordinance dealing with the protection of human health and the environment.

"**Equity Interests**" means, with respect to a Person, shares of capital stock, partnership interests, membership or limited liability company interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such interest.

"**ERC**" means a United States refundable tax credit (sometimes called the employee retention tax credit or the employee retention credit) for certain eligible businesses and tax-exempt organizations that had employees and were affected during the COVID-19 pandemic.

"**ERC Funds**" means funds representing a United States refundable tax credit (sometimes called the employee retention tax credit or the employee retention credit) for certain eligible businesses and tax-exempt organizations that had employees and were affected during the COVID-19 pandemic.

"**ERISA**" shall have the meaning set forth in **Section 6(j)**.

"**ERISA Affiliate**" means (a) any Person, trade or business (whether or not incorporated) subject to ERISA whose employees are treated as being employed by the same employer as the employees of any Debtor under Section 414(b) of the IRC, (b) any Person, trade or business (whether or not incorporated) subject to ERISA whose employees are treated as being employed by the same employer as the employees of any Debtor under Section 414(c) of the IRC, (c) solely for purposes of Section 302 of ERISA and Section 412 of the IRC, any organization subject to ERISA that is a member of an affiliated service group of which any Debtor is a member under Section 414(m) of the IRC, or (d) solely for purposes of Section 302 of ERISA and Section 412 of the IRC, any Person subject to ERISA that is a party to an arrangement with any Debtor and whose employees are aggregated with the employees of any Debtor under Section 414(o) of the IRC.

"**ERISA Termination Event**" means (i) a Reportable Event with respect to any Plan; (ii) the existence with respect to any Plan of a non-exempt "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the IRC) for which a Borrower could have liability that would result in a material adverse effect; (iii) the withdrawal of a Borrower or any ERISA Affiliate from an Plan or Multiemployer Plan during a plan year in which such entity was a "substantial employer" as defined in Section 4001(a)(2) of ERISA; (iv) the providing of notice of intent to terminate an Plan in a distress termination described in Section 4041(c) of ERISA; (v) the institution by the Pension Benefit Guaranty Corporation of proceedings to terminate an Plan or Multiemployer Plan; (vi) any event or condition (a) which might constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan or Multiemployer Plan, or (b) that may result in termination of a Multiemployer Plan pursuant to Section 4041A of ERISA; or (vii) the partial or complete withdrawal within the meaning of

50

Sections 4203 and 4205 of ERISA, of a Borrower or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization.

"**Estate**" means, as to any Debtor, such Debtor and its bankruptcy estate (as defined under Bankruptcy Code section 541).

"**Event of Default**" and "**Events of Default**" shall have the respective meanings set forth in **Section 10(a)**.

"**Existing Reporting Orders**" shall mean (1) the *Interim Order Authorizing Debtors' Use of Cash Collateral and Granting Adequate Protection and Related Relief* [Docket No. 61], (2) the *Final Order (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System and Maintain Existing Bank Accounts and Business Forms and Honor Certain Prepetition Obligations Related to the Use Thereof, and (B) Continue to Perform Intercompany Transactions, and (II) Granting Related Relief* [Docket No. 130], (3), the *Order Granting Debtors' Emergency Motion for Authority to Pay Prepetition Wages, Compensation, and Employee Benefits* [Docket No. 66] and (4) any other order entered in the Cases obligating the Debtors to provide reporting, notices, or other information or cooperation to Lender or , in each case as the same is amended, renewed, extended, or replaced in form and substance acceptable to Lender.

"**FCPA**" means the Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder.

"**Final Order**" means a final order of the Bankruptcy Court in the Case authorizing and approving this Agreement and the other Loan Documents under, *inter alia*, Sections 364(c) and (d) of the Bankruptcy Code on a final basis and entered at or after a final hearing, in form and substance satisfactory to Lender in its reasonable discretion. The Final Order shall, among other things:

      (a)    authorize the transactions contemplated by this Agreement and the extensions of credit under this Agreement in an amount not less than the Credit Limit provided for herein;

      (b)    grant the claim and Lien status and Liens described in **Section 16**, and prohibit the granting of additional Liens on the assets of Debtors and any Superpriority Claim status except for any Liens and Claims specifically provided for in such order;

      (c)    provide that such Liens are automatically perfected as of the Applicable Petition Date by the entry of the Final Order and also grant to Lender relief from the automatic stay of Section 362(a) of the Bankruptcy Code to enable Lender, if Lender elects to do so in its discretion, to make all filings and recordings and to take all other actions considered necessary or advisable by Lender to perfect, protect and insure the priority of its Liens upon the DIP Collateral as a matter of non-bankruptcy law;

      (d)    provide that no Person will be permitted to surcharge the DIP Collateral under Section 506(c) of the Bankruptcy Code, nor shall any costs or expenses whatsoever be imposed against the DIP Collateral, except for the Carve-Out; and

      (e)    provide Lender with the option, in its discretion, to effect a "Final Roll-Up" as defined in and described in the Interim Order, and reimbursement in full in cash of all reasonable professional fees, costs and expenses of the Pre-Petition Lender, in each case using the proceeds of loans and extensions of credit hereunder, in each case upon entry of such Final Order.

"**Final Order Entry Date**" means the date on which the Final Order is entered by the Bankruptcy Court.

"**First Petition Date**" shall have the meaning set forth in the recitals hereto.

"**Full Payment**" means (a) the full and indefeasible cash payment of the Obligations, and prior to giving effect to the Final Roll-Up, the then outstanding Pre-Petition Obligations (other than inchoate indemnification and reimbursement obligations and other obligations which, by their terms, survive termination of this Agreement), including any interest, fees and other charges accruing during an insolvency proceeding (whether or not allowed in the proceeding), (b) the termination or expiration of the commitments of Lender to make Term Loans, and (c) the execution and delivery by Debtors of a general release in favor of Lender and Pre-Petition Lender.

"**GAAP**" means generally accepted accounting principles, applied on a basis consistent with the accounting practices applied in the financial statements required to be delivered hereunder.

"**Governmental Authority**" means the government of any nation or any political subdivision thereof, whether at the national, state, territorial, provincial, county, municipal or any other level, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of, or pertaining to, government (including any supra-national bodies such as the European Union or the European Central Bank).

"**Guarantor**" means each of the Guarantors party to this agreement as of the date hereof and each Person that becomes a guarantor after the date hereof.

"**Hazardous Substances**" means pollutants, contaminants, hazardous substances, hazardous wastes, petroleum and fractions thereof, and all other chemicals, wastes, substances and materials listed in, regulated by or identified in any Environmental Law; and

"**IRC**" means the Internal Revenue Code of 1986, as amended and in effect from time to time.

"**Initial DIP Budget**" has the meaning specified therefor in the definition of "DIP Budget".

"**Intellectual Property Rights**" shall have the meaning set forth in **Section 6(m)**.

"**Interim Availability Amount**" means $750,000.

"**Interim Availability Period**" means the period commencing on the Interim Order Entry Date and ending on the date of, and immediately prior to, the Bankruptcy Court's entry of the Final DIP Order on the Final Order Entry Date.

"**Interim Order**" means an order of the Bankruptcy Court in the Case authorizing and approving this Agreement and the other Loan Documents, for an interim period, under, *inter alia*, Sections 364(c) and (d) of the Bankruptcy Code and entered at or after a hearing, in form and substance substantially similar to that attached hereto as Exhibit 7 and/or satisfactory to Lender in its sole and absolute discretion.  The Interim Order shall, among other things, have:

   (a)  authorized the transactions contemplated by this Agreement and the extensions of credit under this Agreement in an amount not less than the Credit Limit provided for herein;

52

(b)      granted the claim and Lien status and Liens described in Section 16, and prohibited the granting of additional Liens on the assets of Debtors except for any Liens and Claims specifically provided for in such order;

(c)      provided that such Liens are automatically perfected as of the Applicable Petition Date by the entry of the Interim Order and also granted to the Lender relief from the automatic stay of Section 362(a) of the Bankruptcy Code to enable the Lender, if the Lender elects to do so in its discretion, to make all filings and recordings and to take all other actions considered necessary or advisable by the Lender to perfect, protect and insure the priority of its Liens upon the DIP Collateral as a matter of non-bankruptcy law;

(d)      provided that, upon entry of the Final Order, no Person will be permitted to surcharge the DIP Collateral under Section 506(c) of the Bankruptcy Code, nor shall any costs or expenses whatsoever be imposed against the DIP Collateral, except for the Carve-Out;

(e)      provided for a "roll-up" of all of Pre-Petition Revolver Obligations upon entry of such Final Order, and

(f)      authorized Lender to apply payments received hereunder and proceeds of DIP Collateral received by Lender to either the Pre-Petition Revolver Obligations or the Post-Petition Obligations as Lender may determine in its sole and absolute discretion, as contemplated by **Section 5(b)** hereof.

"**IP License Agreement**" any license agreement granting to a Borrower a license of Intellectual Property Rights that is used in any Borrower's Inventory.

"**Lender**" shall have the meaning set forth in the preamble.

"**Licensed Intellectual Property**" shall have the meaning set forth in **Section 6(m)**.

"**Lien**" shall have the meaning set forth in **Section 9(b)**.

"**Loan Documents**" means this Agreement, the Interim Order, the Final Order (upon the issuance thereof), the Term Note, the Settlement Agreement, the Participation Agreement, the PEC Pledge Agreement, each guaranty or other agreement signed by a Guarantor or Debtor, work through agreements, any pledge agreements, each subordination agreement, each intercreditor agreement, each security agreement, each Mortgage, the Mortgage Documents, together with every other agreement, note, document, contract or instrument to which a Borrower or any other Debtor now or in the future may be a party and which may be required by Lender in connection with, or as a condition to, the execution of this Agreement, each as may be amended, modified, replaced, substituted, superseded or restated from time to time.

"**Loan**" and "**Loans**" individually and collectively refer to the Term Loan and Term Loans.

"**Debtor**" and "**Debtors**" shall have the meaning set forth in the preamble.

"**Material Contract**" means (a) any contract or other agreement (other than the Loan Documents), written or oral, of a Borrower involving monetary liability of or to any Person in an amount in excess of $500,000 in any fiscal year, (b) any lease of a Borrower pertaining to a location with Eligible Inventory of such Borrower is located, and (c) any other contract or other agreement (other than the Loan Documents),

whether written or oral, to which a Borrower is a party as to which the breach, nonperformance, cancellation or failure to renew by any party thereto would have a material adverse effect.

"**Maturity Date**" shall have the meaning set forth in **Exhibit 1**.

"**Milestones**" means each of the milestones set forth on **Exhibit 10**.

"**Monthly Financial Statement**" means, for any given month, the financial statements received by Lender from the Debtors in accordance with **Section 8(a)(i)**.

"**Mortgages**" means, individually and collectively, one or more mortgages, deeds of trust, or deeds to secure debt, executed and delivered by the Debtors, any Subsidiary of the Debtors or any Guarantor in favor of Lender, in form and substance reasonably satisfactory to Lender, that encumber the Real Property DIP Collateral, each as may be amended, modified, replaced, substituted, superseded or restated from time to time.

"**Mortgage Documents**" means the Mortgages and each other document executed in connection with the Real Property DIP Collateral, including any assignments and indemnities, each as may be amended, modified, replaced, substituted, superseded or restated from time to time.

"**Multiemployer Plan**" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which any Debtor or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding six plan years, has made or been obligated to make contributions.

"**Net Cash Proceeds**" means the cash proceeds of any asset sale (including cash proceeds received as deferred payments pursuant to a note, installment receivable or otherwise, but only upon actual receipt) net of (a) reasonable attorney, accountant, and investment banking fees and other customary transaction costs, (b) reasonable brokerage commissions, (c) amounts required to be applied to the repayment of debt secured by a Lien not prohibited by this Agreement on the asset being sold, and (d) reasonable taxes paid or reasonably estimated to be payable as a result of such asset sale.

"**Non-Allocable Disbursements**" means (i) disbursements/payments in respect of professional fees, including funding in respect of the Carve Out, (ii) disbursements/payments in respect of this Agreement or the other Loan Documents and/or the Post-Petition Obligations (including interest and fees payable hereunder), (iii) Adequate Protection Payments, and (iv) payments to the Office of the United States Trustee.

"**Obligations**" means:

(1)    to the extent arising under or in connection with this Agreement or any other Loan Document, any and all loans (including the Term Loans and Roll-Up Loans), debts, principal, interest (including any interest that accrues after the Closing Date, reimbursement or indemnification obligations, premiums, liabilities (including all amounts charged to the Borrowers as Term Loans pursuant to this Agreement), obligations (including indemnification obligations (including any indemnification obligations that accrue after the conversion of the Case to a chapter 7 case as to any Debtor, regardless of whether allowed or allowable in whole or in part as a claim in any such chapter 7 case)), fees (including any fees that accrue after the conversion of the Case to a chapter 7 case as to any Debtor, regardless of whether allowed or allowable in whole or in part as a claim in any such chapter 7 case), expenses (including any fees, costs or expenses that accrue after the conversion of the Case to a chapter 7 case as to any Debtor regardless of whether allowed or allowable in whole or in part as a claim in any such chapter 7 case),

54

guaranties, and all covenants and duties of any other kind and description owing by any Debtor arising out of, under, pursuant to, in connection with, or evidenced by this Agreement or any of the other Loan Documents, the Interim Order, and/or the Final Order, and irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, and including all interest not paid when due and all other expenses or other amounts that Debtors are required to pay or reimburse by the Loan Documents or by law or otherwise in connection with the Loan Documents.  Without limiting the generality of the foregoing, the Obligations of Debtors under the Loan Documents include the obligation to pay (i) the principal of the Term Loans, (ii) interest accrued on the Term Loans, (iii) expenses, (vi) fees payable under this Agreement or any of the other Loan Documents and (vii) indemnities and other amounts payable by any Debtor under any Loan Document, and

> (2)    all Pre-Petition Obligations (after giving effect to the Final Roll-Up);

in each case, whether now existing or arising hereafter and notwithstanding that any such Obligations or claims therefor shall be disallowed, voided or subordinated in any insolvency proceeding or under any debtor relief law or other applicable law.

"**OFAC**" means The Office of Foreign Assets Control of the U.S. Department of the Treasury.

"**OFAC Prohibited Person**" means (a) a Person on OFAC's list of Specially Designated Nationals and Blocked Persons, or any other OFAC sanctions list, or (b) a Person with whom any Borrower would be prohibited from transacting with under OFAC sanctions regulations.

"**Off-the-shelf Software**" shall have the meaning set forth in **Section 6(m)**.

"**Owned Intellectual Property**" shall have the meaning set forth in **Section 6(m)**.

"**Parent**" shall have the meaning set forth in the preamble.

"**Participation Agreement**" shall have the meaning set forth in **Section 7(l)**.

"**Patriot Act**" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA Patriot Act of 2001), as amended, and the rules and regulations thereunder.

"**PEC Pledge Agreement**" shall have the meaning set forth in **Section 7(l)**.

"**Permitted Liens**" means those liens permitted pursuant to **Section 9(b)** of this Agreement.

"**Permitted Protest**" shall have the meaning set forth in **Section 9(b)**.

"**Person**" means any individual, corporation, partnership, joint venture, limited and unlimited liability company, association, joint stock company, trust, unincorporated organization or government or any agency or political subdivision of a governmental entity, and any such Person's successors and assigns.

"**Plan**" shall have the meaning set forth in **Section 6(j)**.

"**Post-Petition Obligations**" means all Obligations other than the Pre-Petition Obligations; for the avoidance of doubt, and notwithstanding anything to the contrary otherwise provided for herein.

"**Pre-Petition Collateral**" means all "Collateral" (as defined in Pre-Petition Loan Agreement) in existence as of the Applicable Petition Date of each Debtor party to the Pre-Petition Loan Agreement.

"**Pre-Petition Financing Documents**" means the Pre-Petition Loan Agreement, the "Loan Documents" as defined in the Pre-Petition Loan Agreement, and each document, agreement and instrument (and all schedules and exhibits thereto) executed in connection therewith, in each case, as in effect immediately prior to the Applicable Petition Date.

"**Pre-Petition Guarantors**" means the guarantors party to the Pre-Petition Loan Agreement.

"**Pre-Petition Lender**" means the meaning set forth in the recitals hereto.

"**Pre-Petition Liens**" means, collectively, the Liens granted by Debtors to the Pre-Petition Lender on the Pre-Petition Collateral.

"**Pre-Petition Loan Agreement**" shall have the meaning set forth in the recitals hereto.

"**Pre-Petition Loan Documents**" means the Pre-Petition Loan Agreement, the "Loan Documents" as defined in the Pre-Petition Loan Agreement, and each document, agreement and instrument (and all schedules and exhibits thereto) executed in connection therewith, in each case, as in effect immediately prior to the Applicable Petition Date.

"**Pre-Petition Obligations**" shall have the meaning set forth in **Section 17(a)** hereof.

"**Pre-Petition Payment**" means a payment (by way of adequate protection or otherwise) of principal or interest or otherwise on account of any pre-petition Indebtedness or trade payables or other pre-petition claims against any Debtor.

"**Pre-Petition Released Claim**" or "**Pre-Petition Released Claims**" shall have the meaning set forth in **Section 17** hereof.

"**Pre-Petition Revolver Obligations**" means, collectively, all Pre-Petition Obligations.

"**Pre-Petition Revolving Loan**" means a "Revolving Loan" as defined in (and funded under) the Pre-Petition Loan Agreement.

"**Qualified Equity Interest**" means and refers to any Equity Interests issued by a Borrower (and not by one or more of its Subsidiaries) that is not a Disqualified Equity Interest.

"**Real Property**" means any estates or interests in real property now owned or hereafter acquired by a Debtor or any subsidiary of a Debtor and the improvements thereto.

"**Real Property DIP Collateral**" means the Real Property described on **Exhibit 8** attached hereto.

"**Reorganization Plan**" means a plan or plans of reorganization in the Case.

"**Reportable Event**" means a reportable event as defined in Section 4043 of ERISA and the regulations issued thereunder as to which the Pension Benefit Guaranty Corporation and any entity succeeding to any or all of its functions under ERISA has not waived the notification requirement of Section 4043(a), or the failure of a Plan to meet the minimum funding standards of Section 412 of the Internal

Revenue Code of 1986, as amended (without regard to whether the Plan is a plan described in Section 4021(a)(2) of ERISA) or under Section 302 of ERISA.

"**Restricted Payment**" means to (a) declare or pay any dividend or make any other payment or distribution, directly or indirectly, on account of Equity Interests issued by a Debtor (including any payment in connection with any merger or consolidation involving such Debtor) or to the direct or indirect holders of Equity Interests issued by such Debtor in their capacity as such (other than dividends or distributions payable in Qualified Equity Interests issued by such Debtor), or (b) purchase, redeem, make any sinking fund or similar payment, or otherwise acquire or retire for value (including in connection with any merger or consolidation involving a Debtor) any Equity Interests issued by such Debtor, or (c) make any payment to retire, or to obtain the surrender of, any outstanding warrants, options, or other rights to acquire Equity Interests of a Debtor now or hereafter outstanding, or (d) make, or cause or suffer to permit any of any Debtor's Subsidiaries to make, any payment or prepayment of principal of, premium, if any, or interest on, or redemption, purchase, retirement, defeasance (including in-substance or legal defeasance), sinking fund or similar payment with respect to, any Debt.

"**RTO Contracts**" means all commercial paper held by Debtors with respect to the business of renting, on a rent-to-own basis, and selling furniture, electronics, appliances, and other merchandise to customers conducted at the Debtors' store locations, including without limitation, all of such Debtors' rights, titles and interests under the consumer rental agreements held by Debtors.

"**Sale Order**" means an order of the Bankruptcy Court, on terms and conditions and in form and substance acceptable to the Lender in its sole and absolute discretion, approving any Approved 363 Sale.

"**Sanctioned Entity**" means (a) a country or territory or a government of a country or territory, (b) an agency of the government of a country or territory, (c) an organization directly or indirectly controlled by a country or territory or its government, or (d) a Person resident in or determined to be resident in a country or territory, in each case of clauses (a) through (d) that is a target of Sanctions, including a target of any country or list-based sanctions program administered and enforced by OFAC or any Canadian Governmental Authority.

"**Sanctioned Person**" means, at any time (a) any Person named on the list of Specially Designated Nationals and Blocked Persons maintained by OFAC, OFAC's consolidated Non-SDN list or any other Sanctions-related list maintained by any Governmental Authority, (b) a Person or legal entity that is a target of Sanctions, (c) any Person operating, organized or resident in a Sanctioned Entity, or (d) any Person directly or indirectly owned or controlled (individually or in the aggregate) by or acting on behalf of any such Person or Persons described in clauses (a) through (c) above.

"**Sanctions**" means individually and collectively, respectively, any and all economic sanctions, trade sanctions, financial sanctions, sectoral sanctions, secondary sanctions, trade embargoes anti-terrorism laws and other sanctions laws, regulations or embargoes, including those imposed, administered or enforced from time to time by:  (a) the United States of America, including those administered by OFAC, the U.S. Department of State, the U.S. Department of Commerce, or through any existing or future executive order, (b) the United Nations Security Council, (c) the European Union or any European Union member state, (d) Her Majesty's Treasury of the United Kingdom, or (d) any other Governmental Authority with jurisdiction over Lender or any Debtor or any of their respective Subsidiaries or Affiliates.

"**Second Petition Date**" shall have the meaning set forth in the recitals hereto.

"**Settlement Agreement**" means that certain Settlement Agreement dated as of the date hereof by and among the Debtors, Ian MacDonald and Lender in form and substance substantially similar to that attached hereto as **Exhibit 11** and satisfactory to the Pre-Petition Lender and Lender in their respective sole and absolute discretion.

"**Senior Liens**" means, collectively, (i) the Prior Permitted Liens, (ii) any valid, perfected, and unavoidable Lien (other than the Pre-Petition Liens) existing as of the Applicable Petition Date, which is senior in priority to the liens granted to the Pre-Petition Lender in the Pre-Petition Collateral, and (iii) any valid and unavoidable Lien, which is senior in priority to the Pre-Petition Liens granted to the Pre-Petition Lender in the Pre-Petition Collateral that is validly perfected subsequent to the Applicable Petition Date as permitted by Bankruptcy Code section 546(b).

"**Subject RTO Real Property**" means all real property owned by the Debtors specified on Schedule 7 to the Settlement Agreement.

"**Superpriority Claim**" means an allowed claim against any Debtor or such Debtor's estate in the Case which is an administrative expense claim having priority over (a) any and all allowed administrative expenses (other than the Carve-Out) and (b) all unsecured claims now existing or hereafter arising, including any administrative expenses of the kind specified in the Bankruptcy Code, including without limitation Sections 105, 326, 328, 330, 331, 364(c)(1), 365, 503, 506(c) (upon entry of the Final Order), 507, 546, 726, 1113 or 1114 of the Bankruptcy Code.

"**Term**" shall have the meaning set forth in **Section 12(a)**.

"**Term Loan**" or "**Term Loans**" shall have the meaning set forth in **Section 1(a)**.

"**Termination Date**" means the earliest to occur of (the date of such earliest occurrence, the "Termination Date"): (a) the Maturity Date; (b) delivery of a termination declaration to Borrowers during the continuance of an Event of Default pursuant to Section 10; (c) the effective date or substantial consummation of an Approved 363 Sale; (d) the effective date or substantial consummation of a plan of reorganization or plan of liquidation in the Case; (e) the date of filing or support by the Debtors of a plan of reorganization or plan of liquidation that does not provide for the indefeasible payment in full in cash of all Obligations (including for the avoidance of doubt, even if prior to the Final Order, all Pre-Petition Revolving Obligations); (f) date of the conversion of the Case to a case under Chapter 7 of the Bankruptcy Code; (g) the date of the dismissal of the Case.

"**Term Note**" shall have the meaning set forth in **Section 1(a)**.

"**Third Petition Date**" shall have the meaning set forth in the recitals.

"**U.S. Trustee**" shall have the meaning given to such term in the Interim Order, or, after the entry of the Final Order, in the Final Order.

## 15.    JOINT AND SEVERAL LIABILITY•

(a)    Each Borrower is accepting joint and several liability hereunder and under the other Loan Documents in consideration of the financial accommodations to be provided by Lender under this Agreement, for the mutual benefit, directly and indirectly, of each Borrower and in consideration of the undertakings of each other Borrower to accept joint and several liability for the Obligations.

58

(b)      If and to the extent that any Borrower shall fail to make any payment with respect to any of the Obligations as and when due or to perform any of the Obligations in accordance with the terms thereof, then in each such event the other Borrowers will make such payment with respect to, or perform, such Obligation.

(c)      The Obligations of each Borrower under the provisions of this **Section 15** constitute the absolute and unconditional, full recourse Obligations of each Borrower enforceable against each Borrower to the full extent of its properties and assets, irrespective of the validity, regularity or enforceability of this Agreement or any other circumstances whatsoever.

(d)      Except as otherwise expressly provided in this Agreement, each Borrower hereby waives notice of acceptance of its joint and several liability, notice of any Loans issued under or pursuant to this Agreement, notice of the occurrence of any Event of Default, or of any demand for any payment under this Agreement, notice of any action at any time taken or omitted by Lender under or in respect of any of the Obligations, any requirement of diligence or to mitigate damages and, generally, to the extent permitted by applicable law, all demands, notices and other formalities of every kind in connection with this Agreement (except as otherwise provided in this Agreement).  Each Borrower hereby assents to, and waives notice of, any extension or postponement of the time for the payment of any of the Obligations, the acceptance of any payment of any of the Obligations, the acceptance of any partial payment thereon, any waiver, consent or other action or acquiescence by Lender at any time or times in respect of any default by any Borrower in the performance or satisfaction of any term, covenant, condition or provision of this Agreement, any and all other indulgences whatsoever by Lender in respect of any of the Obligations, and the taking, addition, substitution or release, in whole or in part, at any time or times, of any security for any of the Obligations or the addition, substitution or release, in whole or in part, of any Borrower.  Without limiting the generality of the foregoing, each Borrower assents to any other action or delay in acting or failure to act on the part of Lender with respect to the failure by any Borrower to comply with any of its respective Obligations, including, without limitation, any failure strictly or diligently to assert any right or to pursue any remedy or to comply fully with applicable laws or regulations thereunder, which might, but for the provisions of this **Section 15** afford grounds for terminating, discharging or relieving any Borrower, in whole or in part, from any of its Obligations under this **Section 15**, it being the intention of each Borrower that, so long as any of the Obligations hereunder remain unsatisfied, the Obligations of each Borrower under this **Section 15** shall not be discharged except by performance and then only to the extent of such performance.  The Obligations of each Borrower under this **Section 15** shall not be diminished or rendered unenforceable by any winding up, reorganization, arrangement, liquidation, reconstruction or similar proceeding with respect to any Borrower or Lender.

(e)      Each Borrower represents and warrants to Lender that such Borrower is currently informed of the financial condition of Borrowers and of all other circumstances which a diligent inquiry would reveal and which bear upon the risk of nonpayment of the Obligations.  Each Borrower further represents and warrants to Lender that such Borrower has read and understands the terms and conditions of the Loan Documents.  Each Borrower hereby covenants that such Borrower will continue to keep informed of Borrowers' financial condition, the financial condition of other guarantors, if any, and of all other circumstances which bear upon the risk of nonpayment or nonperformance of the Obligations.

(f)      Each Borrower waives all rights and defenses arising out of an election of remedies by Lender, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed Lender's rights of subrogation and reimbursement against such Borrower.

59

(g)    The provisions of this **Section 15** are made for the benefit of Lender and its successors and assigns, and may be enforced by it or them from time to time against any Borrower as often as occasion therefor may arise and without requirement on the part of Lender, successor or assign first to marshal any of its or their claims or to exercise any of its or their rights against any Borrower or to exhaust any remedies available to it or them against any Borrower or to resort to any other source or means of obtaining payment of any of the Obligations hereunder or to elect any other remedy.  The provisions of this **Section 15** shall remain in effect until all of the Obligations shall have been paid in full or otherwise fully satisfied.  If at any time, any payment, or any part thereof, made in respect of any of the Obligations, is rescinded or must otherwise be restored or returned by Lender upon the insolvency, bankruptcy or reorganization of any Borrower, or otherwise, the provisions of this **Section 15** will forthwith be reinstated in effect, as though such payment had not been made.

(h)    Until the Obligations have been paid in full and this Agreement has been terminated, each Borrower hereby agrees that it will not enforce any of its rights of contribution or subrogation against any other Borrower with respect to any liability incurred by it hereunder or under any of the other Loan Documents, any payments made by it to Lender with respect to any of the Obligations or any collateral security therefor until such time as all of the Obligations have been paid in full in cash.  Any claim which any Borrower may have against any other Borrower with respect to any payments to Lender hereunder or under any other Loan Documents are hereby expressly made subordinate and junior in right of payment, without limitation as to any increases in the Obligations arising hereunder or thereunder, to the prior payment in full in cash of the Obligations and, in the event of any insolvency, bankruptcy, receivership, liquidation, reorganization or other similar proceeding under the laws of any jurisdiction relating to any Borrower, its debts or its assets, whether voluntary or involuntary, all such Obligations shall be paid in full in cash before any payment or distribution of any character, whether in cash, securities or other property, shall be made to any other Borrower therefor.

(i)    Each Borrower hereby agrees that, after the occurrence and during the continuance of any default or Event of Default, the payment of any amounts due with respect to the Debt owing by any Borrower to any other Borrower is hereby subordinated to the prior payment in full in cash of the Obligations.  Each Borrower hereby agrees that after the occurrence and during the continuance of any default or Event of Default, such Borrower will not demand, sue for or otherwise attempt to collect any Debt of any other Borrower owing to such Borrower until the Obligations shall have been paid in full in cash.  If, notwithstanding the foregoing sentence, such Borrower shall collect, enforce or receive any amounts in respect of such Debt, such amounts shall be collected, enforced and received by such Borrower as trustee for Lender, and such Borrower shall deliver any such amounts to Lender, for application to the Obligations.

16.    **SUPERPRIORITY CLAIMS, DIP COLLATERAL SECURITY, ETC**. The Debtors hereby represent and warrant, covenant and agree, and acknowledge that:

(a)    (A) pursuant to the Final Order (or, prior to the entry of the Final Order, the Interim Order), to secure all Post-Petition Obligations, whether now existing or hereafter arising, subject only to the Carve-Out, Lender has been granted an allowed superpriority administrative expense claim in Debtors' Estates pursuant to Bankruptcy Code section 364(c)(1), having priority in right of payment over any and all other obligations, liabilities, and indebtedness of any of such Debtors, whether now in existence or hereafter incurred by any of such Debtors of every kind or nature, including any and all unsecured claims, administrative expenses, adequate protection claims, priority claims or any other claims of the kind specified in, or ordered pursuant to, the Bankruptcy Code, including without limitation, *inter alia*, Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 507, 364(c)(1), 546(c), 726 or 1114 and, upon entry of the Final Order, sections 506(c) and 552(b) (the "**DIP Superpriority Claim**"); and (B) other than

60

the Carve-Out, (a) effective upon entry of the Final Order with respect to rights preserved under Bankruptcy Code Section 506(c), no costs or expenses of administration, including without limitation, professional fees allowed and payable under Bankruptcy Code sections 328, 330, and 331, or otherwise, that have been or may be incurred in the Case, or in any successor cases under the Bankruptcy Code, and (b) no priority claims are, or will be, senior to, prior to, or on a parity with the DIP Superpriority Claim or the Post-Petition Obligations or with any other claims of the Lender arising hereunder;

      **(b)**        pursuant to the Final Order (or, prior to the entry of the Final Order, the Interim Order where applicable), to secure the prompt payment and performance of any and all Post-Petition Obligations of Debtors to Lender of whatever kind, nature, or description, absolute or contingent, now existing or hereafter arising, Lender has been granted, effective *nunc pro tunc* as of the Applicable Petition Date, valid, binding, enforceable, continuing, non-avoidable and perfected first priority (subject only to any Senior Liens (including the Carve-Out)), security interests and liens in and upon all property and rights and interests in property of each of the Debtors or their Estates of any kind or nature whatsoever in existence as of the Applicable Petition Date as well as thereafter created or acquired, and wherever located, including without limitation, all of the DIP Collateral as defined herein;

      **(i)**        subject to Section IX of the Interim Order and any corresponding provisions of the Final Order, the Liens in favor of Lender described in the foregoing Section 4 (the "**DIP Liens**") are and shall be:

          **(A)**        pursuant to Bankruptcy Code section 364(c)(2), continuing valid, perfected, enforceable, first priority, and fully perfected liens on and security interests in all of the Debtors' right, title, and interest in, to, and under all DIP Collateral that is not otherwise encumbered by a validly perfected security interest or lien as of the Applicable Petition Date;

          **(B)**        pursuant to Bankruptcy Code section 364(c)(3), a continuing valid, enforceable, second priority, and fully perfected lien on and security interest (other than as set forth in clause (c) below) in all of the Debtors' right, title, and interest in, to, and under all DIP Collateral which is subject to, as of the Applicable Petition Date, a Senior Lien,

          **(C)**        subject to any applicable Senior Liens, pursuant to Bankruptcy Code section 364(d), valid, enforceable, and fully perfected first priority senior priming security interests in and senior priming liens upon all of the Debtors' right, title, and interest in, to, and under all DIP Collateral, including, without limitation, priming security interests and priming liens which are senior to (i) the Pre-Petition Liens held by the Pre-Petition Lender, on behalf of the Pre-Petition Lender, and (ii) the Adequate Protection Liens;

          **(D)**        notwithstanding anything to the contrary contained in the Interim Order or the Final Order, the DIP Liens and the Adequate Protection Liens shall not be subject or subordinate to (i) Bankruptcy Code sections 510, 549, or 550; (ii) any lien or security interest that is avoided or preserved for the benefit of the Debtors or their Estates under Bankruptcy Code section 551; or (iii) any intercompany or affiliate liens of the Debtors;

      **(ii)**        (A) until the Payment in Full of the Pre-Petition Obligations, the Pre-Petition Lender, for itself and for the benefit of the Pre-Petition Lender, has been granted, pursuant to the Final Order (or, prior to the entry of the Final Order, the Interim Order where applicable), the Adequate Protection Liens, which are valid, binding, enforceable and perfected replacement and additional security interests and liens on all the Debtors' right, title, and interest in and to the

61

DIP Collateral to the extent of the Adequate Protection Obligations, which liens shall be junior in all respects only to the DIP Liens, the Senior Liens, and the Carve Out; (B) the Adequate Protection Liens shall be deemed to be fully perfected as of the Applicable Petition Date and, subject to Section IX of the Interim Order and any corresponding provisions of the Final Order, not subject to subordination or avoidance for any cause or purpose in the Case, and (C) except for the DIP Liens and the Senior Liens and the Carve Out), the Adequate Protection Liens (i) shall not be made subject to or *pari passu* with any lien or security interest by any court order heretofore or hereafter entered in the Case (unless with the consent of the Pre-Petition Lender); (ii) shall not be subject to Bankruptcy Code sections 506(c) (upon entry of the Final Order), 510, 549, or 550 and (iii) no lien or interest avoided and preserved for the benefit of any Estate pursuant to Bankruptcy Code section 551 shall be made *pari passu* with or senior to the Adequate Protection Liens;

(iii)     pursuant to the Final Order (or, prior to the entry of the Final Order, the Interim Order), As further adequate protection, to the extent that the Adequate Protection Liens do not adequately protect the diminution in value of the Pre-Petition Lender's interest in the Pre-Petition Collateral, the Pre-Petition Lender is hereby granted the Adequate Protection Claim against the Debtors' Estates under Bankruptcy Code sections 503 and 507(b), which shall, subject only to the DIP Superpriority Claim and the Carve-Out, have priority over all other administrative expense claims, priority claims and unsecured claims against the Debtors or their Estates, which are now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses and priority or other claims of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 364, 365, 503(a), 503(b), 506(c) (upon entry of the Final Order), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114;

(iv)     the Final Order (and prior to the entry thereof, the Interim Order where applicable) is sufficient and conclusive evidence of the priority, perfection, and validity of  the DIP Liens, effective as of the Applicable Petition Date, without any further act and without regard to any other federal, state, or local requirements or law requiring notice, filing, registration, recording, or possession of the DIP Collateral, or other act to validate or perfect such security interest or lien, including, without limitation, control agreements with any financial institution(s) holding any deposit account of Borrowers or any Guarantor (a "**Perfection Act**").  Notwithstanding the foregoing, if Lender or the Pre-Petition Lender (on account of its Adequate Protection Liens) shall, in their respective sole discretion, elect for any reason to file, record, or otherwise effectuate any Perfection Act, pursuant to the Final Order (or, prior to the entry of the Final Order, the Interim Order), each of Lender and the Pre-Petition Lender (with the prior written consent of Lender) is authorized to perform such act, and, pursuant to the Final Order (or, prior to the entry of the Final Order, the Interim Order), Debtors are authorized to perform such acts to the extent necessary or reasonably requested by Lender and/or the Pre-Petition Lender, which act or acts shall be deemed to have been accomplished as of the Applicable Petition Date notwithstanding the date and time actually accomplished, and in such event, the subject filing or recording office is authorized to accept, file or record any document in regard to such act in accordance with applicable law. Pursuant to the Final Order (or, prior to the entry of the Final Order, the Interim Order), Lender and/or the Pre-Petition Lender may choose to file, record or present a certified copy of the Final Order (or, prior to the entry of the Final Order, the Interim Order where applicable), in the same manner as a Perfection Act, which shall be tantamount to a Perfection Act, and, in such event, the subject filing or recording office is authorized to accept, file, or record such certified copy of the Final Order (or, prior to the entry of the Final Order, the Interim Order where applicable) in accordance with applicable law. Should Lender and/or the Pre-Petition Lender so choose and attempt to file, record or perform a Perfection Act, no defect or failure in connection with such attempt shall in any way limit, waive, or alter the validity, enforceability, attachment, priority, or

62

perfection of the DIP Liens or the Adequate Protection Liens granted herein by virtue of the entry of the Final Order (or, prior to the entry of the Final Order, the Interim Order where applicable).

(c)      **Non-Exclusive Relief**. The agreement of Lender to provide Post-Petition financing to Borrowers will not prohibit Lender or Pre-Petition Lender from moving in the Bankruptcy Court for any other and further relief which Lender or such Pre-Petition Lender, as applicable, believes in good faith to be reasonably and immediately necessary to protect their rights with respect to the DIP Collateral and/or the Pre-Petition Collateral (as applicable) (including a request for Debtors to abandon any part of the DIP Collateral and/or the Pre-Petition Collateral (as applicable)) or otherwise.

(d)      **No Intent to Hinder, Delay or Defraud**.  Neither the incurrence of the Obligations, the granting of Liens under this Agreement on the DIP Collateral to secure the Obligations, the creation of Liens on the DIP Collateral to secure the Obligations under the Interim Order or Final Order and/or any other Loan Document, the granting of Liens under this Agreement on the DIP Collateral to secure the Adequate Protection Obligations or the creation of the Liens on the DIP Collateral to secure the Adequate Protection Obligations under the Interim or Final Order and/or any other Loan Document, was incurred, granted or transferred, as applicable, with any intent to hinder, delay or defraud any of its respective creditors.

(e)      **Grants, Rights and Remedies**.  The Liens and administrative priority granted by or pursuant to the Interim Order, the Final Order, this Agreement or any other Loan Document (and, in the case of Liens in the Pre-Petition Collateral in favor of the Pre-Petition Lender, granted by or pursuant to the Pre-Petition Loan Documents) are independently granted.  The Interim Order, the Final Order, this Agreement and the other Loan Documents (and, in the case of Liens in the Pre-Petition Collateral in favor of the Pre-Petition Lender, the Pre-Petition Loan Documents) supplement each other, and the grants, priorities, rights and remedies of Lender hereunder and thereunder and of Pre-Petition Lender hereunder and thereunder are cumulative.

## 17.      ACKNOWLEDGMENT; REAFFIRMATION AND RELEASE.

(a)      As of the Second Petition Date, the aggregate amount of all Obligations (as defined in the Pre-Petition Loan Agreement) owing by Debtors to the Pre-Petition Lender under and in connection with the Pre-Petition Financing Documents was not less than (A) $12,792,674.70, consisting of (1) Pre-Petition Revolving Loans in an outstanding principal amount of $11,974,354 under the Pre-Petition Loan Agreement, plus interest accrued and accruing thereon at the rate in effect on the Second Petition Date, plus (2) accrued and accruing fees, plus (3) all accrued and accruing costs and expenses (including attorneys' fees and legal expenses), plus (4) any other charges and liabilities accrued, accruing or chargeable, whether due or to become due, matured or contingent, under the Pre-Petition Loan Agreement (collectively, "**Pre-Petition Obligations**"). Without limiting the foregoing, the Pre-Petition Obligations shall include all indemnification obligations of Debtors to the Pre-Petition Lender arising under the Pre-Petition Financing Documents, including without limitation the indemnitee and other protections provided to indemnitees under the obligations arising under the Pre-Petition Loan Agreement which survive payment in full of the Pre-Petition Obligations.

(b)      The Pre-Petition Obligations constitute allowed, legal, valid, binding, enforceable, and non-avoidable obligations of Debtors, and are not subject to any offset, deduction, defense, counterclaim, avoidance, recovery, recharacterization, or subordination pursuant to the Bankruptcy Code or any other applicable law, and the Debtors do not possess, and shall not assert, any claim, counterclaim, setoff, deduction, or defense of any kind, nature, or description that would in any way impair, reduce, or affect the validity, enforceability, and nonavoidability of any of the Pre-Petition Obligations.

63

(c)     Each Debtor confirms and agrees that:

    (i)     as of the Applicable Petition Date, the Pre-Petition Lender, had and shall continue to have, and the Pre-Petition Obligations were and shall continue to be secured by, the Pre-Petition Liens on the Pre-Petition Collateral, which were and are valid, binding, perfected, enforceable and non-avoidable first priority security interests and Liens, subject only to (A) Senior Liens, and (B) from and after the entry of the Final Order, or, prior to the entry of the Final Order, the Interim Order, (1) the Carve-Out, (2) the Liens of Lender securing the Post-Petition Obligations, and (3) the Adequate Protection Liens,

    (ii)     the Pre-Petition Lender has a valid, binding and perfected nonavoidable and first priority security interest (subject only to (A) Senior Liens, and (B) from and after the entry of the Final Order, or, prior to the entry of the Final Order, the Interim Order, (1) the Carve-Out, (2) the Liens of Lender securing the Post-Petition Obligations, and (3) the Adequate Protection Liens)) and lien in all of Debtor's Cash Collateral, including all amounts on deposit in all of Debtor's banking, checking or other deposit accounts with each of the Pre-Petition Lender, whether as original Collateral or proceeds of other Pre-Petition Collateral, and all such Cash Collateral is part of the Pre-Petition Collateral, and

    (iii)     pursuant to the Final Order, or, prior to the entry of the Final Order, the Interim Order where applicable, the Pre-Petition Lender, has been granted and shall continue to have valid, enforceable and perfected security interests and Liens on all the Debtors' right, title, and interest in and to the DIP Collateral to the extent of the Adequate Protection Obligations, which liens shall be junior in all respects only to the DIP Liens, the Senior Liens and the Carve-Out).

(d)     In consideration of, and as a condition to Lender  making Term Loans under this Agreement, the Pre-Petition Lender consenting to the use of Cash Collateral, and providing other credit and financial accommodations to the Debtors pursuant to the provisions of the Interim Order and the DIP Loan Documents, each Debtor, on behalf of itself, its successors and assigns and its Estate (collectively, the "**Releasors**"), subject only to Section IX of the Interim Order, hereby absolutely releases and forever discharges and acquits Pre-Petition Lender and each of its successors, participants, and assigns, and their present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees, and other representatives (the Pre-Petition Lender, and all such other parties being hereinafter referred to collectively as the "**Releasees**") of and from any and all claims, demands, causes of action, suits, covenants, contracts, controversies, agreements, promises, sums of money, accounts, bills, reckonings, damages, and any and all other claims, counterclaims, cross claims, defenses, rights of set-off, demands, and liabilities whatsoever (individually, a "**Pre-Petition Released Claim**" and collectively, the "**Pre-Petition Released Claims**") of every kind, name, nature and description, known or unknown, foreseen or unforeseen, matured or contingent, liquidated or unliquidated, primary or secondary, suspected or unsuspected, both at law and in equity, including, without limitation, any so-called "lender liability" claims or defenses, that any Releasor may now or hereafter own, hold, have, or claim to have against the Releasees, or any of them for, upon, or by reason of any nature, cause, or thing whatsoever that arose or may have arisen at any time on or prior to the date of the Interim Order, in respect of the Debtors, the Pre-Petition Obligations, the Pre-Petition Financing Documents, and any Pre-Petition Revolving Loans or other financial accommodations under the Pre-Petition Financing Documents; **provided**, **however**, that such release shall not be effective with respect to the Debtors until entry of the Final Order, and with respect to the Estates, until the expiration of the Challenge Period.

(e)     In addition, (i)(x) with respect to the Debtors, upon entry of the Final Order and (y) with respect to the Debtors' Estates, upon expiration of the Challenge Period, (ii) the Payment in Full of the

Obligations, and (iii) termination of the rights and obligations arising under the Interim Order and the Loan Documents (which payment and termination shall be on terms and conditions acceptable to Lender), Lender shall be automatically deemed to be absolutely and forever released and discharged from any and all obligations, liabilities, actions, duties, responsibilities, commitments, claims, and causes of action arising, occurring in connection with, or related to the Loan Documents or the Interim Order (whether known or unknown, direct or indirect, matured or contingent, foreseen or unforeseen, due or not due, primary or secondary, liquidated or unliquidated).

(f)     Upon the entry of the Final Order, and subject to Section IX of the Interim Order with respect to all applicable parties other than the Debtors, each Releasor hereby absolutely, unconditionally and irrevocably covenants and agrees with each Releasee that it will not sue (at law, in equity, in any regulatory proceeding, or otherwise) any Releasee on the basis of any Pre-Petition Released Claim that has been released and discharged by each Releasor pursuant to Section IX(28)(b) of the Interim Order and Section 17(a) above. If any Releasor violates the foregoing covenant, Debtors agree to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.

(g)     Each Debtor, in its capacity as a Borrower or Guarantor under the Pre-Petition Financing Documents or as a Borrower or Guarantor hereunder, as applicable, hereby: (i) ratifies, assumes, adopts and agrees to be bound by all of the Pre-Petition Financing Documents to which it is a party and (ii) agrees to pay all Pre-Petition Obligations for which it is obligated in accordance with the terms of the Pre-Petition Loan Documents and in accordance with the Interim Order and Final Order. All of the Pre-Petition Financing Documents to which any Debtor, in its capacity as a capacity as a Borrower or Guarantor under the Pre-Petition Financing Documents, as applicable, are hereby and shall be deemed adopted and assumed in full by each such Debtor, in each case as a Debtor and Debtor-in-possession, and considered as agreements among the Debtors, on the one hand, and Pre-Petition Lender, on the other.

(h)     Each Debtor, in its capacity as a Borrower or Guarantor hereunder or under the Pre-Petition Financing Documents , as applicable, hereby acknowledges and agrees that: (i) Lender (or its designee) may credit bid some or all of the Pre-Petition Obligations and the Post-Petition Obligations, which are in the aggregate amount acknowledged hereunder, to acquire the DIP Collateral pursuant to documents, agreements, instruments, orders and papers that are in form and substance acceptable to Lender; (ii)_ Lender (or its designee) may act as a stalking horse purchaser for substantially all of the Debtors' assets, which are DIP Collateral, and as such will require (x) the Debtors to establish a minimum topping bid of $650,000 in respect of any such stalking horse bid by Lender, (y) such minimum topping bid shall also include reasonable expense reimbursement for the Lender in connection with the professional fees and expenses incurred in connection with this DIP financing and the related sale process contemplated by the Milestones, which shall not exceed $550,000, and (z) the Lender shall have designation rights in respect of all Material Contracts, including, without limitation, Debtor leases of non-residential real property.

(i)     Notwithstanding the foregoing or anything herein to the contrary, the Pre-Petition Lender agrees to the deferral of any and all fees to the closing of the Credit Bid (as defined in the Interim Order). In the event that the Credit Bid is topped by an alternate bidder, the fees of the Pre-Petition Lender and Lender shall be paid immediately upon the closing of the sale of the Debtors' assets, however, shall the Credit Bid be the successful bidder, the fees of the Pre-Petition Lender and the Lender shall be paid through the Loans pursuant to this Agreement.

**18.    GUARANTY.**

65

(d)    <u>**Guaranty**</u>.    Each Guarantor hereby jointly and severally and unconditionally and irrevocably guarantees the punctual payment when due, whether at stated maturity, by acceleration or otherwise, of all Obligations of the Borrowers now or hereafter existing under any Loan Document, whether for principal, interest (including, without limitation, all interest that accrues after the commencement of any Insolvency Proceeding of any Borrower, whether or not a claim for post-filing interest is allowed in such Insolvency Proceeding), fees, commissions, expense reimbursements, indemnifications or otherwise (such obligations, to the extent not paid by the Borrowers, being the "<u>**Guaranteed Obligations**</u>"), and agrees to pay any and all expenses (including reasonable counsel fees and expenses) incurred by Secured Parties in enforcing any rights under the guaranty set forth in this Section 18.  Without limiting the generality of the foregoing, each Guarantor's liability shall extend to all amounts that constitute part of the Guaranteed Obligations and would be owed by the Borrowers to the Secured Parties under any Loan Document but for the fact that they are unenforceable or not allowable due to the existence of an Insolvency Proceeding involving any Borrower.  Notwithstanding any of the foregoing, Guaranteed Obligations shall not include any Excluded Swap Obligations.  In no event shall the obligation of any Guarantor hereunder exceed the maximum amount such Guarantor could guarantee under any Debtor Relief Law.

(e)    <u>**Guaranty Absolute**</u>.    Each Guarantor jointly and severally guarantees that the Guaranteed Obligations will be paid strictly in accordance with the terms of the Loan Documents, regardless of any law, regulation or order now or hereafter in effect in any jurisdiction affecting any of such terms or the rights of the Secured Parties with respect thereto. Each Guarantor agrees that this Section 18 constitutes a guaranty of payment when due and not of collection and waives any right to require that any resort be made by the Agent or any Lender to any Collateral.  The obligations of each Guarantor under this **Error! Reference source not found.** are independent of the Guaranteed Obligations, and a separate action or actions may be brought and prosecuted against each Guarantor to enforce such obligations, irrespective of whether any action is brought against any Debtor or whether any Debtor is joined in any such action or actions.   The liability of each Guarantor under this **Error! Reference source not found.** shall be irrevocable, absolute and unconditional irrespective of, and each Guarantor hereby irrevocably waives any defenses it may now or hereafter have in any way relating to, any or all of the following:

(i)    any lack of validity or enforceability of any Loan Document or any agreement or instrument relating thereto;

(ii)    any change in the time, manner or place of payment of, or in any other term of, all or any of the Guaranteed Obligations, or any other amendment or waiver of or any consent to departure from any Loan Document, including, without limitation, any increase in the Guaranteed Obligations resulting from the extension of additional credit to any Debtor or otherwise;

(iii)    any taking, exchange, release or non-perfection of any Collateral, or any taking, release or amendment or waiver of or consent to departure from any other guaranty, for all or any of the Guaranteed Obligations;

(iv)    the existence of any claim, set-off, defense or other right that any Guarantor may have at any time against any Person, including, without limitation, Lender;

(v)    any change, restructuring or termination of the corporate, limited liability company or partnership structure or existence of any Debtor; or

(vi)    any other circumstance (including, without limitation, any statute of limitations) or any existence of or reliance on any representation by the Secured Parties that might otherwise constitute a defense available to, or a discharge of, any Debtor or any other guarantor or surety.

66

This **Error! Reference source not found.** shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Guaranteed Obligations is rescinded or must otherwise be returned by Secured Parties or any other Person upon the insolvency, bankruptcy or reorganization of any Borrower or otherwise, all as though such payment had not been made.

     **(f)**     **Waiver**. Each Guarantor hereby waives (i) promptness and diligence, (ii) notice of acceptance and any other notice with respect to any of the Guaranteed Obligations and this **Error! Reference source not found.** and any requirement that the Secured Parties exhaust any right or take any action against any Debtor or any other Person or any Collateral, (iii) any right to compel or direct Lender to seek payment or recovery of any amounts owed under this **Error! Reference source not found.** from any one particular fund or source or to exhaust any right or take any action against any other Debtor, any other Person or any Collateral, (iv) any requirement that any Lender protect, secure, perfect or insure any security interest or Lien on any property subject thereto or exhaust any right to take any action against any Debtor, any other Person or any Collateral, and (v) any other defense available to any Guarantor. Each Guarantor agrees that the Secured Parties shall have no obligation to marshal any assets in favor of any Guarantor or against, or in payment of, any or all of the Obligations. Each Guarantor acknowledges that it will receive direct and indirect benefits from the financing arrangements contemplated herein and that the waiver set forth in this 1(f) is knowingly made in contemplation of such benefits. Each Guarantor hereby waives any right to revoke this **Error! Reference source not found.**, and acknowledges that this Error! Reference source not found. is continuing in nature and applies to all Guaranteed Obligations, whether existing now or in the future.

     **(g)**     **Continuing Guaranty; Assignments**. This **Error! Reference source not found.** is a continuing guaranty and shall (a) remain in full force and effect until the later of the cash payment in full of the Guaranteed Obligations (other than Contingent Indemnity Obligations) and all other amounts payable under this **Error! Reference source not found.** and the Maturity Date, (b) be binding upon each Guarantor, its successors and assigns and (c) inure to the benefit of and be enforceable by the Secured Parties and their successors, pledgees, transferees and assigns. Without limiting the generality of the foregoing clause (c), Lender may pledge, assign or otherwise transfer all or any portion of its rights and obligations under this Agreement (including, without limitation, all or any portion of its commitments, its Loans owing to it) to any other Person, and such other Person shall thereupon become vested with all the benefits in respect thereof granted such Lender herein or otherwise, in each case as provided in Section 13(d).

     **(h)**     **Subrogation**. No Guarantor will exercise any rights that it may now or hereafter acquire against any Debtor or any other guarantor that arise from the existence, payment, performance or enforcement of such Guarantor's obligations under this **Error! Reference source not found.**, including, without limitation, any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of the Secured Parties against any Debtor or any other guarantor or any Collateral, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including, without limitation, the right to take or receive from any Debtor or any other guarantor, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security solely on account of such claim, remedy or right, unless and until all of the Guaranteed Obligations (other than contingent indemnity obligations) and all other amounts payable under this **Error! Reference source not found.** shall have been paid in full in cash and the Maturity Date shall have occurred. If any amount shall be paid to any Guarantor in violation of the immediately preceding sentence at any time prior to the later of the payment in full in cash of the Guaranteed Obligations (other than contingent indemnity obligations) and all other amounts payable under this **Error! Reference source not found.** and the Maturity Date, such amount shall be held in trust for the benefit of the Secured Parties and shall forthwith be paid to the Secured Parties to be credited and applied to the Guaranteed Obligations and all other amounts payable under this **Error! Reference source not found.**, whether matured or unmatured, in

67

accordance with the terms of this Agreement, or to be held as Collateral for any Guaranteed Obligations or other amounts payable under this **Error! Reference source not found.** thereafter arising.  If (i) any Guarantor shall make payment to the Secured Parties of all or any part of the Guaranteed Obligations, (ii) all of the Guaranteed Obligations and all other amounts payable under this **Error! Reference source not found.** shall be paid in full in cash and (iii) the Maturity Date shall have occurred, the Secured Parties will, at such Guarantor's request and expense, execute and deliver to such Guarantor appropriate documents, without recourse and without representation or warranty, necessary to evidence the transfer by subrogation to such Guarantor of an interest in the Guaranteed Obligations resulting from such payment by such Guarantor.

       **(i)**       **Contribution**.  All Guarantors desire to allocate among themselves, in a fair and equitable manner, their obligations arising under this Guaranty.  Accordingly, in the event any payment or distribution is made on any date by a Guarantor under this Guaranty such that its Aggregate Payments exceeds its Fair Share as of such date, such Guarantor shall be entitled to a contribution from each of the other Guarantors in an amount sufficient to cause each Guarantor's Aggregate Payments to equal its Fair Share as of such date.  "**Fair Share**" means, with respect to any Guarantor as of any date of determination, an amount equal to (a) the ratio of (i) the Fair Share Contribution Amount with respect to such Guarantor, to (ii) the aggregate of the Fair Share Contribution Amounts with respect to all Guarantors multiplied by, (b) the aggregate amount paid or distributed on or before such date by all Guarantors under this Guaranty in respect of the obligations Guaranteed.  "**Fair Share Contribution Amount**" means, with respect to any Guarantor as of any date of determination, the maximum aggregate amount of the obligations of such Guarantor under this Guaranty that would not render its obligations hereunder subject to avoidance as a fraudulent transfer or conveyance under Section 548 of Title 11 of the United States Code or any comparable applicable provisions of state law; provided, solely for purposes of calculating the "Fair Share Contribution Amount" with respect to any Guarantor for purposes of this 1(i), any assets or liabilities of such Guarantor arising by virtue of any rights to subrogation, reimbursement or indemnification or any rights to or obligations of contribution hereunder shall not be considered as assets or liabilities of such Guarantor.  "**Aggregate Payments**" means, with respect to any Guarantor as of any date of determination, an amount equal to (A) the aggregate amount of all payments and distributions made on or before such date by such Guarantor in respect of this Guaranty (including, without limitation, in respect of this 1(i)), minus (B) the aggregate amount of all payments received on or before such date by such Guarantor from the other Guarantors as contributions under this 1(i).  The amounts payable as contributions hereunder shall be determined as of the date on which the related payment or distribution is made by the applicable Guarantor.  The allocation among Guarantors of their obligations as set forth in this 1(i) shall not be construed in any way to limit the liability of any Guarantor hereunder.  Each Guarantor is a third party beneficiary to the contribution agreement set forth in this 1(i).

       •Signature Page to Follow]

68

 

**IN WITNESS WHEREOF**, the parties hereto have caused this Secured Superpriority Debtor-In-Possession Loan, Security and Guaranty Agreement to be duly executed as of the date first above written.

The entities defined as Borrowers hereunder are authorized by Resolutions attached to each of their respective Petitions or otherwise to enter into this agreement. Mr. William Ian MacDonald, acting as Manager and/or controlling Member or Shareholder, as the case may be, is hereby authorized to execute this agreement on behalf of each of the below Borrower, and so executes this Agreement in such capacity.

<u>**BORROWERS:**</u>

**BMH RTO, LLC**
**BUDDY MAC TWENTY-ONE, LLC**
**BUDDY MAC TWENTY-TWO, LLC**
**BUDDY MAC TWENTY-THREE, LLC**
**BUDDY MAC TWENTY-FOUR, LLC**
**BUDDY MAC TWENTY-FIVE, LLC**
**BUDDY MAC TWENTY-SIX, LLC**
**BUDDY MAC TWENTY-SEVEN, LLC**
**BMH-TNM 28, LLC**
**BMH-TNM 29, LLC**
**BMH-TNM 30, LLC**
**BMH-TNM 31, LLC**
**BMH-TNM 32, LLC**
**BMH-TNM 33, LLC**
**BMH-RCL 34, LLC**
**BMH-RCL 35, LLC**
**BMH-RCL 36, LLC**
**BMH-RCL 37, LLC**
**BMH-RCL 38, LLC**
**BMH-RCL 39, LLC**
**BMH-RCL 40, LLC**
**BMH-RCL 41, LLC**
**BMH-RCL 42, LLC**
**BMH-FAN 43, LLC**
**BMH-FAN 44, LLC**
**BMH-FAN 45, LLC**
**BMH-FAN 46, LLC**
**BMH-FAN 47, LLC**
**BMH-FAN 48, LLC**
**BMH-FAN 49, LLC**
**BMH-FAN 50, LLC**
**BMH-FAN 51, LLC**
**BMH-FAN 52, LLC**
**BMH-FAN 53, LLC**
**BMH-FAN 54, LLC**

*[Secured Superpriority Debtor-In-Possession Loan, Security and Guaranty Agreement]*

**BMH-SM 79, LLC**
**BMH-SM 80, LLC**
**BMH-SM 81, LLC**
**BMH-SM 82, LLC**
**BMH-SM 83, LLC**
**BMH-SM 84, LLC**
**BMH-SM 85, LLC**
**BMH-SM 86, LLC**
**BMH-SM 87, LLC**
**BUDDY MAC ONE, LLC**
**BMH ONE RE, LLC**
**BMH 95 RE CARUTHERSVILLE, LLC**
**BMH 96 RE MARION, LLC**
**BUDDY MAC TWO, LLC**
**BUDDY MAC SIX, LLC**
**BUDDY MAC SIX RE, LLC**
**BUDDY MAC EIGHT, LLC**
**BUDDY MAC ELEVEN, LLC**
**BUDDY MAC TWLEVE, LLC**
**BUDDY MAC EIGHTEEN, LLC**
**BUDDY MAC NINETEEN, LLC**
**BMH-NEW 58, LLC**
**BMH-NEW 62, LLC**
**BMH-WF TX 67, LLC**
**BMH-TB 75, LLC**
**BMH 85 RE SIKESTON, LLC**
**BMH PRIME 95, LLC**
**BMH PRIME 96, LLC**
**BMH PRIME 97, LLC**
**BMH HR LLC**
**SAM BROWNFIELD, LLC**
**SAM PLAINVIEW, LLC**
**MACDONALD CAPITAL CORPORATION**

By:_____
Name:
Title:

70

**GUARANTORS:**

**BUDDY MAC HOLDINGS, LLC**


By:_____
Name:
Title:


**MACDONALD CAPITAL CORPORATION**


By:_____
Name:
Title:


**LENDER:**

**PHONIX RBS, LLC**


By:_____
Name:
Title:

71

SCHEDULES

The following Schedules to the within Secured Superpriority Debtor-In-Possession Loan, Security and Guaranty Agreement are respectively described in the section indicated. Those Schedules in which no information has been inserted shall be deemed to read "None".

### SCHEDULE A

**[TO BE PROVIDED]**

**<u>SCHEDULE B</u>**

**Bank Schedule**

Buddy Mac Holdings, LLC, et al.
Case No. 25-34839-mvl11

**Initial Debtors' Bank Accounts**

| STORE | DEBTOR NAME | CASH BANK | CASH BANK ACCT NO. | SOUTHSTATE BANK ACCT NO. |
|-------|-------------|-----------|--------------------|--------------------------|
| #488 | Buddy Mac One LLC | Chase Bank | xxxxx7932 | xxxxxxxx4715 |
| #432 | Buddy Mac Twenty-one LLC | Banc First | xxxxxx4362 | xxxxxx4744 |
| #433** | Buddy Mac Twenty-two LLC | Banc First | xxxxxx4370 | xxxxxx4736 |
| #434 | Buddy Mac Twenty-three LLC | RBC Bank | xxxxx2480 | xxxxxx4769 |
| #435 | Buddy Mac Twenty-four LLC | Banc First | xxxxxx4420 | xxxxxx4777 |
| #436** | Buddy Mac Twenty-five LLC | Banc First | xxxxxx4388 | xxxxxx4751 |
| #437 | Buddy Mac Twenty-six LLC | Banc First | xxxxxx4404 | xxxxxx4785 |
| #515** | Buddy Mac Twenty-seven LLC | Security Bank of Tulsa | xxx6781 | xxxxxx4793 |
| #375 | BMH-TNM 28 LLC | Wells Fargo | xxxxxx8638 | xxxxxx5188 |
| #568** | BMH-TNM 29 LLC | Wells Fargo | xxxxxx0102 | xxxxxx5204 |
| #376 | BMH-TNM 30 LLC | Wells Fargo | xxxxxx0128 | xxxxxx5212 |
| #377 | BMH-TNM 31 LLC | Wells Fargo | xxxxxx0169 | xxxxxx5220 |
| #378 | BMH-TNM 32 LLC | Wells Fargo | xxxxxx0201 | xxxxxx5238 |
| #592 | BMH-TNM 33 LLC | SUNDOWN BANK | xx3949 | xxxxxx5246 |
| #311** | BMH-RCL 34 LLC | ARVEST | xxxx3842 | xxxxxx5253 |
| #312** | BMH-RCL 35 LLC | ARVEST | xxxx5484 | xxxxxx5261 |
| #310** | BMH-RCL 36 LLC | ARVEST | xxxx5882 | xxxxxx5279 |
| #307 | BMH-RCL 37 LLC | ARVEST | xxxx6250 | xxxxxx5287 |
| #308** | BMH-RCL 38 LLC | ARVEST | xxxx6632 | xxxxxx5295 |
| #313 | BMH-RCL 39 LLC | ARVEST | xxxx7275 | xxxxxx5303 |
| #309 | BMH-RCL 40 LLC | COMMERCE BANK | xxxxx5431 | xxxxxx5311 |
| #305 | BMH-RCL 41 LLC | Wells Fargo | xxxxxx8620 | xxxxxx5329 |
| #304** | BMH-RCL 42 LLC | Regions Bank | xxxxxx1501 | xxxxxx5337 |
| #612 | BMH-FAN 43 LLC | Community First Banking Company | xxxxx0221 | xxxxxx5266 |
| #603 | BMH-FAN 44 LLC | Centennial Bank | xxxxx8079 | xxxxxx5308 |
| #604 | BMH-FAN 45 LLC | Centennial Bank | xxxxx8857 | xxxxxx5274 |
| #605 | BMH-FAN 46 LLC | Southern Bankcorp | xxx7406 | xxxxxx5316 |
| #614 | BMH-FAN 47 LLC | Arvest Bank | xxxx0616 | xxxxxx5282 |
| #606 | BMH-FAN 48 LLC | Partners Bank | xxxx1928 | xxxxxx5324 |
| #607 | BMH-FAN 49 LLC | Southern Bankcorp | xxx7414 | xxxxxx5290 |
| #608 | BMH-FAN 50 LLC | FIRST HORIZON | xxxxxxx2680 | xxxxxx5332 |
| #609 | BMH-FAN 51 LLC | Centennial Bank | xxxxx8997 | xxxxxx5340 |
| #610 | BMH-FAN 52 LLC | Arvest Bank | xxxx0315 | xxxxxx5357 |
| #613 | BMH-FAN 53 LLC | Regions Bank | xxxxxx1056 | xxxxxx5365 |
| #611** | BMH-FAN 54 LLC | FIRST HORIZON | xxxxxxx2672 | xxxxxx5373 |
| #631 | BMH-SM 79, LLC | FIRST STATE COMMUNITY BANK | xxx8575 | xxxxxx3435 |
| #632 | BMH-SM 80, LLC | FIRST STATE COMMUNITY BANK | xxx8633 | xxxxxx3377 |
| #633 | BMH-SM 81, LLC | FIRST STATE COMMUNITY BANK | xxx8641 | xxxxxx3393 |
| #634 | BMH-SM 82, LLC | FIRST STATE COMMUNITY BANK | xxx8682 | xxxxxx3443 |
| #635 | BMH-SM 83, LLC | FIRST STATE COMMUNITY BANK | xxx8708 | xxxxxx3427 |
|  | BMH-SM 84, LLC | N/A | N/A | xxxxxx3385 |
| #636 | BMH-SM 85, LLC | FIRST STATE COMMUNITY BANK | xxx8724 | xxxxxx3419 |
| #637 | BMH-SM 86, LLC | FIRST STATE COMMUNITY BANK | xxx8922 | xxxxxx3401 |
| #638** | BMH-SM 87, LLC | FIRST STATE COMMUNITY BANK | xxx8948 | xxxxxx3450 |
|  | BMH-RTO, LLC | N/A | N/A | xxxxxx5485 |
|  | **Buddy Mac Holdings LLC** | **Wells Fargo DIP ACCOUNT** | xxxxxx7011 | N/A |
|  | **Buddy Mac Holdings LLC** | **UTILITY DEPOSIT** | N/A | xxxxxx5234 |

** closed/merged into other stores

Buddy Mac Holdings, LLC, et al.
Case No. 25-34839-mvl11

**Subsequent Debtors' Bank Accounts**

| STORE | DEBTOR NAME | CASH BANK | CASH BANK ACCT NO. | SOUTHSTATE BANK ACCT NO. |
|-------|-------------|-----------|---------------------|--------------------------|
| #489 | Buddy Mac Two LLC | Wells Fargo | xxxxxx2420 | xxxxxx0620 |
| #496 | Buddy Mac Six LLC | Wells Fargo | xxxxxx1223 | xxxxxx1784 |
| #602 | Buddy Mac Eight LLC | Wells Fargo | xxxxxx7086 | xxxxxx1800 |
| #601 | Buddy Mac Eleven LLC | Wells Fargo | xxxxxx4471 | xxxxxx1834 |
| #497 | Buddy Mac Twelve LLC | Chase bank | xxxxx9353 | xxxxxx0355 |
| #430 | Buddy Mac Eighteen LLC | Regions Bank | xxxxxx6323 | xxxxxx3845 |
| #620 | BMH- NEW 58, LLC | Bank of Commerce | xxx2300 | xxxxxx4276 |
| #643 | BMH-WF TX 67, LLC | Wells Fargo | xxxxxx6859 | xxxxxx5242 |
| #007 | BMH-TB 75, LLC | Wells Fargo | xxxxxx9825 | xxxxxx5903 |
| #646 | BMH PRIME 95 LLC | First State Bank and Trust | xxx0738 | xxxxxx8591 |
| #644 | BMH PRIME 96 LLC | Regions Bank | xxxxxx3446 | xxxxxx8583 |
| #645 | BMH Prime 97, LLC | Arvest Bank | xxxx7059 | xxxxxx7585 |
| 615 | Buddy Mac Nineteen, LLC | Arvest Bank | xxxx1366 | xxxxxx5208 |
| 641 | BMH-NEW 62, LLC | Happy State | xxxxxx2351 | xxxxxx7593 |
| | BMH-HR, LLC | Plains Capital | xxxx2900 | xxxxxx9042 |
| | MacDonald Capital Corp. | | N/A | xxxxxx4987 |
| | Buddy Mac Six RE LLC | | N/A | N/A |
| | SAM Plainview, LLC | | N/A | N/A |
| | SAM Brownfield, LLC | | N/A | N/A |
| | BMH 85 RE Sikeston, LLC | | N/A | N/A |

** closed/merged into other stores

## SCHEDULE C

**Personal Property Leases**

**[TO BE PROVIDED]**

## SCHEDULE D

### [Reserved]

### SCHEDULE E

**Other Encumbrances and Liens**

**[TO BE PROVIDED]**

## SCHEDULE F

**Intellectual Property**

**[TO BE PROVIDED]**

**<u>SCHEDULE G</u>**

**<u>ERISA PLANS</u>**

**[TO BE PROVIDED]**

**SCHEDULE H**

**[Reserved]**

### SCHEDULE I

**Guarantees**

**[TO BE PROVIDED]**

**EXHIBIT 1**

**Financial and Other Terms**

The following capitalized terms shall have the respective and corresponding meaning set forth in the table below.

| | |
|---|---|
| Credit Limit | $1,500,000 |
| Accordion Amount | $1,000,000 |
| Default Rate Margin | 2.00% |
| Maturity Date | February 22, 2026 |

**DEBTOR NOTICE ADDRESS:**

Buddy Mac Holdings, LLC
400 East Centre Park Blvd.
Suite 101
DeSoto, TX  75115
Email: ian@macfamco.com
Attention: Ian MacDonald

With a copy to:

Kane Russell Coleman Logan PC
901 Main St., Suite 5200
Dallas, Texas 75202
Email: jkane@krcl.com
Attention: John Kane

**LENDER NOTICE ADDRESS:**

Phonix RBS, LLC
7219 Renee Parker Way
Barling, AR 42933
Email: brent@motusadvised.com
Attention: Brent Turner, Manager of Member AF Newco 1 LLC, its sole member

With a copy to (which shall not constitute notice):

Blank Rome LLP
One Logan Square
130 North 18th Street
Philadelphia, PA 19103
Email: regina.kelbon@blankrome.com
Attention: Regina Stango Kelbon

**EXHIBIT 2**

**TERM NOTE**

$1,500,000.00

January [  ], 2026
New York, New York

     For value received, each of the undersigned (hereinafter jointly, severally and collectively, "**Borrowers**" and each, a "**Borrower**") hereby jointly and severally promise to pay in accordance with the Loan Agreement (defined below), to the order of Phonix RBS, LLC , a Delaware limited liability company (the "**Lender**"), at its offices in 7219 Renee Parker Way, Barling, AR 42933, or at any other place designated at any time by the holder hereof, in lawful money of the United States of America and in immediately available funds, the principal sum of $1,500,000.00 or, if less, the aggregate unpaid principal amount of all Term Loans made by Lender to Borrowers under the Loan Agreement, together with interest on the principal amount hereunder remaining unpaid from time to time, computed on the basis of the actual number of days elapsed and a 360-day year, from the date hereof until this Term Note (as amended, modified, replaced, substituted, superseded or restated from time to time, the "**Note**") is fully paid at the rate from time to time in effect under the Secured Superpriority Debtor-In-Possession Loan, Security and Guaranty Agreement of even date herewith (as amended, modified, replaced, substituted, superseded, extended, renewed, or restated from time to time, the "**Loan Agreement**"; capitalized terms used herein and not otherwise defined have the meanings set forth in the Loan Agreement) by and among Lender, Borrowers and the other parties thereto. The principal hereof and interest accruing thereon shall be due and payable as provided in the Loan Agreement.

     This Note may be prepaid only in accordance with the Loan Agreement.

     This Note is issued pursuant, and is subject, to the Loan Agreement, which provides, among other things, for acceleration hereof. This Note is the "Term Note" referred to in the Loan Agreement.

     This Note is secured, among other things, pursuant to the Loan Agreement, and may now or hereafter be secured by one or more other security agreements, mortgages, deeds of trust, assignments or other instruments or agreements.

     Borrowers hereby agree to pay all costs of collection, including attorneys' fees and legal expenses in the event this Note is not paid when due, whether or not legal proceedings are commenced.

     Presentment or other demand for payment, notice of dishonor and protest are expressly waived.

**[*Signature Page to Follow*]**

All rights and obligations hereunder shall be governed by the laws of the State of New York, without regard to conflicts of law principles, but including giving effect to Sections 5-1401 and 5-1402 of the New York General Obligations Law.  This Note shall be deemed to be under seal. The entities defined as Borrowers hereunder are authorized by Resolutions attached to each of their respective Petitions or otherwise to enter into this agreement.  Mr. William Ian MacDonald, acting as Manager and/or controlling Member or Shareholder, as the case may be, is hereby authorized to execute this agreement on behalf of each of the below Borrower, and so executes this Agreement in such capacity.

**BORROWERS:**

**BMH RTO, LLC**
**BUDDY MAC TWENTY-ONE, LLC**
**BUDDY MAC TWENTY-TWO, LLC**
**BUDDY MAC TWENTY-THREE, LLC**
**BUDDY MAC TWENTY-FOUR, LLC**
**BUDDY MAC TWENTY-FIVE, LLC**
**BUDDY MAC TWENTY-SIX, LLC**
**BUDDY MAC TWENTY-SEVEN, LLC**
**BMH-TNM 28, LLC**
**BMH-TNM 29, LLC**
**BMH-TNM 30, LLC**
**BMH-TNM 31, LLC**
**BMH-TNM 32, LLC**
**BMH-TNM 33, LLC**
**BMH-RCL 34, LLC**
**BMH-RCL 35, LLC**
**BMH-RCL 36, LLC**
**BMH-RCL 37, LLC**
**BMH-RCL 38, LLC**
**BMH-RCL 39, LLC**
**BMH-RCL 40, LLC**
**BMH-RCL 41, LLC**
**BMH-RCL 42, LLC**
**BMH-FAN 43, LLC**
**BMH-FAN 44, LLC**
**BMH-FAN 45, LLC**
**BMH-FAN 46, LLC**
**BMH-FAN 47, LLC**
**BMH-FAN 48, LLC**
**BMH-FAN 49, LLC**
**BMH-FAN 50, LLC**
**BMH-FAN 51, LLC**
**BMH-FAN 52, LLC**
**BMH-FAN 53, LLC**
**BMH-FAN 54, LLC**
**BMH-SM 79, LLC**
**BMH-SM 80, LLC**
**BMH-SM 81, LLC**
**BMH-SM 82, LLC**
**BMH-SM 83, LLC**
**BMH-SM 84, LLC**

**BMH-SM 85, LLC**
**BMH-SM 86, LLC**
**BMH-SM 87, LLC**
**BUDDY MAC ONE, LLC**
**BMH ONE RE, LLC**
**BMH 95 RE CARUTHERSVILLE, LLC**
**BMH 96 RE MARION, LLC**
**BUDDY MAC TWO, LLC**
**BUDDY MAC SIX, LLC**
**BUDDY MAC SIX RE, LLC**
**BUDDY MAC EIGHT, LLC**
**BUDDY MAC ELEVEN, LLC**
**BUDDY MAC TWLEVE, LLC**
**BUDDY MAC EIGHTEEN, LLC**
**BUDDY MAC NINETEEN, LLC**
**BMH-NEW 58, LLC**
**BMH-NEW 62, LLC**
**BMH-WF TX 67, LLC**
**BMH-TB 75, LLC**
**BMH 85 RE SIKESTON, LLC**
**BMH PRIME 95, LLC**
**BMH PRIME 96, LLC**
**BMH PRIME 97, LLC**
**BMH HR LLC**
**SAM BROWNFIELD, LLC**
**SAM PLAINVIEW, LLC**

By:_____
Name:
Title:

**EXHIBIT 3**

**[Reserved]**

**EXHIBIT 4**

**[Reserved]**

**EXHIBIT 5**

**[Reserved]**

**EXHIBIT 6**

**DIP Budget**

See attached.

**Buddy Mac Holdings, LLC** *et. al.*

*Cash Budget*
$ - Thousands

| | Actual 1 | Actual 2 | Actual 3 | Actual 4 | Actual 5 | Actual 6 | Actual 7 | Budget 8 | Budget 9 | Budget 10 | Budget 11 | Budget 12 | Budget Total 12 Weeks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Filing Date>> 4-Dec / Week Ending---> ** | 6-Dec | 13-Dec | 20-Dec | 27-Dec | 3-Jan | 10-Jan | 17-Jan | 24-Jan | 31-Jan | 7-Feb | 14-Feb | 21-Feb | |
| **Cash Receipts** | - | 387.0 | 318.7 | 241.5 | 379.6 | 430.4 | 315.7 | 292.0 | 305.6 | 599.5 | 422.4 | 436.0 | 4,128.4 |
| **Operating Disbursements** | | | | | | | | | | | | | |
| Inventory Purchases | - | - | 196.2 | 21.5 | 117.7 | - | - | 1,000.0 | - | 200.0 | - | - | 1,535.4 |
| Payroll and Benefits | - | 0.8 | 207.0 | - | - | 252.1 | - | 217.0 | 310.0 | 85.0 | 310.0 | - | 1,381.9 |
| Property Taxes | - | 0.1 | - | - | 3.5 | 9.5 | 1.2 | 20.9 | - | - | - | - | 35.2 |
| Store Rent Expense | - | - | - | - | - | 173.4 | - | 3.6 | - | 272.3 | - | 155.0 | 604.4 |
| Repairs & Maintenance | - | 4.3 | (0.2) | - | - | 3.8 | 0.3 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 33.2 |
| Insurance | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Vehicle Leases | - | - | - | - | - | - | - | 58.0 | - | - | - | 90.0 | 148.0 |
| General and Administrative | - | 35.1 | (0.2) | 6.5 | 6.8 | 67.8 | 16.2 | 50.0 | 20.0 | 70.0 | 20.0 | 20.0 | 312.3 |
| Corporate Support | - | 3.3 | 66.0 | - | 73.6 | 1.1 | 62.2 | 5.0 | 98.7 | 55.1 | 98.7 | 10.0 | 473.7 |
| Sales Taxes | - | - | 25.9 | 106.8 | - | - | - | 100.0 | - | - | - | 153.0 | 385.6 |
| **Total Operating Disbursements** | - | 43.7 | 494.7 | 134.8 | 453.7 | 255.7 | 296.9 | 1,242.5 | 433.7 | 687.4 | 433.7 | 433.0 | 4,909.8 |
| **Operating Cash Flow** | - | 343.3 | (176.0) | 106.7 | (74.1) | 174.7 | 18.8 | (950.5) | (128.1) | (87.9) | (11.4) | 3.0 | (781.4) |
| Accumulated | - | 343.3 | 167.3 | 274.1 | 200.0 | 374.7 | 393.5 | (557.0) | (685.1) | (773.1) | (784.4) | (781.4) | (781.4) |
| **Other (Sources)/Uses** | | | | | | | | | | | | | |
| DIP Proceeds | - | - | - | - | - | - | - | (750.0) | - | (750.0) | - | - | (1,500.0) |
| Funds from BMH-HR, LLC | - | - | - | - | - | (56.5) | - | (100.0) | - | - | - | - | (156.5) |
| Adequate Protection - Phonix | - | - | - | - | - | - | 56.5 | 100.0 | - | - | - | - | 156.5 |
| Restructuring Fees | - | - | - | - | - | - | - | - | 21.2 | - | - | 775.0 | 796.2 |
| Critical Vendors | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utilities Deposit | - | - | 25.0 | - | - | - | - | - | - | - | - | - | 25.0 |
| **Total Other (Sources/Uses)** | - | - | 25.0 | - | - | (56.5) | 56.5 | (750.0) | 21.2 | (750.0) | - | 775.0 | (678.8) |
| **Net Cash Flow** | - | 343.3 | (201.0) | 106.7 | (74.1) | 231.3 | (37.7) | (200.5) | (149.3) | 662.1 | (11.4) | (772.0) | (102.6) |
| Accumulated | - | 343.3 | 142.3 | 249.1 | 175.0 | 406.2 | 368.5 | 168.0 | 18.7 | 680.8 | 669.4 | (102.6) | (102.6) |
| **Cash Balance** | 133.9 | 133.9 | 477.3 | 276.3 | 383.0 | 308.9 | 540.2 | 502.5 | 302.0 | 152.6 | 814.7 | 803.3 | 31.4 / 31.4 |

# EXHIBIT 7

## Interim Order

See attached.

**EXHIBIT 8**

**Real Property DIP Collateral**

**[TO BE PROVIDED]**

## EXHIBIT 9

### Buddy Mac Entities

1. Buddy Mac Two, LLC
2. Buddy Mac Six, LLC
3. Buddy Mac Six RE, LLC
4. Buddy Mac Eight, LLC
5. Buddy Mac Eleven, LLC
6. Buddy Mac Twleve, LLC
7. Buddy Mac Eighteen, LLC
8. Buddy Mac Nineteen, LLC
9. BMH-NEW 58, LLC
10. BMH-NEW 62, LLC
11. BMH-WF TX 67, LLC
12. BMH-TB 75, LLC
13. BMH 85 RE Sikeston, LLC
14. BMH Prime 95, LLC
15. BMH Prime 96, LLC
16. BMH Prime 97, LLC
17. BMH HR LLC
18. SAM Brownfield, LLC
19. SAM Plainview, LLC
20. MacDonald Capital Corporation

**EXHIBIT 10**

**Milestones**

Within the time periods set forth below (or such later times as Lender may agree in its sole and absolute discretion), the Debtors shall perform each action with respect to the Case as set forth below (the "**Milestones**"):

| Event [1] | Milestone |
|---|---|
| Filing of the (i) Buddy Mac Entity voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, (ii) DIP Motion, in form and substance satisfactory to Lender in its sole discretion, and (iii) motion for the sale of substantially all of their assets pursuant to Section 363 of the Bankruptcy Code (the "Sale Motion"), which Sale Motion shall be in form and substance satisfactory to Lender in its sole discretion | No later than Friday, January 23, 2026. |
| Retain and file an application ("Retention Application") to retain a third-party national real estate brokerage firm to market the Subject RTO Real Property owned by Buddy Mac One in Tyler, Texas (the "Texas Sale") | Within 7 days of the Third Petition Date |
| (i) Enter into an asset purchase agreement naming Lender as stalking horse bidder, in a form and substance acceptable to Lender, and (ii) file a motion establishing bidding procedures 2026 and (iii) obtain entry of a bidding procedures order  (the "Bidding Procedures Order"), which motion, bid procedures, and Bidding | On or before January 26, 2026 |

---

[1] Each event involving the filing of a motion shall include the filing of any necessary application to expedite the hearing on such motion to accommodate the milestones set forth herein.

| | |
|---|---|
| Procedures Order must be in form and substance acceptable to Lender | |
| Obtain entry of Interim Order, in form and substance acceptable to Lender, and hold a first day hearing in the Buddy Mac Entity cases: | No later than January 27, 2026 |
| Committee completes its investigation and consents to releases by the estates: | No later than February 6, 2026 |
| Obtain entry of a Final Order, in form and substance acceptable to Lender, and obtain approval of Settlement Agreement, in form and substance acceptable to Lender | No later than February 10, 2026 |
| Hold an auction in connection with the Sale Motion | Within 21 days from the entry of the Interim Order |
| Sale hearing and obtain entry of Sale Order, in form and substance acceptable to Lender | No later than February 19, 2026 |
| Debtors to consummate a sale of assets | No later than February 22, 2026 |
| Debtors to close Texas Sale | Within 45 days of the filing of the Retention Application |

## EXHIBIT 11

### Settlement Agreement

See attached.

**Execution Version**

## <u>SETTLEMENT AGREEMENT AND MUTUAL RELEASES</u>

This *Settlement Agreement and Mutual Release* (the "**Settlement Agreement**"), dated as of January 26, 2026, is entered into by and among William Ian MacDonald (and any successor thereto) and certain affiliated MacDonald Entities identified on Schedule 1 hereto (collectively, "**MacDonald**"), BMH RTO, LLC and the other BMH Debtors (as defined below; the BMH Debtors and the Buddy Mac Entities (as defined below) are referred to herein collectively as the "**Debtors**"), and Phonix RBS, LLC ("**Lender**" or "**Phonix**"). MacDonald, the Debtors, and Phonix may be referenced herein collectively as the "**Parties**" and/or each as a "**Party**."

## <u>BACKGROUND</u>

A. On December 1, 2025 (the "**First Petition Date**"), Buddy Mac One, LLC ("**Buddy Mac One**"), BMH One RE, LLC ("**BMH One**"), BMH 95 RE Caruthersville, LLC ("**BMH 95**"), and BMH 96 RE Marion, LLC ("**BMH 96**"; together with BMH One and BMH 95, the "**Limited Recourse Guarantors**") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, and on December 4, 2025 (the "**Second Petition Date**"), BMH RTO, LLC and affiliated Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, commencing Chapter 11 bankruptcy cases which are jointly administered under Bankruptcy Case No. 25-34839 (collectively and individually as the context may require, the "**Case**") before the United States Bankruptcy Court for the Northern District of Texas (the "**Bankruptcy Court**"). The Debtors that filed their respective Cases on the First Petition Date and the Second Petition Date are referred to herein as the "**BMH Debtors**."

B. The BMH Debtors are operating their business as debtors-in-possession under Chapter 11 of the Bankruptcy Code. William Ian MacDonald acts as the Debtors' chief executive officer.

C. Phonix is the BMH Debtors' pre-petition secured creditor with a blanket lien on all BMH Debtor assets, including cash collateral, and is owed secured obligations in an aggregate amount of at least $12.83 million. William Ian MacDonald has guaranteed the payment of the Phonix pre-petition indebtedness. Pre-petition, Phonix has filed enforcement actions against the BMH Debtors and William Ian MacDonald, including, without limitation, a receivership petition in Kansas state court and a claim asserting tort and other claims against William Ian MacDonald in Texas state court. As those claims are asserted against William Ian MacDonald those claims are referred to as the "**Phonix Pre-Petition MacDonald Enforcement Actions.**"

D. The BMH Debtors have sought to administer the Case based on the use of Phonix' cash collateral, to which Phonix did not consent. Phonix has objected to the BMH Debtors' use of cash collateral and has filed motions to convert the Case to a case under chapter 7 of the Bankruptcy Code and, in the alternative, for relief from the automatic stay to asserts its rights and claims against the BMH Debtors and their assets. The BMH Debtors have opposed such relief.

E.  On January 20, 2026, Phonix submitted a non-binding, non-inclusive summary expression of interest (the "**Phonix Expression**") in respect of a settlement, post-petition financing, and related sale matters to MacDonald and to the Debtors.

F.  On January 21, 2026, prior to the hearing on the Debtors' request for final authority to use cash collateral, William Ian MacDonald submitted a signed and sworn declaration regarding his personal financial statement (the "**MacDonald PFS**"), which declaration attached the MacDonald PFS, affirming that the MacDonald PFS was true and correct. Among other things, (1) MacDonald owns a direct interest in MRG Boulders Apartments, Ltd. ("**MRG Boulders**") and MacLubbock Boulders GP, Inc. ("**MacLubbock BGP**") (as general partner), which owns the Boulders Property (as defined below), (2) MRG Boulders is indebted to MacDonald Realty Group LLC (this entity is also the general partner of P.E.C. Finance, Ltd. and the fee owner of the Subject Alvarado Property (as defined below) ("**MacDonald Realty**" and the term "MacDonald Realty" shall include any MacDonald affiliate, subsidiary or related party as it relates to Boulders Advances) and the MacDonald Family Trust on account of advances made to MRG Boulders in an aggregate amount of no less than \$4,239,910.13[1] (the "**Boulders Advances**"), (3) no less than \$2,839,909.13 of the Boulders Advances is directly or indirectly owed to MacDonald Realty, and (4) no less than \$1,400,001 of the Boulders Advances is directly or indirectly owed to the MacDonald Family Trust.

G.  On or about January 23, 2026 (the "**Third Petition Date**"; together with the First Petition Date and the Second Petition Date, the "**Petition Date**"), the entities listed on **Exhibit "G"** (collectively, the "**Buddy Mac Entities**") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code before the Bankruptcy Court, commencing chapter 11 bankruptcy cases, which will be jointly administered with the BMH Debtor Cases. Each Debtor remains in possession of its assets and is operating its business as a debtor-in-possession under Chapter 11 of the Bankruptcy Code.

H.  On January 23, 2026, each of the Debtors and Phonix entered into that certain Secured Superpriority Debtor-In-Possession Loan, Security, and Guaranty Agreement (the "**DIP Credit Agreement**") and the Debtors have filed an emergency motion (the "**DIP Motion**") seeking approval of the DIP Credit Agreement on an interim and a final basis and for related relief, including, without limitation, approval of this Settlement Agreement at the final hearing on the DIP Motion pursuant to the DIP Motion. The DIP Motion requires MacDonald to pledge certain non-Debtor assets as collateral for the Phonix DIP loan and contemplates the sale of the Debtors' assets to Phonix by a credit bid, with MacDonald's consent and support. The agreement embodied in this transaction resolves disputes and claims by and among the Debtors, Phonix, and MacDonald, including, without limitation, the Phonix Pre-Petition MacDonald Enforcement Actions. Initially capitalized terms in this Settlement Agreement that are not otherwise defined shall have the meaning set forth in the DIP Credit Agreement, DIP Orders (as defined below), or in the Phonix Expression.

---

[1] This amount includes only intercompany transfers made to MRG Boulders as advances, and does not include Accrued Management Fees, which Fees are subordinate as to payment and otherwise to the Boulders Advances, the Subject Boulders Interest, and the Estate Boulders Share.

I.  The Parties have engaged in extensive good faith, arms' length negotiations and have agreed to resolve all matters between them on the terms set forth herein.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree that:

1.  <u>Recitals</u>. The recitals set forth above are agreed to by the Parties and are incorporated herein by reference.

2.  <u>Conditions to Settlement Effective Date</u>. The effective date (the "**Settlement Effective Date**") of this Settlement Agreement and all of its terms shall be the date upon which all of the following have occurred: (i) the Buddy Mac Entities will have filed voluntary petitions under chapter 11 of the Bankruptcy Code and their cases will have been jointly administered in the Case (for the avoidance of doubt, neither MRG Boulders Apartments, Ltd. nor its general partner entity, shall file chapter 11 cases); (ii) this Settlement Agreement shall have been signed and delivered by and among the Parties; (iii) the unstayed entry of the Interim DIP Order (as defined in the Phonix Expression) by the Bankruptcy Court and the implementation of the transactions contemplated by the Phonix Expression and the DIP Documents, including, without limitation, in respect of the ERC Funds (as that term is defined in the Interim DIP Order) (for the avoidance of doubt, upon entry of the Final DIP Order, the ERC Funds shall be released to Phonix for application against its Pre-Petition Loan and DIP Loan obligations pursuant to the Final DIP Order and the DIP Documents and effective upon entry of the Final DIP Order, the ERC Funds shall be deemed collateral for the Pre-Petition Loan obligations as well as the DIP Loan obligations under the DIP Documents and the Final DIP Order), and, the transactions contemplated by the Sale Motion (as defined in the Interim DIP Order), in accordance with the milestones and other deadlines set forth in the Phonix Expression and the Interim DIP Order; (iv) MacDonald, MacDonald Realty, and MacLubbock BGP shall grant to Phonix the Subject Boulders Interest (as defined below); (v) William Ian MacDonald shall grant to Phonix the Subject PEC Interest (as defined below); (vi) William Ian MacDonald and MacDonald Realty shall grant to Phonix the Subject Alvarado Mortgage (as defined below); and (vi) the entry of a final and non-appealable order of the Bankruptcy Court approving the Final DIP Order, which Final DIP Order likewise approves this Settlement Agreement.

3.  <u>Subject Boulders Interest</u>. **MacDonald, MacLubbock BGP, and MacDonald Realty shall grant to Phonix a participation in their rights in respect of the advances made to, and in respect of MacDonald's and MacLubbock BGP's equity in, MRG Boulders (collectively, the "Subject Boulders Interest") to accommodate and support the Phonix Pre-Petition Obligations, the DIP Obligations, and Adequate Protection Obligations (each as defined in the DIP Orders, as applicable), which grant shall be made and documented by a participation agreement (the "Participation Agreement") and other related documents, agreements, and instruments to be entered into prior to, and effective upon, entry of the Final DIP Order.** The Boulders real property that is the subject of the Subject Boulders Interest (the "**Boulders Property**"), which is owned and controlled by MacDonald and MacLubbock BGP, will be sold in an orderly process. Such orderly Boulders Property sale process is subject to Phonix rights of consent to: (i) the selection of the broker, (ii) the material conditions and requirements of the marketing process (marketing and sale milestones acceptable to Phonix shall be established), and (iii) the selection of a buyer (the "**Sale Process Consent Rights**"). The consents set forth in

the preceding sentence (a) shall be further evidenced by the Participation Agreement and (b) shall not be unreasonably withheld; in the event of any dispute regarding the withholding of any such consent, such dispute shall be subject to dispute resolution procedures to be set forth in the Participation Agreement. The Boulders Property shall be marketed by a third party national real estate brokerage firm unaffiliated with MacDonald or his affiliates (an "**Acceptable Broker**"), with the assistance of the Debtors' CRO, Mark Shapiro, and William Ian MacDonald to the extent his assistance is requested, and sold as soon as reasonably possible for a market price for cash. Phonix shall be entitled to regular updates regarding the marketing and sale process from any appointed broker. Further, MacDonald shall provide to Phonix updates regarding the financial condition and results relating to the Subject Boulder Interest promptly upon (x) the occurrence of any material changes thereto and (y) otherwise upon reasonable request. If the buyer assumes the senior loan encumbering the Boulders Property, the buyer will provide a new personal guaranty of the loan and William Ian MacDonald will be released from his personal guaranty of the loan, and with sale proceeds net of normal and reasonable closing costs to third parties for the transaction, to be distributed to Phonix on account of the Subject Boulders Interest as set forth herein.

4.    <u>Subject Boulders Sale Distribution Matters</u>. MacDonald, MacLubbock BGP and Phonix agree, and the Debtors consent to such agreement, that, upon any sale of the Boulders Property, the net closing proceeds, after payment of the senior mortgage on the Boulders Property and normal and reasonable closing expenses to third parties and subject to the terms of the sale contract, shall be divided and paid at closing: (i) sixty percent (60%) to Phonix; (ii) twenty five percent (25%) to the MacDonald Family Irrevocable Trust; and (iii) fifteen percent (15%) to the Debtors' estates (the "**Estate Boulders Share**").  These sale distribution matters shall be further evidenced by the Participation Agreement.

5.    <u>Subject PEC Interest</u>. **William Ian MacDonald shall grant to Phonix a lien on, and security interest in, all of his limited partner interests (the "PEC LP Interests") in P.E.C. Finance Ltd. (such lien and security interest, the "Subject PEC Interest") to accommodate and support the Phonix Pre-Petition Obligations, the DIP Obligations, and Adequate Protection Obligations, which grant shall be made and documented by a pledge agreement (the "Pledge Agreement") and other related documents, agreements, and instruments to be entered into prior to, and effective upon, entry of the Final DIP Order.** Phonix shall be permitted to purchase the PEC LP Interests in the WholeCo Sale (as defined below) pursuant to its credit bid. The real property, which is subject to liens and encumbrances which shall be addressed pursuant to the Subject PEC Real Property Sale Process (as defined below), that is owned and controlled by P.E.C. Finance Ltd. (the "**Subject PEC Real Property**"), will be sold in an orderly process, which may include the existing process ongoing in respect of the Subject PEC Real Property (the **"Subject PEC Real Property Sale Process"**). The Subject PEC Real Property Sale Process is subject to Phonix's Sale Process Consent Rights, which (a) shall be further evidenced by the Pledge Agreement and (b) shall not be unreasonably withheld; in the event of any dispute regarding the withholding of any such consent, such dispute shall be subject to dispute resolution procedures to be set forth in the Pledge Agreement. The Subject PEC Real Property shall be marketed by an Acceptable Broker (which may be the existing broker), with the assistance of the Debtors' CRO, Mark Shapiro, and William Ian MacDonald to the extent his assistance is requested, and sold as soon as reasonably possible for a market price for cash. Phonix shall be entitled to regular updates regarding the marketing and sale process from any appointed broker. Further, MacDonald shall provide to Phonix updates regarding the financial condition and results

relating to the Subject PEC Interest promptly upon (x) the occurrence of any material changes thereto and (y) otherwise upon reasonable request. MacDonald Realty, in its capacity as general partner of P.E.C. Finance, Ltd., by executing this Settlement Agreement, hereby (i) consents to the sale of the Subject PEC Real Property as conducted in accordance with the procedures specified above and (ii) agrees to execute and deliver to Phonix and PEC Finance, Ltd., as applicable, such further documents, instruments, and agreements reasonably requested in order to facilitate such sale and process. If the buyer assumes the senior loan encumbering the Subject PEC Real Property, the buyer will provide a new personal guaranty of the loan and William Ian MacDonald will be released from his personal guaranty of the loan, and with sale proceeds net of normal and reasonable closing costs to third parties for the transaction, to be distributed to Phonix on account of the Subject PEC Interest as set forth herein. William Ian MacDonald hereby represents and warrants to Phonix that the PEC LP Interests are not subject to any liens, pledges or security interests. If the Subject PEC Real Property is sold pursuant to the Subject PEC Real Property Sale Process, Phonix agrees that it shall distribute fifty percent (50%) of the proceeds from such sale to William Ian MacDonald.

6.    <u>Subject Alvarado Real Property</u>. In respect of that certain real property owned by MacDonald Realty in Alvarado, Texas (the "**Subject Alvarado Real Property**"), to secure (i) Phonix DIP Obligations and Adequate Protection Obligations under the Interim DIP Order, and (ii) Phonix DIP Obligations, Adequate Protection Obligations, and Pre-Petition Obligations under the Final DIP Order after entry of the Interim DIP Order and upon entry of the Final DIP Order, MacDonald Realty shall grant Phonix a mortgage lien (by deed of trust or as otherwise reasonably required by Phonix) (the "**Subject Alvarado Mortgage**") on the Subject Alvarado Real Property. Upon closing on the WholeCo Sale, MacDonald Realty shall convey to Phonix (or its designee) title to the Subject Alvarado Real Property by appropriate form of deed or conveyancing document acceptable to Phonix and related documents, agreements, and instruments, and Phonix will agree to a fixed reduction to its DIP Obligations and Pre-Petition Obligations, which shall be $298,000. MacDonald Realty hereby represents and warrants to Phonix that the Subject Alvarado Real Property is not subject to any lien or other encumbrance.

7.    <u>Subject RTO Real Property</u>. In respect of all real property owned by the Debtors specified on Schedule 7 hereto (such real property owned by the Debtors, the "**Subject RTO Real Property**"), Phonix and the Debtors agree that, subject to the Interim DIP Order and Final DIP Order (the "**DIP Orders**") and pursuant to the DIP Orders and the DIP Documents (and Phonix rights of consultation and consent to be contained therein), the Debtors will (a) file an application to retain, within 7 days of the filing of the Buddy Mac Entity Chapter 11 cases, a third party real estate brokerage firm unaffiliated with the Debtors or MacDonald to market the Subject RTO Real Property owned by Buddy Mac One, LLC in Tyler, Texas, and (b) the Debtors (and or any successor trustee) will sell such Subject RTO Real Property under Bankruptcy Code section 363(b) in the Debtors' Chapter 11 cases within 45 days of the filing of the retention application. In respect of the other Subject RTO Real Property, such property shall be subject to the Sale Motion and Phonix will include such Subject RTO Real Property in its credit bid and as part of that credit bid will satisfy any SouthState Bank mortgage liens on such Subject RTO Real Property at closing on the credit bid; *provided, however*, that Phonix will consent to the sale of Subject RTO Real Property owned by BMH 95 RE Caruthersville, LLC and BMH 85 RE Sikeston, LLC to National RTO to be applied as provided in the following sentence in satisfaction of its lien encumbering such Subject RTO Real Property, so long as the portion of the National RTO cash purchase price

allocated to such Subject RTO Real Property is paid to Phonix at any closing with National RTO. After satisfaction of SouthState Bank mortgage liens as set forth above, Phonix may apply the proceeds of the sale of any Subject RTO Real Property paid to Phonix to any of the Pre-Petition Obligations, DIP Obligations, or Adequate Protection Obligations in Phonix's sole discretion. Phonix reserves rights of direction and designation in respect of any leases relating to the Subject RTO Real Property.

8.  <u>Debtor/MacDonald Acknowledgments of Phonix Secured Claims</u>. Subject to the entry of the Final DIP Order and Bankruptcy Court approval of this Settlement Agreement, each of the Debtors and MacDonald acknowledge and consent to the validity, extent, amount, priority and enforceability of Phonix Pre-Petition Obligations, Phonix DIP Obligations, Phonix security interests and liens on Pre-Petition Collateral, the inclusion of the assets of BMH HR, LLC in such Phonix Pre-Petition Collateral, and Phonix DIP Liens and rights in DIP Collateral, and as otherwise set forth in the DIP Documents, the Interim DIP Order, and the Final DIP Order. For the avoidance of doubt, the acknowledgments and consents set forth in this paragraph shall survive execution of this Settlement Agreement. The DIP Credit Agreement, other DIP Documents, Interim DIP Order, and Final DIP Order shall be in form and substance acceptable to Phonix.

9.  <u>Credit Bidding</u>. Subject to the terms of this Settlement Agreement and as set forth in the DIP Documents and the DIP Orders, pursuant to documents (such documents, the "**Phonix Sale Documents**") acceptable to Phonix evidencing such a transaction (such transaction, the "**WholeCo Sale**"), including, without limitation the Sale Motion and an Asset Purchase Agreement, Phonix shall be designated as the stalking horse bidder for the sale of substantially all of the Debtors' assets and will be permitted to acquire such assets in a credit bid (including the DIP Obligations, Pre-Petition Obligations, and Adequate Protection Obligations) provided that third parties may top the credit bid at the sale hearing by submitting a higher and better offer, subject to bidding and sale procedures acceptable to Phonix which shall include an agreed minimum bid increment and reasonable bid protections and expense reimbursement. The Phonix Sale Documents shall be in form and substance acceptable to Phonix.

10.  <u>Budget</u>. The Debtors shall propose a winddown budget. The winddown budget shall be acceptable to Phonix and shall be funded solely from (a) residual assets of the estates after closing of the transactions contemplated by the Sale Motion to Phonix or a topping bidder  and (b) the proceeds of the Estate Boulders Share.  The wind-down budget may be used to fund a liquidating Chapter 11 plan process, which can be done on a consolidated approval process basis or liquidation of the Debtors' estates by a Chapter 7 trustee following the conversion of the Debtors' cases. In the context of a liquidating plan, to the extent any Phonix debt remains outstanding following consummation of the WholeCo Sale, in any plan of reorganization, and without any impairment of its rights as a purchaser or secured creditor, Phonix agrees to subordinate any deficiency claim, whatever the priority or character of that deficiency claim under the Final DIP Order, that it may have to the claims of general unsecured creditors solely for purposes of enabling distribution of the Estate Boulders Share, and any contingent recoveries upon estate claims and causes of action arising under Chapter 5 not released pursuant to this Settlement Agreement, the Final DIP Order, or the WholeCo Sale order, to unsecured creditors, and facilitating plan confirmation (for the avoidance of doubt, such subordination shall not affect or impair Phonix's right to receive:  (i) the balance of the proceeds of the Subject Boulders Interest, (ii) the proceeds of the sale of (x) the Subject Real RTO Property owned by Buddy Mac One, LLC

in Tyler, Texas, and (y) the Subject PEC Real Property, or (iii) title to the Subject Alvarado Real Property). Any such plan and confirmation order shall be in form and substance acceptable to Phonix, MacDonald, and the Debtors. Any such liquidating plan will incorporate and implement this Settlement Agreement.

11.    Debtors' MacDonald Release. **Effective on the Settlement Effective Date, the Debtors, on behalf of themselves and their estates (collectively, the "Estate Releasors") shall be deemed to have irrevocably and unconditionally, fully, finally, and forever waived, released, acquitted and discharged William Ian MacDonald and any and all of his affiliates, relations, agents, representatives, attorneys, and parties directly related to such released parties such as family-related trusts and MacDonald Capital, LP (in each case excluding, for the avoidance of doubt, the Debtors and their estates) (the "MacDonald Releasees") from any and all claims, manner of actions, causes of action, suits, costs, debts, liabilities, obligations, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, executions and demands whatsoever, of whatever kind or nature, whether known or unknown, suspected or unsuspected, in law or equity, which the Estate Releasors have, have had, may have or may claim to have against the MacDonald Releasees arising out of, related to or in connection with chapter 5 of the Bankruptcy Code or arising from MacDonald's actions or inactions in any capacity, including as chief executive officer, director, manager or authorized representative of the Debtors; provided, however and for the avoidance of doubt, the foregoing release shall not limit nor be deemed to limit the rights of the Debtors to enforce this Settlement Agreement in accordance with its terms and/or to assert claims against William Ian MacDonald if the MacDonald PFS is materially false.**

12.    Phonix MacDonald Release. **Effective on the Settlement Effective Date, Phonix, binding their successors and assigns, shall be deemed to have irrevocably and unconditionally, fully, finally, and forever waived, released, acquitted and discharged the MacDonald Releasees, as defined above, from any and all claims, manner of actions, causes of action, suits, costs, debts, liabilities, obligations, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, executions and demands whatsoever, of whatever kind or nature, whether known or unknown, suspected or unsuspected, in law or equity, which Phonix has, has had, may have or may claim to have against the MacDonald Releasees in connection with the Phonix Pre-Petition Debt Documents, any guaranty claims in respect of such Phonix Pre-Petition Debt Documents, and arising out of, related to or in connection with the Phonix MacDonald Pre-Petition Enforcement Actions; provided, however and for the avoidance of doubt, the foregoing release shall not limit nor be deemed to limit the rights, liens, security interests, claims, and expenses of Phonix under the DIP Documents, cash collateral orders of the Bankruptcy Court, the Interim DIP Order, the Final DIP Order, any asset purchase agreement ("Phonix CB APA") evidencing the sale of substantially all of the Debtors assets by credit bid to Phonix (the "WholeCo Sale"), the sale order of the Bankruptcy Court authorizing the WholeCo Sale or an alternative transaction to the WholeCo Sale expressly permitted by the Phonix CB APA, and any related Phonix Sale Documents, to enforce this Settlement Agreement or the Participation Agreement, in accordance with each of its terms, and/or to assert claims against the MacDonald Releasees if the MacDonald PFS is materially false.**

13.   <u>MacDonald/Debtor Phonix Release</u>. **Effective on the Settlement Effective Date, each of MacDonald, the MacDonald Releasees, and the Debtors (on behalf of themselves and their estates), and their affiliates, attorneys, financial advisors, and other professionals, and related entities (the "Debtor/MacDonald Releasors" and, together with the Estate Releasors and Phonix, collectively, the "Releasors"), binding their successors and assigns, shall be deemed to have irrevocably and unconditionally, fully, finally, and forever waived, released, acquitted and discharged Phonix, its assignor and/or predecessor-in-interest, affiliates, and related entities, and each of their respective managers, directors, officers, employees, agents, and representatives, (the "Phonix Releasees") from (a) any and all claims, manner of actions, causes of action, suits, costs, debts, liabilities, obligations, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, executions and demands whatsoever, of whatever kind or nature, whether known or unknown, suspected or unsuspected, in law or equity, which the Debtor/MacDonald Releasors have, have had, may have or may claim to have against the Phonix Releasees arising out of, related to or in connection with the Pre-Petition Debt Documents and arising out of, related to or in connection with the Phonix MacDonald Pre-Petition Enforcement Actions; provided, however and for the avoidance of doubt, the foregoing release shall not limit nor be deemed to limit the rights of Debtor/MacDonald Releasors to enforce this Settlement Agreement in accordance with its terms.**

14.   <u>Debtor/Phonix Transfer Release</u>. **Effective on the Settlement Effective Date, each of Phonix and the Debtors, and their affiliates and related entities, binding their successors and assigns, shall be deemed to have irrevocably and unconditionally, fully, finally and forever waived and released any and all claims and/or causes of action, including but not limited to Chapter 5 causes of action, which could arise from those transfers referenced in the Plains Capital Bank Deposit Report(s) dated January 15, 2026 and attached hereto as Appendix 14.**

15.   For avoidance of doubt, the releases contained in this Settlement Agreement include any released claim that any Releasor does not know or suspect to exist in such Releasor's favor at the time of such release that if known by such Releasor, might have affected this Settlement Agreement. With respect such releases, the Parties stipulate and agree that, on their own behalf and on behalf of their respective Releasors, upon the execution of this Settlement Agreement, each of the Releasors expressly waives and shall be deemed to have waived, any and all rights and benefits of California Civil Code § 1542, to the extent applicable, which provides:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

Each of the Parties expressly waives, and shall be deemed to have waived, on its behalf on and behalf of its respective Releasors, any and all rights and benefits conferred by any law of any state or territory of the United States, or principle of common law or foreign law, that is similar,

comparable or equivalent in effect to California Civil Code § 1542. The Releasors may hereafter discover facts in addition to or different from those that any of them now knows or believes to be true with respect to the subject matter of the releases contained in this Settlement Agreement, but each of the Releasors shall expressly have and be deemed to have, fully, finally and forever settled and released any and all of the claims subject to the releases contained in this Settlement Agreement, known or unknown, suspected or unsuspected, contingent or non-contingent, whether or not concealed or hidden, that now exist or heretofore have existed, upon any theory of law or equity now existing or coming into existence in the future, including, but not limited to, conduct that is negligent, reckless, intentional, with or without malice, or a breach of any duty, law or rule, without regard to the subsequent discovery or existence of such different or additional facts. The Parties acknowledge, and shall be deemed to have acknowledged, that the foregoing waiver was separately bargained for and a key element of the settlement of which this release is a part.

16.     Notwithstanding anything to the contrary in the DIP Documents or this Settlement Agreement, the Debtors and MacDonald shall retain and not transfer to Phonix any rights, claims and/or defenses any of them may have against the Buddy's Franchisor and its parent company FRG, arising out of the franchisor/franchisee relationship between the parties, including the Debtors and MacDonald and their affiliates.

17.     <u>No Admissions</u>. This Settlement Agreement is not and shall not in any way be construed as an admission by the Parties of any allegations made in connection with the matters that are the subject of releases or as an admission of any liability by any Party.

18.     <u>Severability</u>. The Parties agree that if any provision of this Settlement Agreement is determined by a court of competent jurisdiction to be illegal, invalid, or unenforceable, that provision shall not be a part of this Settlement Agreement. The legality, validity, and enforceability of the remaining provisions shall not be affected by a provision of this Settlement Agreement that is illegal, invalid, or unenforceable.

19.     <u>Miscellaneous</u>.

a.      Neither this Settlement Agreement, nor any statement made or action taken in connection with the negotiation of this Settlement Agreement, shall be offered or received in evidence or in any way referred to in any legal action or administrative proceeding among or between the Parties hereto, other than as may be necessary: (i) to obtain approval of and to enforce this Settlement Agreement (including the mutual releases contained herein) or (ii) to seek damages or injunctive relief in connection therewith.

b.      Each of the Parties shall execute and deliver any and all additional papers, documents, and other assurances, and shall do any and all acts and things reasonably necessary or appropriate in conjunction with the performance of each of the Parties' respective obligations hereunder.

c.      No provision of this Settlement Agreement is intended to confer any rights, benefits, remedies, obligations, or liabilities hereunder upon any person other than the Parties hereto and their respective successors.

d.      This Settlement Agreement shall be governed by and construed in accordance with the law of the state of Texas without regard to any choice of law provisions.

e.      This Settlement Agreement may be signed in counterpart originals and delivered by facsimile or email, which, when fully executed, shall constitute a single original.

f.      Except as provided in paragraph 3, the Bankruptcy Court shall retain exclusive jurisdiction (and the Parties expressly consent to such jurisdiction) with respect to any disputes arising from or related to, or other actions to interpret, administer, or enforce the terms and provisions of, this Settlement Agreement.

g.      Each person or entity who executes this Settlement Agreement on behalf of another person or entity represents and warrants that he, she, or it is duly authorized to execute this Settlement Agreement on behalf of such person or entity, has the requisite authority to bind such person or entity, and such person or entity has full knowledge of and has consented to this Settlement Agreement. The representations and warranties set forth in this paragraph shall survive execution of this Settlement Agreement.

h.      In executing the Settlement Agreement, each of the Parties represents and warrants, for itself, that: (i) it does so with full knowledge of its available rights, (ii) it is not relying and has not relied upon any representations made by any person with regard to the Settlement Agreement, other than any written representations and agreements contained herein, (iii) it has had available to it such information as it or its counsel considered necessary to making an informed judgment concerning the Settlement Agreement, and (iv) it has conducted such investigation as it or its counsel deemed appropriate regarding the settlement and its rights and asserted rights in connection with the matters that are the subject of the Settlement Agreement.

i.      The Parties acknowledge that this Settlement Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof, and all prior agreements, negotiations and understandings with respect to the subject matter hereof are canceled and superseded by this Settlement Agreement.

j.      This Settlement Agreement shall not be modified, altered, amended, or vacated without the written consent of all parties hereto or order of the Bankruptcy Court.

k.      This Settlement Agreement shall inure to the benefit of and be binding upon the successors and assigns of the Parties hereto, including any subsequently appointed Chapter 7 trustee.

l.      The headings of all sections of this Settlement Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision hereof.

20.      <u>Bankruptcy Court Approval</u>. The Debtors shall seek approval of this Settlement Agreement at the hearing on final relief in respect of the DIP Motion. In the event the Bankruptcy Court denies approval of this Settlement Agreement, this Settlement Agreement shall be null and void and of no force and effect, and the Parties shall be returned to the same positions they were

in prior to execution of this Settlement Agreement, as if this Settlement Agreement had never been executed.

[signature page(s) follow]

Docusign Envelope ID: A6AA8314-F70A-4C0E-A11D-4C01C565D695

IN WITNESS WHEREOF, this Settlement Agreement is hereby executed as of the date first set forth above:

ACCEPTED AND AGREED TO BY:

**PHONIX RBS LLC**

By: _____

Name: Brent Turner

Title: Manager

[signature page(s) continue]

Signature Page to Settlement Agreement and Mutual Release

_____ [seal]
WILLIAM IAN MACDONALD


**DEBTORS:**

BUDDY MAC HOLDINGS, LLC
BMH RTO, LLC
BUDDY MAC TWENTY-ONE, LLC
BUDDY MAC TWENTY-TWO, LLC
BUDDY MAC TWENTY-THREE, LLC
BUDDY MAC TWENTY-FOUR, LLC
BUDDY MAC TWENTY-FIVE, LLC
BUDDY MAC TWENTY-SIX, LLC
BUDDY MAC TWENTY-SEVEN, LLC
BMH-TNM 28, LLC
BMH-TNM 29, LLC
BMH-TNM 30, LLC
BMH-TNM 31, LLC
BMH-TNM 32, LLC
BMH-TNM 33, LLC
BMH-RCL 34, LLC
BMH-RCL 35, LLC
BMH-RCL 36, LLC
BMH-RCL 37, LLC
BMH-RCL 38, LLC
BMH-RCL 39, LLC
BMH-RCL 40, LLC
BMH-RCL 41, LLC
BMH-RCL 42, LLC
BMH-FAN 43, LLC
BMH-FAN 44, LLC
BMH-FAN 45, LLC
BMH-FAN 46, LLC
BMH-FAN 47, LLC
BMH-FAN 48, LLC
BMH-FAN 49, LLC
BMH-FAN 50, LLC
BMH-FAN 51, LLC
BMH-FAN 52, LLC
BMH-FAN 53, LLC
BMH-FAN 54, LLC
BMH-SM 79, LLC
BMH-SM 80, LLC
BMH-SM 81, LLC

Signature Page to Settlement Agreement and Mutual Release

Docusign Envelope ID: 1627638E3B58-4CFB-8B44-C68E8E665497

BMH-SM 82, LLC
BMH-SM 83, LLC
BMH-SM 84, LLC
BMH-SM 85, LLC
BMH-SM 86, LLC
BMH-SM 87, LLC
BUDDY MAC ONE, LLC
BMH ONE RE, LLC
BMH 95 RE CARUTHERSVILLE, LLC
BMH 96 RE MARION, LLC
BUDDY MAC TWO, LLC
BUDDY MAC SIX, LLC
BUDDY MAC SIX RE, LLC
BUDDY MAC EIGHT, LLC
BUDDY MAC ELEVEN, LLC
BUDDY MAC TWLEVE, LLC
BUDDY MAC EIGHTEEN, LLC
BUDDY MAC NINETEEN, LLC
BMH-NEW 58, LLC
BMH-NEW 62, LLC
BMH-WF TX 67, LLC
BMH-TB 75, LLC
BMH 85 RE SIKESTON, LLC
BMH PRIME 95, LLC
BMH PRIME 96, LLC
BMH PRIME 97, LLC
BMH HR LLC
SAM BROWNFIELD, LLC
SAM PLAINVIEW, LLC
MACDONALD CAPITAL CORPORATION


By: _Ian MacDonald_
     DocuSigned by:
     EFD8FED8026C428...
 Name: William Ian MacDonald
 Title: Authorized Representative


[signature page(s) continue]


Signature Page to Settlement Agreement and Mutual Release

**MACDONALD ENTITIES:**

MRG BOULDERS APARTMENTS, LTD.
MRG PREMIUM FINANCE, LLC
MACLUBBOCK BOULDERS GP INC.
P.E.C. FINANCE, LTD.
MACDONALD REALTY GROUP, LLC
MACDONALD CAPITAL, LP

By: _Ian MacDonald_____
  Name: William Ian MacDonald
  Title: Authorized Representative

Signature Page to Settlement Agreement and Mutual Release

## SCHEDULE 1

### MacDonald Entities

1. MRG Boulders Apartments, Ltd.
2. MRG Premium Finance, LLC
3. MacLubbock Boulders GP Inc.
4. P.E.C. Finance, Ltd.
5. MacDonald Capital, LP
6. MacDonald Realty Group, LLC

## SCHEDULE 7

### Subject RTO Debtor Real Property

| Ownership Entity | Street Address | City, State | ZIP |
|---|---|---|---|
| SAMPlainview, LLC | 414 N. Columbia St. | Plainview, TX | 79072 |
| MacDonald Capital Corp | 218 N. Main St. | Seminole, OK | 74868 |
| Buddy Mac Six RE, LLC | 1100 N. HWY 491 | Gallup, NM | 87301 |
| SAMBrownfield, LLC | 501 W. Main St. | Brownfield, TX | 79316 |
| BMH 85 RE Sikeston, LLC | 1501 E Malone Ave | Sikeston, MO | 63801 |
| BMH One RE, LLC | 1404 W. Gentry Pkwy | Tyler, TX | 75702 |
| BMH 95 RE Caruthersville, LLC | 810 W 13th St | Caruthersville, MO | 63830 |
| BMH 96 RE Marion, LLC | 103 N Carbon | Marion, IL | 62959 |

## EXHIBIT G

### Buddy Mac Entities

1. Buddy Mac Two, LLC
2. Buddy Mac Six, LLC
3. Buddy Mac Six RE, LLC
4. Buddy Mac Eight, LLC
5. Buddy Mac Eleven, LLC
6. Buddy Mac Twleve, LLC
7. Buddy Mac Eighteen, LLC
8. Buddy Mac Nineteen, LLC
9. BMH-NEW 58, LLC
10. BMH-NEW 62, LLC
11. BMH-WF TX 67, LLC
12. BMH-TB 75, LLC
13. BMH 85 RE Sikeston, LLC
14. BMH Prime 95, LLC
15. BMH Prime 96, LLC
16. BMH Prime 97, LLC
17. BMH HR LLC
18. SAM Brownfield, LLC
19. SAM Plainview, LLC

## APPENDIX 14

**Plains Capital Bank Deposit Report(s)**

(See attached)

# Deposit Accounts Activity Summary

| | |
|---|---|
| **Report Created:** | 01/15/2026 12:00:31 AM (ET) |
| **Account:** | Bmh-Hr LLC - Checking - 111322994 - *2900 - Available $387,161.58 |
| **Date range:** | 11/01/2025 to 01/14/2026 |
| **Transaction types:** | All transactions |
| **Detail option:** | Includes transaction detail |

### Bmh-Hr LLC - Checking - 111322994 -  *2900 - Available $387,161.58

| Post Date | Reference | Additional Reference | Description | Debit | Credit | Calculated Balance |
|---|---|---|---|---|---|---|
| 01/09/2026 | 000000000000000 | | MISCELLANEOUS DEBIT WIRE FEE | $35.00 | | $387,161.58 |
| 01/09/2026 | 202600900025360 | | OUTGOING WIRE TRANSFER OUTGOING WIRE 2026009000253600;  BNF BMH RTO LLC;REF | $56,545.57 | | $387,196.58 |
| 01/07/2026 | 997000107184549 | | BOOK TRANSFER DEBIT REF 0071845L   FUNDS TRANSFER TO DEP XXXXX6665    FROM BCY A PPRV PMT | $24,583.33 | | $443,742.15 |
| 12/31/2025 | 000000000000000 | | INTEREST CREDIT | | $115.11 | $468,325.48 |
| 12/31/2025 | 997001231102246 | | BOOK TRANSFER DEBIT REF 3651022L   FUNDS TRANSFER TO DEP XXXXX6665    FROM APPRO VED BMH BCY DEC | $24,583.33 | | $468,210.37 |
| 12/29/2025 | 000000000000000 | | MISCELLANEOUS DEBIT WIRE FEE | $35.00 | | $492,793.70 |
| 12/29/2025 | 202536300019110 | | OUTGOING WIRE TRANSFER OUTGOING WIRE 2025363000191100;  BNF KUTAK ROCK LLP IOLTA ACCOUNT;REF | $9,578.69 | | $492,828.70 |
| 12/03/2025 | 000000000000000 | | MISCELLANEOUS DEBIT WIRE FEE | $35.00 | | $502,407.39 |
| 12/03/2025 | 202533700021580 | | OUTGOING WIRE TRANSFER OUTGOING WIRE 2025337000215800;  BNF KANE RUSSELL COLEMAN & LOGAN PC TRU ST ACC;REF | $75,000.00 | | $502,442.39 |
| 12/01/2025 | 000000000000000 | | MISCELLANEOUS DEBIT WIRE FEE | $35.00 | | $577,442.39 |
| 12/01/2025 | 202533500029920 | | OUTGOING WIRE TRANSFER OUTGOING WIRE 2025335000299200;  BNF GLASS RATNER ADVISORY & CAPITAL GRO UP, LL;REF | $150,000.00 | | $577,477.39 |
| 12/01/2025 | 997001201132905 | | BOOK TRANSFER DEBIT REF 3351329L   FUNDS TRANSFER TO DEP XXXXX6665    FROM PAY | $45,000.00 | | $727,477.39 |
| 11/28/2025 | 000000000000000 | | INTEREST CREDIT | | $19.05 | $772,477.39 |

| 11/26/2025 | 000000000000000 | | MISCELLANEOUS DEBIT WIRE FEE | $35.00 | | $772,458.34 |
| 11/26/2025 | 202533000034050 | | OUTGOING WIRE TRANSFER OUTGOING WIRE 2025330000340500;  BNF KANE RUSSELL COLEMAN & LOGAN PC TRU ST ACC;REF | $500,000.00 | | $772,493.34 |
| 11/26/2025 | 000000000000000 | | MISCELLANEOUS DEBIT WIRE FEE | $35.00 | | $1,272,493.34 |
| 11/26/2025 | 202533000033900 | | OUTGOING WIRE TRANSFER OUTGOING WIRE 2025330000339000;  BNF KUTAK ROCK LLP IOLTA ACCOUNT;REF | $5,000.00 | | $1,272,528.34 |
| 11/21/2025 | 000000000000000 | | MISCELLANEOUS DEBIT WIRE FEE | $35.00 | | $1,277,528.34 |
| 11/21/2025 | 202532500008490 | | OUTGOING WIRE TRANSFER OUTGOING WIRE 2025325000084900;  BNF CLIFFORD TOWNS;REF | $249,816.33 | | $1,277,563.34 |
| 11/21/2025 | 000000000000000 | | MISCELLANEOUS DEBIT WIRE FEE | $35.00 | | $1,527,379.67 |
| 11/21/2025 | 202532500007570 | | OUTGOING WIRE TRANSFER OUTGOING WIRE 2025325000075700;  BNF BUDDY MAC HOLDINGS LLC; REF | $199,866.21 | | $1,527,414.67 |
| 11/21/2025 | 000000000000000 | | MISCELLANEOUS DEBIT WIRE FEE | $35.00 | | $1,727,280.88 |
| 11/21/2025 | 202532500008220 | | OUTGOING WIRE TRANSFER OUTGOING WIRE 2025325000082200;  BNF ZARCO EINHORN SALKOWSKI & BRITO PA; REF | $100,000.00 | | $1,727,315.88 |
| 11/21/2025 | 000000000000000 | | MISCELLANEOUS DEBIT WIRE FEE | $35.00 | | $1,827,315.88 |
| 11/21/2025 | 202532500007720 | | OUTGOING WIRE TRANSFER OUTGOING WIRE 2025325000077200;  BNF JACKSON WALKER LLP;REF | $100,000.00 | | $1,827,350.88 |
| 11/21/2025 | 000000000000000 | | MISCELLANEOUS DEBIT WIRE FEE | $35.00 | | $1,927,350.88 |
| 11/21/2025 | 202532500007520 | | OUTGOING WIRE TRANSFER OUTGOING WIRE 2025325000075200;  BNF WOMBLE BOND DICKENSON LP;REF | $80,376.81 | | $1,927,385.88 |
| 11/19/2025 | | | MISCELLANEOUS DEBIT WIRE FEE | $35.00 | | $2,007,762.69 |
| 11/19/2025 | | | OUTGOING WIRE TRANSFER OUTGOING WIRE 2025323000242800; BNF SRB CAPITAL   LLC;REF | $607,519.63 | | $2,007,797.69 |
| 11/18/2025 | | | DEPOSIT | | $2,615,317.32 | $2,615,317.32 |
| 01/14/2026 | **Totals** | | | **$2,228,289.90** | **$2,615,451.48** | |



## **Exhibit B**

(Final DIP Order)



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed February 11, 2026**

_____

**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| BUDDY MAC HOLDINGS, LLC, *et al.*, | Case No. 25-34839 |
| Debtors.[1] | (Jointly Administered) |

### ORDER (I) AUTHORIZING THE DEBTORS, ON A FINAL BASIS TO
### (A) OBTAIN POSTPETITION FINANCING AND (B) USE CASH COLLATERAL,
### (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE
### EXPENSE CLAIMS, (III) GRANTING ADEQUATE PROTECTION, (IV) MODIFYING
### THE AUTOMATIC STAY, AND (V) GRANTING RELATED RELIEF

Upon the motion ("DIP Motion") of Buddy Mac Holdings, LLC ("Parent"), BMH RTO,

LLC ("BMH RTO"), and each debtor subsidiary of Parent listed as a "Borrower" on the DIP Loan

Agreement (as defined below) (each a "Borrower" and collectively, the "Borrowers"), and each

debtor subsidiary listed as a "Guarantor" on the DIP Loan Agreement (each, including Parent, a

"Guarantor"), each of the foregoing is a debtor and debtor-in-possession (collectively the

---

[1]   A complete list of the Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal
tax ID numbers, is set forth on Schedules I and II to the Motion. A complete list of the Debtors is also available
on the claims agent's website: https://dm.epiq11.com/case/buddyshome/info. The Debtors' service address is 400
E. Centre Park Blvd., Suite 101, DeSoto, Texas 75115

"Debtors," and each, a "Debtor") in the above-captioned chapter 11 cases (collectively, "Chapter 11 Cases"), pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d), 364(e), and 507(b) of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code") and rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rules 2002-1, 4001-1, 5005-1, and 9013-1 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Local Rules"), and Section D of the Procedures for Complex Cases in the Northern District of Texas (the "Complex Case Procedures") for the United States Bankruptcy Court for the Northern District of Texas (this "Court") seeking entry of an interim order (this "Interim Order") and a final order, in form and substance acceptable to the Prepetition Lender and the DIP Lender (the "Final Order"; together with the Interim Order, the "DIP Orders") granting among other things:

1.      authorization and approval for the Debtors to obtain up to $1.5 million[2] in principal of post-petition revolving credit debtor-in-possession financing and other financial accommodations (the "**DIP Facility**"), and the revolving loans made under such facility, the "**DIP Loans**"), pursuant to and in accordance with the terms and conditions set forth in that certain *Secured Superpriority Debtor-in-Possession Loan, Security, and Guaranty Agreement* (as it may be amended, modified, supplemented, extended, restated or replaced from time to time, the "**DIP Loan Agreement**")[3] substantially in the form attached hereto as Exhibit 2, by and among the Debtors, as borrower and/or guarantors, and Phonix RBS LLC, as Lender (the "**DIP Lender**");

2.      authorization for the Debtors to use or direct the use of the proceeds of the DIP Facility, DIP Collateral and Pre-Petition Collateral (each as defined herein) (the "**Cash Collateral**"), in accordance with the terms of the DIP Orders and the DIP Financing Documents (as defined herein), and as limited by the Approved Budget (as defined herein), for, *inter alia*: (a) the purchase of inventory by Lender on behalf of the Debtors, (b) general operating, corporate, and working capital purposes of the Debtors in the ordinary course of business, exclusive of the inventory purchases by the DIP Lender as more fully set forth in the DIP Loan Agreement and this Final Order; (c) reasonable and documented costs, fees, and other expenses of DIP Lender; (d) Adequate Protection Payments (as defined herein); (e) approved fees and expenses of the Debtors' and Committees' professionals; and (f) a portion of the outstanding amount of the Loan (as defined in the Pre-Petition Loan Agreement; referred to herein as the "**Pre-Petition Loan**") to be

---

[2] Exclusive of the Accordion Amount of $1,000,000, which, subject to the sole and absolute discretion of the DIP Lender, may be made available to the Debtors following the entry of this Final Order.

[3] Capitalized terms used but not otherwise defined herein have the meaning ascribed to them in the DIP Loan Agreement.

automatically "rolled-up" and converted into DIP Loans, on a cashless basis of three dollars ($3.00) of Roll-Up Amount for every one dollar ($1.00) of funded DIP Loans (the "**Roll-Up**"), which amount shall include any post-petition advance that has been made by Lender to the Debtors since the First Petition Date.

3.      approval of, authorization and direction for Debtors to (a) enter into, execute and perform under (i) the DIP Loan Agreement and (ii) all security agreements, pledge agreements, notes, guarantees, mortgages, deeds of trust, control agreements, Uniform Commercial Code financing statements, certificates, reports and other agreements, documents and instruments either or both executed and/or delivered with or to the DIP Lender in connection with or related thereto (collectively, as amended, modified, supplemented, extended, restated or replaced from time to time, the "**DIP Financing Documents**"), with such DIP Financing Documents in form and substance acceptable to the Pre-Petition Lender and the DIP Lender, and (c) take and perform all other acts and steps as may be required or contemplated by or in connection with the DIP Financing Documents and the DIP Orders;

4.      granting to the DIP Lender, priming (subject to the limitations set forth in proviso 11(b)(3)), valid, perfected and enforceable liens (as defined in Bankruptcy Code section 101 (37)) in and upon all of the DIP Collateral to secure all existing and future obligations and liabilities of every kind or nature (including without limitation, principal of, and accrued interest on, amounts advanced to the Debtors under the DIP Facility), and all other fees, and indemnity obligations, reimbursement obligations, any other Obligations (as defined in the DIP Loan Agreement) under or in connection with the DIP Financing Documents, whether due or to become due, absolute or contingent, (collectively, the "**DIP Obligations**");

5.      granting to the DIP Lender an allowed superpriority administrative expense claim status for the DIP Obligations, pursuant to Bankruptcy Code section 364(c)(1) and 507(b), subject to the terms of the DIP Orders;

6.      authorizing Lender's use for the direct purchase of inventory, and the Debtors' use, in accordance with the terms of the DIP Financing Documents and as limited by the Approved Budget, of all Cash Collateral and DIP Loans;

7.      granting adequate protection, including without limitation, Adequate Protection Liens, Adequate Protection Claims, and Adequate Protection Payments (each as defined herein and collectively, the "**Adequate Protection Obligations**") to (a) Phonix RBS, LLC, as successor in interest to INTRUST Bank, N.A. ("**Pre-Petition Lender**", together with the DIP Lender the "**Lenders**") under that certain Loan, Security and Guaranty Agreement dated as of February 28, 2025 (as amended, restated, amended and restated, modified, supplemented, or extended from time to time, the "**Pre-Petition Loan Agreement**") by and among debtor BMH RTO, LLC, as borrower ("**Pre-Petition Borrower**"), Ian MacDonald ("**MacDonald**"), Buddy Mac Holdings, LLC ("**Parent**"), and certain subsidiary guarantors (collectively, the "**Pre-Petition Guarantors**") from time to time party thereto, and the Pre-Petition Lender, and all security agreements, pledge agreements, notes, mortgages, guarantees, control agreements, collateral access agreements, and related agreements and documents (collectively, with the Pre-Petition Loan Agreement, as amended, modified, supplemented, extended, restated, amended and restated, or replaced from time to time, the "**Pre-Petition Financing Documents**");

8.      approving the treatment of the collection and use by Debtors of any Pre-Petition Collateral (as defined below) and post- petition Collateral by the Debtors in accordance with the Approved Budget as a dollar for dollar Adequate Protection Claim in the manner and on the terms set forth in the DIP Loan Agreement and the DIP Orders;

9.      authorizing the application of the remaining ERC Funds, which are currently being held by Lenders in a segregated, suspense account (the "**Suspense Account**") to be applied by Lenders, as deemed proceeds of the pre-petition Collateral, on account of the pre-petition Obligations or the DIP Facility, in Lenders' sole and absolute discretion. The ERC Funds shall secure the DIP Obligations and the Adequate Protection Obligations;

10.     the waiver of: (a) the ability of the Debtors and their bankruptcy estates (as defined under Bankruptcy Code section 541, the "**Estates**") to surcharge against the DIP Collateral with respect to the DIP Lender and the Pre-Petition Collateral with respect to the Pre-Petition Lender pursuant to Bankruptcy Code section 506(c); (b) the applicability of the "equities of the case" exception under Bankruptcy Code section 552(b) with respect to the proceeds, products, offspring or profits of the DIP Collateral and Pre-Petition Collateral;

11.     the waiver of the equitable doctrine of "marshaling" and any similar equitable doctrine with respect to (a) any of the DIP Collateral (as defined herein) for the benefit of any party other than the DIP Lender, and (b) any of the Pre-Petition Collateral (as defined herein), including Cash Collateral, for the benefit of any party other than the Pre-Petition Lender;

12.     approval of the milestones set forth in the DIP Loan Agreement.

13.     approval of the remaining terms of the settlement agreement (the "Settlement Agreement"), in a form and substance acceptable to the Pre-Petition Lender and the DIP Lender, attached as Exhibit A to the *Debtors' Emergency Motion for (I) Approval of Settlement Agreement Between the Debtors and Phonix RBS LLC Pursuant to Federal Rule of Bankruptcy Procedure 9019; and (II) Granting Related Relief* [ECF # 174], and the granting of releases contained therein and in this Final Order;

14.     pursuant to section 1(c) of the DIP Loan Agreement, authorizing DIP Lender, in its sole and absolute discretion, to make available an additional $1,000,000 (the "Accordion Amount"), solely for the purpose of purchasing additional inventory on behalf of the Debtors, and increasing the Credit Limit as in effect on the Closing Date;

15.     modifying the automatic stay imposed by Bankruptcy Code section 362 to the extent hereinafter set forth and waiving the fourteen (14) day stay provisions of Bankruptcy Rule 4001(a)(3); and

16.     waiving the 21-day provision of Bankruptcy Rule 6003(b), the notice requirements of Bankruptcy Rule 6004(a), waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of this Final Order.

Notice of the DIP Motion ("Notice") having been served by the Debtors in accordance with

Bankruptcy Rule 4001-1 on: (i) the United States Trustee for Region 6 ("U.S. Trustee");

(ii) proposed counsel for the Official Committee of Unsecured Creditors (the "<u>Committee</u>");

(iii) the Pre-Petition Lender and counsel thereto; (iv) the proposed DIP Lender and counsel thereto;

(v) the Internal Revenue Service; (vi) other governmental agencies having a regulatory or statutory

interest in these cases; (vii) all parties known to the Debtors that hold any liens, mortgages or

security interests in the Debtors' assets, including those parties that have filed UCC-1 financing

statements against the Debtors, or that, to the Debtors' knowledge, have asserted any liens or

mortgages on any of the Debtors' assets; (viii) all landlords and warehouseman of the Debtors;

(ix) all creditors known to the Debtors to be holding a judgment against the Debtors; (x) any other

parties claiming an interest in the Pre-Petition Collateral (defined below); and (xi) any party that

has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "<u>Noticed Parties</u>").  In

light of the nature of the relief requested, no other or further notice is required.

This Court having considered the relief requested in the DIP Motion, the First Day

Declarations,[4] the DIP Declaration,[5] and the arguments of counsel made at  the Interim Hearing

and the Final Hearing; an interim hearing (the "<u>Interim Hearing</u>") and a final hearing ("<u>Final</u>

<u>Hearing</u>") on the DIP Motion having been held by this Court and concluded; all objections and

reservations of rights, if any, to the relief requested in the DIP Motion having been withdrawn,

resolved, or overruled by this Court; it appearing that approval of the relief requested in the DIP

Motion is fair and reasonable and in the best interests of the Debtors and their Estates; it appearing

that the Debtors' entry into and performance under the DIP Financing Documents and the other

transactions contemplated by the Interim Order and this Final Order is a sound and prudent

---

[4]    The term "**<u>First Day Declarations</u>**" means that certain collectively, (1) *Declaration of William Ian MacDonald in Support of the Debtors' Chapter 11 Petitions and First Date Motions* [D.I. 12] ("<u>Debtor First Day Declaration</u>") and (2) *Declaration of Mark Shapiro in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [D.I. 13] (the "<u>CRO First Day Declaration</u>")

[5]    The term "**<u>DIP Declaration</u>**" means the *Declaration of Mark Shapiro in Support of the Debtors' Sale and DIP Financing Motions* filed on January 26, 2026.

exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor:

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING AND FINAL HEARING, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[6]**

A.  <u>Disposition</u>.  The relief requested in the DIP Motion is **GRANTED** to the extent set forth herein in accordance with the terms of this Final Order.  Any objections to the DIP Motion with respect to the entry of this Final Order that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are hereby denied and overruled.  This Final Order shall become effective immediately upon its entry and any applicable stay (including under Bankruptcy Rule 6004) is waived to permit such effectiveness.

B.  <u>Petition Dates</u>.  On December 1, 2025 (the "<u>First Petition Date</u>"), Buddy Mac One, LLC ("<u>Buddy Mac One</u>") , BMH One RE, LLC ("<u>BMH One</u>"), BMH 95 RE Caruthersville, LLC ("<u>BMH 95</u>"), and BMH 96 RE Marion, LLC ("<u>BMH 96</u>")  filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, and on December 4, 2025 (the "<u>Second Petition Date</u>"), an additional  forty five (45) related entities (together with Buddy Mac One, BMH One, BMH 95, and BMH 96, the "<u>December Debtors</u>") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, and on January 25, 2026 (the "<u>Third Petition Date</u>", together with the First Petition Date and the Second Petition Date, the "<u>Petition Dates</u>" and each individually referred to

---

[6]  The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

6

as the applicable "Petition Date"), twenty-one (21) additional related entities (the "January Debtors") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

C.    Debtors-in-Possession.    The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  No trustee or examiner has been appointed in the Chapter 11 Cases. On December 19, 2025, the U.S. Trustee appointed the Committee.

D.    Jurisdiction and Venue.    The Court has jurisdiction of these Chapter 11 Cases, the DIP Motion, the Interim Order, this Final Order, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.   This Court's consideration of the DIP Motion constitutes a "core" proceeding as defined in 28 U.S.C. §§ 157(b)(2)(A), (D) and (M).  This Court may enter a final order consistent with Article III of the United States Constitution.   Venue of the Chapter 11 Cases and the DIP Motion in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and procedural bases for the relief sought in the DIP Motion and granted in this Final Order are Bankruptcy Code sections 105, 361, 362, 363, 364, 503, 506, 507, and 552, Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014, and Bankruptcy Local Rules 2002-1, 4001-1, 5005-1, and 9013-1, and the Complex Case Procedures.

E.    Notice.    Upon the record presented to this Court at the Interim Hearing and the Final Hearing, and under the exigent circumstances set forth therein and in the DIP Motion, the First Day Declarations and the DIP Declaration, notice of the DIP Motion and the relief requested thereby and granted in this Final Order has been provided in accordance with Bankruptcy Rules 2002, 4001(b) and 4001(c)(1) and Bankruptcy Local Rule 9013-1, which notice was appropriate

under the circumstances and sufficient for entry of this Final Order.  No other or further notice of the DIP Motion is required for entry of this Final Order.

      F.    <u>Final Hearing</u>.  At the Final Hearing, the Debtors sought approval of this Final Order, which shall be subject to the terms and conditions of the DIP Financing Documents and contain approval of the Settlement Agreement.  Notice of the Final Hearing and Final Order were provided in accordance with the Interim Order.

      G.    <u>Debtors' Acknowledgements and Agreements</u>.  Without prejudice to the rights of all parties-in-interest other than the Debtors, but subject to the limitations contained in Section VIII below, the Debtors admit, stipulate, acknowledge, and agree (the "<u>Debtors' Stipulations</u>") that:

      (1).    *Pre-Petition Financing Documents*.  Prior to the commencement of the Chapter 11 Cases, Pre-Petition Borrower and Pre-Petition Guarantors, entered into the Pre-Petition Loan Agreement with INTRUST Bank, N.A. The Pre-Petition Financing Documents were subsequently assigned to Pre-Petition Lender pursuant to that certain *Loan Sale Agreement* dated as of September 2, 2025. Pursuant to the Pre-Petition Financing Documents, Pre-Petition Lender made loans and advances, and provided other financial accommodations to the Pre-Petition Borrower. The Pre-Petition Guarantors guaranteed the Pre-Petition Obligations (as defined herein) of the Pre-Petition Borrower under the Pre-Petition Loan Agreement.  The Pre-Petition Obligations (as defined herein) matured prior to the assignment of the Pre-Petition Financing Documents to Pre-Petition Lender, are due and owing in accordance with the terms of the Pre-Petition Financing Documents, and all commitments of the Pre-Petition Lender are terminated.

      (2).    *Pre-Petition Obligations*.

(a).  *Pre-Petition Loan Obligations.*  As of the First Petition Date, the
Pre-Petition Borrower and the Pre-Petition Guarantors were justly and lawfully indebted and liable
to the Pre-Petition Lender, without defense, counterclaim or offset of any kind, in the aggregate
amount of not less than $12,792,674.70, including, without limitation, Pre-Petition Loans in an
outstanding principal amount of $11,974,354 (together with accrued and unpaid interest, any fees,
costs, expenses and disbursements (including attorneys' fees, accountants' fees, auditor fees,
appraisers' fees and financial advisors' fees, and related expenses and disbursements),
indemnification obligations, hedging obligations, guarantee obligations, and other charges,
amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued,
accruing, due, owing, or chargeable in respect of any of the Pre-Petition Borrower's or the Pre-
Petition Guarantors' obligations pursuant to, or secured by, the Pre-Petition Financing Documents,
including all Obligations (as defined in the Pre-Petition Loan Agreement) (collectively, the "Pre-
Petition Obligations")), which Pre-Petition Obligations have been guaranteed on a joint and several
basis by the Pre-Petition Guarantors.

(b).  The Pre-Petition Obligations constitute allowed, legal, valid,
binding, enforceable, and non-avoidable obligations of Debtors, and are not subject to any offset,
deduction, defense, counterclaim, avoidance, recovery, recharacterization, or subordination
pursuant to the Bankruptcy Code or any other applicable law, and the Debtors do not possess, and
shall not assert, any claim, counterclaim, setoff, deduction, or defense of any kind, nature, or
description that would in any way impair, reduce, or affect the validity, enforceability, and non-
avoidability of any of the Pre-Petition Obligations.

(3).  *Pre-Petition Collateral (for Pre-Petition Obligations).*

9

(a).    As of the First Petition Date, the Pre-Petition Obligations were secured pursuant to the Pre-Petition Financing Documents by valid, binding, perfected, enforceable, and non-avoidable security interests and liens ("Pre-Petition Liens") granted by the Debtors to the Pre-Petition Lender upon the "Collateral" (as defined in the Pre-Petition Loan Agreement) in existence as of the First Petition Date (hereafter, the "Pre-Petition Collateral").

(b).    The Pre-Petition Lender has a valid, binding, and perfected nonavoidable security interest and lien in all of Pre-Petition Collateral, including Cash Collateral, including all amounts on deposit in all of Pre-Petition Borrower's banking, checking, or other deposit accounts whether as original collateral or as proceeds of other Pre-Petition Collateral, and all such Cash Collateral is part of the Pre-Petition Collateral.

(c).    The Pre-Petition Lender's security interests are perfected by those certain UCC-1 financing statements naming each of the Borrowers and Guarantors, UCC-3 amendments assigning such financing statements from INTRUST Bank, LLC to Pre-Petition Lender, the Limited Recourse Guaranty (as defined in the Pre-Petition Loan Agreement), and three (3) Mortgages on the respective real properties of the Guarantors (the "Guarantor Real Property").

(d).    The Debtors do not possess, and will not assert, any claim, counterclaim, setoff, deduction, or defense of any kind, nature, or description that would in any way impair, reduce, or affect the validity, enforceability, and non-avoidability of any of the Pre-Petition Lender's liens, claims, or security interests in the Pre-Petition Collateral, which liens and security interests are not subject to subordination or avoidance pursuant to the Bankruptcy Code or any other applicable law.

H.    Adequate Protection.

10

(1).    Based on the DIP Motion, the First Day Declarations, and the DIP Declaration, and the record presented to this Court at the Interim Hearing and the Final Hearing, the terms of the adequate protection granted to the Pre-Petition Lender as provided in this Final Order are fair and reasonable under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and provide the Debtors with reasonably equivalent value and fair consideration.

(2).    *Adequate Protection Obligations.*  The Debtors acknowledge and agree that the Pre-Petition Lender is entitled to and being provided with adequate protection (including the Adequate Protection Obligations) with respect to the aggregate diminution in value ("Diminution in Value") of the Pre-Petition Lender's respective interests in the Pre-Petition Collateral for any reason for which adequate protection may be granted under the Bankruptcy Code, including as a result of the: (a) provisions of this Final Order granting either or both first priority and priming liens on the Pre-Petition Collateral to the DIP Lender with respect to the DIP Facility; (b) use of the Cash Collateral since the First Petition Date; (c) use, sale, lease, decrease, or depreciation of the Pre-Petition Collateral since the First Petition Date; (d) subordination to the Carve Out solely as provided for herein; and (e) the imposition of the automatic stay under Bankruptcy Code section 362(a) or otherwise pursuant to Bankruptcy Code sections 361(a), 363(c), 364(c), and 364(d)(1). Pursuant to Bankruptcy Code sections 361, 363 and 507(b), as adequate protection for any Diminution in Value, since the First Petition Date, the Debtors have agreed to provide the Pre-Petition Lender with the Adequate Protection Liens, the Adequate Protection Claim and the Adequate Protection Payments (each as defined herein), which Adequate Protection Payments shall be payable from the proceeds of DIP Loans and any other asset of the Debtors' estates.

11

(3).    In exchange for such adequate protection (including the Adequate
Protection Obligations), the Pre-Petition Lender has agreed to the Debtors' use of the Cash
Collateral on the terms set forth in this Final Order and the DIP Loan Agreement.

(4).    *Necessity for Adequate Protection.*  The adequate protection being provided
pursuant to this Final Order is authorized by the Bankruptcy Code, is consistent with the Debtors'
need for the DIP Facility and will facilitate the Debtors' ability to continue their business
operations.

I.    <u>No Control</u>.  Neither the Pre-Petition Lender nor the DIP Lender, as applicable, do
not control (or have in the past controlled) the Debtors or their properties or operations, have
authority to determine the manner in which any Debtors' operations are conducted or are control
persons or insiders of the Debtors by virtue of any of the actions taken with respect to, in
connection with, related to or arising from the Pre-Petition Financing Documents or the DIP
Documents or the Settlement Agreement.

J.    <u>Findings Regarding the DIP Facilities and Use of Cash Collateral</u>.

(1).    *Request for DIP Financing.*  The Debtors have requested that the DIP
Lender extend loans, advances, and other financial accommodations and the DIP Lender is only
willing to do so as more particularly described, and subject to the terms and conditions set forth,
in this Final Order and the DIP Financing Documents.

(2).    *Need for DIP Financing.*  As set forth in the DIP Declaration and the First
Day Declaration, and the record of the Cash Collateral Hearings since the First Petition Date, the
Debtors do not have sufficient available sources of working capital to fund the purchase of
inventory and generate sufficient working capital in the ordinary course without the DIP Facility
and the ability to use Cash Collateral, or to fund these Chapter 11 Cases without the DIP Facility,

12

all on the terms set forth in the DIP Financing Documents and this Final Order.  The Debtors'
ability to maintain business relationships with their vendors, suppliers, and customers, to pay their
employees, and to otherwise fund their operations is essential to the viability of the Debtors and to
run a sale process and the Chapter 11 Cases. The ability of the Debtors to obtain sufficient working
capital and liquidity through the proposed DIP Facility and the use of Cash Collateral on the terms
set forth in the DIP Financing Documents and this Final Order is vital to the preservation and
maximization of the going concern value one or more of the Debtors' currently operating
businesses pending sale(s) of such assets.  Accordingly, the Debtors have an immediate need to
obtain funds from the DIP Facility and authorization to use Cash Collateral for the purposes and
on the terms and subject to the limitations set forth herein and in the DIP Financing Documents,
including the Approved Budget (defined herein), in order to, among other things, (a) maintain
business relationships; (b) permit the continued operation of their businesses; (c) make Adequate
Protection Payments; (d) pay the costs of administration of these Chapter 11 Cases and satisfy
their other working capital and general corporate purposes; (e) minimize disruption of their
business operations; and (f) manage and preserve the assets of the Debtors' Estates in order to
maximize the value of such assets and the recoveries to creditors of the Estates and to conduct a
sale process.

(3).    *No Credit Available on More Favorable Terms*.  As stated in the DIP
Declaration, the Debtors are unable to procure financing or other financial accommodations on
more favorable terms from sources other than from the DIP Lender under the DIP Financing
Documents and are unable to obtain satisfactory unsecured credit allowable under Bankruptcy
Code section 364(a) or 364(b) and 503(b)(1) as an administrative expense.  The Debtors also are
unable to obtain secured credit for the purposes set forth in the DIP Financing Documents and the

consensual use of Cash Collateral on more favorable terms without the grant of liens (including priming liens) on all or substantially all of the Debtors' assets pursuant to Bankruptcy Code sections 364(c) and (d), subject to the Carve Out solely as provided for herein.  In the Debtors' business judgment, the Debtors cannot procure the necessary financing on terms more favorable than the financing offered by the DIP Lender pursuant to the DIP Financing Documents and this Final Order.

(4).    *Budget*.  Based upon the record presented to this Court by the Debtors, (a) the Debtors have prepared and delivered the Initial DIP Budget (as defined in the DIP Loan Agreement) (the Initial DIP Budget and each subsequent approved budget, including the current budget attached hereto as Exhibit 1 shall constitute without duplication, the "Approved Budget"), (b) the Approved Budget was prepared by the Debtors, with the assistance of their professional advisors and management, as well as review and approval of the DIP Lender, and (c) the Approved Budget (as the same may be amended or extended solely as provided for herein) sets forth, among other things, the projected cash receipts and disbursements for the periods covered thereby.  The Initial DIP Budget and any supplemental Approved Budget may be modified, amended and updated from time to time in accordance with the DIP Loan Agreement, and, once approved in writing by the DIP Lender pursuant to the DIP Loan Agreement, shall supplement and replace the Initial DIP Budget or the then Approved Budget. If any revised Approved Budget is not approved in writing by the DIP Lender pursuant to the DIP Loan Agreement, the then-existing Approved Budget shall remain in full force and effect. The Debtors believe in good faith that the Approved Budget, subject to such variances as permitted in the DIP Loan Agreement is achievable and will allow the Debtors to operate in chapter 11 during the term of the Approved Budget. The Pre-Petition Lender and the DIP Lender are relying upon the Debtors' compliance with the Approved

Budget, subject to such variances as permitted in the DIP Loan Agreement, in determining to consent to the use of Cash Collateral solely as contemplated in this Final Order and to enter into (or as the case may be, consent to) the DIP Facility as provided for in this Final Order and the DIP Financing Documents.

(5).    *Business Judgment and Good Faith Pursuant to Section 364(e) and Section 363(m).*  Based on the record before this Court, including the Debtors' Stipulations, (a) the Debtors and the Pre-Petition Lender and the DIP Lender have negotiated at arms' length and in good faith regarding the terms of the DIP Financing Documents, the Settlement Agreement, the DIP Facility, and the Debtors' use of Pre-Petition Collateral, including the Cash Collateral, respectively, all subject to the terms of this Final Order and (b) the terms of the DIP Loan Agreement, the other DIP Financing Documents, and the DIP Facility are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and constitute reasonably equivalent value and fair consideration.  Any credit extended under the terms of this Final Order shall be deemed to have been extended in "good faith" (as that term is used in Bankruptcy Code sections 364(e) and 363(m)) by the Pre-Petition Lender and the DIP Lender, as applicable.

(6).    *Objections.*  The Pre-Petition Lender has no objection to the DIP Facility and the use of Cash Collateral on the terms and conditions set forth in this Final Order, . Nothing in this Final Order, including, without limitation, any of the provisions herein with respect to adequate protection, shall constitute, or be deemed to constitute, a finding that the interests of the Pre-Petition Lender are or will be adequately protected with respect to any non-consensual use of Pre-Petition Collateral, including Cash Collateral.  Other than the Objection filed by the United

15

States Trustee [D.I. 224], no other party has filed an objection.  The Objection filed by the U.S. Trustee, and any other objection asserted by any other party,  have been overruled.

(7).    *No Responsible Person.*  The Debtors stipulate that in making the decision to finance the Debtors' continued business operations through the DIP Facility, to permit the Debtors to use Cash Collateral for the limited purposes set forth herein, in administering any loans, in approving the Initial Budget, or in taking any actions permitted by this Final Order or the DIP Financing Documents, neither the DIP Lender nor the Pre-Petition Lender shall be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person," "owner or operator," or part of any "control group" with respect to any of the Debtors or the management of the Debtors ore owe any fiduciary duty to the Debtors, their respective creditors, shareholders, or Estates.

(8).    *Good Cause*.  Good and sufficient cause has been shown for the entry of this Final Order and for authorizing the Debtors to obtain financing pursuant to the DIP Facility and to use the Cash Collateral of the Pre-Petition Lender (solely to the extent consistent with the Approved Budget) and to authorize the provision of adequate protection. The relief requested in the DIP Motion is necessary, essential, and appropriate, and is in the best interest of and will benefit the Debtors and their Estates, as its implementation will, among other things, provide the Debtors with the necessary liquidity to: (a) minimize disruption to the Debtors' efforts for the continued operations of their businesses; (b) preserve and maximize the value of the Debtors' Estates; and (c) avoid immediate and irreparable harm to the Debtors, their respective businesses, employees, and assets.

(9).    *Immediate Entry.*  Good and sufficient cause exists for immediate entry of this Final Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2), 6003(b), and, to the extent

16

applicable, 6004(h). Absent the immediate grant by this Court of the relief sought by the DIP

Motion, each Debtors' Estates will be immediately and irreparably harmed. Consummation of the

DIP Facility and the use of Cash Collateral, in accordance with the terms of this Final Order, the

Approved Budget and the DIP Financing Documents, and approval of the Settlement Agreement

is in the best interests of the Debtors' Estates and is consistent with the Debtors' exercise of their

fiduciary duties.

Based upon the foregoing findings and conclusions, the DIP Motion, and the record before

this Court with respect to the DIP Motion, and after due consideration and good and sufficient

cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

**I.    Authorization and Terms of Financing.**

1.    <u>DIP Motion Granted</u>.  The relief sought in the DIP Motion is granted, the financing

described herein is authorized and approved, and the use of Cash Collateral is authorized, in each

case subject to the terms and conditions set forth in the DIP Financing Documents, the Approved

Budget and this Final Order. All objections to this Final Order to the extent not withdrawn, waived,

settled, or resolved are hereby denied and overruled. This Final Order shall become effective

immediately upon its entry.

2.    <u>Authorization to Borrow, Guaranty, and Use Loan Proceeds</u>. The Debtors are

hereby expressly authorized and empowered to immediately borrow, or guaranty, as applicable,

and obtain, on a joint and several basis, DIP Loans under the DIP Facility, and the Debtors (on a

joint and several basis) are hereby authorized and empowered to incur all other indebtedness and

obligations owing to the DIP Lender on the terms and subject to the conditions and limitations set

forth in the DIP Financing Documents and this Final Order, subject to the Approved Budget (with

any variances permitted thereto under the terms and conditions of the DIP Loan Agreement) and

from the entry of this Final Order through and including the Termination Date (as defined in the
DIP Loan Agreement). It is specifically contemplated that the Lender, in coordination with the
Debtors, will arrange for the purchase of inventory to be delivered to Debtor locations and the
Lender will purchase the inventory on behalf of the Debtors and such purchase will be deemed an
advance under the DIP Facility.

    3.    <u>Financing Documents</u>.

    (a).    *Authorization*.  The Debtors are hereby authorized to execute, deliver, enter
into and, as applicable, perform all of their obligations under the DIP Financing Documents.  The
Debtors are hereby authorized to borrow money which will occur by (1) the Lender purchasing
inventory for the Debtors' stores pursuant to the DIP Loan Agreement, or in Lender's sole and
absolute discretion funding the Accordion Amount for the sole purpose of purchasing additional
inventory, and (2) such other funding as permitted by the DIP Financing Documents, which shall
be used for all limited purposes permitted hereunder and under the DIP Financing Documents (and
subject to and in accordance with the Approved Budget).  In furtherance of the foregoing and
without further approval of this Court, the Debtors are hereby authorized and empowered, and the
automatic stay imposed by Bankruptcy Code section 362 is hereby lifted to the extent necessary,
to: (i) enter into, execute, deliver, perform, and comply with all of the terms, conditions, and
covenants of the DIP Financing Documents, including, without limitation, the DIP Loan
Agreement and all security and pledge agreements (including any mortgage); (ii) execute and
deliver all certificates, reports, statements, and other agreements and documents required or
contemplated by the DIP Financing Documents (including, without limitation, documents required
for the Debtors' performance of their obligations under the DIP Financing Documents and the
creation and perfection of liens granted or contemplated therein); and (iii) pay all obligations

incurred under the DIP Financing Documents in accordance herewith (whether principal, interest, fees, costs, expenses, indemnities, or other amounts described in the DIP Financing Documents as such amounts become earned, due, and payable and without need to obtain further Court approval, including, without limitation, appraisal fees, late fees, and the fees and disbursements of the DIP Lender's attorneys, advisors, accountants, and other consultants, whether or not such fees arose before or after the First Petition Date), and perform all other undertakings and acts required or contemplated by, the DIP Financing Documents.

(b).     *Approval of Financing Documents*.  The DIP Financing Documents (and all certificates, reports, statements, and other agreements and documents) are approved to the extent necessary to implement the terms and provisions of this Final Order.

(c).     *Amendment of DIP Financing Documents*.  The Debtors and the DIP Lender are hereby authorized to approve and implement, in accordance with the terms of the DIP Financing Documents, any modification of the DIP Financing Documents; *provided*, *however*, that any material modification or amendment to the DIP Financing Documents that is materially adverse to the interests of the Debtors or their Estates (or to the interest of any of the Pre-Petition Lender) shall be subject to providing notice of such material modification or amendment to counsel to the Committee, the U.S. Trustee and the Pre-Petition Lender, each of which shall have three (3) business days from the date of such notice within which to object in writing to such modification or amendment unless the  Committee, U.S. Trustee, and/or the Pre-Petition Lender, as applicable, agrees in writing to a shorter period.  If no timely objection is raised by the Committee, the U.S. Trustee or the Pre-Petition Lender to any material modification or amendment to the DIP Financing Documents, then such modification or amendment shall become effective upon the

expiration of the aforementioned notice period. If a timely objection is interposed, the Court shall resolve such objection prior to such modification or amendment becoming effective.

(d).     *Application of DIP Facility Proceeds.* The advances under the DIP Facility and the use of Cash Collateral shall be used in each case solely in a manner consistent with the terms and conditions of the DIP Financing Documents and this Final Order and in accordance with and as may be limited by the Approved Budget (subject to any variances thereto permitted under the terms and conditions of the DIP Loan Agreement), solely as follows:

(i)     for the purchase or deemed purchase of inventory.

(ii)     to pay fees, costs, and expenses, subject to the Fee Deferment Provision (as defined below), as provided in the applicable DIP Financing Documents, including amounts incurred in connection with the preparation, negotiation, execution and delivery of the DIP Loan Agreement and the other DIP Financing Documents;

(iii)     for general operating and working capital purposes, for the payment of fees, expenses, and costs incurred in connection with the Chapter 11 Cases, and other proper corporate purposes of the Debtors not otherwise prohibited by the terms hereof for working capital, and other lawful corporate purposes of the Debtors;

(iv)     for making other payments as expressly provided in this Final Order and the Approved Budget (including, the Carve-Out, for the payment of the Debtors' and Committees' Professional Fees, as set forth in the Approved Budget);

(v)     at the discretion of the DIP Lender, to effectuate the Roll-Up on the basis of 3 to 1 for every dollar advanced or deemed advanced (for the purchase of inventory) on a post petition basis, without which the DIP Lender would not be willing to provide the DIP Loans;

(e).    *Conditions Precedent*.  The DIP Lender shall have no obligation to make

any loan or advance under the DIP Loan Agreement unless the conditions precedent to such loan

or extension of credit under the DIP Loan Agreement have been satisfied in full or waived in

accordance with the DIP Loan Agreement.  The Debtors shall have no ability to use Cash Collateral

unless the conditions precedent to the use of such Cash Collateral have been satisfied in full or

waived in accordance with the DIP Loan Agreement.

(f).    *Budget Maintenance*.  The Debtors' proposed budget shall become the

"Approved Budget" upon written approval of such budget by the DIP Lender, and the Debtors

shall update the Approved Budget each month unless otherwise agreed to by the DIP Lender,

subject to written approval of the DIP Lender. If any revised Approved Budget is not approved by

the DIP Lender pursuant to the DIP Loan Agreement, the prior Approved Budget shall remain in

full force and effect.  A copy of any updated Approved Budget shall be filed with the Court within

one (1) business day after it has been approved in writing by the DIP Lender.

4.    <u>Payments and Application of Payments</u>.  The Debtors are authorized to make all

payments and transfers of the Estates' property to the DIP Lender as provided, permitted, or

required under the DIP Financing Documents and this Final Order, which payments, proceeds, and

other amounts shall be applied either to the Pre-Petition Obligations or the DIP Obligations in such

order and manner determined by the DIP Lender's sole and absolute discretion, including to

effectuate the Roll-Up, through which each one dollar borrowed by the Debtors under the DIP

Facility (a) Debtors are deemed to have borrowed and incurred DIP Obligations in the amount of

three dollars, and (b) three dollars of Pre-Petition Obligations owed to Pre-Petition Lender shall

be "rolled-up" into DIP Obligations. Upon entry of this Final Order, the DIP Financing Documents

shall constitute legal, valid, binding, and non-avoidable obligations of the Debtors, enforceable in

accordance with the terms of this Final Order and the other DIP Financing Documents, against

each Debtor, or in any case under chapter 7 of the Bankruptcy Code upon the conversion of any

of the Chapter 11 Cases or any other chapter of the Bankruptcy Code, or in any other proceedings

superseding or related to any of the foregoing (collectively, the "Successor Cases").  No obligation,

payment, transfer, or grant of security hereunder or under the DIP Financing Documents to the

DIP Lender shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy

Code or under applicable law (including, without limitation, under Bankruptcy Code sections

502(d), 544, and 547 to 550 or under any applicable state Uniform Voidable Transactions Act,

Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or

common law), or subject to any defense, avoidance, reduction, setoff, recoupment, offset,

recharacterization, subordination (whether equitable, contractual, or otherwise), disallowance,

impairment, claim, counterclaim, cross-claim, or challenge, whether under the Bankruptcy Code

or any other applicable law or regulation by any person or entity for any reason. Without limiting

the generality of the foregoing, and subject to the Fee Deferment Provision (as defined below), the

Debtors are authorized, without further Order of this Court, to (i) pay all principal, interest, fees,

and indemnities when due, under the DIP Financing Documents and (ii) pay or reimburse the DIP

Lender, in accordance with the DIP Financing Documents for all present and future costs and

expenses, including, without limitation, all Mandatory Prepayments, and, subject to the Fee

Deferment Provision (as defined below), all reasonable and documented professional fees,

consultant fees, and legal fees and expenses paid or incurred by the DIP Lender in connection with

the financing transactions in, as well as the enforcement or amendment of the  DIP Financing

Documents and this Final Order regardless of whether such amounts are in the Approved Budget;

*provided*, *however*, that DIP Lender shall pay for such amounts from DIP Collateral/sale proceeds

and acknowledges that the Approved Budget does not contain a specific line item for its period in respect of such fees and expenses; *provided further, however,* that DIP Lender shall send a redacted summary invoice of any professional fees, consultant fees, and legal fees and expenses incurred by DIP Lender, regardless of whether such fees and expenses were incurred pre- or post-petition (subject in all respects to applicable privilege or work product doctrines) to the Debtors and their counsel, the U.S. Trustee and the Committee's counsel. Within ten (10) days after delivery of such invoices in accordance with this paragraph (or such shorter time period agreed to by the DIP Lender, the Debtors, the U.S. Trustee, and the Committee), the Debtors shall pay such fees and costs; *provided*, *however*, that to the extent an objection has been raised to certain professional, consultant, or legal fees and costs incurred on or after the First Petition Date within such ten (10) days, Debtors shall pay only such fees and costs to which no objection has been raised; *provided further*, that such ten (10) day notice period shall not apply to the payment of any such professional, consultant, or legal fees and costs paid on or about (x) the effective date of, a plan of reorganization (the "Chapter 11 Plan") in the Chapter 11 Cases or (y) the closing of any sale of Debtors' assets that results in the payment in full of all Pre-Petition Obligations and DIP Obligations owed to the Prepetition Lender or DIP Lender. To the extent there is an objection with respect to any such professional, consultant, or legal fees, costs and expenses that is not consensually resolved, this Court may resolve the objection. Such written invoices shall include the invoices of Blank Rome LLP, counsel to the DIP Lender, Berkeley Research Group, LLC, as consultant to the DIP Lender, and any other professional, advisor, or agent reasonably retained by the DIP Lender in connection with the Chapter 11 Cases and as permitted by the DIP Financing Documents; *provided*, *however*, that none of such fees and expenses payable pursuant to this paragraph shall be subject to the United States Trustee Guidelines or shall require approval by the Court unless an objection is

interposed that cannot be resolved by the parties. No recipient of any such payment shall be required to file with respect thereto any interim or final fee application with the Court. Notwithstanding the foregoing, the Pre-Petition Lender and DIP Lender agree to the deferral of any and all fees of its counsel and consultants until the closing of the Credit Bid, however, if the Pre-Petition Lender or DIP Lender, as applicable, is the successful bidder, the fees of the Pre-Petition Lender and DIP Lender shall be added to the DIP Obligations (the "Fee Deferment Provision").

5.      Interest and Fees.  The rate(s) of interest to be charged for the DIP Loans under the DIP Facility shall be the rates set forth in the DIP Loan Agreement and shall be calculated in the manner and payable at the times set forth therein.  The fees charged under the DIP Facility shall be those set forth in the DIP Loan Agreement (including, without limitation, the fees identified in Section 3(c) of the DIP Loan Agreement) and shall be unconditionally payable in the amounts and at the times set forth in the DIP Loan Agreement; *provided*, that if Debtors' fail to pay such fees at the times set forth in the DIP Loan Agreement, the DIP Lender is authorized to charge the DIP Facility for such fees. Subject to the Fee Deferment Provision, the Debtors are hereby authorized and directed to pay, in accordance with this Final Order, the principal, interest, fees, payments, expenses, and other amounts described above and in the DIP Financing Documents as such amounts become due and without need to obtain further Court approval, and the Debtors shall be jointly and severally obligated to pay all such amounts, and satisfy all such obligations, which in each case shall constitute DIP Obligations hereunder and under the applicable DIP Financing Documents.

6.      Application of Collections.  All proceeds of the Pre-Petition Collateral and DIP Collateral, including, for the avoidance of doubt, the proceeds from the sale of certain assets in

Missouri pursuant to the *Debtors Emergency Motion for Entry of an Order (I) Authorizing (A) The Sale of Missouri Stores Free and Clear of Liens, Claims, and Encumbrances, and (B) The Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection therewith; and (II) Granting Related Relief* (the "Missouri Sale"), the Texas Sale (as defined below), and any other sale outside of the ordinary course of business, shall be applied to reduce the Pre-Petition Obligations or the DIP Facility, in the Lender's sole and absolute discretion at the earlier of the maturity of the DIP Facility and or the closing of the sale, whichever is sooner; in the interim all proceeds of collections on account of the Pre-Petition Collateral may be used solely in accordance with the Budget, the DIP Financing Documents and the Pre-Petition Financing Documents, as applicable, and this Final Order, in such order and manner determined by the DIP Lender in its sole and absolute discretion. On the Termination Date, all Collateral Proceeds shall be turned over to the Lender, except for the Carve Out.

7.    Continuation of Pre-Petition Procedures. All pre-petition practices and procedures for the payment and collection of proceeds of Pre-Petition Collateral or DIP Collateral, including the turnover of Cash Collateral to the DIP Lender for application in accordance with this Final Order and the DIP Loan Agreement, and the use of any lockbox or blocked depository bank account arrangements, will be unchanged, remain in place, and be identical under the DIP Financing Documents for the benefit of the DIP Lender and are hereby approved and shall continue without interruption after the commencement of the Chapter 11 Cases; *provided*, *however*, that the practices and procedures are otherwise consistent with the terms of the *Final Order Authorizing the Debtors to (A) Continue to Operate Their Cash Management System and Maintain Existing Bank Accounts and Business Forms and Honor Certain Prepetition Obligations Related to the Use Thereof, and (B) Continue to Perform Intercompany Transactions, and (II) Granting Related*

*Relief* [D.I. 130] and any further final orders that may be entered with respect to the Debtors' cash management system.

8.    <u>Roll-Up</u>.  Without any further action by the Debtors or any other party, and subject to the rights of parties set forth in Section VIII below, at the option of DIP Lender and in accordance with the DIP Loan Agreement and the other DIP Financing Documents, the Lender shall treat all advances made or deemed made or to be made under the DIP Facility since the First Petition Date as an exchange and substitute for a portion of the Pre-Petition Obligations, including without limitation the Pre-Petition Loans outstanding under the Pre-Petition Loan Agreement on the date of this Final Order on a cashless, three dollar to one dollar basis with the DIP Facility and subject to the terms and conditions set forth in the DIP Financing Documents. For example, if the total advanced under the DIP Facility is $1.5 million, the prepetition Obligation will be deemed reduced by $4.5 million and the post-petition Obligations will be deemed increased by $4.5 million.

9.    <u>Purchase of Inventory as Advances</u>. As directed by the Debtors and agreed upon by the DIP Lender, DIP Lender shall purchase inventory on behalf of the Debtors and at the direction of the Debtors based on identified need for each store, at the prices that the Debtors have negotiated, and by virtue of the inventory purchase, which purchases shall be deemed an advance under the DIP Facility. For the avoidance of doubt, the purchase of such inventory shall not be deemed control of the Debtors.

10.    [<u>Reserved</u>.]

**II.    Collateralization and Superpriority Administrative Claim Status.**

11.    <u>Collateralization</u>.

(a).    *DIP Lien Grant.*  To secure the prompt payment and performance of any and all DIP Obligations of the Debtors to the DIP Lender of whatever kind, nature, or description, absolute or contingent, now existing or hereafter arising, DIP Lender shall have and is hereby

26

granted, effective as of and from the First Petition Date, valid, binding, enforceable, continuing,

non-avoidable and perfected security interests and liens (such security interests and liens

collectively, "DIP Liens") in and upon all property and rights and interests in property of each of

the Debtors or their Estates of any kind or nature whatsoever in existence as of the First Petition

Date as well as thereafter created or acquired, and wherever located, including, without limitation:

(i) all Pre-Petition Collateral; (ii) all accounts and accounts receivable, inventory, chattel paper,

equipment, fixtures, machinery, commercial tort claims, deposit accounts, instruments, documents,

cash and cash equivalents, investment property (including without limitation all equity interests in

subsidiaries), books and records, patents, trademarks, trade names, copyrights, rights under license

agreements and all other intellectual property, rights, rebates, refunds (including ERC Funds) and

other claims under and with respect to insurance policies, tax refunds, deposits, rebates, contract

rights and other general intangibles, software, letter of credit rights, money, and inter-company

claims or receivables (whether or not evidenced by notes) at any time owing to each Debtor; (iii)

all real property, leaseholds, rents and profits, and proceeds thereof, including without limitation

the Guarantor Real Property and the Subject RTO Real Property (as defined in Exhibit 11 to the

DIP Loan Agreement); (iv) if not otherwise described above, all of the property or rights in

property identified as Collateral (as defined in the Pre-Petition Loan Agreement) and DIP

Collateral (as defined in the DIP Loan Agreement); (v) all claims and causes of action of the

Debtors and their Estates, whether pursuant to federal or applicable state law, and the proceeds

thereof and property received thereby, whether by judgment, settlement, or otherwise, and all

proceeds thereof and the property received thereby whether by judgment, settlement, or otherwise,

whether pursuant to federal law or applicable state law; *provided, however,* neither the DIP Lender

nor the Prepetition Lender shall be granted a lien on any claims and causes of action under chapter

27

5 of the Bankruptcy Code and Bankruptcy Code section 724(a) (collectively "Avoidance Actions")

which shall be preserved solely for the benefit of the estate; *provided further, however,* the

Committee acknowledges that certain Avoidance Actions are being released in accordance with

the terms of the Settlement Agreement; (vi) all other personal property of the Debtors and their

Estates of every kind and nature; and (vii) as to all of the foregoing, all rents, issues, products,

proceeds (including insurance policies), and profits of, from, or generated by any of the foregoing,

in whatever form (all of the foregoing being collectively referred to in this Final Order as "DIP

Collateral").

     (b).    The DIP Liens shall be:

     (i)    *Liens on Unencumbered Property*.  Pursuant to Bankruptcy Code

section 364(c)(2), continuing valid, perfected, enforceable, and non-avoidable, and fully perfected

liens on and security interests in all now owned or hereafter acquired assets and property of the

Debtors' right, title, and interest in, to, and under all DIP Collateral that is not otherwise

encumbered by a validly perfected security interest or lien as of the First Petition Date;

     (ii)    *Liens on Encumbered Assets*.  Pursuant to Bankruptcy Code section

364(c)(3), a continuing valid, enforceable, and non-avoidable, and fully perfected lien on and

security interest (other than as set forth in clauses (iii) and (iv) below) in all now owned or hereafter

acquired assets and property of the Debtors' right, title, and interest in, to, and under all DIP

Collateral that is subject to, as of the First Petition Date, a Senior Lien;

     (iii)    *Priming Liens on Encumbered Assets.*  Pursuant to Bankruptcy Code

section 364(d), valid, enforceable, non-avoidable, and fully perfected priming security interests in

and priming liens upon all now owned or hereafter acquired assets and property of the Debtors'

right, title, and interest in, to, and under all Pre-Petition Collateral; *provided however,* the DIP

Liens shall not prime any valid, perfected, unavoidable liens or mortgages held by South Street

Bank in the January Debtors;

(iv)    *Liens Senior to Certain Other Liens.*    Notwithstanding anything to

the contrary contained in this Final Order, the DIP Liens and the Adequate Protection Liens (as

defined herein) shall not be subject to (A) avoidance or subordination (equitable or otherwise)

under Bankruptcy Code sections 510, 549, or 550, or any other provision of the Bankruptcy Code

or applicable law (B) any lien or security interest that is avoided or preserved for the benefit of the

Debtors or their Estates under Bankruptcy Code section 551, (C) any liens arising after the First

Petition Date provided for herein or (D) any intercompany or affiliate liens of the Debtors, if any;

*provided* that the Adequate Protection Liens shall be subject to Section VIII herein.

(c).    *Post-Petition Lien Perfection.*    This Final Order shall be sufficient and

conclusive evidence of the priority, perfection, and validity of the post-petition liens and security

interests granted herein, effective as of the applicable petition date, without any further act and

without regard to any other federal, state, or local requirements or law requiring notice, filing,

registration, recording, or possession of the DIP Collateral, or other act to validate or perfect such

security interest or lien, including, without limitation, control agreements with any financial

institution(s) holding any deposit account of the Debtors (a "Perfection Act").  Notwithstanding

the foregoing, if the DIP Lender or the Pre-Petition Lender elects for any reason to file, record, or

otherwise effectuate any Perfection Act, each of the DIP Lender and the Pre-Petition Lender, as

applicable, is authorized to perform such Perfection Act, and the Debtors are authorized to perform

such Perfection Acts to the extent necessary or required by the DIP Lender or Pre-Petition Lender,

which act or acts shall be deemed to have been accomplished as of the First Petition Date

notwithstanding the date and time actually accomplished, and in such event, the subject filing or

recording office is authorized to accept, file, or record any document in regard to such act in
accordance with applicable law.  The DIP Lender and/or the Pre-Petition Lender may choose, or
may choose to direct the Debtors, to file, record, or present a certified copy of this Final Order in
the same manner as a Perfection Act, which shall be tantamount to a Perfection Act, and, in such
event, the subject filing or recording office is authorized to accept, file, or record such certified
copy of this Final Order in accordance with applicable law. Should the DIP Lender and/or the Pre-
Petition Lender so choose and attempt to file, record, or perform a Perfection Act, no defect or
failure in connection with such attempt shall in any way limit, waive, or alter the validity,
enforceability, attachment, priority, or perfection of the DIP Liens or the Adequate Protection
Liens granted herein by virtue of the entry of this Final Order.

      12.   <u>Superpriority Administrative Expense</u>.

      (a).   For the applicable DIP Obligations, whether now existing or hereafter
arising pursuant to this Final Order, the applicable DIP Financing Documents, or otherwise,
subject only to the Carve Out, the DIP Lender is granted an allowed superpriority administrative
expense claim in the Debtors' Estates pursuant to Bankruptcy Code section 364(c)(1), having
priority in right of payment over any and all other obligations, liabilities, and indebtedness of any
of such Debtors, whether now in existence or hereafter incurred by any of such Debtors, of every
kind or nature, including any and all unsecured claims, administrative expenses, adequate
protection claims, priority claims or any other claims of the kind specified in, or ordered pursuant
to, the Bankruptcy Code, including without limitation, *inter alia*, Bankruptcy Code sections 105,
326, 328, 330, 331, 503(b), 506(c), 507, 364(c)(1), 546(c), 552(b), 726, or 1114 (the "<u>DIP
Superpriority Claims</u>").

(b).    (i) with respect to rights preserved under Bankruptcy Code section 506(c), no costs or expenses of administration, including, without limitation, professional fees allowed and payable under Bankruptcy Code sections 328, 330, and 331, or otherwise, that have been or may be incurred in the Chapter 11 Cases, or in any Successor Cases, and (ii) no priority claims are, or will be, senior to, prior to, or *pari passu* with the DIP Superpriority Claims or the DIP Obligations or with any other claims of the DIP Lender arising hereunder.

**III.    Authorization to Use Cash Collateral.**

13.    Subject to the terms and conditions of this Final Order, pursuant to Bankruptcy Code section 363(c)(2), the Debtors are authorized to use Cash Collateral, in accordance with the DIP Loan Agreement and as may be limited by the Approved Budget (subject to variances permitted under the terms and conditions of the DIP Loan Agreement).  Except for the sale of inventory in the ordinary course of Debtors' business (and the proceeds thereof) or as may be otherwise expressly permitted herein or in the DIP Loan Agreement, or in any agency arrangement between Debtors and a third party in connection with the liquidation of the DIP Collateral approved in writing by DIP Lender and Pre-Petition Lender, nothing in this Final Order shall be deemed to authorize the use, sale, lease, encumbrance, or disposition of any assets of the Debtors or their Estates or the use of any Cash Collateral or other proceeds resulting therefrom.

**IV.    Adequate Protection for Pre-Petition Lender.**

14.    <u>Pre-Petition Adequate Protection</u>.  As adequate protection for the interests of the Pre-Petition Lender in the Pre-Petition Collateral on account of the Adequate Protection Obligations, the Pre-Petition Lender is being provided with adequate protection as set forth below.

(a).    *Adequate Protection Liens*.  Solely to the extent of any Diminution in Value of such interests pursuant to Bankruptcy Code section 361 and 363(c) as of the First Petition Date,

31

the Debtors shall grant the Pre-Petition Lender valid and perfected replacement security interests in, and liens on (the "Adequate Protection Liens"), the DIP Collateral.

(i)    The Adequate Protection Liens shall be deemed to be valid, binding, enforceable and fully-perfected as of the applicable petition for such Debtor, and, subject to Section VIII below, not subject to subordination or avoidance for any cause or purpose in these Chapter 11 Cases.

(ii)    The Adequate Protection Liens shall be enforceable against the Debtors, their Estates and any successors thereto, including without limitation, any trustee or other Estate representative appointed or elected in the Chapter 11 Cases or any Successor Cases.  The Adequate Protection Liens (A) shall not be made subject to or *pari passu* with any lien or security interest by any court Order heretofore or hereafter entered in these Chapter 11 Cases (unless with the consent of the Pre-Petition Lender); (B) shall not be subject to Bankruptcy Code section 506(c); (C) shall not be subject to Bankruptcy Code sections 510, 549, or 550; and (D) no lien or interest avoided and preserved for the benefit of any Estate pursuant to Bankruptcy Code section 551 shall be made *pari passu* with or senior to the Adequate Protection Liens.

(b).    *Adequate Protection Claim.*  As further adequate protection, to the extent that the Adequate Protection Liens do not adequately protect the Diminution in Value of the Pre-Petition Lender's interests in the Pre-Petition Collateral since the applicable Petition Date, the Pre-Petition Lender is hereby granted, to the extent of such Diminution in Value, on a dollar for dollar basis of the Collateral used in accordance with the Approved Budget, an allowed superpriority administrative expense claim (the "Adequate Protection Claim" and together with the Adequate Protection Liens, the "Adequate Protection") in these Chapter 11 Cases or an Successor Cases against the Debtors' Estates under Bankruptcy Code sections 503 and 507(b), which shall have

32

priority over all other administrative expense claims, priority claims, and unsecured claims against the Debtors or their Estates, which are now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses and priority or other claims of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 364, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114.

(c).    *Interest*.  As further adequate protection, the Pre-Petition Lender shall be entitled to interest accruing on account of the outstanding Pre-Petition Obligations at the default rate set forth in the Pre-Petition Financing Documents, which was in effect as of the First Petition Date and which shall accrue and be paid at the times and in the manner set forth in the Pre-Petition Financing Documents.

(d).    *Adequate Protection Payments*.  As further adequate protection, and without limiting any rights of the Pre-Petition Lender under Bankruptcy Code section 506(b) (which rights are hereby preserved), the Debtors shall pay or reimburse the Pre-Petition Lender (the "Adequate Protection Payments") for any and all of its reasonable fees, costs, expenses, and charges accrued and payable under the Pre-Petition Financing Documents, including, without limitation, the fees, costs and expenses of the Pre-Petition Lender (including attorneys' fees and costs) as provided in Section 3(d) of the Pre-Petition Loan Agreement, whether accrued and unpaid pre-petition or accrued and unpaid post-petition, all without further notice, motion, or application to, Order of, or hearing before, this Court. Subject to Payment Deferment Provision, any and all fees, costs, and expenses charged under the Pre-Petition Financing Documents shall be as set forth in the Pre-Petition Financing Documents and shall be payable at the times set forth in the Pre-Petition Financing Documents.

33

(e).    *Procedure for Payment of Professional, Consulting, and Legal Fees as Adequate Protection Payments*.  Subject to Payment Deferment Provision, within ten (10) days after delivery by Pre-Petition Lender of a redacted summary invoice for all professional, consulting, and legal fees and expenses incurred by Pre-Petition Lender, regardless of whether such fees and expenses were incurred pre- or post-petition (subject in all respects to applicable privilege or work product doctrines) to the Debtors and their counsel, the U.S. Trustee and the Committee's counsel (or such shorter time period agreed to by the Pre-Petition Lender, Debtors, the U.S. Trustee, and the Committee), Debtors shall pay such reasonable professional, consulting, and legal fees and costs from the DIP Loans or Cash Collateral, *provided, however,* that to the extent an objection has been raised to certain professional, consulting, or legal fees and costs within such ten (10) days, Debtors shall pay only such fees and costs to which no objection has been raised, *provided further,* that such ten (10) day notice period shall not apply to the payment of any such fees and costs paid at or in connection with (i) the closing of the DIP Facility, (ii) pursuant to, and on or about the effective date of, a Chapter 11 Plan in these Chapter 11 Cases, or (iii) the closing of any sale of Debtors' assets that results in the payment in full of all Pre-Petition Obligations and DIP Obligations owed to the Prepetition Lender and DIP Lender, as applicable. To the extent there is an objection with respect to such costs and fees that is not consensually resolved, the Court may resolve the objection. Such written invoices shall include the invoices of Blank Rome LLP, as counsel to the Pre-Petition Lender, and any other professional, advisor, or agent reasonably retained by the Pre-Petition Lender or its counsel in connection with the Chapter 11 Cases and as permitted by the Pre-Petition Financing Documents; *provided*, *however*, that none of such fees and expenses paid pursuant to this paragraph shall be subject to the United States Trustee Guidelines or shall require approval by the Court unless an objection is interposed that cannot be resolved by

the parties. No recipient of any such payment shall be required to file with respect thereto any interim or final fee application with the Court.

15.  *ERC Funds*.  As security for the DIP Obligations and as adequate protection, the DIP Obligations and the Adequate Protection Obligations, are secured by the "ERC Funds" meaning the sum of (i) the initial ERC funds on hand, estimated at $202,000, which amount is net of the  portion of the ERC Funds used to pay Debtors professionals a $175,000 retainer before the January Debtors, including BMH HR, LLC ("BMH HR"), file chapter 11, plus (ii) the additional ERC Funds received by BMH HR immediately prior to or after the Third Petition Date, in the net amount (less Commission) of $2,878,514.82. Immediately upon the entry of this Final Order, Lenders shall apply the ERC Funds presently held in the Suspense Account, as deemed proceeds of the Pre-Petition Collateral to the Pre-Petition Obligations or DIP Obligations in its sole and absolute discretion (in an amount equal to funds advanced or deemed advanced under this Final Order). At all times after entry of the Final Order, the ERC Funds shall secure the DIP Obligations and the Adequate Protection Obligations.

16.  *Missouri Sale Proceeds*. As security for the DIP Obligations and as adequate protection, the proceeds of the Missouri Sale shall be paid to Lenders by National RTO and immediately applied to the Pre-Petition Obligations or DIP Obligations, in Lenders' sole and absolute discretion (in an amount equal to funds advanced or deemed advanced under this Final Order).

17.  [Reserved.]

**V.  Carve Out.**

18.  *Carve Out.*  The DIP Liens granted to the DIP Lender, the DIP Superpriority Claim provided to the DIP Lender, the Adequate Protection Liens, and the Adequate Protection Claims

shall be subject only to the right of payment and priority of the following expenses (which expenses are collectively referred to as the "Carve Out"), to the extent provided herein:

(a).    all fees required to be paid to the Clerk of the Court and to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6), together with the statutory rate of interest, which shall not be limited by any budget;

(b).    the allowed fees and expenses actually incurred by persons or firms retained by the Debtors or the Committee on or after the First Petition Date and prior to the delivery of a Carve Out Trigger Notice (as defined herein) whose retention is approved by this Court pursuant to Bankruptcy Code section 327, 328, 363, or 1103 (each a "Professional" and collectively, the "Professionals") and payable, subject in all respects to the terms of this Final Order, and any other interim or other compensation Order entered by this Court in these Chapter 11 Cases (the "Interim Compensation Procedures"), (i) for the period prior to the delivery of a Carve Out Trigger Notice to the Debtors, Debtors' counsel, and counsel for any Committee, an amount not to exceed the lesser of (A) the aggregate weekly amounts budgeted to be funded in advance for each such Professional for such week in accordance with the Approved Budget (to the extent a Carve Out Trigger Notice is delivered mid-week, pro-rated for such week) and (B) the actual amount of such Allowed Professional Fees for each Professional incurred on or after the First Petition Date up through and including the date a Carve Out Trigger Notice is delivered ("Allowed Professional Fees").  The Carve Out shall include all Allowed Professional Fees that are incurred or earned (i) at any time before delivery of a Carve Out Trigger Notice as provided above, whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice, subject and limited in all respects to the amounts set forth in the Approved Budget for payment of such Professionals, *provided*, that the budgeted disbursements for subsequent Approved Budget periods shall be amended so that the

Borrower may (x) carry forward any unspent budgeted line item disbursements for Professionals from prior periods and (y) carry back any unspent budgeted line item disbursements for Professionals from future periods (the "Pre-EOD Carve Out"), and (ii) beginning the first day after the delivery by DIP Lender of written notice (which for the avoidance of doubt may be by electronic mail) of the occurrence of an Event of Default (as defined herein) (such notice, the "Carve Out Trigger Notice") to the Debtors, the Debtors' counsel, and counsel for the Committee, the fees and expenses incurred by the Professionals retained by the Debtors in an aggregate amount not to exceed $15,000 and $15,000 for the Chapter 7 trustee (the "Post-EOD Carve Out", with the aggregate amounts of the Pre-EOD Carve Out and the Post-EOD Carve Out, the "Carve Out Cap"). For the avoidance of doubt, the Carve Out Cap shall not exceed $500,000 in the aggregate, as set forth in the Approved Budget; p*rovided further*, *however*, that the Carve Out shall not include any bonus, sale transaction fees, success fees, completion fees, substantial contribution fees, or any other fees of similar import of any of the Professionals. Notwithstanding the foregoing, the Carve Out Trigger Notice shall be deemed to have been delivered to the required notice parties on the Termination Date (as defined in the DIP Loan Agreement).

(c). Subject to the terms of this Final Order, the Carve Out Cap shall be allocated on a Professional-by-Professional basis based on the amounts budgeted to be funded in advance for each Professional pursuant to the Approved Budget.

(d). For the avoidance of doubt, (i) so long as a Carve Out Trigger Notice has not been issued, the Debtors shall be permitted to pay Allowed Professional Fees as the same may be due and payable in accordance with the DIP Loan Agreement and this Final Order; and (ii) nothing herein shall be construed to impair the ability of any party to object to the fees, expenses,

reimbursement or compensation described herein.  The Debtors' professionals shall be permitted to apply the retainers in their possession once their fees have been approved by Order of the Court.

19.    Excluded Professional Fees.  Notwithstanding anything to the contrary in this Final Order, neither the Carve Out, nor the proceeds of the DIP Facility or DIP Collateral shall be used to pay any Allowed Professional Fees or any other fees or expenses incurred by any Professional in connection with any of the following: (a) an assertion or joinder in any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any Order, judgment, determination, or similar relief:  (i) challenging the legality, validity, priority, perfection, or enforceability of the Pre-Petition Obligations, the DIP Obligations, the Pre-Petition Lender's or the DIP Lender's respective liens on and security interests in any of the Pre-Petition Collateral or DIP Collateral, as applicable; (ii) seeking to invalidate, set aside, avoid, or subordinate, in whole or in part, the Pre-Petition Obligations or DIP Obligations or the Pre-Petition Lender's or DIP Lender's respective liens on and security interests in the Pre-Petition Collateral or the DIP Collateral, as applicable; or (iii) preventing, hindering, or delaying the Pre-Petition Lender's or DIP Lender's respective assertion or enforcement of any lien, claim, right, or security interest or realization upon any Pre-Petition Collateral or DIP Collateral, as applicable, in accordance with the terms and conditions of this Final Order; (b) without the consent of the DIP Lender, a request to use Cash Collateral or DIP Loans in any manner except to the extent expressly permitted in this Final Order and DIP Financing Documents; (c) a request, without the prior written consent of DIP Lender, for authorization to obtain debtor-in-possession financing or other financial accommodations pursuant to Bankruptcy Code section 364(c) or 364(d) other than from the DIP Lender as contemplated herein), unless such other debtor-in-possession financing or financial accommodation is used, in whole or in part, to indefeasibly pay and satisfy in full in cash all Pre-

Petition Obligations and DIP Obligations owed respectively to the Pre-Petition Lender and DIP Lender as contemplated herein; (d) the commencement or prosecution of any action or proceeding of any claims, causes of action, or defenses against the Pre-Petition Lender or the DIP Lender, or any of their respective officers, directors, employees, agents, attorneys, affiliates, successors, or assigns, including, without limitation, any attempt to avoid any claim, lien, or interest of, or obtain any recovery from any of the Pre-Petition Lender or the DIP Lender, under Chapter 5 of the Bankruptcy Code; *provided*, *however*, that, subject to the Carve Out Cap, an amount not to exceed $20,000.00 in the aggregate of the indebtedness incurred pursuant to the DIP Facility may be used to pay the Allowed Professional Fees of the Committee to investigate (but not prosecute) claims or any Challenge against and possible objections with respect to the Pre-Petition Obligations, and the pre-petition liens and security interests of, the Pre-Petition Lender (including, without limitation, issues regarding validity, perfection, priority, or enforceability of the secured claims of the Pre-Petition Lender).

20.      *Payment of Carve Out*.

(a).      Payment of any amounts on account of the Carve Out, whether by or on behalf of the DIP Lender, shall not and shall not be deemed to, reduce the Pre-Petition Obligations or the DIP Obligations, and shall not, and shall not be deemed to, subordinate any of the DIP Lender's liens and security interests in the DIP Collateral or the DIP Superpriority Claims to any junior pre- or post-petition lien, interest, or claim in favor of any other party. DIP Lender shall not, under any circumstance, be responsible for the payment or reimbursement of any fees or disbursements of any Professionals incurred in connection with the Chapter 11 Cases or Successor Cases under any chapter of the Bankruptcy Code, and nothing in this Section V shall be construed to obligate DIP Lender, in any way, to pay compensation to or to reimburse expenses of any

39

Professional, or to ensure that the Debtors have sufficient funds to pay such compensation or reimbursement.

(b).    Nothing in this Final Order shall be construed as a consent to the allowance of the fees and expenses of any Professional or shall affect the right of the Pre-Petition Lender and/or the DIP Lender to object to the allowance and payment of such fees and expenses. So long as no Event of Default has occurred or is continuing, the Debtors shall be permitted to pay fees and expenses allowed and payable pursuant to an Order of the Court, including any Order approving Interim Compensation Procedures, under Bankruptcy Code sections 330 and 331, as the same may be due and payable, solely to the extent set forth in the Approved Budget, and not to exceed the amounts set forth in the Approved Budget; *provided*, *however*, that any such payment shall be subject to entry of a final Order of the Court of each Professional's final application for allowance of such fees and expenses.

**VI.    Right to Credit Bid.**

21.    Pursuant to Bankruptcy Code section 363(k), the Pre-Petition Lender and the DIP Lender, as the case may be, may credit bid against the assets of the Debtors' estates, and the PEC LP Interests (as defined in exhibit 11 to the DIP Loan Agreement), up to the outstanding aggregate amount of the Pre-Petition Obligations and DIP Obligations in respect of any such sale (the "Credit Bid"), the form of which, including any proposed asset purchase agreement and related sale order, is reasonably acceptable to the Pre-Petition Lender and the DIP Lender. In the context of the Credit Bid, MacDonald Realty Group, LLC will convey certain real property in Alvarado, TX to the DIP Lender by its designee, which will satisfy any DIP Lender deed of trust on such real property, and the conveyance, when closed shall reduce the Pre-Petition Obligations and the DIP Obligations by $[298,000], which reduction may be applied to such Obligations in such order as the DIP Lender may elect.

40

**VII.    Default; Rights and Remedies; Relief from Stay.**

22.    <u>Events of Default</u>.  The following shall constitute an "<u>Event of Default</u>" under this Final Order:

(a).    the occurrence of any Event of Default as defined and under the DIP Loan Agreement.

(b).    the failure of (1) the January Debtors to file voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, (2) the Debtors to file the DIP Motion, or (3) the Debtors to file a motion for the sale of substantially all of their assets pursuant to Section 363 of the Bankruptcy Code (the "<u>Sale Motion</u>"), in form and substance acceptable to the Lenders, by January 26, 2026.

(c).    the failure of the Debtors to (1) hold a First Day Hearing for the January Debtors, and (2) obtain entry of the Interim Order by January 27, 2026.

(d).    the failure of the Debtors to retain and file an application ("<u>Retention Application</u>") to retain a third-party national real estate brokerage firm to market the Subject RTO Real Property owned by Buddy Mac One in Tyler, Texas (the "<u>Texas Sale</u>"), with seven (7) days after the Third Petition Date.

(e).    the failure of Debtors to (1) enter into and file an asset purchase agreement naming DIP Lender as stalking horse bidder, in a form and substance acceptable to the DIP Lender, and (2) file a motion establishing bidding procedures, on or before January 26, 2026, which motion, bid procedures, and bid procedures order must be in form and substance acceptable to the Lenders.

(f).    the failure of the Debtors to obtain entry of a Final DIP Order, in form and substance acceptable to the Lenders, and approval of the Settlement Agreement on or before February 10, 2026, unless otherwise agreed in writing by the Pre-Petition Lender and the DIP Lender.

41

(g).    the failure of the Debtors to hold an auction in connection with the Sale Motion within twenty-one (21) days from entry of the Interim DIP Order.

(h).    the failure to obtain a sale order, in form and substance acceptable to Lenders, on or before February 19, 2026.

(i).    the failure of the Debtors to consummate a sale of the assets on or before February 22, 2026.

(j).    the failure of the Debtors to close the Texas Sale within forty-five (45) days of the filing of the Retention Application.

23.    <u>Rights and Remedies Upon Event of Default/Relief from Stay</u>.

(a).    Upon the occurrence of and during the continuance of an Event of Default, and without the necessity of seeking relief from the automatic stay or any further Order of the Court or providing an Enforcement Notice (as defined below):  (i) the DIP Lender shall no longer have any obligation to make any DIP Loans (or otherwise extend credit) under the DIP Facility; (ii) all amounts outstanding under the DIP Financing Documents shall, at the option of the DIP Lender, be accelerated and become immediately due and payable; (iii) the DIP Lender and the Pre-Petition Lender shall be entitled to immediately terminate the Debtors' right to use Cash Collateral, without further application or Order of this Court, *provided*, *however*, that the Debtors shall have the right to use Cash Collateral to pay (a) their weekly ordinary course payroll as provided in the Approved Budget, (b) Professional Fees included in the Approved Budget through the date on which such Event of Default occurs, *provided, however,* that such Professional Fees, other than those amounts being paid out of retainers paid pre-petition, shall be paid subject to Order of this Court and shall not be paid prior to entry of the Final Order and the approval of the Settlement Agreement thereby; (iv) the Debtors shall be bound by all post-default restrictions, prohibitions,

42

and other terms as provided in this Final Order, the DIP Loan Agreement and the other DIP
Financing Documents and the Pre-Petition Financing Documents; (v) the DIP Lender shall be
entitled to charge the default rate of interest under the DIP Loan Agreement.

(b).    Without further notice, application or order of this Court, upon the
occurrence of and during the continuance of an Event of Default, and after providing not less than
three (3) business days' advance written notice thereof (such period the "Remedies Notice Period")
(which three (3) business day period applies only to the DIP Collateral enforcement remedies
described below), which notice may be by electronic mail (the "Enforcement Notice"), to counsel
to the Debtors, the U.S. Trustee, and counsel the Committee, the DIP Lender and the Pre-Petition
Lender, as applicable, shall be entitled to take any other action and exercise all other rights and
remedies provided in this Final Order, the DIP Financing Documents, the Pre-Petition Financing
Documents, or applicable law (including, without limitation, setting off any DIP Obligations or
Pre-Petition Obligations with DIP Collateral, Pre-Petition Collateral or proceeds in the possession
of the Pre-Petition Lender or DIP Lender), unless otherwise ordered by this Court, as the DIP
Lender or the Pre-Petition Lender, as applicable, may deem appropriate in their sole discretion to,
among other things, proceed against and realize upon the DIP Collateral or any other assets or
properties of the Debtors' Estates upon which the DIP Lender and the Pre-Petition Lender, as
applicable, has been or may hereafter be granted liens or security interests to obtain the full and
indefeasible payment of all the Pre-Petition Obligations and DIP Obligations. Notwithstanding the
foregoing or anything in paragraph 22(a) above, upon delivery of the Enforcement Notice, the
Debtor shall turnover all proceeds of collection directly to the Lender, and the Lender may apply
the proceeds received into the lockbox or collection account to reduce the Pre-Petition Obligations

or the DIP Obligations in any order at the sole discretion of the DIP Lender during the Remedies
Notice Period.

(c).      Additionally, upon the occurrence and during the continuance of an Event
of Default, expiration of the Remedies Notice Period, and the exercise by a DIP Lender or a Pre-
Petition Lender of their respective rights and remedies under this Final Order, the DIP Financing
Documents, or Pre-Petition Financing Documents, the Debtors shall cooperate with the DIP
Lender in the exercise of such rights and remedies and assist the DIP Lender in effecting any sale
or other disposition of the DIP Collateral required by the DIP Lender, including any sale of DIP
Collateral pursuant to Bankruptcy Code section 363 or assumption and assignment of DIP
Collateral consisting of contracts and leases pursuant to Bankruptcy Code section 365, in each
case, upon such terms that are acceptable to the DIP Lender.

(d).      Upon the occurrence and during the continuance of an Event of Default, and
subject to the Remedies Notice Period provided for above, in connection with a liquidation of any
of the Pre-Petition Collateral or DIP Collateral as provided for herein, the DIP Lender or the Pre-
Petition Lender (or any of their respective employees, agents, consultants, contractors, or other
professionals), as applicable, shall have the right, at the sole cost and expense of the Debtors, to:
(i) enter upon, occupy, and use any real or personal property, fixtures, equipment, leasehold
interests, or warehouse arrangements owned or leased by the Debtors; *provided*, *however*, that the
DIP Lender may only be permitted to do so in accordance with (A) existing rights under applicable
non-bankruptcy law, including, without limitation, applicable leases, (B) any pre-petition (and, if
applicable, post-petition) landlord waivers or consents, or (C) further order of the Court on motion
and notice appropriate under the circumstances; and (ii) use any and all trademarks, tradenames,
copyrights, licenses, patents, equipment, or any other similar assets of the Debtors, or assets that

44

are owned by or subject to a lien of any third party and that are used by the Debtors in their
businesses; *provided*, *however*, the DIP Lender and the Pre-Petition Lender may use such assets
to the extent permitted by non-bankruptcy law. The DIP Lender (or the Pre-Petition Lender) will
be responsible for the payment of any applicable fees, rentals, royalties, or other amounts owing
to such lessor, licensor or owner of such property (other than the Debtors) for the period of time
that the DIP Lender actually occupies any real property or uses the equipment or the intellectual
property (but in no event for any accrued and unpaid fees, rentals, or other amounts owing for any
period prior to the date that the DIP Lender actually occupies or uses such assets or properties).

(e).      The rights and remedies of the DIP Lender and Pre-Petition Lender
specified herein are cumulative and not exclusive of any rights or remedies that the DIP Lender
and/or Pre-Petition Lender may have under the DIP Financing Documents or Pre-Petition
Financing Documents, as applicable, or otherwise and may be exercised in whole or in part in any
order. With respect to the exercise of such rights and remedies, the fourteen-day stay provisions
of Bankruptcy Rules 6004(h) and 4001(a)(3) are hereby waived.

(f).      Nothing herein shall prevent or preclude the Debtors from seeking
appropriate relief from the Court including, but not limited to, a determination that no Event of
Default has occurred.

24.      Relief from Stay. For the purpose of exercising rights, options and remedies set
forth in this Section VII, upon expiration of the Remedies Notice Period, and unless otherwise
ordered by the Court, the Pre-Petition Lender and DIP Lender, as applicable, shall be automatically
and completely relieved from the effect of any stay under Bankruptcy Code section 362, any other
restriction on the enforcement of their liens upon and security interests in the DIP Collateral or

45

any other rights granted to them, or any of them, pursuant to the terms and conditions of the DIP Financing Documents, the Pre-Petition Financing Documents, or this Final Order.

25.    <u>Waiver Agreements</u>.  All rights, options, and remedies granted to the Pre-Petition Lender or DIP Lender in either or both of any landlord or warehouseman's waiver and/or consent executed and delivered in connection with the Pre-Petition Obligations and Pre-Petition Loan Agreement, as applicable, including the right to access any premises leased by Debtors and access the Pre-Petition Collateral, shall be deemed to be continuing, enforceable, and applicable to and binding upon the landlords and other parties to such waiver or consent agreements with respect to the Pre-Petition Collateral and DIP Collateral.

**VIII.    Challenges to Pre-Petition Obligations.**

26.    The Debtors have admitted, stipulated, and agreed to the various stipulations and admissions contained in this Final Order, including, without limitation, the Debtors' Stipulations included in Paragraph G, which stipulations and admissions are and shall be binding upon the Debtors. For any party in interest, including the Committee, upon no later than the date of the Final Hearing, February 10, 2026 (the "<u>Initial Challenge Period</u>"), the stipulations and admissions contained in this Final Order, including without limitation, the Debtors' Stipulations, shall also be binding upon the Debtors' Estates and all other parties in interest, including the Committee and any other person or entity acting or seeking to act on behalf of the Debtors' Estates, and any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors (a "<u>Trustee</u>") for all purposes, unless (a) during the Initial Challenge Period the Committee or any other party interest, in each case with requisite standing, has properly and timely filed an adversary proceeding as required under the Bankruptcy Rules (x) challenging the amount, validity, enforceability, priority or extent of the Pre-Petition Obligations, the liens of the Pre-Petition Lender on the Pre-Petition Collateral securing the Pre-Petition Obligations or (y) otherwise asserting any other claims, counterclaims,

46

causes of action, objections, contests, or defenses against the Pre-Petition Lender on behalf of the
Debtors' Estates ((x) and (y), collectively, referred to herein as "Challenges") in connection with
the matters related to the Pre-Petition Financing Documents, the Pre-Petition Obligations, the Pre-
Petition Liens, or the Pre-Petition Collateral, and (b) there is a final non-appealable order in favor
of the plaintiff sustaining any such Challenge or claim in any such timely filed adversary
proceeding; *provided*, *however*, that, as to the Debtors, all such Challenges are hereby irrevocably
waived and relinquished effective as of the applicable Petition Date.  If during the Initial Challenge
Period, the Committee or other third party files a motion for standing with a draft complaint
identifying and describing all Challenge(s) consistent with applicable law and rules of procedure,
the Initial Challenge Period will be tolled for the Committee or other third party solely with respect
to the Challenge(s) asserted in the draft complaint until three (3) business days from the entry of
an Order granting the motion for standing to prosecute such Challenge(s) described in the draft
complaint and permitted by the Court (the "Extended Challenge Period", together with the Initial
Challenge Period, the "Challenge Period").  If standing is denied by the Court, the Challenge
Period shall be deemed to have expired.  If no such Challenge or motion for standing, as applicable,
is timely filed prior to the expiration of the Initial Challenge Period, without further order of the
Court:  (1) the Debtors' stipulations, admissions and releases contained in this Final Order
(including the Debtors' Stipulations and the releases set forth in paragraph 26 below) shall be
binding on all parties in interest, including the Debtors' Estates, the Committee, and any
subsequently appointed Trustee, case fiduciary, or other successors and assigns of the Debtors and
the Debtors' Estates; (2) the Pre-Petition Obligations shall constitute allowed claims, not subject
to counterclaim, setoff, subordination, recharacterization, defense or avoidance, for all purposes
in these Chapter 11 Cases and any Successor Cases, including, without limitation, any subsequent

47

chapter 7 case; (3) the Pre-Petition Lender's liens on the Pre-Petition Collateral shall be deemed

to have been, as of the First Petition Date, and to be, legal, valid, binding, perfected, and with the

priority specified in the Debtors' Stipulations, not subject to defense, counterclaim,

recharacterization, subordination or avoidance; and (4) the Pre-Petition Obligations, the Pre-

Petition Lender's liens on the Pre-Petition Collateral; and the Pre-Petition Lender (and its

respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors)

shall not be subject to any other or further Challenge by the Committee or any other party in interest,

and the Committee or party in interest shall be enjoined from seeking to exercise the rights of the

Debtors' Estates, including, without limitation, any successor thereto (including, without

limitation, any estate representative or a Trustee, whether such Trustee is appointed or elected prior

to or following the expiration of the Initial Challenge Period); *provided*, *however*, that if the

Chapter 11 Cases are converted to chapter 7 or a Trustee is appointed prior to the expiration of the

Initial Challenge Period, any such estate representative or Trustee shall receive the full benefit of

any remaining Initial Challenge Period or ten (10) days from appointment, whichever is greater,

subject to the limitations described herein. If any Challenge or motion for standing, as applicable,

is timely and properly filed prior to the expiration of the Initial Challenge Period, the releases,

stipulations, and admissions (including without limitation, in the Debtors' Stipulations), contained

in this Final Order shall nonetheless remain binding and preclusive (as provided in the second

sentence of this paragraph) on the Committee and any other person, including any Trustee

appointed in any Chapter 11 Case(s) or Successor Cases, as applicable, except as to any such

findings and admissions that were expressly challenged as set forth with specificity in the original

complaint initiating the adversary proceeding, and any claims or challenges not so specified shall

be deemed forever, waived, released and barred, including any amended or additional claims that

may or could have been asserted thereafter through an amended complaint under Federal Rules of Civil Procedure 15 or otherwise. Nothing in this Final Order vests or confers on any person, including the Committee, any Trustee, or any other party in interest, standing or authority to pursue any claim or cause of action belonging to the Debtors or their Estates. Notwithstanding anything to the contrary contained herein, upon the entry of this Final Order, the Challenge Period will be deemed to have expired and no Challenges may be brought by any party.

**IX.    Debtors' Waivers and Releases.**

27.    <u>Section 506(c) Claims; 552(b) Equities;  Marshaling</u>.  No costs or expenses of administration that have been or may be incurred in the Chapter 11 Cases or Successor Cases at any time shall be charged against any of the Pre-Petition Lender or the DIP Lender, their respective claims, or the DIP Collateral or Pre-Petition Collateral, as applicable, pursuant to Bankruptcy Code section 506(c) without the prior written consent of the DIP Lender (and no such consent shall be implied from any other action, inaction or acquiescence by the DIP Lender or the Pre-Petition Lender). The Pre-Petition Lender and DIP Lender shall each be entitled to all of the rights and benefits of Bankruptcy Code section 552(b), and the "equities of the case" exception under Bankruptcy Code section 552(b) shall not apply to the Pre-Petition Lender and DIP Lender with respect to proceeds, products, offspring, or profits of any of the Pre-Petition Collateral or DIP Collateral, as applicable. In no event shall the DIP Lender or the Pre-Petition Lender be subject to the equitable doctrine of "marshaling" or any similar equitable doctrine with respect to the Pre-Petition Collateral or the DIP Collateral.

28.    <u>Release</u>.

(a)    In consideration of and as a condition to the DIP Lender making the DIP Facility available under the applicable DIP Loan Agreement, the consent by the Pre-Petition Lender and DIP Lender to the use of Cash Collateral, the consent of the Pre-Petition Lender to

have its liens primed as specifically set forth herein, and providing other credit and financial

accommodations to the Debtors pursuant to the provisions of this Final Order and the DIP

Financing Documents (including the Carve Out provisions), each Debtor, on behalf of itself, and

successors and assigns and its Estate (collectively, the "Releasors"), hereby absolutely releases

and forever discharges and acquits the Pre-Petition Lender and each of its respective successors,

participants, and assigns, and their present and former shareholders, affiliates, subsidiaries,

divisions, predecessors, directors, officers, attorneys, employees, and other representatives (the

Pre-Petition Lender, and all such other parties being hereinafter referred to collectively as the

"Releasees") of and from any and all claims, demands, causes of action, suits, covenants, contracts,

controversies, agreements, promises, sums of money, accounts, bills, reckonings, damages, and

any and all other claims, counterclaims, cross claims, defenses, rights of set-off, demands, and

liabilities whatsoever (individually, a "Pre-Petition Released Claim" and collectively, the "Pre-

Petition Released Claims") of every kind, name, nature and description, known or unknown,

foreseen or unforeseen, matured or contingent, liquidated or unliquidated, primary or secondary,

suspected or unsuspected, both at law and in equity, including, without limitation, any so-called

"lender liability" claims or defenses, that any Releasor may now or hereafter own, hold, have, or

claim to have against the Releasees, or any of them for, upon, or by reason of any nature, cause,

or thing whatsoever that arose or may have arisen at any time on or prior to the date of this Final

Order, arising out of, relating to, or in connection with, any of the Pre-Petition Obligations, the

Pre-Petition Financing Documents, any Pre-Petition Loans, or other financial accommodations

under the Pre-Petition Financing Documents. In addition, upon the closing of the credit bid for the

payment and satisfaction in full of all Obligations (as defined in the DIP Financing Documents)

owed to the DIP Lender by the Debtors, and termination of the rights and obligations arising under

this Final Order, and the DIP Financing Documents (which payment and termination shall be on terms and conditions acceptable to the DIP Lender), the DIP Lender shall be automatically deemed to be absolutely and forever released and discharged from any and all obligations, liabilities, actions, duties, responsibilities, commitments, claims, and causes of action arising, occurring in connection with, or related to the DIP Financing Documents, or this Final Order (whether known or unknown, direct or indirect, matured or contingent, foreseen or unforeseen, due or not due, primary or secondary, liquidated or unliquidated).

(b).    Subject to Section VIII with respect to all applicable parties other than the Debtors, each Releasor hereby absolutely, unconditionally and irrevocably covenants and agrees with each of the Releasee that it will not sue (at law, in equity, in any regulatory proceeding, or otherwise) any Releasee on the basis of any Pre-Petition Released Claim that has been released and discharged by each Releasor pursuant to clause 25(a) above.  If any Releasor violates the forgoing covenant, Debtors agree to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.

**X.    Other Rights and Obligations.**

29.    <u>No Modification or Stay of this Final Order</u>.  Based upon the record presented to the Court by the Debtors, notwithstanding (a) any stay, modification, amendment, supplement, *vacatur*, revocation, or reversal of this Final Order, the DIP Financing Documents or any term hereunder or thereunder, or (b) the dismissal or conversion of one or more of the Chapter 11 Cases, the DIP Lender shall retain and be entitled to all of the rights, remedies, privileges, and benefits in favor of the DIP Lender pursuant to Bankruptcy Code section 364(e), this Final Order, and the DIP Financing Documents as of the date any event referred to in clauses (a) or (b) shall have occurred.

51

30.    <u>Power to Waive Rights; Duties to Third Parties; Extension of Maturity Date</u>.  The
Pre-Petition Lender and the DIP Lender shall have the right, in their respective sole discretions, to
waive any of the terms, rights, and remedies provided or acknowledged in this Final Order, the
Pre-Petition Loan Agreement, or the DIP Loan Agreement ("<u>Lender Rights</u>") with respect to each
of them, as applicable, and shall have no obligation or duty to any other party with respect to the
exercise or enforcement, or failure to exercise or enforce, any Lender Right(s).  Any waiver by
any of them of any Lender Rights shall apply solely to such party and to the Lender Right so
waived and shall not be or constitute a continuing waiver, except that any waiver by the Pre-
Petition Lender or the DIP Lender shall bind the Pre-Petition Lender or DIP Lender, as applicable,
in accordance with the Pre-Petition Financing Documents or DIP Financing Documents. Any delay
in or failure to exercise or enforce any Lender Right shall neither constitute a waiver of such
Lender Right, nor cause or enable any other party to rely upon or in any way seek to assert as a
defense to any obligation owed by the Debtors to the Pre-Petition Lender or the DIP Lender.  For
the avoidance of doubt, such discretion with respect to the DIP Lender shall be governed by the
terms of the DIP Loan Agreement. Notwithstanding the foregoing or anything in the DIP Loan
Agreement, the Maturity Date may be extended without further order of the Court upon (1) consent
of the DIP Lender, the Debtors, and the Committee, (2) written notice to the U.S. Trustee, and (3)
the filing of a notice of such extension in the Chapter 11 Cases.

31.    <u>Reservation of Rights</u>.  The terms, conditions, and provisions of this Final Order
are in addition, and without prejudice, to the rights of the Pre-Petition Lender or the DIP Lender,
as applicable, to pursue any and all rights and remedies under the Bankruptcy Code, the DIP
Financing Documents, the Pre-Petition Financing Documents, or any other applicable agreement
or law, including, without limitation, rights to seek either or both adequate protection and

52

additional or different adequate protection, to seek relief from the automatic stay, to seek an injunction, to oppose any request for use of Cash Collateral, other Pre-Petition Collateral or the proceeds of the DIP Facility (other than as permitted under this Final Order and the DIP Loan Agreement) or the granting of any interest in the DIP Collateral (other than as contemplated herein or permitted under the DIP Financing Documents), to object to any sale of assets, and to object to applications for either or both allowance and payment of compensation of Professionals or other parties seeking compensation or reimbursement from the Estates.

32. <u>Modification of the Automatic Stay</u>. The automatic stay under Bankruptcy Code section 362(a) is hereby modified as necessary to effectuate all of the terms and provisions of this Final Order and the DIP Financing Documents, including, without limitation, the application of collections, authorization to make payments, granting of liens, and perfection of liens.

33. <u>Binding Effect</u>.

(a). The provisions of this Final Order, the DIP Financing Documents, the DIP Superpriority Claims, DIP Liens, Adequate Protection Liens, Adequate Protection Claims, the DIP Obligations and any and all rights, remedies, privileges, and benefits in favor of the DIP Lender, and the Pre-Petition Lender provided or acknowledged in this Final Order, and any actions taken pursuant thereto, shall be effective immediately upon entry of this Final Order pursuant to Bankruptcy Rules 6004(g) and 7062, shall continue in full force and effect, and shall survive entry of any such other Order, including, without limitation, any order that may be entered confirming any plan of reorganization, converting one or more of the Chapter 11 Cases to any other chapter under the Bankruptcy Code, or dismissing one or more of the Chapter 11 Cases.

(b). Any order dismissing one or more of the Chapter 11 Cases under Bankruptcy Code section 1112 or otherwise shall be deemed to provide (in accordance with

Bankruptcy Code sections 105 and 349) that (i) the DIP Lender's and the Pre-Petition Lender's

respective, liens on, and security interests in, the DIP Collateral shall continue in full force and

effect notwithstanding such dismissal until the DIP Obligations, Adequate Protection Obligations,

and Pre-Petition Obligations, as applicable, owed to such parties, respectively, are indefeasibly

paid and satisfied in full, and (ii) this Court shall retain jurisdiction, to the extent permissible under

applicable law, notwithstanding such dismissal, for the purposes of enforcing the DIP

Superpriority Claims, DIP Liens, Adequate Protection Liens, and Adequate Protection Claims of

the Pre-Petition Lender and DIP Lender, as applicable.

(c).    This Final Order shall be binding upon the Debtors, their Estates, all parties

in interest in the Chapter 11 Cases, and their respective successors and assigns, including any

trustee or other fiduciary appointed in the Chapter 11 Cases or any Successor Cases of any Debtors,

and shall inure to the benefit of the Pre-Petition Lender, the DIP Lender, the Debtors, and their

respective successors and assigns, subject to the rights of any party in interest or trustee under

Section VIII above.

34.    Proofs of Claim.  Notwithstanding the entry of an order establishing a bar date in

any of these Chapter 11 Cases, or the conversion of these Chapter 11 Cases to a case under chapter

7 of the Bankruptcy Code, neither the Pre-Petition Lender nor the DIP Lender shall be required to

file proofs of claim in any of the Chapter 11 Cases or Successor Cases with respect to, as applicable,

any of Pre-Petition Obligations, Adequate Protection Obligations, Adequate Protection Liens, DIP

Obligations, DIP Liens, DIP Superpriority Claims, or any other claims or liens granted hereunder

or created by this Final Order. The Pre-Petition Lender and the DIP Lender are hereby authorized

and entitled, in each's respective sole and absolute discretion, but in no event are required, to file

(and amend and/or supplement, as each sees fit) proofs of claim in each of the Chapter 11 Cases

on behalf of the Pre-Petition Lender in respect of the Pre-Petition Obligations or on behalf of the

DIP Lender in respect of the applicable DIP Obligations, as applicable. Any proof of claim so filed

shall be deemed to be in addition to, and not in lieu of, any other proof of claim that may be filed

by any of the Pre-Petition Lender or DIP Lender.

35.  <u>Waiver of Bankruptcy Rule 6003(b), 6004(a) and 6004(h)</u>.  The 21-day provision

of Bankruptcy Rule 6003(b), the notice requirements of Bankruptcy Rule 6004(a), and the 14-day

stay of 6004(h) are hereby waived.

36.  <u>Order Controls</u>.  In the event of a conflict between (a) the terms and provisions of

the DIP Financing Documents or the Pre-Petition Financing Documents, as applicable, and (b) the

terms and provisions of this Final Order, then in each case the terms and provisions of this Final

Order shall govern.

37.  <u>Calculation of Dates</u>.  All time periods set forth in this Order shall be calculated in

accordance with Bankruptcy Rule 9006(a).

38.  <u>No Third Party Rights</u>.  Except as explicitly provided for herein, this Final Order

does not create any rights for the benefit of any third party, creditor, equity holder, or any direct,

indirect, or incidental beneficiary.

39.  <u>Property Tax Liens</u>. Notwithstanding any other provision herein, all pre- and post-

petition statutory ad valorem tax liens of the Texas Taxing Authorities[7] on the Debtors' business

personal property and/or real property located in Texas (the "Tax Liens") shall retain their lien

priority as provided by applicable non-bankruptcy law and shall not be primed by nor made

---

[7]   Dallas County, Fort Bend County, Gray County Tax Office, Grayson County, Gregg County, Harris County, Hopkins County, Jasper County, Midland CAD, Midland County, Navarro County, Pine Tree ISD, Smith County, City of Sulphur Springs, Sulphur Springs ISD, Tarrant County, Terry County CAD, Tom Green CAD, Wise County, Lubbock Central Appraisal District, Hale County Appraisal District, Val Verde County, Wichita County, Tyler Independent School District, Bowie CAD, Jasper ISD, Ector CAD, and Hidalgo County

subordinate to any liens granted to any party hereby, to the extent the Tax Liens are valid, senior, perfected, and unavoidable. Further, to the extent that there are any unpaid Tax Liens owing to such Texas Taxing Authority, the rights of the Texas Taxing Authorities to object to the allowance of superpriority administrative expense claims of the Lender are fully reserved.

40.     The terms of the provision of the *Interim Order Authorizing Debtors' Use of Cash Collateral and Granting Adequate Protection and Related Relief* [D.I. 61] (the "First Interim Cash Collateral Order"), the *Second Interim Order Authorizing Debtors' Use of Cash Collateral and Granting Adequate Protection and Related Relief* [D.I. 144] (the "Second Interim Cash Collateral Order"), and *Third Interim Order Authorizing Debtors' Use of Cash Collateral and Granting Adequate Protection and Related Relief* [D.I. 188] (the "Third Interim Cash Collateral Order", collectively, the "Earlier Cash Collateral Orders"), shall remain in full force and affect as to the rights and benefits of the Pre-Petition Lender. This Final Order shall provide additional adequate protection to the Pre-Petition Lender since the First Petition Date. To the extent there are any inconsistencies between the Earlier Cash Collateral Orders and this Final Order, this Final Order shall control.

**Exhibit 1**

**Approved Budget**

Case 25-34839-mvl11    Doc 357-10    Filed 02/25/26    Entered 02/25/26 14:14:10    Desc PHONIX EX 10    Page 401 of 525

**Buddy Mac Holdings, LLC et. al.**
*Cash Budget*
*$ - Thousands*

Filing Date: 4-Dec — Beginning Cash Balance: $ 133.9

| $ Thousands | Actual 1 6-Dec | Actual 2 13-Dec | Actual 3 20-Dec | Actual 4 27-Dec | Actual 5 3-Jan | Actual 6 10-Jan | Actual 7 17-Jan | Budget 8 24-Jan | Budget 9 31-Jan | Budget 10 7-Feb | Budget 11 14-Feb | Budget 12 21-Feb | Budget Total 12 Weeks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Receipts** | $ - | $ 387.0 | $ 318.7 | $ 241.5 | $ 379.6 | $ 430.4 | $ 315.7 | $ 292.0 | $ 305.6 | $ 599.5 | $ 422.4 | $ 436.0 | $ 4,128.4 |
| **Operating Disbursements** | | | | | | | | | | | | | |
| Inventory Purchases | | | | | | | | 1,000.0 | | | | | 1,000.0 |
| Payroll and Benefits | | 0.8 | 196.2 | 21.5 | 117.7 | | 217.0 | | 310.0 | 200.0 | 310.0 | | 1,373.2 |
| Property Taxes | | 0.1 | 207.0 | | 252.1 | 9.5 | 1.2 | 20.9 | | 85.0 | | | 575.8 |
| Store Rent Expense | | | | | 3.5 | 173.4 | | | | 272.3 | | 155.0 | 604.2 |
| Repairs & Maintenance | | 4.3 | (0.2) | | | 3.8 | 0.3 | 3.6 | | | | | 11.8 |
| Insurance | | | | | | | | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 25.0 |
| Vehicle Leases | | | | | | | | 58.0 | | | | 90.0 | 148.0 |
| General and Administrative | | 35.1 | (0.2) | 6.5 | 6.8 | 67.8 | 16.2 | 50.0 | 20.0 | 70.0 | 20.0 | 20.0 | 312.2 |
| Corporate Support | | 3.3 | 66.0 | | 73.6 | 1.1 | 62.2 | 5.0 | 98.7 | 55.1 | 98.7 | 10.0 | 473.7 |
| Sales Taxes | | | 25.9 | 106.8 | | | | 100.0 | | | | 153.0 | 385.7 |
| **Total Operating Disbursements** | $ - | $ 43.7 | $ 494.7 | $ 134.8 | $ 453.7 | $ 255.7 | $ 296.9 | $ 1,242.5 | $ 433.7 | $ 687.4 | $ 433.7 | $ 433.0 | $ 4,909.8 |
| **Operating Cash Flow** | $ - | $ 343.3 | (176.0) | 106.7 | (74.1) | 174.7 | 18.8 | (950.5) | (128.1) | (87.9) | (11.4) | 3.0 | (781.4) |
| Accumulated | - | 343.3 | 167.3 | 274.1 | 200.0 | 374.7 | 393.5 | (557.0) | (685.1) | (773.1) | (784.4) | (781.4) | (781.4) |
| **Other (Sources)/Uses** | | | | | | | | | | | | | |
| DIP Proceeds | | | | | | | | | | (750.0) | | | (750.0) |
| Funds from BMH-HR, LLC | | | | | | (56.5) | | (750.0) | | | | | (806.5) |
| Adequate Protection - Phonix | | | | | | | 56.5 | (100.0) | | | | | (43.5) |
| Restructuring Fees | | | | | | | | 100.0 | 21.2 | | | | 121.2 |
| Critical Vendors | | | | | | | | | | | | 775.0 | 775.0 |
| Utilities Deposit | | | 25.0 | | | | | | | | | | 25.0 |
| **Total Other (Sources)/Uses** | | | 25.0 | | | (56.5) | 56.5 | (750.0) | 21.2 | (750.0) | | 775.0 | (678.8) |
| **Net Cash Flow** | $ - | $ 343.3 | (201.0) | 106.7 | (74.1) | 231.3 | (37.7) | (200.5) | (149.3) | 662.1 | (11.4) | (772.0) | (102.6) |
| Accumulated | - | 343.3 | 142.3 | 249.1 | 175.0 | 406.2 | 368.5 | 168.0 | 18.7 | 680.8 | 669.4 | (102.6) | (102.6) |
| **Cash Balance** | $ 133.9 | $ 477.3 | $ 276.3 | $ 383.0 | $ 308.9 | $ 540.2 | $ 502.5 | $ 302.0 | $ 152.6 | $ 814.7 | $ 803.3 | $ 31.4 | $ 31.4 |

**Exhibit 2**

**DIP Loan Agreement**

**SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION LOAN, SECURITY AND
GUARANTY AGREEMENT**

**among**

**BUDDY MAC HOLDINGS, LLC,
as RTO Parent,**

**MACDONALD CAPITAL CORPORATION
as MCC Parent,**

**BMH RTO, LLC,
AND
EACH DEBTOR LISTED AS A BORROWER ON THE SIGNATURE PAGES HERETO,
as Borrowers,**

**THE PARENT AND EACH DEBTOR LISTED AS A GUARANTOR ON THE SIGNATURE
PAGES HERETO,
as Guarantors,**

**and**

**PHONIX RBS, LLC, as Lender**

**January 27, 2026**

## TABLE OF CONTENTS

1.  LOANS AND OTHER FINANCIAL ACCOMMODATIONS. ........................................2

2.  CONDITIONS OF LENDING. ........................................................................5

3.  INTEREST; FEES; EXPENSES; INDEMNIFICATION; TAXES. .................................7

4.  SECURITY. ...........................................................................................11

5.  COLLECTIONS; SET OFF; DEPOSIT ACCOUNTS; NOTICE OF ASSIGNMENT;
    POWER OF ATTORNEY; LENDER REPORTS. ...........................................13

6.  REPRESENTATIONS AND WARRANTIES.......................................................17

7.  AFFIRMATIVE COVENANTS. .....................................................................21

8.  REPORTING. ..........................................................................................25

9.  NEGATIVE COVENANTS. ..........................................................................28

10. DEFAULT; RIGHTS AND REMEDIES UPON DEFAULT. ....................................33

11. STANDARDS FOR EXERCISING REMEDIES. ..................................................41

12. TERMINATION........................................................................................42

13. MISCELLANEOUS. ..................................................................................42

14. DEFINITIONS..........................................................................................46

15. JOINT AND SEVERAL LIABILITY ...............................................................63

16. SUPERPRIORITY CLAIMS, DIP COLLATERAL SECURITY, ETC.........................65

17. ACKNOWLEDGMENT; REAFFIRMATION AND RELEASE...................................68

18. GUARANTY…………………………………………………………………….71

i

## SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION LOAN, SECURITY AND GUARANTY AGREEMENT

January [•], 2026

Pursuant to Section 364(c) and (d) of the Bankruptcy Code, this SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION LOAN, SECURITY AND GUARANTY AGREEMENT (as amended or modified from time to time, this "**Agreement**"), is entered into as of the date set forth above by and among **BUDDY MAC HOLDINGS, LLC** (the "**RTO Parent**"), **MACDONALD CAPITAL CORPORATION** (the "**MCC Parent**"), **BMH RTO, LLC,** a Texas limited liability company ("**BMH RTO**"), and each Debtor listed as a "Borrower" on the signature pages hereto (together with each other Person that executes a joinder agreement and becomes a "Borrower" hereunder and BMH RTO, each a "**Borrower**" and collectively, the "**Borrowers**"), each Debtor listed as a "Guarantor" on the signature pages hereto (together with the RTO Parent and MCC Parent and each other Person that executes a joinder agreement and becomes a "Guarantor" hereunder, each a "**Guarantor**" and collectively, the "**Guarantors**"; each Borrower and each Guarantor are each individually a "**Debtor**" and collectively, the "**Debtors**"), and **PHONIX RBS, LLC**, a Delaware limited liability company ( "**Lender**").

## RECITALS

A.    On December 1, 2025 (the "**First Petition Date**"), Buddy Mac One, LLC ("**Buddy Mac One**"), BMH One RE, LLC ("**BMH One**"), BMH 95 RE Caruthersville, LLC ("**BMH 95**"), and BMH 96 RE Marion, LLC ("**BMH 96**"; together with BMH One and BMH 95, the "**Limited Recourse Guarantors**") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, and on December 4, 2025 (the "**Second Petition Date**"), BMH RTO, LLC and affiliated Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, commencing Chapter 11 bankruptcy cases which are jointly administered under Bankruptcy Case No. 25-34839 (collectively and individually as the context may require, the "**Case**") before the United States Bankruptcy Court for the Northern District of Texas (the "**Bankruptcy Court**"). The Debtors that filed their respective Cases on the First Petition Date and the Second Petition Date are referred to herein as the "**BMH Debtors.**"

B.    The BMH Debtors are operating their business as debtors-in-possession under Chapter 11 of the Bankruptcy Code. William Ian MacDonald acts as the Debtors' chief executive officer.

C.    On January 23, 2026 (the "**Third Petition Date**"; the term "**Applicable Petition Date**" refers to any of the First Petition Date, the Second Petition Date or the Third Petition Date as the context may require)), the entities listed on **Exhibit 9** (collectively the "**Buddy Mac Entities**") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code before the Bankruptcy Court, commencing Chapter 11 bankruptcy cases, which will be jointly administered with the BMH Debtor Cases. Each Debtor remains in possession of its assets and is operating its business as a debtor-in-possession under Chapter 11 of the Bankruptcy Code.

D.    Pursuant to that certain Amended and Restated Loan, Security and Guaranty Agreement dated as of February 28, 2025 (as has been amended, supplemented and modified through the date hereof, the "**Pre-Petition Loan Agreement**"), by and among BMH RTO, LLC, as borrower ("**BMH RTO**"), the Pre-Petition Guarantors party thereto, and Phonix RBS, LLC, as assignee of Intrust Bank, N.A. (the "**Pre-Petition Lender**"), Pre-Petition Lender made certain credit facilities and advances of credit available to certain of the Debtors prior to the Second Petition Date on the terms and conditions set forth therein, which credit facilities and advances of credit and all other Pre-Petition Obligations (as defined below) thereunder

1

were unconditionally guaranteed by certain Pre-Petition Guarantors and secured by Liens on substantially all the assets of BMH RTO and certain of the Pre-Petition Guarantors.

E.    The Borrowers have requested that during the Case, Lender make advances and other financial accommodations available to the Borrowers of up to the Credit Limit specified herein on a senior secured, superpriority basis, pursuant to, inter alia, Sections 364(c) and (d) of the Bankruptcy Code.

F.    Lender is willing to provide advances and other financial accommodations to the Borrowers on a senior secured, superpriority basis on the terms and subject to the conditions of this Agreement, so long as, among other things, such post-petition credit obligations are (i) secured by Liens on all of the assets, property and interests, real and personal, tangible and intangible, of the Debtors, whether now owned or hereafter acquired, which Liens are superior to all other Liens pursuant to Sections 364(c) and (d) of the Bankruptcy Code (subject to (x) the priority of Liens set forth in Section II(b) of the Interim Order and (y) the Carve-Out); (ii) given priority over any administrative expenses of the kind specified in the Bankruptcy Code, including without limitation, under Sections 105, 326, 328, 330, 331, 503(b), 507, 364(c)(1), 546(c), 726, or 1114 and, upon entry of a Final Order, sections 506(c) and 552(b) of the Bankruptcy Code, as provided in the Interim Order and the Final Order; and (iii) guaranteed by the Guarantors pursuant to the terms of **Section 18**.

IN CONSIDERATION of the foregoing recitals, which are incorporated herein by this reference, the mutual covenants and undertakings herein contained, the Debtors, the other Borrowers, the Guarantors, Lender and Issuer (as hereinafter defined) hereby agree as follows:

**1.    LOANS AND OTHER FINANCIAL ACCOMMODATIONS.**

    **(a)    <u>Term Loans</u>**.

        **(i)    New Money Term Loans**.  Subject to the terms and provisions of this Agreement, and also subject to any further restrictions or limitations in the Final Order (or, prior to the entry of the Final Order, the Interim Order), Lender agrees to make Term Loans to the Borrowers, during the period from the Closing Date until the Maturity Date, in an aggregate principal amount not to exceed the amount of the Credit Limit; <u>provided</u>, <u>however</u>, that (A) the amount of Term Loans to be borrowed for any advance during any week shall be in an aggregate principal amount not to exceed the amount required pursuant to the Approved Budget (subject to Permitted Variances) as then in effect and (B) during the Interim Availability Period, the total aggregate principal amount of the outstanding Term Loans shall not exceed the Interim Availability Amount.

        **(ii)    Limitations**.  Notwithstanding the foregoing:

        (A)    The Credit Limit shall be permanently reduced immediately and without further action upon the making of each Term Loan in an aggregate amount equal to the aggregate amount of such Term Loan. The Credit Limit shall terminate immediately and without further action on the Maturity Date.  The aggregate principal amount of the Term Loans made during the period from the Closing Date until the Maturity Date shall not exceed the Credit Limit.  Any principal amount of a Term Loan which is repaid or prepaid may not be reborrowed.

        (B)    During the Interim Availability Period, the Term Loans in an amount up to the Interim Availability Amount may be advanced by Lender; provided that during the Interim Availability Period, Borrowers will use the proceeds from any Term Loans to

2

direct Lender to purchase inventory on behalf of the Borrowers and at the direction of the Borrowers based on identified need for each store, at the prices that the Borrowers have negotiated, and by virtue of the inventory purchase, which purchases shall be deemed the funding of a Term Loan. For the avoidance of doubt, the purchase of such inventory shall not be deemed control of the Debtors. If a dispute arises between Lender and Debtors regarding the appropriate stores to which inventory should be delivered, the Debtors, in the fulfillment of their fiduciary obligations to their estates, shall have final say. During the Final Availability Period, Term Loans in an amount up to the Final Availability Amount plus any undrawn Interim Availability Amount may be advanced by Lender; provided, that in no event shall the aggregate amount of the Term Loans advanced exceed $1,500,000, subject to **Section 1(c)**.

(iii)    **Term Note**. All term loans made by Lender pursuant to this **Section 1** (each a "**Term Loan**" and collectively, the "**Term Loans**") shall bear interest pursuant to **Section 3(a)(i)** and, at the option of Lender, shall be evidenced by and repayable in accordance with a term note payable to Lender (or its registered assigns) substantially in the form of **Exhibit 2** hereto (as amended, modified, replaced, substituted, superseded or restated from time to time, the "**Term Note**"), as the same may hereafter be amended, supplemented or restated from time to time and any note or notes issued in substitution therefor, but in all events shall be conclusively evidenced by Lender's records of loans and repayments (absent manifest error) and shall be payable as described herein.

(iv)    **Protective Advances**. Notwithstanding anything to the contrary contained herein, at its option, and without limiting any other rights or remedies, following prior written notice to Borrower (which such prior notice is not required to the extent an Event of Default shall have occurred and be continuing), Lender may at any time make a Term Loan or other advances hereunder to pay or discharge any taxes, liens, rent, security interests or other encumbrances at any time levied against, impacting in any manner or placed on any of the DIP Collateral, and may procure and make a Term Loan or other advance hereunder to pay any premiums on any insurance required to be carried by a Borrower, and provide for the maintenance and preservation of any of the DIP Collateral, and otherwise take any action reasonably deemed necessary by Lender to protect its security, and all amounts expended by Lender in connection with any of the foregoing matters, including reasonable attorneys' fees, shall be considered Obligations of Borrowers and outstanding Term Loans (and shall be added to Borrowers' balance of Term Loans pursuant to this Agreement), and shall be secured by the DIP Collateral.

(v)    **Advance Procedures**. Unless otherwise approved by Lender in its sole discretion, all requests for Term Loans shall be made upon the Borrower's irrevocable notice to Lender, which may be given by (A) telephone, or (B) a written notice; provided that any telephone notice must be confirmed immediately by delivery to Lender of a written notice. Each such notice must be received by Lender not later than 1:00 p.m. (New York time) one Business Day prior to (or in the case of the initial Borrowing, the same day of) the requested date of any Term Loan.

(vi)    **Roll-Up of Pre-Petition Revolver Obligations**

(A)    Immediately upon entry of the Final Order, a portion of the outstanding Pre-Petition Revolver Obligations (the "**Roll-Up Amount**") held by Lender shall be automatically "rolled up" and converted into Term Loans, on a cashless basis of three

3

dollars ($3.00) of Roll-Up Amount for each dollar of Term Loans, and constitute Obligations of the Debtors hereunder for all purposes hereunder as if originally funded on the Closing Date (the "**Roll-Up Loans**"), without any further action by the Debtors or any other party (which conversion shall not, for the avoidance of doubt, constitute a novation). The conversion (or "roll-up") shall be authorized as compensation for, in consideration for, and solely on account of, the agreement of the Pre-Petition Lender, as Lender hereunder, to fund the Term Loans hereunder and not as payments under, adequate protection for, or otherwise on account of, any Pre-Petition Revolver Obligations. Notwithstanding any other provision of the Interim Order, the Final Order, or the Loan Documents, all rights of the Pre-Petition Lender shall be fully preserved, including with respect to the Roll-Up Loans.

(B)     Subject to the terms and conditions set forth herein and in the Final Order, and without any further action by any party to this Agreement, each Lender's Roll-Up Loans shall be deemed to be Loans, administered hereunder and secured by perfected Liens on, and security interests in, all of the DIP Collateral of the Debtors to the same extent as all other Obligations of the Debtors hereunder. For the avoidance of doubt, until any Pre-Petition Revolver Obligations are deemed to be Roll-Up Loans as provided herein, such Pre-Petition Revolver Obligations shall remain Pre-Petition Revolver Obligations under the Pre-Petition Credit Agreement and guaranteed by the guarantors of and secured by and entitled to the benefits of all liens created and arising under the Pre-Petition Loan Documents, which liens shall remain in full force and effect on a continuous basis, unimpaired, uninterrupted and undischarged, and having the same perfected status and priority. The Roll-Up Loans and the other Term Loans shall jointly constitute a single facility hereunder.

**(vii)     Payment Direction**. Each Borrower hereby authorizes and directs Lender, in Lender's sole discretion (provided, however, Lender shall have no obligation to do so): (A) to make, or treat as being made, a Term Loan to Borrowers, and add the same to Borrowers' balance of Term Loans pursuant to this Agreement, in order to pay accrued interest, fees, charges and expenses and other Obligations, as the same become due and payable pursuant to this Agreement, or any note or other agreement between a Borrower and Lender; (B) to charge any of Borrowers' or other Debtors' accounts under the control of Lender for the payment of any such Obligations; and/or (C) apply the proceeds of DIP Collateral and any other funds of such Borrower or other Debtors received by Lender, including, without limitation, payments on accounts and other payments from sales or lease of inventory to the payment of any such Obligations. Lender shall use commercially reasonable efforts to give Borrowers notice of any such payments or charges under clauses (A) and (B) respectively promptly following the same.

**(b)     Mandatory Prepayments**.

**(i)**     When any Debtor receives any Net Cash Proceeds: (A) under any insurance policy on account of damage or destruction of any DIP Collateral, or (B) as a result of any taking or condemnation of any DIP Collateral, Debtors shall, no later than one (1) Business Days after the receipt thereof, make a repayment of the Post-Petition Obligations or Pre-Petition Revolver Obligations (as determined by Lender in its sole and absolute discretion) in an amount equal to one hundred percent (100%) of such net cash proceeds. Such repayments shall be applied to the Obligations in accordance with **Section 5(b)** hereof.

4

(ii)     In the event of any issuance or other incurrence of Indebtedness (other than Indebtedness permitted hereunder) by any Debtor, or the issuance of Equity Interests by any Debtor, Debtors shall, no later than one (1) Business Day after the receipt by such Debtor of any net cash proceeds (i.e., gross cash proceeds less the reasonable direct costs of such issuance or incurrence) of such issuance or incurrence, make a repayment of the Post-Petition Obligations or Pre-Petition Revolver Obligations (as determined by Lender in its sole and absolute discretion) in an amount equal to one hundred percent (100%) of such net cash proceeds.  The foregoing shall not be deemed to be implied consent to any such sale otherwise prohibited by the terms and conditions hereof.  Such repayments shall be applied to the Obligations in accordance with **Section 5(b)** hereof.

(iii)    When any Debtor sells or otherwise disposes of any DIP Collateral (including, without limitation any Subject RTO Real Property), Borrowers shall make a repayment of the Post-Petition Obligations or Pre-Petition Revolver Obligations (as determined by Lender in its sole and absolute discretion) in an amount equal to one hundred percent (100%) of the net cash proceeds of such sale (i.e., gross cash proceeds less the reasonable direct costs of such sales or other dispositions) and less amounts required to be first paid over to the holder(s) of any applicable Senior Liens as a result of such sale or disposition), such repayments to be made promptly but in no event more than one (1) Business Days following receipt of such net proceeds, and until the date of payment, such proceeds shall be held in trust for Lender.  The foregoing shall not be deemed to be implied consent to any such sale otherwise prohibited by the terms and conditions hereof.  Such repayments shall be applied to the Obligations in accordance with **Section 5(b)** hereof.

(iv)     Subject to **Section 4(l)** and the Final Order, when BMH HR LLC ("**BMH HR**") receives additional ERC Funds, which ERC Funds constitute DIP Collateral, Borrowers shall, or shall cause BMH HR to, make a repayment of the Post-Petition Obligations or Pre-Petition Revolver Obligations (as determined by Lender in its sole and absolute discretion) in an amount equal to one hundred percent (100%) of the net cash proceeds of such ERC Funds (i.e., gross cash proceeds less the reasonable direct broker's fee) along with any pre-existing ERC Funds in its possession less the Additional ERC Remittance required to be paid over to Debtors in the amount of $175,000 for professional fee retainers, costs, and expenses.  To the extent such Additional ERC Remittance has not been previously paid, and subject to entry of the Final Order, such repayments shall be made promptly but in no event more than one (1) Business Days following receipt of such net proceeds, or entry of the Final Order approving this agreement, whichever is later, and until the date of payment, such proceeds shall be held in trust for Lender.  Such repayments shall be applied to the Obligations in accordance with **Section 5(b)** hereof.

(v)      Borrowers shall, or shall cause Ian MacDonald to, as a Pre-Petition Guarantor, and in exchange for the consideration provided herein, make a repayment of the Post-Petition Obligations or Pre-Petition Revolver Obligations (as determined by Lender in its sole and absolute discretion) in an amount equal to seventy-five percent (75%) of the net cash proceeds received by Ian MacDonald (whether through his direct or indirect ownership of the Boulders Property) from the sale of the Boulders Property, such repayments to be made promptly but in no event more than one (1) Business Days following receipt of such net proceeds, and until the date of payment, such proceeds shall be held in trust for Lender.  Such repayments shall be applied to the Obligations in accordance with Section 5(b) hereof.

(c)     **Incremental Facility Increase.**

       (i)     **Request for Incremental Facility Increase**. Borrowers may, by notice to the Lender, request that the Credit Limit be increased by up to an amount (for all such requests) not exceeding $1,000,000 (such amount, the "**Accordion Amount**" and such increase to the Credit Limit as in effect on the Closing Date, the "**Incremental Facility Increase**"); <u>provided</u> that (i) any such request for the Incremental Facility Increase shall be in a minimum amount of the lesser of (x) $250,000 (or such lesser amount as may be approved by Lender) and (y) the entire remaining amount available under this **Section 1(c)** and (ii) Borrowers shall make no more than a total of four (4) requests for an Incremental Facility Increase under this **Section 1(c)** (unless otherwise approved by Lender)

       (ii)     **Conditions to Effectiveness Incremental Lenders**. The Accordion Amount may be provided by Lender. Notwithstanding anything herein to the contrary, Lender shall not have any obligation to agree to provide all or part of the Accordion Amount pursuant to this **Section 1(c)** and any election to do so shall be in the sole discretion of such Lender.

       (iii)     **Terms of the Incremental Facility Increase**. Lender and the Borrowers shall determine the effective date for such Incremental Facility Increase pursuant to this **Section 1(c)** (an "**Incremental Commitment Effective Date**"); <u>provided</u> that such date shall be a Business Day at least ten Business Days after delivery of the Accordion Increase Notice (unless otherwise approved by Lender) and at least 30 days prior to the Maturity Date then in effect (unless otherwise approved by Lender).

       Effective as of the applicable Incremental Commitment Effective Date, subject to the terms and conditions set forth in this Section, the Accordion Amount shall constitute part of the Credit Limit, and the Loans made by it on such Incremental Commitment Effective Date pursuant to this **Section 1(c)** shall be Term Loans, for all purposes of this Agreement.

       (iv)     **Conditions to Effectiveness**. Notwithstanding the foregoing, the Incremental Facility Increase pursuant to this Section shall not be effective with respect to Lender unless:

       (A)     no Default or Event of Default shall have occurred and be continuing on the Incremental Commitment Effective Date and after giving effect to the Loans of the Accordion Amount to be made on the Incremental Commitment Effective Date;

       (B)     the representations and warranties contained in this Agreement are true and correct on and as of the Incremental Commitment Effective Date and after giving effect to such Incremental Facility Increase, as though made on and as of such date (or, if any such representation or warranty is expressly stated to have been made as of a specific date, as of such specific date);

       (C)     Lender shall have approved the Incremental Facility Increase.

**2.     CONDITIONS OF LENDING.**

6

    **(a)**    <u>**Initial Loans**</u>. The willingness of Lender to consider making the initial loan hereunder shall be subject to the condition precedent that Lender shall have received all of the following, each in form and substance satisfactory to Lender, subject to waiver of any such requirement by Lender:

    **(i)**    This Agreement and each applicable Loan Document, properly executed on behalf of the Debtors or other applicable party.

    **(ii)**    A Term Note in favor of Lender.

    **(iii)**    The Initial DIP Budget.

    **(iv)**    The Case shall have been commenced in the Bankruptcy Court and all of the first day orders entered at the time of commencement of the Case shall be reasonably satisfactory, in form and substance, to Lender and no trustee or examiner shall have been appointed with respect to the Debtors, or any of them, or any property of or any Estate of any Debtor;

    **(v)**    The Interim Order shall have been entered by the Bankruptcy Court, which Interim Order (A) shall have been entered upon an application or motion of the Debtors satisfactory in form and substance to Lender and upon prior notice to such parties required to receive such notice and such other parties as may be reasonably requested by Lender; (B) shall be in full force and effect and shall not have been amended, modified or stayed, or reversed; and, if the Interim Order is the subject of a pending objection, appeal or motion for reconsideration in any respect, neither the Interim Order, nor the making of the Term Loans, nor the performance by the Debtors of any of the Obligations shall be the subject of a presently effective stay, and (C) shall otherwise satisfy the requirements of the definition of Interim Order set forth herein. The Debtors and the Lender shall be entitled to rely in good faith upon the Interim Order notwithstanding any such objection, appeal or motion for reconsideration;

    **(vi)**    Current searches of appropriate filing offices showing that (A) no state or federal tax liens have been filed and remain in effect against any Debtor, (B) no financing statements have been filed and remain in effect against any Debtor, except (1) the financing statements relating to the liens set forth on **Schedule E** and (2) the Obligations, and (C) Lender has duly filed all financing statements necessary to perfect the security interests granted hereunder, to the extent the security interests are capable of being perfected by filing.

    **(vii)**    A certificate of the Clerk, Secretary or an Assistant Secretary, or other manager or officer approved by Lender, of each Debtor certifying as to (A) the resolutions of the directors/managers and, if required, the shareholders/members of such Debtor, authorizing the execution, delivery and performance of this Agreement and related Loan Documents, as applicable, (B) the certified Articles/Certificate of Incorporation/Organization/Formation and Bylaws/Operating Agreement (or other similar constituting documents) of such Debtor, and (C) the signatures of the officers or agents of such Debtor authorized to execute and deliver this Agreement and other instruments, agreements and certificates, including loan requests, on behalf of such Debtor.

    **(viii)**    A current certificate issued by the Secretary of State of the state of such Debtor's formation, certifying that such Debtor is legally existing and in good standing under the laws of such jurisdiction to the extent such jurisdiction issues such or similar certifications.

7

(ix)    Evidence that each Debtor is duly licensed or qualified to transact business in all jurisdictions where the character of the property owned or leased or the nature of the business transacted by it makes such licensing or qualification necessary.

(x)    Certificates of the insurance required hereunder, and related assignments as applicable, with all hazard insurance containing a lender's loss payable endorsement in favor of Lender and naming Lender as an additional insured (including as to foreign credit insurance).

(xi)    Payment of the fees due through the date of the initial loan and expenses incurred by Lender through such date required to be paid by Borrowers pursuant to this Agreement.

(xii)    An executed and sworn declaration by Ian MacDonald (the "MacDonald Declaration") to the effect that his final personal financial statement delivered to Lender on that date is true and correct, which personal financial statement form shall  be consistent with the representations received by Lender as to such personal financial statement from counsel for Ian MacDonald counsel on January 15, 2025, all in form and substance satisfactory to Lender.

(xiii)    An executed Consent from Ian MacDonald consenting to the Debtors entering into this Agreement and the terms and conditions hereof.

(xiv)    An executed Settlement Agreement.

(xv)    Such other documents, instruments and agreements as Lender in its discretion may reasonably require.

(b)    **Loans Funded On and After the Final Order Entry Date**.  The willingness of Lender to consider making any loan hereunder on and after the Final Order Entry Date shall be subject to the condition precedent that Lender shall have received all of the following, each in form and substance satisfactory to Lender:

(i)    **Final DIP Orders and Cash Management Order**.  The Final Order Entry Date shall have occurred, and the conditions set forth in this **Section 2** shall have been satisfied.  The Final Order and the Cash Management Order shall be in full force and effect and shall not have been reversed, modified, amended, stayed, vacated or subject to a stay pending appeal, in the case of any modification, amendment or stay pending appeal, in any manner, or relating to any matter, that is adverse to the interests of Lender.  The Final Order shall approve the Settlement Agreement, authorize the compromise and transactions evidenced and contemplated thereby, including, without limitation, the Participation Agreement and the PEC Pledge Agreement.  Debtors shall be in compliance with the Final Order.

(ii)    **Milestones**.  Debtors shall have satisfied all Milestones which are required to be satisfied on or prior to the date such Loan is funded.

(iii)    **Approved Budget**.  Lender shall have received, and approved, the Approved Budget that is in effect as of the Final Order Entry Date.

(iv)    **Payment of Fees, Etc**.  Borrowers shall have paid all fees, costs, expenses and taxes then payable by the Borrowers pursuant to this Agreement and the other Loan Documents to the Lenders, including, without limitation, any and all fees, costs, expenses and taxes set forth in the Interim Order and the Final Order.

8

(v)      **Participation Agreement**.  An executed Participation Agreement.

(vi)      **PEC Pledge Agreement**.  An executed PEC Pledge Agreement.

(vii)      **Real Estate Documents**.  Mortgage, Assignment of Leases and Rents, Hazardous Materials Indemnification Agreements and Fixture Filings each properly executed, as applicable, and delivered by the Borrowers in favor of Lender, each in form and substance satisfactory to Lender, with respect to the Real Property DIP Collateral.

(viii)      **Other Real Estate Documents**.  Such other documentation and opinions, in form and substance satisfactory to Lender, in connection with the granting of the Mortgages on the Real Property DIP Collateral, including surveys, financing statements, fixture filings, flood insurance, flood insurance certifications and environmental audits.  All such environmental audits and surveys shall be prepared or issued by parties reasonably acceptable to Lender.

(ix)      **Other Documents; Miscellaneous.**  Such other documents, instruments and agreements as Lender in its discretion may reasonably require.

(c)      <u>**Conditions Precedent to All Borrowings**</u>.  The obligation of each Lender to make any Loan at any time is subject to the following conditions precedent:

(i)      **Notice of Borrowing**.  Lender shall have received a notice of borrowing in accordance with **Section 1(a)(v)** and the other requirements hereof.

(ii)      **Representations and Warranties**.  The representations and warranties contained in Section 6 hereof are correct in all material respects (except to the extent such representations and warranties are qualified by materiality, in which case they shall be correct in all respects) on and as of the date of such loan, as though made on and as of such date, except to the extent that such representations and warranties relate solely to an earlier date in which case they shall be true and correct in all material respects as of such earlier date; and

(iii)      **No Default or Event of Default**.  No event has occurred and is continuing or would result from such loan which constitutes an Event of Default or which, with notice or the passage of time or both, would constitute an Event of Default.

(iv)      **Other Conditions Precedent**.  With respect to any Loan (i) made during the Interim Availability Period, the conditions specified in **Section 3(a)** shall have been satisfied and (ii) made during the Final Availability Period, the conditions specified in **Section 3(b)** shall have been satisfied.

(v)      **Status of Bankruptcy Cases**.  The Cases shall not have been dismissed or converted under Chapter 7 of the Bankruptcy Code.

(vi)      **Trustees**.  (i) No trustee or examiner with enlarged powers (beyond those set forth in Bankruptcy Code sections 1106(a)(3) and (4)) shall have been appointed with respect to the Debtors or their respective properties and (ii) no trustee under Chapter 7 of the Bankruptcy Code or under Chapter 11 of the Bankruptcy Code shall have been appointed in the Cases.

(vii)      **Milestones**.  Each Milestone that is required to be complied with prior to or concurrently with the borrowing shall have been complied with.

9

(viii)   **Interim Order and Final Order**.  Debtors shall be in compliance with the Interim Order and the Final Order, as applicable.

(ix)   **Approved Budget**.  The Approved Budget shall be in full force and effect on and as of the proposed date of borrowing, and the making of any Loan on any such borrowing date shall be in accordance with the Approved Budget (or as otherwise approved in advance in writing by Lender).

(x)   **Professional Fee Reserve**.  The Professional Fee Reserve (as defined in the Interim Order) shall have been funded in sufficient amounts in accordance with the Interim Order and the Final Order and the Approved Budget (applicable as of the date of such Loan).

(xi)   **Legality**.  The making of such Loan shall not contravene any law, rule or regulation applicable to Lender.

(xii)   **Proceedings; Receipt of Documents**.  All proceedings in connection with the making of such Loan and the other transactions contemplated by this Agreement and the other Loan Documents, and all documents incidental hereto and thereto, shall be satisfactory to Lender and its counsel, and Lender and such counsel shall have received such other agreements, instruments, approvals, and other documents, each in form and substance satisfactory to Lender, as Lender may reasonably request.

(d)   **Effect of Requests**. Each request by Borrowers for the making of any loan shall be deemed to constitute a representation and warranty by each Borrower that the conditions precedent set forth in clauses (c)(ii) and (c)(iii) above of this **Section 2** will be satisfied at the time of the making of such loan.

3.   **INTEREST; FEES; EXPENSES; INDEMNIFICATION; TAXES.**

(a)   **Interest Rates**.

(i)   **Term Loans; Other Obligations**.  Interest on (A) the Pre-Petition Obligations shall be governed as to rates of interest and other fees and related charges by the Pre-Petition Loan Agreement and the other Pre-Petition Loan Documents and (B) the amounts outstanding hereunder, including, without limitation, under the Term Notes, shall bear interest at the rate of ten percent (10%) per annum.

(ii)   **[Reserved]**.

(iii)   **Adjustment.**  Interest shall be computed on the basis of the actual number of days elapsed over a year of three hundred sixty (360) days.  Lender's determination of such interest rate shall be binding and conclusive absent manifest error.  The interest rate need not and may not necessarily be the lowest or most favorable rate.

(iv)   **Maximum Rate.**  It is the intention of the parties hereto to comply strictly with applicable usury laws, if any; accordingly, notwithstanding any provisions to the contrary in this Agreement or any other documents or instruments executed in connection herewith, in no event shall this Agreement or such documents or instruments require or permit the payment, taking, reserving, receiving, collecting or charging of any sums constituting interest under applicable laws which exceed the maximum amount permitted by such laws.  If any such excess interest is called for, contracted for, charged, paid, taken, reserved, collected or received in connection with the Obligations or in any communication by Lender or any other Person to a Borrower or any other Person, or in the event all or part of the principal of the Obligations or interest thereon shall be

10

prepaid or accelerated, so that under any of such circumstances or under any other circumstance whatsoever the amount of interest contracted for, charged, taken, collected, reserved, or received on the amount of principal actually outstanding from time to time under this Agreement shall exceed the maximum amount of interest permitted by applicable usury laws, if any, then in any such event it is agreed as follows: (i) the provisions of this paragraph shall govern and control, (ii) neither any Borrower nor any other Person now or hereafter liable for the payment of the Obligations shall be obligated to pay the amount of such interest to the extent such interest is in excess of the maximum amount of interest permitted by applicable usury laws, if any, (iii) any such excess which is or has been received notwithstanding this paragraph shall be credited against the then unpaid principal balance hereof or, if the Obligations have been or would be paid in full by such credit, refunded to Borrowers, and (iv) the provisions of this Agreement and the other documents or instruments executed in connection herewith, and any communication to Borrowers, shall immediately be deemed reformed and such excess interest reduced, without the necessity of executing any other document, to the maximum lawful rate allowed under applicable laws as now or hereafter construed by courts having jurisdiction hereof or thereof.  Without limiting the foregoing, all calculations of the rate of interest contracted for, charged, taken, collected, reserved, or received in connection herewith which are made for the purpose of determining whether such rate exceeds the maximum lawful rate shall be made to the extent permitted by applicable laws by amortizing, prorating, allocating and spreading during the period of the full term of the Obligations, including all prior and subsequent renewals and extensions, all interest at any time contracted for, charged, taken, collected, reserved or received.  The terms of this paragraph shall be deemed to be incorporated in every Loan Document and communication relating to the Obligations.

(v)     **Default Rate**.  Upon the occurrence of, and during the continuance of, an Event of Default, Borrowers, as additional compensation to Lender for its increased credit risk, promises to pay interest on all Obligations (including, without limitation, principal, whether or not past due, past due interest and any other amounts past due under this Agreement) at a per annum rate equal to the sum of the rate of interest then specified in this **Section 3(a)** plus the Default Rate Margin (the "**Default Rate**").

(b)     **Interest Payments**.  Interest shall be payable in lawful money of the United States of America to Lender, or as Lender shall direct, without set-off, deduction or counterclaim monthly, in arrears, on the first Business Day of each month, commencing on the first Business Day of the month next succeeding the date hereof.

(c)     **Fees and Charges**.

(i)     **Appraisals**.  To the extent funds are available within the DIP Budget to satisfy such costs and expenses, Borrowers hereby agree to pay Lender, on demand, Lender's reasonable fees, costs and expenses (including any reasonable fees, costs and expenses incurred by any appraiser) in connection with any appraisals of all or any part of the DIP Collateral conducted at the request of Lender; provided, however, that absent an Event of Default, the Borrowers will not have to reimburse Lender for such fees, costs and expenses for more than one (1) appraisal per DIP Collateral category (i.e., separate appraisals may be obtained for inventory and equipment) in any twelve (12) month period (in addition, Borrowers shall be obligated to reimburse Lender for all fees, costs and expenses related to appraisals obtained prior to the date hereof).

(ii)     **Late Fee.**  If any amount due under this Agreement is not received by Lender within five (5) Business Days of the date such amount is due, Borrowers shall pay to Lender a late

11

fee of five percent (5%) of such amount not paid, such late fee to be immediately due and payable by Borrowers without demand by Lender.

(d) **Expenses.** In accordance with the Fee Deferment Provision (as defined in the Interim Order) pursuant to Section I(4) of the Interim Order, Lenders are entitled to accrue, as amounts due and owing pursuant to this Credit Agreement, any and all reasonable counsel fees and other expenses incurred by Lender in connection with the preparation, interpretation, enforcement, administration or amendment of this Agreement, or of any documents relating thereto, and any and all expenses, including, but not limited to, a collection charge on all accounts collected, and all other expenses of like or unlike nature which may be expended by Lender to obtain or enforce payment of any account either as against the account debtor, a Borrower, or any guarantor or surety of a Borrower or in the prosecution or defense of any action or concerning any matter growing out of or connected with the subject matter of this Agreement, the Obligations or the DIP Collateral or any of Lender's rights or interests therein or thereto, including, without limiting the generality of the foregoing, any counsel fees or expenses incurred in any bankruptcy or insolvency proceedings and all costs and expenses (including search fees) incurred or paid by Lender in connection with the administration, supervision, protection or realization on any security held by Lender for the debt secured hereby, whether such security was granted by a Debtor or by any other Person primarily or secondarily liable (with or without recourse) with respect to such debt, and all costs and expenses incurred by Lender in connection with the defense, settlement or satisfaction of any action, claim or demand asserted against Lender in connection therewith, which amounts shall be considered advances to protect Lender's security, and shall be secured hereby.

**NOTWITHSTANDING ANYTHING TO THE CONTRARY PROVIDED FOR HEREIN OR IN ANY OTHER LOAN DOCUMENTS, ALL OBLIGATIONS ARISING HEREUNDER OR IN CONNECTION HEREWITH CONSISTING OF (1) INTEREST ON THE TERM LOANS MADE HEREUNDER, (2) COLLECTION DAYS PROVIDED FOR IN SECTION 5(b) HEREOF, (3) ANY EXPENSE REIMBURSEMENT OR INDEMNITY OBLIGATION FOR OR WITH RESPECT TO MATTERS NOT ADDRESSED IN THE DIP BUDGET, SHALL, INSTEAD OF BEING DUE AND PAYABLE ON THE DATE OTHERWISE PROVIDED FOR HEREUNDER AND/OR UNDER ANY APPLICABLE DOCUMENT, BE DEFERRED TO AND INSTEAD BE DUE AND PAYABLE ON THE EARLIEST OF (x) THE MATURITY DATE, (y) ANY PAYMENT IN FULL OF THE POST-PETITION OBLIGATIONS, OR (z) ANY ACCELERATION OF THE POST-PETITION OBLIGATIONS IN ACCORDANCE WITH THE PROVISIONS OF SECTION 10 HEREOF.**

(e) **Indemnification**. Except to the extent solely caused by Lender's gross negligence or willful misconduct, as finally determined by a court of competent jurisdiction, each Debtor will indemnify and save Lender harmless from all loss, costs, damage, liability or expenses (including, without limitation, court costs and reasonable attorneys' fees) that Lender may sustain or incur by reason of defending or protecting this security interest or the priority thereof or enforcing the Obligations, or in the prosecution or defense of any action or proceeding concerning any matter growing out of or in connection with this Agreement and/or any other documents now or hereafter executed in connection with this Agreement and/or the Obligations and/or the DIP Collateral. This indemnity shall survive the repayment of the Obligations and the termination of Lender's agreement to make loans available to Borrowers and the termination of this Agreement.

(f) **Taxes**. At the option of Lender, each Borrower will furnish to Lender, from time to time, within five (5) days after the accrual in accordance with applicable law of any Borrower's obligation to make deposits for F.I.C.A. and withholding taxes and/or sales taxes, proof satisfactory to Lender that such deposits or payments have been made as required. Should a Borrower fail to make any of such deposits or furnish such proof then Lender may, in its sole and absolute discretion, (i) make any of such deposits or

12

any part thereof, (ii) pay such taxes, or any part thereof, or (iii) set-up such reserves as Lender, in its judgment, shall deem necessary to satisfy the liability for such taxes.  Each amount so deposited or paid shall constitute an advance under the terms hereof, repayable on demand with interest, as provided herein, and secured by all DIP Collateral and any other property at any time pledged by a Borrower with Lender. Nothing herein shall be deemed to obligate Lender to make any such deposit or payment or set-up such reserve and the making of one or more of such deposits or payments or the setting-up of such reserve shall not constitute (i) an agreement on Lender's part to take any further or similar action, or (ii) a waiver of any default by any Borrower under the terms hereof.

**4.      SECURITY.**

**(a)      Security Interest**.  Subject to the terms and conditions of the Interim Order and the Final Order, to secure the full payment and performance of all of the Obligations, each Debtor, for valuable consideration, receipt whereof is hereby acknowledged, hereby grants to Lender a continuing security interest in and to, and assigns to Lender, all assets of such Debtor, wherever located and whether now owned or hereafter owned, existing, acquired or arising, whether tangible or intangible, wherever now or hereafter located, and whether or not eligible or qualified for lending purposes, including, without limitation, the following: all Pre-Petition Collateral, all accounts, chattel paper, RTO Contracts, documents, software, general intangibles (including without limitation all patents, patent applications, trademarks, trademark applications, trade names, trade secrets, goodwill, copyrights, copyright applications, registrations, licenses, software, franchises, customer lists, tax refund claims (including, without limitation, ERC tax refunds), claims against carriers and shippers, all causes of action, whether pursuant to federal or applicable state law, and the proceeds thereof and property received thereby whether by judgment, settlement, or otherwise, and upon entry of the Final Order, all Avoidance Actions of the Debtors or their Estates; all property and assets of such Debtor and its Estate included in the definition of "DIP Collateral" in the Interim Order, or, after the entry of the Final Order, in the Final Order, guarantee claims, contracts rights, payment intangibles, all security interests, security deposits and rights to indemnification), intellectual property, payment intangibles, instruments, deposit accounts, bank accounts, deposits, money, letters of credit and letter of credit rights, supporting obligations, commercial tort claims, investment property (including, without limitation, any equity interests in its subsidiaries and all economic rights, all control rights, authority and powers and all equity interests in the Boulders Property owned by Ian MacDonald (whether directly or indirectly), inventory, equipment, farm products, health-care-insurance receivables, vehicles, fixtures, books and records, and other goods (as those terms are defined in the Code), any other property of such Debtor now or hereafter in the possession, custody or control of Lender or any agent or any parent, Affiliate or Subsidiary of Lender or any Participant with Lender in the Loans, for any purpose (whether for safekeeping, deposit, collection, custody, pledge, transmission or otherwise), without limitation of any of the foregoing, all of the Pre-Petition Collateral in which any Debtor or its Estate has any right, title, or interest, and all additions, accessions, replacements, substitutions, proceeds and products of all of the foregoing in any form, including, without limitation, all proceeds of credit, fire or other insurance, and also including, without limitation, rents and profits resulting from the temporary use of any of the foregoing (hereinafter called the "**DIP Collateral**").  In addition, (i) all real property, leaseholds, rents and profits, and proceeds thereof, including without limitation Subject RTO Real Property and the Real Property DIP Collateral shall be deemed to be included as part of the DIP Collateral, and (ii) all security interests granted pursuant to the Participation Agreement and the PEC Pledge Agreement shall be deemed to be included as part of shall be deemed to be included as part of the DIP Collateral.

It is the intention of the parties that if Lender shall fail to have a perfected Lien in any particular property or assets of any Debtor for any reason whatsoever, but the provisions of this Agreement and/or of the other Loan Documents, or of the Interim Order and/or the Final Order, together with all financing statements and other public filings relating to Liens filed or recorded by Lender against Debtors, would be sufficient to

13

create a perfected Lien in any property or assets that such Debtor may receive upon the sale, lease, license, exchange, transfer or disposition of such particular property or assets, then all such "proceeds" of such particular property or assets shall be included in the DIP Collateral as original Collateral that is the subject of a direct and original grant of a security interest as provided for herein and in the Loan Documents, and/or in the Interim Order and/or Final Order (and not merely as proceeds (as defined in Article 9 of the Code) in which a security interest is created or arises solely pursuant to Section 9-315 of the Code).

(b)    **Government Contracts**.  If any of a Debtor's accounts arise out of contracts with the United States or any department, agency, or instrumentality thereof, such Debtor will promptly notify Lender thereof in writing and execute any instruments and take any steps reasonably required by Lender in order that all monies due and to become due under such contracts shall be assigned to and enforceable by Lender and notice thereof given to and an acknowledgment given by the applicable contracting officer in accordance with the Federal Assignment of Claims Act.

(c)    **Instruments**.  If any of a Debtor's accounts should be evidenced by promissory notes, trade acceptances, or other instruments for the payment of money, such Debtor will promptly deliver same to Lender, appropriately endorsed to Lender's order and, regardless of the form of such endorsement, such Debtor hereby waives presentment, demand, notice of dishonor, protest and notice of protest and all other notices with respect thereto.

(d)    **Possessory Collateral**.  If any Debtor receives any DIP Collateral and any investment property (as defined in the Code) consisting of certificated securities, such Debtor shall deliver the original thereof to Lender together with an appropriate endorsement or other specific evidence of assignment thereof to Lender (in form and substance reasonably acceptable to Lender).  If an endorsement or assignment of any such items shall not be made for any reason, Lender is hereby irrevocably authorized, as attorney and agent-in-fact (coupled with an interest) for the Debtor, to endorse or assign the same on the Debtor's behalf.

(e)    **Bailee**. If any goods are at any time in the possession of a bailee, Debtors shall promptly notify Lender thereof and, if requested by Lender, shall promptly obtain an acknowledgment from the bailee, in form and substance satisfactory to Lender, that the bailee holds such DIP Collateral for the benefit of the Debtors and Lender and shall act upon the instructions of Lender, without the further consent of any Debtor.  Lender agrees with Debtors that Lender shall not give any such instructions unless an Event of Default has occurred and is continuing or would occur after taking into account any action by a Debtor with respect to the bailee.

(f)    **Letters of Credit**.  If any Debtor is at any time a beneficiary under a letter of credit now or hereafter issued in favor of such Debtor, such Debtor shall promptly notify Lender thereof and, at the request and option of Lender, such Debtor  shall, pursuant to an agreement in form and substance reasonably satisfactory to Lender, either (i) arrange for the issuer and any confirmer of such letter of credit to consent to an assignment to Lender of the proceeds of any drawing under the letter of credit, or (ii) arrange for Lender to become the transferee beneficiary of the letter of credit, with Lender agreeing, in each case, that the proceeds of any drawing under the letter of credit are to be applied in the same manner as any other payment on an account.

(g)    **Commercial Tort Claims**.  If any Debtor  shall at any time hold or acquire a commercial tort claim, such Borrower shall promptly notify Lender in a writing signed by such Debtor of the brief details thereof and grant to Lender in such writing a security interest therein, and in the proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance reasonably satisfactory to Lender.

14

(h)   **Financing Statements**. Each Debtor hereby irrevocably authorizes Lender at any time and from time to time to file in any Uniform Commercial Code jurisdiction any initial financing statements and amendments thereto that (a) indicate the DIP Collateral (i) as all assets of such Debtor or words of similar effect, regardless of whether any particular asset comprised in the DIP Collateral falls within the scope of Article 9 of the Uniform Commercial Code of such jurisdiction, or (ii) as being of an equal or lesser scope or with greater detail, and (b) contain any other information required by the Uniform Commercial Code for the sufficiency or filing office acceptance of any financing statement or amendment, including (i) whether such Debtor is an organization, the type of organization and any organization identification number issued to such Debtor, and (ii) in the case of a financing statement filed as a fixture filing or indicating DIP Collateral as as-extracted DIP Collateral or timber to be cut, a sufficient description of real property to which the DIP Collateral relates. Each Debtor agrees to furnish any such information to Lender promptly upon request. Each Debtor also ratifies its authorization for Lender to have filed in any Uniform Commercial Code jurisdiction any like initial financing statements or amendments thereto if filed prior to the date hereof.

(i)   **Access**. Each Debtor hereby grants to Lender for a term to commence on the date of this Agreement and continuing thereafter until all debts and Obligations (other than inchoate indemnification or reimbursement obligations or other obligations which, by their terms, survive termination of this Agreement) of any kind or character owing from Borrowers to Lender are fully paid and discharged, the right to use all premises or places of business which any Debtor presently has or may hereafter have and where any of the DIP Collateral may be located, at a total rental for the entire period of $1.00. Unless and until an Event of Default has occurred and Lender determines to exercise its rights against the DIP Collateral, and subject to the terms and provisions of the Interim Order (or the Final Order, when entered) Lender agrees not to exercise the rights granted in this **Section 4(i)**.

(j)   **License**. Each Debtor hereby grants to Lender for a term to commence on the date of this Agreement and continuing thereafter until all debts and Obligations (other than inchoate indemnification or reimbursement obligations or other obligations which, by their terms, survive termination of this Agreement) of any kind or character owed to Lender are fully paid and discharged, a non-exclusive irrevocable royalty-free license in connection with Lender's exercise of its rights hereunder, to use, apply or affix any trademark, trade name logo or the like and to use any patents, in which a Debtor now or hereafter has rights, which license may be used by Lender upon and after the occurrence of any one or more of the Events of Default, provided, however, that such use by Lender shall be suspended if such Events of Default are waived. This license shall be in addition to, and not in lieu of, the inclusion of all of Debtors' trademarks, servicemarks, tradenames, logos, goodwill, patents, franchises and licenses in the DIP Collateral; in addition to the right to use said DIP Collateral as provided in this paragraph, Lender shall have full right to exercise any and all of its other rights regarding DIP Collateral with respect to such trademarks, servicemarks, tradenames, logos, goodwill, patents, franchises and licenses.

(k)   **Security Interest in the DIP Collateral**. Subject to the terms and conditions of the Interim Order and the Final Order, to secure the prompt payment and performance to the Post-Petition Lender of the Post-Petition Obligations of whatever kind, nature or description, absolute or contingent, now existing or hereafter arising, Lender shall have and is hereby granted by each Debtor, effective as of the Applicable Petition Date, valid and perfected first priority (subject to the Senior Liens and the Carve-Out), security interests and liens in and upon all pre- and post- petition property of each Debtor, whether existing on the Applicable Petition Date or thereafter acquired including a continuing security interest in and to and Lien on all of its DIP Collateral, whether now owned or existing or hereafter created, acquired or arising and wheresoever located. Each Debtor shall mark its books and records as may be necessary or appropriate to evidence, protect and perfect Lender's security interest and shall cause its financial statements to reflect such security interest. Without limiting the generality of the foregoing, as adequate protection and as

15

consideration to Pre-Petition Lender for its agreement to the terms hereof and as replacement Collateral for the Pre-Petition Collateral used, consumed or sold by the Debtors in the Case, the DIP Collateral shall secure the Pre-Petition Obligations to the extent of the diminution in value of the Pre-Petition Collateral.

**(l)** **ERC Funds**. As security for the Obligations and as adequate protection, immediately upon the entry of the Interim Order, the Obligations (in an amount equal to funds advanced or deemed advanced under the Interim Order) and those Adequate Protection Obligations incurred by Lender exclusively during the period between the entry of the Interim Order and Final Order, are secured by the "ERC Funds" meaning the sum of (i) the initial ERC Funds on hand, estimated at $202,931.58, which amount is net of the portion of the ERC Funds used to pay Debtors professionals a $175,000 retainer before the Buddy Mac Entities, including BMH HR, file chapter 11, plus (ii) the additional ERC Funds received by BMH HR immediately prior to or after the Third Petition Date, in the amount (less commission) of $2,878,514.82. Immediately upon the entry of the Interim Order, Lender shall apply the initial ERC Funds in BMH HR to the Pre-Petition Obligations in accordance with the Settlement Agreement, and BMH HR shall transfer to Lender the remaining ERC Funds, which shall be held by Lender in a segregated, suspense account (the "**Suspense Account**") pending entry of the Final Order. Until entry of the Final Order, the ERC Funds are to be held in the Suspense Account and may not be applied, hypothecated, or charged against by Lender except as specifically and expressly authorized under the Interim Order or by further order of the Bankruptcy Court upon notice to the Debtors and Ian MacDonald. The Suspense Account, in addition to being segregated for the specific purpose of holding the ERC Funds and identified to the Debtors and Ian MacDonald specifically, shall be established by Lender with Wells Fargo Bank, N.A. Lender may, only upon the entry of the Final Order, apply the ERC Funds to the Pre-Petition Obligations or DIP Obligations in its sole and absolute discretion (in an amount equal to funds advanced or deemed advanced hereunder and under the Interim Order). At all times after entry of the Interim Order, the ERC Funds shall secure the DIP Obligations, but only to the extent of funds actually advanced, and the Adequate Protection Obligations, but only as to any diminution occurring during the period covered by the Interim Order.

**5.** **COLLECTIONS; SET OFF; DEPOSIT ACCOUNTS; NOTICE OF ASSIGNMENT; POWER OF ATTORNEY; LENDER REPORTS.**

**(a)** **Collections**. Borrowers will immediately, upon receipt of all checks, drafts, cash and other remittances in payment of any inventory sold or in payment or on account of Borrowers' accounts, contracts, contract rights, notes, bills, drafts, acceptances, general intangibles, choses in action and all other forms of obligations, deposit to the Collection Account accompanied by a remittance report in form reasonably specified by Lender. Borrowers may deliver said proceeds to Lender in the same form received except for the endorsement of a Borrower where necessary to permit collection of items, which endorsement Borrowers agree to make.

**(b)** **Application and Collection Days**.

**(i)** Lender will credit (conditional upon final collection and receipt of the remittance report and identification by the Debtors of such collections) all payments against the Obligations; provided, however, for the purpose of computing interest, any items or payments received by Lender shall not be considered to have been credited against any loans secured hereby until three (3) Business Days after receipt by Lender of any such items. The order and method of such application to the Obligations shall be in the sole discretion of Lender and any portion of such funds which Lender elects not to so apply shall be paid over from time to time by Lender to Borrowers.

**(ii)** All repayments received by Lender hereunder shall be applied to either the Pre-Petition Revolver Obligations or the Post-Petition Obligations as Lender may determine in its sole

16

and absolute discretion, so long as such application is in accordance with the authorizations set forth in the Interim Order and (once entered) the Final Order; provided that, amounts charged to the Borrowers' Account by Lender in connection with the coming due of any specific Obligations as provided for in **Section 3(b)** shall be applied by Lender to the payment of such particular Obligation. Following the occurrence and during the continuance of any Event of Default, all repayments received by Lender hereunder shall be applied to either the Pre-Petition Revolver Obligations or the Post-Petition Obligations as Lender may determine in its sole and absolute discretion, so long as such application is in accordance with the authorizations set forth in the Interim Order and (once entered) the Final Order, until the Post-Petition Obligations and the Pre-Petition Revolver Obligations are paid in full and thereafter to such Person as may be legally entitled thereto, provided that, unless Lender shall at any time elect otherwise in its sole and absolute discretion, repayments applied to the Post-Petition Obligations shall be applied, first, to pay the interest and/or principal of all protective advances made pursuant to **Section 1(a)** and/or any other Post-Petition Obligations then owing to Lender and due and payable, all until paid in full, second, to pay the interest and/or principal of all Term Loans and/or any other Obligations then owing to Lender and due and payable, all until paid in full, and, thereafter, to such Person as may be legally entitled thereto.

(iii)    For purposes of **Section 5(b)(ii)** and without limiting the otherwise generally applicable provisions of **Section 13(j)**, "paid in full" of a type of Obligation means indefeasible payment in cash or immediately available funds of all amounts owing on account of such type of Obligation, including interest accrued after the commencement (or any conversion to Chapter 7) of the Case, default interest, interest on interest, and expense reimbursements, irrespective of whether any of the foregoing would be or is allowed or disallowed in whole or in part in any insolvency proceeding.

(c)    Set Off. Each Borrower hereby grants to Lender a lien, security interest and right of setoff as security for all liabilities and Obligations to Lender, whether now existing or hereafter arising, upon and against all deposits, credits, collateral and property, now or hereafter in the possession, custody, safekeeping or control of Lender. At any time, with reasonable prior written notice (which such prior notice, subject to the terms and provisions of the Interim Order (or the Final Order, when entered), is not required to the extent an Event of Default shall have occurred and be continuing), Lender may set off the same or any part thereof and apply the same to any liability or Obligation of a Borrower and any guarantor regardless of the adequacy of any other collateral securing the Obligations. ANY AND ALL RIGHTS TO REQUIRE LENDER TO EXERCISE ITS RIGHTS OR REMEDIES WITH RESPECT TO ANY OTHER DIP COLLATERAL WHICH SECURES THE OBLIGATIONS, PRIOR TO EXERCISING ITS RIGHT OF SETOFF WITH RESPECT TO SUCH DEPOSITS, CREDITS OR OTHER PROPERTY OF A BORROWER OR ANY GUARANTOR, ARE HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVED.

(d)    Deposit Accounts. Each Debtor shall maintain all of its bank accounts, including without limitation, its operating and depository accounts, as described on **Schedule B** (the "**Bank Schedule**") during the Term. Upon fulfillment of the applicable conditions set forth in this Agreement and Lender's determination to make a loan to Borrowers, Lender shall disburse the proceeds of the requested loan by crediting the same to an operating account of a Borrower designated by the Borrowers to receive proceeds of loan advances on the Bank Schedule (the "**Designated Account**"). Each Borrower hereby agrees to maintain the accounts as set forth on the Bank Schedule except for changes consented to in advance by Lender, which any such consent by Lender may be conditioned, among other things, upon receipt of an updated Bank Schedule. Upon the request of Lender, each Borrower shall, and shall cause the respective bank to, enter into and thereafter maintain a control or blocked account agreement with respect to the

17

accounts of such Borrower set forth on the Bank Schedule, such agreement to be in form and substance satisfactory to Lender; provided, that, the provisions of this **Section 5(d)** shall not apply to deposit accounts specially and exclusively used for payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of Borrowers' salaried employees (so long as each such account does not contain amounts in excess of amounts necessary to pay such payroll and related expenses).

(e)    **Account Verification**.  Lender may in its own name or in the name of others communicate with account debtors in order to verify with them to Lender's reasonable satisfaction the existence, amount and terms of any accounts.  Upon request by Lender, Debtors shall provide Lender with a full and complete list of account debtors including contact information with respect to each account debtor and a copy of each RTO Contract.

(f)    **Notice of Assignment**.  Upon request of Lender at any time during the continuance of an Event of Default and subject to the terms and provisions of the Interim Order (or the Final Order, when entered), each Debtor will so notify such account debtors and will indicate on all billings to such account debtors that their accounts must be paid to Lender.  Lender shall have full power to collect, compromise, endorse, sell or otherwise deal with the DIP Collateral or proceeds thereof in its own name or in the name of a Debtor.

(g)    **Power of Attorney**.  Without any further order of the Bankruptcy Court (but subject to the Interim Order (or the Final Order, when entered)), each Debtor hereby grants to Lender an irrevocable power of attorney, coupled with an interest, authorizing and permitting Lender (acting through any of its officers, employees, attorneys or agents), at Lender's option, but without obligation, with or without notice to any Debtor, and at Debtor's expense, to do any or all of the following, in Debtor's name or otherwise:

(i)    execute on behalf of any Debtor any documents that Lender may, in its sole discretion, deem advisable in order to perfect, protect and maintain Lender's security interests, and priority thereof, in the DIP Collateral (including such financing statements and continuation financing statements, and amendments or other modifications thereto, as Lender shall deem necessary or appropriate); and

(ii)    after the occurrence and during the continuance of an Event of Default following entry of the Interim Order; (I) to endorse the name of such Debtor or any of such Debtor's officers or agents upon any notes, checks, drafts, money orders, or other instruments of payment or remittances (including payments payable under any policy of insurance on the DIP Collateral) or DIP Collateral that may come into possession of Lender in full or part payment of any amounts owing to Lender; (II) to sign and endorse the name of such Debtor or any of such Debtor's officers or agents upon any invoice, freight or express bill, bill of lading, storage or warehouse receipts, drafts against Debtors, assignments, verifications and notices (provided that collection notifications shall be subject to **Section 5(f)**) in connection with accounts, and any instrument or documents relating thereto or to such Debtor's rights therein, (III) receive and otherwise take control in any manner of any cash or non-cash items of payment or proceeds of DIP Collateral; (IV) endorse or assign to Lender on Debtor's behalf any portion of DIP Collateral evidenced by an agreement, Instrument or document if an endorsement or assignment of any such items is not made by such Debtor pursuant to **Section 5(a)**; (V) notify account debtors that DIP Collateral has been assigned to Lender and that payments shall be made directly to Lender, (VI) to give written notice to such office and officials of the United States Post Office to effect such change or changes of address so that all mail addressed to such Debtor may be delivered directly to Lender, (VII) instruct any third party having custody or control of any DIP Collateral or books or records belonging to, or relating to, any Debtor to give Lender the same rights of access and other rights with respect thereto as

18

Lender has under this Agreement or any other Loan Document; (VIII) execute on behalf of any Debtor any document exercising, transferring or assigning any option to purchase, sell or otherwise dispose of or lease (as lessor or lessee) any real or personal property which is part of the DIP Collateral or in which Lender has an interest; (IX) execute on behalf of any Debtor any invoices relating to any accounts, any draft against any account debtor, any proof of claim in bankruptcy, any notice of Lien or claim, and any assignment or satisfaction of mechanic's, materialman's or other Lien; (X) execute on behalf of any Debtor any notice to any account debtor; (XI) pay, contest or settle any Lien, charge, encumbrance, security interest and adverse claim in or to any of the DIP Collateral, or any judgment based thereon, or otherwise take any action to terminate or discharge the same; (XII) grant extensions of time to pay, compromise claims relating to, and settle accounts, chattel paper and general intangibles for less than face value and execute all releases and other documents in connection therewith; (XIII) settle and adjust, and give releases of, any insurance claim that relates to any of the DIP Collateral and obtain payment therefor; and (XIV) vote any right or interest with respect to any investment property.

This power of attorney shall be irrevocable as long as a Debtor may be indebted to Lender and does hereby grant upon such Debtor's said attorney full power to do any and all things necessary to be done in and about the premises as fully and effectually as such Debtor might or could do, and hereby ratifying all that said attorney shall lawfully do or cause to be done by virtue hereof. Neither Lender nor the attorney shall be liable for any acts or omissions nor for any error of judgment or mistake, except for their gross negligence or willful misconduct.

(h)    **Viewing Rights**.  Lender shall be provided and thereafter have viewing rights with respect to any bank account maintained by any Debtor.

(i)    **Lender Reports**. After the end of each month, Lender will render to Borrowers a statement of Borrowers' loan account with Lender hereunder, showing all applicable credits and debits, which Lender may distribute by electronic mail, or other electronic means.  Each statement shall be considered correct and to have been accepted by Borrowers and shall be conclusively binding upon Borrowers in respect of all charges, debits and credits of whatsoever nature contained therein under or pursuant to this Agreement, and the closing balance shown therein, unless a Borrower notifies Lender in writing of any discrepancy within twenty (20) days from the delivery by Lender to Borrowers of any such monthly statement.

## 6.    REPRESENTATIONS AND WARRANTIES.

Any request for a loan hereunder will be deemed a representation by the Debtors that all representations and warranties in this **Section 6** are true, correct and complete in all material respects as of the time of the request, unless they relate exclusively to an earlier date in which case they shall be true and correct in all material respects as of such earlier date, and unless they are qualified by materiality in which case they shall be true and correct in all respects.  Each Debtor represents and warrants that:

(a)    **Places of Business; Principal Executive Office; Inventory Locations.**

(i)    Such Debtor has no places of business other than the places of business listed on **Schedule A**, as such **Schedule A** may be updated in accordance with this **Section 6(a)**;

(ii)    Such Debtor's principal executive office and the office where such Debtor keeps its records concerning its accounts, contract rights and other property, is that shown on **Schedule A**;

19

      **(iii)**     All inventory presently owned by a Debtor is stored at the locations set forth on **Schedule A**, as updated in accordance with this **Section 6**; and

      **(iv)**     Each Debtor will notify Lender promptly, and in no event later than thirty (30) days after any such change, in writing, and provide an updated **Schedule A** reflecting the same, of any change in the location of any place of business or the location at which inventory or equipment is stored or the establishment of any new place of business or location at which inventory or equipment is stored or office where its records are kept which would be shown in this Agreement if it were executed after such change.

      **(b)**     **Existence; Qualification**. Each Debtor is a corporation, partnership or limited liability company, as applicable, duly organized or formed, validly existing and in good standing under the laws of their respective States of organization or formation, as applicable as reflected in the preamble of this Agreement and shall hereafter remain in good standing as a corporation or limited liability company, as applicable, in such jurisdiction. Each Debtor is duly qualified and in good standing in every other state in which it is doing business, and shall hereafter remain duly qualified and in good standing in every other state in which the failure to qualify or become licensed could have a material adverse effect on the financial condition, business or operations of a Debtor or the value of any DIP Collateral. The Certificate of Formation/Articles of Incorporation and all amendments thereto of each Debtor have been duly filed and are in proper order.

      **(c)**     **Name; Organizational Identification Number**. Each Debtor's exact legal name is as set forth in this Agreement. The organizational identification number of each Debtor is as set forth on **Schedule A** annexed hereto.

      **(d)**     **Authority; Conflict**. The execution, delivery and performance of this Agreement, and any other document executed in connection herewith, are, subject to the entry of the Interim Order (or the Final Order, when entered) and subject to any restrictions arising on account of the Debtors' status as "debtors" under the Bankruptcy Code, within each Debtor's corporate or company powers, have been duly authorized, are not in contravention of law or the terms of such Debtor's charter, by-laws, operating agreement, or other incorporation or company papers, or of any indenture, agreement or undertaking to which a Debtor is a party or by which it or any of its properties may be bound. Subject to the entry of the Interim Order (or the Final Order, when entered), this Agreement constitutes, and each of the other Loan Documents upon execution and delivery will constitute, the legal, valid and binding obligation of the Borrowers, enforceable against it in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally, by general equitable principles or by principles of good faith and fair dealing (regardless of whether enforcement is sought in equity or at law).

      **(e)**     **Capitalization**. All capital stock, membership interests or other equity interests issued by each Debtor and outstanding were and are properly issued and all books and records of the applicable Debtor, including but not limited to its minute books, by-laws, operating agreements and books of account, are accurate and up to date and will be so maintained.

      **(f)**     **Title; Liens**. Each Debtor owns all of the assets reflected in the most recent of such Debtor's financial statements provided to Lender, except assets sold or otherwise disposed of in the ordinary course of business since the date thereof, and such assets together with any assets acquired since such date, including without limitation the DIP Collateral, are free and clear of any lien, pledge, security interest, charge, adverse right or claim or trust (statutory or otherwise), mortgage or encumbrance of any nature whatsoever, except for Permitted Liens. The Real Property owned by each Debtor and each subsidiary

20

thereof is as set forth on **Schedule A** annexed hereto.  Each Debtor's leases of personal property are as set forth on **Schedule C** annexed hereto.  Each Debtor is in full compliance with all of the terms of each of its respective capital, operating and real property leases, except where the failure to so comply could not reasonably be expected to have a material adverse effect.

(g)      **Taxes**.  Each Debtor has made or filed all tax returns, reports and declarations relating to any material tax liability required by any jurisdiction to which it is subject (any tax liability which may result in a Lien on any DIP Collateral being hereby deemed material);, subject to any prohibition under the Bankruptcy Code with respect to pre-petition claims, but otherwise in accordance with applicable law and if, as, and to the extent contemplated and provided for and permitted in the DIP Budget (subject to Permitted Variances, has paid all taxes shown or determined to be due thereon except those being contested in good faith and which a Debtor has, prior to the date of such contest, identified in writing to Lender as being contested; and has made adequate provision for the payment of all taxes so contested, so that no Lien resulting from unpaid Taxes will encumber any DIP Collateral.

(h)      **Compliance**.  Each Debtor (i) is subject to no charter, corporate or other legal restriction, or any judgment, award, decree, order, governmental rule or regulation or contractual restriction which would reasonably be expected to have a material adverse effect on its financial condition, business or operations, and (ii) is in compliance with its charter documents, by-laws or operating agreement, all material contractual requirements by which it or any of its properties may be bound and all applicable laws, rules and regulations (including without limitation those relating to environmental protection) other than laws, rules or regulations the validity or applicability of which it is contesting in good faith or provisions of any of the foregoing the failure to comply with which cannot reasonably be expected to materially adversely affect its financial condition, business or operations or the value of any DIP Collateral.

(i)      **Litigation**.  Except for the Case, there is no action, suit, proceeding, or to any Debtor's knowledge, investigation pending or, threatened against or affecting it or any of its assets before or by any court or other governmental authority which, if determined adversely to it, would have a material adverse effect on its financial condition, business or operations or the value of any DIP Collateral.

(j)      **ERISA**.  Each Debtor is in compliance with ERISA in all material respects; no Reportable Event has occurred and is continuing with respect to any Plan; and no Debtor has an unfunded vested liability under any Plan.  The word "**Plan**" as used in this Agreement means "employee benefit plan" (as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974 ("**ERISA**")) as to which any Debtor or any ERISA Affiliate (a) is (currently or hereafter), or at any time during the immediately preceding six (6) years has, sponsored, maintained or contributed to on behalf of any of its employees or (b) has (currently or hereafter), or has had at any time within the preceding six (6) years, any liability (contingent or otherwise).

(k)      **OFAC; Sanctions; Anti-Corruption Laws; Anti-Money Laundering Laws; Anti-Terrorism Laws**.

(i)      No Debtor nor any of its Subsidiaries is in violation of any Sanctions.  No Debtor nor any of its Subsidiaries nor, to the knowledge of such Debtor, any director, officer, employee, agent or Affiliate of such Debtor or such Subsidiary (a) is a Sanctioned Person or a Sanctioned Entity, (b) has any assets located in Sanctioned Entities, or (c) derives revenues from investments in, or transactions with Sanctioned Persons or Sanctioned Entities.  Each of the Debtors and its Subsidiaries has implemented and maintains in effect policies and procedures reasonably designed to ensure compliance with Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws.  Each of the Debtors and its Subsidiaries, and to the knowledge of each such Debtor, each director,

21

officer, employee, agent and Affiliate of each such Debtor and each such Subsidiary, is in compliance with all Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws. No proceeds of any loan made hereunder will be used to fund any operations in, finance any investments or activities in, or make any payments to, a Sanctioned Person or a Sanctioned Entity, or otherwise used in any manner that would result in a violation of any Sanction, Anti-Corruption Law or Anti-Money Laundering Law by any Person (including Lender or other individual or entity participating in any transaction).

       **(ii)**     To the extent applicable, each Debtor and each of its Subsidiaries are in compliance with applicable Anti-Terrorism Laws.

    **(l)**    **Debt**. Except for the Debt to Lender to be outstanding following the date hereof, the Debt of the Debtors that will be outstanding immediately following the Applicable Petition Date has been disclosed in writing to Lender and shall be further disclosed in writing from time to time thereafter.

    **(m)**    **Intellectual Property**. For purposes of this Agreement, "**Intellectual Property Rights**" **means** all actual or prospective rights and goodwill associated therewith arising in connection with any intellectual property or other proprietary rights, including all rights arising in connection with copyrights, patents, industrial designs, service marks, trade dress, trade secrets, trademarks, trade names or mask works.

       **(i)**     Set forth on **Schedule F** annexed hereto is a complete list of all patents, industrial designs, applications for patents, trademarks, applications to register trademarks, service marks, applications to register service marks, mask works, trade dress and copyrights for which each Debtor is the owner of record (the "**Owned Intellectual Property**").

       **(ii)**     Except as set forth on **Schedule F** annexed hereto and other than (in the case of each of the following) as a result of the Case and subject to any necessary order or authorization of the Bankruptcy Court, (A) the Debtors own the Owned Intellectual Property free and clear of all restrictions (including covenants not to sue any Person), court orders, injunctions, decrees, writs or Liens (other than Permitted Liens), whether by agreement memorialized in a record authenticated by a Borrower or otherwise, (B) no Person other than the Debtors owns or has been granted any right in the Owned Intellectual Property (other than rights that have been subordinated or disclosed to Lender in writing, in each case, on terms acceptable to Lender in its reasonable discretion), (C) all Owned Intellectual Property is valid, subsisting and enforceable, and (D) the Debtors have taken all commercially reasonable action necessary to maintain and protect the Owned Intellectual Property.

       **(iii)**    Set forth on **Schedule F** annexed hereto is a complete list of all agreements under which a Debtor has licensed Intellectual Property Rights from another Person ("**Licensed Intellectual Property**") other than readily available, non-negotiated licenses of computer software and other intellectual property used solely for performing accounting, word processing and similar administrative tasks ("**Off-the-shelf Software**") and a summary of any ongoing payments any Debtor is obligated to make with respect thereto. Except as set forth on **Schedule F** annexed hereto, other than (in the case of each of the following) as a result of the Case and subject to any necessary order or authorization of the Bankruptcy Court, the Debtors' licenses to use the Licensed Intellectual Property, copies of which have been given to Lender, are free and clear of all restrictions, Liens, court orders, injunctions, decrees, or writs. Except as disclosed in **Schedule F** annexed hereto, no Debtor is contractually obligated to make royalty payments of a material nature, or pay fees to any owner of, licensor of, or other claimant to, any Intellectual Property Rights.

22

(iv)     Except for Off-the-shelf Software and as disclosed on **Schedule F** annexed hereto, the Owned Intellectual Property and the Licensed Intellectual Property constitute all Intellectual Property Rights used or necessary to conduct each Borrower's business as it is presently conducted.

(v)     Except as disclosed on **Schedule F** annexed hereto, no Debtor has knowledge of, and has not received notice either orally or in writing alleging, any infringement of another Person's Intellectual Property Rights (including any claim set forth in writing that a Debtor must license or refrain from using the Intellectual Property Rights of any Person) nor, to any Debtor's knowledge, is there any threatened claim or any reasonable basis for any such claim.

(n)     [**Reserved**].

(o)     **Environmental Condition**.  (i) To each Debtor's knowledge, no Debtor's nor any of its Subsidiaries' properties or assets has ever been used by a Debtor, its Subsidiaries, or by previous owners or operators in the disposal of, or to produce, store, handle, treat, release, or transport, any Hazardous Substances, where such disposal, production, storage, handling, treatment, release or transport was in violation, in any material respect, of any applicable Environmental Law, (ii) to each Debtor's knowledge, no Debtor's nor any of its Subsidiaries' properties or assets has ever been designated or identified in any manner pursuant to any environmental protection statute as a Hazardous Substances disposal site, (iii) no Debtor nor any of its Subsidiaries has received notice that a Lien arising under any Environmental Law has attached to any revenues or to any real property and improvements owned or operated by a Debtor or its Subsidiaries, and (iv) no Debtor nor any of its Subsidiaries nor any of their respective facilities or operations is subject to any outstanding written order, consent decree, or settlement agreement with any Person relating to any Environmental Law or environmental related liabilities that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.

(p)     **Affiliates of Borrower**.  No Affiliate of any Borrower (excluding foreign Affiliates) is currently engaged in any business activities competitive to the business activities or prospects of such Borrower as currently conducted or contemplated, or otherwise is engaged in activities similar to the business of such Borrower as currently conducted or contemplated.

(q)     **DIP Budget**.  The DIP Budget was prepared in good faith by the Debtors in consultation with Lender and its advisors and is based upon assumptions which, as of the date of delivery thereof, the Debtors believe provide a reasonable basis for the projections contained therein and reflect the Debtors' reasonable judgment based on present circumstances of the most likely set of conditions and course of action for the projected period (it being recognized that such projections are not to be viewed as facts and are subject to significant uncertainties and contingencies many of which are beyond the control of the Debtors, that no assurance can be given that any particular financial projections will be realized, that actual results may differ from projected results and that such differences may be material).

(r)     **Submissions to Lender**.  All financial and other information submitted to Lender by or on behalf of the Debtors, including without limitation submissions and advance requests made through Lender's electronic client portal, was true and correct in all material respects when submitted or requested and, as to projections, valuations or proforma financial statements, present a good faith opinion as to such projections, valuations and proforma condition and results.

(s)     **Accounts**.

(i)     [Reserved].

23

(ii)    With respect to all Accounts, all such Accounts are genuine and in all respects what they purport to be, arise out of a completed, bona fide and unconditional and non-contingent sale and delivery of goods or rendition of services by the applicable Debtor in the ordinary course of its business and in accordance with the terms and conditions of all purchase orders, contracts or other documents relating thereto, each Account Debtor thereunder had the capacity to contract at the time any contract or other document giving rise to such Accounts were executed, and the transactions giving rise to such Accounts comply with all applicable laws and governmental rules and regulations.

(t)    **Equipment.**  The Equipment of each Debtor is in good operating condition and repair, and all necessary replacements of and repairs thereto were or are in the processes of being made so that the operating efficiency thereof shall be maintained and preserved within reasonable time frames, reasonable wear and tear excepted.

7.    **AFFIRMATIVE COVENANTS.**

(a)    **Insurance**. Each Debtor agrees to keep all the DIP Collateral insured with coverage and in amounts not less than that usually carried by one engaged in a like business and in any event not less than that reasonably required by Lender (with loss payable to Lender (including as a Lender loss payee as to any and all property coverages) and Borrowers, as their interests may appear, hereby appointing Lender as attorney for Borrowers in obtaining, adjusting, settling and canceling such insurance and endorsing any drafts.  As further assurance for the payment and performance of the Obligations, each Debtor hereby assigns to Lender all sums, including returns of unearned premiums, which may become payable under any policy of insurance on the DIP Collateral and each Borrower hereby directs each insurance company issuing any such policy to make payment of such sums directly to Lender.  Without limiting the generality of the foregoing, to the extent any Borrower maintains any credit insurance policies in respect of any accounts or account debtors, then such Borrower shall cause such policies to be collaterally assigned to Lender, as security for the Obligations, pursuant to assignments in form and substance reasonably satisfactory to Lender.

(b)    **Books and Records**.  Each Debtor will at all times keep accurate and complete records of such Debtor's inventory, accounts and other DIP Collateral.

(c)    **Field Examinations.** Lender, or any of its agents, shall have the right to call at Borrowers' or any other Debtors' place or places of business at intervals to be determined by Lender, following reasonable prior written notice (which such prior notice is not required to the extent an Event of Default shall have occurred and be continuing), and without hindrance or delay, to inspect, audit, check, and make extracts from any copies of the books, records, journals, orders, receipts, correspondence which relate to Borrowers' accounts, and other DIP Collateral or other transactions, between the parties thereto and the general financial condition of Borrowers and the other Debtors and Lender may remove any of such records temporarily for the purpose of having copies made thereof; provided, however, that unless an Event of Default shall have occurred and be continuing, Lender shall not conduct more than four (4) such inspections or audits in any twelve (12) month period.

(d)    **Existence and Good Standing**.  Each Debtor will maintain its corporate/company existence in good standing and comply in all material respects with all laws and regulations of the United States or of any state or states thereof or of any political subdivision thereof, or of any governmental authority which may be applicable to it or to its business.

24

    **(e)**    **Taxes**. Each Borrower and each Debtor will pay, at such times and in such manner as to prevent any penalty from accruing or any Lien arising (other than Permitted Liens) or charge from attaching to its property, all real and personal property taxes, assessments and charges and all franchises, income, unemployment, old age benefits, withholding, sales, goods and services, harmonized sales and other taxes assessed (i) against it or upon the DIP Collateral, or (ii) for its use or operation (unless a Borrower is challenging such tax or assessment pursuant to a Permitted Protest pursuant to **Section 9(b)** hereof), or (iii) upon this Agreement, or upon any note or notes evidencing the Obligations, and will, at the request of Lender, promptly furnish Lender the receipted bills therefor. At its option, to the extent that a default or an Event of Default shall have occurred and be continuing, Lender may discharge taxes, liens or security interests or other encumbrances at any time levied or placed on the DIP Collateral, may pay for insurance on the DIP Collateral and may pay for the maintenance and preservation of the DIP Collateral. Each Debtor agrees to reimburse Lender on demand for any payments made, or any expenses incurred by Lender pursuant to the foregoing authorization, and upon failure of any Debtor so to reimburse Lender, any such sums paid or advanced by Lender shall be deemed secured by the DIP Collateral and constitute part of the Obligations.

    **(f)**    **Hazardous Substances**. Each Debtor will immediately notify Lender upon receipt of notification of any potential or known material release or threat of material release of any Hazardous Substances in violation of any Environmental Law.

    **(g)**    **OFAC; Sanctions; Anti-Corruption Laws; Anti-Money Laundering Laws; Anti-Terrorism Laws.**

    **(i)**    Each Debtor will, and will cause each of its Subsidiaries to, comply with all applicable Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws. Each of the Debtors and its Subsidiaries shall implement and maintain in effect policies and procedures reasonably designed to ensure compliance by the Debtors and their Subsidiaries and their respective directors, officers, employees, agents and Affiliates with Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws.

    **(ii)**    Each Debtor will, and will cause each of its Subsidiaries to, to the extent the same are applicable to such Person, comply with any Anti-Terrorism Laws.

    **(h)**    **Use of Proceeds**. Borrowers shall use or direct the use of proceeds of the Term Loans made by Lender hereunder and the Cash Collateral, in accordance with the terms of the Final Order, or, prior to the entry of the Final Order, the Interim Order and the Loan Documents, and as limited by the Approved Budget, for, inter alia: (a) the purchase of inventory by Lender on behalf of the Debtors (for the avoidance of doubt, pursuant to the Approved Budget, the interim draw of $750,000 shall be used on account of inventory purchases), (b) general operating, corporate, and working capital purposes of the Debtors in the ordinary course of business, exclusive of the inventory purchases by Lender; (c) reasonable and documented costs, fees, and other expenses of Lender; (d) Adequate Protection Payments; (e) approved fees and expenses of the Debtors' and Committees' professionals; and (f) upon entry of the Final Order, the Roll-Up Amount shall be used for the Roll-Up, which amount shall include any post-petition advance that has been made by Lender to the Debtors since the First Petition Date, and will be made by the Lender to the Debtors under this Agreement following the entry of the Interim Order, in each case under the foregoing clauses (a) through (f): (i) to the extent such use of proceeds is not otherwise prohibited under the terms of this Agreement (including that no part of the proceeds of the loans made to Debtors will be used to purchase or carry any such Margin Stock or to extend credit to others for the purpose of purchasing or carrying any such Margin Stock or for any purpose that violates the provisions of Regulation T, U or X of the Board of Governors) and (ii) if, as, and to the extent contemplated and provided for and permitted in the DIP Budget

25

(subject to Permitted Variances). No part of the proceeds of any loan will be used, directly or indirectly, in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws, Anti-Money Laundering Laws or Anti-Terrorism Laws.

Notwithstanding anything herein to the contrary, Debtors hereby authorize Lender to purchase inventory on behalf of the Debtors and to buy inventory that the Debtors have identified as being needed for each store, and at the prices that the Debtors have negotiated, and by virtue of the inventory purchase which shall be deemed Loans pursuant to **Section 1** hereof, Lender shall not be deemed to be in control of the Debtors.

(i)     **Material Contracts**. Each Borrower will at all times pay rent on or before the due date thereof under its leases that are Material Contracts.

(j)     **Additional Assurances**.  Each Debtor will, at its expense, upon request of Lender promptly and duly take, execute, acknowledge and deliver (and/or cause such other applicable Person to take, execute, acknowledge and deliver) all such further acts, documents, agreements and instruments as may from time to time be necessary or desirable or as Lender may from time to time reasonably require in order to (i) correct any defect, error or omission which may at any time be discovered, (ii) carry out the intent and purposes of the Loan Documents and the transactions contemplated thereby, (iii) establish, create, preserve, protect and perfect a first priority lien (subject only to Permitted Liens) in favor of Lender in all real and personal property (wherever located) from time to time owned by the Debtor and in all capital stock and other equity from time to time owned by any Debtor, (iv) cause each subsidiary of a Debtor to guarantee all of the Obligations, all pursuant to documentation that is in form and substance reasonably satisfactory to Lender, and (v) facilitate the collection of the DIP Collateral.  Without limiting the foregoing, each Debtor shall, at its own cost and expense, promptly and duly take, execute, acknowledge and deliver (and/or cause such other applicable Person to take, execute, acknowledge and deliver) to Lender all promissory notes, security agreements, agreements with landlords, mortgagees and processors and other bailees, subordination and intercreditor agreements and other agreements, instruments and documents, in each case in form and substance reasonably acceptable to Lender, as Lender may request from time to time to perfect, protect, and maintain Lender's security interests in the DIP Collateral, including the required priority thereof, and to fully carry out the transactions contemplated by the Loan Documents.

(k)     **Milestones**.  Each Debtor shall comply with all Milestones.

(l)     **Participation Agreement and PEC Pledge Agreement**.  Immediately upon entry of the Final Order or a court order authorizing the Settlement Agreement, as the case may be, to the extent applicable, (i) Ian MacDonald and MacDonald Realty Group LLC shall grant to Lender a participation in their rights in respect of the advances made to, and in respect of their equity in, MRG Boulders (collectively, the "**Subject Boulders Interest**") to accommodate and support the Pre-Petition Obligations, the DIP Obligations, and the Adequate Protection Obligations (each as defined in the Interim Order and the Final Order, as applicable), which grant shall be made and documented by a participation agreement (the "Participation Agreement") and other related documents, agreements, and instruments to be entered into upon entry of the Final DIP Order, all of which shall be in form and substance satisfactory to Lender in its sole discretion; and (ii) William Ian MacDonald shall grant to Lender a lien on, and security interest in, all of his unencumbered limited partner interests (the "**PEC LP Interests**") in P.E.C. Finance Ltd. to accommodate and support the Pre-Petition Obligations, the DIP Obligations, and Adequate Protection Obligations (each as defined in the Interim Order and the Final Order, as applicable), which grant shall be made and documented by a pledge agreement (the "**PEC Pledge Agreement**") and

26

other related documents, agreements, and instruments to be entered into upon entry of the Final DIP Order, all of which shall be in form and substance satisfactory to Lender in its sole discretion.

     **(m)**     **DIP Budgetary Compliance**.  Debtors:

     **(i)**     shall not permit the actual cash disbursements for all Debtors, tested as of the last business day of each week (beginning with the week in which the Applicable Petition Date occurs) for the cumulative period beginning with the week in which the Applicable Petition Date occurs and ending on such testing date, to exceed one hundred ten percent (110%) of the aggregate cash disbursements for all Debtors projected in the DIP Budget for such period (provided, however, that in Lender's reasonable discretion and without court order, approval of, or notice to, any other Persons, Lender may increase such percentage up to one hundred fifteen percent (115%)) of the projected disbursements in the DIP Budget for such period); provided that, notwithstanding anything to the contrary in the foregoing:

     (A)     during any applicable testing period, the Debtors may reallocate the amounts of any disbursements permitted under any one or more particular line item categories of the DIP Budget but not so spent/dispersed by the Debtors under such line item categories to any one or more other line item categories during the same testing period, except that:

     i)     no amounts may be reallocated from any line item category of the DIP Budget that does not cover Non-Allocable Disbursements to any line item categories that do cover Non-Allocable Disbursements and

     ii)     without the prior consent of Lender grated in its sole and absolute discretion, no amounts may be relocated to any "miscellaneous" line item category of the DIP Budget from any other line item categories;

(the ability of the Debtors' to exceed the limitations on cash disbursements during any applicable testing period by up to 10% (or, with the approval of Lender granted in reasonable discretion, 15%) and the limited ability of Debtors to reallocate unspent amounts from one or more line item categories in any applicable testing period to one or more other line item categories in the same testing period, all as and to the extent provided for in this **Section 7(m)**, collectively, the "**Permitted Variances**").

     **(ii)**     shall not permit the actual cash receipts (including without limitation, all collections on Accounts and all other proceeds of DIP Collateral) of all Debtors, tested as of the last business day of each week (beginning with the week in which the Applicable Petition Date occurs) for the cumulative period beginning with the week in which the Applicable Petition Date occurs and ending on such testing date, to be less than ninety (90%) of the aggregate cash receipts for all Debtors projected in the DIP Budget for such period (provided, however, that in Lender's sole and absolute discretion and without court order, approval of, or notice to, any other Persons, Lender may decrease such percentage down to eighty five percent (85%)).

     **(n)**     **Retention of Consultant by Debtors**.  Debtors engaged and retained Mark Shapiro of GlassRatner Capital and Advisory Group LLC (the "**Consultant**") for the purposes of, among other things, finding a buyer to purchase all or substantially all of the assets and properties of the Debtors in the U.S., including the DIP Collateral under Section 363 of the Bankruptcy Code and assisting the Debtors in their

27

chapter 11 Case, including the preparation of the DIP Budget. Subject to the protection of applicable privileges, Debtors hereby (i) authorize any and all of the officers or other representative of Lender (and its employees, officers, partners, and directors), to communicate directly with the Consultant (and such employees, officers, partners, and directors of any such firm of the Consultant) to discuss the affairs, finances, condition, and compliance with the terms of this Agreement and other Loan Documents of each of the Debtors and their Subsidiaries and joint ventures and (ii) authorize the Consultant (and such employees, officers, partners, and directors of any such firm of the Consultant) to engage in such communications directly with Lender (and its employees, officers, partners, and directors), and agree that Debtors shall cause the Consultant to cooperate with Lender (and its employees, officers, partners, and directors), in all such communications and respond to all requests of Lender (and its employees, officers, partners, and directors) and keep Lender fully informed of the progress of the business and operations of Debtors and respond fully to any inquiries of Lender regarding the business and operations of Debtors. Debtors shall not terminate the Consultant without the consent of Lender unless they deem it necessary to the fulfillment of their fiduciary duties to their estate or because conflicts preclude continued engagement. If the Consultant resigns, Debtors shall immediately notify Lender in writing and provide Lender with a copy of any notice of resignation immediately upon the sending of such notice by the Consultant.

**8.** **REPORTING.**

    **(a)** **Financial Reporting**. The Debtors shall deliver or cause to be delivered to Lender, each to be in form, scope and substance satisfactory to Lender:

        **(i)** monthly financial reporting consistent with prepetition Loan Documents by and between Phonix and Debtors; financial reporting required of Debtors by Existing Reporting Orders, or any other order of the Bankruptcy Court, including the Interim Order and Final Order; and other monthly financial reporting reasonably requested by Lender of Borrower, and where applicable and reasonably requested, containing a certification by such chief financial officer as to the statements being accurate and fairly presenting the financial condition of the Debtors and a certification to the effect that such officer has not become aware of any Event of Default that has occurred and is continuing or, if there is any such event, describing it and the steps, if any, being taken in response thereto or to otherwise remediate it.

    **(b)** **DIP Collateral Reporting**. The Debtors shall deliver or cause to be delivered to Lender, each to be in form, scope and substance satisfactory to Lender:

        **(i)** monthly collateral reporting consistent with prepetition Loan Documents by and between Phonix and Debtors; monthly collateral reporting required of Debtors by any Existing Reporting Orders, or any other order of the Bankruptcy Court, including the Interim Order and Final Order; and other monthly collateral reporting reasonably requested by Lender of Borrower;

        **(ii)** within ten (10) days of the close of each month, and to the extent produced in the ordinary course of Borrowers' business: (a) a reconciliation of Borrowers' accounts receivable aging to its general ledger, a reconciliation of Borrowers' unbilled accounts receivable, and Lender's collateral statement of accounts, (b) a reconciliation of accounts payable aging to its general ledger, and (c) in each case a roll forward from the previous report, in form, scope and substance satisfactory to Lender;

28

      (iii)     monthly loan and collateral descriptions, including, without limitation, Borrowers' sales, cash receipts, adjustments, in the form supplied by Lender to Borrowers;

      (iv)     as of the date of this Agreement and within ten (10) days of the close of each month thereafter or more frequently as may be requested by Lender, Borrowers' detailed inventory stock status report and a reconciliation of such stock status report to its general ledger in form, scope and substance satisfactory to Lender;

**(c)**     **DIP Budgetary Reporting.**

      (i)     Beginning on January 28, 2026, and continuing on each Wednesday thereafter, Debtors shall deliver to Lender a certificate of the chief financial officer of the Debtors or their Financial Advisor setting forth (x) a weekly cash flow analysis comparing the prior week's actual cash disbursements and cash receipts for all Debtors to the projected cash disbursements and cash receipts for all Debtors projected for such week in the DIP Budget, in a form and format and with a scope and level of detail acceptable to Lender in its discretion and (y) demonstrating Debtors' compliance with (or failure to comply with) the covenants set forth in **Section 7(m)** hereof.

      (ii)     Debtors may, at any time and from time to time, but no more than twice during the term of this Agreement, deliver to Lender a proposed revised and updated DIP Budget for the period beginning with the week that begins no less than five (5) Business Days after the delivery thereof (or such earlier week as to which Lender shall consent in its sole and absolute discretion ) through the Maturity Date, which shall be in substantially the same form and detail of the Initial DIP Budget, and accompanied by a certificate signed by the chief financial officer of the Debtors to the effect that such DIP Budget has been prepared in good faith by the chief financial officer of the Debtors and based upon assumptions which provide a reasonable basis for the projections contained therein and reflect the Debtors' reasonable judgment based on present circumstances of the most likely set of conditions and course of action for the projected period and that such officer has no reason to question the reasonableness of any material assumptions on which such projections were prepared. Upon receipt of each such proposed updated DIP Budget, Lender shall review the same, and if, following a reasonable opportunity to review and comment thereon, Lender in its sole and absolute discretion shall give its written approval to such proposed updated DIP Budget, it shall become the "DIP Budget" as defined and for all purposes hereunder and under the Interim Order and (upon entry of the Final Order) the Final Order effective as of the first day of the first week covered thereby.

      **(d)**     **Case Reporting**. Debtors will deliver to Lender: (a) substantially contemporaneous with the filing thereof, copies of all pleadings, motions, applications, financial information and other papers and documents filed by the Debtors in the Case, with copies of such papers and documents also provided to or served on Lender's counsel; (b) substantially contemporaneous with the receipt and/or execution thereof, copies of all letters of intent, expressions of interest, and offers to purchase with respect to any of the Collateral; (c) substantially contemporaneously with delivery thereof to the Committee or any other official or unofficial committee in the Case, copies of all material written reports and all term sheets for a Reorganization Plan or any sale under Section 363 of the Bankruptcy Code given by the Debtors to the Committee or any other official or unofficial committee in the Case, with copies of such reports and term sheets also provided to or served on Lender's counsel; and (d) projections, operating plans and other financial information and information, reports or statements regarding the Debtors, their business and the Collateral as Lender may from time to time reasonably request.

29

(e)    <u>**Other Reporting and Notifications**</u>.  The Debtors shall deliver or cause to be delivered to Lender, each to be in form, scope and substance satisfactory to Lender:

(i)    within ten (10) days after any Debtor's receipt, any management letter prepared by the Debtors' independent auditors;

(ii)    contemporaneously with the delivery to shareholders or governmental agencies, copies of all material reports and information delivered to shareholders or filed with governmental agencies or that otherwise pertain to, or affect, the Loan Documents;

(iii)    within ten (10) days following the end of each fiscal month, copies of all bank account statements and reconciliations for all bank accounts maintained by any Debtors and a schedule of all bank accounts of any Debtors;

(iv)    promptly upon Lender's written request, a schedule of Debt of the Debtors outstanding as of such fiscal quarter end;

(v)    as of the date of this Agreement and thereafter upon the request by Lender, a detailed master customer list;

(vi)    promptly upon Lender's written request, such other information about the financial condition and operations of any Borrower or any Guarantor, as Lender may, from time to time, reasonably request;

(vii)    promptly upon becoming aware such change in circumstance, written notification to Lender of any change in circumstance that would affect the accuracy of any representation or warranty in **Section 6** hereof, unless the representation and warranty specifically relates to an earlier date;

(viii)    promptly upon becoming aware such event or circumstance, written notification to Lender of any breach or non-performance of, or any default under (A) any Material Contract or (B) any contractual obligation of any Debtor, or any violation of, or non-compliance with, any applicable law, which, in the case of this clause (B) would reasonably be expected to result, either individually or in the aggregate, in a material adverse effect, and including, in the case of clauses (A) and (B), a description of such breach, non-performance, default, violation or non-compliance and the steps, if any, such Debtor has taken, is taking or proposes to take in respect thereof;

(ix)    promptly upon becoming aware such event or circumstance, written notification to Lender of any cancellation or material change in any insurance maintained by any Debtor;

(x)    promptly upon becoming aware such event or circumstance, written notification to Lender of any "default" or "event of default" under any Debt of a Debtor from Lender other than Lender;

(xi)    promptly of: (A) any material delay in any Debtor's performance of any of its material obligations to any account debtor or the assertion of any claims, offsets, defenses or counterclaims by any account debtor, or any disputes with account debtors, or any settlement, adjustment or compromise thereof, and (B) all material adverse information relating to the financial condition of any account debtor;

30

(xii)    Promptly upon becoming aware of any sale contemplated in accordance with the Milestones; and

(xiii)    promptly upon becoming aware of any Event of Default, or the occurrence or existence of an event which, with the passage of time or the giving of notice or both, would constitute an Event of Default hereunder, notice thereof in writing.

(f)    All information regarding sales, cash receipts, accounts and inventory shall be transmitted to Lender electronically, in acceptable formats (files with extensions *.prn, *.pdf, *.txt, *.xls, *.xlsx, and other electronic readable formats are acceptable; scanned copies are not acceptable), either transmitted to Lender via internet or e-mail.  In the event that Borrowers fail to report such information to Lender electronically, Lender reserves the right, in its sole discretion, to charge Borrowers a monthly fee in an amount necessary to cover the costs of the manual input of such data by Lender.

(g)    For the avoidance of doubt, the foregoing requirements are without limitation of the obligations of the Debtors to provide reporting, notices, or other information or cooperation to Lender set forth in any Existing Reporting Orders, which obligations shall (i) survive entry of the Interim Order or any Final Order and (ii) constitute obligations of the Debtors under this Agreement, the breach of which shall constitute an Event of Default.

9.    **NEGATIVE COVENANTS.**

No Debtor will at any time:

(a)    **Disposition of DIP Collateral**. sell, assign, exchange or otherwise dispose of any of the DIP Collateral, other than (I) inventory consisting of (i) scrap, waste, defective goods and the like; (ii) obsolete goods; (iii) finished goods sold in the ordinary course of business or any interest therein to any individual, partnership, trust or other corporation, provided that such sale in the ordinary course of business shall not include a transfer in total or partial satisfaction of a debt; (II) equipment which is no longer required or obsolete or deemed necessary for the conduct of such Debtor's business, so long as such Debtor receives therefor a sum substantially equal to such equipment's fair value, remits such sum to Lender in accordance with the terms of this Agreement or replaces such equipment with other equipment of similar value which is subject to a first security interest in Lender's favor, (III)  Restricted Payments to the extent expressly permitted hereunder; and (IV) any discount, other compromise or sale for less than the face value of receivables (or notes accepted to evidence same) in order to resolve disputes that occur in the ordinary course of business, provided that the aggregate amount of any such discount or compromise does not exceed ten percent of the face amount of the applicable receivable and the sale price of any such receivable is not less than ninety percent of the face amount of such receivable;

(b)    **Liens**. create, permit to be created or suffer to exist any lien, encumbrance, adverse right or claim or deemed trust, or security interest of any kind ("**Lien**") upon any of the DIP Collateral or any other property of such Debtor, now owned or hereafter acquired, except:

(I) with respect to the DIP Collateral that is not Real Property DIP Collateral:

(i)    landlords', carriers', warehousemen's, mechanics' and other similar liens arising by operation of law in the ordinary course of such Debtor's business;

31

(ii)    Liens arising out of pledge or deposits under worker's compensation, unemployment insurance, old age pension, social security, retirement benefits or other similar legislation;

(iii)    purchase money Liens arising in the ordinary course of business for the purchase of equipment so long as the Debt secured thereby does not exceed the lesser of the cost or fair market value of the property subject thereto, and such Lien extends to no other property, and the amount of the Debt secured thereby does not exceed the amount outstanding prior to the Closing Date at any time;

(iv)    Liens for unpaid taxes that are either (x) not yet due and payable, or (y) are subject of Permitted Protests and to the extent contemplated and provided for and permitted in the DIP Budget (subject to Permitted Variances);

(v)    Liens which are the subject of Permitted Protests and to the extent contemplated and provided for and permitted in the DIP Budget (subject to Permitted Variances);

(vi)    rights of setoff or bankers' liens upon deposits of cash in favor of banks or other depository institutions, solely to the extent incurred in connection with the maintenance of such deposit accounts in the ordinary course of business and to the extent contemplated and provided for and permitted in the DIP Budget (subject to Permitted Variances);

(vii)    the Liens (if any) listed on **Schedule E** annexed hereto or those leases of personal property set forth on **Schedule C** annexed hereto;

(viii)    Liens in favor of Lender and Pre-Petition Lender; and

(II) with respect to the Real Property DIP Collateral, Liens permitted pursuant to the terms of the respective Mortgage applicable to such Real Property DIP Collateral.

The term "**Permitted Protests**" as used herein means the right of a Debtor to protest any Lien (other than a Lien that secures the Obligations), taxes (other than payroll taxes or taxes that are the subject of a federal tax lien) or rental payment, provided that (x) the Debtor has disclosed the related Lien to Lender, (y) any such protest is instituted and diligently prosecuted by such Debtor in good faith, and (z) Lender is reasonably satisfied that, while such protest is pending, there will be no impairment of the enforceability, validity or priority of any of the Liens of Lender in and to the DIP Collateral;

(c)    **Loans**. make any loans or advances to any individual, partnership, trust or other corporation, including without limitation a Debtor's directors, officers and employees;

(d)    **Guarantees**. assume, guaranty, endorse or otherwise become directly or contingently liable in respect of (including without limitation by way of agreement, contingent or otherwise, to purchase, provide funds to or otherwise invest in a Debtor or otherwise to assure a creditor against loss), any Debt (except (i) guarantees by endorsement of instruments for deposit or collection in the ordinary course of business, (ii) guarantees in favor of Lender and Pre-Petition Lender, and (iii) guarantees set forth on **Schedule I** hereof);

(e)    **Debt**. issue evidence of Debt or suffer to exist Debt in addition to Debt to Lender except (i) Debt of a Debtor other than for money borrowed, incurred or arising in the ordinary course of business, (ii) Subordinated Debt and other Debt of a Debtor for money borrowed which is on terms satisfactory to

Lender and has been subordinated on terms and conditions satisfactory to Lender, (iii) Debt relating to Liens permitted under **Section 9(b)(I)(iii)**, (iv) any guarantees of Debt permitted under **Section 9(d)** hereof; (v) any Debt relating to Liens listed on **Schedule E** hereof, and (v) accounts payable incurred in the ordinary course of business (to the extent constituting Debt hereunder);

(f)    **Investments**. (i) use any loan proceeds to purchase or carry any "margin stock" (as defined in Regulation U of the Board of Governors of the Federal Reserve System) or (ii) invest in or purchase any stock, securities, membership interest or other Equity Interests of any individual, partnership, trust, limited liability company or other corporation except readily marketable direct obligations of, or obligations guaranteed by, the United States of America or any agency thereof;

(g)    **Transactions with Affiliates**. enter into any lease or other transaction with any shareholder, officer or Affiliate on terms any less favorable than those which might be obtained at the time from Persons who or which are not such a shareholder, officer or Affiliate, except for (i) payment of dividends, distributions, directors fees, and other similar payments permitted under **Section 9(l)** or **Section 9(q)** hereof, (ii) loans or advances permitted pursuant to **Section 9(c)** hereof, (iii) payment to employees and officers of reasonable compensation and employee benefits in the ordinary course of business, and (iv) the reimbursement of out of pocket costs and expenses for employees, directors, officers and consultants in the ordinary course of business;

(h)    **Subsidiaries.** sell, transfer or otherwise dispose of any stock of any subsidiary of a Debtor;

(i)    **Mergers, Consolidations, Sales, Asset Acquisitions, or Statutory Plan of Division or Liquidation.** (i) merge, amalgamate, or consolidate with or into any corporation; (ii) enter into any joint venture or partnership with any Person; (iii) convey, lease or sell all or any material portion of its property or assets or business to any other Person except as permitted by **Section 9(a)**; (iv) convey, lease or sell any of its assets to any Person for less than the fair market value thereof; (v) acquire (in any transaction analogous in purpose or effect to a consolidation, amalgamation, or merger) all or substantially all of the assets of any Person, or (vi) consummate any statutory plan of division;

(j)    **Change in Legal Status**. (i) change its name, its place of business or, if more than one, chief executive office, or its mailing address or organizational identification number if it has one, or (ii) change its type of organization, jurisdiction of organization or other legal structure. If a Debtor does not have an organizational identification number and later obtains one, such Debtor shall promptly notify Lender of such organizational identification number;

(k)    **Amendments of Certain Agreements; Material Contracts.**

(i)    amend or modify any agreement, instrument or document evidencing or relating to any such subordinated debt, except in accordance with the subordination agreement relative thereto or the subordination provisions thereof; or

(ii)    amend or modify any management or similar agreement in any manner which is materially adverse to the interests of Lender as determined in Lender's reasonable discretion; or

(iii)    amend and modify any Material Contract in any manner which is materially adverse to the interests of Lender as determined in Lender's reasonable discretion.

33

(l)   **Restricted Payments**. make any Restricted Payments other than repayments of Debt referenced in **Section 9(e)(i)** so long as such payments are made in the ordinary course of business and are subject to the Approved Budget.

(m)   **[Reserved];**

(n)   **[Reserved];**

(o)   **Compliance with ERISA**.  (i) maintain, or permit any ERISA Affiliate to maintain, or become obligated to contribute, to any Plan other than those Plans disclosed on **Schedule G**, (ii) engage, or knowingly permit any ERISA Affiliate to engage, in any non-exempt "prohibited transaction", as that term is defined in Section 406 of ERISA and Section 4975 of the IRC, (iii) incur, or permit any ERISA Affiliate to incur, any "accumulated funding deficiency", as that term is defined in Section 302 of ERISA or Section 412 of the IRC, (iv) terminate, or permit any ERISA Affiliate to terminate, any Plan where such event could result in any material liability of any Debtor or any ERISA Affiliate or the imposition of a lien on the property of any Debtor or any ERISA Affiliate pursuant to Section 4068 of ERISA, (v) assume, or permit any ERISA Affiliate to assume any obligation to contribute to any Multiemployer Plan, (vi) incur or permit any ERISA Affiliate to incur, any withdrawal liability to any Multiemployer Plan, (vii) fail promptly to notify Lender of the occurrence of any Termination Event, (viii) fail to comply in any material respect, or permit an ERISA Affiliate to fail to comply in any material respect, with the requirements of ERISA or the IRC or other applicable law in respect of any Plan, (ix) fail to meet, or permit any ERISA Affiliate to fail to meet, all minimum funding requirements under ERISA or the IRC or postpone or delay or allow any ERISA Affiliate to postpone or delay any funding requirement with respect of any Plan.

(p)   **Equipment**.  permit (i) any Equipment to become affixed to any real property leased to any Debtor so that an interest arises therein under the real estate laws of the applicable jurisdiction unless the landlord of such real property has executed a landlord waiver or leasehold mortgage in favor of and in form reasonably acceptable to Lender, or (ii) permit any of the Equipment of any Debtor to become an accession to any personal property other than Equipment that is subject to first priority (except for Permitted Liens) Liens in favor of Lender.

(q)   **[Reserved]**.

(r)   **Bankruptcy Matters**.

(i)   Fail to file with the Bankruptcy Court and deliver to Lender, within forty (40) days after the Applicable Petition Date, all Bankruptcy Schedules of the Debtors.

(ii)   Fail to serve:

(A)   all secured creditors, all judgment creditors (if any) actually known to the Debtors, the twenty (20) largest unsecured creditors, the federal and state taxing authorities, any and all Governmental Bodies holding a claim, any of the Debtors' unions, and any other party claiming an interest in the Collateral in accordance with the Federal Rules of Bankruptcy Procedure with a copy of the Motion and Interim Order as approved by the Bankruptcy Court in accordance with the Federal Rules of Bankruptcy Procedure; and

(B)   all parties from whom the Debtors have received or that the Debtors believe they may have received goods from within twenty (20) days of the filing of the Case, and who have not been paid, a copy of the Interim Order and notice of the hearing

34

on entry of the proposed Final Order in accordance with the Federal Rules of Bankruptcy Procedure.

(C)    a certificate from the Secretary or another authorized officer of each Debtor attesting to the resolutions of such Debtor's board of directors, manager or managing member, ratifying its execution, delivery, and performance of the Loan Documents to which it is a party,  such resolution to be in form and substance reasonably acceptable to Lender.

## 10.    DEFAULT; RIGHTS AND REMEDIES UPON DEFAULT.

(a)    The occurrence of any one or more of the following events listed below (herein, each an "**Event of Default**" and individually and collectively, "**Events of Default**") shall constitute an Event of Default hereunder and shall also constitute a default under all Loan Documents and any other agreements between Lender and any Debtor and instruments and papers given Lender by any Debtor, whether such agreements, instruments, or papers now exist or hereafter arise.

(i)    The failure by a Borrower to pay when due, any principal, interest or fees due under this Agreement or the Term Loan Note.

(ii)    The failure by a Borrower to pay when due any costs, expenses owed to Lender, or other Obligations where such failure is not cured within three (3) days following the date when due.

(iii)    (A) Except as provided in clauses (iii)(B), (iii)(C) and (iii)(D) below, the failure by a Debtor to promptly, punctually and faithfully perform, or observe any term, covenant or agreement on its part to be performed or observed pursuant to any of the provisions of this Agreement, or (B)  the failure by a Borrower to promptly, punctually and faithfully perform, or observe any term, covenant or agreement on its part to be performed or observed pursuant to **Sections 7(d) or 7(f)** hereof and the continuation of such default for seven (7) days following the initial failure, or (C) the failure by a Borrower to promptly, punctually and faithfully perform, or observe any term, covenant or agreement on its part to be performed or observed pursuant to pursuant to **Sections 7(e) or 7(i)** hereof or any other Loan Documents, and the continuation of such default for fifteen (15) days following the initial failure.

(iv)    Any warranty, representation, written report or certification made or delivered to Lender by or on behalf of any Debtor pursuant to or in connection with this Agreement or any other Loan Document or Lender's electronic client portal, was not true or accurate in any material respect (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of the date of issuance, delivery or making or deemed making thereof, including when made and reaffirmed in accordance with **Section 2**.

(v)    The occurrence of any event such that any Post-Petition Debt  of a Debtor from any creditor or lender other than Lender, involving an aggregate amount of $100,000 or more, could be accelerated, notwithstanding that such acceleration has not taken place.

(vi)    The occurrence of any event which would cause a lien creditor, as that term is defined in Section 9-102 of the Code, to take priority over the Liens of Lender in the DIP Collateral.

35

(vii)    Except to the extent in respect of clause (B) the lien and amount owed is subject to a Permitted Protest, a filing against or relating to a Debtor of (A) a federal tax lien in favor of the United States of America or any political subdivision of the United States of America, or (B) a state tax lien in favor of any state of the United States of America or any political subdivision of any such state, and the payment pertaining to such lien is not paid before such payment is delinquent.

(viii)    Any (x) Lien in respect of the DIP Collateral securing the Post-Petition Obligations created or provided for under any Loan Agreement and/or under the Final Order (or, prior to the entry of the Final Order, the Interim Order), (y) any Adequate Protection Lien in respect of the DIP Collateral securing any Adequate Protection Obligations created or provided for under the Final Order (or, prior to the entry of the Final Order, the Interim Order), or (y) any Pre-Petition Liens in respect of the Pre-Petition Collateral created or provided for under any Pre-Petition Loan Documents, in any such case, for any reason ceases to be or is not a valid and perfected Lien having a first priority interest (subject only to Senior Liens and the Carve-Out, and, with respect to the Pre-Petition Liens, the Liens of Lender securing the Post-Petition Obligations created or provided for under any Loan Agreement and/or under the Final Order (or, prior to the entry of the Final Order, the Interim Order) and the Adequate Protection Liens);

(ix)    The occurrence of any event of default under any other Loan Document or other agreement between Lender and a Debtor or instrument or paper given Lender by any Borrower, whether such agreement, instrument, or paper now exists or hereafter arises (notwithstanding that Lender may not have exercised its rights upon default under any such other agreement, instrument or paper).

(x)    Any act by, against, or relating to a Debtor, or its property or assets, which act constitutes the application for, consent to, or sufferance of the appointment of a receiver, trustee, liquidator, monitor or other Person, pursuant to court action or otherwise, over all or any material part of a Debtor's property (which, in the case of any involuntary act, is not discharged, dismissed or stayed within forty five (45) days, so long as during which period the Debtor is diligently seeking the discharge, dismissal or stay of such act and Lender shall be under no obligation to advance any Term Loans).

(xi)    The entry of one or more judgments (other than the Interim Order and the Final Order and any judgment resulting in an allowed general unsecured claim) in excess of $100,000 in the aggregate against a Debtor or its assets, which judgment is not satisfied or appealed from (with execution or similar process stayed) within twenty (20) days of its entry, except to the extent fully covered (other than to the extent of customary deductibles) by insurance pursuant to which the insurer has not denied coverage.

(xii)    The entry of any court order which enjoins, restrains or in any way prevents a Debtor from conducting all or any material part of its business affairs in the ordinary course of business.

(xiii)    The occurrence of any loss, theft, damage or destruction to any material asset(s) of a Debtor, except to the extent fully covered (other than to the extent of customary deductibles) by insurance pursuant to which the insurer has not denied coverage.

(xiv)    Any act by or against, or relating to a Debtor or its assets pursuant to which any creditor of such Debtor seeks to reclaim or repossess or reclaims or repossesses all, or a portion with a value in excess of $100,000, of such Debtor's assets.

(xv)    [Reserved].

(xvi)    This Agreement shall, at any time after its execution and delivery and for any reason, cease (A) to create a valid and perfected first priority Lien in and to the DIP Collateral; or (B) to be in full force and effect or shall be declared null and void, or the validity or enforceability hereof shall be contested by a Debtor or any other Guarantor of Borrowers denies it has any further liability or obligation hereunder.

(xvii)    Any Guarantor shall repudiate, purport to revoke or fail to perform his, her or its obligations under his, her or its guaranty or any other guarantor shall cease to exist.

(xviii)    Any Debtor shall take or participate in any action which would be prohibited under the provisions of any subordination or intercreditor agreement or make any payment on subordinated debt to any Person or entity that was not entitled to receive under the provisions of any such agreement.

(xix)    Any Change of Control shall occur unless subject to the prior written consent of the Lender.

(xx)    The occurrence of an ERISA Termination Event.

(xxi)    [Reserved].

(xxii)    the Bankruptcy Court shall enter any order, that has not been consented to by Lender (i) revoking, reversing, staying, vacating, rescinding, modifying, supplementing or amending (x) the Interim Order, the Final Order (after entry thereof), any Bidding Procedures Order (after entry thereof), any Sale Order (after entry thereof), this Agreement, any other Loan Document, the Pre-Petition Loan Agreement Documents or any other Pre-Petition Loan Document, or (y) any other "first day" orders to the extent such revocation, reversal, stay, vacation, rescission, modification, supplement or amendment is materially adverse to the interests of Lender or the Pre-Petition Lender, (ii) permitting any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to any Debtor equal or superior to the priority of Lender in respect of the Obligations, or there shall arise any such Superpriority Claim, or (iii) granting or permitting the grant of a Lien on the DIP Collateral superior to, or pari passu with, the Liens of Lender on the Pre-Petition Collateral or the DIP Collateral (other than the Senior Liens (as defined in the Interim Order), and the Carve-Out);

(xxiii)    the Bankruptcy Court shall enter any order (i) appointing a Chapter 11 trustee under Section 1104 of the Bankruptcy Code in the Case, (ii) appointing an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code in the Case, (iii) appointing a fiduciary or representative of the estate with decision-making or other management authority over some or all of any Debtor's senior management, (iv) substantively consolidating the estate of any Debtor with the estate of any other Person, (v) dismissing the Case or converting the Case to a Chapter 7 case; or (vi) approving a sale of substantially all of the assets of the Borrowers and/or of the Debtors which order does not provide for Payment in Full of the

37

Pre-Petition Obligations and Post-Petition Obligations upon consummation of such sale and which shall otherwise be reasonable satisfactory to Lender, and in connection with such sale order, Post-Petition Lender and Pre-Petition Lender shall not have received a release (on terms and conditions and in form and substance satisfactory to Lender in its sole discretion) of Post-Petition Lender and Pre-Petition Lender in full from all claims of the Debtors and their estates on or before the entry of such sale order;

(xxiv)   this Agreement, any of the other Loan Documents, the Interim Order or the Final Order for any reason ceases to be in full force and effect or is declared to be null and void by a court of competent jurisdiction, or any of the Debtors shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court) any other Person's motion to, disallow in whole or in part the Post-Petition Lender' claim in respect of the Post-Petition Obligations, or to challenge the validity and enforceability of the Liens in favor of any of Lender or the Pre-Petition Lender securing any part of the Obligations;

(xxv)   any Debtor files a motion with the Bankruptcy Court asserting that any of Lender or Pre-Petition Lender do not have a right to, or supports a motion filed with the Bankruptcy Court that asserts the Lender or Pre-Petition Lender do not have the right to, credit bid for any assets of the Debtors in connection with any sale pursuant to Section 363(k) of the Bankruptcy Code;

(xxvi)   the Bankruptcy Court shall enter any order granting relief from the automatic stay to any creditor holding or asserting a Lien, reclamation claim or other rights on the assets of any Debtor in excess of $[50,000];

(xxvii)   except (i) as permitted by the Interim Order or Final Order (or any other order of the Bankruptcy Court) and if, as, and to the extent contemplated and provided for and permitted in the DIP Budget (subject to Permitted Variances) hereof, or (ii) as otherwise agreed to by Lender in writing, and approved by all necessary Bankruptcy Court orders/approvals, any Debtor shall make any Pre-Petition Payment (including, without limitation, related to any reclamation claims but excluding any Pre-Petition Payment in respect of the Pre-Petition Obligations of the Pre-Petition Lender) following the Closing Date;

(xxviii) any Debtor shall be unable to pay its Post-Petition debts as they mature, shall fail to comply with any order of the Bankruptcy Court in any material respect, or shall fail to make, as and when such payments become due or otherwise; provided however, that the foregoing shall not apply to any debts as to which the Debtors contest in good faith;

(xxix)   [Reserved];

(xxx)   any Debtor shall file a motion in the Case (i) to use Cash Collateral under Section 363(c) of the Bankruptcy Code without Lender's prior written consent except to the extent expressly permitted in the Interim Order or, once entered, the Final Order, (ii) to sell a material portion of the assets of any Debtor without Lender's prior written consent, (iii) to recover from any portions of the DIP Collateral any costs or expenses of preserving or disposing of such DIP Collateral under Section 506(c) of the Bankruptcy Code, or to cut off rights in the DIP Collateral under Section 552(b) of the Bankruptcy Code, or (iv) to obtain additional financing under Sections 364(c) or (d) of the Bankruptcy Code not otherwise permitted under this Agreement, unless such motion and additional financing shall provide that upon closing and consummation of such financing, all of the Pre-Petition Obligations and the Post-Petition Obligations shall be Paid in Full and both Pre-Petition Lender and Post-Petition Lender receive a release (on terms and conditions

38

and in form and substance satisfactory to Lender in its sole discretion) in full from all claims of the Debtors and their estates;

(xxxi)   (i) a Reorganization Plan is filed in the Case by one or more of the Debtors which does not contain provisions for termination of Lender's commitment to make Advances hereunder and Payment in Full of the Pre-Petition Obligations and the Post-Petition Obligations and the release of both the Pre-Petition Lender and the Post-Petition Lender (on terms and conditions and in form and substance satisfactory to Lender) in full from all claims of the Debtors and their estates, in each case, on or before, and the continuation of the Liens and security interests granted to Lender and the Pre-Petition Lender until, the effective date of such Reorganization Plan, or (ii) an order shall be entered by the Bankruptcy Court confirming a Reorganization Plan in the Case which does not contain provisions for termination of Lender's commitment to make Advances hereunder and Payment in Full of the Pre-Petition Obligations and the Post-Petition Obligations and the release of both the Pre-Petition Lender and the Post-Petition Lender (on terms and conditions and in form and substance satisfactory to Lender) in full from all claims of the Debtors and their estates on or before, and the continuation of the Liens and security interests granted to Pre-Petition Lender until, the effective date of such Reorganization Plan upon entry thereof;

(xxxii)   the expiration or termination of the "exclusive period" of the Debtors under Section 1121 of the Bankruptcy Code for the filing of a plan of reorganization;

(xxxiii) (i) any Debtor engages in or takes any action to support any challenge to the validity, perfection, priority, extent and/or enforceability of any of the Obligations, the Pre-Petition Obligations, the Liens of Lender in the DIP Collateral, the Adequate Protection Liens, or the Liens of Pre-Petition Lender in the Pre-Petition Collateral or (ii) any Debtor engages in, or takes any action to support, any investigation or asserts any claims or causes of action (or directly or indirectly support assertion of the same) against the Lender or the Pre-Petition Lender and/or any of their respective Liens in the DIP Collateral and/or the Pre-Petition Collateral, as applicable; provided, however, that it shall not constitute an Event of Default under subsections (i) or (ii) hereof if any Debtor provides documents and information with respect to the Pre-Petition Loan Documents and any pre-petition Lender enforcement actions to (x) the Creditors' Committee and (y) with prior written notice to Lender of any requirement to do so, any other party in interest;

(xxxiv)   the termination or rejection of any contract of any Debtor which would reasonably be expected to result in a Material Adverse Effect;

(xxxv)   the failure of the Debtors to satisfy any of the Milestones :

(xxxvi)   the Case is converted (as to any one or more Debtors) to a case under Chapter 7 of the Bankruptcy Code;

(xxxvii)      the Case is dismissed (as to any one or more Debtors);

(xxxviii)      a breach by the Debtors of the terms or provisions of the Interim Order or Final Order;

(xxxix) any Person shall be permitted to surcharge the DIP Collateral or the Pre-Petition Collateral under Section 506(c) of the Bankruptcy Code, or any costs or expenses whatsoever shall be imposed against the DIP Collateral or the Pre-Petition Collateral, other than the Carve-Out;

39

(xl)     Lender or Pre-Petition Lender shall be made subject to any equitable remedy of marshalling or any similar doctrine with respect to the Collateral and the Pre-Petition Collateral; or

(xli)     Any of the Debtors cease the ordinary course operation of their businesses (except in connection with an Approved 363 Sale).

(b)     Subject to the Interim Order (or the Final Order, when entered) and **Section 10(j)**, upon the occurrence, and during the continuance, of an Event of Default, Lender may, with three (3) Business Days prior notice, declare any obligation Lender may have hereunder to be cancelled, declare all Obligations to be due and payable and, and without the necessity of seeking relief from the automatic stay or any further order from the Bankruptcy Court, proceed to enforce payment of the Obligations and to exercise any and all of the rights and remedies afforded to Lender by the Code or under the terms of this Agreement, the other Loan Documents or otherwise.

(c)     Subject to the Interim Order (or the Final Order, when entered) and the last paragraph of this Section 10, any sale or other disposition of the DIP Collateral may be at public or private sale upon such terms and in such manner as Lender deems advisable, having due regard to compliance with any statute or regulation which might affect, limit or apply to Lender's disposition of the DIP Collateral.  Lender may conduct any such sale or other disposition of the DIP Collateral upon a Debtor's premises.  Unless the DIP Collateral is perishable or threatens to decline speedily in value, or is of a type customarily sold on a recognized market (in which event Lender shall provide Borrowers with such notice as may be practicable under the circumstances), Lender shall give Borrowers at least the greater of the minimum notice required by law or ten (10) days prior written notice of the date, time and place of any proposed public sale, and of the date after which any private sale or other disposition of the DIP Collateral may be made.  Lender may purchase the DIP Collateral, or any portion of it at any public sale.

(d)     If Lender sells any of the DIP Collateral on credit, the Borrowers will be credited only with payments actually made by the purchaser of such DIP Collateral and received by Lender.  If the purchaser fails to pay for the DIP Collateral, Lender may re-sell the DIP Collateral, and the Borrowers shall be credited with the proceeds of the sale.

(e)     In connection with Lender's exercise of Lender's rights under this Agreement, Lender may enter upon, occupy and use any premises owned or occupied by a Debtor, and may exclude such Debtor from such premises or portion thereof as may have been so entered upon, occupied, or used by Lender. Lender may, but shall not be required to remove any of the DIP Collateral from any such premises upon Lender's taking possession thereof, and may render any DIP Collateral unusable to Borrowers.  In no event shall Lender be liable to a Debtor for use or occupancy by Lender of any premises pursuant to this Agreement.

(f)     Upon the occurrence and during the continuance of any Event of Default, Lender may require a Borrower to assemble the DIP Collateral and make it available to Lender at such Borrower's sole risk and expense at a place or places which are reasonably convenient to both Lender and such Borrower.

(g)     Any default of this Agreement by a Debtor shall constitute, likewise, a default by such Debtor of any other existing agreement with Lender, and any default by a Debtor of any other agreement with Lender shall constitute a default of this Agreement.

(h)     Each Borrower acknowledges that the purpose of this section is to provide non-exhaustive indications of what actions or omissions by Lender would not be commercially unreasonable in Lender's exercise of remedies against the DIP Collateral and that other actions or omissions by Lender shall not be

40

deemed commercially unreasonable solely on account of not being indicated in this section. Without limitation upon the foregoing, nothing contained in this section shall be construed to grant any rights to any Borrower or to impose any duties on Lender that would not have been granted or imposed by this Agreement or by applicable law in the absence of this section.

Notwithstanding any other provision of this Agreement or any other Loan Document:

(i)      Upon the occurrence of and during the continuance of an Event of Default, and without the necessity of seeking relief from the automatic stay or any further order from the Bankruptcy Court, but subject to the provisions of **Sections 10(b)** and **10(j)** hereof, (i) Lender shall no longer have any obligation to make any Term Loans (or otherwise extend credit) hereunder; (ii) all amounts outstanding under Loan Documents shall, at the option of Lender, be accelerated and become immediately due and payable; (iii) Lender and the Pre-Petition Lender shall be entitled to immediately terminate the Debtors' right to use Cash Collateral, without further application or Order of the Bankruptcy Court, provided, however, that the Debtors shall have the right to use Cash Collateral to pay their weekly ordinary course payroll included in the Approved Budget through the date on which such Event of Default occurs; (iv) the Debtors shall be bound by all post-default restrictions, prohibitions, and other terms as provided in the Interim Order, the Final Order, the Loan Documents; (v) Lender shall be entitled to charge the default rate of interest hereunder; and (vi) subject only to the notice requirement set forth in subparagraph (b) above, Lender shall be entitled to take any other action or exercise any other right or remedy as provided in the Interim Order, the Final Order, the Loan Documents, or applicable law, including, without limitation, setting off any Obligations with DIP Collateral, Pre-Petition Collateral or proceeds in the possession of Pre-Petition Lender or Lender, continue collecting (and the Debtors shall be obligated to turn over) all proceeds of DIP Collateral or Pre-Petition Collateral, as applicable, and Lender shall be able to apply such proceeds to repayment of the Post-Petition Obligations or Pre-Petition Revolver Obligations (as determined by Lender in its sole and absolute discretion), and enforcing any and all rights and remedies with respect to the DIP Collateral or Pre-Petition Collateral, as applicable.

(j)      Upon the occurrence and during the continuance of an Event of Default, and after providing not less than thee (3) Business Days' advance written notice thereof (which may be by electronic mail) by means of delivery of a termination declaration (the "**Remedies Notice Period**" (which Remedies Notice Period applies only to the DIP Collateral enforcement remedies described below)) to counsel to the Debtors, the U.S. Trustee, and counsel to any Committee, Lender shall be entitled to take any action and exercise all rights and remedies provided to them by the Interim Order, the Final Order, or the Documents, or applicable law, unless otherwise ordered by the Bankruptcy Court, as Lender may deem appropriate in its sole discretion to, among other things, proceed against and realize upon the DIP Collateral (including the Pre-Petition Collateral) or any other assets or properties of the Debtors' Estates upon which Lender, been or may hereafter be granted liens or security interests to obtain the full and indefeasible payment of all the Obligations. During the Remedies Notice Period, the Debtors and/or a Committee (if appointed) shall be entitled to seek an emergency hearing within the Remedies Notice Period with respect to the termination declaration and whether an Event of Default has occurred and is continuing. However, notwithstanding anything to the contrary provided for herein (specifically including without limitation this subparagraph (b) and the immediately preceding subparagraph (b)), at no time prior to Payment in Full of the Obligations, including but not limited to during any Remedies Notice Period, shall Lender be prohibited from or limited in its ability to apply any and all payments in respect of the Obligations (including without limitation payments pursuant to **Section 1(b)** hereof) and any and all proceeds of DIP Collateral received into the Controlled Collections Accounts received by any of them to the Obligations in accordance with **Section 5(b)** hereof.

**11.     STANDARDS FOR EXERCISING REMEDIES.**

41

To the extent that applicable law imposes duties on Lender to exercise remedies in a commercially reasonable manner, each Borrower acknowledges and agrees that it is not commercially unreasonable for Lender (a) to fail to incur expenses reasonably deemed significant by Lender to prepare DIP Collateral for disposition or otherwise to complete raw material or work in process into finished goods or other finished products for disposition, (b) to fail to obtain third party consents for access to DIP Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain governmental or third party consents for the collection or disposition of DIP Collateral to be collected or disposed of, (c) to fail to exercise collection remedies against account debtors or other Persons obligated on DIP Collateral or to remove liens or encumbrances on or any adverse claims against DIP Collateral, (d) to exercise collection remedies against account debtors and other Persons obligated on DIP Collateral directly or through the use of collection agencies and other collection specialists, (e) to advertise dispositions of DIP Collateral through publications or media of general circulation, whether or not the DIP Collateral is of a specialized nature, (f) to contact other Persons, whether or not in the same business as a Borrower, for expressions of interest in acquiring all or any portion of the DIP Collateral, (g) to hire one or more professional auctioneers to assist in the disposition of DIP Collateral, whether or not the DIP Collateral is of a specialized nature, (h) to dispose of the DIP Collateral by utilizing Internet sites that provide for the auction of assets of the types included in the DIP Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets, (i) to dispose of assets in wholesale rather than retail markets, (j) to disclaim disposition warranties, and specifically to disclaim any warranties of title or the like, (k) to purchase insurance or credit enhancements to insure Lender against risks of loss, collection or disposition of DIP Collateral or to provide to Lender a guaranteed return from the collection or disposition of DIP Collateral, or (l) to the extent deemed appropriate by Lender, to obtain the services of other brokers, investment bankers, consultants and other professionals to assist Lender in the collection or disposition of any of the DIP Collateral. Each Borrower acknowledges that the purpose of this section is to provide non-exhaustive indications of what actions or omissions by Lender would not be commercially unreasonable in Lender's exercise of remedies against the DIP Collateral and that other actions or omissions by Lender shall not be deemed commercially unreasonable solely on account of not being indicated in this section. Without limitation upon the foregoing, nothing contained in this section shall be construed to grant any rights to any Borrower or to impose any duties on Lender that would not have been granted or imposed by this Agreement or by applicable law in the absence of this section.

## 12.    TERMINATION.

This Agreement, which shall inure to the benefit of and shall be binding upon the respective successors and permitted assigns of each Debtor and Lender, shall become effective on the Closing Date and shall continue in full force and effect until the Termination Date (such period from the Closing Date through and ending on the Termination Date, the "**Term**"). At the end of the Term, Borrowers shall pay the Full Payment to Lender. Further, upon termination of this Agreement, all of the rights, interests and remedies of Lender and Obligations of the Debtors shall survive and Borrowers shall have no right to receive, and Lender shall have no obligation to make, any further loans. Upon Full Payment to Lender, all rights and remedies of the Debtors and Lender hereunder (other than inchoate indemnification and reimbursement obligations and other obligations which, by their terms, survive termination of this Agreement) shall cease, so long as any payment so made to Lender and applied to the Obligations is not thereafter recovered from or repaid by Lender in whole or in part in any bankruptcy, insolvency or similar proceeding instituted by or against a Debtor, whereupon this Agreement shall be automatically reinstated without any further action by any Debtor and Lender and shall continue to be fully applicable to such Obligations to the same extent as though the payment so recovered or repaid had never been originally made on such Obligations.

## 13.    MISCELLANEOUS.

(a)    **Governing Law; Sealed Instrument**.  The laws of the State of New York shall exclusively (without regard to rules or principles relating to conflicts of laws) govern the construction of this Agreement and the rights and duties of the parties hereto.  This Agreement shall take effect as a sealed instrument.

(b)    **Consent to Jurisdictions**.  Each Debtor and Lender agree that any action or proceeding to enforce or arising out of this Agreement may be commenced in the Bankruptcy Court, and each Debtor waives personal service of process and agrees that a summons and complaint commencing an action or proceeding in any such court shall be properly served and confer personal jurisdiction if served by registered or certified mail to a Debtor, or as otherwise provided by the laws of the State of New York or the United States of America.

(c)    **WAIVER OF JURY TRIAL**.  EACH DEBTOR AND LENDER EACH HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHT SUCH DEBTOR OR LENDER MAY HAVE OR HEREAFTER HAVE TO A TRIAL BY JURY IN RESPECT OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT.  Each Debtor hereby certifies that neither Lender nor any of its representatives, agents or counsel has represented, expressly or otherwise, that Lender would not, in the event of any such suit, action or proceeding, seek to enforce this waiver of right to trial by jury.  Each Debtor acknowledges that Lender has been induced to enter into this Agreement by, among other things, this waiver.  Each Debtor acknowledges that it has read the provisions of this Agreement and in particular, this section; has consulted legal counsel; understands the right it is granting in this Agreement and is waiving in this section in particular; and makes the above waiver knowingly, voluntarily and intentionally.

(d)    **Assignment and Participations**. This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties hereto; provided, however, that Debtors may not assign this Agreement or any rights or duties hereunder without Lender's prior written consent and any prohibited assignment shall be absolutely void.  No consent to an assignment by Lender shall release any Borrower from its Obligations.  Lender may assign this Agreement and its rights and duties hereunder and no consent or approval by a Debtor is required in connection with any such assignment.  Lender reserves the right to sell, assign, transfer, negotiate or grant participations in all or any part of, or any interest in Lender's rights and benefits hereunder.  In connection with any assignment or participation, Lender may disclose all documents and information which Lender now or hereafter may have relating to a Debtor or a Debtor's business.  To the extent that Lender assigns its rights and obligations hereunder to another party, Lender thereafter shall be released from such assigned obligations to the Debtors and such assignment shall effect a novation between the Debtors and such other party.

(e)    **[Reserved]**.

(f)    **Notices**.  Unless otherwise provided in this Agreement, all notices or demands by any party relating to this Agreement or any other loan document shall be in writing and (except for financial statements and other informational documents which may be sent by first-class mail, postage prepaid) shall be personally delivered or sent by registered or certified mail (postage prepaid, return receipt requested ), overnight courier, or electronic mail to the Debtors at its address set forth on **Exhibit 1** to this Agreement, or to Lender at its address set forth on **Exhibit 1** to this Agreement.

The parties hereto may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other.  All notices or demand sent in accordance with this section shall be deemed received on the earlier of the date of actual receipt or three (3) days after the deposit thereof in the mail.

43

(g)    <u>Records</u>.  Lender shall have no obligation to maintain any electronic records or any documents, schedules, invoices, agings or any other paper delivered to Lender by a Debtor in connection with this Agreement or any other agreement for more than four (4) months after receipt of the same by Lender.

(h)    <u>Amendments.</u>  This Agreement can only be amended by a writing signed by Lender and each Borrower.

(i)    <u>Counterparts and Signatures</u>.  This Agreement may be executed in multiple counterparts, each of which shall be effective upon delivery and, thereafter, shall be deemed to be an original, and all of which shall be taken as one and the same instrument with the same effect as if each party hereto had signed on the same signature page.  Any signature page of this Agreement may be detached from any counterpart of this Agreement without impairing the legal effect of any signature thereto and may be attached to another part of this Agreement identical in form hereto and having attached to it one or more additional signature pages.  This Agreement may be transmitted by facsimile machine or by electronic mail in portable document format ("pdf") and signatures appearing on faxed instruments and/or electronic mail instruments shall be treated as original signatures.  Any party delivering an executed counterpart of this Agreement by telefacsimile or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement, but the failure to deliver an original executed counterpart shall not affect the validity, enforceability or binding effect hereof.

(j)    <u>Construction</u>.  Unless the context of this Agreement or any other Loan Document clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, the terms "includes" and "including" are not limiting, and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or."  The words "hereof," "herein," "hereby," "hereunder," and similar terms in this Agreement or any other Loan Document refer to this Agreement or such other Loan Document, as the case may be, as a whole and not to any particular provision of this Agreement or such other Loan Document, as the case may be.  Section, subsection, clause, schedule, and exhibit references herein are to this Agreement unless otherwise specified.  Any reference in this Agreement or in any other Loan Document to any agreement, instrument, or document shall include all alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements, thereto and thereof, as applicable (subject to any restrictions on such alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements set forth herein).  The words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties.

(k)    <u>Code</u>.  Unless otherwise defined herein, any terms (including Accounts, account debtor, certificated security, chattel paper, commercial tort claims, deposit Accounts, documents, electronic chattel paper, Equipment, farm products, fixtures, general intangibles, goods, health-care-insurance receivables, instruments, Inventory, letter-of-credit rights, proceeds, supporting obligations and tangible chattel paper) used in this Agreement that are defined in the Code shall be construed and defined as set forth in the Code unless otherwise defined herein; provided, that to the extent that the Code is used to define any term herein and such term is defined differently in different Articles of the Code, the definition of such term contained in Article 9 of the Code shall govern.

(l)    <u>Time</u>.  Unless the context of this Agreement or any other Loan Document clearly requires otherwise, all references to time of day refer to Eastern standard time or Eastern daylight saving time, as in effect in New York, New York on such day.  For purposes of the computation of a period of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to"

44

and "until" each means "to and including"; provided that, with respect to a computation of fees or interest payable to Lender, such period shall in any event consist of at least one full day.

(m)    <u>Schedules and Exhibits</u>.  All of the schedules and exhibits attached to this Agreement shall be deemed incorporated herein by reference.

(n)    <u>Dollars</u>.  All amounts referred to herein shall be in Dollars.  All of the property and assets of the Debtors, including, without limitation, its receivables, shall be valued in, and converted into, Dollars in accordance with Lender's customary banking and conversion practices and procedures.

(o)    <u>Accounting Terms</u>. All accounting terms not specifically defined herein shall be construed in accordance with GAAP; provided, that if Borrowers notify Lender that Borrowers request an amendment to any provision hereof to eliminate the effect of any Accounting Change occurring after the Closing Date or in the application thereof on the operation of such provision, regardless of whether any such notice is given before or after such Accounting Change or in the application thereof, then Lender and Borrowers agree that they will negotiate in good faith amendments to the provisions of this Agreement that are directly affected by such Accounting Change with the intent of having the respective positions of Lender and Debtors after such Accounting Change conform as nearly as possible to their respective positions immediately before such Accounting Change took effect.  When used herein, the term "financial statements" shall include the notes and schedules thereto.  Whenever the term "Borrower" or "Debtor" is used in respect of a financial covenant or a related definition, it shall be understood to mean each such Person and its Subsidiaries on a consolidated basis, unless the context clearly requires otherwise. Notwithstanding anything to the contrary contained herein, all financial statements delivered hereunder shall be prepared, and all financial covenants contained herein shall be calculated, without giving effect to any election under the Statement of Financial Accounting Standards Board's Accounting Standards Codification Topic 825 (or any similar accounting principle) permitting a Person to value its financial liabilities or Debt at the fair value thereof.

(p)    <u>Divisions</u>.  For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

(q)    <u>Events of Default</u>. Notwithstanding anything to the contrary contained herein, any references herein to "during the continuance of," defaults or Events of Default "continuing" or "cure" or words to similar effect in any Loan Document, shall not be construed in any manner to allow for any cure periods that are not otherwise expressly and specifically provided for in this Agreement or any other Loan Document, or create any burden or standard of providing any waivers as to the related Events of Default. Such references are simply included to address the possibility that such cure rights may be expressly and specifically provided for in this Agreement or other Loan Documents for certain provisions, or waivers conceptually may be provided in Lender's sole and unfettered discretion, and the parties hereto agreement as to how such applicable provisions will be construed in the event of any such cure or waiver.

(r)    <u>Ambiguity</u>.  Neither this Agreement nor any uncertainty or ambiguity herein shall be construed or resolved against Lender or a Debtor, whether under any rule of construction or otherwise.  On the contrary, this Agreement has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of all parties hereto.

45

     **(s)**    **Authority**.  Lender is authorized to make loans under the terms of this Agreement upon the request, either written or oral, in the name of any Borrower by any authorized person whose name appears at the end of this Agreement or by any of the following named persons, from time to time, holding the following offices of any Borrower, President, Treasurer, Chief Executive Officer, Chief Financial Officer and such other officers and authorized signatories as may from time to time be set forth in separate resolutions.  Each Borrower agrees that any and all loans made by Lender to Borrowers or for their account at the request of the Borrowers or pursuant to the terms of this Agreement shall be conclusively deemed to have been authorized by such Borrower and to have been made pursuant to duly authorized requests therefor on its behalf.

     **(t)**    **Rights and Remedies**.  No delay or omission on the part of Lender in exercising any rights shall operate as a waiver of such right or any other right.  Waiver on any one occasion shall not be construed as a bar to or waiver of any right or remedy on any future occasion.  All Lender's rights and remedies, whether evidenced hereby or by any other agreement, instrument or paper, shall be cumulative and may be exercised singularly or concurrently.  It is distinctly understood and agreed that all of the rights of Lender contained in this Agreement shall likewise apply, insofar as applicable, to any modification of or supplement to this Agreement and to any other agreements between Lender and any Debtor.

     **(u)**    **Severability**.  Paragraph and section headings used in this Agreement are for convenience only, and shall not affect the construction of this Agreement.  If one or more provisions of this Agreement (or the application thereof) shall be invalid, illegal or unenforceable in any respect in any jurisdiction, the same shall not invalidate or render illegal or unenforceable such provision (or its application) in any other jurisdiction or any other provision of this Agreement (or its application).

     **(v)**    **Integration**.  This Agreement, together with the other documents and instruments executed concurrently herewith represent the entire and final understanding of the parties with respect to the transactions contemplated hereby and shall not be contradicted or qualified by evidence of any prior, contemporaneous or subsequent other agreement, oral or written, before the date hereof.

     **(w)**    **Patriot Act**.  Lender hereby notifies the Debtors that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies the Debtors and each other party to the transaction contemplated hereunder, which information includes the name and address of the Debtors and each such other party and other information that will allow Lender to identify the Debtors and each such other party in accordance therewith.

**14.**    **DEFINITIONS.**

     "**Additional ERC Remittance**" means ERC Funds of BMH HR LLC in the aggregate amount of $175,000.

     "**Adequate Protection Claims**" shall have the meaning given thereto in the Final Order, or, prior to the entry of the Final Order, the Interim Order

     "**Adequate Protection Liens**" shall have the meaning given thereto in the Final Order, or, prior to the entry of the Final Order, the Interim Order.

     "**Adequate Protection Obligations**" shall have the meaning given thereto in the Final Order, or, prior to the entry of the Final Order, the Interim Order.

46

"**Adequate Protection Payments**" shall have the meaning given thereto in the Final Order, or, prior to the entry of the Final Order, the Interim Order.

"**Affiliate**" means any Person (i) which directly or indirectly Controls, or is controlled by or is under common control with a Debtor or a subsidiary, (ii) which directly or indirectly beneficially holds or owns twenty five percent (25%) or more of any class of voting stock of a Debtor or any subsidiary, or (iii) ten percent (10%) or more of the voting stock of which is directly or indirectly beneficially owned or held by a Debtor or a subsidiary.

"**Agreement**" shall have the meaning set forth in the preamble.

"**Allowed Professional Fees**" shall have the meaning given to the term "Allowed Professional Fees" in the Final Order, or, prior to the entry of the Final Order, the Interim Order.

"**Anti-Corruption Laws**" means the FCPA, the U.K. Bribery Act of 2010, as amended, and all other applicable laws and regulations or ordinances concerning or relating to bribery or corruption in any jurisdiction in which any Debtor or any of its Subsidiaries or Affiliates is located or is doing business.

"**Anti-Money Laundering Laws**" means the applicable laws or regulations in any jurisdiction in which any Debtor or any of its Subsidiaries or Affiliates is located or is doing business that relates to money laundering, any predicate crime to money laundering, or any financial record keeping and reporting requirements related thereto.

"**Anti-Terrorism Laws**" means (a) Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended), (b) the Patriot Act; (c) the International Emergency Economic Powers Act, along with any other enabling legislation or executive order relating thereto or any regulations passed thereunder, including the foreign assets control regulations of the United States Treasury Department (31 C.F.R., Subtitle B, Chapter V), and (d) any Sanctions.

"**Applicable Petition Date**" shall have the meaning set forth in the recitals hereto.

"**Approved 363 Sale**" shall mean any sale of any Debtor's assets or business pursuant to Section 363 of the Bankruptcy Code approved by the Lender pursuant to an asset purchase agreement approved by and acceptable to Lender in its sole and absolute discretion, and pursuant to appropriate orders of the Bankruptcy Court that are approved by and acceptable to Lender in its sole and absolute discretion, including (for the avoidance of doubt) any sale as contemplated and provided for in **Exhibit 10**

"**Avoidance Actions**" shall have the meaning given to such term in the Interim Order, or, after the entry of the Final Order, in the Final Order.

"**Bank Schedule**" shall have the meaning set forth in **Section 5(d)**.

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy" and any other federal bankruptcy law.

"**Bidding Procedures Order**" has the meaning specified therefor in **Exhibit 10** of this Agreement.

"**BMH HR LLC**" means BMH HR LLC, a Texas limited liability company.

47

"**Board of Governors**" means the Board of Governors of the Federal Reserve System of the United States (or any successor).

"**Borrower**" and "**Borrowers**" shall have the respective meaning set forth in the preamble.

"**Boulders Property**" means the apartment complex commonly known as The Boulders at Lake Ridge Apartments 4421 82nd Street, Lubbock, TX 79424.

"**Business Day**" means any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of the State of New York or is a day on which banking institutions located in such state are closed.

"**Carve-Out**" shall have the meaning given to such term in the Interim Order, or, after the entry of the Final Order, in the Final Order.

"**Case**" shall have the meaning set forth in the recitals hereto.

"**Cash Collateral**" shall have the meaning given to such term in the Interim Order, or, after the entry of the Final Order, in the Final Order.

"**Cash Management Order**" means an order entered by the Bankruptcy Code, in form and substance acceptable to Lender, governing the Debtors' cash management system.

"**Challenge Period**" shall have the meaning given to such term in the Interim Order, or, after the entry of the Final Order, in the Final Order.

"**Change in Law**" means the occurrence after the date hereof:  (a) the adoption or effectiveness of any law, rule, regulation, judicial ruling, judgment or treaty, (b) any change in any law, rule, regulation, judicial ruling, judgment or treaty or in the administration, interpretation, implementation or application by any Governmental Authority of any law, rule, regulation, guideline or treaty, (c) any new, or adjustment to, requirements prescribed by the Board of Governors for "Eurocurrency Liabilities" (as defined in Regulation D of the Board of Governors), requirements imposed by the Federal Deposit Insurance Corporation, or similar requirements imposed by any domestic or foreign governmental authority or resulting from compliance by Lender with any request or directive (whether or not having the force of law) from its lenders or related agent pertaining to any central bank or other Governmental Authority and related in any manner to SOFR, the Term SOFR Reference Rate, or Term SOFR, or (d) the making or issuance by any Governmental Authority of any request, rule, guideline or directive, whether or not having the force of law; provided that notwithstanding anything in the Agreement to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives concerning capital adequacy promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities shall, in each case, be deemed to be a "Change in Law," regardless of the date enacted, adopted or issued.

"**Change of Control**" means [reserved].

"**Closing Date**" means January 27, 2026 or the date on which the Bankruptcy Court enters the Interim Order.

48

"**Code**" means the Uniform Commercial Code, as in effect from time to time in the State of New York.

"**Collection Account**" means an account in the name of Lender and designated from time to time as the Collection Account hereunder by written notice from Lender to the Borrowers, and which is initially described on **Schedule B**.

"**Committee**" shall have the meaning given to such term in the Interim Order, or, after the entry of the Final Order, in the Final Order.

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of any Person, whether through the ownership of voting securities, by contract or otherwise.

"**Credit Limit**" shall have the meaning set forth in **Exhibit 1**.

"**Creditors' Committee**" means the official unsecured creditors' committee appointed in the Case.

"**Debt**" means of a Person as of a given date, all items of indebtedness or liability which in accordance with GAAP would be included in determining total liabilities as shown on the liabilities side of a balance sheet for such Person and shall also include the aggregate payments required to be made by such Person at any time under any lease that is considered a capitalized lease under GAAP (except, that, any such balance that constitutes an accrued expense or trade payment shall not be considered "Debt").

"**Default Rate**" shall have the meaning set forth in **Section 3(a)**.

"**Default Rate Margin**" shall have the meaning set forth in **Exhibit 1**.

"**Designated Account**" shall have the meaning set forth in **Section 5(d)**.

"**DIP Collateral**" shall have the meaning set forth in **Section 4(a)**.

"**DIP Budget**" shall mean the DIP Budget prepared by the Debtors, in consultation with the Lender, in good faith based upon assumptions which the Debtors believe to be reasonable and delivered to and approved by Lender on or before the Closing Date and attached hereto as Exhibit 6 (the "**Initial DIP Budget**"), setting forth Debtors' cash flow forecast in reasonable detail satisfactory to Lender including projected weekly disbursements, projected weekly cash collections and receipts and such line item detail as satisfactory to Lender, for the period commencing with the week in which the Closing Date shall occur and ending with February 21, 2026, as such DIP Budget may be updated from time to time in accordance with and subject to approval of Lender in its sole and absolute discretion as set forth in **Section 7(m)** hereof.

"**Disqualified Equity Interests**" means any Equity Interest that, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (a) matures or is mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation or otherwise (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Loans and all other Obligations that are accrued and payable and the termination of the commitments to lend hereunder), (b) is redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests), in whole

49

or in part, (c) provides for the scheduled payments of dividends in cash, or (d) is or becomes convertible into or exchangeable for Debt or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is 180 days after the Maturity Date.

"**Distributions**" means all payment or distributions to shareholders in cash or in property other than reasonable salaries, bonuses and expense reimbursements.

"**Dollars**" means lawful money of the United States.

"**Environmental Law**" means any federal, state, local or other governmental statute, regulation, law or ordinance dealing with the protection of human health and the environment.

"**Equity Interests**" means, with respect to a Person, shares of capital stock, partnership interests, membership or limited liability company interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such interest.

"**ERC**" means a United States refundable tax credit (sometimes called the employee retention tax credit or the employee retention credit) for certain eligible businesses and tax-exempt organizations that had employees and were affected during the COVID-19 pandemic.

"**ERC Funds**" means funds representing a United States refundable tax credit (sometimes called the employee retention tax credit or the employee retention credit) for certain eligible businesses and tax-exempt organizations that had employees and were affected during the COVID-19 pandemic.

"**ERISA**" shall have the meaning set forth in **Section 6(j)**.

"**ERISA Affiliate**" means (a) any Person, trade or business (whether or not incorporated) subject to ERISA whose employees are treated as being employed by the same employer as the employees of any Debtor under Section 414(b) of the IRC, (b) any Person, trade or business (whether or not incorporated) subject to ERISA whose employees are treated as being employed by the same employer as the employees of any Debtor under Section 414(c) of the IRC, (c) solely for purposes of Section 302 of ERISA and Section 412 of the IRC, any organization subject to ERISA that is a member of an affiliated service group of which any Debtor is a member under Section 414(m) of the IRC, or (d) solely for purposes of Section 302 of ERISA and Section 412 of the IRC, any Person subject to ERISA that is a party to an arrangement with any Debtor and whose employees are aggregated with the employees of any Debtor under Section 414(o) of the IRC.

"**ERISA Termination Event**" means (i) a Reportable Event with respect to any Plan; (ii) the existence with respect to any Plan of a non-exempt "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the IRC) for which a Borrower could have liability that would result in a material adverse effect; (iii) the withdrawal of a Borrower or any ERISA Affiliate from an Plan or Multiemployer Plan during a plan year in which such entity was a "substantial employer" as defined in Section 4001(a)(2) of ERISA; (iv) the providing of notice of intent to terminate an Plan in a distress termination described in Section 4041(c) of ERISA; (v) the institution by the Pension Benefit Guaranty Corporation of proceedings to terminate an Plan or Multiemployer Plan; (vi) any event or condition (a) which might constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan or Multiemployer Plan, or (b) that may result in termination of a Multiemployer Plan pursuant to Section 4041A of ERISA; or (vii) the partial or complete withdrawal within the meaning of

50

Sections 4203 and 4205 of ERISA, of a Borrower or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization.

"**Estate**" means, as to any Debtor, such Debtor and its bankruptcy estate (as defined under Bankruptcy Code section 541).

"**Event of Default**" and "**Events of Default**" shall have the respective meanings set forth in **Section 10(a)**.

"**Existing Reporting Orders**" shall mean (1) the *Interim Order Authorizing Debtors' Use of Cash Collateral and Granting Adequate Protection and Related Relief* [Docket No. 61], (2) the *Final Order (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System and Maintain Existing Bank Accounts and Business Forms and Honor Certain Prepetition Obligations Related to the Use Thereof, and (B) Continue to Perform Intercompany Transactions, and (II) Granting Related Relief* [Docket No. 130], (3), the *Order Granting Debtors' Emergency Motion for Authority to Pay Prepetition Wages, Compensation, and Employee Benefits* [Docket No. 66] and (4) any other order entered in the Cases obligating the Debtors to provide reporting, notices, or other information or cooperation to Lender or , in each case as the same is amended, renewed, extended, or replaced in form and substance acceptable to Lender.

"**FCPA**" means the Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder.

"**Final Order**" means a final order of the Bankruptcy Court in the Case authorizing and approving this Agreement and the other Loan Documents under, *inter alia*, Sections 364(c) and (d) of the Bankruptcy Code on a final basis and entered at or after a final hearing, in form and substance satisfactory to Lender in its reasonable discretion.  The Final Order shall, among other things:

      (a)    authorize the transactions contemplated by this Agreement and the extensions of credit under this Agreement in an amount not less than the Credit Limit provided for herein;

      (b)    grant the claim and Lien status and Liens described in **Section 16**, and prohibit the granting of additional Liens on the assets of Debtors and any Superpriority Claim status except for any Liens and Claims specifically provided for in such order;

      (c)    provide that such Liens are automatically perfected as of the Applicable Petition Date by the entry of the Final Order and also grant to Lender relief from the automatic stay of Section 362(a) of the Bankruptcy Code to enable Lender, if Lender elects to do so in its discretion, to make all filings and recordings and to take all other actions considered necessary or advisable by Lender to perfect, protect and insure the priority of its Liens upon the DIP Collateral as a matter of non-bankruptcy law;

      (d)    provide that no Person will be permitted to surcharge the DIP Collateral under Section 506(c) of the Bankruptcy Code, nor shall any costs or expenses whatsoever be imposed against the DIP Collateral, except for the Carve-Out; and

      (e)    provide Lender with the option, in its discretion, to effect a "Final Roll-Up" as defined in and described in the Interim Order, and reimbursement in full in cash of all reasonable professional fees, costs and expenses of the Pre-Petition Lender, in each case using the proceeds of loans and extensions of credit hereunder, in each case upon entry of such Final Order.

51

"**Final Order Entry Date**" means the date on which the Final Order is entered by the Bankruptcy Court.

"**First Petition Date**" shall have the meaning set forth in the recitals hereto.

"**Full Payment**" means (a) the full and indefeasible cash payment of the Obligations, and prior to giving effect to the Final Roll-Up, the then outstanding Pre-Petition Obligations (other than inchoate indemnification and reimbursement obligations and other obligations which, by their terms, survive termination of this Agreement), including any interest, fees and other charges accruing during an insolvency proceeding (whether or not allowed in the proceeding), (b) the termination or expiration of the commitments of Lender to make Term Loans, and (c) the execution and delivery by Debtors of a general release in favor of Lender and Pre-Petition Lender.

"**GAAP**" means generally accepted accounting principles, applied on a basis consistent with the accounting practices applied in the financial statements required to be delivered hereunder.

"**Governmental Authority**" means the government of any nation or any political subdivision thereof, whether at the national, state, territorial, provincial, county, municipal or any other level, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of, or pertaining to, government (including any supra-national bodies such as the European Union or the European Central Bank).

"**Guarantor**" means each of the Guarantors party to this agreement as of the date hereof and each Person that becomes a guarantor after the date hereof.

"**Hazardous Substances**" means pollutants, contaminants, hazardous substances, hazardous wastes, petroleum and fractions thereof, and all other chemicals, wastes, substances and materials listed in, regulated by or identified in any Environmental Law; and

"**IRC**" means the Internal Revenue Code of 1986, as amended and in effect from time to time.

"**Initial DIP Budget**" has the meaning specified therefor in the definition of "DIP Budget".

"**Intellectual Property Rights**" shall have the meaning set forth in **Section 6(m)**.

"**Interim Availability Amount**" means $750,000.

"**Interim Availability Period**" means the period commencing on the Interim Order Entry Date and ending on the date of, and immediately prior to, the Bankruptcy Court's entry of the Final DIP Order on the Final Order Entry Date.

"**Interim Order**" means an order of the Bankruptcy Court in the Case authorizing and approving this Agreement and the other Loan Documents, for an interim period, under, *inter alia*, Sections 364(c) and (d) of the Bankruptcy Code and entered at or after a hearing, in form and substance substantially similar to that attached hereto as Exhibit 7 and/or satisfactory to Lender in its sole and absolute discretion.  The Interim Order shall, among other things, have:

(a)    authorized the transactions contemplated by this Agreement and the extensions of credit under this Agreement in an amount not less than the Credit Limit provided for herein;

52

(b)        granted the claim and Lien status and Liens described in Section 16, and prohibited the granting of additional Liens on the assets of Debtors except for any Liens and Claims specifically provided for in such order;

(c)        provided that such Liens are automatically perfected as of the Applicable Petition Date by the entry of the Interim Order and also granted to the Lender relief from the automatic stay of Section 362(a) of the Bankruptcy Code to enable the Lender, if the Lender elects to do so in its discretion, to make all filings and recordings and to take all other actions considered necessary or advisable by the Lender to perfect, protect and insure the priority of its Liens upon the DIP Collateral as a matter of non-bankruptcy law;

(d)        provided that, upon entry of the Final Order, no Person will be permitted to surcharge the DIP Collateral under Section 506(c) of the Bankruptcy Code, nor shall any costs or expenses whatsoever be imposed against the DIP Collateral, except for the Carve-Out;

(e)         provided for a "roll-up" of all of Pre-Petition Revolver Obligations upon entry of such Final Order, and

(f)        authorized Lender to apply payments received hereunder and proceeds of DIP Collateral received by Lender to either the Pre-Petition Revolver Obligations or the Post-Petition Obligations as Lender may determine in its sole and absolute discretion, as contemplated by **Section 5(b)** hereof.

"**IP License Agreement**" any license agreement granting to a Borrower a license of Intellectual Property Rights that is used in any Borrower's Inventory.

"**Lender**" shall have the meaning set forth in the preamble.

"**Licensed Intellectual Property**" shall have the meaning set forth in **Section 6(m)**.

"**Lien**" shall have the meaning set forth in **Section 9(b)**.

"**Loan Documents**" means this Agreement, the Interim Order, the Final Order (upon the issuance thereof), the Term Note, the Settlement Agreement, the Participation Agreement, the PEC Pledge Agreement, each guaranty or other agreement signed by a Guarantor or Debtor, work through agreements, any pledge agreements, each subordination agreement, each intercreditor agreement, each security agreement, each Mortgage, the Mortgage Documents, together with every other agreement, note, document, contract or instrument to which a Borrower or any other Debtor now or in the future may be a party and which may be required by Lender in connection with, or as a condition to, the execution of this Agreement, each as may be amended, modified, replaced, substituted, superseded or restated from time to time.

"**Loan**" and "**Loans**" individually and collectively refer to the Term Loan and Term Loans.

"**Debtor**" and "**Debtors**" shall have the meaning set forth in the preamble.

"**Material Contract**" means (a) any contract or other agreement (other than the Loan Documents), written or oral, of a Borrower involving monetary liability of or to any Person in an amount in excess of $500,000 in any fiscal year, (b) any lease of a Borrower pertaining to a location with Eligible Inventory of such Borrower is located, and (c) any other contract or other agreement (other than the Loan Documents),

53

whether written or oral, to which a Borrower is a party as to which the breach, nonperformance, cancellation or failure to renew by any party thereto would have a material adverse effect.

"**Maturity Date**" shall have the meaning set forth in **Exhibit 1**.

"**Milestones**" means each of the milestones set forth on **Exhibit 10**.

"**Monthly Financial Statement**" means, for any given month, the financial statements received by Lender from the Debtors in accordance with **Section 8(a)(i)**.

"**Mortgages**" means, individually and collectively, one or more mortgages, deeds of trust, or deeds to secure debt, executed and delivered by the Debtors, any Subsidiary of the Debtors or any Guarantor in favor of Lender, in form and substance reasonably satisfactory to Lender, that encumber the Real Property DIP Collateral, each as may be amended, modified, replaced, substituted, superseded or restated from time to time.

"**Mortgage Documents**" means the Mortgages and each other document executed in connection with the Real Property DIP Collateral, including any assignments and indemnities, each as may be amended, modified, replaced, substituted, superseded or restated from time to time.

"**Multiemployer Plan**" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which any Debtor or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding six plan years, has made or been obligated to make contributions.

"**Net Cash Proceeds**" means the cash proceeds of any asset sale (including cash proceeds received as deferred payments pursuant to a note, installment receivable or otherwise, but only upon actual receipt) net of (a) reasonable attorney, accountant, and investment banking fees and other customary transaction costs, (b) reasonable brokerage commissions, (c) amounts required to be applied to the repayment of debt secured by a Lien not prohibited by this Agreement on the asset being sold, and (d) reasonable taxes paid or reasonably estimated to be payable as a result of such asset sale.

"**Non-Allocable Disbursements**" means (i) disbursements/payments in respect of professional fees, including funding in respect of the Carve Out, (ii) disbursements/payments in respect of this Agreement or the other Loan Documents and/or the Post-Petition Obligations (including interest and fees payable hereunder), (iii) Adequate Protection Payments, and (iv) payments to the Office of the United States Trustee.

"**Obligations**" means:

(1) to the extent arising under or in connection with this Agreement or any other Loan Document, any and all loans (including the Term Loans and Roll-Up Loans), debts, principal, interest (including any interest that accrues after the Closing Date, reimbursement or indemnification obligations, premiums, liabilities (including all amounts charged to the Borrowers as Term Loans pursuant to this Agreement), obligations (including indemnification obligations (including any indemnification obligations that accrue after the conversion of the Case to a chapter 7 case as to any Debtor, regardless of whether allowed or allowable in whole or in part as a claim in any such chapter 7 case)), fees (including any fees that accrue after the conversion of the Case to a chapter 7 case as to any Debtor, regardless of whether allowed or allowable in whole or in part as a claim in any such chapter 7 case), expenses (including any fees, costs or expenses that accrue after the conversion of the Case to a chapter 7 case as to any Debtor regardless of whether allowed or allowable in whole or in part as a claim in any such chapter 7 case),

54

guaranties, and all covenants and duties of any other kind and description owing by any Debtor arising out of, under, pursuant to, in connection with, or evidenced by this Agreement or any of the other Loan Documents, the Interim Order, and/or the Final Order, and irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, and including all interest not paid when due and all other expenses or other amounts that Debtors are required to pay or reimburse by the Loan Documents or by law or otherwise in connection with the Loan Documents.  Without limiting the generality of the foregoing, the Obligations of Debtors under the Loan Documents include the obligation to pay (i) the principal of the Term Loans, (ii) interest accrued on the Term Loans, (iii) expenses, (vi) fees payable under this Agreement or any of the other Loan Documents and (vii) indemnities and other amounts payable by any Debtor under any Loan Document, and

        (2)     all Pre-Petition Obligations (after giving effect to the Final Roll-Up);

in each case, whether now existing or arising hereafter and notwithstanding that any such Obligations or claims therefor shall be disallowed, voided or subordinated in any insolvency proceeding or under any debtor relief law or other applicable law.

"**OFAC**" means The Office of Foreign Assets Control of the U.S. Department of the Treasury.

"**OFAC Prohibited Person**" means (a) a Person on OFAC's list of Specially Designated Nationals and Blocked Persons, or any other OFAC sanctions list, or (b) a Person with whom any Borrower would be prohibited from transacting with under OFAC sanctions regulations.

"**Off-the-shelf Software**" shall have the meaning set forth in **Section 6(m)**.

"**Owned Intellectual Property**" shall have the meaning set forth in **Section 6(m)**.

"**Parent**" shall have the meaning set forth in the preamble.

"**Participation Agreement**" shall have the meaning set forth in **Section 7(l)**.

"**Patriot Act**" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA Patriot Act of 2001), as amended, and the rules and regulations thereunder.

"**PEC Pledge Agreement**" shall have the meaning set forth in **Section 7(l)**.

"**Permitted Liens**" means those liens permitted pursuant to **Section 9(b)** of this Agreement.

"**Permitted Protest**" shall have the meaning set forth in **Section 9(b)**.

"**Person**" means any individual, corporation, partnership, joint venture, limited and unlimited liability company, association, joint stock company, trust, unincorporated organization or government or any agency or political subdivision of a governmental entity, and any such Person's successors and assigns.

"**Plan**" shall have the meaning set forth in **Section 6(j)**.

"**Post-Petition Obligations**" means all Obligations other than the Pre-Petition Obligations; for the avoidance of doubt, and notwithstanding anything to the contrary otherwise provided for herein.

"**Pre-Petition Collateral**" means all "Collateral" (as defined in Pre-Petition Loan Agreement) in existence as of the Applicable Petition Date of each Debtor party to the Pre-Petition Loan Agreement.

"**Pre-Petition Financing Documents**" means the Pre-Petition Loan Agreement, the "Loan Documents" as defined in the Pre-Petition Loan Agreement, and each document, agreement and instrument (and all schedules and exhibits thereto) executed in connection therewith, in each case, as in effect immediately prior to the Applicable Petition Date.

"**Pre-Petition Guarantors**" means the guarantors party to the Pre-Petition Loan Agreement.

"**Pre-Petition Lender**" means the meaning set forth in the recitals hereto.

"**Pre-Petition Liens**" means, collectively, the Liens granted by Debtors to the Pre-Petition Lender on the Pre-Petition Collateral.

"**Pre-Petition Loan Agreement**" shall have the meaning set forth in the recitals hereto.

"**Pre-Petition Loan Documents**" means the Pre-Petition Loan Agreement, the "Loan Documents" as defined in the Pre-Petition Loan Agreement, and each document, agreement and instrument (and all schedules and exhibits thereto) executed in connection therewith, in each case, as in effect immediately prior to the Applicable Petition Date.

"**Pre-Petition Obligations**" shall have the meaning set forth in **Section 17(a)** hereof.

"**Pre-Petition Payment**" means a payment (by way of adequate protection or otherwise) of principal or interest or otherwise on account of any pre-petition Indebtedness or trade payables or other pre-petition claims against any Debtor.

"**Pre-Petition Released Claim**" or "**Pre-Petition Released Claims**" shall have the meaning set forth in **Section 17** hereof.

"**Pre-Petition Revolver Obligations**" means, collectively, all Pre-Petition Obligations.

"**Pre-Petition Revolving Loan**" means a "Revolving Loan" as defined in (and funded under) the Pre-Petition Loan Agreement.

"**Qualified Equity Interest**" means and refers to any Equity Interests issued by a Borrower (and not by one or more of its Subsidiaries) that is not a Disqualified Equity Interest.

"**Real Property**" means any estates or interests in real property now owned or hereafter acquired by a Debtor or any subsidiary of a Debtor and the improvements thereto.

"**Real Property DIP Collateral**" means the Real Property described on **Exhibit 8** attached hereto.

"**Reorganization Plan**" means a plan or plans of reorganization in the Case.

"**Reportable Event**" means a reportable event as defined in Section 4043 of ERISA and the regulations issued thereunder as to which the Pension Benefit Guaranty Corporation and any entity succeeding to any or all of its functions under ERISA has not waived the notification requirement of Section 4043(a), or the failure of a Plan to meet the minimum funding standards of Section 412 of the Internal

56

Revenue Code of 1986, as amended (without regard to whether the Plan is a plan described in Section 4021(a)(2) of ERISA) or under Section 302 of ERISA.

"**Restricted Payment**" means to (a) declare or pay any dividend or make any other payment or distribution, directly or indirectly, on account of Equity Interests issued by a Debtor (including any payment in connection with any merger or consolidation involving such Debtor) or to the direct or indirect holders of Equity Interests issued by such Debtor in their capacity as such (other than dividends or distributions payable in Qualified Equity Interests issued by such Debtor), or (b) purchase, redeem, make any sinking fund or similar payment, or otherwise acquire or retire for value (including in connection with any merger or consolidation involving a Debtor) any Equity Interests issued by such Debtor, or (c) make any payment to retire, or to obtain the surrender of, any outstanding warrants, options, or other rights to acquire Equity Interests of a Debtor now or hereafter outstanding, or (d) make, or cause or suffer to permit any of any Debtor's Subsidiaries to make, any payment or prepayment of principal of, premium, if any, or interest on, or redemption, purchase, retirement, defeasance (including in-substance or legal defeasance), sinking fund or similar payment with respect to, any Debt.

"**RTO Contracts**" means all commercial paper held by Debtors with respect to the business of renting, on a rent-to-own basis, and selling furniture, electronics, appliances, and other merchandise to customers conducted at the Debtors' store locations, including without limitation, all of such Debtors' rights, titles and interests under the consumer rental agreements held by Debtors.

"**Sale Order**" means an order of the Bankruptcy Court, on terms and conditions and in form and substance acceptable to the Lender in its sole and absolute discretion, approving any Approved 363 Sale.

"**Sanctioned Entity**" means (a) a country or territory or a government of a country or territory, (b) an agency of the government of a country or territory, (c) an organization directly or indirectly controlled by a country or territory or its government, or (d) a Person resident in or determined to be resident in a country or territory, in each case of clauses (a) through (d) that is a target of Sanctions, including a target of any country or list-based sanctions program administered and enforced by OFAC or any Canadian Governmental Authority.

"**Sanctioned Person**" means, at any time (a) any Person named on the list of Specially Designated Nationals and Blocked Persons maintained by OFAC, OFAC's consolidated Non-SDN list or any other Sanctions-related list maintained by any Governmental Authority, (b) a Person or legal entity that is a target of Sanctions, (c) any Person operating, organized or resident in a Sanctioned Entity, or (d) any Person directly or indirectly owned or controlled (individually or in the aggregate) by or acting on behalf of any such Person or Persons described in clauses (a) through (c) above.

"**Sanctions**" means individually and collectively, respectively, any and all economic sanctions, trade sanctions, financial sanctions, sectoral sanctions, secondary sanctions, trade embargoes anti-terrorism laws and other sanctions laws, regulations or embargoes, including those imposed, administered or enforced from time to time by: (a) the United States of America, including those administered by OFAC, the U.S. Department of State, the U.S. Department of Commerce, or through any existing or future executive order, (b) the United Nations Security Council, (c) the European Union or any European Union member state, (d) Her Majesty's Treasury of the United Kingdom, or (d) any other Governmental Authority with jurisdiction over Lender or any Debtor or any of their respective Subsidiaries or Affiliates.

"**Second Petition Date**" shall have the meaning set forth in the recitals hereto.

"**Settlement Agreement**" means that certain Settlement Agreement dated as of the date hereof by and among the Debtors, Ian MacDonald and Lender in form and substance substantially similar to that attached hereto as **Exhibit 11** and satisfactory to the Pre-Petition Lender and Lender in their respective sole and absolute discretion.

"**Senior Liens**" means, collectively, (i) the Prior Permitted Liens, (ii) any valid, perfected, and unavoidable Lien (other than the Pre-Petition Liens) existing as of the Applicable Petition Date, which is senior in priority to the liens granted to the Pre-Petition Lender in the Pre-Petition Collateral, and (iii) any valid and unavoidable Lien, which is senior in priority to the Pre-Petition Liens granted to the Pre-Petition Lender in the Pre-Petition Collateral that is validly perfected subsequent to the Applicable Petition Date as permitted by Bankruptcy Code section 546(b).

"**Subject RTO Real Property**" means all real property owned by the Debtors specified on Schedule 7 to the Settlement Agreement.

"**Superpriority Claim**" means an allowed claim against any Debtor or such Debtor's estate in the Case which is an administrative expense claim having priority over (a) any and all allowed administrative expenses (other than the Carve-Out) and (b) all unsecured claims now existing or hereafter arising, including any administrative expenses of the kind specified in the Bankruptcy Code, including without limitation Sections 105, 326, 328, 330, 331, 364(c)(1), 365, 503, 506(c) (upon entry of the Final Order), 507, 546, 726, 1113 or 1114 of the Bankruptcy Code.

"**Term**" shall have the meaning set forth in **Section 12(a)**.

"**Term Loan**" or "**Term Loans**" shall have the meaning set forth in **Section 1(a)**.

"**Termination Date**" means the earliest to occur of (the date of such earliest occurrence, the "Termination Date"): (a) the Maturity Date; (b) delivery of a termination declaration to Borrowers during the continuance of an Event of Default pursuant to Section 10; (c) the effective date or substantial consummation of an Approved 363 Sale; (d) the effective date or substantial consummation of a plan of reorganization or plan of liquidation in the Case; (e) the date of filing or support by the Debtors of a plan of reorganization or plan of liquidation that does not provide for the indefeasible payment in full in cash of all Obligations (including for the avoidance of doubt, even if prior to the Final Order, all Pre-Petition Revolving Obligations); (f) date of the conversion of the Case to a case under Chapter 7 of the Bankruptcy Code; (g) the date of the dismissal of the Case.

"**Term Note**" shall have the meaning set forth in **Section 1(a)**.

"**Third Petition Date**" shall have the meaning set forth in the recitals.

"**U.S. Trustee**" shall have the meaning given to such term in the Interim Order, or, after the entry of the Final Order, in the Final Order.

## 15.    JOINT AND SEVERAL LIABILITY•

(a)      Each Borrower is accepting joint and several liability hereunder and under the other Loan Documents in consideration of the financial accommodations to be provided by Lender under this Agreement, for the mutual benefit, directly and indirectly, of each Borrower and in consideration of the undertakings of each other Borrower to accept joint and several liability for the Obligations.

58

**(b)**      If and to the extent that any Borrower shall fail to make any payment with respect to any of the Obligations as and when due or to perform any of the Obligations in accordance with the terms thereof, then in each such event the other Borrowers will make such payment with respect to, or perform, such Obligation.

**(c)**      The Obligations of each Borrower under the provisions of this **Section 15** constitute the absolute and unconditional, full recourse Obligations of each Borrower enforceable against each Borrower to the full extent of its properties and assets, irrespective of the validity, regularity or enforceability of this Agreement or any other circumstances whatsoever.

**(d)**      Except as otherwise expressly provided in this Agreement, each Borrower hereby waives notice of acceptance of its joint and several liability, notice of any Loans issued under or pursuant to this Agreement, notice of the occurrence of any Event of Default, or of any demand for any payment under this Agreement, notice of any action at any time taken or omitted by Lender under or in respect of any of the Obligations, any requirement of diligence or to mitigate damages and, generally, to the extent permitted by applicable law, all demands, notices and other formalities of every kind in connection with this Agreement (except as otherwise provided in this Agreement).  Each Borrower hereby assents to, and waives notice of, any extension or postponement of the time for the payment of any of the Obligations, the acceptance of any payment of any of the Obligations, the acceptance of any partial payment thereon, any waiver, consent or other action or acquiescence by Lender at any time or times in respect of any default by any Borrower in the performance or satisfaction of any term, covenant, condition or provision of this Agreement, any and all other indulgences whatsoever by Lender in respect of any of the Obligations, and the taking, addition, substitution or release, in whole or in part, at any time or times, of any security for any of the Obligations or the addition, substitution or release, in whole or in part, of any Borrower.  Without limiting the generality of the foregoing, each Borrower assents to any other action or delay in acting or failure to act on the part of Lender with respect to the failure by any Borrower to comply with any of its respective Obligations, including, without limitation, any failure strictly or diligently to assert any right or to pursue any remedy or to comply fully with applicable laws or regulations thereunder, which might, but for the provisions of this **Section 15** afford grounds for terminating, discharging or relieving any Borrower, in whole or in part, from any of its Obligations under this **Section 15**, it being the intention of each Borrower that, so long as any of the Obligations hereunder remain unsatisfied, the Obligations of each Borrower under this **Section 15** shall not be discharged except by performance and then only to the extent of such performance.  The Obligations of each Borrower under this **Section 15** shall not be diminished or rendered unenforceable by any winding up, reorganization, arrangement, liquidation, reconstruction or similar proceeding with respect to any Borrower or Lender.

**(e)**      Each Borrower represents and warrants to Lender that such Borrower is currently informed of the financial condition of Borrowers and of all other circumstances which a diligent inquiry would reveal and which bear upon the risk of nonpayment of the Obligations.  Each Borrower further represents and warrants to Lender that such Borrower has read and understands the terms and conditions of the Loan Documents.  Each Borrower hereby covenants that such Borrower will continue to keep informed of Borrowers' financial condition, the financial condition of other guarantors, if any, and of all other circumstances which bear upon the risk of nonpayment or nonperformance of the Obligations.

**(f)**      Each Borrower waives all rights and defenses arising out of an election of remedies by Lender, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed Lender's rights of subrogation and reimbursement against such Borrower.

59

**(g)**     The provisions of this **Section 15** are made for the benefit of Lender and its successors and assigns, and may be enforced by it or them from time to time against any Borrower as often as occasion therefor may arise and without requirement on the part of Lender, successor or assign first to marshal any of its or their claims or to exercise any of its or their rights against any Borrower or to exhaust any remedies available to it or them against any Borrower or to resort to any other source or means of obtaining payment of any of the Obligations hereunder or to elect any other remedy.  The provisions of this **Section 15** shall remain in effect until all of the Obligations shall have been paid in full or otherwise fully satisfied.  If at any time, any payment, or any part thereof, made in respect of any of the Obligations, is rescinded or must otherwise be restored or returned by Lender upon the insolvency, bankruptcy or reorganization of any Borrower, or otherwise, the provisions of this **Section 15** will forthwith be reinstated in effect, as though such payment had not been made.

**(h)**     Until the Obligations have been paid in full and this Agreement has been terminated, each Borrower hereby agrees that it will not enforce any of its rights of contribution or subrogation against any other Borrower with respect to any liability incurred by it hereunder or under any of the other Loan Documents, any payments made by it to Lender with respect to any of the Obligations or any collateral security therefor until such time as all of the Obligations have been paid in full in cash.  Any claim which any Borrower may have against any other Borrower with respect to any payments to Lender hereunder or under any other Loan Documents are hereby expressly made subordinate and junior in right of payment, without limitation as to any increases in the Obligations arising hereunder or thereunder, to the prior payment in full in cash of the Obligations and, in the event of any insolvency, bankruptcy, receivership, liquidation, reorganization or other similar proceeding under the laws of any jurisdiction relating to any Borrower, its debts or its assets, whether voluntary or involuntary, all such Obligations shall be paid in full in cash before any payment or distribution of any character, whether in cash, securities or other property, shall be made to any other Borrower therefor.

**(i)**     Each Borrower hereby agrees that, after the occurrence and during the continuance of any default or Event of Default, the payment of any amounts due with respect to the Debt owing by any Borrower to any other Borrower is hereby subordinated to the prior payment in full in cash of the Obligations.  Each Borrower hereby agrees that after the occurrence and during the continuance of any default or Event of Default, such Borrower will not demand, sue for or otherwise attempt to collect any Debt of any other Borrower owing to such Borrower until the Obligations shall have been paid in full in cash.  If, notwithstanding the foregoing sentence, such Borrower shall collect, enforce or receive any amounts in respect of such Debt, such amounts shall be collected, enforced and received by such Borrower as trustee for Lender, and such Borrower shall deliver any such amounts to Lender, for application to the Obligations.

16.     **SUPERPRIORITY CLAIMS, DIP COLLATERAL SECURITY, ETC**. The Debtors hereby represent and warrant, covenant and agree, and acknowledge that:

**(a)**     (A) pursuant to the Final Order (or, prior to the entry of the Final Order, the Interim Order), to secure all Post-Petition Obligations, whether now existing or hereafter arising, subject only to the Carve-Out, Lender has been granted an allowed superpriority administrative expense claim in Debtors' Estates pursuant to Bankruptcy Code section 364(c)(1), having priority in right of payment over any and all other obligations, liabilities, and indebtedness of any of such Debtors, whether now in existence or hereafter incurred by any of such Debtors of every kind or nature, including any and all unsecured claims, administrative expenses, adequate protection claims, priority claims or any other claims of the kind specified in, or ordered pursuant to, the Bankruptcy Code, including without limitation, *inter alia*, Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 507, 364(c)(1), 546(c), 726 or 1114 and, upon entry of the Final Order, sections 506(c) and 552(b) (the "**DIP Superiority Claim**"); and (B) other than

60

the Carve-Out, (a) effective upon entry of the Final Order with respect to rights preserved under Bankruptcy Code Section 506(c), no costs or expenses of administration, including without limitation, professional fees allowed and payable under Bankruptcy Code sections 328, 330, and 331, or otherwise, that have been or may be incurred in the Case, or in any successor cases under the Bankruptcy Code, and (b) no priority claims are, or will be, senior to, prior to, or on a parity with the DIP Superpriority Claim or the Post-Petition Obligations or with any other claims of the Lender arising hereunder;

(b)    pursuant to the Final Order (or, prior to the entry of the Final Order, the Interim Order where applicable), to secure the prompt payment and performance of any and all Post-Petition Obligations of Debtors to Lender of whatever kind, nature, or description, absolute or contingent, now existing or hereafter arising, Lender has been granted, effective *nunc pro tunc* as of the Applicable Petition Date, valid, binding, enforceable, continuing, non-avoidable and perfected first priority (subject only to any Senior Liens (including the Carve-Out)), security interests and liens in and upon all property and rights and interests in property of each of the Debtors or their Estates of any kind or nature whatsoever in existence as of the Applicable Petition Date as well as thereafter created or acquired, and wherever located, including without limitation, all of the DIP Collateral as defined herein;

(i)    subject to Section IX of the Interim Order and any corresponding provisions of the Final Order, the Liens in favor of Lender described in the foregoing Section 4 (the "**DIP Liens**") are and shall be:

(A)    pursuant to Bankruptcy Code section 364(c)(2), continuing valid, perfected, enforceable, first priority, and fully perfected liens on and security interests in all of the Debtors' right, title, and interest in, to, and under all DIP Collateral that is not otherwise encumbered by a validly perfected security interest or lien as of the Applicable Petition Date;

(B)    pursuant to Bankruptcy Code section 364(c)(3), a continuing valid, enforceable, second priority, and fully perfected lien on and security interest (other than as set forth in clause (c) below) in all of the Debtors' right, title, and interest in, to, and under all DIP Collateral which is subject to, as of the Applicable Petition Date, a Senior Lien,

(C)    subject to any applicable Senior Liens, pursuant to Bankruptcy Code section 364(d), valid, enforceable, and fully perfected first priority senior priming security interests in and senior priming liens upon all of the Debtors' right, title, and interest in, to, and under all DIP Collateral, including, without limitation, priming security interests and priming liens which are senior to (i) the Pre-Petition Liens held by the Pre-Petition Lender, on behalf of the Pre-Petition Lender, and (ii) the Adequate Protection Liens;

(D)    notwithstanding anything to the contrary contained in the Interim Order or the Final Order, the DIP Liens and the Adequate Protection Liens shall not be subject or subordinate to (i) Bankruptcy Code sections 510, 549, or 550; (ii) any lien or security interest that is avoided or preserved for the benefit of the Debtors or their Estates under Bankruptcy Code section 551; or (iii) any intercompany or affiliate liens of the Debtors;

(ii)    (A) until the Payment in Full of the Pre-Petition Obligations, the Pre-Petition Lender, for itself and for the benefit of the Pre-Petition Lender, has been granted, pursuant to the Final Order (or, prior to the entry of the Final Order, the Interim Order where applicable), the Adequate Protection Liens, which are valid, binding, enforceable and perfected replacement and additional security interests and liens on all the Debtors' right, title, and interest in and to the

61

DIP Collateral to the extent of the Adequate Protection Obligations, which liens shall be junior in all respects only to the DIP Liens, the Senior Liens, and the Carve Out; (B) the Adequate Protection Liens shall be deemed to be fully perfected as of the Applicable Petition Date and, subject to Section IX of the Interim Order and any corresponding provisions of the Final Order, not subject to subordination or avoidance for any cause or purpose in the Case, and (C) except for the DIP Liens and the Senior Liens and the Carve Out), the Adequate Protection Liens (i) shall not be made subject to or *pari passu* with any lien or security interest by any court order heretofore or hereafter entered in the Case (unless with the consent of the Pre-Petition Lender); (ii) shall not be subject to Bankruptcy Code sections 506(c) (upon entry of the Final Order), 510, 549, or 550 and (iii) no lien or interest avoided and preserved for the benefit of any Estate pursuant to Bankruptcy Code section 551 shall be made *pari passu* with or senior to the Adequate Protection Liens;

(iii)     pursuant to the Final Order (or, prior to the entry of the Final Order, the Interim Order), As further adequate protection, to the extent that the Adequate Protection Liens do not adequately protect the diminution in value of the Pre-Petition Lender's interest in the Pre-Petition Collateral, the Pre-Petition Lender is hereby granted the Adequate Protection Claim against the Debtors' Estates under Bankruptcy Code sections 503 and 507(b), which shall, subject only to the DIP Superpriority Claim and the Carve-Out, have priority over all other administrative expense claims, priority claims and unsecured claims against the Debtors or their Estates, which are now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses and priority or other claims of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 364, 365, 503(a), 503(b), 506(c) (upon entry of the Final Order), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114;

(iv)     the Final Order (and prior to the entry thereof, the Interim Order where applicable) is sufficient and conclusive evidence of the priority, perfection, and validity of  the DIP Liens, effective as of the Applicable Petition Date, without any further act and without regard to any other federal, state, or local requirements or law requiring notice, filing, registration, recording, or possession of the DIP Collateral, or other act to validate or perfect such security interest or lien, including, without limitation, control agreements with any financial institution(s) holding any deposit account of Borrowers or any Guarantor (a "**Perfection Act**").  Notwithstanding the foregoing, if Lender or the Pre-Petition Lender (on account of its Adequate Protection Liens) shall, in their respective sole discretion, elect for any reason to file, record, or otherwise effectuate any Perfection Act, pursuant to the Final Order (or, prior to the entry of the Final Order, the Interim Order), each of Lender and the Pre-Petition Lender (with the prior written consent of Lender) is authorized to perform such act, and, pursuant to the Final Order (or, prior to the entry of the Final Order, the Interim Order), Debtors are authorized to perform such acts to the extent necessary or reasonably requested by Lender and/or the Pre-Petition Lender, which act or acts shall be deemed to have been accomplished as of the Applicable Petition Date notwithstanding the date and time actually accomplished, and in such event, the subject filing or recording office is authorized to accept, file or record any document in regard to such act in accordance with applicable law. Pursuant to the Final Order (or, prior to the entry of the Final Order, the Interim Order), Lender and/or the Pre-Petition Lender may choose to file, record or present a certified copy of the Final Order (or, prior to the entry of the Final Order, the Interim Order where applicable), in the same manner as a Perfection Act, which shall be tantamount to a Perfection Act, and, in such event, the subject filing or recording office is authorized to accept, file, or record such certified copy of the Final Order (or, prior to the entry of the Final Order, the Interim Order where applicable) in accordance with applicable law. Should Lender and/or the Pre-Petition Lender so choose and attempt to file, record or perform a Perfection Act, no defect or failure in connection with such attempt shall in any way limit, waive, or alter the validity, enforceability, attachment, priority, or

perfection of the DIP Liens or the Adequate Protection Liens granted herein by virtue of the entry of the Final Order (or, prior to the entry of the Final Order, the Interim Order where applicable).

**(c)** **Non-Exclusive Relief**. The agreement of Lender to provide Post-Petition financing to Borrowers will not prohibit Lender or Pre-Petition Lender from moving in the Bankruptcy Court for any other and further relief which Lender or such Pre-Petition Lender, as applicable, believes in good faith to be reasonably and immediately necessary to protect their rights with respect to the DIP Collateral and/or the Pre-Petition Collateral (as applicable) (including a request for Debtors to abandon any part of the DIP Collateral and/or the Pre-Petition Collateral (as applicable)) or otherwise.

**(d)** **No Intent to Hinder, Delay or Defraud**. Neither the incurrence of the Obligations, the granting of Liens under this Agreement on the DIP Collateral to secure the Obligations, the creation of Liens on the DIP Collateral to secure the Obligations under the Interim Order or Final Order and/or any other Loan Document, the granting of Liens under this Agreement on the DIP Collateral to secure the Adequate Protection Obligations or the creation of the Liens on the DIP Collateral to secure the Adequate Protection Obligations under the Interim or Final Order and/or any other Loan Document, was incurred, granted or transferred, as applicable, with any intent to hinder, delay or defraud any of its respective creditors.

**(e)** **Grants, Rights and Remedies**. The Liens and administrative priority granted by or pursuant to the Interim Order, the Final Order, this Agreement or any other Loan Document (and, in the case of Liens in the Pre-Petition Collateral in favor of the Pre-Petition Lender, granted by or pursuant to the Pre-Petition Loan Documents) are independently granted. The Interim Order, the Final Order, this Agreement and the other Loan Documents (and, in the case of Liens in the Pre-Petition Collateral in favor of the Pre-Petition Lender, the Pre-Petition Loan Documents) supplement each other, and the grants, priorities, rights and remedies of Lender hereunder and thereunder and of Pre-Petition Lender hereunder and thereunder are cumulative.

## 17. ACKNOWLEDGMENT; REAFFIRMATION AND RELEASE.

**(a)** As of the Second Petition Date, the aggregate amount of all Obligations (as defined in the Pre-Petition Loan Agreement) owing by Debtors to the Pre-Petition Lender under and in connection with the Pre-Petition Financing Documents was not less than (A) $12,792,674.70, consisting of (1) Pre-Petition Revolving Loans in an outstanding principal amount of $11,974,354 under the Pre-Petition Loan Agreement, plus interest accrued and accruing thereon at the rate in effect on the Second Petition Date, plus (2) accrued and accruing fees, plus (3) all accrued and accruing costs and expenses (including attorneys' fees and legal expenses), plus (4) any other charges and liabilities accrued, accruing or chargeable, whether due or to become due, matured or contingent, under the Pre-Petition Loan Agreement (collectively, "**Pre-Petition Obligations**"). Without limiting the foregoing, the Pre-Petition Obligations shall include all indemnification obligations of Debtors to the Pre-Petition Lender arising under the Pre-Petition Financing Documents, including without limitation the indemnitee and other protections provided to indemnitees under the obligations arising under the Pre-Petition Loan Agreement which survive payment in full of the Pre-Petition Obligations.

**(b)** The Pre-Petition Obligations constitute allowed, legal, valid, binding, enforceable, and non-avoidable obligations of Debtors, and are not subject to any offset, deduction, defense, counterclaim, avoidance, recovery, recharacterization, or subordination pursuant to the Bankruptcy Code or any other applicable law, and the Debtors do not possess, and shall not assert, any claim, counterclaim, setoff, deduction, or defense of any kind, nature, or description that would in any way impair, reduce, or affect the validity, enforceability, and nonavoidability of any of the Pre-Petition Obligations.

63

(c)        Each Debtor confirms and agrees that:

(i)        as of the Applicable Petition Date, the Pre-Petition Lender, had and shall continue to have, and the Pre-Petition Obligations were and shall continue to be secured by, the Pre-Petition Liens on the Pre-Petition Collateral, which were and are valid, binding, perfected, enforceable and non-avoidable first priority security interests and Liens, subject only to (A) Senior Liens, and (B) from and after the entry of the Final Order, or, prior to the entry of the Final Order, the Interim Order, (1) the Carve-Out, (2) the Liens of Lender securing the Post-Petition Obligations, and (3) the Adequate Protection Liens,

(ii)        the Pre-Petition Lender has a valid, binding and perfected nonavoidable and first priority security interest (subject only to (A) Senior Liens, and (B) from and after the entry of the Final Order, or, prior to the entry of the Final Order, the Interim Order, (1) the Carve-Out, (2) the Liens of Lender securing the Post-Petition Obligations, and (3) the Adequate Protection Liens)) and lien in all of Debtor's Cash Collateral, including all amounts on deposit in all of Debtor's banking, checking or other deposit accounts with each of the Pre-Petition Lender, whether as original Collateral or proceeds of other Pre-Petition Collateral, and all such Cash Collateral is part of the Pre-Petition Collateral, and

(iii)        pursuant to the Final Order, or, prior to the entry of the Final Order, the Interim Order where applicable, the Pre-Petition Lender, has been granted and shall continue to have valid, enforceable and perfected security interests and Liens on all the Debtors' right, title, and interest in and to the DIP Collateral to the extent of the Adequate Protection Obligations, which liens shall be junior in all respects only to the DIP Liens, the Senior Liens and the Carve-Out).

(d)        In consideration of, and as a condition to Lender  making Term Loans under this Agreement, the Pre-Petition Lender consenting to the use of Cash Collateral, and providing other credit and financial accommodations to the Debtors pursuant to the provisions of the Interim Order and the DIP Loan Documents, each Debtor, on behalf of itself, its successors and assigns and its Estate (collectively, the "**Releasors**"), subject only to Section IX of the Interim Order, hereby absolutely releases and forever discharges and acquits Pre-Petition Lender and each of its successors, participants, and assigns, and their present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees, and other representatives (the Pre-Petition Lender, and all such other parties being hereinafter referred to collectively as the "**Releasees**") of and from any and all claims, demands, causes of action, suits, covenants, contracts, controversies, agreements, promises, sums of money, accounts, bills, reckonings, damages, and any and all other claims, counterclaims, cross claims, defenses, rights of set-off, demands, and liabilities whatsoever (individually, a "**Pre-Petition Released Claim**" and collectively, the "**Pre-Petition Released Claims**") of every kind, name, nature and description, known or unknown, foreseen or unforeseen, matured or contingent, liquidated or unliquidated, primary or secondary, suspected or unsuspected, both at law and in equity, including, without limitation, any so-called "lender liability" claims or defenses, that any Releasor may now or hereafter own, hold, have, or claim to have against the Releasees, or any of them for, upon, or by reason of any nature, cause, or thing whatsoever that arose or may have arisen at any time on or prior to the date of the Interim Order, in respect of the Debtors, the Pre-Petition Obligations, the Pre-Petition Financing Documents, and any Pre-Petition Revolving Loans or other financial accommodations under the Pre-Petition Financing Documents; **provided**, **however**, that such release shall not be effective with respect to the Debtors until entry of the Final Order, and with respect to the Estates, until the expiration of the Challenge Period.

(e)        In addition, (i)(x) with respect to the Debtors, upon entry of the Final Order and (y) with respect to the Debtors' Estates, upon expiration of the Challenge Period, (ii) the Payment in Full of the

Obligations, and (iii) termination of the rights and obligations arising under the Interim Order and the Loan Documents (which payment and termination shall be on terms and conditions acceptable to Lender), Lender shall be automatically deemed to be absolutely and forever released and discharged from any and all obligations, liabilities, actions, duties, responsibilities, commitments, claims, and causes of action arising, occurring in connection with, or related to the Loan Documents or the Interim Order (whether known or unknown, direct or indirect, matured or contingent, foreseen or unforeseen, due or not due, primary or secondary, liquidated or unliquidated).

(f)     Upon the entry of the Final Order, and subject to Section IX of the Interim Order with respect to all applicable parties other than the Debtors, each Releasor hereby absolutely, unconditionally and irrevocably covenants and agrees with each Releasee that it will not sue (at law, in equity, in any regulatory proceeding, or otherwise) any Releasee on the basis of any Pre-Petition Released Claim that has been released and discharged by each Releasor pursuant to Section IX(28)(b) of the Interim Order and Section 17(a) above. If any Releasor violates the foregoing covenant, Debtors agree to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.

(g)     Each Debtor, in its capacity as a Borrower or Guarantor under the Pre-Petition Financing Documents or as a Borrower or Guarantor hereunder, as applicable, hereby: (i) ratifies, assumes, adopts and agrees to be bound by all of the Pre-Petition Financing Documents to which it is a party and (ii) agrees to pay all Pre-Petition Obligations for which it is obligated in accordance with the terms of the Pre-Petition Loan Documents and in accordance with the Interim Order and Final Order.  All of the Pre-Petition Financing Documents to which any Debtor, in its capacity as a capacity as a Borrower or Guarantor under the Pre-Petition Financing Documents, as applicable, are hereby and shall be deemed adopted and assumed in full by each such Debtor, in each case as a Debtor and Debtor-in-possession, and considered as agreements among the Debtors, on the one hand, and Pre-Petition Lender, on the other.

(h)     Each Debtor, in its capacity as a Borrower or Guarantor hereunder or under the Pre-Petition Financing Documents , as applicable, hereby acknowledges and agrees that: (i) Lender (or its designee) may credit bid some or all of the Pre-Petition Obligations and the Post-Petition Obligations, which are in the aggregate amount acknowledged hereunder, to acquire the DIP Collateral pursuant to documents, agreements, instruments, orders and papers that are in form and substance acceptable to Lender; (ii)_ Lender (or its designee) may act as a stalking horse purchaser for substantially all of the Debtors' assets, which are DIP Collateral, and as such will require (x) the Debtors to establish a minimum topping bid of $650,000 in respect of any such stalking horse bid by Lender, (y) such minimum topping bid shall also include reasonable expense reimbursement for the Lender in connection with the professional fees and expenses incurred in connection with this DIP financing and the related sale process contemplated by the Milestones, which shall not exceed $550,000, and (z) the Lender shall have designation rights in respect of all Material Contracts, including, without limitation, Debtor leases of non-residential real property.

(i)     Notwithstanding the foregoing or anything herein to the contrary, the Pre-Petition Lender agrees to the deferral of any and all fees to the closing of the Credit Bid (as defined in the Interim Order). In the event that the Credit Bid is topped by an alternate bidder, the fees of the Pre-Petition Lender and Lender shall be paid immediately upon the closing of the sale of the Debtors' assets, however, shall the Credit Bid be the successful bidder, the fees of the Pre-Petition Lender and the Lender shall be paid through the Loans pursuant to this Agreement.

## 18.    <u>GUARANTY.</u>

(d)    **Guaranty**.  Each Guarantor hereby jointly and severally and unconditionally and irrevocably guarantees the punctual payment when due, whether at stated maturity, by acceleration or otherwise, of all Obligations of the Borrowers now or hereafter existing under any Loan Document, whether for principal, interest (including, without limitation, all interest that accrues after the commencement of any Insolvency Proceeding of any Borrower, whether or not a claim for post-filing interest is allowed in such Insolvency Proceeding), fees, commissions, expense reimbursements, indemnifications or otherwise (such obligations, to the extent not paid by the Borrowers, being the "**Guaranteed Obligations**"), and agrees to pay any and all expenses (including reasonable counsel fees and expenses) incurred by Secured Parties in enforcing any rights under the guaranty set forth in this Section 18.  Without limiting the generality of the foregoing, each Guarantor's liability shall extend to all amounts that constitute part of the Guaranteed Obligations and would be owed by the Borrowers to the Secured Parties under any Loan Document but for the fact that they are unenforceable or not allowable due to the existence of an Insolvency Proceeding involving any Borrower.  Notwithstanding any of the foregoing, Guaranteed Obligations shall not include any Excluded Swap Obligations.  In no event shall the obligation of any Guarantor hereunder exceed the maximum amount such Guarantor could guarantee under any Debtor Relief Law.

(e)    **Guaranty Absolute**.  Each Guarantor jointly and severally guarantees that the Guaranteed Obligations will be paid strictly in accordance with the terms of the Loan Documents, regardless of any law, regulation or order now or hereafter in effect in any jurisdiction affecting any of such terms or the rights of the Secured Parties with respect thereto.  Each Guarantor agrees that this Section 18 constitutes a guaranty of payment when due and not of collection and waives any right to require that any resort be made by the Agent or any Lender to any Collateral.  The obligations of each Guarantor under this **Error! Reference source not found.** are independent of the Guaranteed Obligations, and a separate action or actions may be brought and prosecuted against each Guarantor to enforce such obligations, irrespective of whether any action is brought against any Debtor or whether any Debtor is joined in any such action or actions.  The liability of each Guarantor under this **Error! Reference source not found.** shall be irrevocable, absolute and unconditional irrespective of, and each Guarantor hereby irrevocably waives any defenses it may now or hereafter have in any way relating to, any or all of the following:

(i)    any lack of validity or enforceability of any Loan Document or any agreement or instrument relating thereto;

(ii)    any change in the time, manner or place of payment of, or in any other term of, all or any of the Guaranteed Obligations, or any other amendment or waiver of or any consent to departure from any Loan Document, including, without limitation, any increase in the Guaranteed Obligations resulting from the extension of additional credit to any Debtor or otherwise;

(iii)    any taking, exchange, release or non-perfection of any Collateral, or any taking, release or amendment or waiver of or consent to departure from any other guaranty, for all or any of the Guaranteed Obligations;

(iv)    the existence of any claim, set-off, defense or other right that any Guarantor may have at any time against any Person, including, without limitation, Lender;

(v)    any change, restructuring or termination of the corporate, limited liability company or partnership structure or existence of any Debtor; or

(vi)    any other circumstance (including, without limitation, any statute of limitations) or any existence of or reliance on any representation by the Secured Parties that might otherwise constitute a defense available to, or a discharge of, any Debtor or any other guarantor or surety.

66

This **Error! Reference source not found.** shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Guaranteed Obligations is rescinded or must otherwise be returned by Secured Parties or any other Person upon the insolvency, bankruptcy or reorganization of any Borrower or otherwise, all as though such payment had not been made.

(f)    Waiver.    Each Guarantor hereby waives (i) promptness and diligence, (ii) notice of acceptance and any other notice with respect to any of the Guaranteed Obligations and this **Error! Reference source not found.** and any requirement that the Secured Parties exhaust any right or take any action against any Debtor or any other Person or any Collateral, (iii) any right to compel or direct Lender to seek payment or recovery of any amounts owed under this **Error! Reference source not found.** from any one particular fund or source or to exhaust any right or take any action against any other Debtor, any other Person or any Collateral, (iv) any requirement that any Lender protect, secure, perfect or insure any security interest or Lien on any property subject thereto or exhaust any right to take any action against any Debtor, any other Person or any Collateral, and (v) any other defense available to any Guarantor. Each Guarantor agrees that the Secured Parties shall have no obligation to marshal any assets in favor of any Guarantor or against, or in payment of, any or all of the Obligations. Each Guarantor acknowledges that it will receive direct and indirect benefits from the financing arrangements contemplated herein and that the waiver set forth in this 1(f) is knowingly made in contemplation of such benefits. Each Guarantor hereby waives any right to revoke this **Error! Reference source not found.**, and acknowledges that this Error! Reference source not found. is continuing in nature and applies to all Guaranteed Obligations, whether existing now or in the future.

(g)    Continuing Guaranty; Assignments.    This **Error! Reference source not found.** is a continuing guaranty and shall (a) remain in full force and effect until the later of the cash payment in full of the Guaranteed Obligations (other than Contingent Indemnity Obligations) and all other amounts payable under this **Error! Reference source not found.** and the Maturity Date, (b) be binding upon each Guarantor, its successors and assigns and (c) inure to the benefit of and be enforceable by the Secured Parties and their successors, pledgees, transferees and assigns. Without limiting the generality of the foregoing clause (c), Lender may pledge, assign or otherwise transfer all or any portion of its rights and obligations under this Agreement (including, without limitation, all or any portion of its commitments, its Loans owing to it) to any other Person, and such other Person shall thereupon become vested with all the benefits in respect thereof granted such Lender herein or otherwise, in each case as provided in Section 13(d).

(h)    Subrogation.    No Guarantor will exercise any rights that it may now or hereafter acquire against any Debtor or any other guarantor that arise from the existence, payment, performance or enforcement of such Guarantor's obligations under this **Error! Reference source not found.**, including, without limitation, any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of the Secured Parties against any Debtor or any other guarantor or any Collateral, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including, without limitation, the right to take or receive from any Debtor or any other guarantor, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security solely on account of such claim, remedy or right, unless and until all of the Guaranteed Obligations (other than contingent indemnity obligations) and all other amounts payable under this **Error! Reference source not found.** shall have been paid in full in cash and the Maturity Date shall have occurred. If any amount shall be paid to any Guarantor in violation of the immediately preceding sentence at any time prior to the later of the payment in full in cash of the Guaranteed Obligations (other than contingent indemnity obligations) and all other amounts payable under this **Error! Reference source not found.** and the Maturity Date, such amount shall be held in trust for the benefit of the Secured Parties and shall forthwith be paid to the Secured Parties to be credited and applied to the Guaranteed Obligations and all other amounts payable under this **Error! Reference source not found.**, whether matured or unmatured, in

67

accordance with the terms of this Agreement, or to be held as Collateral for any Guaranteed Obligations or other amounts payable under this **Error! Reference source not found.** thereafter arising.  If (i) any Guarantor shall make payment to the Secured Parties of all or any part of the Guaranteed Obligations, (ii) all of the Guaranteed Obligations and all other amounts payable under this **Error! Reference source not found.** shall be paid in full in cash and (iii) the Maturity Date shall have occurred, the Secured Parties will, at such Guarantor's request and expense, execute and deliver to such Guarantor appropriate documents, without recourse and without representation or warranty, necessary to evidence the transfer by subrogation to such Guarantor of an interest in the Guaranteed Obligations resulting from such payment by such Guarantor.

(i)     _Contribution_.  All Guarantors desire to allocate among themselves, in a fair and equitable manner, their obligations arising under this Guaranty.  Accordingly, in the event any payment or distribution is made on any date by a Guarantor under this Guaranty such that its Aggregate Payments exceeds its Fair Share as of such date, such Guarantor shall be entitled to a contribution from each of the other Guarantors in an amount sufficient to cause each Guarantor's Aggregate Payments to equal its Fair Share as of such date.  "**Fair Share**" means, with respect to any Guarantor as of any date of determination, an amount equal to (a) the ratio of (i) the Fair Share Contribution Amount with respect to such Guarantor, to (ii) the aggregate of the Fair Share Contribution Amounts with respect to all Guarantors multiplied by, (b) the aggregate amount paid or distributed on or before such date by all Guarantors under this Guaranty in respect of the obligations Guaranteed.  "**Fair Share Contribution Amount**" means, with respect to any Guarantor as of any date of determination, the maximum aggregate amount of the obligations of such Guarantor under this Guaranty that would not render its obligations hereunder subject to avoidance as a fraudulent transfer or conveyance under Section 548 of Title 11 of the United States Code or any comparable applicable provisions of state law; _provided_, solely for purposes of calculating the "Fair Share Contribution Amount" with respect to any Guarantor for purposes of this 1(i), any assets or liabilities of such Guarantor arising by virtue of any rights to subrogation, reimbursement or indemnification or any rights to or obligations of contribution hereunder shall not be considered as assets or liabilities of such Guarantor.  "**Aggregate Payments**" means, with respect to any Guarantor as of any date of determination, an amount equal to (A) the aggregate amount of all payments and distributions made on or before such date by such Guarantor in respect of this Guaranty (including, without limitation, in respect of this 1(i)), _minus_ (B) the aggregate amount of all payments received on or before such date by such Guarantor from the other Guarantors as contributions under this 1(i).  The amounts payable as contributions hereunder shall be determined as of the date on which the related payment or distribution is made by the applicable Guarantor.  The allocation among Guarantors of their obligations as set forth in this 1(i) shall not be construed in any way to limit the liability of any Guarantor hereunder.  Each Guarantor is a third party beneficiary to the contribution agreement set forth in this 1(i).

•Signature Page to Follow]

68

**IN WITNESS WHEREOF**, the parties hereto have caused this Secured Superpriority Debtor-In-Possession Loan, Security and Guaranty Agreement to be duly executed as of the date first above written.

The entities defined as Borrowers hereunder are authorized by Resolutions attached to each of their respective Petitions or otherwise to enter into this agreement.  Mr. William Ian MacDonald, acting as Manager and/or controlling Member or Shareholder, as the case may be, is hereby authorized to execute this agreement on behalf of each of the below Borrower, and so executes this Agreement in such capacity.

<u>**BORROWERS:**</u>

**BMH RTO, LLC**
**BUDDY MAC TWENTY-ONE, LLC**
**BUDDY MAC TWENTY-TWO, LLC**
**BUDDY MAC TWENTY-THREE, LLC**
**BUDDY MAC TWENTY-FOUR, LLC**
**BUDDY MAC TWENTY-FIVE, LLC**
**BUDDY MAC TWENTY-SIX, LLC**
**BUDDY MAC TWENTY-SEVEN, LLC**
**BMH-TNM 28, LLC**
**BMH-TNM 29, LLC**
**BMH-TNM 30, LLC**
**BMH-TNM 31, LLC**
**BMH-TNM 32, LLC**
**BMH-TNM 33, LLC**
**BMH-RCL 34, LLC**
**BMH-RCL 35, LLC**
**BMH-RCL 36, LLC**
**BMH-RCL 37, LLC**
**BMH-RCL 38, LLC**
**BMH-RCL 39, LLC**
**BMH-RCL 40, LLC**
**BMH-RCL 41, LLC**
**BMH-RCL 42, LLC**
**BMH-FAN 43, LLC**
**BMH-FAN 44, LLC**
**BMH-FAN 45, LLC**
**BMH-FAN 46, LLC**
**BMH-FAN 47, LLC**
**BMH-FAN 48, LLC**
**BMH-FAN 49, LLC**
**BMH-FAN 50, LLC**
**BMH-FAN 51, LLC**
**BMH-FAN 52, LLC**
**BMH-FAN 53, LLC**
**BMH-FAN 54, LLC**

*[Secured Superpriority Debtor-In-Possession Loan, Security and Guaranty Agreement]*

**BMH-SM 79, LLC**
**BMH-SM 80, LLC**
**BMH-SM 81, LLC**
**BMH-SM 82, LLC**
**BMH-SM 83, LLC**
**BMH-SM 84, LLC**
**BMH-SM 85, LLC**
**BMH-SM 86, LLC**
**BMH-SM 87, LLC**
**BUDDY MAC ONE, LLC**
**BMH ONE RE, LLC**
**BMH 95 RE CARUTHERSVILLE, LLC**
**BMH 96 RE MARION, LLC**
**BUDDY MAC TWO, LLC**
**BUDDY MAC SIX, LLC**
**BUDDY MAC SIX RE, LLC**
**BUDDY MAC EIGHT, LLC**
**BUDDY MAC ELEVEN, LLC**
**BUDDY MAC TWLEVE, LLC**
**BUDDY MAC EIGHTEEN, LLC**
**BUDDY MAC NINETEEN, LLC**
**BMH-NEW 58, LLC**
**BMH-NEW 62, LLC**
**BMH-WF TX 67, LLC**
**BMH-TB 75, LLC**
**BMH 85 RE SIKESTON, LLC**
**BMH PRIME 95, LLC**
**BMH PRIME 96, LLC**
**BMH PRIME 97, LLC**
**BMH HR LLC**
**SAM BROWNFIELD, LLC**
**SAM PLAINVIEW, LLC**
**MACDONALD CAPITAL CORPORATION**


By:_____
Name:
Title:

70

**GUARANTORS:**

**BUDDY MAC HOLDINGS, LLC**


By:_____
Name:
Title:


**MACDONALD CAPITAL CORPORATION**


By:_____
Name:
Title:


**LENDER:**

**PHONIX RBS, LLC**


By:_____
Name:
Title:

71

SCHEDULES

The following Schedules to the within Secured Superpriority Debtor-In-Possession Loan, Security and Guaranty Agreement are respectively described in the section indicated.  Those Schedules in which no information has been inserted shall be deemed to read "None".

## SCHEDULE A

**[TO BE PROVIDED]**

## <u>SCHEDULE B</u>

**Bank Schedule**

Buddy Mac Holdings, LLC, et al.
Case No. 25-34839-mvl11

### Initial Debtors' Bank Accounts

| STORE | DEBTOR NAME | CASH BANK | CASH BANK ACCT NO. | SOUTHSTATE BANK ACCT NO. |
|---|---|---|---|---|
| #488 | Buddy Mac One LLC | Chase Bank | xxxxx7932 | xxxxxxxx4715 |
| #432 | Buddy Mac Twenty-one LLC | Banc First | xxxxxx4362 | xxxxxx4744 |
| #433** | Buddy Mac Twenty-two LLC | Banc First | xxxxxx4370 | xxxxxx4736 |
| #434 | Buddy Mac Twenty-three LLC | RBC Bank | xxxxx2480 | xxxxxx4769 |
| #435 | Buddy Mac Twenty-four LLC | Banc First | xxxxxx4420 | xxxxxx4777 |
| #436** | Buddy Mac Twenty-five LLC | Banc First | xxxxxx4388 | xxxxxx4751 |
| #437 | Buddy Mac Twenty-six LLC | Banc First | xxxxxx4404 | xxxxxx4785 |
| #515** | Buddy Mac Twenty-seven LLC | Security Bank of Tulsa | xxx6781 | xxxxxx4793 |
| #375 | BMH-TNM 28 LLC | Wells Fargo | xxxxxx8638 | xxxxxx5188 |
| #568** | BMH-TNM 29 LLC | Wells Fargo | xxxxxx0102 | xxxxxx5204 |
| #376 | BMH-TNM 30 LLC | Wells Fargo | xxxxxx0128 | xxxxxx5212 |
| #377 | BMH-TNM 31 LLC | Wells Fargo | xxxxxx0169 | xxxxxx5220 |
| #378 | BMH-TNM 32 LLC | Wells Fargo | xxxxxx0201 | xxxxxx5238 |
| #592 | BMH-TNM 33 LLC | SUNDOWN BANK | xx3949 | xxxxxx5246 |
| #311** | BMH-RCL 34 LLC | ARVEST | xxxx3842 | xxxxxx5253 |
| #312** | BMH-RCL 35 LLC | ARVEST | xxxx5484 | xxxxxx5261 |
| #310** | BMH-RCL 36 LLC | ARVEST | xxxx5882 | xxxxxx5279 |
| #307 | BMH-RCL 37 LLC | ARVEST | xxxx6250 | xxxxxx5287 |
| #308** | BMH-RCL 38 LLC | ARVEST | xxxx6632 | xxxxxx5295 |
| #313 | BMH-RCL 39 LLC | ARVEST | xxxx7275 | xxxxxx5303 |
| #309 | BMH-RCL 40 LLC | COMMERCE BANK | xxxxx5431 | xxxxxx5311 |
| #305 | BMH-RCL 41 LLC | Wells Fargo | xxxxxx8620 | xxxxxx5329 |
| #304** | BMH-RCL 42 LLC | Regions Bank | xxxxxx1501 | xxxxxx5337 |
| #612 | BMH-FAN 43 LLC | Community First Banking Company | xxxxx0221 | xxxxxx5266 |
| #603 | BMH-FAN 44 LLC | Centennial Bank | xxxxx8079 | xxxxxx5308 |
| #604 | BMH-FAN 45 LLC | Centennial Bank | xxxxx8857 | xxxxxx5274 |
| #605 | BMH-FAN 46 LLC | Southern Bankcorp | xxx7406 | xxxxxx5316 |
| #614 | BMH-FAN 47 LLC | Arvest Bank | xxxx0616 | xxxxxx5282 |
| #606 | BMH-FAN 48 LLC | Partners Bank | xxxx1928 | xxxxxx5324 |
| #607 | BMH-FAN 49 LLC | Southern Bankcorp | xxx7414 | xxxxxx5290 |
| #608 | BMH-FAN 50 LLC | FIRST HORIZON | xxxxxxx2680 | xxxxxx5332 |
| #609 | BMH-FAN 51 LLC | Centennial Bank | xxxxx8997 | xxxxxx5340 |
| #610 | BMH-FAN 52 LLC | Arvest Bank | xxxx0315 | xxxxxx5357 |
| #613 | BMH-FAN 53 LLC | Regions Bank | xxxxxx1056 | xxxxxx5365 |
| #611** | BMH-FAN 54 LLC | FIRST HORIZON | xxxxxxx2672 | xxxxxx5373 |
| #631 | BMH-SM 79, LLC | FIRST STATE COMMUNITY BANK | xxx8575 | xxxxxx3435 |
| #632 | BMH-SM 80, LLC | FIRST STATE COMMUNITY BANK | xxx8633 | xxxxxx3377 |
| #633 | BMH-SM 81, LLC | FIRST STATE COMMUNITY BANK | xxx8641 | xxxxxx3393 |
| #634 | BMH-SM 82, LLC | FIRST STATE COMMUNITY BANK | xxx8682 | xxxxxx3443 |
| #635 | BMH-SM 83, LLC | FIRST STATE COMMUNITY BANK | xxx8708 | xxxxxx3427 |
|  | BMH-SM 84, LLC | N/A | N/A | xxxxxx3385 |
| #636 | BMH-SM 85, LLC | FIRST STATE COMMUNITY BANK | xxx8724 | xxxxxx3419 |
| #637 | BMH-SM 86, LLC | FIRST STATE COMMUNITY BANK | xxx8922 | xxxxxx3401 |
| #638** | BMH-SM 87, LLC | FIRST STATE COMMUNITY BANK | xxx8948 | xxxxxx3450 |
|  | BMH-RTO, LLC | N/A | N/A | xxxxxx5485 |
|  | **Buddy Mac Holdings LLC** | **Wells Fargo DIP ACCOUNT** | xxxxxx7011 | N/A |
|  | **Buddy Mac Holdings LLC** | **UTILITY DEPOSIT** | N/A | xxxxxx5234 |

** closed/merged into other stores

Buddy Mac Holdings, LLC, et al.
Case No. 25-34839-mvl11

### Subsequent Debtors' Bank Accounts

| STORE | DEBTOR NAME | CASH BANK | CASH BANK ACCT NO. | SOUTHSTATE BANK ACCT NO. |
|---|---|---|---|---|
| #489 | Buddy Mac Two LLC | Wells Fargo | xxxxxx2420 | xxxxxx0620 |
| #496 | Buddy Mac Six LLC | Wells Fargo | xxxxxx1223 | xxxxxx1784 |
| #602 | Buddy Mac Eight LLC | Wells Fargo | xxxxxx7086 | xxxxxx1800 |
| #601 | Buddy Mac Eleven LLC | Wells Fargo | xxxxxx4471 | xxxxxx1834 |
| #497 | Buddy Mac Twelve LLC | Chase bank | xxxxx9353 | xxxxxx0355 |
| #430 | Buddy Mac Eighteen LLC | Regions Bank | xxxxxx6323 | xxxxxx3845 |
| #620 | BMH- NEW 58, LLC | Bank of Commerce | xxx2300 | xxxxxx4276 |
| #643 | BMH-WF TX 67, LLC | Wells Fargo | xxxxxx6859 | xxxxxx5242 |
| #007 | BMH-TB 75, LLC | Wells Fargo | xxxxxx9825 | xxxxxx5903 |
| #646 | BMH PRIME 95 LLC | First State Bank and Trust | xxx0738 | xxxxxx8591 |
| #644 | BMH PRIME 96 LLC | Regions Bank | xxxxxx3446 | xxxxxx8583 |
| #645 | BMH Prime 97, LLC | Arvest Bank | xxxx7059 | xxxxxx7585 |
| 615 | Buddy Mac Nineteen, LLC | Arvest Bank | xxxx1366 | xxxxxx5208 |
| 641 | BMH-NEW 62, LLC | Happy State | xxxxxx2351 | xxxxxx7593 |
|  | BMH-HR, LLC | Plains Capital | xxxx2900 | xxxxxx9042 |
|  | MacDonald Capital Corp. |  | N/A | xxxxxx4987 |
|  | Buddy Mac Six RE LLC |  | N/A | N/A |
|  | SAM Plainview, LLC |  | N/A | N/A |
|  | SAM Brownfield, LLC |  | N/A | N/A |
|  | BMH 85 RE Sikeston, LLC |  | N/A | N/A |

** closed/merged into other stores

## SCHEDULE C

**Personal Property Leases**

**[TO BE PROVIDED]**

## SCHEDULE D

## [Reserved]

<u>**SCHEDULE E**</u>

**Other Encumbrances and Liens**

**[TO BE PROVIDED]**

## SCHEDULE F

**Intellectual Property**

**[TO BE PROVIDED]**

## SCHEDULE G

## ERISA PLANS

**[TO BE PROVIDED]**

## SCHEDULE H

### [Reserved]

## SCHEDULE I

**Guarantees**

**[TO BE PROVIDED]**

## EXHIBIT 1

### Financial and Other Terms

The following capitalized terms shall have the respective and corresponding meaning set forth in the table below.

| | |
|---|---|
| Credit Limit | $1,500,000 |
| Accordion Amount | $1,000,000 |
| Default Rate Margin | 2.00% |
| Maturity Date | February 22, 2026 |

**DEBTOR NOTICE ADDRESS:**

Buddy Mac Holdings, LLC
400 East Centre Park Blvd.
Suite 101
DeSoto, TX 75115
Email: ian@macfamco.com
Attention: Ian MacDonald

With a copy to:

Kane Russell Coleman Logan PC
901 Main St., Suite 5200
Dallas, Texas 75202
Email: jkane@krcl.com
Attention: John Kane

**LENDER NOTICE ADDRESS:**

Phonix RBS, LLC
7219 Renee Parker Way
Barling, AR 42933
Email: brent@motusadvised.com
Attention: Brent Turner, Manager of Member AF Newco 1 LLC, its sole member

With a copy to (which shall not constitute notice):

Blank Rome LLP
One Logan Square
130 North 18th Street
Philadelphia, PA 19103
Email: regina.kelbon@blankrome.com
Attention: Regina Stango Kelbon

## EXHIBIT 2

## TERM NOTE

$1,500,000.00                                              January [  ], 2026
                                                          New York, New York

For value received, each of the undersigned (hereinafter jointly, severally and collectively, "**Borrowers**" and each, a "**Borrower**") hereby jointly and severally promise to pay in accordance with the Loan Agreement (defined below), to the order of Phonix RBS, LLC , a Delaware limited liability company (the "**Lender**"), at its offices in 7219 Renee Parker Way, Barling, AR 42933, or at any other place designated at any time by the holder hereof, in lawful money of the United States of America and in immediately available funds, the principal sum of $1,500,000.00 or, if less, the aggregate unpaid principal amount of all Term Loans made by Lender to Borrowers under the Loan Agreement, together with interest on the principal amount hereunder remaining unpaid from time to time, computed on the basis of the actual number of days elapsed and a 360-day year, from the date hereof until this Term Note (as amended, modified, replaced, substituted, superseded or restated from time to time, the "**Note**") is fully paid at the rate from time to time in effect under the Secured Superpriority Debtor-In-Possession Loan, Security and Guaranty Agreement of even date herewith (as amended, modified, replaced, substituted, superseded, extended, renewed, or restated from time to time, the "**Loan Agreement**"; capitalized terms used herein and not otherwise defined have the meanings set forth in the Loan Agreement) by and among Lender, Borrowers and the other parties thereto. The principal hereof and interest accruing thereon shall be due and payable as provided in the Loan Agreement.

This Note may be prepaid only in accordance with the Loan Agreement.

This Note is issued pursuant, and is subject, to the Loan Agreement, which provides, among other things, for acceleration hereof. This Note is the "Term Note" referred to in the Loan Agreement.

This Note is secured, among other things, pursuant to the Loan Agreement, and may now or hereafter be secured by one or more other security agreements, mortgages, deeds of trust, assignments or other instruments or agreements.

Borrowers hereby agree to pay all costs of collection, including attorneys' fees and legal expenses in the event this Note is not paid when due, whether or not legal proceedings are commenced.

Presentment or other demand for payment, notice of dishonor and protest are expressly waived.

**[*Signature Page to Follow*]**

All rights and obligations hereunder shall be governed by the laws of the State of New York, without regard to conflicts of law principles, but including giving effect to Sections 5-1401 and 5-1402 of the New York General Obligations Law.  This Note shall be deemed to be under seal. The entities defined as Borrowers hereunder are authorized by Resolutions attached to each of their respective Petitions or otherwise to enter into this agreement.  Mr. William Ian MacDonald, acting as Manager and/or controlling Member or Shareholder, as the case may be, is hereby authorized to execute this agreement on behalf of each of the below Borrower, and so executes this Agreement in such capacity.

**BORROWERS:**

**BMH RTO, LLC**
**BUDDY MAC TWENTY-ONE, LLC**
**BUDDY MAC TWENTY-TWO, LLC**
**BUDDY MAC TWENTY-THREE, LLC**
**BUDDY MAC TWENTY-FOUR, LLC**
**BUDDY MAC TWENTY-FIVE, LLC**
**BUDDY MAC TWENTY-SIX, LLC**
**BUDDY MAC TWENTY-SEVEN, LLC**
**BMH-TNM 28, LLC**
**BMH-TNM 29, LLC**
**BMH-TNM 30, LLC**
**BMH-TNM 31, LLC**
**BMH-TNM 32, LLC**
**BMH-TNM 33, LLC**
**BMH-RCL 34, LLC**
**BMH-RCL 35, LLC**
**BMH-RCL 36, LLC**
**BMH-RCL 37, LLC**
**BMH-RCL 38, LLC**
**BMH-RCL 39, LLC**
**BMH-RCL 40, LLC**
**BMH-RCL 41, LLC**
**BMH-RCL 42, LLC**
**BMH-FAN 43, LLC**
**BMH-FAN 44, LLC**
**BMH-FAN 45, LLC**
**BMH-FAN 46, LLC**
**BMH-FAN 47, LLC**
**BMH-FAN 48, LLC**
**BMH-FAN 49, LLC**
**BMH-FAN 50, LLC**
**BMH-FAN 51, LLC**
**BMH-FAN 52, LLC**
**BMH-FAN 53, LLC**
**BMH-FAN 54, LLC**
**BMH-SM 79, LLC**
**BMH-SM 80, LLC**
**BMH-SM 81, LLC**
**BMH-SM 82, LLC**
**BMH-SM 83, LLC**
**BMH-SM 84, LLC**

**BMH-SM 85, LLC**
**BMH-SM 86, LLC**
**BMH-SM 87, LLC**
**BUDDY MAC ONE, LLC**
**BMH ONE RE, LLC**
**BMH 95 RE CARUTHERSVILLE, LLC**
**BMH 96 RE MARION, LLC**
**BUDDY MAC TWO, LLC**
**BUDDY MAC SIX, LLC**
**BUDDY MAC SIX RE, LLC**
**BUDDY MAC EIGHT, LLC**
**BUDDY MAC ELEVEN, LLC**
**BUDDY MAC TWLEVE, LLC**
**BUDDY MAC EIGHTEEN, LLC**
**BUDDY MAC NINETEEN, LLC**
**BMH-NEW 58, LLC**
**BMH-NEW 62, LLC**
**BMH-WF TX 67, LLC**
**BMH-TB 75, LLC**
**BMH 85 RE SIKESTON, LLC**
**BMH PRIME 95, LLC**
**BMH PRIME 96, LLC**
**BMH PRIME 97, LLC**
**BMH HR LLC**
**SAM BROWNFIELD, LLC**
**SAM PLAINVIEW, LLC**

By:_____
Name:
Title:

**EXHIBIT 3**

**[Reserved]**

**EXHIBIT 4**

**[Reserved]**

**EXHIBIT 5**

**[Reserved]**

**EXHIBIT 6**

**DIP Budget**

See attached.

Case 25-34839-mvl11   Doc 32092   Filed 02/11/26   Entered 02/11/26 10:52:52   Desc
Main Document   Page 163 of 179

**Buddy Mac Holdings, LLC et. al.**
Cash Budget
$ - Thousands

Filing Date>> 4-Dec

| Week # | | Actual 1 | Actual 2 | Actual 3 | Actual 4 | Actual 5 | Actual 6 | Actual 7 | Budget 8 | Budget 9 | Budget 10 | Budget 11 | Budget 12 | Budget Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending---> | 4-Dec | 6-Dec | 13-Dec | 20-Dec | 27-Dec | 3-Jan | 10-Jan | 17-Jan | 24-Jan | 31-Jan | 7-Feb | 14-Feb | 21-Feb | 12 Weeks |
| **Cash Receipts** | | - | 387.0 | 318.7 | 241.5 | 379.6 | 430.4 | 316.7 | 292.0 | 305.6 | 599.5 | 422.4 | 436.0 | 4,128.4 |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Inventory Purchases | | - | - | 196.2 | 21.5 | 117.7 | - | - | 1,000.0 | - | 200.0 | - | - | 1,535.4 |
| Payroll and Benefits | | - | 0.8 | 207.0 | - | 252.1 | - | 217.0 | - | 310.0 | 85.0 | 310.0 | - | 1,381.9 |
| Property Taxes | | - | 0.1 | - | - | 3.5 | 9.5 | 1.2 | 20.9 | - | - | - | - | 35.2 |
| Store Rent Expense | | - | - | - | - | - | 173.4 | - | - | - | 272.3 | - | 155.0 | 604.4 |
| Repairs & Maintenance | | - | 4.3 | (0.2) | 6.5 | - | 3.8 | 0.3 | 3.6 | 5.0 | 5.0 | 5.0 | 5.0 | 35.2 |
| Insurance | | - | - | - | - | - | - | - | 5.0 | - | - | - | - | 33.2 |
| Vehicle Leases | | - | - | - | - | - | - | - | 58.0 | - | - | - | 10.0 | 148.0 |
| General and Administrative | | - | 35.1 | (0.2) | - | 6.8 | 67.8 | 16.2 | 50.0 | 20.0 | 70.0 | 20.0 | 90.0 | 312.3 |
| Corporate Support | | - | 3.3 | 66.0 | - | 73.6 | 1.1 | 62.2 | 5.0 | 50.0 | 55.1 | 98.7 | 20.0 | 473.7 |
| Sales Taxes | | - | - | 25.9 | 106.8 | - | - | - | 100.0 | 98.7 | - | - | 153.0 | 385.6 |
| **Total Operating Disbursements** | | - | 43.7 | 494.7 | 134.8 | 453.7 | 255.7 | 296.9 | 1,242.5 | 433.7 | 687.4 | 433.7 | 433.0 | 4,909.8 |
| **Operating Cash Flow** | | - | 343.3 | (176.0) | 106.7 | (74.1) | 174.7 | 18.8 | (950.5) | (128.1) | (87.9) | (11.4) | 3.0 | (781.4) |
| Accumulated | | - | 343.3 | 167.3 | 274.1 | 200.0 | 374.7 | 393.5 | (557.0) | (685.1) | (773.1) | (784.4) | (781.4) | |
| **Other (Sources/Uses)** | | | | | | | | | | | | | | |
| DIP Proceeds | | | | | | | | | (750.0) | | (750.0) | | | (1,500.0) |
| Funds from BMH-HR, LLC | | | | | | | (56.5) | 56.5 | (100.0) | | | | | (156.5) |
| Adequate Protection - Phonix | | | | | | | | | 100.0 | | | | | 156.5 |
| Restructuring Fees | | | | | | | | | | 21.2 | | | 775.0 | 796.2 |
| Critical Vendors | | | | | | | | | | | | | | 25.0 |
| Utilities Deposit | | | | 25.0 | | | | | | | | | | 25.0 |
| **Total Other (Sources/Uses)** | | - | - | (201.0) | - | - | (56.5) | (37.7) | (200.5) | (149.3) | 662.1 | (11.4) | (772.0) | (102.6) |
| **Net Cash Flow** | | - | 343.3 | (201.0) | 106.7 | (74.1) | 231.3 | (37.7) | (200.5) | (149.3) | 662.1 | (11.4) | (772.0) | (102.6) |
| Accumulated | | - | 343.3 | 142.3 | 249.1 | 175.0 | 406.2 | 368.5 | 168.0 | 18.7 | 680.8 | 669.4 | (102.6) | |
| **Cash Balance** | 133.9 | 133.9 | 477.3 | 276.3 | 383.0 | 308.9 | 540.2 | 502.5 | 302.0 | 152.6 | 814.7 | 803.3 | 31.4 | 31.4 |

**EXHIBIT 7**

**Interim Order**

See attached.

**EXHIBIT 8**

**Real Property DIP Collateral**

**[TO BE PROVIDED]**

## EXHIBIT 9

### Buddy Mac Entities

1. Buddy Mac Two, LLC
2. Buddy Mac Six, LLC
3. Buddy Mac Six RE, LLC
4. Buddy Mac Eight, LLC
5. Buddy Mac Eleven, LLC
6. Buddy Mac Twleve, LLC
7. Buddy Mac Eighteen, LLC
8. Buddy Mac Nineteen, LLC
9. BMH-NEW 58, LLC
10. BMH-NEW 62, LLC
11. BMH-WF TX 67, LLC
12. BMH-TB 75, LLC
13. BMH 85 RE Sikeston, LLC
14. BMH Prime 95, LLC
15. BMH Prime 96, LLC
16. BMH Prime 97, LLC
17. BMH HR LLC
18. SAM Brownfield, LLC
19. SAM Plainview, LLC
20. MacDonald Capital Corporation

## EXHIBIT 10

## Milestones

Within the time periods set forth below (or such later times as Lender may agree in its sole and absolute discretion), the Debtors shall perform each action with respect to the Case as set forth below (the "**Milestones**"):

| Event [1] | Milestone |
|---|---|
| Filing of the (i) Buddy Mac Entity voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, (ii) DIP Motion, in form and substance satisfactory to Lender in its sole discretion, and (iii) motion for the sale of substantially all of their assets pursuant to Section 363 of the Bankruptcy Code (the "Sale Motion"), which Sale Motion shall be in form and substance satisfactory to Lender in its sole discretion | No later than Friday, January 23, 2026. |
| Retain and file an application ("Retention Application") to retain a third-party national real estate brokerage firm to market the Subject RTO Real Property owned by Buddy Mac One in Tyler, Texas (the "Texas Sale") | Within 7 days of the Third Petition Date |
| (i) Enter into an asset purchase agreement naming Lender as stalking horse bidder, in a form and substance acceptable to Lender, and (ii) file a motion establishing bidding procedures 2026 and (iii) obtain entry of a bidding procedures order  (the "Bidding Procedures Order"), which motion, bid procedures, and Bidding | On or before January 26, 2026 |

---

[1] Each event involving the filing of a motion shall include the filing of any necessary application to expedite the hearing on such motion to accommodate the milestones set forth herein.

| Procedures Order must be in form and substance acceptable to Lender | |
|---|---|
| Obtain entry of Interim Order, in form and substance acceptable to Lender, and hold a first day hearing in the Buddy Mac Entity cases: | No later than January 27, 2026 |
| Committee completes its investigation and consents to releases by the estates: | No later than February 6, 2026 |
| Obtain entry of a Final Order, in form and substance acceptable to Lender, and obtain approval of Settlement Agreement, in form and substance acceptable to Lender | No later than February 10, 2026 |
| Hold an auction in connection with the Sale Motion | Within 21 days from the entry of the Interim Order |
| Sale hearing and obtain entry of Sale Order, in form and substance acceptable to Lender | No later than February 19, 2026 |
| Debtors to consummate a sale of assets | No later than February 22, 2026 |
| Debtors to close Texas Sale | Within 45 days of the filing of the Retention Application |

# EXHIBIT 11

## Settlement Agreement

See attached.

**Execution Version**

## SETTLEMENT AGREEMENT AND MUTUAL RELEASES

This *Settlement Agreement and Mutual Release* (the "**Settlement Agreement**"), dated as of January 26, 2026, is entered into by and among William Ian MacDonald (and any successor thereto) and certain affiliated MacDonald Entities identified on Schedule 1 hereto (collectively, "**MacDonald**"), BMH RTO, LLC and the other BMH Debtors (as defined below; the BMH Debtors and the Buddy Mac Entities (as defined below) are referred to herein collectively as the "**Debtors**"), and Phonix RBS, LLC ("**Lender**" or "**Phonix**"). MacDonald, the Debtors, and Phonix may be referenced herein collectively as the "**Parties**" and/or each as a "**Party**."

## BACKGROUND

A. On December 1, 2025 (the "**First Petition Date**"), Buddy Mac One, LLC ("**Buddy Mac One**"), BMH One RE, LLC ("**BMH One**"), BMH 95 RE Caruthersville, LLC ("**BMH 95**"), and BMH 96 RE Marion, LLC ("**BMH 96**"; together with BMH One and BMH 95, the "**Limited Recourse Guarantors**") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, and on December 4, 2025 (the "**Second Petition Date**"), BMH RTO, LLC and affiliated Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, commencing Chapter 11 bankruptcy cases which are jointly administered under Bankruptcy Case No. 25-34839 (collectively and individually as the context may require, the "**Case**") before the United States Bankruptcy Court for the Northern District of Texas (the "**Bankruptcy Court**"). The Debtors that filed their respective Cases on the First Petition Date and the Second Petition Date are referred to herein as the "**BMH Debtors**."

B. The BMH Debtors are operating their business as debtors-in-possession under Chapter 11 of the Bankruptcy Code. William Ian MacDonald acts as the Debtors' chief executive officer.

C. Phonix is the BMH Debtors' pre-petition secured creditor with a blanket lien on all BMH Debtor assets, including cash collateral, and is owed secured obligations in an aggregate amount of at least $12.83 million. William Ian MacDonald has guaranteed the payment of the Phonix pre-petition indebtedness. Pre-petition, Phonix has filed enforcement actions against the BMH Debtors and William Ian MacDonald, including, without limitation, a receivership petition in Kansas state court and a claim asserting tort and other claims against William Ian MacDonald in Texas state court. As those claims are asserted against William Ian MacDonald those claims are referred to as the "**Phonix Pre-Petition MacDonald Enforcement Actions.**"

D. The BMH Debtors have sought to administer the Case based on the use of Phonix' cash collateral, to which Phonix did not consent. Phonix has objected to the BMH Debtors' use of cash collateral and has filed motions to convert the Case to a case under chapter 7 of the Bankruptcy Code and, in the alternative, for relief from the automatic stay to asserts its rights and claims against the BMH Debtors and their assets. The BMH Debtors have opposed such relief.

E.   On January 20, 2026, Phonix submitted a non-binding, non-inclusive summary expression of interest (the "**Phonix Expression**") in respect of a settlement, post-petition financing, and related sale matters to MacDonald and to the Debtors.

F.   On January 21, 2026, prior to the hearing on the Debtors' request for final authority to use cash collateral, William Ian MacDonald submitted a signed and sworn declaration regarding his personal financial statement (the "**MacDonald PFS**"), which declaration attached the MacDonald PFS, affirming that the MacDonald PFS was true and correct. Among other things, (1) MacDonald owns a direct interest in MRG Boulders Apartments, Ltd. ("**MRG Boulders**") and MacLubbock Boulders GP, Inc. ("**MacLubbock BGP**") (as general partner), which owns the Boulders Property (as defined below), (2) MRG Boulders is indebted to MacDonald Realty Group LLC (this entity is also the general partner of P.E.C. Finance, Ltd. and the fee owner of the Subject Alvarado Property (as defined below) ("**MacDonald Realty**" and the term "MacDonald Realty" shall include any MacDonald affiliate, subsidiary or related party as it relates to Boulders Advances) and the MacDonald Family Trust on account of advances made to MRG Boulders in an aggregate amount of no less than \$4,239,910.13[1] (the "**Boulders Advances**"), (3) no less than \$2,839,909.13 of the Boulders Advances is directly or indirectly owed to MacDonald Realty, and (4) no less than \$1,400,001 of the Boulders Advances is directly or indirectly owed to the MacDonald Family Trust.

G.   On or about January 23, 2026 (the "**Third Petition Date**"; together with the First Petition Date and the Second Petition Date, the "**Petition Date**"), the entities listed on **Exhibit "G"** (collectively, the "**Buddy Mac Entities**") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code before the Bankruptcy Court, commencing chapter 11 bankruptcy cases, which will be jointly administered with the BMH Debtor Cases. Each Debtor remains in possession of its assets and is operating its business as a debtor-in-possession under Chapter 11 of the Bankruptcy Code.

H.   On January 23, 2026, each of the Debtors and Phonix entered into that certain Secured Superpriority Debtor-In-Possession Loan, Security, and Guaranty Agreement (the "**DIP Credit Agreement**") and the Debtors have filed an emergency motion (the "**DIP Motion**") seeking approval of the DIP Credit Agreement on an interim and a final basis and for related relief, including, without limitation, approval of this Settlement Agreement at the final hearing on the DIP Motion pursuant to the DIP Motion. The DIP Motion requires MacDonald to pledge certain non-Debtor assets as collateral for the Phonix DIP loan and contemplates the sale of the Debtors' assets to Phonix by a credit bid, with MacDonald's consent and support. The agreement embodied in this transaction resolves disputes and claims by and among the Debtors, Phonix, and MacDonald, including, without limitation, the Phonix Pre-Petition MacDonald Enforcement Actions. Initially capitalized terms in this Settlement Agreement that are not otherwise defined shall have the meaning set forth in the DIP Credit Agreement, DIP Orders (as defined below), or in the Phonix Expression.

---

[1] This amount includes only intercompany transfers made to MRG Boulders as advances, and does not include Accrued Management Fees, which Fees are subordinate as to payment and otherwise to the Boulders Advances, the Subject Boulders Interest, and the Estate Boulders Share.

I.   The Parties have engaged in extensive good faith, arms' length negotiations and have agreed to resolve all matters between them on the terms set forth herein.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree that:

1.   Recitals. The recitals set forth above are agreed to by the Parties and are incorporated herein by reference.

2.   Conditions to Settlement Effective Date. The effective date (the "**Settlement Effective Date**") of this Settlement Agreement and all of its terms shall be the date upon which all of the following have occurred: (i) the Buddy Mac Entities will have filed voluntary petitions under chapter 11 of the Bankruptcy Code and their cases will have been jointly administered in the Case (for the avoidance of doubt, neither MRG Boulders Apartments, Ltd. nor its general partner entity, shall file chapter 11 cases); (ii) this Settlement Agreement shall have been signed and delivered by and among the Parties; (iii) the unstayed entry of the Interim DIP Order (as defined in the Phonix Expression) by the Bankruptcy Court and the implementation of the transactions contemplated by the Phonix Expression and the DIP Documents, including, without limitation, in respect of the ERC Funds (as that term is defined in the Interim DIP Order) (for the avoidance of doubt, upon entry of the Final DIP Order, the ERC Funds shall be released to Phonix for application against its Pre-Petition Loan and DIP Loan obligations pursuant to the Final DIP Order and the DIP Documents and effective upon entry of the Final DIP Order, the ERC Funds shall be deemed collateral for the Pre-Petition Loan obligations as well as the DIP Loan obligations under the DIP Documents and the Final DIP Order), and, the transactions contemplated by the Sale Motion (as defined in the Interim DIP Order), in accordance with the milestones and other deadlines set forth in the Phonix Expression and the Interim DIP Order; (iv) MacDonald, MacDonald Realty, and MacLubbock BGP  shall grant to Phonix the Subject Boulders Interest (as defined below); (v) William Ian MacDonald shall grant to Phonix the Subject PEC Interest (as defined below); (vi) William Ian MacDonald and MacDonald Realty shall grant to Phonix the Subject Alvarado Mortgage (as defined below); and (vi) the entry of a final and non-appealable order of the Bankruptcy Court approving the Final DIP Order, which Final DIP Order likewise approves this Settlement Agreement.

3.   Subject Boulders Interest. **MacDonald, MacLubbock BGP, and MacDonald Realty shall grant to Phonix a participation in their rights in respect of the advances made to, and in respect of MacDonald's and MacLubbock BGP's equity in, MRG Boulders (collectively, the "Subject Boulders Interest") to accommodate and support the Phonix Pre-Petition Obligations, the DIP Obligations, and Adequate Protection Obligations (each as defined in the DIP Orders, as applicable), which grant shall be made and documented by a participation agreement (the "Participation Agreement") and other related documents, agreements, and instruments to be entered into prior to, and effective upon, entry of the Final DIP Order.** The Boulders real property that is the subject of the Subject Boulders Interest (the "**Boulders Property**"), which is owned and controlled by MacDonald and MacLubbock BGP, will be sold in an orderly process. Such orderly Boulders Property sale process is subject to Phonix rights of consent to: (i) the selection of the broker, (ii) the material conditions and requirements of the marketing process (marketing and sale milestones acceptable to Phonix shall be established), and (iii) the selection of a buyer (the "**Sale Process Consent Rights**"). The consents set forth in

the preceding sentence (a) shall be further evidenced by the Participation Agreement and (b) shall not be unreasonably withheld; in the event of any dispute regarding the withholding of any such consent, such dispute shall be subject to dispute resolution procedures to be set forth in the Participation Agreement. The Boulders Property shall be marketed by a third party national real estate brokerage firm unaffiliated with MacDonald or his affiliates (an "**Acceptable Broker**"), with the assistance of the Debtors' CRO, Mark Shapiro, and William Ian MacDonald to the extent his assistance is requested, and sold as soon as reasonably possible for a market price for cash. Phonix shall be entitled to regular updates regarding the marketing and sale process from any appointed broker. Further, MacDonald shall provide to Phonix updates regarding the financial condition and results relating to the Subject Boulder Interest promptly upon (x) the occurrence of any material changes thereto and (y) otherwise upon reasonable request. If the buyer assumes the senior loan encumbering the Boulders Property, the buyer will provide a new personal guaranty of the loan and William Ian MacDonald will be released from his personal guaranty of the loan, and with sale proceeds net of normal and reasonable closing costs to third parties for the transaction, to be distributed to Phonix on account of the Subject Boulders Interest as set forth herein.

      4.    <u>Subject Boulders Sale Distribution Matters</u>. MacDonald, MacLubbock BGP and Phonix agree, and the Debtors consent to such agreement, that, upon any sale of the Boulders Property, the net closing proceeds, after payment of the senior mortgage on the Boulders Property and normal and reasonable closing expenses to third parties and subject to the terms of the sale contract, shall be divided and paid at closing: (i) sixty percent (60%) to Phonix; (ii) twenty five percent (25%) to the MacDonald Family Irrevocable Trust; and (iii) fifteen percent (15%) to the Debtors' estates (the "**Estate Boulders Share**"). These sale distribution matters shall be further evidenced by the Participation Agreement.

      5.    <u>Subject PEC Interest</u>. **William Ian MacDonald shall grant to Phonix a lien on, and security interest in, all of his limited partner interests (the "PEC LP Interests") in P.E.C. Finance Ltd. (such lien and security interest, the "Subject PEC Interest") to accommodate and support the Phonix Pre-Petition Obligations, the DIP Obligations, and Adequate Protection Obligations, which grant shall be made and documented by a pledge agreement (the "Pledge Agreement") and other related documents, agreements, and instruments to be entered into prior to, and effective upon, entry of the Final DIP Order.** Phonix shall be permitted to purchase the PEC LP Interests in the WholeCo Sale (as defined below) pursuant to its credit bid. The real property, which is subject to liens and encumbrances which shall be addressed pursuant to the Subject PEC Real Property Sale Process (as defined below), that is owned and controlled by P.E.C. Finance Ltd. (the "**Subject PEC Real Property**"), will be sold in an orderly process, which may include the existing process ongoing in respect of the Subject PEC Real Property (the **"Subject PEC Real Property Sale Process"**). The Subject PEC Real Property Sale Process is subject to Phonix's Sale Process Consent Rights, which (a) shall be further evidenced by the Pledge Agreement and (b) shall not be unreasonably withheld; in the event of any dispute regarding the withholding of any such consent, such dispute shall be subject to dispute resolution procedures to be set forth in the Pledge Agreement. The Subject PEC Real Property shall be marketed by an Acceptable Broker (which may be the existing broker), with the assistance of the Debtors' CRO, Mark Shapiro, and William Ian MacDonald to the extent his assistance is requested, and sold as soon as reasonably possible for a market price for cash. Phonix shall be entitled to regular updates regarding the marketing and sale process from any appointed broker. Further, MacDonald shall provide to Phonix updates regarding the financial condition and results

relating to the Subject PEC Interest promptly upon (x) the occurrence of any material changes thereto and (y) otherwise upon reasonable request. MacDonald Realty, in its capacity as general partner of P.E.C. Finance, Ltd., by executing this Settlement Agreement, hereby (i) consents to the sale of the Subject PEC Real Property as conducted in accordance with the procedures specified above and (ii) agrees to execute and deliver to Phonix and PEC Finance, Ltd., as applicable, such further documents, instruments, and agreements reasonably requested in order to facilitate such sale and process. If the buyer assumes the senior loan encumbering the Subject PEC Real Property, the buyer will provide a new personal guaranty of the loan and William Ian MacDonald will be released from his personal guaranty of the loan, and with sale proceeds net of normal and reasonable closing costs to third parties for the transaction, to be distributed to Phonix on account of the Subject PEC Interest as set forth herein. William Ian MacDonald hereby represents and warrants to Phonix that the PEC LP Interests are not subject to any liens, pledges or security interests. If the Subject PEC Real Property is sold pursuant to the Subject PEC Real Property Sale Process, Phonix agrees that it shall distribute fifty percent (50%) of the proceeds from such sale to William Ian MacDonald.

6.   Subject Alvarado Real Property. In respect of that certain real property owned by MacDonald Realty in Alvarado, Texas (the "**Subject Alvarado Real Property**"), to secure (i) Phonix DIP Obligations and Adequate Protection Obligations under the Interim DIP Order, and (ii) Phonix DIP Obligations, Adequate Protection Obligations, and Pre-Petition Obligations under the Final DIP Order after entry of the Interim DIP Order and upon entry of the Final DIP Order, MacDonald Realty shall grant Phonix a mortgage lien (by deed of trust or as otherwise reasonably required by Phonix) (the "**Subject Alvarado Mortgage**") on the Subject Alvarado Real Property. Upon closing on the WholeCo Sale, MacDonald Realty shall convey to Phonix (or its designee) title to the Subject Alvarado Real Property by appropriate form of deed or conveyancing document acceptable to Phonix and related documents, agreements, and instruments, and Phonix will agree to a fixed reduction to its DIP Obligations and Pre-Petition Obligations, which shall be $298,000. MacDonald Realty hereby represents and warrants to Phonix that the Subject Alvarado Real Property is not subject to any lien or other encumbrance.

7.   Subject RTO Real Property. In respect of all real property owned by the Debtors specified on Schedule 7 hereto (such real property owned by the Debtors, the "**Subject RTO Real Property**"), Phonix and the Debtors agree that, subject to the Interim DIP Order and Final DIP Order (the "**DIP Orders**") and pursuant to the DIP Orders and the DIP Documents (and Phonix rights of consultation and consent to be contained therein), the Debtors will (a) file an application to retain, within 7 days of the filing of the Buddy Mac Entity Chapter 11 cases, a third party real estate brokerage firm unaffiliated with the Debtors or MacDonald to market the Subject RTO Real Property owned by Buddy Mac One, LLC in Tyler, Texas, and (b) the Debtors (and or any successor trustee) will sell such Subject RTO Real Property under Bankruptcy Code section 363(b) in the Debtors' Chapter 11 cases within 45 days of the filing of the retention application. In respect of the other Subject RTO Real Property, such property shall be subject to the Sale Motion and Phonix will include such Subject RTO Real Property in its credit bid and as part of that credit bid will satisfy any SouthState Bank mortgage liens on such Subject RTO Real Property at closing on the credit bid; *provided, however*, that Phonix will consent to the sale of Subject RTO Real Property owned by BMH 95 RE Caruthersville, LLC and BMH 85 RE Sikeston, LLC to National RTO to be applied as provided in the following sentence in satisfaction of its lien encumbering such Subject RTO Real Property, so long as the portion of the National RTO cash purchase price

allocated to such Subject RTO Real Property is paid to Phonix at any closing with National RTO. After satisfaction of SouthState Bank mortgage liens as set forth above, Phonix may apply the proceeds of the sale of any Subject RTO Real Property paid to Phonix to any of the Pre-Petition Obligations, DIP Obligations, or Adequate Protection Obligations in Phonix's sole discretion. Phonix reserves rights of direction and designation in respect of any leases relating to the Subject RTO Real Property.

8.   Debtor/MacDonald Acknowledgments of Phonix Secured Claims. Subject to the entry of the Final DIP Order and Bankruptcy Court approval of this Settlement Agreement, each of the Debtors and MacDonald acknowledge and consent to the validity, extent, amount, priority and enforceability of Phonix Pre-Petition Obligations, Phonix DIP Obligations, Phonix security interests and liens on Pre-Petition Collateral, the inclusion of the assets of BMH HR, LLC in such Phonix Pre-Petition Collateral, and Phonix DIP Liens and rights in DIP Collateral, and as otherwise set forth in the DIP Documents, the Interim DIP Order, and the Final DIP Order. For the avoidance of doubt, the acknowledgments and consents set forth in this paragraph shall survive execution of this Settlement Agreement. The DIP Credit Agreement, other DIP Documents, Interim DIP Order, and Final DIP Order shall be in form and substance acceptable to Phonix.

9.   Credit Bidding. Subject to the terms of this Settlement Agreement and as set forth in the DIP Documents and the DIP Orders, pursuant to documents (such documents, the "**Phonix Sale Documents**") acceptable to Phonix evidencing such a transaction (such transaction, the "**WholeCo Sale**"), including, without limitation the Sale Motion and an Asset Purchase Agreement, Phonix shall be designated as the stalking horse bidder for the sale of substantially all of the Debtors' assets and will be permitted to acquire such assets in a credit bid (including the DIP Obligations, Pre-Petition Obligations, and Adequate Protection Obligations) provided that third parties may top the credit bid at the sale hearing by submitting a higher and better offer, subject to bidding and sale procedures acceptable to Phonix which shall include an agreed minimum bid increment and reasonable bid protections and expense reimbursement. The Phonix Sale Documents shall be in form and substance acceptable to Phonix.

10.   Budget. The Debtors shall propose a winddown budget. The winddown budget shall be acceptable to Phonix and shall be funded solely from (a) residual assets of the estates after closing of the transactions contemplated by the Sale Motion to Phonix or a topping bidder  and (b) the proceeds of the Estate Boulders Share.  The wind-down budget may be used to fund a liquidating Chapter 11 plan process, which can be done on a consolidated approval process basis or liquidation of the Debtors' estates by a Chapter 7 trustee following the conversion of the Debtors' cases. In the context of a liquidating plan, to the extent any Phonix debt remains outstanding following consummation of the WholeCo Sale, in any plan of reorganization, and without any impairment of its rights as a purchaser or secured creditor, Phonix agrees to subordinate any deficiency claim, whatever the priority or character of that deficiency claim under the Final DIP Order, that it may have to the claims of general unsecured creditors solely for purposes of enabling distribution of the Estate Boulders Share, and any contingent recoveries upon estate claims and causes of action arising under Chapter 5 not released pursuant to this Settlement Agreement, the Final DIP Order, or the WholeCo Sale order, to unsecured creditors, and facilitating plan confirmation (for the avoidance of doubt, such subordination shall not affect or impair Phonix's right to receive:  (i) the balance of the proceeds of the Subject Boulders Interest, (ii) the proceeds of the sale of (x) the Subject Real RTO Property owned by Buddy Mac One, LLC

in Tyler, Texas, and (y) the Subject PEC Real Property, or (iii) title to the Subject Alvarado Real Property). Any such plan and confirmation order shall be in form and substance acceptable to Phonix, MacDonald, and the Debtors. Any such liquidating plan will incorporate and implement this Settlement Agreement.

11.     Debtors' MacDonald Release. **Effective on the Settlement Effective Date, the Debtors, on behalf of themselves and their estates (collectively, the "Estate Releasors") shall be deemed to have irrevocably and unconditionally, fully, finally, and forever waived, released, acquitted and discharged William Ian MacDonald and any and all of his affiliates, relations, agents, representatives, attorneys, and parties directly related to such released parties such as family-related trusts and MacDonald Capital, LP (in each case excluding, for the avoidance of doubt, the Debtors and their estates) (the "MacDonald Releasees") from any and all claims, manner of actions, causes of action, suits, costs, debts, liabilities, obligations, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, executions and demands whatsoever, of whatever kind or nature, whether known or unknown, suspected or unsuspected, in law or equity, which the Estate Releasors have, have had, may have or may claim to have against the MacDonald Releasees arising out of, related to or in connection with chapter 5 of the Bankruptcy Code or arising from MacDonald's actions or inactions in any capacity, including as chief executive officer, director, manager or authorized representative of the Debtors; provided, however and for the avoidance of doubt, the foregoing release shall not limit nor be deemed to limit the rights of the Debtors to enforce this Settlement Agreement in accordance with its terms and/or to assert claims against William Ian MacDonald if the MacDonald PFS is materially false.**

12.     Phonix MacDonald Release. **Effective on the Settlement Effective Date, Phonix, binding their successors and assigns, shall be deemed to have irrevocably and unconditionally, fully, finally, and forever waived, released, acquitted and discharged the MacDonald Releasees, as defined above, from any and all claims, manner of actions, causes of action, suits, costs, debts, liabilities, obligations, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, executions and demands whatsoever, of whatever kind or nature, whether known or unknown, suspected or unsuspected, in law or equity, which Phonix has, has had, may have or may claim to have against the MacDonald Releasees in connection with the Phonix Pre-Petition Debt Documents, any guaranty claims in respect of such Phonix Pre-Petition Debt Documents, and arising out of, related to or in connection with the Phonix MacDonald Pre-Petition Enforcement Actions; provided, however and for the avoidance of doubt, the foregoing release shall not limit nor be deemed to limit the rights, liens, security interests, claims, and expenses of Phonix under the DIP Documents, cash collateral orders of the Bankruptcy Court, the Interim DIP Order, the Final DIP Order, any asset purchase agreement ("Phonix CB APA") evidencing the sale of substantially all of the Debtors assets by credit bid to Phonix (the "WholeCo Sale"), the sale order of the Bankruptcy Court authorizing the WholeCo Sale or an alternative transaction to the WholeCo Sale expressly permitted by the Phonix CB APA, and any related Phonix Sale Documents, to enforce this Settlement Agreement or the Participation Agreement, in accordance with each of its terms, and/or to assert claims against the MacDonald Releasees if the MacDonald PFS is materially false.**

13.    <u>MacDonald/Debtor Phonix Release</u>. **Effective on the Settlement Effective Date,
each of MacDonald, the MacDonald Releasees, and the Debtors (on behalf of themselves and
their estates), and their affiliates, attorneys, financial advisors, and other professionals, and
related entities (the "Debtor/MacDonald Releasors" and, together with the Estate Releasors
and Phonix, collectively, the "Releasors"), binding their successors and assigns, shall be
deemed to have irrevocably and unconditionally, fully, finally, and forever waived, released,
acquitted and discharged Phonix, its assignor and/or predecessor-in-interest, affiliates, and
related entities, and each of their respective managers, directors, officers, employees, agents,
and representatives, (the "Phonix Releasees") from (a) any and all claims, manner of actions,
causes of action, suits, costs, debts, liabilities, obligations, dues, sums of money, accounts,
reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements,
promises, variances, trespasses, damages, judgments, executions and demands whatsoever,
of whatever kind or nature, whether known or unknown, suspected or unsuspected, in law
or equity, which the Debtor/MacDonald Releasors have, have had, may have or may claim
to have against the Phonix Releasees arising out of, related to or in connection with the Pre-
Petition Debt Documents and arising out of, related to or in connection with the Phonix
MacDonald Pre-Petition Enforcement Actions; provided, however and for the avoidance of
doubt, the foregoing release shall not limit nor be deemed to limit the rights of
Debtor/MacDonald Releasors to enforce this Settlement Agreement in accordance with its
terms.**

14.    <u>Debtor/Phonix Transfer Release</u>. **Effective on the Settlement Effective Date,
each of Phonix and the Debtors, and their affiliates and related entities, binding their
successors and assigns, shall be deemed to have irrevocably and unconditionally, fully, finally
and forever waived and released any and all claims and/or causes of action, including but
not limited to Chapter 5 causes of action, which could arise from those transfers referenced
in the Plains Capital Bank Deposit Report(s) dated January 15, 2026 and attached hereto as
Appendix 14.**

15.    For avoidance of doubt, the releases contained in this Settlement Agreement
include any released claim that any Releasor does not know or suspect to exist in such Releasor's
favor at the time of such release that if known by such Releasor, might have affected this
Settlement Agreement. With respect such releases, the Parties stipulate and agree that, on their
own behalf and on behalf of their respective Releasors, upon the execution of this Settlement
Agreement, each of the Releasors expressly waives and shall be deemed to have waived, any and
all rights and benefits of California Civil Code § 1542, to the extent applicable, which provides:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE
> CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO
> EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE
> RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE
> MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE
> DEBTOR OR RELEASED PARTY.

Each of the Parties expressly waives, and shall be deemed to have waived, on its behalf on
and behalf of its respective Releasors, any and all rights and benefits conferred by any law of any
state or territory of the United States, or principle of common law or foreign law, that is similar,

comparable or equivalent in effect to California Civil Code § 1542. The Releasors may hereafter discover facts in addition to or different from those that any of them now knows or believes to be true with respect to the subject matter of the releases contained in this Settlement Agreement, but each of the Releasors shall expressly have and be deemed to have, fully, finally and forever settled and released any and all of the claims subject to the releases contained in this Settlement Agreement, known or unknown, suspected or unsuspected, contingent or non-contingent, whether or not concealed or hidden, that now exist or heretofore have existed, upon any theory of law or equity now existing or coming into existence in the future, including, but not limited to, conduct that is negligent, reckless, intentional, with or without malice, or a breach of any duty, law or rule, without regard to the subsequent discovery or existence of such different or additional facts. The Parties acknowledge, and shall be deemed to have acknowledged, that the foregoing waiver was separately bargained for and a key element of the settlement of which this release is a part.

16.     Notwithstanding anything to the contrary in the DIP Documents or this Settlement Agreement, the Debtors and MacDonald shall retain and not transfer to Phonix any rights, claims and/or defenses any of them may have against the Buddy's Franchisor and its parent company FRG, arising out of the franchisor/franchisee relationship between the parties, including the Debtors and MacDonald and their affiliates.

17.     <u>No Admissions</u>. This Settlement Agreement is not and shall not in any way be construed as an admission by the Parties of any allegations made in connection with the matters that are the subject of releases or as an admission of any liability by any Party.

18.     <u>Severability</u>. The Parties agree that if any provision of this Settlement Agreement is determined by a court of competent jurisdiction to be illegal, invalid, or unenforceable, that provision shall not be a part of this Settlement Agreement. The legality, validity, and enforceability of the remaining provisions shall not be affected by a provision of this Settlement Agreement that is illegal, invalid, or unenforceable.

19.     <u>Miscellaneous</u>.

a.     Neither this Settlement Agreement, nor any statement made or action taken in connection with the negotiation of this Settlement Agreement, shall be offered or received in evidence or in any way referred to in any legal action or administrative proceeding among or between the Parties hereto, other than as may be necessary: (i) to obtain approval of and to enforce this Settlement Agreement (including the mutual releases contained herein) or (ii) to seek damages or injunctive relief in connection therewith.

b.     Each of the Parties shall execute and deliver any and all additional papers, documents, and other assurances, and shall do any and all acts and things reasonably necessary or appropriate in conjunction with the performance of each of the Parties' respective obligations hereunder.

c.     No provision of this Settlement Agreement is intended to confer any rights, benefits, remedies, obligations, or liabilities hereunder upon any person other than the Parties hereto and their respective successors.

       d.     This Settlement Agreement shall be governed by and construed in accordance with the law of the state of Texas without regard to any choice of law provisions.

       e.     This Settlement Agreement may be signed in counterpart originals and delivered by facsimile or email, which, when fully executed, shall constitute a single original.

       f.     Except as provided in paragraph 3, the Bankruptcy Court shall retain exclusive jurisdiction (and the Parties expressly consent to such jurisdiction) with respect to any disputes arising from or related to, or other actions to interpret, administer, or enforce the terms and provisions of, this Settlement Agreement.

       g.     Each person or entity who executes this Settlement Agreement on behalf of another person or entity represents and warrants that he, she, or it is duly authorized to execute this Settlement Agreement on behalf of such person or entity, has the requisite authority to bind such person or entity, and such person or entity has full knowledge of and has consented to this Settlement Agreement. The representations and warranties set forth in this paragraph shall survive execution of this Settlement Agreement.

       h.     In executing the Settlement Agreement, each of the Parties represents and warrants, for itself, that: (i) it does so with full knowledge of its available rights, (ii) it is not relying and has not relied upon any representations made by any person with regard to the Settlement Agreement, other than any written representations and agreements contained herein, (iii) it has had available to it such information as it or its counsel considered necessary to making an informed judgment concerning the Settlement Agreement, and (iv) it has conducted such investigation as it or its counsel deemed appropriate regarding the settlement and its rights and asserted rights in connection with the matters that are the subject of the Settlement Agreement.

       i.     The Parties acknowledge that this Settlement Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof, and all prior agreements, negotiations and understandings with respect to the subject matter hereof are canceled and superseded by this Settlement Agreement.

       j.     This Settlement Agreement shall not be modified, altered, amended, or vacated without the written consent of all parties hereto or order of the Bankruptcy Court.

       k.     This Settlement Agreement shall inure to the benefit of and be binding upon the successors and assigns of the Parties hereto, including any subsequently appointed Chapter 7 trustee.

       l.     The headings of all sections of this Settlement Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision hereof.

     20.    <u>Bankruptcy Court Approval</u>. The Debtors shall seek approval of this Settlement Agreement at the hearing on final relief in respect of the DIP Motion. In the event the Bankruptcy Court denies approval of this Settlement Agreement, this Settlement Agreement shall be null and void and of no force and effect, and the Parties shall be returned to the same positions they were

in prior to execution of this Settlement Agreement, as if this Settlement Agreement had never been executed.

[signature page(s) follow]

Docusign Envelope ID: A9AA8314-F78A-4C0F-A11D-4C019266D595

IN WITNESS WHEREOF, this Settlement Agreement is hereby executed as of the date first set forth above:


ACCEPTED AND AGREED TO BY:


**PHONIX RBS LLC**


By: _____

Name: Brent Turner

Title: Manager


[signature page(s) continue]


Signature Page to Settlement Agreement and Mutual Release

_____[seal]
WILLIAM IAN MACDONALD


**DEBTORS:**

BUDDY MAC HOLDINGS, LLC
BMH RTO, LLC
BUDDY MAC TWENTY-ONE, LLC
BUDDY MAC TWENTY-TWO, LLC
BUDDY MAC TWENTY-THREE, LLC
BUDDY MAC TWENTY-FOUR, LLC
BUDDY MAC TWENTY-FIVE, LLC
BUDDY MAC TWENTY-SIX, LLC
BUDDY MAC TWENTY-SEVEN, LLC
BMH-TNM 28, LLC
BMH-TNM 29, LLC
BMH-TNM 30, LLC
BMH-TNM 31, LLC
BMH-TNM 32, LLC
BMH-TNM 33, LLC
BMH-RCL 34, LLC
BMH-RCL 35, LLC
BMH-RCL 36, LLC
BMH-RCL 37, LLC
BMH-RCL 38, LLC
BMH-RCL 39, LLC
BMH-RCL 40, LLC
BMH-RCL 41, LLC
BMH-RCL 42, LLC
BMH-FAN 43, LLC
BMH-FAN 44, LLC
BMH-FAN 45, LLC
BMH-FAN 46, LLC
BMH-FAN 47, LLC
BMH-FAN 48, LLC
BMH-FAN 49, LLC
BMH-FAN 50, LLC
BMH-FAN 51, LLC
BMH-FAN 52, LLC
BMH-FAN 53, LLC
BMH-FAN 54, LLC
BMH-SM 79, LLC
BMH-SM 80, LLC
BMH-SM 81, LLC

Signature Page to Settlement Agreement and Mutual Release

BMH-SM 82, LLC
BMH-SM 83, LLC
BMH-SM 84, LLC
BMH-SM 85, LLC
BMH-SM 86, LLC
BMH-SM 87, LLC
BUDDY MAC ONE, LLC
BMH ONE RE, LLC
BMH 95 RE CARUTHERSVILLE, LLC
BMH 96 RE MARION, LLC
BUDDY MAC TWO, LLC
BUDDY MAC SIX, LLC
BUDDY MAC SIX RE, LLC
BUDDY MAC EIGHT, LLC
BUDDY MAC ELEVEN, LLC
BUDDY MAC TWLEVE, LLC
BUDDY MAC EIGHTEEN, LLC
BUDDY MAC NINETEEN, LLC
BMH-NEW 58, LLC
BMH-NEW 62, LLC
BMH-WF TX 67, LLC
BMH-TB 75, LLC
BMH 85 RE SIKESTON, LLC
BMH PRIME 95, LLC
BMH PRIME 96, LLC
BMH PRIME 97, LLC
BMH HR LLC
SAM BROWNFIELD, LLC
SAM PLAINVIEW, LLC
MACDONALD CAPITAL CORPORATION

By: *Ian MacDonald*
—DocuSigned by:
EFD8FED8028C428...
Name: William Ian MacDonald
Title: Authorized Representative

[signature page(s) continue]

Signature Page to Settlement Agreement and Mutual Release

**MACDONALD ENTITIES:**

MRG BOULDERS APARTMENTS, LTD.
MRG PREMIUM FINANCE, LLC
MACLUBBOCK BOULDERS GP INC.
P.E.C. FINANCE, LTD.
MACDONALD REALTY GROUP, LLC
MACDONALD CAPITAL, LP

By: _____
  Name: William Ian MacDonald
  Title: Authorized Representative

## SCHEDULE 1

### MacDonald Entities

1. MRG Boulders Apartments, Ltd.
2. MRG Premium Finance, LLC
3. MacLubbock Boulders GP Inc.
4. P.E.C. Finance, Ltd.
5. MacDonald Capital, LP
6. MacDonald Realty Group, LLC

## SCHEDULE 7

### Subject RTO Debtor Real Property

| Ownership Entity | Street Address | City, State | ZIP |
|---|---|---|---|
| SAMPlainview, LLC | 414 N. Columbia St. | Plainview, TX | 79072 |
| MacDonald Capital Corp | 218 N. Main St. | Seminole, OK | 74868 |
| Buddy Mac Six RE, LLC | 1100 N. HWY 491 | Gallup, NM | 87301 |
| SAMBrownfield, LLC | 501 W. Main St. | Brownfield, TX | 79316 |
| BMH 85 RE Sikeston, LLC | 1501 E Malone Ave | Sikeston, MO | 63801 |
| BMH One RE, LLC | 1404 W. Gentry Pkwy | Tyler, TX | 75702 |
| BMH 95 RE Caruthersville, LLC | 810 W 13th St | Caruthersville, MO | 63830 |
| BMH 96 RE Marion, LLC | 103 N Carbon | Marion, IL | 62959 |

<u>**EXHIBIT G**</u>

**Buddy Mac Entities**

1.  Buddy Mac Two, LLC
2.  Buddy Mac Six, LLC
3.  Buddy Mac Six RE, LLC
4.  Buddy Mac Eight, LLC
5.  Buddy Mac Eleven, LLC
6.  Buddy Mac Twleve, LLC
7.  Buddy Mac Eighteen, LLC
8.  Buddy Mac Nineteen, LLC
9.  BMH-NEW 58, LLC
10. BMH-NEW 62, LLC
11. BMH-WF TX 67, LLC
12. BMH-TB 75, LLC
13. BMH 85 RE Sikeston, LLC
14. BMH Prime 95, LLC
15. BMH Prime 96, LLC
16. BMH Prime 97, LLC
17. BMH HR LLC
18. SAM Brownfield, LLC
19. SAM Plainview, LLC

**APPENDIX 14**

**Plains Capital Bank Deposit Report(s)**

(See attached)

# Deposit Accounts Activity Summary

| | |
|---|---|
| **Report Created:** | 01/15/2026 12:00:31 AM (ET) |
| **Account:** | Bmh-Hr LLC - Checking - 111322994 - *2900 - Available $387,161.58 |
| **Date range:** | 11/01/2025 to 01/14/2026 |
| **Transaction types:** | All transactions |
| **Detail option:** | Includes transaction detail |

### Bmh-Hr LLC - Checking - 111322994 -  *2900 - Available $387,161.58

| Post Date | Reference | Additional Reference | Description | Debit | Credit | Calculated Balance |
|---|---|---|---|---|---|---|
| 01/09/2026 | 000000000000000 | | MISCELLANEOUS DEBIT WIRE FEE | $35.00 | | $387,161.58 |
| 01/09/2026 | 202600900025360 | | OUTGOING WIRE TRANSFER OUTGOING WIRE 2026009000253600;  BNF BMH RTO LLC;REF | $56,545.57 | | $387,196.58 |
| 01/07/2026 | 997000107184549 | | BOOK TRANSFER DEBIT REF 0071845L    FUNDS TRANSFER TO DEP XXXXX6665    FROM BCY A PPRY PMT | $24,583.33 | | $443,742.15 |
| 12/31/2025 | 000000000000000 | | INTEREST CREDIT | | $115.11 | $468,325.48 |
| 12/31/2025 | 997001231102246 | | BOOK TRANSFER DEBIT REF 3651022L    FUNDS TRANSFER TO DEP XXXXX6665    FROM APPRO VED BMH BCY DEC | $24,583.33 | | $468,210.37 |
| 12/29/2025 | 000000000000000 | | MISCELLANEOUS DEBIT WIRE FEE | $35.00 | | $492,793.70 |
| 12/29/2025 | 202536300019110 | | OUTGOING WIRE TRANSFER OUTGOING WIRE 2025363000191100;  BNF KUTAK ROCK LLP IOLTA ACCOUNT;REF | $9,578.69 | | $492,828.70 |
| 12/03/2025 | 000000000000000 | | MISCELLANEOUS DEBIT WIRE FEE | $35.00 | | $502,407.39 |
| 12/03/2025 | 202533700021580 | | OUTGOING WIRE TRANSFER OUTGOING WIRE 2025337000215800;  BNF KANE RUSSELL COLEMAN & LOGAN PC TRU ST ACC;REF | $75,000.00 | | $502,442.39 |
| 12/01/2025 | 000000000000000 | | MISCELLANEOUS DEBIT WIRE FEE | $35.00 | | $577,442.39 |
| 12/01/2025 | 202533500029920 | | OUTGOING WIRE TRANSFER OUTGOING WIRE 2025335000299200;  BNF GLASS RATNER ADVISORY & CAPITAL GRO UP, LL;REF | $150,000.00 | | $577,477.39 |
| 12/01/2025 | 997001201132905 | | BOOK TRANSFER DEBIT REF 3351329L    FUNDS TRANSFER TO DEP XXXXX6665    FROM PAY | $45,000.00 | | $727,477.39 |
| 11/28/2025 | 000000000000000 | | INTEREST CREDIT | | $19.05 | $772,477.39 |

| | | | | |
|---|---|---|---|---|
| 11/26/2025 | 000000000000000 | MISCELLANEOUS DEBIT WIRE FEE | $35.00 | $772,458.34 |
| 11/26/2025 | 202533000034050 | OUTGOING WIRE TRANSFER OUTGOING WIRE 2025330000340500;  BNF KANE RUSSELL COLEMAN & LOGAN PC TRU ST ACC;REF | $500,000.00 | $772,493.34 |
| 11/26/2025 | 000000000000000 | MISCELLANEOUS DEBIT WIRE FEE | $35.00 | $1,272,493.34 |
| 11/26/2025 | 202533000033900 | OUTGOING WIRE TRANSFER OUTGOING WIRE 2025330000339000;  BNF KUTAK ROCK LLP IOLTA ACCOUNT;REF | $5,000.00 | $1,272,528.34 |
| 11/21/2025 | 000000000000000 | MISCELLANEOUS DEBIT WIRE FEE | $35.00 | $1,277,528.34 |
| 11/21/2025 | 202532500008490 | OUTGOING WIRE TRANSFER OUTGOING WIRE 2025325000084900;  BNF CLIFFORD TOWNS;REF | $249,816.33 | $1,277,563.34 |
| 11/21/2025 | 000000000000000 | MISCELLANEOUS DEBIT WIRE FEE | $35.00 | $1,527,379.67 |
| 11/21/2025 | 202532500007570 | OUTGOING WIRE TRANSFER OUTGOING WIRE 2025325000075700;  BNF BUDDY MAC HOLDINGS LLC; REF | $199,866.21 | $1,527,414.67 |
| 11/21/2025 | 000000000000000 | MISCELLANEOUS DEBIT WIRE FEE | $35.00 | $1,727,280.88 |
| 11/21/2025 | 202532500008220 | OUTGOING WIRE TRANSFER OUTGOING WIRE 2025325000082200;  BNF ZARCO EINHORN SALKOWSKI & BRITO PA; REF | $100,000.00 | $1,727,315.88 |
| 11/21/2025 | 000000000000000 | MISCELLANEOUS DEBIT WIRE FEE | $35.00 | $1,827,315.88 |
| 11/21/2025 | 202532500007720 | OUTGOING WIRE TRANSFER OUTGOING WIRE 2025325000077200;  BNF JACKSON WALKER LLP;REF | $100,000.00 | $1,827,350.88 |
| 11/21/2025 | 000000000000000 | MISCELLANEOUS DEBIT WIRE FEE | $35.00 | $1,927,350.88 |
| 11/21/2025 | 202532500007520 | OUTGOING WIRE TRANSFER OUTGOING WIRE 2025325000075200;  BNF WOMBLE BOND DICKENSON LP;REF | $80,376.81 | $1,927,385.88 |
| 11/19/2025 | | MISCELLANEOUS DEBIT WIRE FEE | $35.00 | $2,007,762.69 |
| 11/19/2025 | | OUTGOING WIRE TRANSFER OUTGOING WIRE 2025323000242800; BNF SRB CAPITAL   LLC;REF | $607,519.63 | $2,007,797.69 |
| 11/18/2025 | | DEPOSIT | | $2,615,317.32 | $2,615,317.32 |
| 01/14/2026 | **Totals** | | **$2,228,289.90** | **$2,615,451.48** |

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| BUDDY MAC HOLDINGS, LLC, *et al.*, | Case No. 25-34839 |
| Debtors.[1] | (Jointly Administered) |

### SUPPLEMENTAL ORDER GRANTING DEBTORS' EMERGENCY MOTION AND EXTENDING FINAL DIP ORDER TO APPLY TO TIC PROPERTIES, INCLUDING ALL TIC INTERESTS

Upon Debtors' *Emergency Motion to Supplement Notice of DIP Financing Motion to TIC Interest Holders and for Supplemental Order Approving DIP Financing on a Final Basis* (the "Motion"), which sought, to the extent necessary, entry of an order applying the Final DIP Order [Dkt. No. 293] to the TIC Interest holders such that the TIC Properties would be DIP Collateral subject, in their entirety, to the DIP Liens set forth in the DIP Credit Agreement and Final DIP Order, as contemplated by the Debtors and Phonix; and this Court having reviewed the Motion,

---

[1]    A complete list of the Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax ID numbers, is set forth on Schedules I and II to the Motion. A complete list of the Debtors is also available on the claims agent's website: https://dm.epiq11.com/case/buddyshome/info. The Debtors' service address is 400 E. Centre Park B

DIP Motion, DIP Credit Agreement, DIP Final Order, 9019 Motion, Settlement Agreement, Sale

Motion, relevant certificates of services, the pleadings of parties to these Chapter 11 Cases, and

evidence and argument presented; and this Court having jurisdiction to consider the Motion and

the relief requested therein in accordance with 28 U.S.C. § 1334; and this Court having found that

this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue

of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409;

and it appearing that proper and adequate notice has been given of the Motion and, on account of

the Motion, the DIP Motion; and upon the record herein; and after due deliberation thereon; and

this Court having determined that there is good and sufficient cause for the relief granted in this

Order (this "Order"), therefor, it is **HEREBY ORDERED THAT**:

1.      The Motion is granted on a final basis as set forth herein.

2.      The Debtors have cured any notice deficiency that existed, if any, that could

preclude application of the Final DIP Order to the TIC Properties.

3.      Section 10(c) of the TIC Agreements authorizes the "CPO" of the TIC Property to,

in its sole discretion, encumber and sell the applicable TIC Properties in their entirety, on notice

to the TIC Interest holders.

4.      The TIC Interest holders have been provided appropriate notice of the proposed

encumbrance, as set forth in the DIP Motion, DIP Credit Agreement, DIP Final Order, 9019

Motion, Settlement Agreement, and otherwise.  Accordingly, the TIC Properties shall constitute

DIP Collateral, and shall be encumbered by automatically perfected DIP Liens in favor of Phonix,

in accordance with the lien priority set forth in the DIP Final Order, which is incorporated by

reference in this Order.

5.      Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of the Bankruptcy Rules and the Local Rules are satisfied by such notice.

6.      Notwithstanding the applicability of Bankruptcy Rule 6004(h), the terms and conditions of this order shall be immediately effective and enforceable upon its entry.

7.      This Court retains exclusive jurisdiction and power with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

### END OF ORDER ###