

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed February 20, 2026**

_____
**United States Bankruptcy Judge**

---

EXHIBIT

**PHONIX EX 11**

Case 25-34839

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| BUDDY MAC HOLDINGS, LLC, *et al.*, | § | Case No. 25-34839-mvl11 |
| | § | |
| Debtors.[1] | § | (Jointly Administered) |
| | § | |

**ORDER (I) AUTHORIZING (A) THE WHOLECO SALE BY CREDIT BID FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES, AND (B) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION THEREWITH; AND (II) GRANTING RELATED RELIEF**

Upon the motion [Docket No. 172] (the "Motion") filed by Buddy Mac Holdings, LLC

("Buddy Mac Holdings") and its debtor subsidiaries and affiliates, as debtors and debtors-in-

possession in the above-referenced chapter 11 cases (collectively, the "Debtors"), pursuant to, *inter*

*alia*, sections 105(a), 363, and 365 of title 11 of the United States Code (the "Bankruptcy Code")

---

[1] A complete list of the Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax ID numbers, is set forth on **Schedule I** (Initial Debtors) and **Schedule II** (Subsequent Debtors) attached to the Motion. The Debtors' service address is 400 E. Centre Park Blvd., Suite 101, DeSoto, Texas 75115.

- 1 -

11863587v5 (75669.00003.000)

and rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"),

requesting entry of (i) the Bid Procedures Order (defined below) [Docket No. 229], and (ii) this

Order (this "Order") (a) approving the Asset Purchase Agreement attached hereto as **Exhibit A**

(as amended by that certain Amendment to Asset Purchase Agreement dated as of February 19,

2026, and together with any further amendments, restatements, supplements, or modifications

thereto, and all other documents executed in connection with or otherwise related to the transaction

contemplated therein, the "APA")[2] by and among Buddy Mac Holdings and the Debtors set forth

on the signature pages to the APA (the "Debtor Sellers" or "Sellers"), and Phonix RBS, LLC, a

Delaware limited liability company, or its designee (the "Buyer"), as buyer, (b) authorizing the

sale of the Purchased Assets (as defined in the APA), including, without limitation, the Customer

Rental Contracts, of the Debtor Sellers to the Buyer, and the Debtor Sellers' assumption and

assignment of Other Assigned Contracts and Assigned Property Leases (as defined in the APA) to

the Buyer, free and clear of all liens, claims, encumbrances, and interests on the terms set forth in

the APA (the "Sale"), and (c) granting related relief, all as more fully described in the Motion; and

upon the Debtors having determined that the Purchase Price is fair and that consummation of the

Sale is a sound exercise of the Debtors' business judgment; and the Court having reviewed the

Motion and all evidence admitted at the hearing to consider approval of the Sale (the "Sale

Hearing"); and the Court having determined that the legal and factual bases set forth in the Motion

and at the Sale Hearing establish just cause for the relief granted herein; and it appearing that the

relief requested in the Motion is in the best interests of the Debtors, the Debtors' bankruptcy estates

(the "Estates"), the Debtors' creditors, and all other parties in interest; and any objections to the

Motion having been withdrawn with prejudice or overruled on the merits; and upon the record of

---

[2] Capitalized terms not otherwise defined herein have the meanings provided in the APA.

11863587v5 (75669.00003.000)

the Sale Hearing and all other pleadings and proceedings in these cases; and after due deliberation and good and sufficient cause appearing therefor, **THE COURT HEREBY FINDS AND DETERMINES AS FOLLOWS**:

A.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The Court has jurisdiction over the Purchased Assets of the Debtor Sellers (the "Debtor Purchased Assets") pursuant to 28 U.S.C. § 1334(e), because the Debtor Purchased Assets are property of the Estates.  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.      This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Order, waives any applicable stay, and expressly directs entry of judgment as set forth herein.

C.      The Debtors have full power and authority to: (i) execute the APA and all other documents contemplated thereby, (ii) consummate the Sale, and (iii) convey title to all Debtor Purchased Assets to the Buyer.

D.      All of the Debtors' assets were encumbered by properly perfected first priority senior secured liens in favor of Buyer pursuant in part to certain prepetition liens and secured claims in favor of Buyer, and in part to post-petition liens, claims and expenses arising pursuant to its DIP Credit Agreement and Interim and Final DIP Orders approving its DIP Motion, with the exception of certain real property, which was subject to a first lien in favor of South State Bank and second priority lien in favor of Buyer, all as more fully set forth and acknowledged in the Interim DIP Order and the Final DIP Order.  Pursuant to the Interim DIP Order, the Final DIP Order, and Bid Procedures Order, Buyer has the right to Credit Bid against the Purchased Assets. Pursuant to the Bid Procedures Order, Buyer was Qualified as a Bidder in respect of the Credit Bid.

E.      Further, on January 26, 2026, the Debtors, the Buyer, and MacDonald (and related non-Debtor entities) entered into the Settlement Agreement, which provides for the sale of certain assets, including real property, outside of chapter 11 for Buyer's benefit, and certain releases.

F.      Entry into the APA and consummation of the Sale constitutes a sound exercise of the Debtors' business judgment and a proper exercise of the Debtors' fiduciary duties, and such acts are in the best interests of the Debtors, the Estates, and the Debtors' creditors and other parties in interest.  The Debtors have articulated good and sufficient business reasons justifying the Sale of the Purchased Assets on the terms and conditions set forth in the APA.  No other person or entity has offered to

11863587v5 (75669.00003.000)

purchase the Purchased Assets for greater economic value to the Estates than the Buyer. The Debtors will suffer irreparable harm if the relief requested is not granted.

G.    The Sale of the Debtor Purchased Assets shall be free and clear of all liens (including any "lien" as defined in section 101(37) of the Bankruptcy Code), interests, obligations, rights, encumbrances, pledges, mortgages, deeds of trust, security interests, liabilities, rights under any pension plan or federal or state law governing such plan, including, without limitation, the Employment Retirement Income Security Act of 1974 as amended, rights under any bulks sales law or rule, rights under any tax statutes or rules, claims (including any "claim" as defined in section 101(5) of the Bankruptcy Code), leases, possessory leasehold interests, charges, options, rights of first refusal or option to purchase any real property, easements, servitudes, transfer restrictions under any agreement, judgments, hypothecations, demands, licenses, sublicenses, limitations, deposits, credits, allowances, assignments, debts, obligations, guaranties, options, contractual and other commitments, restrictions, environmental liabilities, options to purchase, and options, in each case of whatever kind, nature, or description in, against, or with respect to any of the Debtor Purchased Assets, having arisen, existed or accrued prior to and through the Closing Date (as defined in the APA), whether recorded or unrecorded, filed or unfiled, perfected or unperfected, scheduled or unscheduled, noticed or unnoticed, allowed or disallowed, known or unknown, whether by setoff, recoupment, credit, or netting, direct or indirect, absolute or contingent, choate or inchoate, fixed or contingent, matured or unmatured, liquidated or unliquidated, arising or imposed by agreement, understanding, law, equity, rule or judicial act, possession, statute, or otherwise and whether arising prior to, on, or after the Petition Date ("Liens," "Encumbrances," "Claims," and/or "Interests," as applicable), *except* for any such Liens, Encumbrances, Claims, or Interests that, by the express terms of the APA or this Order, shall be preserved and remain attached to the Debtor Purchased Assets following the Closing, if any ("Permitted Encumbrances").

H.    The Debtors may sell the Debtor Purchased Assets free and clear of all Liens, Claims, and Interests because one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied with respect to each such Lien, Claim, and Interest. Those holders of Encumbrances who did not object, or who withdrew their objections, to the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. If the Purchased Assets were not sold free and clear of all Liens, Claims, and Interests, the Buyer would not have entered into the APA and the Purchased Assets would have yielded less value for the Estates. Therefore, the Sale of the Purchased Assets free and clear of all Liens, Claims, and Interests is in the best interests of the Debtors, the Estates, and the Debtors' creditors.

I.    Subject to paragraph 24, the Debtors may sell any TIC Properties purchased by Buyer pursuant to the APA in whole, including any TIC Interests, in accordance with section 363(h) of the Bankruptcy Code because partition in kind of such

11863587v5 (75669.00003.000)

property among the Debtors and TIC Interest holders is impracticable under the circumstances.  Further, sale of the Debtors' undivided interests in such TIC Properties would realize significantly less for the estate than sale of such property free of the interests of such TIC Interest holders.  Because the TIC Properties have no equity, the benefit to the estate of a sale of the TIC Properties free of the TIC Interests outweighs the detriment, if any, to the TIC Interest holders.  Finally, none of the TIC Properties are used in the production, transmission, or distribution for sale, of electric energy or of natural or synthetic gas for heat, light, or power.

J.    The Debtors and the Buyer have, to the extent necessary, satisfied the requirements of section 365 of the Bankruptcy Code, including, without limitation, sections 365(b)(l)(A), (B), and (C) and 365(f) of the Bankruptcy Code, in connection with the Sale and the assumption and assignment of the Other Assigned Contracts and Assigned Property Leases to be assumed and assigned to the Buyer under the terms of the APA. The Other Assigned Contracts and Assigned Property Leases are assumable and assignable notwithstanding any provisions contained therein to the contrary.  For the avoidance of doubt, the assumption and assignment authorized by this Order shall include any applicable Assigned Contract (as defined in the APA) that is added as an Other Assigned Contract or Assigned Property Lease pursuant to the APA from time to time after entry of this Order, and no further order of the Court shall be required to effectuate the assumption and assignment of any such Assigned Contract in accordance with the APA and this Order.  There are no outstanding defaults by the Debtors, offsets or Encumbrances on the property covered by an Assigned Property Lease except as will be cured by the payment by Buyer in accordance with this Order and the APA, subject to the Cure Costs Cap (as defined in the APA).  The Buyer has provided adequate assurance of future performance to any Contract Counterparty as required by section 365(b)(1)(C), 365(f)(2)(B) and 365(b)(3) of the Bankruptcy Code.  Each of the Assigned Property Leases are in full force and effect and have not been further modified or amended, and the Sellers have validly exercised all rights to option terms under the Assigned Property Leases with respect to which the time for exercise has passed.  Buyer's intended use of the real property (the "Intended Use") subject to the Assigned Property Leases will not breach any of the provisions of the Assigned Property Leases or, if the applicable Assigned Property Lease is within a shopping center, Buyer's Intended Use will not breach any other lease in such shopping center, and the Sellers' assignment of the Assigned Leases to Buyer will not violate any radius clauses contained in any of the Assigned Leases.  Buyer's placement of its signs on such property (in similar sizes, colors and names utilized by Buyer in its other stores) covered by the Assigned Property Leases in substantially the same location as those of the Sellers, and in such form and manner which is in accordance with applicable law, will not breach any of the provisions of the Assigned Property Leases.  None of the provisions of the Assigned Property Leases that purport to prohibit, restrict or condition the Sellers' assignment of the Assigned Property Leases shall have any force or effect with respect to the assignment authorized by this Order, and no Contract Counterparties shall have any right to cancel the Assigned Property Leases or increase the rent or impose any penalty by reason of such assignment.  To the extent required under the APA, any "going dark" or

11863587v5 (75669.00003.000)

continuous operating restrictions and/or other related restrictions in the Lease are unenforceable anti-assignment clauses under Sections 365(f)(1) and (3) of the Bankruptcy Code. Any portions of the Assigned Property Lease, which permit the Contract Counterparty to cancel the remaining terms of the Assigned Property Lease if the Sellers discontinue the operation of the stores are invalid *ipso facto* clauses under Section 365(e) of the Bankruptcy Code, and such Contract Counterparty shall not have the right to cancel the Assigned Property Lease or increase the rent or impose any penalty by reason of such discontinuation due to the Sellers' cessation of operations, the assignment of the Assigned Property Lease to Buyer or the interruption of business activities at subject demised property in order to enable Buyer to perform remodeling work. Nothing contained herein shall constitute a limitation on Buyer's ability to go dark beyond one hundred eighty (180) days after the Closing Date of the assignment of each Assigned Property Lease to the extent such Lease does not contain a going dark or continuous operating clause. Buyer's performance and completion of remodeling work shall not constitute a default under the provisions of any Assigned Property Lease nor give the Contract Counterparty the right to cancel the remaining terms of the Assigned Property Lease. The performance and completion by Buyer of alterations to subject demised property to adapt and equip such property for use and occupancy by Buyer, and if performed in accordance with the Assigned Property Lease and applicable building and zoning codes and regulations, consistent with the parties' respective obligations under the Assigned Leases, will neither breach any of the provisions of the Assigned Property Leases nor give the Contract Counterparties the right to cancel the remaining terms of the Assigned Property Leases. In accordance with the Bid Procedures and the terms of this Order, following the Closing, Buyer shall be fully and irrevocably vested with all of the Sellers' right, title and interest in and under the Assigned Property Leases in connection with related demised property, free and clear of any Liens, Claims, Interests, or Encumbrances, and each Assigned Property Lease shall be fully enforceable by Buyer in accordance with its respective terms and conditions. Following assignment or transfer of the Assigned Property Leases to Buyer, the Sellers shall be relieved from any further liability with respect to such Assigned Property Leases.

K.    The APA was negotiated and is undertaken by the Debtors and the Buyer at arm's length, without collusion or fraud, and in good faith within the meaning of Bankruptcy Code section 363(m). Neither the Debtors nor the Buyer has engaged in any conduct that would cause or permit the application of Bankruptcy Code section 363(n) to the Sale. None of the Sellers or Buyer entered into an agreement to control the sale price for the Purchased Assets.

L.    The APA was not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession, or the District of Columbia. The transfer of the Debtor Purchased Assets to the Buyer (a) does not constitute an avoidable transfer under the Bankruptcy Code or under other applicable bankruptcy or non-bankruptcy law and (b) does not and will not subject the Buyer to any liability whatsoever with respect to the operation of the Debtors' business. The consideration provided by

Buyer in accordance with the APA in exchange for the Purchased Assets (i) is fair, and adequate, (ii) is the highest or otherwise best offer for the Purchased Assets, (iii) will provide a greater, ultimate recovery for the estate than would be provided by any other available alternative, and (iv) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and the laws of the United States, any state, territory, possession, or the District of Columbia.

M.    The Buyer and the Sellers, in conducting their respective rent-to-own business operations, have each established written internal policies and procedures to protect the personally identifiable information (as defined in 11 U.S.C. § 101(41)) of their customers ("Customer Privacy Policies"). Buyer represents that its Customer Privacy Policies are not less restrictive or less robust than the Sellers' Customer Privacy Policies.

N.    The transfer of the Purchased Assets to the Buyer will be a legal, valid, and effective sale and transfer of the Property and will vest the Buyer with all right, title, and interest of the Sellers to the Property free and clear of all Liens, Claims, Interests, and Encumbrances, and any liabilities of the Sellers, except as otherwise expressly set forth in the APA, the Final DIP Order, the Settlement Agreement or any documents, agreements, and instruments referenced therein or contemplated thereby, the Participation Agreement, or in this Order.

O.    The APA, and the sale and the other transactions contemplated by the APA neither impermissibly restructure the rights of the Sellers' creditors nor impermissibly dictate a liquidating chapter 11 plan for the Sellers, and therefore do not constitute a *sub rosa* chapter 11 plan. Nothing in this Order is approving any disclosure statement, plan, or a finding or conclusion of law in connection therewith. Further, nothing in this Order is approving any distribution that would be inconsistent with the Bankruptcy Code's priority scheme, including the timing and/or amount of money to be paid to creditors in a future plan (if any).

P.    To the maximum extent possible under the Bankruptcy Code, each and every provision of the documents, agreements and instruments governing the Purchased Assets or applicable non-bankruptcy law or rules that purports to prohibit, restrict, or condition or could be construed as prohibiting, restricting, or conditioning assignment of any of the Purchased Assets, if any, has been or will be satisfied or is otherwise unenforceable under section 365 of the Bankruptcy Code.

**NOW, THEREFORE, IT IS ORDERED, ADJUDGED, AND DECREED THAT:**

1.    The Motion is GRANTED as set forth herein and the relief requested therein in respect of the APA and authorizing the sale, assignment or other transfer of the Purchased Assets to Buyer is granted and approved in its entirety, as set forth herein.  All objections and reservations of right in respect of the Sale Motion or the relief requested therein or the entry of the Sale Order

11863587v5 (75669.00003.000)

or the sale, assignment, or other transfer of the Purchased Assets to Buyer that have not been withdrawn, waived, settled or not otherwise resolved pursuant to the terms hereof are denied and overruled on the merits with prejudice.  All persons and entities with notice that failed to timely object to the Sale Motion are deemed to have consented to the relief granted herein for all purposes.

2.    **Findings and Conclusions**.  The findings of fact and conclusions of law set forth herein constitute the Court's findings of fact and conclusions of law for the purposes of Bankruptcy Rule 7052, made applicable pursuant to Bankruptcy Rule 9014.  To the extent any findings of fact are conclusions of law, they are adopted as such.  To the extent any conclusions of law are findings of fact, they are adopted as such.

3.    **Incorporation by Reference**.  Findings of fact and conclusions of law in the *Order (I) Authorizing and Approving (A) Bidding Procedures and (B) Form and Manner of Notice of Bidding Procedures, Auction, and Sale Hearing; (II) Scheduling an Auction and Sale Hearing; and (III) Granting Related Relief* [Docket No. 229] (the "Bid Procedures Order"), and in connection with the Settlement Agreement (the "Settlement Agreement") by and among MacDonald, MacDonald non-Debtor entities, the Debtors, and Phonix, dated as of January 25, 2026, the Participation Agreement, the PEC LP Interests, the PEC Interest Transfer Documents, and the Alvarado Real Property, and related documents, agreements, and instruments, and the *Final Order  Authorizing the Debtors to, (A) Obtain Post-Petition Financing, and (B) Use Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, (V) Authorizing Settlement Agreement, and (VI) Granting Related Relief* [Docket No. 279] are incorporated herein by reference.

11863587v5 (75669.00003.000)

4.      **Sale Approved**.  The Sale of the Debtor Purchased Assets to the Buyer is hereby approved on the terms set forth in the APA.  The transfer of the Purchased Assets to the Buyer pursuant to the APA is a legal, valid, proper, unavoidable (including, without limitation under Bankruptcy Code section 363(n) and chapter 5 of the Bankruptcy Code) and effective transfer of the Purchased Assets for reasonably equivalent and fair consideration, vesting the Buyer with all right, title and interest of the Sellers in and to the Purchased Assets free and clear of all Liens, Claims, Interests, and Encumbrances.  The Debtors and the Buyer are authorized to take all actions necessary or appropriate to consummate the Sale and perform their respective obligations under the APA and this Order (including, without limitation, by executing, delivering, and performing their respective obligations under one or more transition services agreements as set forth on the record at the hearing on the Sale and relating to certain executory contracts and leases of non-residential real property and the extension of deadlines for the assumption and assignment of such contracts or leases, including, without limitation, the TSA (as defined in the APA), which the Debtors may enter into with Buyer in connection with Closing on the Sale without further order of this Court).  The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the provisions of this Order.  All Inventory and Tangible Personal Property remaining in transferred demised property subject to Assigned Property Leases or stores under this Order shall be deemed transferred to Buyer (without further Court Order or documentation from the Sellers) pursuant to the terms of this Sale Order.  For the avoidance of doubt, title and control over all Seller deposit accounts associated with each store relating to Assigned Property Leases and collection in respect of Customer Rental Contracts shall be transferred to Buyer.

11863587v5 (75669.00003.000)

5.     **Debtor Sellers**.  The relief granted in this Order is limited to the Debtor Sellers (as defined herein above); provided, however, that the parties to the Settlement Agreement have consented to the APA and the relief sought in this Order.

6.     **Binding Effect**.  This Sale Order and the APA shall be binding in all respects upon the Debtors, the Estates, all creditors of the Debtors, any holders of Liens, Claims, or Interests in or against the Property (whether known or unknown), the Buyer and its respective successors and permitted assigns, MacDonald and non-Debtor entities affiliated with the Debtors and MacDonald, including, without limitation, MRG Boulders, P.E.C. Finance Ltd., and MRG and any other affected third parties, including all persons asserting any interests or claims in the Debtor Purchased Assets.  The terms and provisions of the APA and this Order will inure to the benefit of the Debtors, the Estates, the Debtors' creditors, the Buyer and its respective successors and permitted assigns, and any other affected third-party or party-in-interest.  Nothing contained in any chapter 11 plan confirmed in the Debtors' chapter 11 cases, any order confirming any such plan, or in any other order entered in these chapter 11 cases (including any order entered after any conversion of any of these chapter 11 cases to a case under chapter 7 of the Bankruptcy Code) or any related proceeding subsequent to the entry of this Order shall modify, alter, conflict with, or derogate from the provisions of the APA or this Sale Order. No bulk sales law or similar law shall apply in any way to the transactions contemplated by the Sale Motion, the Settlement Agreement, the Participation Agreement, and this Sale Order  This Order shall be binding with respect to any Assigned Contract that in accordance with the terms of the APA and this Order is added as an Assigned Contract pursuant to the APA prior to or after Closing, to the same extent as if such Assigned Contract had been identified as of the date of entry of this Order.

11863587v5 (75669.00003.000)

7.      **Notice**.  Notice of the Sale Motion, the hearing on Bid Procedures, the Bid

Procedures Order, the assumption and assignment of Other Assigned Contracts and the Assigned

Property Leases, the Auction, the Sale Hearing, the sale and all transactions contemplated by the

APA and the Sale Motion was fair, sufficient, proper and equitable under the circumstances and

complied in all respects with sections 102(1) and 363 of the Bankruptcy Code, the Bankruptcy

Rules, the Local Rules, the Bid Procedures Order, the Bid Procedures, and due process.  The

Debtors shall serve a copy of this Order via email or overnight mail to all landlords and

counterparties to the Other Assigned Contracts and Assigned Property Leases (collectively, the

"Counterparties," and each a "Counterparty") within **two (2)** calendar days after the Court's entry

of this Order.

8.      **Bid Procedures Order**.    On February 4, 2026, this Court entered the Bid

Procedures Order [Docket No. 229] approving, among other things, bid procedures for the sale of

substantially all or portions of the Debtors' Assets and the procedures governing: (i) approving the

Buyer as a stalking horse purchaser and certain Expense Reimbursement; (ii) the solicitation and

submission of bids, (iii) the designation of Qualified Bids, (iv) the conduct of any Auction, and (v)

the assumption and assignment or transfer of any executory contracts and unexpired leases of

non-residential real property. The Bid Procedures and the Bid Procedures Order provided a full,

fair, and reasonable opportunity for interested parties to submit bids for the Purchased Assets and

a full, fair, and reasonable opportunity for Contract Counterparties to object to any proposed Cure

Costs, any proposed assumption and assignment or transfer of their contracts or leases, and the

Buyer's adequate assurance of future performance. The Sellers and the Buyer have complied with

the Bid Procedures Order and the Bid Procedures in all respects.

11863587v5 (75669.00003.000)

9.     **Procedural Compliance**.   The Court finds that the Sellers complied with all applicable requirements under the Bankruptcy Code, the Bankruptcy Rules, and the Bid Procedures Order in connection with the Sale and the assumption and assignment of the Other Assigned Contracts and Assigned Property Leases.

10.     **Adequate Marketing; Highest and Best Offer**.   Based on the evidence presented at the Sale Hearing and the representations of counsel on the record, the Sellers adequately marketed the Debtor Purchased Assets and conducted the Sale process in good faith and in compliance with the Bid Procedures Order. The Sale process was fair, open, and competitive, and provided a full and reasonable opportunity for any interested party to conduct due diligence and submit a Qualified Bid. The consideration provided by the Buyer under the APA constitutes the highest and best offer for the Purchased Assets, represents fair and reasonable value, and maximizes recoveries for the Sellers' Estates compared to any other available alternative.

11.     **Contract and Lease Assignment; Related Transfer Matters**.   The Sellers have demonstrated sound business reasons for entering into the APA and for transferring the Purchased Assets to the Buyer and assuming and assigning the Other Assigned Contracts and Assigned Property Leases to the Buyer, as set forth in the Motion, the APA, and the evidence presented at the Sale Hearing. The transfer of the Purchased Assets and the assumption and assignment of the Other Assigned Contracts and Assigned Property Leases to the Buyer each constitute a reasonable and valid exercise of the Sellers' business judgment, and approval of such actions is warranted. All deposits and other security associated with Other Assigned Contracts and Assigned Property Leases shall be transferred to the Buyer.  Any provision in any Assigned Property Lease regarding percentage rent to the extent of each Seller's sales prior to the Closing Date shall not be imputed against Buyer. To the greatest extent available under applicable law or rules, the Buyer shall be

11863587v5 (75669.00003.000)

authorized as of the Closing Date to operate under any license, permit, registration, and governmental authorization or approval of the Seller in respect of the Purchased Assets and all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to be transferred to the Buyer as of the Closing Date.

12.     **Anti Assignment Provisions**.  Each provision of the Other Assigned Contracts and Assigned Property Leases, and each provision of applicable non-bankruptcy law, that purports to prohibit, restrict, or condition, or that could be construed as prohibiting, restricting, or conditioning, the assignment of any Other Assigned Contract or Assigned Property Lease, including, without limitation, "going dark" provisions, repair/remodeling prohibitions, prohibitions on Buyer's Intended Use, unreasonable signage or replacement signage  prohibitions, provisions requiring use of a certain tradename, minimum sales level requirements, and/or radius provisions,  has been, or will be, satisfied, or is otherwise unenforceable under section 365 of the Bankruptcy Code in connection with the Sellers' assumption and assignment of such agreements to the Buyer. Any Counterparty to any Other Assigned Contract or Assigned Property Lease that did not timely file an objection to the proposed assumption or assignment of such agreement is deemed to have consented to the assumption and assignment, and the Buyer shall be entitled to all rights and benefits thereunder as of the applicable effective date of such assumption and assignment without the necessity of obtaining the Counterparty's consent.

13.     **Deemed Consent**.  All Counterparties for which the deadline to object to the assumption and assignment of their Other Assigned Contract or Assigned Property Lease has passed as of the date of entry of this Order, and that did not timely file an objection prior to the applicable deadline, shall be deemed to have consented to the Debtor Sellers' assumption and assignment of their respective Other Assigned Contract or Assigned Property Lease to the Buyer

11863587v5 (75669.00003.000)

effective as of the Closing, and the Buyer shall enjoy all rights and benefits thereunder as of the effective date of assumption and assignment without the necessity of obtaining further consent.

14. **Cure-Cost Disputes**. If a timely objection to any Cure Costs relating to an Other Assigned Contract or Assigned Property Lease cannot be resolved by the parties, the Debtor Sellers, after consultation with the Buyer, may assume and assign the applicable agreement pending resolution of such objection in accordance with the Bid Procedures Order.

