

**EXHIBIT**

**PHONIX EX 12**

Case 25-34839

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | CASE NO. 25-34839 (mvl) |
| | § | |
| **BUDDY MAC HOLDINGS, LLC. et al.,** | § | CHAPTER 11 |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

## LIMITED OBJECTION BY TIC PROPERTY CO-OWNERS TO DEBTORS' MOTIONS FOR APPROVAL OF (A) POST-PETITION FINANCING; AND (B) ASSET SALES

Property co-owners Ronald Berg; Joanne O. Heathe; Bohdan Klymkowych and Natalie O. Klymkowych, as Trustees or their Successors in Trust under the Natalie O. Klymkowych Trust Agreement dated August 9, 1994 and any amendments thereto; Family Trust of George M. Hjorth and Evlin D. Hjorth; and Darwin M. Bolsinger and Margie A. Bolsinger, Trustees of the Darwin M. Bolsinger and Margie A. Bolsinger Trust, Dated July 8, 2005 (collectively, the "TIC Co-Owners") file this objection to certain relief sought by the Debtors through the *Debtors' Emergency Motion For Entry Of Interim And Final Orders Authorizing The Debtors To Obtain Post-Petition Financing And Granting Related Relief* [Main Case ECF No. 173] (the "DIP Motion") and *Debtors' Emergency Motion For Entry Of An Order (I) Authorizing (A) The Sale Of Substantially All Assets Free And Clear Of Liens, Claims, And Encumbrances, And (B) The Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases In Connection Therewith; And (II) Granting Related Relief* [Main Case ECF No. 172] (the "Sale Motion") (collectively, the "Motions"), stating as follows:

## SUMMARY

When these bankruptcy cases were commenced, the TIC Co-Owners held valuable real property interests in assets they that co-owned with certain Debtors. The Debtors argue that they

1

are entitled to render worthless and deprive the TIC Co-Owners of their separate real estate interests through proposed financing and asset sale agreements.  Their argument fails for reasons set forth herein, including that (a) a close review of such agreements reveals that the Debtors did not actually agree to lien or to sell the non-debtor real estate interests in the subject properties; and (b) the governing real estate instruments cannot reasonably be construed to authorize the Debtors to eliminate the non-debtor real estate interests in the manner alleged.  Moreover, the Debtors did not have the authority under such instruments to dispose through the financing and asset sale agreements of the Debtors' own partial real estate interests in the manner alleged because the real estate instruments require any transferee specifically to assume the terms of the instruments.   The Court should deny the Motions to the extent that the Debtor seeks through them to impose liens, grant credit bidding rights, approve sales, or grant other relief with respect to any of the subject real estate.

## **BACKGROUND**

1.    During the period from 2021 through 2025, the TIC Co-Owners transferred hundreds of thousands of dollars to five particular Debtors (the "TIC Debtors") in order to acquire undivided tenancy in common ownership interests ("TIC Interests") in five real estate properties (the "TIC Properties").

2.    Below is a summary of the TIC Properties and the TIC Debtors along with their stated percentage ownership interests:

2

| TIC Property | TIC Debtor | TIC Debtor Interest |
|---|---|---|
| 414 North Columbia Avenue, Plainview TX | SAM Plainview, LLC | 56.06%[1] |
| 218 N. Main Street, Seminole, OK | MacDonald Capital Corporation | 76.51%[2] |
| 1100 N. Highway 491, Gallup, NM | Buddy Mac Six RE, LLC | 73.19%[3] |
| 501 West Main Street, Brownfield, TX | SAM Brownfield, LLC | 74.65%[4] |
| 1404 W. Gentry Parkway, Tyler, TX | Buddy Mac One, LLC | 56.46%[5] |

3.     The TIC Debtors and the TIC Co-Owners memorialized the terms and conditions of such real estate transactions in signed, substantially identical, tenant-in-common agreements ("TIC Agreements").[6]  A sample agreement is attached as **Exhibit A.**

4.     On December 1, 2025, the first tranche of Debtors commenced Chapter 11 cases in this Court.  Only one of the five TIC Debtors (the owner of the Tyler, TX property) was among them.[7]

---

[1]     Case No. 26-30346 ECF No. 8 (schedules), p. 20.
[2]     Case No. 26-30344 ECF No. 8 (schedules), p. 20.
[3]     Case No. 26-30329 ECF No. 8 (schedules), p. 20.
[4]     Case No. 26-30345 ECF No. 8 (schedules), p. 20.
[5]     The Debtors have not been consistent as to which of them owns a TIC interest in the Tyler, Texas, property.  The Debtors have filed a declaration stating as follows: "Ownership of the Tyler Property is divided among four parties that own undivided interests in the property as tenants in common.  Buddy Mac One owns a 56.46% interest in the Tyler Property.  The remaining interests are owned by three different non-debtor third parties, none of which are affiliates or insiders of the Debtors."  [Main Case ECF No. 12, p. 6 n. 4].  While the APA (as later defined) identifies the owner of the Tyler property as BMH One RE, LLC [Main Case ECF No. 229, p. 76], the bankruptcy schedules filed by such entity do not disclose any real estate interests, [Case No. 25-34789, ECF No. 11, p. 16].  The TIC Co-Owners assume that majority TIC interest is held by Debtor Buddy Mac One.
[6]     *See* Main Case ECF No. 309, Exhibits.
[7]     That entity's schedules disclosed a variety of assets and that its only creditor was an affiliate. [Case No. 25-34788 ECF No. 9].

3

5.      On January 25, 2026, the four remaining TIC Debtors were included in the third tranche of affiliates commencing Chapter 11 cases.   The schedules filed by such entities reflect that each was a single-purpose real estate holding company for one of the TIC interests whose only liability was to secured creditor SouthState Bank.[8]

6.      The Chapter 11 cases of the Debtors are being jointly administered for procedural purposes only, and have not been substantively consolidated.[9]

7.      On January 26, 2026, the Debtors filed their DIP Motion.  In it, the Debtors sought approval of a debtor-in-possession ("DIP") loan agreement (the "DIP Loan Agreement")[10] with Phonix RBS  LLC (the "DIP Lender" or "Phonix").

8.      On January 26, 2026, the Debtors also filed their Sale Motion.  In it, the Debtors sought approval to sell certain assets on certain terms set forth in an asset purchase agreement ("APA") with the DIP Lender.

9.      On February 19, 2026, the Debtors filed a court paper[11] arguing as follows with respect to the Motions:

> The DIP Order and DIP Loan Agreement provide that Phonix shall have postpetition DIP liens on the entirety (100%) of the interests in the TIC Properties, such that it will be able to credit bid its DIP Facility advances for those properties. The Sale Motion requests authority to sell the TIC Properties to Phonix (if its Stalking Horse credit bid is the highest and best bid) free and clear of the TIC Owners' interests in the properties, pursuant to section 363(h) of the Bankruptcy Code.

---

[8]      *See* Case No. 26-30346, ECF No. 8 (schedules of SAM Plainview LLC); Case No. 26-30344, ECF No. 8 (schedules of MacDonald Capital Corporation); Case No. 26-30329, ECF No. 8 (schedules of Buddy Mac Six RE, LLC); Case No. 26-30345, ECF No. 8 (schedules of SAM Brownfield LLC). MacDonald Capital Corporation also disclosed that it owned membership interests in certain Debtor affiliates and was a party to a lease with TIC Debtor Buddy Mac Six RE, LLC.

[9]      *See* Main Case ECF No. 187, pp. 2 & 6.

[10]      A copy of the DIP Loan Agreement was also attached to a subsequent related order [Main Case ECF No. 279].

[11]      *See* Main Case ECF No. 322 (motion to continue sale hearing), p. 6.

10.    The Debtors have also argued in court filings that they possessed authority to take such actions adverse to the interests of TIC Co-Owners based on their interpretation of isolated language of the TIC Agreements.

