EXHIBIT

PHONIX EX 15

Case 25-34839

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| In Re: | **Case No. 25-34839-mvl-11** |
| | (Jointly Administered) |
| BUDDY MAC HOLDINGS, LLC, et al., | Dallas, Texas |
| | February 10, 2026 |
| | 1:30 p.m. Docket |
| Debtors. | |
| | - MOTION TO MAINTAIN BANK ACCOUNTS (166) |
| | - MOTION TO OBTAIN POSTPETITION FINANCING (173) |
| | - MOTION TO COMPROMISE CONTROVERSY WITH PHONIX RBS (174) |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE MICHELLE V. LARSON,
UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:

For the Debtors:          John J. Kane
                          Kyle Woodard
                          KANE RUSSELL COLEMAN LOGAN, P.C.
                          901 Main Street, Suite 5200
                          Dallas, TX  75202
                          (214) 777-4261

For the Debtors:          Mark C. Taylor
                          KANE RUSSELL COLEMAN LOGAN, P.C.
                          401 Congress Avenue, Suite 2100
                          Austin, TX  78701
                          (512) 487-6560

For Phonix RBS, LLC:      Regina Stango Kelbon
                          BLANK ROME, LLP
                          1201 N. Market Street, Suite 800
                          Wilmington, DE  19801
                          (214) 425-6400

For Phonix RBS, LLC:      David M. Clem
                          BLANK ROME, LLP
                          200 Crescent Court, Suite 1000
                          Dallas, TX  75201
                          (972) 850-1485

2

```
 1   APPEARANCES, cont'd.:

 2   For Phonix RBS, LLC:        Matthew E. Kaslow
                                 BLANK ROME, LLP
 3                               One Logan Square
                                 130 North 18th Street
 4                               Philadelphia, PA  19103
                                 (215) 569-5762
 5
     For the Official Committee  William James Hotze
 6   of Unsecured Creditors:     Dominique A. Douglas
                                 DYKEMA GOSSETT, PLLC
 7                               5 Houston Center
                                 1401 McKinney Street, Suite 1625
 8                               Houston, TX  77010
                                 (713) 904-6959
 9
     For the U.S. Trustee:       Meredyth Kippes
10                               OFFICE OF THE UNITED STATES
                                    TRUSTEE
11                               1100 Commerce Street, Room 976
                                 Dallas, TX  75242
12                               (214) 767-8967

13   For William Ian            Kevin D. McCullough
     MacDonald:                  ROCHELLE MCCULLOUGH, LLP
14                               Bank of America Plaza
                                 901 Main Street, Suite 3200
15                               Dallas, TX  75202
                                 (214) 953-0182
16
     Recorded by:                Bryon A. Robinson
17                               UNITED STATES BANKRUPTCY COURT
                                 1100 Commerce Street
18                               Dallas, TX  75242
                                 (214) 753-2011
19
     Transcribed by:             Kathy Rehling
20                               311 Paradise Cove
                                 Shady Shores, TX  76208
21                               (972) 786-3063

22

23

24
           Proceedings recorded by electronic sound recording;
25            transcript produced by transcription service.
```

3

1               DALLAS, TEXAS - FEBRUARY 10, 2026 - 1:41 P.M.

2               THE COURT:  Please be seated.

3        Good afternoon, everyone.  We are here on our 1:30 docket.

4   We have one matter on the docket this afternoon, and that is

5   Case No. 25-34839, Buddy Mac Holdings, LLC.

6        I'll take appearances for the record, and I'll start with

7   those folks in the courtroom.  Mr. Kane?

8               MR. KANE:  Good afternoon, Your Honor.  John Kane,

9   Mark Taylor, Kyle Woodard for the Debtors.  And Mark Shapiro,

10  the Debtors' chief restructuring officer, is with us as well.

11              THE COURT:  Excellent. Thank you.

12       Ms. Kippes?

13              MS. KIPPES:  Good afternoon, Your Honor.  Meredyth

14  Kippes on behalf of the United States Trustee.

15              THE COURT:  Thank you.

16              MR. CLEM:  Good afternoon, Your Honor.  David Clem

17  for Phonix.

18              THE COURT:  Thank you.

19       Mr. McCullough?

20              MR. MCCULLOUGH:  Good afternoon, Your Honor.  Kevin

21  McCullough of Rochelle McCullough on behalf of William Ian

22  MacDonald individually.

23              THE COURT:  Thank you.

24              MR. MCCULLOUGH:  Thank you.

25              THE COURT:  All right.  I'll now take appearances on

4

1   WebEx.

2       I know that we've got at least one name on the electronic

3   roll, and that's Ms. Dominique Douglas with the Dykema law

4   firm on behalf of the Official Committee of Unsecured

5   Creditors.  I see that Mr. Hotze is on as well.  So I'll get

6   them down.  Anyone else on WebEx who would like to make an

7   appearance?

8           MS. KELBON:  Good afternoon, Your Honor.  Regina

9   Stango Kelbon from Blank Rome on behalf of Phonix RBS, LLC.

10  And I am here with my colleague Matthew Kaslow.

11          THE COURT:  All right.  Thank you both.

12      Anyone else wish to make an appearance?

13      (No response.)

14          THE COURT:  Okay.  So, as I understand it, we have

15  three matters on the docket today:  a final hearing on cash

16  management, a final hearing on postpetition financing, as well

17  as the expedited motion for the 9019 settlement between Phonix

18  and the Debtor and the Debtor-related entities.  Is there

19  anything that I'm missing?

20      (WebEx interruption.)

21          THE COURT:  Mr. Bellisimo, you're coming through in

22  the courtroom.  So if you could mute your line, I'd appreciate

23  it.  Thank you.  That's an amazing name, though.

24      All right.  Am I missing any motions, Mr. Kane?

25          MR. KANE:  No, Your Honor.  You're not.

5

1          THE COURT:  All right.  Thank you.

2     Okay.  In terms of the order of operations, I think the

3 only objections that the Court saw come across were those

4 filed by the United States Trustee.  Is that accurate?

5          MR. KANE:  That's correct, Your Honor.

6          THE COURT:  Okay.  All right.  So should we start

7 with cash management?

8          MR. KANE:  Yes.  Let's do that.

9          THE COURT:  Okay.

10          MR. WOODARD:  Good afternoon, Your Honor.

11          THE COURT:  Good afternoon.

12          MR. WOODARD:  Kyle Woodard; Kane Russell Coleman &

13 Logan; on behalf of the Debtors.

14     Before I get into this, I have two folders for the Court,

15 --

16          THE COURT:  Okay.

17          MR. WOODARD:  -- if I may approach the bench.

18          THE COURT:  All right.

19          MR. WOODARD:  These are just copies of the motions

20 and the proposed orders that were filed for each of the --

21          THE COURT:  Okay.  Appreciate it.

22          MR. WOODARD:  So, the Court entered an interim order

23 on the Debtors' cash management motion at the first day

24 hearings for the subsequent Debtors.  The motion is filed at

25 Docket No. 166.  The interim order was entered at Docket No.

6

1  193.  And the proposed final order as well as redlines are

2  filed at Docket No. 259.

3      At 259, we actually included a redline against the interim

4  order and a redline against the prior final order for the

5  initial Debtors so the Court could see that there's no

6  substantive changes from either one of those orders.  There's

7  a few nits that we cleaned up as far as the case style and

8  things like that.

9      And not reflected at Docket No. 259 is something that I

10  noticed earlier that I would like to change before we upload

11  the final order, which is to define "Petition Date" as the

12  subsequent petition date of January 25th, to avoid any

13  confusion as to whether we're talking about the initial

14  petition date or the new Debtors' petition date.