15. **Customer Rental Agreements**. The Buyer and Sellers shall adhere to their Customer Privacy Policies in all respects in transferring Customer Rental Agreements and any other Purchased Assets that contain customers' personally identifiable information, if any, from the Sellers to the Buyer at Closing. The Buyer's Customer Privacy Policy shall not be, and the Buyer represents that it is not, less restrictive that the Customer Privacy Policy of the Sellers.

16. **Designation Rights Post-Closing.** The Buyer reserves the right to identify additional Property Leases or Contracts to be designated as Other Assigned Contracts or Assigned Property Leases after entry of this Order, with or without a Cure Cost obligation, in accordance with the terms of the APA and this Order. The Debtor Sellers shall provide each Counterparty to any such post-Closing designated Lease or Contract with five (5) calendar days' written notice of such designation and an opportunity to contest the asserted Cure Cost, if any, by serving a written Cure-Cost notice (a "Cure Notice") on the Debtor Sellers, the Debtor Sellers' counsel, the Buyer, and the Buyer's counsel in accordance with the APA and the Bid Procedures Order. Any Cure Notice shall state the amount of the asserted Cure Cost and shall describe with particularity the basis for such Cure Cost. Cure Notices that cannot be resolved by agreement among the Debtor Sellers, the Buyer, and the Counterparty may be resolved by the Court after notice and a hearing, or the Buyer may change the designation of the Counterparty's Contract or Lease so that it is not

assumed and assigned, by delivering written notice to the Debtor Sellers and the applicable
Counterparty. Any Counterparty that fails to timely serve a Cure Notice in accordance with this
paragraph with respect to any post-Closing Buyer designation shall be deemed to have waived any
Cure Costs that may have been owed. The deadline under the APA for Sellers to file a final
Schedule 1.01(a), Schedule 1.01(i), and Schedule 1.01(u), shall be extended through the Secondary
Closing Date. The foregoing procedures afford Contract Counterparties a full, fair, and reasonable
opportunity to object to asserted Cure Costs with respect to any applicable Assigned Contract that
is designated as an Other Assigned Contract or Assigned Property Lease after the entry of this
Order.

17.    **<u>Non-Executory Agreements</u>**. To the extent any Other Assigned Contract or
Assigned Property Lease is not an executory contract or unexpired lease within the meaning of
section 365 of the Bankruptcy Code, including, without limitation, the Customer Rental Contracts,
such agreement shall be transferred to the Buyer in accordance with the APA, and other than with
respect to Assumed Liabilities (including Cure Costs), the Buyer shall have no liability or
obligation for any: (i) defaults or breaches under such agreement relating to acts or omissions
occurring prior to the Closing, or (ii) claims, counterclaims, or offsets relating to any acts or
omissions occurring prior to the Closing. The Buyer shall not assume or become liable for any
Liens, Claims, or Interests relating to the Debtor Purchased Assets except as expressly provided
in the APA.

18.    **<u>Cure Costs</u>**. Pursuant to the APA, the Sellers shall be responsible for paying all
agreed Cure Costs (as defined in the APA) to the Counterparties to any Other Assigned Contracts
and Assigned Property Leases, which agreed Cure Costs shall not exceed the Cure Costs Cap. If
at any time the Cure Costs or any portion thereof with respect to an Assigned Contract exceeds or

would exceed the Cure Costs Cap, Buyer shall not be required to include such Assigned Contract

as a Purchased Asset and such Assigned Contract shall constitute and Excluded Asset, unless and

until Sellers pay such excess Cure Costs or Buyer, in its sole discretion, elects to pay such excess

Cure Costs. For the avoidance of doubt, the Assigned Property Leases and related Cure Cost as of

the date of this Sale Order are:

| Store # | Store Address | Cure Cost |
|---|---|---|
| 602 | 2510 Main St. NE, Suite D, Los Lunas, NM 87031 | $0.00 |
| 615 | 1337 E. Lindsey St., Norman, OK 73071 | $0.00 |
| 434 | 36 S Adair, Pryor, OK 74361 | $0.00 |
| 375 | 1301 N. Turner, Suite A, Hobbs, NM 88240 | $7,736.80 |
| 307 | 1810 W. Sunset, Suite A, Springdale, AR 72762 | $6,870.00 |
| 313 | 412 W. Cherokee, Sallisaw, OK 74955 | $1,250.00 |
| 612 | 1413 Mitchell Rd., West Plains, MO 65775 | $15,092.80 |
| 609 | 8117 Rogers Ave, Ft. Smith, AR 72903 | $8,201.77 |
| 610 | 2425 Fayetteville Rd., Van Buren, AR 72956 | $6,500.00 |
| 608[3] | 610 N. HWY 67B N, Walnut Ridge, AR 72476 | $19,016.58 |

The Cure Costs constitute the amounts necessary to cure all defaults (within the meaning of section

365(b)) under such agreements.  The Cure Costs set forth herein constitute all amounts necessary

to cure all defaults under the Other Assigned Contracts and Assigned Property Leases pursuant to

section 365(b)(1)(A) of the Bankruptcy Code, and no further amounts shall be owed by the Sellers

or the Buyer with respect to any such defaults; provided, however, that the Cure Costs set forth

herein relate solely to the Other Assigned Contracts and Assigned Property Leases identified as of

the date of entry of this Order and do not constitute a final, exclusive, or binding determination of

Cure Costs with respect to any applicable Assigned Contract that may be added as an Other

Assigned Contract or Assigned Property Lease pursuant to the APA, or the terms of this Order,

after the entry of this Order. Any Counterparty to an applicable Assigned Contract that is

designated as an Other Assigned Contract or Assigned Property Lease pursuant to the APA, or the

---

[3] To be assigned to Buyer if the sale to S.K.C. Enterprises, Inc., does not close.

11863587v5 (75669.00003.000)

terms of this Order, after the entry of this Order shall be entitled to assert Cure Costs, if any, in accordance with the notice and Cure-Cost procedures set forth in the APA and this Order, and subject to the applicable Cure Costs Cap, and nothing herein shall be deemed to limit or waive the Buyer's right to object to the existence, amount, or validity of any such Cure Costs.

19.    **Adequate Assurance**. Counterparties to the Other Assigned Contracts and Assigned Property Leases were provided with the notice of proposed assumption and assignment of such agreements and the procedures for objecting to the Buyer's ability to provide adequate assurance of future performance, as set forth in the notices filed at Docket Nos. 249, 278, 292, 302, and 304. Counterparties were required to file any objections to the Buyer's ability to provide adequate assurance of future performance under sections 365(b)(1)(C), 365(b)(3) (to the extent applicable), and 365(f)(1) of the Bankruptcy Code (each, an "Adequate Assurance Objection") on or before the applicable objection deadline (the "Adequate Assurance Objection Deadline"). Any Counterparty that failed to timely file an Adequate Assurance Objection is deemed to have waived such objection and is forever barred from challenging the assumption and assignment of its Other Assigned Contract or Assigned Property Lease on the basis of adequate assurance of future performance. Based on the evidence presented at the Sale Hearing and the record in these Chapter 11 Cases, the Debtor Sellers have satisfied the requirements of section 365 of the Bankruptcy Code, including sections 365(b)(1)(A), 365(b)(1)(B), 365(b)(1)(C), 365(b)(3) (to the extent applicable), and 365(f), in connection with the Sale and the assumption and assignment of the Other Assigned Contracts and Assigned Property Leases to the Buyer pursuant to the APA. Accordingly, subject to payment of the applicable Cure Costs in accordance with this Order and the APA, the Other Assigned Contracts and Assigned Property Leases may be assumed by the Debtor Sellers and assigned to the Buyer as provided in the APA and this Order.  The Buyer has

11863587v5 (75669.00003.000)

provided credible and satisfactory evidence of adequate assurance of future performance, including financial information, operational capability, and such other documentation as the Debtor Sellers presented at the Sale Hearing, and the Court finds such evidence sufficient under sections 365(b)(1)(C), 365(b)(3) (to the extent applicable), and 365(f)(2)(B) of the Bankruptcy Code.  Notwithstanding anything to the contrary in this Order or the APA, the designation of any additional Assigned Contract as an Other Assigned Contract or Assigned Property Lease pursuant to the APA, and any extension of the Outside Closing Date, shall not reopen, revive, or extend any adequate-assurance objection period with respect to any Other Assigned Contract or Assigned Property Lease that has already been noticed and addressed pursuant to this Order.

20.    **Objections and Waiver**.  Payment of the Cure Costs in accordance with this Order and the APA, together with the Buyer's promise to perform obligations under the Other Assigned Contracts and Assigned Property Leases as of the Closing, constitutes adequate assurance of future performance. Objections to the assumption and assignment of the Other Assigned Contracts and Assigned Property Leases, other than the Cure Cost Objection of B-Thap, L.C. [Docket No. 297], are overruled.[4]  The Cure Cost Objection of B-Thap, L.C. shall be resolved by agreement, at a hearing after the Sale Hearing in accordance with the Bid Procedures Order, or by separate order of this Court. Any Counterparty that failed to timely object to its Cure Costs or assert any other default is deemed to have consented to its Cure Costs and to the assumption and assignment of its respective agreement to the Buyer and to have waived any additional defaults or breaches, subject to the post-Closing designation and Cure Notice process set forth in the APA and this Order.

---

[4] B-Thap, L.C.'s lease (Store #007 in Tampa, FL) is not an Assigned Property Lease.  B-Thap's Objection is continued as stated on the record at the Sale Hearing on February 19, 2026.

21.     **Section 365 Compliance**.  The Court finds that with respect to all Other Assigned Contracts and Assigned Property Leases, the payment of Cure Costs as provided in this Order and the APA is reasonable and appropriate and fully satisfies the Debtor Sellers' obligations under sections 365(b) and 365(f) of the Bankruptcy Code, subject only to any timely Cure Notices served in connection with the Buyer's post-Closing designation rights under the APA. The assumption and assignment of the Other Assigned Contracts and Assigned Property Leases pursuant to this Order is integral to the APA, is in the best interests of the Debtor Sellers, their Estates, their creditors, and all parties in interest, and constitutes a sound and prudent exercise of the Debtor Sellers' business judgment.

22.     **Modification of APA**.  The APA and any other agreements, documents, or other instruments related thereto in effect as of the date of this Order may be modified, amended, or supplemented as to any non-material modification term or terms through a written document signed by the parties thereto in accordance with the terms thereof without further order of this Court upon prior written notice to the Creditors' Committee and the Office of the United States Trustee.

23.     **Sale Free and Clear**.  Subject only to Permitted Encumbrances, upon closing of the Sale under the APA (the "Closing"), the Sale shall effect a legal, valid, enforceable, and effective transfer of the Purchased Assets and shall vest the Buyer with all of the Debtors' right, title, and interest in the Purchased Assets, expressly including any TIC Properties (subject to paragraph 24) included as Purchased Assets, free and clear of all Liens, Claims, Encumbrances, and Interests (including TIC Interests), and any such Liens, Claims, or Interests shall attach to the proceeds from the Sale of the Purchased Assets (the "Sale Proceeds") with the same nature, validity, priority, extent, perfection, force and effect that such Liens, Claims, Encumbrances and

Interests encumbered the Purchased Assets immediately prior to the Closing, subject to any rights, claims, defenses, and objections of the Debtors, the Estates, and other parties in interest with respect to such Liens, Claims, and Interests.  All persons and entities holding or otherwise asserting a Lien, Claim, Encumbrance or Interest in or against the Purchased Assets are hereby forever barred, estopped, and permanently enjoined from asserting such Lien, Claim, Encumbrance, or Interest against the Buyer or its successors or assigns, their property, or the Debtor Purchased Assets.  For the avoidance of doubt, no Lien, Claim, Encumbrance or Interest in or against the Purchased Assets as of the Closing shall impact Buyer's future rights to sell, transfer or dispose of the Purchased Assets in the ordinary course of its business.  Notwithstanding any provision of the APA to the contrary, after the Closing, the Debtors and the Estates shall have no further liability to any party (including, but not limited to, the Buyer) with respect to the Purchased Assets, and any claims, whether administrative or otherwise, relating to or arising from the Purchased Assets after the Closing of the sale and transfer of the Purchased Assets that are asserted against the Debtors or the Estates shall be deemed disallowed.

24.    **Secondary Closing**.  Notwithstanding anything in this Sale Order  or the APA, the Sale of the TIC Properties (including the real properties of Sellers situated in (i) Plainview, Texas; (ii) Seminole, Oklahoma; (iii) Gallup, New Mexico; and (iv) Brownfield, Texas) shall not be approved, the Secondary Closing shall not occur, and the TIC Properties shall not be sold free and clear of all Liens, Claims, Encumbrances, and Interests (including TIC Interests), until this Court enters a Final Order (the "Subsequent Order") reaffirming the liens granted to Buyer on such properties under the Final DIP Order at the February 26, 2026 hearing in respect of such issues (the "February 26 Hearing").  For the avoidance of doubt, the rights, claims, liens, interests, and encumbrances of all parties in interest, including, without limitation, Ronald Berg and other

11863587v5 (75669.00003.000)

**PHONIX EX 11**                                                    **Page 20 of 116**

holders of tenancy in common interests relating to the TIC Properties, Buyer (in its capacity as such, as DIP Lender and otherwise), William Ian MacDonald, and the Sellers, are reserved in full as to the February 26 Hearing where a contest in connection with the reaffirmation of the liens granted to Buyer on such properties will be heard. Immediately upon entry of the Subsequent Order, the Sale of the TIC Properties shall automatically be deemed approved by the entry of this Order.

25. **Sale "As-Is, Where-Is"**. Notwithstanding anything to the contrary in this Order, the Motion, or the APA, (a) the Sale and conveyance of the Debtor Purchased Assets to the Buyer shall be on an "as-is, where is" basis, without any representations or warranties whatsoever (whether express, statutory, or implied); and (b) the Debtors and the Estates expressly disclaim all representations or warranties, express, statutory or implied, as to the Debtor Purchased Assets.

26. **No Successor Liability**. Neither the Buyer nor any of its affiliates are or shall be deemed, as a result of the consummation of the Sale, to: (a) be legal successors to the Debtor Sellers or their Estates by reason of any theory of law or equity; (b) have, *de facto* or otherwise, merged with or into any of the Debtors; or (c) be an alter ego or a mere continuation or substantial continuation or successor of any of the Debtors in any respect. Neither the Buyer nor any of its affiliates shall assume or in any way be responsible for any liability or obligation of any of the Debtors or the Estates, except for Assumed Liabilities (as defined in the APA) and any Permitted Encumbrances or as otherwise expressly provided in the APA. Without limiting the foregoing, the Buyer shall not have any successor, transferee, derivative, or vicarious liabilities of any kind or character for any Claims, including, without limitation, under any theory of successor or transferee liability, *de facto* merger or continuity, environmental, tax, labor, mass layoff (federal, state, or local laws or rules) and employment, products or antitrust liability, whether known or

unknown as of the Closing Date, now existing or hereafter arising, asserted or unasserted, fixed or

contingent, liquidated or unliquidated.  No Counterparty may assert any default or claim against

the Buyer based on any act or omission of the Sellers occurring prior to the Closing.

27.    **Release of Liens, Claims and Interests**.  Effective upon the Closing, subject to

the provisions of the APA relating to the Credit Bid, the Settlement Agreement, the Participation

Agreement and the Final DIP Order, this Order: (a) is and shall be effective as a determination that

all Liens, Claims, Encumbrances, and Interests of any kind or nature whatsoever existing as to the

Purchased Assets prior to the Closing have been unconditionally released, discharged, and

terminated (with such Liens, Claims, Encumbrances, and Interests attaching to any cash Sale

Proceeds with the same nature, validity, priority, extent, perfection, force and effect that such

Liens, Claims, Encumbrances and Interests encumbered the Debtor Purchased Assets immediately

prior to the entry of this Order) and that the conveyances described herein have been effected; and

(b) is and shall be binding upon and shall govern the acts of all entities, including all filing agents,

filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars

of deeds, administrative agencies or units, governmental departments or units, secretaries of state,

federal, state and local officials and all other persons and entities who may be required by operation

of law, the duties of their office, or contract, to accept, file, register or otherwise record or release

any documents or instruments presented by Buyer, or who may be required to report or insure any

title or state of title in or to the Purchased Assets conveyed to the Buyer as requested by Buyer,

and upon Buyer's direction, any recorded Liens, Claims, and Interests against the Purchased Assets

shall be deemed stricken from such entities' records, official and otherwise.

28.    **Exculpation**.  Because the entry into the APA and consummation of the sale

transaction contemplated by the APA constitute the exercise by the Debtors of sound business

11863587v5 (75669.00003.000)

judgment, the Debtors and all representatives, advisors, professionals or agents of the Debtors shall neither have, nor incur, any liability or otherwise be subject to any damages whatsoever either personally or to the Estates or any holder of a claim against or interest in the Debtors for any act or omission in connection with, related to, or arising out of the negotiations of the APA or the consummation of the Sale, other than liability of the Debtors arising out of or relating to any act or omission that constitutes a breach of the APA, fraud, gross negligence, or willful misconduct, in each case as determined by a court of competent jurisdiction pursuant to a final order.

29. **Indemnification by Buyer**. From and after the Closing, the Buyer shall release, defend, indemnify and hold harmless the Debtors, the Estates, and all advisors, professionals, representatives, or agents of the Debtors from and against any and all losses, liabilities, obligations, damages, costs and expenses based upon, attributable to or resulting from: (a) any breach of any representation or warranty of Buyer, as set forth in the APA, or any representation or warranty contained in any certificate delivered by or on behalf of APA; (b) any breach of any covenant or other agreement on the part of Buyer under the APA; (c) the Assumed Liabilities (as defined in the APA) or any Permitted Encumbrances; and (d) any other indemnity obligations of Buyer and its affiliates expressly set forth in the APA.

30. **Good Faith Buyer**. The Sale contemplated by the APA is undertaken by the Buyer in good faith, as that term is used in Bankruptcy Code section 363(m), and the Buyer has acted without collusion in undertaking the Sale transaction contemplated by the APA. Accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale transaction shall not affect the validity of the sale of the Purchased Assets to the Buyer (including the assumption and assignment by the Sellers of any of the Other Assigned Contracts or Assigned Property Leases), unless such authorization is duly stayed pending such appeal. The Buyer is a

11863587v5 (75669.00003.000)

buyer in good faith of the Purchased Assets and is entitled to all the protections afforded by Bankruptcy Code section 363(m).  There has been no showing that the Debtors or the Buyer engaged in any action or inaction that would cause or permit the Sale and underlying transactions to be avoided or costs or damages to be imposed under Bankruptcy Code section 363(n).

31.    **Corporate Authority**. The Sellers: (i) have full corporate power and authority to execute the APA and all other documents contemplated thereby, and the Sale and transfer of the Debtor Purchased Assets have been duly and validly authorized by all necessary corporate action of the Debtor Sellers, (ii) have all corporate power and authority necessary to consummate the transactions contemplated by the APA, (iii) have taken all corporate action necessary to authorize and approve the APA and the consummation of the transactions contemplated thereby, and (iv) require no consents or approvals other than those expressly provided for in the APA, subject to the waiver of such consents or approvals to the extent provided in the APA and as may be permitted under applicable law.  The APA shall be in full force and effect regardless of any Seller entity's lack of good standing in any jurisdictions in which such Seller is formed or authorized to transact business.

32.    **Governmental Units**.  Nothing in this Order or the APA releases, nullifies, precludes, or enjoins the enforcement of any police or regulatory liability to a governmental unit that any entity would be subject to as the post-sale owner, lessee, or operator of the Debtor Purchased Assets after the date of entry of this Order.  Nothing in this Order or the APA authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization, (e) certification, or (f) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory

law.  Nothing in this Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Order or to adjudicate any defense asserted under this Order.

33.  **Texas Taxing Authorities**.[5]  To the extent any of the Purchased Assets in Texas that are subject to any secured ad valorem prepetition tax claim(s) held by any Texas Taxing Authority ("Prepetition Tax Claims") are sold, such Prepetition Tax Claims, if any, shall be paid upon closing, provided, that the Texas Taxing Authorities shall provide Sellers and Buyer such information reasonably necessary to make any such payments.  For the avoidance of doubt, (1) Buyer shall be responsible for paying ad valorem taxes pertaining to the Purchased Assets for the tax year 2026 in full, as and when such taxes become due in the ordinary course of business, and (2) notwithstanding anything to the contrary in this Sale Order or the APA, the Texas Taxing Authorities shall have all liens, rights, and remedies with respect to such taxes and the Purchased Assets to which they are entitled under applicable non-bankruptcy law.

34.  **Satisfaction of Conditions Precedent**.  Neither the Buyer nor the Debtors shall have an obligation to close the sale contemplated by the APA until all conditions precedent in the APA to each of their respective obligations to close such sale have been satisfied or waived in accordance with the APA.

35.  **Related Relief**.  The failure to specifically reference any particular provisions of the APA or other related documents in this Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the APA and any other related documents be authorized and approved in their entirety.

---

[5] "Texas Taxing Authorities" refers to Dallas County, Fort Bend County, Gray County Tax Office, Grayson County, Gregg County, Harris County, Hopkins County, Jasper County, Midland CAD, Midland County, Navarro County, Pine Tree ISD, Smith County, City of Sulphur Springs, Sulphur Springs ISD, Tarrant County, Terry County CAD, Tom Green CAD, Wise County, Lubbock Central Appraisal District, Hale County Appraisal District, Val Verde County, Wichita County Tax Office, Tyler Independent School District, Nacogdoches CAD, Randall County, Bowie CAD, Jasper ISD, Ector CAD, and Hidalgo County.

36.    **General Assignment, Related Direction and Injunction.**    Upon Closing, this Sale Order shall be construed and shall constitute a full and complete assignment, conveyance and transfer of the Seller's interest in the Purchased Assets and a bill of sale transferring good and marketable title in the Purchased Asset to the Buyers, free and clear of Liens, Claims, Interests and Encumbrances.  Each and every governmental unit is hereby authorized to accept any and all documents and instruments necessary to consummate the sale transactions contemplated under the APA. Upon the closing, each of the Debtors' creditors and any other holder of an Encumbrance (other than Buyer and holders of Permitted Encumbrances) is authorized and directed to execute such documents and take all other actions as may be reasonable necessary to release its Encumbrance on Purchased Assets.  All persons or entities that are currently, or as of the Closing, may be in possession of some or all of the Purchased Assets are hereby directed to surrender possession of such Purchased Assets to the Buyer at Closing, unless Buyer otherwise agrees.  **All persons and entities are prohibited and enjoined from commencing, asserting, continuing, enforcing, or taking or failing to take any action or proceeding to adversely affect or interfere with the ability of the Sellers to transfer the Property to the Buyer in accordance with the APA and this Sale Order.**

37.    **Post-Closing Actions and Transactions**. The Sellers and the Buyer, and each of their respective officers, employees, and agents, will be authorized and empowered to take all actions and execute and deliver any and all documents and instruments that either the Sellers or the Buyer deem necessary or appropriate to implement and effectuate the terms of the APA, the sale transaction contemplated therein and this Order.  For the avoidance of doubt, this Order authorizes and approves in all respects the assignment, transfer, and conveyance by Phonix of all

11863587v5 (75669.00003.000)

of its rights, titles, and interests in, to, and under the APA to its designee after giving effect to the submission by Phonix of its Credit Bid pursuant to Section 1.05 of the APA.

38.     **Sale is Self-Executing.** The sale contemplated by the Sale Order is self-executing, and neither the Sellers nor the Buyer shall be required to execute or file releases, termination statements, assignments, consents, or other instruments to effectuate, consummate, and implement the provisions of this Order.

39.     **No Discriminatory Treatment.** To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may deny, revoke, suspend, or refuse to renew any permit, license, or similar grant relating to the operation of the Property sold, transferred, or conveyed to the Buyer on account of the filing or pendency of these Chapter 11 Cases or the consummation of the transactions contemplated by the APA.

40.     **Retained Jurisdiction.** This Court retains exclusive jurisdiction prior to, on, and after Closing to, among other things, interpret, enforce and implement the terms and provisions of this Order and the APA, all amendments thereto, any waivers and consents thereunder, and any agreements executed in connection therewith in all respects.

41.     **Immediate Effect of Sale Order.** This Order shall take effect immediately and shall not be stayed pursuant to Bankruptcy Rules 6004(h), 6006(d), 7062, or 9014 or other applicable law or procedural rules, and the provisions of this Order shall be self-executing. The Debtors and the Buyer are authorized to close the Sale immediately upon entry of this Order and are authorized to satisfy the conditions to Closing (as set forth in the APA), as soon as reasonably practicable.

42.     **Conflict Rules.** In the event of any conflict between the terms of this Order and the APA, the terms of this Order shall control. In the event of any conflict between the terms of this

11863587v5 (75669.00003.000)

Order and any other prior orders or pleadings in the Debtors' chapter 11 cases, the terms of this

Order shall control and such prior orders shall be deemed amended or otherwise modified to the

extent required to permit consummation of the Sale.

43.    The provisions of this Order are non-severable and mutually dependent.

**# # # END OF ORDER # # #**

11863587v5 (75669.00003.000)

# Exhibit A

**Asset Purchase Agreement**

# Exhibit A

**Asset Purchase Agreement**

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "**Agreement**"), dated as of January 26, 2026 is entered into between **Buddy Mac Holdings, LLC**, a Texas limited liability company ("**Company**"), and each of the entities listed on <u>Annex I</u> attached hereto, on behalf of themselves as the debtors in the "Bankruptcy Case" referred to below on behalf of their respective estates (together with the Company, the "**Sellers**", and each a "**Seller**"), William Ian MacDonald ("**MacDonald**"), and **Phonix RBS, LLC**, a Delaware limited liability company ("**Phonix**") or its designee ("**Buyer**"). Buyer, each Seller, and MacDonald shall be referred to herein as a "**Party**" and collectively as the "**Parties**".  Unless otherwise defined in this Agreement, all capitalized terms used in this Agreement are defined in <u>Section 9.04</u>.