## ARGUMENT

### A. THE TIC DEBTORS DID NOT EVEN PURPORT THROUGH THE DIP AGREEMENT TO GRANT LIENS AGAINST ASSETS OF THE TIC CO-OWNERS.

11.    The Debtors have not cited any specific language in the DIP Loan Agreement supporting their argument that TIC Debtors granted liens against separate property rights of the TIC Co-Owners.  No such language.

12.    The Debtors granted liens against a broad array of <u>assets of the Debtors</u> and their bankruptcy estates.[12]  Nowhere does the DIP Loan Agreement identify as collateral the separate real property interests of the TIC Co-Owners.

13.    The only real estate interests in the TIC Properties identified in the DIP Loan Agreement as collateral are those owned by the TIC Debtors themselves.

14.    Section 4(a) of the DIP Loan Agreement provides as follows: "In addition, (i) all real property, leaseholds, rents and profits, and proceeds thereof, including without limitation Subject RTO Real Property and the Real Property DIP Collateral shall be deemed to be included as part of the DIP Collateral . . . ."  The agreement defines the term "Subject RTO Real Property" to mean "all real property <u>owned by the Debtors</u> specified on Schedule 7 to the Settlement Agreement."[13]  As a result, the defined term "Subject RTO Real Property" as used in the DIP Loan Agreement did not encompass the interests of TIC Co-Owners.   The agreement defines the term

---

[12]    *See* Main Case ECF No. 279, p. 74.
[13]    *See* Main Case ECF No. 279, p. 119 (emphasis added).

"Real Property DIP Collateral" to mean  "the Real Property described on Exhibit 8 attached hereto."[14] The agreement defines the term "Real Property" to mean "any estates or interests in real property now owned or hereafter acquired by a Debtor or any subsidiary of a Debtor and the improvements thereto.  As a result, the defined term "Real Property DIP Collateral" as used in the DIP Loan Agreement similarly did not encompass the interests of TIC Co-Owners.

15.    On a related note, there is no specific language in the DIP Loan Agreement or  the APA supporting the Debtors' position that the DIP Lender possesses credit-bidding rights with respect to the separate property interests of the TIC Co-Owners.[15]

16.    A close reading of the DIP Loan Agreement confirms that the TIC Debtors did not actually purport to grant liens to the DIP Lender against the separate real property interests of the TIC Co-Owners. As a result, the Court should reject the Debtors' characterization of the DIP Motion as affecting such separate ownership interests.

**B.  THE TIC DEBTORS SIMILARLY DID NOT EVEN PURPORT THROUGH THE APA TO SELL ASSETS OF THE TIC CO-OWNERS.**

17.    The Debtors similarly have not cited any specific language in the APA supporting their argument that they agreed to sell to the DIP Lender the separate property rights of the TIC Co-Owners.  No such language exists.

---

[14]    *See* Main Case ECF No. 279, p. 117.  Exhibit 8 was left blank.  *See id.* at p. 154.

[15]    *See* Main Case ECF No. 279, p. 99 (DIP Loan Agreement provisions identifying as event of default any motion by a Debtor disputing right of DIP Lender to "credit bid for any assets of the Debtors…") (emphasis added); *id.* at 164 (settlement agreement provision that DIP Lender will "be designated as the stalking horse bidder for the sale of substantially all of the Debtors' assets and will be permitted to acquire such assets in a credit bid . . . .") (emphasis added); Main Case ECF No. 172, p. 8 (Sale Motion provision that "Phonix has committed to credit bid for substantially all of the Debtors' assets not otherwise sold, as set forth in the attached APA (the "Purchased Assets"), with the exception of the Tyler TIC Property …") (emphasis added).

18.    The Debtors agreed in the APA to sell a broad array of <u>assets of the Debtors</u> and their bankruptcy estates.[16]  Nowhere does the APA identify as assets to be sold the separate real property interests of the TIC Co-Owners.

19.    The only real estate interests in the TIC Properties identified in the APA as being sold are those owned by the TIC Debtors themselves with respect to all but one of the TIC Properties.  The APA defines the term "Sellers"  to mean the Debtors.[17]  Section 1.01(b) of the APA provides for the sale of the following real estate interests: "<u>Sellers' rights, titles and interests as owners of the real property</u> identified on Schedule 1.01(b) and all improvements thereon and fixtures therein (collectively, the "Subject Real Property")."[18] The TIC Property located in Tyler, Texas, was excluded from the APA.[19]

20.    A close reading of the APA confirms that the TIC Debtors did not actually purport to sell to the DIP Lender the separate real property interests of the TIC Co-Owners.  As a result, the Court should reject the Debtors' characterization of the APA as affecting such separate ownership interests.

### C.  THE TIC DEBTORS LACKED AUTHORITY UNDER THE CIRCUMSTANCES TO HAVE LIENED AND SOLD ASSETS OF THE TIC CO-OWNERS FOR THE SOLE BENEFIT OF THE DEBTORS.

21.    The Debtors' campaign to deprive the TIC Co-Owners of their separate real property interests rests on their key assumption that such co-owners ceded to the TIC Debtors through the TIC Agreements complete control over their separate TIC interests.  That assumption is based on a misinterpretation of the TIC Agreements.

---

[16]    *See* Main Case ECF No. 172-1, p. 28.
[17]    *See* Main Case ECF No. 172-1, p. 26.
[18]    *See* Main Case ECF No. 172-1, p. 28 (emphasis added).
[19]    *See* Main Case ECF No. 172-1, p. 31.

7

22.     When determining the meaning of an instrument, established rules of contract construction include that (a) no single provision is to be given controlling effect because the meaning of an instrument must be determined based upon consideration of the instrument as a whole; and (b) an interpretation that harmonizes various provisions of the instrument must be favored over one that renders some provisions meaningless surplusage.[20]

23.     Several provisions of the TIC Agreements are critical to an accurate understanding of the respective rights and obligations of all co-owners.

24.     Each TIC Agreement involved the grant of an undivided ownership interest in real property by a TIC Debtor (referred to in the instrument as the "CPO") to one of the TIC Co-Owners (referred to in the instrument as the "IPO").

25.     Section 6 of each TIC Agreement reflects that each TIC Co-Owner is entitled to a share of the financial benefits of property ownership.  It provides as follows (emphasis added):

> **6.  <u>Distribution of Net Profits From</u>** Operation**, <u>Financing,</u>** Refinancing, Exchange, Lease **and <u>Sale of the Property.</u>**
> (a) **All income derived from the operation of the Property in whatever form and however derived (less reasonable working capital and capital repairs and replacement reserves), shall be divided and paid when received as follows:**
> (i) First, to each Tenant in an amount equal to such Tenant's Agreed Share of the Owner Costs, or, at CPO's option, to pay such Tenant's Agreed Share of such Owner Costs directly on its behalf,
> (ii) The IPO tenant shall receive the greater of (i) percentage interest of the net income of the Property as set forth in Exhibit 'A', or (ii) the annual pay rate paid on the originally invested amount set forth in Exhibit 'A' ("Originally Invested Amount") to be paid on a monthly basis,

---

[20]     *Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W.3d 296, 305 (Tex. 2015); *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133-34 (Tex. 1994*); Brooks, Tarlton, Gilbert, Douglas & Kressler v. United States Fire Ins. Co.*, 832 F.2d 1358, 1366 (5th Cir. 1987) ("As a general rule of contract construction, a contract should not be construed in a way which renders any of its terms meaningless.").

(iii) The IPO tenant shall also a receive a two percent (2%) annual accrual on the invested amount to be paid upon redemption of the IPO interest, and
(iv) Thereafter, the CPO tenant shall receive the remaining available balance of the cash flow and distributions from all other distributable sources.