15          THE COURT:  Okay.

16          MR. WOODARD:  There were no objections filed.  Per

17  the Court's interim order, objections were due last Friday,

18  February the 6th.  We did not receive any objections.  I have

19  not received any comments from any parties to the form of

20  proposed order that we filed yesterday, but I won't speak for

21  any parties as to whether there are comments or not.  But I

22  have not received any.

23      And not that it's relevant to the motion, but I came in

24  here today contemplating asking the Court for some specific

25  relief with respect to Wells Fargo.  We've had some trouble

7

1    with our accounts with them.

2              THE COURT:  Okay.

3              MR. WOODARD:  But prior to coming in here, I

4    understand that that's all resolved, so I have nothing for the

5    Court there.

6              THE COURT:  Nothing like a setting to grease the

7    wheels --

8              MR. WOODARD:  Yeah.

9              THE COURT:  -- to a resolution.  Love that.  All

10   right.

11             MR. WOODARD:  So, with any questions that the Court

12   has, I'm happy to address those.  Otherwise, we'd request

13   entry of the final order granting this motion.

14             THE COURT:  All right.  Thank you very much, Mr.

15   Woodard.

16        Is there anyone who wishes to be heard with respect to

17   cash management?  Ms. Kippes?

18             MS. KIPPES:  Thank you, Your Honor.  Meredyth Kippes

19   on behalf of the United States Trustee.

20        I'd just announce to the Court that I have reviewed the

21   orders and have no comments.

22             THE COURT:  All right.  Thank you very much.

23        As I recall, I think cash management was in Mr. Kaslow's

24   wheelhouse.  Any comments on behalf of Phonix, Mr. Kaslow?

25             MR. KASLOW:  Thank you, Your Honor.  No, no comments.

8

1          THE COURT:  All right.  Thank you very much.

2          MR. KASLOW:  Appreciate you checking.

3          THE COURT:  All right.  Hearing no objections, the

4    Court has had an opportunity to review the form of order

5    relative to cash management on a few occasions now, and I've

6    also taken a look at your 259-3, a proposed form of order, and

7    I don't have any comments.  So I will sign the final order on

8    that one.

9          MR. WOODARD:  Thank you, Your Honor.

10         THE COURT:  You're welcome.

11      All right.  Mr. Kane, where should we go next?

12         MR. KANE:  I think the DIP motion next, Your Honor.

13         THE COURT:  Okay.

14         MR. TAYLOR:  Good afternoon, Your Honor.  Mark Taylor

15   here on behalf of the Debtors.

16      Your Honor, we uploaded a redline to the interim order

17   that's at Docket 263.  It was really just changing the interim

18   terminology to final terminology and taking out the provisions

19   that required entry of a final order in order for them to be

20   effective.

21      The only substantive change was in Paragraph 11(a) on the

22   DIP lien.  That was the agreement by the DIP Lender not to

23   take a lien on the Chapter 5 causes of action --

24         THE COURT:  Okay.

25         MR. TAYLOR:  -- and to reserve those for the estate,

9

1  --

2          THE COURT:  Okay.

3          MR. TAYLOR:  -- which is one of the objections that

4  the U.S. Trustee had filed.

5      The objections that remain, Your Honor, were really just

6  those of the U.S. Trustee.  All of those have been resolved at

7  this point.  I know that Ms. Kippes does want us to put on

8  testimony concerning the rollup --

9          THE COURT:  Right.

10          MR. TAYLOR:  -- and the nature of the rollup, which

11  we are prepared to do.  But other than that, I believe that

12  all of the objections have been resolved.

13          THE COURT:  All right.  Thank you very much, Mr.

14  Taylor.

15      Ms. Kippes?

16          MS. KIPPES:  Thank you, Your Honor.  Meredyth Kippes

17  on behalf of the United States Trustee.

18      The lien on Chapter 5s has been resolved, and I want to

19  give credit where credit is due:  I think the Committee had a

20  lot to do with that, too, not just my piece of paper.

21      In light of that give, we're going to stand down on the

22  objection on the waivers.

23          THE COURT:  Okay.

24          MS. KIPPES:  And as Mr. Taylor indicated, provided

25  that the evidence shows that the rollup is market, that should

10

1    be fine as well.  So we'll see what the evidence says.  I

2    think I know what it will say, but it's not --

3              THE COURT:  Not your first rodeo, I guess.

4              MS. KIPPES:  It is not.  And yes, they have to tell

5    it to you first.

6              THE COURT:  Excellent.

7              MS. KIPPES:  Thank you.

8              THE COURT:  Thank you very much, Ms. Kippes.  All

9    right.

10             MR. TAYLOR:  And to echo Ms. Kippes' statements, this

11   was a result of negotiations between the Debtors and Phonix

12   and the U.S. Trustee and the Committee.

13             THE COURT:  Okay.

14             MR. TAYLOR:  So we're happy to reach a resolution.

15             THE COURT:  Excellent.

16             MR. TAYLOR:  Your Honor, we would call Mark Shapiro.

17             THE COURT:  So, but before --

18             MR. TAYLOR:  Yes, Your Honor.

19             THE COURT:  -- we address evidence, I'll see if

20   anyone else wants to be heard with respect to the DIP by way

21   of opening.

22             MS. KELBON:  Yes, Your Honor.

23             THE COURT:  Ms. Stango Kelbon?

24             MS. KELBON:  Regina Stango Kelbon.

25             THE COURT:  Yes?

11

1          MS. KELBON:  Yes, Regina Stango Kelbon from Blank

2     Rome on behalf of Phonix RBS.

3          And once again, I want to thank Your Honor for permitting

4     the parties and counsel to appear remotely.  This hybrid

5     format has materially aided coordination among the parties and

6     kept the cases moving very efficiently and quickly, which has

7     been a great benefit to all parties.

8          I stand here before you to say it's nice to finally have a

9     fully consensual agreement and hearing with all parties.  We

10    did work with the Debtors, we worked with the Committee -- and

11    I thank Mr. Holtze -- and the U.S. Trustee's Office to try to

12    resolve their issues.  You will see globally that the

13    resolution with the Committee is a combination of some changes

14    in the DIP order and some changes in the settlement order.

15          THE COURT:  Okay.

16          MS. KELBON:  So we addressed the Committee's

17    objections through both documents, so they do go hand-in-hand

18    and arm-in-arm.

19          And the U.S. Trustee's concerns will be addressed by the

20    record.  We're comfortable that it is market, the rollup, as

21    well as the release of the Chapter 5 avoidance actions.

22          Part of it, there is one other change in the DIP order

23    that I just wanted to highlight.  There is obviously material

24    benefits to the estate, including the $500,000 carve-out which

25    will now be effective for the professionals, the release of

12

1   the lien on the avoidance actions.  But we also, part of our

2   agreement with the Committee is that they are supportive of

3   the credit bid and the settlement and the auction and the sale

4   to Phonix.

5       So, with that, Your Honor, I don't want to take up more of

6   the Court's time.  We're just very happy that we're able to

7   get to a consensual resolution, because we do think this is

8   the best value-maximizing path for all parties and should

9   avoid value destruction.  Thank you, Your Honor.

10          THE COURT:  All right.  Thank you very much, Ms.

11   Stango Kelbon.  Appreciate it.

12      Mr. Hotze, do you wish to be heard by way of opening, sir?

13   Or Ms. Douglas?

14          MR. HOTZE:  Yes, Your Honor.  Very briefly.  William

15   Hotze with Dykema Gossett on behalf of the Committee.

16      I'll echo the sentiments and statements of the Debtors'

17   and Phonix's counsel.  We were, last week, after a number of

18   discussions, able to reach a global resolution, which you'll

19   see, as Ms. Kelbon said, in the settlement agreement order and

20   the DIP order that I think, given where we were six weeks ago,

21   is a great result for all parties and I think prevents value

22   destruction and provides a smooth pathway going forward.  So

23   we're appreciative of everybody's efforts.