## RECITALS

**WHEREAS**, Sellers are engaged in the business of renting, on a rent-to-own basis, and selling furniture, electronics, appliances, and other merchandise to customers (the "**Business**"); and

**WHEREAS,** Sellers operate the Business at the store locations set forth on <u>Exhibit A</u> hereto (the "**Transferred Stores**");

**WHEREAS**, Sellers have filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Northern District of Texas Dallas Division (the "**Bankruptcy Court**"), commencing Case No. 25-34839 (the "**Bankruptcy Case**"), and Sellers continue to operate the Business and manage their assets as debtors-in-possession under Sections 1107 and 1108 of the Bankruptcy Code. Since the dates when Sellers filed their respective petitions, the term "**Petition Date**" as used in this Agreement shall mean January 25, 2026, which is the last day on which the last Seller filed its Petition;

**WHEREAS**, Buyer, is the successor in interest to INTRUST Bank, N.A. ("**Pre-Petition Lender**") under that certain Loan, Security and Guaranty Agreement dated as of February 28, 2025 (as amended, restated, amended and restated, modified, supplemented, or extended from time to time, the "**Pre-Petition Loan Agreement**"), pursuant to which Sellers owed to the Pre-Petition Lender as of the date of the first petition filed by a Seller, an aggregate amount of not less than $12,792,674, which amount is secured with a blanket lien on all of the Sellers' assets ("**Pre-Petition Loan**");

**WHEREAS**, Buyer has agreed to provide debtor-in-possession financing to Sellers in the Bankruptcy Case (the "**DIP Facility**") pursuant to that certain Secured Superpriority Debtor-in-Possession Loan, Security, and Guaranty Agreement dated as of January 25, 2026 between Debtors and Phonix ("**DIP Financing Agreement**") to fund Sellers' operations and administration of the Bankruptcy Case pending the sale of the Purchased Assets, with the outstanding obligations of the Sellers under the DIP Facility from time to time being collectively referred to herein as the "**DIP Loans**");

**WHEREAS**, the Bankruptcy Court will issue on or about January 27, 2026 an Order (I) Authorizing the Debtors, for the interim period, to (A) obtain postpetition financing and (B) use

1

cash collateral, (II) granting liens and providing superpriority administrative expense claims, (III) granting adequate protection, (IV) modifying the automatic stay, (V) granting related relief, and (VI) scheduling a final hearing pursuant to Bankruptcy Rule 4001 (the "**Interim DIP Order**");

 **WHEREAS**, pursuant to the Interim DIP Order, upon entry of the Final DIP Order, a portion of the outstanding amount of the Pre-Petition Loan will be automatically "rolled-up" and converted into DIP Loans, on a cashless basis of three dollars ($3.00) of Roll-Up Amount for every one dollar ($1.00) of funded DIP Loans (in the aggregate, the "**Roll-Up**");

 **WHEREAS**, Buyer intends to credit bid a portion of the outstanding obligations under the Pre-Petition Loan and/or a portion of the outstanding obligations under the DIP Facility (after giving effect to the Roll-Up) as part of the Purchase Price (as defined in <u>Section 1.05</u>) for the Purchased Assets;

 **WHEREAS**, Sellers wish to sell and assign to Buyer, and Buyer wishes to purchase and assume from Sellers, substantially all the assets, and certain specified Liabilities, of the Business at the Transferred Stores in satisfaction of a certain portion of the indebtedness owed by Sellers to Phonix, and the assumption of such specified Assumed Liabilities, as more particularly set forth in <u>Section 1.05</u> of this Agreement, through a sale and assumption to be conducted under Sections 105, 363 and 365 of the Bankruptcy Code, all subject to the terms and conditions set forth herein and the approval of the Bankruptcy Court, subject to the terms and conditions set forth herein;

 **WHEREAS**, as a condition to Closing, Phonix shall have acquired a participation in the rights of MacDonald and entities affiliated with MacDonald in respect of the advances made to, and in respect of their equity in, MRG Boulders, as more particularly set forth in a certain Participation Agreement dated by and between MacDonald, certain entities affiliated with MacDonald, and Phonix ("**Participation Agreement**"), which Participation Agreement shall be in form and substance satisfactory to Phonix and shall be entered into promptly after entry of the Interim DIP Order and prior to the entry of the Final DIP Order; and

 **WHEREAS**, as a condition to Closing, William Ian MacDonald shall have (a) granted to Phonix a lien on, and security interest in, all of his unencumbered limited partner interests (the "**PEC LP Interests**") in P.E.C. Finance Ltd. to accommodate and support the Pre-Petition Obligations, the DIP Obligations, and Adequate Protection Obligations, which grant shall be made and documented by a pledge agreement (the "**PEC Pledge Agreement**") and other related documents, agreements, and instruments, which PEC Pledge Agreement and other related documents, agreements, and instruments shall be in form and substance satisfactory to Phonix and entered into promptly after entry of the Interim DIP Order and prior to the entry of the Final DIP Order; and (b) assigned and transferred to Phonix all of his rights, titles and interests in and to the PEC LP Interests in satisfaction of the pledge set forth in the PEC Pledge Agreement pursuant to documents, agreements, and instruments satisfactory to Buyer prior to the entry of the Final DIP Order (the "**PEC Interest Transfer Documents")**; and

 **WHEREAS,** as a condition to Closing, MacDonald Realty Group, LLC ("**MRG**") shall have granted to Phonix a mortgage lien on, by deed of trust or as otherwise acceptable to Phonix (the "**MRG Deed of Trust**"), certain unencumbered real property in Alvarado, Texas more

specifically identified on Exhibit B hereto (the "**Alvarado Real Property**") to accommodate and support the Pre-Petition Obligations, the DIP Obligations, and Adequate Protection Obligations. The MRG Deed of Trust and other related documents, agreements and instruments shall be in form and substance satisfactory to Phonix (the "**Alvarado Real Property Documents**") and shall be entered into and delivered to Phonix promptly after entry of the Interim DIP Order and prior to the entry of the Final DIP Order.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the parties hereto agree as follows:

## ARTICLE I
Purchase and Sale

Section 1.01    **Purchase and Sale of Assets**. Subject to the terms and conditions set forth herein, at the Closing, each Seller shall sell, convey, assign, transfer, and deliver to Buyer, and Buyer shall purchase and acquire from Sellers, free and clear of any Encumbrances, except Permitted Encumbrances, all of such Seller's respective right, title, and interest in, to, and under all of the tangible and intangible assets, properties, and rights of every kind and nature, wherever located, of Sellers related to or used in the Business conducted at the Transferred Stores (other than the Excluded Assets) (collectively, the "**Purchased Assets**"), including, without limitation, the following:

(a)    Sellers' rights as tenants under the real property leases ("**Property Leases**") identified on Schedule 1.01(a) (collectively, the "**Assigned Property Leases**");

(b)    Sellers' rights, titles and interests as owners of the real property identified on Schedule 1.01(b) and all improvements thereon and fixtures therein (collectively, the "**Subject Real Property**");

(c)    all cash, cash equivalents, and marketable securities of Sellers as of the Closing Date, including, but not limited to, any and all cash received by the Sellers after the Closing Date in respect of payments made through credit card charges incurred prior to the Closing Date, but excluding cash that is otherwise to be disbursed pursuant to the Approved Budget or by Order of this Court, including the Interim DIP Order and the Final DIP Order, and the cash amount referred to in Section 1.02(d));

(d)    all bank accounts owned by or in the name of Sellers or its Affiliates;

(e)    all deposits (including maintenance deposits, and security deposits for rent, electricity, telephone, or otherwise), or prepaid or deferred charges and expenses (including all lease and rental payments), that have been prepaid by Sellers and relate to the Business conducted at the Transferred Stores;

(f)    all accounts receivable (trade and non-trade), notes receivable, and other receivables of Sellers (the "**Accounts Receivable**");

(g)    all inventory, finished goods, raw materials, work-in-process, packaging, supplies, parts and other inventories owned by Sellers and located in the Transferred Stores or in the possession of customers (the "**Inventory**");

(h)    all commercial paper held by the Sellers with respect to the Business conducted at the Transferred Stores, including without limitation, all of such Sellers rights, titles and interests under the consumer rental agreements held by Sellers, as such rental agreements are listed in Schedule 1.01(h) (collectively, the "**Consumer Rental Contracts**"), including the rights to receive payments from active customers from and after the Closing Date;

(i)    all of Sellers' rights, titles and interests under the Contracts listed on Schedule 1.01(i) (the "**Assigned Other Contracts**");

(j)    all items of furniture, electronics, appliances and other merchandise rented to customers pursuant to active Consumer Rental Contracts;

(k)    all rights with respect to inactive or charged off Consumer Rental Contracts for each of the Transferred Stores, including all rights to collect and receive payment thereunder and all related files, data and information regarding the same;

(l)    any fixed assets and tangible personal property located at the Transferred Stores that is not an Excluded Asset;

(m)    all Intellectual Property and other intangible proprietary rights owned or licensed by Sellers or used in the Business conducted at the Transferred Stores, including those items listed on Schedule 1.01(m) (collectively, the "**Intellectual Property**");

(n)    all IT Assets of Sellers and its Affiliates;

(o)    all furniture, fixtures, equipment, machinery, tools, vehicles, office equipment, computers, telephones, hardware, peripherals and other tangible personal property, wherever located (the "**Tangible Personal Property**");

(p)    all prepaid expenses, credits, advance payments, claims, refunds, rights of recovery, rights of set-off, rights of recoupment, security and other deposits, charges, sums, and fees (including any such item relating to the payment of Taxes) of Sellers;

(q)    all of each Seller's rights under warranties, indemnities and all similar rights against third parties to the extent related to any Purchased Assets or Assumed Liabilities;

(r)    all insurance benefits, rights and proceeds arising from or relating to the Business, the Purchased Assets or the Assumed Liabilities, including insurance arising from any claims, occurrences or loss events prior to Closing;

(s)    all of the rights, interests and benefits (if any) accruing under all Permits and Governmental Authorizations, and all pending applications therefor;

(t)     all federal, state and local tax refunds and tax credits owed to Sellers with respect to the periods prior to Closing, including, without limitation, all of Sellers' rights, titles and interests in and to all ERC Funds to the extent such funds have not been received by Phonix and applied to the Pre-Petition Loan and the DIP Loans prior to the Closing;

(u)     all interests in (i) vehicles that are leased by Sellers pursuant to an Assigned Contract and (ii) vehicles that are owned by the Sellers, with all such vehicles referred to in subparagraphs (i) and (ii) being identified on Schedule 1.01(u) and designated as leased or owned (collectively, the "**Assigned Vehicles**");

(v)     any and all claims or causes of action of any Seller arising under Chapter 5 of the Bankruptcy Code (including Sections 544, 545, 547, 548, 549, 550 and 553 thereof) and any proceeds or recoveries thereof;

(w)     originals, or where not available, copies, of all books and records of Sellers, including books of account, ledgers and general financial and accounting records, machinery and equipment maintenance files, customer lists and customer purchasing histories, price lists, vendor and supplier lists, distribution lists, production data, quality control records and procedures, customer complaints and inquiry files, research and development files, records, and data (including all correspondence with any federal, state, local or foreign government or any agency or instrumentality thereof, or any court or tribunal of competent jurisdiction), sales and marketing materials, studies, reports and other documents and records, in each case to the extent related to the Business or the Purchased Assets, but excluding any credit card numbers or related customer payment sources, social security numbers, or other information to the extent prohibited by any applicable law (collectively, the "**Books and Records**");

(x)     all goodwill, enterprise value and going concern value of the Business conducted at the Transferred Stores and the Purchased Assets;

(y)     software and proprietary rights owned or licensed by Sellers to the extent assignable and used or held for use in connection with the ownership or operation of the Business conducted at the Transferred Stores;

(z)     any claims of Sellers against third parties related solely to the Purchased Assets and/or the Assumed Liabilities, whether choate or inchoate, known or unknown, contingent or non-contingent;

(aa)     all rights with respect to the names "MAC Sales & Leasing", "MAC" and/or "BM" in connection with the retail home furnishing sales, leasing and/or rentals, and all registered and unregistered logos, service marks, trademarks and tradenames associated with such names;

(bb)     all rights with respect to inactive or charged off Consumer Rental Contracts for each of the Transferred Stores, including all rights to collect and receive payment thereunder and all related files, data and information regarding the same; and

(cc)     if and to the extent not otherwise set forth in subparagraphs (a) through (bb) above, any and all "Excluded Assets" under that certain Asset Purchase Agreement dated as of January 20, 2026 by and between Buddy Mac Holdings, LLC and the entities identified as sellers

on Annex I thereto, and National TV Sales & Rentals of Missouri, Inc. (the "**Missouri APA**") which relate to the Business conducted at the Transferred Stores, if and only if the transactions contemplated under the Missouri APA are consummated prior to the Closing Date.

Section 1.02    **Excluded Assets**. Other than the Purchased Assets subject to <u>Section 1.01</u>, Buyer expressly understands and agrees that it is not purchasing or acquiring, and Sellers are not selling or assigning, any other assets or properties of Sellers, and all such other assets and properties shall be excluded from the Purchased Assets (collectively, the "**Excluded Assets**"). Without limiting the generality of the foregoing, Excluded Assets include the following assets and properties of Seller:

(a)    any corporate infrastructure or other assets (tangible, intangible or otherwise) or properties of any Seller or its Affiliates that are not used or held for use exclusively in the Business;

(b)    the assets, properties, and rights, if any, specifically set forth on <u>Schedule 1.02;</u>

(c)    that certain real property located at 1404 W Gentry Pkwy, Tyler, TX 75702 and commonly referred to as the "**Tyler Property**"

(d)    cash equal to the amount necessary to fund the professionals, as set forth in the DIP Budget;

(e)    the participation rights acquired by Sellers pursuant to the Participation Agreement; and

(f)    if the transactions contemplated under the Missouri APA have been consummated prior to the Closing Date, all of the "Purchased Assets" referred to therein.

Section 1.03    **Assumed Liabilities**. Subject to the terms and conditions set forth herein, at the Closing, Buyer shall assume and agree to pay, discharge, perform or otherwise satisfy when due the following Liabilities and obligations of Sellers and their Affiliates (the "**Assumed Liabilities**"): (i) all Liabilities and obligations of Sellers under the Consumer Rental Contracts and the Assigned Contracts, but only to the extent such Liability or obligation (A) does not arise from any breach by a Seller, any of its Affiliates of any such Assigned Contract prior to the Closing Date, (B) is not required to be performed on or prior to the Closing Date, and (C) does not arise from or relate to any event, circumstance or condition occurring or existing prior to the Closing that, with or without notice or lapse of time, would constitute or result in a breach of such transferred Contract; and (ii) all Liabilities for Taxes allocated to Buyer hereunder.

Section 1.04    **Excluded Liabilities**. Buyer is not assuming and Sellers shall pay, perform or otherwise satisfy when due, all Liabilities of Sellers other than the Assumed Liabilities (the "**Excluded Liabilities**"). Without limiting the generality of the foregoing and except as otherwise expressly provided herein, Buyer is assuming no obligation for, and shall have no responsibility with respect to: (i) any Liability for any litigation matter or other third party claim to the extent arising from the conduct of the Transferred Stores prior to the Closing Date; (ii) any Liability for any claims by employees or former employees of any Seller concerning acts or omissions of any

Seller, to the extent such acts or omissions occurred prior to the Closing Date; (iii) any Liabilities of any Seller for any income or other Tax obligations (including, without limitation, any sales Tax and personal Tax obligations) or for any compensation or obligation under any Seller benefit plans for any Seller's employees or former employees or both, in each case to the extent arising prior to the Closing Date (excluding, for the avoidance of doubt, the Taxes allocated to Buyer hereunder); (iv) any Liability under any employment severance retention or termination agreement with any employee of any Seller (provided, that after the Closing Date, Buyer may make offers of employment to prior employees in connection with Transferred Store); (v) any accounts payable of Sellers to the extent arising from ownership and operation of the Transferred Stores prior to Closing or prior to the date on which assets are transferred to Buyer pursuant to this Agreement; and (vi) any Liabilities of any Seller under Environmental Law to the extent arising from ownership and operation of the Transferred Stores prior to Closing or prior to the date on which assets are transferred to Buyer pursuant to this Agreement.

Section 1.05    **Purchase Price**. On the terms and subject to the conditions hereof, at the Closing, the aggregate consideration for the Purchased Assets will consist of (a) a cash-less credit bid by Phonix pursuant to section 363(k) of the Bankruptcy Code (the "**Credit Bid**"), on a dollar-for-dollar basis, of (i) DIP Obligations (after giving effect to the Roll-Up), including all principal, fees, penalties and other obligations thereunder that are outstanding as of the Closing, and any accrued and unpaid fees (including Agent Obligations and the DIP Lender Professional Fees and Expenses) (each, as defined in the DIP Financing Agreement) and interest at the time of Closing, plus (ii) Pre-Petition Obligations (after giving effect to the Roll-Up), in an aggregate amount equal to $9,7000,000 in such order as Buyer elects; provided, however, if the total net amount of ERC Funds (after giving effect to any brokerage commissions) have been received by Phonix and applied to the Pre-Petition Loan and the DIP Loans prior to the entry of the Final DIP Order, then such amount shall be reduced to $7,000,000, and (b) the assumption of the Assumed Liabilities (the sum of <u>clauses (a)</u> through <u>(b)</u>, collectively, the "**Purchase Price**"). For the avoidance of doubt, Buyer reserves the right to increase the amount of its Credit Bid at any time through the Closing Date.

Section 1.06    **Allocation of Purchase Price**.

(a)    The Purchase Price and the Assumed Liabilities (and all other amounts required to be taken into account for U.S. federal income tax purposes) shall be allocated among the Purchased Assets for income Tax purposes (the "**Allocation**") in accordance with Section 1060 of the Code and the following allocation methodology ("**Allocation Methodology**"): After allocating the appropriate portion of the Purchase Price to cash, inventory, accounts receivable, prepaid assets, property, plant and equipment, the remaining portion of the Purchase Price shall be allocated first, to class VI intangibles per Transferred Store based on customer lists to be provided by Sellers at a value per customer determined by Buyer in good faith, and second, the remaining portion of the Purchase Price, if any, shall be allocated to goodwill.

(b)    Buyer and Sellers shall file all Tax Returns (including amended returns and claims for refund) and information reports in a manner consistent with the Allocation Methodology. Buyer and Sellers shall file all returns, declarations, reports, information returns and statements, and other documents relating to income Taxes (including amended returns and claims for refund) in a manner consistent with the Allocation Methodology.

Section 1.07    **Withholding Tax**. Buyer shall be entitled to deduct and withhold from the Purchase Price all Taxes that Buyer is required to deduct and withhold under any provision of applicable tax law. Any such withheld amounts shall be treated as delivered to Sellers for all purposes of this Agreement.

Section 1.08    **Assigned Contracts and Designation Rights of Buyer**.

(a)    No later than the date of entry of the Sale Order, Sellers shall deliver to Buyer an updated Schedule 1.01(a) and Schedule 1.01(i) and Schedule 1.01(u) setting forth all of the Assigned Contracts used in, or otherwise related to, the Business conducted at the Transferred Stores with the anticipated amount of the Cure Costs associated with each such Contract as reasonably determined in good faith.  Between the date hereof and the Closing, Sellers shall cooperate with and provide such additional information to Buyer with respect to such Contracts and the associated Cure Costs as may be reasonably necessary in order to identify all Assigned Contracts.  Prior to the Closing Date, Sellers shall supplement such list to add any Assigned Contracts used in, or otherwise related to, the Business conducted at the Transferred Stores which were entered into by Sellers during the pendency of the Bankruptcy Cases.

(b)    The Sale Motion shall seek, among other things, the authority to cause notice to be provided regarding the potential assumption and assignment to Buyer of all Assigned Contracts.

(c)    No later than the date of entry of the Sale Order, Sellers shall file a notice to fix the Cure Costs associated with each Assigned Contract, which shall have an objection deadline established under the Sale Procedures Order, which deadline Buyer and Sellers will negotiate in good faith and agree within three days of filing such notice on the Cure Costs Cap, which shall be based on the Cure Costs set forth in such notice plus a reasonable buffer, which shall be no later than three days in advance of the "Auction" referred to in the Sale Procedures Order.

(d)    From and after the date hereof through the Closing, no Seller shall, directly or indirectly, reject or take any action (or fail to take any action that would (or would reasonably be likely to) result in rejection by operation of law) to reject, repudiate or disclaim any Assigned Contract used in, or otherwise related to, the Business without the prior written consent (email being sufficient) of Buyer (including by filing any motions with the Bankruptcy Court seeking authorization to assume or reject (or Orders with respect to the assumption or rejection of) any Assigned Contracts).  Sellers may not amend, modify or compromise with respect to Cure Costs or other material terms of any Assigned Contract without the prior written consent (email being sufficient) of Buyer.

(e)    For the purposes of determining whether an Assigned Contract shall be included as a Purchased Asset, on the one hand, or an Excluded Asset, on the other hand, from and after the date of the filing of the Sale Motion, all Assigned Contracts shall be treated as follows:

(i)    Prior to the date of the Sale Hearing, Buyer shall notify Sellers in writing of those Assigned Contracts set forth on the latest updated Schedule 1.01(a) and Schedule

1.01(i) and Schedule 1.01(u) which Buyer, in its sole discretion, desires to be designated to be assigned to Buyer on the Closing Date;

(ii)    promptly following any Seller's entry into any other Assigned Contract used in, or otherwise related to, the Business conducted at the Transferred Stores during the period between the date of the filing of the Sale Motion and the date of the Sale Hearing, Sellers shall provide written notice of such Assigned Contract and Buyer shall notify Sellers in writing (email being sufficient) prior to the Closing Date whether Buyer, in its sole discretion, shall (A) purchase such Assigned Contract as a Purchased Asset (in which case, such Assigned Contract shall be included on an updated Schedule 1.01(a) or Schedule 1.01(i) or Schedule 1.01(u), as applicable or (B) not purchase such Assigned Contract (in which case, such Assigned Contract shall not be assigned to Buyer, shall be deleted from the updated Schedule 1.01(a) or Schedule 1.01(i) or Schedule 1.01(u), as applicable, and shall constitute an Excluded Asset);

(iii)    at any time prior to the Closing Date, Buyer shall have the right to provide written notice (email being sufficient) to Sellers of Buyer's election in its sole discretion to designate any Assigned Contract previously included as a Purchased Asset under the updated Schedule 1.01(a) or Schedule 1.01(i) or Schedule 1.01(u) as an Excluded Asset, and upon such designation such Assigned Contract shall constitute an Excluded Asset, without any resulting modification to the Purchase Price;

(iv)    at any time prior to the Closing Date, Buyer shall have the right to provide written notice (email being sufficient) to Sellers of Buyer's election in its sole discretion to designate any Assigned Contract previously included as an Excluded Asset, as an Assigned Contract constituting a Purchased Asset, and upon such designation such Assigned Contract shall constitute a Purchased Asset, without any resulting modification to the Purchase Price;

(v)    prior to the Closing Date, Buyer shall provide Sellers final version of the updated Schedule 1.01(a) and Schedule 1.01(i) and Schedule 1.01(u) and accordingly all Assigned Contracts set forth thereon shall constitute Purchased Assets and be assigned to Buyer at Closing, and all Assigned Contracts not set forth thereon shall not be assigned to Buyer and shall constitute Excluded Assets; and

(f)    At Closing, to the extent not previously paid, Sellers shall pay or cause to be paid any and all Cure Costs in respect of all Assigned Contracts that are Purchased Assets, subject to the Cure Costs Cap.

(g)    Notwithstanding anything to the contrary set forth in this Section or elsewhere in this Agreement, if at any time the Cure Costs or any portion thereof with respect to an Assigned Contract exceeds or would exceed the Cure Costs Cap, Buyer shall not be required to include such Assigned Contract as a Purchased Asset and such Assigned Contract shall constitute and Excluded Asset, unless and until Sellers pay such excess Cure Costs or Buyer, in its sole discretion, elects to pay such excess Cure Costs.

(h)      Notwithstanding anything to the contrary set forth in this Section or elsewhere in this Agreement, during the fifteen (15) Business Day period following the Closing Date, Buyer shall have the right, exercisable in its sole discretion, to designate any Assigned Contract previously included as a Purchased Asset as of Closing under the updated <u>Schedule 1.01(a)</u> or <u>Schedule 1.01(i)</u> or <u>Schedule 1.01(u)</u> as an Excluded Asset, and upon such designation such Assigned Contract shall constitute an Excluded Asset, without any resulting modification to the Purchase Price;

(i)      Nothing in this Agreement shall be construed as an attempt by Sellers to assign any Assigned Contract to the extent that such Assigned Contract is not assignable under the Bankruptcy Code or otherwise without the consent of the other party or parties thereto where the consent of such other party has not been given or received, as applicable.

(j)      With respect to any Assigned Other Contract or Assigned Property Lease or Assigned Vehicle Lease for which the consent of a party thereto to the assignment thereof is required (notwithstanding the entry of the Sale Order) shall not have been obtained at Closing, Sellers and Buyer shall use commercially reasonable efforts to obtain as expeditiously as possible the written consent of the other party or parties to such Assigned Other Contract or Assigned Property Lease or Assigned Vehicle Lease necessary for the assignment thereof to Buyer.  Until any such consent, waiver, confirmation, novation or approval is obtained, Sellers and Buyer shall cooperate to establish an arrangement reasonably satisfactory to Sellers and Buyer under which Buyer would obtain the claims, rights and benefits and assume the corresponding Liabilities and obligations thereunder (including by means of any subcontracting, sublicensing or subleasing arrangement).  In such event, Sellers will hold in trust for and promptly pay to Buyer, when received, all monies received by them under any such Assigned Contract any claim, right or benefit arising thereunder.  Buyer acknowledges that no adjustment to the Purchase Price shall be made for any Assigned Contracts that are not assigned.  Until such written consent is obtained, Buyer shall have the ability to designate any such Assigned Contract as an Excluded Asset.  Nothing in this paragraph shall be deemed a waiver of Buyer's right to receive an effective assignment of all of the Purchased Assets at Closing nor shall any Assigned Contracts covered by this paragraph be deemed to constitute Excluded Assets solely by virtue of this paragraph.

(k)      At any time prior to the Closing Date, Buyer shall be entitled to, in Buyer's sole discretion, designate (by delivery of written notice to Sellers of such designation) additional assets or liabilities to purchase, assume or exclude, which assets and liabilities will thereinafter constitute "Purchased Assets," "Excluded Assets," "Assumed Liabilities," or "Excluded Liabilities" hereunder, as applicable, and such designation shall not result in any adjustments to the Purchase Price unless such assets are not subject to any lien, claim, or encumbrance in favor of Buyer.  For the avoidance of doubt: (i) the only Debtor assets that are not subject to such Buyer lien, claim, or encumbrance are the professional carveout under the Final DIP Order and the Estate Boulders Share under the Settlement Agreement; and (ii) Buyer may not designate the Excluded Assets referred to in <u>Sections 1.02(d) or (e)</u> as Purchased Assets.

(l)      As soon as reasonably practicable, and not later than February 26, 2026, Sellers shall file with the Bankruptcy Court a final <u>Schedule 1.01(a)</u> and <u>Schedule 1.01(i)</u> and <u>Schedule 1.01(u)</u>.

## ARTICLE II
## CLOSING

Section 2.01 **Closing**. Subject to the terms and conditions of this Agreement, the consummation of the transactions contemplated by this Agreement (the "**Closing**") shall take place at remotely by exchange of electronic documents and signatures, on a date that is no later than 3 Business Days after the satisfaction or waiver of all of the conditions set forth in Article VI (other than conditions which by their nature are to be satisfied at the Closing), or on such other date or at such other time as Company and Buyer may mutually agree in writing; provided, however, that in no event shall the Closing occur after February 28, 2026, unless Phonix elects to extend such date to a date not later than March 9, 2026 and provide for sufficient cash collateral and/or financing reasonably acceptable to Sellers to enable the Transferred Stores to operate through such extended date (with February 28, 2026 or such extended date, as applicable, being referred to herein as the "**Outside Closing Date**"). The date on which the Closing actually occurs is referred to herein as the "**Closing Date**." For purposes of this Agreement, "**Business Day**" means any day other than Saturday, Sunday or a day on which banking institutions in Dallas, Texas are permitted or obligated by law to remain closed.