(b) **In the event of the financing**, refinancing, exchange or lease of the Property, **or in the event of a sale under Section 10 herein**, **the Net Profits, if any, from the sale,** lease, **financing**, refinancing or exchange of the Property **shall be divided between the Tenants when received in the same manner set forth in Section 6(a)**. **The term "Net Profits" for the purpose of this paragraph shall mean the net proceeds from any financing**, refinancing, exchange or lease (less all reasonable and bona fide financing, exchange or leasing costs) **or the net sales price** of the Property (gross sales price less all reasonable and bona fide selling expenses) **less (i) the outstanding unpaid indebtedness of all notes secured by loans on the Property at the time of such sale**; (ii) the outstanding principal balance plus accrued but unpaid interest on any Tenant Loans, and (iii) **all other reasonable and bona fide expenses incurred by the Tenancy in connection with the ownership, maintenance, financing, refinancing, exchange, lease or the sale of the Property, including any unpaid Owner Costs**. **Each Tenant shall receive its share of the Net Profits under this Section 6(b) in the form of any** promissory note(s) or **cash received from the** leasing, **financing**, refinancing, exchange **or sale.**

26.     Thus, each TIC Co-Owner has under Section 6(a) a right to a share of all income generated by its TIC Property and a right under Section 6(b) to a share of all secured loan proceeds and sale proceeds.

27.     With respect to any sale, Section 6(b) provides for proceeds to be applied in the following order: (a) reasonable and bona fide sale expenses; (b) satisfaction of all pre-existing real estate mortgages; (c) satisfaction of all other property expenses; and (d) distributions of excess sale proceeds to all owners in the proportions established by Section 6(a).

28.     Section 6(b) provides for funds generated by any secured financing similarly be applied.  Section 6(b) protects TIC Co-Owners in the event of a property financing transaction by ensuring that they benefit through satisfaction of all prior mortgage liens encumbering their property interests, satisfaction of all outstanding property expenses for which they might otherwise

bear some responsibility under the TIC Agreement, and distribution to them of a share of excess

loan proceeds to the extent not otherwise used or preserved for the benefit of the property.

29.     Section 8 of the TIC Agreement also protects TIC Co-Owners against dissipation

of funds generated as a result of the TIC Property transactions including financing.  It provides as

follows (emphasis added):

> **Bank Accounts**. **All funds of the Tenancy shall be deposited by CPO in a bank
> or brokerage account or accounts in the name of the Tenancy** and funds from
> said bank account or accounts shall be disbursed upon the signature of CPO in the
> ordinary course of business, and in accordance with the provisions of this
> Agreement, unless all Tenants direct otherwise. **Tenancy funds shall be used only
> for Tenancy purposes.**

30.     Moreover, each TIC Agreement limits the authority of all co-owners with respect

to the transfer and encumbrance of ownership interests.  It provides the following the general rule

in Section 1:  "Except as expressly provided herein, no Tenant shall sell, assign, hypothecate or

otherwise dispose of or encumber its interest or any part thereof in the Property without the prior

written consent of the other Tenants."

31.     Section 12 affords the co-owners various option rights with respect to the purchase

and sale of ownership interests.

32.     Real estate rights of all owners are further addressed in Section 10, which provides

in part as follows (emphasis added):

> **10.  Transfer of Tenant's Interest and Sale of Property.**
> (a) **No Tenant may sell**, transfer, convey, **encumber** or otherwise hypothecate **the
> Property or its undivided interest in the Property without the written consent
> of the other Tenants, except as provided in Section 10(c) herein** and Section 11
> herein.
> (b) **Any permitted transfer of a Tenant's Ownership Interest in the Property
> shall be  subject to such transferee's written agreement to be bound by all of
> the terms and conditions of this Agreement; any transfer without such written
> assumption agreement shall be null and void.**

10

(c) CPO may, at any time, sell, finance, exchange or otherwise transfer or encumber all of the Property (including the other Ownership Interests) on such terms and conditions as CPO may, in CPO's sole discretion, determine, **so long as such transaction is a bona fide transaction and all of the terms and conditions of such transaction are fully disclosed to all Tenants at the time such transaction is entered into**. If requested by CPO, all Tenants shall join in the conveyance of the Property and/or execute all documents necessary or desirable to close such transaction.

33.    The Debtors appear to argue that Section 10(c) in isolation has authorized the TIC Debtors fully to encumber the TIC Properties, including the undivided ownership interests of the TIC Co-Owners, and to divert all of the net loan proceeds for the sole benefit of the TIC Debtors and their insiders and affiliates. Such an interpretation is unreasonable for several independent reasons.

34.    The Debtors' argument glosses over the express condition that a TIC Debtor encumber the property only in connection with a "bona fide transaction."

35.    When viewed in the context of the TIC Agreement as a whole in a manner that gives meaning to all of its provisions, a bona fide financing transaction can only reasonably interpreted to mean to one that generates loan proceeds to and for the benefit of the tenancy in common itself that must be used in the manner described in Section 6 (e.g., first to pay reasonable and bona fide financing expenses, satisfy the existing mortgage loans, satisfy other property expenses, and maintain in a tenancy account reasonable working capital and capital repairs and replacement reserves) before any excess loan proceeds are distributed to all of the owners in the proportions described in Section 6(a).[21]    Under Section 10(c), the TIC Debtors retain discretion regarding

---

[21]    *See Kimbell v. United States*, 371 F.3d 257, 263 (5th Cir. 2004) ("Black's Law Dictionary defines a "bona fide sale" as "A completed transaction in which seller makes sale in good faith, for a valuable consideration without notice of any reason against the sale." BLACK'S LAW DICTIONARY 161 (5th ed. 1979). "Bona fide" is defined as "in or with good faith; honestly,

ordinary loan terms and conditions for the benefit of the tenancy including the principal loan amount, interest rate, and repayment terms.

36.     Section 10(c) cannot reasonably be interpreted to vest the TIC Debtors with authority to disregard the rights and protections afforded TIC Co-Owners by other provisions of the TIC Agreement such as Sections 6 and 8 and thereby render such provisions meaningless.

37.     The Debtors' argument also glosses over the express condition that a TIC Debtor only enter into bona fide  transaction after fully disclosing to co-owners all terms and conditions. To the extent that the DIP Agreement or APA purport to adversely affect TIC Co-Owner interests (which they deny), the TIC Debtors were required to provide notice of such agreements before executing such documents, regardless of whether such agreement was conditioned upon court approval.[22]  Their argument fails for this reason as well.

**D.  THE TIC DEBTORS ALSO LACKED AUTHORITY UNDER THE CIRCUMSTANCES TO HAVE LIENED AND SOLD THEIR OWN PARTIAL INTERESTS IN THE TIC PROPERTIES.**

38.     The TIC Co-Owners also object to the Motions to the extent they seek to lien, transfer, or otherwise adversary affect the TIC Property rights of the TIC Debtors themselves.

39.     Section 10(b) of each TIC Agreement renders null and void any attempt by a TIC Debtor to transfer property rights to a transferee who does not agree in writing to be bound by all terms and conditions of the TIC Agreement.  In this case, the TIC Debtors are attempting to grant liens, arrange related credit-bidding rights, and make sales with respect their TIC property interests

---

openly, and sincerely; without deceit or fraud" and "Real, actual, genuine, and not feigned." *Id.* at 160.").

[22]     *Compare Utah Reverse Exch., LLC v. Donado*, No. 14-0408-WS-B, 2016 U.S. Dist. LEXIS 17349, at *4 (S.D. Ala. 2016) ("a debtor-in-possession (or trustee) can enter an agreement with a creditor in settlement or compromise of a claim; the agreement thereupon exists, subject only to the condition subsequent of judicial approval.").

12

based on credit-bidding rights to the DIP Lender without first obtaining the required written commitment by the DIP Lender to be bound by all of the terms and conditions of each TIC Agreements.  As a result, the DIP Loan Agreement and APA are null and avoid with respect to transactions affecting the TIC interests of the TIC Debtors themselves.

40.     Furthermore, the Debtors could only be authorized under Section 10(c) of the TIC Agreements to encumber or transfer their own ownership interests through a bona fide transaction after providing full disclosure to the TIC Co-Owners.  The Debtors failed to satisfy these conditions with respect to the TIC Debtors' property interests as well.