24          THE COURT:  And correct me if I'm wrong, because

25   that's what I'd read in the form of order:  The Committee has

13

1   agreed that the challenge period has expired, correct?

2           MR. HOTZE:  Yes, Your Honor.  Phonix was very

3   diligent in providing us all of their lien perfection

4   documentation that we reviewed and analyzed.  And so, separate

5   and aside from negotiations on the settlement agreement and

6   the DIP, we've agreed for that to pass.

7           THE COURT:  Okay.  Excellent.  All right.  And so,

8   with that, Mr. McCullough, do you wish to be heard on DIP at

9   all?

10          MR. MCCULLOUGH:  No, Your Honor.

11          THE COURT:  Okay.  Thank you.

12      What I will forecast just a little bit are the things that

13  piqued the Court's interest as I was going through the DIP,

14  which was I'd like to understand the maturity date of February

15  22nd.  And I'm not trying to change deal terms at all.  I'm

16  just trying to make it make sense logistically.  Because just

17  looking at Missouri sale, it took me about three days to get

18  that order, and then we got the order entered.  If the sale

19  hearing is on the 19th, and I'm just going to hypothetically

20  assume that Phonix is not the winning bidder, that I won't

21  have a sale order and a closed sale in three days.  That's

22  just common sense.

23      So I need to understand how Play pipeline that maturity

24  date makes business sense.  And again, I recognize that a DIP

25  is a bucket of agreements, but I just need to understand that

14

1 one.

2     Likewise, I want a little bit of understanding on the ERC

3 funds.  I think I understand the deal there.  But I noticed

4 that some of the language has been struck through in the last

5 proposed form of order with respect to the ERC funds.  So I

6 just kind of want to know if these ERC funds are still there,

7 are they being held in suspense, kind of what's happening with

8 those.

9     And then I guess a little bit of clarity on commercial

10 tort claims and if there are any.  I see that they're being

11 liened up, so I'm just curious if there are any.

12          MR. TAYLOR:  So, briefly, Your Honor, on those three

13 topics.

14          THE COURT:  Uh-huh.

15          MR. TAYLOR:  We went back and forth with the DIP

16 Lender on the February 22nd order date, and that's what they

17 insisted on.

18          THE COURT:  Sure.

19          MR. TAYLOR:  We've been working cooperatively.  And I

20 know that in the discussions, they've been that if there is a

21 problem with getting the order entered because we're still

22 waiting on something or the Court is tied up, I believe that

23 the DIP Lender will confirm that they're not going to call a

24 default simply because we're waiting for an order to be

25 entered.  But I'll let Ms. Kelbon address that.

15

1          MS. KELBON:  Yes, Your Honor.  Regina Kelbon on

2    behalf of Phonix.

3        Yes, that is our intent, Your Honor.  We do have an

4    outside date in the APA for the 28th, I believe.  And the DIP,

5    however, expires on the 22nd.  Our goal is to close on the

6    22nd, but if there were to be a higher and better bid that we

7    were approving, Your Honor, we would most certainly cooperate

8    with the extension of the DIP facility.  And I envision that

9    would be done by a stipulation that we would extend the

10   maturity date and submit it to Your Honor for signature, if we

11   need to extend it for a few days.  The budget goes out, I

12   believe, through the end -- through the 22nd, and I think

13   that's one of the reasons why we picked that.

14         THE COURT:  Okay.  Well, we'll take a look at that in

15   evidence, and I'll take a look at the exhibits.

16       So, please proceed, Mr. Taylor.

17         MR. TAYLOR:  Secondly, Your Honor, with respect to

18   the ERC funds, Mr. Shapiro will testify that those are being

19   held in escrow.

20         THE COURT:  Okay.

21         MR. TAYLOR:  The language that was struck through was

22   really just all the language relating to the requirement that

23   there be a final order --

24         THE COURT:  Okay.

25         MR. TAYLOR:  -- before those funds could be

16

1    distributed.

2              THE COURT:  Okay.  All right.

3              MR. TAYLOR:  So the $2.8, almost $2.9 million is in

4    escrow and it will be released to the Secured Lender upon

5    entry of the final order and applied to the debt.

6              THE COURT:  All right.  Yes, and some of it that was

7    struck through was with respect to -- I'm sorry, Ms. Stango

8    Kelbon -- was with respect to the suspense account.  So I

9    assumed that it was probably already being held, and that was

10   the catchall, so I just wanted to make sure on that.

11      Ms. Stango Kelbon?

12             MS. KELBON:  Your Honor, yes, I just wanted to be a

13   little more precise.  It's not an escrow account *per se*, I

14   don't want to correct Mr. Taylor, but it is a suspense account

15   in that we were not permitted to apply it.  We're holding it,

16   though.

17             THE COURT:  Okay.

18             MS. KELBON:  We, the DIP Lender, have been holding

19   the funds, and we're not -- we were not permitted to apply it

20   until this entry of this order approving this whole settlement

21   and DIP.

22             THE COURT:  Okay.  Fair enough.

23             MR. TAYLOR:  That's right.  That was imprecise

24   language.  It is in suspense.

25             THE COURT:  Okay.

17

1          MR. TAYLOR:  There's not an escrow agent.

2          THE COURT:  All right.

3          MR. TAYLOR:  So it will simply be released from

4    suspense.

5          THE COURT:  All right.

6          MR. TAYLOR:  With respect to the commercial tort

7    claims, I know that there was a lawsuit pending between

8    certain of the Debtors and the Buddy Mac franchisor in

9    Florida.  As part of the 9019, I believe that's being

10   compromised, those claims are being compromised --

11         THE COURT:  Okay.

12         MR. TAYLOR:  -- on both sides.

13         THE COURT:  Okay.

14         MR. TAYLOR:  But that's the only commercial tort

15   claim I'm aware of, and certainly none have been listed in the

16   UCC-1 filings.

17         THE COURT:  Okay.  Thank you.  You've hit to the

18   heart of my question.  Okay.  Thank you.

19         MR. TAYLOR:  And with that, Your Honor, we would

20   call Mark Shapiro.

21         THE COURT:  All right.  Mr. Shapiro, if you could

22   approach the witness stand, I'll go ahead and swear you in,

23   sir.  Thank you.

24              MARK SHAPIRO, DEBTORS' WITNESS, SWORN

25         THE COURT:  Thank you very much.

Shapiro - Direct                              18

1      Please proceed, Mr. Taylor.

2           MR. TAYLOR:   Thank you, Your Honor.

3                     DIRECT EXAMINATION

4   BY MR. TAYLOR:

5   Q    Mr. Shapiro, I'm not going to go back through all of

6   your testimony from the prior hearings, but just for the

7   purposes of the record, you are the CRO for the Debtor; is

8   that right?

9   A    I am.

10  Q    And you're familiar with the Debtors' operations?

11  A    Yes.

12  Q    Have you been actively involved in the case?

13  A    Yes.

14  Q    And you're a managing senior director at GlassRatner?

15  A    Senior managing director, yes.

16  Q    Senior managing director?   I'll get it right.   And how

17  long have you been doing restructuring work?

18  A    Twenty, twenty-five years.

19  Q    Okay.   Let's go first to the questions the Court had.

20  How did the February 22nd date for the closing of the sale

21  process occur?   Why did the Debtor agree to that?

22  A    The 22nd --

23  Q    Yes.

24  A    -- was the tail-end of the DIP budget.   But as you said

25  before, we've had discussions with the DIP Lender that if we

Shapiro - Direct                              19

1   need extensions, they would be amenable to them.