Section 2.02 **Closing Deliverables**.

(a) At the Closing, Sellers shall deliver to Buyer the following:

(i) a duly executed bill of sale and assignment and assumption agreement (in the form attached hereto as Exhibit C) (the "**Bill of Sale and Assignment and Assumption Agreement**") transferring to Buyer all of the Purchased Assets;

(ii) certificates of title or origin (or similar documents) with respect to any vehicles included in the Purchased Assets for which a certificate of title or origin evidences title, together with properly completed assignments of such vehicles or other equipment to Buyer, duly executed by the appropriate Seller and in form and substance satisfactory to the Buyer;

(iii) grant deeds or other customary deeds with respect to each Subject Real Property pursuant to which fee simple title to each such Subject Real Property is transferred to Buyer of record, together with such other documents and instruments as may be necessary or appropriate to effect such transfer of title, all of which shall be in form and substance satisfactory to Buyer and duly executed and, if required, notarized;

(iv) an IRS Form W-9, duly completed by, duly executed by each Seller;

(v) a certificate dated as of a date not earlier than five (5) days prior to the Closing Date as to the good standing of each Seller, executed by the appropriate officials of each jurisdiction of organization;

(vi)    a certified copy of the Sale Order (as defined in <u>Section 6.02</u>) entered by the Bankruptcy Court, which Sale Order shall be a final order not subject to any pending appeal and in full force and effect as of the Closing;

(vii)    a certificate of an authorized officer of each Seller, dated as of the Closing Date, certifying that the conditions set forth in <u>Sections 6.02(a)</u> and <u>6.02(b)</u> (such Seller's representations and covenants) have been satisfied;

(viii)    a certificate of the Secretary or other authorized officer of each Seller attaching (A) the resolutions of the governing body of such Seller authorizing the execution, delivery and performance of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby, and (B) the incumbency and specimen signatures of the officers of such Seller executing this Agreement and any other documents to be delivered by Sellers at the Closing; and

(ix)    such other customary instruments of transfer, assignment or assumption, filings, or documents (reasonably satisfactory in form and substance to Buyer) as may be required to give effect to this Agreement and the transactions contemplated hereby (including documents and instruments sufficient to release any Liens on the Purchased Assets, other than Permitted Liens or any Liens that will be released by the Sale Order).

(b)    At the Closing, Buyer shall deliver to Sellers the following:

(i)    a duly executed counterpart to the Assignment and Assumption Agreement;

(ii)    a certificate of an authorized officer of Buyer, dated as of the Closing Date, certifying that the conditions set forth in <u>Sections 6.03(a)</u> and <u>6.03(b)</u> (Buyer's representations and covenants) have been satisfied; and

(iii)    a certificate of the Secretary or other authorized officer of Buyer attaching (A) the resolutions of the governing body of Buyer authorizing the execution, delivery and performance of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby, and (B) the incumbency and specimen signatures of the officers or representatives of Buyer executing this Agreement and any other documents to be delivered by Buyer at the Closing.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Each Seller represents and warrants to Buyer that the statements contained in this <u>Article III</u> are true and correct as of the date hereof and as of the Closing Date (or, in the case of any representation or warranty expressly made as of a specified date, as of such specified date), except as set forth in the disclosure schedules (the "**Disclosure Schedules**") delivered by Sellers to Buyer (it being understood that disclosure of any item in any section or subsection of the

Disclosure Schedules shall be deemed disclosed with respect to any other section or subsection of this Agreement to which the relevance of such item is reasonably apparent on its face):

Section 3.01 **Organization and Authority of each Seller**. Each Seller duly organized, validly existing and in good standing under the applicable laws of the state of organization of such entity. Subject to any necessary authorization from the Bankruptcy Court, each Seller has full company power and authority to enter into this Agreement and the other Transaction Documents to which such Seller is a party, to carry out its respective obligations hereunder and thereunder and to consummate the transactions contemplated hereby, subject to any required Bankruptcy Court approval. The execution and delivery by Sellers of this Agreement and the Transaction Documents, and the performance by Sellers of their respective obligations hereunder and thereunder, have been duly authorized by all requisite company (and, if required, stockholder or other) action on the part of each Seller. This Agreement has been duly executed and delivered by Sellers and (assuming due authorization, execution and delivery by Buyer and subject to Bankruptcy Court approval) constitutes the legal, valid and binding obligation of Sellers, enforceable against each Seller in accordance with its terms.

Section 3.02 **No Conflicts or Consents**. The execution, delivery and performance by each Seller of this Agreement and the other Transaction Documents, and the consummation of the transactions contemplated hereby and thereby, do not and will not violate or conflict with any provision of the certificate of formation, company agreement, or other governing documents of any Seller.

Section 3.03 **Assigned Contracts**. Schedule 1.01(a) and Schedule 1.01(d) and Schedule 1.01(u) (with respect to the Assigned Vehicles Leases) together sets forth a correct and complete list of all Assigned Contracts. Except as specified on such Schedules, Sellers have not rejected any executory contract or unexpired lease that would have been a Purchased Asset, and Sellers have not received any written notice of any plan or intention of any other party to any Assigned Contract to cancel, terminate or materially modify such Assigned Contract.

Section 3.04 **Title to Purchased Assets**. Pursuant to the Sale Order and Section 363(f) of the Bankruptcy Code Sellers will convey to Buyer at the Closing, title to, or in the case of leased or licensed assets, a leasehold or license interest in, all of the Purchased Assets, free and clean of all Encumbrances other than Permitted Encumbrances.

Section 3.05 **Permitted Encumbrances Relating to Subject Real Property**. Schedule 3.05 sets forth a complete list of all Permitted Encumbrances relating to each Subject Real Property. As of the Closing, there will be no Permitted Encumbrance relating to any Subject Real Property other than those set forth on Schedule 3.05.

Section 3.06 **Environmental Matters**. Except as set forth in Schedule 3.06, to the Knowledge of Sellers and except as would not reasonably be expected to materially adverse to the Business as operated as of the date hereof:

(a) the operation of the Business is in compliance with all applicable Environmental Laws (including obtaining and complying with all Permits required pursuant to Environmental Law to operate the Business);

13

(b)     Sellers are not the subject of any outstanding Environmental Claim with respect to violation of Environmental Laws and have not received any written notice in the last two years prior to the date of this Agreement alleging that any Seller, the Business, or any Purchased Assets may be in violation in any material respect of any applicable Environmental Law; and

(c)     there has been no Environmental Release of Hazardous Materials by any Seller, or by any other Person at any Subject Real Property or the real property associated with any Assigned Property Lease, in contravention of Environmental Law that would (or would reasonably be expected to), after the Closing Date, require remediation pursuant to Environmental Law, and (ii) Sellers have not received any written notice that any of the Purchased Assets, the Business, or real property currently or formerly owned, leased or operated by any Seller in connection with its business operations has been contaminated with any Hazardous Materials which would reasonably be expected to result in an Environmental Claim against, or otherwise result in Liability of, Sellers.

Section 3.07    **Brokers**. Except as set forth on Schedule 3.07, no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission from any Seller in connection with the transactions contemplated by this Agreement. Any fees due to the Persons listed on Schedule 3.05 shall be the sole responsibility of Sellers (as an expense of the estate in the Bankruptcy Case), and no claim for any such fee shall be asserted against Buyer or the Purchased Assets.

Section 3.08    **No Other Representations; "As Is" Sale**. Except for the representations and warranties expressly set forth in this Article III (as qualified by the Disclosure Schedules) or in any certificate delivered by Sellers pursuant to this Agreement, none of the Sellers nor any other Person is making any representation or warranty of any kind, express or implied, at law or in equity, in respect of any Seller, the Business or any of the Purchased Assets, including with respect to merchantability or fitness for any particular purpose, or as to the future revenue, profitability or success of the Business, or any representation or warranty arising from statute or otherwise in law. Buyer hereby acknowledges and agrees that, except for the express representations set forth in this Agreement and any express representations set forth in the Sale Order, the Purchased Assets are being transferred to Buyer on a strictly "AS IS, WHERE IS" basis and "WITH ALL FAULTS." Buyer has had the opportunity to conduct, and has conducted to its satisfaction, its own independent investigation and review of the Business, the Purchased Assets and Assumed Liabilities, and in making the determination to proceed with the transactions contemplated by this Agreement, Buyer has relied solely on the express representations and warranties of Sellers set forth in this Agreement (as qualified by the Disclosure Schedules) and upon its own examination and investigation.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Sellers that the statements contained in this ARTICLE IV are true and correct as of the date hereof.

Section 4.01    **Organization and Authority of Buyer**. Buyer is a Delaware limited liability company duly organized, validly existing and in good standing under the laws of the State

of Delaware. Buyer has full organizational power and authority to enter into this Agreement and the other Transaction Documents to which Buyer is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby. The execution and delivery by Buyer of this Agreement and any other Transaction Document, and the performance by Buyer of its obligations hereunder and thereunder, have been duly authorized by all requisite action on the part of Buyer and its general partner. This Agreement has been duly executed and delivered by Buyer and (assuming due authorization, execution and delivery by Sellers and entry of the Sale Order) constitutes a legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms.

Section 4.02    **No Conflicts; Consents**. The execution, delivery and performance by Buyer of this Agreement and the other Transaction Documents, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) violate or conflict with the organizational documents of Buyer; (b) violate or conflict with any law applicable to Buyer; or (c) require any consent or notice under, conflict with, or result in a violation or breach of, or constitute a default under, any material contract or other instrument binding upon Buyer. Except for the Sale Order and such other orders of the Bankruptcy Court as may be necessary, no consent, approval, authorization or order of, or filing with, any governmental authority is required by Buyer in connection with the execution and delivery of this Agreement and the other Transaction Documents or the consummation of the transactions contemplated hereby or thereby.

Section 4.03    **Brokers**. No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission from Buyer in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Buyer.

Section 4.04    **Legal Proceedings**. There are no actions pending or, to Buyer's knowledge, threatened against or by Buyer or any Affiliate of Buyer that challenge or seek to prevent, enjoin or materially delay the transactions contemplated by this Agreement.

## ARTICLE V
## COVENANTS

Section 5.01    **Access and Information**.

(a)    During the period from the date hereof until the earlier of the Closing or the termination of this Agreement in accordance with Article VIII (the "**Interim Period**"), Sellers shall (a) afford Buyer and its Representatives reasonable access to the Business and the Purchased Assets, and information reasonably requested by Buyer pertaining to the Assumed Liabilities, and (b) use commercially reasonable efforts to cause its employees and Representatives of Sellers to cooperate with and aid Buyer and its Representatives in its investigation of the Business. Any request or investigation under this Section 5.01(a) shall be made or conducted on a reasonable basis by Buyer providing reasonable notice to Company and shall be conducted during normal business hours in such a manner as not to interfere unreasonably with the conduct of the Business. Buyer acknowledges and agrees that Company shall be entitled to restrict any such access to or restrict information of Sellers (x) as determined, in its reasonable discretion, to be appropriate to ensure compliance with any law, (y) that in the reasonable judgment of Company would result in the disclosure of any trade secrets or any violation of any of the Sellers obligations with respect to

confidentiality and/or (z) to preserve any applicable attorney client privilege, attorney work product or other legal privilege.

(b)     During the Interim Period, Buyer hereby agrees it shall not contact, and it shall cause its Affiliates or Representatives to not contact, any employee, licensor, licensee, competitor, supplier, distributor, franchisee, or customer of Sellers with respect to the Purchased Assets, the Business, this Agreement, the other Transaction Documents or the transactions contemplated hereby or thereby, without the prior written consent of Company.

Section 5.02    **Ordinary Course of Business**. Except (a) with the prior written consent of Buyer, which consent shall not be unreasonably withheld or delayed, (b) as required by applicable law or order of the Bankruptcy Court, including the DIP Financing Order, (c) as expressly provided in this Agreement Schedule 5.02, or (d) for actions taken by Sellers as required in connection with the Bankruptcy Case, during the Interim Period, Seller shall:  (i) use commercially reasonable efforts to operate and/or maintain the tangible Purchased Assets in the ordinary course and in compliance with applicable laws in all material respects, taking into account the resources (financial or otherwise) and personnel available to Sellers, (ii) (A) not terminate or cancel any of the Assigned Other Contracts other than expirations of any Assigned Other Contracts in accordance with the terms of such Assigned Other Contract, or (B) amend in any material respect or release, assign or waive any material rights under any Assigned Other Contract other than in the Ordinary Course or as provided for in the DIP Financing Order or as contemplated or permitted in the DIP Budget (as defined in the DIP Financing Order), (iii) not abandon or allow to lapse any rights in any material Intellectual Property other than (A) in the Ordinary Course or (B) due to the expiration of issued or registered Intellectual Property at the end of the maximum statutory term, and (iv) not sell, assign, license, transfer, convey, lease, sublease, surrender, relinquish, terminate or otherwise dispose of any material portion of the Purchased Assets other than (A) in the ordinary course or (B) the disposition of obsolete, worn out, used or immaterial assets.

Section 5.03    **Obligation to Consummate the Transaction**. Each of the parties hereto agrees that it shall use commercially reasonable efforts to take, or cause to be taken, all action and to do, or cause to be done, all things necessary, proper or advisable to the extent permissible under applicable law, to consummate and make effective the transactions contemplated by this Agreement and to ensure that the conditions set forth in Article VI are satisfied.

Section 5.04    **Public Announcements**. Buyer shall not issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of Sellers, except as may be necessary to comply with applicable law or the requirements of the Bankruptcy Court (including the filing of this Agreement with the Bankruptcy Court and information contained in the motions seeking the DIP Order, Sale Procedures Order or Sale Order). Sellers and Buyer shall cooperate on the content and timing of any press releases or public statements announcing the consummation of the transactions contemplated by this Agreement.

Section 5.05    **Bankruptcy Court Matters**. Sellers shall use its best efforts to obtain entry of the following orders of the Bankruptcy Court in accordance with the specified timing:

16

(a)      DIP Order.  By no later than January 26, 2026 at 2:59 pm Central Time, Sellers shall file a motion (the "**DIP Motion**") with the Bankruptcy Court seeking entry of interim and final orders authorizing the DIP Facility on the terms attached as Exhibit D (the "**DIP Credit Agreement**") and otherwise acceptable to Buyer. Sellers shall use commercially reasonable efforts to obtain entry of an interim DIP financing order (the "**Interim DIP Order**") by no later than January 28, 2026, and a final DIP financing order (the "**Final DIP Order**") by no later than February 10, 2026. The Interim DIP Order and Final DIP Order (collectively, the "**DIP Orders**") shall be in form and substance acceptable to Buyer. Without limiting the generality of the foregoing, the DIP Orders shall provide, among other things, that (i) Buyer (as DIP lender) has the right, pursuant to Section 363(k) of the Bankruptcy Code, to credit bid the DIP Obligations and the Pre-Petition Obligations (as defined in the DIP Orders) in connection with any sale of the Purchased Assets, (ii) the DIP Obligations and the Pre-Petition Obligations shall be credit bid (to the fullest extent elected by Buyer) as consideration for the Purchased Assets if Buyer is the successful purchaser at the Sale (as defined below), and (iii) the Expense Reimbursement (as defined in Section 8.02) are approved and shall be payable as set forth in this Agreement, and shall constitute allowed superpriority administrative expenses of Sellers' estate. Sellers shall not seek or consent to any modification or amendment to the DIP Orders or any DIP financing documentation without Buyer's prior written consent. Sellers shall promptly provide Buyer and its counsel with draft copies of all proposed DIP Motions, DIP Orders and other material pleadings or documents related to the DIP Facility for Buyer's review and comment in advance of filing, and such documents shall be acceptable to Buyer in all material respects.

(b)      Sale Order. No later than January 26, 2026, Sellers shall file a motion (the "**Sale Motion**") with the Bankruptcy Court seeking entry of an order (the "**Sale Order**").

(i)      The Sale Motion, the Sale Order, the Bid Procedures and the Bid Procedures Order shall be in form and substance acceptable to Buyer.

(ii)      The Bid Procedures Order shall be entered no later than February 10, 2026.

(iii)      The Bid Procedures shall set forth the following Key Dates and Deadlines.  If any of such Key Dates and Deadlines are changed or otherwise modified without the prior written consent of Buyer, Buyer shall receive advance written notice of such changes or modifications.

| Event or Deadline | Date and Time |
| --- | --- |
| Bid Deadline | February 13, 2026, at 5:00 p.m. CT |
| Auction Date | February 17, 2026, at 10:00 a.m. CT |
| Objection Deadline | February 18, 2026, at 12:00 p.m. noon CT |
| W&E List Deadline | February 18, 2026, at 12:00 p.m. noon CT |
| Sale Hearing | February 19, 2026, at 9:30 a.m. CT |
| Outside Closing Date | February 28, 2026 (subject to Section 2.01 of APA) |

(iv)     The Sale Motion, the Sale Order, the Bid Procedures and the Bid Procedures Order shall acknowledge and confirm that Buyer shall be entitled to submit a credit bid as set forth in Section 1.05 of this Agreement in accordance with Section 363(k) of the Bankruptcy Code and Buyer shall be deemed to be a "Qualified Bidder" for purposes of the Bid Procedures approved by the Bankruptcy Court without any requirement of providing financial information as to capability to close or any deposit or other bidding requirement.

(v)     Sellers shall give Buyer reasonable opportunity to review and comment upon all motions, proposed orders, notices and other documents that Sellers propose to file with the Bankruptcy Court in connection with or that might reasonably affect approval of the Sale Order, and such documents shall be in form and substance acceptable to Buyer. Sellers shall use their best efforts to seek and obtain entry of the Sale Order at or following the Sale Hearing approving this Agreement, which Sale Order shall authorize Sellers to consummate the sale of the Purchased Assets to Buyer pursuant to Section 363(b), free and clear of all Encumbrances, claims and interests pursuant to Section 363(f) of the Bankruptcy Code, other than the Permitted Encumbrances and authorizing the assumption and assignment of the Assigned Contracts pursuant to Section 365. In addition, the Sale Order shall, without limitation: (i) approve this Agreement and the transactions contemplated hereby; (ii) find that Buyer is a "good faith" purchaser entitled to the protections of Section 363(m) of the Bankruptcy Code; (iii) provide that the sale of the Purchased Assets to Buyer shall be free and clear of all Encumbrances, claims, and interests of any kind or nature whatsoever (except for Assumed Liabilities and Permitted Encumbrances), with any such interests to attach to the sale proceeds with the same validity, priority and extent as existed immediately prior to the sale; (iv) confirm that the Purchased Assets are transferred free and clear of any claims of copyright, trade secret, or other intellectual-property infringement arising prior to the Closing (including any asserted or potential rights, licenses, or claims relating to the Sellers' intellectual property, technology, data, software, or platforms, whether known or unknown, with any such claims or interests to be deemed extinguished and to attach to the proceeds of the sale with the same priority and extent as existed immediately prior to the sale, pursuant to Section 363(f) of the Bankruptcy Code; (v) authorize the assumption and assignment to Buyer of each of the Assigned Contracts, and fix the Cure Costs for each Assigned Contract (with Sellers responsible for payment of such Cure Costs at Closing); (vi) permanently bar and enjoin each counterparty to an Assigned Contract from asserting against Buyer any default, claim, breach or condition arising prior to the Closing (including any liability for the Cure Costs); (vii) include findings that adequate notice of the Sale and Sale Hearing was given in accordance with the Bankruptcy Code and applicable rules, and that Buyer is not a successor to Sellers or their estate by reason of any theory of law or equity and Buyer shall not have any successor or transferee liability for any Liabilities of Sellers other than the Assumed Liabilities; (viii) order that the provisions of the Sale Order shall remain in effect in the event of any conversion or dismissal of the Bankruptcy Case. Sellers agree that it will promptly take such actions as may be reasonably requested by Buyer to assist in obtaining Bankruptcy Court approval of the Sale Order and all other orders necessary or

18

appropriate to consummate the transactions contemplated by this Agreement; and (ix) expressly provide that the Purchased Assets are transferred free and clear of any and all claims and causes of action, with any such claims to attach to the proceeds with the same validity, priority and extent as existed immediately prior to the Sale. Sellers shall give Buyer and its counsel reasonable opportunity to review and comment upon all motions, proposed orders, notices or other documents that Sellers propose to file with the Bankruptcy Court in connection with the Sale (including the Sale Procedures Motion and the proposed Sale Order), and such documents shall be in form and substance acceptable to Buyer. If the Sale Order or another relevant order of the Bankruptcy Court shall be appealed by any party (or a petition for certiorari or motion for rehearing or reargument shall be filed with respect thereto), Sellers shall take all reasonable steps as may be necessary to defend against such appeal or petition and to endeavor to obtain an expedited resolution of any such appeal or petition.

(c)    Consultation and Support. Sellers shall keep Buyer reasonably informed of the status of the Bankruptcy Case and promptly notify Buyer of any material motions, applications, objections or other pleadings or documents served, filed or entered in the Bankruptcy Case relating to the Purchased Assets, the DIP Facility or the transactions contemplated by this Agreement. Sellers shall consult with Buyer and its Representatives in good faith regarding the strategy for obtaining (and in connection with any hearing to consider approval of) the DIP Orders, the Sale Procedures Order and the Sale Order. Sellers shall not take any action, file any motion, pleading or plan, or seek any relief, that is inconsistent with or could reasonably be expected to prevent or materially impede the transactions contemplated by this Agreement, the DIP Facility, or the stalking-horse bid status of Buyer (including any agreement to grant bid protections to any third party). Sellers shall diligently prosecute the entry of the DIP Orders, the Sale Procedures Order and the Sale Order and shall use commercially reasonable efforts to satisfy all milestones or deadlines relating to the Sale and DIP process that are established in the DIP Facility or by order of the Bankruptcy Court (including those set forth in this Section 5.05).

Section 5.06    **Employee Matters**.  Prior to Closing: (a) Buyer shall provide Sellers in writing a list of Sellers' employees to whom Buyer intends to offer employment, on an "at will" basis following the Closing Date (the "**Named Employees**"); and (b) Sellers will take all commercially reasonable steps to coordinate with Buyer to present the offers of employment from Buyer to the Named Employees.  Named Employees who accept such offers of employment are referred to herein as "**Transferred Employees**."  Except as otherwise expressly provided herein, Buyer is not obligated to offer employment to any of Sellers' employees and Sellers shall not have any obligation to offer or reserve any Named Employees for Buyer's hiring thereof.   The provisions of this Agreement are for the benefit of Buyer and Sellers only, and no employees of Sellers or any other Person shall have any rights hereunder.

Section 5.07    **Non-Competition Provisions**.  **Non-Competition; Non-Solicitation**.

(a)    Each Seller and MacDonald acknowledges the competitive nature of the Business and accordingly agrees, in connection with the sale of the Purchased Assets, including the goodwill of the Business, which Buyer considers to be a valuable asset, and in exchange for good and valuable consideration, that for a period of one (1) year commencing on the Closing Date

(the "**Restricted Period**"), each such Seller and MacDonald shall not, and shall not permit any of its or his Affiliates to, directly or indirectly, (i) engage in or assist others in engaging in the Business (the "**Restricted Business**") within five (5) miles of any Transferred Store (the "**Territory**"); (ii) have an interest in any Person that engages directly or indirectly in the Restricted Business in the Territory in any capacity, including as a partner, shareholder, director, member, manager, employee, principal, agent, trustee, or consultant; or (iii) cause, induce, or encourage any actual or prospective client, customer, supplier, or licensor of the Business (including any existing or former client or customer of such Seller and any Person that becomes a client or customer of the Business after the Closing), or any other Person who has a material business relationship with the Business, to terminate or modify any such actual or prospective relationship. Notwithstanding the foregoing, each Seller and MacDonald may own, directly or indirectly, solely as an investment, securities of any Person traded on any national securities exchange if such Seller and MacDonald is not a controlling Person of, or a member of a group which controls, such Person and does not, directly or indirectly, own two percent (2%) or more of any class of securities of such Person.

(b)     During the Restricted Period, each Seller and MacDonald shall not, and shall not permit any of its Affiliates to, directly or indirectly, hire or solicit any individual who is or was employed by the Business prior to or during the Restricted Period, or encourage any such employee to leave such employment or hire any such employee who has left such employment within six (6) months of such employee's termination of employment, except pursuant to a general solicitation which is not directed specifically to any such employee.

(c)     Each Seller and MacDonald acknowledges that a breach or threatened breach of this Section 5.07 would give rise to irreparable harm to Buyer, for which monetary damages would not be an adequate remedy, and hereby agrees that in the event of a breach or a threatened breach by a Seller or MacDonald of any such obligations, Buyer shall, in addition to any and all other rights and remedies that may be available to it in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance, and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond). If, during any calendar month within the Restricted Period, a Seller or MacDonald or any Affiliate of a Seller or MacDonald is not in compliance with the terms of this Section 5.07, Buyer shall be entitled to, among other remedies, require compliance by such Seller or MacDonald or Affiliate of such Seller or MacDonald with the terms of this Section 5.07 for an additional number of calendar months that equals the number of calendar months during which such noncompliance occurred.

(d)     Each Seller and MacDonald acknowledges that the restrictions contained in this Section 5.07 are reasonable and necessary to protect the legitimate interests of Buyer and constitute a material inducement to Buyer to enter into this Agreement and consummate the transactions contemplated by this Agreement. In the event that any covenant contained in this Section 5.07 should ever be adjudicated to exceed the time, geographic, product or service, or other limitations permitted by applicable law in any jurisdiction or any governmental order, then any court is expressly empowered to reform such covenant in such jurisdiction to the maximum time, geographic, product or service, or other limitations permitted by applicable law or such governmental order. The covenants contained in this Section 5.07 and each provision hereof are severable and distinct covenants and provisions. The invalidity or unenforceability of any such covenant or provision as written shall not invalidate or render unenforceable the remaining

covenants or provisions hereof, and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such covenant or provision in any other jurisdiction.

Section 5.08    **Transfer Taxes**.

(a)    All Transfer Taxes owed or to be owed by the Sellers with respect to the operation of the Business and all Transfer Taxes owed in connection with transactions entered into during period prior to the Closing shall have been paid in full by Sellers.

(b)    Prior to Closing, all Transfer Taxes imposed or to be imposed in connection with the consummation of the transactions contemplated under this Agreement, and under the Participation Agreement, the PEC Pledge Agreement and the MRG Deed of Trust, shall have been paid in full by the Sellers or the Sellers shall have made arrangements satisfactory to Buyer to pay such Transfer Taxes immediately following the Closing.