41.     For the foregoing reasons, the Motions should be denied with respect to all relief sought with respect to the real estate interests in the TIC Properties of the TIC Debtors as well as the TIC Co-Owners.

### E.  THE DEBTORS ARE VIOLATING THE RIGHTS OF CO-OWNERS UNDER 11 U.S.C. SECTIONS 363(i) & (j).

42.     Assuming for the sake of argument only that the Debtors actually agreed to grant liens and transfer title both to debtor and non-debtor ownership interests in the TIC Properties and that they had the authority under the TIC Agreements to do so under the circumstances presented, the Debtors are seeking to deprive the TIC Co-Owners of protections to which they are entitled under the Bankruptcy Code.

43.     The Debtors claim a statutory right to sell the property interests of the non-debtor TIC Co-Owners under Bankruptcy Code Section 363(h).  Any right of a debtor-in-possession to sell co-owned property under that subsection is subject to protections afforded to co-owners by Sections 363(i) & (j).

44.     Section 363(i) provides in relevant part as follows:

> (i) Before the consummation of a sale of property to which subsection (g) or (h) of this section applies . . . the . . . co-owner of such property . . . may purchase such property at the price at which such sale is to be consummated."

45.    With respect to Section 363(i), "the legislative history reflects that Congress intended to provide a means for obtaining the maximum benefit possible for the debtor's estate while also providing protection for co-owners by way of right of first refusal."[23]  This protection is stronger than a mere right to participate in a competitive auction sale.  It is not triggered until some period of time after the conclusion of the bidding by third parties.  In the case of *In re Alisa P'ship*, 14 B.R. 54, 55 (Bankr. D. Del. 1981), the court recognized the absence of a specific statutory deadline for a co-owner to exercise a Section 363(i) election before closing, but recognized the reasonableness of setting a case-appropriate deadline between completion of the auction sale and the scheduled closing.[24]

46.    In the case of *In re Fehl*, 19 B.R. 310, 312 (Bankr. N.D. Cal. 1982), the court criticized a trustee's sale notice as inadequate "because it did not delineate to potential buyers the cotenant's rights under Bankruptcy Code section 363(i); nor did it make any provisions for the manner or the time within which such right could be exercised."

47.    In this case, the Debtors could have asked this Court as part of the Sale Motion to impose and provide notice to TIC Co-Owners of a specific deadline after the conclusion of the auction by which Section 363(i) rights must be elected.  They failed to do so.[25]

---

[23]    *See In re Alisa P'ship*, 15 B.R. 802, 803 (Bankr. D. Del. 1981); *see also In re Reese*, No. 06-50133-RLJ-11, 2006 Bankr. LEXIS 1280, at *13 (Bankr. N.D. Tex. 2006) (also characterizing Section 363(i) as affording a right of first refusal).

[24]    *See also In re Alisa P'ship*, 15 B.R. 802, 803 (Bankr. D. Del. 1981) (later related order establishing default 10-day co-owner election deadline).

[25]    *See In re Alisa P'ship*, 15 B.R. at 803 (imposing deadline for exercise of Section 363(i) election as 10 days after final sale terms with third party are established).

48.     Moreover, the Debtors have deprived TIC Co-Owners of any meaningful opportunity to consider and exercise any Section 363(i) elections with respect to individual TIC Properties. They have done so by failing to disclose to the TIC Co-Owners the specific proposed sale price for each property, whether by credit bid allocation or otherwise. Without knowing the sale price of a specific property, no true right of first refusal can exist.

49.     The Debtors are also seeking to deprive the TIC Owners to their right to receive portions of net sale proceeds under Bankruptcy Code Section 363(j). That statute provides in relevant part as follows:

> (j) After a sale of property to which subsection (g) or (h) of this section applies, the trustee shall distribute to the . . . the co-owners of such property, as the case may be, and to the estate, the proceeds of such sale, less the costs and expenses, not including any compensation of the trustee, of such sale, according to the interests of such . . . co-owners, and of the estate.

50.     The Debtors argue that they have a right to sell the separate real estate interests of the TIC Co-Owners without providing any compensation to the TIC Co-Owners. Such an argument is inconsistent with the protections afforded by Bankruptcy Code Section 363(j).

51.     The Debtors' argument is premised on their assumption that they have already succeeded in completely devaluing the non-debtor property interests through the DIP Financing Agreement. As previously explained, though, they did not actually purport to lien those non-debtor interests through such agreement and could not have done so anyway. The Debtors should not be permitted to accomplish indirectly what Section 363(j) prohibits (*i.e.,* depriving the TIC Co-Owners of their rights to sale proceeds available after payment of costs/expenses and satisfaction of the secured claims of pre-petition lender SouthState Bank).

52.     The relief sought by the Debtors through the Motions relating to the TIC Properties should be denied for these reasons as well.

## F. EACH TIC DEBTOR HAS FAILED TO DEMONSTRATE ANY BENEFIT TO ITS SPECIFIC BANKRUPTCY ESTATE OF THE RUSHED PROPOSED TIC PROPERTY TRANSACTIONS.

53.    Because these cases have not been substantively consolidated, the propriety of each proposed financing and sale transaction by a particular TIC Debtor must be assessed based solely on the financial situation of that specific TIC Debtor.

54.    Each TIC Debtor filed bankruptcy schedules revealing that it is a single-purpose real estate holding company without any non-insider debt other than the secured claim of pre-petition mortgage lender SouthState Bank. The existence of significant equity in the TIC Properties is underscored by the zeal exhibited by the DIP Lender in pursuing their immediate full ownership.

55.    Below is a summary of financial information reflected in the bankruptcy schedules of each TIC Debtor other than the owner of the Tyler, TX, property that is not part of the APA:

a.    Debtor SAM Plainview LLC disclosed that (a) its only asset was a 56.06% ownership interest in real property located at 414 N. Columbia St., Plainview, TX with an undetermined value; (b) its only debt was a secured debt to SouthState Bank in the amount of $531,396.00; and (c) its only executory contract was an insurance policy.

b.    Debtor MacDonald Capital Corporation disclosed that (a) its only assets were a 76.51% ownership interest in real property located at 218 N. Main Street, Seminole, OK, with an undetermined value, membership interests in several other debtors with undetermined values, and cash of $450.33; (b) its only debt was a secured debt to SouthState Bank in the amount of $324,970; and (c) its only executory contracts were a lease with another TIC Debtor (Buddy Mac Six RE, LLC) and an insurance policy.

c.    Debtor Buddy Mac Six RE, LLC disclosed that (a) its only asset was a 73.19% ownership interest in real property located at 1100 N. Hwy. 491, Gallup, NM, with an

16

undetermined value; (b) its only debt was a secured debt to SouthState Bank in the amount of $422,131.00; and (c) its only executory contract was an insurance policy.

d.  Debtor SAM Brownfield LLC disclosed that (a) its only asset was a 74.65% ownership interest in real property located at 501 W. Main Street, Brownsfield, TX, with an undetermined value; (b) its only debt was a secured debt to SouthState Bank in the amount of $271,820.00; and (c) its only executory contract was an insurance policy.

56.    The Debtors have not identified any substantial benefit that the bankruptcy estate of each separate TIC Debtor will enjoy as a result of approval of the DIP Loan Agreement and the APA with respect to the TIC Properties.  Rather, it appears that the Debtors and the DIP Lender orchestrated the bankruptcy and proposed liquidations of TIC Debtors for the sole or at least primary benefit of separate Debtors.

57.    The Debtors similarly have not identified any justification for their proposed fire-sale of the TIC Properties. They have not explained their failure to seek to employ a broker to market each TIC Property for a reasonable period of time in order to maximize value for the benefit the pre-petition secured creditor of the TIC Debtors (i.e., SouthState Bank), the holders of any bona fide unsecured claims against TIC Debtors (recognizing that only TIC Debtor scheduled an unsecured debt, and it was to an affiliate), and the TIC Co-Owners and the TIC Debtors themselves.