2   Q    Do you think you'll be able to close at least around the

3   22nd?

4   A    Yes.

5   Q    With respect to the ERC funds, those are being held in

6   suspense currently; is that right?

7   A    Correct.

8   Q    That's approximately just under $2.9 million?

9   A    Correct.

10  Q    And has the Debtor agreed that those funds can be

11  released upon entry of the final order?

12  A    Yes, we have.

13  Q    And why is that a benefit to the estate?

14  A    It settles a lot of issues.  It allows us to receive DIP

15  financing.  It was part of the agreement to allow us to get

16  financing to keep the case going and to bridge to a sale.

17  Q    And does it also result in a reduction of approximately

18  $2.9 million in the debt?

19  A    Yes.  It will go down to pay down the prepetition debt.

20  Q    And finally, with respect to commercial tort claims, are

21  you familiar or aware of any commercial tort claims that the

22  Debtor holds?

23  A    Just the one you mentioned, which was the disagreement

24  with the franchise -- the Buddy's franchisor.

25  Q    Okay.  Thank you.  I know we talked about this a little

Shapiro - Direct                              20

1  bit last time.  I'm going to turn now to the DIP financing.

2  You, I think, contacted over 50 potential DIP lenders; is

3  that right?

4  A    Correct.

5  Q    And you received no offers for DIP financing other than

6  from Phonix; is that right?

7  A    That is correct.

8  Q    And do you believe that the DIP financing is being made

9  on market terms?

10  A    Yes, I do.

11  Q    And how many DIP financings have you been involved in,

12  say, in the last five years?

13  A    Ten, fifteen.

14  Q    Okay.  The U.S. Trustee has raised a concern about the

15  nature of the rollup, and specifically that it's a three-to-

16  one rollup.  Are you aware of that objection?

17  A    I am.

18  Q    And do you have an opinion on whether or not that is a

19  market or at least within market terms for a rollup?

20  A    It's within market terms.  We went back and looked at the

21  DIP financings in the Northern District over the past five

22  years.  Approximately one-third of the DIP financings have a

23  rollup portion to them, and the range, it ranges anywhere

24  from de minimis up to north of three.  So it's within that

25  range.

Shapiro - Direct                          21

1  Q    And in particular, I notice you looked at the *CareMax*

2  case that was in Judge Larson's court; is that right?

3  A    Yes, it was.

4  Q    And the rollup in that was a three-to-one rollup; is that

5  right?

6  A    Yes.

7  Q    And based upon your experience in the industry and the

8  research that you have done, do you believe that a three-to-

9  one rollup in this case is both reasonable and necessary and

10  within market terms?

11  A    It's within market.  It's on the high end, but it is

12  negotiated terms as part of the deal.

13  Q    Thank you.

14         MR. TAYLOR:  Pass the witness, by Your Honor.

15         THE COURT:  All right.  Ms. Kippes, any cross-

16  examination?

17         MS. KIPPES:  No, Your Honor.

18         THE COURT:  All right.  Thank you.

19      Mr. Clem, Ms. Stango Kelbon, any --

20         MR. CLEM:  Thank you.  Nothing from Phonix.

21         THE COURT:  Okay.  Thank you very much.

22      Mr. Hotze, any cross-examination?

23         MR. HOTZE:  Thank you, Your Honor.  No cross-

24  examination from the Committee.

25         THE COURT:  All right.  Thank you very much.

Shapiro - Examination by the Court          22

1      Mr. McCullough?

2              MR. MCCULLOUGH:  No, Your Honor.

3              THE COURT:  No?

4                      EXAMINATION BY THE COURT

5              THE COURT:  So the only question that the Court

6   would have for you, Mr. Shapiro, is, again, if the DIP order

7   matured on February 22nd, can I assume that the Debtor would

8   have had to have closed on the sale prior thereto in order to

9   repay the DIP?

10             THE WITNESS:  Yes.

11             THE COURT:  Okay.  And recognizing that parties

12  probably expect Phonix to be the winning bidder at the sale,

13  given its ability to credit bid a substantial claim, what is

14  your expectation, if Phonix is not the winning bidder, that

15  our bidder is going to be able to close within three days?

16             THE WITNESS:  We've let everybody know that that is

17  the expected timing.

18             THE COURT:  Okay.

19             THE WITNESS:  Phonix has expressed their interest

20  that if someone truly came in and was a winning bidder, that

21  they would be flexible on a close date.  I don't expect a

22  third party to be able to close in three days.

23             THE COURT:  Okay.

24             THE WITNESS:  But we do have the ability to extend

25  the DIP, at least Phonix has the ability to extend the DIP,

Shapiro - Examination by the Court        23

1   for a week and pay for the costs of the case.  I think we

2   would have to talk to them about a similar situation if a

3   third party came in and wanted to bid.  It would be a tight

4   time frame for a third party.

5        THE COURT:  Okay.  All right.  Does anyone have any

6   further questions for Mr. Shapiro based on the Court's

7   questions?

8        (No response.)

9        THE COURT:  Okay.  Thank you very much for your

10  time, sir.

11       (The witness steps down.)

12       MR. TAYLOR:  And Your Honor, we'll make sure that

13  the order, to the extent it needs to be modified if there is

14  a third-party bidder that is the winning bidder, that we'll

15  work quickly to get that order done.  And we've made sure

16  that Mr. Woodard has cleared his schedule for that.

17       THE COURT:  Excellent.  Excellent.  Well, I've got

18  substantive issues with the thought that we could have a sale

19  on the 19th and a DIP maturity on the 22nd.  I mean, that is

20  just borderline logistically impractical because I think

21  we're going to know ahead of time that we're going to need to

22  adjust things, whether it be -- it's just like I said, you

23  just have to get orders.  And people negotiate orders and

24  things happen and then they have to get signed.  And even if

25  there were the consent to -- I mean, a consent to extend is

24

1  one thing.  Other than that, you're probably talking default

2  interest, and now it's becoming less and less beneficial to

3  the estate.

4      So that is the thing that really concerns me.  And I

5  recognize that once we get past the bid deadline, we'll

6  probably have a lot better idea if this is truly an issue.

7  But we can't get there because we don't have a bid deadline

8  for a while now.

9          MR. TAYLOR:  Here's what I would suggest, and that

10 is if we get to that date and it looks like we're going to

11 have a problem closing by the 22nd or getting the order in,

12 we'll call and request a prompt status conference with the

13 Court to get the Court's guidance on how to move forward.

14         THE COURT:  Okay.  Well, and if not, we'll address

15 it at the sale hearing, right?

16         MR. TAYLOR:  Yes.

17         THE COURT:  Because by that time, it will be three

18 days before the DIP maturity.  But the Court will expect

19 folks to be prepared to adjust for that.  If we're selling to

20 anyone other than Phonix, we're going to have to address that

21 issue.

22     I don't want to stand in the way of an otherwise-fully-

23 negotiated deal between the DIP, the Committee, the Secured

24 Lender, a resolution of UST objection, et cetera.  I just,

25 I'd feel remiss in not recognizing that this is the one time

25

1   where I can actually work a calendar and see that this is

2   really, really aggressive.

3           MR. TAYLOR:  It certainly is, and this whole case

4   has moved in an aggressive fashion, --

5           THE COURT:  Glad you said it.

6           MR. TAYLOR:  -- so this is certainly not out of

7   ordinary for the case.  But we're going to do everything we

8   can to close on time by the 22nd.  If not, I think we'll be

9   able to work with the Secured Lender --

10          THE COURT:  Okay.

11          MR. TAYLOR:  -- and with the Court to make sure that

12  there's appropriate relief.