Section 5.09    **Further Assurances**. Following the Closing, each of the parties shall, and shall cause their respective Affiliate to, execute and deliver such additional documents, instruments, conveyances and assurances, and take such further actions, as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the other Transaction Documents. Without limiting the foregoing, if after the Closing Buyer or Sellers discover any asset, right or property that should have been transferred to Buyer as a Purchased Asset but was not so transferred (including any refund, credit or rebate in respect of any utility deposit or other prepaid expense included in the Purchased Assets), the parties shall cooperate and execute and deliver any instruments or documents of transfer necessary to transfer and convey such asset or right to Buyer for no additional consideration. Sellers shall deliver to Buyer copies of, and assign to Buyer the benefit of, each Seller's employee and contractor confidentiality, invention-assignment and non-disclosure agreements and any other instruments necessary to evidence and enforce each Seller's ownership of the Intellectual Property included in the Purchased Assets. Following the Closing, Buyer shall use commercially reasonable efforts to retain key employees and maintain uninterrupted service to existing customers and partners, consistent with preserving the going-concern value of the Business

Section 5.10    **Use of Buyer's Name**. Sellers shall not file, serve or submit any pleading, notice or paper with the Bankruptcy Court or any governmental authority that purports to bind, obligate or speak on behalf of Buyer (including using Buyer's name or signature block) without Buyer's prior written consent.

Section 5.11    **Cessation of Use of "MAC Sales and Leasing" Name and Trademark**. Within five (5) Business Days following the Closing Date, Sellers shall change their official name to a name that does not use, incorporate or refer to "MAC Sales & Leasing" and/or "MAC" and/or "BM" and all Sellers shall cease using the names "MAC Sales & Leasing" and/or "MAC" and/or "BM" in connection with the retail home furnishing sales, leasing and/or rentals, and shall reflect such name change in the docket of the Bankruptcy Court. Within such five Business Day period, Sellers shall provide to Buyer evidence of such name changes from the applicable Secretary of State of the State of organization of each such Seller and evidence of the change of name on the docket of the Bankruptcy Court.

21

## ARTICLE VI
## CONDITIONS TO CLOSING

Section 6.01   **Conditions to Obligations of Buyer and Sellers**. The respective obligations of each party to consummate the Closing shall be subject to the fulfillment (or waiver by the applicable party in writing) of all the following conditions as of the Closing Date:

(a)   Bankruptcy Court Approval. The Bankruptcy Court shall have entered the Sale Order (and, to the extent not already obtained at the time of the Sale Hearing, the Final DIP Order) and all other orders necessary to approve and authorize each Seller's performance of this Agreement and the consummation of the transactions contemplated hereby, and each such order shall be an order or judgment of the Bankruptcy Court that (i) has not been stayed, modified, or vacated, and (ii) as to which no appeal, motion, or petition is pending or, if any appeal, motion, or petition has been filed, such order has been affirmed and no further appeal or review is available ("**Final Order**"), and in full force and effect as of the Closing. No order staying, reversing, modifying or amending the Sale Order (or the Final DIP Order) shall be in effect on the Closing Date.

(b)   No Prohibition. No temporary restraining order, preliminary or permanent injunction or other order issued by any court of competent jurisdiction or other legal restraint or prohibition preventing the consummation of the sale of the Purchased Assets or the other transactions contemplated by this Agreement shall be in effect. No law shall have been enacted or become effective that makes the consummation of the transactions illegal or otherwise prohibited.

Section 6.02   **Conditions to Obligations of Buyer**. The obligations of Buyer to consummate the Closing shall be subject to the satisfaction or (to the extent permissible under applicable law) waiver by Buyer, at or prior to the Closing, of each of the following additional conditions:

(a)   Representations and Warranties. The representations and warranties of Sellers contained in Article III shall be true and correct on and as of the Closing Date with the same force and effect as if made on the Closing Date (except to the extent that any such representation or warranty is expressly made as of an earlier date, in which case such representation or warranty need only be true and correct as of such earlier date).

(b)   Covenants. Sellers shall have performed and complied in all material respects with all covenants and agreements required by this Agreement to be performed or complied with by Sellers on or prior to the Closing Date (including all obligations and milestones in Section 5.05 required to be performed or achieved by the Closing).

(c)   Entry of Bidding Procedures Order. The Bidding Procedures Order shall have been entered no later than February 10, 2026, unless a different date has been approved in writing in advance by Buyer.

(d)   Auction Date. The date of the Auction (the "**Auction Date**") shall be February 17, 2026, and the Auction shall have occurred and been completed on such Auction Date, unless a different date has been approved in writing in advance by the Buyer.

22

(e)     <u>Sale Order Provisions</u>. The Sale Order as entered by the Bankruptcy Court shall (i) contain all of the provisions (and only the provisions) described in <u>Section 5.05</u> required to be included therein, and (ii) not have been amended, supplemented or otherwise modified in any manner adverse to Buyer without Buyer's consent.

(f)     <u>No Trustee/Conversion</u>. No trustee or examiner with expanded powers shall have been appointed in the Bankruptcy Case, and the Bankruptcy Case shall not have been converted to a case under Chapter 7 or dismissed.

(g)     <u>Deliveries</u>. Sellers shall have delivered (or be ready, willing and able to deliver at Closing) all of the documents and other items required to be delivered by Sellers pursuant to <u>Section 2.02(a)</u>.

(h)     <u>Participation Agreement</u>. The Participation Agreement shall have been entered into and delivered prior to the entry of the Final DIP Order and all of the covenants required to be performed by the parties other than Buyer under the Participation Agreement as of the Closing shall have been performed, and all conditions to the effectiveness of the Participation Agreement shall have been satisfied;

(i)     <u>PEC Pledge Agreement and PEC Interest Transfer Documents</u>. The PEC Pledge Agreement and the PEC Interest Transfer Documents shall have been entered into and delivered prior to the entry of the Final DIP Order and all of the covenants required to be performed by MacDonald under the PEC Pledge Agreement and the PEC Interest Transfer Documents as of the Closing shall have been performed by MacDonald and all conditions to the effectiveness of the PEC Pledge Agreement and the PEC Interest Transfer Documents shall have been satisfied;

(j)     <u>MRG Deed of Trust and Alvarado Real Property Documents</u>. The MRG Deed of Trust and the Alvarado Real Property Documents shall have been entered into and delivered prior to the entry of the Final DIP Order and all of the covenants required to be performed by MRG under the MRG Deed of Trust and the Alvarado Real Property Documents as of the Closing shall have been performed by MRG and all conditions to the effectiveness of the MRG Deed of Trust and the Alvarado Real Property Documents shall have been satisfied;

(k)     <u>DIP Obligations</u>. No event of default (as defined in the DIP Orders or DIP credit agreement) shall have occurred and be continuing under the DIP Facility that would permit Buyer (as DIP lender) to cease making further advances under the DIP Facility or to accelerate the DIP Obligations (unless such default is waived by Buyer in its capacity as DIP lender); and

(l)     <u>No Material Adverse Change</u>. Since the date of this Agreement, there shall not have occurred any Material Adverse Change.

Any condition specified in this <u>Section 6.02</u> may be waived by Buyer, in whole or in part, in writing.

Section 6.03   **Conditions to Obligations of Sellers**. The obligations of Sellers to consummate the Closing shall be subject to the satisfaction or (to the extent permissible under applicable law) waiver by Company, at or prior to the Closing, of each of the following additional conditions:

(a)  <u>Representations and Warranties</u>. The representations and warranties of Buyer contained in <u>Article IV</u> shall be true and correct in all material respects on and as of the Closing Date with the same force and effect as if made on and as of the Closing Date (except to the extent that any such representation or warranty is expressly made as of an earlier date, in which case such representation or warranty need only be true and correct as of such earlier date).

(b)  <u>Covenants</u>. Buyer shall have performed and complied in all material respects with all covenants and agreements required by this Agreement to be performed or complied with by Buyer on or prior to the Closing Date.

(c)  <u>Purchase Price and Deliveries</u>. Buyer shall have delivered (or be ready, willing and able to deliver at Closing) the documents and other items required to be delivered by Buyer pursuant to <u>Section 2.02(b)</u>; and

(d)  <u>No Defaults</u>.  Buyer shall not be in default of any agreement between Buyer and Seller approved by the Bankruptcy Court, and shall not be in violation of any order of the Bankruptcy Court, including any Final Order.

Any condition specified in this <u>Section 6.03</u> may be waived by Company, in whole or in part, in writing.

**ARTICLE VII**
**INDEMNIFICATION**

Section 7.01  **Survival**. None of the representations or warranties of Sellers or Buyer contained in this Agreement or in any certificate or other instrument delivered pursuant to this Agreement shall survive the Closing, and from and after the Closing no party shall have any liability to the other for any breach of any representation or warranty, except in the case of fraud. All covenants and agreements of the parties contained herein that by their terms contemplate performance prior to or at the Closing shall likewise terminate at the Closing. All covenants and agreements that expressly contemplate performance by either party after the Closing (including <u>Section 5.01</u> (Confidentiality), <u>Section 5.08</u> (Further Assurances), Buyer's obligations under the Assigned Contracts and Assumed Liabilities, and any payment or reimbursement obligations of Buyer or Sellers that are to be performed after Closing) shall survive the Closing in accordance with their terms. Notwithstanding the foregoing, nothing in this <u>Section 7.01</u> shall limit any party's rights or remedies for fraud or willful misconduct by the other party.

Section 7.02  **Indemnification by Sellers**. Effective as of the Closing, and except as expressly provided in this Agreement, Sellers shall have no obligation to indemnify, defend or hold harmless Buyer or any other Person for any breach of this Agreement or for any losses or liabilities arising out of or relating to the Business or the Purchased Assets. Buyer, on behalf of itself and its Affiliates, hereby waives and releases any claims or causes of action against any Seller or its respective estate arising under this Agreement or related to the transactions contemplated hereby, except for claims to enforce the terms of this Agreement or for fraud.

Section 7.03  **Indemnification by Buyer**. Subject to the other terms and conditions of this <u>Article VII</u>, from and after the Closing, Buyer shall indemnify and defend Sellers and their Affiliates and their respective Representatives (collectively, the "**Seller Indemnitees**") against,

and shall hold each of them harmless from and against, any and all losses, damages, liabilities, costs or expenses (including reasonable attorneys' fees) (collectively, "**Losses**") incurred or sustained by, or imposed upon, any Seller Indemnitee based upon, arising out of or with respect to any Assumed Liability or the ownership or operation of the Purchased Assets or the Business by Buyer from and after the Closing (other than Losses for which Sellers are expressly responsible under the terms of this Agreement).

Section 7.04 **Indemnification Procedures**. Whenever any claim shall arise for indemnification under Section 7.03, the Seller Indemnitee (the "**Indemnified Party**") shall promptly provide written notice of such claim to Buyer (the "**Indemnifying Party**"). The failure to give such prompt notice shall not, however, relieve the Indemnifying Party of its indemnification obligations, except to the extent (if any) that the Indemnifying Party shall have been materially prejudiced by such failure. In connection with any claim giving rise to indemnity hereunder resulting from or arising out of any action by a Person that is not a party to this Agreement (a "Third-Party Claim"), the Indemnifying Party may, upon written notice to the Indemnified Party, assume the defense of any such Third-Party Claim with counsel reasonably satisfactory to the Indemnified Party. If the Indemnifying Party assumes the defense of any such Third-Party Claim, it shall conduct the defense of the Third-Party Claim actively and diligently at its own expense and the Indemnified Party shall cooperate with the Indemnifying Party in such defense. The Indemnified Party shall have the right to employ separate counsel in any such Third-Party Claim and participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of the Indemnified Party unless (i) the Indemnifying Party has failed to assume or diligently conduct the defense and employ counsel in a timely manner, in which case the Indemnified Party may assume the defense and be reimbursed for its reasonable attorneys' fees and expenses, or (ii) in the reasonable opinion of counsel to the Indemnified Party, a conflict exists between the interests of the Indemnified Party and the Indemnifying Party that would make such separate representation advisable (in which case, the Indemnifying Party shall not have the right to assume the defense of such Third-Party Claim on behalf of the Indemnified Party). If the Indemnifying Party assumes the defense of a Third-Party Claim, no compromise or settlement of such claims may be effected by the Indemnifying Party without the Indemnified Party's consent unless (x) there is no finding or admission of any violation of law or any violation of the rights of any Person and no effect on any other claims that may be made against the Indemnified Party, (y) the sole relief provided is monetary damages that are paid in full by the Indemnifying Party, and (z) the compromise or settlement includes an unconditional release of the Indemnified Party from all liability arising out of such claim. If the Indemnifying Party does not assume the defense of a Third-Party Claim for which it has an indemnification obligation, the Indemnified Party may continue to defend the claim in such manner as it may deem appropriate, and the Indemnifying Party shall remain responsible for all Losses the Indemnified Party may incur as a result of such Third-Party Claim to the extent subject to indemnification under this Article VII. The Indemnified Party shall not settle or compromise any such Third-Party Claim without prior written consent of the Indemnifying Party, which consent shall not be unreasonably withheld or delayed.

**ARTICLE VIII**
**TERMINATION**

25

Section 8.01    **Termination**. Notwithstanding anything herein to the contrary, this Agreement may be terminated and the transactions contemplated hereby abandoned at any time prior to the Closing:

(a)    by mutual written consent of Sellers and Buyer;

(b)    by either Buyer or Sellers, upon written notice to the other party, if the Closing has not occurred by the Outside Date; provided that the right to terminate this Agreement under this Section 8.01(b) shall not be available to any party whose breach of this Agreement (or failure to fulfill any obligation hereunder) has been the principal cause of, or principally resulted in, the failure of the Closing to occur by such date;

(c)    by Buyer, by written notice to Sellers, if there has been a material violation or breach by Sellers of any covenant, representation or warranty contained in this Agreement, which violation or breach (i) would result in a failure of a condition set forth in Section 6.02, and (ii) is not cured by Sellers within five (5) Business Days after written notice thereof from Buyer (or, if the Outside Date is fewer than five Business Days from the date of such notice, by the Business Day immediately preceding the Outside Date);

(d)    by Sellers, by written notice to Buyer, if there has been a material violation or breach by Buyer of any covenant, representation or warranty contained in this Agreement, which violation or breach (i) would result in a failure of a condition set forth in Section 6.03, and (ii) is not cured by Buyer within five (5) Business Days after written notice thereof from Sellers (or, if the Outside Date is fewer than five Business Days from the date of such notice, by the Business Day immediately preceding the Outside Date);

(e)    by Buyer, by written notice to Sellers, if (i) the Bankruptcy Court has not entered the Sale Order by February 19, 2026, or the Sale Order (once entered) is later stayed, vacated, or modified without Buyer's consent; or (ii) the Sale Hearing is not conducted on February 19, 2026 (or such later date as the Bankruptcy Court may establish with Buyer's written consent);

(f)    by Buyer, by written notice to Sellers, if any of the following shall occur: (i) Sellers withdraw the Sale Procedures Motion or otherwise refuses to pursue approval of the transactions and this Agreement as the "stalking horse" bid; (ii) the Bankruptcy Court or another court of competent jurisdiction enters an order dismissing the Bankruptcy Case or converting the Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code, or appointing a trustee or examiner with expanded powers in the Bankruptcy Case; or (iii) the Bankruptcy Court enters an order approving or authorizing an Alternative Transaction;

(g)    by Buyer, by written notice to Sellers, if the DIP Facility or any DIP Order is terminated or ceases to be in full force and effect for any reason, or if a default or Event of Default (as defined in the Dip Facility) by Sellers has occurred and is continuing under the DIP Facility that permits Buyer (as DIP Lender) to cease making further advances or to accelerate the DIP Obligations, or if Sellers materially breach any obligation under the DIP Facility or DIP Orders;

(h)    by Sellers, by written notice to Buyer, at any time prior to the entry of the Sale Order, if Sellers' governing bodies have determined in good faith, based on the advice of its

26

legal counsel, that proceeding with the transactions contemplated by this Agreement or failing to terminate this Agreement would be inconsistent with its or such fiduciary duties under applicable law (a "**Fiduciary Out**"); provided that Sellers may not terminate this Agreement under this Section 8.01(h) unless (i) Sellers have complied in all material respects with Section 5.03 and Company has provided Buyer with written notice of its intent to terminate pursuant to this Section 8.01(h) (including a summary of the material terms of the proposed Alternative Transaction to be accepted) at least three (3) Business Days in advance of such termination, and (ii) Sellers concurrently pay to Buyer the Expense Reimbursement, to the extent and as provided in Section 8.02; or

(i)       automatically, if Sellers consummate a sale or disposition of any of the Purchased Assets in one or more Alternative Transactions with one or more Persons other than Buyer.

Section 8.02    **Expense Reimbursement**. In recognition of Buyer's expenditure of time, energy and resources, and the benefits conferred on Sellers' estate by this Agreement, if this Agreement is terminated under the circumstances described below, Sellers shall pay Buyer (to the extent not already paid pursuant to the DIP Orders) expense reimbursement in the amount of $350,000 (the "**Expense Reimbursemen**t"). The Expense Reimbursement shall be payable by Sellers (A) if Sellers terminate this Agreement pursuant to Section 8.01(h) in order to consummate an Alternative Transaction, (B) if Buyer terminates this Agreement pursuant to Section 8.01(c) or 8.01(e) due to Sellers' material breach or failure to satisfy conditions and an Alternative Transaction is consummated within six (6) months thereafter, or (C) if this Agreement is terminated automatically pursuant to Section 8.01(i) as a result of the closing of an Alternative Transaction. In the case of a termination by Sellers under Section 8.01(h), the Expense Reimbursement shall be paid concurrently with such termination as a condition to the effectiveness thereof; in all other cases, the Expense Reimbursement shall be paid no later than three (3) Business Days following the closing of the applicable Alternative Transaction (and shall be paid only in the event the Alternative Transaction is actually consummated). The Expense Reimbursement, to the extent payable pursuant to this Section 8.02, shall constitute allowed administrative expenses of Sellers' bankruptcy estate under Sections 503(b) and 507(a)(2) of the Bankruptcy Code, and shall be payable by Sellers without further order of the Bankruptcy Court. Each Seller's obligation to pay the Expense Reimbursement shall survive any termination of this Agreement, and Buyer's right to receive the Expense Reimbursement shall be in addition to, and not in limitation of, any other rights or remedies of Buyer under this Agreement or applicable law. This Section 8.02 applies only if the Bankruptcy Court requires an auction or bidding process or if an Alternative Transaction closes.   To the extent Buyer receives the proceeds from any Alternative Transaction, or to the extent the Buyer receives any proceeds from the sale of any of the Purchased Assets in a transaction which does not constitute an Alternative Transaction and with respect to which the Buyer has provided its written consent prior to Closing, such sale proceeds shall be applied towards the payment of the Expense Reimbursement.

Section 8.03    **Effect of Termination**. In the event of termination of this Agreement pursuant to this Article VIII, this Agreement shall forthwith become void and of no further force or effect, without any liability or obligation on the part of any party hereto, and the transactions contemplated hereby shall be abandoned; provided that (a) Section 5.01 (Confidentiality), Section 8.02 (Expense Reimbursement) (to the extent applicable), this Section 8.03, and Article IX

(Miscellaneous) shall survive such termination and remain in full force and effect, (b) any claim for Buyer's fraud or willful breach of this Agreement prior to termination shall survive, and (c) the termination of this Agreement shall not affect the rights and obligations of the parties under the DIP Facility or any order of the Bankruptcy Court (and all rights and remedies of Buyer as DIP Lender are fully preserved). If this Agreement is terminated under Section 8.01(d) due to a willful and material breach by Buyer, then Sellers shall have the right to seek damages (including reimbursement of its professional fees) against Buyer, *provided* that Sellers' aggregate monetary damages for Buyer's breach shall not exceed an amount equal to the Expense Reimbursement. If this Agreement is terminated under Section 8.01(c) due to a willful and material breach by Sellers, then Buyer shall have the right to pursue all rights and remedies available at law or in equity (including specific performance to require Sellers' assumption of this Agreement as the "stalking horse" bid and/or to compel consummation of the Sale in the Bankruptcy Case, and/or the right to seek reimbursement of Buyer's actual expenses).

**ARTICLE IX**
**MISCELLANEOUS**

Section 9.01    **Expenses**. Except to the extent otherwise provided in Section 8.02, all costs and expenses (including legal, accounting and financial advisory fees) incurred in connection with this Agreement, the DIP Facility and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses. For the avoidance of doubt, all fees and expenses of Sellers' attorneys, investment bankers and other advisors in connection with the transactions shall be borne by Sellers as administrative expenses in the Bankruptcy Case (subject to Bankruptcy Court approval), and Buyer shall have no responsibility therefor.

Section 9.02    **Notices**. All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed given: (a) when delivered personally by hand (with written confirmation of receipt); (b) when sent by email (with confirmation of receipt, or if sent after normal business hours, on the next Business Day); (c) one (1) Business Day following the day sent by a nationally recognized overnight courier (with written confirmation of delivery); or (d) three (3) Business Days following the date mailed by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the addresses or email addresses set forth below (or at such other address or email address for a party as shall be specified in a notice given in accordance with this Section 9.02):

| | |
|---|---|
| **If to Sellers**: | Buddy Mac Holdings, LLC<br>400 East Centre Park Blvd.<br>Suite 101<br>DeSoto, TX  75115<br>Email: ian@macfamco.com<br>Attention: Ian MacDonald |
| with a copy to: | Kane Russell Coleman Logan PC<br>901 Main St., Suite 5200<br>Dallas, Texas 75202<br>Email: jkane@krcl.com |

|  | Email: kwoodard@krcl.com |
|  | Attention: John J. Kane |
|  | Attention: Kyle Woodard |

**If to Buyer:**       Phonix RBS, LLC
7219 Renee Parker Way
Barling, AR 42933
Email: brent@motusadvised.com
Attention: Brent Turner, Manager of Member AF Newco 1 LLC, its
sole member

with a copy to:       Blank Rome LLP
One Logan Square
130 North 18th Street
Philadelphia, PA 19103
Email: regina.kelbon@blankrome.com
Attention: Regina Stango Kelbon

Section 9.03    **Transfer Taxes**.    All Transfer Taxes imposed in connection with the transactions contemplated under this Agreement, excluding the Participation Agreement, the PEC Pledge Agreement and the MRG Deed of Trust, shall be the responsibility of the Sellers.

Section 9.04    **Certain Definitions**.

(a)    "**Affiliate**" or "**affiliate**" of any Person means any other Person who either directly or indirectly through one or more intermediaries is in control of, is controlled by, or is under common control with, such Person.  For purposes of this definition, "**control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of securities, partnership interests or by contract, assignment, credit arrangement, as trustee or executor, or otherwise, and the terms "**controls**," "**controlling**" and "**controlled by**" shall have correlative meanings.

(b)    "**Alternative Transaction**" means the sale, transfer, or other disposition, directly or indirectly, including through an asset sale, share sale, merger, amalgamation, foreclosure or other transaction, including a plan of reorganization approved by the Bankruptcy Court, or resulting from the Auction, of any material portion of the Purchased Assets or the Business, in a single transaction or a series of transactions, with one or more Persons other than Buyer or any of its Affiliates (other than sales of Inventory in the Ordinary Course).

(c)    "**Assigned Contracts**" shall mean collectively all Assigned Property Leases, all Assigned Other Contracts, and all Assigned Vehicle Leases.

(d)    "Assigned Vehicle Leases" shall mean collectively all vehicles leased by Sellers in connection with the conduct of the Business at the Transferred Stores, including, without limitation, those leased vehicles identified in Schedule 1.01(u).

(e)    "**Cure Costs**" means all amounts that must be paid and all obligations that otherwise must be paid or satisfied, pursuant to Sections 365(b)(1)(A) and (B) of the Bankruptcy

Code to cure any defaults under any Assigned Contract in connection with the assumption thereof by, and/or assignment thereof to, Buyer.

(f)      "**Cure Costs Cap**" mean an amount acceptable to Buyer.

(g)      "**IT Assets**" means all hardware, computers, storage media, databases, applications, websites, software, servers, workstations, routers, hubs, switches, circuits, networks, computer network equipment or systems, data communications lines, and all other information technology equipment including parts of any of the foregoing such as firmware, screens, terminals, disks, cabling, related infrastructure, and other peripheral and associated electronic equipment and services that are owned, licensed, leased or controlled by Sellers or any of its Affiliates.

(h)      "**Encumbrance**" means any charge, claim, pledge, equitable interest, lien, security interest, restriction of any kind, or other encumbrance on the Purchased Assets.

(i)      "**ERC Funds**" means any and all payments in respect to the federal Employee Retention Credit which one or more Sellers are or may be entitled to receive.

(j)      "**Governmental Authority**" means any (i) nation, state, province, tribal, county, city, town, village, district, or other jurisdiction of any nature; (ii) federal, state, local, provincial, municipal, foreign, or other government; (iii) governmental or quasi-governmental authority of any nature (including any government agency, ministry, branch, department, official, or entity and any court or other tribunal); (iv) multi-national organization or body; or (v) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

(k)      "**Intellectual Property**" means all patents, patent applications, trademarks, trade names, service marks, logos, Internet domain names, websites, social media accounts, software, technology, trade secrets, customer and client data, and other intellectual property rights of Sellers, including those items listed on Schedule 1.01(m) (collectively, the "**Intellectual Property**").

(l)      "**Material Adverse Change**" means (x) a material adverse change in the business, condition (financial or otherwise) of the Sellers, or any material adverse change in the operations of the Business, Purchased Assets, and Assumed Liabilities, taken as whole or (y) any change, event or occurrence that individually or in the aggregate, has prevented or materially delayed or would prevent or materially delay the consummation of the transactions contemplated under this Agreement or has materially impaired or would materially impair the ability of the Sellers to consummate the transactions contemplated under this Agreement.

(m)      "**Permits**" means all approvals, authorizations, certificates, consents, franchises, variances, and Licenses issued by any Governmental Authority (including all applications, renewal applications, or documents filed, or fees paid, in connection therewith).

(n)      "**Permitted Encumbrances**" means (i) liens for Taxes not yet due and payable or being contested in good faith by appropriate procedures; (ii) mechanics', carriers', workmens', repairmen's' or other like liens arising or incurred in the ordinary course of business for amounts that are not delinquent; (iii) landlords' liens or the like arising from a similar real

property agreement or under such applicable state law; (iv) easements, rights of way, zoning ordinances and other similar encumbrances affecting the Purchased Assets, which are not violated by the current conduct of the Business; (v) any and all real estate mortgage, deed of trust, fixture filing, or other real property related lien relating to the Subject Real Property, but only if and to the extent identified and set forth in <u>Schedule 3.05</u>; (vi) all tenant-in-common related interest, if any.

(o)    "**Sale Procedures Order**" or "**Bid Procedures Order**" means an Order of the Bankruptcy Court approving procedures governing the solicitation of bids for Sellers' assets and business and scheduling an auction and hearing on the Sale, in form and substance approved by Buyer (as may be modified or amended only with the written consent of Buyer).