58.    The Debtors cannot establish that the bankruptcy estates of the TIC Debtors (which should be the only bankruptcy estates considered) will be better off if the TIC Properties are fully liened and sold on the terms they propose. The Court should reject all relief sought by the Debtors through the Motions with respect to the TIC Properties for these reasons as well.

17

## CONCLUSION

The Debtors are engaging in a creative reimaging of the actual contents of the DIP Agreement and APA. In neither document did the Debtors actually agree to lien, recognize credit-bidding rights regarding, or sell non-debtor ownership interests in the TIC Properties. Moreover, they would have lacked the authority under the circumstances to have done so. They even lacked the authority under the circumstances to engage in such conduct relative to the ownership interests of the TIC Debtors. The Debtors are effectively seeking to devalue and eliminate assets of non-debtors that had value when these bankruptcy cases were filed. For these and other reasons forth herein, relief sought by the Debtors with respect to the TIC Properties should be denied.

WHEREFORE, the TIC Co-Owners respectfully request that the Court:

A.   deny the DIP Motion and the Sale Motion to the extent that they seek any relief relating to the TIC Properties, including not limited to the Debtors' requests to grant liens and to convey title to the DIP Lender with respect to the real property interests of TIC Co-Owners as well as the TIC Debtors in the TIC Properties; and

B.   grant such other and further relief as might be deemed just, equitable, and proper.

Dated: February 24, 2026                           Respectfully submitted,

                                                   **BARRON & NEWBURGER, P.C.**
                                                   7320 N. MoPac Expwy., Suite 400
                                                   Austin, Texas 78731
                                                   Telephone: (512) 476-9103
                                                   Facsimile: (512) 476-9253

                                                   By:     */s/ David N. Stern*
                                                           Stephen W. Sather
                                                           State Bar No. 17657520
                                                           ssather@bn-lawyers.com
                                                           David Neal Stern
                                                           State Bar No. 24103634
                                                           dstern@bn-lawyers.com
                                                   ***Counsel for TIC Co-Owners***

## CERTIFICATE OF SERVICE

I certify that, on February 24, 2026, I will cause a copy of the foregoing to be filed with the Court's CM/ECF noticing system and thereby automatically uploaded to all parties registered to receive notice, and also to be served upon the following by electronic mail to the parties identified below at the listed email addresses:

| | |
|---|---|
| William Hotze<br>Nicholas Zugaro<br>Dominique A. Douglas<br>DYKEMA GOSSETT PLLC<br>5 Houston Center<br>1401 McKinney Street, Suite 1625<br>Houston, Texas 77010<br>whotze@dykema.com<br>nzugaro@dykema.com<br>ddouglas@dykema.com<br><br>Jeffrey R. Fine<br>DYKEMA GOSSETT PLLC<br>1717 Main Street, Suite 4200<br>Dallas, TX 75201<br>jfine@dykema.com<br><br>*Proposed Counsel to the Official Committee of Unsecured Creditors* | John J. Kane<br>Kyle Woodard<br>JaKayla J. DaBera<br>Joseph M. Coleman<br>KANE RUSSELL COLEMAN LOGAN PC<br>901 Main Street, Suite 5200<br>Dallas, TX 75202<br>jkane@krcl.com<br>kwoodard@krcl.com<br>jdabera@krcl.com<br>jcoleman@krcl.com<br><br>Mark C. Taylor<br>Casey Roy<br>KANE RUSSELL COLEMAN LOGAN PC<br>401 Congress Ave., Suite 2100<br>Austin, TX 78701<br>mtaylor@krcl.com<br>croy@krcl.com<br><br>*Counsel to the Debtors* |
| Meredyth A. Kippes<br>Erin Schmidt<br>OFFICE OF THE UNITED STATES TRUSTEE<br>1100 Commerce Street, Room 976<br>Dallas, TX 75242<br>meredyth.kippes@usdoj.gov<br>erin.schmidt2@usdoj.gov | Worthy Walker<br>Leah N. Duncan<br>SHACKELFORD, MCKINLEY & NORTON, LLP<br>9201 N. Central Expressway, Fourth Floor<br>Dallas, Texas 75231<br>mikemckinley@shackelford.law<br>wwalker@shackelford.law<br>lduncan@shackelford.law<br><br>*Counsel to SouthState Bank* |

*/s/ David N. Stern*
David Neal Stern

19

Case 25-34839-mvl11 Doc 357-12 Filed 02/25/26 Entered 02/25/26 14:14:10 Desc
PHONIX EX 12 Page 20 of 31

Case 25-34839-mvl11 Doc 389-1 Filed 02/28/26 Entered 02/28/26 23:02:07 Desc
Exhibit A - Sample Tenancies in Common Agreement Page 1 of 12

## AGREEMENT AMONG TENANTS IN COMMON
### Plainview, TX

**THIS AGREEMENT AMONG TENANTS IN COMMON** ("Agreement") is made and entered into initially by and between SAM Plainview, LLC (a Texas Limited Liability Company) and Current Property Owner ("CPO") and **RONALD H. BERG**, an unmarried man in Irvine, California as the Incoming Property Owner ("IPO"), being sometimes referred to singularly as "Tenant" or collectively as the "Tenants".

### RECITALS

A.      It is the desire of the Tenants to hold, operate, maintain, finance, keep in repair, lease and/or sell or exchange, as tenants in common, that certain real property together with all improvements located therein, commonly known Buddy's which is more fully described on Exhibit "A" attached hereto and by this reference incorporated herein (the "Property").

B.      It is the desire of IPO to acquire an undivided interest in the Property from CPO as is more fully described In Exhibit 'A'.

NOW, THEREFORE, in consideration of the foregoing Recitals and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Tenants to hereby agree as follows:

1.      Formation of Tenancy.  The Tenants hereby acknowledge their ownership to be a tenancy in common (the "Tenancy") and this Agreement shall govern the ownership and management of the Property. The principal purpose of the Tenancy shall be to hold and maintain the Property as tenants in common for investment purposes.  The address of each Tenant for notice and all other purposes of this Agreement is set forth on the signature page hereof. Except as expressly provided herein, no Tenant shall sell, assign, hypothecate or otherwise dispose of or encumber its interest or any part thereof in the Property without the prior written consent of the other Tenants.

2.      Term.  The Tenancy as governed hereby shall commence on the execution of this Agreement, and shall continue thereafter until dissolved or terminated pursuant to Sections 17 hereof.

3.      Title to the Property.  Contemporaneously with the execution hereof, IPO has acquired an undivided interest in the Property as set forth in Exhibit 'A', the ("IPO Interest"), and CPO retains an interest in the Property as is more fully described in Exhibit 'A' (the "CPO Ownership Interest"). The CPO Ownership Interest and the IPO Ownership Interest are hereinafter sometimes referred to as the "Ownership Interests" or an "Ownership Interest." Each Tenant agrees to be bound by the terms and conditions of this Agreement.

4.      Ownership Rights of Tenants.  Notwithstanding any statute or other rule of law and having previously been advised of their respective rights to bring an action for partition, the Tenants

**AGREEMENT AMONG TENANTS IN COMMON**                              **Page 1**

EXHIBIT

Case 25-34839-mvl11    Doc 357-12    Filed 02/25/26    Entered 02/25/26 14:14:10    Desc
PHONIX EX 12    Page 21 of 31

Case 25-34839-mvl11    Doc 389-1    Filed 02/28/26    Entered 02/28/26 23:02:09    Desc
Exhibit A - Sample Tenancin Common Agreement    Page 2 of 12

agree that during the term hereof the Tenants shall only have those rights in the Property as expressly provided herein and each Tenant hereby irrevocably waives any and all rights that it has (i) to occupy the Property or any portion thereof, or to exclude any other Tenant from the Property or any portion thereof, and (ii) to maintain any action for any partition of the Property, or otherwise force a sale of the Property during the term hereof, all except as expressly provided herein.