13          THE COURT:  Okay.  And I'll be plainly honest.  The

14  other reason that the Court is a little nervous about the

15  timing is because I'm around for the week following this in

16  case there's a need for expedited hearings and emergency

17  hearings and the like, but that next week I'll be out of

18  town, and so we would be dependent upon you finding other

19  court time with other judges to get this issue heard.  And

20  that last week after this one is very, very stacked.  But I

21  would obviously make time if I were here.

22          MR. TAYLOR:  Thank you, Your Honor.

23          THE COURT:  And there's always the weekends.

24          MR. TAYLOR:  Your Honor, the only thing I would

25  point out to the Court is, in Footnote 7, we listed the Texas

26

1   Taxing Authorities.

2          THE COURT:  Yes, I saw that.

3          MR. TAYLOR:  There were about half a dozen that Mr.

4   Turner emailed me and advised me needed to be added.  So in

5   the order that will be uploaded for signature, --

6          THE COURT:  Yes.

7          MR. TAYLOR:  -- we've added those additional Taxing

8   Authorities.

9          THE COURT:  Yes.  And I believe that -- and I don't

10  have my notes from my prior hearing, which I normally would.

11  Because Mr. Turner represented quite a few of them, and then

12  there were two other attorneys I think that represented some

13  tax lien lenders as well.

14         MR. TAYLOR:  These are the only ones that I received

15  comments on, yes.

16         THE COURT:  Not lien lenders, but taxing

17  authorities, should I say.

18         MR. TAYLOR:  Yes.  I think we've -- I think with the

19  names that Mr. Turner gave me, I think we've roped them all

20  in.

21         THE COURT:  Okay.  Excellent.  All right.

22         MR. TAYLOR:  Thank you, Your Honor.

23         THE COURT:  Well, then, yes, I'll look for that

24  change in the one --

25         MR. TAYLOR:  With that, Your Honor, and the

27

1   testimony of Mr. Shapiro, we would ask that the Court enter

2   the final order.

3            THE COURT:  All right.  Anyone else --

4            MS. KELBON:  Your Honor?

5            THE COURT:  Yes?

6            MS. KELBON:  Just as a matter of housekeeping, Your

7   Honor, I just want to make sure that the record from the

8   interim hearing is included, and as well as all the exhibits,

9   as part of this --

10           THE COURT:  That's what I was going to ask next.

11  You got it.

12           MR. TAYLOR:  And Your Honor, we've agreed.  There

13  are certain stipulations contained in the order about the

14  extent and validity of the liens and the debt.  Those were in

15  the interim order.  And, again, the Debtor stipulates those

16  as part of the final order as well.

17           THE COURT:  Okay.  And with respect to evidence, do

18  you want to move in any of your exhibits in connection with

19  the DIP from Docket 254?

20           MR. TAYLOR:  I think all we have is the budget, Your

21  Honor, --

22           THE COURT:  Okay.

23           MR. TAYLOR:  -- that is already in evidence.

24           THE COURT:  Okay.

25           MR. TAYLOR:  And I think that's really all we

28

1   entered last time.  The form of the credit agreement is

2   attached, and I think everything that we needed comes from

3   Mr. Shapiro's testimony from the interim hearing and from

4   this hearing.

5           THE COURT:  Okay.  And do you want Mr. Shapiro's

6   declaration?

7           MR. TAYLOR:  Yes, Your Honor.

8           THE COURT:  Okay.  So the Debtor is moving in

9   Exhibit 1, 7, 8, 9, 10, and 12.  Is that correct?

10          MR. TAYLOR:  I believe that's correct, Your Honor.

11          THE COURT:  All right.

12          MR. TAYLOR:  I had to look back to Mr. Woodard.

13          THE COURT:  All right.  Well, the Court will admit

14  Exhibits 1, 7, 8, 9, 10, and 12, which can be found at Docket

15  254.

16          MR. TAYLOR:  Thank you, Your Honor.

17          THE COURT:  You're welcome.

18      (Debtors' Exhibits 1, 7, 8, 9, 10, and 12 are admitted.)

19          THE COURT:  All right.  Anyone else wish to be heard

20  with respect to the DIP?

21      (No response.)

22          THE COURT:  All right.  Well, hearing no further

23  responses, the Court will approve the DIP on a final basis.

24  I commend counsel.  This case is moving at blazing speed.

25  And I commend the Committee and Phonix for being able to

1   reach a resolution that would resolve at least the

2   Committee's forecasted objections.  And I also commend the

3   parties for working with the United States Trustee's Office

4   to resolve those for purposes of the hearing.

5       I do believe, as I believe was the testimony of Mr.

6   Shapiro, which I found to be credible, that three-to-one is

7   certainly on the higher side of rollup terms, but I believe

8   in this particular instance these Debtors were not flush with

9   tremendous opportunities in terms of DIP financing.  I have

10   heard testimony from Mr. Shapiro on probably at least three

11   occasions as to his attempts to seek out buyers, to seek out

12   lenders for the case, and at the end of the day, the only

13   party that's been willing to step up and reach terms is the

14   Debtors' existing lender, Phonix RBS.

15       And so I appreciate all the work that I know that went

16   into that, especially given that these parties, either pre-

17   and post- or immediately postpetition, were in an adversarial

18   posture.  So I'm happy that the DIP financing will grease the

19   wheels to continue postpetition operations to get us to a

20   sale.

21       As I mentioned before, the Court's only hesitation was

22   with respect to the maturity date of the DIP.  I recognize

23   that it's a limited amount of money for a limited amount of

24   time, and there's purposes for all that.  I just hope that

25   the parties can work in a negotiative manner to the extent

30

1   that the timing of hearings, the timing of closings, the

2   timing of signed orders would require an extension of the DIP

3   maturity date.

4       I would encourage, to the extent, and it's the one thing

5   that I haven't read dot for dot in the DIP order:  If it

6   doesn't allow the parties, the most affected parties being

7   the Committee, the Debtor, and Phonix, with certainly notice

8   to the United States Trustee, I'd like you guys to have the

9   ability to extend that without further court order for a

10  reasonable amount of time to accommodate.  Again, I'm not

11  trying to be Henny Penny here, but I just think that February

12  22nd seems aggressive to me.

13      And so if the parties do extend that by agreement, just

14  file a notice on the docket to let the Court know that that

15  extension has done.  I don't want you to have to run back for

16  a court order if you don't otherwise need one.  It would just

17  run up expenses for the estate.

18      And the last thing is I'm certainly pleased that Phonix

19  and the Committee were able to reach terms with respect to

20  Chapter 5 causes of action and that lien, because that's

21  always a potential source of recovery for unsecured

22  creditors.  So the Court is certainly pleased that that

23  resolution was able to be gained over the course of the last

24  few weeks since the last hearing.

25      But other than that, the Court will grant the DIP on a

31

1 final basis.

2      MR. TAYLOR:  And Your Honor, Paragraph 30 of the

3 final DIP order does provide for the ability of the DIP

4 Lender and the Prepetition Lender to waive the deadlines.

5      THE COURT:  Excellent.

6      MR. TAYLOR:  Thank you.

7      THE COURT:  All right.  And, again, if they are

8 waived, just a notice on the docket will be fine.  I

9 encourage parties, as you've seen in the number of cases that

10 you guys have done before me, I encourage parties to reserve

11 that right, whether it be a scheduling order or a DIP or

12 anything else, to be able to extend those deadlines.  Not

13 that I don't enjoy myself in an emergency hearing, because I

14 do, but I do like you guys to be able to reach those

15 agreements.

16   All right.  So that'll take us to the settlement

17 agreement and the 9019 motion.  Mr. Kane?