(p)    "**Transfer Taxes**" means any and all stamp, duty, stamp duty, transfer, documentary, documentary transfer tax, real property transfer tax, registration, business and occupation and other similar Taxes (other than taxes imposed on or measured by net income or profits, capital gains, capital taxes, franchise taxes and branch taxes of any Seller) imposed by any Governmental Authority.

(q)    "**Transaction Documents**" means this Agreement and any other agreements, documents, instruments or other Contracts to be executed and delivered or executed in connection with this Agreement or the Sale.

Section 9.05    <u>**Interpretation; Headings**</u>. For purposes of this Agreement, (a) whenever the context requires, the singular number includes the plural and vice versa, and (b) the words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." When reference is made in this Agreement to a Section, Article, Exhibit or Schedule, such reference shall be to a Section or Article of, or an Exhibit or Schedule to, this Agreement unless otherwise indicated. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement. If an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring a party by virtue of authorship.

Section 9.06    <u>**Severability**</u>. If any term or provision of this Agreement is held by a court of competent jurisdiction or the Bankruptcy Court to be invalid, illegal or unenforceable under any present or future law, (a) such provision shall be fully severable, (b) this Agreement shall be construed and enforced as if such invalid, illegal or unenforceable provision had never constituted a part hereof, and (c) the remaining provisions of this Agreement shall remain in full force and effect and not be affected by such invalid, illegal or unenforceable provision. Upon such determination, the parties shall negotiate in good faith to modify this Agreement to effect the parties' original intent as closely as possible.

Section 9.07    <u>**Entire Agreement**</u>. This Agreement (together with the DIP Facility documents and all exhibits and schedules hereto, including the DIP Term Sheet and other schedules delivered in connection herewith) constitutes the sole and entire agreement of the parties with respect to the subject matter hereof, and supersedes all prior and contemporaneous representations, warranties, understandings and agreements, both written and oral, with respect to such subject matter. In the event of any conflict or inconsistency between the terms of this

Agreement and any order of the Bankruptcy Court (or the DIP Facility documents), the parties acknowledge and agree that, as between themselves, the terms of this Agreement shall govern and control (except to the extent that Buyer may elect to enforce any additional or supplemental rights and remedies arising under any such order or DIP document).

Section 9.08    **Successors and Assigns**. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns (including any trustee or estate representative acting on behalf of Sellers or their estate). No assignment of this Agreement or of any rights or obligations hereunder may be made by Sellers without the prior written consent of Buyer. Buyer may assign or transfer its rights (in whole or in part) under this Agreement to any Affiliate or designee of Buyer without Company's consent, *provided* that no such assignment or transfer shall relieve Buyer of its obligations hereunder to the extent not performed by such assignee. Any purported assignment or delegation of rights or obligations in violation of this Section 9.08 shall be null and void.

Section 9.09    **Amendment and Waiver**. This Agreement may not be amended or modified except by an instrument in writing signed by each of the parties hereto (or their respective successors or permitted assigns). No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the waiving party, and no waiver shall operate as a waiver of or estoppel with respect to any failure, breach or default not expressly identified by such written waiver.

Section 9.10    **Governing Law; Jurisdiction; Waiver of Jury Trial**. This Agreement (and any action or controversy arising out of or relating to this Agreement or the transactions contemplated hereby) shall be governed by and construed in accordance with the internal laws of the State of Texas, without giving effect to its principles of conflicts of law. The parties agree that the Bankruptcy Court shall have exclusive jurisdiction over all matters arising out of or relating to this Agreement or the transactions contemplated hereby. Each party hereby irrevocably submits to the jurisdiction of the Bankruptcy Court (or, if the Bankruptcy Case is no longer pending, to any federal court sitting in the Northern District of Texas, or if such court lacks jurisdiction, any Texas state court) for the adjudication of any dispute or controversy arising out of or relating to this Agreement. The parties hereby waive, to the fullest extent permitted by law, any objection or defense that they may now or hereafter have based on inconvenient forum or lack of personal jurisdiction. **EACH PARTY HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY** in respect of any action arising out of or relating to this Agreement or the transactions contemplated hereby.

Section 9.11    **Counterparts**. This Agreement may be executed in counterparts (including by facsimile or email transmission), each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission (in PDF or similar format) shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[signature page to follow]

Docusign Envelope ID: DE4681C7-4040-48F0-AF63-5A213ACC7C0D

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their duly authorized representatives.

**BUYER:**
**PHONIX RBS, LLC**

By: AF Newco 1 LLC, its sole Member

By: _____
        Brent Turner, Manager

**MACDONALD**

DocuSigned by:

*Ian MacDonald*

EFD8FED8026C428...

**WILLIAM IAN MACDONALD**

**SELLERS:**

**BUDDY MAC HOLDINGS, LLC**
**BMH RTO, LLC**
**BUDDY MAC TWENTY-ONE, LLC**
**BUDDY MAC TWENTY-TWO, LLC**
**BUDDY MAC TWENTY-THREE, LLC**
**BUDDY MAC TWENTY-FOUR, LLC**
**BUDDY MAC TWENTY-FIVE, LLC**
**BUDDY MAC TWENTY-SIX, LLC**
**BUDDY MAC TWENTY-SEVEN, LLC**
**BMH-TNM 28, LLC**
**BMH-TNM 29, LLC**
**BMH-TNM 30, LLC**
**BMH-TNM 31, LLC**
**BMH-TNM 32, LLC**
**BMH-TNM 33, LLC**
**BMH-RCL 34, LLC**
**BMH-RCL 35, LLC**
**BMH-RCL 36, LLC**
**BMH-RCL 37, LLC**
**BMH-RCL 38, LLC**
**BMH-RCL 39, LLC**
**BMH-RCL 40, LLC**
**BMH-RCL 41, LLC**
**BMH-RCL 42, LLC**
**BMH-FAN 43, LLC**
**BMH-FAN 44, LLC**
**BMH-FAN 45, LLC**
**BMH-FAN 46, LLC**
**BMH-FAN 47, LLC**
**BMH-FAN 48, LLC**
**BMH-FAN 49, LLC**
**BMH-FAN 50, LLC**
**BMH-FAN 51, LLC**
**BMH-FAN 52, LLC**
**BMH-FAN 53, LLC**
**BMH-FAN 54, LLC**
**BMH-SM 79, LLC**

Asset Purchase Agreement                                    Signature Page

**BMH-SM 80, LLC**
**BMH-SM 81, LLC**
**BMH-SM 82, LLC**
**BMH-SM 83, LLC**
**BMH-SM 84, LLC**
**BMH-SM 85, LLC**
**BMH-SM 86, LLC**
**BMH-SM 87, LLC**
**BUDDY MAC ONE, LLC**
**BMH ONE RE, LLC**
**BMH 95 RE CARUTHERSVILLE, LLC**
**BMH 96 RE MARION, LLC**
**BUDDY MAC TWO, LLC**
**BUDDY MAC SIX, LLC**
**BUDDY MAC SIX RE, LLC**
**BUDDY MAC EIGHT, LLC**
**BUDDY MAC ELEVEN, LLC**
**BUDDY MAC TWLEVE, LLC**
**BUDDY MAC EIGHTEEN, LLC**
**BUDDY MAC NINETEEN, LLC**
**BMH-NEW 58, LLC**
**BMH-NEW 62, LLC**
**BMH-WF TX 67, LLC**
**BMH-TB 75, LLC**
**BMH 85 RE SIKESTON, LLC**
**BMH PRIME 95, LLC**
**BMH PRIME 96, LLC**
**BMH PRIME 97, LLC**
**BMH HR LLC**
**SAM BROWNFIELD, LLC**
**SAM PLAINVIEW, LLC**

By: _____
Name: William Ian MacDonald
Title: Authorized Representative

Asset Purchase Agreement                    Signature Page

## ANNEX I
List of Sellers

**BUDDY MAC HOLDINGS, LLC**
**BMH RTO, LLC**
**BUDDY MAC TWENTY-ONE, LLC**
**BUDDY MAC TWENTY-TWO, LLC**
**BUDDY MAC TWENTY-THREE, LLC**
**BUDDY MAC TWENTY-FOUR, LLC**
**BUDDY MAC TWENTY-FIVE, LLC**
**BUDDY MAC TWENTY-SIX, LLC**
**BUDDY MAC TWENTY-SEVEN, LLC**
**BMH-TNM 28, LLC**
**BMH-TNM 29, LLC**
**BMH-TNM 30, LLC**
**BMH-TNM 31, LLC**
**BMH-TNM 32, LLC**
**BMH-TNM 33, LLC**
**BMH-RCL 34, LLC**
**BMH-RCL 35, LLC**
**BMH-RCL 36, LLC**
**BMH-RCL 37, LLC**
**BMH-RCL 38, LLC**
**BMH-RCL 39, LLC**
**BMH-RCL 40, LLC**
**BMH-RCL 41, LLC**
**BMH-RCL 42, LLC**
**BMH-FAN 43, LLC**
**BMH-FAN 44, LLC**
**BMH-FAN 45, LLC**
**BMH-FAN 46, LLC**
**BMH-FAN 47, LLC**
**BMH-FAN 48, LLC**
**BMH-FAN 49, LLC**
**BMH-FAN 50, LLC**
**BMH-FAN 51, LLC**
**BMH-FAN 52, LLC**
**BMH-FAN 53, LLC**
**BMH-FAN 54, LLC**
**BMH-SM 79, LLC**
**BMH-SM 80, LLC**
**BMH-SM 81, LLC**
**BMH-SM 82, LLC**
**BMH-SM 83, LLC**
**BMH-SM 84, LLC**
**BMH-SM 85, LLC**

**BMH-SM 86, LLC**
**BMH-SM 87, LLC**
**BUDDY MAC ONE, LLC**
**BMH ONE RE, LLC**
**BMH 95 RE CARUTHERSVILLE, LLC**
**BMH 96 RE MARION, LLC**
**BUDDY MAC TWO, LLC**
**BUDDY MAC SIX, LLC**
**BUDDY MAC SIX RE, LLC**
**BUDDY MAC EIGHT, LLC**
**BUDDY MAC ELEVEN, LLC**
**BUDDY MAC TWLEVE, LLC**
**BUDDY MAC EIGHTEEN, LLC**
**BUDDY MAC NINETEEN, LLC**
**BMH-NEW 58, LLC**
**BMH-NEW 62, LLC**
**BMH-WF TX 67, LLC**
**BMH-TB 75, LLC**
**BMH 85 RE SIKESTON, LLC**
**BMH PRIME 95, LLC**
**BMH PRIME 96, LLC**
**BMH PRIME 97, LLC**
**BMH HR LLC**
**SAM BROWNFIELD, LLC**
**SAM PLAINVIEW, LLC**

37

## **EXHIBIT A**

### List of Transferred Stores

| Row | Entity Name | Parent | Store # | Street Address | City | ST | Zip | Status |
|---|---|---|---|---|---|---|---|---|
| 1 | Buddy Mac One, LLC | BMH | #488 | 1404 W. Gentry Pkwy | Tyler | TX | 75702 | open |
| 2 | Buddy Mac Two, LLC | BMH | #489 | 2725 Sherwood Way Suite 500 | San Angelo | TX | 76901 | open |
| 3 | Buddy Mac Six, LLC | BMH | #496 | 1100 N. HWY 491 | Gallup | NM | 87301 | open |
| 4 | Buddy Mac Eight, LLC | BMH | #602 | 2510 Main St. NE, Suite D | Los Lunas | NM | 87031 | open |
| 5 | Buddy Mac Eleven, LLC | BMH | #601 | 2330 E. Main St. | Farmington | NM | 87401 | open |
| 6 | Buddy Mac Twelve, LLC | BMH | #497 | 1727 Texoma Parkway | Sherman | TX | 75090 | open |
| 7 | Buddy Mac Eighteen, LLC | BMH | #430 | 1008 North St. | Nacogdoches | TX | 75961 | open |
| 8 | Buddy Mac Nineteen, LLC | BMH | #615 | 1337 E. Lindsey St. | Norman | OK | 73071 | open |
| 9 | Buddy Mac Twenty-One, LLC | RTO | #432 | 1803 N. Harrison St. | Shawnee | OK | 74804 | open |
| 10 | Buddy Mac Twenty-Three, LLC | RTO | #434 | 36 S Adair | Pryor | OK | 74361 | open |
| 11 | Buddy Mac Twenty-Four, LLC | RTO | #435 | 218 N. Main St. | Seminole | OK | 74868 | open |
| 12 | Buddy Mac Twenty-Six, LLC | RTO | #437 | 1366 S. Muskogee Ave | Tahlequah | OK | 74464 | open |
| 13 | BMH-TNM 28, LLC | RTO | #375 | 1301 N. Turner, Suite A | Hobbs | NM | 88240 | open |
| 14 | BMH-TNM 30, LLC | RTO | #376 | 2261 Linda Ave | Odessa | TX | 79763 | open |
| 15 | BMH-TNM 31, LLC | RTO | #377 | 2014 50th St. | Lubbock | TX | 79412 | open |
| 16 | BMH-TNM 32, LLC | RTO | #378 | 414 N. Columbia St. | Plainview | TX | 79072 | open |
| 17 | BMH-TNM 33, LLC | RTO | #592 | 501 W. Main St. | Brownfield | TX | 79316 | open |
| 18 | BMH-RCL 37, LLC | RTO | #307 | 1810 W. Sunset, Suite A | Springdale | AR | 72762 | open |
| 19 | BMH-RCL 39, LLC | RTO | #313 | 412 W. Cherokee | Sallisaw | OK | 74955 | open |
| 20 | BMH-RCL 40, LLC | RTO | #309 | 2524 N. Broadway | Pittsburg | KS | 66762 | open |
| 21 | BMH-RCL 41, LLC | RTO | #305 | 1706 New Boston Rd, #A | Texarkana | TX | 75501 | open |
| 22 | BMH-FAN 43, LLC | RTO | #612 | 1413 Mitchell Rd. | West Plains | MO | 65775 | open |
| 23 | BMH-FAN 44, LLC | RTO | #603 | 2330 Harrison St. | Batesville | AR | 72501 | open |
| 24 | BMH-FAN 45, LLC | RTO | #604 | 140 W. Market St. | Clarksville | AR | 72830 | open |
| 25 | BMH-FAN 46, LLC | RTO | #605 | 500 HWY 463 N. | Trumann | AR | 72472 | open |
| 26 | BMH-FAN 47, LLC | RTO | #614 | 2801 N. Broadway | Poteau | OK | 74953 | open |
| 27 | BMH-FAN 48, LLC | RTO | #606 | 1600 N. Falls Blvd. | Wynne | AR | 72396 | open |
| 28 | BMH-FAN 49, LLC | RTO | #607 | 1025 MLK Blvd. | Malvern | AR | 72104 | open |
| 29 | BMH-FAN 50, LLC | RTO | #608 | 610 N. HWY 67B N | Walnut Ridge | AR | 72476 | open |
| 30 | BMH-FAN 51, LLC | RTO | #609 | 8117 Rogers Ave | Ft. Smith | AR | 72903 | open |
| 31 | BMH-FAN 52, LLC | RTO | #610 | 2425 Fayetteville Rd. | Van Buren | AR | 72956 | open |
| 32 | BMH-FAN 53, LLC | RTO | #613 | 907 HWY Business 60 W. | Dexter | MO | 63841 | open |
| 33 | BMH-NEW 58, LLC | BMH | #620 | 1001 NW Sheridan Road | Lawton | OK | 73505 | open |
| 34 | BMH-NEW 62, LLC | BMH | #641 | 4301 SW 45th Ave. Suite 400 | Amarillo | TX | 79109 | open |
| 35 | BMH-WF TX 67, LLC | BMH | #643 | 2924 Kemp Blvd | Wichita Falls | TX | 76308 | open |
| 36 | BMH-TB 75, LLC | BMH | #007 | 2211 E Hillsborough Ave | Tampa | FL | 33610 | open |
| 37 | BMH-SM 79, LLC | RTO | #631 | 102-B Strauss Drive | Park Hills | MO | 63601 | open |
| 38 | BMH-SM 80, LLC | RTO | #632 | 129 Twin City Plaza | Crystal City | MO | 63019 | open |
| 39 | BMH-SM 81, LLC | RTO | #633 | 3 Parkway Shopping Center | Potosi | MO | 63664 | open |
| 40 | BMH-SM 82, LLC | RTO | #634 | 121 Perry Plaza | Perryville | MO | 63775 | open |
| 41 | BMH-SM 83, LLC | RTO | #635 | 205 E Karsch Blvd | Farmington | MO | 63640 | open |
| 42 | BMH-SM 85, LLC | RTO | #636 | 1501 E Malone Ave | Sikeston | MO | 63801 | open |
| 43 | BMH-SM 86, LLC | RTO | #637 | 409 West Main St. | Fredericktown | MO | 63645 | open |
| 44 | BMH Prime 95, LLC | BMH | #646 | 810 W 13th St | Caruthersville | MO | 63830 | open |
| 45 | BMH Prime 96, LLC | BMH | #644 | 103 N Carbon | Marion | IL | 62959 | open |
| 46 | BMH Prime 97, LLC | BMH | #645 | 1710 West 7Th St | Joplin | MO | 64801 | open |

## <u>EXHIBIT B</u>

Description of Alvarado, Texas Real Property

That certain parcel of undeveloped real property located at:

**694 E HWY 67, Alvarado, Johnson County, Texas 76009**

## <u>EXHBIT C</u>

Form of Bill of Sale and Assignment and Assumption Agreement

(see attached)

**BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

This Bill of Sale and Assignment and Assumption Agreement (this "<u>Agreement</u>") is executed and delivered _____ _____, 2026, pursuant to that certain Asset Purchase Agreement, dated as of January __, 2026, by and among **Buddy Mac Holdings, LLC**, a Texas limited liability company ("**Company**"), and each of the entities listed on <u>Annex I</u> attached hereto (together with the Company, the "**Sellers**", and each a "**Seller**"), William Ian MacDonald ("**MacDonald**"), and **Phonix RBS, LLC**, a Delaware limited liability company ("**Phonix**") or its designee ("**Buyer**") (the "<u>Purchase Agreement</u>"). Capitalized terms used but not defined herein shall have the meaning given to such terms in the Purchase Agreement.

**WHEREAS**, pursuant to the Purchase Agreement, Sellers have agreed to sell, assign, convey or cause to be conveyed, transfer and deliver to Buyer, the Purchased Assets, and Buyer has agreed to assume certain Assumed Liabilities of Sellers.

**NOW, THEREFORE**, for and in consideration of the mutual promises set forth in the Purchase Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Sellers and Buyer hereby agree as follows:

1.      Sellers hereby sell, transfer and assign to Buyer all of Sellers' right, title, and interest in and to the Purchased Assets, to have and to hold the same unto Buyer and its successors and assigns from and after the date hereof, free and clear of all Encumbrances.

2.      Buyer, for itself, and its successors and assigns, hereby accepts the transfer and assignment of the Purchased Assets, and Buyer assumes and agrees to pay, perform and discharge the Assumed Liabilities in connection with the Purchased Assets.

3.      This Agreement is only intended to effect the sale and assignment of the Purchased Assets and is subject to the representations and warranties of Sellers and Buyer, in addition to all other provisions, contained in the Purchase Agreement. Buyer and Sellers, by their execution of this Agreement, hereby acknowledge and agree that neither the representations and warranties, nor the rights, remedies or obligations of either party under the Purchase Agreement, shall be deemed to be enlarged, diminished, modified or altered in any way by this Agreement.

4.      This Agreement is made subject to, and with the benefit of, the respective representations, warranties, covenants, terms, conditions, limitations and other provisions of the Purchase Agreement and in the event of any conflict or other inconsistency between this Agreement and the Purchase Agreement, the Purchase Agreement shall govern and be the controlling document.

5.      Each Seller hereby covenants and agrees that it will, at the request of Buyer and without further consideration, execute and deliver, such other instruments of sale, transfer, conveyance and assignment, and take such other action, as may reasonably be necessary to sell, transfer, convey, assign and deliver to, and vest in, Buyer, its successors and assigns, title to the Purchased Assets hereby sold, transferred, conveyed, assigned, and delivered, or intended so to be, all as set forth in the Purchase Agreement.

6.      This Agreement may be executed in multiple counterparts, each of which shall be deemed an original for all purposes and all of which shall be deemed, collectively, as one agreement.

7.      THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, WITHOUT GIVING

41

EFFECT TO THE CONFLICT OF LAWS RULES OR CHOICE OF LAWS RULES THEREOF. ANY DISPUTE ARISING UNDER THIS AGREEMENT SHALL BE RESOLVED EXCLUSIVELY IN ACCORDANCE WITH SECTION 9.10 OF THE PURCHASE AGREEMENT.

8.    This instrument shall inure to the benefit of, and be binding upon, the parties hereto and their respective successors and permitted assigns. This Agreement and the rights and obligations hereunder shall not be assignable by any party without the express prior written consent of the other parties hereto; *provided*, *however*, Buyer may assign this Agreement to an Affiliate of Buyer without the other parties' prior written consent.

[SIGNATURE PAGE FOLLOWS]

42

     IN WITNESS WHEREOF, the undersigned have caused their duly authorized representatives to execute this Bill of Sale and Assignment and Assumption Agreement on the day and year first above written.

**SELLERS:**

[ENTITY NAME]


By:_____
Name: [_____]
Title: [_____]

[ENTITY NAME]


By:_____
Name: [_____]
Title: [_____]

[ENTITY NAME]


By:_____
Name: [_____]
Title: [_____]

[ENTITY NAME]


By:_____
Name: [_____]
Title: [_____]


[ENTITY NAME]


By:_____
Name: [_____]
Title: [_____]

43

[ENTITY NAME]

By:_____

Name: [_____]
Title: [_____]

[ENTITY NAME]

By:_____

Name: [_____]
Title: [_____]

44

IN WITNESS WHEREOF, the undersigned have caused their duly authorized representatives to execute this Bill of Sale and Assignment and Assumption Agreement on the day and year first above written.

**BUYER:**

PHONIX RBS, LLC

By:_____
Name: [_____]
Title: [_____]

45

## **EXHIBIT D**

Form of DIP Credit Agreement

To Be Provided

46

Schedule 1.01(a)
Assigned Property Leases

All real property leases entered into by the Sellers relating to the Business conducted at the Transferred Stores.

47

Schedule 1.01(b)
Subject Real Property

| Ownership Entity | Property Address | City, State | ZIP |
|---|---|---|---|
| SAMPlainview, LLC | 414 N. Columbia St. | Plainview, TX | 79072 |
| MacDonald Capital Corp | 218 N. Main St. | Seminole, OK | 74868 |
| Buddy Mac Six RE, LLC | 1100 N. HWY 491 | Gallup, NM | 87301 |
| SAMBrownfield, LLC | 501 W. Main St. | Brownfield, TX | 79316 |
| BMH 85 RE Sikeston, LLC | 1501 E Malone Ave | Sikeston, MO | 63801 |
| BMH One RE, LLC | 1404 W. Gentry Pkwy | Tyler, TX | 75702 |
| BMH 95 RE Caruthersville, LLC | 810 W 13th St | Caruthersville, MO | 63830 |
| BMH 96 RE Marion, LLC | 103 N Carbon | Marion, IL | 62959 |

48

<u>Schedule 1.01(h)</u>
Consumer Rental Contracts

All consumer rental agreements entered into by the Sellers relating to the Business conducted at the Transferred Stores.

(List To be Filed under Seal with the Court)

49

<u>Schedule 1.01(i)</u>
Assigned Other Contracts

All contracts and agreements entered into by the Sellers relating to the Business conducted at the Transferred Stores not otherwise included in another Schedule attached hereto.

50

<u>Schedule 1.01(m)</u>
Intellectual Property

All Intellectual Property owned or used by Sellers in connection with the Business conducted at the Transferred Stores.

51

<u>Schedule 1.01(u)</u>
Assigned Vehicles

A.  <u>Owned Vehicles</u>:  All vehicles owned by Sellers in connection with the conduct of the Business at the Transferred Stores

B.  <u>Leased Vehicles</u>:  All vehicles leased by Sellers in connection with the conduct of the Business at the Transferred Stores

52

### AMENDMENT TO ASSET PURCHASE AGREEMENT

This Amendment To Asset Purchase Agreement (this "**Amendment**"), dated as of February 19, 2026, is entered into between **Buddy Mac Holdings, LLC**, a Texas limited liability company ("**Company**"), and each of the entities listed on <u>Annex I</u> attached to the "Original Agreement" (defined below), on behalf of themselves as the debtors in the "Bankruptcy Case" referred to in such Original Agreement, and on behalf of their respective estates (together with the Company, the "**Sellers**", and each a "**Seller**"), William Ian MacDonald ("**MacDonald**"), and **Phonix RBS, LLC**, a Delaware limited liability company ("**Phonix**") and its Affiliate and permitted assignee pursuant to Section 9.08 of the Original Agreement, **B2 RTO LLC**, a Wyoming limited liability company (collectively, "**Buyer**"). Buyer, each Seller, and MacDonald shall be referred to herein as a "**Party**" and collectively as the "**Parties**".

### R E C I T A L S :

WHEREAS, Sellers and Buyer have entered into that certain Asset Purchase Agreement dated as of January 25, 2026 (the "**Original Agreement**").

WHEREAS, pursuant to the authority granted in the Sale Order, Buyer and Sellers desire to amend the Original Agreement in the manner set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and agreements of the parties, and other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged:

1.    **Recitals; Defined Terms; Effective Date**.  The foregoing recitals are true and are incorporated herein by this reference as though set forth in full.  Unless otherwise expressly defined herein, all capitalized terms used herein shall have the meanings ascribed to them in the Original Agreement.   On and after the date of this Amendment, all references to the "Agreement" in the Original Agreement shall be deemed as a reference to the Original Agreement as modified by this Amendment.

2.    **Exhibits and Schedules**.  All of the Exhibits and Schedules attached to or contemplated by the Original Agreement are hereby amended in their entirety to read in full as set forth on the Exhibits and Schedules attached to this Amendment.

3.    **Insurance**.  Section 1.01(r) is hereby amended in its entirety to read in full as follows:

"(r)    all insurance policies and related documentation, benefits, rights and proceeds arising from or relating to the Business, the Purchased Assets or the Assumed Liabilities, including insurance arising from any claims, occurrences or loss events prior to Closing, if and to the extent such insurance policies are identified on Schedule 1.01(r) attached hereto;"

4.    **Section 1.01(cc)**.  Section 1.01(cc) of the Original Agreement is hereby amended in its entirety to read in full as follows:

"(cc)  all (i) cash, letters of credit, or other assets provided as collateral or security (collectively, the "**Insurance Collateral**") for any Seller's obligations arising under, relating to, or in connection with, and all deposits ("**Insurance Deposits**") provided under, any insurance policy or related document, instrument, or agreement, including, without limitation, (x) that certain Amended and Restated Shareholder Agreement by and among Archway Insurance, Ltd., and each of its shareholders party thereto or to an agreement in the form thereof, as further amended, restated, or modified from time to time (the "**Archway Shareholder Agreement**"), and (y) all documents, instruments, and agreements relating to the Archway Shareholder Agreement or any Seller's obligations thereunder (together with the Archway Shareholder Agreement, collectively, the "**Archway Agreements**") and (ii) all payments received in redemption of any Common Shares or Preferred Shares (each as defined in the Archway Shareholder Agreement) or on account of any Class Funds (as defined in the Archway Shareholder Agreement)."