5.    Tenant Payment Obligations.

(a)    Each Tenant agrees to pay its Agreed Share (such Agreed Share determined as provided, below) of all costs and expenses involved in owning, operating, maintaining, leasing, selling or exchanging the Property, including, but not limited to, ad valorem taxes, insurance premiums, repairs, necessary improvements, contractual fees, professional fees, lease commissions and utility costs, debt service and other financing-related costs, and capital repairs and replacements and other capital expenditures at the Property (collectively, "Owner Costs"). To the extent that the income from the Property is insufficient to pay all Owner Costs in the ordinary course of business, each Tenant's Agreed Share of such Owner Costs shall be paid by each Tenant, upon demand, prior to the due date of all such costs and expenses and no later than ten (10) days prior to the date when such costs and expenses are due.

For purposes of this Agreement, the Agreed Share of each Tenant shall be equal to his respective Ownership Interest in the Property. CPO, which shall be the Tenant managing the Tenancy, shall maintain a banking account or accounts at financial institutions on behalf of the Tenants and shall maintain reasonable reserves for future costs and expenses of the Property.

(b)    If any Tenant fails promptly to contribute such Tenant's share of the Owner Costs ("Defaulting Tenant"), the other Tenants may pay the entire amount' of such Owner Costs and the amount not paid by the Defaulting Tenant shall be deemed a loan to the Defaulting Tenant (the "Tenant Loan" or "Tenant Loans"). All Tenant Loans shall be payable on demand, shall bear interest at the rate of eighteen percent (18%) per annum, and shall constitute a lien on the interest of the Defaulting Tenant in the Property, which lien shall be expressly subject and subordinate to any existing or future lien of any third party lender with a lien on the Property. Each Defaulting Tenant authorizes each other Tenant making a Tenant Loan to execute and record such documents as such Tenant deems necessary to further or better evidence such loan and lien.

In the event a Tenant makes a loan or loans to the Defaulting Tenant ("Loaning Tenant") and any Tenant Loan remains unpaid for a thirty (30) day period after written notice is given to the Defaulting Tenant requesting payment, the Loaning Tenant may bring suit against the Defaulting Tenant for the amount of the Tenant Loans not paid plus all reasonable collection costs. All income from the sale and operation of the Property shall be paid to the Loaning Tenant until all Tenant Loans are paid in full.

**AGREEMENT AMONG TENANTS IN COMMON**                                    **Page 2**

6. <u>Distribution of Net Profits From Operation, Financing, Refinancing, Exchange, Lease and Sale of the Property.</u>

(a)     All income derived from the operation of the Property in whatever form and however derived (less reasonable working capital and capital repairs and replacement reserves), shall be divided and paid when received as follows:

(i)     First, to each Tenant in an amount equal to such Tenant's Agreed Share of the Owner Costs, or, at CPO's option, to pay such Tenant's Agreed Share of such Owner Costs directly on its behalf,

(ii)     The IPO tenant shall receive the greater of (i) percentage interest of the net income of the Property as set forth in Exhibit 'A', or (ii) the annual pay rate paid on the originally invested amount set forth in Exhibit 'A' ("Originally Invested Amount") to be paid on a monthly basis,

(iii)     The IPO tenant shall also a receive a two percent (2%) annual accrual on the invested amount to be paid upon redemption of the IPO interest, and

(iv)     Thereafter, the CPO tenant shall receive the remaining available balance of the cash flow and distributions from all other distributable sources.

(b)     In the event of the financing, refinancing, exchange or lease of the Property, or in the event of a sale under Section 10 herein, the Net Profits, if any, from the sale, lease, financing, refinancing or exchange of the Property shall be divided between the Tenants when received in the same manner set forth in Section 6(a). The term "Net Profits" for the purpose of this paragraph shall mean the net proceeds from any financing, refinancing, exchange or lease (less all reasonable and bona fide financing, exchange or leasing costs) or the net sales price of the Property (gross sales price less all reasonable and bona fide selling expenses) less; (i) the outstanding unpaid indebtedness of all notes secured by loans on the Property at the time of such sale; (ii) the outstanding principal balance plus accrued but unpaid interest on any Tenant Loans, and (iii) all other reasonable and bona fide expenses incurred by the Tenancy in connection with the ownership, maintenance, financing, refinancing, exchange, lease or the sale of the Property, including any unpaid Owner Costs. Each Tenant shall receive its share of the Net Profits under this Section 6(b) in the form of any promissory note(s) or cash received from the leasing, financing, refinancing, exchange or sale.

7. <u>Books and Records.</u>  Proper and complete books of account of the Tenancy shall be kept by CPO (<u>i.e.</u>, the Tenant managing the Tenancy) as an expense of the Tenancy and shall be open to inspection and copying by any Tenant or representatives of each Tenant at any reasonable time. The books and records of account shall be examined and reviewed as of the close of each calendar year by an accountant selected by CPO, and such accountant shall prepare an annual report thereof, copies of which will be furnished to each Tenant as soon, as possible after the conclusion of each calendar year. Each Tenant shall have the right to make a separate audit of the books and records of the Tenancy at such Tenant's own expense at any time and from time to time.

**AGREEMENT AMONG TENANTS IN COMMON**                                    **Page 3**

8.      Bank Accounts.  All funds of the Tenancy shall be deposited by CPO in a bank or brokerage account or accounts in the name of the Tenancy and funds from said bank account or accounts shall be disbursed upon the signature of CPO in the ordinary course of business, and in accordance with the provisions of this Agreement, unless all Tenants direct otherwise.  Tenancy funds shall be used only for Tenancy purposes.

9.      Dissolution of a Tenant.  The dissolution of any Tenant shall not have the affect of terminating or dissolving the Tenancy.  Upon the dissolution of a Tenant, the shareholders, partners, members or other equity owners thereof shall succeed to its interest in this Tenancy and shall be bound by the terms and provisions of this Agreement; however, in the event that the interest of the dissolved Tenant passes to more than one person, then, and in that event, such persons shall, within ninety (90) days after dissolution of the Tenant, execute and deliver to the other Tenants a written instrument (including Power of Attorney) appointing one person as and to be the Agent for collecting, receiving and making all payments and contributions required hereunder, shall vote the entire interest of the successors, and shall perform all other obligations of such successors performable by reason of or arising from their interest in the Tenancy; and, any and all payments and/or disbursements due arising from the successors interest in the Tenancy shall be deemed to have been validly made to such successors by paying the same to such duly designated Agent.  In the event that said successors for any reason fail to designate such Agent in writing in the manner and within the time prescribed and continue to fail to cure such default after ten (10) days written notice from another Tenant to correct same, such other Tenant shall have the right to appoint such Agent.

10.     Transfer of Tenant's Interest and Sale of Property.

(a)      No Tenant may sell, transfer, convey, encumber or otherwise hypothecate the Property or its undivided interest in the Property without the written consent of the other Tenants, except as provided in Section 10(c) herein and Section 11 herein.

(b)      Any permitted transfer of a Tenant's Ownership Interest in the Property shall be subject to such transferee's written agreement to be bound by all of the terms and conditions of this Agreement; any transfer without such written assumption agreement shall be null and void.

(c)      CPO may, at any time, sell, finance, exchange or otherwise transfer or encumber all of the Property (including the other Ownership Interests) on such terms and conditions as CPO may, in CPO's sole discretion, determine, so long as such transaction is a bona fide transaction and all of the terms and conditions of such transaction are fully disclosed to all Tenants at the time such transaction is entered into.  If requested by CPO, all Tenants shall join in the conveyance of the Property and/or execute all documents necessary or desirable to close such transaction.