18      MR. KANE:  Yes, Your Honor.  This does take us to

19 the 9019 motion at Docket No. 174.  I'm happy to announce

20 that there are no objections to the settlement.  I'm happy to

21 cede some floor to folks to say what they need to say, but I

22 do think that the Committee/Debtor/Phonix resolution of the

23 potential objections to the settlement and the DIP really did

24 help to resolve things.

25   So the DIP order that's been submitted to the Court,

32

1  along with the redline, and that's at Docket No. 262, shows

2  the revisions to reflect the Committee, Debtor, and Phonix

3  settlement.

4           THE COURT:  Okay.

5           MR. KANE:  So, under the terms of the settlement,

6  there was originally a 15 percent we'll call it the -- it's

7  the Boulders share proceeds.  It's essentially the net sale

8  proceeds from Boulders after satisfaction of first lien debt.

9  Boulders is an apartment complex in Lubbock.  The evidence

10 that's before this Court now into evidence at Exhibit #1 on

11 our witness and exhibit list really provides a lot of detail

12 on that.  And I know this is open, so I'll try and be quick

13 on the forecast of evidence.  But there's about $20 million

14 of debt on that apartment complex development.  It's being

15 listed for around $25 million.  The 15 percent net share

16 interest that was going to be conveyed to the estate is now

17 increased to 20 percent, along with the Chapter 5 cause of

18 action exchange.

19          THE COURT:  Okay.

20          MR. KANE:  Those Chapter 5s were originally, under

21 the terms of the settlement and the DIP, going to be the

22 collateral of the DIP Lender, Phonix, and then that would be

23 subject to a credit bid, so they would acquire those causes

24 of action.  Those are now sliding over back to the estate.

25      So there is a meaningful increase in the benefit to the

33

1  estate under the terms of the settlement agreement.  Big

2  picture, the settlement agreement is essentially the panacea

3  for the case.

4      I've said in multiple hearings before this Court all

5  these things kind of knit together.  The settlement

6  agreement, the asset purchase agreement, stalking horse

7  proposal, the DIP agreement, are all part of one kind of

8  global agreement that provides the Debtor an opportunity to

9  avoid a Chapter 7 conversion or avoid a stay lifting and then

10  a kind of piecemeal foreclosure process.

11      The major components of the settlement agreement were

12  really the new entity filing, so we have the additional 20

13  new Debtors, and this really kind of completed the entrance

14  into bankruptcy of the total company structure, I'll say.  It

15  also brought in a series of entities that were originally

16  outside of the Phonix collateral base.  Those entities now

17  provided additional collateral on which Phonix to lend, which

18  provided a material benefit to the rest of the Debtors'

19  estates.

20      The next piece was obviously the DIP credit agreement,

21  getting $1.5 million plus a potential accordion fee, so maybe

22  more than $1.5 million --

23          THE COURT:  Right.

24          MR. KANE:  -- in new financing was important.

25      Next was the sale process.  We have sufficient capital.

34

1   Now we can proceed with an additional three weeks of

2   marketing and a potential going concern sale.

3       Then we have the MacDonald contribution of assets.  And I

4   do want to underscore this for the Court.  I know Mr.

5   MacDonald is present.  His counsel is in the courtroom.  And

6   I'll start this section of the forecast here with really

7   commending Mr. McCullough and his co-counsel on trying to get

8   a resolution with Mr. MacDonald and Phonix that would resolve

9   litigation disputes between their various interests but also

10   would provide a platform on which the Debtors could actually

11   seek a going concern sale, preservation of jobs, transition

12   of operations to a potential Newco purchaser, where you have

13   the ability to kind of have a fire/hire, so people have a

14   continuity of employment as well.

15       That was exceptionally important to Mr. MacDonald, and he

16   was willing to put in very significant capital individually

17   and through his various entities.

18       And just for a brief rundown, in addition to the Boulders

19   property, there's also net sale proceeds of an office

20   building property, certain undeveloped real property in

21   Alvarado, Texas, that's being conveyed with, in essence, a

22   stipulated value amount of almost $300,000.  And that's

23   essentially, Your Honor, a debt paydown of the Debtors'

24   obligation by Mr. MacDonald and his entities.

25       And then, in addition, Mr. MacDonald caused certain

35

1    entities that were owned by MacDonald Capital Corp. to slide

2    into bankruptcy to provide the additional real property

3    collateral for the DIP loan.

4        Next, Your Honor, we have a resolution of substantially

5    all of the litigation and all of the potential litigation in

6    this case.  And this is detailed heavily in our Exhibit #1

7    and Mr. Shapiro's declaration.  And I think it's really

8    important to stress for the record and for this Court:  Our

9    alternatives to the proposed DIP financing were various means

10   of using the ERC funds to generate some kind of financing.

11   And I think at one of the hearings you heard Mr. Shapiro

12   talking about maybe we could get 30 percent up front and then

13   an additional 30 percent based on the ERC funds that we

14   anticipated coming in.

15       As Mr. Shapiro outlined in his declaration at Exhibit #1,

16   there is a lot of hair on that.  And with that and the

17   position that Phonix has taken about their potential interest

18   in the ERC funds, we think that any alternative using the ERC

19   funds was essentially a guarantee of very protracted and very

20   expensive litigation.

21       THE COURT:  And at best, you're looking at, what,

22   like $600,000 of cash on the factor?

23       MR. KANE:  It could have even been more than that.

24       THE COURT:  Okay.

25       MR. KANE:  So, two tranches at 30 percent on --

1              THE COURT:  Okay.

2              MR. KANE:  -- two-and-some-change million.

3              THE COURT:  Okay.

4              MR. KANE:  I mean, I think that could have been --

5              THE COURT:  Oh, okay.  Two.

6              MR. KANE:  -- up to 1.2 to 1.5.

7         Our take on that is, if you were in a dispute about the

8    ability to use those funds, or who even has a right to own

9    those funds -- if there is a properly perfected lien, if you

10   have a tracing lien, if there is a payment intangible because

11   those monies really came from contributions from these

12   various entities and should it come back -- that we're

13   looking at litigation with potentially requests for

14   injunctive relief that, between costs, adversity, delays,

15   potential injunction, the detriments to that potential avenue

16   would likely outweigh the likelihood of success on the

17   litigation.  Even if we won, it's probably a moot point

18   because of the costs incurred and the time delays.

19              THE COURT:  Right.  Right.

20              MR. KANE:  So this resolves all of that litigation.

21   It also involves a release of litigation that would have been

22   asserted against the Debtors' principal, Mr. MacDonald, which

23   would obviously have continued to interrupt operations.

24              THE COURT:  Right.

25              MR. KANE:  Phonix is releasing claims against Mr.

37

1  MacDonald, his relatives, his various related entities, and

2  so is the Debtor.  And we think that's a very important issue

3  to just put up front on the table.  We wanted to make sure

4  that the analysis of those releases and the exchange of

5  consideration wasn't just in the court of Mr. MacDonald, so

6  he's signing his own release.  We had Mr. Shapiro, and this

7  is in his declaration, examine the consideration that was

8  being exchanged and then advised the Debtors that, yes, they

9  should support the releases based on the kind of totality of

10 the package that was being delivered to the Debtors' estate.

11      And we do think, Your Honor, that overall this provides

12 the best potential outcome for the Debtors' estate under the

13 circumstances, and we think that's one of the reasons why

14 there are no objections to this proposed deal.

15      I'll say that the Committee's advocacy for its

16 constituents was important.  The Committee worked with the

17 Debtors on potential solutions, worked with Phonix on

18 potential solutions, and came up with amendments or

19 modifications to both the DIP and the settlement agreement

20 that really achieved the goals that the Committee was trying

21 to accomplish for its constituency.