5.    **SKC Transaction-Excluded Assets**.  Section 1.02(g) is hereby added to the Original Agreement, which shall read in full as follows:

"(f) if the transactions contemplated under that certain Asset Purchase Agreement dated as of February 18, 2026 (as amended and supplemented, the "**SKC APA**") between the Sellers identified therein a S.K.C. Enterprises, Inc., an Illinois corporation d/b/a Rent One or its designee (the "**SKC Transaction**") have been consummated prior to the Closing Date, all of the Purchased Assets referred to therein."

6.    **Purchase Price.**  Section 1.05 of the Original Agreement is hereby amended in its entirety to read in full as follows:

"Section 1.05  **Purchase Price**. On the terms and subject to the conditions hereof, at the Closing, the aggregate consideration for the Purchased Assets will consist of (a) a cash-less credit bid by Phonix pursuant to section 363(k) of the Bankruptcy Code (the "**Credit Bid**"), on a dollar-for-dollar basis, of (i) DIP Obligations (after giving effect to the Roll-Up), including all principal, fees, penalties and other obligations thereunder that are outstanding as of the Closing, and any accrued and unpaid fees (including Agent Obligations and the DIP Lender Professional Fees and Expenses) (each, as defined in the DIP Financing Agreement) and interest at the time of Closing, plus (ii) Pre-Petition Obligations (after giving effect to the Roll-Up), in an aggregate amount equal to $9,7000,000 in such order as Buyer elects; provided, however, if the total net amount of ERC Funds (after giving effect to any brokerage commissions) have been received by Phonix and applied to the Pre-Petition Loan and the DIP Loans prior to the entry of the Final DIP Order, then such amount shall be reduced to $7,000,000; provided, further, however, that if the SKC Transaction has been consummated, then such amount shall be reduced from $7,000,000 by an amount equal to $0.778062 for every dollar of the "Purchase Price" under the SKC APA that is received by Buyer as of the Closing Date hereof, or prior to the Expiration of the Hold Back Period (as defined in the SKC APA), subject to a floor Credit Bid of $6,123,559; and (b) the assumption of the Assumed Liabilities (the sum of clauses (a) through (b), collectively, the "**Purchase Price**"). For

2

the avoidance of doubt, Buyer reserves the right to increase the amount of its Credit Bid at any time through the Closing Date."

7.    **Section 2.02(a)(ii)**.    Section 2.02(a)(ii) of the Original Agreement is hereby amended in its entirety to read in full as follows:

"(ii)    certificates of title or origin (or similar documents) with respect to the four (4) owned Assigned Vehicles identified in paragraph A. of Schedule 1.01(u), together with such bills of sale, powers of attorney and other instruments and documents which Buyer may reasonably request and require in connection with the transfer of title to such vehicles to Buyer and the registration of the ownership of such vehicles in the name of Buyer with the appropriate governmental authorities."

8.    **Section 2.02(a)(v)**.    Section 2.2(a)(v) of the Original Agreement is hereby amended in its entirety to read in full as follows:

"(v)    such evidence as Buyer may request evidencing that each Seller is in good standing in its state of organization and in each state which such Seller is qualified or required to be qualified to do business;"

9.    **Section 2.02(a)(ix)**.    Section 2.02(a)(ix) of the Original Agreement is hereby amended in its entirety to read in full as follows:

"(a)(ix)    such other customary instruments of transfer, assignment or assumption, filings, or documents (reasonably satisfactory in form and substance to Buyer) as may be required to give effect to this Agreement and the transactions contemplated hereby (including documents and instruments sufficient to release any Liens on the Purchased Assets, other than Permitted Liens or any Liens that will be released by the Sale Order), including, without limitation, such limited and/or special powers of attorney, in recordable form for all states where Subject Real Property is located, and other limited and/or special powers of attorney as Buyer may request; and"

10.    **Insurance Collateral**.    Section 5.12 is hereby added to the Original Agreement, which shall read in full as follows:

"Section 5.12 **Insurance Collateral and Deposits**. The Sellers (and their successors and assigns, including (including any trustee or estate representative acting on behalf of Sellers or their estates) shall (a) use reasonable best efforts to obtain the return of any and all Insurance Collateral and Insurance Deposits under the Archway Agreements and (b) pay such Insurance Collateral and Insurance Deposits over to Phonix promptly upon receipt."

11.    **Secondary Closing Matters**.    Article X is hereby added to the Original Agreement, which shall read in full as follows:

3

**ARTICLE X**
**SECONDARY CLOSING MATTERS**

Section 10.1  **Secondary Closing**.  Notwithstanding anything in this Agreement, the Parties agree as follows:

(a)  The sale to Buyer of the Subject Real Properties situated in the following locations (such Subject Real Properties, collectively, the "**Secondary Closing Properties**") shall not close on the Closing Date: (i) Plainview, Texas; (ii) Seminole, Oklahoma; (iii) Gallup, New Mexico; and (iv) Brownfield, Texas.

(b)  The sale of the Secondary Closing Properties to Buyer shall close (the "**Secondary Closing**") on the date (the "**Secondary Closing Date**") that each of the following conditions is satisfied:

(i)  the Bankruptcy Court shall have entered a Final Order in form and substance acceptable to Buyer reaffirming that Buyer's liens on (x) the Secondary Closing Properties and (y) the Tyler Property, which were granted under the Final DIP Order, are valid and enforceable to the same extent, and have the same priority, originally set forth in the Final DIP Order.

(ii)  Sellers shall have delivered such other documents, instruments, and agreements reasonably requested by Buyer.

(c)  Buyer shall not assume any Assumed Liability for Taxes allocated to Buyer attributable to the Secondary Closing Properties until the occurrence of the Secondary Closing Date.

(d)  Sellers shall cause the Secondary Closing to occur on or before Friday March 6, 2026, or such later date agreed to by Buyer in its sole discretion (the "**Secondary Closing Outside Date**"). The portion of the Purchase Price consisting of the Credit Bid may be reduced by an amount determined by Buyer in its sole discretion upon written notice by Buyer to Sellers if the Secondary Closing does not occur by the Secondary Closing Outside Date.

(e)  All obligations of Sellers to cooperate with Buyer, provide further assurances to Buyer, and similar obligations of Sellers, to the extent such obligations terminate upon Closing, shall be extended through and including the Secondary Closing Date, unless otherwise agreed by Buyer.

(f)  Buyer's right under (i) Section 1.08(iii) and (iv) to designate any Assigned Contract previously included as a Purchased Asset under Schedule 1.01(a), Schedule 1.01(i), or Schedule 1.01(u) as an Excluded Asset, or to designate any Assigned Contract previously included as an Excluded Asset, as an Assigned Contract constituting a Purchased Asset, at any time prior to the Closing Date, shall be extended to the Secondary Closing Date and Buyer shall provide Sellers the final version of such updated schedules prior to the Secondary Closing Date; and (ii) Section 1.08(h) to designate any Assigned Contract previously included as a Purchased Asset as of Closing as an

4

Excluded Asset during the fifteen (15) Business Day period following the Closing Date shall commence upon the Secondary Closing Date.

(g)    At the Closing the Sellers shall deliver to Buyer a Transition Services Agreement (the "**TSA**") in form and substance, and on terms and conditions, acceptable to Buyer, which shall, among other things, obligate Sellers to provide transition services to Buyer (including, without limitation, the provision of employees) in connection with any operation by Buyer of the Business conducted at the Transferred Stores located at (i) the Secondary Closing Properties, (ii) the Tyler Property, and (iii) any other Transferred Store determined by Buyer in its sole discretion. The Parties acknowledge and agree that Buyer shall not be required to pay rent in connection with any operation of the Transferred Stores located at the Secondary Closing Properties or the Tyler Property under the TSA.

(h)    It shall be an additional condition to the Closing that the Sellers shall have delivered to Buyer a duly executed copy of the TSA.

12.    **Conflict**.  In case of any inconsistency between this Amendment and the Original Agreement, the provisions containing such inconsistency shall first be reconciled with one another to the maximum extent possible and, then to the extent of any remaining inconsistency, the terms of this Amendment shall be controlling.

13.    **Ratification**.  All terms and provisions of the Original Agreement not amended hereby, either expressly or by necessary implication, shall remain in full force and effect and unmodified.

14.    **Counterparts; Authority; Electronic Signatures**.  The parties agree that this Amendment may be executed in multiple counterparts which, when signed by all parties, shall constitute a binding agreement.  Signatures to this Amendment transmitted by facsimile or electronic mail of a so-called "pdf" shall be valid and effective to bind the party so signing.

*[Next Page Is Signature Page]*

*[Signature Page]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their duly authorized representatives.

**BUYER:**
**PHONIX RBS, LLC,**
A Delaware limited liability company

By: AF Newco 1 LLC, its sole Member


By: _____

Name: _____

Title: _____

**SELLERS:**

**BUDDY MAC HOLDINGS, LLC**
**BMH RTO, LLC**
**BUDDY MAC TWENTY-ONE, LLC**
**BUDDY MAC TWENTY-TWO, LLC**
**BUDDY MAC TWENTY-THREE, LLC**
**BUDDY MAC TWENTY-FOUR, LLC**
**BUDDY MAC TWENTY-FIVE, LLC**
**BUDDY MAC TWENTY-SIX, LLC**
**BUDDY MAC TWENTY-SEVEN, LLC**
**BMH-TNM 28, LLC**
**BMH-TNM 29, LLC**
**BMH-TNM 30, LLC**
**BMH-TNM 31, LLC**
**BMH-TNM 32, LLC**
**BMH-TNM 33, LLC**
**BMH-RCL 34, LLC**
**BMH-RCL 35, LLC**
**BMH-RCL 36, LLC**
**BMH-RCL 37, LLC**
**BMH-RCL 38, LLC**
**BMH-RCL 39, LLC**
**BMH-RCL 40, LLC**
**BMH-RCL 41, LLC**
**BMH-RCL 42, LLC**

6

**BMH-FAN 43, LLC**
**BMH-FAN 44, LLC**
**BMH-FAN 45, LLC**
**BMH-FAN 46, LLC**
**BMH-FAN 47, LLC**
**BMH-FAN 48, LLC**
**BMH-FAN 49, LLC**
**BMH-FAN 50, LLC**
**BMH-FAN 51, LLC**
**BMH-FAN 52, LLC**
**BMH-FAN 53, LLC**
**BMH-FAN 54, LLC**
**BMH-SM 79, LLC**
**BMH-SM 80, LLC**
**BMH-SM 81, LLC**
**BMH-SM 82, LLC**
**BMH-SM 83, LLC**
**BMH-SM 84, LLC**
**BMH-SM 85, LLC**
**BMH-SM 86, LLC**
**BMH-SM 87, LLC**
**BUDDY MAC ONE, LLC**
**BMH ONE RE, LLC**
**BMH 95 RE CARUTHERSVILLE, LLC**
**BMH 96 RE MARION, LLC**
**BUDDY MAC TWO, LLC**
**BUDDY MAC SIX, LLC**
**BUDDY MAC SIX RE, LLC**
**BUDDY MAC EIGHT, LLC**
**BUDDY MAC ELEVEN, LLC**
**BUDDY MAC TWELVE, LLC**
**BUDDY MAC EIGHTEEN, LLC**
**BUDDY MAC NINETEEN, LLC**
**BMH-NEW 58, LLC**
**BMH-NEW 62, LLC**
**BMH-WF TX 67, LLC**
**BMH-TB 75, LLC**
**BMH 85 RE SIKESTON, LLC**
**BMH PRIME 95, LLC**
**BMH PRIME 96, LLC**
**BMH PRIME 97, LLC**
**BMH HR LLC**
**SAM BROWNFIELD, LLC**
**SAM PLAINVIEW, LLC**
**MACDONALD CAPITAL**
**CORPORATION**

7

**By:**_____

Name: Ian MacDonald
Title: Authorized Representative

8

## EXHIBIT A

### List of Transferred Stores

| Row | Entity Name | Parent | Store # | Street Address | City | ST | Zip | Status |
|---|---|---|---|---|---|---|---|---|
| 1 | Buddy Mac One, LLC | BMH | #488 | 1404 W. Gentry Pkwy | Tyler | TX | 75702 | open |
| 2 | Buddy Mac Two, LLC | BMH | #489 | 2725 Sherwood Way Suite 500 | San Angelo | TX | 76901 | open |
| 3 | Buddy Mac Six, LLC | BMH | #496 | 1100 N. HWY 491 | Gallup | NM | 87301 | open |
| 4 | Buddy Mac Eight, LLC | BMH | #602 | 2510 Main St. NE, Suite D | Los Lunas | NM | 87031 | open |
| 5 | Buddy Mac Eleven, LLC | BMH | #601 | 2330 E. Main St. | Farmington | NM | 87401 | open |
| 6 | Buddy Mac Twelve, LLC | BMH | #497 | 1727 Texoma Parkway | Sherman | TX | 75090 | open |
| 7 | Buddy Mac Eighteen, LLC | BMH | #430 | 1008 North St. | Nacogdoches | TX | 75961 | open |
| 8 | Buddy Mac Nineteen, LLC | BMH | #615 | 1337 E. Lindsey St. | Norman | OK | 73071 | open |
| 9 | Buddy Mac Twenty-One, LLC | RTO | #432 | 1803 N. Harrison St. | Shawnee | OK | 74804 | open |
| 10 | Buddy Mac Twenty-Three, LLC | RTO | #434 | 36 S Adair | Pryor | OK | 74361 | open |
| 11 | Buddy Mac Twenty-Four, LLC | RTO | #435 | 218 N. Main St. | Seminole | OK | 74868 | open |
| 12 | Buddy Mac Twenty-Six, LLC | RTO | #437 | 1366 S. Muskogee Ave | Tahlequah | OK | 74464 | open |
| 13 | BMH-TNM 28, LLC | RTO | #375 | 1301 N. Turner, Suite A | Hobbs | NM | 88240 | open |
| 14 | BMH-TNM 30, LLC | RTO | #376 | 2261 Linda Ave | Odessa | TX | 79763 | open |
| 15 | BMH-TNM 31, LLC | RTO | #377 | 2014 50th St. | Lubbock | TX | 79412 | open |
| 16 | BMH-TNM 32, LLC | RTO | #378 | 414 N. Columbia St. | Plainview | TX | 79072 | open |
| 17 | BMH-TNM 33, LLC | RTO | #592 | 501 W. Main St. | Brownfield | TX | 79316 | open |
| 18 | BMH-RCL 37, LLC | RTO | #307 | 1810 W. Sunset, Suite A | Springdale | AR | 72762 | open |
| 19 | BMH-RCL 39, LLC | RTO | #313 | 412 W. Cherokee | Sallisaw | OK | 74955 | open |
| 20 | BMH-RCL 40, LLC | RTO | #309 | 2524 N. Broadway | Pittsburg | KS | 66762 | open |
| 21 | BMH-RCL 41, LLC | RTO | #305 | 1706 New Boston Rd, #A | Texarkana | TX | 75501 | open |
| 22 | BMH-FAN 43, LLC | RTO | #612 | 1413 Mitchell Rd. | West Plains | MO | 65775 | open |
| 23 | BMH-FAN 44, LLC | RTO | #603 | 2330 Harrison St. | Batesville | AR | 72501 | open |
| 24 | BMH-FAN 45, LLC | RTO | #604 | 140 W. Market St. | Clarksville | AR | 72830 | open |
| 25 | BMH-FAN 46, LLC | RTO | #605 | 500 HWY 463 N. | Trumann | AR | 72472 | open |
| 26 | BMH-FAN 47, LLC | RTO | #614 | 2801 N. Broadway | Poteau | OK | 74953 | open |
| 27 | BMH-FAN 48, LLC | RTO | #606 | 1600 N. Falls Blvd. | Wynne | AR | 72396 | open |
| 28 | BMH-FAN 49, LLC | RTO | #607 | 1025 MLK Blvd. | Malvern | AR | 72104 | open |
| 29 | BMH-FAN 50, LLC | RTO | #608 | 610 N. HWY 67B N | Walnut Ridge | AR | 72476 | open |
| 30 | BMH-FAN 51, LLC | RTO | #609 | 8117 Rogers Ave | Ft. Smith | AR | 72903 | open |
| 31 | BMH-FAN 52, LLC | RTO | #610 | 2425 Fayetteville Rd. | Van Buren | AR | 72956 | open |
| 32 | BMH-FAN 53, LLC | RTO | #613 | 907 HWY Business 60 W. | Dexter | MO | 63841 | open |
| 33 | BMH-NEW 58, LLC | BMH | #620 | 1001 NW Sheridan Road | Lawton | OK | 73505 | open |
| 34 | BMH-NEW 62, LLC | BMH | #641 | 4301 SW 45th Ave. Suite 400 | Amarillo | TX | 79109 | open |
| 35 | BMH-WF TX 67, LLC | BMH | #643 | 2924 Kemp Blvd | Wichita Falls | TX | 76308 | open |
| 36 | BMH-TB 75, LLC | BMH | #007 | 2211 E Hillsborough Ave | Tampa | FL | 33610 | open |
| 37 | BMH-SM 79, LLC | RTO | #631 | 102-B Strauss Drive | Park Hills | MO | 63601 | open |
| 38 | BMH-SM 80, LLC | RTO | #632 | 129 Twin City Plaza | Crystal City | MO | 63019 | open |
| 39 | BMH-SM 81, LLC | RTO | #633 | 3 Parkway Shopping Center | Potosi | MO | 63664 | open |
| 40 | BMH-SM 82, LLC | RTO | #634 | 121 Perry Plaza | Perryville | MO | 63775 | open |
| 41 | BMH-SM 83, LLC | RTO | #635 | 205 E Karsch Blvd | Farmington | MO | 63640 | open |
| 42 | BMH-SM 85, LLC | RTO | #636 | 1501 E Malone Ave | Sikeston | MO | 63801 | open |
| 43 | BMH-SM 86, LLC | RTO | #637 | 409 West Main St. | Fredericktown | MO | 63645 | open |
| 44 | BMH Prime 95, LLC | BMH | #646 | 810 W 13th St | Caruthersville | AR | 63830 | open |
| 45 | BMH Prime 96, LLC | BMH | #644 | 103 N Carbon | Marion | IL | 62959 | open |
| 46 | BMH Prime 97, LLC | BMH | #645 | 1710 West 7Th St | Joplin | MO | 64801 | open |

## EXHIBIT B

Description of Alvarado, Texas Real Property

That certain parcel of undeveloped real property located at:

**694 E HWY 67, Alvarado, Johnson County, Texas 76009**

<u>Legal Description</u>:
LOT 1, BLOCK 1, DGMS ADDITION, AN ADDITION TO THE CITY OF ALVARADO, TEXAS, JOHNSON COUNTY, TEXAS, ACCORDING TO THE MAP OR PLAT THEREOF RECORDED IN VOLUME 11, PAGE 513, SLIDE D-711, MAP AND/OR PLAT RECORDS, JOHNSON COUNTY, TEXAS.

## **EXHIBIT C**

Form of Bill of Sale and Assignment and Assumption Agreement

(see attached)

**BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

This Bill of Sale and Assignment and Assumption Agreement (this "<u>Agreement</u>") is executed and delivered _____ _____, 2026, pursuant to that certain Asset Purchase Agreement, dated as of January __, 2026, by and among **Buddy Mac Holdings, LLC**, a Texas limited liability company ("**Company**"), and each of the entities listed on <u>Annex I</u> attached hereto (together with the Company, the "**Sellers**", and each a "**Seller**"), William Ian MacDonald ("**MacDonald**"), and **Phonix RBS, LLC**, a Delaware limited liability company ("**Phonix**") or its designee ("**Buyer**") (the "<u>Purchase Agreement</u>"). Capitalized terms used but not defined herein shall have the meaning given to such terms in the Purchase Agreement.

**WHEREAS**, pursuant to the Purchase Agreement, Sellers have agreed to sell, assign, convey or cause to be conveyed, transfer and deliver to Buyer, the Purchased Assets, and Buyer has agreed to assume certain Assumed Liabilities of Sellers.

**NOW, THEREFORE**, for and in consideration of the mutual promises set forth in the Purchase Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Sellers and Buyer hereby agree as follows:

1.      Sellers hereby sell, transfer and assign to Buyer all of Sellers' right, title, and interest in and to the Purchased Assets, to have and to hold the same unto Buyer and its successors and assigns from and after the date hereof, free and clear of all Encumbrances.

2.      Buyer, for itself, and its successors and assigns, hereby accepts the transfer and assignment of the Purchased Assets, and Buyer assumes and agrees to pay, perform and discharge the Assumed Liabilities in connection with the Purchased Assets.

3.      This Agreement is only intended to effect the sale and assignment of the Purchased Assets and is subject to the representations and warranties of Sellers and Buyer, in addition to all other provisions, contained in the Purchase Agreement. Buyer and Sellers, by their execution of this Agreement, hereby acknowledge and agree that neither the representations and warranties, nor the rights, remedies or obligations of either party under the Purchase Agreement, shall be deemed to be enlarged, diminished, modified or altered in any way by this Agreement.

4.      This Agreement is made subject to, and with the benefit of, the respective representations, warranties, covenants, terms, conditions, limitations and other provisions of the Purchase Agreement and in the event of any conflict or other inconsistency between this Agreement and the Purchase Agreement, the Purchase Agreement shall govern and be the controlling document.

5.      Each Seller hereby covenants and agrees that it will, at the request of Buyer and without further consideration, execute and deliver, such other instruments of sale, transfer, conveyance and assignment, and take such other action, as may reasonably be necessary to sell, transfer, convey, assign and deliver to, and vest in, Buyer, its successors and assigns, title to the Purchased Assets hereby sold, transferred, conveyed, assigned, and delivered, or intended so to be, all as set forth in the Purchase Agreement.

6.      This Agreement may be executed in multiple counterparts, each of which shall be deemed an original for all purposes and all of which shall be deemed, collectively, as one agreement.

7.      THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, WITHOUT GIVING

1

EFFECT TO THE CONFLICT OF LAWS RULES OR CHOICE OF LAWS RULES THEREOF. ANY DISPUTE ARISING UNDER THIS AGREEMENT SHALL BE RESOLVED EXCLUSIVELY IN ACCORDANCE WITH SECTION 9.10 OF THE PURCHASE AGREEMENT.

8.    This instrument shall inure to the benefit of, and be binding upon, the parties hereto and their respective successors and permitted assigns. This Agreement and the rights and obligations hereunder shall not be assignable by any party without the express prior written consent of the other parties hereto; *provided*, *however*, Buyer may assign this Agreement to an Affiliate of Buyer without the other parties' prior written consent.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the undersigned have caused their duly authorized representatives to execute this Bill of Sale and Assignment and Assumption Agreement on the day and year first above written.

**SELLERS:**

[ENTITY NAME]


By:_____
Name: [_____]
Title: [_____]

[ENTITY NAME]


By:_____
Name: [_____]
Title: [_____]

[ENTITY NAME]


By:_____
Name: [_____]
Title: [_____]

[ENTITY NAME]


By:_____
Name: [_____]
Title: [_____]


[ENTITY NAME]


By:_____
Name: [_____]
Title: [_____]

[ENTITY NAME]


By:_____
Name: [_____]
Title: [_____]


[ENTITY NAME]


By:_____
Name: [_____]
Title: [_____]

IN WITNESS WHEREOF, the undersigned have caused their duly authorized representatives to execute this Bill of Sale and Assignment and Assumption Agreement on the day and year first above written.

**BUYER:**

PHONIX RBS, LLC


By:_____
Name: [_____]
Title: [_____]

## **EXHIBIT D**

Form of DIP Credit Agreement

Schedule 1.01(a)
Assigned Property Leases

The following leases will be assumed and assigned to Buyer:

| Debtor Name | Case No. | Description | Store # | Effective Date | Termination Date | Counterparty |
|---|---|---|---|---|---|---|
| Buddy Mac Eight, LLC | 26-30330 | Lease Agreement | 602 | 04/11/22 | 04/30/26 | Lunas Properties, LLC |
| Buddy Mac Nineteen, LLC | 26-30334 | Lease Agreement | 615 | 03/09/20 | 09/30/25 | Hoppenstein Properties, Inc. |
| BUDDY MAC TWENTY-THREE LLC | 25-34843 | Lease Agreement | 434 | 01/04/23 | 01/04/28 | LML Investments LLC |
| BMH-TNM 28, LLC | 25-34848 | Assignment and Assumption of Leases | 375 | 04/01/18 | 02/28/28 | Tomorrow IX Broadmoor LP |
| BMH-RCL 37, LLC | 25-34857 | Lease Agreement - Third Amendment | 307 | 05/31/22 | 10/31/27 | SRS Emily, LLC |
| BMH-RCL 39, LLC | 25-34859 | Lease Agreement | 313 | 12/01/20 | 11/30/25 | Schwartz Properties |
| BMH-FAN 43, LLC | 25-34863 | Lease Agreement | 612 | 07/06/23 | 07/01/28 | Guffey West Plains Properties LLC |
| BMH-FAN 51, LLC | 25-34871 | Lease Extension | 609 | 09/01/23 | 08/31/28 | Widmer Place LLC |
| BMH-FAN 52, LLC | 25-34872 | Lease Agreement | 610 | 03/31/17 | 04/01/27 | RNR Investments LLC |

The following leases are subject to the SKC transaction, but will be assumed and assigned to Buyer if the SKC transaction does not close:

| Debtor Name | Case No. | Description | Store # | Effective Date | Termination Date | Counterparty |
|---|---|---|---|---|---|---|
| BMH-FAN 50, LLC | 25-34870 | Lease Agreement | 608 | 10/19/20 | 10/31/33 | Everhart Vail Properties LLC |

Schedule 1.01(b)
Subject Real Property

| Ownership Entity | Property Address | City, State | ZIP |
|---|---|---|---|
| SAM Plainview, LLC | 414 N. Columbia St. | Plainview, TX | 79072 |
| MacDonald Capital Corp | 218 N. Main St. | Seminole, OK | 74868 |
| Buddy Mac Six RE, LLC | 1100 N. HWY 491 | Gallup, NM | 87301 |
| SAM Brownfield, LLC | 501 W. Main St. | Brownfield, TX | 79316 |
| BMH 85 RE Sikeston, LLC | 1501 E Malone Ave | Sikeston, MO | 63801 |
| BMH One RE, LLC | 1404 W. Gentry Pkwy | Tyler, TX | 75702 |
| BMH 95 RE Caruthersville, LLC | 810 W 13th St | Caruthersville, MO | 63830 |
| BMH 96 RE Marion, LLC | 103 N Carbon | Marion, IL | 62959 |

Schedule 1.01(h)
Consumer Rental Contracts

All consumer rental agreements entered into by the Sellers relating to the Business conducted at the Transferred Stores.