(d)      If the signature of a Tenant is required by a third party in connection with the transactions contemplated by Section 10(c), such Tenant agrees to execute and deliver such documents as such third party deems necessary or desirable to accomplish all of the foregoing.  If such Tenant fails to execute and deliver any such documents within ten (10) days following written notice from CPO, CPO is hereby authorized, and each Tenant grants to CPO an irrevocable power of attorney,

**AGREEMENT AMONG TENANTS IN COMMON**                                    **Page 4**

coupled with an interest, to execute and deliver any such documents by, in the name of and on behalf of such Tenant, which documents shall be binding upon such Tenant to the same extent as if such Tenant had personally executed and delivered the same.

(e)     A Tenant may not, without the prior written consent of CPO, which consent may be granted or withheld in the sole and absolute discretion of CPO, sell, transfer, convey, encumber or otherwise hypothecate all or any portion of the Property (including its Ownership Interest).

(f)     IPO Put Option ("Put Option") is available to IPO annually commencing on fifth anniversary of the agreement and extending to the full term of the Term of the Agreement.
Put Option value to be determined based on the greater of the

(i)     the (a) amount of the original purchased interest (as set forth in Exhibit 'A'), plus (b) a two percent (2%) per year accrual on the amount of the original purchased interest, or

(ii)    the amount of the original purchased interest (as set forth in Exhibit 'A'), plus the net increase above the current agreed upon market Property value set forth in Exhibit 'A' times the IPO percentage ownership interest set forth in Exhibit 'A'; (unless otherwise agreed, to be appraised by an independent third party appraiser within 6 months of the Owner Put Option being exercised);

(iii)   however in no event will the IPO Put Option be less than the redemption of original purchased interest plus the two percent (2%) annual accrual during the outstanding period of the interest held by IPO.

(g)     CPO Call Option ("Call Option") is available to CPO annually commencing on the third annual anniversary of the agreement and extending to the full term of the Agreement.
Call Option value to be determined based on the greater of the

(i)     (a) amount of the original purchased interest(as set forth in Exhibit 'A'), plus (b) a two percent (2%) per year accrual of the original purchased interest, or

(ii)    the amount of the original purchased interest (as set forth in Exhibit 'A'), plus net increase above the current agreed upon market Property value as set forth in Exhibit 'A' times the IPO percentage ownership interest set forth in Exhibit 'A'; (unless otherwise agreed, to be appraised by an independent third party appraiser within 6 months of the Owner Put Option being exercised);

(iii)   however in no event will the CPO Call Option be less than the redemption of original purchased interest plus the two percent (2%) annual accrual during the outstanding period of the interest held by IPO.

**AGREEMENT AMONG TENANTS IN COMMON**                                      **Page 5**

11. <u>Management, Financing, and Leasing</u>. It is the objective of the Tenants to maximize the market value of the Property by operating, leasing, financing, and/or sale of the Property.

(a)   The Tenants irrevocably authorize CPO, or any management company or management agent appointed by CPO, (i) to operate, manage and lease all or any portion of the Property upon such terms and conditions as CPO may determine necessary or advisable in its absolute and sole discretion; (ii) to pay from any revenues derived from operation of the Property, on or before the date due, all installments of principal and/or interest on all debts secured by a lien on the Property, (iii) to execute any and all documents necessary to manage and lease all or any portion of the Property as permitted herein, without the necessity of any other Tenant joining in the execution thereof including without limitation the sale, refinance merger or other material event.

(b)   If the signature of a Tenant is required by a third party, each Tenant agrees to execute and deliver such documents as such third party deems necessary or desirable to accomplish all of the foregoing and such management or lease of the Property. If a Tenant fails to execute and deliver any such documents within ten (10) days following written notice from CPO, CPO is hereby authorized, and each Tenant grants to CPO an irrevocable power of attorney, coupled with an interest, to execute and deliver any such documents by, in the name of and on behalf of such Tenant, which documents shall be binding upon such Tenant to the same extent as if such Tenant had personally executed and delivered the same.

(c)   If third party management is not obtained for the Property by CPO, in its sole and absolute discretion, CPO may appoint itself or any affiliate as manager of the Tenancy and the Property. For such services, CPO shall receive a management fee equal to eight percent (8%) of the gross revenues from the Property plus reasonable out of pocket costs, payable monthly following payment of debt service and all other Owner Costs then due.

(d)   Notwithstanding anything contained in this Section 11 to the contrary:

(i)   CPO may exercise the rights provided to CPO in Section 10(c) of this Agreement, without the written approval of any other Tenant, notwithstanding any statute or other law to the contrary.

(ii)   Any note, deed of trust, or loan documents executed in connection with a financing or refinancing of all or any portion of the Property shall not personally obligate a Tenant for the repayment of the principal or interest thereof without the written consent of such Tenant.

(iii)   No litigation shall be brought by or on behalf of a Tenant against a third party involving the Property without the written consent of CPO.

(iv)   By unanimous vote of the Tenants, CPO may be removed as manager of the Tenancy or the Property only upon a judicial determination, in a final, unappealable

**AGREEMENT AMONG TENANTS IN COMMON**                    **Page 6**

judgment of a court of appropriate jurisdiction, of fraud or gross negligence on the part of CPO in connection with the management and operation of the Property.

12.  Conditional Option to Purchase at Selling Tenant's Adjusted Basis.

(a)   Option to Purchase at Selling Tenant's Adjusted Basis. In the event that (i) any Tenant shall pledge, hypothecate or use as security for any loan or obligation, his interest in the Property or any portion thereof, and a default shall occur with respect to such loan or obligation resulting in the interest of such Tenant (or a portion thereof) being subject to levy or sale; or (ii) any Tenant shall make an assignment for the benefit of creditors or similar arrangement, or any proceeding shall be commenced by or against any Tenant under any bankruptcy, reorganization or other similar laws for the relief of debtors, or the property of a Tenant becomes subject to seizure or sale by reason of a judgment having been taken against him or it, or (iii) any Tenant shall fail to remove any lien or security interest on all or any portion of his interest in the Property within ten (10) days following written notice from any other Tenant, so that a third party lender may obtain a first lien on the Property with priority over such lien or security interest in connection with any financing or re-financing of the Property; then, in any of such events, the Ownership Interest of such Tenant (herein the "Selling Tenant") shall automatically be offered for sale to each other Tenant (herein the "Purchasing Tenant") in accordance with (b) and (c) below, upon notice of such event to each Tenant.

(b)   Option Exercise Procedures. In the event that the Ownership Interest of a Tenant shall be offered for sale to the other Tenants pursuant to section (a) above, then the Purchasing Tenant(s) shall have the option, exercisable within ninety (90) days of receipt of notice thereof from the Selling Tenant, to purchase the complete Ownership Interest of the Selling Tenant, which purchase shall be, if more than one Purchasing Tenant exercises such option, pro rata in accordance with their respective Ownership Interests in the Property.

(c)   Purchase Price. The purchase price for the interest of a Tenant to be sold pursuant to (a) shall be said Tenant's adjusted basis in the property after taking into consideration that Tenant's historical cost, return of capital, if any, with appropriate adjustments and allocations for all items of income or, expense accruing prior to the closing date. All closing costs associated with such sale shall be borne by the Selling Tenant. The purchase price shall be paid 100% in cash at closing, which is to occur within ninety (90) days of the Purchasing Tenant's receipt of notice from the Selling Tenant.

13.   NEGATION OF PARTNERSHIP; LIABILITY SEVERAL. NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR CONSTRUED TO CREATE A PARTNERSHIP, JOINT VENTURE OR ASSOCIATION AMONG ANY OF THE PARTIES HERETO. THE LIABILITY OF THE TENANTS UNDER THIS AGREEMENT SHALL BE SEVERAL, NOT JOINT AND SEVERAL, LIMITED AS TO EACH, TO ITS RESPECTIVE OWNERSHIP INTEREST.