22      And Your Honor, I will stress and the evidence shows and

23 Mr. Shapiro's declaration and I think from the -- I'll call

24 it advocacy and solid professionalism, but lots of

25 contentiousness throughout this case -- that these were very

38

1   arm's-length good faith negotiations.  And also the guarantee

2   that any alternatives would have been extraordinarily

3   painful, whether it was continued aggressive protracted

4   litigation or a conversion to Chapter 7 and the fallout from

5   those.

6       So we will say that the releases are appropriate under

7   the circumstances.  The settlement is appropriate and in the

8   best interests of the Debtors' estates.  And we will ask,

9   after our presentation of evidence, what will just be -- we

10  can do that now, if you'd like, or let others submit -- but

11  ours would just be a request for the admission of Exhibits 1

12  through 15.

13           THE COURT:  Okay.

14           MR. KANE:  And part of that is Exhibits 3 through 5,

15  Your Honor.

16           THE COURT:  Uh-huh.

17           MR. KANE:  I know that notice was very important.

18           THE COURT:  Yes.

19           MR. KANE:  The Exhibits 3 through 5 are the

20  Certificates of Service of both the documents and the Notice

21  of Hearing.  I do want to stress for this Court, we probably

22  overdid it on service and notice.  I believe all of the

23  parties in interest in this case were served, which is going

24  to be very expensive for this estate.

25           THE COURT:  Yes.

39

1          MR. KANE:  But it was our belief that, regardless of

2     the expense, the greatest possible notice that we could

3     provide, given the Court's forecasting, was necessary, since

4     this is really the backbone of this Debtors' in-court

5     reorganization.

6          THE COURT:  To be honest, Mr. Kane, I recognize it

7     was expensive, most likely.  I haven't seen, obviously, the

8     bills.  And I recognize that.  But given the nature of all of

9     the compromises that have been made, given the insertion of

10    all of the different players over time from the Debtors'

11    perspective, given the participation of the guarantors and

12    the releases and everything that was going to happen in this

13    9019, to be honest, I think that that level of breadth was

14    needed.  And so I appreciate the Debtor doing so.

15         MR. KANE:  Thank you, Your Honor.  I will say, I

16    think it's been effective, too.  I've been taking a look at

17    who's been participating on the side, and we have the names,

18    but I think a number of different creditors.  I saw also a

19    gentleman with the last name Byrd who was on, who is one of

20    the TIC (phonetic) interest holders who we've been making

21    sure they were also receiving notice of the proposed DIP, of

22    the proposed sale and bid procedures documents, of the

23    proposed settlement.  So we do think that the notice has been

24    effective.

25         THE COURT:  Okay.  Excellent.  Thank you very much.

40

1          MR. KANE:  Thank you.

2          THE COURT:  All right.  And so you moved for 1

3  through 15, correct?

4          MR. KANE:  Yes, Your Honor.

5          THE COURT:  Is there any objection to the admission

6  of Debtors' 1 through 15?  I know the Court has admitted a

7  number of those already, but any objection?

8      Okay.  Hearing no objection, 1 through 15 are hereby

9  admitted.

10     (Debtors' Exhibits 1 through 15 are admitted.)

11         THE COURT:  I'll go to any other parties who wish to

12  be heard by way of argument or opening.  The one thing that I

13  want you to make sure that you have, and maybe find the

14  declaration, I didn't see it in Exhibit 1, the one on good

15  faith.  Because I just want to be able to make the finding.

16  And so if I need a couple minutes of evidence on that, we'll

17  take it.  But if it's in one of the declarations, I'm happy

18  to rely upon it there.

19         MR. KANE:  Just one -- I'll double-check that, Your

20  Honor.  Otherwise, I'm happy to have Mr. Shapiro join the

21  stand again.  If you'll give me just one moment.

22         THE COURT:  Okay.  Thank you.

23     Mr. McCullough, do you wish to be heard with respect to

24  the 9019?

25         MR. MCCULLOUGH:  Thank you, Your Honor.  I just

41

1  wanted to say that I just appreciate all the efforts of the

2  professionals in this.  I think you would have been extremely

3  impressed with the speed and the creativity and the level of

4  expertise that it was kind of humbling to me to watch or to

5  participate in.

6      I have a history with Ms. Kelbon, and I think my immense

7  respect for her allowed us to have frank and candid

8  discussions that really helped speed the process along, and

9  we covered a lot of ground very quickly.  And Mr. Kane was

10 instrumental in staying in his lane and letting me stay in my

11 lane, which I think was also helpful to the process, because

12 sometimes they overlap.  So it was extremely helpful, and I

13 think everybody really worked hard.  And I think that, Judge,

14 you hit the nail on the head by everybody, the concessions

15 that were given by everybody were hard-fought, but the

16 negotiations were all in extremely good faith and at arm's

17 length.  So, thank you.

18         THE COURT:  All right.  Thank you very much, Mr.

19 McCullough.  Appreciate that.

20     All right.  Ms. Stango Kelbon, do you wish to be heard

21 with respect to the 9019?

22         MS. KELBON:  Sure, Your Honor.  Just briefly.

23     I echo the sentiments of Mr. McCullough.  I think

24 everybody worked and fought very hard and professionally

25 throughout the negotiations, and with incredible speed to get

42

1   this done, because we realized just how important it was to

2   preserve the asset as best as possible.  And I don't think I

3   could say anything better than Mr. Kane said it.  It was very

4   articulate, the way he described the settlement.

5       With that, I'd just like to thank all the parties for

6   that.

7           THE COURT:  Thank you very much, Ms. Stango Kelbon.

8       Mr. Hotze, do you wish to be heard, sir?

9           MR. HOTZE:  Thank you, Your Honor.  William Hotze on

10  behalf of the Committee.

11      And I will just echo everybody else's sentiments.  I

12  think this is a great example of how bankruptcy should work,

13  is I think everybody probably is a little bit unhappy, but

14  it's a good deal for the case globally.  And I think it's a

15  testament to the quality of the professionals and the clients

16  that we were able to do it.

17          THE COURT:  All right.  Thank you very much, Mr.

18  Hotze.

19      All right.  Mr. Kane, are we able to find that good faith

20  finding?  I just want to be able to make it.

21          MR. KANE:  I'm sorry, Your Honor.  I just want to

22  clarify.  Were you looking for a good faith finding in the

23  order, or would you like evidence that these negotiations

24  were done in good faith?

25          THE COURT:  Yes.  Anywhere in Mr. Shapiro's

Shapiro - Direct                          43

1  declaration, does it cover that these were at arm's length

2  and in good faith?

3          MR. KANE:  I don't think that it says good faith.  I

4  know it doesn't.  So I'm happy to put him on.

5          THE COURT:  Because that finding is in the order.

6  So let's just put him on --

7          MR. KANE:  All right.

8          THE COURT:  -- right quick.  And then I'll just

9  remind Mr. Shapiro that you're under oath.  I know I'm a

10  stickler for this, --

11          MR. KANE:  No, I appreciate it.

12          THE COURT:  -- but I like to have the evidence to

13  get to findings.

14          MR. KANE:  I know Mr. Shapiro worked very hard on

15  that declaration, too.  So I'd make sure next we got that

16  good faith term.

17          MR. SHAPIRO:  Missed it.

18          THE COURT:  Go ahead.

19      MARK SHAPIRO, DEBTORS' WITNESS, PREVIOUSLY SWORN

20                    DIRECT EXAMINATION

21  BY MR. KANE:

22  Q    All right, Mr. Shapiro.  I believe you testified earlier

23  you're the Debtors' CRO?

24  A    Yes.

25  Q    And did you participate in the negotiations that

Shapiro - Direct                            44

1    eventually led to the settlement agreement that's the subject

2    of this motion?