(List To be Filed under Seal with the Court)

<u>Schedule 1.01(i)</u>
Assigned Other Contracts

All contracts and agreements entered into by the Sellers relating to the Business Conducted at the Transferred Stores not otherwise included in another Schedule attached hereto which constitute Purchased Assets, excluding such contracts and agreements which constituted Excluded Assets.

For the avoidance of doubt, the Assigned Other Contracts include, but are not limited to, the following:

- Maintenance Agreement dated April 22, 2020, by and between Enterprise Fleet Management, Inc. and Buddy Mac Holdings, LLC

- Master Equity Lease Agreement dated April 22, 2020, by and between Enterprise FM Trust, as lessor, and Buddy Mac Holdings, LLC, as lessee, including all Schedules and Amendments thereto

Schedule 1.01(m)
Intellectual Property

All Intellectual Property owned or used by Sellers in connection with the Business conducted at the Transferred Stores.

The Intellectual Property includes, without limitation, the following:

**Trademarks:**

Mac Sales and Leasing trade name (unregistered)



Schedule 1.01(r)

Insurance

| Insurer/ Notice Party's Name | Insured/ Debtor Name | Agreement | Policy # |
|---|---|---|---|
| The Continental Insurance Company | Buddy Mac Holdings LLC | CNA Paramount Excess and Umbrella Liability | CUE 8033272411 |
| Hiscox Inc. | Buddy Mac Holdings, LLC | Terrorism | UTS257692225 |
| Mt. Hawley Insurance Company | Buddy Mac Holdings, LLC | Commercial Property | MCP0180467 |
| Old Republic Insurance Company | Buddy Mac Holdings, LLC | Business Auto | MWTB 319383 25 |
| Old Republic Insurance Company | Buddy Mac Holdings, LLC | Workers Compensation | MWC 319381 25 |
| Zurich American Insurance Company | Buddy Mac Holdings, LLC | Employee Practices and Third Party Liability | MPL 6181213 - 02 |
| Fireman's Fund Insurance Company[1] | MacDonald Capital Corporation | Property, General Liability, Business Auto | USC034304250 |
| Old Republic Insurance Group | Buddy Mac Holdings, LLC | Commercial General Liability | MWZY 319382 25 |

---

[1] Includes each of the Fireman's Fund Insurance Company policies listed on the *Second Amended Notice of Debtors' Executory Contracts and Unexpired Leases and Related Cure Costs* [Docket No. 292].

<u>Schedule 1.01(u)</u>
Assigned Vehicles

A. <u>Owned Vehicles</u>:  All vehicles owned by Sellers in connection with the conduct of the Business at the Transferred Stores, including, without limitation, the following:

| Master Cust Name | VIN | Year | Make | Model | Lease Type[2] | Lease End Date |
|---|---|---|---|---|---|---|
| Buddy Mac Holdings, LLC | 1GCWGFCAXB1114419 | 2011 | Chevrolet | Express Cutaway | COV | |
| Buddy Mac Holdings, LLC | 1GB3G2AA5A1162900 | 2010 | Chevrolet | Express Cutaway | COV | |
| Buddy Mac Holdings, LLC | 1FTEX1C88GKD87999 | 2016 | Ford | F-150 | COV | |
| Buddy Mac Holdings, LLC | 1FDWE3FL0GDC06433 | 2016 | Ford | E-350 Cutaway | COV | |

B. <u>Leased Vehicles</u>:  All vehicles leased by Sellers in connection with the conduct of the Business at the Transferred Stores, including, without limitation, the following:

| Master Cust Name | VIN | Year | Make | Model | Lease Type | Lease End Date |
|---|---|---|---|---|---|---|
| Buddy Mac Holdings, LLC | 3C6MRVSG4SE557736 | 2025 | RAM | ProMaster 3500 | Equity Lease - Fixed | 10/31/2030 |
| Buddy Mac Holdings, LLC | 3C6LRVDGXRE106698 | 2024 | RAM | ProMaster 2500 | Equity Lease - Fixed | 4/30/2029 |
| Buddy Mac Holdings, LLC | 1FDBF6P83MKA20478 | 2021 | Ford | Transit-350 Cutaway | Equity Lease - Fixed | 3/31/2026 |
| Buddy Mac Holdings, LLC | 3C6LRVDG2PE565947 | 2023 | RAM | ProMaster 2500 | Equity Lease - Fixed | 2/28/2029 |
| Buddy Mac Holdings, LLC | 3C6MRVSG2SE557735 | 2025 | RAM | ProMaster 3500 | Equity Lease - Fixed | 9/30/2030 |
| Buddy Mac Holdings, LLC | 3C7WRVMG9PE560530 | 2023 | RAM | ProMaster 3500 Cutaway | Equity Lease - Fixed | 4/30/2029 |
| Buddy Mac Holdings, LLC | 3C7WRVMG6PE544950 | 2023 | RAM | ProMaster 3500 Cutaway | Equity Lease - Fixed | 3/31/2029 |
| Buddy Mac Holdings, LLC | 3C6LRVDG3PE565939 | 2023 | RAM | ProMaster 2500 | Equity Lease - Fixed | 2/28/2029 |
| Buddy Mac Holdings, LLC | 3C7WRVMG2PE560529 | 2023 | RAM | ProMaster 3500 Cutaway | Equity Lease - Fixed | 4/30/2029 |
| Buddy Mac Holdings, LLC | 3C6MRVSG9SE557750 | 2025 | RAM | ProMaster 3500 | Equity Lease - Fixed | 10/31/2030 |
| Buddy Mac Holdings, LLC | 3C7WRVMG7PE560526 | 2023 | RAM | ProMaster 3500 Cutaway | Equity Lease - Fixed | 4/30/2029 |
| Buddy Mac Holdings, LLC | 3C7WRVMG1PE560523 | 2023 | RAM | ProMaster 3500 Cutaway | Equity Lease - Fixed | 4/30/2029 |
| Buddy Mac Holdings, LLC | 3C6LRVDG7PE565944 | 2023 | RAM | ProMaster 2500 | Equity Lease - Fixed | 4/30/2029 |

---

[2] COV (Client-Owned Vehicle) indicates vehicles owned by the Debtors.

| Master Cust Name | VIN | Year | Make | Model | Lease Type | Lease End Date |
|---|---|---|---|---|---|---|
| Buddy Mac Holdings, LLC | 1FDBF6Z82NKA07428 | 2022 | Ford | Transit-350 Cutaway | Equity Lease - Fixed | 10/31/2026 |
| Buddy Mac Holdings, LLC | 1GCWGAFP4K1295438 | 2019 | Chevrolet | Express 2500 | Equity Lease - Fixed | 11/30/2026 |
| Buddy Mac Holdings, LLC | 3C6LRVDG1RE106671 | 2024 | RAM | ProMaster 2500 | Equity Lease - Fixed | 4/30/2029 |
| Buddy Mac Holdings, LLC | 3C6MRVSG0SE557734 | 2025 | RAM | ProMaster 3500 | Equity Lease - Fixed | 10/31/2030 |
| Buddy Mac Holdings, LLC | 3C6LRVDG7RE106674 | 2024 | RAM | ProMaster 2500 | Equity Lease - Fixed | 4/30/2029 |
| Buddy Mac Holdings, LLC | 3C6LRVDG1PE558598 | 2023 | RAM | ProMaster 2500 | Equity Lease - Fixed | 11/30/2028 |
| Buddy Mac Holdings, LLC | 3C7WRVMG2PE544945 | 2023 | RAM | ProMaster 3500 Cutaway | Equity Lease - Fixed | 4/30/2029 |
| Buddy Mac Holdings, LLC | 3C6LRVDGXPE558597 | 2023 | RAM | ProMaster 2500 | Equity Lease - Fixed | 9/30/2028 |
| Buddy Mac Holdings, LLC | 7GZ37TCG4HN901151 | 2017 | GMC | Savana Cutaway | Equity Lease - Fixed | 11/30/2026 |
| Buddy Mac Holdings, LLC | 3C7WRVMG8PE544948 | 2023 | RAM | ProMaster 3500 Cutaway | Equity Lease - Fixed | 4/30/2029 |
| Buddy Mac Holdings, LLC | 3C6LRVDG4PE565951 | 2023 | RAM | ProMaster 2500 | Equity Lease - Fixed | 7/31/2029 |
| Buddy Mac Holdings, LLC | 3C7WRVMG3PE560524 | 2023 | RAM | ProMaster 3500 Cutaway | Equity Lease - Fixed | 5/31/2029 |
| Buddy Mac Holdings, LLC | 1GD37SCG8J1321899 | 2018 | GMC | Savana Cutaway | Equity Lease - Fixed | 11/30/2026 |
| Buddy Mac Holdings, LLC | 3C6LRVDG3RE106669 | 2024 | RAM | ProMaster 2500 | Equity Lease - Fixed | 4/30/2029 |
| Buddy Mac Holdings, LLC | 3C6LRVDG6PE558595 | 2023 | RAM | ProMaster 2500 | Equity Lease - Fixed | 10/31/2028 |
| Buddy Mac Holdings, LLC | 1FDWE3F68HDC52538 | 2017 | Ford | E-350 Cutaway | Equity Lease - Fixed | 11/30/2026 |
| Buddy Mac Holdings, LLC | 3C7WRVLG4PE566625 | 2023 | RAM | ProMaster 3500 Cutaway | Equity II | 5/31/2029 |
| Buddy Mac Holdings, LLC | 3C7WRVMG5PE560525 | 2023 | RAM | ProMaster 3500 Cutaway | Equity Lease - Fixed | 5/31/2029 |
| Buddy Mac Holdings, LLC | 1FTBR1C80MKA52874 | 2021 | Ford | Transit-250 Cargo | Equity II | 10/31/2026 |
| Buddy Mac Holdings, LLC | 3C7WRVMG0PE560528 | 2023 | RAM | ProMaster 3500 Cutaway | Equity Lease - Fixed | 5/31/2029 |
| Buddy Mac Holdings, LLC | 3C7WRVMG1PE544953 | 2023 | RAM | ProMaster 3500 Cutaway | Equity Lease - Fixed | 3/31/2029 |
| Buddy Mac Holdings, LLC | 3C7WRVMGXPE544949 | 2023 | RAM | ProMaster 3500 Cutaway | Equity Lease - Fixed | 5/31/2029 |
| Buddy Mac Holdings, LLC | 3C6LRVDG1RE106704 | 2024 | RAM | ProMaster 2500 | Equity Lease - Fixed | 4/30/2029 |
| Buddy Mac Holdings, LLC | 1FDBF6Z80NKA07427 | 2022 | Ford | Transit-350 Cab Chassis | Equity Lease - Fixed | 10/31/2026 |
| Buddy Mac Holdings, LLC | 3C6LRVDGXPE565940 | 2023 | RAM | ProMaster 2500 | Equity Lease - Fixed | 4/30/2029 |
| Buddy Mac Holdings, LLC | 3C7WRVMG9PE529195 | 2023 | RAM | ProMaster 3500 Cutaway | Equity Lease - Fixed | 3/31/2030 |

| Master Cust Name | VIN | Year | Make | Model | Lease Type | Lease End Date |
|---|---|---|---|---|---|---|
| Buddy Mac Holdings, LLC | 1FTBR1C81MKA52866 | 2021 | Ford | Transit-250 Cargo | Equity II | 10/31/2026 |
| Buddy Mac Holdings, LLC | 1FDBF6Z89MKA85865 | 2021 | Ford | Transit-350 Cab Chassis | Equity Lease - Fixed | 10/31/2027 |
| Buddy Mac Holdings, LLC | 1FTBR1C81MKA52883 | 2021 | Ford | Transit-250 Cargo | Equity II | 10/31/2026 |
| Buddy Mac Holdings, LLC | 3C7WRVMG2PE515154 | 2023 | RAM | ProMaster 3500 Cutaway | Equity Lease - Fixed | 4/30/2029 |
| Buddy Mac Holdings, LLC | 3C7WRVMG9PE560527 | 2023 | RAM | ProMaster 3500 Cutaway | Equity Lease - Fixed | 3/31/2029 |
| Buddy Mac Holdings, LLC | 3C6LRVDG5RE106673 | 2024 | RAM | ProMaster 2500 | Equity Lease - Fixed | 5/31/2029 |
| Buddy Mac Holdings, LLC | 3C6LRVDG5PE565943 | 2023 | RAM | ProMaster 2500 | Equity Lease - Fixed | 2/28/2029 |
| Buddy Mac Holdings, LLC | 3C6LRVDG9PE565640 | 2023 | RAM | ProMaster 2500 | Equity Lease - Fixed | 1/31/2029 |
| Buddy Mac Holdings, LLC | 3C6LRVDG2PE565950 | 2023 | RAM | ProMaster 2500 | Equity Lease - Fixed | 1/31/2029 |
| Buddy Mac Holdings, LLC | 3C6LRVDG8PE558596 | 2023 | RAM | ProMaster 2500 | Equity Lease - Fixed | 12/31/2028 |
| Buddy Mac Holdings, LLC | 3C6LRVDG1PE558603 | 2023 | RAM | ProMaster 2500 | Equity Lease - Fixed | 11/30/2028 |
| Buddy Mac Holdings, LLC | 3C6LRVDG6PE558600 | 2023 | RAM | ProMaster 2500 | Equity Lease - Fixed | 11/30/2028 |
| Buddy Mac Holdings, LLC | 3C6LRVDG8PE558601 | 2023 | RAM | ProMaster 2500 | Equity Lease - Fixed | 9/30/2028 |
| Buddy Mac Holdings, LLC | 3C6LRVDG3PE558599 | 2023 | RAM | ProMaster 2500 | Equity Lease - Fixed | 9/30/2028 |
| Buddy Mac Holdings, LLC | 1FDBF6P81MKA23864 | 2021 | Ford | Transit-350 Cutaway | Equity Lease - Fixed | 10/31/2026 |
| Buddy Mac Holdings, LLC | 1GB3GSC70M1167718 | 2021 | Chevrolet | Express Cutaway | Equity Lease - Fixed | 10/31/2026 |
| Buddy Mac Holdings, LLC | 1GB0GSF76M1310895 | 2021 | Chevrolet | Express Cutaway | Equity II | 6/30/2027 |
| Buddy Mac Holdings, LLC | 1FTYR2CM6KKB56196 | 2019 | Ford | Transit-250 | Equity Lease - Fixed | 11/30/2026 |
| Buddy Mac Holdings, LLC | 4UZBYG117KGKM6633 | 2019 | *Mitsubishi | *FE140 | Equity Lease - Fixed | 11/30/2026 |
| Buddy Mac Holdings, LLC | 1FTBW2CM9KKB87022 | 2019 | Ford | Transit-350 | Equity Lease - Fixed | 11/30/2026 |
| Buddy Mac Holdings, LLC | 1FTBR1C81MKA43374 | 2021 | Ford | Transit-250 Cargo | Equity II | 11/30/2026 |
| Buddy Mac Holdings, LLC | 1FDBF8ZM0JKA83703 | 2018 | Ford | Transit Connect | Equity Lease - Fixed | 11/30/2026 |
| Buddy Mac Holdings, LLC | 3C6TRVDG8KE554346 | 2019 | RAM | ProMaster 2500 | Equity Lease - Fixed | 11/30/2026 |
| Buddy Mac Holdings, LLC | 4UZBYG11XKGKG3728 | 2019 | *Mitsubishi | *FE140 | Equity Lease - Fixed | 11/30/2026 |
| Buddy Mac Holdings, LLC | 1FTMF1C83HKE05423 | 2017 | Ford | F-150 | Equity Lease - Fixed | 11/30/2026 |
| Buddy Mac Holdings, LLC | 1GB3GSCFXH1239666 | 2017 | Chevrolet | Express Cutaway | Equity Lease - Fixed | 11/30/2026 |

Case 25-34839-mvl11   Doc 357-11   Filed 02/25/26   Entered 02/25/26 14:14:10   Desc
PHONIX EX 11   Page 110 of 116
Case 25-34839-mvl11   Doc 343-1   Filed 02/23/26   Entered 02/23/26 17:33:04   Desc
Exhibit A - Asset Purchase Agreement   Page 81 of 87

| Master Cust Name | VIN | Year | Make | Model | Lease Type | Lease End Date |
|---|---|---|---|---|---|---|
| Buddy Mac Holdings, LLC | 1FTEX1C89GKD16097 | 2016 | Ford | F-150 | Equity Lease - Fixed | 11/30/2026 |
| Buddy Mac Holdings, LLC | 1FTYR2CM0KKB55190 | 2019 | Ford | Transit-250 | Equity Lease - Fixed | 11/30/2026 |
| Buddy Mac Holdings, LLC | 4UZBYG11XKGKM6626 | 2019 | *Mitsubishi | *FE140 | Equity Lease - Fixed | 11/30/2026 |
| Buddy Mac Holdings, LLC | 3C6TRVAG0HE521354 | 2017 | RAM | ProMaster 1500 | Equity Lease - Fixed | 11/30/2026 |
| Buddy Mac Holdings, LLC | 1HA3GSCF7HN000804 | 2017 | Chevrolet | Express Cutaway | Equity Lease - Fixed | 11/30/2026 |
| Buddy Mac Holdings, LLC | 1GD07RFF4G1231334 | 2016 | GMC | Savana Cutaway | Equity Lease - Fixed | 11/30/2026 |
| Buddy Mac Holdings, LLC | 1FTYR2CM2KKB56180 | 2019 | Ford | Transit-250 | Equity Lease - Fixed | 11/30/2026 |
| Buddy Mac Holdings, LLC | 1FTYR2CM5KKB66315 | 2019 | Ford | Transit-250 | Equity Lease - Fixed | 11/30/2026 |
| Buddy Mac Holdings, LLC | 1FTEX1C87HKE50253 | 2017 | Ford | F-150 | Equity Lease - Fixed | 11/30/2026 |
| Buddy Mac Holdings, LLC | 1N6BF0KY9LN806174 | 2020 | Nissan | NV Cargo NV1500 | Equity Lease - Fixed | 11/30/2026 |
| Buddy Mac Holdings, LLC | 7GZ37TCG8HN901069 | 2017 | GMC | Savana Cutaway | Equity Lease - Fixed | 11/30/2026 |
| Buddy Mac Holdings, LLC | 7GZ37TCG6HN901054 | 2017 | GMC | Savana Cutaway | Equity Lease - Fixed | 11/30/2026 |
| Buddy Mac Holdings, LLC | 1FTYR2CM4HKA14261 | 2017 | Ford | Transit-250 | Equity Lease - Fixed | 11/30/2026 |
| Buddy Mac Holdings, LLC | 3C6TRVBG6KE555806 | 2019 | RAM | ProMaster 1500 | Equity Lease - Fixed | 11/30/2026 |

*[remainder of page left intentionally blank]*

C. The following vehicles are associated with stores sold to National TV Sales & Rentals of Missouri, Inc. but are subject to the Master Equity Lease Agreement with Enterprise FM Trust being assumed and assigned to the Buyer:

| Master Cust Name | VIN | Year | Make | Model | Lease Type[3] | Lease End Date |
|---|---|---|---|---|---|---|
| Buddy Mac Holdings, LLC | 1GB0GRFG9J1332703 | 2018 | Chevrolet | Express Cutaway | Equity Lease - Fixed | 11/30/2026 |
| Buddy Mac Holdings, LLC | NM0LS7E26K1396004 | 2019 | Ford | Transit Connect | Equity Lease - Fixed | 11/30/2026 |
| Buddy Mac Holdings, LLC | 1FTYE1YM2GKA68705 | 2016 | Ford | Transit-150 | Equity Lease - Fixed | 11/30/2026 |
| Buddy Mac Holdings, LLC | 3C6LRVDGXRE106670 | 2024 | RAM | ProMaster 2500 | Equity Lease - Fixed | 4/30/2029 |
| Buddy Mac Holdings, LLC | 1FDWE3FL1FDA20690 | 2015 | Ford | E-350 Cutaway | Equity Lease - Fixed | 11/30/2026 |
| Buddy Mac Holdings, LLC | 1FTNE14W89DA75787 | 2009 | Ford | E-150 | Equity Lease - Fixed | 12/31/2026 |
| Buddy Mac Holdings, LLC | 3C6LRVDG9PE565945 | 2023 | RAM | ProMaster 2500 | Equity Lease - Fixed | 1/31/2029 |
| Buddy Mac Holdings, LLC | 3C7WRVMG3PE544954 | 2023 | RAM | ProMaster 3500 Cutaway | Equity Lease - Fixed | 3/31/2029 |
| Buddy Mac Holdings, LLC | 1FTNR2CM6FKA08235 | 2015 | Ford | Transit-250 | Equity Lease - Fixed | 11/30/2026 |
| Buddy Mac Holdings, LLC | 3C6LRVDG4PE565948 | 2023 | RAM | ProMaster 2500 | Equity Lease - Fixed | 3/31/2029 |
| Buddy Mac Holdings, LLC | 3C7WRVKG7KE530129 | 2019 | RAM | ProMaster 3500 Cutaway | Equity Lease - Fixed | 11/30/2026 |
| Buddy Mac Holdings, LLC | 3C6LRVDGXPE558602 | 2023 | RAM | ProMaster 2500 | Equity Lease - Fixed | 9/30/2028 |
| Buddy Mac Holdings, LLC | 1FDBW7PM6HKA82465 | 2017 | Ford | Transit-250 Cutaway | Equity Lease - Fixed | 11/30/2026 |
| Buddy Mac Holdings, LLC | 1GB0G2CA7E1137616 | 2014 | Chevrolet | Express Cutaway | Equity Lease - Fixed | 11/30/2026 |
| Buddy Mac Holdings, LLC | 1FTNE2CMXFKA14003 | 2015 | Ford | Transit-150 | Equity Lease - Fixed | 12/31/2026 |
| Buddy Mac Holdings, LLC | 3C7WRVLG8PE561377 | 2023 | RAM | ProMaster 3500 Cutaway | Equity II | 5/31/2029 |
| Buddy Mac Holdings, LLC | 3C6LRVDG6PE565949 | 2023 | RAM | ProMaster 2500 | Equity Lease - Fixed | 1/31/2029 |
| Buddy Mac Holdings, LLC | 3C6LRVDG0ME512594 | 2021 | RAM | ProMaster 2500 | Equity Lease - Fixed | 3/31/2026 |
| Buddy Mac Holdings, LLC | 54DB4W1B1GS808366 | 2016 | *Isuzu | *NPR | Equity Lease - Fixed | 11/30/2026 |

---

[3] COV (Client-Owned Vehicle) indicates vehicles owned by the Debtors.

Schedule 1.02
Excluded Assets

1. Certain Insurance Policies or Insurance-Related Agreements:

| Description | Insurer | Insured | Agreement |
|---|---|---|---|
| 25-26 Signed Finance Agreement | AFCO Credit Corporation | Buddy Mac Holdings, LLC | Premium Finance Agreement - Promissory Note |
| Archway Insurance Agreement | Archway Insurance Ltd. | Buddy Mac Holdings, LLC | Shareholder Agreement |
| Archway Insurance Agreement | Archway Insurance Ltd. | Buddy Mac Holdings, LLC | Subscription Agreement |

2. Other Agreements:

| Debtor | Notice Party | Description of Contract or Lease |
|---|---|---|
| Buddy Mac Holdings, LLC | TPX Communications | Master Service Agreement(s) (IT/Network) |
| Buddy Mac Holdings, LLC | Costar Realty Information Inc | Lease Software |
| Buddy Mac Holdings, LLC | 8 x 8 | Phone Systems |
| Buddy Mac Holdings, LLC | Great Lakes Fund Solutions, Inc | Agent Authorization for Depository Services |
| Buddy Mac Holdings, LLC | Great Lakes Fund Solutions, Inc | Software and Services Agreement |
| Buddy Mac Holdings LLC | Ryan, LLC | Property Tax Professional Services Agreement |
| Buddy Mac Holdings LLC | Securities Transfer Corporation | Software and Services Agreement |
| Buddy Mac Holdings LLC | Stericycle, Inc. | Agreement - Shredding |
| Buddy Mac Holdings, LLC | UMB Bank, N.A. | Agent Authorization for Depository Services |
| Buddy Mac Twenty-Three LLC | Computers Plus Wireless | Rental Agreement |

3. Property Leases under which Sellers are tenants that are not assumed and assigned to Buyer in accordance with Schedule 1.01(a)

Schedule 3.05
Permitted Encumbrances Relating to Subject Real Property

| Debtor/Owner | Mortgage/Lien(s)/Recordings | Property Address |
|---|---|---|
| SAM Plainview, LLC | (1) Assignment of Rents Recorded in Hale County, Texas on 3/25/2020<br>(2) Deed of Trust Recorded in Hale County, Texas on 3/25/2020 | 414 N Columbia St., Plainview, Texas 79073 |
| Buddy Mac Six RE LLC | (1) Deed of Trust, Security Agreement, Assignment of Leases and Rents and Fixture Financing Statement Recorded in McKinley County, New Mexico on 7/25/2016<br>(2) Modification of Deed of Trust Recorded in McKinley County, New Mexico on 8/6/2021<br>(3) Subordination and Attornment Agreement Recorded in McKinley County, New Mexico on 6/24/2016 | 1100 N Highway 491 Gallup, New Mexico 87301 |
| SAM Brownfield LLC | (1) Assignment of Rents Recorded in Terry County, Texas on 5/15/2020<br>(2) Deed of Trust Recorded in Terry County, Texas on 5/15/2020<br>(3) Extension of Real Estate Note and Lien Recorded in Terry County, Texas on 5/28/2025 | 501 W. Main Street, Brownfield, Terry County, Texas 79316 |
| MacDonald Capital Corporation | (1) Assignment of Rents Recorded in Seminole County, Oklahoma on 12/31/2020<br>(2) Mortgage (DOT) Recorded in Seminole County, Oklahoma on 12/31/2020 | 218 N. Main Street, Seminole, Oklahoma 74868 |

| | | |
|---|---|---|
| BMH 85 RE Sikeston LLC | (1) Assignment of Rents Recorded in Scott County, Missouri on 10/24/2022 (2) Deed of Trust with Future Advances and Future Obligations Govered by Section 443.055 RSMO Recorded in Scott County, Missouri on 10/24/2022 | 1501 E. Malone Sikeston, Missouri 63801 |
| BMH 95 RE Caruthersville LLC | (1) Deed of Trust, with Future Adances and Future Obligations Governed by Section 443.055 RSMO Recorded in Pemiscot County, Missouri on 10/24/2022 | 810 W. 13th St., Caruthersville, Missouri 63830 |

<u>Schedule 3.06</u>
Environmental Matters

NONE

<u>Schedule 3.07</u>
Brokers

NONE