14.   Events of Default. If any of the following events shall occur and shall not be cured within the time period set forth in Section 14 after written notice thereof to the Tenant committing

**AGREEMENT AMONG TENANTS IN COMMON**                                          Page 7

such acts, such Tenant committing such act shall be deemed to have committed an Event of Default (herein so called):

(a)    A Tenant shall file a voluntary petition in bankruptcy or shall be adjudicated a bankrupt or insolvent, or shall file any petition or answer seeking any reorganization, arrangement, composition, readjustment liquidation, dissolution or similar relief for itself under any applicable federal state or other statute or law relative to bankruptcy, insolvency or other relief for debtors, or the appointment of any trustee, receiver, conservator or liquidator of said Party or of any part of its properties or interest in the Note or the Property, or

(b)    A Tenant shall admit in writing its inability to pay its debts as they mature; or

(c)    A Tenant shall make an assignment for the benefit of creditors or take any other similar action for the protection or benefit of creditors; or

(d)    A Tenant fails to make any payment required hereunder on a timely basis;

(e)    A Tenant shall fail to perform its covenants or obligations contained herein; or

(f)    A Tenant shall fail to perform its covenants or obligations contained in any agreement secured by a lien on the Property.

In addition to all other rights of CPO, if any other Tenant commits an uncured Event of Default, CPO may require such Tenant to convey its Ownership Interest in the Property in consideration for the payment to such Tenant of an amount equal to such Tenant's direct cost of acquiring his Ownership Interest from CPO, less such Tenant's closing costs incurred in connection with its acquisition of such Ownership Interest.

15.    Notice of Default and Cure. In the event of an Event of Default, the remedies provided for in Section 14 shall apply only if said Event of Default is not timely cured. If a Tenant believes another Tenant is in default hereunder, such Tenant shall give the defaulting Tenant written notice setting forth such default and the defaulting Tenant shall have thirty (30) days after the receipt of such notice to cure such default. In the event such default is not cured during such thirty (30) day period, such defaulting Tenant shall be deemed to have committed such Event of Default and the other Tenant may enforce such Tenant's rights and remedies contained herein and at law.

Each Tenant (the "Indemnifying Tenant") agrees to indemnify the other Tenants for any loss, damage or claim arising from any uncured Event of Default of the Indemnifying Tenant.

16.    Election to be Excluded from Provisions of Subchapter K. Each Tenant hereby elects to be excluded from all of the provisions of Subchapter K of Chapter I of the Internal Revenue Code of 1986, as amended (the "Code"). The exclusion elected by each Tenant hereunder shall commence with the execution of this Agreement. Each Tenant hereby covenants and agrees that each Tenant shall abide by all regulatory requirements in order to maintain such election and shall report on such

**AGREEMENT AMONG TENANTS IN COMMON**                                    Page 8

Tenant's income tax return such respective share of items of income, deduction and credit which results from holding of the Property, in a manner consistent with the exclusion of the Tenancy from Subchapter K of Chapter I of the Code, commencing with the first taxable year of the Tenancy. No Tenant shall notify the Commissioner of Internal Revenue (the "Commissioner") that such Tenant desires that Subchapter K of the Code apply to the Tenancy and each Tenant hereby agrees to indemnify and hold each other Tenant free and harmless from all cost, liability, tax consequence and expense, including attorneys' fees, which results from any Tenant so notifying the Commissioner.

17. <u>Dissolution</u>. The Tenancy, as governed hereby, shall be immediately dissolved upon the happening of any of the following events:

(i) The sale or other disposition by the Tenants of all of the Property; or

(ii) The decision of the Tenants that the Tenancy be dissolved; or

(iii) Ten (10) years after the date hereof, absent prior extension of the term of the Tenancy (for one or more years) by written notice from CPO to the other Tenants, at CPO's option in its sole and absolute discretion.

18. <u>Notices</u>. All notices under this Agreement must be in writing and shall be deemed to have been duly given if delivered personally or by certified mail, return receipt requested, to the addresses set forth on the signature page hereof.

19. <u>Amendment; Additional Tenants</u>. This Agreement may be amended only by written agreement signed by all Tenants; provided, however, that CPO may sell additional undivided interests in the Property (from the CPO Ownership Interest) to third parties, in which case such other third party(ies) may be added to this Agreement by CPO as additional Tenants, with the same rights and obligations hereunder as are applicable to IPO and the IPO Ownership Interest, to the extent of the undivided interest in the Property constituting the Ownership Interest of such third party(ies) in the Property. In such event, the Ownership Interests of CPO hereunder shall be reduced pro rata, such that the aggregate Ownership Interests of the Tenants following such sale(s) of undivided interests in the CPO Ownership Interest shall continue to equal one hundred (100%).

20. <u>Counterparts</u>. This Agreement may be executed in counterparts each of which shall be deemed to be an original, but such counterparts, when taken together, shall constitute but one agreement.

21. <u>Gender</u>. All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine or neuter, singular or plural, as the identity of the person, persons, entity or entities may require.

22. <u>Caption Headings</u>. Captions at the beginning of each numbered Section of this Agreement are solely for the convenience of the parties and shall not be deemed part of the context of this Agreement.

**AGREEMENT AMONG TENANTS IN COMMON**                    **Page 9**

23.     Negotiated Transaction.  The provisions of this Agreement were negotiated by all of the parties hereto and said Agreement shall be deemed to have been drafted by all of the parties thereto.

24.     Further Assurances.  Each Tenant hereby agrees to promptly sign any additional instruments or documents which are necessary or appropriate to carry out the purpose of this Agreement.

25.     Interpretation.  It is the intent of the Tenants to own the Property for investment purposes, only and not for the conduct of a business, and to otherwise comply with all statutes and regulations allowing an election to be excluded from Subchapter K of the Code and this Agreement shall be interpreted to conform to such intent.

26.     Litigation.  In the event of any litigation between the parties hereto, the prevailing party in such litigation shall be paid all attorneys' fees, court costs and litigation expenses incurred in such litigation by the non-prevailing party.  The parties hereto agree that specific performance is an appropriate remedy for the enforcement of the rights of the Tenants hereunder concerning a sale of the Property and the obligations of the parties hereunder.

27.     Recording.  A memorandum of this Agreement may be recorded by CPO and the other Tenants agree to cooperate and facilitate such recording.


[SIGNATURE PAGE FOLLOWS]


**AGREEMENT AMONG TENANTS IN COMMON**                    **Page 10**

Case 25-34839-mvl11   Doc 357-12   Filed 02/25/26   Entered 02/25/26 14:14:10   Desc
PHONIX EX 12   Page 30 of 31

Case 25-34839-mvl11   Doc 369-1   Filed 02/28/26   Entered 02/28/26 23:02:07   Desc
Exhibit A - Sample Tenancy in Common Agreement   Page 11 of 12

EXECUTED effective as of February 1, 2022 (the "Effective Date").

SAM Plainview, LLC (a Texas Limited Liability Company)

By: MacDonald Capital Corporation (a Texas corporation), gp

By: _____

      Name: Wm. Ian MacDonald
      Title: President

Date: Agreed to as of the "Effective Date" set forth above

Address:  400 East Centre Park Blvd., Suite 101
          DeSoto, Texas 75115
Facsimile: 972-283-0193

**RONALD H. BERG**

**By:** _____
   **Individually**

Date: Agreed to as of the "Effective Date" set forth above
Address:  20 Canyon Ridge,
         Irvine, CA  92603
Phone Number: (714) 402-2374
Facsimile: _____

**AGREEMENT AMONG TENANTS IN COMMON**          Page 11

## EXHIBIT A

### The Property

An undivided Six point Six Six percent (6.66%) interest in

Street Lots 1-4, Block 47, Old Town Plainview, Plainview, Hale County, Texas
414 North Columbia Avenue, Plainview, TX 79072

**Buyer:**
Ownership Interest Percentage: Six point Six Six percent (6.66%)

**Buyer:**
Purchase Price of Ownership Interest (Originally Invested Amount): $89,368.61

**Seller Ownership Interest:**
Seventy Three point One Nine percent (64.23%)

Agreed Upon Current Value of the Property: $2,151,553.

**AGREEMENT AMONG TENANTS IN COMMON**                                    Page 12
DALLAS1 1068268v3 51997-00001