3    A    Yes, I did.

4    Q    And based on your observations, were these negotiations

5    made in good faith and at arm's length?

6    A    Most definitely.

7    Q    Thank you.

8              THE COURT:  Thank you very much, Mr. Shapiro.

9        Is there anyone who wishes to cross-examine the witness?

10       All right.  Hearing no takers, thank you very much, sir.

11             MR. KANE:  Thank you, Your Honor.

12             THE COURT:  You may step down.

13       (The witness is excused.)

14             THE COURT:  All right.  The Court is going to

15   approve the 9019 in this case.  The Court has had a number of

16   occasions in a number of opinions to go through the Fifth

17   Circuit's factors as they relate to 9019.  And in this

18   particular instance, the Court finds that the settlement

19   easily addresses those factors that have been stated by the

20   Fifth Circuit in the *Jackson Brewing*, *Foster Mortgage*, and

21   related cases.

22       The Court would specifically note that, in this case, my

23   predecessor, Judge Harold C. Abramson, may he rest in peace,

24   used to say that a settlement is no good unless everyone

25   walks out unhappy.  I hope that everyone's not walking out

45

1  unhappy, but I know that everyone -- how can you better say

2  it than felt pain -- during the course of these negotiations.

3  The beginning of these hearings was very, very contentious.

4  A lot of money was going to be spent.  And I'm not sure that,

5  in pure litigation, we were going to achieve a result that

6  was going to be beneficial to the Debtors, the estates, and

7  their unsecured creditors, and to the principals of the

8  Debtor, and therefore the guarantors.

9      And I applaud the Debtors on continuing to roll with what

10  could only have been rabbit punches at various and sundry

11  different times as to the speed that you needed to act with,

12  as well as bringing consensus among the parties of what's the

13  best thing to do.  You've brought the first number of Debtors

14  in and now you need to bring in the second group of Debtors,

15  which includes Debtors that are probably not necessarily

16  tangentially related to the stores themselves.  Obviously,

17  Mr. MacDonald and his family and affiliated entities have put

18  in a number of different entities into bankruptcy, which

19  allowed for the bigger settlement in this case.  And I

20  applaud both the principals and the clients and counsel as

21  well, because I know, I could see it in Mr. MacDonald's face

22  how troubling, how hard this is for him personally, and I

23  know it is very difficult, having done debtor's work in the

24  past prior to taking the bench, I know how hard it is when

25  you're at the point and you're selling a business.

46

1         And so all that to say I appreciate Phonix and the

2    concessions that they have made along the way.  I've seen

3    nothing but professionalism from the folks in the courtroom.

4    I applaud that.  And I know that Mr. Hotze and his team have

5    had to work really, really hard in a really short period of

6    time to achieve the best they could for the unsecured

7    creditors in this case.

8         So all of that goes into the Court's finding that I will

9    approve this sale under Bankruptcy Rule 9019.  I believe that

10   the settlement is fair and equitable.  I believe that it is

11   in the best interest of creditors, with proper deference to

12   their reasonable views, and is truly the product of arm's-

13   length bargaining and not the product of fraud or collusion.

14        This, I think as Mr. Kane has said a few times, is one

15   step in a chain of the new bankruptcies, the DIP, the 9019,

16   and then eventually the sales process.  And so it speaks a

17   lot, given the broad service of this motion, and, frankly,

18   just how many folks that we've had on the line from time to

19   time watching this case, to see that there's been no

20   objections to this sale.  So, again, I think that speaks

21   volumes for how beneficial it is to the creditors of the

22   estate, the concessions that Phonix has made along the way,

23   and the fact that they're obviously getting a paydown via the

24   ERC funds and otherwise that they wouldn't have had ready

25   access to without a fight.

47

1       And so I appreciate that folks have really put their time

2    and their pencils to good work of finding resolution rather

3    than further fight, because I think it would have been very,

4    very easy for this case to get outpaced by litigation such

5    that there would have been no tangible recovery to anyone.

6       So all that to say the Court will approve the 9019.  I

7    have had an opportunity to review the form of order that was

8    filed at Docket 262, and I don't have any comment, and I see

9    the changes that have been made there to address the

10   different share percentages relative to the Boulders

11   property.

12      Any questions?  Any further comments?

13           MR. KANE:  No, Your Honor.  Thank you.

14           THE COURT:  All right.

15           MR. KANE:  We appreciate the Court's time.

16           THE COURT:  You're very welcome.

17      I don't know if Ms. Harden has had an opportunity to

18   reach out.  I have granted the expedition of the broker

19   motion to be heard in connection with the sale, which, again,

20   I think is on the 19th.  I know that that timing is probably

21   not perfect, because we'll have the broker's motion and the

22   sale be heard at the same time.  But you can certainly tell

23   your broker that I've never not approved an employment

24   application on reasonable terms.  But I did have to require

25   that declaration get filed.

48

1          MR. KANE:  Yes, Your Honor.  And just for a

2     clarification on that, that is a -- that property is being

3     sold independently.

4          THE COURT:  Oh, that's true.

5          MR. KANE:  So if someone wants to come --

6          THE COURT:  So it's not necessarily tied together.

7          MR. KANE:  Right.

8          THE COURT:  Thank you.

9          MR. KANE:  It's:  If someone wants to come bid for

10    it, great, but that's not part of the stalking horse APA.

11         THE COURT:  Oh, excellent.

12         MR. KANE:  And so that can -- that actually has a

13    longer extension date, and it can sell or, you know, not

14    sell.

15         THE COURT:  All right.  Even better.  All right.  So

16    I will take that.

17       The only thing that I'll remind you, when it's come to

18    preparation of the order, do double-check the agreement for

19    things relative to payment of attorneys' fees,

20    indemnifications, venue, and choice of law.

21         MR. KANE:  Will do.  Thank you.

22         THE COURT:  All right?  Because those are things

23    that I typically make sure come back to the Court so that I

24    don't have disputes going on outside of the bankruptcy court

25    during the course of the case.  All right.

49

1      Anything else, ladies and gentlemen?

2      All right.  With that, the Court will stand in recess, or

3  stand adjourned for the day.  You guys have a good one.

4           MR. KANE:  Thank you, Your Honor.

5           MS. KELBON:  Thank you, Your Honor.

6           THE CLERK:  All rise.

7      (Conclusion of proceedings at 2:40 p.m.)

8                         --oOo--

9

10

11

12

13

14

15

16

17

18

19                    CERTIFICATE

20      I certify that the foregoing is a correct transcript from
   the electronic sound recording of the proceedings in the
21  above-entitled matter.

22   **/s/ Kathy Rehling**                    **02/16/2026**

23  _____        _____

    Kathy Rehling, CETD-444                      Date
24  Certified Electronic Court Transcriber

25

50

INDEX

1

2  PROCEEDINGS                                                    3

3  WITNESSES

4  Debtors' Witnesses

5
   Mark Shapiro
6  - Direct Examination by Mr. Taylor                           18
   - Examination by the Court                                   22
7
   Mark Shapiro, Recalled
8  - Direct Examination by Mr. Taylor                           43

9  EXHIBITS

10 Debtors' Exhibits

11 Debtors' Exhibits 1, 7, 8, 9, 10, and 12      Received    28
   (Docket 254)
12
   Debtors' Exhibits 1 through 15 (Docket 254)   Received    40
13
   RULINGS
14
   Motion to Maintain Bank Accounts (166)                        8
15
   Motion to Obtain Postpetition Financing (173)                28
16
   Motion to Compromise Controversy with Phonix RBS             44
17 (174)

18 END OF PROCEEDINGS                                           49

19 INDEX                                                        50

20

21

22

23

24

25